## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **CRIMINAL NO.:** |
| | ) | |
| KEITH BERMAN, | ) | **Grand Jury Original** |
| | ) | |
| Defendant. | ) | **15 U.S.C. §§ 78j & 78ff; 17 C.F.R.** |
| | ) | **§ 240.10b5; 18 U.S.C. §§ 1001 & 2; 18** |
| | ) | **U.S.C. § 981(a)(1)(C); 28 U.S.C.** |
| | ) | **§ 2461(c); 21 U.S.C. § 853(p).** |
| | ) | |

### INDICTMENT

The Grand Jury charges that:

### General Allegations

At all times material to this Indictment, unless otherwise specified:

1.      Decision Diagnostics Corp. ("DECN") was a medical device company based in California. DECN was in the business of developing, manufacturing, and distributing glucose test strips and meters.  DECN retained Vendor 1, a company based in the Republic of Korea, and Person 1, as technical advisors to assist with developing and manufacturing glucose test strips that used a process known as "impedance technology."

2.      DECN common stock traded over the counter ("OTC"), and shares were available for purchase and sale by the public.  DECN securities were regulated by the U.S. Securities and Exchange Commission ("SEC"), which was an agency within the executive branch of the federal government based in Washington, D.C.  DECN's shareholders lived throughout the United States and around the world, including in this District.

3.      Defendant KEITH BERMAN served as DECN's Chief Executive Officer, Chief Financial Officer, Secretary, and Treasurer.  BERMAN was also DECN's sole director.  In these roles,

BERMAN oversaw all aspects of DECN's business operations, and owed a fiduciary duty to DECN's shareholders.

4.      BERMAN frequently used press releases as a means of communicating with the public, including actual and potential investors in DECN.  BERMAN participated in drafting and approved all of the press releases issued on behalf of DECN.  BERMAN transmitted DECN press releases to the public via the Internet, including to actual and potential investors in this District, using means and instrumentalities of interstate commerce.

5.      In late 2019, COVID-19 was first detected in Wuhan, China, and has since spread systematically across the world.  As a result of the spread of COVID-19 to and within the United States, on January 31, 2020, the Secretary of Health and Human Services declared a national public health emergency, and, on March 13, 2020, the President of the United States issued Proclamation 9994 declaring a national emergency beginning on March 1, 2020.  *See* 85 Fed. Reg. 15,337. During the first months of the pandemic, there was a shortage of adequate testing capability, spurring significant demand for quick and affordable testing solutions.  In response, governments, companies, and other entities began searching for workable COVID-19 tests that could be deployed to test individuals and prevent the spread of the virus, making the manufacture and sales of a workable testing product a highly lucrative business opportunity.  The U.S. Food and Drug Administration ("FDA"), which was the United States' primary regulator of medical devices, began considering applications for "emergency use authorization" ("EUA") to allow rapid expansion of testing.

## DECN's Precarious Financial Condition

6.      While serving as DECN's CEO and director, BERMAN repeatedly represented that he "has not received any form of cash compensation as a result of our limited cash flow."  BERMAN

made these representations to investors in periodic filings and disclosures made public on the OTC Markets Group Inc. ("OTC Markets") website and elsewhere.

7.      BERMAN's representations to the public about his own compensation were materially false and misleading. In recent years, BERMAN misappropriated hundreds of thousands of dollars in DECN funds for his own personal use and benefit.

8.      For example, in 2019 and 2020 alone, BERMAN used over $360,000 in DECN company funds to pay to chat live on webcams with individuals living in foreign countries. BERMAN did not disclose this use of company funds to investors.

9.      In early 2020, BERMAN and DECN were experiencing financial difficulties. On or about March 3, 2020, BERMAN stated in an email that "my personal situation is perilous." BERMAN further elaborated on DECN's poor financial condition, stating that "I am letting three more people go Friday."

10.     In or around March 2020, BERMAN discussed his plan to use the COVID-19 crisis as an opportunity to increase DECN's value and address DECN's financial issues. On or about March 3, 2020, BERMAN stated in an email that "This will work out. I did something yesterday that worked. I am doubling down today. If this continues to work money will not be a problem for a long time."

