UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------------------x

UNITED STATES OF AMERICA,

    Plaintiff

  -v-

KEITH BERMAN,

    Defendant

Docket No. 1-20-cr-00278-TNM

**Leave to file GRANTED**
TREVOR N. MCFADDEN
United States District Judge
4/21/21

---------------------------------------x

## DEFENDANT'S REPLY TO THE GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO MODIFY THE TERMS OF PRETRIAL RELEASE

### INTRODUCTION

The Government's opposition to each and every proposed modification reveals an attitude toward bail, and to Mr. Berman in particular, that is difficult to fathom.

The Government's position is at odds with the governing principles of bail set forth in 18 U.S.C. Section 3142, which provides, in pertinent part, "The judicial officer shall order the pretrial release…subject to the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community."

Contrary to the letter and spirit of this "least restrictive" conditions approach, the Government opposes any modification of the bail set four months ago while accusing Mr.

Berman of violating the existing terms of his bail plus a panoply of other wrongful and even criminal conduct in a manner that is so exaggerated it borders on the hysterical. Despite these claims, the Government cites nothing from Pretrial Services Officer Ochoa, who is supervising Mr. Berman's release on bail, suggestive of any such concerns. Indeed, defense counsel contacted Officer Ochoa to alert her about the intended bail motion. She remarked that she appreciated the "head's up" but evinced no concern about any modification of the initial bail terms—much less, as the Government alleges, that she considers Mr. Berman to have embarked on a criminal campaign to intimidate so-called "victims," tamper with witnesses, obstruct justice, and sneak across the border to Mexico. The Government goes so far as to raise the specter of seeking a detention order from the Court even though the high bar for such an order, under Section 3142, is one the Government could not meet.

### The Claim of Inappropriate Communication

Although the Government devotes a good portion of its opposition to paraphrasing the unproven allegations in the Indictment, the heart of its submission is the contention that Mr. Berman has engaged in "inappropriate discussions…with victims of the [alleged] fraud." (Govt. Opp. p.4). The Government has included with its submission three exhibits containing communications between Mr. Berman and two of the approximately 12,000 DECN shareholders. But its description of them fails to take into account both the content and context of these communications as well as, more significantly, that the relationship these two persons have with DECN is not limited to that of shareholder. They are supporters of the company who have provided it with their personal assistance.

Several preliminary points are relevant. First, while some of the text exchanges with the two persons include references to the pending case, most are about the subject of DECN's development of a saliva-based COVID-19 home test kit, a subject unrelated to the pending case, which focuses on Mr. Berman's prior effort to develop a blood-based test kit. Second, the prohibition on Mr. Berman's communications with shareholders is highly artificial, even hyper-technical. It prohibits only individual communication and would permit such communication as long as more than one shareholder is present. In addition, Mr. Berman objects to the Government's inclusion in the publicly-filed record of what he regards as confidential proprietary information concerning certain ratios relevant to the saliva-based product. (Ex. 2, p. 3). The Government also contends that Mr. Berman need not communicate at all with DECN shareholders because, when interviewed about his income by Pre-Trial Services, he said he received no compensation from DECN. Therefore, according to the Government, Mr. Berman should devote himself to other more remunerative employment. The fact is that being the sole officer and director of DECN is Mr. Berman's full-time vocation and primary focus of his energies. He derives a modest income from managing the assets of two predecessor companies, from occasional consulting and, before team sports were discontinued due to the pandemic, coaching high school baseball. Finally, while the Government refers to the risk of witness tampering, (Govt. Opp. p. 5), one searches its submission in vain for the name of any witness who is the target of improper influence.

Turning to the specific text messages at issue, the Government contends these communications were with "known victims" of the alleged fraud and, deploying its customary overwrought tone, characterizes the texts as involving Mr. Berman's "pattern of using,

3

misleading, intimidating and influencing shareholders for his own personal benefit." (Govt. App. p. 3). However, upon examination, the actual communications are friendly, congenial, and involve not a scintilla of intimidation or other wrongful behavior.

Indeed, although the Government states that it has interviewed both of the persons to whom it has assigned the sobriquets of "Victim 1" and "Victim 2," it mentions nothing it gleaned from these interviews. Conspicuous by its absence is anything that would support the designation of these individuals as "victims." This may well be due to the fact, as the actual communications show, the two persons are supporters of DECN who believe in its development of the saliva-based home COVID-19 test kit. This was confirmed by defense counsel's conversations with both persons. They both resisted—and thus we continue to resist—the notion that they are victims of a fraud perpetrated by Mr. Berman. As one of these persons volunteered to Mr. Berman in the Exhibit 2 exchange: "I am supporting something that can help a pandemic…I will do what I can to help." It is my understanding that this person's help included acting as the liaison with the XPrize Foundation in connection with DECN's entry in the XPrize competition.

