IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------x

UNITED STATES OF AMERICA,

        Plaintiff,


     v.                          No. 1:20-CR-000278 TNM

KEITH BERMAN,

        Defendant.

------------------------------------------------------x



**DEFENDANT KEITH BERMAN'S OMNIBUS PRETRIAL MOTIONS**

Walter P. Loughlin, Esq. (DC Bar No. NY0433)

Walter P. Loughlin
Attorney-at-Law
340 West 57th Street
Suite 5D
New York, York 10019
Tel. (203) 216-3445

Ronald S. Herzog, Esq.

Goldberg Segalla LLP
50 Main Street
Suite 425
White Plains, New York 10606
Tel. (914) 798-5419

## **TABLE OF CONTENTS**

Page(s)

MOTION TO DISMISS COUNT FOUR OF THE INDICTMENT ................................................ 1

PRELIMINARY STATEMENT .................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................................... 3

ARGUMENT .................................................................................................................................. 6

CONCLUSION ............................................................................................................................... 8

MOTION TO DISMISS COUNT THREE OF THE INDICTMENT ......................................... 10

MOTION TO DISMISS COUNTS TWO AND THREE............................................................. 13

MOTION IN LIMINE TO PRECLUDE THE ADMISSION IN EVIDENCE OF PREJUDICIAL
UNCHARGED SIMILAR ACT EVIDENCE ............................................................................. 15

      The Applicable Legal Standards ...................................................................................... 16

CONCLUSION ............................................................................................................................. 18

MOTION IN LIMINE TO PRECLUDE EVIDENCE OF
SECURITIES AND WIRE FRAUD AFTER THE TRADING PUBLIC
RECEIVED EXPLICIT WARNINGS FROM THE SEC AND
OTC MARKETS GROUP ABOUT THE RISKS OF PURCHASING SHARES IN DECN ...... 19

      The Relevant Facts .......................................................................................................... 20

MOTION IN LIMINE TO PRECLUDE EXPERT EVIDENCE ............................................... 24

MOTION FOR A BILL OF PARTICULARS ........................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apprendi v. New Jersey*,
    530 U.S. 466 (2000) (Thomas, J., concurring) ..........................................................2

*Berger v. United States*,
    295 U.S. 78 (1935)..................................................................................................8

*Blair v. United States*,
    250 U.S. 273 (1919)................................................................................................8

*Brown v. United States*,
    359 U.S. 41 (1959)..................................................................................................8

*Crawford v. Washington*,
    541 U.S. 36 (2004)................................................................................................24

*Huddleston v. United States*,
    485 U.S. 681 (1988)..............................................................................................16

*Midland Asphalt v. United States*,
    489 U.S. 799 (1989)................................................................................................2

*Old Chief v. United States*,
    519 U.S. 172 (1997)..............................................................................................17

*Russell v. United States*,
    369 U.S. 749 (1962)................................................................................................2

*State v. EJJ*,
    183 Wn. 497P.3d 815 (2015)................................................................................11

*United States v. Alvarez*,
    567 U.S. 709 (2012)..............................................................................................11

*United States v. Baker*,
    262 F. Supp. 657 (D.D.C. 1966)...........................................................................25

*United States v. Bronston*,
    409 U.S. 352 (1973)................................................................................................2

*United States v. Butler*,
    822 F.2d 1191 (D.C. Cir. 1987)............................................................................25

*United States v. Calandra,*
    414 U.S. 338 (1974) .......................................................................................8

*United States v. Clarke,*
    24 F.3d 257 (D. C. Cir. 1994) ......................................................................16

*United States v. Daniels,*
    770 F.2d 1111 (D. C. Cir. 1985) ..................................................................16

*United States v. Diogo,*
    320 F.2d 898 (2d Cir. 1963) ...........................................................................2

*United States v. Foskey,*
    636 F.2d 517 (D.C. Cir. 1980) .....................................................................16

*United States v. Long,*
    328 F.3d 655 (D. C. Cir. 1993) ....................................................................16

*United States v. Mejia,*
    448 F.3d 436 (D.C. Cir. 2006) .....................................................................25

*United States v. Parrott,*
    248 F. Supp.196 (D.D.C. 1965) ................................................................4, 5

*United States v. Scrushy,*
    366 F. Supp.2d 1134 (N.D. Ala. 2005) .....................................................4, 5

*Watts v. United States,*
    394 U.S. 705 (1969) .....................................................................................11

**Statutes**

18 U.S.C. §704(b) ................................................................................................11

18 U.S.C. §871(a) ................................................................................................11

18 U.S.C. §1001 ...........................................................................................1, 6, 18

18 U.S.C. §1505 ...................................................................................................10

Securities Exchange Act of 1934 Section 12(k) ................................................20

**Other Authorities**

Fed. R. Crim. P. Rule 7(f) ...............................................................................25, 26

Fed. R. Crim. P. Rule 12(b)(3) ............................................................................1

Fed. R. Evid. Rule 401 ...................................................................................15, 17

Fed. R. Evid. Rule 403 ..................................................................................................15, 16, 17, 18

Fed. R. Evid. Rule 404(b) ...............................................................................................15, 16, 18

Notes of Advisory Committee on Rules, 39 F.R.D. 69 (1966)...................................................26

SEC Rules of Practice §550 ...............................................................................................12, 21

U.S. Const., First Amendment ........................................................................................10, 11, 12

## MOTION TO DISMISS COUNT FOUR OF THE INDICTMENT

Pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure, Count Four of the Indictment should be dismissed on the multiple grounds specified below. There is a need for a hearing on certain of the issues described herein.

