**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
------------------------------------------------------x
UNITED STATES OF AMERICA,

                    Plaintiff,

v.                                       Case No.: 1:20-CR-000278 TNM

KEITH BERMAN,

                    Defendant.
------------------------------------------------------x

**DEFENDANT'S REPLY TO THE GOVERNMENT'S**
**OPPOSITION TO DEFENDANT'S OMNIBUS PRETRIAL MOTIONS**

Defendant Keith Berman respectfully submits this reply to the Government's opposition to the Defendant's omnibus pretrial motions.

**I.**        **Motion to Dismiss Count Four**

The initial defense motion challenging Count Four established that the testimony alleged in the Indictment to be the false statement made by Mr. Berman during his SEC deposition was a statement he never uttered.

Count Four alleges that during Mr. Berman's October 9, 2020 SEC deposition, he "did knowingly and willfully make materially false, fictitious and fraudulent statements and representations, to wit, in sworn testimony before the U.S. Securities and Exchange Commission, BERMAN falsely stated that he was not involved in posting on Investors Hub message boards." However, that was not his testimony. It is undisputed that Mr. Berman's actual testimony was: "I've not been part of Money Makers, PNQ1, or Investors Hub Daily." (Def. Ex.1 to the original

1

motion and Govt. Ex. 1A to its opposition include the pertinent pages of the SEC deposition transcript.)

Tellingly, the Government offers no explanation for the material discrepancy between Mr. Berman's actual testimony and the fabricated version of it that Count Four wrongly alleges he stated during the deposition. It also studiously avoids what it recognizes to be the "four bases" on which the defendant moves to dismiss this count, but simply asserts that they all spring from Mr. Berman not " precisely say[ing] that he was not involved with posting on Investor's Hub message boards…." (Govt. Opp.). The Government's use of the adverb "precisely" is wrong. Mr. Berman did not say it at all—as a comparison of the actual and charged sworn testimony conclusively demonstrates.

Instead of even attempting to clarify how this disparity occurred, the Government offers further obfuscation. First, the Government asserts that there is no difference between Investors Hub Daily and Investors Hub Stock Market Message Board due to the fact that Investors Hub Hub Daily provides a link to the message board. The existence of the link is a make-weight. Mr. Berman testified at the deposition that he "was not part of Investors Hub Daily." That statement was true, which is apparently what caused the Government to distort what he said, changing his actual testimony into a denial of posting on Investor Hub message boards—a denial he never made in his SEC deposition.

The Government accuses the defense of creating a "manufactured distinction" between Investors Hub Daily and Investors Hub Stock Market Message Board and cites to the internet address to Investors Hub Daily. (https://ih.advfn.com/daily/). What the Government fails to mention is that the Investors Hub Stock Market Message Board has a separate and distinct internet address because it is a different web site. (https://investorshub.adfvn.com/boards/hubstocks.aspx)

Moreover, this was a distinction that Mr. Berman's testimony reflects, as even the Government recognizes. According to the Government, Mr. Berman "immediately volunteered" that he had "not been part of Money Makers, PNQ1, or Investors Hub Daily," but when asked by SEC counsel more specifically about "internet message boards," the defendant "refused to answer." (Govt. Opp.at 5).  Count Four alleges the crime of making a false statement, in violation of Section 1001, not a refusal to answer.

Although the Government acknowledges that Investors Hub Daily is a "daily news bulletin," it insists that Mr. Berman should have deduced the question about leaving part of the SEC questionnaire blank was really intended to refer "to the message board part of the Investors Hub website, not the daily bulletin." (Govt. Opp. at 6) This echoes the position the Supreme Court rejected in *Bronston*, where the Government argued that the perjury statute should extend to one who makes "affirmative statements of one fact that, in context, constitute denials by negative implication of a related fact." *United States v. Bronston*, 409 U.S. 352, 361-62 (1973). The Court unanimously held that "perjury by implication" cannot be a proper  basis for perjury liability. The false statement statute has no lesser standard.

Finally, the Government's position is that the Court should ignore the extraordinary circumstance that Mr. Berman is accused of making a false statement, in violation of 18 U.S.C. Section 1001, for a fictitious statement he never made, and instead let the jury decide whether he can be convicted of this crime based on a spurious charge. However, in *United States v. Good*, 326 F.3d 589 (4th Cir. 2003), a case relied on by the Government, a defendant charged with a section 1001 offense made a pretrial motion to dismiss the Indictment on the ground that her allegedly false statement was literally true and immaterial. Following a hearing, the district court dismissed the indictment for lack of materiality. The Government appealed and the dismissal of the

Indictment was affirmed. Contrary to the Government's position, the Good case demonstrates that motions, such as the defense challenge to Count Four, are appropriate for pretrial consideration.

