Exhibit A

```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,        :
                                 :          Docket No. CR 20-278
                                 :
            vs.                  :          Washington, D.C.
                                 :        Friday, July 30, 2021
KEITH BERMAN,                    :             10:00 a.m.
                                 :
               Defendant.        :
-----------------------------x




              TRANSCRIPT OF VIDEO STATUS CONFERENCE
            BEFORE THE HONORABLE TREVOR N. MCFADDEN
                  UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:      JUSTIN D. WEITZ, Esquire
                         VIJAY SHANKER, Esquire
                         United States Department of Justice
                         1400 New York Ave., NW
                         Washington, DC  20530


For the Defendant:       RONALD HERZOG, Esquire
                         WALTER LOUGHLIN, Esquire
                         340 West 57th Street
                         Suite 5d
                         New York, New York  10019


Court Reporter:          CRYSTAL M. PILGRIM, FCRR, RMR
                         Official Court Reporter
                         United States District Court
                         District of Columbia
                         333 Constitution Avenue, NW
                         Washington, DC  20001
```

```
 1                         P-R-O-C-E-E-D-I-N-G-S

 2            THE DEPUTY CLERK:  This is criminal case 20-278,

 3  United States of America versus Keith Berman.

 4      Counsel please introduce yourselves for the record,

 5  starting with the government.

 6            MR. WEITZ:  Yes, good morning, Your Honor.  Justin

 7  Weitz and Vijay Shanker on behalf of the United States.

 8            THE COURT:  Good morning, gentlemen.

 9            MR. SHANKER:  Good morning.

10            MR. LOUGHLIN:  Walter Loughlin and Robert Herzog for

11  the defendant, Keith Berman.

12            THE COURT:  Good morning, gentlemen, and good

13  morning, Mr. Berman.

14            THE DEFENDANT:  Good morning.

15            MR. HERZOG:  Ronald Herzog for the defendant.

16            THE COURT:  Good morning, Mr. Herzog.  I've got a

17  couple of things I want to deal with this morning.  First, I

18  want to address the defense notice for motion for discovery or

19  relief relating to an apparent grand jury subpoena of one of

20  the attorney's telephone logs.

21      As I understand it, there's no evidence that the

22  government got content from any of the telephone

23  communications, just the total logs that would show when and to

24  whom the attorney's phone communicated.

25      I guess an initial question for the defense is,
```

1  Mr. Loughlin, can you tell from the discovery when the subpoena

2  went out?  In other words, I'm trying to understand if this was

3  before or after the superseding indictment?

4          MR. LOUGHLIN:  Well, we don't really have -- we're in

5  the dark really about that.  I think it's possible that looking

6  at the logs one might be able to tell the earliest and the

7  latest calls that were logged, but I don't have that

8  information.  In fact, I was going to suggest even though we

9  didn't put this in our request for relief, that it would be

10 useful if the government would provide us or if the Court would

11 instruct the government to provide us with a subpoena.

12 Subpoena isn't such a grand jury secrecy.  It was served on a

13 third-party custodian of records and then we would know exactly

14 what the government -- when it was issued and what it sought in

15 terms of the scope.

16     But what we're certainly talking about here is even if no

17 content was intercepted, the notion that prosecutors would seek

18 to find out who defense counsel is speaking to:  Both incoming

19 calls, outgoing calls; text and data usage; the length of a

20 call; the sequence of calls; when Mr. Herzog and Mr. Berman had

21 telephone calls and who each of them, you know, at least who

22 Mr. Herzog might have called afterwards.

23     We don't know if the government has similar information

24 about Mr. Berman's telephone calls.  I haven't seen that in any

25 discovery.  We do know from the government's response that this

1  discovery was sent to us after the superseder was returned, but

2  we don't know the beginning -- we don't know when the subpoena

3  issued, for what it sought.  As I say, for what period of time.

4         MR. HERZOG:  Your Honor, we do know from the Verizon

5  records that at least part of the subpoena was complied with

6  apparently on March 5th and we got the Verizon records that

7  specifically identified the last four digits  both my office

8  direct dial and my cell phone, on May 28th when that

9  information as well as other information was provided to us as

10 part of the government's ongoing discovery.

11        THE COURT:  Sorry, Mr. Herzog, what did you say

12 regarding May 28th?

