UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------X

UNITED STATES OF AMERICA,

        Plaintiff,

                                                                                                 1:20-cr-00278  TNM

    -v-

KEITH BERMAN,

        Defendant.

-------------------------------------------------------X

### DEFENDANT'S SECOND MOTION IN LIMINE

By letter dated October 7, 2021, the Government notified defense counsel of its intention to offer evidence at trial "relating to impermissible contact" that Mr. Berman had with a "victim and potential witness," whom he had also told that he had "attempted to convince The Bio to retract [a] March 2020 communication" about the feasibility of developing a blood-based test for COVID-19. The Government contends this evidence is admissible because it is either (1) evidence of the "offenses and scheme charged," or (2) evidence of Mr. Berman's state of mind pursuant to Federal Rule of Evidence 404(b).

Following receipt of the letter, defense counsel was advised by the Government that the proposed evidence consists of communications between Mr. Berman and Michael Triglia, a long-time DECN shareholder who works as a nurse anesthetist at a hospital in South Carolina. It was Mr. Berman's communications with Mr. Triglia and another person, Shelly Breton, a DECN shareholder and beta tester of DECN's saliva-based test, that formed the principal part of the Government's opposition to Mr. Berman's prior bail modification motion. In that opposition, the

Government argued, as it does again now, that Mr. Berman's communications with Mr. Triglia violated the bail condition that he refrain from communicating with individual shareholders.

True to form, the Government is exaggerating, both factually and legally, the admissibility of this purported evidence of uncharged alleged bad acts. This case ought to proceed with a focus on the charged offenses rather than risking juror confusion and undue delay by the introduction of evidence on collateral issues that could spark mini-trials on these extraneous issues and that will require repetitious limiting instructions—with respect both to the issues that have given rise to this motion as well as the other evidence of uncharged alleged bad conduct that are the subjects of a previously submitted defense motion in limine.

Factual Background

First, as the Government well knows, it is affirmatively misleading to refer to Mr. Triglia as a victim of the alleged securities and wire fraud charged in the Indictment. This is because on April 25, 2021—eight months ago—Mr. Triglia sent an email to Government counsel, produced in discovery to the defense, in which he denied being a victim. Specifically, Mr. Triglia stated in the email that he had been interviewed three times by a postal inspector assigned to this case and in those interviews: "I was always completely transparent and stressed that I believe in the product and Mr. Berman and I have never considered myself a victim."

Mr. Triglia also advised Government counsel: "I was never a victim but actually felt I was fortunate to be a part of something great if the product made it." He further described himself "as an investor and ultimately an[ ] advocate and usher, so to speak, for the success of a product that I have always believed in." Finally, Mr. Triglia's letter also explained that after "he stumbled upon the ticker symbol DECN," he was attracted to the development of the COVID-19 test because of

his own experience in treating patients in the intensive care units at his hospital who had been stricken by the virus. (Ex. A)

These are not the words of a man who is a victim of a fraud or who was discouraged from cooperating with the Government. He has, after all, been questioned three times in connection with this matter. Indeed, the Government's persistent characterization of Mr. Triglia as a victim appears to be based on the dubious theory that any DECN shareholder—regardless of his or her sophistication, experience as an investor or attitude toward DECN—is a possible target of Mr. Berman's predations.

Turning to the issue of the claim of Mr. Berman being engaged in communications in violation of the bail condition that he refrain from individual communications with DECN shareholders, the defense is prepared to submit to the Court, for in camera review, hundreds of pages of Mr. Berman's communications on an internet-based platform with multiple investors, including Mr. Triglia and Ms. Breton, that are compliant with the bail condition. These conversations range across many subjects, including Mr. Triglia's health, his children and their college plans, the real estate market, the 2020 presidential election, the death of Mr. Berman's cat, and the quality of Chinese food at a restaurant in New Jersey. One cannot read these messages without inferring that the two men are friendly. Some conversations also include references to this case and Mr. Berman's defense. Hence, they ought not to be available for perusal by the Government.

