UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------X

UNITED STATES OF AMERICA,

        Plaintiff,

    -v-                                      1:20-cr-00278  TNM

KEITH BERMAN,

        Defendant.

------------------------------------------------------X

**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Defendant Keith Berman, by and through undersigned counsel, respectfully submits this motion to suppress all evidence obtained, and all evidence derived from, the April 17, 2020 interview of Mr. Berman by FBI personnel. The interview took place in Mr. Berman's office at Decision Diagnostics Corporation ("DECN") in West Lake Village, California. The FBI surreptitiously tape recorded the interview in violation of California Penal Code Section 632 which requires all parties to a conversation to consent to its recording. Violation of this provision is punishable by imprisonment and a fine.

**The California Law**

The Constitution of the State of California defines the right to privacy as an inalienable right. It provides, at Article I, Section 1: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Ten other

states also have constitutional rights to privacy: Alaska, Arizona, Florida, Hawaii, Illinois, Louisiana, Montana, New Hampshire, South Carolina, and Washington.

Consistent with the right of privacy conferred on Californians by their Constitution, in 1967 the California Legislature enacted the Invasion of Privacy Act codified in its Penal Code at Section 630-638.55. This was a year before Congress passed Title III of the Omnibus Crime Control and Safe Streets Act of 1968, codified at 18 U.S.C. Sections 2510-2520.

The preamble to the California statue includes the following language: "The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society. The Legislature by this chapter intends to protect the right of privacy of the people of this state."

This calls to mind the words of a great judge of this Court, Judge Gerhard Gesell, who presciently wrote, years before Title III or Section 632 became law, of the "insidious" dangers posed by the interception of communications: "We are becoming a society that must exist in constant hazard from official snooping. Whatever incidental good flows from this invasion of privacy is submerged by the growing appearance of police surveillance so typical of totalitarian states." *United States v. Kline*, 366 F. Supp. 994, 996-97 (D.D.C. 1977).

Section 632(a) of the California Penal Code provides: "A person who, intentionally, and without the consent of all parties to a confidential communication, uses a…recording device to…record the confidential communication…shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500), per violation, or imprisonment in a county jail not

exceeding one year, or in the state prison, or by both that fine and imprisonment." This is precisely what the FBI did—intentionally recording Mr. Berman's statements without his consent.

Section 632(d) requires the suppression of any evidence obtained in violation of Section 632(a): "evidence obtained as a result of eavesdropping upon or recording a confidential communication in violation of this Section is not admissible in any judicial, administrative, legislative, or other proceeding." Section 633 sets forth a law enforcement exception. By its terms, it applies solely to California state prosecutors and California state law enforcement personnel.

Section 632(c) defines a confidential communication as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." It excludes communications that occur in a public place where it would be unreasonable to expect the conversation not to be overheard.

**The FBI Interview**

The circumstances of the interview show that it was reasonable for Mr. Berman to believe the communications between him and the agents were confined to the three persons participating in that communication.

The transcript of the taped interview indicates that the recording device was activated before the FBI entered DECN's office. The two FBI personnel and Mr. Berman spoke in his office with the door closed. The transcript further shows that the recording device was only turned off after the FBI personnel had exited DECN's offices. Because the recording was done surreptitiously, Mr. Berman had no reason to believe he was being secretly taped. The circumstances did not alert him to this possibility. It is undisputed that Mr. Berman was not asked

if he consented to being tape recorded. The issue of consent never arose because the tape recording was done in a clandestine manner.

The FBI agent who conducted the interview, apparently seeking to put Mr. Berman at ease, described the unannounced visit as just a "chat" for "a couple of minutes." Along the same lines, upon her arrival at DECN's offices, the agent declared that the interview would be a "fun, enjoyable time." Mr. Berman called his counsel so he would be represented during this surprise encounter with the FBI. He was not able to reach his lawyer—which likely was part of the FBI's plan. Had the interview been scheduled in advance, rather than sprung on him, Mr. Berman would have been able to arrange for his counsel to participate.

