UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,         )  Criminal Action
                                  )  No. 20-278
vs.                               )
                                  )
KEITH BERMAN,                     )  December 15, 2021
               Defendant.         )  2:05 p.m.
                                  )  Washington, D.C.
    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE TREVOR N. McFADDEN,**
**UNITED STATES DISTRICT COURT JUDGE**


<u>**APPEARANCES**</u>:

FOR THE UNITED STATES: CHRISTOPHER R. FENTON
                       JUSTIN D. WEITZ
                       VIJAY SHANKER
                       U.S. Department of Justice
                       Criminal Division, Fraud Section
                       1400 New York Avenue, NW
                       Washington, DC 20530
                       (202) 514-0561
                       Email: christopher.fenton@usdoj.gov


FOR THE DEFENDANT:  WALTER P. LOUGHLIN
                    340 West 57th Street
                    New York, NY 10019
                    (203) 216-3445
                    Email: walter.loughlin@gmail.com

                    RONALD S. HERZOG
                    50 Main Street, Suite 425
                    White Plains, NY 10606
                    (914) 798-5419
                    Email: rherzog@goldbergsegalla.com


Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                    Official Court Reporter

Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

1              **P R O C E E D I N G S**

2              THE COURTROOM DEPUTY:  This is Criminal Case

3      20-278, United States of America versus Keith Berman.

4              Counsel, please come forward to identify yourself

5      for the record, starting with the government.

6              MR. FENTON:  Good afternoon, Your Honor.

7      Christopher Fenton, Justin Weitz, and Vijay Shanker for the

8      United States.

9              THE COURT:  Good afternoon, gentlemen.

10             MR. LOUGHLIN:  Walter Loughlin and Ronald Herzog

11     for the defendant.

12             THE COURT:  Good afternoon, gentlemen.

13             Mr. Loughlin, does your client waive his presence

14     for purposes of today's hearing?

15             MR. LOUGHLIN:  Yes, Your Honor.  He is

16     participating by telephone.

17             THE COURT:  Okay.  Great.

18             Before the Court is the defense motion to

19     suppress, ECF No. 50.  The defendant moves to suppress

20     evidence obtained and derived from the April 17, 2020,

21     interview of the defendant by FBI personnel because the FBI

22     apparently violated the California State Constitution's

23     right to privacy in sections of the California Penal Code

24     that require the suppression of evidence obtained through

25     recordings without the consent of all parties in the

1    recording.

2            I will deny the motion for the following reasons:

3            First, Article 4, paragraph 2, of the U.S.

4    Constitution provides that the laws of the United States

5    shall be the supreme law of the land; this means that, where

6    Congress has legislated, contrary state laws are preempted.

7            Congress has legislated on this issue.  18 U.S.C.

8    2511 provides that, quote, It shall not be unlawful under

9    this chapter for a person acting under the color of law to

10   intercept a wire, oral, or electronic communication, where

11   such person is a party to the communication or one of the

12   parties to the communication has given prior consent to such

13   interpretation -- or interception -- I'm sorry, close quote.

14           Second, the defendant responds that:  There is no

15   language in Section 2511 or elsewhere in Title III that

16   evidences a congressional intent to authorize federal agents

17   to act in violation of California law when intercepting an

18   oral communication in that state; that's from his motion at

19   page 5.

20           But multiple federal courts have found that 2511

21   does preempt state law to the contrary.  For example, in

22   *United States v. Hall*, 543 F.2d 1229, out of the Ninth

23   Circuit in 1976, a defendant challenged her conviction on

24   the basis that she was arrested by state officials in

25   California who were acting on information obtained by

1    wiretaps authorized under federal law but illegal under

2    California law.

3           The Court held that 2510, and following from

4    18 U.S.C., preempted state law to the contrary, reasoning,

5    quote, We recognize that a California court would exclude

6    the contents and would also prohibit evidence derived

7    therefrom as fruit from the poisonous tree of wiretapping.

8    But under the federal statute this wiretapping is not

9    poisonous to a federal court, so its fruit should not be

10   poisonous either, in the absence of any federal violation;

11   therefore, we are not required to exclude the challenged

12   material; the bounds of admissibility of evidence for

13   federal courts are not ordinarily subject to determination

14   by the states, close quote.  That's from 1232 and 1235 of

15   that opinion.

16          In *United States v. Edmond,* 718 Federal Supplement

17   988, out of this District in 1989, the defendant moved to

18   suppress information from certain wiretaps.  The Court found

19   the wiretaps were lawfully performed under 2511(2)(c).

20          The defendant then argued that because the

21   conversations occurred in Maryland and Maryland law required

22   the consent of all parties before a conversation could be

23   recorded, the evidence should be suppressed because:

24   Wherever state law provides greater protections for

25   constitutional interests than federal law, state law must

1    control.  But the Court disagreed, stating, quote, The

2    defendant's argument either overlooks or ignores the body of

3    settled precedent which provides that evidence obtained by

4    federal officials in violation of state law is admissible in

5    federal court if all federal requirements have been complied

6    with.

7         Indeed, recent authority indicates that federal

8    law determines admissibility even when state officials have

9    seized evidence in violation of state law, but the evidence

10   is sought to be introduced in connection with a federal

11   prosecution; and that's from page 993.  The Court,

12   therefore, denied the defendant's motion.

13        Courts in other circuits have come to similar

14   conclusions; and I will just point toward *United States v.*

15   *McNulty*, 729 F.2d, 1243, at page 1251, out of the Tenth

16   Circuit in 1983; and *United States v. Infelice*, 506 F.2d

17   1358, page 1365, from the Seventh Circuit in 1974.

18        Even if I am wrong on this issue, I don't think

19   suppression would be the appropriate remedy here.  As the

20   government has pointed out in its briefing, suppression is

21   the last, not first, instinct of a federal court when

22   considering a constitutional violation.

23        I think this issue is unsettled enough, to the

24   extent that there is any question -- frankly, I don't think

25   there is a question.  But if I am wrong about this, that

1    somehow state law would apply, I certainly don't think it

2    would have been obvious to the federal agents.  I don't

3    think there is any evidence of intentional misdoing,

4    misconduct.  And I don't think that suppression would be an

5    appropriate remedy to somehow punish them.  And, frankly, I

6    mean -- I think, as the government suggests, the agents

7    would certainly be permitted to testify to that

8    conversation, putting aside the recording.

9         I think it's probably best, all the way around, to

10   know actually what was said rather than to have an agent

11   give the agent's perspective of what the defendant said,

12   particularly when the recording is available.  So, for all

13   of those reasons, I am going to deny the motion to dismiss.

14        I want to talk about the voir dire.  First of all,

15   I want to thank the parties for working together to come up

16   with voir dire questions and, really, the -- also the jury

17   instructions.

18        I guess I will give, kind of, one big picture

19   concern.  This feels like a lot -- a lot of questions.  And

20   I just want to remind you, I think we are going to be in the

21   ceremonial courtroom.  I think the veniremen are going to be

22   masked.  We only have the day; I am going to get through

23   voir dire, so help me God, in one day.  And just -- I think

24   it is in everyone's interest to get this done quickly.  I

25   don't want people sitting around masked all day going

1   through innumerable questions.

2          So I have got some thoughts about cutting down

3   some of the questions.  A number of my questions --

4   suggestions, frankly, have to do with expanding beyond the

5   veniremen to also asking about any of your family, close

6   friends, or household members.  I am looking to questions

7   15, 16, and 17.

