```
 1                 IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2

 3    United States of America,       ) Criminal Action
                                      ) No. 20-cr-278
 4                   Plaintiff,       )
                                      ) TELEPHONIC MOTION
 5    vs.                             ) HEARING
                                      )
 6    Keith Berman,                   ) Washington, DC
                                      ) January 11, 2022
 7                   Defendant.       ) Time:  10:00 a.m.
      _____

 8
                  TRANSCRIPT OF TELEPHONIC MOTION HEARING
 9                            HELD BEFORE
                THE HONORABLE JUDGE TREVOR N. McFADDEN
10                   UNITED STATES DISTRICT JUDGE
      _____
11
                        A P P E A R A N C E S
12
      For Plaintiff:      Vijay Shanker
13                        U.S. DEPARTMENT OF JUSTICE
                          Criminal Division
14                        1400 New York Ave, Room 7101
                          Washington, DC 20530
15                        202-514-1138
                          Email:  Vijay.shanker@usdoj.gov
16
      For Defendant:      Walter Patrick Loughlin
17                        WALTER P. LOUGHLIN ATTORNEY AT LAW
                          340 West 57th Street, Suite 5d
18                        New York, NY 10019
                          203-216-3445
19                        Email:  Walter.loughlin@gmail.com

20                        Ronald S. Herzog
                          GOLDBERG SEGALLA LLP
21                        50 Main Street, Suite 425
                          White Plains, NY 10606
22                        914-798-5419
                          Email:  Rherzog@goldbergsegalla.com
23
      Court Reporter:         Janice E. Dickman, RMR, CRR, CRC
24                            United States Courthouse, Room 6523
                              333 Constitution Avenue, NW
25                            Washington, DC  20001
                              202-354-3267
```

1          THE COURTROOM DEPUTY:  Thank you.  I believe I heard

2     another beep.  Is there someone else that joined?

3          MR. SHANKER:  Yes, Vijay Shanker with the

4     United States.

5          THE COURTROOM DEPUTY:  Thank you, Mr. Shanker.

6          THE COURT:  So, all attorneys and Mr. Berman are

7     present.

8          Mr. Loughlin, any objection to handling this

9     telephonically?

10          MR. LOUGHLIN:  No, Your Honor.

11          THE COURT:  Okay.  So, let's address the show cause

12     issue first.  Has the government received Exhibit N?

13          MR. SHANKER:  We have not, Your Honor.  We asked for

14     and received from the defense a tracking number, and we tracked

15     the package this morning.  It looks like it was not sent for

16     immediate overnight, first-thing-in-the-morning delivery, but

17     is scheduled to arrive at 4:30 this afternoon.  The last we

18     checked it was in Indianapolis.  So we, obviously, have not had

19     a chance to look at that object.

20          THE COURT:  And this is Mr. Shanker?

21          MR. SHANKER:  Yes.  I'm sorry, Your Honor.  Michelle

22     asked us to introduce ourselves, and I failed to do that.  Yes,

23     Mr. Shanker.

24          THE COURT:  All right.  Mr. Shanker, I guess I'm

25     inclined to discharge the show cause at this point.  Obviously,

1    you can re-raise this if the package does not arrive or does

2    not contain what you expect it to contain.  But anything

3    further you wish to be heard on this matter?

4              MS. SHANKER:  Yes, Your Honor.  And certainly that

5    would be fine with the government.  We defer to your Court,

6    with your Court's best judgment, how to remedy the situation.

7    The fact is, obviously, we haven't seen this package.  We've

8    had quite a bit of time for the defense to give us an

9    opportunity to inspect it.

10             But we have continuing concerns, one of which is that

11   we don't know that what is being sent is actually the object

12   that will be introduced by the defense in trial.  We presume

13   it's not, given that they are providing us with a tangible

14   object by mail, rather than giving us an opportunity to inspect

15   in person the actual item that they intend to introduce.  And

16   so we don't know what might happen between now and trial.  And

17   that's not to suggest any impropriety on the part of the

18   defense, but simply that tangible objects can change and we

19   just haven't had a chance to see what that is.

