# Exhibit A

```
1              UNITED STATES DISTRICT AND BANKRUPTCY COURTS
                     FOR THE DISTRICT OF COLUMBIA
2

3   UNITED STATES OF AMERICA      Criminal No. 20-cr-00278

4         v.                      Washington, D.C.

5   KEITH BERMAN,                 November 19, 2021

6              Defendant.         11:00 a.m.

7   ------------------------/

8              TRANSCRIPT OF MOTIONS HEARING
           BEFORE THE HONORABLE TREVOR N. McFADDEN
9               UNITED STATES DISTRICT JUDGE

10  APPEARANCES:

11  For the Government:  U.S. Department of Justice
                        By: JUSTIN WEITZ, ESQUIRE
12                          VIJAY SHANKER, ESQUIRE
                            CHRISTOPHER FENTON, ESQUIRE
13                      1400 New York Avenue, NW
                        Washington, D.C.  20530
14

15  For the Defendant:  Walter P. Loughlin
                        By: WALTER P. LOUGHLIN, ESQUIRE
16                      340 West 57th Street
                        Suite 5d
17                      New York, New York 10019

18                      Goldberg Segalla LLP
                        By: RONALD HERZOG, ESQUIRE
19                      665 Main Street
                        Suite 400
20                      Buffalo, New York 14203

21  Court Reporter      Lisa K. Bankins RMR FCRR RDR
                        United States District Court
22                      District of Columbia
                        333 Constitution Avenue, NW
23                      Washington, D.C. 20001

24

25  Proceedings recorded by mechanical stenography,
    transcript produced by notereading.
```

1

1    United States, 140 Supreme Court 1565 from 2020 for the

2    proposition that a defendant can commit wire fraud only by

3    trying to obtain a victim's money or property.  But Kelly

4    involved a scheme by U.S. officials or by public officials

5    to close certain traffic lanes at the George Washington

6    Bridge.  The court reversed the convictions because there

7    was no money at issue.  Here, the government is alleging

8    that Mr. Berman schemed to steal money from DECN.  I,

9    therefore, find that Kelly is inapposite.

10          All right.  I now have some questions for you

11   all.  Let's talk about the Defense Motion In Limine,

12   Number 30 -- oh, I'm sorry -- the Government's Motion In

13   Limine, ECF Number 30.  It looks like the government is --

14   wishes to exclude two categories of evidence, whether

15   the -- and that's -- that defense should be precluded from

16   offering evidence about a COVID-19 test.  DECN was

17   ostensibly seeking to develop largely as a replacement for

18   the COVID-19 blood test.

19          And so the first, I guess you had kind of a

20   saliva test argument and then I think you also argued

21   about the theoretical possibility of the blood test.  I'll

22   hear first from the government.  Mr. Shanker?

23          MR. SHANKER:  Good morning, Your Honor.  Thank

24   you.  Yes.  As the government explained in its papers,

25   there are two categories of evidence that the government

 1    thinks is irrelevant and likely to confuse the jury.  The

 2    first one we would like to discuss is evidence of an

 3    unrelated saliva test that the defendant purportedly

 4    sought to develop after the events at issue in this case.

 5    The issue here relates to the purported blood test for

 6    the COVID-19 virus and false statements, fraudulent

 7    statements that the defendant made with respect to that

 8    particular test.

 9            The saliva test is simply a different test that

10    arose later chronologically and has no bearing really on

11    the truth or falsity of the statements that the defendant

12    made in press releases and other places about the status

13    of the development of this blood test.  The two tests are,

14    quite frankly, just different products and we see no

15    relevance to the saliva test with respect to the

16    allegations in the indictment here.

17            In addition, the science here which the

18    government would submit -- and this relates to our second

19    motion in limine as well -- is quite complex and can be

20    complex and more importantly, we think that it's not

21    relevant to the issues in this case.  And so the

22    defendant's attempt to alter his test or devise a separate

23    test related to saliva can get very confusing for the

24    jury.  And if the jury starts hearing about similar tests

25    that in this case really had the same name or similar

1  name, it is likely to misunderstand the facts that are

2  presented in this case.

