UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** <br><br> v. <br><br> **KEITH BERMAN** <br><br> **Defendant.** | **Criminal No.** <br> **1:20-cr-00278-TNM** <br><br><br> **EX PARTE AND UNDER SEAL** |

### GOVERNMENT'S MOTION TO REVOKE THE
### PRETRIAL RELEASE OF DEFENDANT KEITH BERMAN

In the two-plus years defendant Keith Berman has been on pre-trial release, he has repeatedly and flagrantly violated his Court-ordered conditions of release. He has repeatedly contacted his victims to harass, intimidate, manipulate, and defraud them anew; worked to obstruct the government's prosecution of the criminal case against him by tampering with witnesses; and, without providing the requisite notice and obtaining the requisite approval from this Court, fraudulently sold, assigned, and transferred Decision Diagnostics Corp.'s future receipts in exchange for cash advances from five different parties in five separate agreements (on which he subsequently defaulted). His violative behavior has escalated precipitously in recent months, culminating in his agreement to transfer a 20 percent equity stake in one of Decision Diagnostics Corp.'s subsidiaries as collateral for a $6 million loan for which there is no business purpose and that he could never repay.

Considering the defendant's pattern and recent escalation of violative conduct, the government respectfully moves the Court, *ex parte* and under seal, to issue a warrant for the arrest of the defendant and to hold a hearing to revoke the defendant's pretrial release and issue an order

1

of detention. The government readily meets the bond revocation standard under 18 U.S.C. § 3148 for all of the reasons set forth below. The government asks that the Court issue an arrest warrant before holding a hearing in order to mitigate what, at this point, is an obvious risk of flight.

## BACKGROUND

*The Defendant Is Charged with Committing an Egregious Fraud, Among Other Crimes*

At a time when the world was desperate for a test to slow the transmission of COVID-19 and save lives, the defendant lied and told investors that he had invented a medical miracle – a 15-second test to detect COVID-19 in a finger-prick sample of blood – that, in truth, did not exist. (ECF 19 (Superseding Indictment).) The defendant then engaged in a relentless campaign of lies to raise millions of dollars to make himself rich. (*Id.*) When it appeared that the U.S. Securities and Exchange Commission ("SEC") had caught the defendant lying about his COVID-19 test, the defendant: (i) used aliases and fake identities as part of an elaborate scheme to intimidate and manipulate his victims in order to obstruct and shut down the SEC's investigation; (ii) lied to the SEC; and (iii) lied to federal law enforcement agents. (*Id.*)

*The Court Released the Defendant on Bond Subject to Certain Conditions*

Following the unsealing of the indictment, the defendant was taken into custody. The defendant was released on bond subject to the following conditions, among others:

- "I will not commit a federal, state, or local crime during the period of release."

- "I will not intimidate any witness, juror, or officer of the court or obstruct the criminal investigation in this case. Additionally, I will not tamper with, harass, or retaliate against any alleged witness, victim, or informant in this case."

- "Avoid all contact, directly or indirectly (including by any electronic means), with any person who is a known victim or witness in the subject investigation or prosecution …"

2

- "Avoid all contact, directly[ or] indirectly [with] …. Investors on an individualized basis."[1]
- "Do not sell, transfer, or give away any asset valued at $ 10,000 or more without notifying and obtaining permission from the Court."

(ECF 13; *United States v. Keith Berman*, Case No. 2:20-mj-06108 (C.D. Cal.) (ECF 4, filed Dec. 17, 2020).)

### *The Defendant Contacted, Harassed, and Intimidated His Victims in Violation of His Conditions*

Within days of being released from custody, on December 21, 2020, defense counsel "made clear to Mr. Berman that he cannot have any individual communications with any DECN investor involving any aspect of either the DOJ or SEC charges that were filed last week." (Ex. 1.) That same day, the defendant communicated with Victim 2 – on an individual basis via email – to launch a campaign to attack the XPRIZE Foundation, a non-profit organization that designs and hosts public competitions intended to encourage technological development to benefit humanity. Specifically, the defendant directed Victim 2 to recruit 100 other victims to participate in an attack campaign against XPRIZE (akin to the attack which the defendant manipulated and deceived his victims into launching against the SEC). (Ex. 2, 3.) The defendant's attack was based on his false claim that his purported COVID-19 test (which did not exist) had been unfairly removed from XPRIZE's COVID-19 test competition based on the allegations made in the indictment rather than the merits of the test itself. (Ex. 4.) The defendant's prohibited communications with Victim 2

