# Exhibit 21



# LOAN AGREEMENT BETWEEN

AND

This Loan Agreement (this "Agreement") is made and dated as of the 31st day of January, 20 23 and is entered into by and between:

████████████████████ located at ████████████████████

and

████████ located at ████████████████████

████ and ████ are sometimes referred to collectively herein as the "Parties" and each individually as a "Party".

Whereas:

████ is a business group and financial investor, who is willing to make a loan to the ████ in the initial principal amount of $6,000,000.00 (USD Six Million Dollars) (the "Loan"); and

Whereas:

████ is willing to accept the Loan and ████ is prepared to make the Loan to ████ subject to the terms of this Agreement.

## RECITALS
Now, therefore, in consideration of the foregoing facts and the mutual representations and covenants hereinafter set forth, the Parties hereto agree as follows:



## ARTICLE 1.   DEFINITIONS AND INTERPRETATION.

1.1      Definitions

In this Agreement, including recitals, unless the context otherwise requires:

"Agreement" means this Agreement and all attached Schedules and Exhibits.

"Business Day" means any day other than Saturday and Sunday, any other day on which banking institutions in the Gulf Region are closed for business.

"Closing Date" means the date on which the approved loan will be disbursed to ███ at its designated bank account.

"Designated Account" means ███ s bank account as set forth below [**to follow**].

     Bank Name:
     Address:
     Swift Code:
     Account Name:
     Account Number:

"Event of Default" means any event or circumstance specified as such in this Agreement which with the giving of notice and/or the passage of time would become an Event of Default.

"Financing Documents" means this Agreement, the company documents of ███ the Collateral documents, and other documents from time to time executed by the Parties, including all their supplements, replacements, and amendments.

## ARTICLE 2: RECITALS PART OF AGREEMENT

2.1      The recitals set forth above always constitute an integral part of this Agreement and are considered a fundamental condition for its execution.

## ARTICLE 3: PURPOSE OF THIS AGREEMENT

3.1      The purpose of this Agreement is to define the contractual relations between the Parties and to serve as a term loan agreement upon execution by both Parties.

Case 1:20-cr-00278-TNM   Document 115-21   Filed 03/28/23   Page 4 of 9


## ARTICLE 4: AMOUNT AND ADVANCE OF LOAN

4.1     Subject to the terms set forth herein, ▌▌▌▌ hereby commits to loan to **DIC** the principal amount of $6,000,000.00 (USD Six Million Dollars).

## ARTICLE 5: PURPOSE

5.1  The provision of the Loan is to enable ▌▌ to fund certain costs and expenses of its business, as determined in its sole and absolute discretion.

## ARTICLE 6: THE LOAN

6.1     **Loan.** ▌▌ shall provide the Loan in the initial principal amount of $6,000,000.00 (USD Six Million Dollars) in immediately available funds to ▌▌ in accordance with the terms and conditions set forth in this Agreement. On the Closing Date, the Loan shall be advanced by ▌▌ by wire transfer or electronic deposit to the Designated Account or to such other bank account designated by ▌▌ on or prior to such date. ▌▌ hereby irrevocably and unconditionally declares to ▌▌ that the Loan including any interest and its repayment shall be and is hereby subordinated to all current and future claims of creditors of ▌▌ and that the subordination shall only be terminated if an auditor confirms based on audited financial statements of ▌▌ that all claims of ▌▌ are sufficiently covered by assets. If required by the auditors, ▌▌ shall repeat this subordination in a separate subordination declaration.

6.2     **Interest.** The Loan shall bear interest thereon at the rate of three percent (3%) per annum based on a year consisting of three hundred sixty-five (365) days (the "Interest"). Interest shall be due and payable in accordance with Section 6.6, below.

6.3     **Maturity and Conversion.** The entire then-outstanding principal balance of the Loan and all accrued and unpaid interest thereon shall be due and payable at the end of the 7-year following the date upon which the Loan is fully funded (the "Maturity Date").

6.4     **No Right to Interfere.** The Parties acknowledge and agree that the Loan does not entitle ▌▌ to any right to participate in the business activities of ▌▌ and for greater certainty, ▌▌ is not allowed to interfere at any time with the business of ▌▌ or claim any right to do so.

6.5     **Payment of Interest:** ▌▌ hereby grants to ▌▌ a one-year (01) grace period from the Closing Date (the "Interest Free Loan Period") before Interest becomes due and payable. At the end of the Interest Free Loan Period, Interest for the first twelve (12) months shall be due and payable to ▌▌ on the first (1st) Business Day following the second (2nd) anniversary of the Closing Date. Thereafter, Interest will be payable annually on the first (1st) Business Day following each subsequent anniversary of the Closing Date and, finally, on the Maturity Date.





**6.6** **Pre-payment penalty:** There is no pre-payment penalty associated with this funding. Therefore, ███ is entitled to repay the Loan, in part or in full, at any time, subject to the limitations due to the subordination as per Section 6.1, without having to pay any interest for the remaining period until Maturity Date, and thus, terminating this Agreement (including any rights of conversion) as per the re-payment date.

