```
 1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2
        * * * * * * * * * * * * * * *    )
 3      UNITED STATES OF AMERICA,        )      Criminal Action
                                         )      No. 20-00278-1
 4                      Plaintiff,       )
                                         )
 5         vs.                           )
                                         )
 6      KEITH BERMAN,                    )      Washington, D.C.
                                         )      April 25, 2023
 7                      Defendant.       )      10:03 a.m.
                                         )
 8      * * * * * * * * * * * * * * *    )

 9


10       TRANSCRIPT OF MOTION HEARING AND BOND REVOCATION HEARING
              BEFORE THE HONORABLE TREVOR N. McFADDEN,
11                    UNITED STATES DISTRICT JUDGE

12


13      APPEARANCES:

14      FOR THE GOVERNMENT:       CHRISTOPHER R. FENTON, ESQ.
                                  KATHERINE McCARTHY, ESQ.
15                                MATTHEW REILLY, ESQ.
                                  U.S. DEPARTMENT OF JUSTICE
16                                CRIMINAL DIVISION, FRAUD SECTION
                                  1400 New York Avenue, Northwest
17                                Washington, D.C. 20530

18      FOR THE DEFENDANT:        KEVIN B. COLLINS, ESQ.
                                  ELIZABETH ERTLE, ESQ.
19                                NICHOLAS XENAKIS, ESQ.
                                  COVINGTON & BURLING, LLP
20                                850 Tenth Street, Northwest
                                  Washington, D.C. 20001
21
                                  MICHELLE PETERSON, ESQ.
22                                OFFICE OF THE FEDERAL PUBLIC
                                    DEFENDER
23                                625 Indiana Avenue, Northwest
                                  Suite 550
24                                Washington, D.C. 20004

25      FOR PRETRIAL SERVICES:  CHRISTINE SCHUCK
```

1     REPORTED BY:                 LISA EDWARDS, RDR, CRR
                                    Official Court Reporter
2                                      United States District Court for the
                                      District of Columbia
3                                      333 Constitution Avenue, Northwest
                                    Room 6706
4                                      Washington, D.C. 20001
                                    (202) 354-3269
5

 1          THE COURTROOM DEPUTY:  Your Honor, this is

 2     Criminal Case 20-278, the United States of America versus

 3     Keith Berman.

 4          Counsel, please come forward to identify

 5     yourselves for the record, starting with the Government.

 6          MR. FENTON:  Good morning, your Honor.

 7     Christopher Fenton, Kate McCarthy, Matt Reilly for the

 8     United States along with Postal Inspector Kevin Towers and

 9     Rachel Boyer, who is our paralegal.

10          THE COURT:  Good morning, folks.

11          MR. COLLINS:  Good morning, your Honor.  Kevin

12     Collins from Covington on behalf of Mr. Berman.  I'm joined

13     by my colleagues Elizabeth Ertle, Nicholas Xenakis and our

14     co-counsel, Michelle Peterson.  Also at counsel table is one

15     of our colleagues, José Giron.

16          THE COURT:  Good morning, folks.

17          MR. COLLINS:  Good morning.

18          THE COURT:  And I see we have Mr. Berman appearing

19     via video.

20          Mr. Berman, are you comfortable proceeding

21     remotely for purposes of today's hearing?

22          THE DEFENDANT:  Yes.  Yes, your Honor.

23          THE COURT:  So we've got two motions before the

24     Court.  The first is the motion to transfer; the second is

25     the detention hearing.

1              I'm going to -- I've reviewed the parties'

2      pleadings on the motion to transfer, and I'm prepared to

3      rule at this time.

4              Under Rule 21(b), the Court may transfer this case

5      for the convenience of the parties, any victim, and the

6      witnesses and in the interest of justice.  To assess that,

7      Courts typically weigh ten factors, none of which is

8      necessarily dispositive.  I'm looking to *United States*

9      *versus Bochene*, 579 F.Supp. 3d 177, from Page 183, from this

10     Court in 2022.

11             The Defendant bears the burden of showing that the

12     circumstances of his case warrant transfer, according to

13     United States versus Quinn, 401 F.Supp. 2d 80, Page 85, from

14     this district in 2005.

15             The Court will take each factor in turn.

16             The first factor is where the Defendant is

17     located.  I find that this factor weighs in favor of

18     transfer because the Defendant is currently in custody in

19     California, and if he wasn't in custody I think he would

20     also be at his residence in California.

21             The second factor is where possible witnesses are

22     located.  I find that this factor is neutral.  The Defendant

23     argues that because his company is based in California,

24     company witnesses are likely in California, too.  That may

25     well be.  As the Government notes, most of its witnesses are

1     on the East Coast within driving distance of D.C.

2              So I'm quite confident that there's a number of

3     witnesses who are here.  I think it's reasonable to believe

4     that there are some witnesses who are in California,

5     although there's less evidence on that point.

6              The third question is where the events in issue

7     took place.  I find that this factor is neutral as well.

8     The Defendant claims that the events at issue took place in

9     California because his company is based there.  The

10    Government responds that the Defendant's alleged

11    misrepresentations and alleged obstruction affected people

12    in and around D.C. and specifically the SEC, which is

13    supposed to be the victim of the misrepresentations here;

14    and of course the SEC is headquartered here.  I find both

15    sides' points are well-taken and I find this factor is a

16    wash as well.

17             The fourth factor is where the relevant documents

18    and records are located.  I believe that this factor is also

19    neutral.  I think the Defendant rightly points to his

20    business being in California with presumably many documents

21    and records there.

22             However, I think there's also documents submitted

23    to the SEC.  The grand jury has received many, if not all,

24    relevant documents, and they would be in D.C.  So I find

25    that the fourth factor is also neutral.

1          As is the fifth, whether the Defendant's business

2     will suffer any disruption if this case is not transferred.

3     I believe that the location of this case will have little

4     effect on the Defendant's capacity to run his business.  I

5     think his ability to do that really turns much more on his

6     bond status and his health, not where we would try the case.

7     I think if the Defendant is in custody, he's going to have

8     difficulty running his business wherever he is.  If he's not

9     in custody, I presume that he would remain in California

10    until trial; and I don't think there's any evidence that the

11    relatively short trial would impact his business per se,

12    depending on whether it's in California or here.

13          Turning to the sixth factor, the cost to the

14    parties, I think this factor cuts against transfer because

15    the Government would need to fly and house its lawyers in

16    California for trial and it lacks a cost-effective facility

17    for housing the Defendant should he remain incarcerated

18    pretrial.

19          I take the defense point that the Government has

20    an office in the Central District, but I think this case is

21    being run out of Main Justice.  Those attorneys are here.  I

22    don't think there's an expectation that the prosecutors

23    would switch to California prosecutors if the case was

24    transferred.  This is of course a complicated case that's

25    already been prepared for trial once, and so I think frankly

1    all of the attorneys from both sides or the majority of them

2    are here, which also goes into the seventh factor, where

3    counsel are located.  And I find that that factor as well

4    cuts against transfer in that all or substantially all of

5    the attorneys are located in D.C.

6           The defense noted that FPD has an office in

7    California.  I'm sure that's right.  But Ms. Peterson is

8    here; and again, I don't think these attorneys are

9    necessarily fungible.  So I think that factor does cut

10   against transfer.

11          Turning to the eighth factor, the accessibility of

12   the place of trial, I find this factor is neutral.  Both

13   districts are in major, easily accessible cities.

14          The ninth factor is the docket conditions of each

15   district.  I find that this factor cuts against transfer.

16   The defense is certainly right that the Government has

17   blessed this Court with a number of criminal cases over the

18   last couple of years and that our criminal docket has become

19   more congested due to all the January 6th cases.

20          But it looks to me that the Central District of

21   California is even more swamped and is in some ways

22   habitually swamped.  Last year, it had more criminal felony

23   filings per judge than this district and took over two

24   months longer on average to take criminal cases from filing

25   to disposition.

1          The tenth factor asks whether there's any special

2     elements that justify a transfer.  I find that this factor

3     cuts against transfer, too.  The Court agrees with the

4     Defendant that his health concerns offer some support for

5     transfer, assuming that he is released pretrial.  If he's

6     not, then it seems to me that those concerns may well cut in

7     the opposite direction, given that the Central District

8     apparently lacks a place to house the Defendant that is

9     medically sufficient and cost-effective, while the Marshals

10    Service says this district has a couple of viable options.

11         I'm also convinced by the Government that their

12    plan to transfer the Defendant via Learjet to D.C. if I do

13    indeed order him detained is a safe and medically

14    appropriate way to transfer him if it in fact comes to that.

15         I reject the Government's argument that the

16    Defendant's motion should be dismissed offhand as untimely.

17    For one, the Federal Rules allow for a motion to transfer to

18    be filed at or before arraignment or at any other time the

19    Court or these rules prescribes.  I'm looking to Criminal

20    Rule 21(d).

21         The Court does not view the Defendant's motion as

22    bad faith or for purposes of delay.  The Defendant has

23    certainly suffered ongoing health problems.  He now has the

24    benefit of new counsel, and of course he's facing detention

25    now.  I think all of these factors certainly both

1    individually and together can explain why this motion is

2    suddenly a lot more appealing to the defense.

3              Having said that, I still think this final factor

4    favors denying transfer.  Perhaps mostly importantly, the

5    Court is now very familiar with this complicated case.  I've

6    already heard over a dozen hearings.  I've resolved many of

7    the pretrial motions.  I think starting partway over would

8    waste judicial resources and the parties' time.

9              And I think, as I say, while I don't fault the

10   defense for filing this motion now, I do think transferring

11   this case at this point would likely delay the trial

12   further.

13             And I think there are two key problems with that:

14   First, it would harm the public's interest in a speedy

15   trial.  Of course, the public have a freestanding interest

16   in speedy criminal trials regardless of the parties'

17   position.

18             And second, I think a delay would prejudice both

19   parties' ability to try this case.  This case is already now

20   several years old.  Witnesses' memories are likely to

21   continue to fade.

22             Considered all together, I find that the transfer

23   factors favor keeping this case here.  As I say, a number of

24   these factors are neutral and at least one factor favors

25   transfer.  However, I think the issues that I mentioned at

1    the end are most salient in my mind, and I do find that

2    transferring the case at this point would prejudice the

3    Government and the public while offering little to the

4    Defendant in return.

5            Therefore, I'm going to deny the Defendant's

6    motion to transfer.

7            All right.  I'll hear now regarding the

8    Government's detention motion.

9            Mr. Fenton, how did you propose proceeding?

10           MR. FENTON:  Thank you, your Honor.

11           It's our understanding that the Court would be

12   amenable to the Government proffering certain facts and then

13   making available Postal Inspector Towers for

14   cross-examination to the extent that the Defendant would

15   like to cross-examine him about the factors that we

16   proffered.

17           THE COURT:  I think that's fine.

18           Mr. Collins, do you have any concern with that?

19           MR. COLLINS:  No, your Honor.

20           THE COURT:  Go ahead, Mr. Fenton.

21           MR. FENTON:  Thank you, your Honor.

22           For two years, the Defendant has engaged in

23   conduct that clearly violates his conditions of release; and

24   the Government has submitted overwhelming evidence along

25   with its written submission.

1          And three things are apparent:  One, that his
2     conduct follows a pattern; two, that his conduct is really a
3     continuation of the criminal conduct alleged in the
4     indictment; and, three, that he's engaged in the conduct
5     with disdain and disregard for law enforcement, the SEC, the
6     Department of Justice and the Court.

7          And the Government largely stands by its
8     submissions, but we would want to highlight for the Court
9     some key facts that we believe are illustrative of the
10    Defendant's violation and the unlikelihood that he will
11    comply with any conditions.

12         First, on December 21st, 2020, defense counsel
13    assured the Government that the Defendant will not
14    communicate with investors about the DOJ case.  That was
15    Exhibit 1 to the Government's submission.

16         That very same day, the Defendant is directing an
17    investor, Victim 1, to attack a nonprofit organization based
18    on a lie that the Defendant concocted about how the
19    nonprofit organization disqualified the Defendant's COVID
20    test because of the Department of Justice case.  Those are
21    Exhibits 2, 3, 4 and 5.

22         And this is the same type of conduct that is
23    alleged in the indictment, when the Defendant used investors
24    to attack the SEC.  Here, he was using an investor to attack
25    a nonprofit organization who was trying to come up with a

1   solution to help resolve the COVID-19 pandemic at a time of

2   national and international emergency.

3         Second, in April of 2021, your Honor admonished

4   the Defendant in open court for his obstructive behavior,

5   specifically that the Defendant had directed certain

6   investors, again, Victim 1 and now Victim 2, not to

7   cooperate with federal law enforcement agents and not to

8   become Government witnesses.

9         And these are the text messages that the

10   Government submitted as Exhibit 6 to its motion to revoke

11   bond.

12         Almost immediately after the Court admonished the

13   Defendant, the Defendant engaged in these same obstructive

14   behavior with the same investors.  He discussed details

15   about the case; he attacked the Court; he directed the

16   investors to stop other investors from saying negative

17   things about him and about the criminal case on the

18   internet; and he defrauded these investors anew to dissuade

19   them from selling Decision Diagnostics stock.  And this is

20   Exhibit 7.

21         This is the same conduct that is alleged in the

22   indictment.  Again, the Defendant is undeterred.

23         At the same time, and into 2022, the Defendant is

24   harassing and intimidating investors, other investors who

25   lost money.  And the investors that we highlight here,

1   Victim 3 and Victim 4 -- and these are Exhibits 8 and 9 that

2   we submitted along with our revocation motion -- the

3   Defendant's words are telling.

4           The Defendant was obsessed with the continuance of

5   the trial date, and the Defendant tried to use the

6   continuance to persuade these investors that the Department

7   of Justice case against him was weak.  And his motive is

8   always the same.  When you look here, it's the stock price.

9   The Defendant believes that there is a link between the

10  criminal case and the company's stock price.

11          Another example -- and this is separate conduct --

12  is that the Defendant was ordered to notify and seek

13  approval from the Court of every sale, assignment or

14  transfer of assets valued at $10,000 or more.

15          And the Defendant ignores the Court's order

16  repeatedly.  And we provide six examples.  These are

17  Exhibits 10 through 19 and Exhibits 22 through 25, submitted

18  along with the Government's revocation motion and its reply

19  in support.

20          And the six examples involve six different

21  companies:  Cloudfund, LLC; Fox Capital Group, LLC; BMF

22  Advance, LLC; Green Grass Holdings, LLC; Avion Funding; and

23  ByzFunder.  And these sales are based on false and

24  misleading statements.  They're fraudulent.  One, he's

25  misrepresenting that he has the authority to engage in the

1    sale of the company's assets, which he doesn't, because

2    first he's required to obtain the approval of the Court and

3    to provide notice.

4         And, two, they're fraudulent because he had

5    committed to not stack, which means to not engage in

6    multiple sales of the same assets with multiple companies.

7         And not surprisingly, the Defendant defaults.  And

8    this is not some pittance of a sum; these are large amounts

9    of money well after the Defendant has already been indicted

10   for a multi-, multimillion-dollar fraud.  And what we're

11   talking about here are hundreds of thousands of dollars.

12        And this is not a legitimate way to do business.

13   There is a legitimate way to do business, and the legitimate

14   way to do business in this situation would be to provide

15   notice to the Court, to seek approval from the Court and to

16   deal with these parties in a truthful manner, to not make

17   false and misleading statements to them to get them to

18   fraudulently induce them into a contract.

19        And the Defendant doesn't do that.  The Defendant

20   does the opposite here, because he's hiding his activities

21   from the Court and he's also lying to these parties.

22        Importantly, the Defendant also lied to the Court

23   on his financial affidavit -- that's Exhibit 20 -- when he

24   describes for the Court and details for the Court the amount

25   of his liabilities.  He misstates that vastly, because at

1   the time there are hundreds and hundreds of thousands of

2   dollars of default judgments against him.

3          Finally, the final example is the $6 million loan

4   with which the Court is familiar.  This is Exhibit 21 that

5   we submitted as well.  This again was not disclosed to the

6   Court.  In fact, it was concealed.

7          And it came to light entirely by accident.  And

8   these are the emails that the Defendant sent to the Court.

9   He was trying to send his financial affidavit, which was

10  written -- which was where he's perjuring himself; and

11  instead of submitting the financial affidavit, he by

12  accident submits this signed $6 million loan agreement.

13  This is a massive amount of money.

14         And the reason that the Government characterizes

15  this as an escalation in its papers is because while the

16  Defendant was previously seeking hundreds of thousands of

17  dollars, at this point he's seeking 6 million.  And he's

18  also seeking an immediate disbursement of funds.

19         At this point, the Defendant had run out of

20  excuses to delay trial, and the fair inference was that he

21  was amassing a small fortune so that he could run.  And

22  either way, he's making false and misleading statements to

23  take somebody else's money.

24         So regardless of whether or not there's a risk of

25  flight, there's no doubt that this is fraud.  And this is

1   fraud in January 2023.

2           So when the Court looks back, we have 2020, 2021,

3   2022 and now 2023.  For that entire period, there is

4   documentary evidence and testimonial evidence from

5   witnesses, including many victims, demonstrating that the

6   Defendant has violated his conditions repeatedly and in a

7   variety of different ways.

8           Lastly, and I think perhaps most importantly,

9   there is -- based on this record, there is absolutely no

10  evidence to suggest that, were the Court to impose

11  additional conditions, that there is any reason to believe

12  that the Defendant would actually comply with those

13  conditions.  In fact, the overwhelming evidence that the

14  Court -- that the Government has submitted demonstrates that

15  the Defendant will not.

16          And the fundamental reason why it appears that the

17  Defendant will not is twofold:  One, he is desperate for the

18  money, which means that there's no other way for him to get

19  it, so he's trying to get it through unlawful, fraudulent

20  means; and the second is because the Defendant has a

21  demonstrative lack of respect for law enforcement, for the

22  criminal justice system, for the Government and for the

23  Court.

24          For all of those reasons, the Government believes

25  that we have absolutely satisfied the standards both to show

```
 1     violation and also to show the Defendant is unlikely to

 2     comply with his conditions.

 3              THE COURT:  Thank you, Mr. Fenton.

 4              Mr. Collins?

 5              MR. COLLINS:  Your Honor, Ms. Ertle is going to

 6     address the Court.

 7              THE COURT:  Okay.  Say your name for me one more

 8     time.

 9              MS. ERTLE:  Elizabeth Ertle.

10              THE COURT:  Good morning, ma'am.

11              MS. ERTLE:  Thank you, your Honor.

12              The Government's motion relies primarily on very

13     stale conduct.

14              THE COURT:  I'm sorry.  Happy to hear argument

15     from you.

16              MS. ERTLE:  Yes, your Honor.

17              THE COURT:  Did you want to put a witness on or

18     cross-examine the Government's witness?

19              MS. ERTLE:  At this point, no, your Honor.  We're

20     happy to proceed to argument unless your Honor would prefer

21     something else first.

22              THE COURT:  No.  That's fine.  I just wanted to

23     make sure.  I think we should go in order.  So if you do

24     want to do a witness, let's do that first.

25              MS. ERTLE:  No.  I think we're fine proceeding
```

```
 1      with argument.

 2                  THE COURT:  Okay.

 3                  MS. ERTLE:  The Government's motion relies

 4      primarily on stale conduct.  While the Government portrays

 5      this as an escalating pattern, what we have actually seen

 6      from Mr. Berman is that, over time, there has not been a

 7      pattern but a deescalation in conduct that the Government

 8      raises today.

 9                  And we're going to submit Defense Exhibit 1.  And

10      this is just a timeline; it's a demonstrative of a lot of

11      the conduct the Government just went through.

12                  THE COURT:  You can probably just put it --

13                  Can we put it on the ELMO there, Ms. Chaclan?

14      Does that make the most sense?   Oh, but then we won't be

15      able to see Mr. Berman.

16                  You know what?  Just go ahead and hand it up.  I

17      think you had the better idea.

18                  MS. ERTLE:  Yes, your Honor.

19                  (Tenders document to the Court.)

20                  THE COURT:  Thanks.

21                  MS. ERTLE:  We've provided this just to illustrate

22      the inaccuracy of portraying Mr. Berman's conduct, alleged

23      conduct here, as a pattern of escalation.

24                  Instead, what we see is the Government's

25      allegations fall primarily into two buckets.  One has to do
```

1    with Mr. Berman's contact with investors and the second has

2    to do with these loans that the Government has alleged that

3    Mr. Berman has fraudulently obtained.

4         So we'll take those one at a time, starting with

5    the investor conduct.

6         Now, the majority of the Government's conduct

7    occurred over a year ago.  There's only one instance that

8    the Government has alleged of anything happening in the past

9    year.  And to the extent that items or conduct occurred

10   between Mr. Berman's indictment and the Court's April 2021

11   hearing, the Government relies on conduct that this Court

12   has already addressed.

13        Instead, the Government tries to use that as an

14   indication that Mr. Berman fails to comply with his required

15   bond requirements.

16        Instead, what happened is that Mr. Berman appeared

17   before this Court.  The bond requirements were clarified in

18   April 2021.  And after that point, Mr. Berman complied with

19   this Court's requirements in terms of bonds.

20        The Government has conflated bond -- contact with

21   investors that is permissible and impermissible.  As this

22   Court acknowledged in April of 2021, Mr. Berman is not

23   wholly prohibited from contact with investors.  Instead,

24   what this Court stated in the April 2021 hearing is that

25   Mr. Berman was not intended to not be able to speak with

1    investors at all, but that he was required to contact them

2    only in a group setting.

3            After April 2021, that is exclusively what the

4    Government has offered evidence of.

5            The Government's Exhibits 7 through 9 all have to

6    do with conduct in which Mr. Berman was talking with

7    investors as part of a group.  And if you look at those

8    exhibits, you'll see multiple references to the fact that

9    Mr. Berman is involving additional investors so as to comply

10   with this Court's requirements in terms of the bond

11   requirements for his contact with those investors.

12           The Government's confusion of permissible and

13   impermissible contact with his investors undermines their

14   position that Mr. Berman cannot abide by his bond conditions

15   when in fact what we saw was significant evidence of him

16   taking affirmative steps to do just that.

17           The Government has argued that the timing of these

18   stale allegations doesn't affect the fact that Mr. Berman

19   has had contact with investors.  But it is significant

20   because it illustrates exactly the fact that Mr. Berman can

21   and has shown that he will, is able to and is willing to

22   respect the bond requirements.

23           The characterization of this as a pattern that is

24   escalating is simply contrary to the timeline of the

25   Government's allegations.  Even the Government doesn't have

1    anything to point to in the past 12 months in terms of

2    inappropriate investor conduct.

3                   THE COURT REPORTER:  Sorry.  Conduct or contact?

4                   THE COURT:  Either one would do.

5                   MS. ERTLE:  Contact.  Yes.

6                   Furthermore, the Government characterizes a lot of

7    this communication as coercive.  Looking at the actual

8    exhibits that the Government has submitted, that's simply

9    not the case.  And indeed, this is what the Government has

10   previously argued; and in fact, Victim 1 and Victim 2 have

11   specifically previously written to this Court and contested

12   the characterization of themselves as victims.

