# EXHIBIT B

H1CTAFRC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          16 CR 377 (PAE)

JOHN AFRIYIE,

               Defendant.

------------------------------x

                                        New York, N.Y.
                                        January 12, 2017
                                        4:00 p.m.


Before:

                    HON. PAUL A. ENGELMAYER,

                                        District Judge


                        APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
EDWARD IMPERATORE
CHRISTINE MAGDO
     Assistant United States Attorneys

EZRA SPILKE
     Attorney for Defendant

BLANK ROME
     Attorneys for Defendant
SUSAN WOLFE

H1CTAFRC

```
 1              (In open court, case called)
 2              MR. IMPERATORE:  Good afternoon, your Honor, Edward
 3    Imperatore and Christine Magdo for the government, and with us
 4    at counsel table is Special Agent Michael Savona from the FBI,
 5    and Mary Diaz, a paralegal with our office.
 6              THE COURT:  Good afternoon all.
 7              MR. SPILKE:  Good afternoon, your Honor, Ezra Spilke
 8    for John Afriyie.
 9              MS. WOLFE:  Good afternoon, Judge, Susan Wolfe, also
10    for Mr. Afriyie.
11              THE COURT:  Good afternoon to both of you, and good
12    afternoon to you, Mr. Afriyie.  Happy new year to everyone.
13              This is our final pretrial conference in the case, and
14    I have a handful of items to take up with you.  Let me give you
15    the sequence that I would like to go in today.
16              To begin with, I just want to get a refreshed estimate
17    of the length of the trial and discuss my thinking on whether
18    to sit on the Friday of the trial week, which I have left
19    unresolved as of now.
20              Second, I want to read to you the proposed description
21    of the case that I would use for voir dire purposes and see if
22    anyone has any tweaks to make to that.
23              Third, I have, by my tally, four different motions in
24    limine all made by the defense that are unresolved, and I want
25    to briefly engage with you on each of them and ideally rule
```

Case 1:20-cr-00278-TNM-Document-144-2-Filed-10/19/23-Page-4-of-57
Case 1:15-cr-00379-PKC-Document-125-Filed-11/25/19-Page-3-Page-1-of-57 #: 3874

1    today on all of them.

2             Finally, a handful of courtroom mechanics, issues

3    relating to the trial.

4             So with that, let's begin just with the length of the

5    trial.  What's the government's present estimate, cradle to

6    grave, of the length of trial?

7             MR. IMPERATORE:  Your Honor, the government estimates

8    it will take roughly one week.

9             THE COURT:  Put that in day terms.

10            MR. IMPERATORE:  We think it would be roughly five

11   trial days, your Honor, four or five trial days.  We think that

12   that would obviously depend on the length of cross-examination.

13            THE COURT:  When you say trial days, you mean voir

14   dire, closing arguments, everything in five days?

15            MR. IMPERATORE:  Yes.

16            THE COURT:  Not just receipt of evidence.

17            MR. IMPERATORE:  Correct.  So in that regard, I think

18   we would encourage the Court to consider sitting on Friday.  It

19   may facilitate resolving the case in one week.

20            THE COURT:  Right.

21            MR. IMPERATORE:  And in that regard, I wanted to note

22   also, your Honor, that in the spirit of conserving the Court's

23   and the jury's time, we have proposed various stipulations to

24   defense counsel.  We provided roughly five stipulations to

25   counsel today to sign.  We understand we have an agreement in

Case 1:20-cr-00278-TNM Document 144-2 Filed 10/19/23 Page 5 of 57
Case 1:20-cr-00278-TNM Document 123 Filed 01/26/23 Page 4 of 450 #: 3875

1    principle for those to be signed, business records

2    stipulations, and so with the defense signature on those, we

3    think that that will further conserve the Court's time.

4              THE COURT:  Good.  Obviously I can't force you or

5    anyone to stipulate, but I am always delighted to hear that and

6    think the juries appreciate it.

7              I don't want you to tip your hand any more than you're

8    doing, but can you give me some more texture to what the

9    government's case looks like?

10             MR. IMPERATORE:  May I have a moment, your Honor?

11             THE COURT:  Yes.

12             MR. IMPERATORE:  Your Honor, the government's case in

13   chief would consist principally of the testimony of a number of

14   employees at MSD Capital, as well as the case agent or the

15   former case agent, and Deborah Oremland.

16             THE COURT:  So assuming you get the stipulations you

17   are seeking, how many witnesses do you expect?

18             MR. IMPERATORE:  We would estimate approximately

19   seven, your Honor, if the stipulations are signed.

20             THE COURT:  Thank you.

21             All right.  Mr. Spilke, I'm mindful that you are not

22   controlling the government's case here, but you may have a

23   different perspective on things.  Do you have a different

24   estimate, I guess, of the overall length of the trial?

25             MR. SPILKE:  As to the government's list of witnesses,

1    I'm hearing it now for the first time, so but as far as our

2    case, you're saying?

3            THE COURT:  Well, I am not trying to make you make any

4    disclosures you don't want to make, but you know more about the

5    case than anybody other than the government table, so do you

6    have a different perspective on the estimate of the length of

7    the case?  Do you have a sense of what you're going to aim to

8    do in cross?  I'm not asking you to reveal substance, just to

9    tell me whether the estimates were on target or were off

10   target, as you see it.

11           MR. SPILKE:  I believe that's pretty close to the

12   target.  We haven't determined whether we're going to call

13   anyone yet.  It may be slightly longer than the government

14   anticipates, however, we have been cooperative with

15   stipulations and that may shorten things.

16           THE COURT:  Good.  It seems to me then that, although

17   I have got a lot of things scheduled on that Friday, they tend

18   to be movable things, and my instinct with Mr. Imperatore is

19   that it's the better part of valor to sit on the Friday and to

20   try to get the case over with if we possibly can on that

21   Friday.  The jury will do what they will do, but I think

22   psychologically there is some value to their understanding

23   there is a greater likelihood that a five-day trial ends in one

24   week than it hangs over into the next week.  So I will make a

25   decision that we will be sitting on the Friday of trial, that

1    is to say January 27, so you should plan accordingly.

2              The next thing I want to do is to read to you the

3    description that I intend to use, subject to your commentary,

4    in voir dire of the case.  And I use, as you will see from my

5    individual rules, the struck panel method, the same method used

6    overwhelmingly in the courthouse.  It will all be familiar to

7    you.  I would be happy to respond to questions if any of that

8    is unclear, but very early on I describe the case to the jury

9    just to make sure that they have a fairly nuanced sense of what

10   the case is about so they can self-identify any issues and

11   everyone has a real portrait of what they're about to hear.

12             So I will read to you what I have got, and this will

13   go for about a page and a quarter.  I will take this nice and

14   slow, make notes, and then I will invite any tweaks either to

15   make sure that it's fair and balanced or make sure the details

16   or right or whatnot:

17             So you can understand the reasons for the questions I

18   will about be asking you shortly, I will now tell you briefly

19   about this case.  I want you to understand that nothing I say

20   today regarding the description of the case is evidence.  The

21   evidence that you will consider, if selected as a juror, will

22   come only from the trial testimony of witnesses, from the

23   reading of prior -- well, let me back up.  Will come only from

24   the trial testimony of witnesses, from exhibits that are

25   received into evidence, and from stipulations or agreements

H1CTAFRC

1   between the parties.

2           As I have explained, this is a criminal case, it is

3   entitled United States of America v. John Afriyie, whom I will

4   refer to as the defendant or Mr. Afriyie.

5           Mr. Afriyie has been charged with committing federal

6   crimes in an indictment returned by a grand jury sitting in

7   this district.  An indictment is formal method of accusing a

8   defendant of a crime.  It is not evidence of any kind, it

9   merely states what crimes the government intends to prove the

10  defendant committed.

11          I will now summarize the charges in this case in order

12  to determine whether anything about this case may make it

13  inappropriate for any of you to serve on the jury.

14          The indictment alleges that Mr. Afriyie committed a

15  crime called insider trading.  The government alleges that

16  during the years 2015 and 2016, Mr. Afriyie worked at a company

17  called MSD Capital.  It alleges that Mr. Afriyie accessed

18  MSD -- which I will call MSD.  It alleges that Mr. Afriyie

19  accessed MSD's electronic files, which contained confidential

20  information about potential mergers and acquisitions, in other

21  words, deals, involving its corporate clients.

22          It alleges that Mr. Afriyie learned of an upcoming

23  deal involving a company called ADT, and that he used this

24  confidential information to buy a type of security called a

25  call option in ADT.

1          It alleges that when the deal involving ADT was

2     publicly announced, ADT's stock price rose and the call options

3     that Mr. Afriyie bought realized more than $1.5 million in

4     profit.  In connection with this alleged scheme, the indictment

5     charges Mr. Afriyie with two crimes:  First, securities fraud;

6     and second, wire fraud.  Mr. Afriyie denies these charges.

