**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Criminal No.** |
| **v.** | **1:20-cr-00278-TNM** |
| **KEITH BERMAN** | |
| **Defendant.** | |

**UNITED STATES' MOTION TO EXCLUDE PROPOSED EXPERT TESTIMONY**

At the start of the pandemic, the defendant falsely claimed he had developed a 15-second test to detect COVID-19 in a finger-prick sample of blood. The defendant repeatedly lied to shareholders, falsely claiming, among other things, that his blood test was functional and had produced results in ten seconds; that the test had been validated; and that his blood test had passed a major FDA "milestone" on its way to approval. At trial, the government will prove the defendant's statements about his blood test were materially false and misleading because: no working prototype existed; no validation testing had been conducted; and the defendant was unable and unwilling to conduct the type of testing that the FDA required to complete its review process.

The defendant evidently expects to spend a substantial amount of time at trial eliciting testimony from purported experts about a series of topics that are not relevant to the question of what the defendant knew at the time he made these materially false and misleading statements, or any other elements of the crimes charged. According to his expert disclosures, the defendant wants the jury to hear about how, even if he had not developed his blood test when he said he had, his blood test was theoretically possible; how factors other than his false statements may have caused his company's stock price to move; and how the FDA makes it difficult for companies, like the defendant's company, to navigate the approval process. These issues are not probative in this case and, even if they were, any probative value would be substantially outweighed by a danger of confusing the issues and misleading the jury by focusing jurors on complex scientific and econometric questions whose answers do not bear on the elements of the crimes charged.

Even if his experts' conclusions were admissible under Rules 401, 402, and 403 (which they are not), the defendant cannot meet his burden to demonstrate the reliability of his experts' principles and methods under *Daubert* and Rule 702. The defendant's expert disclosures are so

deficient that he fails to provide basic information required to facilitate the government's preparation for trial and to enable the Court to perform its gatekeeping role with respect to such testimony.   The defendant had ample opportunity to provide the required information: the defendant participated in selecting the expert disclosures deadline, and he had months to prepare his expert disclosures.   In addition, the government promptly followed-up on the defendant's deficient disclosures to pose specific questions that he needed to answer in order to satisfy his obligations under Federal Rule of Criminal Procedure 16 – and the defendant refused to respond. There is no excuse for the defendant's failure to timely provide the information required under Rule 16, or to withhold it from the government when the government has repeatedly made good faith requests.

For these and a myriad of other reasons set forth below, the Court should exclude the proposed testimony from all four of the defendant's purported experts.

## BACKGROUND

The Court provided the defendant with two months to prepare his expert disclosures. (ECF 128; July 7, 2023 Minute Order.)   Minutes before the midnight deadline on September 25, 2023, the defendant disclosed that he expected to call up to four experts to testify at trial, namely:

- Stuart Williams, Ph.D., who is expected to testify that the defendant's blood test is theoretically feasible (Government Exhibit ("GEX") 1A);

- Mark DuVal and Lisa Pritchard, who are both expected to testify about the FDA approval process (GEX 1B; GEX 1C); and

- James Reilly, who is expected to testify that the defendant's lies did not cause his victims' losses (GEX 1D).[1]

---

[1]  The defendant attached the CV for each proposed expert to his or her respective disclosure.   The government did not include these attachments in GEX 1A, 1B, 1C, or 1D.

The defendant's disclosures, however, were cursory and deficient.   The defendant provided a list of general topics about which his proposed experts might testify.   (*Id.*)   The defendant did not provide the government requisite notice of the proposed experts' actual opinions on those topics; the methodology, bases or reasons underlying the proposed experts' opinions; or, for certain witnesses, the proposed expert's qualifications.   (*Id.*)

On September 27, 2023, the government sent defense counsel correspondence explaining how the defendant failed to provide the information required by Federal Rule of Criminal Procedure 16(b)(1)(C)(iii) with respect to each of the noticed experts, and requesting that the defendant provide the missing information by September 28, 2023 (GEX 2 (Stuart Williams), and September 29, 2023 (GEX 3 (Mark DuVal and Lisa Pritchard); GEX 4 (James Reilly)).   On September 29, 2023, the defendant notified the government he would respond to the government's requests on October 2, 2023.   (GEX 5.)   The night of October 2, 2023, the defendant sent a letter purporting to respond the government's requests for the missing information required by Rule 16(b)(1)(C)(iii).   (GEX 6.)   While the defendant's letter provided some additional information, the defendant still had not satisfied his disclosure obligations.   Moreover, the defendant's letter raised additional questions, including about the defendant's apparent failure to meet his disclosure obligations under Rule 16(b)(1)(A) and (B).

The next day, on October 3, 2023, the government asked counsel for a conference call to discuss its requests.   (GEX 7.)   Counsel demurred and asked the government to submit its questions in writing.   (*Id.*)   The government responded: "The reason we asked for a call is because we feel that it would be more efficient and productive if we could have a conversation around some of the issues raised in your disclosures and follow-up letter, particularly given that

the government has only have a few business days left to file its motions." (*Id.*)   Counsel replied: "We appreciate your position.  But given our team's schedule and the underlying issue, it would be most productive and quickest to try and first address any questions you may have in writing.  If you send your questions along, we would be happy to consider them." (*Id.*)

The government promptly complied with counsel's request that the government submit its questions in writing.  Later that day and early the next morning, the government sent counsel additional correspondence explaining how the defendant failed to provide the information required by Rule 16(b)(1)(C)(iii) with respect to each of the noticed experts.  (GEX 8 (Stuart Williams); GEX 9 (Mark DuVal and Lisa Pritchard); and GEX 10 (James Reilly).)   In light of the fact that this missing information was known to the defendant and was required to be disclosed 10 days prior, the government requested a prompt response.  The night of October 4, 2023, counsel replied: "Because your requests within these letters exceed the requirements of Rule 16, we will not be responding."   (GEX 11.)

## **STANDARD**

All evidence, including expert testimony, must be relevant to be admissible.  *Fed. R. Ev.* 402.  Evidence is relevant if (i) "it has any tendency to make a fact more or less probable than it would be without the evidence" and (ii) "the fact is of consequence in determining the action." Fed. R. Ev. 401.  Courts have discretion to "exclude relevant evidence if its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Fed. R. Ev.* 403.

An expert may be permitted to testify if he or she is qualified, reliable, and helpful.  *Fed. R. Ev.* 702.  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court charged district

courts with a gatekeeping role with respect to expert testimony.  509 U.S. 579, 597 (1993).  This inquiry is "guided" by Federal Rule of Evidence 702, *id.* at 598-95, under which courts have discretion to admit expert testimony when:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

*Fed. R. Ev.* 702.

