# Government Exhibit 6

# COVINGTON

BEIJING  BOSTON  BRUSSELS  DUBAI  FRANKFURT
JOHANNESBURG  LONDON  LOS ANGELES  NEW YORK
PALO ALTO  SAN FRANCISCO  SEOUL  SHANGHAI  WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 6000

**By Electronic Mail**                                     October 2, 2023

Glenn S. Leon
Christopher Fenton
Kate McCarthy
Matthew Reilly
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Ave. NW
Washington, DC 20005

Re: __*United States v. Berman*, No. 1:20-cr-278-TNM (D.D.C.)__

Dear Counsel:

We write to respond to your three letters sent on September 27, 2023, regarding the expert disclosures of Dr. Stuart J. Williams, Mr. James Reilly, Mr. Mark DuVal, and Ms. Lisa Pritchard. We disagree with the characterization of our initial expert disclosures. All four disclosures fully comply with Rule 16(b)(1)(C), and indeed went beyond that rules' requirements. Rule 16(b)(1)(C) "does not require recitation of the chapter and verse of the experts' opinions, bases and reasons," rather it only requires "that the bases and reasons provided must be sufficient to allow counsel to frame a *Daubert* motion (or other motion in limine), to prepare for cross-examination." *United States v. Kelly*, No. 21-CR-00402-RS-1, 2023 WL 4032011, at *1 (N.D. Cal. June 14, 2023) (internal quotation marks and citations omitted). Nevertheless, the following is a voluntary supplement to the initial expert disclosures there were provided on September 25, 2023, and it further exceeds the requirements under Rule 16(b)(1)(C).

## Expert Disclosures of Mark DuVal and Lisa Pritchard

As noted in Ms. Pritchard's and Mr. DuVal's expert disclosures, Mr. Berman "may choose not to attempt to elicit the testimony outlined" but rather provided these disclosures "out of an abundance of caution." Ms. Pritchard and Mr. DuVal may offer opinions regarding any, all, or none of the topics outlined in the disclosures, but their testimony will not be duplicative.

We dispute your characterization of Ms. Pritchard's and Mr. DuVal's disclosures as providing "only (the same) list of nine categories of possible testimony." Following the paragraph which includes a list of nine categories of possible testimony, the disclosures include an additional paragraph (beginning with the phrase "In particular") that provides additional information regarding their anticipated testimony.

**COVINGTON**

Fraud Section
October 2, 2023
Page 2

        Ms. Pritchard or Mr. DuVal will offer testimony regarding the regulatory approvals needed to commercialize medical devices in the United States, including but not limited to premarket submissions.  Ms. Pritchard or Mr. DuVal will explain what a medical device is pursuant to the Food, Drug & Cosmetic Act and describe applicable statutes and regulations relating to commercialization.  Ms. Pritchard or Mr. DuVal will outline the steps in the FDA approval process, including required and discretionary filings and related meetings between applicants and FDA staff, the methods and means through which FDA staff offer feedback regarding potential medical device products, including through letters, phone calls, and meetings; requirements typically imposed by the FDA (including which are discretionary versus mandatory), such as testing protocols; and how companies generally meet these requirements.  Ms. Pritchard or Mr. DuVal will describe the FDA's Emergency Use Authorization ("EUA") process, including the criteria used to evaluate medical devices for authorization pursuant to EUA authority.

        Ms. Pritchard or Mr. DuVal will also offer testimony about the preparations that companies seeking to commercialize medical devices typically undertake, as well as the challenges faced by these businesses in bringing a new medical device to market.  Ms. Pritchard or Mr. DuVal will explain how investment in medical device development may impact the timing of certain regulatory strategies, and will offer testimony regarding particular challenges faced by small companies seeking to commercialize medical devices in the United States.  Ms. Pritchard or Mr. DuVal will explain how it is often difficult for the average small to mid-sized company to efficiently and effectively navigate through the FDA review process.  In particular, Ms. Pritchard or Mr. DuVal will explain that small and mid-sized companies often do not have deep financial resources and hence often do not have the ability to engage in expanded testing beyond that required to establish safety and effectiveness.  In addition, Ms. Pritchard or Mr. DuVal will describe how the lack of process and predictability in the FDA's review processes can disproportionately burden small and mid-sized medical device companies.  Ms. Pritchard or Mr. DuVal will also describe commercialization and regulatory strategies employed by companies of all sizes and how these were impacted by the COVID-19 pandemic, including additional pandemic-related delays and the availability of seeking authorization via Emergency Use Authorization authority.

