UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| | ) CRIMINAL NO. 20-CR-278-TNM |
| v. | ) |
| | ) |
| KEITH BERMAN, | ) |
| | ) |
| Defendant. | ) |

### DEFENDANT'S RESPONSE TO THE UNITED STATES' RENEWED MOTION TO EXCLUDE PROPOSED EXPERT TESTIMONY OF DR. STUART WILLIAMS

Less than a month has passed since this Court last reviewed challenges to Dr. Stuart J. Williams, a defense expert. During that review, this Court recognized that the "parties [had] . . . extensively briefed the qualifications and credentials of Dr. Williams." Transcript of Pretrial Conference at 107:7–9 (Nov. 13, 2023) ("Tr."). This Court noted that the parties had "provided information about [Dr. Williams] in their initial disclosures, in their briefs, in their motions in limine, and in the exhibits attached to those briefs." Tr. 107:9–11.[1] This Court also acknowledged that it had "heard extensive further argument . . . on [Dr. Williams's] qualifications and testimony." Tr. 107:12–13. The record was so voluminous that there was no need for a *Daubert* hearing. Tr. 106:12–13.

"[S]atisfied that all the relevant issues to the qualification decision [had] been fully ventilated," Tr. 107:19–20, this Court largely approved Dr. Williams's testimony. It rejected the government's contention that Dr. Williams's testimony was irrelevant. Tr. 111:15–18. On the contrary, this Court ruled that such testimony could establish the "theoretical possibility of a COVID-19 blood test." Tr. 111:5–6. The Court found Dr. Williams's testimony relevant for a second reason: Mr. Berman intends to argue that the press releases at the core of the indictment,

---

[1] Weeks before the pretrial conference took place, Mr. Berman had supplemented Dr. Williams's disclosures, further developing an already rich record.

conveyed only that his company was developing a COVID-19 test kit, not that it had finished such a kit. And according to this Court, Dr. Williams's testimony went to whether such a product was, in fact, under development. As such, this Court held that Dr. Williams's opinions were "clearly relevant." Tr. 111:14–18.

Pivoting to Dr. Williams's credentials, the Court noted that "Dr. Williams holds a PhD in mechanical engineering." Tr. 111:19–24. It added that Dr. Williams had published articles on the "subject of impedance testing and methodologies for [detecting] viruses." Tr. 111:25–112:1. So this Court ruled that his "education and experience" are "clearly connected to his proposed testimony." Tr. 112:10–11.

Next, the Court considered the reliability of Dr. Williams's methodology. It rejected the idea that Dr. Williams's testimony needed to be flawless in order to be reliable. Tr. 112:18–22. Noting the "liberal standard for qualification of experts," this Court concluded that Dr. Williams did not fall "below the floor of reliable methodology." Tr. 112:23–25. After all, stressed this Court, "the impact" of any methodological errors "is properly reserved for the jury." Tr. 112:5–13.

Finally, the Court addressed the defense's Rule 16 disclosures regarding Dr. Williams. The Court acknowledged that the old disclosures listed the topics Dr. Williams would cover. But an intervening Rule change now required more: a "complete statement" of Dr. Williams's opinions and the "bases and reasons" supporting those opinions. Fed. R. Crim. P. 16(b)(1)(C)(i). So the Court ordered supplemental disclosures, which the defense provided on November 20, 2023. Nov. 20, 2023 Suppl. Disclosure, ECF No. 157-1.

Unable or unwilling to accept this Court's rulings, the government has "renewed" its motion to exclude Dr. Williams, invoking essentially the same arguments that this Court rejected three weeks ago. *See* United States' Renewed Mot. to Exclude Proposed Expert Test, ECF No.

157 ("Renewed Mot. to Exclude"). For example, the government again claims that Dr. Williams's testimony is irrelevant and inadmissible under Federal Rules of Evidence 401 and 402. And it again insists that such testimony is substantially more prejudicial than probative. This Court should reject the government's second bite at the apple for the same reasons it rejected the first.