11.     On or about March 5, 2020, BERMAN wrote an email in which he stated "We have a lot at stake here. I am not just trying to raise money to pay [Vendor 1], but we need a new story and this coronavirus through impedance is the story that will allow me to raise millions."

**The Scheme to Defraud DECN Investors**

Purpose of the Scheme

12.     It was the purpose of the scheme for BERMAN to artificially increase and maintain the share price of DECN securities to enrich himself through access to additional corporate funds and compensation by: (a) making materially false and misleading public statements related to DECN's purported COVID-19 test; (b) concealing the true facts about DECN's purported COVID-19 test; (c) diverting the proceeds of the scheme for his personal use and benefit; and (d) concealing the scheme from regulators, law enforcement, and the investing public.

Manner and Means of the Scheme to Defraud

13.     In furtherance of the scheme, BERMAN used the following manner and means, among others:

     a.  BERMAN made, and caused to be made, materially false and misleading public statements about, among other subjects: (i) DECN's development of a test capable of detecting COVID-19 in a sample of blood; (ii) DECN's application to the FDA for EUA of a test capable of detecting COVID-19 in a sample of blood; (iii) DECN's business and operations; and (iv) BERMAN's use of DECN's corporate funds.

     b.  BERMAN authored, reviewed, approved, issued, and distributed to the public, via the Internet, press releases and periodic filings and disclosures containing materially false and misleading statements about DECN, in order to artificially increase and maintain the share price of DECN securities;

     c.  BERMAN used an alias to post positive messages about DECN's business and operations on investor message boards, in order to artificially increase and maintain the share price of DECN securities;

d.  BERMAN used an alias to post messages on investor message boards refuting allegations that BERMAN had made false and misleading public statements about DECN's business and operations and BERMAN's use of corporate funds, and otherwise making lulling statements to actual and potential investors in DECN securities;

e.  BERMAN made false statements to the SEC and federal law enforcement concealing his use of an alias to post messages in investor message boards;

f.  BERMAN concealed and disguised his involvement in drafting a series of purportedly independent shareholder letters calling for the SEC to terminate its trading suspension of DECN common stock and end its investigation of BERMAN and DECN; and

g.  BERMAN made false statements to federal law enforcement concealing his involvement in drafting the purportedly independent shareholder letters.

<u>Acts in Furtherance of the Scheme to Defraud</u>

*BERMAN's Materially False and Misleading Public Statements About the Viability of the COVID-19 Blood Test*

14.     As the effects of the COVID-19 pandemic began to be felt in the United States and many patients faced difficulty obtaining access to COVID-19 testing, BERMAN used the COVID-19 pandemic as an opportunity to capitalize on the public health crisis to personally benefit himself and DECN.  On or about February 29, 2020, BERMAN emailed Vendor 1 to ask whether it was "theoretically possible" to use the impedance technology that DECN used in glucose tests in order to test for COVID-19 in blood or saliva.  Vendor 1 responded that while it could be "theoretically possible" to use impedance technology to detect a virus, Vendor 1 did not know whether impedance technology could be used to detect COVID-19 in blood or saliva.

15.     On or about March 2, 2020, BERMAN emailed Person 1 and falsely stated that Vendor 1 believed it could use an impedance test to detect COVID-19 in blood.  Person 1 expressed skepticism and asked BERMAN how Vendor 1 planned to develop such a test.  BERMAN responded that it "[b]eats me how the Koreans plan to do this."

16.     On or about March 3 and 4, 2020, BERMAN issued two press releases introducing DECN's "new screening methodology" for COVID-19, which he characterized as a "break-through."  BERMAN stated that DECN had "developed a Coronavirus screening method," and that DECN had "the technology perfected which will take months off of the development schedule."  BERMAN further represented that the test provided a positive or negative result in 15 seconds based on a small finger prick blood sample, and that, in addition, the test provided a probability statistic that allows the user to determine the likelihood that the result is a false positive or a false negative.  BERMAN also claimed "government fast track and waivers [sic] begun" and that the test kits would be "commercial ready in summer 2020."