The other person whose communications are quoted said the following about receiving a saliva-based kit for testing: "I believed it all along, but it is very exciting to hold it!" When in the same texts, Mr. Berman suggests the person: "try to video the test if you can," the reply is: "do people really think I am going to spit in public?? Lol." (Ex. 4). Is this evidence of what the Government genuinely believes to be a "pattern of using, misleading, intimidating, and influencing shareholders for [Mr. Berman's] own personal benefit?"

4

The Government also repeatedly misconstrues the communications cited in its three exhibits. For instance, it describes an exchange set forth in Exhibit 2 as Mr. Berman having "directed Victim 1 to stop cooperating with the government's investigation." (Govt. App. p.4). However, a natural reading of the excerpt of the text exchange is that appears to have arisen from the person contacting Mr. Berman, perhaps to express annoyance, that he was apparently being asked by a postal inspector to submit to a third government interview. Rather than "direct[ing] Victim 1 to stop cooperating," as the Government contends, Mr. Berman's response amounts to no more than a suggestion to a then possibly reluctant interviewee that he tell the postal inspector he might feel more comfortable conferring with counsel before scheduling yet another government interview.

Second, the Government takes Mr. Berman to task for observing that the postal inspector's interviewing appeared to focus "not directly [on me]" but on the saliva-based test kit, "[a] product that [is] not part of the indictment," and for speculating to his interlocutors that such interviews were aimed at the discovery of government trial witnesses. (*Id.*) Neither statement seems false or improperly motivated.

The Government studiously avoids drawing the Court's attention to the portions of the texts in Exhibit 2 which refute its claims of intimidation or wrongful influence. In response to Mr. Berman's comment about the postal inspector and the search for new witnesses, his correspondent says: "I think [the postal inspector] is just doing her job. I can't speak for the rest of the team against you…I just hope there are some good people on the other side," and in the same vein: "I hope there are respectable, fair people on the prosecutions side."

5

The Government also focuses on Mr. Berman's reference to the reputational damage that he believes the Indictment and parallel SEC civil case caused to DECN—an unremarkable opinion for a defendant in his position. The Government's objection is that it regards Mr. Berman's opinion to be a "false statement" made "to influence Victim 1's view of the facts of the case," because it "blam[ed] the government." This recalls the Government's December 17 statement to defense counsel, while negotiating the initial bail terms, to the effect that Mr. Berman was not a good candidate for bail because he had demonstrated a "disdain for the federal government." The fact that a defendant sends a text critical of the Government should not weigh much in the pretrial release balance pan. Moreover, as we have already shown, the person with whom Mr. Berman was communicating was not wrongly influenced at all but rather sought to reassure Mr. Berman about his hope in the fairness of the prosecution.

Finally, the Government contends it was wrong for Mr. Berman to ask supporters to express to the XPrize Foundation—which rewards innovation in, among other areas, the life sciences—the unfairness of dropping DECN from the final stages of competition because the Foundation was apparently notified by a third party of the pending criminal case against Mr. Berman. His request for help in this regard seems no different in kind from the familiar email requests many receive from companies and nonprofit organizations to cast a vote for them so they can attain a higher ranking on some list and gain heightened exposure. Here, Mr. Berman was hoping an outpouring of support might similarly enable DECN and its saliva-based test kit to garner positive exposure—especially if the Foundation was willing to take a second look at the product rather than focusing on Mr. Berman's personal circumstances.

Mr. Berman's belief that there are third parties who will take action to harm him and DECN—such as spoiling its chances in the XPrize competition—is not imaginary. Within hours of filings in this case, there are internet trolls and self-appointed critics of Mr. Berman and DECN who pull these filings from PACER, and availing themselves of the anonymity of the internet, post scurrilous and erroneous statements vilifying Mr. Berman and DECN. One such post mistakenly stated that any sale by an owner of DECN shares did not go to the seller but instead went to the coffers of DECN. These posts often include vulgar epithets. The gentlest of these is "Bozo Berman," but also "MF Berman," and Berman that "POS." Apart from such disparagement, there are also posts that even take credit for interfering in DECN's business. One illustrative example is a March 28, 2021 post by Johnny C in which he boasts: "I was certainly a big factor in torpedoing Bozo Berman's attempted merger with TAUG," which refers to Tauriga Sciences, Inc., another life sciences company. (Exhibit A) In sum, it is difficult to discern what this email campaign has to do with the issue of bail.