## PRELIMINARY STATEMENT

In Count Four, the Grand Jury charged: "On or about October 9, 2020, in the District of Columbia or elsewhere, in a matter within the jurisdiction of the executive branch of the Government of the United States, the defendant Keith Berman, did knowingly, and willfully make materially false, fictitious, and fraudulent statements and representations, to wit, in sworn testimony before the U.S. Securities and Exchange Commission, Berman falsely stated that he was not involved with posting on Investors Hub message boards," in violation of Title 18, United States Code, Section 1001. (All references to the Indictment are to the Superseding Indictment.)

However, that was not Mr. Berman's testimony. What he said in the SEC deposition was: "I've not been part of Money Makers, PNQ1, or Investors Hub Daily." Consequently, the Government caused the Grand Jury to indict Mr. Berman for making a false statement he never uttered. Moreover, his testimony is literally true and therefore cannot validly be prosecuted as a false statement.

This motion first seeks dismissal of Count Four of the Indictment because Mr. Berman's testimony is literally true. His testimony referred to Investors Hub Daily which is an internet-based daily news bulletin containing articles about financial and economic developments. There is no allegation in the Indictment that Mr. Berman wrote an article for Investors Hub Daily or had anything to do with it. Hence, his testimony that he had not "been a part of Investors Hub Daily" is true.

1

Count Four, however, alleges that Mr. Berman falsely denied posting on Investors Hub message boards. It may be the Government ardently hoped that he had so testified but the transcript of the SEC deposition shows that he did not. The Indictment's allegations make it clear that the prosecution is based on allegations about Mr. Berman's activity on message boards such as iHub and Investors Hangout—not Investors Hub Daily which was the subject of his deposition testimony. (Indictment par.12, 40-47, 53, 57, 59, 62 refer solely to iHUB and Investors Hangout). Because Mr. Berman's testimony that he had "not been a part of" Investors Hub Daily is literally true, he cannot validly be convicted of making a false statement. *United States v. Bronston*, 409 U.S. 352 (1973) (no perjury liability for literally true testimony); *United States v. Diogo*, 320 F.2d 898, 905-09 (2d Cir. 1963) (same)

In sum, the Government deliberately altered Mr. Berman's actual testimony into a statement he did not make, and then caused the Grand Jury to indict Mr. Berman for making a false statement that he never uttered—and despite its literal truth.

Second, Count Four must also be dismissed because it violates Mr. Berman's Fifth Amendment right not to be tried except upon a valid Indictment by a Grand Jury. This provision includes within it a "right not to be tried" where the Indictment contains a fatal flaw or defect. Under such circumstances, the defective pleading ceases to be an Indictment. *Midland Asphalt v. United States*, 489 U.S. 799, 802 (1989); *Russell v. United States*, 369 U.S. 749 (1962). An Indictment's allegation of the testimonial offense of making a false statement which fails to cite to the defendant's actual testimony is a defective Indictment.

An indictment, to allege an offense, must include "every fact that is by law a basis for imposing punishment." *Apprendi v. New Jersey*, 530 U.S. 466, 501 (2000) (Thomas, J., concurring). There is no fact more fundamental in a prosecution for making a false statement than

the statement that was actually said. Count Four does not allege this fundamental fact. It instead alleges the Government's substituted version of what it wishes he had said for what his actual testimony was. Hence, Mr. Berman has a constitutional right not to be tried on Count Four.

Third, the Government's insertion in the Indictment's false statement charge of language different from Mr. Berman's actual testimony constitutes prosecutorial misconduct in the form of Grand Jury abuse. If there is a factual dispute about this, a hearing is requested to resolve how, why, and by whom the false statement charge was drafted and presented to the two Grand Juries that returned the original and superseding Indictments.

Finally, Count Four should be dismissed because it is not possible for the Government to prove the false statement attributed to Mr. Berman in that count—having not made the charged false statement, and having made a literally true statement—Mr. Berman cannot have testified falsely, much less to have done so knowingly and willfully. Hence, as a matter of law, the false statement charged in Count Four cannot lead to a valid conviction because any evidence offered in support of the charged offense will be legally insufficient.

## FACTUAL BACKGROUND

Over two days, on October 9 and 16, 2020, Mr. Berman was deposed by the SEC for a total of 9 hours and 52 minutes. The deposition transcript consumes 346 pages. Unlike this Court's Local Rule, which limits the questioning of a witness by a single lawyer, LCrR 44.2, Mr. Berman was subjected to tag-team questioning by several of the six SEC lawyers who participated in the deposition—with some SEC lawyers interrupting their colleagues to pose their own preferred line of questioning. The deposition was conducted remotely. Mr. Berman testified from California; his counsel was in New York. The six SEC lawyers were each at separate locations. The transcript shows that the images on the remote platform's screen froze from time to time, causing a loss of audio, and the need for the repetition of questions and answers.

During the first day of testimony, Mr. Berman's attention was drawn to a document known as a background questionnaire. (Dep. Ex. 64). The SEC Enforcement Division Manual, at 3.3.52, describes this as a document used to obtain "a variety of personal information from a witness," such as "date and place of birth, names and account numbers" of securities and brokerage accounts, "a list of educational institutions attended and degrees received, and an employment history." SEC counsel asked Mr. Berman about some of the entries on the questionnaire—focusing initially on email accounts and mobile and landline telephones he used. SEC counsel then turned to the issue of internet investor message boards and discussion forums.