### II. Motion to Dismiss Count Three

The initial defense motion argued that this count, which alleges that Mr. Berman corruptly influenced "a proceeding conducted by the Securities and Exchange Commission in relation to DECN," in violation of 18 U.S.C. Section 1505, should be dismissed to the extent Count Three is based on one or more letters submitted to the SEC Chairman, its Inspector General, and SEC Enforcement Division staff, complaining about the investigation and its impact on DECN's business, because such letters are protected First Amendment speech.

First, the Government opposes the motion on the ground that the obstruction count "encompasses conduct broader" than the SEC letters. (Govt. Opp. at 8). The Government citations to this purportedly broader conduct refute rather than support its position.  The Government cites to paragraphs 14e-f and 49-64 of the Indictment as alleging obstructive conduct other than the letters. However, paragraphs 14f, 49, 52-60, and 62-64—in other words all but 5 of the 18 paragraphs— cited by the Government concern the SEC letters.  Further, the section of the Indictment alleging SEC obstruction is entitled: "BERMAN'S Role in Creation of a a Purported Shareholder Letter to Corruptly Influence, Obstruct, and Impede the SEC's Investigation." In short, despite the Government's disingenuous argument about alleged conduct other than the letters, the Indictment's obstruction allegations are clearly centered on the subject of the SEC letters, which are protected speech.

These letters had no obstructive effect on the SEC whose proceedings were not impaired by them one whit. The letters were sent on June 22, July 28, and August 11, 2020. On August 12,

2020, one day after the date of the third letter, the SEC took the deposition of Dr. Matthew Musho, described in the Indictment as a technical adviser to DECN and someone the Government has said is a trial witness. Although the Government contends the letters "were designed to impede an SEC proceeding and intimidate SEC staff attorneys," (Govt. Opp. at 8), they had no such effect. Indeed, several of the SEC lawyers whose names appear in the letters participated in Dr. Musho's deposition. Two months after the third letter, Mr. Berman was deposed, on October 9 and 16, 2020 by some of the same evidently unintimidated SEC attorneys.

One month later, on November 13, 2020, the SEC issued a Wells notice to counsel for Mr. Berman. The SEC Enforcement Division Manual describes the purpose of a Wells notice is to advise a person under investigation that the SEC staff has decided to recommend to the Commission that an action or proceeding commence alleging securities law violations. (Section24, SEC Enf. Div.Manual). In short, within 90 days after the third SEC letter, the Enforcement Division had concluded its investigation and decided it should go forward.

On or about December 5, 2020 counsel for Mr. Berman submitted a written response to the Wells notice. This notice referenced some of the same material included in the SEC letters. Less than two weeks later, on December 17, 2020, the SEC filed an action against Mr. Berman and DECN in the United States District Court for the Southern District of New York, alleging securities law violations arising from the same conduct that gave rise to the securities law and wire fraud allegations in the Indictment. *SEC v. Keith Berman and Decision Diagnostics Corp.*, 20 Civ. 10658. The SEC case has been stayed by Judge Loretta Preska, to whom it was assigned, until the conclusion of the criminal case. Although the Indictment alleges that the SEC letters "were intended to bring about the end of the SEC investigation," this description of this very active investigation was clearly unaffected by the SEC letters.

The Government focuses on a small handful of internet posts in May and June 2020 in which Mr. Berman used "fake personas," such as "plutonium," plutoniumimplosion, and "Matthew Steinmann." As anyone with an internet search engine can verify, when one registers for either IHUB or Investors Hangout, the sites ask what alias you want to use on the site. (https://investorshub.adfvn.com/secure/reguser3.aspx;https://investorshangout./login). Even a brief tour of these sites, shows that others who participate on these sites use pseudonyms. The use of aliases for all kinds of activities on the internet utilize aliases. This even extends to on-line dating.https://www.washingtonpost.com/news/the-intersect/wp2015/02/13want-to-suceed-in-online-dating-pay-more-attention-to-your-user-name.