13        MR. HERZOG:  The Verizon records were provided to us

14 under a FedEx delivery that was sent out on May 28th.  There

15 were two thumb drives that contained significant amounts of

16 information; included in that was the following description.

17 Subpoena return from Verizon containing subscriber and call

18 detail records for numbers X5419 and X7843; 5419, Your Honor,

19 are the last four digits of my direct dial number in the

20 office, 7843 are the last four digits of my cell phone.  Both

21 numbers are provided on my signature block and emails.  So

22 anyone who looked or requested those knew specifically that

23 those were my phone numbers.

24        THE COURT:  So I -- just let me tell you how I

25 understand things and I don't know if you're taking the lead on

1  this, Mr. Loughlin.  But my understanding is the burden is on

2  you to show there's irregularity in the grand jury subpoena

3  process.  I think there's a presumption of regularity that you

4  have the burden to shift.

5      What I'm hearing from you is that there's no evidence that

6  any subpoenas went out after the second superseding, or the

7  superseding indictment. What I'm hearing is you have evidence

8  that there was subpoenaed information that was at least

9  collected and quite possibly sought between the time of the

10 original indictment and the superseding indictment.

11     Tell me if I'm misunderstanding any of that.

12         MR. LOUGHLIN:  I'm saying I don't know.  I don't

13 know, you know, what the -- when the indictment issued.  I mean

14 when the subpoena issued in relation to the superseding

15 indictment, which I think was returned on, maybe, May 17th.

16 Justin, you probably have this at your finger tips; May 12th,

17 May 17th, some date.  And, you know, what we've sort of gleaned

18 from the somewhat opaque statements in the government's

19 opposition is that this seeking of this telephone record

20 information was part of perhaps the obstruction investigation

21 that resulted in one of the new counts and was added in the

22 superseder, although it relates only to activity that occurred

23 in the summer of 2020.  So as I said, we're in the dark.

24     It may be that it, you know, by fly specking the material

25 that was contained in the drives that we could piece together

1   the scope of the subpoena, but we don't know that.

2           THE COURT:  Well, I think it sounds like what

3   Mr. Herzog is saying is that compliance was completed on March

4   5th, which makes it a physical impossibility that there was --

5   that the subpoena went out after the superseding indictment.  I

6   hear you when you say you don't know and you don't know what

7   you don't know.  This is your opportunity to convince me that

8   that is enough to show there was something, there's

9   irregularity with the grand jury process.

10          MR. LOUGHLIN:  Well, it is difficult to overcome a

11  presumption of regularity when you don't have any information.

12  I would say, as I said in our motion, it's res ipsa loquitor.

13  I've been doing this work as a prosecutor or defense lawyer for

14  40 years.  I've never, never encountered a situation in which

15  the prosecutors have sought this kind of information so they

16  can track what a defense lawyer is doing in terms of who he's

17  calling and who's calling him, who's texting him and who he's

18  texting.  It's unprecedented, as far as I'm concerned.

19          THE DEFENDANT:  Emails.

20          MR. LOUGHLIN:  And certainly the government hasn't

21  pointed to any case in which this has ever been brought before

22  a court.  This may be novel.  I think overcoming the

23  presumption is almost definitionally simply describing what

24  occurred here.

25          THE COURT:  Okay.  Mr. Weitz, are you speaking for

1  the government?

2          MR. WEITZ:  Yes, Your Honor.

3          THE COURT:  I'll hear from you.

4          MR. WEITZ:  Yes.  I mean, Your Honor, there's no --

5  there's simply nothing in the record to overcome the

6  presumption.  The government would be perfectly comfortable

7  explaining to Your Honor ex parte and in camera the reasons why

8  we issued the subpoena and its relation to the broader

9  investigation.  But as Your Honor indicated, it was issued well

10  prior to the superseding indictment.  It was turned over in the

11  discovery following the superseding indictment.  But none of

12  the conduct or none of the material obtained by the grand jury

13  postdated anything to do with the superseding indictment.

14      I'd also just add for the record, without getting into too

15  much of the matters occurring before the grand jury, the period

16  -- the very limited period of phone records we obtained, it was

17  about a two-month period, was based on a very specific lead

18  that we were following.  This wasn't an attempt -- we've never,

19  we've never attempted to get anybody conflicted off this case.