To be sure, once Mr. Triglia took on the role of DECN's liaison with the XPrize competition, he had individual communications with persons associated with DECN about its application and the steps to be taken in the competition, including Mr. Berman. This was a months-long competition with 700 contestants submitting COVID tests and vying for a $5 million prize

aimed at incentivizing innovation. Out of 700 contestants, DECN made the semi-finals after 500 other contestants were eliminated. (EX. B)

Next, the Government's notice letter contends that Mr. Berman discussed with Mr. Triglia his cooperation with the Government investigation and at some later point said something to Mr. Triglia to the effect that Mr. Berman wanted The BIO to retract an unspecified March 2020 email. The implication is that Mr. Berman sought improperly to influence a witness and evidence.

We saw the first allegation in connection with the bail modification motion. There, as here, the Government objects to Mr. Berman having suggested to Mr. Triglia that he might consider conferring with counsel about submitting, for a third time, to questioning by the postal inspector. This comment had neither the purpose nor the effect of discouraging Mr. Triglia from being, as he stated in his email, "completely transparent" in the three interviews and "neutral with regard to the case against" Mr. Berman.

Indeed, the Government's determination to offer this comment into evidence gives rise to the question whether it preferred to take advantage of a layman without access to counsel. Further, if this evidence is nevertheless admitted, we will be compelled to call Mr. Triglia as a defense witness so he can debunk the Government's theory that he is a fraud victim who was discouraged from agreeing to a third round of questioning on account of Mr. Berman's anodyne comment about the value of lawyerly advice.

Finally, the Government suggests that Mr. Berman interfered with The Bio because he told Mr. Triglia he wanted The Bio to retract a March 2020 email questioning the feasibility of the COVID-19 test. Assuming, arguendo, that Mr. Berman made such a comment to Mr. Triglia, the Government's letter notably fails to refer to any evidence that Mr. Berman ever sought such a retraction.

What is known is that, during the same period, The BIO told Mr. Berman that a test to detect the virus in blood or saliva was "theoretically possible" and sent him a scientific white paper supporting this conclusion. (Ind. par. 16-17) The Bio outlined a plan for the development of the test, set forth in two power point slide decks dated March 3, 2020. These documents describe the product being designed as involving a "finger prick of blood," able to produce a result "in 15 seconds, or less," with an "expected sample production and test schedules" for the stages of product development—including anticipated performance testing to occur 6-8 weeks later. (Ex. C) This does not exclude the possibility that there may have been an email from The Bio with which Mr. Berman was unhappy. But in view of the fact that both DECN and The BIO were on the same page during the beginning of March—and in the absence of evidence of Mr. Berman pressuring someone at The Bio to retract an email—it is difficult to understand how any evidence of Mr. Berman's comment to Mr. Triglia is relevant to any issue in this case.

The Legal Standards

In briefing of other motions in this case, the defense has described the treatment of case citations by the Government as focusing on particular quotations it regards as helpful but lacking fidelity to what the court actually decided. The cases set forth in the Government's letter are a particularly impressive illustration of the Government's continuing misuse of precedent.

The Government relies on five cases to support the admissibility of the alleged uncharged acts set forth in the letter and challenged by the defense in this motion. Three of them are RICO cases, particularly RICO conspiracies, where the use of uncharged conduct was admitted "to prove the nature of the conspiracy and the purpose of the [RICO] enterprise." *United States v. Machado-Erazo*, 901 F. 3d 326 (D.C. Cir. 2018). Additionally, the Court identified some of the challenged evidence in this case as being charged as overt acts in the indictment, a further justification for

5

admission of the evidence. *Id*. at 331. The Court also referred to "the considerable leeway" allowed for such evidence in "conspiracy prosecutions…to inform the jury of the background of the conspiracy charged." *Id*. at 355-57 (quoting *United States v. Mathis*, 216 F.3d 18, 26 (D. D. Cir. 2000) and *United States v. Williams*, 205 F. 3d 23, 33-34 (2d Cir. 2000)).