During the interview, the agent told Mr. Berman how she was "super pumped about COVID products," but whenever he began to describe how the tests worked, she appeared to resist—twice telling him that she did not know "anything about science," and three times that she just wasn't "science-y." After having falsely described the questioning as a "chat" for a "couple of minutes," the interview lasted just over an hour.

Although not charged with any crime arising from the interview, the Indictment alleges, and the Government intends to offer into evidence, two allegedly false statements attributed to Mr. Berman in the covertly taped interview. They are set forth in paragraphs 48 and 64 of the Indictment and allege that Mr. Berman falsely denied involvement in message boards and the letters sent to the SEC.

**Neither 18 U.S.C. Section 2511 Nor the Supremacy Clause Preempt Section 632**

On November 19, 2021, when defense counsel first raised this issue with the Court, the Government responded by invoking 18 U.S.C. Code Section 2511, suggesting that it permitted the FBI to tape the interview of Mr. Berman in disregard of the governing law in the jurisdiction where

the interview took place. However, by its terms, Section 2511 does not authorize federal agents to ignore applicable state law. In the main, like other sections of the federal criminal code, Section 2511 defines prohibited conduct and the punishments for engaging in the unlawful interception of oral, wire, or electronic communications.

Section 2511 has a law enforcement exception but that only protects an FBI agent, or other "person acting under color of law," from violating Title III. Specifically, it provides: "It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral or electronic communication where such person is a party to the communication or one of the parties to the communication has given prior consent to interception." Of course, the only persons who consented to tape recording Mr. Berman were the agents doing the taping.

The key language here is "it shall not be unlawful under this chapter." Consequently, Congress chose a narrow law enforcement exception only to the offenses defined in Title III. The FBI agents apparently acted in conformity with Section 2511. But there is no language in section 2511 or elsewhere in Title III that evidences a congressional intent to authorize federal agents to act in violation of California law when intercepting an oral communication in that state. In short, this provision protects the FBI agents from violations of Title III when they abide by it—but it does not immunize them from the consequences of violating the California Penal Code.

Even the Department of Justice agrees that federal agents must abide by state laws that are more protective of privacy than Title III. As DOJ's Bureau of Justice Assistance has written, in connection with the interplay of Title III and state law: "Title III preempt[s] all state law to the extent that no state may allow access to wire, oral, or electronic communication with less justification than required by federal law. Thus, the federal law establishes the minimum privacy protections for all wire, oral, and electronic communications that no state may relax. However,

states may impose greater requirements than those required by federal law…[Some] states may require all parties to a communication to consent to a recording of it, where the federal law requires only one party to consent. Individual state law should be consulted to determine whether [the] interception of communications is authorized, and if so, what standards should be applied." http://bja.ojp.gov/programs/it/privacy-civil-liberties/statutes/1284.

In other words, Title III establishes the floor but not the ceiling of privacy protections. This stems from the congressional purpose of Title III, which was enacted in direct response to two 1967 Supreme Court decisions in which the Court held that the Fourth Amendment protection against unreasonable searches and seizures extends to the interception of communications where an individual has a reasonable expectation of privacy. *Berger v. New York*, 388 U.S. 41 (1967); *United States v. Katz*, 389 U.S. 347 (1967). Thus understood, Title III sets forth what is constitutionally required to protect privacy rights—but state legislatures can exceed that constitutional minimum.

**The Supremacy Clause and the Doctrine of Federal Preemption**

Also on November 19, the Court responded to this issue by making reference to the Supremacy Clause. While preemption may not have been specifically mentioned, it is derived from the Supremacy Clause, and is subject to similar standards.

Article VI of the U.S. Constitution states, in pertinent part: "This Constitution, and the laws of the United States which shall be made in Pursuance thereof…shall be the supreme Law of the Land…the Constitution or Laws of any State to the contrary." In *Edgar v. MITE Corp.*, 457 U.S. 624, 631(1982), the Supreme Court held: " [A] state statute is void to the extent that it actually conflicts with a valid federal statute." The Court then set out the legal standard for determining, for Supremacy Clause purposes, whether a state law conflicted with a federal statute: "[A] conflict

will be found where compliance with both the federal and state regulations is a physical impossibility or where the state law stands as an obstacle to the accomplishment and execution of the full purpose of Congress." (internal citations omitted).