8          I guess -- on 15, I am fine asking that question

9   as to the -- a person; but I think once we go beyond to

10  friends and family, that becomes a pretty amorphous group

11  and I just feel like everybody is going to be raising their

12  hands, and we're going to spend forever hearing information

13  that really isn't that useful.

14          So any objection, Mr. Fenton, to striking the

15  "family and friends" and just limiting 15 to "you"?

16          MR. FENTON:  No objection, Your Honor.

17          THE COURT:  Mr. Loughlin?

18          MR. LOUGHLIN:  No objection, Your Honor --

19          THE COURT:  Okay.

20          MR. LOUGHLIN:  -- to the extent we used -- we

21  borrowed it from the government's formulation.

22          THE COURT:  Okay.  So I will do that.  And I'd

23  just note that's twice there in 15; on both cases I am just

24  going to limit it to "you."

25          No. 16.  So I certainly would want to strike that

```
 1      language.  I guess I am wondering, a little bit, whether we

 2      need 16 at all.  I am not quite sure if I would know how to

 3      answer this if I were asked this question; whether I have

 4      something beyond a broad basket of stocks or bonds.  And I

 5      just wonder whether this advances the ball very much

 6      knowing, even whether individuals would -- if somebody

 7      answers "yes" to this, what difference does that make?

 8              Mr. Fenton, any objection to striking 16?

 9              MR. FENTON:  No objection.

10              MR. LOUGHLIN:  Your Honor, that was one of ours.

11      Given the nature of the case, we thought it was important to

12      find out what people's experience --

13              THE COURT:  Can you approach the podium, sir?

14              MR. LOUGHLIN:  I'm sorry.

15              We thought it was important, given the nature of

16      the case, where the claim is that the defendant defrauded

17      investors and prospective investors that we ought to have

18      some idea what the people who might be on the jury -- what

19      experiences they have had with their own investments.

20              THE COURT:  All right.  So it looks to me like you

21      have got three questions here.  You have got that one; and

22      anyone own any stock in a microcap company, and whether

23      anyone has had any positive or negative experiences from

24      those things.

25              I am inclined to give you one shot at this.  I
```

1    don't know if you want to take a look at this and get back

2    to me.

3            MR. LOUGHLIN:  I would prefer, actually, to do

4    that and also confer with our client and Mr. Herzog.  And I

5    don't know how to communicate this.  Should I just --

6            THE COURT:  I think you can just email.

7    Obviously, talk with the government.  It looks like you-all

8    have been working very cooperatively on this.  Ideally,

9    you-all can agree to something.  But, in any event, tell me

10   what you are suggesting.

11           I am really not interested in knowing about family

12   or friends on this.  But if you want to come up with one

13   question that gets at the heart of what you are concerned

14   about here, I am certainly happy to entertain it.

15           MR. LOUGHLIN:  Okay.  Thank you, Your Honor.

16   I don't think the government objected.

17           THE COURT:  No, they hadn't.  I am objecting.

18           MR. LOUGHLIN:  I think, against all odds,

19   agreements broke out between us.

20           THE COURT:  Yes.  Christmas miracles.

21           Okay.  So 16 through 18, I am just going to wait

22   to hear back from you to hear what one question out of that,

23   or some sort of culmination of that really gets to what you

24   are most interested in.

25           20 -- just so you know -- I am happy to give this.

1    But I am going to -- well, I guess, what I will do is I will

2    keep it as a public question.  But if anybody has any

3    familiarity with any of them, I am going to take those at

4    the bench.

5           So you know how I do this, all of these public

6    questions -- everybody is going to be seated around the

7    ceremonial courtroom, physically distanced.  I am just going

8    to ask people to raise their hands if they have a

9    question -- yes answer to any of the public questions.  If

10   so, I will do the questioning of them unless I feel like

11   it's getting into some material that is -- you know, we

12   don't want everybody to hear.  If it's just kind of pretty

13   benign, I am going to do the questioning there in open

14   court.  If it seems like any of these public questions are

15   delving into material that we don't want everybody to hear,

16   I will ask the veniremen to come up to the podium, and we'll

17   have one of those telephones on the podium where you-all and

18   I can communicate with that person.  And we'll deal with --

19   again, I will probably be asking the questions.  But if I

20   invite them up, I will probably give you an opportunity to

21   follow up there.

22          But assuming you haven't had a follow-up

23   opportunity, that they're not coming up to the microphone,

24   you should just kind of make notes because -- the private

25   questions I am going to be -- people will have a card;

1    people are going to write down the number for any question

2    they have a yes answer to; and people will come up one by

3    one.  Using the same method, we will have the husher on.

4    Each person will come up to the podium.  I will introduce --

5    I will start the questioning; but I will typically give

6    you-all an opportunity to ask follow-up questions.

7             Again, I want to remind you -- not looking for

8    autobiographies here.  We're going to try to move through

9    this; and I am going to cut you off if we're strained or

10   going on at length.  But that would be your opportunity to

11   ask any pertinent follow-ups, both to anything they answered

12   on the private questions but, also, if there was anything

13   you wanted to follow up on to the public questions; that

14   would be your opportunity to deal with that.

15            If you wish to strike for cause, I will -- you

16   should do that immediately after the person leaves the

17   podium and before the next person comes up; we will deal

18   with that, with the husher on of course, at that point.

19            There will be times -- there are usually a few

20   people who will have answered "yes" to, like, half a dozen

21   questions.  And I will often just go to one question and

22   often it's, like, the hardship question; and if I think it's

23   clear that this person needs to be excused, I probably won't

24   even go on to the other questions.  I will just say, you

25   know, any questions -- give you, attorneys, an opportunity

1   to ask some questions.  But, really, what I'm signaling to

2   you there, if I have only asked about one issue and have not

3   gone to the others, it's that I think this person is going

4   to be dismissed for cause.  And so -- if you want to try to

5   rehabilitate the person, that's your opportunity; but,

6   otherwise, I would expect that we would be striking that

7   person.  But the normal course would be, once I have gone

8   through all of the questions, I have asked any follow-ups,

9   the attorneys have asked follow-ups, immediately after that

10   person leaves is your opportunity to make a motion to strike

11   for cause.

12              Mr. Fenton, does that make sense?

13              MR. FENTON:  Yes, Your Honor.

14              THE COURT:  Mr. Loughlin, does that make sense?

15              MR. LOUGHLIN:  Yes, Your Honor.

16              THE COURT:  Great.  Okay.  So that was a little

17   bit of a tangent.  I am going to -- on question 20, I will

18   ask this question; but that would be one where, if anybody

19   is answering yes, I would have them approach to explain

20   their positive or negative experiences.

21              So 21:  Have you ever worked for a publicly-traded

22   company; that also strikes me as very broad.  I mean, in

23   this city, I guess just about everybody works for the

24   federal government.  But most cities -- I think every big

25   company now is a publicly-traded company; I am not sure that

1    that really adds much.

2            Mr. Loughlin, is this one of your questions?

3            MR. LOUGHLIN:  Was that 21?

4            THE COURT:  Yes, sir.

5            MR. LOUGHLIN:  I believe so.

6            THE COURT:  Do you want to try to convince me to

7    keep it?

8            MR. LOUGHLIN:  I think we will deal with it in

9    tandem, with 16 and 18.