20             All of that is underscored by the fact that there has

21   been a somewhat odd modification of the description of this

22   object by the defense that gives us, you know, quite a bit of

23   concern.  The object was described in the defense's exhibit

24   list as "GenViro package and contents."  And we were,

25   obviously, never given a chance to know what that was or what

1    that meant.  And when the defense was finally forced to come

2    forward with the object, they acknowledged that it, in fact,

3    was not actually a GenViro test, but a preexisting glucose test

4    and glucose test strips, you know, which is a test that the

5    defendant company has had in its possession for years.  And

6    we're not sure what the relevance of that object is to the

7    issues in this trial.  And, of course, that might be a subject

8    of a later motion.

9          But all of this just goes to show that -- I mean,

10   again, without casting any aspersions on my colleagues on the

11   other side, that there seems to be quite a bit of gamesmanship

12   here that has put the government at some disadvantage.

13         So, again, we defer to the Court on how to remedy the

14   situation.  And perhaps the best course is to wait and see what

15   we get in the mail later today.  But, quite frankly, we don't

16   really know what's going on.

17         THE COURT:  All right.  So, Mr. Loughlin, what is

18   actually being sent to the government?

19         MR. LOUGHLIN:  Mr. Herzog is --

20         THE COURT:  Okay.  Mr. Herzog.

21         MR. HERZOG:  Your Honor, what is being sent is what

22   was described in the submission yesterday, the -- a meter for

23   the glucose product which was going to being modified for use

24   in the blood testing product, and the test -- the test strips.

25   And as we noted, we believe two of the government's witnesses

1    will verify that this was the existing product that was in the

2    process of being modified for the blood testing product, and

3    that that will be relevant to refute any assertion that this

4    was all some sort of fraud or some sort of scheme and that no

5    product ever existed.

6              THE COURT:  So, remembering that you all know a lot

7    more about the facts of the case than I do, are you saying this

8    is something that your client had not produced, but he was,

9    kind of, intending to modify a -- something that had been

10   created elsewhere?  Am I understanding that correctly?  And

11   this is the pre-modified item?

12             MR. HERZOG:  Essentially correct, Your Honor.  This

13   uses the impedance technology, which was an integral part of

14   the -- originally the blood testing and then, ultimately, the

15   saliva.  And it shows that the technology was perfected and had

16   been utilized.  And one of the assertions in one of the early

17   press releases is that the claim that the technology had been

18   perfected was false and misleading.

19             THE COURT:  All right.

20             MR. HERZOG:  It will show that that's not the case.

21             THE COURT:  Just to be clear --

22             MR. HERZOG:  I'm sorry?

23             THE COURT:  -- this item is something that -- I guess

24   I can imagine, you know, on the one hand your client created

25   it; on the other, somebody else created it and your client has

1    done nothing with it, or; on the third, it was created by

2    someone else and your client or his company did -- has modified

3    it.  Which of those is that?

4            MR. HERZOG:  It is an existing product that uses the

5    technology that was being utilized to develop the COVID testing

6    product.

7            MR. LOUGHLIN:  This is Mr. Loughlin.  Just to clarify

8    the point, if there's any confusion of it, this is a product

9    created by Decision Diagnostics and manufactured by the buyer,

10   the company in South Korea, and it contains the technology

11   which Mr. Berman sought to adapt for the blood test.  It is an

12   internal product of Decision Diagnostics.

13           THE COURT:  So, thank you, Mr. Loughlin.  So this is

14   like a bit of a prototype, is that --

15           MR. LOUGHLIN:  No, it's an existing product that was

16   to be -- this technology was to be utilized in the COVID

17   testing product.  But it is not purely a prototype, it is an

18   existing product that has been sold by Mr. Berman's company for

19   many years, but it uses -- it uses the basic technology.