3          THE COURT:  Isn't evidence of the saliva test

4  though, wouldn't that help the defense show that there's

5  not an intent to defraud, but that he's, you know,

6  working hard to provide a product that would be useful to

7  Americans and that would be a valuable product for DECN?

8  I guess I kind of feel like the general thrust that I

9  think I'm getting from the government is that this is

10 just kind of all a hoax, that this is kind of a Ponzi

11 scheme almost for the defendant to obtain to kind of

12 fleece shareholders and that he's working on a saliva

13 test seems to me to suggest that he is -- there's kind of

14 a good faith effort to provide a product for his

15 shareholders.

16         MR. SHANKER:  Well, Your Honor, I don't think

17 it's central to our allegations that the defendant here

18 had no interest ever in devising some sort of product

19 that might make his company money.  And perhaps --

20 although we wouldn't necessarily concede it -- might be

21 good for society.  And I don't we have to prove that to

22 succeed in our case here.

23         I think the point is that the defendant,

24 whatever his early intentions were, good or bad and

25 probably a mix of both learned very early on that the test

15

1    that he was proposing, a blood test for COVID-19 was

2    simply not possible, was not being developed.  That people

3    he enlisted to develop and design and manufacture the

4    product were telling him repeatedly that it was not

5    happening and could not happen.  And despite that

6    knowledge on his part, he repeatedly put out press

7    releases and other information to the public directly

8    contradicting that information that he had and that he did

9    that at that point for unlawful purposes.

10              And so I think to the extent the saliva test

11   might suggest that the defendant also had a genuine desire

12   to develop a test that might identify and detect the

13   COVID-19 virus, we don't think that's relevant and it

14   doesn't contradict the central theory of our case which is

15   that once the defendant was put on notice that this test

16   simply could not happen, he maintained his false

17   statements to the public in order to drive up and

18   artificially increase the stock price of his company.

19              THE COURT:  All right.  I'm going to handle the

20   theoretical blood test thing.  I mean there, your

21   indictment talks about him asking whether it's

22   theoretically possible to use the impedance technology.

23   Why isn't it relevant that he can -- he's working on

24   something and again, you know, kind of goes to good

25   faith, his good faith efforts?

1          MR. SHANKER:  Yeah.  Certainly, Your Honor.

2    The question or the issue of whether the defendant did

3    seek an opinion as to whether a blood test for the

4    COVID-19 is theoretically possible, that fact we would

5    not deny can come in.  It's in our indictment.  It's

6    probably going to be a part of our affirmative case.

7          The answer that the defendant received, which I

8    don't think is really before us today, but the answer the

9    defendant received in our view was quite clearly that it

10   was not theoretically possible.

11         But aside from that, this is almost -- I

12   analogize this to almost a hearsay analysis.  The fact is

13   the defendant did ask that question.  The truth of the

14   answer or the actual answer as to whether it's

15   theoretically possible is what we're trying to say is

16   really irrelevant and will be confusing to the jury.

17         In other words, the scientific medical question

18   of whether somebody out there could devise a test that

19   through impedance or any other method could detect a virus

20   in whole blood, that is a different question because the

21   defendant here was put on early notice that it was not

22   possible or at least the test that he was proposing and

23   was claiming was being developed was not possible.  Our

24   fear is that once we open the door to this type of

25   evidence really we're going to be having a scientific

1    lesson for the jury that could take days and could be very

2    confusing for the jury.

3              THE COURT:  So you're not concerned about

4    the -- what the defendant might bring in about what he

5    had learned.  What you're saying is you don't want some

6    sort of new expert to say, oh, this would have been

7    possible.

8              MR. SHANKER:  That is right.

9              THE COURT:  Okay.  I think I understand your

10   position.  Anything else you wanted to say, Mr. Shanker?

11             MR. SHANKER:  No.  I think that's all.  Thank

12   you.

13             THE COURT:  Thank you.

14             MR. SHANKER:  Thank you.

15             THE COURT:  Defense?  Good morning, Mr.

16   Loughlin.

17             MR. LOUGHLIN:  Good morning, Your Honor.  I

18   didn't really understand and haven't understood the

19   government's position here that, for instance, the saliva

20   has nothing to do with this case.  The saliva test was

21   developed in the late spring of 2000.  The government's

22   theory of the fraud extends from February 2000 to

23   December 2000.  So it's right within the timeframe of the

24   case.  Similarly as --

25             THE COURT:  Sorry.  I mean let's say that he

18

1    was working on something completely different like cold

2    medicine.  I mean that wouldn't be relevant whether or

3    not he was doing it at the same time.  Right?