---

[1] In addition to the standard condition prohibiting contact with victims or witnesses, the government requested that the defendant be prohibited from communicating with Decision Diagnostics Corp. (and its subsidiaries) (together "DECN") investors (whom he was alleged to have defrauded) on an individualized basis. This condition sought to protect those investors while still allowing the defendant, to the extent necessary, to issue general shareholder communications or press releases on behalf of DECN. This condition did not in any way replace the blanket prohibition on contacting victims or the prohibition on tampering with, harassing or retaliating against any alleged witness, victim, or informant in this case. Those conditions applied without regard for the number of people with whom the defendant communicated at any given time.

3

clearly violated his conditions, including the conditions prohibiting direct and indirect contact with victims and the commission of new crimes (like fraud).[2]

The defendant did not stop there. The government also uncovered evidence that, only two months later, in February 2021, the defendant again repeatedly contacted two victims – Victim 1 and Victim 2 – to harass, intimidate and mislead them for his own personal benefit and to impede and obstruct the government's prosecution of the criminal case against him:

- The defendant directed Victim 1 to stop cooperating with the government's investigation: "the general concensus [sic] is to tell your nail [sic] lady that you have given her two interviews and you are uncomfortable and need to consult with an attorney[.] thank you and good bye." (Ex. 6.)[3]

- The defendant discussed with Victim 1 and Victim 2 the questions the Postal Inspector had asked them and then attacked the Postal Inspector for asking those questions: "Isn't it ironic that the postal inspector could care less about that[.] it is also ironic that the questions they asked you [Victim 1] and [Victim 2] are not directly related to me, but to the company and the product which are not part of the indictment[.] what job is that[.] trying to make anyone who helps the company quit and become government witnesses[.]" (Ex. 6.)

- The defendant tried to influence Victim 1's view of the facts of the case by making false statements blaming the government for causing his COVID-19 tests to fail: "the SEC ruined our relationship with the fda just like the doj ruined our relationship with the clia lab[.] and they are trying to ruin our relationship with you[.]" (Ex. 6.)

The defendant's communications violated numerous conditions, including the conditions prohibiting contact with victims, tampering with and harassing any witnesses or alleged victims, and the commission of new crimes (namely obstruction of justice). When the government informed

---

[2] The government interviewed XPRIZE employees who confirmed that the defendant's claim was false – they eliminated the defendant's COVID-19 test from the competition because it did not work. (Ex. 5 at 1.) They were not even aware that the defendant had been indicted at the time they had made the decision.

[3] The law enforcement agent who interviewed Victim 1 was Misty Racimo, a female U.S. Postal Inspector. The government believes, based on the context, that the defendant meant to write "mail lady," not "nail lady."

the Court of the defendant's violative behavior, the Court denied the defendant's request to modify his conditions, explaining: "given that the defendant is currently in violation of or allegedly in violation of the prohibition against communication with individual investors and given that regardless of the release conditions that those communications … are potentially obstructive, I'm not comfortable loosening the contact conditions at this point." (Apr. 27, 2021 Tr. at 16:4-9.)

The defendant did not stop his violative behavior despite the Court's warning. From at least June 2021 through at least October 2021, the defendant continued to communicate with the same individuals, Victims 1 and 2, in a small group chat. (Ex. 7) These text messages make clear that the defendant was committed to harassing, misleading, and manipulating his victims while he was on pre-trial release.

On June 29, 2021, the defendant communicated absolute confidence to these victims that his (non-existent) COVID-19 test would be sold in the market:

> [6/29/21, 9:15:15 PM] Victim 1: Honest question. In your opinion. From 1-100% what are the chances Genviro [DECN's purported COVID-19 testing mechanism] will see the light of day?
>
> [6/29/21, 9:21:44 PM] Defendant: 100%
>
> [6/29/21, 9:21:51 PM] Defendant: 99.98765

On July 26, 2021, the defendant stated that his purported COVID-19 test could test for the delta variant and potentially a separate illness (SARs-1):

> [7/26/21, 9:07:49 PM] Defendant: By the way on our device the delta variant gas an identifiable signature
>
> [7/26/21, 9:08:50 PM] Defendant: It looks to our machine a lot like sars1
>
> [7/26/21, 9:09:03 PM] Victim 2: My friend from zoom said if anyone comes to his house and tells him to get vaccinated, he'll show them his gun!    He thought it was like a bad cold

5

or the flu. A week later he got covid- relentless fever, coughing all night, achy, no taste or smell.