**6.7** **Automatic Conversion (Optional):** If the Company issues shares (**"Financing Shares"**) to third party investors (the "Investors") in a transaction or series of related transactions resulting in aggregate gross proceeds to the Company of at least CAD $1,000,000, excluding any convertible debt such as this Loan converted into equity interests in such Financing (a "**Qualified Financing**"), then, at the option of ███ (no duty to convert) the entire outstanding principal amount and accrued and unpaid interest under this Loan will automatically convert into a number of Financing Shares, determined based on a per share price equal to the Conversion Price (as defined below). This Section 6.7 shall only apply to any Financing that is occurring one year after the Closing Date.

**6.8** **Conversion Price:** means the price per share equal to (i) with respect to Financing Shares, 80% of the per share price paid by the purchasers of such Financing Shares in the Qualified Financing. The shares issued to the Investors upon conversion of this Loan shall have identical rights, privileges, restrictions and conditions as the shares being issued to ███ in connection with such Financing, other than with respect to: (i) the per share liquidation preference and the conversion price for purposes of price-based anti-dilution protection, which will equal the applicable Conversion Price, and (ii) the basis for any dividend rights, which will be based on the applicable Conversion Price. ███ or its legal successor shall enter into the Company's then-current shareholders agreement(s) to be entered into between the Company and each of the Company's shareholders in connection with such Financing if such holder is not already a party thereto.

**6.9** **Trade Sale:** In the case of trade sale of ███ i.e., acquisition of more than 50% of outstanding shares) ███ shall have to option to ask for a conversion of the Loan into shares o ███ t 80% of the per share price paid by the purchaser of ███

## ARTICLE 7: SECURITY

**7.1** As Closing condition ███ is providing ███ with a collateral of 20% equity shares to secure the funds to ███ as Collateral. The 20% equity shares as Collateral in respect thereof, have been accepted by ███ and agreed to by ███ will then set up a special purpose vehicle (SPV/SPE), which shall be a 100% subsidiary of ███ that will hold the Collateral in favor of ███ The SPV/SPE registration cost would amount to $16,800 (USD Sixteen Thousand Eight Hundred Dollars) and shall be pre-funded by ███ If the Parties are unable to agree on acceptable Collateral (including the execution thereof by both Parties) within sixty (60) Business Days following the execution of this Agreement by both Parties, then this Agreement shall terminate automatically without the need for notice to or further obligation of either Party to the other. For the avoidance of doubt, under no circumstances shall the shareholders, board members, members of management or other employees of ███ be personally liable in any way for the repayment of the Loan or any interest due and payable

on the principal thereof or for the conversion of the Loan into shares (if any).

7.2     Typically, ▮ would require that ▮ chief executive officer would make himself available for a face-to-face meeting with representatives of ▮ However, due to the COVID-19 pandemic travel restrictions, this requirement has been waived by ▮

## ARTICLE 8: REPRESENTATIONS AND WARRANTIES

8.1     ▮ represents and warrants to ▮ as of the date hereof that (i) it is a company duly qualified to carry on business under the laws of the jurisdiction of its incorporation, (ii) it has the authority to execute and deliver this Agreement, and (iii) it has the power, capacity, and authority to perform and observe all its obligations hereunder; ▮ hereby confirms that it operates in compliance with applicable laws and the Loan funds are "clean" (no criminal origin).

8.2     ▮ represents and warrants to ▮ as of the date hereof that (i) it is a company duly qualified to carry on business under the laws of the jurisdiction of its incorporation, (ii) it has the authority to execute and deliver this Agreement, and (iii) it has the power, capacity, and authority to perform and observe all its obligations hereunder.

## ARTICLE 9: MISCELLANEOUS PROVISIONS

9.1     **Notice.** Except as otherwise provided herein, any notice, demand, request, consent, approval, declaration, service of process or other communication that is required, contemplated, or permitted under this Agreement or the Financing Documents or with respect to the subject matter hereof shall be in writing, and shall be deemed to have been validly served, given, delivered, and received upon the earlier of: (i) the next Business Day following the day of transmission by facsimile, electronic mail or hand delivery with confirmed receipt; or (ii) the fourth (4th) Business Day following delivery if transmitted by an overnight express service or overnight mail delivery service, in each case with confirmed delivery and addressed to the Party to be notified as follows:

If to ▮



Manager

If to ▮

Keith M. Berman, Owner
**DECISION IT CORP**
1623 Elmsford Place Westlake Village, CA 91361



5

9.2     **Amendments.** This Agreement may be amended only by a written document signed by both Parties and by their duly authorized representatives.

9.3     **Governing Language.** The English language shall govern the interpretation of this Agreement.