13                  Instead, the vast majority of what the Government

14   has submitted is communications with investors in which

15   Mr. Berman is merely talking about the state of the

16   business, which clearly is contemplated by this Court's

17   April 2021 hearing on the bond issues.

18                  THE COURT:  Mr. Ertle, can you remind me, what is

19   the relevant release condition there?

20                  MS. ERTLE:  I'm sorry, your Honor?

21                  THE COURT:  The relevant release condition that

22   you're saying that he's abiding by.

23                  MS. ERTLE:  I don't have the conditions in front

24   of me, your Honor.  But there's a requirement that

25   Mr. Berman not have individual contact with the investors.

1    And what that requirement meant was clarified in this

2    Court's April 2021 hearing on bond issues when Mr. Berman's

3    prior counsel requested that he have those bond conditions

4    loosened.

5         Your Honor addressed the fact that Mr. Berman's

6    bond conditions were not intended to be the death blow to

7    his business.

8         And his prior counsel represented Mr. Berman may

9    have communications; there just have to be two investors

10   present.  And your Honor said in Exhibit A to our opposition

11   on the -- to the bond motion -- your Honor said -- and I

12   think as you point out, it does permit various attempts to

13   keep going by doing group communications.

14        And, your Honor, Ms. Peterson just helpfully

15   handed me the bond conditions themselves.  This is 7-G.

16        THE COURT:  And what does it say?

17        MS. ERTLE:  Avoid all contact, directly or

18   indirectly, with any person who is or may be a victim or

19   witness in the investigation or prosecution, including

20   investors of Decision Diagnostic Corp. on an individual

21   basis.  If Defendant is contacted by a prohibited person, he

22   is to refer them to counsel.

23        And that was the issue that was raised in the

24   April 2021 hearing where your Honor stated, yes, the

25   intention or the way this is written allows for what your

1   Honor said was, quote, "group communications."

2          THE COURT:  My guess is Mr. Fenton is going to

3   suggest that this is witness tampering regardless of the

4   release conditions that I think would be freestanding and

5   potentially criminal conduct regardless of the permutations

6   of my order.

7          Why is it not that?

8          MS. ERTLE:  There's an inherent tension, your

9   Honor, with the suggestion that Mr. Berman can have these

10  group communications in order to accomplish the running of

11  his business and that any conversation about the state of

12  the case or Mr. Berman's case with respect to the criminal

13  charges is forbidden.

14          In fact, what we see is Mr. Berman was updating

15  his investors on the status of the case.  But many of these

16  investors were also employees of his company.  And so in

17  order to run the day-to-day business of his own corporation,

18  he had to be required to have some contact and some

19  discussions about what was happening as part of the case.

20          Now, the Court did not indicate that Mr. Berman

21  was wholly prohibited from discussing the case with any of

22  these individuals.  As that would have been the sort of

23  death blow to his business that he was able to continue

24  successfully running following that hearing and indeed

25  through the end of 2021 and the beginning of 2022 when he

1    ultimately became ill.

2           Turning to the second category of violations that

3    the Government has alleged:  Again, there are two instances,

4    two time periods, that the Government points to with respect

5    to financial allegations that the Government has made.

6           The first occurred in fall 2021, when Mr. Berman

7    is alleged to have taken out a series of loans.  And then

8    the second is with respect to this $6 million loan

9    application from 2023.

10          With respect to the fall 2021 loans, these were

11   all loans made on behalf of the company and taken out in the

12   company's name.  And contrary to the Government's

13   representation in its motion, these were not loans that were

14   requested or received when the company was defunct.  In

15   fact, the company had been in operation for decades at this

16   point.  And at the point that Mr. Berman took out loans, we

17   have evidence from the Government that at least some of them

18   Mr. Berman began to repay.

19          In Exhibit 22 to the Government's submissions on

20   the bond issue, the Government interviewed one of those six

21   lenders that the Government just talked about, ByzFunder.

22   And the ByzFunder interview confirmed that Mr. Berman was

23   making payments on some of those loans.  In fact, Mr. Berman

24   had paid back $35,000 as of January 2022.

25          The Government stated that, not surprisingly, the

 1    Defendant defaults on these loans.  It's not surprising, but

 2    not for the reason that the Government insinuates.

 3              Just after Mr. Berman took out those loans and

 4    began those repayments that we have evidence of, Mr. Berman

 5    became very ill.  Mr. Berman developed the current medical

 6    condition that he's suffering from in February of 2022.

 7              And so the fact that Mr. Berman took out loans and

 8    was unable to repay them because he promptly was

 9    hospitalized for multiple weeks before ultimately having to

10    receive regular medical care doesn't mean that those loans

11    were taken out at bad faith or that the Government -- or

12    that Mr. Berman's company was defunct and Mr. Berman was

13    attempting to amass funds to himself as part of that series

14    of loans.

15              THE COURT:  So, Ms. Ertle, I understand your point

16    that you're saying these were not kind of fraudulent loans.

17    Were they still -- well, were they still a violation of his

18    release conditions?

19              MS. ERTLE:  We don't believe so, your Honor,

20    consistent with this Court's guidance that the bond

21    conditions were never intended to be a death blow to

22    Mr. Berman's company.  And that's because Mr. Berman, as the

23    CEO, as the main administrator of his company, had to be

24    able to continue to run the company.

25              THE COURT:  But wasn't there this requirement to

1    preclear?  I mean, I don't think preclearance is a death

2    blow.  It just meant that he needed -- there was an extra

3    step he needed to take that he wouldn't have had to take had

4    he not been facing a felony indictment.

5             MS. ERTLE:  That may have been the case if the

6    loans were taken out in Mr. Berman's own personal capacity.

7    But I think that it's reasonable that Mr. Berman understood

8    that he was able to continue running the day-to-day company

9    to the extent that he was taking out loans on behalf of his

10   business and repaying them with business money.

11            None of the loans were for Mr. Berman's personal

12   benefit.  And it's reasonable to understand that Mr. Berman

13   looked at that situation, understood the Court's guidance

14   and continued to run his company in a manner that he

15   believed was consistent with the guidance that he received

16   the entire time during that period from his arraignment

17   until he fell ill.

18            The Government's other argument about these loans

19   being fraudulently obtained relates to the stacking

20   provisions of the loans.

21            THE COURT:  Sorry.  Back on this point.

22            MS. ERTLE:  Yes, your Honor.

23            THE COURT:  He underwrote them, though,

24   personally.  Didn't you say that he would be personally

25   responsible if his company couldn't make good on them?

1            MS. ERTLE:  In his capacity as CEO, I believe that

2      is standard for these sorts of loans, your Honor.  It's --

3      Mr. Berman would have still understood that personal

4      underwriting to be in his role as CEO.

5            So the loans -- Mr. Berman always understood that

6      they did not accrue to his personal benefit.  Even if he

7      could be held personally liable for them, that's just how

8      these loans operate.  And Mr. Berman, understanding that, as

9      someone who's been working in this business for decades,

10     would have understood that, he was attempting to continue

11     running his business, which he believed that and the Court

12     advised he was able to continue to do.

13           THE COURT:  And is the company still a going

14     concern?

15           MS. ERTLE:  Sorry?

16           THE COURT:  Is it still a going concern?

17           MS. ERTLE:  Mr. Berman has attempted to resurrect

18     the business, particularly more recently.  Obviously, it's

19     very difficult with Mr. Berman's health condition.  But he

20     has made attempts to try to resurrect the company.

21           He's continued to do that.  Obviously, things

22     really fell apart in a meaningful way after his

23     hospitalizations.  But Mr. Berman still runs the company and

24     still very much wants to continue running the company.

25           THE COURT:  I wouldn't be surprised if you don't

1   know this.  But do you know how many employees there were

2   back in 2021?

3          MS. ERTLE:  I don't know as of 2021.

4          THE COURT:  I guess I'm trying to figure out to

5   what extent this company is just a -- "shell" is the wrong

6   word, but almost an alter ego for him.

7          MS. ERTLE:  As of 2021, I don't know how many

8   employees there were.  But we do understand from the

9   Government's productions that as of the end of 2021, that

10  Mr. Berman was still invoicing clients, that clients were

11  still purchasing product.  So this isn't something that was,

12  you know, dormant at the time that Mr. Berman received those

13  loans.

14          In addition, there is additional evidence that the

15  Government has produced about repayments being made, not

16  just with respect to these six loans, but with respect to

17  other loans that Mr. Berman had.  So there's no reason to

18  believe that it was a shell as of 2021.

19          There are SEC filings that Mr. Berman was required

20  to file, and he complied with those requirements until he

21  ultimately became ill.  There are annual reports filed, and

22  those are all publicly available.

23          With respect to the January 2023 loan negotiations

24  that Mr. Berman was engaged with, it does bear noting that

25  this agreement was not executed.  Preliminarily, the nature

1   of this loan application, the Government portrays it in its

2   motion as an attempt to steal $6 million.

3           There's simply no evidence -- even if, even if

4   Mr. Berman were fraudulently obtaining the loan, which

5   obviously Mr. Berman strongly disagrees with, that wouldn't

6   make it theft.  And so that characterization is simply not

7   accurate.

8           Similarly, the Government's complaint that

9   Mr. Berman was giving away assets worth $1.2 million as part

10  of obtaining this loan similarly falls shorts.  As part of

11  collateral for the loan, Mr. Berman had to provide stock in

12  the business.  And it was not something that Mr. Berman

13  personally was guaranteeing; it's part of the business

14  exchange in order to obtain the loan.

15          That service as collateral is something that is

16  standard for these types of agreements and does not involve

17  the -- necessarily the transfer of these kinds of goods.

18          Fundamentally, the Government takes issue with the

19  $6 million loan in part because of that $1.2 million alleged

20  value of collateral.

21          The Government can't have it both ways.  The

22  Government suggests in their motion both that the business

23  was defunct as of 2021, but also that this stock was worth

24  $1.2 million when Mr. Berman was attempting to get this loan

25  to resuscitate the business that he's long run, for decades.

1     Both things cannot be true.

2            And what happened here is Mr. Berman, attempting,

3     as I suggested -- alluded to a moment ago, is Mr. Berman,

4     attempting to resuscitate the business, consistent with his

5     understanding of how that should happen and taking out the

6     loan in order to further the interests of the business, is

7     consistent with that.

8            And this was not something that ultimately was

9     executed.  It's something that Mr. Berman ultimately -- it

10    was disclosed to the Government before there was any sort of

11    finalization.  And as of this point, it still has not been

12    finalized.

13           The related issue of perjury on the financial

14    affidavit:  As a preliminary matter, for purposes of the

15    financial affidavit, Mr. Berman's additional liabilities

16    would not change the result for which that affidavit was

17    used, which was whether he was eligible for public defender

18    assistance.

19           In fact, if Mr. Berman had disclosed additional

20    liabilities, that would have only made him more likely to

21    qualify for public defender assistance.  This is a very

22    technical violation.  The financial affidavit does -- is

23    targeted at identifying personal liabilities.  It's

24    understandable that Mr. Berman provided what he viewed as

25    personal liabilities and assets, and any additional

1    corporate liabilities that the Government would attribute to

2    Mr. Berman would only make it more likely for Mr. Berman to

3    qualify for the public defender assistance.

4           Even if Mr. Berman should have included these

5    liabilities on the affidavit, this is not the kind of

6    admission -- omission that is intended to be misleading in a

7    way that would impact the purpose for which the affidavit is

8    intended.

9           Finally, we do want to talk briefly about

10   Mr. Berman's medical condition.  And that's because the

11   Government has moved to revoke Mr. Berman's bond partially

12   on the basis that it believes that Mr. Berman is a flight

13   risk and cannot comply with the conditions of the bond.

14          To be direct, Mr. Berman's health condition makes

15   it essentially impossible for Mr. Berman to flee.  The

16   medical records and the medical evidence that we have on

17   this show that Mr. Berman is significantly limited in what

18   he's able to accomplish in his day-to-day life.

19          Dr. Dutta, who the Government interviewed, is

20   Mr. Berman's primary physician; and he has confirmed both in

21   letters to this Court and in the interview with the

22   Government that Mr. Berman requires ongoing care.

23          Since Mr. Berman's arrest, medical records from

24   the hospital have further confirmed that.  According to the

25   most recent medical record from the hospital on April 9th,

1   Mr. Berman requires wound dressings to be changed twice

2   every day.  Before he was admitted to the hospital,

3   Dr. Dutta confirmed it was at least every other day if not

4   every day that that kind of treatment was necessary.

5          Mr. Berman is unable to safely travel for long

6   distances.  Regardless of whether or not the Government

7   could go to extenuating lengths to transfer Mr. Berman to

8   D.C., as a day-to-day matter, Mr. Berman cannot drive for

9   lengthy periods.  He cannot fly for lengthy periods.

10         The Government has argued that Mr. Berman's

11  medical condition is not a relevant consideration to the

12  issue of bond.  But it does go directly to the fact that

13  Mr. Berman is not a flight risk and it goes to the issue of

14  whether or not the tradeoffs are appropriate to keep

15  Mr. Berman in custody.

16         Although Mr. Berman has been detained in marshal

17  custody for the past nearly 40 days, the Government has also

18  acknowledged that this has been an extreme drain or

19  government resources.  Even if the Government believes that

20  there is a D.C. facility that can hold Mr. Berman, they have

21  failed to identify any particular facility.  They have

22  failed to discuss or disclose evidence of their discussions

23  with medical professionals about what that kind of detention

24  would entail, particularly of an eight-month period.

25         If the Government insists that Mr. Berman should

1    be incarcerated in the District of Columbia for those eight

2    months, then it has an obligation to show that those

3    tradeoffs make sense here.

4         Mr. Berman's medical condition makes it such that

5    Mr. Berman can resume his previous bond provision.  All the

6    parties would be best served by him resuming his previous

7    bond condition.  And he can be reasonably expected to abide

8    by those requirements.  As this Court offered guidance

9    previously in April of 2021, Mr. Berman's conduct materially

10   changed.

11        Although the Government thought Mr. Berman

12   disrespects this Court, that's simply not borne out in the

13   exhibits that the Government submitted, where Mr. Berman

14   repeatedly cites, "I have to involve someone else."  Even if

15   there's a misunderstanding about those bond conditions, at

16   the point that that became clear, Mr. Berman -- there's no

17   evidence that Mr. Berman had any individual contact with

18   investors after that point.

19        That kind of condition and that kind of clarity

20   can be applied here.  Mr. Berman has shown a willingness to

21   abide by the Court's requirements.

22        And at most, enhanced bond requirements can ensure

23   the goals of bond, particularly given Mr. Berman's medical

24   condition and his inability to really leave or flee in the

25   absence of ongoing treatment.

1          Thank you.

2          THE COURT:  Thank you, ma'am.

3          Ms. Schuck, I see you there.  I should have asked

4    you earlier.  Anything you wish to add to any of this?

5          THE PROBATION OFFICER:  Good morning, your Honor.

6    Christine Schuck, Pretrial Services.

7          Pretrial Services' recommendation at this point is

8    that there are no combination of conditions that will assure

9    the Defendant's appearance in court.

10          That is the recommendation that was presented to

11   the Court by the Central District of California when

12   Mr. Berman appeared for his Rule 5 hearing on the warrant

13   that was issued by your Honor.

14          And Pretrial Services for the District of Columbia

15   also concurs with that recommendation.

16          THE COURT:  Can you remind me?  Had he been on

17   HISP?

18          THE PROBATION OFFICER:  He was on location

19   monitoring, but he was on what they call standalone

20   monitoring with voice recognition.  Standalone monitoring is

21   not something that is used here in the District of Columbia,

22   because it is reactive.  There is nothing that your Honor

23   would -- that we are actually monitoring.  It's just --

24   there's no curfew; there's no home incarceration; there's no

25   home detention.  You're just -- you're supposed to be on

1      GPS.  But in this case, Mr. Berman was put on voice

2      recognition.

3                THE COURT:  What does that mean?

4                THE PROBATION OFFICER:  It's a type of location

5      monitoring technology.  I'll be honest with you:  I don't

6      use it, so I'm not familiar with it.  I use GPS.

7                So it's a type of of location monitoring

8      technology.  But you're not going to really know -- I

9      believe it's almost -- you would know when he's in the

10     house, but that's it, if he goes home.  But you're not

11     monitoring anything.  It's reactive, which is why our office

12     doesn't use standalone technology -- you know, standalone

13     monitoring.

14               THE COURT:  To the extent I'm concerned about him

15     being a flight risk, are there options greater than what

16     he's been under but less than incarceration that can try to

17     address that?

18               THE PROBATION OFFICER:  Absolutely.

19               If your Honor is considering release, you could

20     place him on home incarceration with GPS monitoring.

21               So home incarceration is he's only allowed to

22     leave his residence for medical necessities and court

23     obligations.  And your Honor could order that GPS technology

24     be used.

25               That would -- GPS technology, basically you see

1   every step that is being taken by the individual.  In my

2   personal caseload, I've tracked people driving 90 miles an

3   hour on the Beltway just because the monitor can tell me how

4   fast they're going.

5            THE COURT:  And so that is something that you

6   would -- if you see someone heading towards the airport or

7   something like that, there's realtime monitoring?  Or is it

8   kind of, We see he did go to the airport, but he's now out

9   of domestic aerospace?

10            THE PROBATION OFFICER:  In my experience, if they

11   are not authorized to leave the residence, I'm going to get

12   an alert that they have left the residence.  And I'm going

13   to be like, Why have you left the residence?  And I'm going

14   to start questioning that.

15            If you cut the bracelet off, I'm going to get an

16   immediate notification that the bracelet's been cut off.

17   And that's going to be -- but the issue with courtesy

18   supervision is they're going to get the notification in

19   California.  They now have to notify me.  I'm actually

20   Mr. Berman's supervising officer here in D.C.  So they have

21   to notify me and then I have to notify you.

22            THE COURT:  I see.

23            THE PROBATION OFFICER:  So you're almost playing

24   the telephone game.

25            THE COURT:  Thank you, ma'am.

```
 1                    THE PROBATION OFFICER:  Thank you.

 2                    MS. ERTLE:  Can I make one note on that, your

 3          Honor?

 4                    THE COURT:  Sure.

 5                    MS. ERTLE:  Mr. Berman --

 6                    THE COURT:  If you could approach the podium.

 7                    MS. ERTLE:  Our understanding is that Mr. Berman

 8          does not have a passport.  So concerns about him leaving

 9          domestic aerospace are significantly minimized in this case.

10          Even if he was headed towards the airport, he would be

11          severely limited not only by his medical condition, but by

12          the fact that he doesn't have a passport to leave the

13          country.

14                    THE COURT:  Thank you, ma'am.

15                    MR. FENTON:  Your Honor, may the Government

16          briefly address that point?

17                    THE COURT:  Well, I was going to give you an

18          opportunity to have the last word.  So now's your chance.

19          Go ahead and hit that.  I do have a couple things I want you

20          to discuss based on what Ms. Ertle told me.

21                    MR. FENTON:  Sure, your Honor.

22                    I can reply to Ms. Ertle's arguments and then

23          entertain your Honor's questions or -- would that okay?

24                    THE COURT:  Sure.

25                    MR. FENTON:  The Defendant committed to numerous
```

1   conditions that are absolutely crystal clear, one of which

2   being "I will not intimidate any witness, juror or officer

3   of the Court or obstruct the criminal investigation in this

4   case.

5            "Additionally, I will not tamper with, harass or

6   retaliate against any alleged witness, victim or informant

7   in this case."

8            The Defendant also agreed to "avoid all contact,

9   directly or indirectly, including by any electronic means,

10   with any person who is a known victim or witness in the

11   subject investigation or prosecution."

12            These conditions are crystal clear.  There's no

13   confusion here with respect to what they say.

14            And defense counsel tries to make complex that

15   which is simple.  The Defendant knew that he was doing these

16   things.  And if you look at these text messages, they are,

17   quite frankly, stunning.  It is repeated harassment,

18   repeated intimidation, repeated conversations with these

19   individuals, who are victims.  Even though they didn't

20   consider themselves victims, they in fact lost money.

21            And it's about the case.  It's about the

22   Government.  It's about testifying in connection with this

23   investigation or serving as a witness.  It's about the

24   Court.

25            These individuals are not employees.  But even

1        if -- they're victims.  But even if they were, which there

2        is absolutely no evidence to support that they in fact

3        are --

4                   THE COURT:  Are employees?

5                   MR. FENTON:  Are employees.

6                   -- he was intimidating them, harassing them,

7        engaging in witness tampering.  He's also trying to make

8        them -- if you look at these exhibits, he is asking them to

9        do things on --

10                  THE COURT:  What's your best example of

11       intimidation?  I don't remember thinking, This is obviously

12       intimidation.  I thought it might be something else.

13                  MR. FENTON:  There's an example where the

14       Defendant is saying to Victim 2, the general consensus is to

15       tell your nail lady --

16                  THE COURT REPORTER:  What lady, please?

17                  MR. FENTON:  Nail lady.  N as in Nancy.

18                  -- that you've given her two interviews and you

19       are uncomfortable and need to consult with an attorney.

20       Thank you and good-bye.  They're trying to ruin our

21       relationship with you.  Isn't it ironic that the postal

22       inspector could care less about that?  Isn't it ironic the

23       questions they asked you and Victim 1 are not directly

24       related to me, but to the company and product, which are not

25       part of the indictment?  What job is that?

```
1            And that is an example here.  You have Victim 2
2    saying to the Defendant, Look, I'm just trying to be fair.
3    I'm just trying to comply with my obligations here and to
4    answer questions.  And the Defendant is trying to intimidate
5    this individual to not do that.
6            Then you look at the text messages which all came
7    after the Court admonished the Defendant.  And there are
8    instances where they're asking him -- asking the
9    Defendant -- the victims are asking the Defendant about the
10   business.  The Defendant is not interested in talking about
11   when the product is going to come to light.  The Defendant
12   is instead interested in talking about his case and talking
13   about what other individuals -- he calls them the bash
14   crew -- what other individuals who are on the internet who
15   are doubting him are saying about his case.
16           And there are lots of examples of this throughout
17   these text messages.  But there's one in particular where
18   the Defendant basically harasses Victim No. 2 and claims
19   that he's going to cut ties with him.  And Victim No. 2
20   says, I'm trying to help you.
21           And Victim No. 1 comes to his aid and said, I
22   don't understand what the issue is because, you know, Victim
23   2 is trying to help you, Mr. Berman.  And instead, you know,
24   you're attacking him.  And the concern here was that he was
25   going to sell the company, that Victim 2 would sell his
```

1   shares of company stock, which the Defendant thought would

2   hurt him.

3            So we see examples like that throughout these text

4   messages.

5            We also see examples where he is harassing the

6   other individuals.  And what's key here is that it's not

7   that the harassment stops because the Defendant stops

8   harassing these individuals; the harassment stops because,

9   as one of the victims described it, he said, He didn't

10  leave; I kicked him out.