7          Now let me stress that an indictment is not evidence.

8     It simply contains the charges against the defendant, and no

9     inference may be drawn against the defendant from the existence

10    of the indictment.  You must always keep in mind that the

11    defendant is presumed innocent, that he has entered a plea of

12    not guilty to charges against him, and that the government must

13    prove the charges in the indictment beyond a reasonable doubt.

14         So that's the description that I would intend to give

15    to make sure that they understand, going into jury selection,

16    what the case is about.  Beginning with the government, any

17    objections or modifications?

18              MR. IMPERATORE:  No, your Honor.

19              THE COURT:  Mr. Spilke?

20              MR. SPILKE:  Well, your Honor, to my ear, I would like

21    to hear the portion at the end, the portion that how the

22    indictment is not evidence, I would like to hear that portion

23    earlier.

24              THE COURT:  You mean apart from the fact that I say I

25    want you to understand that nothing I say today regarding the

1  description of the case is evidence, the evidence that you will

2  consider, if selected as a juror, will come only from the trial

3  testimony of witnesses, from exhibits that are admitted into

4  evidence, and from stipulations or agreements between the

5  parties?  And later on I say -- in fact, right even before I

6  describe the case, I also say an indictment is a formal method

7  of accusing a defendant of a crime.  It is not evidence of any

8  kind.

9         So I have said it before and after the description,

10  what more do you want?

11         MR. SPILKE:  I'm saying maybe if you could flip the

12  portion about -- the lengthier portion about how the indictment

13  is only a charging --

14         THE COURT:  I'm not going to do that.  This is the

15  form that I routinely use in criminal cases.  I'm saying this

16  twice and bracketing the description of the case at the

17  beginning and the end by pointing out that it's not evidence.

18         But as to the actual account of the case here, is the

19  description about Mr. Afriyie and ADT and MSD accurate?  Are

20  there any modifications that you would want?

21         MR. SPILKE:  Well, I understand your Honor wants to

22  give the jury panel an understanding of what they're going to

23  hear, maybe preview to help them understand what they're about

24  to hear in opening statements.

25         THE COURT:  That's not the purpose.  The purpose of is

1  to help me and them ascertain if any of them is unfit to serve.

2  And since one of the very first questions that I'm going to ask

3  the jury is do any of you feel that for any reason you could

4  not fairly and impartially view a case involving allegations

5  such as I described, I need to give at least understanding to

6  them of what the allegations are.

7        It's not that I'm previewing the opening statement,

8  and I'm happy to preview your defense more.  If you want me to

9  say anything other than he denies these charges, I'm delighted

10  to do that.  I don't know what the defense is, so I am ill

11  equipped to do that, that's why we're having this conversation,

12  but this is to facilitate helpful jury selection.

13        MR. SPILKE:  Understood, your Honor.

14        THE COURT:  Is there anything that you would like

15  beyond saying Mr. Afriyie denies these charges?  If you want me

16  to, I am delighted to do so.  Do you want me to say that he

17  denies knowingly trading on confidential information?  Do you

18  want me to say he denies the trading?  I'm happy for you to

19  amplify if you would like me to.

20        MR. SPILKE:  No, your Honor, that's not what we're

21  asking for.

22        THE COURT:  Is there anything inaccurate about

23  anything I said or anything that presents the allegations in a

24  jaundiced or biased light?  Again I'm open to edits here.

25        MS. WOLFE:  Your Honor, I don't know if you have a

1    firm rule about one person from the team speaking.

2            THE COURT:  No.

3            MS. WOLFE:  My concern is that your Honor's

4    description of the charge is significantly more detailed than

5    what is in the indictment.

6            THE COURT:  I understand, but the issue, from the

7    jury's perspective, is what they're going to hear in the case.

8    So since they will hear more than the words in the indictment,

9    I'm trying to smoke out whether there is something about MSD,

10   mergers, acquisitions, ADT, call options, $1.5 million, I want

11   to make sure that if somebody is going to be affronted by any

12   of that, or has some prior expertise relating to anything like

13   that or something like that, that that I have fronted the issue

14   early.

15           That's the point.  I was very precise in using "the

16   indictment alleges" versus "the government alleges" to make

17   sure there isn't a technical inaccuracy of what comes from

18   where, but the broader point is to get the nutshell in front of

19   the jury for the purpose of the venire, for the purpose of

20   assuring a dispassionate panel.

21           MS. WOLFE:  That's fine.  I'm not sure I heard it

22   correctly, I just didn't want the jury to be told that those

23   things were in the indictment when --

24           THE COURT:  No, the only words that I say about the

25   indictment are, "The indictment alleges that Mr. Afriyie

1    committed a crime called insider trading."  Everything else is

2    put in terms of what the government says until the end where I

3    say, "In connection with this alleged scheme, the indictment

4    charges Mr. Afriyie with two crimes, securities fraud and wire

5    fraud."

6            But while you're speaking, would you want

7    amplification on the defense beyond my saying Mr. Afriyie

8    denies these charges?  I can well understand why you might not

9    want to lock into anything, but perhaps there's a sentence that

10   you can add that at least adds a little more texture.

11           MS. WOLFE:  May we think about it and certainly tell

12   your Honor well before Monday?

13           THE COURT:  I much prefer to get it today.  I'm out

14   next week.  I would like to be in a position where I put this

15   to bed.  You can keep reflecting on it during the conference,

16   but I would like to resolve this.

17           Do you want to take a moment and consult with each

18   other?

19           MS. WOLFE:  Would your Honor mind just rereading the

20   portion of the factual -- what the government alleges portion

21   and when the deal was publicly announced?

22           THE COURT:  I will read the whole paragraph that is

23   about the actual alleged crime here.

24           "The indictment alleges that Mr. Afriyie committed a

25   crime called insider trading.  The government alleges that

1    during the years 2015 and 2016, Mr. Afriyie worked at a company

2    called MSD Capital, which I will call MSD.  It alleges that

3    Mr. Afriyie accessed MSD's electronic files which contained

4    confidential information about potential mergers and

5    acquisitions, in other words, deals involving its corporate

6    clients.

7         "It alleges that Mr. Afriyie learned of an upcoming

8    deal involving a company called ADT, and that he used this

9    confidential information to buy a type of security called a

10   call option in ADT.  It alleges that when the deal involving

11   ADT was publicly announced, ADT's stock price rose and the call

12   options Mr. Afriyie bought realized more than $1.5 million in

13   profit.

14        "In connection with this alleged scheme, the

15   indictment charges Mr. Afriyie with two crimes:  First,

16   securities fraud; and second, wire fraud.  Mr. Afriyie denies

17   these charges."

18        (Pause)

19        MS. WOLFE:  No, your Honor, we'll stick with -- we're

20   satisfied with the sentence that he denies these allegations.

21        THE COURT:  All right.  I'm taking a look at this.  I

22   see a few ways of truncating this.  Give me a minute and I will

23   make a small proposal.

24        (Pause)

25        THE COURT:  I'm going to make one change.  Instead of

Case 1:20-cr-00278-TNM Document 144-2 Filed 10/09/23 Page 15 of 57
Case 1:16-cr-00338-PKC Document 231 Filed 01/26/18 Page 14 of 114    3885

H1CTAFRC

1  where it says "potential mergers and acquisitions, in other

2  words deals," I will simply say "potential deals."  I may make

3  some other nips and tucks in the paragraph to make it a little

4  tighter, but I want to make sure it's factually accurate.

5            Everybody comfortable with this as to what the

6  government's allegations are?

7            MR. IMPERATORE:  Yes, your Honor.

8            MR. SPILKE:  Yes.

9            THE COURT:  The next issue I have involves the motions

10  in limine.  And what I propose to do is simply take these in

11  order and briefly make sure I understand the state of play as

12  to each of them and try to resolve the motion from the bench.

13            The first motion in limine made by the defense is to

14  preclude the government from offering evidence of Mr. Afriyie's

15  expenditures, and I want to make sure I understand concretely

16  what that evidence is.

17            Government, in your brief in opposition you offer that

18  the evidence is being used to prove identity, personal benefit,

19  and motive.  I just want to make sure I understand concretely

20  what expenditures we're talking about.  Can I pin you down on

21  what expenditure evidence you are proposing to offer?

22            MR. IMPERATORE:  Yes, your Honor, if I could take a

23  step back and explain the source of money.

24            So on or about February 17, 2016, the defendant

25  liquidated or sold the call options that were in his brokerage

1  account, the brokerage account in the name of his mother,

2  Lawrencia Afriyie.  In two separate wire transfers the

3  defendant wired a total of $150,000 from that brokerage account

4  to a personal bank account at Bank of America in the

5  defendant's name.  There was one wire transfer for

6  approximately $50,000 in February of 2016 and one wire transfer

7  of approximately $100,000 in March of 2016.