"[T]he twin requirements for the admissibility of expert testimony are evidentiary reliability and relevance."  *United States v. Sutton*, 642 F. Supp. 3d 57, 65 (D.D.C. 2022), *on reconsideration in part*, No. CR 21-0598 (PLF), 2022 WL 17572835 (D.D.C. Dec. 7, 2022) (citing *Ambrosini v. Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996)).  With respect to reliability, the Court must focus on the methodology or reasoning employed by application of the factors in Rule 702 and the non-exhaustive lists of factors set forth in *Daubert*, namely: "(1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the method's known or potential rate of error; and (4) whether the theory or technique finds general acceptance in the relevant scientific community."  *Ambrosini*, 101 F.3d at 133-34.  With respect to relevance, the Court must determine whether the proffered testimony "'is sufficiently tied to the facts of the case and whether it will aid the jury in resolving a factual dispute.'"  *Id.* at 134 (quoting *Daubert*, 501 U.S. at 591).  The proponent of the expert testimony has the burden of establishing reliability – as well as the other admissibility requirements in Rule 702 – by a preponderance of the evidence.  *See Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127, n. 9 (D.C. Cir. 2001).

Federal Rule of Criminal Procedure 16(b)(1)(C)(i) provides that "the defendant must disclose to the government, in writing, the information required by (iii) for any testimony that the defendant intends to use under Federal Rule of Evidence 702, 703, or 705 during the defendant's case-in- chief at trial."   "The disclosure for each expert witness must contain:

- a complete statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief;

- the bases and reasons for them;

- the witness's qualifications, including a list of all publications authored in the previous 10 years; and

- a list of all other cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition."

*Fed. R. Crim. P.* 16(b)(1)(C)(iii).   "Merely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions."   *United States v. Kaufman*, No. 19-CR-504 (LAK), 2021 WL 4084523, at *19 (S.D.N.Y. Sept. 8, 2021), *aff'd*, No. 21-2589, 2023 WL 1871669 (2d Cir. Feb. 10, 2023) (quotations omitted) (citing *United States v. Duvall*, 272 F.3d 825, 828 (7th Cir.2001) ("The Rule requires a summary of the expected testimony, not a list of topics.")   The Advisory Committee notes to Rule 16 explain that the expert disclosure requirements are intended "to facilitate trial preparation, allowing the parties a fair opportunity to prepare to cross-examine expert witnesses and secure opposing expert testimony if needed," by providing "enforceable deadlines" for the disclosure of specific information about the content of each propose expert witness's testimony and potential impeachment.   Fed. R. Crim. P. 16 Advisory Committee Notes to 2022 Amendment.   "If a defendant fails to provide disclosures in accordance with Rule 16(b)(1)(C), the district court may exclude the expert's testimony at trial." *Kaufman*, 2021 WL 4084523, at *19.

6

## ARGUMENT

## I. THE COURT SHOULD EXCLUDE THE PROPOSED EXPERT TESTIMONY BY STUART WILLIAMS

### A. The Proposed Testimony Is Irrelevant and Will Confuse and Mislead the Jury

### 1. The Court Should Exclude Under Rules 401, 402 and 403 the Proposed Testimony About Whether the Defendant's COVID-19 Blood Test Is Theoretically Feasible

When the parties were preparing for trial in 2021, the government moved under Rules 401, 402 and 403 to preclude the defendant from offering evidence and argument relating to the question whether a blood test for COVID-19 is theoretically feasible.  (ECF 30.)   The government explained that whether the defendant's blood test could have been developed is not relevant to the question whether the defendant lied when he said that he already had developed it.  (ECF 30 at 5-6.)    The government also explained that scientific evidence about impedance testing, the presence of viruses in the blood, and the ability to distinguish the COVID-19 virus from other viruses will be extremely technical and time consuming.  And that the danger of confusing and misleading the jury and wasting time substantially outweighs any probative value of theoretical evidence, given that the defendant represented that the test was functional and "perfected" when he knew that the COVID-19 blood test was nothing more than an idea, that he had not even produced a prototype, and that he could not perform the testing required for FDA approval.  (*Id; see also* ECF 37; Nov. 19, Hr'g Tr. at 17:1 – 18:14; 20:15 – 21:7.)   The government was specifically concerned that the defendant might call an expert at trial to testify about the science surrounding the possibility, in general, of impedance testing for COVID-19 in blood.  (Nov. 19, Hr'g Tr. at 18:3-8, 20:15 – 21:7.)

At that time, the defendant (who was then represented by different counsel), assured the

7

Court that he was not planning to call an expert to testify about such matters:

| THE COURT: | I think [the government is] just saying you shouldn't be able to put on evidence that regardless of your client's knowledge or despite your client's knowledge to the contrary, that it is theoretically possible to put on a blood test.   Do you take issue with that? |
|---|---|
| PRIOR COUNSEL: | No, Your Honor. … |

*     *     *

| PRIOR COUNSEL: | So we're not going to go off on a detour and frolic on different scientific evidence. We are just going to ask [Daniel Kim and Dr. Matthew Musho] what they did in connection with the journey of trying to create this home-based test kit for COVID-19. … |
|---|---|
| THE COURT: | Okay. All right. Anything further? |
| PRIOR COUNSEL: | On this point? |
| THE COURT: | Yes. |
| PRIOR COUNSEL: | No. |

(Nov. 19, 2021 Hr'g Tr. at 26:11-17.)  Based, in part, on the defendant's representation, the Court deferred judgment of the government's motion.   (ECF 49.)

Now the defendant is proposing to do what he previously assured the Court he would not: call an expert, who was not involved in the development of the defendant's blood test, to testify that the defendant's blood test could have been developed.  (GEX 6 at 4-5.)   According to the defendant's disclosures, "based on his review of peer-reviewed publications that consider whether impedance technology could be or has been used to detect the presence of viruses," Dr. Williams expects to explain that "it is feasible to use an electrochemical impedance spectroscopy-based biosensor for the detection of pathogen viruses, including COVID-19."  (GEX 6 at 4.)   The defendant also disclosed that Dr. Williams expects to testify that "under controlled testing

8

conditions in a laboratory environment, which includes control over the liquid sample itself, DECN's COVID-19 device kit was able to accurately detect the presence or the absence of COVID-19."[2]   (*Id.* at 5.)

Testimony about whether the defendant's blood test was theoretically possible is not probative to the issue whether the defendant lied when he said that he already had developed it.   Similarly, the results of tests conducted after the defendant made the allegedly false and misleading statements that are the subject of the indictment are not probative of the defendant's knowledge at the time he made those statements.   Such testimony would be improper *post hac* opinion with respect to the question of whether the defendant acted with fraudulent intent.   *See, e.g., Kaufman*, No. 19-CR-504 (LAK), 2021 WL 4084523, at *22-23 (excluding a proposed expert's analysis because it was based on information about which the defendant could not have had knowledge during the relevant time period).