        Ms. Pritchard's opinions will be based on her extensive professional experience in regulatory matters.  Ms. Pritchard's experience, which is detailed in Exhibit A of her expert disclosure, includes both serving in regulatory and quality roles in medical device companies and counseling medical device companies.  For example, while working as a Senior Regulatory Affairs Specialist at American Medical Systems, Ms. Pritchard prepared over 300 worldwide Regulatory submissions and was responsible for the design, submission and maintenance of 510(k) and PMA applications for medical devices.  While at Medtronic, Ms. Pritchard was responsible for worldwide approval strategy development, submission and maintenance of PMA and 510(k) applications and was recognized as one of the top regulatory professionals at that company.  Ms. Pritchard then led the regulatory affairs function in two small companies before joining DuVal and Associates.  Ms. Pritchard is a Member of the Regulatory Affairs Professional Society.  In addition to her experience, Ms. Pritchard will rely on her training in regulatory.  Her training is also detailed in Exhibit A.

**COVINGTON**

Fraud Section
October 2, 2023
Page 3

Mr. DuVal's opinions will be based on his legal training and his extensive professional experience in helping companies navigate complex regulatory environments.  Mr. DuVal's experience, which is detailed in Exhibit A of his expert disclosure, includes counseling both mature and venture-backed companies in the United States.  He regularly advises clients in all areas of FDA law and regulation and negotiates Investigational Device Exemption approvals, 510(k) clearances, de novo and PMA approvals with the FDA on behalf of medical device clients.  Mr. DuVal also advised business teams regarding FDA device approvals as an in-house attorney at Medtronic.

With respect to your question relating to "allegations of improprieties in the FDA approval process," please indicate which disclosed testimony you believe addresses this topic.

**Expert Disclosure of Jim Reilly**

As noted in our disclosure, Mr. Reilly's testimony will be based on his training, experience, and intimate knowledge of federal securities laws and decades of analysis and surveillance of trading in securities.  This experience, which is detailed in Exhibit A of his expert disclosure, includes the implementation of surveillance programs focused on reviewing trading in equity securities.  The creation and implementation of these surveillance programs necessarily requires a deep understanding of (a) manipulative patterns in the trading of equity securities and (b) methods for reviewing for manipulative patterns.

The eight (8) other public companies that Mr. Reilly relies upon—similarly sized companies that were also developing products to address the COVID-19 pandemic—are listed below:

- SNANF – Sona Nanotech Inc
- TAUG – Tauriga Sciences Inc
- SRNE – Sorrento Therapeutics Inc
- NVAX – Novavax Inc
- CODX – Co-Diagnostics Inc
- VXRT – Vaxart Inc
- TOMDF – Todos Medical Ltd
- CYDY – CytoDyn Inc

With respect to your question relating to whether the defense intends to have Mr. Reilly testify that Mr. Berman "complied with federal securities laws and regulations," please indicate which disclosed testimony you believe addresses this topic.

With respect to your assertion that Mr. Reilly's disclosure "fails to include what opinion Mr. Reilly will offer related to the dollar trading volume of the other [eight public] companies," as stated in Mr. Reilly's disclosure, "[his] analysis and comparison will demonstrate a very close correspondence between DECN and these other companies in terms of the pattern of changes in share price."

**COVINGTON**

Fraud Section
October 2, 2023
Page 4

### <u>Expert Disclosure of Stuart J. Williams</u>

As noted in Dr. Williams's expert disclosure, Mr. Berman may choose to call upon Dr. Williams to testify on: (a) the detection of viruses through impedance technology; (b) the scientific publications that are the basis for Decision Diagnostic Corp.'s ("DECN") COVID-19 test kits; (c) the design features of DECN's COVID-19 test kits; (d) the design feasibility of DECN's COVID-19 test kits to detect the COVID-19 virus; and (e) the testing protocols and testing data that DECN generated as it developed its COVID-19 test kits. We dispute your characterization that Dr. Williams's disclosure does not provide "a complete statement of all opinions that the defendant will elicit from Dr. Williams in the defendant's case-in-chief, and the bases and reasons for them[.]" However, out an abundance of caution we voluntarily offer the following information to supplement our initial expert disclosure of Dr. Williams.