The only novel issue raised by the government concerns Dr. Williams's (second) supplemental disclosure. That document speaks for itself. It lists every opinion the defense intends to elicit from Dr. Williams. And it provides the bases and reasons that justify such opinions. Rule 16 requires no more. Accordingly, this Court should deny the government's Rule 16 challenge.

## ARGUMENT

I. **Dr. Williams's Disclosure Satisfies Federal Rule of Criminal Procedure 16.**

Rule 16 requires "a complete statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief." Fed. R. Crim. P. 16 (b)(1)(c)(iii). And, relatedly, Rule 16 requires that defendants disclose "the bases and reasons" for their experts' opinions. *Id.* In response to the Court's order to supplement Dr. Williams's expert disclosure, Mr. Berman provided to the government, in good faith, a supplemental disclosure spanning 10 pages. The supplement outlined every single opinion Mr. Berman intends to elicit from Dr. Williams, provided the bases and reasons for each opinion, noted each study that supports each point Dr. Williams will testify about, and in the interest of full disclosure, even attempted to explain some of the complexities inherent to the subject matter that Dr. Williams intends to testify about.

Consistent with the Court's ruling on the admissibility of Dr. Williams's testimony, Dr. Williams's disclosure shows that he will discuss four topics:

1. Viruses can be detected through the use of electrochemical impedance spectroscopy ("EIS");

2. Each of the three scientific publications that are the basis for Decision Diagnostic Corp.'s ("DECN") COVID-19 test kit provided a valid EIS technique for detecting viruses;

3. DECN logically adopted, omitted, and augmented design features detailed in the three scientific publications when developing its COVID-19 test kit; and

4. DECN's COVID-19 test kit has a logical electrode design and proper detection parameters for the EIS detection of the COVID-19 virus in a clean sample.

Nov. 20, 2023 Suppl. Disclosure at 2.

Contrary to the government's remarkable assertion, these conclusions are not "materially different" from what Mr. Berman previously disclosed.[2] *See* Oct. 2, 2023 Suppl. Disclosure at 4, ECF No. 145-9 ("Mr. Berman may choose to call upon Dr. Williams to testify on: ***(a) the detection of viruses through impedance technology; (b) the scientific publications that are the basis for Decision Diagnostic Corp.'s ("DECN") COVID-19 test kits; (c) the design features of DECN's COVID-19 test kits; [and] (d) the design feasibility of DECN's COVID-19 test kits to detect the COVID-19 virus***" (emphasis added)). Indeed, Dr. Williams's supplemental disclosure is hardly the "bait and switch" the government complains that it is. Renewed Mot. to Exclude at 6.

Rather, the disclosure provides additional detail about the basis and reasons for each of Dr. Williams's conclusions. For his first opinion—that viruses can be detected through the use of electrochemical impedance spectroscopy—the disclosure explains how electrochemical impedance spectroscopy works, and the basic elements in an EIS system that allow a device to detect the presence of a virus. *See* Nov. 20, 2023 Suppl. Disclosure at 2–4. It also explains the various options individuals have in developing an EIS device—such as different electrode material selections, surface geometries, and methods to target the species to be detected—in order to help

---

[2] Though Mr. Berman believes that stipulating that it is theoretically possible to detect COVID-19 in a blood sample is not a like-for-like substitute for Dr. Williams's testimony, it is worth noting that the government never even offered that stipulation. Instead, it filed another motion *in limine*.

4

the jury understand (i) how EIS has been used to detect viruses and (ii) the design decisions Mr. Berman made when he was developing his COVID-19 test. *Id.* at 3–4.

For his second opinion—that the three publications DECN relied on to develop its COVID-19 test provided a valid EIS technique for detecting viruses—the disclosure describes how each study used EIS technology to detect viruses, and it outlines the strengths and weaknesses of each method. *See id.* at 4–7. For example, in the discussion of the third study that Mr. Berman relied upon, which used a boron-doped diamond as an electrode to help detect the Influenza virus, the disclosure explains how the authors used that electrode to target the virus. *Id.* at 6–7. It also notes that the method used to target the virus—"functionalizing an electrode"—requires "multi-step preparation and is typically restricted to laboratory wet-bench applications" and is therefore difficult to use for at-home testing. *Id.* at 7.