17.     The statements in these press releases were materially false and misleading, as BERMAN well knew.  DECN did not at that time have a COVID-19 test, did not know whether BERMAN's purported impedance method would actually be able to detect COVID-19, had not validated the accuracy of the impedance method for detecting COVID-19, and did not have a product that could test for COVID-19 using a blood sample, much less one that would accurately test for COVID-19 in less than 15 seconds; indeed, BERMAN's technical advisors had expressed doubt as to the viability of such a product.  Further, DECN had taken no steps towards obtaining any government approvals or waivers for a COVID-19 test that would be required for a COVID-19 test kit to be "commercial ready in summer 2020."

18.     Throughout March 2020, BERMAN and DECN continued to issue materially misleading press releases regarding the purported DECN COVID-19 blood test, including to falsely represent that DECN was making significant progress toward bringing the product to market and would be ready to manufacture and sell hundreds of millions of units in the first year.  BERMAN issued nine press releases in March 2020, and filed the company's annual report and accompanying disclosures on or about March 30, 2020.  During this period, Vendor 1 repeatedly informed BERMAN that his proposed impedance method for detecting COVID-19 was unlikely to be scientifically workable.

19.     On or about March 18, 2020, BERMAN issued a press release in which he falsely represented that Vendor 1 had successfully validated a test that used impedance technology to detect coronavirus in a blood sample.  This press release was materially false and misleading because Vendor 1 had not validated such a test.

20.     On or about March 22, 2020, Vendor 1 informed BERMAN that it had concluded it could not use impedance technology to test blood for COVID-19.  Vendor 1 informed BERMAN that his proposed methodology was flawed because it could not actually detect COVID-19 in a blood sample, let alone distinguish COVID-19 from other viruses.  BERMAN did not disclose these material facts to the market or correct DECN's prior materially false and misleading statements.

21.     On or about March 23, 2020, BERMAN issued a press release in which he falsely claimed that "DECN [] through its advanced development team in Korea, have finalized the configuration of the [] test strip that will go into production just as soon as the FDA grants emergency status to the DECN product."

22.     On or about April 2, 2020, Vendor 1 again emailed BERMAN to repeat its conclusion that it could not use impedance technology to test for COVID-19 from a blood sample because it could

not actually detect COVID-19 in a blood sample, let alone distinguish COVID-19 from other viruses. BERMAN responded that "We will respond to this next week AFTER FDA approval. That is all we are concerned about now. FDA approval so we can raise money."

*BERMAN's Materially False and Misleading Public Statements About DECN's EUA Application*

23.     Throughout 2020, BERMAN and DECN issued press releases and periodic disclosures that contained materially false and misleading statements touting the progress of DECN's emergency use application to the FDA for use of DECN's purported COVID-19 test. BERMAN failed to disclose that DECN was unable and unwilling to conduct the type of clinical testing that the FDA required in order for companies to demonstrate that their COVID-19 test was sufficiently accurate in detecting COVID-19.

24.     The FDA informed DECN that it would not be able to complete the EUA application process without such clinical testing. BERMAN concealed and disguised from the market that DECN had not actually built a prototype for use in testing and lacked the necessary insurance to conduct scientifically reliable validation testing on human beings, as required by the FDA. Without such insurance and such testing, DECN's purported COVID-19 blood test lacked the indicia of reliability that the FDA required before approving a medical device for emergency use by human beings.

25.     One example of BERMAN's materially false and misleading statements about the EUA application occurred on or about March 16, 2020, when BERMAN issued a press release titled: "Emergency Waiver in Progress With U.S. FDA," in which BERMAN represented that DECN was "awaiting release of blood samples from previously infected people in Daegu, Korea, so that [DECN] can complete testing and make a final report to the U.S. FDA so that [DECN] may secure our Emergency Waiver. In the meantime, all other requests made by the FDA will be met this

8

week and next." This statement was materially false and misleading because DECN was not yet prepared to make a "final report" to the FDA, and had not yet submitted its initial EUA application.

26.     On or about April 3, 2020, DECN submitted its EUA application to the FDA.  On or about April 4, 2020, the FDA sent a "Pre-EUA Acknowledgment," which was a standard form letter acknowledging that it had received the application, but that did not express a view as to whether the EUA was likely to be approved.