## The Travel Restrictions

Devoting barely a single page to this issue, the Government pronounces itself satisfied that limiting Mr. Berman to the Central District of California and the District of Columbia is "relatively lenient" and "no meaningful restraint[ ] on his personal liberty" (Govt. Opp. p.8) because the bail-setting Magistrate Judge could have but did not require that he wear an ankle monitor or observe a curfew. This is a fallacious argument in that those more restrictive conditions were never considered by the Court.

The Government also opposes Mr. Berman being allowed to travel to Southern California or Arizona because, even though these districts are contiguous with the Central District, they are

also "jurisdictions bordering Mexico," providing an opportunity for Mr. Berman to "successfully flee." (Govt. Opp. p. 7). This is a red herring. The Government knows Mr. Berman has no passport which is needed to travel to Mexico. https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Mexico.html. Had he been so eager to flee, as the Government contends, why has he not done so in the past four months?

The balance of the Government's objections are practical quibbles—Mr. Berman need not travel for business since he can have meetings via Zoom or some other platform; he need not travel to San Diego to visit his son because his son can travel to Los Angeles to see his father; despite being DECN's sole officer and director, Mr. Berman could deputize someone else to conduct business meetings outside of Los Angeles. Repeating the argument it made on December 17th, the Government has persuaded itself that a 67-year old businessman, under active PreTrial Services supervision, is on the verge of making a break for the border.

The only point with which we agree with the Government is that, if the Court modifies the travel restrictions, Mr. Berman will of course work with his supervising PreTrial Services Officer about any travel outside the Central District of California.

## CONCLUSION

For the foregoing reasons, and the grounds set forth in the initial motion, the motion to modify bail conditions should be granted.

Dated:   April 13, 2021
         New York, New York

8

Walter P. Loughlin
Attorney-at-Law
340 West 57th Street
Suite 5D
New York, New York 10019
Tel. (203) 216-3445
walter.loughlin@gmail.com

/s/

Ronald S. Herzog
Goldberg Segalla LLP
50 Main Street, Suite 425
White Plains, New York 10606
Tel. (914) 798-5419
rherzog@goldbergsegalla.com

Counsel for Defendant Keith Berman

EXHIBIT A

Decision Diagnostics Corp. (DECN): So who is bullshitting who..." I'm confident that                4/11/21, 7:29 PM



Spongetech was in business for a few years before the pump and dump and while I don't know the exact sales it was well into the 50 million range. They didn't have a fake blood test Covid 12 second test like Bozo Berman. Anyone that Googles the case will see the numerous deals they also had with a dozens of major league sports teams.

That is another factual difference between DECN's bozo berman CEO and the Spongetech guys.

Any comparison to a potential similar sentence for DECN's Berman and Spongetech is nonsense.

1. Berman committed fraud on investors using a pandemic as the catalyst and the stock traded well into the 100's of millions of dollars from 2 cents with no volume to up to .50 cents on 20 million share days

2. Did you purposely leave out that one of the reasons for the light sentence was that the judge rules key evidence inadmissable due to misconduct by the Government? Or was that just an oversight? Why was the civil settlement only $100.00? Why did you not state that the criminal case never went to trial?

3. There are plenty of cases where penny stock fraudsters like berman got jail time, so the example you cite is silly. Moreover, I don't know of any cases like berman's. Most criminal cases have a CEO, CFO, Vice President and BOD so blame can be passed around. Berman is it, he is the guy; chief honcho, chef, dishwasher, floor sweeper. Berman cannot pass the uck to anyone!

Any dope on the street with a bit of common sense will know that if berman's case goes to trial and he is found guilty he will get a heavier sentence than he would have with a plea bargain. Add that this was pandemic which the SEC and DOJ put out warnings about and then sprinkle on Berman's intimidation tactics of the SEC lawyers and it is a recipe for a heavier sentence.

I had about 400,000 more reasons to pay attention to Bozo Berman before you knew his name even existed, as in $400,000 of reasons stemming back to believing the Johnson and Johnson hype. That is why I had every one of Berman's posts on three forums copied. I certainly was a big factor in torpedoing Bozo Berman's attempted merger with TAUG which he rightfully blamed me, which showed that I didn't care about losing all that dough!





https://investorshub.advfn.com/boards/read_msg.aspx?message_id=162841714                Page 2 of 4