Before describing that questioning and testimony, it is worth observing that this is a subject of much greater interest to the Government than to the SEC. The subject is not mentioned at all in the lengthy SEC Complaint filed on December 17, 2020, just 8 weeks after the completion of Mr. Berman's deposition. This was the very same day that the Indictment was unsealed and Mr. Berman was arrested. Such coordination is to be expected since DOJ and SEC were conducting a parallel investigation, as the Government has previously described. While the subject of investor message boards and forums is absent from the SEC Complaint, it is an important part of the Indictment which refers to this subject in at least 16 paragraphs of its factual allegations.

This raises the issue of whether the DOJ-SEC coordination also led the Government to propose that the SEC include the subject in its questionnaire and probe Mr. Berman with questions about investor message board forums in the hope that he would testify falsely. *United States v. Scrushy*, 366 F. Supp.2d 1134 (N.D. Ala. 2005) (suppression of SEC testimony and perjury charge dismissed with prejudice due to Justice Department influence over content and venue of SEC deposition); *United States v. Parrott*, 248 F. Supp.196 (D.D.C. 1965) (parallel civil proceeding may not be used by Government to elicit evidence for a criminal prosecution).

In the absence of a complete dismissal with prejudice of this count we request a hearing, or an affidavit from the DOJ and SEC attorneys with personal knowledge, setting forth the provenance of the internet message boards and discussion forums referred to in the SEC background questionnaire and about which Mr. Berman was questioned to determine how a presentation to the Grand Jury was made that differed from Mr. Berman's actual testimony. This hearing is relevant to the issues discussed in *Scrushy* and *Parrott*, and also to the issue of the materiality of the questioning on the subject of internet message boards. If the SEC included this subject on its questionnaire, and then questioned Mr. Berman on this topic at the Government's request, any resulting alleged false statement would not be material to the SEC's deposition—an essential element of the offense alleged in Count Four.

Returning to the transcript of the deposition, after putting the questionnaire (Dep. Ex. 64) on the remote platform screen, SEC counsel stated to Mr. Berman: "You were asked to list all internet messages boards or discussion forums including but not limited to Money Makers Group, PNQ1 message board, Investors Hub Daily of which you are a member or on which you posted any messages at any time during the last three years. You left that blank." At this point no question on this subject had been put to Mr. Berman. Next, the questioning continued.

SEC Counsel: "Do you see that?"

Berman: "Yeah. I've not been part of Money Makers, PNQ1, or Investors Hub Daily."

Responding to the only question he was asked, Mr. Berman acknowledged that he saw he had left that portion of the questionnaire blank ("Yeah.") He then volunteered that he had "not been part of" the sites identified in the questionnaire. Not finding any need to clarify or follow-up on Mr. Berman's response, SEC counsel instead shifted the focus and scope of the questioning on this subject.

SEC Counsel: "And what about any other internet message boards or discussion? Have you posted to any others?"

Berman: "I'm just not going to talk about internet message boards or discussion forums. My life has been made a living hell by message board posters. I'm just—my car has been vandalized. The office has had windows broken. My son has been followed by message board posters. I'm just not going to talk about it.

SEC Counsel: "And that was not my question."

Berman: "I know but you are barking up the wrong tree, Mr. Misler."

SEC Counsel: "My question to you [is] have you made posts on any internet—

Berman:  [interrupting] "You have my answer."

SEC Counsel: [completing the question] "message boards?"

Berman: "You have my answer."

SEC Counsel: "Mr. Berman—I want the record to reflect that Mr. Berman is interrupting me and not answering the question, I'll ask it one more time. Mr. Berman is it your testimony that you are not a member of any internet message boards or discussion forums?"

Counsel for Mr. Berman: "He's answered it."

Berman: "You may not like the answer, but I answered it."

SEC Counsel: "He has refused to answer the question. He went on a long discussion that was unresponsive to the [question]. I am happy to move on at this point."

(Ex. A Dep. Tr. 21-23).

## ARGUMENT

While this exchange, covering two pages of the 346-page transcript, is no model of clarity, the dispositive legal issues are (1) the literal truth of Mr. Berman's testimony, and (2) the discrepancy between what Mr. Berman said in the deposition and the true bill returned by the Grand Jury. The statement alleged in Count Four to be a false statement, in violation of Section 1001, is that Mr. Berman: "[I]n sworn testimony before the [SEC] Berman falsely stated he was not involved in posting on Investors Hub message boards."

However, that was not Mr. Berman's "sworn testimony." His actual testimony was: "I've not been part of Money Makers, PNQ1, or Investors Hub Daily." (Dep. Tr. 22)  Nonetheless, the Government saw fit to cause two Grand Juries to return a false statement charge alleging that Mr. Berman had given "sworn testimony" that he "was not involved in posting on Investor Hub message boards," when that clearly was not his "sworn testimony."

The Government surely knew that Mr. Berman's "sworn testimony" was not what is alleged in Count Four. Indeed, his testimony does not refer to "posting" at all; nor does the testimony refer to "being involved," one way or the other, in "Investors Hub message boards." His sole testimony in this connection was that he had not "been a part of" the three discrete sites selected by the SEC for inclusion in the questionnaire, one of which was Investors Hub Daily. The Government either did not know, or chose to ignore, that Investors Hub Daily—what Mr. Berman truthfully said he was not part of—is not the same as Investors Hub ("iHUB") or Investors Hangout which are message boards and discussion forums. Investors Hub Daily is not.