Indeed, persons much more prominent than Mr. Berman have been known to use "fake personas" when it suited their purposes, including former Present Trump, who falsely pretended, well before he ran for president, to be a Trump publicist, using the names John Miller and John Barron, to plant favorable stories about himself in the New York press. (See https://www.washingtonpost.com/news/the-fix/wp/2016/03/21/the-amazing-story-of-donald-trump's-old-spokesman-john-barron-who-was-actually-donald-trump-himself.

The Government goes so far as to contend "everything about the purported 'shareholder letters' was as lie," although it is careful to specify that this is what the "government alleges," because the Indictment does not do so. Paragraph 58 is the sole part of the Indictment that describes the content of any of the letters and not alleges no false statement. (Govt. Opp. at 8, n. 3)

The Government also wrongly contends that the Indictment alleges that Mr.Berman signed the purported "shareholder letter" using the fake name 'Matthew Steinmann." (Ind. par. 59; Govt. Opp. at 9, n. 4) Both the Indictment and the Government are mistaken. All three letters bear the hand-written signature of Matt Chad. All three were e-mailed to the SEC from Mr. Chad's

email. Each letter includes the type-written names of dozens of persons under the heading "Shareholders in support of this document." Among these are the names Matt Matt Chad and Matthew Steinmann.

Finally, the Government refers to the Indictment's allegation that Mr. Berman posted messages on internet message boards "to threaten investors with civil liability or jail time if they approached the SEC with concerns about the defendant's fraudulent conduct." (Govt. Opp. at 9). The Indictment includes no allegation that Mr. Berman ever threatened a single DECN investor. The Indictment instead refers to this alleged conduct as pertaining "to individuals who approached the SEC and other regulators," and refers to the following statement attributed to Mr. Berman: "he hope[d] the list of people that complained to the [SEC] …have been accurate when they listed their allegations" suggesting that someone who supplied false information to the SEC could face civil or criminal liability, using in this connection the phrase "knock knock day." (Ind. par. 50). This had nothing to do with investors, which the SEC letters clearly show. Each letter complains that the SEC had been influenced by "malicious information supplied by "rogue" message board posters intent on harming DECN.

Turning to the cases cited by the Government, they have little or nothing to do with the circumstances of the present case or this motion. The Government argues these authorities undermine Mr. Berman's First Amendment challenge to Count Three. They do not. For instance, in *United States v. Safavian*, 528 F.3d 957 (D.C. Cir. 2008), all of the counts—including the obstruction charges—were either reversed or vacated. The Government also cites to cases which it contends rebut Mr. Berman's First Amendment challenge to this count. However, these decisions seem to have been selected solely because of scattered dicta plucked from the opinions which make them appear superficially to be relevant.

For example, the only connection with the First Amendment in *Lund v.City of Rockford, Illinois*, 956 F.3d 938, 947 (7th Cir. 2020), is that a reporter, while photographing near the location of a police investigation of prostitution, was chased away from the scene by police officers, leading to his arrest on a traffic violation for driving the wrong way on a one-way street. The reporter later brought a civil rights action, under 42 U.S.C. Section 1983, alleging First Amendment retaliation for the arrest, but lost because the arrest was supported by probable cause for the traffic violation. In *Sutherland v. United States*, 921 F.3d 421,426-27 (4th Cir. 2019), the defendant was convicted for obstruction after submitting falsified documents to the U.S. Attorney's Office. He claimed on appeal that he was charged with obstruction of a grand jury proceeding and the relationship between the phony documents he submitted to the U.S. Attorney and the grand jury proceeding did not meet the nexus requirement set forth in *United States v. Aguilera*, 515 U.S. 593 (1995), and *Marinello v. United States*, 138 S. Ct. 1101 (2018). This prompted the Court to consider whether a broadly construed obstruction statute could chill or unduly burden the right of persons to protest government action. Understood, in context, the decision supports Mr. Berman's right to participate in the submission of the SEC letters protesting about the harm being incurred by DECN.

In *United States v. Parker*, 871 F3d 590, 605 (8th Cir. 2017), a defendant challenged multiple convictions on appeal. One claim was that the district court erred in denying a request for a jury instruction to the effect that certain emails he had sent were protected First Amendment speech. The emails in question were sent to the defendant's fellow gang members in prison instructing them to "smash" another inmate who had become a "rat." This hardly compares to the SEC letters that are the basis of Mr. Berman's First Amendment claim. In *United States v. Clum*, 607 F. App'x 922, 928(11th Cir. 2015), a tax resistor's claim that seminars he gave were protected speech was belied by the evidence that he used the seminars to incite other tax payer's to file false

refund claims and engage in other illegal tax-related acts. Finally, and ironically, the Government relies on *United States v. Alvarez*, 567 U.S. 709 (2012), a case which the defense cited in its initial motion because it is Supreme Court precedent that even false speech—in this case, a bogus claim by the defendant to have received the Congressional Medal of Honor—is protected from prosecution by the First Amendment.