20  We've never done anything like that.  We wouldn't do anything

21  like that improperly.  But there was a specific allegation of

22  potential criminal activity that we felt obligated to follow up

23  on.

24          THE COURT:  Do you want to put on the record -- you

25  said there's a two-month period.  Do you want to put some dates

1  on the record here?

2         MR. WEITZ:  Yes.  I believe the subpoena covers the

3  period from December 1st, 2020, to the date of this subpoena,

4  which the subpoena is dated February 23rd, 2021.  It's about

5  two and a half months.

6         THE DEFENDANT:  Emails.

7         THE COURT:  Okay, and then, Mr. Weitz, ultimately

8  this is your record on appeal.  Do you want to approach ex

9  parte?

10         MR. WEITZ:  I would actually defer to my co-counsel

11  as to whether he thinks that's something that we should be

12  doing.

13         THE COURT:  That's wise, Mr. Shanker?

14         MR. SHANKER:  Your Honor, I think at this point it's

15  our position that the defense has not met its burden.  The

16  facts show, as we have them now, that these subpoenas were

17  obtained before the superseding indictment was issued and so

18  while we would be happy to go ex parte and in camera if Your

19  Honor would ask us to, I think at this point we're happy with

20  the record as it is and our position that the defense has not

21  met its burden.

22     But again, I understand it's our duty to create the

23  record.  Hopefully we would preserve our ability to go in

24  camera and ex parte if Your Honor requests that, but I think at

25  this point we are content to stand on the record as it is.

1          THE COURT:  All right.  Mr. Loughlin, I'll give you

2     the last word.

3          MR. LOUGHLIN:  I can tell you, Your Honor, that I

4     have been under considerable pressure from our client to file a

5     motion to dismiss the indictment because of the incursion into

6     the attorney-client privilege and impairment of his Sixth

7     Amendment rights.

8       I thought that we might get some more information.  We

9     ought not to do that until we had a resolution of this

10    particular motion.  And we have gotten a little more

11    information, especially with respect to the issuance of the

12    subpoena and the scope of it.  I don't really have anything

13    else to say except, you know, invoking a presumption of

14    regularity with respect to something that is highly irregular

15    and then repeating that the government has not, the defense has

16    not met its burden, you know, when we don't have much in the

17    way of facts until we've got a few little scraps of information

18    by virtue of Your Honor's help in trying to get that

19    information out into the open.

20          THE COURT:  Okay.

21          MR. LOUGHLIN:  So I think Mr. Herzog and Mr. Berman

22    and I will confer about what we've learned today and make a

23    decision.

24          THE COURT:  All right, well.  I do see you've already

25    filed a motion to dismiss on the civil counts of the

1  indictment, but I certainly understand you may wish to file a

2  new motion.

3      Before me is the defense motion for discovery that's ECF

4  number 24 relating to this apparent subpoena of toll records

5  for Mr. Herzog's phones.  As we've discussed and I've noted,

6  there is a strong presumption of regularity that attaches to

7  the grand jury process and I as a judge need to be careful

8  about peering behind that or second guessing what the grand

9  jury has done.

10     I think it's also clear from the case law that there's a

11 heavy burden on a party seeking to resist compliance with a

12 grand jury subpoena which is not quite the same thing as what

13 Mr. Berman is seeking here, but there is nonetheless a long

14 standing principle that the public has a right every man's

15 evidence except for those persons protected by a constitutional

16 common law or statutory privilege.  And that's particularly

17 applicable to the grand jury proceedings.  I'm looking to

18 *Branzburg v. Hayes*, 408 U.S. 665 page, 668, from 1972.  More

19 because of its investigatory function, it's necessary for the

20 grand jury to paint with quote/unquote a broad brush.  That's

21 from *United States v. R. Enterprises*, 498 U.S. 292, page 297,

22 from 1991.

23     I think there's two questions here.  One is whether there

24 was -- kind of the timing of the grand jury subpoena.  And

25 secondly, the content of the grand jury subpoena.  I'll deal

1  with the first issue.  First, the evidence before me is there

2  was a subpoena that was issued on or about February 23rd,

3  seeking toll records from December to February of this year for

4  a couple of Mr. Herzog's phones.  This would have been a time

5  after the initial indictment, but obviously before a subsequent

6  indictment.  And the subsequent indictment obviously sweeps in

7  allegedly obstructive conduct that the defendant engaged in in

8  the recent past.