Another case cited by the Government, *United States v. Perholz*, 842 F.2d 343 (D. C. Cir. 1988), is to the same effect. In that RICO case, the Court approved the admission of other act evidence, over a defense objection on Rule 404(b) and Rule 403 grounds, because the evidence was the statement of a co-conspirator in furtherance of the conspiracy; it was also admitted as relevant to proving the defendant's "role in the conspiracy," including his "particular relationship to the conspiracy and to other conspirators." *Id*. at 355-57.

The rationales supporting the admission of uncharged conduct in these cases are inapplicable to the present prosecution where no conspiracy or racketeering is charged in the Indictment.

In the third RICO case, *United States v. Gatto*, 995 F.2d 449 (3d Cir. 1993), the district court permitted a witness to testify that he had been intimidated, both before and during an organized crime trial by members of the Genovese crime family in order pressure him to give testimony favorable to the defense. He also admitted to being bribed for this testimony. The Court held the witness's testimony was relevant to credibility and consciousness of guilt. It is difficult to believe the Government is likening the communications between Mr. Berman and Mr. Triglia to the mafia misconduct in *Gatto*.

What the Government's very brief reference in its letter to this case omits is the care the Court took to draw a distinction between admissible evidence of threats and intimidation and others which "will have little tendency to demonstrate consciousness of guilt" and "may frequently

be excludable under Rule 403." *Id*. 995 F.2d at 456-57. The communications between Mr. Berman and Mr. Triglia have so little to do with the concept of consciousness of guilt that they ought not be admissible on that or any ground.

The final two cases cited by the Government provide it no support. *United States v. Lieu*, 963 F.3d 122(D.C. Cir 2020), involved a charge of child pornography and interstate travel for the purpose of having illicit sex with a nine year old child. While preparing the case, the Government discovered that the defendant had wrongfully touched his own daughter, and caused her to touch him sexually when she was a child between six and ten years of age. The defendant objected to her testimony on the ground that it was prejudicial evidence of other crimes. While the Court addressed that claim on the merits, the evidence was admissible under Rule 414(a) which states: "In a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed other child molestation." Because this Rule of Evidence explicitly authorizes the admission other uncharged offenses, it has nothing to do with the question of the admissibility of the evidence the Government refers to in its letter on the grounds on which it seeks its admission.

Finally, *United States v. Miller*, 895 F.2d 1431 (D.C Cir. 1990), involved a bank fraud prosecution where the Government elicited testimony from two witnesses that they feared the defendant because they knew he had a criminal record and had been previously incarcerated. The defendant objected to the admission of evidence that he had committed other crimes. The Court approved the admission of the testimony of a bank teller who had assisted the defendant so that she could explain why she had been afraid not to do so.

However, the Court held that permitting similar testimony from the second witness was erroneous pursuant to both Rule 404(b) and Rule 403. Indeed, the Court stated that: "[W]e are at

7

a loss to connect" the witness's awareness of the defendant's criminal record" with any "material issue in the case." On Rule 403, the Court, using language equally applicable to the evidence cited in the Government's letter, stated: "The probative value of the [the second witness's] testimony was infinitesimal." *Id*. at 1438. The Court ultimately concluded this error was harmless.

Conclusion

As the foregoing shows, the evidence described by the Government in its letter is wildly overstated. The cases it relies on to support the admission of the evidence are either inapt or supportive of the defense challenge to the admissibility of the evidence. In the interest of brevity, the defense incorporates by reference the points and authorities set forth in our previously filed motion in limine for the affirmative case why the interplay of Rules 404(b) and 403 render evidence of uncharged conduct inadmissible at trial.

Respectfully submitted,

/s/ Walter P. Loughlin
Walter P. Loughlin, Esq.
340 West 57th Street
Suite 5D
New York, New York 10009
Tel. (203) 216-3445

Ronald S. Herzog, Esq.
Goldberg Segalla LLP
50 Main Street, Suite 425
White Plains, New York 10606
Tel. (914) 798-5419

Counsel for Defendant Keith Berman