The preemption doctrine is to the same effect. No federal statute has preemptive effect over a state statute "unless that was the clear and manifest purpose of Congress. In other words, we are not to conclude that Congress legislated the ouster of [a state] statute in the absence of an unambiguous congressional mandate to that effect." *Florida Avocado Growers v. Paul*, 373 U.S. 132, 146-47 (1963) (interior citation omitted).

California Penal Code 632 meets both the Supremacy Clause and preemption doctrine. First, it cannot be said that compliance with Title III and Penal Code 362 is a physical impossibility. If this were so, the DOJ Bureau of Justice Assistance would not advise that state laws, like Section 632, be consulted in order to determine what legal standards apply and whether a planned interception of a communication is authorized. The FBI, and others, are free to act in accord with Section 2511 in the 38 states and the District of Columbia, which are one-party consent jurisdictions. All-party consent is required in only 12 states. http://www.rcfp.org/wp-content/imported/CANWETAPE.pdf. This does not seem an undue burden on federal investigative techniques—much less a physical impossibility.

Section 632 does not conflict with Congress's purpose in creating Title III because the legislative history shows that Congress contemplated—and even encouraged— states to enact laws regulating the interception of communications. This is clear from the comprehensive Report of the Senate Judiciary Committee on the Omnibus Safe Streets and Crime Control Act. S. Rep. 90-1097, 90th Congress., 2nd Session (1968).

First, the Report states, "There is no intent to preempt state law," while referring to criminal violations and possible punishments. (*Id*. at 64). There can be no federal preemption where Congress has renounced it. Moreover, Congress invited states to modify their laws: "Only a few states have enacted statutes dealing with [wiretapping or] other forms of electronic surveillance…Even those existing statutes must now be reformed in light of the standards for constitutional electronic surveillance laid down by the Supreme Court in *Berger v. New York*, 388 U.S. 41 (1967), and *Katz v. United States*, 389 U.S. 347 (1967)…New protections for privacy must be enacted." (*Id*. 39). That is just what California did—enact new privacy protections.

Congress also recognized that some states would enact legislation in this area more protective of privacy and more restrictive of the interception of communications. Specifically, the Senate Report discusses how states should designate a state official or officials who will be authorized to apply for wiretap applications—to parallel the centralized authorization process set out in Title III. In doing so, Congress acknowledged that this would be "a question of state law," and with respect to state law and Title III, it "envision[ed] that states would be free to adopt more restrictive legislation, or no legislation at all, but not less restrictive legislation." (*Id*. at 69). Again, this is the floor and ceiling concept—Congress envisioned just what California chose to do in exceeding the federal statutory minimum.

**Conclusion**

In sum, Section 632 of California's Penal Code granted Mr. Berman with the privacy right not to have his statements tape recorded without his consent. Section 2511 provides no safe harbor for the unlawful and covert taping that occurred. As shown above, the language of that section immunizes a person acting under color of law solely from violations of Title III. Moreover, since Congress contemplated—even invited—states to provide their citizens with rights to privacy that

exceeded the constitutional minimum set out in Title III, there is no conflict between Congress and Section 632 either under the Supremacy Clause or the preemption doctrine.

The relief the defense seeks is suppression of all evidence from the April 17, 2020 interview, and any evidence derived from it. Upon the grant of this motion, the defense will renew its motion dismiss the two uncharged false statements in paragraphs 48 and 64 of the Indictment.

Respectfully submitted,

/s/ Walter P. Loughlin
Walter P. Loughlin, Esq. (DC Bar No. NY 0043)
340 West 57th Street
Suite 5D
New York, NY 10019
Tel. (203) 216-3445

Ronald S. Herzog, Esq.
Goldberg Segalla LLP
50 Main Street
Suite 425
White Plains, NY 10606
Tel. (914) 798-5400

Counsel for Defendant Keith Berman