10           THE COURT:  Okay.  So I am going to, presumably,

11   strike this; but if you want to come up with a more focused

12   question, I am happy to hear from you.

13           22, I am willing to give it; but, again, I'd like

14   to limit that just to the person.  I don't -- I don't know

15   that we are going to learn much from what somebody's

16   friends -- whether somebody's friends worked in the

17   biomedical device field.

18           Mr. Fenton, any objection?

19           MR. FENTON:  No objection.

20           THE COURT:  Mr. Loughlin, any objection?

21           MR. LOUGHLIN:  No, Your Honor.

22           THE COURT:  All right.  So that will be "have

23   you."

24           Okay.  23.  I am not sure that I understand this

25   question, honestly; it may be just because I have not worked

```
1     in this field, but I don't know what that means.

2               Mr. Loughlin, is this your question?

3               MR. LOUGHLIN:  I just don't have it in front of

4     me, Your Honor.

5               THE COURT:  Sure.  This is:  Have you, or someone

6     close to you, ever worked in an office that handles matters

7     before the SEC?

8               MR. LOUGHLIN:  I don't think -- I am not sure that

9     we asked that.

10              THE COURT:  Okay.  Mr. Fenton, was that yours?

11              MR. FENTON:  Yes, Your Honor.

12              So I think the thinking here is -- you know, if an

13    individual or their spouse, for example, works at a law firm

14    that represents clients before the SEC, that would be a

15    relevant consideration; but I think that we agree that we

16    could limit it using Your Honor's formula and just limit it

17    to the individual and, perhaps, their spouse.

18              THE COURT:  Okay.  So how about:  Have you ever

19    handled matters before the SEC?  I mean, because if you are

20    talking now in office -- if you say a law firm, as you

21    probably -- maybe you don't know but, like, every other

22    person here is going to be a lawyer on venire; all of them

23    work in law firms that have somebody who works -- according

24    to your definition, works in front of the SEC.

25              MR. FENTON:  I think that it would be -- if we can
```

1    limit it to the individual and perhaps their spouse, to the

2    extent they have a spouse, that would be satisfactory in the

3    government's view.

4              THE COURT:  Who works -- who has handled a matter

5    in front of the SEC?

6              MR. FENTON:  Yes, Your Honor.

7              THE COURT:  Okay.  Are you comfortable with that,

8    Mr. Loughlin?

9              MR. LOUGHLIN:  I have the same sort of question

10   about what information -- what that information tells the

11   government about whether it wants a juror who has some

12   experience with the SEC; but I don't have any particular

13   objection to it.

14             THE COURT:  Okay.  So I guess that's a fair

15   question.  And similarly -- I guess this is similar to 25.

16             What is the -- with, kind of, someone who has

17   handled matters before the FDA -- how will this help us

18   understand whether somebody is an appropriate juror here?

19             MR. FENTON:  Your Honor, I believe those

20   individuals could potentially have their own personal

21   opinions about how things should be done before the SEC or

22   how an SEC investigation might be conducted or what would be

23   relevant to that.  And the same would be true, potentially,

24   with respect to matters before the FDA; for example, how the

25   FDA should or shouldn't handle emergency use authorization

 1    application.

 2              THE COURT:  And are we going into that?  I mean,

 3    are you going to be talking about what the SEC investigation

 4    looked like?

 5              MR. FENTON:  No, not in detail.  But to the extent

 6    that a juror might have an opinion about that matter, the

 7    government thinks that it would be relevant.

 8              THE COURT:  But if we're not going into it, how is

 9    it relevant?

10              MR. FENTON:  We wouldn't want a juror who would be

11    second guessing whether or not something mattered based on

12    their own professional experience -- if something mattered

13    to the SEC or mattered to the FDA based on their own

14    professional experience, as opposed to just the same type of

15    information that an average juror would have.

16              THE COURT:  Okay.  With my limiting instruction --

17    my narrowing of it, I think there's going to be few enough

18    people that I am willing to allow it.

19              MR. FENTON:  Thank you, Your Honor.

20              THE COURT:  Okay.  So 23 and 25 will be:  Have you

21    or your spouse handled matters before the United States SEC

22    or the FDA?

23              I am going to move 24 down to the private portion

24    of the questions.

25              26, Mr. Loughlin, this is:  Have you, or your

1    close family members or friends, or any business with which

2    you, a close family member or friend was affiliated, ever

3    applied for approval, authorization, or emergency use

4    authorization of a product, device, or pharmaceutical by the

5    FDA?

6               I guess I want to strike:  Or has any business

7    with which you, a close family member, or a friend was

8    affiliated.

9               So I think I want to have it read:  Have you, or

10   any close family members or friends ever applied for

11   approval, authorization, or emergency use authorization of a

12   product, device, or pharmaceutical by the FDA?

13              Any objection, Mr. Fenton?

14              MR. LOUGHLIN:  I actually think that's probably

15   one of the government's; I don't think it's one of ours.

16              THE COURT:  Yes.  So you don't have any objection

17   while you are up there, sir?

18              MR. LOUGHLIN:  I have no objection to your

19   revision.

20              THE COURT:  Okay.  Mr. Fenton?

21              MR. FENTON:  No objection, Your Honor.

22              THE COURT:  Okay.

23              MR. FENTON:  Your Honor, may we make just one

24   clarification for purposes of the record?

25              May we make one clarification for purposes of the

1    record?

2              THE COURT:  Yes, at the podium.

3              MR. FENTON:  So, naturally, there is an

4    obstruction -- charge of obstruction of the SEC proceedings.

5    So there will be obviously some discussion of the SEC

6    investigation, but at a high level.

7              THE COURT:  Okay.

8              MR. FENTON:  And I think Your Honor's question

9    went to whether or not we would be discussing the details or

10   the mechanics of the investigation; and my response was we

11   wouldn't.  But, at a high level, we will be discussing the

12   investigation because of that charge.

13             THE COURT:  All right.  So 36 is whether the

14   defendant has a constitutional right not to testify at

15   trial.  I am not inclined to give this one; I don't think I

16   ever give this.  Obviously, there are all sorts of rights

17   that the defendant has that -- I am not inclined to go

18   through each one.

19             I think, 35, anyone who is selected to serve on

20   this jury will take an oath to follow the laws instructed by

21   the Court.  Would you, for any reason, not be able to accept

22   and follow the judge's instruction regarding the law?

23             I think that appropriately encompasses 36, which

24   is on the constitutional right to testify or not testify at

25   trial.

1          Any objection to striking 36, Mr. Fenton?

2          MR. FENTON:  No objection.

3          THE COURT:  Mr. Loughlin?

4          MR. LOUGHLIN:  No, Your Honor.

5          THE COURT:  All right.  And then, also, I am

6   inclined to strike 41 and 42; these are COVID questions.

7          41, I just don't know what the relevance there is

8   to this proceeding on whether you have been -- gotten in

9   trouble for failing to adhere to a COVID-19-related safety

10  protocol; and 42 is whether you have been affected in a

11  personal, specific, and significant way by COVID?  We all

12  have.  So, again, I just can't imagine what -- I just don't

13  think that's a helpful question.

14          And I will tell you, I mean, the hardship question

15  that I have here, I think, typically brings out anybody who

16  is going to say that they have got an issue; that they are

17  not going to be able to be a juror because of COVID, a

18  family member they need to look after; that type of thing.