20           THE COURT:  Sorry.  I think I'm hearing Mr. Loughlin

21   disagree there.

22           MR. LOUGHLIN:  No, Your Honor.  That was the point I

23   was trying to make, is that it has been a product of Decision

24   Diagnostics for many years, and that was the basis on which

25   Mr. Berman suggested, back in the beginning of 2020, you know,

1   can this product be adapted for either a blood-based test or

2   saliva-based test?  And that's what this case is all about.

3          THE COURT:  Okay.  So this item that -- is an item

4   from your client's company, but that preexisted COVID, and it's

5   not been modified, but that he hoped to modify.  Am I

6   understanding that correctly?

7          MR. HERZOG:  A step further, essentially, Your Honor,

8   that he was in the process of modifying, not simply that he

9   hoped to modify.

10          THE COURT:  And so this is -- I see.  All right.  And

11   so this actual product has not been on the market, but it's

12   been modified from the version that was on the market?

13          MR. HERZOG:  No, Your Honor.  This product is on the

14   market.  It was to be used to modify -- as the technological

15   basis for modifying it to test for COVID.  It does test for

16   diabetes.  It is a glucose testing product, but the technology

17   in the two products is the same, the basic technology, the

18   impedance technology is the same.

19          THE COURT:  Okay.  Yeah, I got to tell you, I'm kind

20   of confused right now.  I mean, I'm not sure that we need to

21   come to ground on this immediately, although, you know, if the

22   government is going to be seeking to prohibit the introduction

23   of this, I'm certainly going to need more confidence than I

24   currently have about what this is and how it fits in.  Suffice

25   it to say, the item you are sending is not the item that you're

1    going to be introducing at trial.  You're going to be

2    introducing a substantially similar one at trial, but you're

3    not hoping to get this item back from the government to

4    introduce at trial, is that correct, Mr. Herzog?

5              MR. HERZOG:  Not necessarily, but we can, if the

6    government returns it.  But it is not unique, if that was the

7    question, Your Honor.

8              THE COURT:  Yeah.  I think that's what I was trying

9    to ask.  Okay.

10             All right.  So, Mr. Shanker, you know, I think we

11   should wait for you all to see it.  Maybe it will make more

12   sense to you than it makes to me and we can go from there.

13   But, I think that, you know, the important thing is that you

14   all, at least, can get your hands on it and try to check it out

15   yourselves.

16             MR. SHANKER:  Thank you, Your Honor.  This is

17   Mr. Shanker.

18             THE COURT:  So I am going to discharge the show cause

19   order, Mr. Loughlin.  Mr. Herzog, I understand, you know, it

20   sounds like there have been some illness issues and, obviously,

21   the trial has been pushed back.  But, I do try to stick by my

22   deadlines, and I certainly expect the parties to.  And it's

23   going to be important for all of us working together in the

24   next month or so that you're sticking on top of the deadlines.

25   And if there's some reason that you cannot meet a deadline,

1    that you let the government and me know.  And I'm not hearing

2    from the government that you were supposed to do something that

3    I ordered you to do and you haven't done it.

4              MR. HERZOG:  Apologize, Your Honor, for not being

5    more proactive.  There were, unfortunate, hopefully

6    non-recurring, circumstances.  But we won't let this happen

7    again.

8              THE COURT:  All right.  Thank you, sir.  All right.

9    Let's try to come to ground now on the transcript of the

10   interview.  We've had some back and forth on briefing, on the

11   tape-recording.  It sounds to me like there are -- there's an

12   agreement that the government can bring in, what it seeks to

13   bring in.  And the defense now has three relatively discrete

14   portions that they are seeking to get in.  And I'm not sure

15   that the government actually disagrees with all of these anyway

16   at this point, but I want to go through those.