4              MR. LOUGHLIN:  No.  But both products were

5    designed to be home-based test kits for COVID.  As the

6    issue was framed in paragraph 16 of the indictment when

7    Mr. Berman queried his long-time manufacturer of the

8    glucose blood product which tests glucose levels in

9    blood, whether the impedance technology of that product

10   could be adapted to detect virus in blood.  And what he

11   was told is it can detect virus, but it's an open

12   question whether it could detect COVID-19 and that's what

13   they embarked upon with the two -- what the government

14   has described as the two technical advisers, the people

15   in Korea at the bio and Dr. Musho in Pennsylvania.

16   Dr. Musho was supposed to design the product and the

17   Koreans were supposed to manufacture it.

18             It turned out that the problems with the

19   identification of COVID-19 in blood, they couldn't

20   overcome and so they turned to saliva.  And the press

21   release that announced the saliva test is also referred to

22   in the indictment.  It's the July 10 press release which

23   the government says contained false statements about the

24   blood test, but it was really a press release announcing

25   the saliva test.

1          And also going back to paragraph 16, the

2     question Mr. Berman asked the bio was could you detect

3     virus in blood or saliva.  So from the very outset, saliva

4     was an alternative to blood and this is critical to our

5     defense.  I don't understand why the government believes

6     that this is excluded under either 403 or 404(b).  It's

7     not prejudicial.  I mean the government also doesn't want

8     anyone to talk about impedance technology.  Yet, impedance

9     technology is in at least ten paragraphs in the

10     indictment.

11          THE COURT:  I don't understand them to be

12     saying that.  Is that what you are saying, Mr. Shanker?

13          MR. SHANKER:  I'm sorry.  I missed the

14     characterization --

15          THE COURT:  You don't have a problem with

16     discussion of impedance technology.  Correct?  You're

17     just saying you don't want theoretical -- kind of a

18     theoretical evidence that was not actually before the

19     defendant.

20          MR. SHANKER:  That is right.  And to the extent

21     that -- I mean it's no secret that Dr. Musho and Mr. Kim

22     will be witnesses in this case, but they will be

23     percipient fact witnesses.  We're not calling them as

24     expert witnesses.  So to the extent that they made

25     statements about the possibility of this test, they can

1   certainly be cross-examined about what they meant by

2   those statements.  But not about in our view the science

3   surrounding the possibility in general of impedance

4   testing of the virus in blood.

5            THE COURT:  Okay.  Thank you.  All right.  I

6   just wanted to clarify that for myself.  Go ahead,

7   Mr. Loughlin.

8            MR. LOUGHLIN:  Well, Your Honor, Daniel Kim and

9   Dr. Musho along with our client, Mr. Berman, embarked on

10   the process to try to create these products, both the

11   blood-based product and the saliva-based product.  All

12   three of them worked on it together.  And it was

13   essentially seamless over the early spring to late spring

14   of 2000.

15            It's critical to our defense as I think Your

16   Honor suggested to say this was a serious good faith

17   effort to create a new product.  It wasn't from the get-go

18   a hoax.  Otherwise, I'm sure the witnesses the government

19   is referring to who worked with Mr. Berman can testify to

20   what they did.  They worked on the glucose product.  They

21   worked on the blood-based test and then the saliva test.

22   It's all of a piece.  And it's critical to our defense to

23   tell that story.

24            THE COURT:  But I mean they are two different

25   products, right --

1          THE DEFENDANT:  No.

2          THE COURT:  -- need separate permission,

3   authorization from the FDA that, you know, your -- it's

4   like hamburgers and hot dogs.  I get that there's kind of

5   a relation there.  But it's two different products and I

6   don't think your client is being charged with anything

7   relating to the saliva product.  He's being charged with

8   the blood product.

9          MR. LOUGHLIN:  Yes.  But the advent of the

10  saliva product is fundamental to our defense.  That this

11  was not from the get-go a fraud or a hoax.  But a serious

12  good faith effort to achieve the same end through

13  different means.  It's not hamburgers and hot dogs.  It's

14  just two different home-based tests both using impedance

15  technology which simply measures a liquid and, you know,

16  whether it's blood for testing glucose levels or whether

17  it's trying to detect a virus.

18          In each case you have a liquid.  You use a very

19  sensitive test strip.  You dip it in the liquid and you

20  put it into the meter to get the result of whether you are

21  positive or not.