[7/26/21, 9:09:51 PM] Defendant: For which there is no vaccine and as far as I know we are the only test

Also in July 2021, the defendant encouraged his victims to post in online message boards to counter negative comments the company was receiving:

[7/29/21, 8:51:04 PM] Defendant: Someone should post on the Yahoo board, because in the last hour the really bad guys are posting shit

[7/29/21, 8:51:43 PM] Victim 2: I don't go on yahoo.

[7/29/21, 8:52:01 PM] Defendant: Oh

[7/29/21, 8:52:08 PM] Victim 2: Lol

[7/29/21, 8:52:12 PM] Defendant: It is a bad place

[7/29/21, 8:53:15 PM] Defendant: Someone should post... "Well bash crew he got you badgers yet again"

[7/29/21, 8:54:07 PM] Victim 2: I can't...I won't battle with crazy people

[7/29/21, 8:59:27 PM] Defendant: Ok

By August 2021, the defendant began assuring his victims that "big orders" for the non-existent COVID-19 test were rolling in:

[8/2/21, 2:48:44 PM] Defendant: Anyway the demo kits are working well and big orders are in

[8/2/21, 2:49:52 PM] Defendant: Well unfortunately the delta is rampant. But it opens up fir the use of Genviro.

…

[8/4/21, 5:46:09 PM] Defendant: So abbott had the deal for testing the formula one circuit

[8/4/21, 5:46:48 PM] Defendant: The next formula one race is august 23 in brussels

6

[8/4/21, 5:47:00 PM] Defendant: Abbott pulled out

[8/4/21, 5:47:20 PM] Defendant: We were awarded the contract this morning

[8/4/21, 5:47:29 PM] Defendant: 100,000 kits

[8/4/21, 5:51:08 PM] Victim 1: That's awesome Keith!

[8/4/21, 5:51:27 PM] Defendant: No shit

…

[8/4/21, 5:55:44 PM] Defendant: Regardless we have the contract and it is for 17 formula one races[4]

Also in August 2021, the defendant told his victims that he tested himself for COVID-19 with his own test and that it worked:

[8/31/21, 10:37:09 AM] Victim 1: Keith did you test yourself with the Genviro that detects delta?

[8/31/21, 10:37:56 AM] Victim 1: I know you said the updated meter would be able to detect that variant

[8/31/21, 10:38:44 AM] Defendant: Yes three times and all solidly positive

[8/31/21, 10:39:50 AM] Victim 1: Great... not great, but great

[8/31/21, 10:39:58 AM] Victim 1: 🧑

[8/31/21, 10:40:14 AM] Defendant: Yes the product works[5]

In addition to repeatedly lying to Victim 1 and Victim 2 about the COVID-19 test (which did not exist), the defendant also repeatedly communicated with them about his criminal case.

---

[4] The government is not aware of any contract between the defendant's companies and Formula 1 racing. Even if such a contract existed, DECN did not possess a working COVID-19 test to provide to customers.

[5] As alleged in the Superseding Indictment, the defendant lied about inventing a working COVID-19 test. (*See generally* ECF 19.) In reality, the defendant had been repeatedly informed by his consultants that the technology he sought to use could not actually detect COVID-19 in a blood sample, let alone distinguish COVID-19 from other viruses and no clinical testing was ever performed. (*Id.*) The test therefore simply did not exist and, for that reason, could not be sold to Formula 1 or anyone else.

7

Between June 2021 and September 2021, the defendant discussed his criminal case with Victim 1 and Victim 2 on at least different 17 occasions. (*See* Ex. 7 at June 29, June 30, July 6, July 15, July 16, July 18, July 21, July 26, July 27, July 28, July 30, August 5, August 6, August 9, August 19, August 25, September 7.) The defendant even harassed them to act on his behalf on Internet message boards in support of his criminal defense:

[9/7/21, 7:15:49 PM] Defendant: [Victim 2] do you have a little time

[9/7/21, 7:16:07 PM] Victim 2: Yes

[9/7/21, 7:16:21 PM] Victim 2: What's up

[9/7/21, 7:17:50 PM] Defendant: Do you know who that guy chinaisgreat guy is on facebook

[9/7/21, 7:18:32 PM] Victim 2: No. I've seen him in fb but don't know anything about him. Why?