## ARTICLE 10: EVENTS OF DEFAULT

Each of the following shall constitute an Event of Default under this Agreement:

10.1    **Reimbursements.** Failure of  to make any payments in accordance with the provisions of this Agreement which failure continues for a period of thirty (30) Business Days, following written notice from

10.2    **Failure to Fund.** Failure of to disburse all of the Loan proceeds to on the Closing Date will result in a penalty payment to the an amount equal to Five percent (5%) of the Loan.

10.3    **False Statements.** Any warranty, representation or statement made or furnished to either Party under Article 8 of this Agreement or the other Financing Documents shall have been false or misleading in any material respect either now or at the time made or furnished.

10.4    **Insolvency.** Insolvency of appointment of a receiver for any part of property, any assignment for the benefit of the creditors of any type of creditor workout in respect of or the commencement of any proceeding under any bankruptcy or insolvency laws by or against which, in the case of any involuntary proceeding, continues undischarged or uncontested by for a period of more than sixty (60) calendar days; or

10.5    **Other Defaults.** Failure of either Party to comply with or to perform any other material term, obligation, covenant, or condition contained in this Agreement or the Collateral Agreement or in any of the transaction documents between the Parties and such failure continues for more than thirty (30) calendar days after the date on which the Party not in default has given notice of such alleged default to the Party alleged to be in Default.

10.6    **Effect of Default.** Upon an Event of Default, which is continuing and is not cured in accordance with this Agreement, all obligations of the Party not in Default ("Non-Defaulting Party") will be immediately suspended, and the Non-Defaulting Party may, at its option, upon proper notice given to the Party alleged to be in Default (the "Defaulting Party") of the nature and reasonably full particulars of such Event of Default, elect to proceed with any all remedies provided for under Article 10 of this Agreement. Subject to any and all cure rights provided for in this Agreement, if the Defaulting Party does not cure such Default within the time period(s) provided for in this Agreement or provide reasonable evidence that an Event of Default has not in fact occurred, then (i) if the Defaulting Party is may accelerate



and demand re-payment of all or any part of the remaining outstanding balance of the Loan and declare such amount(s) to be immediately due and payable and all obligations of under this Agreement will be immediately suspended, and (ii) if the Defaulting Party is then compensation will be paid to ▮ for any damages arising from ▮ failure to perform, and all obligations of ▮ under this Agreement will be immediately suspended, in addition to any other rights or remedies available at law or in equity to ▮

### 10.7  Force Majeure:

Neither Party shall be liable in any way for delays or failure to perform obligations under this Agreement resulting from an event of "Force Majeure" which, for purposes of this Agreement, shall mean any cause whatsoever beyond a Party's reasonable control and which was not (i) foreseeable by the Party claiming Force Majeure and (ii) whether or not foreseeable, could not be remedied or avoided by such Party. The Party claiming Force Majeure will promptly notify the other Party in writing of the occurrence of an event of Force Majeure (and the likely duration and anticipated effects thereof) and take all reasonable steps to overcome the delay or failure to perform occasioned by the occurrence of such event of Force Majeure.

### ARTICLE 11: CONFIDENTIALITY

11.1  The Parties agree to respect the confidential nature of information which they receive during the term of this Agreement, including information concerning the transaction, distribution, financial statements or bank account information of either Party or the execution of this Agreement and/or the Financial Documents, and the Parties shall undertake to keep such information strictly confidential during the term of this Agreement and after the termination of this Agreement, except as may be required by law, or in any judicial, arbitration or other proceeding arising out of this Agreement.

### ARTICLE 12: GOVERNING LAW AND JURISDICTION

12.1  All disputes concerning the validity, the interpretation or the performance of this Agreement shall be finally settled under the rules of conciliation and arbitration of the International Chamber of Commerce by three arbitrators appointed in accordance with the said rules by both Parties. The seat of such arbitration shall be London, England, and the language of such arbitration shall be English.

12.2  This Agreement and any matters arising out of or relating in any way to this Agreement shall in all respects be governed and construed in accordance with the laws of the United Arab Emirates except that any disputes relating to the Collateral and the rights and obligations of the Parties in respect thereof shall be governed and construed in accordance with the laws of the United Arab Emirates.

12.3  This Agreement may be executed in any number of original counterparts, with the same effect as if the Parties had signed the same document and will become effective when one or more counterparts have been signed by all the Parties and delivered in person to, or

7



when a true copy of a signed counterpart has been received by facsimile or electronic transmission (including Portable Document Format) by the other Party. All counterparts will be construed together and evidence only one Agreement, which, notwithstanding the dates of execution of any counterparts, will be deemed to be dated the first above written and only one of which need be produced for any purposes hereunder.

12.4    **It is further agreed that electronically sent copies will be accepted as legal and binding on all parties.**

IN WITNESS WHEREOF, the Parties have duly executed and delivered this Loan Agreement as of the day and year first written above.

Sign: _____

**DECISION IT CORP**

Sign: _____

**Name:** Keith M. Berman
**Position:** Owner, CEO, Director

Sign: _____

Nam ████████████
████████ Al-████
████████████
████████████
████ Al-A████████

8