11           The victims had to push Mr. Berman out of the

12  conversation, cut him off from the Facebook platform in

13  order to get him to stop harassing them.  And that's

14  Footnote 6 of the reply brief.  And that's referencing

15  Exhibit 8.  "He didn't leave; I kicked him out."

16           So the reason why he stopped contacting these

17  individuals is not because he chose to; it's because they

18  decided to cut him off.  And that's extremely important.

19           What's also important is the fact that the

20  Defendant is making a farce, a joke, of the Court's

21  conditions.  There was no confusion as to whether or not the

22  Defendant was able to contact these individuals and harass

23  them about his criminal case.

24           But what he does is he writes -- if you look at

25  Exhibit 8, he is writing this stock language after his

1    communications that is, quite frankly, just silly.  He

2    writes these attacks about various victims; and then at the

3    end he writes, I write this with another investor present on

4    my end.  And this is the same thing that he writes multiple

5    times.

6            The fact that the Defendant, who was indicted for

7    fraud and who has committed all these violations, is

8    writing, "I write this with another investor present on my

9    end" is ludicrous.  There's no evidence to suggest that he

10   in fact did have another investor present on that end.  And

11   quite frankly, your Honor, if he did, that would be worse,

12   because he would have an investor sitting with him in his

13   office at this time one on one, which he knows he's not

14   supposed to do, texting all these other people these other

15   things.  It's not plausible.

16           But if it were, it's a violation.  He's not

17   supposed to be interacting with these individuals, period,

18   let alone in this fashion.

19           THE COURT:  I think I didn't remember that

20   being -- I mean, we have struggled with this all along, this

21   tension between trying to allow him to maintain his business

22   and prohibiting unlawful communication.  Is it correct that

23   he wasn't allowed to have one-on-one contact with investors

24   at all?

25           MR. FENTON:  Absolutely, your Honor.  And he

1    certainly is not allowed to harass them.

2            THE COURT:  Well, I understand that point.

3            MR. FENTON:  But the condition is clear as could

4    be:  "Avoid all contact, directly or indirectly, including

5    by any electronic means, with any person who is a known

6    victim or witness in the subject investigation or

7    prosecution."

8            THE COURT:  Okay.

9            MR. FENTON:  Now, on April 27th, 2021, your Honor

10   specifically admonished the Defendant, told him not to

11   engage in obstructive behavior.  That's on Page 16 of the

12   transcript.

13           What we see immediately following that is the

14   Defendant ignoring the Court's admonition.  And that's

15   Exhibit 7.

16           In addition, the Defendant -- defense counsel is

17   suggesting that the Defendant needed to do this to run his

18   business and that his business was, you know, ongoing at the

19   time.

20           And it's just -- it's not true.  These individuals

21   are not serving a business function and he's not talking to

22   them about his business.  When you look at these text

23   messages, he's talking to them about his criminal case; he's

24   talking to them about what he can do for -- what they can do

25   for him to help him attack other victims who are victims of

1    the fraud with which he is charged.

2         None of this activity, none of these

3    communications, are in favor -- in support of a legitimate

4    business.  And importantly, the Defendant also acknowledges

5    at this time, on August 9th, 2021, he says -- Victim 1 says,

6    Are you thinking that the company will now go under?  And

7    Mr. Berman says, So unfortunately the company has no money

8    and no way to raise it.  So he admits in August 2021 that

9    the company is now defunct.

10        These are private conversation, but that's what he

11   says.  And this is immediately before he lodges the advance

12   fee payment scheme that he engaged in, which is Exhibits 10

13   through 19 and 22 to 25, where he is defrauding multiple

14   parties.

15        He's saying in this text message in August 2021,

16   We don't have money, and I have no way to raise it.  What

17   does he do?  He goes and he steals it.

18        And defense counsel's argument is, Well, he didn't

19   steal it; it's just fraud.  That's what fraud is.  Fraud is

20   lying to somebody in order to take their money.

21        And when you look at these documents, the lies are

22   crystal clear.  One example that they cite is ByzFunder.

23   They say ByzFunder got paid.  Right?  They got paid in some

24   form or fashion.

25        If you look at the interview that we conducted

1     with ByzFunder, what they say here is, the victim says, had

2     they known Mr. Berman had been indicted and is awaiting

3     trial, they would not have extended an offer.  ByzFunder was

4     not made aware Mr. Berman was required to obtain approval

5     before selling, transferring or giving away any asset valued

6     at $10,000 or more without notifying and obtaining

7     permission from the Court.

8             They would have wanted to know about this

9     condition.  Had ByzFunder known about the Court's

10    requirement, they would not have entered into an MCA

11    agreement with Mr. Berman.

12            In addition, when you look at the agreement, which

13    is -- and this is Government's Exhibit 22 -- when you look

14    at the agreement itself, which is Government's Exhibit 24,

15    there are representations that the Defendant made when he

16    signs this agreement, representations about government

17    approval:  Merchant is in compliance with all laws and valid

18    agreements, authorizations and licenses to own, operate and

19    lease its properties and conduct the business in which it is

20    presently engaged or will engage in hereafter -- I'm

21    sorry -- so Section 2.3, Authorization:  Merchant and the

22    persons signing the agreement on behalf of merchant have

23    full power and authority to incur and perform the

24    obligations under this agreement, all of which have been

25    duly authorized.

1          That's simply not true.  And we know that that's a

2    material fact, because we asked the individual who runs

3    ByzFunder whether or not that fact mattered to them.  And

4    they said it did.

5          So these are lies that are being told so that

6    Mr. Berman, who admitted he no longer has any money, can get

7    more money.

8          THE COURT:  So, Mr. Fenton, why isn't Ms. Ertle

9    right that this was done on behalf of the company, that he

10    didn't understand that the prohibition extended to the

11    company, and he's not making -- he's not seeking personal

12    loans or making personal contracts here?

13          MR. FENTON:  Because that's not what the facts

14    bear out.

15          In fact, he is making a personal guarantee.  He is

16    signing his name as a personal guarantor.  And importantly,

17    when these companies who he victimized went and tried to

18    recover their money from the company, they also tried to

19    recover their money from him in his personal capacity as a

20    personal guarantor.

21          And when he personally decided to default and not

22    appear on behalf of himself or the company, he was -- the

23    Court entered default judgment, which held him personally

24    liable for that amount.

25          So there is no doubt, regardless of whether or not

1    he is functioning as a CEO of the company or if the company

2    is an alter ego, regardless, the bottom line is that he

3    entered into these agreements as an individual in his own

4    personal capacity and he put his personal finances at stake.

5            And we point out the financial affidavit and the

6    fact that Mr. Berman perjured himself in that affidavit not

7    as some sort of technical violation to basically lend

8    weight, to add weight to our motion.  I think that the

9    evidence here is no doubt overwhelming.

10           The reason why we point to that is because it's

11   evidence of state of mind.  The fact that he lied on the

12   financial affidavit about how much money he owed, about his

13   liabilities, the relevance is not with respect to whether or

14   not it would make him less likely or more likely to be able

15   to benefit from CJA or to get a federal public defender.

16   The relevance of that fact to this proceeding is that he was

17   hiding his fraud from the Court.

18           Had he been honest about the fact that he owed

19   hundreds and hundreds and hundreds of thousands of dollars

20   to these companies and that he had default judgments against

21   him in his personal capacity, it would have been much easier

22   for the Court to uncover the fact that he had illegally and

23   unlawfully and fraudulently engaged in a series of

24   agreements to take these -- to take money from these

25   companies, multiple companies.  Here, we've identified six.

1          So that is the significance of that fact.  Yes,

2     it's a standalone crime.  Yes, it's another violation.

3     Yes, it further supports the idea that he is unlikely to

4     abide by any condition or combination of conditions.

5          But the relevance here is it goes to state of

6     mind.  This is not a legitimate attempt to keep his company

7     afloat.  This was him fraudulently obtaining money and

8     trying to hide it from the Court and from the Government at

9     all costs.

10          THE COURT:  So let me ask you the same question I

11     asked Ms. Ertle about the state of the Defendant's company.

12     I mean, is your position that it's basically an alter ego

13     for the Defendant at this point?

14          MR. FENTON:  Yes.

15          THE COURT:  Do you understand when it -- the

16     employees went away and -- is your position this has always

17     been the case?

18          MR. FENTON:  No.  At some point, this appears to

19     have been a company that sold glucose testing strips to

20     diabetic patients, patients with diabetes.  And at some

21     point, when that business was running aground and the

22     pandemic occurred, Mr. Berman saw an opportunity to defraud

23     his investors and raise millions of dollars based on a lie.

24     And that's the point at which the indictment begins.  That's

25     when the relevant allegations in the indictment start.

1          There is a point in time where the company, which

2     had very few employees just generally, which is fine,

3     because often company -- some companies don't have a lot of

4     employees -- it went from having a few to having one to

5     having zero, based on our understanding.  And that's

6     approximately at some point in 2021.

7          And we do see some -- as Ms. Ertle referenced,

8     there is some evidence of business activity that goes into

9     2021.

10         But as the Defendant says here in his own words,

11    as of August 2021 -- this again is Exhibit 7 -- he's out of

12    money.  And that's the point at which he is engaging in this

13    fraud, by going out there and trying to get all this money.

14         So based on the record and the facts known to the

15    Government, this is the time when the company really starts

16    to cease to operate.

17         And I don't think that there's a dispute here,

18    because defense counsel makes very clear that Mr. Berman is

19    no longer really running this company.  And they talk about

20    resurrection as, you know, a hope.  And that's why he tried

21    to get the $6 million.  But the bottom line is, it appears

22    that there's no functioning business at this time based on

23    counsel's representations.

24         The one final point I'd like to address is just

25    Mr. Berman's medical condition.  First, I'd just like to say

1     that the Defendant's medical condition is simply not a

2     consideration under Section 3148.  It's just not.

3                THE COURT:  Well, I think Ms. Ertle is -- it's a

4     fair point that -- if you're saying he's about to flee and

5     she's saying he can't flee, I think that's a fair argument.

6                MR. FENTON:  It could potentially be relevant to

7     flight.

8                The Government need not demonstrate flight in

9     order to win this motion, in order to have him detained.

10    And the reason why is because we've established by well

11    above the standard of clear and convincing that he has

12    violated his conditions and well above a preponderance that

13    he will simply not abide by whatever conditions your Honor

14    imposes.

15               But I understand that the Court may be concerned

16    about his medical condition.  And I would point your Honor

17    to the recent medical records that the Defendant submitted

18    from April 9th, 2023.  And these are records that the

19    Defendant has -- from his stay at White Memorial Hospital.

20    And when you look at those records, they say:  Mr. Berman is

21    able to ambulate and climb stairs independently.  He is

22    independent with activities of daily living, eating,

23    bathing, dressing, et cetera.

24               So, yes, while he has this medical condition, he

25    is in fact independent.  And when we spoke to Dr. Dutta,

1    Dr. Dutta said that he can drive for up to an hour.  And the

2    issue here is whether or not he can elevate his legs.

3          Now, his medical condition, there is an

4    opportunity -- were the Court to order him detained, there's

5    an opportunity for him to be transported here using a

6    method, a reliable and safe method, a private Learjet that

7    is owned and operated by the U.S. Marshals Service and that

8    is staffed with a full medical staff.  That's the best

9    chance that he has to get to Washington, D.C., safely to

10   proceed with his trial.

11         But in terms of flight, there is simply nothing to

12   prevent him from fleeing.  The fact that he has -- doesn't

13   have a passport is of no matter.  There are plenty of

14   defendants who surrender their passports and then flee.

15   Sometimes they do it on a private jet; sometimes they do it

16   by driving across the border; sometimes they do it by

17   walking across the border; sometimes they get on a boat.  If

18   he wanted to get away, he can get away.

19         The bracelet, that is not a preventative measure.

20   That is simply an after-the-fact means of determining

21   whether or not the Defendant has left the jurisdiction.

22   Plenty of defendants cut their bracelets and run.

23         THE COURT:  This guy's not running.

24         I think her point is about he needs -- he's got

25   his medical team.  This doesn't seem like somebody -- he is

1     tied to his community by more than most defendants would be.

2               MR. FENTON:  And I think that there are two

3     points, your Honor.  One is that, yes, his medical condition

4     appears to be poor, but it's also not something that

5     Dr. Dutta and Dr. Dutta alone can prescribe.  There's no

6     evidence to suggest that Mr. -- that Dr. Dutta is the only

7     individual who can provide the medical care that Mr. Berman

8     needs.  Were he to go somewhere else and disappear, he could

9     certainly find a doctor elsewhere.

10              The second point is, we are focused on flight.

11    And flight is certainly a significant factor here.  It's

12    something that the Government is legitimately concerned

13    about.

14              Flight aside, the Defendant has engaged in a

15    pattern of just egregious criminal conduct all

16    post-indictment.  Witness tampering, obstruction, fraud.

17    And the amount of money, the intended loss -- this is not

18    for sentencing purposes or anything like that.  But if you

19    look at what he has tried to do here, he has tried to

20    fraudulently obtain in excess of $6 million.  That's all

21    after he was indicted.  That's all well -- while the Court

22    was watching, while the Government was watching, while

23    Probation was supervising him.  He has done that the entire

24    time over the last two years.

25              And that's relevant.  It's relevant because, even

1    if he doesn't flee or even if your Honor orders that he wear

2    a GPS bracelet, he can continue -- he can continue to do all

3    of these things that he did for the last two years without

4    detection.

5          And that's a serious problem, because it affects

6    the prosecution of this case; it affects the quality of life

7    of these victims that Mr. Berman has repeatedly serially

8    victimized; and it also -- extremely importantly, it causes

9    harm to the community.  And Mr. Berman has no intention of

10   defending these actions.  We see that in the evidence that

11   the Government submitted to the Court, where he has just

12   defaulted, just walked away.

13         So regardless of whether or not he's a flight

14   risk, there's no condition or combination of conditions that

15   your Honor could impose that would prevent him from doing

16   these things again for the next eight months.

17         THE COURT:  So your basis is both flight risk and

18   danger to the community.  Is that correct?

19         MR. FENTON:  Absolutely.  And also obstruction.

20         THE COURT:  Well, I think I need to find one or

21   the other or both there if I was going to revoke.  Maybe you

22   disagree.  And I think obstruction is arguably -- it goes to

23   dangerousness.  But I think that would be a necessary

24   finding here.

25         Thank you, sir.

1          MS. ERTLE:  May we be heard very briefly, your

2     Honor?

3          THE COURT:  Yes, you may.

4          MS. ERTLE:  I'll make -- I'll address three

5     issues; and we'll attempt to be brief.

6          First, on the harassment:  The Government uses a

7     lot of rhetoric to paint the exhibits that it submits as

8     harassment, obstruction, tampering.  What they actually

9     point to is, number one, primarily over a year old and,

10     number two, does not rise to the level of harassment.

11          There are heated discussions between Mr. Berman

12     and some of his colleagues about the state of the case, the

13     state of his business.  That does not amount to harassment

14     or tampering.  It's not as if he is sending those folks into

15     the world to go accomplish some illegal aim.

16          Most fundamentally, the Government essentially

17     concedes on reply that it does not have a single instance of

18     this kind of contact within the past year.  Now, the

19     Government has a theory for why that's happened.  It's that

20     the investors no longer speak to him.  Regardless of whether

21     or not that's true, it shows that Mr. Berman's able to abide

22     by that condition; and there has been no violation in the

23     past year.  It strongly mitigates any claim by the

24     Government that he's a danger to the community because there

25     simply is no communication or evidence of communication

1    that's occurring with the witnesses.

2         Second, with respect to the loans:  There have

3    been a lot of representations that aren't within the record

4    that's been submitted about what the state of the business

5    was at the time Mr. Berman received these loans.  The bottom

6    line is that these types of loans are standard.  They always

7    require some CEO personal guarantee.  Ultimately, if

8    Mr. Berman wasn't able to make that sort of guarantee, he

9    wouldn't be able to run the business.

10        His understanding was always that he was able to

11   run the business; and, consistent with that, the fact that

12   he was obtaining those loans, he did make efforts to repay

13   those loans.  Any misrepresentations that the Government

14   points to in the attempt to get those loans is ultimately a

15   civil matter and doesn't go to Mr. Berman's bond conditions.

16        THE COURT:  So I guess I'm concerned that there's

17   just a lot of playing fast and loose with my bond conditions

18   here.  It does say, "Do not sell or give away any asset

19   valued at more than $10,000 without permission from the

20   Court."

21        Your suggestion that, Oh, I thought that was just

22   for me personally, I mean, that's conceivable, I suppose.

23   He didn't check with me.  He ends up in a situation where he

24   is personally on the hook for millions of dollars.

25        I mean, it feels like somebody who's been trying

1    to manipulate or minimize the bond conditions rather than

2    making sure that he's abiding by them; and rather than

3    checking with his attorney or Probation or the Court, he's

4    just trying to skirt by them.

5              MS. ERTLE:  I'll note, unfortunately, we weren't

6    counsel at the time.  So we can't --

7              THE COURT:  I understand that.

8              MS. ERTLE:  We can't speak to whether or not he

9    actually did speak with his attorney.  That's something we

10   are not privy to.

11             But ultimately, the pattern here that the

12   Government keeps alluding to is one where Mr. Berman, when

13   he receives those clear instructions, he's able to follow

14   them.  He did that with the individual communications.

15             Regardless of whether or not he should have

16   conducted himself slightly differently with respect to those

17   loans, it was an understanding that he was able to run the

18   business.

19             There was some tension with the idea that he has

20   to be able to run that business.  The day-to-day operations

21   of that business require that he sign those loans.  And

22   Mr. Berman never understood that there was some sort of

23   court-ordered babysitter over his day-to-day transactions as

24   part of the business.

25             The fact that Mr. Berman, when given clarity on

1    the individual communications -- the Government kind of

2    makes fun of Mr. Berman for saying "I have someone here,"

3    but it shows a certain level of diligence in the fact that

4    he's aware of the clarity that he received.  He was able to

5    comply with that requirement.

6         Furthermore, I will note that the primary conduct

7    that the Government points to again is well over a year old

8    at this point.  Notwithstanding Mr. Berman's recent attempts

9    to, you know, continue to run the business, the majority of

10   this is a long time ago; and the fact that Mr. Berman has

11   continued to -- he continued to attempt to repay those loans

12   until he became ill is consistent with the fact that he was

13   just trying to run the business.

14        Finally, on the fact -- on the issue of whether or

15   not the conditions -- if there are conditions that can

16   reasonably assure Mr. Berman's appearance in court:  I do

17   want to note that the Rule 3142(c), the standard is whether

18   or not Mr. Berman's appearance can be reasonably assured.

19   The Government may spin some fiction about getting on a boat

20   or running across the border, when this is clearly not an

21   individual who is able to do either of those things.  He

22   does not have extensive financial resources.  That's why we

23   are involved in the case.  He does not have the medical

24   capacity to do anything that would be particularly demanding

25   in order for him to flee.

1          The fact of the matter is that Mr. Berman's

2     medical condition is extremely restrictive.  The Government

3     has continued in both its pleadings and today to suggest

4     that he can walk, he can care for himself, he can do

5     day-to-day activities.  Those same medical records that the

6     Government points to show that he requires daily medical

7     care.  Dr. Dutta in the interview with the Government that

8     the Government submitted the -- or the transcript for

9     emphasized that Mr. Berman, if he does not receive that

10    care, he will end up hospitalized.

11         The fact that he's able to walk within a single

12    hospital room that's under 24/7 surveillance by U.S.

13    marshals doesn't mean that he's able to do some extensive

14    physical activity that suggests that he's able to sustain

15    himself should he flee.

16         Ultimately, Mr. Berman simply wants to be able to

17    return home, resume the medical care that he has been

18    receiving for over a year.  And the fact that he is able to

19    abide by the conditions, he has evidenced a willingness to

20    abide by those conditions, and the fact that he is unable to

21    physically flee all warrants in favor of allowing him to

22    resume his bond.

23         THE COURT:  Thank you, ma'am.

24         Let's come back at about 11:45.  Thanks.

25         (Thereupon a recess was taken, after which the

1    following proceedings were had:)

2          THE COURT:  Before the Court is the Government's

3    motion to revoke the Defendant's detention -- I'm sorry --

4    to revoke the Defendant's pretrial release and detain him

5    pending trial.

6          Title 18 of Section 3148 provides that a judicial

7    officer shall enter an order of revocation and detention if,

8    after a hearing, the judicial officer finds, one, by clear

9    and convincing evidence that the Defendant violated a

10   condition of release; and, two, the Defendant is unlikely to

11   abide by a condition or combination of conditions.

12          The Court may also revoke where it finds probable

13   cause to believe the person has committed a federal, state

14   or local crime while on release.

15          The Government has raised a number of different

16   incidents that it believes satisfies the standard.  First,

17   there were various contacts between the Defendant and Victim

18   1 and Victim 2 back in December of 2020 and February of

19   2021, where the Defendant was communicating with them about

20   the case, including encouraging one of the victims not to

21   cooperate with law enforcement.

22          I think those communications were clear violations

23   of his release and quite possibly -- and actually, I think

24   there is probable cause to believe the Defendant was

25   involved in witness tampering and obstruction at that point.

1          Having said that, while I think those are

2     important background points, they did happen some time ago.

3     I addressed them back in April of 2021, and I would not

4     revoke solely on that conduct.

5          The Government also points to various messages

6     between the Defendant and those victims and Victim 3 and

7     Victim 4 through 2021 and with the most recent being

8     Facebook contact in March or April of 2022, a friend request

9     to Victim 4.

10          I think those messages are problematic.  It looks

11     to me like the Defendant was probably taking a

12     hypertechnical reading of his release conditions and

13     ostensibly communicating with two people so that he would

14     get around my prohibition on contacts with shareholders.

15          Even if those -- and nonetheless, I think at least

16     the friend request back in March or April of 2022 would be a

17     violation even of that release condition.  Regardless, the

18     content of the communications themselves are such that I

19     think, even if they were not violations of a release

20     condition, I think there's also probable cause of

21     obstructive behavior and possibly witness tampering there.

22          Having said that, those communications seem to

23     have ceased about a year ago.  And I think the defense makes

24     fair staleness arguments there.  While I do think those are

25     relevant to my consideration, I would not revoke on the

1    basis of those alone.

2         Finally, the Government has pointed to six

3    completed or attempted contracts that the Defendant entered

4    into over the last couple of years and one unexecuted loan

5    document as recently as January of this year where the

6    Defendant was entering into these agreements on behalf of

7    his company.

8         By the time he had entered into these agreements,

9    it seems like both parties agree the company was struggling.

10   To the extent that it was really an ongoing concern at all,

11   it seems like there were no longer any employees working

12   there.  I have the Defendant's text message on ECF 11-8,

13   Page 17 and 18, that he was funding his company from his

14   inheritance.  And I also see him signing many, if not all,

15   of these contracts as an owner of the company.