8      THE COURT:  I take it that substantially depleted the

9  brokerage account.  It's not like there's a lot more in there.

10     MR. IMPERATORE:  Well, the profits were $1.5 million.

11     THE COURT:  Let me put it this way, I misspoke, the

12  money that is in the brokerage account is substantially from

13  the call options such that there isn't a substantial argument

14  that the $150,000 that is removed is the fruit of something

15  else that populated the brokerage account.

16     MR. IMPERATORE:  That's correct, your Honor.  The time

17  that the trade started, which was on or about January 28, 2016,

18  there was only $4,000 in the brokerage account, 2,000 in equity

19  and 2,000 in cash.  So all of the money -- and he actually

20  wired money from his Bank of America account into the brokerage

21  account to start the trading at ADT, so it's all proceeds.

22     THE COURT:  So the 150 is all proceeds of the alleged

23  insider trading.

24     MR. IMPERATORE:  Correct.  There the government

25  intends to introduce records from approximately six or seven

1   businesses showing expenses in February and March 2016 which

2   reflect essentially the expenditure of proceeds of the insider

3   trading.

4        They involve -- they all reflect the payment of money

5   for the defendant's own benefit on personal belongings.  They

6   include clothes, they include electronics, and they include

7   payments at a club called One Oak.  There are about six records

8   in total, may be multiple clothing records, and multiple

9   electronic records.

10       THE COURT:  How would you get those in?

11       MR. IMPERATORE:  We proposed a business records

12  stipulation to the defense we understand they have agreed to

13  sign to stipulate to many of those records.  With respect to

14  others, we're considering calling custodian witnesses to admit

15  those records.

16       THE COURT:  But these are the records of the

17  establishments or retailers where the money was spent, as

18  opposed to a credit card record?

19       MR. IMPERATORE:  Right.  The government will admit the

20  bank record itself, which will list -- all these payments were

21  not made from a credit card account, they were made directly

22  from the bank account.  So the bank record would come in that

23  shows a list of expenses, and in addition the business records

24  are particularly relevant to show that the money is being spent

25  on the defendant himself.

H1CTAFRC

1          And I failed to note, your Honor, there is one other

2     expense, that is Delta Airlines.

3          THE COURT:  Delta Airlines.  What is the Delta

4     expense?

5          MR. IMPERATORE:  It's a trip that the defendant took.

6          THE COURT:  And I take it each of these records --

7     what shows that it is for the defendant's own benefit as

8     opposed to somebody else?  That it is being paid out of his

9     personal bank account?

10         MR. IMPERATORE:  It's more than that, it's the

11    business record itself, on the face of it, reflects this is an

12    expense that was paid for by the defendant.  So just to give

13    the Court an example, the receipt from One Oak, which is the

14    club, shows that the defendant filled out a particular form in

15    which he agreed to incur certain expenses.  And then the

16    receipt for the shoes is similar.

17         THE COURT:  So Mr. Spilke had attached to the filing

18    he made on January 10 in response to my order the various

19    business record documents, including the One Oak receipt, the

20    shoe receipt and the like.  I take it those are all within the

21    scope of what you propose to offer.

22         MR. IMPERATORE:  Yes.

23         THE COURT:  All right.  Mr. Spilke, I'm not inviting

24    argument on this from either of you, I'm trying to understand

25    factually, have I been given an accurate portrait of what it is

1    the government is proposing to offer along these lines and what

2    you're objecting to?

3            MR. SPILKE:  Yes, your Honor.  First of all, the

4    business record stipulations are for authentication purposes.

5            THE COURT:  Understood.  You're not conceding

6    admissibility under 403, you're getting rid of the custodial

7    aspect.

8            MR. SPILKE:  Of course, your Honor.  As far as the

9    personal benefit, I don't see how, from the face of the

10   records, the government can show that, at least for the

11   electronics, for even the One Oak out at a nightclub, that the

12   government can show was for the defendant's personal benefit.

13   Sure, he eventually paid for it, but he could have not had

14   anything to drink at One Oak, he could have bought the

15   electronics as gifts.

16           THE COURT:  But if he's at One Oak and he's the one

17   filling out the One Oak form and apparently signing the

18   1,500-dollar -- $1,515.39 receipt, sure, it's not conclusive, I

19   suppose he could have walked in at the end and comped four

20   strangers, but that's for the jury.  It's a fair inference as

21   the signer of the credit card bill that he's either one of the

22   folks at the table or getting some benefit out of comping the

23   people who dined there.  I understand your point as a

24   metaphysical matter, but as a matter of fair inference, it's

25   more than a fair inference, isn't it?

Case 1:20-cr-00278-TNM Document 144-2 Filed 10/09/23 Page 20 of 57
Case 1:16-cr-00031-KPF Document 731-2 Filed 01/26/23 Page 20 of 57    3890
H1CTAFRC

1          MR. SPILKE:  I tend to agree with you, it's more for

2     the electronics, let's say, there's no -- I understand from the

3     apparel, you can show that they're men's clothing, he was

4     buying them as gifts, but --

5          THE COURT:  But it is being charged to him, right?

6          MR. SPILKE:  That's right.

7          THE COURT:  All right.  Look, I mean on this motion in

8     limine I'm going to deny the motion in limine to exclude this

9     evidence, and I find under Rules of Evidence 402 and 403(a)

10    that it is quite substantially relevant to several elements;

11    and second, that it is far more probative than unfairly

12    prejudicial.  Indeed, I don't really find any unfair prejudice

13    at all, let alone any confusion or capacity for delay.

14         First of all, although the government leads with the

15    ingredient of personal benefit, and I will get to that, it

16    seems to me that this is absolutely fair argument as far as

17    motive.  Motive is not a required element but it is absolutely

18    probative.  And that in reasonably short order after the fruits

19    of the alleged insider trading scheme are obtained that they

20    were routed to the defendant's account as opposed to kept in

21    the mother's brokerage account and used to pay for a number of

22    lifestyle expenditures that would be at least pleasant or

23    pleasurable seems to me to supply a very coherent and

24    old-fashioned motive for the scheme, which is to say fund a

25    more comfortable lifestyle.

Case 1:20-cr-00278-TNM Document 144-2 Filed 10/10/23 Page 21 of 57
Case 1:18-cr-00328-KPF Document 751 Filed 01/26/23 Page 21 of 57   3891

H1CTAFRC

1          So to begin with, all this is relevant and would be

2    admissible solely as a basis of proving motive, but secondly,

3    it is an important fact in this case that the trading is not

4    done in the defendant's name.  And while it appears, I think,

5    to be undisputed that the defendant is the causal agent of the

6    trading, that is not necessarily coterminous with the issue of

7    whether the defendant was the intended beneficiary of the

8    trading.

9          And to extent the government can establish that the

10   mother's name was really being used as a fig leaf and all this

11   was about Mr. Afriyie both at the causation of the trading and

12   benefit of it, it obviously tends to establish an important

13   ingredient of the scheme.  It also undermines further any claim

14   that the scheme was the brainchild of the mother.  So it seems

15   to me the fact that the defendant is the beneficiary of what

16   the government will fairly argue are fruits of the scheme tend

17   to establish personal benefit.  All of that is relevant,

18   important evidence and purposes.

19          On the flip side of the 403 balance, I don't see

20   anything that is unfair here.  Indeed, Mr. Spilke quite fairly

21   notes that, as to a number of the items bought here, they're

22   the sorts of things that people in the business world in New

23   York tend to have, like phones and shoes.

24          And even the one expense that arguably might be a

25   little more rich than some of the others, which is One Oak, is

Case 1:20-cr-00278-TNM   Document 144-2   Filed 10/10/23   Page 23 of 57
Case 1:18-cr-00319-DLC   Document 151   Filed 01/26/19   Page 22 of 57   PageID #: 3892
H1CTAFRC

1    not a dollar amount that I think shocks the conscience.  It's

2    an expensive night out for four people, but it's not the sort

3    of thing that I think is going to lead the jury to shut down in

4    being able to evaluate the case on the merits.  It's not unfair

5    prejudice.  If it's prejudice, it's prejudice because it shows

6    the defendant had a little bit of champagne tastes and was

7    using the scheme to accomplish them.  So with no hesitation I

8    find the 403 balance overwhelmingly favors the receipt of this

9    evidence.  The other countervailing factors under 403 of

10   confusion and delay are simply not present.

11          With respect then to the second issue, there the state

12   of play appears to have changed a bit over the course of the

13   briefing process, and I want to make sure I have a clear

14   understanding.  Mr. Spilke expressed the concern in his motion

15   in limine that some of the identity evidence, the evidence used

16   to associate the defendant with the ixjunitxio3@yahoo email

17   address might be prejudicial insofar as they had some risque

18   coloration to them, but I would refer to them as the Yahoo

19   address.