Even if such opinion testimony was probative (which it is not), any probative value would be substantially outweighed by a danger of confusing the issues and misleading the jury by

---

[2] The government asked the defendant to "[p]lease provide some basic information about this testing, including where the tests were conducted, when and by whom," and to "[p]lease also disclose what role, if any, Dr. Williams played with respect to this testing and what specific opinions he expects to offer about the results".   (GEX 8.)   The defendant, however, refused to respond.   (GEX 11 ("[W]e will not be responding.").)

The government also reminded counsel that, on the eve of trial in 2021, the defendant told the government and the Court he was planning to introduce as an exhibit what he claimed was a functional COVID-19 blood test.   (GEX 8 at 2 (citing ECF 76).)   However, when ordered by the Court to produce this test, the defendant demurred and instead produced what he described as "'the pre-existing glucose meter and associated finger stick, which at least two government witnesses [would] identify as the basis for the adaption for the blood-based test.'"   (GEX 8 at 2 (quoting ECF 77 at 1).)   The government wrote that "[t]o the extent the defendant now claims – for a second time – that he has a functional COVID-19 blood test and seeks to introduce at trial the test itself and/or the results of such a test, the government requests that the defendant immediately produce a copy of such evidence."   (GEX 8 at 2.)   The defendant also refused to respond to this request.   (GEX 11.)

focusing jurors on theoretical facts and information not known to the defendant at the time he made the allegedly false statements. The mere suggestion that subsequent developments or later acquired information could be relevant (it is not) creates a significant risk of misleading the jury.

2.    **The Court Should Exclude Under Rules 401, 402 and 403 the Proposed Testimony About the Defendant's Purported COVID-19 Saliva Test**

The defendant also disclosed that Dr. Williams may offer testimony about the defendant's purported saliva test. (GEX 1 at 2 ("Dr. Williams will explain that DECN's COVID-19 blood and saliva test kits, generally, shared an identical product design.").) The government repeatedly asked the defendant to explain how testimony about his saliva test is relevant given that the indictment is based on the defendant's lies about his blood test. (GEX 2 at 1-2; GEX 8 at 2.) The defendant refused to respond. (GEX 11.) The government's motion to preclude evidence and argument about the theoretical feasibility of the defendant's blood test also sought preclusion of evidence and argument about the defendant's saliva test under Rules 401, 402 and 403. (ECF 30; ECF 37.) As explained above, the Court deferred ruling on that motion. (ECF 49.) In light of the defendant's recent disclosures, the government respectfully submits that the Court should now grant that motion (ECF 30; ECF 37) for all of the reasons stated therein and at the motions hearing (Nov. 19, 2021 Hr'g Tr. at 13:23 – 16:18).[3]

3.    **The Court Should Exclude Under Rules 401, 402 and 403 the Proposed Testimony About COVID-19 Antibody Tests**

According to the disclosure, Dr. Williams co-authored a paper titled "Rapid Detection of SARS-Cov-2 Antibodies Using Electrochemical Impedance-Based Detector," which will, in part,

---

[3] For example, the disclosures suggest that Dr. Williams will testify about DECN's GenViro! Registration Report to the European Union – which concerned the saliva test and was not submitted until after the defendant had lied to investors about his blood test (if at all).

inform the basis of the opinions he expects to offer at trial.   The government asked the defendant to provide a copy of the paper.   (GEX 8.)   He refused.   (GEX 11.)

The government nevertheless obtained what it believed to be a copy of Dr. Williams' paper and, true to its title, the work performed by Dr. Williams involved the detection of COVID-19 antibodies in sample of serum (which requires the collection of a whole blood sample.)   This is not relevant to the defendant's case because, as the defendant and his consultants told the FDA in April 2020: his blood test "***does not measure antibodies***".   (GEX 12 (emphasis in original).   *See also* Tr. of Oct. 26, 2020 U.S. Securities & Exchange Commission ("SEC") Deposition of K. Berman (GEX 13) at 213:11-16 (Q: "Does DECN's COVID-19 test kit utilize any type of capture antibody?" A: "No."   Q Does DECN's COVID-19 test kit utilize any immobilization antibodies?" A "No.")   Instead, the defendant's test purportedly required only a finger prick drop of blood (not serum) and purportedly detected virus (not antibodies).   (GEX 12.)   The defendant and his consultants also told the FDA in April 2020 that his blood test was different – and better – than antibody tests:   "***Advantage over antibody tests: short sampling and missed draws with antibody tests can create erroneous results***."   (GEX 12 (emphasis in original).)   The defendant also admitted to the SEC in October 2020 it was "[v]ery, very difficult if not impossible to get [FDA] approval for an antibody [test]".   (GEX 13 at 93:1-2.)

Testimony about an antibody test is clearly not probative of the issues relating to the blood test that is the subject of the superseding indictment.   Even if such testimony was probative (which it is not), any probative value would be substantially outweighed by a danger of confusing the issues and misleading the jury by focusing jurors on yet another type of test that, like the saliva test, is different than the blood test at issue here.

### B. The Proposed Testimony Is Insufficiently Reliable

The defendant's expert disclosures for Dr. Williams are so deficient that the defendant cannot satisfy his obligation under Rule 16(b)(1)(C)(iii) and also cannot meet his burden to demonstrate reliability under *Daubert* and Rule 702.   (GEX 1A.)

For example, the defendant's expert disclosure, provided on September 25, 2023, he disclosed that Dr. Williams may offer testimony regarding "the feasibility of using an electrochemical impedance spectroscopy-based biosensor for the detection of pathogen viruses". (GEX 1A.)   The government promptly wrote that the disclosure did not state what Dr. Williams' opinion will be or the bases and reasons for his opinion, and requested the defendant provide more information.   (GEX 2.)   On October 2, 2023, one week past the due date for his expert disclosures, the defendant responded that: "Dr. Williams may offer testimony explaining that it is feasible to use an electrochemical impedance spectroscopy-based biosensor for the detection of pathogen viruses" and, for the first time, the defendant disclosed that that Dr. Williams also may testify that, "under controlled testing conditions in a laboratory environment, … DECN's COVID-19 device kit was able to accurately detect the presence or absence of COVID-19".   (GEX 6 at 4-5.)   According to the defendant's October 2, 2023 letter, the basis of Dr. Williams' opinion included "DECN blood and saliva standardized testing data; DECN hematocrit testing data; [and] DECN GenViro! Meter Programming Database," among other things.   (*Id.*)

The government asked the defendant to (i) "provide some basic information about this testing, including where the tests were conducted, when and by whom"; (ii) "disclose what role, if any, Dr. Williams played with respect to this testing and what specific opinions he expects to offer about the results"; and (iii) produce the vaguely described "testing data" and other information on

which Dr. Williams' opinion is purportedly based (and which the defendant is otherwise obligated to produce under Rule 16(b)(1)(A) and (B).   (GEX 8.)   The defendant refused, writing that "[w]e will not be responding".   (GEX 11.)