Dr. Williams may offer testimony explaining that it is feasible to use an electrochemical impedance spectroscopy-based biosensor for the detection of pathogen viruses, including COVID-19. Dr. Williams testimony is based on his review of peer-reviewed publications that consider whether impedance technology could be or has been used to detect the presence of viruses. Specifically, Dr. Williams will reference the white-paper titled Nonlinear Electrical Impedance Spectroscopy of Viruses Using Very High Electric Fields Created by Nanogap Electrodes, authored by Ryuji Hatsuki; and Rapid Detection of SARS-Cov-2 Antibodies Using Electrochemical Impedance-Based Detector, co-authored by Dr. Williams.

Dr. Williams may offer testimony that DECN's COVID-19 test kits share fundamental designs elements described in the white-paper titled Nonlinear Electrical Impedance Spectroscopy of Viruses Using Very High Electric Fields Created by Nanogap Electrodes, which served as the basis for DECN's test kits' design. Specifically, Dr. Williams may offer testimony on design similarities between the test kits' biosensor test strip fabrication and impedance measurement methodology. The basis for Dr. Williams testimony includes, but is not limited to, his wealth of experience on impedance spectroscopy and electrical impedance systems; the white-paper titled Nonlinear Electrical Impedance Spectroscopy of Viruses Using Very High Electric Fields Created by Nanogap Electrodes; DECN's GenViro! Registration Report to the European Union; and the Development of a Biosensor for Virus Detection paper, authored by Lee Won Young.

Dr. Williams may offer testimony that DECN's COVID-19 blood and saliva test kits, generally, shared a near identical product design, which includes using the same product fabrications for the biosensor test strip and the impedance meter. Dr. Williams testimony is based, in part, on his wealth of experience on impedance spectroscopy and electrical impedance systems; DECN's GenViro! Registration Report to the European Union; and the Development of a Biosensor for Virus Detection paper, authored by Lee Won Young. Indeed, Dr. Williams's testimony on this topic is relevant because the similarities between the two products highlights that they are underpinned by the same technology.

Dr. Williams may offer testimony that under controlled testing conditions in a laboratory environment, which includes control over the liquid sample itself, DECN's COVID-19 device kit was able to accurately detect the presence or the absence of COVID-19. The basis for Dr.

**COVINGTON**

Fraud Section
October 2, 2023
Page 5

Williams testimony includes, but is not limited to, his wealth of experience on impedance spectroscopy and electrical impedance systems; DECN's GenViro! Registration Report to the European Union; DECN blood and saliva standardized testing data; DECN hematocrit testing data; DECN GenViro! Meter Programming Database; and the Development of a Biosensor for Virus Detection paper, authored by Lee Won Young.

 The government stated that it "understand[s] [that] the defendant wishes to call Dr. Williams as an expert witness to testify about whether the defendant's purported blood test was theoretically possible[,]" and to "provide an explanation as to how such testimony is relevant to the defendant's knowledge or intent, or any other element of the crimes charged in the indictment."  Mr. Williams testimony is relevant to show that Mr. Berman made objectively good faith efforts to develop and bring to market a COVID-19 test kit, which directly negates the government's allegation that Mr. Berman defrauded DECN investors.

 Mr. Berman reserves the right to supplement these disclosures in advance of trial. Please do not hesitate to contact us if you have any questions.

         Sincerely,

         Kevin Collins
         Nicholas Xenakis
         Jose Ramos
         Lori Taubman
         José Girón
         Jonah Panikar
         Covington & Burling LLP
         One CityCenter
         850 Tenth Street, NW
         Washington, DC 20001

         *Assigned Public Defenders for*
         *Defendant Keith Berman*