As for the third opinion—that DECN logically adopted, omitted, and augmented design features detailed in the three scientific publications when developing its COVID-19 test kit—the disclosure describes in depth the electrode design utilized by DECN's COVID-19 test kit, and outlines why Dr. Williams concluded, after comparing DECN's design with the designs in the three publications, that DECN logically adopted, omitted, and augmented design features from the three publications. *See id.* at 7–9. For example, the disclosure states the following about DECN's electrode design for its COVID-19 test:

> Dr. Williams will testify that DECN's COVID-19 test kit includes two pairs of platinum electrodes—sensing electrodes and "hematocrit correction electrodes." He will testify that the sensing electrodes have a 5 micrometer gap and the "hematocrit correction electrodes" are spaced 1.84 millimeters apart (or 368 times greater than the 5 micrometer gap of the sensing electrodes). Dr. Williams will state that these electrodes are patterned on top of a silicon wafer, and portions of the electrodes are insulated with a dielectric layer in order to expose only the sensing regions of the metal electrode layer. Dr. Williams will then testify that the sensing gap of 5 micrometers

5

>is about ten times larger than the 'nanogap' of 510 nm used from *Nonlinear electrical impedance spectroscopy*. Despite this difference, Dr. Williams will testify that DECN's electrode micrometer gap is sufficient for EIS based on larger geometries used in *Label-free virus identification* and in many other EIS studies. As such, Dr. Williams will opine that the choice of platinum is sufficient based on its inertness and biocompatible properties.

*Id.* at 7.

Finally, for the last opinion—that DECN's COVID-19 test kit has a logical electrode design and proper detection parameters for the EIS detection of the COVID-19 virus in a clean sample—the disclosure provides extensive detail about how Dr. Williams reached his conclusion. It explains that "the only element typical of traditional EIS systems that was not shown in DECN's design was the isolation and/or targeting of the virus itself." *Id.* at 9. One method for doing that, as the disclosure notes, is using "functionalized electrodes," but "functionalizing an electrode for detection requires multi-step preparation and is typically restricted to laboratory wet-bench applications." *Id.* at 7, 9. Accordingly, Mr. Berman chose to use "inert electrodes with precise geometry, hematocrit correction electrodes, and larger frequencies (> 100 kHz)," which "are characteristics aligned with designing an EIS system to detect suspended particles." *Id.* at 9. The disclosure notes that the studies that did not use functionalized electrodes "used controlled samples for the detection of virus type and concentration," and thus "based on its design, DECN's COVID-19 test kit would be able to detect COVID-19 viruses from a controlled virus sample similar to those prepared in [two of the three studies], but if a complex biological fluid was used in DECN's COVID-19 test kit, the sample would need to be properly processed before being introduced to the sensing electrodes in order to prevent potential measurement error." *Id.*

The government brushes past all detail. Instead, it faults Dr. Williams's disclosure because it shows "Dr. Williams will actually testify about something new and different." Renewed Mot. to Exclude at 6. Not so. As explained above, the conclusions are the same. Dr. Williams's

disclosure merely provides more detail about the bases and reasons for those conclusions, which the government explicitly asked for. On the government's theory, Dr. Williams's disclosures are deficient if too abstract and deficient if too granular.

To the extent the government finds this disclosure lacking, it stems from the government's own misreading of what the disclosure says. For instance, the government misstates when it says that Dr. Williams admits in his disclosure that "the defendant's design did not include the most important feature: a workable means of isolating or targeting COVID-19." Renewed Mot. to Exclude at 5. What the disclosure *actually* says is that Mr. Berman chose an approach different than functionalizing an electrode. Nov. 20, 2023 Suppl. Disclosure at 9. As the disclosure states, Mr. Berman instead used "inert electrodes with precise geometry, hematocrit correction electrodes, and larger frequencies," and according to the disclosure, that approach meant that Mr. Berman had a test capable of detecting COVID-19 in a clean sample. *Id.*

The government's complaints about Dr. Williams's disclosure ring hollow.[3] The government has every conclusion Mr. Berman intends for Dr. Williams to testify about, the basis and reason for every conclusion, the articles that inform these conclusions, and even an explanation of basic EIS technology to ensure the government has what it needs should it decide to cross examine Dr. Williams. Mr. Berman complied in good faith with the Court's order to supplement Dr. Williams's disclosure, and Mr. Berman has done precisely that.