27.     On or about April 7, 2020, BERMAN issued a press release characterizing DECN's receipt of the FDA acknowledgement letter as a "grant by the FDA" and a "major milestone."  BERMAN further stated that, in response to DECN's submission of its EUA application, "the FDA review staff [made clear it] was aware that [DECN's] methodology was different than those slower and older methods that had received FDA EUAs, or were in review," and provided DECN a copy of its guidance so that the company could complete its "final product testing."

28.     These statements were misleading.  BERMAN knew, but failed to disclose, that DECN had not yet conducted any testing showing that the company's purported test was actually capable of detecting COVID-19 in a sample of blood, let alone capable of distinguishing COVID-19 from other viruses.  Moreover, contrary to the representations he made in the April 7, 2020, press release, BERMAN knew that DECN was not prepared to conduct "final" product testing and that the FDA was not on the verge of approving the company's application for emergency use of its purported COVID-19 blood test.

29.     In the following weeks, the FDA told BERMAN that it would not approve the EUA unless DECN conducted clinical testing, which BERMAN knew DECN was unable to do because of a lack of financial resources and insurance coverage necessary for clinical testing.

30.     Since BERMAN knew that DECN could not meet the FDA's testing requirements, BERMAN hired consultants to assist him with pressuring the FDA to approve DECN's EUA application.  BERMAN, through his consultants, also began pressuring Members of Congress to engage the FDA on DECN's behalf, in the hope of influencing the FDA's EUA process.

31.     On or about April 21, 2020, the consultants circulated "talking points" which had been "approved for use by" BERMAN.  The talking points for Members of Congress stated BERMAN's actual view that that DECN's EUA application was originally "moth-balled" and then "stuck in limbo" due to FDA inaction.  BERMAN was therefore aware that FDA approval was not imminent, although BERMAN concealed this material fact from the market.

32.     On or about April 23, 2020, BERMAN issued a press release stating that DECN had "completed discussions and have come to an understanding with the FDA on all of the testing required to receive the EUA.  We plan to engage a specialty reference laboratory to complete this testing in the next 10 days. Testing should take about a week."

33.     These statements were materially false and misleading because, as BERMAN well knew, DECN had not come to an understanding with the FDA on all of the testing required to receive the EUA; in truth, DECN was neither willing nor able to comply with the FDA's testing requirements; at that point, it had conducted no testing whatsoever to demonstrate that the impedance technology could accurately detect COVID-19 in blood.

34.     On or about April 23, 2020, the SEC suspended trading in DECN stock due to questions regarding the accuracy of information in DECN's press releases regarding COVID-19.  The SEC had an open investigation into DECN at this time.  Between early March 2020 and the trading suspension, DECN's stock price had risen by over 1500%, as a result of purchases and sales of DECN securities.

35.     In the following months, DECN still did not take any steps to develop a COVID-19 test, validate the accuracy of the impedance method for detecting COVID-19, conduct the clinical studies required by the FDA, or receive FDA authorization related to the DECN COVID-19 blood test. Nevertheless, BERMAN continued to issue materially false and misleading statements to investors. For example, on or about July 10, 2020, BERMAN issued a press release representing that DECN's COVID-19 blood test was functional, "producing results at :10.5 seconds," and that DECN continued working toward completing the EUA application process by completing the FDA's testing requirements. BERMAN well knew that these statements were materially false and misleading, since Person 1 had repeatedly expressed concerns to BERMAN that COVID-19 may not be present in blood at all or in detectable amounts, DECN's purported COVID-19 blood test had never been developed nor reliably tested, and BERMAN was unwilling and unable to take the steps necessary to conduct the type of clinical testing required by the FDA.

*BERMAN's Use of a Fake Identity to Tout DECN Stock on Investor Message Boards*

36.     Investors Hub ("iHUB") was a public website and message board service used by investors and potential investors in publicly-traded stocks. iHUB offered a variety of online tools for investors to use when researching securities, including message boards. iHUB was widely used by OTC investors in DECN and other similar stocks.

37.     BERMAN created an alias, "plutoniumimplosion," for use on the iHUB message board for DECN. BERMAN, posting under plutoniumimplosion, did not disclose his true identity or involvement with DECN; indeed, through the plutoniumimplosion alias, BERMAN denied that he was BERMAN in a public post on at least one occasion. While using the alias plutoniumimplosion, BERMAN falsely claimed to be an independent shareholder who had owned DECN stock for

nearly twenty years.  BERMAN also falsely claimed that he was an industry insider with years of experience working for medical device manufacturers.