Apparently not satisfied with Mr. Berman's actual testimony, the Government apparently decided it had a better chance of obtaining a conviction if it invented its own version of his testimony. Compounding its grand jury abuse, the Government then advised two Grand Juries that its contrived version of Mr. Berman's "sworn testimony" was what he had testified to, thus all too predictably causing these Grand Juries to indict Mr. Berman twice for the offense of making a false statement which he never uttered—and despite its literal truth.

This is particularly difficult to understand because Mr. Berman's SEC deposition testimony is accurately recounted in the body of the Indictment and only altered in Count Four. Specifically, paragraph 47 of the Indictment states: "On or about October 9, 2020, Berman provided sworn testimony to the SEC in Washington, D.C. When asked under oath about his use of message

boards, BERMAN falsely stated: "Yeah. I've not been a part of….Investors Hub Daily." Of course, it is now plain that the testimony was literally true. But it remains inexplicable why the Government would draft an Indictment that accurately recounts the testimony in one part only to then change the description of the testimony in the allegation of the false statement offense.

Most prosecutors are familiar with Justice Sutherland's catalogue of prosecutorial misconduct set forth in *Berger v. United States*, 295 U.S. 78 (1935). One of the categories of misconduct listed is what occurred here—"putting into the mouths of witnesses things which they had not said." *Id.* at 84-85. The breadth of the Grand Jury's power and its ex parte nature can lead to unfairness if prosecutors fail to observe Justice Sutherland's admonition to "strike hard blows…but not foul ones." *Id.* at 88. Moreover, the Grand Jury acts under the power and protection of the Court.   As the Supreme Court has observed: "A grand jury is clothed with great independence in many areas, but it remains an appendage of the Court." *Brown v. United States*, 359 U.S. 41, 49 (1959); *Blair v. United States*, 250 U.S. 273, 280 (1919) ("the function of the grand jury [derives] from the judicial power of the United States"); *United States v. Calandra*, 414 U.S. 338, 346 and n. 4 (1974).

We call upon the Court not to countenance the Government's wrongful conduct in substituting its own preferred language, instead of the actual SEC deposition testimony, in its presentation of the false statement offense alleged in Count Four.

## CONCLUSION

As the foregoing demonstrates, Count Four accuses Mr. Berman of making a false statement in his SEC deposition but cites to "sworn testimony" which it cannot be disputed he did not give. Moreover, the testimony is literally true. This renders Count Four both the product of prosecutorial misconduct and a charge as to which Mr. Berman has a right "not to be tried" in that

it alleges that his literally true testimony was a false statement—that he did not make. For all the foregoing reasons, Count Four should be dismissed with prejudice.

## MOTION TO DISMISS COUNT THREE OF THE INDICTMENT

Count Three of the Indictment should be dismissed on the ground that the offense charged in that Count, obstruction of an SEC proceeding, in violation of 18 U.S.C. Section 1505, is based entirely on speech protected by the First Amendment.

The Indictment alleges that "in or around March 2020" the SEC "initiated an investigation of DECN and Mr. Berman" that "constituted a pending proceeding through the remainder of 2020." (par. 37). It is this SEC "proceeding" that Count Three alleges Mr. Berman obstructed. However, these allegations are based entirely on letters submitted by an unnamed third-party to the SEC Commissioners, copied to lawyers in the Enforcement Division who were handling the investigation, and to email and other internet communications about this and related subjects.

According to the Indictment: "These letters were intended to bring an end to the SEC investigation." (par. 63). The defense seriously doubts that the sensibilities of SEC Commissioners and experienced SEC lawyers are so tender that they would bring an investigation to a halt on the basis of the letters in question. The letters do not bear Mr. Berman's signature; nor does the Indictment allege that he ghost-wrote the letters for someone else's signature. It alleges only that Mr. Berman "provided information" for inclusion in the letters, "outlined themes, reviewed drafts," and was involved in "developing, reviewing, and editing." (par. 55).

However, it is black-letter law that such letters are constitutionally protected speech. Citizens are entitled to petition their government to air their grievances. U.S. Const., First Amendment ("Congress shall make no law…abridging…the right of the people to petition the Government for a redress of grievances.)  Mr. Berman did not lose his First Amendment rights when the letters were submitted the SEC—months before it filed its Complaint. Even now, when he is a defendant in parallel civil and criminal cases, he retains his First Amendment rights.

There are ample precedents supporting the constitutionally protected nature of the SEC letters. For instance, in *Watts v. United States*, 394 U.S. 705 (1969), the defendant was convicted of the serious offense of making a threat of violence against the President of the United States, in violation of 18 U.S.C. Section 871(a). In substance, the defendant, who anticipated being drafted and sent to Vietnam, was heard to say at a public event that, once he was assigned a rifle, he would aim it at President Lyndon B. Johnson. Reversing the conviction, the Supreme Court did not believe the statement was a genuine threat and held that a statute which criminalizes speech "must be interpreted with the commands of the First Amendment clearly in mind." *Id*. at 707. The Court also stressed that when government or public officials are involved, even "vehement, caustic and sometimes unpleasantly sharp attacks" are protected by the Constitution." *Id*. at 708.

Conduct much more obstructive than the letters to the SEC was held by the Washington Supreme Court to involve protected speech. In *State v. EJJ*, 183 Wn. 497, 507 P.3d 815 (2015), the defendant was convicted of obstructing a law enforcement officer by shouting abusive names, yelling, and using profanity while the officer was engaged in a criminal investigation. The Washington Supreme Court reversed the conviction on the ground that the First Amendment protects the right of citizens to criticize their government officials.