In sum, both the evidence and the law support the defendant's claim that the SEC letters are protected First Amendment speech that cannot be the basis of a criminal prosecution for obstruction of an SEC proceeding.

### III. Motion to Dismiss Counts Two and Three

In its opposition to this motion, the Government proves the defense point, despite its self-congratulatory assertion that it fully and frankly responded to the Court's question to the Government whether the superseding Indictment "is going to relate to information that you were not aware of before and you feel like this is the only option."

Of course, seeking a superseding Indictment was not 'the only option." Indeed, from December 17, 2020, when the original Indictment was unsealed, and April 27, 2021, when the Government advised the Court of its intent to supersede, the Government presumably believed proceeding on the two counts of securities fraud and the making of a false statement was a perfectly good option for the prosecution of this case.

Assuring a Court that a superseder "will include new charges" is simply tautological reasoning. By definition, a superseding Indictment includes new charges. Moreover, the purportedly newly-discovered evidence justifying a superseder appears to consist merely of the discovery of the name Matthew Steinmann being linked to Mr. Berman. But the initial source of

this was Person 2 whom the Government describes as having written the SEC letters though effectively as Mr. Berman's amanuensis. No explanation is offered of the importance of interviewing Person 2 on April 16, 2021— especially since there are references to Person 2's role in the SEC letters at paragraph 47-50 in the original Indictment.

The Government's claim that the superseder is based on new discovery—"some of which had not been obtained as of the date of the status conference" (Govt. Opp. at 12) —appears to be true but barely so if this is a reference to the information received from Investors Hangout the very next day after the April 27 status conference. (*Id.*)

The Government opposition itemizes the purportedly new information in the superseder. This is very thin gruel indeed. Virtually all of these references to "new" information can be traced to allegations in the original Indictment.  For instance, it was alleged in the original Indictment that Mr. Berman used aliases on internet forums; his alleged role in the SEC letters was set forth in the original Indictment, as was even the reference to an SEC lawyer as Fredo. There are emails in the superseder dated between March and May 2020, none of which could fairly be called "new" information a year later in April 2021. The Government's contention that the obstruction count "was based on new information as a result of the government's continued investigation," obscures the fact that the Government was well aware of Person 2 and Mr. Berman's alleged role in the SEC letters when it brought the original Indictment, as the allegations in the original Indictment describe at paragraphs 47-49.

The Government once again ignores the Court's question of whether the addition of the wire fraud count to the securities fraud count was the Government's "only option." Instead, the Government's explanation consists of a sentence remarkable only for its vacuous verbiage: While the securities and wire fraud counts are based on similar facts, the government believes it

10

reasonably necessary to charge one count of each in light of the circumstances of this case." (Govt. Opp. 14)

In sum, the Government's position appears to be that it can disregard the Court's expressed concerns, suggest that the superseding Indictment was prompted by newly discovered evidence, which apart from its unexplained failure to follow-up with Person 2 —who is referred to in the original Indictment—was fully available before as the original Indictment reflects.

In exercising its power to add offenses in a superseding Indictment, the Government believes the defendant should be grateful the Indictment includes four counts instead of 15. In doing so, the Government has failed to heed Professor Moore's warning of the unfairness that can result: "The way in which a prosecutor chooses to combine offenses…in a single indictment is perhaps second in importance only to his decision to prosecute. Equally decisive may be the number of offenses which are cumulated against a single defendant, particularly if they are unconnected." 8 Moore's Federal Practice 8-3 (1983 ed.).

### IV. Motion in Limine to Preclude the Admission of Uncharged Conduct

This motion seeks to preclude the Government—at a trial dominated by evidence of charged falsehoods in the press releases about the development of tests designed to detect COVID-19 and of a charged false statement in an SEC deposition—from introducing evidence of other allegedly untruthful statements by Mr. Berman.