9      I think the case law is clear in terms of timing that

10 while a grand jury subpoena is not to be used just to bolster

11 the government's case, the government can certainly investigate

12 subsequent misconduct or even prior misconduct that it is newly

13 aware of.  I'm pointing to *In re Grand Jury Subpoena*, 767 F.2d

14 26, page 29, from the Second Circuit in 1985,  which notes that

15 the United States may not use the grand jury for the sole or

16 dominant purpose of trial discovery in an already indicted

17 prosecution.  But the grand jury certainly is entitled to

18 continue a good faith inquiry into unindicted persons or

19 uncharged criminal activity even if that inquiry happens to

20 uncover further evidence against an already indicted defendant.

21 That last part is from *In re Grand Jury Proceedings*, 632 F.2d

22 1033, pages 1040 to 1041, out of the Third Circuit in 1981.

23     So I think that's the evidence I have at this point.  It

24 certainly suggests that that's what was going on here; that in

25 terms of the timing, the government was looking into potential

1  additional criminal misconduct that was not captured in the

2  original indictment.

3       The second question is I think a little closer issue.  I

4  agree with Mr. Loughlin.  Frankly, I have not seen many, if

5  any, instances of the government seeking to subpoena

6  information from or about a criminal defense attorney, and that

7  does raise concerns about the attorney-client privilege.

8       But it is also clear that not all communications between

9  an attorney and his client are privileged.  One of my

10 colleagues on this court has allowed grand jury subpoenas

11 actually to an attorney, a defense attorney, for fee and

12 billing information of a defense attorney.  I'm looking to *In

13 re Grand Jury Proceedings*, 201 F Supp. 2d, page 5 from 2001.

14 And there are a number of circuits that have reached similar

15 findings that at least fee and billing information is not

16 protected by the attorney-client privilege.  That's not what we

17 have here.

18      What we have are the toll logs from the attorney's phone

19 and to be clear, that information wouldn't show the content of

20 the conversations, the potentially privileged conversations.

21 It would show what numbers were in communication with the

22 attorneys's phone and for when and for how long.

23      This is not happening in a vacuum.  Obviously there is

24 evidence here that Mr. Herzog has communicated with and

25 potentially represented other individuals associated with the

1  defense and associated with this conduct.  I have already found

2  -- we've already discussed those things at length before.  The

3  defense has argued that there's no conflict there and I've

4  agreed the government has not disagreed.  But I think where you

5  have this kind of relatively unique fact pattern of the ongoing

6  obstructive conduct at least allegedly taking place combined

7  with a defense counsel who is regularly in contact with

8  individuals who may be part of that allegedly obstructive

9  conduct, it's not inappropriate for the government to obtain

10 this very limited information that again would not divulge the

11 content, but merely shed light on who's contacting the attorney

12 and the kind of -- the communication rings that may be going on

13 during this obstructive conduct.

14     I want to make clear that there's no allegation that the

15 defense attorney was doing anything wrong.  I'm not suggesting

16 that.  I don't think the government has suggested that.  But

17 merely in this rather unusual situation where there's

18 allegations of ongoing obstructive conduct and the unusual

19 situation of a defense attorney who is also communicating with

20 and potentially representing third parties that have relevant

21 information to this overall case, I don't think it's

22 inappropriate for the government to obtain this type of

23 information.  Especially given the burdens and the regularity

24 that attaches to the grand jury process. So for all of those

25 reasons I'm going to deny the defense motion.

1          MR. LOUGHLIN:  Can I just say one thing?  I'm sorry

2   Your Honor. Because you were focusing on the timing of the

3   issuance of the subpoena in relation to the obstruction count

4   that was included in the superseder.

5          The conduct, that is, the alleged obstruction in the

6   superseder, is obstruction of an SEC proceeding.  And the

7   conduct related to that is alleged to have occurred six or

8   seven months before the issuance of the subpoena.

9          THE DEFENDANT:  Emails.

10         THE COURT:  Okay, thank you, sir.

11         Obviously, the government is -- I think where there's

12   evidence of obstruction, I think the government is entitled to

13   try to find the metes and bounds of that, and that may well end

14   up encompassing a broader area of time frame than what the

15   government ends up alleging.