19          So, you know, in my experience with trying cases

20  during COVID, I think, the questions that we already have

21  kind of appropriately bring out the issues that I think

22  would be relevant here; and it just feels to me like those

23  last few questions invite a lot of information and confusion

24  from the jury that is not going to help.

25          Any objection to striking 41 and 42, Mr. Fenton?

1          MR. FENTON:  No objection.

2          THE COURT:  And Mr. Loughlin?

3          MR. LOUGHLIN:  No objection, Your Honor.

4          THE COURT:  Okay.  Great.  So I will look to hear

5    from you, Mr. Loughlin, on that one issue; but, otherwise, I

6    think those are -- I will give the voir dire as we have just

7    discussed there.

8          MR. LOUGHLIN:  One issue has occurred to me while

9    Your Honor was talking about hardship; and I assume that

10   that raises the question about the length of the trial.

11         THE COURT:  Yes.  Thanks.  I wanted -- I was about

12   to ask you.  So you go on -- I am going to ask you how long

13   you expect your defense to last.

14         Did you have a question on that?

15         MR. LOUGHLIN:  Yes, Your Honor.  But I think, you

16   know, it's important to know, for a variety of reasons, how

17   long the government's case is expected to be.  We have been

18   told that their case in chief might be as short as three

19   days, even though they have 15 people on their witness list,

20   and a tsunami of documents.

21         And we have one particular issue that we raised

22   with the government earlier this afternoon, which is our

23   expert witness recently told us that he is only available

24   the first week of January or the week following Martin

25   Luther King, Jr. Day; I suspect that the trial would be over

1    before that weekend.

2              And so we raised with the government -- the issue

3    with this witness -- maybe Mr. Herzog, who has actually

4    spoken to him, may be the better person to address this.

5    But we raised with the government whether it would be

6    possible to take this witness out of turn in their case.

7    And, as part of that discussion, we raised the issue again

8    about whether Your Honor would still not be sitting on this

9    trial on Fridays, which would mean that the government would

10   really probably only have two days in the first week to

11   present their case; but they could rest, as they have

12   described.  Maybe I am speaking out of turn again; but they

13   may rest early in the second week.

14             THE COURT:  Yes.  Thanks for raising this.

15             So let me ask, while you are up there, sir, how

16   long you expect your case in chief to last?

17             MR. LOUGHLIN:  You mean our defense?

18             THE COURT:  Yes.

19             MR. LOUGHLIN:  Two and a half days, at most.

20             THE COURT:  Okay.  And is that -- the expert, how

21   long do you think your expert will take?

22             MR. LOUGHLIN:  I think the expert -- both on

23   direct and cross, would probably only be two hours.

24             THE COURT:  Okay.  Thank you.

25             Mr. Fenton, what is your case looking like right

1    now?  And do you have any thoughts about how to handle this

2    issue with the defense expert?

3            MR. FENTON:  Yes, Your Honor.

4            The government believes that there will be three

5    days of direct testimony, assuming, of course, that we get

6    favorable rulings on the motions that we submitted regarding

7    authentication and admission of business records.  If we

8    don't have to put on any custodians of record, we think it

9    will be three days of direct testimony.

10            With respect to Mr. Loughlin's request, the

11   government is agreeable to work with the defense to permit

12   the witness to testify at a time that works for them in the

13   first week.  We would -- I think the primary concern for us

14   is whether or not the Court is going to be sitting on

15   Friday.  It's easier for the government to work with the

16   defense if the Court is sitting on Friday; and then we would

17   ask that that witness be put toward the very end.

18   Otherwise, we would have to give some considerations to

19   where to work them in toward the -- we believe it would be

20   more appropriate or most appropriate toward the end of the

21   government's case.

22            THE COURT:  Okay.  So I do have a bunch of matters

23   scheduled for that Friday.

24            MR. LOUGHLIN:  Excuse me, Your Honor.

25            While you are thinking about that, what I would

1    say is we wouldn't want to bring the jury back on Friday

2    just to hear one witness.

3              THE COURT:  No, I am not thinking about that.  I

4    mean, possibly, I will have -- although that is less than

5    ideal too.

6              I mean, obviously it would be unusual, but I don't

7    think it's inappropriate; an expert is kind of a bit of an

8    odd duck anyway.  I mean, how disruptive to your case would

9    it be, Mr. Fenton, if we had him, like -- were to have him

10   on Thursday afternoon?

11             MR. FENTON:  The government could work with

12   Thursday afternoon.  We would just like to avoid a situation

13   where the defense expert is testifying just right in the

14   middle of the government's case in chief; but that should be

15   toward the end, and I think that we would be able to

16   accommodate the defense and the Court.

17             THE COURT:  All right.  Thanks.  Yes.  Why don't

18   we plan to do that.  I usually don't sit on Fridays.  I am

19   open to it, but it would mean rescheduling seven matters.  I

20   just -- if I can avoid doing that, I think that would be

21   best.

22             I guess -- so it sounds to me like we would

23   probably finish up the following Thursday as, kind of, the

24   back end.  Hopefully, it will be less than that; but if we

25   have, kind of, two and a half days the first week.  And that

1    would be -- Mr. Fenton, I would ask you to have at least a

2    witness available on the Tuesday.  I am certainly hoping

3    that we will be able to pick a jury and do openings and,

4    ideally, begin with your chase in chief on Tuesday, the 4th;

5    and then go through that Thursday, and then finish up the

6    next week.

7         MR. FENTON:  Yes, Your Honor.

8         THE COURT:  Okay.  Thanks for flagging that,

9    Mr. Loughlin.  Thanks for your flexibility, Mr. Fenton.

10        So I think what I will tell the jurors, especially

11   given that we will, kind of, look to have longer days, that

12   they should plan to -- that we will be starting around nine

13   o'clock and finishing -- nine o'clock each day, and

14   finishing around 5, 5:30 each day, just so you know.  And I

15   guess I will tell them that I would expect the case to

16   last -- we wouldn't be sitting that Friday.  I would expect

17   it to last through, potentially, Thursday, the 13th, and

18   then obviously it's going to take -- the jury deliberations

19   would take as long as they take.  And I would have them

20   deliberate on the Friday, just so you-all know; I don't

21   think that makes much of a difference.

22        Mr. Loughlin.

23        MR. LOUGHLIN:  One other housekeeping issue, Your

24   Honor.

25        Obviously, Mr. Berman has to be here for the

1     trial.  And we wondered whether there has to be some -- we

2     have to speak to pretrial services to make sure -- the

3     current limits of his bail are Los Angeles.  But I don't

4     want him to get in trouble with pretrial services by getting

5     on a plane to come to Washington the first week of January.

6               THE COURT:  Do you have a motion?

7               MR. LOUGHLIN:  Well, I guess, I would -- my motion

8     would be that his bail limits be extended to include the

9     District of Columbia for the length of the trial.

10              THE COURT:  Mr. Fenton, any objection?

11              MR. FENTON:  No, Your Honor.  I believe that the

12    current conditions allow for Mr. Berman to travel to D.C.;

13    but to the extent that they do not, the government would not

14    oppose that modification solely for the purposes of trial.

15              THE COURT:  Okay.  I am going to -- just so it's

16    clear, I am going to modify his release conditions to allow

17    him to travel to D.C. for the month of January; and we'll

18    enter a minute order to that effect.