17             My understanding is that the three segments that we

18   need to decide about today, the only ones that are at issue are

19   from the 4:00 mark to 5:02 mark.  The second one is from 45:04

20   to 45:47.  And the third is 50:11 to 50:43.  So, we've got

21   relatively narrow segments at issue.

22             Addressing the first, Mr. Shanker, are you going to

23   handle this?

24             MR. SHANKER:  Yes, Your Honor.

25             THE COURT:  All right.  Is the government objecting

1   to 4:00 to 5:02?

2          MR. SHANKER:  Yes, Your Honor.  We continue to object

3   to 4:00 -- actually, through 5:09.

4          THE COURT:  I think the defendant has withdrawn its

5   request for those last few seconds.  Is that correct?

6          MR. HERZOG:  Yes, Your Honor.  All we want -- we

7   don't want any reference to Mr. Berman trying to call a lawyer.

8   It just seemed to me it was helpful context to have the initial

9   description by the FBI agent who comes in and says he wants to

10  talk to Mr. Berman.  He says, "What about?"  And then he

11  describes the scope of the interview.  I don't understand

12  why --

13         THE COURT:  I understand.  All right.  Mr. Shanker,

14  I'm kind of inclined to agree with Mr. Loughlin, honestly.  It

15  kind of sets the stage and, I think, it strikes me is fair

16  context.  What am I missing here?

17         MR. SHANKER:  Your Honor, in the interest of speeding

18  things along, I think we would -- we can go with that.  I mean,

19  we still think it -- you know, full context is not necessarily

20  required when we're simply putting in particular snippets that

21  relate to relevant conduct.  But, if there's just a desire to

22  set the stage and explain that there was an interview and an

23  investigation, I think that's fine, as long as we're cutting

24  out the reference to a lawyer.

25         THE COURT:  Okay.  So I will grant the defense

1    request to play 4:00 to 5:02.

2         The second segment at issue is, as I said, 45:04 to

3    45:47.  So, Mr. Shanker, I guess, one clarifying question here,

4    there's a statement from the defendant, 45:54, "Yeah, we've

5    been broken into and had things stolen, things that have no

6    value.  It's like your desktop computers, right?  $1,000

7    monitor sits on the desktop and stolen."  I mean, I thought you

8    had intended to play that.  In your -- in your initial motion

9    in limine you have that as language that you wanted to play,

10   but it looks to me like, in your reply, that you're objecting

11   to that.  Can you help me out understand what's going on?

12        MR. SHANKER:  Yes, Your Honor.  I'm sorry if there's

13   some confusion about the timing that we set forth in our

14   initial motion.  My understanding is that we were seeking to

15   admit from 46:14 forward, which is the line starting with, "Do

16   people ever go on the message board?"  And so, again, I can

17   look at our initial filing again.  I don't think it was ever

18   our intention to put in the piece about things broken into and

19   stolen.

20        THE COURT:  Okay.  Well, I was reading from your -- I

21   mean, you do actually have that verbatim in your motion

22   in limine.  So, but I can understand how these things are

23   irrelevant to the rest of what's filed.

24        So, Mr. Loughlin, you're seeking to have 45:04, where

25   the interviewer says, "I totally believe you, by the way,"

 1        through where your client says, "It's like I said to you, the

 2        anonymity of message boards creates verbal situation," is that

 3        correct.

 4                  MR. LOUGHLIN:  Yes, Your Honor.  I think that's 45:04

 5        to 45:38.  And I would be happy to go straight from that to the

 6        beginning of the government's, which I actually thought was

 7        46:12, not 46:14, as Mr. Shanker just said.  I don't see any

 8        reason to include Mr. Berman's description of the difficulties

 9        that were experienced, as he described it, by message board

10        posters or other people who have animus towards his company and

11        him.

12                  THE COURT:  So, Mr. Shanker, why shouldn't we allow

13        in that very brief back and forth, where the interviewer says,

14        "I totally believe you, by the way.  You're trying to come up

15        with a product that helps humanity.  I believe you, I get it.