22          THE COURT:  Okay.  I mean I guess I'm just --

23  the government is saying that your client was

24  fraudulently making statements about the blood test.  I'm

25  trying to understand how a retort that "but we were

1    working on a saliva test" is responsive to that argument.

2            MR. LOUGHLIN:  Well, it goes to the issue of

3    the intent to defraud.  If they sincerely in good faith

4    were trying to develop this home-based ability to test

5    for COVID-19, they tested the hypothesis of whether it

6    would work in blood.  Then they switched to saliva and

7    it's the same --

8            THE COURT:  But did they inform the investing

9    public of that?  Isn't the claim that they were

10   purporting to have this product that was ready or about

11   to be ready that is a blood test and that they had -- and

12   that was not true.  I mean I think that's the

13   government's allegation anyway.  Right?

14           MR. LOUGHLIN:  Well, I think the government's

15   allegation is that whatever the status of development of

16   a blood test, whatever the problems that were encountered

17   that there were false statements and omissions in the

18   press releases about that.  But even just as a matter of

19   completeness, the July 10 press release which is referred

20   to in the indictment is the press release announcing the

21   saliva product.  July 10.  Right in the heart of the

22   alleged period of fraud.

23           THE COURT:  Yeah.  I hear you on the timing

24   point.  I got to say that the timing point isn't terribly

25   persuasive to me if these are in fact separate products.

1    And the government is alleging that your client didn't --

2    was acting fraudulently as to the blood test.

3              MR. LOUGHLIN:  Well, you know, our defense

4    doesn't have to be aligned with the prosecution case.

5    And as I said, we aren't thrusting into the case subjects

6    that are not in the indictment.  Saliva is in the

7    indictment both in paragraph 16 and in the July 10 press

8    release that's referred to also in the body of the

9    indictment.  It's absolutely fundamental to our defense

10   which is why the government is trying to preclude us.

11             It's not evidence that we're just pulling out of

12   thin air.  The government's own witnesses, Daniel Kim and

13   Dr. Musho, worked on both products and worked on the

14   glucose product before that.  And to constrain their

15   testimony to what the government prefers is handicapping

16   our defense.

17             THE COURT:  So when you say this is going to be

18   central to your defense, you know, I want to be

19   respectful of that.  I'm also kind of concerned about

20   confusion of the issues and where this is going.  I mean

21   are you expecting to have witnesses who are coming in

22   talking about the development of the saliva test or is

23   this more a matter of cross-examining the government's

24   witnesses and showing that there was the saliva test that

25   was being constructed?

1          MR. LOUGHLIN:  Yes.  I think as I've said

2    before, this is a product that both Dr. Musho and Daniel

3    Kim worked on and we should be allowed to elicit from

4    those witnesses what they did in trying to develop a

5    home-based test kit to detect COVID-19.

6          THE COURT:  All right.  So your request and I

7    want to make sure -- you know, I'm reluctant to put you

8    on the spot about what your case is going to be.  But I

9    also -- I think a factor here is the amount of time and

10   kind of the scope that you're seeking.  You're not

11   seeking to bring in witnesses to discuss the saliva test.

12   Is that -- am I understanding that correctly?

13         MR. LOUGHLIN:  Yes.  Our view is that we can

14   get those facts from the government witnesses.  If we're

15   permitted, if we're permitted, I mean I'm -- as I put in

16   our papers, I'm very worried about the government

17   circumscribing their testimony only to blood and if we

18   ask them about what they worked on after that, that

19   they'll object that it's beyond the scope.

20         It's absolutely critical to our defense that

21   Mr. Berman did not have intent to defraud, but was

22   actually trying to create a home-based test kit.  First

23   testing whether it could be done with the blood-based kit

24   and then later with saliva.  But we're talking about he

25   started with the blood in March, you know, which is early

1    spring, switched to saliva in June and announced the

2    saliva product in July.

3            THE COURT:  Okay.  I understand your position,

4    sir.  As I now understand what the government is saying

5    on the theoretical blood test point, they're not saying

6    that you can't elicit the fact that your client was

7    asking whether it's theoretically possible -- they're

8    not -- to develop a blood test.  They're not seeking to

9    circumscribe any evidence or any knowledge that your

10   client would have had as to whether it's theoretically

11   possible or not to have a blood test.  I think they are

12   just saying you shouldn't be able to put on evidence that

13   regardless of your client's knowledge or despite your

14   client's knowledge to the contrary, that it is

15   theoretically possible to put on a blood test.  Do you

16   take issue with that?