[9/7/21, 7:19:35 PM] Defendant: Because he made posts today taking the government's side and I was wondering if he was a criminal lawyer

[9/7/21, 7:20:03 PM] Victim 2: I wasn't on. I will have to ck

[9/7/21, 7:20:57 PM] Defendant: He ends his posts by saying he wants to read my lawyers court response to the government

[9/7/21, 7:22:09 PM] Victim 2: I haven't been on at all. I am looking now

[9/7/21, 7:22:18 PM] Defendant: I was wondering if you could put a quick post beneath his posts asking him what he thinks of my criminal lawyer laughlin

[9/7/21, 7:23:00 PM] Victim 2: Kind of hard for me to do that. I don't post anything on fb other than happy birthday

[9/7/21, 7:23:13 PM] Defendant: Oh, ok

[9/7/21, 7:24:05 PM] Defendant: Could you ask ▮▮▮▮ ?

[9/7/21, 7:25:02 PM] Victim 2: Another awkward move. I don't talk to him at all. Nothing against him but it wouldn't make any sense for me to ask him

8

[9/7/21, 7:25:14 PM] Defendant: Ok

[9/7/21, 7:25:48 PM] Defendant: What about ▇

(Ex. 7.)[6]

These communications violated numerous conditions, including the conditions prohibiting contact with victims, tampering with and harassing victims, and the commission of new crimes (namely fraud and obstruction of justice).

Throughout 2021 until at least April 2022, the defendant was also separately communicating with numerous victims on Facebook. The defendant communicated with these victims about his criminal case, harassed and intimidated them, and tried to influence their opinion of the allegations against him – all in clear violation of his conditions of release. The government interviewed two of these victims, Victim 3 and Victim 4, who provided details about the defendant's communications with them and other victims. (Ex. 8, 9.) For example, on August 6, 2021, the defendant sent Victim 3 a private Facebook message harassing and intimidating Victim 3 to take action against other victims who had expressed views about the criminal case with which the defendant disagreed. Specifically, several victims had posted on Facebook about the Court's order continuing the trial for five months. These victims believed the delay was bad news for the defendant; the defendant disagreed, expressing the view that the delay for good news for him. The defendant wrote:

> The posts this morning are a prime example of what I talked about yesterday. There are posters who attributed everything in the negative. The judge in the criminal case sets a new court date in 5+ months and it is viewed as negative. The only thing that was said in

---

[6] The defendant expressed the view that day-to-day developments and filings in his criminal case could influence DECN's stock price. (*See, e.g.*, Ex. 7 at August 9, 2021 ("The court papers and the 3vtine [sic] mention of the 6th amendment should drive the stock to 5 fents [sic] Cents").

9

> the Minute Order that means anything is the judge acknowledging that the case is complex. He is giving DOJ 4 extra months to make a case out of their so far very dangerous nonsense. It has not been lost on the judge that DOJ has changed lead lawyers 3 times. You have 3-4 of these posters…people who are more like Yahoo type posters. I brought in another shareholder into this conversation although I am writing in my own name. Thank you.

(Ex. 8 at 19.)[7] On September 22, 2021, the defendant continued to harass and intimidate Victim 3 to stop these victims, complaining that they were discussing "lies and frauds" and might "become SEC and DOJ informants". (Ex. 8 at 21; *id*. at 24 ("my troubles were/are caused by message board posters"). When sharing his experience with other victims, Victim 3 explained that "all he does is look for people talking negative about him or the stock. Then message me about it." (Ex. 8 at 27.)

Several of the victims on Facebook discussed the fact that the defendant had reached out to them in 2022 (after the defendant's trial had been continued because of his purported medical condition). For example, Victim 4 said she received a 'friend request' from the defendant on March 29, 2022. (Ex. 8 at 5.) She cautioned other victims on Facebook that the defendant's efforts to communicate with them were "desperate manipulation". (Ex. 8 at 8.) Among other things, these victims believed the defendant was attempting to dissuade them from selling their DECN shares because it would have a negative effect on the stock price. (Ex. 8 at 25-30.)