16        I do think by this point he was essentially using

17   the company a bit as an alter ego, funding it with his

18   personal finances and looking to reap the benefits of this

19   company for himself.  He personally guaranteed these

20   purported transfers.  The last one was for over $6 million,

21   although that one was not completed.

22        I think the evidence at this point is strongly

23   suggestive that these were -- there was no real collateral

24   or benefit of the bargain to the other side in these, that

25   the Defendant was essentially fleecing people who were

1    entering into these contracts with him.

2          Regardless of whether that's correct or not, I do

3    find that this was a violation of his release condition, and

4    specifically that he shall not sell, transfer or give away

5    any asset valued at more than $10,000 without permission

6    from the Court.  I think the fact that he was personally

7    liable for these contracts meant that even if he was

8    ostensibly acting on behalf of his company, he was violating

9    my release conditions.

10          But as a practical matter, I think at this point

11   he was the company and the company was him.  And so I think

12   the suggestion that he was not doing this in his personal

13   capacity but on behalf of the company is frankly just a

14   little too cute at this point.

15          The defense is right that I had certainly wanted

16   to give the Defendant an opportunity to continue running the

17   company.  I think when we initially discussed this, the

18   company was in a very different state than it was by the

19   time he was entering into these loan agreements, and

20   whatever chance there was of resuscitating the company seems

21   to have passed by.

22          But in any event, that was not a license for him

23   to ignore my release conditions to the extent they involved

24   the company.  Rather, if he thought he was allowed to do

25   these, he should have checked with Pretrial Services, as the

1     release conditions required.

2            I do think this conduct is particularly concerning

3     in the context of this indictment where the Defendant is

4     charged with fraudulent conduct.  Whether these particular

5     loans were criminal or just civil, as the defense argues, I

6     think this is further evidence of fraudulent financial

7     conduct that does have real victims and at the very least is

8     quite possibly tying up the Defendant's assets that could be

9     relevant to this case and any penalty the Defendant might

10    have to pay here.

11           So I think this is concerning, and it is a

12    violation of his conditions of release.

13           And I think the Defendant committed these various

14    violations now over a couple of years while under really

15    pretty strict release conditions and despite at least one

16    warning from me about the importance of following his

17    release conditions.

18           Therefore, I find the Defendant is unlikely to

19    abide by any condition or combination of conditions.  I note

20    that the type of actions the Defendant is accused of doing,

21    financial fraud, witness tampering, obstruction, are exactly

22    the types of crimes that unfortunately can be committed with

23    an iPhone, with a computer right from the comfort of one's

24    own home or even one 's own bed.  Especially given the

25    violations I'm finding here, I don't think there's any other

1    condition or combination of conditions that can assure the

2    Defendant complies with the law and with his release

3    conditions.

4          I also do think -- while I don't find the

5    Defendant is a flight risk, I do believe the Defendant poses

6    a danger to the community, not of course that the Defendant

7    poses a physical danger to the community, but as the D.C.

8    Circuit has made clear in various cases, including the

9    *Hale-Cusanelli* case, the dangerousness to the community

10   prong is not just about acts of physical violence, but

11   further acts of illegal conduct.  And I think that is what I

12   am concerned about here and what the Government has

13   demonstrated through clear and convincing evidence that the

14   Defendant does pose to the community.

15         Therefore, I'm granting the Government's motion to

16   detain the Defendant.  I'm lifting the stay on the

17   Defendant's transfer to this jurisdiction.

18         Where does that leave us?  Mr. Fenton, we have a

19   new trial date.  Do we have a briefing schedule, sir?

20         MR. FENTON:  No, your Honor.

21         THE COURT:  I know we've gone through -- I think

22   we've had one round of motions for trial already.  What are

23   you requesting at this point, Mr. Fenton?

24         MR. FENTON:  Your Honor, we've actually had, I

25   believe, more than one round at this point because we had

1    the round in the lead-up to the January 2022 trial date and

2    then we had additional briefing following that into the

3    spring.  So I think at this point we've had two rounds.

4              It would be the Government's position that no

5    further briefing is necessary, given that the briefing has

6    been extensive.  But -- and at this point, we're also not

7    aware of any motions that the Defendant would make.

8              THE COURT:  So you're just suggesting we return --

9    do we have a pretrial conference scheduled?

10             MS. ERTLE:  Your Honor, the defense would

11   submit --

12             THE COURT:  I'll hear from you in just a moment.

13             MS. ERTLE:  Yes, your Honor.

14             THE COURT:  Mr. Fenton, are you just suggesting we

15   return for trial?

16             MR. FENTON:  Yes, your Honor.  Well, we believe we

17   should have a pretrial conference to prepare for the next

18   trial date.  But we don't believe at that point that it

19   would be appropriate to allow any further motion practice.

20             THE COURT:  Are you looking for an interim status

21   conference?

22             MR. FENTON:  Perhaps at a month before the

23   pretrial.

24             THE COURT:  Ms. Ertle, I'll hear from you.

25             MS. ERTLE:  Yes, your Honor.

1      We would prefer that there be a briefing schedule

2    set.  We do believe that this case warrants additional

3    effort on our part.  Obviously, we are new counsel, so we

4    continue to review the underlying facts.  As I believe we

5    have submitted to your Honor, there are about 400,000 pages

6    of discovery that have been involved in this case.  And our

7    understanding is that there may very well be issues that

8    have not yet been briefed that would be appropriate for the

9    Court to take up before trial.

10      So we think that it's appropriate at this time to

11    set a schedule.  Certainly this is something that we would

12    need additional time to review, just given the voluminous

13    records that are involved in this case.

14      THE COURT:  When do you think you'd be in a

15    position to speak to what, if any, motions you'd be seeking

16    to file?

17      MS. ERTLE:  Approximately 90 days, your Honor.  We

18    believe we could get our arms around the facts.  Obviously,

19    we've been very focused on the bond issues up until this

20    point.  But that would give us time to really spend some

21    effort reviewing that material and raising whether or not

22    there is additional items that need to be briefed.

23      THE COURT:  So I think what I want to do is pick a

24    status conference date early this summer.  Frankly, I'm not

25    sure that I've been in this situation before where we've had

1    multiple rounds of briefing and then have new attorneys

2    coming in.  I recognize that takes this case out of the

3    mine-run of cases where additional briefing is not

4    warranted.  But I think I'm not willing at this point to say

5    that I'm just going to accept any and all new motions.

6           So what I think I want to do is pick a status

7    conference for early this summer, ask the parties to --

8    well, I'm going to ask the defense to share with the

9    Government the gist of the motions you'd be looking to file

10   and see if we can have some agreement as to those as to

11   whether it's at least appropriate for you to file them or

12   not.  And then at that status conference, I'd hear from the

13   parties; and to the extent I'm going to permit further

14   motions practice, we'd set a motions schedule at that point.

15          Ms. Chaclan has noted for me we have a status

16   conference this Friday.  I'm going to vacate that status

17   conference.

18          So our next -- the dates we have right now is

19   trial on December 8th and pretrial conference on November

20   13th.

21          How about 10:00 on July 7th?  Would that work for

22   the Government for a status conference?

23          MR. FENTON:  Your Honor, if it would be at all

24   possible to just choose another week.  I believe at least

25   some members of the team will be on annual leave at that

1  time because of the July 4th holiday.

2          THE COURT:  How about 10:00 on June 26th?

3          MR. FENTON:  Yes, your Honor.

4          THE COURT:  And does that work for the defense?

5          MS. ERTLE:  Yes, your Honor.

6          THE COURT:  I know that's not as long as you

7  wanted, but I'm going to push you a little bit.  Obviously,

8  I'm not looking for the motions to be filed, but at least

9  I'll ask you all to kind of think through what additional

10 motions you'd like to be filing.

11         And I'll ask you to, as we say in the civil

12 practice, meet and confer with the Government that preceding

13 week.  So you let them know at least a week ahead of time

14 what you're thinking of filing, and then you all talk that

15 preceding week about whether or not we can achieve consensus

16 on that.  If we can, I'd love to get a proposed motions

17 schedule from you all that makes sense to the parties so we

18 can just take care of that all on June 26th.

19         So I'm setting a status conference for June 26th

20 at 10:00 a.m.

21         Anything further from the Government?

22         MR. FENTON:  No, your Honor.

23         THE COURT:  And from defense?

24         MS. ERTLE:  No, your Honor.

25         THE COURT:  Thanks, folks.  I'll see you on June

1    26th.

2              MR. FENTON:  Thank you, your Honor.

3              (Proceedings concluded.)

1                              **<u>CERTIFICATE</u>**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings produced to the

7    best of my ability.

8

9

10                   Dated this 30th day of April, 2023.

11

12            <u>/s/ Lisa Edwards, RDR, CRR</u>
              Official Court Reporter
13            United States District Court for the
                District of Columbia
14            333 Constitution Avenue, Northwest
              Washington, D.C. 20001
15            (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## $

**$10,000** [4] - 13:14, 45:6, 55:19, 62:5
**$35,000** [1] - 24:24

## /

**/s** [1] - 70:12

## 1

**1** [9] - 11:15, 11:17, 12:6, 18:9, 21:10, 39:23, 40:21, 44:5, 59:18
**1.2** [3] - 29:9, 29:19, 29:24
**10** [2] - 13:17, 44:12
**10:00** [3] - 67:21, 68:2, 68:20
**10:03** [1] - 1:7
**11-8** [1] - 61:12
**11:45** [1] - 58:24
**12** [1] - 21:1
**13th** [1] - 67:20
**1400** [1] - 1:16
**16** [1] - 43:11
**17** [1] - 61:13
**177** [1] - 4:9
**18** [2] - 59:6, 61:13
**183** [1] - 4:9
**19** [2] - 13:17, 44:13

## 2

**2** [10] - 11:21, 12:6, 21:10, 39:14, 40:1, 40:18, 40:19, 40:23, 40:25, 59:18
**2.3** [1] - 45:21
**20** [1] - 14:23
**20-00278-1** [1] - 1:3
**20-278** [1] - 3:2
**20001** [3] - 1:20, 2:4, 70:14
**20004** [1] - 1:24
**2005** [1] - 4:14
**202** [2] - 2:4, 70:15
**2020** [3] - 11:12, 16:2, 59:18
**2021** [30] - 12:3, 16:2, 19:10, 19:18, 19:22, 19:24, 20:3, 21:17, 22:2, 22:24, 23:25, 24:6, 24:10, 28:2, 28:3, 28:7, 28:9,

28:18, 29:23, 33:9, 43:9, 44:5, 44:8, 44:15, 49:6, 49:9, 49:11, 59:19, 60:3, 60:7
**2022** [9] - 4:10, 12:23, 16:3, 23:25, 24:24, 25:6, 60:8, 60:16, 65:1
**2023** [7] - 1:6, 16:1, 16:3, 24:9, 28:23, 50:18, 70:10
**20530** [1] - 1:17
**21** [1] - 15:4
**21(b** [1] - 4:4
**21(d)** [1] - 8:20
**21st** [1] - 11:12
**22** [4] - 13:17, 24:19, 44:13, 45:13
**24** [1] - 45:14
**24/7** [1] - 58:12
**25** [3] - 1:6, 13:17, 44:13
**26th** [4] - 68:2, 68:18, 68:19, 69:1
**27th** [1] - 43:9
**2d** [1] - 4:13

## 3

**3** [3] - 11:21, 13:1, 60:6
**30th** [1] - 70:10
**3142(c** [1] - 57:17
**3148** [2] - 50:2, 59:6
**333** [2] - 2:3, 70:14
**354-3269** [2] - 2:4, 70:15
**3d** [1] - 4:9

## 4

**4** [4] - 11:21, 13:1, 60:7, 60:9
**40** [1] - 32:17
**400,000** [1] - 66:5
**401** [1] - 4:13
**4th** [1] - 68:1

## 5

**5** [2] - 11:21, 34:12
**550** [1] - 1:23
**579** [1] - 4:9

## 6

**6** [11] - 12:10, 15:3, 15:12, 15:17, 24:8, 29:2, 29:19, 41:14, 49:21, 52:20, 61:20
**625** [1] - 1:23
**6706** [1] - 2:3
**6th** [1] - 7:19

## 7

**7** [4] - 12:20, 20:5, 43:15, 49:11
**7-G** [1] - 22:15
**7th** [1] - 67:21

## 8

**8** [3] - 13:1, 41:15, 41:25
**80** [1] - 4:13
**85** [1] - 4:13
**850** [1] - 1:20
**8th** [1] - 67:19

## 9

**9** [2] - 13:1, 20:5
**90** [2] - 36:2, 66:17
**9th** [3] - 31:25, 44:5, 50:18

## A

**a.m** [2] - 1:7, 68:20
**abide** [10] - 20:14, 33:7, 33:21, 48:4, 50:13, 54:21, 58:19, 58:20, 59:11, 63:19
**abiding** [2] - 21:22, 56:2
**ability** [3] - 6:5, 9:19, 70:7
**able** [25] - 18:15, 19:25, 20:21, 23:23, 25:24, 26:8, 27:12, 31:18, 41:22, 47:14, 50:21, 54:21, 55:8, 55:9, 55:10, 56:13, 56:17, 56:20, 57:4, 57:21, 58:11, 58:13, 58:14, 58:16, 58:18
**absence** [1] - 33:25
**absolutely** [7] - 16:9, 16:25, 35:18, 38:1,

39:2, 42:25, 53:19
**accept** [1] - 67:5
**accessibility** [1] - 7:11
**accessible** [1] - 7:13
**accident** [2] - 15:7, 15:12
**accomplish** [3] - 23:10, 31:18, 54:15
**according** [2] - 4:12, 31:24
**accrue** [1] - 27:6
**accurate** [2] - 29:7, 70:4
**accused** [1] - 63:20
**achieve** [1] - 68:15
**acknowledged** [2] - 19:22, 32:18
**acknowledges** [1] - 44:4
**acting** [1] - 62:8
**Action** [1] - 1:3
**actions** [2] - 53:10, 63:20
**activities** [3] - 14:20, 50:22, 58:5
**activity** [1] - 44:2, 49:8, 58:14
**acts** [2] - 64:10, 64:11
**actual** [1] - 21:7
**add** [2] - 34:4, 47:8
**addition** [3] - 28:14, 43:16, 45:12
**additional** [12] - 16:11, 20:9, 28:14, 30:15, 30:19, 30:25, 65:2, 66:2, 66:12, 66:22, 67:3, 68:9
**additionally** [1] - 38:5
**address** [5] - 17:6, 35:17, 37:16, 49:24, 54:4
**addressed** [3] - 19:12, 22:5, 60:3
**administrator** [1] - 25:23
**admission** [1] - 31:6
**admits** [1] - 44:8
**admitted** [2] - 32:2, 46:6
**admonished** [4] - 12:3, 12:12, 40:7, 43:10
**admonition** [1] - 43:14
**Advance** [1] - 13:22
**advance** [1] - 44:11
**advised** [1] - 27:12

**aerospace** [2] - 36:9, 37:9
**affect** [1] - 20:18
**affected** [1] - 5:11
**affects** [2] - 53:5, 53:6
**affidavit** [12] - 14:23, 15:9, 15:11, 30:14, 30:15, 30:16, 30:22, 31:5, 31:7, 47:5, 47:6, 47:12
**afloat** [1] - 48:7
**after-the-fact** [1] - 51:20
**agents** [1] - 12:7
**ago** [5] - 19:7, 30:3, 57:10, 60:2, 60:23
**agree** [1] - 61:9
**agreed** [1] - 38:8
**agreement** [9] - 15:12, 28:25, 45:11, 45:12, 45:14, 45:16, 45:22, 45:24, 67:10
**agreements** [7] - 29:16, 45:18, 47:3, 47:24, 61:6, 61:8, 62:19
**agrees** [1] - 8:3
**aground** [1] - 48:21
**ahead** [4] - 10:20, 18:16, 37:19, 68:13
**aid** [1] - 40:21
**aim** [1] - 54:15
**airport** [3] - 36:6, 36:8, 37:10
**alert** [1] - 36:12
**allegations** [5] - 18:25, 20:18, 20:25, 24:5, 48:25
**alleged** [12] - 5:10, 5:11, 11:3, 11:23, 12:21, 18:22, 19:2, 19:8, 24:3, 24:7, 29:19, 38:6
**allow** [3] - 8:17, 42:21, 65:19
**allowed** [4] - 35:21, 42:23, 43:1, 62:24
**allowing** [1] - 58:21
**allows** [1] - 22:25
**alluded** [1] - 30:3
**alluding** [1] - 56:12
**almost** [4] - 12:12, 28:6, 35:9, 36:23
**alone** [3] - 42:18, 52:5, 61:1
**alter** [4] - 28:6, 47:2, 48:12, 61:17
**amass** [1] - 25:13
**amassing** [1] - 15:21

**ambulate** [1] - 50:21
**amenable** [1] - 10:12
**America** [1] - 3:2
**AMERICA** [1] - 1:3
**amount** [5] - 14:24, 15:13, 46:24, 52:17, 54:13
**amounts** [1] - 14:8
**AND** [1] - 1:10
**anew** [1] - 12:18
**annual** [2] - 28:21, 67:25
**answer** [1] - 40:4
**apart** [1] - 27:22
**apparent** [1] - 11:1
**appealing** [1] - 9:2
**appear** [1] - 46:22
**appearance** [3] - 34:9, 57:16, 57:18
**aPPEARANCES** [1] - 1:13
**appeared** [2] - 19:16, 34:12
**appearing** [1] - 3:18
**application** [2] - 24:9, 29:1
**applied** [1] - 33:20
**approach** [1] - 37:6
**appropriate** [6] - 8:14, 32:14, 65:19, 66:8, 66:10, 67:11
**approval** [5] - 13:13, 14:2, 14:15, 45:4, 45:17
**April** [18] - 1:6, 12:3, 19:10, 19:18, 19:22, 19:24, 20:3, 21:17, 22:2, 22:24, 31:25, 33:9, 43:9, 50:18, 60:3, 60:8, 60:16, 70:10
**arguably** [1] - 53:22
**argued** [3] - 20:17, 21:10, 32:10
**argues** [2] - 4:23, 63:5
**argument** [7] - 8:15, 17:14, 17:20, 18:1, 26:18, 44:18, 50:5
**arguments** [2] - 37:22, 60:24
**arms** [1] - 66:18
**arraignment** [2] - 8:18, 26:16
**arrest** [1] - 31:23
**aside** [1] - 52:14
**assess** [1] - 4:6
**asset** [3] - 45:5, 55:18, 62:5
**assets** [6] - 13:14,

14:1, 14:6, 29:9, 30:25, 63:8
**assignment** [1] - 13:13
**assistance** [3] - 30:18, 30:21, 31:3
**assuming** [1] - 8:5
**assure** [3] - 34:8, 57:16, 64:1
**assured** [2] - 11:13, 57:18
**attack** [4] - 11:17, 11:24, 43:25
**attacked** [1] - 12:15
**attacking** [1] - 40:24
**attacks** [1] - 42:2
**attempt** [5] - 29:2, 48:6, 54:5, 55:14, 57:11
**attempted** [2] - 27:17, 61:3
**attempting** [5] - 25:13, 27:10, 29:24, 30:2, 30:4
**attempts** [3] - 22:12, 27:20, 57:8
**attorney** [3] - 39:19, 56:3, 56:9
**attorneys** [5] - 6:21, 7:1, 7:5, 7:8, 67:1
**attribute** [1] - 31:1
**August** [4] - 44:5, 44:8, 44:15, 49:11
**authority** [2] - 13:25, 45:23
**Authorization** [1] - 45:21
**authorizations** [1] - 45:18
**authorized** [2] - 36:11, 45:25
**available** [2] - 10:13, 28:22
**Avenue** [4] - 1:16, 1:23, 2:3, 70:14
**average** [1] - 7:24
**Avion** [1] - 13:22
**avoid** [3] - 22:17, 38:8, 43:4
**awaiting** [1] - 45:2
**aware** [3] - 45:4, 57:4, 65:7

**B**

**babysitter** [1] - 56:23
**background** [1] - 60:2
**bad** [2] - 8:22, 25:11

**bargain** [1] - 61:24
**based** [10] - 4:23, 5:9, 11:17, 13:23, 16:9, 37:20, 48:23, 49:5, 49:14, 49:22
**bash** [1] - 40:13
**basis** [4] - 22:21, 31:12, 53:17, 61:1
**bathing** [1] - 50:23
**bear** [2] - 28:24, 46:14
**bears** [1] - 4:11
**became** [5] - 24:1, 25:5, 28:21, 33:16, 57:12
**become** [2] - 7:18, 12:8
**bed** [1] - 63:24
**BEFORE** [1] - 1:10
**began** [2] - 24:18, 25:4
**beginning** [1] - 23:25
**begins** [1] - 48:24
**behalf** [9] - 3:12, 24:11, 26:9, 45:22, 46:9, 46:22, 61:6, 62:8, 62:13
**behavior** [4] - 12:4, 12:14, 43:11, 60:21
**believes** [5] - 13:9, 16:24, 31:12, 32:19, 59:16
**Beltway** [1] - 36:3
**benefit** [5] - 8:24, 26:12, 27:6, 47:15, 61:24
**benefits** [1] - 61:18
**Berman** [107] - 3:3, 3:12, 3:18, 3:20, 18:6, 18:15, 19:3, 19:14, 19:16, 19:18, 19:22, 19:25, 20:6, 20:9, 20:14, 20:18, 20:20, 21:15, 21:25, 22:8, 23:9, 23:14, 23:20, 24:6, 24:16, 24:18, 24:22, 24:23, 25:3, 25:4, 25:5, 25:7, 25:12, 25:22, 26:7, 26:12, 27:3, 27:5, 27:8, 27:17, 27:23, 28:10, 28:12, 28:17, 28:19, 28:24, 29:4, 29:5, 29:9, 29:11, 29:12, 29:24, 30:2, 30:3, 30:9, 30:19, 30:24, 31:2, 31:4, 31:12, 31:15, 31:17, 31:22, 32:1, 32:5, 32:7, 32:8, 32:13,