20          And specifically Mr. Spilke was concerned that a

21   Messenger friends list associated with the Yahoo account

22   included suggestive user names, including Erotic Babe and Kinky

23   Chick.  I have to say that upon reading that I thought that

24   there was some validity to Mr. Spilke's critique; not to

25   preclude altogether that there couldn't be some development at

Case 1:20-cr-00278-TNM Document 144-2 Filed 05/10/23 Page 23 of 57
Case 1:15-cr-00637-KAM Document 751-2 Filed 01/26/18 Page 22 of 57 PageID #: 3893
H1CTAFRC

1    trial that justifies bringing that in, but it certainly seems

2    to be associating the defendant with Erotic Babe or Kinky Chick

3    into the financial case.  So I was pleased to see the

4    government's response appeared to remove the Babe and the Chick

5    from the equation.

6         So let me make sure I understand, Mr. Imperatore, can

7    you walk me through concretely what you're proposing now to

8    offer vis-a-vis the Yahoo account?

9         MR. IMPERATORE:  Yes, your Honor.  In addition the

10   actual subscriber records, we will offer two particular emails

11   sent to this account.  We attached them to our submission.

12   They're totally innocuous emails.

13        THE COURT:  That's, to be clear, the Twitter one that

14   has the subject line Follow Taylor Swift, et cetera, and it

15   says "Hey, John Afriyie," and it is addressed to him at the

16   Yahoo address.  And the second one is the

17   trials@pharmainsight.com, addressed to him there, and reads

18   "Dear John Afriyie."

19        MR. IMPERATORE:  Right.  And the purpose for our

20   introducing those, your Honor, were to show the emails were

21   addressed to Jonathan Afriyie to show he was the person who

22   controls this account.

23        THE COURT:  May I ask you -- that's all fine and good

24   and there certainly doesn't seem to be a problem with those

25   emails -- when a person applies to something like a Yahoo

1    account, if one were to subpoena Yahoo, would there be account

2    ownership or control records that, independent of how these

3    emails pop out, would reflect who the person is behind

4    ixjunitxio3.

5              MR. IMPERATORE:  Yes.  What those records show, your

6    Honor, is -- the government obtained records for this account

7    at two different period of time, it obtained -- it had a

8    preservation request that was in play, it then subsequently got

9    a search warrant on the account.  So it obtained records,

10   mirror images of the account at two periods of time, including

11   subscriber records.

12             And it shows as of approximately March 2016 the

13   account was registered with the name John Afriyie with the

14   email address johnafriyie@gmail.com or jafriyie@gmail.com.  The

15   records show that on April 15, two days after the defendant's

16   arrest, he changed the subscriber name to Larry Afriyie with

17   lafriyie@gmail.com as the contact email account, and then on

18   May 26 he deleted the whole account.

19             THE COURT:  And you mentioned that it's in March.  The

20   trading here is in February?

21             MR. IMPERATORE:  Correct.

22             THE COURT:  And it's in March that the account is

23   denominated as John Afriyie.  Was the account opened in

24   February?

25             MR. IMPERATORE:  No, your Honor.  I don't know the

Case 1:20-cr-00278-TNM Document 144-2 Filed 10/10/23 Page 25 of 57
Case 1:18-cr-00036-JPO Document 251 Filed 01/26/19 Page 24 of 57 PageID #: 3895
H1CTAFRC

1    date off the top of my head.  It was potentially years earlier.

2    But as your Honor can see from the emails, we have emails -- we

3    have evidence that it was his email account both before and

4    after the trading, insofar as we have emails addressed to him.

5           THE COURT:  Remind me, what is the relevance of the

6    email accounts specifically as to government's proof at trial?

7           MR. IMPERATORE:  So the TD Ameritrade account was

8    subscribed in the name of Lawrencia Afriyie.  As part of that

9    subscription, a contact email account was provided.  It's that

10   account that was used to exchange automated emails with TD

11   Ameritrade, and significantly they're not in the account at the

12   time.

13          THE COURT:  So in other words, you will be tying him

14   to that account for the reason you just gave because it helps

15   identify who is really behind, if you will, the TD Ameritrade

16   account, but you will be proving it both through the endemic

17   Yahoo records as well as these two emails, the Pharma and the

18   Taylor Swift ones.

19          MR. IMPERATORE:  Correct.  And it's also independently

20   admissible to show consciousness of guilt --

21          THE COURT:  Understood.

22          MR. IMPERATORE:  -- when he changed and deleted the

23   account.

24          THE COURT:  Am I correct you're taking -- at least for

25   the time being you are no longer offering the stuff that

1    Mr. Spilke objected to, which is the Kinky Babe and the Chick

2    stuff?

3         MR. IMPERATORE:  Correct.  We reserve the right to

4    attempt to introduce it to the extent the defendant contends

5    that he is the person behind this email account.

6         THE COURT:  And if you were to do that, we would

7    certainly have to have a discussion about whether there are

8    some wise redactions that could be made so as to use only

9    Messenger names that don't have some bad miasma about them.

10        MR. IMPERATORE:  The government would not introduce

11   that record without raising the issue first with the Court

12   outside the presence of the jury.

13        THE COURT:  Thanks, very helpful.

14        Mr. Spilke, you may want to declare the victory on

15   this one, but the government has taken the Babe and Chick out

16   of the equation, and seems to be at this point saying the way

17   we will prove his association with the Yahoo account is with

18   Yahoo records and through the Pharma and Taylor Swift emails.

19   Any objection to that?

20        MR. SPILKE:  No, your Honor, that's exactly the

21   substitution we were arguing for.

22        THE COURT:  Good.  So look, I'm going to deny your

23   motion, Mr. Spilke, only because it's moot.  In effect you won

24   through the government's withdrawal of what it was trying to

25   obtain.

1        But for the record, Mr. Imperatore, had your

2   application still been alive to offer that stuff, it would have

3   been a source of considerable concern, particularly given the

4   much more benign ways available to you, which you're now

5   proposing to use, to prove up the association with the account.

6        And I take it, Mr. Spilke, you're not objecting to

7   evidence of the account coming in at trial, you acknowledge its

8   relevance for the various purposes proffered by Mr. Imperatore.

9        MR. SPILKE:  Yes, your Honor.  There is one brief

10  thing that I don't know if I misheard Mr. Imperatore, but just

11  to clear up the record as to the name change of the Yahoo

12  account.  There are two snapshots basically of the account

13  ownership information, and you can change it at will, it's

14  not -- there's no -- you don't have to give Yahoo any kind of

15  verification of your identity or anything like that.

16       The two snapshots were I believe March 18, 2016, and

17  as of that date the name on the account was still John Afriyie

18  and the rescue email address, meaning the email address that

19  Yahoo would send you instructions on how to change your

20  password if you were locked out, the rescue email was

21  jafriyie@gmail.com.  As of May 26, well after Mr. Afriyie was

22  arrested, the next snapshot said Lawrence Afriyie and lafriyie

23  with respect to emails.

24       THE COURT:  Is that the rescue email or a different

25  one?

Case 1:20-cr-00278-TNM   Document 144-2   Filed 10/10/23   Page 28 of 57
Case 1:20-cr-00278-TNM   Document 121   Filed 11/26/21   Page 27 of 57   PageID #: 3898

1          MR. SPILKE:  That's the email lafriyie.  The rescue

2     changed from jafriyie as of March 18, and the next snapshot on

3     May 26 it was lafriyie.

4          THE COURT:  What the date the defendant was arrested?

5          MR. SPILKE:  April 13.

6          THE COURT:  Mr. Imperatore says two day later

7     something was changed to lafriyie, is that the same email

8     you're referring to?

9          MR. SPILKE:  I believe so.  I acknowledge that

10    something was changed, I'm talking about the date.

11         THE COURT:  I'm trying to understand what your point

12    is.  Mr. Imperatore's point is that there's a change right

13    after the arrest, which he will argue as a matter of timing

14    suggests a failed attempt by your client to distance himself

15    from an account he doesn't want to be associated with, i.e.,

16    consciousness of guilt.  Do the facts as you understand them --

17    you seem to be suggesting there's -- that the facts are

18    different, so as perhaps to blunt that inference.

19         MR. SPILKE:  We have asked the government to narrow

20    down the date range.  We have basically between March 18 and

21    May 26.  At some point the name was changed.

22         THE COURT:  And you'd like to know what date.

23         MR. SPILKE:  Well, we never heard until just now the

24    government is saying two days after.