This proposed testimony should be excluded because the defendant has not complied with his obligations under Rule 16 by the Court-imposed deadline and, as such is unable to meet his burden of demonstrating that Dr. Williams' opinions are sufficiently reliable to satisfy *Daubert* and Rule 702.   The substance of Dr. Williams' proposed testimony remains unclear.   The defendant failed to disclose the principles or methods Dr. Williams used to arrive at his opinions – or even what those specific opinions will be with respect to the purported test results. Specifically, the defendant's expert disclosures for Dr. Williams failed to provide any information that would allow the Court to determine:   "(1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the method's known or potential rate of error; and (4) whether the theory or technique finds general acceptance in the relevant scientific community."   *Ambrosini*, 101 F.3d at 133-34 (summarizing *Daubert* factors).   The defendant has failed to disclose what was tested, when and by whom, let alone how and what results were obtained.   Moreover, the defendant's assertion that Dr. Williams has relevant and reliable test results is inherently suspect given that when the Court previously ordered the defendant to produce what the defendant claimed was his blood test, the defendant demurred and instead produced what he described as "the pre-existing glucose meter and associated finger stick, which at least two government witnesses [would] identify as the basis for the adaption for the blood-based test."   (ECF 77 at 1.)

The defendant's expert disclosures for Dr. Williams are deficient in other respects.   For

example:

- The defendant's September 25, 2023 disclosure states that Dr. Williams will offer testimony about "The Bio's criticism of using impedance technology to test for COVID-19 from a blood sample". (GEX 1A at 2.) The disclosure does not state which of The Bio's criticisms Dr. Williams will address or what opinion he will offer with respect to such criticism. And the defendant's letter dated October 2, 2023 (GEX 6), did not respond to the government's request for this information (GEX 2; GEX 8).

- The defendant's September 25, 2023 disclosure also states that Dr. Williams will discuss "the soundness of DECN's testing protocols and testing data it employed in developing its COVID-19 test kits". (GEX 1A at 2.) The disclosure does not state which testing protocols or testing data Dr. Williams will address, or what opinions he will offer with respect to those testing protocols and testing data. And the defendant's October 2, 2023 letter (GEX 6), also did not respond to the government's request for this information (GEX 2; GEX 8).

- The defendant's September 25, 2023 disclosure indicates that Dr. Williams will explain that "DECN's COVID-19 blood and saliva test kits, generally, shared an identical product design". (GEX 1A at 2.) The government wrote the defendant to point out that the disclosure does not state how the blood and saliva tests are identical, why such an opinion is relevant, or how such an opinion relates to the other opinions set forth in his expert disclosures. As stated, it appeared to be a standalone statement about an irrelevant topic: a purported saliva test that is not the subject of the crimes charged. (GEX 2.) The defendant's October 2, 2023 letter did not respond to the government's requests for the information required under Rule 16. (GEX 6; GEX 8.)

There is no excuse for the defendant's failure to timely provide the information required under Rule 16, or to withhold it from the government when the government has repeatedly made good faith requests. The defendant agreed on the expert disclosure deadline, which the Court so ordered. The defendant had two months to prepare his disclosures. And the defendant can easily disclosure the requested information because it is known to him. Under these circumstances, the defendant's failure to comply with Rule 16 and the Court's order warrants exclusion of this proposed testimony. *United States v. Ornelas*, 906 F.3d 1138, 1150–51 (9th Cir. 2018) (affirming exclusion of expert where the court "simply enforce[d] reasonable deadlines

14

established in a pretrial order setting disclosure deadlines"). Exclusion is independently warranted by the defendant's failure to meet his burden to show that the proposed testimony is sufficiently reliable or remotely relevant to the charged crimes.

## II. THE COURT SHOULD EXCLUDE THE PROPOSED EXPERT TESTIMONY BY JAMES REILLY

The proposed expert testimony of James Reilly should not be admitted under Rule 702. According to the scant information in the defendant's expert disclosure of James Reilly (GEX 1D) and the defendant's supplemental letter (GEX 6), Reilly will rely on his experience as a compliance professional to testify as to "the relationship between stock prices and public statements; comparing stock activity of similarly situated businesses during the relevant time period; and analyzing if Decision Diagnostics Corp. ("DECN") stockholders made more money than they lost." (GEX 1D at 2.4.) Specifically, Reilly will testify that "changes in DECN's share price during the relevant period were due to a strong interest by the trading public to invest in companies" developing Covid-19 products. (*Id.*) The defendant contends that these opinions will be supported largely by Reilly's experience designing and implementing surveillance programs for manipulative trading patterns at broker-dealers. (*Id.* at 1-2.)

This testimony should be excluded for three reasons. *First*, the defendant's expert

---

[4] The defendant's disclosures also state "[a]s a senior-level compliance professional at multiple financial firms, Reilly has been deeply involved in the design and implementation of programs to comply with federal securities laws and regulations." On two occasions, the government has asked the defendant to confirm that he does not intend to elicit testimony from Reilly as to whether the defendant complied with federal securities laws and regulations, which would be impermissible. *See Sutton*, 642 F. Supp. 3d 57, 65 (D.D.C. 2022) (quoting *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997) ("Expert testimony consisting of legal conclusions is not admissible because it 'cannot properly assist the trier of fact in either'" understanding the evidence or determining a fact in issue). The defendant, however, has twice failed to respond. As it is clearly improper, the government asks that Court confirm on the record at that the next hearing, that the defendant understands the impermissibility of such testimony.

disclosures for James Reilly are deficient and do not comport with Rule 16(b)(1)(C)(iii)'s requirements as it fails to provide a complete statement of the Reilly's opinions and lacks sufficient information on the bases and reasons supporting the opinions it does provide.  *Second*, Reilly lacks the qualifications under Rule 702 to conduct the proposed causal analysis showing that movements in DECN's stock price were attributable to a general interest in companies with COVID-19 products.  Moreover, Reilly's proposed analysis—which is rooted in a comparison of DECN to eight cherry-picked companies—is neither the product of reliable principles and methods nor could it be reliably applied to the facts here.  *Third*, Reilly's opinions on the cause of DECN's stock price movements and investor victim harm are irrelevant, highly prejudicial, and guaranteed to mislead the jury by confusingly introducing evidence related to a non-element.  For all of these reasons, Reilly's proposed expert testimony should be excluded.

### A.   The Proposed Testimony Should Be Excluded Because the Defendant Failed to Comply with His Disclosure Obligations Under the Federal Rules

As with the other proposed experts, the defendant has failed to satisfy his obligations under Rule 16(b)(1)(C)(iii) with respect to Reilly.   And the proposed expert testimony should be excluded on that ground alone.  As with the others, despite the government's efforts to identify and obtain clarity on the deficiencies in the defendant's disclosure (GEX 4; GEX 10), the defendant refused to provide responsive information to the government's questions, refused to hold a telephone call to discuss the issues, and ultimately refused to engage in further dialogue about the issues with Reilly's disclosure (GEX 6; GEX 7; GEX 11).  That leaves the government where it started: with a wholly lacking expert disclosure that provides neither complete opinions nor an adequate discussion of the reasons or bases for reaching them.