---

[3] To the extent the government suggests that Dr. Williams's supplemental disclosure was procured without his involvement, that is blatantly false and merely an attempt to distract from the deficiencies in the government's own motion. Dr. Williams's signature was not affixed to the supplemental disclosure because it was a supplement, and was intended to clarify what previous disclosures already said. Dr. Williams was heavily involved in the preparation of his supplemental disclosure, and any suggestion to the contrary is completely without merit. He is prepared to testify as much during trial.

**II.     Dr. Williams's Testimony is Relevant and not Outweighed by Unfair Prejudice.**

Once more, the government offers a tortured mischaracterization of Dr. Williams's supplemental disclosure. This time, the government incorrectly speculates—without any basis—that Dr. Williams would "testify that it is not theoretically possible to use the defendant's test kit design to detect COVID-19," and therefore, Dr. Williams's testimony should be excluded under FRE 401, 402, and 403. Renewed Mot. to Exclude at 4. As explained above, the defense intends to elicit from Dr. Williams the same opinions that were previously disclosed to the government (multiple times). Specifically, Dr. Williams's supplemental disclosure has painstakingly detailed "that this wasn't a fraud. That there's something real there," which this Court explained to the parties as being relevant. Tr. 80:9–10. Therefore, each of Dr. Williams's opinions is relevant and well within the Court's ruling.

*First*, COVID-19 "is a disease caused by a *virus* named SARS-CoV-2."[4] Dr. Williams's supplemental disclosure explicitly states that "each of the three scientific publications that are the basis for [DECN's] COVID-19 test kit provided *a valid* EIS technique for *detecting viruses*." Nov. 20, 2023 Suppl. Disclosure at 2 (emphasis added). Dr. Williams will offer testimony regarding how Mr. Berman adopted and augmented valid EIS techniques to create a blood based COVID-19 test kit. Indeed, as Mr. Berman made clear at the pretrial conference, Dr. Williams's testimony is relevant to show that it was theoretically possible to take pre-existing impedance technology for the purposes of detecting COVID-19 in the blood. *See* Tr. 22:9–23:6 ("To the extent [Dr. Williams] is going to testify about [theory], it's essentially that at the time Mr. Berman was making the choice there were a few options that he had available to use impedance to test for COVID-19.").

---

[4] The Center for Disease Control and Prevention, *About COVID-19*, www.cdc.com, https://www.cdc.gov/coronavirus/2019-ncov/your-health/about-covid-19.html. (emphasis added).

8

Accordingly, Dr. Williams will opine that it was theoretically possible to test for COVID-19 in blood using DECN's COVID-19 test kit design.

*Second*, the government's argument that "[w]hether the defendant thought it was theoretically possible to develop a general virus screening test is not probative of the defendant's knowledge and intent at the time that he told investors he had developed a COVID-19 screening test," has been considered and rejected by this Court. Renewed Mot. to Exclude at 5. Specifically, the Court ruled that:

> [Dr. Williams's testimony] is relevant for yet another reason. The parties anticipate a dispute over the meaning of Mr. Berman's press releases. The defendant intends to argue that the press releases were simply stating that a blood test for COVID was in development. Under the defense reading of these press releases, I think Dr. Williams's testimony would be clearly relevant because it would go to the feasibility of such a test and whether it could reasonably be said to have been in development.

Tr. 111:10–18. Accordingly, Dr. Williams's opinions that (1) viruses can be detected through the use of EIS; and that (2) each of the three scientific publications that are the basis for DECN's COVID-19 test kit provided a valid EIS technique for detecting viruses, are relevant in order to demonstrate that preexisting glucose impedance technology could theoretically be used to develop a blood based COVID-19 test kit.