38.     Between on or about March 1, 2020, and on or about August 15, 2020, BERMAN posted over a thousand messages to the iHUB DECN message board, in order to promote DECN and pump the stock price higher.

39.     BERMAN's messages also responded to investor concerns and doubts regarding the accuracy of DECN's public statements about its COVID-19 blood test.  For example, on or about March 12, 2020, an investor questioned whether anybody actually believed that DECN would be ready to bring to market and sell hundreds of millions of units in the first year.  BERMAN wrote (using his alias):

> I do. And my company has looked at this situation/opportunity and we believe that the first year worldwide demand for a screening product will be close to 3 billion kits. Eventually large pharma and copy cats will get into the market, or perhaps there are companies a little ahead of DECN. But by and large DECN is, by hook, crook or luck, is in the forefront no matter how loud the naysayers are.  But then again the 5-6 message board posters may be right and Mr. Berman will find himself in jail or prison.

40.     On or about March 25, 2020, after an investor questioned whether DECN could bring its product to market, BERMAN posted (using his alias):

> Not if my company manufactures them. We have excess factory capacity in Korea and Japan. And by the way, DECN CEO Berman knows us well and we do not at all think of him like posters … are trying to make us all believe. We know CEO Berman well and we have reviewed the product specifications and find them to be game changing.

41.     BERMAN also used his alias to attempt to threaten and intimidate individuals who approached the SEC and other regulators regarding DECN.  BERMAN stated that he "hope[d] [the list of people that complained to the SEC] have indemnification agreements with the SEC, and they better have been accurate when they listed their allegations."  BERMAN also repeatedly warned

about what he called "knock knock day," implying that the authorities would show up at the homes of the individuals who had complained about DECN and arrest them.

42.     BERMAN continued to conceal and disguise his use of the iHUB message board to communicate with and influence investors. On or about October 9, 2020, Berman provided sworn testimony to the SEC in Washington, D.C. When asked under oath about his use of message boards, BERMAN falsely stated: "Yeah. I've not been a part of .... Investors Hub Daily."

43.     On or about October 27, 2020, BERMAN falsely told federal law enforcement agents that he was not involved with the message boards.

*BERMAN Directs Purported Shareholder Letter Calling for an End to the SEC's Investigation*

44.     On or about April 23, 2020, as discussed above, the SEC announced it was suspending trading in DECN securities, citing questions about the accuracy of DECN's public statements about its COVID-19 blood test.

45.     BERMAN responded to the trading suspension by denying the SEC's allegations.

46.     In an email sent to Vendor 1, BERMAN stated "my company cannot raise money based on GenViro news as long as the SEC is investigating us."

47.     In an attempt to end the SEC's investigation and resume raising money, BERMAN enlisted a long-time DECN shareholder, Person 2, to write a "shareholder letter" to the SEC. BERMAN played a significant role in developing, reviewing, and editing the purported shareholder letter. For example, BERMAN provided information to Person 2 to include in the shareholder letter, outlined themes, and reviewed drafts and made extensive comments and line edits. BERMAN also instructed Person 2 about how, when, and to whom to send the shareholder letter.

48.     BERMAN also encouraged Person 2 to gather signatures from a certain number of shareholders before sending the letter to the SEC. Person 2, in concert with BERMAN, used the

13

alias "Bret Weir" to quietly gather shareholder signatures and conceal their involvement in developing the purported shareholder letter.

49.     The 19-page shareholder letter accused the SEC of unethical and inappropriate conduct against DECN. For example, the letter levied allegations of "bias and possibly collusion between the SEC investigators and rogue message board posters many of whom are also perhaps cyber criminals, who aim to destroy Decision Diagnostics Corp., and with that the chance to possibly curtail the spread of COVID-19 and return normalcy to all Americans." The shareholder letter further asserted that the SEC's actions between April and June 2020 "are damaging to humanity with respect to the creation, development and, we hope (as should you and every American), emergency use authorization of the GenViro! products to assist in the detection of the deadly Coronavirus." The shareholder letter also accused the SEC of using an "official [] purpose" as pretext to make submissions that were really intended "to pile on and to demean [] Mr. Berman."