Even speech that is false has been held to be entitled to protection. In *United States v. Alvarez*, 567 U.S. 709 (2012), a local government official falsely claimed to be a recipient of the Congressional Medal of Honor when he had never served in the military. He was convicted of falsely claiming a military decoration, in violation of Title 18, United States Code, Section 704(b), known as the Stolen Valor Act. The Supreme Court reversed the conviction on the principle that content-based restrictions on speech are presumptively invalid.

The Indictment alleges that the letters sent to the SEC amounted to "an attempt to impede and end the SEC's investigation." (par. 52) However, it does not allege that anything in the letters was false or defamatory. The Indictment does, however, tread on First Amendment principles by its references to content—describing one letter as having "accused the SEC of unethical and inappropriate conduct against DECN," and of having "levied allegations of 'bias and possibly collusion between SEC investigators and rogue message board posters…who aim to destroy Decision Diagnostics Corp.'" The letter also criticized the SEC for impairing DECN's ability to develop its products to combat the spread of COVID-19. (par. 58)

The letters to the SEC contain constitutionally protected speech. Indeed, the Indictment contains fewer allegations about the content of the letters than it does about the colorful language used in some of the email and internet communications about them and the SEC. Moreover, some of the purportedly obstructive comments in the letters were previously submitted to the SEC in connection with DECN's Rule 550 petition to terminate the temporary trading suspension—a petition no one has ever hinted amounted to the obstruction of an SEC proceeding.

For the foregoing reasons, Count Three must be dismissed because it amounts to a criminal charge based on constitutionally protected speech.

## MOTION TO DISMISS COUNTS TWO AND THREE

Count Two (wire fraud) and Count Three (obstruction of an SEC proceeding), the two counts that were added when the superseding Indictment was returned on May 11, 2021, should be dismissed on two grounds. First, the Government misled the Court and defense counsel when it initially announced its intention to seek a superseding Indictment. Second, adding these additional counts violated applicable Justice Department Guidelines.

At an April 27, 2021 status conference, the Government first advised the Court that it intended to seek a superseding Indictment during the month of May 2021. Government counsel had notified the defense of this one day before, on April 26, 2021, which led to a discussion among all counsel about how this would affect the schedule the Court had previously put in place, including the need for an adjournment of the trial date of July 12, 2021, which had been scheduled by the Court as early as February 24, 2021,

The Court stated at the status conference that it generally was not in favor of adjourning trial dates and asked Government counsel for an assurance that the superseding Indictment was based on new evidence that had had come to light in the months since the return of the original Indictment. The defense recollection of the Government's response was that it did not directly address the Court's inquiry.

Nor could Government counsel have done so as events have now confirmed. The superseder includes a wire fraud count which is premised on the very same allegations on which the original securities fraud count is based. They are mirror images. Both proceed on allegations of the same fraud; they rely on the same press releases as proof of the alleged fraud. Indeed, the superseding Indictment describes the purpose and means of the wire fraud scheme in paragraphs 13 and 14—paragraphs that are essentially in *haec verba* with paragraphs 12 and 13 of the original

13

Indictment. The wire fraud adds nothing to the case other than providing the prosecution and jury with two theories of criminal liability for the same conduct.

Nor is the obstruction count based on evidence discovered only after the return of the original Indictment. By its terms, it alleges that the period of the obstruction ended "in or around December 2020," which is when the original Indictment was unsealed. Further, the factual allegations of the obstruction count alleged in the superseding Indictment relate exclusively to alleged conduct occurring months before, in May and June 2020, and thus was available prior to, not after, the original Indictment was unsealed. (par. 51-65).

In addition to being economical with the truth to the Court, the Government's decision to add two additional offenses to the Indictment violates the Justice Department Guideline which advises Government counsel that: "In order to promote the fair administration of justice, as well as the appearance of justice, all U.S. Attorneys should charge in indictments and informations as few separate counts as are reasonably necessary to prosecute fully and successfully and to provide for a fair sentence on conviction." Criminal Resource Manual, U.S. Department of Justice, Section 215. For many months, the Government was satisfied that an Indictment alleging the two counts of securities fraud and the making of a false statement was "reasonably necessary" to discharge its duty to "prosecute fully" and, if a conviction resulted, "to provide for a fair sentence."

We challenge the Government to explain how the addition of two additional counts is consistent with the expressed concern of the Court and the applicable DOJ guidance. If the Government cannot do so, then the inference is plain that the Government ignored both the Court and DOJ Rule to seek a perceived adversarial advantage by piling up new offenses based on pre-existing evidence.

**MOTION IN LIMINE TO PRECLUDE THE ADMISSION IN EVIDENCE OF
PREJUDICIAL UNCHARGED SIMILAR ACT EVIDENCE**

Pursuant to Rules 401, 403, and 404(b) of the Federal Rules of Evidence, the Government should be precluded from introducing similar act evidence and from making any reference to such evidence in the jury's presence.

The heart of the Indictment is the allegation, repeated throughout, that Mr. Berman made false statements and omissions in press releases about the process by which Decision Diagnostics Corp. [hereinafter DECN] sought to develop and market a COVID-19 home test kit utilizing a blood sample obtained from a finger prick. It will be the jury's task to determine whether the press releases contain materially false statements and omissions, and if this occurred at all, whether it was done willfully and with intent to defraud.