The Government's opposition contends that none of this proposed evidence is subject to Rule 404(b) because it is instead intrinsic to the charged crimes. The cases on which the Government relies for this position are multi-defendant conspiracy cases. For instance, in *United States v. Machado-Erazo*, 901 F.3d 326, 333-34 (D.C. Cir. 2018), the Court stated: "In conspiracy

11

prosecutions, the prosecution is usually allowed considerable leeway in offering evidence of other offenses," for two reasons neither of which apply to the present case: "to inform the jury of the background of the conspiracy charged [and] to link a defendant to other defendants and drug transactions for which the conspiracy was responsible." *United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011), is to the same effect. It was a prosecution of a drug conspiracy, RICO conspiracy, continuing criminal enterprise, and murder.

In short, the admission of other acts evidence in such multi-defendant conspiracy cases cannot be equated with the admissibility of other acts of alleged untruthfulness in the present case against a lone defendant in a classic white collar matter. That is why it is wrong for the Government apparently to use the "considerable leeway" applicable to conspiracy cases in the absence of a conspiracy charge in the present case.

The Government also relies on *United States v. McGill*, 815 F.3d 846, 880-82  (D.C. Cir. 2016), where the Court stated that uncharged other act evidence—even without a forbidden propensity purpose—may still "contain the seeds of a forbidden propensity inference." (citing *United States v. Bowie*, 232 F.3d 923, 930 (D.C. Cir. 2000)). The Court also criticized the Government in *McGill* for having an "overly capacious understanding of what can be introduced as intrinsic evidence," a criticism that applies to the Government's stratagem of seeking to introduce multiple uncharged lies in addition to the charged false statements that are at the core of this case.

The Government acknowledges that it has ample evidence that DECN did not have sufficient revenue from Mr. Berman's emails to the effect that his "personal situation is perilous," and "I am letting therefore people go on Friday." (Ind. par. 9) The Indictment reflects knowledge of DECN's "periodic filings and disclosures," which show that for the relevant period, DECN had

a net operating loss of $3.1 million and a "Going Concern" qualification in its filings which referred to conditions under which the Company would be unable to continue in existence. The Government need not introduce the so-called misappropriation episode to establish an economic motive here.

In the event the Court denies this aspect of the motion, and allows the introduction of the alleged misappropriation, the alternative relief is requested that this evidence be referred to solely as the use of corporate funds for a personal and non-business purpose, omitting the unnecessarily prejudicial facts of the alleged nature of the expenditures—which will only serve to either titillate the jury or possibly result in their prejudicial moral disapproval.

With respect to the uncharged acts that Mr. Berman lied when interviewed by law enforcement agents, as we argued in our initial motion, such evidence is prejudicial in the extreme in the context of the charged conduct already focused on allegations of false statements in press releases and a false statement in an SEC deposition. If the Court denies this aspect of the motion, our request is for the alternative relief set forth in *United States v. Figueroa*, 618 F.2d 934, 939-40 (2d Cir. 1980), which provides that the admission of uncharged similar act evidence should await the conclusion of the defendant's case where the trial judge is in the best position to "assess the probative worth of the evidence on this issue against its prejudicial effect."  Judge Newman's *Figueroa* opinion warned about the dangers associated with the undue tendency of the Government to offer uncharged similar act evidence: "Despite the frequency with which these principles have been expressed and the reversals that have followed, the Government persists in jeopardizing convictions by offering evidence of similar crimes or acts." We urge the Court to follow the *Figueroa* protocol.

Finally, whether the Government labels the uncharged acts as "intrinsic" to its case or "intertwined" with the charged offenses, the admission of these uncharged acts will necessitate the Court giving multiple limiting instructions to the jury about the purposes they may and may not consider them. Punctuating the trial and jury instructions with limiting instructions advising the jury which alleged untrue statements are charged and for what purpose evidence of uncharged false statements may be considered calls to mind Justice Jackson's well-known comment: "The naive assumption that prejudicial effects can be overcome by instructions to the jury…all practicing lawyers know to be unmitigated fiction" *Krulewitch v. United States*, 336 U.S.440, 453 (1949) (Jackson, J., concurring); *Bruton v. United States*, 392 U.S. 123 (1968) (questioning the efficacy of limiting instructions); *United States v. Kaplan*, 502 F.2d 606 (2d Cir.1974)(recognizing limitations on jurors to keep interconnected thoughts separate from each other).

In sum, for all the foregoing, and the points and arguments in our initial motion, defendant's motion in limine should be granted.