16         Anyway, I made my ruling, Mr. Loughlin.  Obviously if you

17   wish to file a motion to dismiss based on that, I can certainly

18   take that under advisement.

19         All right, as I think my clerk mentioned to the parties, I

20   unfortunately now have work travel the week of September 27th.

21   I know one defense counsel also has a personal engagement right

22   around that time.  I certainly don't want to entrench on that.

23   So with my apologies, I think we need to look to potentially

24   reschedule here.

25         I actually don't have in my notes -- how long are we

1    expecting this trial to last, Mr. Weitz?

2          MR. WEITZ:  Yes, Your Honor.  So we originally said

3    we expected the government's case in chief to take five or six

4    days.  But we sat down last week and counted through how long

5    we think all of our direct examinations will be.  We think our

6    total direct exam time is about 19 hours' worth of direct, so

7    let's say three trial dates.  Obviously that doesn't include

8    jury selection, opening and closing statements, crosses and any

9    defense case if there is one.

10      But I imagine the government's case in chief, just direct

11   will be three days.  The other stuff is up in the air, but I

12   think we could do this in a week or a week and a half max.

13          THE COURT:  Mr. Loughlin, I know it's a little harder

14   to anticipate what the defense case is going to look like, but

15   do you have a ballpark?

16          MR. LOUGHLIN:  Well, Your Honor, I mean both sides

17   have experts and we would expect to have several fact

18   witnesses.  And the difficulty also with the case is that the

19   spinal column of the prosecution are all these press releases

20   which the government alleges contain false and misleading

21   information, and we think that that's not true.  So an awful

22   lot of the case is going to be very detailed examination of

23   multipage documents.  And I don't know how many press releases

24   the government is going to focus on, but I think there's at

25   least nine or ten referred to in the indictment.

1          THE COURT:  Okay, so from what I'm hearing from

2   you-all, I think we've got a solid week of trial.

3          MR. HERZOG:  Respectfully, Your Honor.  I think it's

4   more than that knowing if there are 19 hours of direct from the

5   government, we're obviously going to have cross.  My

6   understanding is that at least one of these witnesses needs an

7   interpreter.  And I think we've all been down that road and

8   know how long that protracts in that.  It seems more than

9   double.  I don't know if the government's 18 or 19 hours takes

10  into account the need for that interpreter, and then there's

11  the defense case.

12         THE COURT:  Okay.

13         MR. LOUGHLIN:  Obviously Mr. Fenton is not on the

14  call.  But I do recall seeing an email that he sent to Michelle

15  back at the end of April when we had the status conference

16  about the superseder and that email refers to a two-week trial,

17  including both cases.  Obviously Justin says that they're

18  circumscribing the scope of the government's case, but I'm a

19  little skeptical; but, you know, when Mr. Fenton says it's a

20  two-week trial and now we're talking about six days, maybe.

21         THE COURT:  Okay, thanks.

22     So I asked Ms. Chaclan to pull up -- an added complication

23  at least at this point, we're expecting that we need to use the

24  ceremonial courtroom for voir dire so that we can do a certain

25  amount of social distancing.

1      I was going to suggest December 6th.  Before I ask the

2  parties, let me ask Ms. Chaclan if that's even available for

3  the ceremonial courtroom.

4          MR. WEITZ:  I'm sorry, Your Honor, what was that

5  date?

6          THE COURT:  December 6th, but I need to -- that may

7  not even be available.  But I'm thinking you-all take a look at

8  your calendars; I'm thinking that block right around there,

9  basically pre-Christmas block, is about the first time I have

10 at least a week and a half free.

11         MR. LOUGHLIN:  We could call this the Advent.

12         MR. WEITZ:  Sorry, go ahead.

13         THE COURT:  Mr. Weitz, are you not available then?

14         MR. WEITZ:  I mean, I'll be in; I'm scheduled to be

15 in trial in California then.  We had wondered whether November

16 8th is possible.  I think that works for both parties.

17         THE COURT:  Yes, well I looked at that.  This is

18 where Mr. Herzog's point comes in.  I'm free that week, but

19 I've got another trial that is suppose to start, but it's a

20 civil trial.  I guess we could trail that.

21         MR. HERZOG:  Well, Your Honor, that appears to be a

22 four-day week.