19              MR. LOUGHLIN:  Thank you, Your Honor.

20              THE COURT:  Mr. Loughlin, I guess it wasn't -- I

21    have seen the government has filed a couple of motions.

22    It's not clear to me if you object to them; the motion to

23    admit business records pursuant to Federal Rule 902.  I

24    believe you have -- there are stipulations as to a number of

25    documents.  Do you object to these?

 1          MR. LOUGHLIN:  No, Your Honor.

 2          I think we have told the government that we do not

 3   object to the admission of any documents where there is a

 4   certification from a custodian that the documents meet the

 5   business records exception of the hearsay rule.  And we have

 6   examined, I think, dozens of those certifications.

 7          And, certainly, we have no objection to the

 8   admission of any document that was generated by Decision

 9   Diagnostics, or any email that was sent or received by

10   Mr. Berman.  I think there are -- I think we have agreed on

11   almost all of these things, with a few small exceptions.

12          THE COURT:  All right.  Stay there, sir, if you

13   don't mind.

14          So, Mr. Fenton, I think this resolves your motion,

15   ECF 60; is that -- do you agree?

16          MR. FENTON:  Yes, Your Honor.

17          THE COURT:  Okay.  So I am going to grant the

18   government's motion in limine to admit business records

19   without objection.

20          Mr. Loughlin, can you address the government's

21   motion to preclude an advice of counsel or involvement of

22   counsel argument?  It sounds to me like you don't have a

23   problem -- you are in kind of agreement with them that you

24   are not going to be raising an advice of counsel argument.

25          MR. LOUGHLIN:  No, Your Honor.  We have a fact

 1    witness who did the preparation and submission of the FDA

 2    application for emergency use authorization.

 3              THE COURT:  And this is an attorney?

 4              MR. LOUGHLIN:  There is -- we are not sure exactly

 5    which witness from the law firm that we would use.  One is

 6    an attorney; one is not an attorney but also worked on the

 7    application directly.

 8              THE COURT:  All right.  So --

 9              MR. LOUGHLIN:  She's technically a consultant at

10    the firm -- a full-time job -- consultant.

11              THE COURT:  Okay.  So, I guess, are you objecting

12    to the government's motion in limine.

13              MR. LOUGHLIN:  Yes, Your Honor.  And I have filed

14    an opposition to it.

15              THE COURT:  You did?

16              MR. LOUGHLIN:  Just yesterday.

17              THE COURT:  I have not seen that yet.

18              All right.  So as -- well --

19              MR. LOUGHLIN:  And I think the government's -- the

20    government's position with respect to its motion was really

21    just asking for an in camera submission or offer of proof

22    about the relevance of the testimony; but I think I have

23    explained it in my opposition, which is the fact that

24    Mr. Berman took the issue of the FDA application for the

25    COVID test to a well-respected law firm with FDA expertise

1    is relevant to the issue of whether he acted with intent to

2    defraud.

3              THE COURT:  Okay.  Let me go -- I think what I

4    will do is take a break in a minute here, go back and find

5    your opposition and --

6              MR. LOUGHLIN:  And I don't know whether the

7    government wants to reply.

8              THE COURT:  I am sure they will; but I want to

9    make sure that I understand -- I have read your opposition

10   before I hear about that.  So we will take a break in a

11   minute.

12             Mr. Fenton, do you have -- well, Mr. Loughlin, let

13   me ask you; do you want to pick an alternate seat, jury,

14   juror seat, 1 to 14?

15             MR. LOUGHLIN:  I'm sorry.  Say that again, Your

16   Honor.

17             THE COURT:  Pick an alternate seat, 1 to 14.

18             MR. LOUGHLIN:  I am not sure I understand.

19             THE COURT:  For the jury.  I am going to have two

20   alternates, you get to name one.

21             MR. LOUGHLIN:  I get to name one?  Oh.  You mean

22   the number?

23             THE COURT:  Yes.

24             MR. LOUGHLIN:  You mean 13 or 14?

25             THE COURT:  It can be any one.  We don't

1    automatically do 13 or 14.

2                MR. LOUGHLIN:  Okay.  I will say lucky 7.

3                THE COURT:  All right.  Mr. Fenton?

4                MR. FENTON:  13.

5                THE COURT:  All right.  So the first alternate

6    will be Juror No. 7; the second alternate will be Juror

7    No. 13.  So you all know, we are going to be doing the trial

8    in here; and I guess the jury will be spread out in the

9    audience section, kind of, as you see these bullet signs.

10   They're all going to be around the courtroom.  I think I

11   have a half bench or so for the public, so this will be a

12   public proceeding.  I am expecting, kind of, to rely on that

13   seating.  We don't -- I haven't typically been opening

14   the -- well, we don't have technology in this courtroom,

15   frankly, to do an overflow courtroom.

16              So if you think there are going to be crowds who

17   are wanting to hear it or come observe, let me know;

18   otherwise, people -- family, friends, well wishers, fan

19   club, whatever -- they should -- they are welcome to come in

20   here, and I will have a row reserved for them.

21              MR. LOUGHLIN:  Can I ask a procedural question?

22              THE COURT:  Yes, sir.

23              MR. LOUGHLIN:  When we are addressing the jury, do

24   we have to stay at the podium or can we -- can we get closer

25   to them?

 1            THE COURT:  Yes.  Thanks for asking.

 2            So, for openings and closings, I do allow you to

 3   move around the well; otherwise, that podium right there,

 4   sir, is your podium to address the witness who is going to

 5   be sitting over there behind Mr. Shanker; and this podium,

 6   here, will be the government's.

 7            Also, I am directing counsel to make sure to meet

 8   with Ms. Chaclan and our IT folks to make sure you know how

 9   to use the ELMO and our IT -- such as we have it, our

10   gadgets here in the courtroom.  I don't want counsel, kind

11   of, bringing papers back and forth to the witness.  You

12   should be using the ELMO or your laptop connected to my

13   courtroom technology to show documents, and what have you,

14   to the witness that way.

15            Just one thing that occurred to me, so we're

16   clear, upstairs in the ceremonial courtroom I am not going

17   to be re-seating people because of COVID.  People are going

18   to be sitting throughout the courtroom in their assigned

19   seats.  So when it comes to your peremptory strikes, you are

20   going to be doing that -- we are not going to be re-seating

21   or anything; you will just have to, kind of, keep track of

22   where people are sitting and how far back we have gotten.

23            MR. LOUGHLIN:  On that issue, Your Honor, do we --

24   I have been in courtrooms where peremptories are made

25   simultaneously by both sides, and I have been in courtrooms

 1    where it alternates.

 2            THE COURT:  I am willing to alternate by -- I

 3    think we do 5-3, 5-3, as long as you-all are going to move

 4    it along, okay?

 5            I am not pointing at you, Mr. Loughlin.  I am

 6    saying you, the attorneys; I don't want to make this an

 7    all-day thing.  You-all keep it moving, and we'll give you

 8    an opportunity to pass back and forth.

 9            MR. LOUGHLIN:  I clerked for a judge who insisted

10    on it being simultaneous in order to speed things along.

11            THE COURT:  I see a lot that is attractive to

12    that; but having been an attorney, I also see the advantage

13    to not using your peremptories unnecessarily.

14            All right.  I want to take a break in just a

15    moment to address the motion -- so I can read the motion

16    in limine, and then I will hear from Mr. Fenton.