16        It's important.  It's just all this other stuff that's in the

17        ether that I'm trying to make sense of in my head and why so

18        many people would hate.  Is it because it's -- is it because --

19        has it always been shareholder-based, stock prices changing?"

20        And then Mr. Berman responds, "It's like I said to you, the

21        anonymity of message boards creates horrible situation."  And

22        that strikes me as relevant to what you want to admit about

23        message boards, starting, I guess, at 46:14.

24                  MR. SHANKER:  Well, Your Honor, it may be relevant,

25        but I think the defense first has to show, first of all, that

1     the questions by the interviewer is not hearsay.  And,

2     secondly, if it is hearsay, that it is necessary to correct a

3     misimpression from -- that arises from the portion that we

4     would like to introduce.  And I'm not sure what that

5     misimpression is.

6              Now, if there's a desire to get in the FBI agent's

7     statement that the defendant was trying to help humanity, I

8     think that's just clearly hearsay and would be used to suggest

9     that the FBI agent believed that the defendant hadn't done

10    anything wrong, and I think that would confuse the jury, it's

11    hearsay, and it's not really relevant to the issue.

12             MR. LOUGHLIN:  Well -- this is Mr. Loughlin -- I can

13    respond to that.  It's clearly relevant because you're trying

14    to prove, through this interview, to uncharged, false

15    statements, including false statements about the message board

16    posting, which is referred to in this very question by the

17    agent.  And if you're going to try to prove that he was lied

18    to, the fact that she told Mr. Berman that she believed him and

19    believed in the importance of the product that he was

20    developing is not going to confuse the jury.  It balances what

21    you're going to try to persuade the jury of.  And without

22    this -- now, I'm saying contextual information -- I would say

23    your snippets are actually distorted of the record.

24             THE COURT:  Mr. Shanker, do you want to respond?

25             MR. SHANKER:  Yes, Your Honor.  The issue is not one

1    of balance, that's what the cases have made clear.  Simply

2    because the government puts in inculpatory information, the

3    defendant doesn't get to put in, presumably, or allegedly,

4    exculpatory information simply as an issue of balance.  That's

5    not what Rule 106 is about.  If it's hearsay, the defendant has

6    to show that the government's portion is misleading or taken

7    out of context before he gets to put in something to correct

8    that misimpression, not just to, quote, unquote, balance out

9    the harm that comes in from the admitted portion by the

10   government.

11         And Mr. Loughlin makes clear that that's exactly what

12   he's trying to do here, by getting in a portion to suggest that

13   the FBI agent didn't totally believe that something criminal

14   had occurred here, or that the defendant was actually trying to

15   help humanity.  And Mr. Loughlin's own statement suggests that

16   he's trying to balance out the inculpatory nature of the

17   following statement, and that's simply not what Rule 106 is

18   about.

19         THE COURT:  Okay.  I'm going to allow this portion.

20   I do think it kind of segues into the discussion about the

21   message boards, which is the topic of the later snippet.  I

22   think it's helpful context for the defendant's answer.  And,

23   you know, whether the -- that it includes some language that is

24   arguably helpful to the defendant I think is fine, given that

25   the government has the burden to show that it is -- that

1   there's a false statement here.  And, you know, who knows which

2   way it cuts?  But the agent is saying that the agent believes

3   the defendant, I think that actually helps the government.  I

4   don't know.

5         But the defense is asking for this first part to come

6   in.  That, in my mind, directly relates to the message board

7   discussion and I think it's appropriate to allow that in.

8         So I'm going to allow in -- so, for the record,

9   what -- how I think this will go is we'll have 45:04 through

10  45:38.  So we have the interviewer saying, "I totally believe

11  you, by the way," those couple lines there from the

12  interviewer.  Mr. Berman responds, "It's like I said to you,

13  the anonymity of the message board creates horrible situation."