17           MR. LOUGHLIN:  No, Your Honor.  In fact that's

18   what is quoted in the indictment in paragraph 16 in which

19   when Mr. Berman asked the bio whether it was

20   theoretically possible to detect virus in blood or

21   saliva, the response was it's certainly theoretically

22   possible.  But whether you can from that detect COVID is

23   an open question and that's what they were trying to

24   figure out.  I believe Dr. Musho will say he had doubts

25   about it, but it was worth experimenting with and trying

1      to come to grips with it and determine whether it would

2      work or not.

3                  THE COURT:  Okay.

4                  MR. LOUGHLIN:  And Dr. Musho, you know, is a

5      scientist with 33 patents.  I mean he is a serious

6      person.  I think Daniel Kim is a serious person.  And if

7      they thought from the get-go that this was a con job, a

8      Ponzi scheme to use Your Honor's terms, they wouldn't

9      have anything to do with it.

10                 THE COURT:  And so do you believe you are going

11     to be able to show that -- help me understand what you

12     are expecting to show here, Mr. Loughlin.  That Dr. Musho

13     believed that it's theoretically possible to do blood

14     tests and that he conveyed that to your client?  Is that

15     what you expect to come out?

16                 MR. LOUGHLIN:  Yes.  All I'm going to ask

17     Dr. Musho about is what his work consisted of with

18     Mr. Berman and I think the evidence will show -- I mean

19     I've never spoken to Dr. Musho.  I've never spoken to

20     Daniel Kim.  But I believe that Dr. Musho principally

21     dealt with Mr. Berman and Mr. Berman principally dealt

22     with the Koreans because he had such a long relationship

23     with them and I think he has a 25 or 30-year relationship

24     with Dr. Musho.

25                 So we're not going to go off on a detour and

1    frolic on different scientific evidence.  We are just

2    going to ask these two men what they did in connection

3    with the journey of trying to create this home-based test

4    kit for COVID-19.  And it's my understanding that the FDA

5    has approved saliva-based tests.

6              THE COURT:  Okay.  All right.  Anything

7    further?

8              MR. LOUGHLIN:  On this point?

9              THE COURT:  Yes.

10             MR. LOUGHLIN:  No.

11             THE COURT:  Okay.  Thanks.  I think this is

12   also kind of wrapped up in the question of the scope for

13   Dr. Musho and Mr. Kim.  And so what you are asking is to

14   be able to, regardless of what the government asks in

15   their direct, to be able to go into the saliva test and

16   whether Dr. Musho believes it's theoretically possible to

17   do a blood test in their case in chief.

18             MR. LOUGHLIN:  Yes.  Although I don't think

19   there's any question about whether it was theoretically

20   possible.  The question is whether in testing the

21   hypothesis that it could happen, they both worked on this

22   and certainly had some doubts because it had never been

23   done before.

24             I think though I've heard this phrase, seen

25   documents to the extent where someone said you can detect

1    virus in blood, but there's too much noise.  There's too

2    much virus and it's difficult to identify one particular

3    virus in particular COVID-19.  They tried to overcome that

4    problem by making the device more sensitive.

5            But at the end of the day decided and as I said

6    paragraph 16 says from the get-go, the question was blood

7    or saliva.  They decided to switch to saliva.  And all I'm

8    going to ask both of those witnesses is what they did.

9            THE COURT:  Tease that out.

10           MR. LOUGHLIN:  Pardon me?

11           THE COURT:  What do you mean "what they did"?

12           MR. LOUGHLIN:  What they did in trying to

13   develop both products, blood and saliva --

14           THE COURT:  Okay.

15           MR. LOUGHLIN:  -- because it's all of the

16   piece.

17           THE COURT:  All right.

18           MR. LOUGHLIN:  And critical to the issue of

19   intent to defraud.

20           THE COURT:  Okay.  Thank you, sir.  Mr.

21   Shanker, I'll give you the last word on this.

22           MR. SHANKER:  Thank you, Your Honor.  With all

23   due respect to Mr. Loughlin, I find it interesting that

24   the saliva test is now coming up as a point in the

25   defendant's favor.  The fact is and I know that a deep

1   dive into the evidence isn't really appropriate in this

2   particular hearing, but the evidence does show that the

3   defendant was focused on a blood test.  A blood test, an

4   instantaneous finger prick blood test was exactly what he

5   hoped would make his company millions of dollars.  And he

6   repeatedly told Mr. Kim and Dr. Musho that that's what he

7   wanted to develop.