These communications violated numerous conditions, including the conditions prohibiting contact with victims, tampering with and harassing victims, and the commission of new crimes (namely obstruction of justice).

---

[7] The evidence clearly establishes that the defendant is the individual contacting victims via Facebook because his Facebook account is in his name – Keith M Berman – and contemporaneous text messages between the defendant and Victim 1 and Victim 2 repeatedly discuss the events unfolding on the Facebook message boards, including on August 6, 2021, when the defendant complained to Victim 1 and Victim 2 that Facebook posters were claiming that it was bad for the defendant that the trial was delayed. According to the defendant, he strenuously disagreed: the defendant believed that the delay was good for him. (Ex. 7 at August 6.)

***The Defendant Engaged in Numerous Financial Transactions that Violated His Conditions***

The defendant repeatedly sold or transferred assets valued at $10,000 or more without notifying and obtaining permission from the Court – again violating his Court-ordered conditions of release.

Specifically, at the end of 2021, in the lead-up to the trial that was supposed to begin on January 4, 2022, the defendant entered into five separate agreements whereby he agreed to sell, assign, and transfer to five different parties approximately $329,120 of DECN's future receipts in exchange for $230,000 in short-term financing:

- On October 13, 2021, the defendant entered into an agreement with ▆▆▆ to sell $108,420 of the company's future receipts in exchange for $78,000. (Ex. 10.)

- On October 21, 2021, the defendant entered into an agreement with ▆▆▆ to sell $68,000 of the company's future receipts in exchange for $50,000. (Ex. 11.)

- On December 13, 2021, the defendant entered into an agreement with ▆▆▆ to sell $74,950 of the company's future receipts in exchange for $50,000. (Ex. 12.)

- On December 28, 2021, the defendant entered into an agreement with ▆▆▆ to sell $32,780 of the company's future receipts in exchange for $22,000. (Ex. 13.)

- On December 29, 2021, the defendant entered into an agreement with ▆▆▆ to sell $44,970 of the company's future receipts in exchange for $30,000. (Ex. 14.)

Each agreement required the defendant to represent that: (i) the defendant was entering into the agreement solely for business purposes and not for his personal benefit; (ii) the defendant will not enter into with any other party an agreement relating to the sale, assignment or transfer of the company's future receipts (*i.e.*, "no stacking"); and (iii) the defendant was authorized to sign the

agreement. (Exs. 10-14.) In addition, the defendant personally guaranteed all five agreements. (Exs. 10-14.)

The defendant, however, had no revenue to repay the large amounts of money due under the five agreements. He also falsely represented that he was not entering into similar agreements with other parties. He almost immediately defaulted on each agreement. And, when the parties to these agreements brought actions to recover their money from the defendant, he did not defend against the action and default judgments were entered. (Exs. 15-19.) Significantly, the defendant did not notify or obtain permission from the Court before entering into any of these five agreements. To the contrary, the defendant affirmatively concealed from the Court all of these agreements – and the resulting default judgments. Despite the fact that the defendant is now personally liable for default judgments totaling $273,934.29, the defendant did not disclose this information in his financial affidavit, which he signed under "penalty of perjury".[8] (Ex. 20.)

Undeterred, on January 31, 2023, the defendant signed a "loan agreement" on behalf of one of Decision Diagnostics' subsidiaries, Decision IT Corp. (Ex. 21.) This agreement required Decision IT Corp. to immediately transfer twenty percent of the equity shares in Decision IT Corp. as collateral for a $6 million loan from a ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.[9] (*Id.* at 7.1) The agreement lists the purpose of the funds as "certain costs and expenses of [Decision IT Corp.], as determined in its sole and absolute discretion." (*Id.* at Sec. 5.1)

---

[8] The defendant also defaulted in the federal securities class action against him and the company based on allegations substantially similar to those alleged in the indictment. *See* Order Granting Plaintiffs' Motion for Default Judgment (ECF 60), *Sanchez et al. v. Decision Diagnostics Corp. and Keith Berman*, Civ. No. 2:21-cv-00418-FWS-JPR (C D. Cal. Dec. 5, 2022). This resulted in a default judgment of $338,045. (*Id.* at 34.) The defendant did not disclose this massive liability on his financial affidavit, which is another material omission. Such an omission is significant because, among other things, its yet another incentive to flee the country rather than remain to defend the criminal case.