32:15, 32:16, 32:20, 32:25, 33:5, 33:11, 33:13, 33:16, 33:17, 33:20, 34:12, 35:1, 37:5, 37:7, 40:23, 41:11, 44:7, 45:2, 45:4, 45:11, 46:6, 47:6, 48:22, 49:18, 50:20, 52:7, 53:7, 53:9, 54:11, 55:5, 55:8, 56:12, 56:22, 56:25, 57:2, 57:10, 58:9, 58:16
**BERMAN** [1] - 1:6
**Berman's** [29] - 18:22, 19:1, 19:10, 22:2, 22:5, 23:12, 25:12, 25:22, 26:6, 26:11, 27:19, 30:15, 31:10, 31:11, 31:14, 31:20, 31:23, 32:10, 33:4, 33:9, 33:23, 36:20, 49:25, 54:21, 55:15, 57:8, 57:16, 57:18, 58:1
**best** [4] - 33:6, 39:10, 51:8, 70:7
**better** [1] - 18:17
**between** [6] - 13:9, 19:10, 42:21, 54:11, 59:17, 60:6
**bit** [2] - 61:17, 68:7
**blessed** [1] - 7:17
**blow** [4] - 22:6, 23:23, 25:21, 26:2
**BMF** [1] - 13:21
**boat** [2] - 51:17, 57:19
**Bochene** [1] - 4:9
**bond** [29] - 6:6, 12:11, 19:15, 19:17, 19:20, 20:10, 20:14, 20:22, 21:17, 22:2, 22:3, 22:6, 22:11, 22:15, 24:20, 25:20, 31:11, 31:13, 32:12, 33:5, 33:7, 33:15, 33:22, 33:23, 55:15, 55:17, 56:1, 58:22, 66:19
**BOND** [1] - 1:10
**bonds** [1] - 19:19
**border** [3] - 51:16, 51:17, 57:20
**borne** [1] - 33:12
**bottom** [3] - 47:2, 49:21, 55:5
**Boyer** [1] - 3:9
**bracelet** [3] - 36:15, 51:19, 53:2

**bracelet's** [1] - 36:16
**bracelets** [1] - 51:22
**brief** [2] - 41:14, 54:5
**briefed** [2] - 66:8, 66:22
**briefing** [7] - 64:19, 65:2, 65:5, 66:1, 67:1, 67:3
**briefly** [3] - 31:9, 37:16, 54:1
**buckets** [1] - 18:25
**burden** [1] - 4:11
**BURLING** [1] - 1:19
**business** [45] - 5:20, 6:1, 6:4, 6:8, 6:11, 14:12, 14:13, 14:14, 21:16, 22:7, 23:11, 23:17, 23:23, 26:10, 27:9, 27:11, 27:18, 29:12, 29:13, 29:22, 29:25, 30:4, 30:6, 40:10, 42:21, 43:18, 43:21, 43:22, 44:4, 45:19, 48:21, 49:8, 49:22, 54:13, 55:4, 55:9, 55:11, 56:18, 56:20, 56:21, 56:24, 57:9, 57:13
**BY** [1] - 2:1
**bye** [1] - 39:20
**ByzFunder** [9] - 13:23, 24:21, 24:22, 44:22, 44:23, 45:1, 45:3, 45:9, 46:3

**C**

**California** [15] - 4:19, 4:20, 4:23, 4:24, 5:4, 5:9, 5:20, 6:9, 6:12, 6:16, 6:23, 7:7, 7:21, 34:11, 36:19
**cannot** [5] - 20:14, 30:1, 31:13, 32:8, 32:9
**capacity** [8] - 6:4, 26:6, 27:1, 46:19, 47:4, 47:21, 57:24, 62:13
**Capital** [1] - 13:21
**care** [9] - 25:10, 31:22, 39:22, 52:7, 58:4, 58:7, 58:10, 58:17, 68:18
**case** [47] - 4:4, 4:12, 6:2, 6:3, 6:6, 6:20, 6:23, 6:24, 9:5, 9:11, 9:19, 9:23, 10:2, 11:14, 11:20, 12:15,

12:17, 13:7, 13:10, 21:9, 23:12, 23:15, 23:19, 23:21, 26:5, 35:1, 37:9, 38:4, 38:7, 38:21, 40:12, 40:15, 41:23, 43:23, 48:17, 53:6, 54:12, 57:23, 59:20, 63:9, 64:9, 66:2, 66:6, 66:13, 67:2

**Case** [1] - 3:2
**caseload** [1] - 36:2
**cases** [5] - 7:17, 7:19, 7:24, 64:8, 67:3
**category** [1] - 24:2
**causes** [1] - 53:8
**cease** [1] - 49:16
**ceased** [1] - 60:23
**Central** [4] - 6:20, 7:20, 8:7, 34:11
**CEO** [5] - 25:23, 27:1, 27:4, 47:1, 55:7
**certain** [3] - 10:12, 12:5, 57:3
**certainly** [8] - 7:16, 8:23, 8:25, 43:1, 52:9, 52:11, 62:15, 66:11
**CERTIFICATE** [1] - 70:1
**certify** [1] - 70:4
**cetera** [1] - 50:23
**Chaclan** [2] - 18:13, 67:15
**chance** [3] - 37:18, 51:9, 62:20
**change** [1] - 30:16
**changed** [2] - 32:1, 33:10
**characterization** [3] - 20:23, 21:12, 29:6
**characterizes** [2] - 15:14, 21:6
**charged** [2] - 44:1, 63:4
**charges** [1] - 23:13
**check** [1] - 55:23
**checked** [1] - 62:25
**checking** [1] - 56:3
**choose** [1] - 67:24
**chose** [1] - 41:17
**Christine** [1] - 34:6
**CHRISTINE** [1] - 1:25
**CHRISTOPHER** [1] - 1:14
**Christopher** [1] - 3:7
**Circuit** [1] - 64:8
**circumstances** [1] - 4:12
**cite** [1] - 44:22

**cites** [1] - 33:14
**cities** [1] - 7:13
**civil** [3] - 55:15, 63:5, 68:11
**CJA** [1] - 47:15
**claim** [1] - 54:23
**claims** [2] - 5:8, 40:18
**clarified** [2] - 19:17, 22:1
**clarity** [3] - 33:19, 56:25, 57:4
**clear** [12] - 33:16, 38:1, 38:12, 43:3, 44:22, 49:18, 50:11, 56:13, 59:8, 59:22, 64:8, 64:13
**clearly** [1] - 10:23, 21:16, 57:20
**clients** [2] - 28:10
**climb** [1] - 50:21
**cloudfund** [1] - 13:21
**co** [1] - 3:14
**co-counsel** [1] - 3:14
**Coast** [1] - 5:1
**coercive** [1] - 21:7
**collateral** [4] - 29:11, 29:15, 29:20, 61:23
**colleagues** [3] - 3:13, 3:15, 54:12
**COLLINS** [5] - 1:18, 3:11, 3:17, 10:19, 17:5
**Collins** [2] - 3:12, 17:4
**collins** [1] - 10:18
**Columbia** [5] - 2:2, 33:1, 34:14, 34:21, 70:13
**COLUMBIA** [1] - 1:1
**combination** [6] - 34:8, 48:4, 53:14, 59:11, 63:19, 64:1
**comfort** [1] - 63:23
**comfortable** [1] - 3:20
**coming** [1] - 67:2
**committed** [6] - 14:5, 37:25, 42:7, 59:13, 63:13, 63:22
**communicate** [1] - 11:14
**communicating** [2] - 59:19, 60:13
**communication** [4] - 21:7, 42:22, 54:25
**communications** [12] - 21:14, 22:9, 22:13, 23:1, 23:10,

42:1, 44:3, 56:14, 57:1, 59:22, 60:18, 60:22
**community** [8] - 52:1, 53:9, 53:18, 54:24, 64:6, 64:7, 64:9, 64:14
**companies** [7] - 13:21, 14:6, 46:17, 47:20, 47:25, 49:3
**company** [52] - 4:23, 4:24, 5:9, 23:16, 24:11, 24:14, 24:15, 25:12, 25:22, 25:23, 25:24, 26:8, 26:14, 26:25, 27:13, 27:20, 27:23, 27:24, 28:5, 39:24, 40:25, 41:1, 44:6, 44:7, 44:9, 46:9, 46:11, 46:18, 46:22, 47:1, 48:6, 48:11, 48:19, 49:1, 49:3, 49:15, 49:19, 61:7, 61:9, 61:13, 61:15, 61:17, 61:19, 62:8, 62:11, 62:13, 62:17, 62:18, 62:20, 62:24
**company's** [3] - 13:10, 14:1, 24:12
**complaint** [1] - 29:8
**complete** [1] - 70:6
**completed** [2] - 61:3, 61:21
**complex** [1] - 38:14
**compliance** [1] - 45:17
**complicated** [2] - 6:24, 9:5
**complied** [2] - 19:18, 28:20
**complies** [1] - 64:2
**comply** [8] - 11:11, 16:12, 17:2, 19:14, 20:9, 31:13, 40:3, 57:5
**computer** [1] - 63:23
**concealed** [1] - 15:6
**concedes** [1] - 54:17
**conceivable** [1] - 55:22
**concern** [5] - 10:18, 27:14, 27:16, 40:24, 61:10
**concerned** [5] - 35:14, 50:15, 52:12, 55:16, 64:12
**concerning** [2] - 63:2, 63:11
**concerns** [3] - 8:4, 8:6, 37:8

**concluded** [1] - 69:3
**concocted** [1] - 11:18
**concurs** [1] - 34:15
**condition** [31] - 21:9, 21:21, 25:6, 27:19, 31:10, 31:14, 32:11, 33:4, 33:7, 33:19, 33:24, 37:11, 43:3, 45:9, 48:4, 49:25, 50:1, 50:16, 50:24, 51:3, 52:3, 53:14, 54:22, 58:2, 59:10, 59:11, 60:17, 60:20, 62:3, 63:19, 64:1
**conditions** [43] - 7:14, 10:23, 11:11, 16:6, 16:11, 16:13, 17:2, 20:14, 21:23, 22:3, 22:6, 22:15, 23:4, 25:18, 25:21, 31:13, 33:15, 34:8, 38:1, 38:12, 41:21, 48:4, 50:12, 50:13, 53:14, 55:15, 55:17, 56:1, 57:15, 58:19, 58:20, 59:11, 60:12, 62:9, 62:23, 63:1, 63:12, 63:15, 63:17, 63:19, 64:1, 64:3
**Conduct** [1] - 21:3
**conduct** [30] - 10:23, 11:2, 11:3, 11:4, 11:22, 12:21, 13:11, 17:13, 18:4, 18:7, 18:11, 18:22, 18:23, 19:5, 19:6, 19:9, 19:11, 20:6, 21:2, 23:5, 33:9, 45:19, 52:15, 57:6, 60:4, 63:2, 63:4, 63:7, 64:11
**conducted** [2] - 44:25, 56:16
**confer** [1] - 68:12
**conference** [11] - 65:9, 65:17, 65:21, 66:24, 67:7, 67:12, 67:16, 67:17, 67:19, 67:22, 68:19
**confident** [1] - 5:2
**confirmed** [4] - 24:22, 31:20, 31:24, 32:3
**conflated** [1] - 19:20
**confusion** [3] - 20:12, 38:13, 41:21
**congested** [1] - 7:19
**connection** [1] -

38:22
**consensus** [2] - 39:14, 68:15
**consider** [1] - 38:20
**consideration** [3] - 32:11, 50:2, 60:25
**considered** [1] - 9:22
**considering** [1] - 35:19
**consistent** [6] - 25:20, 26:15, 30:4, 30:7, 55:11, 57:12
**constitutes** [1] - 70:4
**Constitution** [2] - 2:3, 70:14
**consult** [1] - 39:19
**contact** [19] - 19:1, 19:20, 19:23, 20:1, 20:11, 20:13, 20:19, 21:3, 21:5, 21:25, 22:17, 23:18, 33:17, 38:8, 41:22, 42:23, 43:4, 54:18, 60:8
**contacted** [1] - 22:21
**contacting** [1] - 41:16
**contacts** [2] - 59:17, 60:14
**contemplated** [1] - 21:16
**content** [1] - 60:18
**contested** [1] - 21:11
**context** [1] - 63:3
**continuance** [1] - 13:4, 13:6
**continuation** [1] - 11:3
**continue** [12] - 9:21, 23:23, 25:24, 26:8, 27:10, 27:12, 27:24, 53:2, 57:9, 62:16, 66:4
**continued** [5] - 26:14, 27:21, 57:11, 58:3
**contract** [1] - 14:18
**contracts** [5] - 46:12, 61:3, 61:15, 62:1, 62:7
**contrary** [2] - 20:24, 24:12
**convenience** [1] - 4:5
**conversation** [3] - 23:11, 41:12, 44:10
**conversations** [1] - 38:18
**convinced** [1] - 8:11
**convincing** [3] - 50:11, 59:9, 64:13

cooperate [2] - 12:7, 59:21

Corp [1] - 22:20

corporate [1] - 31:1

corporation [1] - 23:17

correct [3] - 42:22, 53:18, 62:2

cost [3] - 6:13, 6:16, 8:9

cost-effective [2] - 6:16, 8:9

costs [1] - 48:9

counsel [14] - 3:4, 3:14, 7:3, 8:24, 11:12, 22:3, 22:8, 22:22, 38:14, 43:16, 49:18, 56:6, 66:3

counsel's [2] - 44:18, 49:23

country [1] - 37:13

couple [5] - 7:18, 8:10, 37:19, 61:4, 63:14

course [5] - 5:14, 6:24, 8:24, 9:15, 64:6

Court [64] - 2:1, 2:2, 3:24, 4:4, 4:10, 4:15, 7:17, 8:3, 8:19, 8:21, 9:5, 10:11, 11:6, 11:8, 12:12, 12:15, 13:13, 14:2, 14:15, 14:21, 14:22, 14:24, 15:4, 15:6, 15:8, 16:2, 16:10, 16:14, 16:23, 17:6, 18:19, 19:11, 19:17, 19:22, 19:24, 21:11, 23:20, 27:11, 31:21, 33:8, 33:12, 34:11, 38:3, 38:24, 40:7, 45:7, 46:23, 47:17, 47:22, 48:8, 50:15, 51:4, 52:21, 53:11, 55:20, 56:3, 59:2, 59:12, 62:6, 66:9, 70:12, 70:13

COURT [73] - 1:1, 3:10, 3:16, 3:18, 3:23, 10:17, 10:20, 17:3, 17:7, 17:10, 17:14, 17:17, 17:22, 18:2, 18:12, 18:20, 21:3, 21:4, 21:18, 21:21, 22:16, 23:2, 25:15, 25:25, 26:21, 26:23, 27:13, 27:16, 27:25, 28:4, 34:2, 34:16, 35:3, 35:14, 36:5, 36:22, 36:25, 37:4, 37:6, 37:14, 37:17,

37:24, 39:4, 39:10, 39:16, 42:19, 43:2, 43:8, 46:8, 48:10, 48:15, 50:3, 51:23, 53:17, 53:20, 54:3, 55:16, 56:7, 58:23, 59:2, 64:21, 65:8, 65:12, 65:14, 65:20, 65:24, 66:14, 66:23, 68:2, 68:4, 68:6, 68:23, 68:25

court [5] - 12:4, 34:9, 35:22, 56:23, 57:16

Court's [12] - 13:15, 19:10, 19:19, 20:10, 21:16, 22:2, 25:20, 26:13, 33:21, 41:20, 43:14, 45:9

court-ordered [1] - 56:23

courtesy [1] - 36:17

COURTROOM [1] - 3:1

Courts [1] - 4:7

COVID [1] - 11:19

COVID-19 [1] - 12:1

Covington [1] - 3:12

COVINGTON [1] - 1:19

crew [1] - 40:14

crime [2] - 48:2, 59:14

crimes [1] - 63:22

criminal [16] - 7:17, 7:18, 7:22, 7:24, 9:16, 11:3, 12:17, 13:10, 16:22, 23:5, 23:12, 38:3, 41:23, 43:23, 52:15, 63:5

Criminal [3] - 1:3, 3:2, 8:19

CRIMINAL [1] - 1:16

cross [3] - 10:14, 10:15, 17:18

cross-examination [1] - 10:14

cross-examine [2] - 10:15, 17:18

CRR [3] - 2:1, 70:3, 70:12

crystal [3] - 38:1, 38:12, 44:22

curfew [1] - 34:24

current [1] - 25:5

Cusanelli [1] - 64:9

custody [6] - 4:18, 4:19, 6:7, 6:9, 32:15, 32:17

cut [8] - 7:9, 8:6, 36:15, 36:16, 40:19,

41:12, 41:18, 51:22

cute [1] - 62:14

cuts [4] - 6:14, 7:4, 7:15, 8:3

## D

D.C [16] - 1:6, 1:17, 1:20, 1:24, 2:4, 5:1, 5:12, 5:24, 7:5, 8:12, 32:8, 32:20, 36:20, 51:9, 64:7, 70:14

daily [2] - 50:22, 58:6

danger [4] - 53:18, 54:24, 64:6, 64:7

dangerousness [2] - 53:23, 64:9

date [5] - 13:5, 64:19, 65:1, 65:18, 66:24

Dated [1] - 70:10

dates [1] - 67:18

day-to-day [7] - 23:17, 26:8, 31:18, 32:8, 56:20, 56:23, 58:5

days [2] - 32:17, 66:17

deal [1] - 14:16

death [4] - 22:6, 23:23, 25:21, 26:1

decades [3] - 24:15, 27:9, 29:25

December [3] - 11:12, 59:18, 67:19

decided [2] - 41:18, 46:21

Decision [2] - 12:19, 22:20

deescalation [1] - 18:7

default [4] - 15:2, 46:21, 46:23, 47:20

defaulted [1] - 53:12

defaults [2] - 14:7, 25:1

Defendant [99] - 1:7, 4:11, 4:16, 4:18, 4:22, 5:8, 5:19, 6:7, 6:17, 8:4, 8:8, 8:12, 8:22, 10:4, 10:14, 10:22, 11:13, 11:16, 11:18, 11:23, 12:4, 12:5, 12:13, 12:22, 12:23, 13:4, 13:5, 13:9, 13:12, 13:15, 14:7, 14:9, 14:19, 14:22, 15:8, 15:16, 15:19, 16:6, 16:12, 16:15,

16:17, 16:20, 17:1, 22:21, 25:1, 37:25, 38:8, 38:15, 39:14, 40:2, 40:4, 40:7, 40:9, 40:10, 40:11, 40:18, 41:1, 41:7, 41:20, 41:22, 42:6, 43:10, 43:14, 43:16, 43:17, 44:4, 45:15, 48:13, 49:10, 50:17, 50:19, 51:21, 52:14, 59:9, 59:10, 59:17, 59:19, 59:24, 60:6, 60:11, 61:3, 61:6, 61:25, 62:16, 63:3, 63:9, 63:13, 63:18, 63:20, 64:2, 64:5, 64:6, 64:14, 64:16, 65:7

DEFENDANT [2] - 1:18, 3:22

Defendant's [17] - 5:10, 6:1, 6:4, 8:16, 8:21, 10:5, 11:10, 11:19, 13:3, 34:9, 48:11, 50:1, 59:3, 59:4, 61:12, 63:8, 64:17

defendants [3] - 51:14, 51:22, 52:1

DEFENDER [1] - 1:22

defender [4] - 30:17, 30:21, 31:3, 47:15

defending [1] - 53:10

Defense [1] - 18:9

defense [17] - 6:19, 7:6, 7:16, 9:2, 9:10, 11:12, 38:14, 43:16, 44:18, 49:18, 60:23, 62:15, 63:5, 65:10, 67:8, 68:4, 68:23

defraud [1] - 48:22

defrauded [1] - 12:18

defrauding [1] - 44:13

defunct [4] - 24:14, 25:12, 29:23, 44:9

delay [4] - 8:22, 9:11, 9:18, 15:20

demanding [1] - 57:24

demonstrate [1] - 50:8

demonstrated [1] - 64:13

demonstrates [1] - 16:14

demonstrating [1] - 16:5

demonstrative [2] - 16:21, 18:10

deny [1] - 10:5

denying [1] - 9:4

Department [3] - 11:6, 11:20, 13:6

DEPARTMENT [1] - 1:15

DEPUTY [1] - 3:1

described [1] - 41:9

describes [1] - 14:24

desperate [1] - 16:17

despite [1] - 63:15

details [2] - 12:14, 14:24

detain [2] - 59:4, 64:16

detained [4] - 8:13, 32:16, 50:9, 51:4

detection [1] - 53:4

detention [7] - 3:25, 8:24, 10:8, 32:23, 34:25, 59:3, 59:7

determining [1] - 51:20

developed [1] - 25:5

diabetes [1] - 48:20

diabetic [1] - 48:20

Diagnostic [1] - 22:20

Diagnostics [1] - 12:19

different [4] - 13:20, 16:7, 59:15, 62:18

differently [1] - 56:16

difficult [1] - 27:19

difficulty [1] - 6:8

diligence [1] - 57:3

direct [1] - 31:14

directed [2] - 12:5, 12:15

directing [1] - 11:16

direction [1] - 8:7

directly [5] - 22:17, 32:12, 38:9, 39:23, 43:4

disagree [1] - 53:22

disagrees [1] - 29:5

disappear [1] - 52:8

disbursement [1] - 15:18

disclose [1] - 32:22

disclosed [3] - 15:5, 30:10, 30:19

discovery [1] - 66:6

discuss [2] - 32:22, 37:20

discussed [2] - 12:14, 62:17

**discussing** [1] - 23:21

**discussions** [3] - 23:19, 32:22, 54:11

**disdain** [1] - 11:5

**dismissed** [1] - 8:16

**disposition** [1] - 7:25

**dispositive** [1] - 4:8

**dispute** [1] - 49:17

**disqualified** [1] - 11:19

**disregard** [1] - 11:5

**disrespects** [1] - 33:12

**disruption** [1] - 6:2

**dissuade** [1] - 12:18

**distance** [1] - 5:1

**distances** [1] - 32:6

**District** [10] - 2:2, 2:2, 6:20, 7:20, 8:7, 33:1, 34:11, 34:14, 34:21, 70:13

**DISTRICT** [3] - 1:1, 1:1, 1:11

**district** [5] - 4:14, 7:15, 7:23, 8:10, 70:13

**districts** [1] - 7:13

**DIVISION** [1] - 1:16

**docket** [2] - 7:14, 7:18

**doctor** [1] - 52:9

**document** [2] - 18:19, 61:5

**documentary** [1] - 16:4

**documents** [5] - 5:17, 5:20, 5:22, 5:24, 44:21

**DOJ** [1] - 11:14

**dollar** [1] - 14:10

**dollars** [6] - 14:11, 15:2, 15:17, 47:19, 48:23, 55:24

**domestic** [2] - 36:9, 37:9

**done** [2] - 46:9, 52:23

**dormant** [1] - 28:12

**doubt** [3] - 15:25, 46:25, 47:9

**doubting** [1] - 40:15

**dozen** [1] - 9:6

**Dr** [8] - 31:19, 32:3, 50:25, 51:1, 52:5, 52:6, 58:7

**drain** [1] - 32:18

**dressing** [1] - 50:23

**dressings** [1] - 32:1

**drive** [2] - 32:8, 51:1

**driving** [3] - 5:1, 36:2, 51:16

**due** [1] - 7:19

**duly** [1] - 45:25

**during** [1] - 26:16

**Dutta** [8] - 31:19, 32:3, 50:25, 51:1, 52:5, 52:6, 58:7

---

**E**

---

**early** [2] - 66:24, 67:7

**easier** [1] - 47:21

**easily** [1] - 7:13

**East** [1] - 5:1

**eating** [1] - 50:22

**ECF** [1] - 61:12

**Edwards** [1] - 70:12

**EDWARDS** [2] - 2:1, 70:3

**effect** [1] - 6:4

**effective** [2] - 6:16, 8:9

**effort** [2] - 66:3, 66:21

**efforts** [1] - 55:12

**ego** [4] - 28:6, 47:2, 48:12, 61:17

**egregious** [1] - 52:15

**eight** [3] - 32:24, 33:1, 53:16

**eight-month** [1] - 32:24

**eighth** [1] - 7:11

**either** [3] - 15:22, 21:4, 57:21

**electronic** [2] - 38:9, 43:5

**elements** [1] - 8:2

**elevate** [1] - 51:2

**eligible** [1] - 30:17

**ELIZABETH** [1] - 1:18

**Elizabeth** [2] - 3:13, 17:9

**ELMO** [1] - 18:13

**elsewhere** [1] - 52:9

**emails** [1] - 15:8

**emergency** [1] - 12:2

**emphasized** [1] - 58:9

**employees** [10] - 23:16, 28:1, 28:8, 38:25, 39:4, 39:5, 48:16, 49:2, 49:4, 61:11

**encouraging** [1] - 59:20

**end** [8] - 10:1, 23:25,

28:9, 42:3, 42:4, 42:9, 42:10, 58:10

**ends** [1] - 55:23

**enforcement** [4] - 11:5, 12:7, 16:21, 59:21

**engage** [4] - 13:25, 14:5, 43:11, 45:20

**engaged** [8] - 10:22, 11:4, 12:13, 28:24, 44:12, 45:20, 47:23, 52:14

**engaging** [2] - 39:7, 49:12

**enhanced** [1] - 33:22

**ensure** [1] - 33:22

**entail** [1] - 32:24

**enter** [1] - 59:7

**entered** [5] - 45:10, 46:23, 47:3, 61:3, 61:8

**entering** [1] - 61:6, 62:1, 62:19

**entertain** [1] - 37:23

**entire** [3] - 16:3, 26:16, 52:23

**entirely** [1] - 15:7

**ERTLE** [35] - 1:18, 17:9, 17:11, 17:16, 17:19, 17:25, 18:3, 18:18, 18:21, 21:5, 21:20, 21:23, 22:17, 23:8, 25:19, 26:5, 26:22, 27:1, 27:15, 27:17, 28:3, 28:7, 37:2, 37:5, 37:7, 54:1, 54:4, 56:5, 56:8, 65:10, 65:13, 65:25, 66:17, 68:5, 68:24