25         THE COURT:  Well, then your motion in limine may have

```
 1    had the collateral benefit of smoking out a little more about
 2    the government's case.
 3              Mr. Imperatore, what is your basis for saying it was
 4    two days after the arrest the change was made?
 5              MR. IMPERATORE:  Your Honor, last night we received
 6    supplemental records from Yahoo which we produced today, Bates
 7    17611 to 617, and what they show is they are subscriber records
 8    that show on April 15, two days after the defendant's arrest,
 9    he substituted Larry Afriyie as the subscriber for John
10    Afriyie.
11              THE COURT:  So Mr. Spilke just hasn't had a chance to
12    dig into those materials.
13              MR. IMPERATORE:  Right.
14              MR. SPILKE:  For the record, I know that I received an
15    email from the paralegal, but I haven't opened it on my phone.
16              THE COURT:  I, too, have received some documents at
17    the last minute today.  So if I may, will the Yahoo records be
18    offered by means of stipulating or is some Yahoo custodian
19    going to need to explain how to decode these records?
20              MR. IMPERATORE:  They're being offered by stipulation,
21    your Honor.  We understand there's an agreement from the
22    defense to that stipulation and it will include testimonial
23    language that simply explains what is apparent from the face of
24    the records.
25              THE COURT:  You clearly need to freshen up the
```

1    stipulation if you are proposing to offer the change on that

2    two-day later date.

3             MR. IMPERATORE:  Yes.

4             THE COURT:  Very good.  Anything more on the second

5    motion in limine?

6             I will about pass over the third one because the third

7    one requires me to go into the robing room about the use of the

8    subpoena, and I want do that, but let me take up the motion in

9    limine that was filed today.

10            And in a word, the defense is seeking to preclude the

11   testimony of Deborah Harbor Oremland and the associated

12   materials on the premise that hers is, although not denominated

13   as such, in fact expert testimony.  The government disputes

14   that the testimony is expert testimony.  All of this has hit my

15   desk in such a hurry today that I think I would do better to

16   start here with the government and ask you for a detailed

17   preview of what her testimony will consist of.  That will

18   assist me in assessing this.

19            By the way, for what it's worth, I don't fault anybody

20   here for the timing.  The disclosure by the government when it

21   did is fine, it's consistent with the trial date, and as a

22   result, Mr. Spilke's motion, filed when it was, is also timely.

23   He had no basis to file it earlier.

24            Go ahead.

25            MS. MAGDO:  Ms. Oremland is an employee of FINRA, and

1    the government engaged her to look at certain records -- and I

2    will tell you what those records are in a moment -- and to

3    present them in a summary fashion that is easy for the jury to

4    understand.

5            And namely those records are the following things:

6    There are brokerage account records, the TD Ameritrade records

7    of the account that was held in Lawrencia Afriyie's name, there

8    are bank account records, namely the Bank of America account

9    that was held in the defendant's name.  Both of those were

10   produced a long time ago in discovery, and in fact the

11   defendant has stipulated to their authenticity.

12           So that's one source of her review.  The other one is

13   three press releases that we provided to the defendant, and

14   they said that they had no objection to their authenticity, in

15   fact they asked that we include another press release.

16           THE COURT:  Briefly, what are the press releases

17   about?

18           MS. MAGDO:  One of them is the press release that

19   announced that ADT would be acquired.

20           THE COURT:  Date, approximately, if you know?

21           MS. MAGDO:  February 16, 2016.  That also is the day

22   that the stock price increased by 46 percent and Mr. Afriyie's

23   call options were in the money and he made the profit.  So

24   that's the relevance of that.

25           The two other ones that the government has originally

1    proposed relate to XPO.

2              THE COURT:  That's the similar --

3         MS. MAGDO:  That's the 404(b) evidence.  So there is

4    the press release that announces that XPO will be acquiring

5    another transportation company called Norbert Dentressangle,

6    and thereafter, the firm MSD is engaged by XPO to help it come

7    up with ways to finance the acquisition, and MSD and the

8    defendant become privy to material non-public information about

9    XPO.

10        About a month later, on June 2nd, that financing

11   arrangement that MSD has been working on becomes public.  And

12   there are two announcements on June 2nd, one announces some

13   senior securities that are being offered, and the other one is

14   some debt restructuring being offered.  And in between that

15   time period of those two press releases, the defendant had

16   material non-public information from his employer about XPO --

17             THE COURT:  Which you will establish by other means.

18        MS. MAGDO:  Absolutely.  I'm providing why it's

19   relevant.

20             -- and traded in XPO securities.

21        And the defendant produced another press release, that

22   was from ADT in early 2016, or maybe it was an article about

23   ADT in which they talked about the fact that the -- sorry,

24   about Apollo, which is the private equity firm which ended up

25   acquiring ADT, and it talks about how the market for leveraged

1    buy outs dried up in that period of time.  And we don't contest

2    the authenticity of that as an article that was out there in

3    the world.

4            THE COURT:  So going back to Ms. Oremland, we have

5    brokerage records, the bank account records, and press

6    releases.

7            MS. MAGDO:  Yes.  And finally we have publicly

8    available data taken from Bloomberg, principally, regarding the

9    price of ADT stock and call options during the relevant time

10   period, as well as trading volume for those securities, and

11   also the analogous information for XPO.

12           THE COURT:  Is she the authenticator of that or is

13   that coming in through some other means?

14           MS. MAGDO:  There is actually -- Rule 803(17), I

15   believe -- if you could just give me one moment, your Honor,

16   there's a specific provision.  It is 803(17), it deals with

17   market reports and similar commercial publications, namely

18   market quotations, lists, directories or other compilations

19   that are generally relied upon by the public or by persons in

20   particular occupations.

21           THE COURT:  In any event, you're not using her to

22   authenticate it, your proposal is it's independent of her

23   testimony pursuant to that hearsay exception.

24           MS. MAGDO:  Yes.

25           THE COURT:  Okay.  Any other data that she is going to

1    be basing her testimony on?  Anything else?

2              MS. MAGDO:  No.

3              THE COURT:  So now that you have given me the raw

4    material, what will the testimony look like?

5              MS. MAGDO:  It will look like some graphs where you

6    have time on the X axis and price on the Y axis, and you can

7    see the price of the stock or the options moving in time.

8    There may or may not be some columns showing the trading volume

9    on each day that the stock or the option was traded.

10             THE COURT:  I take it this is not such an oddball

11   option that there aren't recoupable records of what the value

12   was of the price of the option was, in other words, it's traded

13   enough so that one can get this like the Microsoft stock price,

14   it's out there.

15             MS. MAGDO:  Yes.

16             THE COURT:  It's a liquid market, if you will, the

17   option?

18             MS. MAGDO:  Yes, exactly.  And then superimposed on

19   that kind of graph are the dates of the trades.

20             THE COURT:  So she's doing a temporal graph with time,

21   price options, and dates of the trades.

22             MS. MAGDO:  Yes.

23             THE COURT:  What else?

24             MS. MAGDO:  She will also put -- in the TD Ameritrade

25   records there are IP addresses that show a time and an IP

1    address, so that reflects when the TD Ameritrade -- the

2    brokerage account was accessed via the internet and what IP

3    address it was accessed from.

4           THE COURT:  But that's in the records that will be

5    received per stipulation.

6           MS. MAGDO:  Yes, exactly.

7           THE COURT:  So she's not interpreting the records,

8    it's front and center in the records itself.

9           MS. MAGDO:  Correct.  And I believe in the stipulation

10   it says that this IP address corresponds to the -- puts it into

11   English, essentially -- to the IP address of the device that

12   logged into the brokerage account at the time indicated.

13          So she will also make a table, for lack of a better

14   word, that shows the time and the log-in address and then the

15   subsequent trades, for example.  Again, that's purely derived

16   from the brokerage accounts and it's been stipulated to.  So

17   it's just going to be presented in a jury friendly format.

18          THE COURT:  Anything else?

19          MS. MAGDO:  And in connection with her testimony, she

20   will define the terms that she finds in the records.  So for

21   example, when she talks about the purchase of a call option,

22   for the assistance of the jury and because it's a completely

23   uncontroversial aid, she would define what a call option is.

24          THE COURT:  Presumably she needs to testify not near

25   the lead off role, I'm not objecting to that, we'll hear what

Case 1:20-cr-00278-TNM Document 144-2 Filed 10/10/23 Page 36 of 57
Case 1:16-cr-00338-PKC Document 251 Filed 01/26/18 Page 35 of 57 #: 3906
H1CTAFRC

1   Mr. Spilke has to say, but won't they have heard what a call

2   option is through other witnesses?

3          MS. MAGDO:  Not necessarily.  They will have heard

4   what a public company is, what a private company is, what an

5   exchange is, what a stock is, but I'm not sure that it will

6   come out from someone else what a call option is and what a put

7   option is.