For example, the defendant still has not provided a complete statement of Reilly's opinions with respect to his anticipated analysis of whether DECN "stockholders made more money than they lost[.]"  The disclosure offers no opinion at all as to this topic; instead, it merely appears to offer a question to which Reilly might provide a still unknown answer.  Moreover, the disclosure lacks any indication as to what reasons or bases Reilly will rely on to reach his eventual opinion on this topic.

In addition, in his September 25, 2023 disclosure and October 2, 2023 letter, the defendant states that Reilly's compliance work gives him a "deep understanding of (a) manipulative patterns in the trading of equity securities and (b) methods for reviewing for manipulative patterns" and will allow him to testify as to (1) the reasons that eight companies and DECN's stock prices and volume moved in a particular direction, and (2) the profits and losses of the defendant's victims. (GEX 1D; GEX 6.)   As to the first finding, it is unclear how experience identifying manipulative trading at a broker-dealer will allow Reilly to provide his thesis on why nine public companies' stock price moved, presumably in the absence of the manipulation he was charged with spotting. As to the second finding, there is simply no articulated connection between Reilly's experience and determining victim's losses or gains.

The defendant's disclosure also states that Reilly will opine that there was a "close correspondence between DECN and these other companies in terms of the pattern of changes in share price (GEX 1D), but fails to either explain what a "very close correspondence" means, how that result was derived, or what parameters were used to establish this finding.  The defendant also fails to include any information about Reilly's qualifications to make complex causal

inferences nor does it provide details as to the econometric skills and qualifications held by Reilly, if any.[5]

The disclosure states that "the changes in DECN's share price during the relevant period were due to a strong interest by the trading public to invest in companies seeking to develop products aimed at addressing the onset of the Covid-19 worldwide pandemic." (GEX 1D.)  The disclosure fails to include any explanation as to how Reilly's experience designing policies and surveillance program bears any relation to or provides any support for providing such an opinion. Additionally, the disclosure fails to provide any reasons or bases for this opinion.

In addition, the disclosure states that Reilly will "offer testimony regarding the dollar trading volume of [the eight public] companies." (GEX 1D.)  The disclosure fails to include what opinion Reilly will offer related to the dollar trading volume of the other companies.   In his October 2, 2023 letter, in an attempt to clarify this opinion, the defendant simply cited Reilly's opinion regarding the price of the other securities.  (GEX 6.)  This again failed to provide any statement as to Reilly's opinion with regard to the trading volume of the eight other companies or what bases were used for Reilly's purported comparative analysis.

## B.     The Proposed Testimony Should Be Excluded Because Reilly Is Not Qualified Under Rule 702

Reilly is not qualified to offer the opinions listed in the disclosure.   Reilly has experience ensuring that his market-participant employer was complying with its regulatory obligations and that its customers were not engaging in fraud.   Reilly's proffered credentials appear to hold no

---

[5] The absence of this disclosure is strikingly inconsistent with the arguments made in the Defendant's Motion to Exclude the Testimony and Opinions of Thomas Carocci. (ECF 142 at 9 ("The government disclosure lacks sufficient details regarding the econometric skills necessary to establish and opine on the causal inferences that are key to proving the alleged securities fraud.").

bearing on the two topics that the defendant proposes he will testify on: (i) the cause of DECN's price movements and the correlation of those movements to purportedly similarly situated companies and (ii) the profits and losses of the defendant's victim investors.   The Court need look no further than the defendant's own arguments against the government's expert, Thomas Carocci, to see that the defendant does not consider an individual lacking econometric skills—such as Reilly—as qualified to offer an opinion on the causal inferences behind stock price movements. (ECF 142 at 9).   Moreover, as the government explained above, there is a wide gap between Reilly's compliance experience and his conclusions.   Despite the government's repeated efforts, the defendant has yet to disclose sufficient information for the government and the Court to understand how someone who set up and monitored compliance systems to detect manipulation is qualified to explain investors' motives for investing in DECN and other companies.

More troubling, and equally disqualifying, is that the proposed testimony fails to meet each of Rule 702's required prongs for reliability.   "The Court may find that a particular witness qualifies as an expert in their field and yet that 'the methodology employed by the expert in analyzing the data' is unreliable." *Evans v. Aramark Sports & Ent. Servs*., LLC, No. 19-CV-2092-RMM, 2022 WL 19520781, at *5 (D.D.C. Nov. 22, 2022) (Meriweather, M.J.) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999)).   There are ten non-exhaustive factors courts use to test reliability and, as relevant here, include:

> (1) whether an expert's theory or technique can be or has been tested;
> (2) whether the theory or method has been subjected to peer review and publication;
> (3) the known or potential rate of error;
> (4) whether standards exist and are maintained for controlling the technique's operation;
> (5) the extent to which a theory or technique has achieved general acceptance  in the relevant expert community;
> (6) whether the expert is proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have

19

developed their opinions expressly for purposes of testifying;

(7) whether the expert is being as careful as he or she would be in his or her regular professional work;

(8) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion by taking too great an analytical leap from existing data to the opinion proffered;

(9) whether the opinion adequately accounts for obvious alternative explanations; and

(10) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert proposes to give.

*Evans*, 2022 WL 19520781, at \*5 (citing *Daubert*, 509 U.S. at 593–94; Fed. R. Evid. 702 Advisory Committee's Notes to 2000 Amendment) (noting no factor is dispositive and they need not all apply in every case).

Applying these factors, Reilly's proposed testimony is neither reliable, reliably applied, nor based on sufficient facts or data and should be excluded under Rule 702(b)-(d).[6]  From the limited information provided in the disclosure, Reilly intends to offer a broad-based opinion about the motive for investors to purchase DECN stock based on his review of eight other cherry-picked public companies.  Reilly's theory or technique for finding a "very close correspondence between DECN and these other companies" to establish that the "changes in DECN's share price" was "due to a strong interest by the trading public to invest in companies seeking to develop products aimed at addressing the onset of the Covid-19 worldwide pandemic" is based on no discernible theory or technique and does not appear to have been published or peer reviewed.  *See* Factors 1-2.  There are apparently no other controls, standards, error rates, or generally accepted techniques governing how Reilly came to this conclusion.  *See* Factors 3-5.  And Reilly appears to have derived his opinion solely for the purposes of this litigation.  *See* Factor 6.

---

[6]  The government addresses how this evidence fails to assist the trier of fact understand the evidence or determine a fact at issue in the next section.