*Third*, Dr. Williams's opinion that DECN logically adopted, omitted, and augmented design features detailed in the three scientific publications when developing its COVID-19 test kit is relevant because it demonstrates that Mr. Berman was legitimately attempting to develop a COVID-19 test kit. It is plainly obvious that if Mr. Berman was grappling with scientific literature on EIS and trying to use that literature to leverage technology that his company already used to develop a COVID-19 test, it is less likely he had fraudulent intent. Once again, the Court

recognized precisely this as relevant at the pre-trial conference. Tr. 111:10–18. The Court should therefore reject the government's argument asserting that this opinion is irrelevant.

*Fourth*, Dr. Williams's opinion that DECN's COVID-19 test kit has a logical electrode design and proper detection parameters for the EIS detection of the COVID-19 virus in a clean sample is relevant for the same reason as his third opinion—it demonstrates that Mr. Berman engaged in genuine product development and lacked fraudulent intent. To argue that it is not relevant, the government makes the same error it made at the pre-trial conference: it is attempting to enforce its crabbed reading of DECN's press releases on Mr. Berman to dictate what is relevant in the case. As the Court acknowledged, there is a dispute over the meaning of the press releases. Under the defense's theory, these press releases document iterative development of a product over time, and thus Dr. Williams testifying that Mr. Berman's test could detect COVID-19 in a clean sample is relevant, because it demonstrates that Mr. Berman lacked fraudulent intent and that the technology he was seeking to develop was indeed possible, as shown by it working with a clean sample (an important step in the process). The Court should once again deny the government's attempt to summarily decide a hotly contested question of fact before the jury can even hear from the first witness.

Finally, the defense does not intend to call Dr. Williams to offer testimony on the following three scholarly articles: (i) V. Ong, A. Soleimani, et al., "Impedimetric sensing: An emerging tool for combating the COVID-19 pandemic," *Biosensors*, 2023, 204 (the "Ong Article"); (ii) S. Witt, A. Rogien, et al., "Boron doped diamond thin films for the electrochemical detection of SARS-CoV-2 S1 protein," *Diamond and Related Materials*, 2021, 108542 (the "Witt Article"); and (iii) Y. Zhao, H Gu, et al., "Accuracy improvement of electrochemical whole blood ketone sensor based on HCT compensation algorithm," *Electrophoresis*, 2020, 1446-1449 (the "Zhao Article"). Rather,

they were provided to the government out of an abundance of caution to demonstrate that Dr. Williams is a qualified expert in the use of EIS to detect COVID-19.

Dr. Williams's testimony is plainly relevant to the case. The government's arguments are merely an attempt to rehash its previously rejected arguments. The Court should not oblige the government's attempt to take a second bite at the apple.

## CONCLUSION

For the reasons explained above, this Court should deny the Government's Renewed Motion To Exclude Dr. Williams's expert testimony.

DATED:  December 4, 2023

Respectfully submitted,

 /s/Kevin B. Collins
Kevin B. Collins (D.C. Bar No. 445305)
Nicholas J. Xenakis (D.C. Bar No. 90001123)
Jose J. Ramos (*pro hac vice*)
Lori Taubman (D.C. Bar No. 1673026)
Jonah T. Panikar (D.C. Bar No. 90006218)
José Girón (*pro hac vice*)
Brandon Howell (D.C. Bar No. 1671396)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001
(202) 662-5598

Michelle Peterson (D.C. Bar No. 438930)
Assistant Federal Public Defender
For the District of Columbia
625 Indiana Avenue, N.W.
Washington, DC 20004

*Counsel for Keith Berman*

## **CERTIFICATE OF SERVICE**

    I hereby certify that I caused copies of the foregoing to be transmitted to counsel registered to receive electronic service.

                                                 */s/ Kevin B. Collins*
                                                 Kevin B. Collins (D.C. Bar No. 445305)

                                                 *Counsel for Keith Berman*