50.     After the shareholder letter had been sent to the SEC, BERMAN proceeded to post on iHub about this and other purported shareholder letters to the SEC.  For example, on or about June 8, 2020, BERMAN posted, using his alias, that:  "The rumor du jour is that DECN is going to post [on the OTC Markets website] the DECN Shareholder letter to the SEC. I understand names are named. The letter is long, complete and terrifying if you're certain people. It should make for good reading. I will comment on this letter after I have a chance to review it in detail." BERMAN further posted that "Berman had nothing to do with the letter. But I did, and so did almost 60 other shareholders. Knock knock day gets closer."

51.     On or about June 13, 2020, BERMAN further posted, using his alias: "You would be surprised how much weight that Shareholder Letter has carried. And I believe there will be another one that takes the May 20, 2020 Fredo [Last Name of SEC Staff Attorney] fantasy/hit job piece and

brings Shareholder concerns up to the moment. I will consider it an honor to work on this 2nd Shareholder letter."

52.     These letters were intended to bring about the end of the SEC investigation and allow BERMAN to continue to raising money using his false and misleading statements about DECN's purported COVID-19 testing capability.

53.     On or about October 27, 2020, BERMAN falsely told federal law enforcement agents that neither he nor DECN had been involved with the shareholder letters, stating that "we had nothing to do with the shareholder letter."

54.     As a result of the fraudulent scheme detailed above, DECN investors lost millions of dollars by, among other things, purchasing DECN common stock at artificially inflated prices and selling their shares at a loss.

## COUNT ONE

### (15 U.S.C. §§ 78j & 78ff, 17 C.F.R. § 240.10b5 – Securities Fraud)

55.     Paragraphs 1 through 54 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

56.     From at least in or around February 2020 through in or around December 2020, in the District of Columbia and elsewhere, the defendant,

### KEITH BERMAN

willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, and aided and abetted others known and unknown to the grand jury, in violation of Title 15, United States Code, Sections 78j and 78ff, Title 17, Code of Federal Regulations, Sections 240.10b5, and Title 18, United States Code, Section 2, by: (a) employing devices, schemes and artifices to defraud; (b) making, and causing others to make, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon purchasers and sellers of DECN securities; to wit, BERMAN issued materially false and misleading public statements regarding DECN's COVID-19 testing capabilities.

All in violation of Title 15, United States Code, Sections 78j and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

## COUNT TWO
### (18 U.S.C. § 1001 – False Statements)

57.     Paragraphs 1 through 54 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

58.     On or about October 9, 2020, in the District of Columbia and elsewhere, in a matter within the jurisdiction of the executive branch of the Government of the United States, the defendant,

### KEITH BERMAN

did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations, to wit, in sworn testimony before the U.S. Securities and Exchange Commission, BERMAN falsely stated that he was not involved with posting on Investors Hub message boards.

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

17

## FORFEITURE ALLEGATION

The Grand Jury further charges that:

59.     The allegations contained in paragraphs 1 through 54 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

60.     Pursuant to 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461(c), upon conviction of an offense in violation of Count One, as alleged in this Indictment, defendant,

### KEITH BERMAN,

shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to the scheme to defraud.  The property to be forfeited includes, but is not limited to, a money judgment in the amount of the total loss caused by the defendants' criminal conduct, as determined by the Court at sentencing.

61.     If any of the property described above, as a result of any act or omission of the defendants:

        a.  cannot be located upon the exercise of due diligence;

        b.  has been transferred or sold to, or deposited with, a third party;

        c.  has been placed beyond the jurisdiction of the court;

        d.  has been substantially diminished in value; or

        e.  has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

THIS IS A TRUE BILL.


_____

FOREPERSON


DANIEL KAHN
Acting Chief
Criminal Division, Fraud Section
United States Department of Justice

By:    _____

CHRISTOPHER FENTON
Trial Attorney
JACOB FOSTER
JUSTIN WEITZ
Assistant Chiefs
Criminal Division, Fraud Section
United States Department of Justice

Dated:        December 15, 2020