In this context, it is prejudicial in the extreme for the Government to introduce evidence of other instances where Mr. Berman is alleged to have been untruthful. For instance, par. 6-8 of the Indictment alleges that Mr. Berman lied in DECN corporate filings that he would refrain from taking "cash compensation as a result of our limited cash flow." The Indictment alleges this and similar representations "were materially false and misleading," not because Mr. Berman actually was receiving "cash compensation." Instead, the Indictment alleges these representations were false because either "[i]n recent years, or "in 2019 and 2020," Mr. Berman "misappropriated" over "$360,000 in DECN company funds to pay to chat live on webcams with individuals living in foreign countries…for personal entertainment," and that this was neither "business-related" nor "disclose[d] to investors."

The Indictment also alleges other uncharged instances of untruthfulness. For instance, par. 14e alleges that Mr. Berman "made false statements to the SEC and to federal law enforcement concealing his use of aliases to post messages on investor message boards." The same paragraph,

at 14g, alleges that Mr. Berman "made false statements to federal law enforcement concealing his involvement in drafting the purportedly independent shareholder letter." The Indictment, at par. 48, alleges that Mr. Berman lied again to "federal law enforcement," on or about October 27, 2020, when he "falsely" said he was not involved in the message boards." Par. 64 recounts a second lie Mr. Berman allegedly made in the same interview in that he "falsely told federal law enforcement agents that neither he nor DECN had been involved with the shareholder letters."

**The Applicable Legal Standards**

Under Rule 404(b), "other acts" evidence is not admissible to prove the character of a person in order to show they acted in conformity therewith. As the Supreme Court has stated: "The threshold inquiry a court must make before admitting similar acts evidence under Rule 404(b) is whether that evidence is probative of a material other than character." *Huddleston v. United States*, 485 U.S. 681, 686 (1988). The Rule is based on the principle that "a defendant must be tried for what he did, not for who he is." *United States v. Foskey*, 636 F.2d 517, 523 (D.C. Cir. 1980). "The exclusion of bad acts evidence is founded not on a belief that the evidence is irrelevant, but rather on the fear that juries will tend to give it excessive weight, and on a fundamental sense, that no one should be convicted of a crime based on his or her previous misdeeds." *United States v. Daniels*, 770 F.2d 1111, 1116 (D. C. Cir. 1985).

In this circuit, a trial judge undertakes a two-part analysis to determine admissibility under Rule 404(b). First, the Court considers whether the evidence is "probative of some material issue other than character." *United States v. Clarke*, 24 F.3d 257, 264 (D. C. Cir. 1994). Second, if the Court deems the evidence relevant, it will still be excluded if its probative value "is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403; *United States v. Long*, 328 F.3d

655, 661 (D. C. Cir. 1993). The application of these precedents to the multiple other acts included in the Indictment leads to the conclusion that they should all be excluded.

First, the evidence about the alleged falsehood concerning Mr. Berman's statements about refraining from receiving cash compensation yet allegedly spending corporate funds for "personal entertainment" is irrelevant, under Rule 401. This statement does not "make a fact more or less probable than it be would be without the evidence," and the alleged use of corporate funds for a non-business purpose has nothing to do with any fact that "is of consequence in determining [this] action." Fed. R. Evid. 401.

This is a prosecution alleging fraud in connection with the purchase and sale of securities, based on a series of false and misleading press releases, a wire fraud scheme based on the same allegations, obstruction of an SEC proceeding, and the making of a false statement—all alleged to have occurred in 2020 and all related to the development of a blood-based COVID-19 test product. But the alleged "cash compensation" false representation has nothing to do with the proof of any of the offenses charged in the Indictment. Moreover, the two time periods do not align. The Indictment alleges this activity took place, at least in part, in 2019 while all of the charged offenses are alleged to have occurred in 2020, starting with press release issued on March 3, 2020.

Finally, this evidence, with its sexual overtones, has no probative value but clearly creates a very real danger of unfair prejudice. Fed. R. Evid. 403. As the Supreme Court has stated:  The term "unfair prejudice" refers to "the capacity of some concededly relevant evidence (though here the evidence is irrelevant) to lure the fact-finder into declaring guilt on a ground different from proof specific to the offenses charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). This risk is clearly present here due to the salacious nature of the evidence that the Government has

inserted into the Indictment—seemingly for no purpose other than to prejudice and embarrass Mr. Berman.

This same analysis applies with respect to the multiple references in the Indictment to false statements Mr. Berman allegedly made to "federal law enforcement" or "federal law enforcement agents" about the use of aliases on investor message boards and a letter sent to the SEC. This could be called either gilding the lily or the Section 1001 version of a perjury trap. The Government agents surely knew the underlying facts before asking Mr. Berman about them. The answers he gave were not genuinely part of a fact-finding investigation; the interviews were a straightforward effort to obtain false statements—either to create evidence of consciousness of guilt or to load up on cross-examination ammunition so as to discourage Mr. Berman from testifying at trial.

Whether the motives here are pure or ulterior the evidence of these other alleged false statements is inadmissible, under Rules 402, 403 and Rule 404(b). The prosecution's burden at trial is primarily to prove the falsity of the press releases. That is at the heart of both the securities and wire fraud counts. In that context, the evidence of other allegedly false statements presents an undue risk that this uncharged conduct will lead the jury instead to consider this as evidence of the charged fraud offenses: "someone who lies about one thing probably lies about other things." That is the propensity inference forbidden by Rule 404(b).  Rule 403 also speaks to this risk—the risk of unfair prejudice being outweighed by the scant probative value of these alleged false statements.

## CONCLUSION

For all the foregoing reasons, the Government should be precluded from offering the evidence set forth above or otherwise referring to the evidence in the jury's presence. In light of the separate motion to dismiss Count Four, we have not addressed the statements in the Indictment that refer to the alleged false statement in that Count.