### V. Motion in Limine to Preclude Evidence of Evidence of Fraud After SEC and OTC Warnings

In our initial motion, we showed that the trading public had abundant warnings about the risks associated with purchasing shares in DECN after the SEC suspended trading in the company's shares and the OTC Markets Group identified DECN as a Caveat Emptor stock and affixed the Skull and Crossbones image to its web page. Our argument is that after such warnings, press releases or other statements attributed to Mr. Berman could not have had a material impact on an investor who purchased DECN stock after the issuance of such warnings.

In a prosecution for fraud, the Government must prove that the alleged representations were material. *Neder v. United States*, 527 U.S. 1, 24-25 (1999). A statement is material if the alleged

misinformation or omission has a natural tendency to, or is capable of, leading a reasonable person to alter his or her conduct. *United States v. Rybicki*, 354 F.3d 124, 145 (2d Cir. 2003 (en banc) The crux of our motion is that no reasonable investor, in light of the warnings from the SEC about the unreliability of statements from DECN and the resulting suspension of trading, plus the Buyer Beware and universal symbol of danger warnings, could regard any DECN statements of Mr. Berman's as material.

None of the cases cited by the Government is to the contrary. *United States v. Weaver*, 860 F3d 90, 96 (2d Cir. 2017), demonstrates once again the Government's penchant for selectively quoting from the decisions its cites, eliding from its partial quotation what the prosecution of the case actually involved, which was the sale of worthless vending machines, and the defendant's claim that his victims had signed contracts disclaiming they had received false representations. The purchases of the vending machines are the "worthless investments" referred to in the Government's opposition. *Basic v. Levinson*, 485 U.S. 224, 234 (1988), is a civil case involving the "fraud on the market" theory in the context of the merger of two companies. In *United States v. Corsey*, 723 F3d 366 (2d Cir. 2013), the Government excavated a single footnote from the court's discussion of the sentence guidelines, only to find a restatement of materiality.

The balance of the Government's opposition is based on its familiar litany of disapproval of Mr. Berman's complaints about the SEC and warnings that defense counsel should not improperly harass trial witnesses in cross-examination—neither of which call for a substantive response.

In sum, because the "unreasonableness of a fraud victim in relying (or not) on a misrepresentation does not bear or a defendant's criminal intent…whereas, the materiality of the false statement does," United States v. Weaver, supra, at 95, the defense seeks to preclude evidence

that Mr. Berman made materially false statements after the SEC trading suspension and corresponding OTC Markets Group warnings which have been in place continuously for over fifteen months.

### VI. Motion to Preclude Expert Evidence

This motion was prompted by a reference in the Government's expert witness disclosure which suggested the witness would testify to the experience of individual investors. The specific language which provoked concern was that the expert witness "may testify about trading by specific shareholders, (including victims)," which would almost certainly be hearsay and give rise to confrontation issues.

The Government's opposition disclaims that its expert will describe individual investor experiences, and that his testimony will be "based on his review and analysis of brokerage account records and/or raw data reflecting trading in DECN securities, not out-of-court statements made by the specific shareholders themselves." (Govt. Opp. 22). The Government opposition contains the further assurance that its expert's testimony will not relate statements by out-of-court declarants." (Govt. Opp. 23). On the basis of these commitments from the Government as to the anticipated scope of its expert's testimony, there appears to be no need for pretrial preclusion of possible hearsay testimony.

### VII. Motion for a Bill of Particulars

The Government's opposition predictably gives the cold shoulder to the defense request for particulars. As the motion indicated, the Indictment's allegation that Mr. Berman "divert[ed] the proceeds of the scheme for his personal use and benefit," when combined with an absence of

16

any allegation that he ever sold a share of DECN stock during the period of the fraud was of particular concern. (Def. Motion at 25). In light of the Government's failure to provide particulars as to this allegation, the defense is compelled to file a motion challenging the wire fraud count on the ground that the statute "prohibits only deceptive schemes to deprive the victim of money or property," *Kelly v. United States*, 140 S. Ct. 1565 (2020), and "only a scheme to defraud money or property from the victim of the fraud" is actionable under the wire and mail fraud statutes. *United States v. Walters*, 997 F.3d 1219 (7th Cir. 1993).

Dated: August 17, 2021

Respectfully submitted,

*/s/ Walter P. Loughlin*

Walter P. Loughlin, Esq. (D.C. Bar No.NY0433)
340 West 57th Street
Suite 5D
New York, NY 10019
Tel. (203) 216-3445

Ronald S. Herzog, Esq.
Goldberg Segalla LLP
50 Main Street
Suite 425
White Plains, NY 10606
Tel. (914) 798-5419

*Counsel for Defendant Keith Berman*