23         THE COURT:  Yes, right, I know.

24         MR. HERZOG:  I don't think we're going to have a

25 couple of happy jurors if they're off Thursday and have to come

1  back Friday, but it is a four-day week, Your Honor.

2          THE COURT:  Well, yes, not ideal, but I do want --

3  well I can do either.  Is the defense preference for the

4  December time?

5          THE DEFENDANT:  Yes.

6          MR. LOUGHLIN:  Yes, please.

7          THE COURT:  All right, give me a second.

8      What were you saying, Mr. Weitz?  You're in trial in

9  December?

10          MR. WEITZ:  I'm in trial in California in December.

11  I mean, if there's no way to make the 8th work, November 8th

12  work -- as soon as I got an email from Ms. Chaclan that that

13  date works for them so we assume -- so we assumed it did as

14  well.  Assuming with the four-day week -- assuming that we'd be

15  able to go into the next week a little bit.  Aside from the one

16  witness who needs an interpreter, I think our case is going to

17  move very quickly.  But one other option I will just throw out,

18  Your Honor, if we want to save some time is we could pick a

19  jury the week before potentially, then the jurors will have the

20  certainty of kind of knowing what their schedule is.

21          THE COURT:  Yes, actually Friday, November 5th --

22  just looking at that ceremonial courtroom it looks like it's

23  open on Friday, November 5th.  We could potentially pick a jury

24  then and then have -- I think as Mr. Herzog is suggesting,

25  probably only four days the following week.  My preference

1  would be to try to do that.  Does that work for the defense?

2            THE DEFENDANT:  No.

3            MR. LOUGHLIN:  I think we may have to confer and get

4  back to Michelle about this.

5            THE COURT:  Okay, that's fine.  Let me just say

6  obviously we're dealing with a number of people's schedules, so

7  I want to be cognizant of that.  The courts here are going to

8  have very busy trials and schedules for the foreseeable future.

9  So I don't have a whole lot of availability.  If Mr. Weitz is

10  in trial elsewhere that's in December, it doesn't sound like

11  December is an option.

12      So if the defense wants a trial as soon as possible, I

13  want to try to make that happen and I think November 5th is

14  that time.  But if that doesn't work for you all, I'm open to

15  looking later, but it sounds like it would be in the new year.

16      Why don't I just ask you all to talk together with

17  Ms. Chaclan offline and we can reschedule the trial by a minute

18  order here once the parties have had a chance to talk and we

19  can double check the calendar.

20      Anything else we should be dealing with today, Mr. Weitz?

21            MR. WEITZ:  Nothing from the government, Your Honor.

22            THE COURT:  Okay.  Mr. Loughlin?

23            MR. LOUGHLIN:  Nothing from the defense, Your Honor,

24  except that I'm wondering whether we land in November or some

25  other date, whether some of those interim deadlines might move?

1          THE COURT:  I'm certainly open to that.  If you-all

2  -- particularly if you-all can agree on a new timeline.

3  Obviously motion hearings, you have to check with Ms. Chaclan

4  on that, but if there's agreement between the parties on moving

5  the interim dates, I'm certainly happy to be flexible on that.

6          MR. LOUGHLIN:  Thank you, Your Honor.

7          THE COURT:  Thanks, folks.  Please let's try to do

8  this certainly within the next week.  You've got Ms. Chaclan's

9  contact information and she has access to my calendar, and I'll

10  make sure she has access to the calendar from the ceremonial

11  courtroom, and we can go from there.

12      Have a good weekend, folks.

13          MR. WEITZ:  Thank you, Your Honor.

14          MR. LOUGHLIN:  Thank you.

15          (Video conference adjourned 10:40 a.m.)

16                          -oOo-

17

18

19

20

21

22

23

24

25

```
 1                         CERTIFICATE

 2       I, Crystal M. Pilgrim, Official Court Reporter, certify

 3   that the foregoing is a true and accurate transcript, to the

 4   best of my ability, of the proceedings remotely reported in the

 5   above-entitled matter.

 6       **Please Note:** This hearing occurred during the COVID-19

 7   pandemic and is, therefore, subject to the technological

 8   limitations of court reporting remotely.

 9

10   _____    _____

11   /s/Crystal M. Pilgrim, FCRR, RMR    Date:  August 26, 2021

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```