17            Yes, sir?

18            MR. WEITZ:  Your Honor, can I ask one quick

19    procedural question?  Actually, two.

20            THE COURT:  Yes.

21            MR. WEITZ:  I agree that leaving a bench open

22    satisfies the public trial clause requirement.  Just so we

23    know, I think some of our colleagues may be interested in

24    coming to court.  Will it really just be five or six seats?

25    That's it?

1          THE COURT:  Yes.  You can give a lottery.

2          MR. WEITZ:  Okay.  It's rare, I think, in the

3     criminal division that people get to see their colleagues in

4     court.

5          The second question is just on jury address

6     length.  We don't have to deal with closings now; but just

7     for openings, in terms of how long each side will get.

8          THE COURT:  Yes.  How long are you seeking?

9          MR. WEITZ:  12, 15 minutes.

10          THE COURT:  That's fine.

11          Mr. Loughlin, how long are you seeking?

12          MR. LOUGHLIN:  I'd say, unlike government counsel,

13     I will have fewer fans in the courtroom.

14          But I would say maybe a bit longer than 15

15     minutes; but, you know, maybe 20.

16          THE COURT:  That's fine.  That's fine.

17          Okay.  Mr. Fenton, before I go back and read this,

18     does the government -- I mean, is there a disagreement on

19     the advice of counsel defense?

20          MR. WEITZ:  If it's on the record -- if it's on

21     the record, Your Honor, that they won't be seeking --

22          THE COURT:  Sorry.  You can --

23          MR. WEITZ:  Your Honor, if it's on the record that

24     the defendant will not be seeking to use an advice of

25     counsel defense, I think that issue is moot -- which I think

1    it is.

2              THE COURT:  I mean, have you read the objection?

3    I haven't seen it yet.

4              MR. WEITZ:  I have.  I think it's really just an

5    involvement of counsel question, and some issues that might

6    stem from that; but I think the advice of counsel itself is

7    not on the table.

8              THE COURT:  Okay.  So I don't need to rule on

9    anything right now; is that what you are telling me?

10             MR. WEITZ:  I think we would like to just discuss

11   whether there is some discovery necessary in relation to the

12   involvement of counsel and whether it's relevant.

13             THE COURT:  Okay.  What are you seeking?

14             MR. WEITZ:  So, I mean, we have a threshold

15   question as to whether the mere fact of a law firm's

16   retention is relevant to anything.  I mean, you bring in a

17   prestigious law firm; it sounds a lot like suggesting to the

18   jury:  Well, you know, there is a big law firm here and so,

19   therefore, I acted appropriately; which requires a bunch of

20   inferences that may not be supported by any evidence.

21             But if the Court finds that that is relevant and

22   that the involvement of counsel is something that the

23   defendant will be allowed to argue, we would ask for two

24   things; the first is just a confirmation on the record --

25   and defense counsel has told us this, but we want it on the

1    record, that Decision Diagnostics is waiving privilege over

2    the subject matter because -- and I know Your Honor hasn't

3    read the response.

4         The defendant mentions that, you know, the

5    government hasn't gone and interviewed the attorney, that's

6    really the government's fault.  Well, we are not going to be

7    able to go and interview somebody -- we are not going to

8    take that risk unless there has been an affirmative

9    privilege waiver.  And they have told us there will be, but

10   we just want it on the record in court before we send an

11   agent out to conduct an interview of a lawyer; that's number

12   one.

13        Number two is just that we would -- if there is

14   that privilege waiver, a confirmation that they have

15   produced everything related -- everything related to

16   whatever the scope of the involvement of counsel testimony

17   is.  So if the involvement of counsel -- if the retention of

18   the law firm is itself relevant well, then, the retention

19   agreement is something that should be produced.  Any

20   documents related to the retention should be produced.  You

21   know, we may have the right -- subject to certain criminal

22   division procedures -- to go and issue a trial subpoena to

23   the law firm.

24        So we just want to -- there is a lot there.  We

25   just want to make sure that the contours of what the

1   government is allowed to do if the Court allows the

2   involvement of counsel defense that that is clear for us to

3   protect our investigation.

4           THE COURT:  So are you -- have you gotten

5   anything?

6           MR. WEITZ:  We have gotten certain documents that

7   Decision Diagnostics produced in response to an SEC subpoena

8   back in 2020.  Now, I don't know --

9           THE COURT:  Do you have this -- the contract or

10  the engagement letter?

11          MR. WEITZ:  I don't believe we have the engagement

12  letter.

13          THE COURT:  Okay.  So you have gotten some things,

14  but you think there is more out there?

15          MR. WEITZ:  We have gotten some things.  We think

16  there is more out there.  We also just want to make sure we

17  are able, if we decide to, to independently go and get that

18  without running afoul of any privilege.

19          THE COURT:  Okay.  Mr. Herzog, it looks like you

20  are going to address this.

21          MR. HERZOG:  Thank you, Your Honor -- since I was

22  the one involved at that point in time.

23          The information relating to this law firm was

24  responsive to the SEC subpoena which ultimately found its

25  way into justice, and they produced it back to us.

 1            The point for this afternoon's consideration is on

 2     the advice of counsel defense.  It was not asserted in the

 3     SEC proceeding; it was not -- it will not be asserted here.

 4     And in fact --

 5            THE COURT:  It will not be?

 6            MR. HERZOG:  It will not be -- there is no

 7     reliance on counsel.

 8            And in fact, Your Honor, when the production was

 9     made to the SEC back in June of 2020, we produced the entire

10     file pertaining to this product and this development and

11     made it explicitly clear, in our transmittal letter, that no

12     assertion of privilege had been invoked and that no

13     documents that would arguably be subject to attorney-client

14     privilege, without conceding that they would be, had been

15     withheld.  There was nothing withheld on anything that could

16     remotely approach a reliance on counsel defense.

17            What this involves in our anticipated testimony is

18     the testimony of one of the individuals -- or perhaps two --

19     from this law firm who were involved in the process -- and

20     that's the very process that one of the government's key

21     witnesses -- Dr. Musho was involved with.  They coordinated

22     with Dr. Musho in making this application and the various

23     submissions --

24            THE COURT:  By "they" you mean this law firm?

25            MR. HERZOG:  The law firm, Musho, and DECN acted

1    on a coordinated basis.

2              And if Dr. Musho is going to be questioned about

3    this, as it appears to be the case, I don't see how you can

4    segregate his testimony and somehow exclude that of another

5    participant just because that participant may happen to be

6    an attorney.

7              THE COURT:  All right.  I don't think the

8    government is suggesting that.

9              So I am clear, Decision Diagnostics is waiving the

10   privilege on the subject matter; is that correct?

11             MR. HERZOG:  Has waived the privilege on the

12   GenViro! submission, yes; transactional waiver with respect

13   to that.

14             THE COURT:  Okay.

15             MR. HERZOG:  Now, so the record is clear, Your

16   Honor, this law firm had other dealings with DECN; those are

17   not relevant, and those were not produced.  And

18   hypothetically, if those are privileged, those would not be

19   subject to the waiver.

20             THE COURT:  I understand.

21             MR. HERZOG:  As far as the product that gives rise

22   to this, there was a complete waiver, and we are reaffirming

23   that to be the case.

24             THE COURT:  Okay.  And I think I understood from

25   you, Mr. Herzog, that you believe all of the relevant

1    documents have been produced to the SEC.