14        I don't think either side is now seeking the next few

15  lines.  So it would skip -- which, anyway, are kind of a

16  tangent -- and so it will skip directly to 46:14, where the

17  interviewer then asks, "Do people ever go on the message

18  boards, or something, and shut it down on their own,

19  anonymous?"  And so I think we'll have a, kind of, continuous

20  conversation there about the message board.

21        Any questions about that, Mr. Loughlin?

22        MR. LOUGHLIN:  No, Your Honor.

23        THE COURT:  And Mr. Shanker?

24        MR. SHANKER:  No, Your Honor.

25        THE COURT:  All right.  And the third is, I think,

1     the only other thing that is at question here, is 50:11 to

2     50:43, a discussion about the shareholder letter and coming

3     from somebody named Matt.

4              Mr. Shanker, are you still opposing the introduction

5     of this language?

6              MR. SHANKER:  We do, Your Honor, for the same

7     reasons, it's hearsay.  And, again, the defense has not shown

8     why it's necessary to correct the misimpression from the

9     government's designated portion.

10             THE COURT:  But, I mean, there's a conversation

11    here -- I mean, I think -- you're seeking to admit language

12    about this conversation about Matt and that Mr. Berman didn't

13    have any involvement in it, in that letter, but that here

14    Mr. Berman -- your agent says, "Okay.  So he, like, reached out

15    to you to make sure this was all correct?"  And Mr. Berman

16    said, "Yeah."  The agent said, "Is that what you mean?"

17    Mr. Berman said, "Yeah."  I mean, how is that not relevant to

18    the shareholder letter statement?

19             MR. SHANKER:  Well, it may be relevant, Your Honor,

20    but it's hearsay.  It's Mr. Berman claiming that all that

21    happened was that he was reached out at the end -- reached out

22    to at the end to make sure that the material in the shareholder

23    letter was correct, when, in fact, our allegation is that he

24    basically wrote the shareholder letter.  And, so, he is trying

25    to nuance the answer, in our view.  Obviously, this is an issue

1    for trial.  But, in our view, he's trying to nuance the

2    question, to give a, you know, partially -- a partial answer,

3    and so that would be hearsay.  So it may be relevant, but it's

4    still hearsay.

5            THE COURT:  I understand that point.  But isn't

6    the -- isn't defense right that -- I mean, under Rule 106,

7    only -- is the value add, where it does allow hearsay in.  In

8    other words, if the government -- if the defense had to show

9    that everything was not hearsay to get in, you wouldn't need

10   Rule 106.  I thought Rule 106 trumps the hearsay requirement,

11   where something that may be hearsay can, nonetheless, come in

12   to allow for context and completeness for a statement that is

13   admissible under the other rules.

14           MR. SHANKER:  Yes, that's true, Your Honor.  That's

15   correct.  But again, only if the defense can show -- I mean, I

16   think the common law term "rule of completeness," the courts

17   have said that's a little bit of a misnomer under the Federal

18   Rules of Evidence because it's not for completeness, it's

19   actually to correct a misimpression that might arise from the

20   jury from the government's portion.

21           So without a showing that there's some sort of

22   misimpression created from the government's showing, then we

23   would argue that portions don't get to come in.  But we're not

24   going to fall on our sword for this portion, Your Honor.  So if

25   you're inclined to let it in, we reiterate our objection.  But

 1   again, I'm not -- I'm not going to continue to argue.

 2           THE COURT:  All right.  Yeah.  I mean, Mr. Shanker,

 3   again, you know the case a lot better than I do.  It looks to

 4   me like you have this section that you want to get in about the

 5   shareholder letter, and that I take to be the point of this,

 6   that Mr. Berman is saying that he didn't have anything to do

 7   with the shareholder letter.  And you are arguing that that's

 8   false, and that he actually wrote it.

 9           It strikes me, where Mr. Berman says that they did

10   have communication about the shareholder letter, that, you

11   know, feels relevant and in some ways softens the more, kind

12   of, black-and-white statement you have in your section.