8          Both of them, especially Mr. Kim were saying

9   this is a respiratory virus, you could possibly find it in

10  saliva, but not in blood and the defendant didn't want to

11  hear that.  He wanted to develop a blood test.  He already

12  had glucose tests that could test blood and that's what he

13  wanted to adapt and produce immediately at least in his --

14  as he represented.

15         And those are the press releases that he put out

16  because that's how he could represent to the investing

17  public that these tests were going to be distributed

18  immediately and that they were already created and they

19  could test instantaneously from a finger prick sample of

20  blood.

21         He didn't want a saliva test.  A saliva test

22  involves much different methodology.  It involves spitting

23  into a cup.  It involves potentially adding reagents to

24  the saliva.  And the evidence will show that he said that

25  that's not what he wanted to say to the investing public

1    that he was producing.  That would not drive his stock

2    price up.  I mean he wanted this to be done -- to be able

3    to say that this was being done at the outset of the COVID

4    pandemic.

5            And so the fact that Mr. Kim and Dr. Musho were

6    possibly telling him that saliva was the way to go is not

7    relevant.  It's not a defense, although it's not my place

8    to tell my colleagues what their defense should be.  But

9    it's simply not relevant.

10           And the fact that the defendant had to pivot

11   part way through this scheme when he realized or he had

12   realized from the outset, quite frankly, that a blood test

13   was not possible, but he had to pivot doesn't erase the

14   fact that there are multiple, multiple press releases put

15   out in March and April that spoke solely of a blood test

16   and represented that the blood test was right around the

17   corner, was already in development and had a validated

18   methodology and was ready to go into production.  And so

19   that's why we would submit that the saliva test is simply

20   not relevant.  It's going to confuse the jury.

21           THE COURT:  So, Mr. Shanker, let me tell you my

22   inclination.  This does sound very kind of wrapped up in

23   the facts and obviously, I understand a lot less about

24   the case than you all do at this point.  My inclination

25   is to reserve judgment on this.  And it sounds like this

1    is going to really kind of come to a head with

2    Dr. Musho's testimony and we'll just -- I take it you are

3    not expecting him to be your first witness.

4              MR. SHANKER:  That is right.

5              THE COURT:  And that we deal with this if not

6    before he takes the stand, certainly before

7    cross-examination.  And my inclination sitting here now

8    is I'm honestly not very persuaded that there's a huge

9    confusion of the jury issue between a blood test and the

10   saliva test.  D.C. juries I think are very competent and

11   informed and I don't think hearing that there's those two

12   things going on, I have a hard time imagining that's

13   going to be a real confusion.

14             I am, frankly, more worried about just spending

15   a lot of time on something that's irrelevant.  If what

16   Mr. Loughlin wants to do is ask a few questions to kind of

17   showing that his client was also interested in this other

18   thing, I'm kind of inclined to allow it.

19             If we are going to have witnesses or kind of new

20   witnesses or a long discussion going in on the progress of

21   saliva tests, that type of thing, that just feels beside

22   the point to me and I think I would deny evidence on that

23   ground.

24             So that's my inclination as I'm sitting here.

25   I'd say -- and similarly on the hypothetical whether a

1    blood test is hypothetically possible, you know, as -- you

2    say you are going to be bringing some of that out and you

3    don't have any problem with that conversation coming out

4    that you reference in paragraph 16.  Again I don't want to

5    limit Mr. Loughlin's defense.  I am going to be more

6    concerned about whether we are just going off on a frolic

7    here.

8             So that's my inclination right now.  But happy

9    to I think we should try to re-discuss it before

10   cross-examination for Dr. Musho.  Does that make sense to

11   you?

12             MR. SHANKER:  Makes very good sense.

13             THE COURT:  Mr. Loughlin, are you okay with

14   that?

15             MR. LOUGHLIN:  With one caveat, Your Honor.

16             THE COURT:  Okay.

17             MR. LOUGHLIN:  We need to know if we can -- we

18   need to know what we can say to the jury in openings.

19             THE COURT:  Could you approach the lectern

20   just --

21             MR. LOUGHLIN:  We can't wait until the

22   cross-examination of the witnesses because I need to know

23   what I can open to the jury with.

24             THE COURT:  Yeah.  So --

25             MR. LOUGHLIN:  Just as a factual footnote to my