[9] This agreement also requires Decision IT Corp. (the defendant) to pay almost $17,000 to register a special purpose vehicle to hold the collateralized securities. (Ex. 21 at 7.1)

Additionally, the agreement states that the only reason that Decision IT Corp.'s chief executive officer (*i.e.*, the defendant), could not travel to Kuwait to meet with ▮ was "due to the COVID-19 pandemic travel restrictions." (*Id.* at Sec. 7.2) Finally, the defendant stated that he had "the power, capacity, and authority to perform and observe all of its obligations" under the agreement. (*Id.* at Sec. 8.2) Rather than providing the requisite notice or obtaining the requisite permission from the Court before signing the agreement, the defendant mistakenly provided a copy to the Court, weeks after signing it, when he was attempting to submit his financial affidavit stating that he had zero dollars.[10]

## ARGUMENT

Title 18, Section 3148(b) provides that a "judicial officer shall enter an order of revocation and detention if, after a hearing, the judicial officer" (i) finds, by clear and convincing evidence, that a defendant violated a condition of release; and (ii) finds that the defendant "is unlikely to abide by any condition or combination of conditions of release." 18 U.S.C. § 3148(b).[11] A defendant may be detained upon a finding, by a preponderance of the evidence, that he is unlikely to abide by any condition of release. *See, e.g., United States v. Gotti*, 794 F.2d 773, 777 (2d Cir. 1986). The statute clearly provides that these findings alone are sufficient to justify revocation and detention; a court need not also find that the defendant will flee or pose a danger to the community. *See, e.g., United States v. Grier*, 188 F.3d 509 (6th Cir. 1999) (noting that defendant's bond was revoked due to witness tampering); *United States v. Kahn*, No. 17-CR-0029, 2017 WL 11404399,

---

[10] This "loan agreement" is the subject of the violation report filed by Pre-Trial Services on February 13, 2023. (ECF 98.)

[11] Under 18 U.S.C. § 3148(b) the Court may also revoke where it finds "probable cause to believe that the person has committed a Federal, State, or local crime while on release." For the reasons set forth in this motion, the government respectfully submits that there is probable cause that the defendant committed additional federal crimes including securities fraud (15 U.S.C. §§ 78j and 78ff), witness tampering (18 U.S.C. § 1512), obstruction of justice (18 U.S.C. §§ 1510 and 1519), and perjury (18 U.S.C. § 1621).

13

at *1 (D. Wyo. Apr. 20, 2017) (noting that defendant's bond was revoked for violation of his no-contact condition and a upon probable cause that defendant tampered with witnesses while on release); *United States v. Koumbairia*, No. CRIM 07-0061 JDB, 2007 WL 1307909, at *5 (D.D.C. May 3, 2007) (detaining defendant based on violations of release conditions).

## I. CLEAR AND CONVINCING EVIDENCE EXISTS THAT THE DEFENDANT REPEATEDLY VIOLATED HIS CONDITIONS

The defendant has repeatedly violated numerous conditions of his release, including the prohibitions on: (i) contacting his victims; (ii) tampering with or harassing any alleged victim or witness or informant in this case; and (iii) selling and transferring assets valued over $10,000 without notice or obtaining permission from the Court. (ECF 4.)

*First*, clear and convincing evidence, including the defendant's own written communications, demonstrates that following his release from detention, the defendant engaged in engaged in a sustained campaign to tamper with, harass, intimidate, mislead, and improperly influence his victims through prohibited contacts.[12] (*See* Exs. 2-3, 6-8.) The communications establish that the defendant not only contacted his victims in violation of his release conditions, but also did so to gather information on the government's investigation (Ex. 6), spread further false information to victim shareholders (Exs. 2-3, 7), and convince these victims to stop cooperating in the government's investigation (Ex. 6).