**Ertle** [11] - 3:13, 17:5, 17:9, 21:18, 25:15, 37:20, 46:8, 48:11, 49:7, 50:3, 65:24

**Ertle's** [1] - 37:22

**escalating** [2] - 18:5, 20:24

**escalation** [2] - 15:15, 18:23

**especially** [1] - 63:24

**ESQ** [7] - 1:14, 1:14, 1:15, 1:18, 1:18, 1:19, 1:21

**essentially** [4] - 31:15, 54:16, 61:16, 61:25

**established** [1] - 50:10

**et** [1] - 50:23

**event** [1] - 62:22

**events** [2] - 5:6, 5:8

**evidence** [28] - 5:5, 6:10, 10:24, 16:4, 16:10, 16:13, 20:4, 20:15, 24:17, 25:4, 28:14, 29:3, 31:16, 32:22, 33:17, 39:2, 42:9, 47:9, 47:11, 49:8, 52:6, 53:10, 54:25, 59:9, 61:22, 63:6, 64:13

**evidenced** [1] - 58:19

**exactly** [2] - 20:20, 63:21

**examination** [1] - 10:14

**examine** [2] - 10:15, 17:18

**example** [6] - 13:11, 15:3, 39:10, 39:13, 40:1, 44:22

**examples** [5] - 13:16, 13:20, 40:16, 41:3, 41:5

**excess** [1] - 52:20

**exchange** [1] - 29:14

**exclusively** [1] - 20:3

**excuses** [1] - 15:20

**executed** [2] - 28:25, 30:9

**Exhibit** [14] - 11:15, 12:10, 12:20, 14:23, 15:4, 18:9, 22:10, 24:19, 41:15, 41:25, 43:15, 45:13, 45:14, 49:11

**exhibits** [5] - 20:8, 21:8, 33:13, 39:8, 54:7

**Exhibits** [6] - 11:21, 13:1, 13:17, 20:5, 44:12

**expectation** [1] - 6:22

**expected** [1] - 33:7

**experience** [1] - 36:10

**explain** [1] - 9:1

**extended** [2] - 45:3, 46:10

**extensive** [3] - 57:22, 58:13, 65:6

**extent** [8] - 10:14, 19:9, 26:9, 28:5, 35:14, 61:10, 62:23, 67:13

**extenuating** [1] - 32:7

**extra** [1] - 26:2

**extreme** [1] - 32:18

**extremely** [3] - 41:18, 53:8, 58:2

---

**F**

---

**F.Supp** [2] - 4:9, 4:13

**Facebook** [2] - 41:12, 60:8

**facility** [3] - 6:16, 32:20, 32:21

**facing** [2] - 8:24, 26:4

**fact** [44] - 8:14, 15:6, 16:13, 20:8, 20:15, 20:18, 20:20, 21:10, 22:5, 23:14, 24:15, 24:23, 25:7, 30:19, 32:12, 37:12, 38:20, 39:2, 41:19, 42:6, 46:15, 47:6, 47:11, 47:16, 47:18, 47:22, 48:1, 50:25, 51:12, 51:20, 55:11, 56:25, 57:3, 57:10, 57:12, 57:14, 58:1, 58:11, 58:18, 58:20, 62:6

**factor** [24] - 4:15, 4:16, 4:17, 4:21, 4:22, 5:7, 5:15, 5:17, 5:18, 5:25, 6:13, 6:14, 7:2, 7:3, 7:9, 7:11, 7:12, 7:14, 7:15, 8:1, 8:2, 9:3, 9:24, 52:11

**factors** [5] - 4:7, 8:25, 9:23, 9:24, 10:15

**facts** [6] - 10:12, 11:9, 46:13, 49:14, 66:4, 66:18

**fade** [1] - 9:21

**failed** [2] - 32:21, 32:22

**fails** [1] - 19:14

**fair** [5] - 15:20, 40:2, 50:4, 50:5, 60:24

**faith** [2] - 8:22, 25:11

**fall** [3] - 18:25, 24:6, 24:10

**falls** [1] - 29:10

**false** [3] - 13:23, 14:17, 15:22

**familiar** [3] - 9:5, 15:4, 35:6

**farce** [1] - 41:20

**fashion** [2] - 42:18, 44:24

**fast** [2] - 36:4, 55:17

**fault** [1] - 9:9
**favor** [4] - 4:17, 9:23, 44:3, 58:21
**favors** [2] - 9:4, 9:24
**February** [2] - 25:6, 59:18
**federal** [3] - 12:7, 47:15, 59:13
**FEDERAL** [1] - 1:22
**Federal** [1] - 8:17
**fee** [1] - 44:12
**fell** [2] - 26:17, 27:22
**felony** [2] - 7:22, 26:4
**FENTON** [27] - 1:14, 3:6, 10:10, 10:21, 37:15, 37:21, 37:25, 39:5, 39:13, 39:17, 42:25, 43:3, 43:9, 46:13, 48:14, 48:18, 50:6, 52:2, 53:19, 64:20, 64:24, 65:16, 65:22, 67:23, 68:3, 68:22, 69:2
**Fenton** [9] - 3:7, 10:9, 10:20, 17:3, 23:2, 46:8, 64:18, 64:23, 65:14
**few** [2] - 49:2, 49:4
**fiction** [1] - 57:19
**fifth** [1] - 6:1
**figure** [1] - 28:4
**file** [4] - 28:20, 66:16, 67:9, 67:11
**filed** [3] - 8:18, 28:21, 68:8
**filing** [4] - 7:24, 9:10, 68:10, 68:14
**filings** [2] - 7:23, 28:19
**final** [3] - 9:3, 15:3, 49:24
**finalization** [1] - 30:11
**finalized** [1] - 30:12
**finally** [4] - 15:3, 31:9, 57:14, 61:2
**finances** [2] - 47:4, 61:18
**financial** [12] - 14:23, 15:9, 15:11, 24:5, 30:13, 30:15, 30:22, 47:5, 47:12, 57:22, 63:6, 63:21
**fine** [4] - 10:17, 17:22, 17:25, 49:2
**first** [11] - 3:24, 4:16, 9:14, 11:12, 14:2, 17:21, 17:24, 24:6, 49:25, 54:6, 59:16

**flee** [9] - 31:15, 33:24, 50:4, 50:5, 51:14, 53:1, 57:25, 58:15, 58:21
**fleecing** [1] - 61:25
**fleeing** [1] - 51:12
**flight** [13] - 15:25, 31:12, 32:13, 35:15, 50:7, 50:8, 51:11, 52:10, 52:11, 52:14, 53:13, 53:17, 64:5
**fly** [2] - 6:15, 32:9
**focused** [2] - 52:10, 66:19
**folks** [4] - 3:10, 3:16, 54:14, 68:25
**follow** [1] - 56:13
**following** [5] - 23:24, 43:13, 59:1, 63:16, 65:2
**follows** [1] - 11:2
**Footnote** [1] - 41:14
**FOR** [1] - 1:1, 1:14, 1:18, 1:25
**forbidden** [1] - 23:13
**foregoing** [1] - 70:4
**form** [1] - 44:24
**fortune** [1] - 15:21
**forward** [1] - 3:4
**fourth** [2] - 5:17, 5:25
**Fox** [1] - 13:21
**FPD** [1] - 7:6
**frankly** [6] - 6:25, 38:17, 42:1, 42:11, 62:13, 66:24
**fraud** [12] - 14:10, 15:25, 16:1, 42:7, 44:1, 44:19, 47:17, 49:13, 52:16, 63:21
**FRAUD** [1] - 1:16
**fraudulent** [6] - 13:24, 14:4, 16:19, 25:16, 63:4, 63:6
**fraudulently** [7] - 14:18, 19:3, 26:19, 29:4, 47:23, 48:7, 52:20
**freestanding** [2] - 9:15, 23:4
**Friday** [1] - 67:16
**friend** [2] - 60:8, 60:16
**front** [1] - 21:23
**full** [3] - 45:23, 51:8, 70:5
**fun** [1] - 57:2
**function** [1] - 43:21
**functioning** [2] - 47:1, 49:22

**fundamental** [1] - 16:16
**fundamentally** [2] - 29:18, 54:16
**funding** [2] - 61:13, 61:17
**Funding** [1] - 13:22
**funds** [2] - 15:18, 25:13
**fungible** [1] - 7:9
**furthermore** [2] - 21:6, 57:6

# G

**game** [1] - 36:24
**general** [1] - 39:14
**generally** [1] - 49:2
**Giron** [1] - 3:15
**gist** [1] - 67:9
**given** [7] - 8:7, 33:23, 39:18, 56:25, 63:24, 65:5, 66:12
**glucose** [1] - 48:19
**goals** [1] - 33:23
**good-bye** [1] - 39:20
**goods** [1] - 29:17
**GOVERNMENT** [1] - 1:14
**government** [2] - 32:19, 45:16
**Government** [88] - 3:5, 4:25, 5:10, 6:15, 6:19, 7:16, 8:11, 10:3, 10:12, 10:24, 11:7, 11:13, 12:8, 12:10, 16:14, 16:14, 16:22, 16:24, 18:4, 18:7, 18:11, 19:2, 19:8, 19:11, 19:13, 19:20, 20:4, 20:17, 20:25, 21:6, 21:8, 21:9, 21:13, 24:3, 24:4, 24:5, 24:17, 24:20, 24:21, 24:25, 25:2, 25:11, 28:15, 29:1, 29:18, 29:21, 29:22, 30:10, 31:1, 31:11, 31:19, 31:22, 32:6, 32:10, 32:17, 32:19, 32:25, 33:11, 33:13, 37:15, 38:22, 48:8, 49:15, 50:8, 52:12, 52:22, 53:11, 54:6, 54:16, 54:19, 54:24, 55:13, 56:12, 57:1, 57:7, 57:19, 58:2, 58:6, 58:7, 58:8, 59:15, 60:5, 61:2,

64:12, 67:9, 67:22, 68:12, 68:21
**Government's** [22] - 8:15, 10:8, 11:15, 13:18, 17:12, 17:18, 18:3, 18:24, 19:6, 20:5, 20:12, 20:25, 24:12, 24:19, 26:18, 28:9, 29:8, 45:13, 45:14, 59:2, 64:15, 65:4
**GPS** [6] - 35:1, 35:6, 35:20, 35:23, 35:25, 53:2
**grand** [1] - 5:23
**granting** [1] - 64:15
**Grass** [1] - 13:22
**greater** [1] - 35:15
**Green** [1] - 13:22
**group** [5] - 20:2, 20:7, 22:13, 23:1, 23:10
**Group** [1] - 13:21
**guarantee** [3] - 46:15, 55:7, 55:8
**guaranteed** [1] - 61:19
**guaranteeing** [1] - 29:13
**guarantor** [2] - 46:16, 46:20
**guess** [3] - 23:2, 28:4, 55:16
**guidance** [4] - 25:20, 26:13, 26:15, 33:8

# H

**habitually** [1] - 7:22
**Hale** [1] - 64:9
**Hale-Cusanelli** [1] - 64:9
**hand** [1] - 18:16
**handed** [1] - 22:15
**happy** [2] - 17:14, 17:20
**harass** [3] - 38:5, 41:22, 43:1
**harasses** [1] - 40:18
**harassing** [5] - 12:24, 39:6, 41:5, 41:8, 41:13
**harassment** [7] - 38:17, 41:7, 41:8, 54:6, 54:8, 54:10, 54:13
**harm** [2] - 9:14, 53:9
**headed** [1] - 37:10
**heading** [1] - 36:6

**headquartered** [1] - 5:14
**health** [5] - 6:6, 8:4, 8:23, 27:19, 31:14
**hear** [5] - 10:7, 17:14, 65:12, 65:24, 67:12
**heard** [2] - 9:6, 54:1
**hearing** [10] - 3:21, 3:25, 19:11, 19:24, 21:17, 22:2, 22:24, 23:24, 34:12, 59:8
**HEARING** [2] - 1:10
**hearings** [1] - 9:6
**heated** [1] - 54:11
**held** [2] - 27:7, 46:23
**help** [4] - 12:1, 40:20, 40:23, 43:25
**helpfully** [1] - 22:14
**hereafter** [1] - 45:20
**hereby** [1] - 70:3
**hide** [1] - 48:8
**hiding** [2] - 14:20, 47:17
**highlight** [2] - 11:8, 12:25
**himself** [8] - 15:10, 25:13, 46:22, 47:6, 56:16, 58:4, 58:15, 61:19
**HISP** [1] - 34:17
**hit** [1] - 37:19
**hold** [1] - 32:20
**Holdings** [1] - 13:22
**holiday** [1] - 68:1
**home** [7] - 34:24, 34:25, 35:10, 35:20, 35:21, 58:17, 63:24
**honest** [2] - 35:5, 47:18
**Honor** [57] - 3:1, 3:6, 3:11, 3:22, 10:10, 10:19, 10:21, 12:3, 17:5, 17:11, 17:16, 17:19, 17:20, 18:18, 21:20, 21:24, 22:5, 22:10, 22:11, 22:14, 22:24, 23:1, 23:9, 25:19, 26:22, 27:2, 34:5, 34:13, 34:22, 35:19, 35:23, 37:3, 37:15, 37:21, 42:11, 42:25, 43:9, 50:13, 50:16, 52:3, 53:1, 53:15, 54:2, 64:20, 64:24, 65:10, 65:13, 65:16, 65:25, 66:5, 66:17, 67:23, 68:3, 68:5, 68:22, 68:24, 69:2

Honor's [1] - 37:23
HONORABLE [1] - 1:10
hook [1] - 55:24
hope [1] - 49:20
Hospital [1] - 50:19
hospital [4] - 31:24, 31:25, 32:2, 58:12
hospitalizations [1] - 27:23
hospitalized [2] - 25:9, 58:10
hour [2] - 36:3, 51:1
house [3] - 6:15, 8:8, 35:10
housing [1] - 6:17
hundreds [7] - 14:11, 15:1, 15:16, 47:19
hurt [1] - 41:2
hypertechnical [1] - 60:12

I

idea [3] - 18:17, 48:3, 56:19
identified [1] - 47:25
identify [2] - 3:4, 32:21
identifying [1] - 30:23
ignore [1] - 62:23
ignores [1] - 13:15
ignoring [1] - 43:14
ill [5] - 24:1, 25:5, 26:17, 28:21, 57:12
illegal [2] - 54:15, 64:11
illegally [1] - 47:22
illustrate [1] - 18:21
illustrates [1] - 20:20
illustrative [1] - 11:9
immediate [2] - 15:18, 36:16
immediately [3] - 12:12, 43:13, 44:11
impact [2] - 6:11, 31:7
impermissible [2] - 19:21, 20:13
importance [1] - 63:16
important [3] - 41:18, 41:19, 60:2
importantly [6] - 9:4, 14:22, 16:8, 44:4, 46:16, 53:8
impose [2] - 16:10,

53:15
imposes [1] - 50:14
impossible [1] - 31:15
inability [1] - 33:24
inaccuracy [1] - 18:22
inappropriate [1] - 21:2
incarcerated [2] - 6:17, 33:1
incarceration [4] - 34:24, 35:16, 35:20, 35:21
incidents [1] - 59:16
included [1] - 31:4
including [1] - 16:5, 22:19, 38:9, 43:4, 59:20, 64:8
incur [1] - 45:23
indeed [3] - 8:13, 21:9, 23:24
independent [2] - 50:22, 50:25
independently [1] - 50:21
Indiana [1] - 1:23
indicate [1] - 23:20
indication [1] - 19:14
indicted [4] - 14:9, 42:6, 45:2, 52:21
indictment [10] - 11:4, 11:23, 12:22, 19:10, 26:4, 39:25, 48:24, 48:25, 52:16, 63:3
indirectly [1] - 22:18, 38:9, 43:4
individual [11] - 21:25, 22:20, 33:17, 36:1, 40:5, 46:2, 47:3, 52:7, 56:14, 57:1, 57:21
individually [1] - 9:1
individuals [11] - 23:22, 38:19, 38:25, 40:13, 40:14, 41:6, 41:8, 41:17, 41:22, 42:17, 43:20
induce [1] - 14:18
inference [1] - 15:20
informant [1] - 38:6
inherent [1] - 23:8
inheritance [1] - 61:14
insinuates [1] - 25:2
insists [1] - 32:25
inspector [1] - 39:22
Inspector [2] - 3:8, 10:13

instance [2] - 19:7, 54:17
instances [2] - 24:3, 40:8
instead [8] - 15:11, 18:24, 19:13, 19:16, 19:23, 21:13, 40:12, 40:23
instructions [1] - 56:13
intended [6] - 19:25, 22:6, 25:21, 31:6, 31:8, 52:17
intention [2] - 22:25, 53:9
interacting [1] - 42:17
interest [3] - 4:6, 9:14, 9:15
interested [2] - 40:10, 40:12
interests [1] - 30:6
interim [1] - 65:20
international [1] - 12:2
internet [2] - 12:18, 40:14
interview [4] - 24:22, 31:21, 44:25, 58:7
interviewed [2] - 24:20, 31:19
interviews [1] - 39:18
intimidate [2] - 38:2, 40:4
intimidating [1] - 12:24, 39:6
intimidation [3] - 38:18, 39:11, 39:12
investigation [5] - 22:19, 38:3, 38:11, 38:23, 43:6
investor [8] - 11:17, 11:24, 19:5, 21:2, 42:3, 42:8, 42:10, 42:12
investors [30] - 11:14, 11:23, 12:6, 12:14, 12:16, 12:18, 12:24, 12:25, 13:6, 19:1, 19:21, 19:23, 20:1, 20:7, 20:9, 20:11, 20:13, 20:19, 21:14, 21:25, 22:9, 22:20, 23:15, 23:16, 33:18, 42:23, 48:23, 54:20
invoicing [1] - 28:10
involve [3] - 13:20, 29:16, 33:14

involved [5] - 57:23, 59:25, 62:23, 66:6, 66:13
involving [1] - 20:9
iPhone [1] - 63:23
ironic [2] - 39:21, 39:22
issue [12] - 5:6, 5:8, 22:23, 24:20, 29:18, 30:13, 32:12, 32:13, 36:17, 40:22, 51:2, 57:14
issued [1] - 34:13
issues [6] - 9:25, 21:17, 22:2, 54:5, 66:7, 66:19
items [2] - 19:9, 66:22
itself [2] - 45:14

J

January [6] - 7:19, 16:1, 24:24, 28:23, 61:5, 65:1
jet [1] - 51:15
job [1] - 39:25
joined [1] - 3:12
joke [1] - 41:20
José [1] - 3:15
JUDGE [1] - 1:11
judge [1] - 7:23
judgment [1] - 46:23
judgments [2] - 15:2, 47:20
judicial [1] - 9:8, 59:6, 59:8
July [2] - 67:21, 68:1
June [4] - 68:2, 68:18, 68:19, 68:25
jurisdiction [2] - 51:21, 64:17
juror [1] - 38:2
jury [1] - 5:23
justice [2] - 4:6, 16:22
Justice [4] - 6:21, 11:6, 11:20, 13:7
JUSTICE [1] - 1:15
justify [1] - 8:2

K

Kate [1] - 3:7
KATHERINE [1] - 1:14
keep [3] - 22:13, 32:14, 48:6

keeping [1] - 9:23
keeps [1] - 56:12
Keith [1] - 3:3
KEITH [1] - 1:6
Kevin [2] - 3:8, 3:11
KEVIN [1] - 1:18
key [3] - 9:13, 11:9, 41:6
kicked [2] - 41:10, 41:15
kind [10] - 25:16, 31:5, 32:4, 32:23, 33:19, 36:8, 54:18, 57:1, 68:9
kinds [1] - 29:17
known [5] - 38:10, 43:5, 45:2, 45:9, 49:14
knows [1] - 42:13

L

lack [1] - 16:21
lacks [2] - 6:16, 8:8
lady [3] - 39:15, 39:16, 39:17
language [1] - 41:25
large [1] - 14:8
largely [1] - 11:7
last [7] - 7:18, 7:22, 37:18, 52:24, 53:3, 61:4, 61:20
lastly [1] - 16:8
law [5] - 11:5, 12:7, 16:21, 59:21, 64:2
laws [1] - 45:17
lawyers [1] - 6:15
lead [1] - 65:1
lead-up [1] - 65:1
Learjet [2] - 8:12, 51:6
lease [1] - 45:19
least [10] - 9:24, 24:17, 32:3, 60:15, 63:7, 63:15, 67:11, 67:24, 68:8, 68:13
leave [1] - 33:24, 35:22, 36:11, 37:12, 41:10, 41:15, 64:18, 67:25
leaving [1] - 37:8
left [3] - 36:12, 36:13, 51:21
legitimate [5] - 14:12, 14:13, 44:3, 48:6
legitimately [1] - 52:12
legs [1] - 51:2