8          THE COURT:  It sounds like you intend to call people

9   from MSD who presumably -- from whom you need to establish

10  their lack of notice as to what the defendant was doing.  Isn't

11  there going to be some need, at least with somebody there, to

12  establish the lack of knowledge, step back and explain --

13  define the term you're using, were you aware the defendant did

14  X, and don't you need them to find the X through that witness?

15         MS. MAGDO:  Well, we weren't trying to get in through

16  them having them review the defendant's trading and opine on

17  whether it was permissible pursuant to MSD policy, for example.

18         For example, we were going to call a compliance

19  officer from the company who will say that MSD's policy was

20  very clear that no employee may trade in any account over which

21  he has any ownership or control or any beneficial interest any

22  single name security or single name derivative.

23         THE COURT:  In other words, their policy isn't limited

24  to issuers that MSD has some connection with, it's categorical,

25  index funds, that sort of thing.

```
1              MS. MAGDO:  Precisely.

2              THE COURT:  But in other words, as a result you're not

3    expecting through that testimony the jury could learn what a

4    call option is.  At a more macro level, you will simply

5    establish the lack of knowledge at MSD that there was any

6    trading by the defendant of any form of a security in any

7    individual name in general or associated with the issuers

8    associated with their business.

9              MS. MAGDO:  Right.  For example, every quarter every

10   employee is required to certify any transactions that the

11   employee is engaging in.  So if they are buying and selling

12   index funds, for example, they have to disclose that, they have

13   to disclose any accounts that they control in which such

14   activity takes place.  And the defendant certified each quarter

15   that he had no such account and that he engaged in no such

16   trading.  So the firm is not aware of what he was doing with

17   his mother's account.

18             THE COURT:  So the extent that we're talking about

19   defined terms, let's get a list of defined terms she is apt to

20   define.

21             MS. MAGDO:  I think we put it broadly on page 2 of our

22   submission.

23             THE COURT:  Stock call option, put option, strike

24   price, expiration date, in the money and out of the money.

25             MS. MAGDO:  And perhaps the word "margin" as well.
```

1          THE COURT:  All right.  Will she be doing anything

2     more than simply giving a straight, down the middle definitions

3     of those terms?

4          MS. MAGDO:  Well, for example, with a call option, she

5     will say that a call option is the right but not the obligation

6     to purchase a security at a particular price at a particular --

7     by a particular time in the future.  And that particular price

8     is called the strike price, that particular date is called the

9     expiration date.  In order for someone to profit on a call

10    option, by definition, the price of the stock has to go above

11    the strike price before the expiration date.  She is not going

12    to opine on -- I am at a loss for what she could even possibly

13    opine on --

14         THE COURT:  But what you have just proffered to me are

15    fundamentals.  You're talking about the definition of this

16    particular species of security and at a highly macro level how

17    it works.  But there won't be the sort of testimony that one

18    could imagine and perhaps is imagined by Mr. Spilke's motion

19    under which he would be delving into strategy and tactics or

20    anything sophisticated, we're talking about definitional metes

21    and bounds.

22         MS. MAGDO:  Right.  And similarly, with respect to

23    press releases that she will talk about, to the extent this

24    talks about the word -- I'm making this up -- acquisition, I

25    will say:  What's an acquisition?  It's a purchase.  Or what is

1   a leveraged acquisition?  It's one where the person borrows the

2   money to make the acquisition.  So it's really very basic

3   information.

4           THE COURT:  This is equivalent to calling a baseball

5   manager to explain what an RBI is.

6           MS. MAGDO:  Sure.

7           THE COURT:  Home run.  I mean I take it that's your

8   point, which is we're not talking about regressions here, we're

9   talking about metes and bounds of terminology.

10          MS. MAGDO:  Exactly, we're not talking about exotic

11  instruments, thinly traded derivatives, these are things that

12  everyday people, the jurors, could themselves be trading in.

13          THE COURT:  Is there anything else to her testimony?

14  Have you covered it now?

15          MS. MAGDO:  And I don't mean that list to be

16  completely exhaustive, but it's in the nature of such

17  definitions.

18          THE COURT:  Okay, thank you.

19          Mr. Spilke, I think this has been very helpful to me.

20  With the motion and response having both hit today, I needed

21  some education as to what actually the testimony is going to

22  be.  Now that you have heard what it is, perhaps putting to

23  rest whatever the concerns may have been, do you have an

24  objection to that testimony?

25          MR. SPILKE:  Yes, I do.

H1CTAFRC

```
 1                THE COURT:  Explain.
 2                MR. SPILKE:  Well, first of all, I didn't hear the
 3     government say that she is not going to testify about the cause
 4     that -- rather the cause and effect some of these press
 5     releases would have on market prices.
 6                THE COURT:  Let me ask Ms. Magdo, I understand you
 7     might well argue the point, but is the FINRA person going to
 8     say that what caused the stock to rise was the revelation of
 9     the acquisition, or will she merely put those two points in
10     time together and leave it to counsel to argue what is pretty
11     obvious?
12                MS. MAGDO:  The latter.
13                THE COURT:  She's not going to be testifying as to
14     causation, and therefore not opening the door to what
15     alternative theories of what caused the price movement might
16     be, correct?
17                MS. MAGDO:  That's correct.
18                THE COURT:  Mr. Spilke, I think we excluded that
19     conclusion.
20                MR. SPILKE:  Reading her prior testimony, which I only
21     been able to do because --
22                THE COURT:  In a different matter?
23                MR. SPILKE:  In two different matters, absolutely,
24     your Honor.
25                THE COURT:  What's the concern?  Whatever she may have
```

1     testified to in a different case, Ms. Magdo has defined in a

2     way that strikes me as practically lay testimony.  Whatever she

3     could have done in some other matter the government is not

4     apparently calling on her to do any more than what Ms. Magdo

5     proffered.

6           MR. SPILKE:  The fact and opinion testimony lie in a

7     spectrum, your Honor, and even when she's been called in the

8     past to testify as a lay witness, she's veered pretty far.

9           THE COURT:  Look, if she goes rogue on us, that's your

10    role to object and my role to sustain the objection, but all I

11    can deal with now is what is made concrete by the government's

12    offer of proof.  Is there anything that Mr. Magdo proffered

13    that is properly termed expert testimony?

14          MR. SPILKE:  No, your Honor, not in the subjects that

15    she's outlined.

16          THE COURT:  So look, I think the answer is if

17    ultimately the questions to the witnesses or the testimony of

18    the witness is materially different than as proper, we'll deal

19    with that then, but I don't know that I can address a

20    hypothetical that isn't prompted by the offer of proof.

21          Look, I fully understand your point that economists

22    and market experts struggle with causation issues, and it

23    doesn't sound like this witness will be qualified to say that

24    what caused a particular stock movement was a particular event

25    as opposed to industry factors or day-to-day factors or G7

 1    factors or whatever, but it doesn't sound like she's going

 2    there.  Given the res ipsa quality of the stock movement, it

 3    certainly seems to me fair argument for counsel to argue the

 4    point that whether or not literally every piece of the stock

 5    increase was attributable to the announcement that the material

 6    amount of it was, that seems to me more than fair

 7    circumstantial orientation.

 8            But in any event, this witness is not going to,

 9    Mr. Magdo, correct?

10            MS. MAGDO:  That's correct, your Honor.

11            MR. SPILKE:  To the extent that she doesn't veer from

12    what is generally done or typically done, I think the content

13    of that testimony is fine, it's really the identity of the

14    witness also matters.

15            THE COURT:  The what?

16            MR. SPILKE:  The identity of the witness also matters.

17            THE COURT:  Why?

18            MR. SPILKE:  Well, she was engaged post-trial to

19    review documents that --

20            THE COURT:  But regardless of when she was hired --

21    sure, if the government wanted to hire an office investigator

22    from the U.S. Attorney's Office, they could have done that,

23    too, but the issue is whether they're competent to testify to

24    what they're testifying about, not expertise.  In this case, no

25    reason why the government shouldn't get somebody who presumably

Case 1:20-cr-00278-TNM Document 144-7 Filed 10/10/23 Page 43 of 57
Case 1:18-cr-00319-KPF Document 251 Filed 01/26/23 Page 42 of 57 Page ID #: 3913

H1CTAFRC

1    lives in the space and is more articulate with the terminology.

2    Doesn't make her an expert.

3         MR. SPILKE:  As your Honor pointed out --

4         THE COURT:  Look, I would rather have Joe Torre

5    testify about home runs and RBIs than the coach of the Knicks.

6    Doesn't is mean it's expertise, right?

7         Sorry for the sports reference.

8         MR. SPILKE:  They will have Sparky Anderson.  They

9    will have MSD witnesses on the stand.