However, the clearest indicator of unreliability is the analytical leaps Reilly takes to reach his unfounded conclusion that DECN's stock price movement is attributable to a general interest in companies with COVID-19 products.  *See* Factor 8 (questioning whether an expert unjustifiably extrapolates from accepted data to his ultimate opinion by taking "too great an analytical leap").  Reilly starts with the premise that eight—seemingly cherry-picked—companies apparently have "a very close correspondence" in price and volume movement.  From there, he jumps to finding that the movement in DECN's stock price—during the time of a series of false and misleading press releases issued at the defendant's behest—is a result of the general interest in its product.  As explained below, DECN's product was a purported blood test, which is a very different product from that offered by the eight companies Reilly selected for comparison. Such an untethered analytical approach should not be sanctioned by this Court.  To offer such an opinion, Reilly must show his work; but he has not and cannot.  This transparently result-driven approach to Reilly's proposed analysis cannot meet Rule 702's reliability requirements and should not be permitted.  *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 568 (D.C. Cir. 1993) (expert testimony based on "guesswork, speculation, and conjecture" should be excluded) (internal quotation omitted); *Robinson v. District of Columbia*, 75 F. Supp. 3d 190, 199 (the court's limited gate-keeping role is "directed at excluding expert testimony that is based upon subjective belief or unsupported speculation") (internal quotations and citations omitted).

The defendant neither asserts that these other companies all offered COVID-19 tests, like the defendant claimed for DECN, nor contends that they were traded on similar securities markets or are of similar size.  Novavax Inc. is an illustrative example.  Unlike DECN, which was traded over the counter, Novavax was listed on the NASDAQ.  Additionally, Novavax was developing

a COVID-19 vaccine, not a test.   As the below chart indicates, the eight companies were in disparate businesses, listed on a variety of exchanges, and with a wide-range of market capitalizations.

| Company | Stock Exchange | March/April 2020 Covid Product |
|---|---|---|
| NVAX – Novavax Inc | NASDAQ | Vaccine |
| SNANF – Sona Nanotech Inc | OTC | Saliva-based lateral flow test |
| TAUG – Tauriga Sciences Inc | OTC | PCR nasal swab test |
| SRNE – Sorrento Therapeutics Inc | NASDAQ | Vaccine |
| CODX – Co-Diagnostics Inc | NASDAQ | PCR test |
| VXRT – Vaxart Inc | NASDAQ | Vaccine |
| TOMDF – Todos Medical Ltd | OTC | PCR test |
| CYDY – CytoDyn Inc. | OTC | Treatment for COVID-19 |

Lastly, Reilly's proposed methodology conveniently avoids accounting for an obvious alternative explanation for DECN's 2020 price increases: the defendant's false and misleading press releases concerning a COVID-19 blood test that did not exist.   *See* Factor 9.

    As the defendant does not even disclose the proposed principles and methods by which it purports Reilly reached his opinion regarding investor victim losses and gains, the government is without a basis to challenge the principles and methods that Reilly would apply.   In the absence of timely disclosed and reliable principles and methods, the Court should preclude Reilly from providing expert testimony on this topic.

    **C.    The Proposed Testimony Is Irrelevant and Will Confuse and Mislead the Jury**

    Because Reilly's opinions are directed at issues that are not elements of the charged crimes, his testimony should be excluded pursuant to Rules 702(a) (requiring that the expert's testimony "help the trier of fact to understand the evidence or to determine a fact in issue"), 401 (requiring

that evidence relate to a fact that "is of consequence in determining the action"), and 403 (disallowing evidence whose "probative value is substantially outweighed by a danger of" "unfair prejudice, confusing the issues, [or] misleading the jury").

Reilly seeks to attribute DECN's stock price movement to a general interest in companies with COVID-19 products as demonstrated by "a very close correspondence" between DECN's volume and price and the eight companies he has selected. The only apparent basis for this evidence is to try to indicate that defendant's false and misleading press releases did not impact the company's stock price, and instead create an illusory causal chain between movement in the stocks of DECN and other purportedly related companies. The defendant attempts to introduce causation as an issue and have his expert testify as to the ultimate issue – both of which are patently improper and grounds for exclusion. *See Sutton*, 642 F. Supp. 3d at 79 (prohibiting expert testimony that sought to offer a legal conclusion on an element that was not a component of the crime charged). The cause for the DECN's stock price movement is not an element of any crime charged in the case. *See SEC v. Lemelson*, 355 F. Supp. 3d 107, 109 (D. Mass. 2019) (quoting *SEC v. Pirate Inv'r LLC*, 580 F.3d 233, 239 n.10 (4th Cir. 2009) ("Unlike private litigants, the SEC need not prove the additional elements of reliance or loss causation.")). To allow this testimony would mislead the jurors by suggesting that they needed to find that the defendant's fraud moved DECN's stock price in order to find him guilty, which is not the law. To allow this testimony would also substantially prejudice the government by giving the appearance that there is an additional element to the fraud that the government has the burden of proving beyond a reasonable doubt, when it does not. Any probative value to Reilly's comparative analysis is substantially outweighed by the harm done by misleading and confusing the jury into believing there is an

23

additional element for them to consider and by the significant prejudice to the government by effectively placing an additional burden on it to prove a non-element.

The same issues are present by introducing irrelevant evidence of whether or not the victims suffered financial losses.  *SEC v. e-Smart Techs., Inc.*, 31 F. Supp. 3d 69, 80 (D.D.C. 2014) (quoting *Graham v. SEC,* 222 F.3d 994, 1001 n. 15 (D.C. Cir. 2000) ("[U]nlike a plaintiff in a private damages action, the SEC need not prove actual harm.").   To be clear, this proposed testimony also does not relate to the issue of materiality as "[m]ateriality … does not require a showing of actual harm to investors."   *Rockies Fund, Inc. v. SEC*, 428 F.3d 1088, 1097 (D.C. Cir. 2005) (citing  *Graham*, 222 F.3d at 1001 n. 15).   Moreover, courts frequently exclude evidence that places the blame on the purported victim of fraud.  *See, e.g., United States v. Serfling*, 504 F.3d 672, 679 (7th Cir. 2007) ("[T]he perpetrator of a fraud may not defend himself by blaming the victim for being duped.")   All that Reilly's proposed testimony can do is create the false impression that victim loss is an element of the crimes, which it is not, and impermissibly attempt to blame victims or dilute victim impact by purportedly showing that the victims profited from the defendant's fraud.

As with the irrelevant causation opinion, the risks are too great—and substantially outweigh any value to the irrelevant testimony—that the jury will be confused and misled, and the government suffer substantial prejudice, after they hear such testimony but no corresponding jury instruction.   The proposed testimony goes beyond a witness testifying as to an ultimate issue, as the proposed testimony would involve an ultimate issue not before the jury.  This would only amplify the harm of such testimony and undoubtedly causing considerable confusion among the jury as to whether there are additional elements in question beyond the Court's recitation of the

law.