## MOTION IN LIMINE TO PRECLUDE EVIDENCE OF
## SECURITIES AND WIRE FRAUD AFTER THE TRADING PUBLIC
## RECEIVED EXPLICIT WARNINGS FROM THE SEC AND
## OTC MARKETS GROUP ABOUT THE RISKS OF PURCHASING SHARES IN DECN

The Government should be precluded from introducing evidence in support of the securities fraud and wire fraud allegations beyond April 23, 2020, the day the SEC announced it was suspending trading in the shares of DECN for ten business days. The SEC release cited as the basis for the trading suspension the very press releases going to the core of the Government's case. Separately, as a result of the trading suspension, the OTC Markets Group issued a further and equally explicit warning to the investing public in the form of the Caveat Emptor and Skull and Crossbones images affixed to DECN's OTC Markets web page—as well as the explanation for those warnings that remain on the company's OTC web page to this day.

The Government's position is that as a result of the press releases at issue anyone who purchased "DECN common stock at artificially inflated prices and s[old] their shares at a loss" is a victim of the fraud. (par. 65). The Government has also advised that it need not prove that any investor relied upon or even saw the press releases at issue—but only that the releases caused the DECN share price artificially to inflate.

The defense position is that—without conducting extensive individual interviews—it is unknowable what motivated an individual investor to purchase DECN shares at a particular time, how long to hold such shares, and when, if ever, to sell them. What is undisputed is that by April 23, 2020—less than eight weeks after the alleged genesis of the fraud—the trading public was amply warned about the high risk involved in purchasing shares in DECN. These warnings from the SEC and OTC Markets Group put any prospective buyer of DECN shares on notice of the risks involved in the purchase of such shares. As consequence, no such purchaser can be considered to be the victim of a fraud.

**The Relevant Facts**

The Indictment alleges that the securities fraud offense (Count One) and the wire fraud offense (Count Two) occurred over an 11-month period: "From at least on or about February 2020 through in or around December 2020" (par. 67, 69), despite the Indictment's principal focus on the press releases issued in March and April 2020. (par. 14, 18-23, 27-29, 34). By contrast, the SEC Complaint, which alleges securities fraud based exclusively on the March and April press releases, and is based on a parallel investigation to the Government's concerning precisely the same conduct, alleges that the "Relevant Period" of the fraud spanned solely the four-month period between March and June 2020.

After reviewing the core March and April press releases, the SEC—the agency with the primary mission of protecting investors and ensuring the fairness of markets—was satisfied that the appropriate regulatory response was a temporary ten-day suspension, pursuant to Section 12(k) of the Securities Exchange Act of 1934, of trading in DECN shares. In doing so, the SEC warned the trading public that it had imposed the suspension: "because of questions regarding the accuracy and adequacy of information in the marketplace, since at least March 3, 2020 …relat[ing[] to, among other things, (i) DECN's statements claiming to have the "technology perfected" to allow it to manufacturer and sell a COVID-19 test kit that would provide results 'in 15 seconds, based on a small finger prick blood sample,' and (ii) DECN's sales forecasts for the COVID-19 test kit that up to 525 million test kits would be sold in the first year of production." The SEC warning continued: "The Commission cautions brokers, dealers, shareholders, and prospective purchasers that they should carefully consider the foregoing information, along with all other currently available information, and any information subsequently issued by the company." (Ex. B)

Consequently, within weeks of the initial March 3 press release, the SEC in the clearest possible terms, warned all current and potential market participants that the "accuracy and adequacy" of the earliest DECN press releases about the COVID-19 test kit was questionable and that this warning also applied to future press releases—"any information subsequently issued by the company." These warnings were publicly posted and have been readily available, from April 23, 2020, to the present.

In short, anyone with access to a computer search engine, or who has a brokerage account, and might be interested in purchasing (or selling short) shares in DECN, would know of the trading suspension, the significant questions the SEC had raised about prior and future statements by the company—and that no stock transactions in DECN could occur during the temporary suspension. Anyone purchasing shares after the lifting of the suspension was forewarned not only of the riskiness of the investment but also about the SEC's doubts about the reliability of DECN's press releases. No such purchaser can be regarded as a fraud victim.

DECN sought the administrative termination of the suspension. On May 7, 2020, it filed a petition to terminate the suspension, pursuant to Rule 550 of the SEC Rules of Practice, and on May 15 filed a supplemental petition, both of which became public documents. DECN argued, among other points, that it had evidence that a secure company served had been hacked; proprietary information had been stolen; an internet poster then boasted of having the stolen information; the poster was one of many who seemed to be using the internet to damage and manipulate DECN stock; there was strong circumstantial evidence that the stolen information had been given to the SEC; and that an SEC lawyer had submitted a sworn certification in response to the petition which DECN believed contained a false statement about the timing of the SEC's accessing DECN's web

site. Many of these themes appear in one or more of the shareholder letters sent to the SEC that forms the basis of the obstruction charge (Count Three) which we address in a separate motion.

The SEC suspension automatically resulted in OTC Markets Group taking action against DECN. It posted warnings on DECN's OTC web site page marked in red and with an exclamation point for emphasis which warned:" [I]nvestors may have trouble selling this stock," and that OTC had "discontinued the display of quotes on this security because it has been labeled Caveat Emptor (Buyer Beware)." It further stated that it used the designation  "Caveat Emptor" and the Skull and Crossbones next to a stock symbol, such as DECN's, to inform investors that there was reason to exercise additional caution and perform thorough due diligence before making an investment decision in [DECN]."