2          MR. HERZOG:  Everything I have -- everything I got

3    from two sources was produced.

4          THE COURT:  Okay.  Can I ask you -- I mean, it

5    sounds like there is at least an engagement letter that has

6    the --

7          MR. HERZOG:  I don't know, Your Honor.  Excuse me.

8          I don't know, Your Honor, if there was a specific

9    engagement letter for GenViro!; we will undertake to

10   ascertain that.  If there was, it will be reviewed and

11   produced.

12         THE COURT:  Okay.  So it sounds like it might be

13   useful to have you confirm that everything has been turned

14   over to the trial team here.  Regardless of what we think

15   about the government all being connected and all, it's

16   conceivable to me that the SEC might not have turned over

17   everything to justice; so can I ask you to turn over the

18   relevant documents from the law firm to this trial team?

19         MR. HERZOG:  Your Honor, with all due respect, I

20   don't think there is a question because the first production

21   we got in this case was our production to the SEC that they

22   turned around and produced back to us.

23         THE COURT:  Okay.  So I just want you to confirm

24   that everything that -- any documents involving that law

25   firm on this subject matter are in that production; I am

1    going to ask you to do that.

2              MR. HERZOG:  With the potential exception, as we

3    have discussed, of an engagement letter.

4              THE COURT:  With anything, including an engagement

5    letter; I want you to double-check.  And if there is

6    anything that should have been turned over, I am asking you

7    to -- I am directing you to turn it over to the prosecution.

8              MR. HERZOG:  Understood, Your Honor.

9              THE COURT:  Okay.  How long do you need to do

10   that, sir?

11             MR. HERZOG:  Until next Tuesday.

12             THE COURT:  That's fine.  I will give you until

13   next Wednesday.

14             So I will ask for -- direct the defense to turn

15   over any documents relevant to that law firm and the subject

16   matter of this case to disclose that to the defense -- I'm

17   sorry -- to the prosecution by December 22nd, to the extent

18   that it has not already been produced to you by them.

19             MR. HERZOG:  In turn -- okay.  Thank you, Your

20   Honor.

21             THE COURT:  Thank you.

22             MR. LOUGHLIN:  Just a footnote on that, Your

23   Honor.  When you see my opposition, Exhibit A to that

24   opposition is an email in which Mr. Fenton asked us if -- to

25   agree to the authentication of the file from the law firm.

1           THE COURT:  Okay.

2           MR. LOUGHLIN:  They have the file.

3           THE COURT:  I understand that.  I think -- but it

4    sounds like we all agree they don't have an engagement

5    letter.  I understand how there may not be an engagement

6    letter; but I also understand why they could be concerned

7    that maybe they didn't get everything.

8           So, Mr. Weitz, does that answer your concerns

9    there?

10          MR. WEITZ:  Yes, Your Honor.

11          THE COURT:  So I don't need to rule on anything

12   else on that motion?

13          MR. WEITZ:  Your Honor, I think that -- as far as

14   the relevance issue goes, you know, I think we can take it

15   as it comes at trial; I think that's fine.  We just don't

16   want -- if the evidence doesn't support -- we don't want

17   them saying, hey, there was a law firm involved, that's

18   evidence of good faith.  Law firms -- I mean, in and of

19   itself, that's not, I think, evidence of good faith; but I

20   think we can deal with that as it comes in at trial.

21          THE COURT:  Yes.  I mean, it sounds to me like we

22   all agree there was a law firm involved, and I think it's --

23   my gut, Mr. Weitz, is it's okay for them to point that out.

24   I don't know that they're going to be able to make much more

25   with it than that.

```
 1              MR. WEITZ:  I understand, Your Honor.
 2              THE COURT:  But I also don't think they are
 3     suggesting they can.
 4              MR. WEITZ:  Thank you, Your Honor.
 5              THE COURT:  All right.  Mr. Fenton, anything else
 6     we should be discussing today?
 7              MR. FENTON:  One more issue, Your Honor.
 8              Your Honor already ruled on the first motion
 9     in limine to authenticate and admit business records that
10     was submitted by the government; that was ECF document
11     No. 60.
12              There is also a second motion in limine to
13     authenticate and admit business records, which is ECF
14     No. 65.  And that motion was filed yesterday, so the
15     government understands that defense counsel -- to the extent
16     that there is any objection -- may not have yet had the
17     opportunity to respond; but we also don't know whether or
18     not the defendant will ultimately object.
19              THE COURT:  Okay.  I see a certificate here, so I
20     assume that Mr. Loughlin is comfortable with that.  But
21     Mr. Loughlin may be -- I don't know if you have had an
22     opportunity to review this.
23              MR. LOUGHLIN:  I haven't had the opportunity to
24     read the motion that was filed yesterday, but I can.
25              Once I see it -- and it may be that it's subsumed
```

1    within our general agreement that if there is a 103

2    certificate and something is clearly a business record, then

3    we have already told the government we would not oppose

4    that.

5           THE COURT:  Do you have a copy of it, sir?

6           MR. LOUGHLIN:  If I fired up my laptop I can see

7    it.  Maybe during the break I will look at it.

8           THE COURT:  Can you pass that?

9           There is a copy.  If you want to, take a look at

10   that.

11          MR. LOUGHLIN:  Thank you.

12          THE COURT:  I don't want to put you on the spot,

13   but it looks to me like they have got everything there.  If

14   we can resolve this, this would be one less thing we can...

15          MR. LOUGHLIN:  Your Honor -- we have no objection

16   to this motion, Your Honor.

17          THE COURT:  Okay.  So that's ECF No. 65?

18          MR. FENTON:  Yes, Your Honor.

19          THE COURT:  All right.  So I am going to grant

20   ECF No. 65 without objection.

21          Thank you, Mr. Loughlin.

22          MR. LOUGHLIN:  May I hand this back up?

23          THE COURT:  Yes, please.

24          MR. LOUGHLIN:  Thank you, Your Honor.

25          THE COURT:  All right.  Mr. Fenton, I think -- it

1     seems like the last issue, on my list anyway, is the

2     proposed jury instructions.

3             Again, I want to thank you-all for working so

4     cooperatively.  It looks like you-all basically agree on the

5     final jury instructions.  And I think that works much

6     better, to have the attorneys familiar with the case hammer

7     things out rather than me try to do so.

8             It looks like there is an objection on the aiding

9     and abetting.  I will tell you my instinct is to wait on

10    ruling on that until I see how the case is coming out, so I

11    am going to hold off on that.

12            But, Mr. Fenton, can I hear from you on the good

13    faith -- or Mr. Shanker -- on the good faith jury

14    instruction?  And what is wrong with the defense version?

15            MR. SHANKER:  Yes, Your Honor.  Thank you.

16            And sorry for springing a case on you; obviously,

17    we haven't briefed this.  We just flagged it for you.  If

18    the Court would like us to brief it, we can -- or address it

19    at the charge conference.

20            But there is a case from the D.C. Circuit

21    *U.S. v* -- it's hard to pronounce -- *Akhigbe*, it's

22    A-K-H-I-G-B-E; and it's 642 F.3d 1078, D.C. Circuit, 2011.

23            In that case, the D.C. Circuit says that a good

24    faith instruction, such as the one proposed here by the

25    defendant, is not required where the instructions already

1    sufficiently explain the intent requirement, especially if

2    the instructions make clear that mistake, accident, or

3    negligence are not enough to establish the requisite intent;

4    and the instructions we proposed do that.  And so I think

5    that case stands for the proposition that this instruction

6    is unnecessary at best -- at least, and may confuse the

7    jury.