13           MR. SHANKER:  Understood, Your Honor.  We're willing

14   to let this go.

15           THE COURT:  All right.  So I'm going to grant the

16   defense motion to put in 50:11 to 50:43.

17           Mr. Shanker, anything -- well, I guess, Mr. Loughlin,

18   are those -- am I correct, those are the only three sections

19   you are, at this point, seeking to bring in from the taped

20   interview?

21           MR. LOUGHLIN:  There was one more section, Your

22   Honor.  But there was no objection from the government on that,

23   so --

24           THE COURT:  Okay.  All right.  You agree on that,

25   Mr. Shanker?

1          MR. SHANKER:  Yes, Your Honor.

2          THE COURT:  All right.  So, Mr. Loughlin, anything

3     else that we should be discussing today?

4          MR. LOUGHLIN:  Nothing from the defense.

5          THE COURT:  And Mr. Shanker?

6          MR. SHANKER:  Nothing from the government.

7          THE COURT:  Okay.  Oh, just to give you all a

8     heads-up, we've rescheduled this for February 28th, as you

9     know.  Right now I do not have the ceremonial courtroom.  That

10    means that we would be, I think, basically picking a jury

11    twice, having to split the venire up into two groups so that we

12    can fit people into my courtroom.  And, obviously, there's a

13    fair chance that the trial scheduled ahead of me will plead out

14    or continue and, therefore, we can get into the ceremonial

15    courtroom.

16          Another thing that occurred to me is I might be able

17    to slip us in on Tuesday, March 1st, for the ceremonial

18    courtroom, instead of going forward on the 28th.  So, all that

19    to tell you is, you know, I certainly intend to go forward that

20    week.  It's possible I'll be coming to you, suggesting that we

21    continue it one day so that we can use the ceremonial

22    courtroom.  But that's just -- that's going to be -- and,

23    otherwise, we may well end up having a long day of jury

24    selection together in my courtroom on Monday, the 28th.

25          But, just wanted to flag that for you, that we're all

1   going to need to be a little flexible about the beginning of

2   trial there that week.

3          Anything else for -- any questions about that or

4   anything else for today, Mr. Shanker?

5          MR. SHANKER:  No, Your Honor.  I would ask for maybe

6   five seconds to see if either of my co-counsel want to jump in

7   with a question, but, otherwise, nothing.

8          THE COURT:  And Mr. Loughlin?

9          MR. LOUGHLIN:  Nothing from the defense, Your Honor.

10          THE COURT:  All right.

11          MR. LOUGHLIN:  And we'll stay tuned on February 28th

12   or March 1st.

13          THE COURT:  Yeah.  Assume it's February 28th.  I'll

14   certainly let you know if we need to push it to March 1st.  If

15   we do, it would just be to be able to get the ceremonial

16   courtroom and do it all in one fell swoop.  But, for now,

17   assume it will be February 28th in my courtroom, and we'll let

18   you know if that changes.  Thanks, gentlemen.

19          MR. SHANKER:  Thank you.

20          MR. LOUGHLIN:  Thank you.

21                        *   *   *

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER


     I, JANICE DICKMAN, do hereby certify that the above and

foregoing constitutes a true and accurate transcript of my

stenographic notes and is a full, true and complete transcript

of the proceedings to the best of my ability.

                         Dated this 15th day of January




                         _____

                         Janice E. Dickman, CRR, CMR, CCR
                         Official Court Reporter
                         Room 6523
                         333 Constitution Avenue, N.W.
                         Washington, D.C.  20001


This hearing was held telephonically in compliance with the
COVID-19 pandemic stay-at-home orders and is, therefore,
subject to the limitations associated with the use of current
technology, including but not limited to telephone signal
interference, static, signal interruptions, and other
restrictions and limitations associated with remote court
reporting via telephone, speakerphone, and/or
videoconferencing.