*Second*, clear and convincing evidence demonstrates that the defendant has repeatedly

---

[12] These communications violated numerous conditions of the defendant's release, including the prohibition on contacting victims, tampering with witnesses, and committing new crimes (such as obstruction). (ECF 4.) The only manner in which the defendant was permitted to contact DECN investors was on the whole (*i.e.* via shareholder notices or press releases) and solely for the purposes of operating DECN's business. The release conditions, of course, did not permit the defendant to contact his victims and potential witnesses about his criminal case nor did they allow him to commit further crimes (including obstruction and witness tampering).

14

engaged in financial transactions over $10,000 in violation of his conditions of release. Between October and December 2021, the defendant entered into transactions selling, assigning, and transferring his company's future receipts to five third-parties in exchange for short-term financing well over the $10,000 threshold for reporting the transaction to the Court. (Exs. 10-14.) Even more concerning is the defendant's most recent agreement, entered into in January 2023, to transfer 20% of the equity in DECN as collateral for a $6 million "loan" from a Kuwaiti investment company. (Ex. 21.) Probation already correctly determined this was a violation of the defendant's Court-ordered conditions. (ECF 98.)

## II. THE DEFENDANT'S CONDUCT ESTABLISHES BY A PREPONDERANCE OF THE EVIDENCE THAT HE IS UNLIKELY TO ABIDE BY ANY CONDITION OF RELEASE

This Court has generously allowed the defendant to remain out of custody in exchange for his promise to abide by reasonable conditions of release. The defendant, however, has proven incapable of complying with the Court's orders and established that he is unlikely to abide by any condition of release. *First*, the defendant's violative behavior has persisted despite repeated and explicit admonitions by the Court and his counsel. *Second*, the defendant's behavior has consistently escalated throughout his release period, culminating in the defendant's 2023 attempt to raise $6 million dollars from Kuwaiti investors for an apparently defunct company. The defendant's persistent and increasingly brazen violations – despite the numerous admonitions from his counsel and the Court – establish that he is unlikely to abide by any condition of release.

As an initial matter, the defendant's individual communications with his victims disobeyed and violated the explicit instructions of his counsel and the Court. In December 2020, following the defendant's indictment, the defendant's counsel "made clear to Mr. Berman that he cannot

15

have any individual communications with any DECN investor involving any aspect of either the DOJ or SEC charges that were filed last week." (Ex. 1.) Despite this clear instruction from counsel, the defendant subsequently and repeatedly sought information regarding the investigation and endeavored to convince his victims to stop cooperating with the government. (Ex. 6.) At the April 27, 2021 hearing, the Court again admonished the defendant to abide by his conditions of release. (April 27, 2021 Tr. at 20:11-15.)

Despite these repeated and explicit warnings, the defendant continued to flout the Court's order by contacting his victims in small group chats. These subsequent conversations were not only violative, but continued the defendant's attempts to mislead his victims through false statements regarding his product's efficacy (*see*, *e.g.*, Ex. 7 at August 21, 2021) and purported large sales agreements (*id.* at August 4, 2021), as well as attempts to tamper with, harass, and manipulate his victims into posting on his behalf on public message boards (*id.* at July 29, 2021).

Moreover, the defendant's violative financial transactions show that his desperation for cash and willingness to violate this Court's orders have only escalated throughout the period of his release. From October through December 2021, the defendant raised approximately $230,000 from third-party financers in exchange for the sale of hundreds of thousands of dollars in the defendant's purported future earnings. (Exs. 10-14.) Each sale of assets (*i.e.* future earnings) valued over $10,000 was in violation of the defendant's conditions of release. Furthermore, the defendant made numerous false statements as a part of these agreements. These false statements included that the money would be used only for business purposes, (*id.*) as the government is not aware of any legitimate business done by the defendant's companies. The defendant also warranted that his future receipts were otherwise unencumbered and promised that he would not further encumber or

16

transfer his future earnings without the permission of his counterparty, yet he entered into five agreements within two months without notice in violation of these agreements. (*Id.*) Finally, the defendant represented in each agreement that he had the authority to enter into the transaction. (*Id.*) This was false because the defendant, of course, lacks the authority or ability to sell or transfer any assets worth over $10,000 without first obtaining permission from this Court. (ECF 4.)