**lend** [1] - 47:7
**lenders** [1] - 24:21
**lengths** [1] - 32:7
**lengthy** [2] - 32:9
**less** [4] - 5:5, 35:16, 39:22, 47:14
**letters** [1] - 31:21
**level** [2] - 54:10, 57:3
**liabilities** [8] - 14:25, 30:15, 30:20, 30:23, 30:25, 31:1, 31:5, 47:13
**liable** [2] - 27:7, 46:24, 62:7
**license** [1] - 62:22
**licenses** [1] - 45:18
**lie** [2] - 11:18, 48:23
**lied** [2] - 14:22, 47:11
**lies** [2] - 44:21, 46:5
**life** [2] - 31:18, 53:6
**lifting** [1] - 64:16
**light** [2] - 15:7, 40:11
**likely** [7] - 4:24, 9:11, 9:20, 30:20, 31:2, 47:14
**limited** [2] - 31:17, 37:11
**line** [3] - 47:2, 49:21, 55:6
**link** [1] - 13:9
**Lisa** [1] - 70:12
**LISA** [2] - 2:1, 70:3
**living** [1] - 50:22
**LLC** [4] - 13:21, 13:22
**LLP** [1] - 1:19
**loan** [14] - 15:3, 15:12, 24:8, 28:23, 29:1, 29:4, 29:10, 29:11, 29:14, 29:19, 29:24, 30:6, 61:4, 62:19
**loans** [35] - 19:2, 24:7, 24:10, 24:11, 24:13, 24:16, 24:23, 25:1, 25:3, 25:7, 25:10, 25:14, 25:16, 26:6, 26:9, 26:11, 26:18, 26:20, 27:2, 27:5, 27:8, 28:13, 28:16, 28:17, 46:12, 55:2, 55:5, 55:6, 55:12, 55:13, 55:14, 56:17, 56:21, 57:11, 63:5
**local** [1] - 59:14
**located** [5] - 4:17, 4:22, 5:18, 7:3, 7:5
**location** [4] - 6:3, 34:18, 35:4, 35:7

**lodges** [1] - 44:11
**Look** [1] - 40:2
**look** [13] - 13:8, 20:7, 38:16, 39:8, 40:6, 41:24, 43:22, 44:21, 44:25, 45:12, 45:13, 50:20, 52:19
**looked** [1] - 26:13
**looking** [7] - 4:8, 8:19, 21:7, 61:18, 65:20, 67:9, 68:8
**looks** [3] - 7:20, 16:2, 60:10
**loose** [1] - 55:17
**loosened** [1] - 22:4
**loss** [1] - 52:17
**lost** [2] - 12:25, 38:20
**love** [1] - 68:16
**ludicrous** [1] - 42:9
**lying** [2] - 14:21, 44:20

## M

**ma'am** [5] - 17:10, 34:2, 36:25, 37:14, 58:23
**Main** [1] - 6:21
**main** [1] - 25:23
**maintain** [1] - 42:21
**major** [1] - 7:13
**majority** [4] - 7:1, 19:6, 21:13, 57:9
**manipulate** [1] - 56:1
**manner** [2] - 14:16, 26:14
**March** [2] - 60:8, 60:16
**marshal** [1] - 32:16
**marshals** [1] - 58:13
**Marshals** [2] - 8:9, 51:7
**massive** [1] - 15:13
**material** [2] - 46:2, 66:21
**materially** [1] - 33:9
**Matt** [1] - 3:7
**matter** [6] - 30:14, 32:8, 51:13, 55:15, 58:1, 62:10
**mattered** [1] - 46:3
**MATTHEW** [1] - 1:15
**MCA** [1] - 45:10
**McCarthy** [2] - 1:14, 3:7
**McFADDEN** [1] - 1:10
**mean** [8] - 25:10,

26:1, 35:3, 42:20, 48:12, 55:22, 55:25, 58:13
**meaningful** [1] - 27:22
**means** [6] - 14:5, 16:18, 16:20, 38:9, 43:5, 51:20
**meant** [3] - 22:1, 26:2, 62:7
**measure** [1] - 51:19
**medical** [28] - 25:5, 25:10, 31:10, 31:16, 31:23, 31:25, 32:11, 32:23, 33:4, 33:23, 35:22, 37:11, 49:25, 50:1, 50:16, 50:17, 50:24, 51:3, 51:8, 51:25, 52:3, 52:7, 57:23, 58:2, 58:5, 58:6, 58:17
**medically** [2] - 8:9, 8:13
**meet** [1] - 68:12
**members** [1] - 67:25
**Memorial** [1] - 50:19
**memories** [1] - 9:20
**mentioned** [1] - 9:25
**Merchant** [1] - 45:17
**merchant** [2] - 45:21, 45:22
**merely** [1] - 21:15
**message** [2] - 44:15, 61:12
**messages** [8] - 12:9, 38:16, 40:6, 40:17, 41:4, 43:23, 60:5, 60:10
**method** [2] - 51:6
**MICHELLE** [1] - 1:21
**Michelle** [1] - 3:14
**might** [2] - 39:12, 63:9
**miles** [1] - 36:2
**million** [12] - 15:3, 15:12, 15:17, 24:8, 29:2, 29:9, 29:19, 29:24, 49:21, 52:20, 61:20
**millions** [2] - 48:23, 55:24
**mind** [3] - 10:1, 47:11, 48:6
**mine** [1] - 67:3
**mine-run** [1] - 67:3
**minimize** [1] - 56:1
**minimized** [1] - 37:9
**misleading** [4] - 13:24, 14:17, 15:22, 31:6

**misrepresentations** [3] - 5:11, 5:13, 55:13
**misrepresenting** [1] - 13:25
**misstates** [1] - 14:25
**misunderstanding** [1] - 33:15
**mitigates** [1] - 54:23
**moment** [2] - 30:3, 65:12
**money** [20] - 12:25, 14:9, 15:13, 15:23, 16:18, 26:10, 38:20, 44:7, 44:16, 44:20, 46:6, 46:7, 46:18, 46:19, 47:12, 47:24, 48:7, 49:12, 49:13, 52:17
**monitor** [1] - 36:3
**monitoring** [10] - 34:19, 34:20, 34:23, 35:5, 35:7, 35:11, 35:13, 35:20, 36:7
**month** [2] - 32:24, 65:22
**months** [4] - 7:24, 21:1, 33:2, 53:16
**morning** [7] - 3:6, 3:10, 3:11, 3:16, 3:17, 17:10, 34:5
**most** [9] - 4:25, 10:1, 16:8, 18:14, 31:25, 33:22, 52:1, 54:16, 60:7
**mostly** [1] - 9:4
**MOTION** [1] - 1:10
**motion** [23] - 3:24, 4:2, 8:16, 8:17, 8:21, 9:1, 9:10, 10:6, 10:8, 12:10, 13:2, 13:18, 17:12, 18:3, 22:11, 24:13, 29:2, 29:22, 47:8, 50:9, 59:3, 64:15, 65:19
**motions** [12] - 3:23, 9:7, 64:22, 65:7, 66:15, 67:5, 67:9, 67:14, 68:8, 68:10, 68:16
**motive** [1] - 13:7
**moved** [1] - 31:11
**MR** [30] - 3:6, 3:11, 3:17, 10:10, 10:19, 10:21, 17:5, 37:15, 37:21, 37:25, 39:5, 39:13, 39:17, 42:25, 43:3, 43:9, 46:13, 48:14, 48:18, 50:6, 52:2, 53:19, 64:20, 64:24, 65:16, 65:22,

67:23, 68:3, 68:22, 69:2
**MS** [34] - 17:9, 17:11, 17:16, 17:19, 17:25, 18:3, 18:18, 18:21, 21:5, 21:20, 21:23, 22:17, 23:8, 25:19, 26:5, 26:22, 27:1, 27:15, 27:17, 28:3, 28:7, 37:2, 37:5, 37:7, 54:1, 54:4, 56:5, 56:8, 65:10, 65:13, 65:25, 66:17, 68:5, 68:24
**multi** [1] - 14:10
**multimillion** [1] - 14:10
**multimillion-dollar** [1] - 14:10
**multiple** [8] - 14:6, 20:8, 25:9, 42:4, 44:13, 47:25, 67:1

## N

**nail** [2] - 39:15, 39:17
**name** [3] - 17:7, 24:12, 46:16
**Nancy** [1] - 39:17
**national** [1] - 12:2
**nature** [1] - 28:25
**nearly** [1] - 32:17
**necessarily** [3] - 4:8, 7:9, 29:17
**necessary** [3] - 32:4, 53:23, 65:5
**necessities** [1] - 35:22
**need** [6] - 6:15, 39:19, 50:8, 53:20, 66:12, 66:22
**needed** [3] - 26:2, 26:3, 43:17
**needs** [2] - 51:24, 52:8
**negative** [1] - 12:16
**negotiations** [1] - 28:23
**neutral** [6] - 4:22, 5:7, 5:19, 5:25, 7:12, 9:24
**never** [2] - 25:21, 56:22
**new** [5] - 8:24, 64:19, 66:3, 67:1, 67:5
**New** [1] - 1:16
**next** [3] - 53:16, 65:17, 67:18
**Nicholas** [1] - 3:13
**NICHOLAS** [1] - 1:19

ninth [1] - 7:14
none [4] - 4:7, 26:11, 44:2
nonetheless [1] - 60:15
nonprofit [3] - 11:17, 11:19, 11:25
Northwest [5] - 1:16, 1:20, 1:23, 2:3, 70:14
note [5] - 37:2, 56:5, 57:6, 57:17, 63:19
noted [2] - 7:6, 67:15
notes [2] - 4:25, 70:5
nothing [2] - 34:22, 51:11
notice [2] - 14:3, 14:15
notification [2] - 36:16, 36:18
notify [4] - 13:12, 36:19, 36:21
notifying [1] - 45:6
noting [1] - 28:24
notwithstanding [1] - 57:8
November [1] - 67:19
now's [1] - 37:18
number [6] - 5:2, 7:17, 9:23, 54:9, 54:10, 59:15
numerous [1] - 37:25

**O**

obligation [1] - 33:2
obligations [3] - 35:23, 40:3, 45:24
obsessed [1] - 13:4
obstruct [1] - 38:3
obstruction [7] - 5:11, 52:16, 53:19, 53:22, 54:8, 59:25, 63:21
obstructive [4] - 12:4, 12:13, 43:11, 60:21
obtain [4] - 14:2, 29:14, 45:4, 52:20
obtained [2] - 19:3, 26:19
obtaining [5] - 29:4, 29:10, 45:6, 48:7, 55:12
obviously [7] - 27:18, 27:21, 29:5, 39:11, 66:3, 66:18, 68:7

occurred [4] - 19:7, 19:9, 24:6, 48:22
occurring [1] - 55:1
OF [5] - 1:1, 1:3, 1:10, 1:15, 1:22
offer [2] - 8:4, 45:3
offered [2] - 20:4, 33:8
offering [1] - 10:3
offhand [1] - 8:16
OFFICE [1] - 1:22
office [4] - 6:20, 7:6, 35:11, 42:13
officer [4] - 36:20, 38:2, 59:7, 59:8
OFFICER [7] - 34:5, 34:18, 35:4, 35:18, 36:10, 36:23, 37:1
Official [1] - 2:1
official [1] - 70:12
often [1] - 49:3
old [3] - 9:20, 54:9, 57:7
omission [1] - 31:6
once [1] - 6:25
one [36] - 3:14, 8:17, 9:24, 11:1, 13:24, 16:17, 17:7, 18:25, 19:4, 19:7, 21:4, 24:20, 37:2, 38:1, 40:17, 41:9, 42:13, 42:23, 44:22, 49:4, 49:24, 52:3, 53:20, 54:9, 56:12, 59:8, 59:20, 61:4, 61:20, 61:21, 63:15, 63:24, 64:22, 64:25
one's [1] - 63:23
one-on-one [1] - 42:23
ongoing [5] - 8:23, 31:22, 33:25, 43:18, 61:10
open [1] - 12:4
operate [3] - 27:8, 45:18, 49:16
operated [1] - 51:7
operation [2] - 24:15
operations [1] - 56:20
opportunity [5] - 37:18, 48:22, 51:4, 51:5, 62:16
opposite [2] - 8:7, 14:20
opposition [1] - 22:10
options [2] - 8:10, 35:15
order [16] - 8:13,

13:15, 17:23, 23:6, 23:10, 23:17, 29:14, 30:6, 35:23, 41:13, 44:20, 50:9, 51:4, 57:25, 59:7
ordered [2] - 13:12, 56:23
orders [1] - 53:1
organization [3] - 11:17, 11:19, 11:25
ostensibly [2] - 60:13, 62:8
overwhelming [1] - 10:24, 16:13, 47:9
owed [2] - 47:12, 47:18
own [7] - 23:17, 26:6, 45:18, 47:3, 49:10, 63:24
owned [1] - 51:7
owner [1] - 61:15

**P**

Page [4] - 4:9, 4:13, 43:11, 61:13
pages [1] - 66:5
paid [3] - 24:24, 44:23
paint [1] - 54:7
pandemic [2] - 12:1, 48:22
papers [1] - 15:15
paralegal [1] - 3:9
part [10] - 20:7, 23:19, 25:13, 29:9, 29:10, 29:13, 29:19, 39:25, 56:24, 66:3
partially [1] - 31:11
particular [3] - 32:21, 40:17, 63:4
particularly [5] - 27:18, 32:24, 33:23, 57:24, 63:2
parties [10] - 4:5, 6:14, 14:16, 14:21, 33:6, 44:14, 61:9, 67:7, 67:13, 68:17
parties' [4] - 4:1, 9:8, 9:16, 9:19
partway [1] - 9:7
passed [1] - 62:21
passport [2] - 37:8, 37:12, 51:13
passports [1] - 51:14
past [5] - 19:8, 21:1, 32:17, 54:18, 54:23
patients [2] - 48:20
pattern [7] - 11:2,

18:5, 18:7, 18:23, 20:23, 52:15, 56:11
pay [1] - 63:10
payment [1] - 44:12
payments [1] - 24:23
penalty [1] - 63:9
pending [1] - 59:5
people [5] - 5:11, 36:2, 42:14, 60:13, 61:25
per [2] - 6:11, 7:23
perform [1] - 45:23
perhaps [3] - 9:4, 16:8, 65:22
period [4] - 16:3, 26:16, 32:24, 42:17
periods [3] - 24:4, 32:9
perjured [1] - 47:6
perjuring [1] - 15:10
perjury [1] - 30:13
permissible [2] - 19:21, 20:12
permission [3] - 45:7, 55:19, 62:5
permit [2] - 22:12, 67:13
permutations [1] - 23:5
person [5] - 22:18, 22:21, 38:10, 43:5, 59:13
personal [19] - 26:6, 26:11, 27:3, 27:6, 30:23, 30:25, 36:2, 46:11, 46:12, 46:15, 46:16, 46:19, 46:20, 47:4, 47:21, 55:7, 61:18, 62:12
personally [10] - 26:24, 27:7, 29:13, 46:21, 46:23, 55:22, 55:24, 61:19, 62:6
persons [1] - 45:22
persuade [1] - 13:6
Peterson [3] - 3:14, 7:7, 22:14
PETERSON [1] - 1:21
physical [3] - 58:14, 64:7, 64:10
physically [1] - 58:21
physician [1] - 31:20
pick [2] - 66:23, 67:6
pittance [1] - 14:8
place [5] - 5:7, 5:8, 7:12, 8:8, 35:20
Plaintiff [1] - 1:4
plan [1] - 8:12
platform [1] - 41:12

plausible [1] - 42:15
playing [2] - 36:23, 55:17
pleadings [2] - 4:2, 58:3
plenty [2] - 51:13, 51:22
podium [1] - 37:6
point [49] - 5:5, 6:19, 9:11, 10:2, 15:17, 15:19, 17:19, 19:18, 21:1, 22:12, 24:16, 25:15, 26:21, 30:11, 33:16, 33:18, 34:7, 37:16, 43:2, 47:5, 47:10, 48:13, 48:18, 48:21, 48:24, 49:1, 49:6, 49:12, 49:24, 50:4, 50:16, 51:24, 52:10, 54:9, 57:8, 59:25, 61:16, 61:22, 62:10, 62:14, 64:23, 64:25, 65:3, 65:6, 65:18, 66:20, 67:4, 67:14
pointed [1] - 61:2
points [9] - 5:15, 5:19, 24:4, 52:3, 55:14, 57:7, 58:6, 60:2, 60:5
poor [1] - 52:4
portraying [1] - 18:22
portrays [2] - 18:4, 29:1
pose [1] - 64:14
poses [2] - 64:5, 64:7
position [6] - 9:17, 20:14, 48:12, 48:16, 65:4, 66:15
possible [2] - 4:21, 67:24
possibly [3] - 59:23, 60:21, 63:8
post [1] - 52:16
post-indictment [1] - 52:16
Postal [2] - 3:8, 10:13
postal [1] - 39:21
potentially [2] - 23:5, 50:6
power [1] - 45:23
practical [2] - 62:10
practice [3] - 65:19, 67:14, 68:12
preceding [2] - 68:12, 68:15
preclear [1] - 26:1

**preclearance** [1] - 26:1

**prefer** [2] - 17:20, 66:1

**prejudice** [2] - 9:18, 10:2

**preliminarily** [1] - 28:25

**preliminary** [1] - 30:14

**prepare** [1] - 65:17

**prepared** [2] - 4:2, 6:25

**preponderance** [1] - 50:12

**prescribe** [1] - 52:5

**prescribes** [1] - 8:19

**present** [4] - 22:10, 42:3, 42:8, 42:10

**presented** [1] - 34:10

**presently** [1] - 45:20

**presumably** [1] - 5:20

**presume** [1] - 6:9

**PRETRIAL** [1] - 1:25

**Pretrial** [3] - 34:6, 34:14, 62:25

**pretrial** [9] - 6:18, 8:5, 9:7, 34:7, 59:4, 65:9, 65:17, 65:23, 67:19

**pretty** [1] - 63:15

**prevent** [2] - 51:12, 53:15

**preventative** [1] - 51:19

**previous** [2] - 33:5, 33:6

**previously** [4] - 15:16, 21:10, 21:11, 33:9

**price** [2] - 13:8, 13:10

**primarily** [4] - 17:12, 18:4, 18:25, 54:9

**primary** [2] - 31:20, 57:6

**private** [4] - 44:10, 51:6, 51:15

**privy** [1] - 56:10

**probable** [3] - 59:12, 59:24, 60:20

**Probation** [2] - 52:23, 56:3

**PROBATION** [7] - 34:5, 34:18, 35:4, 35:18, 36:10, 36:23, 37:1

**problem** [1] - 53:5

**problematic** [1] -

60:10

**problems** [2] - 8:23, 9:13

**proceed** [2] - 17:20, 51:10

**proceeding** [4] - 3:20, 10:9, 17:25, 47:16

**Proceedings** [1] - 69:3

**proceedings** [2] - 59:1, 70:6

**produced** [2] - 28:15, 70:6

**product** [3] - 28:11, 39:24, 40:11

**productions** [1] - 28:9

**professionals** [1] - 32:23

**proffered** [1] - 10:16

**proffering** [1] - 10:12

**prohibited** [3] - 19:23, 22:21, 23:21

**prohibiting** [1] - 42:22

**prohibition** [2] - 46:10, 60:14

**promptly** [1] - 25:8

**prong** [1] - 64:10

**properties** [1] - 45:19

**propose** [1] - 10:9

**proposed** [1] - 68:16

**prosecution** [4] - 22:19, 38:11, 43:7, 53:6

**prosecutors** [2] - 6:22, 6:23

**provide** [5] - 13:16, 14:3, 14:14, 29:11, 52:7

**provided** [2] - 18:21, 30:24

**provides** [1] - 59:6

**provision** [1] - 33:5

**provisions** [1] - 26:20

**public** [6] - 9:15, 10:3, 30:17, 30:21, 31:3, 47:15

**PUBLIC** [1] - 1:22

**public's** [1] - 9:14

**publicly** [1] - 28:22

**purchasing** [1] - 28:11

**purported** [1] - 61:20

**purpose** [1] - 31:7

**purposes** [4] - 3:21, 8:22, 30:14, 52:18

**push** [2] - 41:11, 68:7

**put** [5] - 17:17, 18:12, 18:13, 35:1, 47:4

## Q

**qualify** [2] - 30:21, 31:3

**quality** [1] - 53:6

**questioning** [1] - 36:14

**questions** [3] - 37:23, 39:23, 40:4

**Quinn** [1] - 4:13

**quite** [6] - 5:2, 38:17, 42:1, 42:11, 59:23, 63:8

**quote** [1] - 23:1

## R

**Rachel** [1] - 3:9

**raise** [3] - 44:8, 44:16, 48:23

**raised** [2] - 22:23, 59:15

**raises** [1] - 18:8

**raising** [1] - 66:21

**rather** [3] - 56:1, 56:2, 62:24

**RDR** [3] - 2:1, 70:3, 70:12

**reactive** [1] - 34:22, 35:11

**reading** [1] - 60:12

**real** [2] - 61:23, 63:7

**really** [10] - 6:5, 11:2, 27:22, 33:24, 35:8, 49:15, 49:19, 61:10, 63:14, 66:20

**realtime** [1] - 36:7

**reap** [1] - 61:18

**reason** [8] - 15:14, 16:11, 16:16, 25:2, 28:17, 41:16, 47:10, 50:10

**reasonable** [3] - 5:3, 26:7, 26:12

**reasonably** [3] - 33:7, 57:16, 57:18

**reasons** [1] - 16:24

**receive** [2] - 25:10, 58:9

**received** [6] - 5:23, 24:14, 26:15, 28:12, 55:5, 57:4

**receives** [1] - 56:13

**receiving** [1] - 58:18

**recent** [4] - 31:25, 50:17, 57:8, 60:7

**recently** [2] - 27:18, 61:5

**recess** [1] - 58:25

**recognition** [2] - 34:20, 35:2

**recognize** [1] - 67:2

**recommendation** [3] - 34:7, 34:10, 34:15

**record** [5] - 3:5, 16:9, 31:25, 49:14, 55:3

**records** [9] - 5:18, 5:21, 31:16, 31:23, 50:17, 50:18, 50:20, 58:5, 66:13

**recover** [2] - 46:18, 46:19

**refer** [1] - 22:22

**referenced** [1] - 49:7

**references** [1] - 20:8

**referencing** [1] - 41:14

**regarding** [1] - 10:7

**regardless** [12] - 9:16, 15:24, 23:3, 23:5, 32:6, 46:25, 47:2, 53:13, 54:20, 56:15, 60:17, 62:2

**regular** [1] - 25:10

**Reilly** [1] - 3:7

**REILLY** [1] - 1:15

**reject** [1] - 8:15

**related** [2] - 30:13, 39:24

**relates** [1] - 26:19

**relationship** [1] - 39:21

**relatively** [1] - 6:11

**release** [21] - 10:23, 21:19, 21:21, 23:4, 25:18, 35:19, 59:4, 59:10, 59:14, 59:23, 60:12, 60:17, 60:19, 62:3, 62:9, 62:23, 63:1, 63:12, 63:15, 63:17, 64:2