10        THE COURT:  But the MSD person isn't there as their

11   summary witness.  There's nothing that says the government has

12   to choose the minimally qualified person in terms of their

13   verbal skills or familiarity with the area as long as the

14   content isn't expert testimony.  If I was either of you I would

15   want someone familiar with the terms.

16        Look, I think we've gone as far as we can go.  You

17   told me based on the proffer you don't see any expertise.

18   You're having raised the motion has been productive because it

19   perhaps has defined and confined the testimony in a useful way.

20        In the event, government, that you envision this

21   witness is doing something else that is not within the metes

22   and bounds that you have broadly laid out, Ms. Magdo -- not

23   talking details, but directionally -- please let me know, let

24   Mr. Spilke know, so if there's an objection we can deal with

25   it.  And if the witness goes rogue on us, that's what the

1    objection and ruling process is for, but I don't at this point

2    have any reason to deal with hypotheticals.

3            MS. MAGDO:  And we'll do so, your Honor.

4            THE COURT:  All right.

5            MS. WOLFE:  Your Honor, may I add something to the

6    total mix, which is a word that going to come up in a lot in

7    the case, and that is what --

8            THE COURT:  Sorry, did you mention the word?  I just

9    didn't hear it.

10           MS. WOLFE:  Total mix.

11           THE COURT:  Total mix.

12           MS. WOLFE:  Total mix is going to be a term that comes

13   up, of information in the market.

14           And anyway, this woman is not only a lawyer, she's a

15   regulator.  She's going to have an enormous amount of influence

16   over the jury.  And what the government is doing is she's

17   putting her up there to give a summation, because all of these

18   charts are the government's summation that these trades

19   occurred at a certain time from a certain place, and they're

20   going to come out of the mouth of a lawyer regulator.

21           THE COURT:  So would you rather have the cafeteria

22   worker downstairs give the same testimony?

23           MS. WOLFE:  Absolutely not.  I would rather have an

24   intelligent paralegal who goes through the data and presents it

25   the jury, which is usually how it goes.  It's one thing to have

1     a university professor testify about basic physics and another

2     to call Stephen Hawking.  And that's what they're doing, and

3     it's going to have a tremendous prejudicial impact on the jury.

4              THE COURT:  Ms. Magdo, I take it you will not elicit

5     any testimony from this witness that implies that the witness

6     has drawn any conclusions about whether this was proper or

7     improper trading.

8              MS. MAGDO:  Absolutely not.

9              THE COURT:  And there won't be any testimony that

10    suggests any regulatory investigation, correct?

11             MS. MAGDO:  That's correct.

12             THE COURT:  Did this witness play any role in the

13    government's investigation?

14             MS. MAGDO:  None.

15             THE COURT:  Okay.

16             MS. MAGDO:  Might I just add, this is actually her job

17    to come and testify as a summary witness for the government.

18    So we could have asked an investigator or a paralegal, but to

19    conserve resources and have someone who is familiar with

20    testifying, as your Honor said, and is eloquent in explaining

21    these concepts, it seems like a natural choice.

22             THE COURT:  Ms. Wolfe, I'm not buying what you're

23    selling.  It seems to me if the content of the testimony is

24    that which a lay summary witness can do, and as long as she's

25    done the blocking and tackling and spadework to plot the charts

1     and figure out the stock price movement and the chronology, the

2     fact that she might be overqualified to do it is not a problem.

3     I will absolutely be attentive to make sure there's nothing

4     that she says that looks as if she's drawing a conclusion about

5     impropriety.  But it seems to me that because we're talking

6     here about a complicated area of the world, there is a value in

7     having somebody for whom the words don't stumble out of the

8     mouth but can speak with some level of articulation.  I think

9     that advantages the truth-seeking process.

10          MS. WOLFE:  The point that gets lost is that she's

11     serving in that professorial mode as to what a call option is.

12     She is a legal regulatory, that's her framework, whereas a

13     markets person, like the people at MSD, can testify that they

14     actually trade these things.

15          THE COURT:  Sure, but this is a summary witness and

16     the market -- I can well understand why the government would

17     want to use somebody other than whoever arguably was a victim

18     here to supply a summary witness.  This is within the realm of

19     the trial lawyer's discretion.

20          MS. WOLFE:  In light of that decision, your Honor, we

21     haven't seen the charts yet, I would ask the Court to give us a

22     one-day adjournment continuance so that -- between her direct

23     and cross.

24          THE COURT:  No, no, no, no, I think it's more

25     reasonable to ask that the government give you the charts in

1    enough time so you can kick the tires on them.  I'm not going

2    to make our jury wait so you can study a chart.

3           But Ms. Magdo, I think it's reasonable, if you're

4    offering a chart, to have the chart -- it sounds like it's the

5    product of data that everyone here already has and you know

6    what it is.  Is there any reason why you can't give the chart

7    to the defense a few days in advance?

8           MS. MAGDO:  We're planning to give it to the defense

9    one week ahead of the start of the trial.

10          THE COURT:  Ms. Wolfe, I think that answers your

11   question more than adequately.

12          MS. WOLFE:  If we don't understand the charts, I ask

13   the government to put us in touch with Ms. -- I get the name

14   wrong.

15          THE COURT:  If you don't understand the chart, call

16   Ms. Magdo.  It's not a civil case.  You don't get to depose

17   your witness.  You're welcome to establish in front of the jury

18   you didn't have access to her and met her before.  But if there

19   is something that's generally confusing, I suspect Ms. Magdo

20   will be happy to explain to you what the Y axis is and what a

21   particular point represents the intersection of.

22          MS. WOLFE:  Thank you.

23          THE COURT:  Let me take care of a couple of

24   housekeeping issues before I break and give you a chance to

25   raise any other issues.  I will want to speak with the

1    government just about the grand jury subpoena issue.

2              Who is going to be at the table for the government?

3              MR. IMPERATORE:  The four of us.

4              THE COURT:  Okay.  And at the defense table, the three

5    of you?

6              MR. SPILKE:  Yes, your Honor.

7              THE COURT:  Have I gotten from each of you a

8    comprehensive list of names or entities that are apt to come up

9    in testimony?

10             MS. MAGDO:  Not yet, your Honor, we were hoping to

11   provide it to the Court on Monday.

12             THE COURT:  That's fine.  Give me an alphabetical list

13   of people on the one hand and the names of entities on the

14   other so I can work it into my voir dire script.  And that goes

15   for both sides.

16             Courtroom technology.  I am out next week, so it's a

17   perfect time for you to reach out to Mr. Smallman if anyone

18   needs to do a walk through here, but I want to make sure we're

19   not wasting time in front of the jury with fumbling with

20   technology that they could have worked out a week before.

21             Government, how are you planning to be presenting

22   evidence to the jury?

23             MR. IMPERATORE:  We'll be presenting it principally

24   through the trial director system.  Ms. Diaz would present

25   images on all of the screens in the courtroom.  I am not aware

```
 1    that we would plan to use the ELMO.

 2              THE COURT:  That's fine.  Make sure you're ready for

 3    prime time on it.  By and large, things have worked well in

 4    this courtroom.  I have had more difficulty -- Mr. Spilke knows

 5    this -- when I have been in the big ceremonial courtrooms

 6    during trial.  So make sure you have given everything a dry

 7    run.

 8              I just had a civil trial this week.  One regrettable

 9    feature of the technology here is that it's not a touch screen

10    in the sense where when the witness touches the screen there's

11    not a blue mark where his or her finger is.  So think about

12    that in working with the witnesses.  If you need something

13    pointed out, you need to be articulate as to what the witness

14    is pointing to.

15              Defense, do you have any anticipation of technology

16    use?

17              MR. SPILKE:  The ELMO, if anything.

18              THE COURT:  Again, whoever is going to be using it,

19    meet with Mr. Smallman at some point next week to make sure you

20    have got -- you're facile with it so we don't have delays.

21              Next thing is just the final thing -- besides the in

22    camera discussion as to the subpoena -- involves my trial day.

23    Mr. Spilke is the only one here who has had a trial in front of

24    me, but I work what I call the Judge Cote schedule, which is to

25    say I expect everyone here at 9 o'clock.  And we use the period
```

1    between 9:00 and 9:30 each trial day to work through any issues

2    that might come up that day, and actually particularly

3    appreciated if they had been raised the evening before, because

4    my whole goal here is to make sure that we have no or almost no

5    sidebars.  I really want to make sure that we do everything

6    that we can so when the jury is here their time is well spent

7    and I'm not wasting time addressing at sidebar issues that were

8    capable of being raised earlier.

9          So I expect everyone in their seats at 9:00, and we

10   use that time productively to anticipate issues during the day.

11   I really value counsel writing letters overnight or raising

12   things at the end of the prior trial day so I could get ahead

13   of things.  My experience -- I have been at this for five and a

14   quarter years -- is my incidents of unforced errors goes down a

15   lot -- sorry, another sports reference -- if I have advance

16   notice.  So I really implore you to do that.