## III.   THE COURT SHOULD EXCLUDE THE PROPOSED EXPERT TESTIMONY OF PRICHARD AND DUVAL

Marc DuVal and Lisa Prichard were two legal and regulatory counsel used by the defendant as part of the unsuccessful FDA approval process for GenViro!.   While DuVal and Prichard were previously included on the defendant's witness lists, they are being noticed as experts for the first time.   (*See*, *e.g.*, ECF 63, 64, and 81.)   The disclosures provided by the defendant indicate that DuVal and Prichard will offer expert testimony about the FDA approval process, impact of COVID-19 on the FDA approval process, and the impact of company size on regulatory strategies. (GEX 1B; GEX 1C; and GEX 6.)   While certain lay testimony offered by DuVal and Prichard may be proper,[7] the expert testimony noticed by defendant should be excluded because (i) it is irrelevant, (ii) it would be impermissibly confusing hybrid witness testimony, and (iii) it is identical and thus violates Rule 403's prohibition on wasteful cumulativeness.   To the extent that any expert testimony from DuVal and Prichard would be proper, it has not been sufficiently noticed.

### A.   Prichard and DuVal's Irrelevant Testimony Should be Excluded Under Rules 401, 402, and 403

Prichard and DuVal's expert testimony regarding the FDA approval process and strategies employed by companies other than DECN is irrelevant.   The indictment, and evidence at trial, focuses on the defendant's lies to investors and securities regulators, *not* on any false statements the defendant may have made to the FDA as part of its approval process.   Testimony regarding, for example:

---

[7] Notably, the government asked counsel to confirm, as prior counsel had, that the defendant would not be raising an advice of counsel (or involvement of counsel) defense. Defense counsel provided no response. The government thus assumes that the defendant will not seek to rely on the presence of FDA counsel in an attempt to negate the *mens rea* of the charged offenses.

- "requirements typically imposed by the FDA (including which are discretionary versus mandatory), such as testing protocols; and how companies generally meet these requirements";

- "small and mid-sized companies often do not have deep financial resources and hence often do not have the ability to engage in expanded testing beyond that required to establish safety and effectiveness"; and

- "preparations that companies seeking to commercialize medical devices typically undertake, as well as the challenges faced by these businesses in bringing a new medical device to market";

is irrelevant to the criminal charges against the defendant, addressing neither the defendant's actual contact with the FDA nor the elements of the crimes charged.   (GEX 6 at 2.)   While DuVal and Prichard's knowledge regarding the defendant's interactions with the FDA may be relevant, strategies and preparations undertaken by other companies have no bearing on issues in this case and will undoubtedly confuse the jury.   Defense counsel provided no explanation when the government inquired about the purported relevancy (or even the relationship to DECN) of this aspect of Prichard and DuVal's proposed testimony.   (GEX 3 and 6.)

Instead of outlining relevant and admissible expert opinions, the defendant's disclosures for DuVal and Prichard indicate that the defendant will seek to impermissibly (and irrelevantly) blame the FDA for the issues with GenViro!.   For example, the disclosures indicate that DuVal and Prichard will testify regarding:

- "how it is often difficult for the average small to mid-sized company to efficiently and effectively navigate through the FDA review process";

- "how the lack of process and predictability in the FDA's review process can disproportionately burden small and mid-sized medical device companies"; and

- "how the [commercialization and regulatory strategies employed by companies of all sizes] were impacted by the COVID-19 pandemic, including additional pandemic-related delays and the availability of seeking authorization via Emergency Use Authorization authority."

(GEX 6 at 2.)   These categories of testimony are not only irrelevant to the charges in the indictment, but they also impermissibly seek to blame the FDA for the defendant's inability to achieve FDA approval for his purported blood test for COVID-19.   This case is about the false statements that the defendant made to the public about where DECN was in the FDA process; the FDA's approval process is not on trial. Such testimony is irrelevant, would confuse the issues for the jury, and force a trial within a trial regarding the FDA approval process.

**B.   Prichard and DuVal's Expert Testimony Should be Excluded Under Rules 403 and 702 as Impermissible Hybrid Witness Testimony**

The hybrid testimony of DuVal and Prichard will impermissibly confuse the jury and inappropriately provide their lay testimony with the imprimatur of expertise.   The Court should thus limit their testimony to their interactions with the defendant and DECN and involvement in DECN's FDA approval process.

*First,* Courts have long recognized the special risks of testimony by hybrid fact and expert witnesses.   *United States v. Williams*, 827 F.3d 1134, 1160–61 (D.C. Cir. 2016) ("[A] 'two-hatted' witness providing closely related lay and expert opinion testimony" presents significant risks due to the "'aura of special reliability and trustworthiness surrounding expert testimony'") (quoting *United States v. Cruz*, 363 F.3d 187, 194 (2d Cir. 2004)).   When hybrid testimony is not presented properly, "the manner in which [the] expert and lay opinions [are] interspersed during the trial" can "require[ ] mental gymnastics of the jurors in determining when [the witness] was testifying as an expert and when he was not, risking confusion." (*Id*. at 1160.)   Additionally, "the fact that an instruction [is] given on [a witness's] expert testimony" sometimes leads "the jury reasonably to assume that all of [the witness's] opinion testimony was based upon his expertise and not merely

on his own perceptions of events presented to the jury." (*Id*.)  In addition to concerns under Rule 403, expert testimony from a hybrid witness may be excluded under Rule 702 because the reliability of expert testimony is critically undermined where the expert witness is biased or has an interest in the outcome of the proceeding.  (Fed. R. Evid. 702(c), (d).)  *See*, *e.g.*, *Phoenix Restoration Grp., Inc. v. Liberty Mut. Grp. Inc.*, No. CV 18-2121 (BAH), 2020 WL 622152, at *4, *6 (D.D.C. Feb. 10, 2020) (collecting cases limiting the scope of opinion testimony by a hybrid witness and finding such limitations "common"; and imposing "strict limitations" on a hybrid fact witness in an insurance including prohibiting "free-standing independent expert testimony divorced from his work on the plaintiffs' claims").