OTC explained that the Caveat Emptor designation was used when it had "determined there is a public interest concern associated with a company." It further explained its rationale for these actions by apparent reference to the SEC suspension, stating: "The Caveat Emptor Designation may be assigned when OTC Markets becomes aware of one or more of the following" concerns, including where "a regulatory authority or an exchange has halted or suspended trading for public interest concerns."

The foregoing makes it abundantly clear that after April 23 prospective purchasers of DECN shares had received multiple warnings from regulatory authorities that both prior and future DECN statements, particularly those contained in press releases, were questionable for their accuracy and adequacy. Additionally, the OTC Markets, where penny stocks like DECN's were traded, issued the Caveat Emptor warning to any potential purchaser of DECN shares—alerting them that they had to exercise extreme care, caution, and due diligence with respect to DECN. If this was not enough, the OTC Markets use of the Skull & Crossbones—a universally recognized

symbol of danger—put any prospective purchaser of DECN shares on notice that buying DECN shares meant they were embarking on a dangerous course involving a particularly risky investment for which accurate information may not be available.

In sum, any person who purchased shares in DECN after the SEC trading suspension and warnings about statements issued by DECN, and who was further explicitly warned by the OTC Markets Group that they might even "have trouble selling this stock," must be deemed to have been aware that DECN was a dangerously risky investment and therefore cannot be considered the victim of a fraud.

## MOTION IN LIMINE TO PRECLUDE EXPERT EVIDENCE

This motion seeks to preclude the Government from seeking to elicit one category of anticipated testimony by an expert witness. Specifically, the Government has served notice to the defense, pursuant to Rule16(a)(1)(G), that its expert witness "may testify about trading by specific shareholders, (including victims)."

The witness should not be permitted to testify to the experiences of individual shareholders because such testimony is hearsay, and would not permit the defense to confront adverse testimony, including through cross-examination, in violation of the Sixth Amendment. Justice Scalia's opinion for a unanimous Supreme Court in *Crawford v. Washington*, 541 U.S. 36 (2004), reversed a criminal conviction because evidence was admitted at trial in a manner that did not protect the defendant's Sixth Amendment right to be confronted with the witnesses against him. Although the trial court ruled the hearsay evidence was sufficiently reliable to be admitted, Crawford makes clear that the reliability of evidence, under the Sixth Amendment, "must be assessed in a particular manner: by testing in the crucible of cross-examination." *Id*. at 61. In sum, the expert witness identified by the Government should be precluded from offering testimony "about specific shareholders (including victims)."

## MOTION FOR A BILL OF PARTICULARS

Pursuant to Rule 7(f) of the Rules of Criminal Procedure, Court should direct the Government to file a bill of particulars on the points set forth below.

The purpose of a bill of particulars is to apprise the defendant of the charges he faces so as to ensure he (1) understands the charges, (2) can prepare a defense, (3) can avoid prejudicial surprise at trial, and (4) can be protected from a possible retrial of the same offense. *United States v. Butler*, 822 F.2d 1191 (D.C. Cir. 1987); *United States v. Mejia*, 448 F.3d 436, 445 (D.C. Cir. 2006) (citing *Butler*); *United States v. Baker*, 262 F. Supp. 657 (D.D.C. 1966) (motion sought particulars on 52 issues; bill of particulars ordered in part, and others particulars voluntarily provided by Government).

The defense seeks particulars solely with respect to the factual allegations in two of the 65 paragraphs in the Indictment. First, paragraph 13 alleges that one purposes of the alleged scheme to defraud was for Mr. Berman "to enrich himself through access to additional corporate funds and compensation by…diverting the proceeds of the scheme for his personal use and benefit." Particularly because there is no allegation in the Indictment that Mr. Berman ever sold a single share of DECN stock during the period of the alleged fraud, the defense seeks the following particulars.

1.  What evidence will the Government rely upon to establish that Mr. Berman enriched himself by virtue of the alleged fraud?

2.  What evidence will the Government rely upon to prove the additional corporate funds referred to in this allegation?

3.  What evidence will the Government rely upon to prove additional compensation for Mr. Berman was a purpose of the alleged fraud?

4.   What evidence will the Government rely upon to prove that Mr. Berman diverted the proceeds of the alleged scheme for his own personal use and benefit?

Second, paragraph 65 of the Indictment alleges: "As a result of the fraudulent scheme detailed above, DECN investors lost millions of dollars by, among other things, purchasing DECN common stock at artificially inflated prices and selling their shares at a loss." The defense seeks the following particulars with respect to this allegation.

1.   What evidence will the Government rely upon to establish how many investors purchased DECN shares during the period the stock was allegedly artificially inflated?

2.   What evidence will the Government rely upon to prove how many investors sold their shares at a loss?

3.   What evidence will the Government rely upon to prove that the amount of DECN investors' losses were "millions of dollars"?

4.   What evidence will the Government rely upon to prove the "other things" that led to the losses alleged in par. 65?

In sum, the defendant is entitled to this small number of particulars which relate to only two paragraphs of the Indictment and to an Order from the Court directing the Government to furnish these particulars. This is a form of relief consistent with the 1966 amendment to Rule 7(f) which was done to "encourage a more liberal attitude by the courts toward bills of particulars." Notes of Advisory Committee on Rules, 39 F.R.D. 69, 70 (1966).

Dated: July 27, 2021

        /s/ Walter P. Loughlin
Walter P. Loughlin, Esq. (DC Bar No. NY0433)
340 West 57th Street
Suite 5D
New York, York 10019
Tel. (203) 216-3445