8              Now, my understanding is that there may be a

9    separate, sort of, theory of the defense good faith

10   instruction that is sometimes given, but that would depend

11   on the evidence at trial.  The defendant could certainly ask

12   for that, you know, perhaps later in these proceedings,

13   depending on what the evidence has shown.  There are certain

14   requirements to get such an instruction, including that

15   there was sufficient evidence to support such a theory of

16   the defense.

17             The defendant obviously need not testify him or

18   herself; but there would have to be some showing in the

19   defense case to establish enough to require a good faith

20   theory of the defense instruction.  But we see that as being

21   a different instruction than the one the defense is asking

22   here to be appended to the intent instruction.

23             THE COURT:  Okay.  Thanks.

24             So I think I will take a look at that case and,

25   kind of, reserve judgment on this for now.  I will certainly

1    give you an opportunity, Mr. Loughlin, before I decide.  And

2    especially if there is a -- it sounds to me like this might

3    be something that may matter depending on how you are --

4    what sort of defense you give; so it may not be -- it may

5    make sense to wait until later, and see how the trial

6    progresses before I decide on this.

7         MR. LOUGHLIN:  We would be content for Your Honor

8    to reserve on this and see how the case comes in and how we

9    believe this is appropriate.  It is a balanced instruction;

10   it comes from a leading source with which I am quite

11   familiar, Modern Federal Jury Instructions.  And we cite an

12   additional two cases as authority in which similar

13   instructions were given.  This is a balanced instruction;

14   it's not one-sided.

15        THE COURT:  All right.  Obviously, Mr. Shanker has

16   suggested there is D.C. Circuit precedent on point.  I am

17   going to look at that; I am sure you will want to as well.

18   You will understand how I am going to be inclined to follow

19   the D.C. Circuit; but I will certainly give you an

20   opportunity to weigh in before I decide.

21        Mr. Shanker?

22        MR. SHANKER:  I'm sorry, Your Honor.

23        With respect to the Modern Federal Jury

24   Instructions, I would just note that that provision -- and I

25   think it's cited in the defense filing on this -- is simply

1     referring to a Second Circuit case.  And that Second Circuit

2     case was simply quoting a jury instruction given in the

3     district -- by the district court in the case that the

4     Second Circuit was reviewing; the Second Circuit didn't

5     bless that instruction.

6            So the Modern Federal Jury Instructions provision

7     that the defense has cited was simply pointing out that that

8     instruction had been given in another case at some point.

9     It's certainly not suggesting that that's always an

10    appropriate instruction.

11           THE COURT:  Okay.  I have already entered the

12    parties' order -- proposed order on witness lists and

13    exhibit lists.  Again, I appreciate the parties working

14    cooperatively to figure out how this is going to go.

15           I will just ask you to make sure exhibits are

16    prenumbered; there is no confusion about any of that.  I

17    imagine this is going to be a document-heavy case, so let's

18    try to avoid issues at trial with the exhibits.

19           If you haven't already done so, I will want both

20    sides to give three copies of your witness list and exhibit

21    list, including numbered exhibits -- what it's going to be,

22    who is going to bring it in; I think we have a form that

23    Ms. Chaclan can give you to fill that out on, but I will

24    want that on the first day of trial.

25           The only other thing I have on my list is -- in

1     the last couple of trials I have done during COVID, what I

2     have told the jurors is that -- during the voir dire, I

3     think it's best for them to stay masked.  Once the trial

4     begins and we are here and they're spread out -- if they are

5     fully vaccinated, I have no objection to them removing their

6     masks if they wish.

7            Also, I am inclined to think that, at the very

8     least, the witness needs to be unmasked so that we can hear

9     and observe the witness.  I think, for similar reasons, the

10    defendant probably should be and attorneys who are speaking

11    probably should be.

12           I have been able to tell the jury in the past that

13    my staff and me and the parties have all been fully

14    vaccinated; and given that -- and given that we want to make

15    sure people can hear and understand them, that I have

16    instructed you-all that you can remove your masks if you so

17    wish, and ask you to do so when you are speaking so that we

18    can all hear you.  So I would be inclined to say something

19    like that at the outset if that's a representation I can

20    appropriately make.

21           I don't know if you-all know about that or have

22    thoughts about that right now, but that's what I have

23    generally -- you know, before I go into the questions with

24    the venire, I talk with them a bit about our COVID

25    protocols, the steps that we're taking to keep everybody

1   safe but also, kind of, explain to them why we are not

2   masked; and I want to try to avoid prejudice to anybody on

3   that.

4           Mr. Fenton, any thoughts about all of that?

5           MR. FENTON:  Your Honor, the government is

6   agreeable with that approach.  I can also confirm that the

7   prosecution team has been vaccinated.

8           THE COURT:  All right.  Mr. Loughlin.

9           MR. LOUGHLIN:  I am fully vaccinated, and even

10  have a booster.  I am perfectly happy, if it would ease the

11  jurors' minds, to be so informed.

12          THE COURT:  Okay.  I don't like singling out

13  individuals; but maybe you can confirm that that is true for

14  your client and anybody who is going to be sitting at

15  counsel table.

16          Just let me know that morning if I can -- I want

17  to be able -- if I can't say that about everybody, I am

18  certainly not going to say:  Everybody but the defendant, or

19  something like that.  So I want to make sure that I am

20  saying something that is, A, accurate; B, you-all are

21  comfortable with; and, C, is not prejudicial to anyone, so

22  maybe you can help me on that.  If there is any

23  clarification on that, I am happy to give it.

24          Also, for the witnesses -- I think we do have face

25  shields, or some sort of transparent masks; so if, for

1    whatever reason, it's not appropriate or a witness doesn't

2    feel comfortable not wearing a mask at all -- I think we

3    have alternatives; but let's figure that out ahead of time.

4    I don't want to have a situation where someone is taking the

5    stand and is masked in a way that the jurors can't observe

6    what the person is saying and how they're saying it.

7             Mr. Fenton, anything else that we should discuss

8    today?

9             MR. FENTON:  Nothing further, Your Honor.

10            THE COURT:  And Mr. Loughlin?

11            MR. LOUGHLIN:  I'm sorry, Your Honor?

12            THE COURT:  Anything that I am forgetting?

13            MR. LOUGHLIN:  Nothing on our agenda, Your Honor.

14            THE COURT:  Okay.  Great.  I will see you all on

15   January 4th, at 9 a.m.

16            And, Ms. Chaclan, are we upstairs?

17            THE COURTROOM DEPUTY:  For the first day, yes.

18            THE COURT:  Yes.  So we'll be up in the ceremonial

19   courtroom for the first day.  Don't come here, we will be

20   upstairs for the first day.  After we pick the jury, we will

21   be moving here.

22            Okay.  Folks, have a happy holiday.  I will see

23   you in a few weeks.

24            THE COURTROOM DEPUTY:  All rise.  This Honorable

25   Court is adjourned.
                  (Whereupon, the proceeding concludes, 3:20 p.m.)

## **CERTIFICATE**

       I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

       This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.

    Dated this 22nd day of December, 2021.

    /s/ Elizabeth Saint-Loth, RPR, FCRR
Official Court Reporter