In addition, the defendant lied to the Court and committed the crime of perjury. Although the defendant had personally guaranteed – and defaulted – on over $230,000 in cash advance agreements, he did not disclose that information in the financial affidavit that he submitted to the Court, which specifically required the defendant to list all "obligations, expenses, & debts." To the contrary, the defendant concealed the fact of his agreements and defaults from the Court. Evidently, hundreds of thousands of dollars was not enough for the defendant: his attempts at procuring fraudulent loans based on nonexistent collateral extended into this year. Following his default judgments on each of the five 2021 agreements (which is clear evidence of a cash-advance fraud scheme), the defendant signed a "loan agreement" in January 2023 to obtain $6 million dollars on behalf of a defunct company. (Ex. 21.) Not only does this agreement require the defendant to transfer assets valued over $10,000 (*id.* at Section 7.1), like his prior agreements, it also contains false statements made by the defendant to ▬▬▬ First, the agreement lists the purpose of the funds as "certain costs and expenses of [Decision IT Corp.], as determined in its sole and absolute discretion." (*Id.* at 5.1.) The government is not aware of any business currently being done by Decision IT Corp. Additionally, the agreement notes that the only reason that Decision IT Corp.'s chief executive officer (the defendant), could not travel to Kuwait to meet with ▬▬▬ was "due to the COVID-19 pandemic travel restrictions." (*Id.* at 7.2.) In fact, the

17

defendant cannot travel to Kuwait because this Court has restricted his travel to the Central District of California and the District of Columbia as he awaits trial on his underlying fraud. (ECF 4.) Finally, in Section 8.2 of the agreement, the defendant stated that he had "the power, capacity, and authority to perform and observe all of its obligations" under the agreement. (*Id*. at 8.2.) In truth, the defendant lacks any power, capacity, or authority to transfer the required collateral or even pay the over $10,000 registration fee required by the agreement without first obtaining the permission of this Court. The defendant's brazenly false statements in this agreement, in addition to violating the defendant's conditions of release, show the defendant's willingness to escalate his fraudulent behavior – even under the Court's supervision.

While the Court need not find that the defendant is likely to flee to revoke his bond, the Government is concerned that that is precisely what the defendant intends to do with the $6 million from ▆▆▆. The Government is aware of no legitimate business purpose for those funds. That amount is also well beyond what the defendant could need to pay counsel in this case, which is, of course, not a legitimate business purpose of Decision IT Corp. In light of the overwhelming evidence in this case and an anticipated United States Sentencing Guidelines Range of close to 20 years if the defendant is convicted, the defendant has every incentive to try to flee the country. And were the defendant to leave the country, his voice ID location monitoring would not alert Pretrial Services until he was already gone.

In addition, the defendant has an established record of not participating in defense of actions brought against him. For example, he failed to defend and defaulted in each of the five cases brought against him by the five entities with whom he entered into cash advance agreements. (Exs. 15-19.) More recently the defendant also failed to defend and defaulted in the federal

securities class action based on allegations that are substantially similar to those set forth in the indictment. *See* Order Granting Plaintiffs' Motion for Default Judgment (ECF 60), *Sanchez et al. v. Decision Diagnostics Corp. and Keith Berman*, Civ. No. 2:21-cv-00418-FWS-JPR (C.D. Cal. Dec. 5, 2022) ("[T]he court finds such circumstances present here based on Defendants' deliberate decision to avoid participating in this litigation."). This pattern further demonstrates that the defendant is unlikely to defend in this action and flee instead.

***

The defendant has now clearly demonstrated that he has no intention of complying with this Court's orders. Despite clear admonitions from the Court and his own counsel, the defendant has violated the terms of his release in an increasingly flagrant manner. The defendant has also demonstrated a deep-seated disrespect for law enforcement, the government and the Court. There is thus ample evidence that the defendant is unlikely to abide by any condition of release.

## CONCLUSION

For the foregoing reasons, the government respectfully requests the Court issue an arrest warrant, hold a hearing to revoke defendant Keith Berman's pretrial release, and order him detained pending trial.

Respectfully submitted,

GLENN S. LEON
CHIEF, FRAUD SECTION
Criminal Division, U.S. Department of Justice

_____//s//_____
CHRISTOPHER FENTON
KATE T. MCCARTHY
MATTHEW REILLY
Trial Attorneys

Fraud Section, Criminal Division
United States Department of Justice
1400 New York Avenue, NW
Washington, D.C. 20005
Telephone: (202) 320-0539
Fax: (202) 514-0152
Christopher.Fenton@usdoj.gov