**released** [1] - 8:5

**relevance** [3] - 47:13, 47:16, 48:5

**relevant** [1] - 5:17, 5:24, 21:19, 21:21, 32:11, 48:25, 50:6, 52:25, 60:25, 63:9

**reliable** [1] - 51:6

**relies** [3] - 17:12, 18:3, 19:11

**remain** [2] - 6:9, 6:17

**receives** — **remember** [2] - 39:11, 42:19

**remind** [2] - 21:18, 34:16

**remotely** [1] - 3:21

**repay** [4] - 24:18, 25:8, 55:12, 57:11

**repaying** [1] - 26:10

**repayments** [2] - 25:4, 28:15

**repeated** [3] - 38:17, 38:18

**repeatedly** [4] - 13:16, 16:6, 33:14, 53:7

**reply** [4] - 13:18, 37:22, 41:14, 54:17

**REPORTED** [1] - 2:1

**REPORTER** [2] - 21:3, 39:16

**Reporter** [2] - 2:1, 70:12

**reports** [1] - 28:21

**representation** [1] - 24:13

**representations** [4] - 45:15, 45:16, 49:23, 55:3

**represented** [1] - 22:8

**request** [2] - 60:8, 60:16

**requested** [2] - 22:3, 24:14

**requesting** [1] - 64:23

**require** [2] - 55:7, 56:21

**required** [7] - 14:2, 19:14, 20:1, 23:18, 28:19, 45:4, 63:1

**requirement** [5] - 21:24, 22:1, 25:25, 45:10, 57:5

**requirements** [10] - 19:15, 19:17, 19:19, 20:10, 20:11, 20:22, 28:20, 33:8, 33:21, 33:22

**requires** [3] - 31:22, 32:1, 58:6

**residence** [5] - 4:20, 35:22, 36:11, 36:12, 36:13

**resolve** [1] - 12:1

**resolved** [1] - 9:6

**resources** [3] - 9:8, 32:19, 57:22

**respect** [13] - 16:21, 20:22, 23:12, 24:4,

24:8, 24:10, 28:16, 28:23, 38:13, 47:13, 55:2, 56:16
**responds** [1] - 5:10
**responsible** [1] - 26:25
**restrictive** [1] - 58:2
**result** [1] - 30:16
**resume** [3] - 33:5, 58:17, 58:22
**resuming** [1] - 33:6
**resurrect** [2] - 27:17, 27:20
**resurrection** [1] - 49:20
**resuscitate** [2] - 29:25, 30:4
**resuscitating** [1] - 62:20
**retaliate** [1] - 38:6
**return** [4] - 10:4, 58:17, 65:8, 65:15
**review** [2] - 66:4, 66:12
**reviewed** [1] - 4:1
**reviewing** [1] - 66:21
**REVOCATION** [1] - 1:10
**revocation** [3] - 13:2, 13:18, 59:7
**revoke** [8] - 12:10, 31:11, 53:21, 59:3, 59:4, 59:12, 60:4, 60:25
**rhetoric** [1] - 54:7
**rightly** [1] - 5:19
**rise** [1] - 54:10
**risk** [7] - 15:24, 31:13, 32:13, 35:15, 53:14, 53:17, 64:5
**role** [1] - 27:4
**room** [1] - 58:12
**Room** [1] - 2:3
**round** [3] - 64:22, 64:25, 65:1
**rounds** [2] - 65:3, 67:1
**ruin** [1] - 39:20
**rule** [1] - 4:3
**Rule** [4] - 4:4, 8:20, 34:12, 57:17
**Rules** [1] - 8:17
**rules** [1] - 8:19
**run** [17] - 6:4, 6:21, 15:19, 15:21, 23:17, 25:24, 26:14, 29:25, 43:17, 51:22, 55:9, 55:11, 56:17, 56:20, 57:9, 57:13, 67:3
**running** [11] - 6:8,

23:10, 23:24, 26:8, 27:11, 27:24, 48:21, 49:19, 51:23, 57:20, 62:16
**runs** [2] - 27:23, 46:2

## S

**safe** [2] - 8:13, 51:6
**safely** [2] - 32:5, 51:9
**sale** [2] - 13:13, 14:1
**sales** [2] - 13:23, 14:6
**salient** [1] - 10:1
**satisfied** [1] - 16:25
**satisfies** [1] - 59:16
**saw** [2] - 20:15, 48:22
**schedule** [5] - 64:19, 66:1, 66:11, 67:14, 68:17
**scheduled** [1] - 65:9
**scheme** [1] - 44:12
**Schuck** [2] - 34:3, 34:6
**SCHUCK** [1] - 1:25
**se** [1] - 6:11
**SEC** [6] - 5:12, 5:14, 5:23, 11:5, 11:24, 28:19
**second** [10] - 3:24, 4:21, 9:18, 12:3, 16:20, 19:1, 24:2, 24:8, 52:10, 55:2
**SECTION** [1] - 1:16
**Section** [3] - 45:21, 50:2, 59:6
**see** [18] - 3:18, 18:15, 18:24, 20:8, 23:14, 34:3, 35:25, 36:6, 36:8, 36:22, 41:3, 41:5, 43:13, 49:7, 53:10, 61:14, 67:10, 68:25
**seek** [2] - 13:12, 14:15
**seeking** [5] - 15:16, 15:17, 15:18, 46:11, 66:15
**seem** [2] - 51:25, 60:22
**sell** [4] - 40:25, 55:18, 62:4
**selling** [2] - 12:19, 45:5
**send** [1] - 15:9
**sending** [1] - 54:14
**sense** [3] - 18:14, 33:3, 68:17

**sent** [1] - 15:8
**sentencing** [1] - 52:18
**separate** [1] - 13:11
**serially** [1] - 53:7
**series** [3] - 24:7, 25:13, 47:23
**serious** [1] - 53:5
**served** [1] - 33:6
**Service** [2] - 8:10, 51:7
**service** [1] - 29:15
**SERVICES** [1] - 1:25
**Services** [3] - 34:6, 34:14, 62:25
**Services'** [1] - 34:7
**serving** [2] - 38:23, 43:21
**set** [3] - 66:2, 66:11, 67:14
**setting** [1] - 20:2, 68:19
**seventh** [1] - 7:2
**several** [1] - 9:20
**severely** [1] - 37:11
**shall** [2] - 59:7, 62:4
**share** [1] - 67:8
**shareholders** [1] - 60:14
**shares** [1] - 41:1
**shell** [2] - 28:5, 28:18
**short** [1] - 6:11
**shorts** [1] - 29:10
**show** [5] - 16:25, 17:1, 31:17, 33:2, 58:6
**showing** [1] - 4:11
**shown** [2] - 20:21, 33:20
**shows** [1] - 54:21, 57:3
**side** [1] - 61:24
**sides** [1] - 7:1
**sides'** [1] - 5:15
**sign** [1] - 56:21
**signed** [1] - 15:12
**significance** [1] - 48:1
**significant** [3] - 20:15, 20:19, 52:11
**significantly** [2] - 31:17, 37:9
**signing** [3] - 45:22, 46:16, 61:14
**signs** [1] - 45:16
**silly** [1] - 42:1
**similarly** [2] - 29:8, 29:10
**simple** [1] - 38:15

**simply** [12] - 20:24, 21:8, 29:3, 29:6, 33:12, 46:1, 50:1, 50:13, 51:11, 51:20, 54:25, 58:16
**single** [2] - 54:17, 58:11
**sitting** [1] - 42:12
**situation** [4] - 14:14, 26:13, 55:23, 66:25
**six** [7] - 13:16, 13:20, 24:20, 28:16, 47:25, 61:2
**sixth** [1] - 6:13
**skirt** [1] - 56:4
**slightly** [1] - 56:16
**small** [1] - 15:21
**sold** [1] - 48:19
**solely** [1] - 60:4
**solution** [1] - 12:1
**someone** [4] - 27:9, 33:14, 36:6, 57:2
**sometimes** [4] - 51:15, 51:16, 51:17
**somewhere** [1] - 52:8
**sorry** [7] - 17:14, 21:3, 21:20, 26:21, 27:15, 45:21, 59:3
**sort** [5] - 23:22, 30:10, 47:7, 55:8, 56:22
**sorts** [1] - 27:2
**special** [1] - 8:1
**specifically** [5] - 5:12, 12:5, 21:11, 43:10, 62:4
**speedy** [2] - 9:14, 9:16
**spend** [1] - 66:20
**spin** [1] - 57:19
**spring** [1] - 65:3
**stack** [1] - 14:5
**stacking** [1] - 26:19
**staff** [1] - 51:8
**staffed** [1] - 51:8
**stairs** [1] - 50:21
**stake** [1] - 47:4
**stale** [3] - 17:13, 18:4, 20:18
**staleness** [1] - 60:24
**standalone** [5] - 34:19, 34:20, 35:12, 48:2
**standard** [6] - 27:2, 29:16, 50:11, 55:6, 57:17, 59:16
**standards** [1] - 16:25
**stands** [1] - 11:7
**start** [2] - 36:14,

48:25
**starting** [3] - 3:5, 9:7, 19:4
**starts** [1] - 49:15
**state** [10] - 21:15, 23:11, 47:11, 48:5, 48:11, 54:12, 54:13, 55:4, 59:13, 62:18
**statements** [3] - 13:24, 14:17, 15:22
**States** [6] - 2:2, 3:2, 3:8, 4:8, 4:13, 70:13
**STATES** [3] - 1:1, 1:3, 1:11
**status** [10] - 6:6, 23:15, 65:20, 66:24, 67:6, 67:12, 67:15, 67:16, 67:22, 68:19
**stay** [2] - 50:19, 64:16
**steal** [2] - 29:2, 44:19
**steals** [1] - 44:17
**stenographic** [1] - 70:5
**step** [2] - 26:3, 36:1
**steps** [1] - 20:16
**still** [11] - 9:3, 25:17, 27:3, 27:13, 27:16, 27:23, 27:24, 28:10, 28:11, 30:11
**stock** [7] - 12:19, 13:8, 13:10, 29:11, 29:23, 41:1, 41:25
**stop** [2] - 12:16, 41:13
**stopped** [1] - 41:16
**stops** [3] - 41:7, 41:8
**Street** [1] - 1:20
**strict** [1] - 63:15
**strips** [1] - 48:19
**strongly** [3] - 29:5, 54:23, 61:22
**struggled** [1] - 42:20
**struggling** [1] - 61:9
**stunning** [1] - 38:17
**subject** [2] - 38:11, 43:6
**submission** [2] - 10:25, 11:15
**submissions** [2] - 11:8, 24:19
**submit** [2] - 18:9, 65:11
**submits** [2] - 15:12, 54:7
**submitted** [15] - 5:22, 10:24, 12:10, 13:2, 13:17, 15:5, 16:14, 21:8, 21:14, 33:13, 50:17, 53:11,

55:4, 58:8, 66:5
**submitting** [1] -
15:11
**substantially** [1] -
7:4
**successfully** [1] -
23:24
**suddenly** [1] - 9:2
**suffer** [1] - 6:2
**suffered** [1] - 8:23
**suffering** [1] - 25:6
**sufficient** [1] - 8:9
**suggest** [5] - 16:10,
23:3, 42:9, 52:6, 58:3
**suggested** [1] - 30:3
**suggesting** [3] -
43:17, 65:8, 65:14
**suggestion** [3] -
23:9, 55:21, 62:12
**suggestive** [1] -
61:23
**suggests** [2] - 29:22,
58:14
**Suite** [1] - 1:23
**sum** [1] - 14:8
**summer** [2] - 66:24,
67:7
**supervising** [2] -
36:20, 52:23
**supervision** [1] -
36:18
**support** [4] - 8:4,
13:19, 39:2, 44:3
**supports** [1] - 48:3
**suppose** [1] - 55:22
**supposed** [4] - 5:13,
34:25, 42:14, 42:17
**surprised** [1] - 27:25
**surprising** [1] - 25:1
**surprisingly** [2] -
14:7, 24:25
**surrender** [1] - 51:14
**surveillance** [1] -
58:12
**sustain** [1] - 58:14
**swamped** [2] - 7:21,
7:22
**switch** [1] - 6:23
**system** [1] - 16:22

## T

**table** [1] - 3:14
**tamper** [1] - 38:5
**tampering** [8] - 23:3,
39:7, 52:16, 54:8,
54:14, 59:25, 60:21,
63:21
**targeted** [1] - 30:23

**team** [2] - 51:25,
67:25
**technical** [2] - 30:22,
47:7
**technology** [5] -
35:5, 35:8, 35:12,
35:23, 35:25
**telephone** [1] - 36:24
**ten** [1] - 4:7
**tenders** [1] - 18:19
**tension** [3] - 23:8,
42:21, 56:19
**tenth** [1] - 8:1
**Tenth** [1] - 1:20
**terms** [4] - 19:19,
20:10, 21:1, 51:11
**test** [1] - 11:20
**testifying** [1] - 38:22
**testimonial** [1] - 16:4
**testing** [1] - 48:19
**text** [8] - 12:9, 38:16,
40:6, 40:17, 41:3,
43:22, 44:15, 61:12
**texting** [1] - 42:14
**THE** [86] - 1:1, 1:10,
1:14, 1:18, 1:22, 3:1,
3:10, 3:16, 3:18, 3:22,
3:23, 10:17, 10:20,
17:3, 17:7, 17:10,
17:14, 17:17, 17:22,
18:2, 18:12, 18:20,
21:3, 21:4, 21:18,
21:21, 22:16, 23:2,
25:15, 25:25, 26:21,
26:23, 27:13, 27:16,
27:25, 28:4, 34:2,
34:5, 34:16, 34:18,
35:3, 35:4, 35:14,
35:18, 36:5, 36:10,
36:22, 36:23, 36:25,
37:1, 37:4, 37:6,
37:14, 37:17, 37:24,
39:4, 39:10, 39:16,
42:19, 43:2, 43:8,
46:8, 48:10, 48:15,
50:3, 51:23, 53:17,
53:20, 54:3, 55:16,
56:7, 58:23, 59:2,
64:21, 65:8, 65:12,
65:14, 65:20, 65:24,
66:14, 66:23, 68:2,
68:4, 68:6, 68:23,
68:25
**theft** [1] - 29:6
**themselves** [4] -
21:12, 22:15, 38:20,
60:18
**theory** [1] - 54:19
**therefore** [3] - 10:5,
63:18, 64:15

**Thereupon** [1] -
58:25
**thinking** [3] - 39:11,
44:6, 68:14
**third** [1] - 5:6
**thousands** [4] -
14:11, 15:1, 15:16,
47:19
**three** [3] - 11:1, 11:4,
54:4
**throughout** [2] -
40:16, 41:3
**tied** [1] - 52:1
**ties** [1] - 40:19
**timeline** [2] - 18:10,
20:24
**timing** [1] - 20:17
**Title** [1] - 59:6
**today** [2] - 18:8, 58:3
**today's** [1] - 3:21
**together** [2] - 9:1,
9:22
**took** [6] - 5:7, 5:8,
7:23, 24:16, 25:3,
25:7
**towards** [2] - 36:6,
37:10
**Towers** [2] - 3:8,
10:13
**tracked** [1] - 36:2
**tradeoffs** [2] - 32:14,
33:3
**transactions** [1] -
56:23
**transcript** [4] -
43:12, 58:8, 70:5,
70:6
**TRANSCRIPT** [1] -
1:10
**transfer** [24] - 3:24,
4:2, 4:4, 4:12, 4:18,
6:14, 7:4, 7:10, 7:15,
8:2, 8:3, 8:5, 8:12,
8:14, 8:17, 9:4, 9:22,
9:25, 10:6, 13:14,
29:17, 32:7, 62:4,
64:17
**transferred** [2] - 6:2,
6:24
**transferring** [3] -
9:10, 10:2, 45:5
**transfers** [1] - 61:20
**transported** [1] -
51:5
**travel** [1] - 32:5
**treatment** [2] - 32:4,
33:25
**TREVOR** [1] - 1:10
**trial** [19] - 6:10, 6:11,
6:16, 6:25, 7:12, 9:11,

9:15, 13:5, 15:20,
45:3, 51:10, 59:5,
64:19, 64:22, 65:1,
65:15, 65:18, 66:9,
67:19
**trials** [1] - 9:16
**tried** [6] - 13:5,
46:17, 46:18, 49:20,
52:19
**tries** [2] - 19:13,
38:14
**true** [6] - 30:1, 43:20,
46:1, 54:21, 70:4,
70:5
**truthful** [1] - 14:16
**try** [4] - 6:6, 9:19,
27:20, 35:16
**trying** [17] - 11:25,
15:9, 16:19, 28:4,
39:7, 39:20, 40:2,
40:3, 40:4, 40:20,
40:23, 42:21, 48:8,
49:13, 55:25, 56:4,
57:13
**turn** [1] - 4:15
**turning** [3] - 6:13,
7:11, 24:2
**turns** [1] - 6:5
**twice** [1] - 32:1
**two** [18] - 3:23, 7:23,
9:13, 10:22, 11:2,
14:4, 18:25, 22:9,
24:3, 24:4, 39:18,
52:2, 52:24, 53:3,
54:10, 59:10, 60:13,
65:3
**twofold** [1] - 16:17
**tying** [1] - 63:8
**type** [4] - 11:22,
35:4, 35:7, 63:20
**types** [3] - 29:16,
55:6, 63:22
**typically** [1] - 4:7

## U

**U.S** [3] - 1:15, 51:7,
58:12
**ultimately** [9] - 24:1,
25:9, 28:21, 30:8,
30:9, 55:7, 55:14,
56:11, 58:16
**unable** [3] - 25:8,
32:5, 58:20
**uncomfortable** [1] -
39:19
**uncover** [1] - 47:22
**under** [7] - 4:4,
35:16, 44:6, 45:24,

50:2, 58:12, 63:14
**underlying** [1] - 66:4
**undermines** [1] -
20:13
**understandable** [1] -
30:24
**understood** [6] -
26:7, 26:13, 27:3,
27:5, 27:10, 56:22
**underwriting** [1] -
27:4
**underwrote** [1] -
26:23
**undeterred** [1] -
12:22
**unexecuted** [1] -
61:4
**unfortunately** [3] -
44:7, 56:5, 63:22
**UNITED** [3] - 1:1,
1:3, 1:11
**united** [1] - 2:2
**United** [5] - 3:2, 3:8,
4:8, 4:13, 70:13
**unlawful** [2] - 16:19,
42:22
**unlawfully** [1] -
47:23
**unless** [1] - 17:20
**unlikelihood** [1] -
11:10
**unlikely** [4] - 17:1,
48:3, 59:10, 63:18
**untimely** [1] - 8:16
**up** [9] - 11:25, 18:16,
51:1, 55:23, 58:10,
63:8, 65:1, 66:9,
66:19
**updating** [1] - 23:14
**uses** [1] - 54:6

## V

**vacate** [1] - 67:16
**valid** [1] - 45:17
**value** [1] - 29:20
**valued** [4] - 13:14,
45:5, 55:19, 62:5
**variety** [1] - 16:7
**various** [6] - 22:12,
42:2, 59:17, 60:5,
63:13, 64:8
**vast** [1] - 21:13
**vastly** [1] - 14:25
**versus** [3] - 3:2, 4:9,
4:13
**via** [2] - 3:19, 8:12
**viable** [1] - 8:10
**Victim** [21] - 11:17,

12:6, 13:1, 21:10, 39:14, 39:23, 40:1, 40:18, 40:19, 40:21, 40:22, 40:25, 44:5, 59:17, 59:18, 60:6, 60:7, 60:9

**victim** [7] - 4:5, 5:13, 22:18, 38:6, 38:10, 43:6, 45:1

**victimized** [2] - 46:17, 53:8

**victims** [15] - 16:5, 21:12, 38:19, 38:20, 39:1, 40:9, 41:9, 41:11, 42:2, 43:25, 53:7, 59:20, 60:6, 63:7

**video** [1] - 3:19

**view** [1] - 8:21

**viewed** [1] - 30:24

**violated** [3] - 16:6, 50:12, 59:9

**violates** [1] - 10:23

**violating** [1] - 62:8

**violation** [11] - 11:10, 17:1, 25:17, 30:22, 42:16, 47:7, 48:2, 54:22, 60:17, 62:3, 63:12

**violations** [6] - 24:2, 42:7, 59:22, 60:19, 63:14, 63:25

**violence** [1] - 64:10

**voice** [2] - 34:20, 35:1

**voluminous** [1] - 66:12

**vs** [1] - 1:5

## W

**walk** [2] - 58:4, 58:11

**walked** [1] - 53:12

**walking** [1] - 51:17

**wants** [2] - 27:24, 58:16

**warning** [1] - 63:16

**warrant** [2] - 4:12, 34:12

**warranted** [1] - 67:4

**warrants** [2] - 58:21, 66:2

**wash** [1] - 5:16

**Washington** [7] - 1:6, 1:17, 1:20, 1:24, 2:4, 51:9, 70:14

**waste** [1] - 9:8

**watching** [2] - 52:22

**ways** [3] - 7:21, 16:7,

29:21

**weak** [1] - 13:7

**wear** [1] - 53:1

**week** [4] - 67:24, 68:13, 68:15

**weeks** [1] - 25:9

**weigh** [1] - 4:7

**weighs** [1] - 4:17

**weight** [2] - 47:8

**well-taken** [1] - 5:15

**White** [1] - 50:19

**wholly** [2] - 19:23, 23:21

**willing** [2] - 20:21, 67:4

**willingness** [2] - 33:20, 58:19

**win** [1] - 50:9

**wish** [1] - 34:4

**witness** [15] - 17:17, 17:18, 17:24, 22:19, 23:3, 38:2, 38:6, 38:10, 38:23, 39:7, 43:6, 52:16, 59:25, 60:21, 63:21

**witnesses** [9] - 4:6, 4:21, 4:24, 4:25, 5:3, 5:4, 12:8, 16:5, 55:1

**witnesses'** [1] - 9:20

**word** [2] - 28:6, 37:18

**words** [2] - 13:3, 49:10

**world** [1] - 54:15

**worse** [1] - 42:11

**worth** [2] - 29:9, 29:23

**wound** [1] - 32:1

**write** [2] - 42:3, 42:8

**writes** [4] - 41:24, 42:2, 42:3, 42:4

**writing** [2] - 41:25, 42:8

**written** [4] - 10:25, 15:10, 21:11, 22:25

## X

**XENAKIS** [1] - 1:19

**Xenakis** [1] - 3:13

## Y

**year** [10] - 7:22, 19:7, 19:9, 54:9, 54:18, 54:23, 57:7, 58:18, 60:23, 61:5

**years** [7] - 7:18, 9:20,

10:22, 52:24, 53:3, 61:4, 63:14

**York** [1] - 1:16

**yourselves** [1] - 3:5

## Z

**zero** [1] - 49:5