17         The jury starts its work at 9:30.  We order breakfast

18   for them at 8:45, and that tends to get them here early.  They

19   come out at 9:30, we take a mid-morning break for 10, in a

20   criminal case with more jurors usually more like 15 minutes.

21   We take a mid-afternoon break of the same length, they have a

22   snack in the jury room, and at lunchtime we take a break of

23   approximately an hour.

24         But we are otherwise working hard from 9:30 to 5:00

25   with the jury.  So I need everyone here on time, and you need

Case 1:20-cr-00278-TNM Document 144-2 Filed 10/10/23 Page 51 of 57
Case 1:16-cr-00363-KPF Document 751 Filed 01/26/23 Page 51 of 57 PageID #: 3921

H1CTAFRC

1  to be prepared after 5 o'clock to stay a little later, not with

2  jury, but with me to make sure that I'm ahead of the curve on

3  any issues that may come up.  So fair warning, please, that

4  there's some security line downstairs isn't a good excuse, you

5  need to assume the worst and plan accordingly.

6          With that, before I see the government in the robing

7  room on the subpoena, does anyone, beginning with the

8  government, have anything else to raise?

9          MR. IMPERATORE:  Briefly, your Honor, we would like to

10  put on the record a couple of things.  First, in November 2016

11  the government made a written plea offer to the defendant which

12  was communicated by email to Mr. Spilke and Ms. Wolfe.  The

13  defendant rejected that plea offer.

14          THE COURT:  Okay.  Mr. Spilke, is that correct?

15          MR. SPILKE:  Yes, your Honor.

16          THE COURT:  Okay.  Government, do I need to inquire of

17  the defendant anything about that?

18          MR. IMPERATORE:  We would encourage the Court to do

19  so.

20          THE COURT:  Were there any other plea offers, before I

21  turn to the defendant?

22          MR. IMPERATORE:  No.

23          THE COURT:  Okay.  Mr. Spilke, do you need to take a

24  moment with your client?  I would like to establish for the

25  record that he was aware of the offer, discussed it with you,

1    and turned it down.

2           MR. SPILKE:  Just one moment.

3           (Pause)

4           MR. SPILKE:  Okay, your Honor, we're ready.

5           THE COURT:  Mr. Afriyie, I need to ask you a few

6    questions to confirm that you were made aware of the plea

7    offer, that you discussed it with your lawyers, and you turned

8    it down.

9           So step by step, the government represents in or

10   around November of last year a written plea offer was made by

11   the government to the defense.  Was that offer communicated to

12   you?

13          THE DEFENDANT:  It was.

14          THE COURT:  That's yes?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Kindly answer yes or no and keep your

17   voice up.  And did you have an opportunity to discuss it with

18   your counsel?

19          THE DEFENDANT:  Yes.

20          THE COURT:  And the government represents that the

21   offer was turned down, that the defense said no.  Is that

22   correct, your intention was to say no to the plea offer?

23          THE DEFENDANT:  Yeah.

24          THE COURT:  Very good.  Does any further inquiry need

25   to be made?

1           MR. IMPERATORE:  Not on that subject, your Honor.

2           THE COURT:  Anything else?

3           MR. IMPERATORE:  Briefly we want to note two things

4    for the record.  First, the government and the defense have

5    agreed that they would make a reciprocal exchange, exchange

6    with each other this coming Monday, the 16th, marked exhibits,

7    3500 material and witness lists.

8           And secondly, just to note that the defendant was

9    served today at this conference with an if-as-and-when subpoena

10   which required him to produce if as and when he testifies.

11          THE COURT:  Very good, I'm glad you mentioned that.

12   And I would like to get two exhibit binders with an exhibit

13   list from the parties sometime before the trial, the Friday

14   before the trial is fine.  And I would also like two binders of

15   3500 material, one -- as to all of these, one for me and one

16   for my law clerk.  Okay?

17          MR. IMPERATORE:  Yes, your Honor.

18          THE COURT:  Anything else from the government?

19          MR. IMPERATORE:  And finally one last thing, your

20   Honor, we have produced Rule 16 material on a rolling basis.

21   We have made repeated requests of the defense -- beginning in

22   June of 2016, and we renewed that request throughout the course

23   of this case -- for Rule 16 material.  We haven't received any

24   Rule 16 material, with the exception of the one press release

25   that Ms. Magdo described.  So we're concerned about that, we're

 1    entitled to Rule 16 material, and we're asking the defense to

 2    produce it immediately.

 3           THE COURT:  Mr. Spilke, is there any other Rule 16

 4    material other than the press release?

 5           MR. SPILKE:  No, your Honor.

 6           THE COURT:  There you go.

 7           Anything further from the government?

 8           MR. IMPERATORE:  No, your Honor.

 9           THE COURT:  Mr. Spilke, before I take the government

10    in the robing room, anything further from the defense?

11           Or Ms. Wolfe?

12           MS. WOLFE:  One thing that has to do with scheduling,

13    your Honor.  I recently learned that I have a Second Circuit

14    argument Monday morning, which isn't the worst thing in the

15    world because I can write to them and ask if I could be put

16    first on the list.

17           THE COURT:  Monday, the 23rd?

18           MS. WOLFE:  Right, the first day of the trial.  And it

19    takes a little time for a jury to come up, so hopefully I won't

20    be inconveniencing the Court too much.

21           THE COURT:  Okay.  I'm glad to know that.  I do

22    encourage you promptly to reach out to the Circuit and explain

23    the circumstances.

24           Look, my experience is that the jury clerk here tends

25    to take criminal cases first.  I don't know what other criminal

1    cases there are that day, if any, but we'll be among the

2    earlier cases out of the chute.  But it's also the first day of

3    jury service, so the jury will need to watch the video and

4    whatnot.  I'm guessing that we'll be lucky if people are here

5    at 10:20, maybe get here at 10:00, but somewhere in the 10:00

6    to 10:40 range is when we're likely to get our panel.

7              But the bottom line is you're in great hands with

8    Mr. Spilke.  I will have to proceed with the jury selection.

9    I'm not going to have all these good people waiting while the

10   argument is going, but I intend at an early point to introduce

11   the various participants.  And if you happen to come a little

12   later, we'll take that and introduce you when that time comes.

13   If you want me to explain that you have a court argument, or be

14   mum on the point, either way.

15             MS. WOLFE:  If that happens and you do start, I would

16   ask that the Court mention my name because --

17             THE COURT:  I will mention your name, and then the

18   question is when you come I will reiterate -- I will ask if any

19   of them recognize you.  I will be happy to do that, and good

20   luck with the argument.

21             Anything else from the defense?

22             MR. SPILKE:  No, your Honor.

23             THE COURT:  Let me have, briefly, government counsel

24   in the robing room with the court reporter.

25             (Pages 55 through 62 SEALED by order of the Court)

H1CTAFRC

```
 1          (In open court)

 2          THE COURT:  I just finished a conversation in the

 3   robing room with government counsel and my staff, which I

 4   explored the third motion in limine filed by the defense, the

 5   one that challenges the subpoena to Delta on the theory that it

 6   is not a valid use of a grand jury subpoena but a trial

 7   subpoena dressed up as such.

 8          Based on my conversation with the government, I am

 9   satisfied that there is a bone fide basis for the issuance of

10   any grand jury subpoena, as opposed to the Delta subpoena, and

11   therefore, putting aside any other bases for denying the

12   defendant's motion, I find this was a valid subpoena and

13   therefore deny the motion.

14          All right.  With that, I look forward to seeing you

15   all on January 23rd.  Obviously the Court is closed on Monday,

16   but in the event anything comes up, please contact my chambers

17   by email or on the phone as promptly as possible, and they will

18   be able to reach me with a little bit of a time delay.  But

19   again, if something comes up, it would be my intention to get

20   you on the phone to sort out what the issues are.

21          MS. WOLFE:  Your Honor, just one question, since your

22   Honor said you would be away next week.  It's my practice to

23   submit a letter with what seems like the most important

24   objections I can identify to the government's request to

25   charge, and I got a little behind this time, but should submit
```

1    it by Friday, if it's not something that you're going to look

2    at until we get closer to the charge conference.

3            THE COURT:  Why don't you get it to me by Wednesday of

4    next week.  That will give you plenty of time and realistically

5    won't delay my reflection on the charge issues.

6            I will tell you that having briefly reviewed each

7    side's request to charge, at first blush I'm not seeing out of

8    the ordinary issues presented by the charge and defenses in the

9    case, but I will obviously get a better understanding of where

10   the defense is going, but also aspects of the government's

11   proof.  But at first blush, this seems reasonably plain vanilla

12   in terms of the charges that are given in this type of case.

13           Thank you.

14                               oOo