*Second*, the issue is particularly acute in this case as DuVal and Prichard were legal and regulatory counsel to the defendant.  Imbuing these witnesses with the qualifications both legal/ regulatory counsel *and* expert imbues their testimony with the strong, unfair, and improper suggestion of reliability, legality, and trustworthiness. *See id.* at *5 (finding the concerns with hybrid testimony present when the proposed expert was "a key witness" who had "completement involvement" in the key issues including "participating in meetings and communications" with the party offering his testimony).  This is especially problematic as they will be testifying as expert and lay witnesses on the same topics.  For example, Prichard and DuVal's will offer proposed expert opinions on "how the [commercialization and regulatory strategies employed by companies of all sizes] were impacted by the COVID-19 pandemic, including additional pandemic-related delays and the availability of seeking authorization via Emergency Use Authorization authority". (GEX 6 at 2).  While defense counsel declined to explain the relevance of this opinion, the government assumes it is being offered to imply that DECN's EUA process was impacted by the

COVID-19 pandemic in the same way that other companies were (an issue that will undoubtedly be a part of their lay testimony regarding their work with DECN).   Allowing Prichard and DuVal to offer opinions on the same question as both and expert and lay witness will undoubtedly confuse the jury, lending inappropriate "expertise" to counsel's lay opinion's on DECN's actual FDA approval process. *See Phoenix Restoration Grp.*, 2020 WL 622152, at *5 (limiting hybrid testimony as allowing the proposed hybrid witness to "opine, as an expert, about the consistency of his conduct with industry standards on claims processing and accounting, as the defendants appear to intend, would improperly bolster his factual testimony by imbuing it with undue weight, under Rule 403").

The proposed expert opinion testimony regarding testing required by the FDA is another illustrative example.   As alleged in the Superseding Indictment, DECN was "unable and unwilling to conduct the type of clinical testing that the FDA required in order for companies to demonstrate that their COVID-19 test was sufficiently accurate in detecting COVID-19.   The FDA informed DECN that it would not be able to complete the EUA application process without such clinical testing."   (ECF 19 ¶¶ 25-26).   Allowing Prichard and Duval to testify as experts regarding how "small and mid-sized companies often do not have deep financial resources and hence often do not have the ability to engage in expanded testing beyond that required to establish safety and effectiveness," (GEX 6 at 2), could confuse the jury on the issues of (i) what testing was required by the FDA for DECN's EUA; (ii) whether DECN had undertaken (or was capable of undertaking) the required testing; and (iii) whether DECN's blood test was "safe and effective".

*Finally*, given their involvement in DECN's FDA approval process, Prichard and DuVal are incentivized to present the defendant's actions in a normalized or favorable light.   No legal or

regulatory counsel want to admit that they were inadvertently party to fraudulent practices (or even that they failed to notice them). *See Phoenix Restoration Grp.*, 2020 WL 622152, at *5 (noting that the hybrid witness "may harbor concern that the outcome of this proceeding will affect his professional reputation or feel that that the plaintiffs' allegations attack him personally, prompting him to defend his actions to a degree that, while understandable, is inconsistent with the objectivity and reliability required of an expert witness"). This is squarely the type of expert bias that Rule 702 seeks to guard against. The expert testimony of Prichard and Duval cannot be deemed sufficiently reliable where they have personal interests in DECN's FDA approval process being blessed by the Court and the jury.

### C. Prichard and DuVal's Expert Testimony Should be Excluded Because It Is Entirely Cumulative

The notices provided for Prichard and DuVal indicate that they will testify on the exact same topics. The disclosures list the same nine categories of possible testimony (GEX 1B and GEX 1C), provide identical paragraphs with further information regarding those categories. (*Id.* at 3). In fact, when compared, the disclosures for these two witnesses are identical (putting aside their names and qualifications). (GEX 14.) When the government asked counsel for an explanation, they said only that "their testimony will not be duplicative," and then went on to list the same possible categories of testimony for each witness. (GEX 6 at 1-2.) Expert testimony is relevant only if it will assist the trier of fact to understand the evidence presented. *See Fed. R. Ev.* 401, 702; *see also Daubert*, 509 U.S. at 592–93 (citing *Fed. R. Evid.* 104(a)). Even if relevant, however, testimony may be excluded if its probative value is substantially outweighed by the needless presentation of cumulative evidence. *Fed. R. Ev.* 403. The defendant has provided no explanation of the differences between the proposed testimony of Prichard and DuVal. The Court

should thus either require the defendant to provide the differences between the proposed testimonies or exclude one of the two duplicative witnesses.

### D. The Disclosures Made Regarding Prichard and DuVal Are Deficient under Rule 16(b)(1)(C)(iii)

As with the defendant's first two proposed experts, the disclosures regarding Prichard and DuVal's proposed testimony are deficient under Rule 16(b)(1)(C)(iii). The disclosures fail to provide (i) "a complete statement of all opinions that the defendant will elicit from the witness" in the defendant's case-in-chief and (ii) the bases and reasons for those opinions. *Fed. R. Ev.* 16(b)(1)(C)(iii).

*First*, rather that provide a complete statement of all opinions—as required—the Prichard and DuVal disclosures provide only lists of subjects on which they may testify. (GEX 1B; GEX 1C; and GEX 6). For example, the disclosures for both witnesses indicate that Prichard and Duval may testify regarding, the "commercialization and regulatory strategies employed by companies of all sizes and how these were impacted by the COVID-19 pandemic, including additional pandemic-related delays and the availability of seeking authorization via Emergency Use Authorization authority." (GEX 6.) The disclosures do not provide Prichard or DuVal's actual opinion on either the kinds of strategies employed by companies or the impacts of the pandemic on those strategies. Additionally, the disclosures indicate that Prichard and DuVal may testify regarding "how investment in medical device development may impact the timing of certain regulatory strategies, and will offer testimony regarding particular challenges faced by small companies seeking to commercialize medical devices in the United States." (*Id.*) But again, the disclosures fail to provide notice of the actual opinions. In Prichard and Duval's opinions, how is investment in medical device development impacted by the timing or certain regulatory

31

strategies? In Prichard and Duval's opinions, what are the challenges faced by small companies seeking to commercialize medical devices in the United States?   The defendant cannot satisfy Rule 16 by merely identifying the subjects of potential testimony.   When asked to provide the required information, the defendant provided no additional substance.   (GEX 6.)

The disclosures also fail to provide the bases for Prichard and DuVal's potential opinions other than bare references to the witnesses' "professional experience in regulatory matters." When asked to provide the requirement information, the defendant provided no additional substance.   (GEX 6.)   This lack of disclosure fails provides the government and the Court with the requisite information to judge the reliability of the opinions and fails to satisfy the defendant's burden under Rule 16.

The Court should require the defendant to provide the information required under Rule 16. To the extent that the defendant will not, the expert testimony of Prichard and DuVal should be excluded on that basis.

## **CONCLUSION**

For the foregoing reasons, the government respectfully requests the Court exclude the expert testimony described above.

Respectfully submitted,

GLENN S. LEON
CHIEF, FRAUD SECTION
Criminal Division, U.S. Department of Justice

_____
        //s//
CHRISTOPHER FENTON
KATE T. MCCARTHY
MATTHEW REILLY
Trial Attorneys

Fraud Section, Criminal Division
United States Department of Justice
1400 New York Avenue, NW
Washington, D.C. 20005
Telephone: (202) 320-0539
Fax: (202) 514-0152
Christopher.Fenton@usdoj.gov

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 11, 2023, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.


          */s/ Kate T. McCarthy*
          Kate T. McCarthy
          Trial Attorney