# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Criminal No.** |
| **v.** | **1:20-cr-00278-TNM** |
| **KEITH BERMAN** | |
| **Defendant.** | |

## UNITED STATES' EVIDENTIARY SUBMISSION
## IN ANTICIPATION OF UPCOMING SENTENCING HEARING

The Defendant waited until the eve of trial to pled guilty. ECF Minute Entry of 12/7/2023. The Defendant pled guilty to securities fraud and wire fraud (Counts One and Two) related to his scheme to defraud DECN shareholders from February 2020 to December 2020, as well as to obstruction of an official proceeding (Count Three) for his corrupt efforts from March 2020 to December 2020 to obstruct and impede the SEC investigation into his fraudulent behavior. *Id.*; ECF No. 19.

Based on the Defendant's representation that he intended to challenge the loss amount, he sought an evidentiary hearing and pre-hearing briefing in advance of sentencing. What has resulted, however, is a wholesale attempt by the Defendant to re-purpose the experts he had expected to call at trial to seek a lighter sentence by minimizing his role in the offenses to which he had pled guilty. Despite pleading guilty, the Defendant now argues that he "genuinely sought to develop and bring to the market an impedance based COVID-19 test kit," Exhibit A[1] (Witness

---

[1] For ease of reference, the Government will letter exhibits specific to the sentencing hearing (*i.e.* the expert disclosures) but will otherwise use the trial exhibit numbers (GX) for the other exhibits.

Disclosure of Dr. Williams) at 2, and that his fraud caused zero dollars of shareholder losses. Exhibit B (James Reilly Disclosure) at 3.

In this submission, the Government addresses the appropriate standard under the Sentencing Guidelines for calculating loss in this case and the resulting loss amount. The Government also previews for the Court the the Defendant's statements and arguments in connection with sentencing thus far demonstrate that he has not met his burden of establishing that he genuinely accepts of responsibility for his serious crimes. The Government intends to address other relevant aspects of the Guidelines analysis and its recommendation as to the Defendant's sentence in its sentencing memorandum to be filed in advance of the sentencing hearing.

## BACKGROUND

At a time when the world was desperate for a test to slow the transmission of COVID-19 and save lives, the Defendant falsely told investors that he had invented a medical miracle – a 15-second test to detect COVID-19 in a finger-prick sample of blood – that, in truth, did not exist. Specifically, beginning on March 3, 2020 and through at least July 10, 2020, the Defendant issued numerous false and misleading indicating that he had developed a working COVID-19 blood test. *See*, *e.g.*, GX 1A; GX 1M.

The Defendant's private communications in February and March 2020 make clear that he issued these false and misleading press releases to raise money from investors (through an inflated DECN share price) and improve his own financial condition. *See*, *e.g.*, GX 38 ("This is a short term product (2 years), but my how profitable it will be. Imagine a screening too for Corona Virus, SARS, bird Flu, and Ebola…$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$"); GX 39 ("This will work out. I did something yesterday that worked. I am doubling down today. If this continues to work money will not be a problem for a long time"); "GX 40 ("We have a lot at stake here. I am not just trying

to raise money to pay [Vendor 1], but we need a new story and this coronavirus through impedance is the story that will allow me to raise millions"). The Defendant, using an alias, also described in private conversations, his efforts to "pump" DECN's stock price using press releases. *See*, *e.g.*, GX 29B ("KB is writing the press release for GenViro or whatever they plan to call it", "he will probably write it and then get a pro to recast it into a penny pump", "desperate times sometimes call for desperate measures," "I don't know about share price. But I do know that this fellow I am pretty sure KB has spoken to can move millions and millions of shares"). From March 1, 2020 through at least August 15, 2020, the Defendant also frequently posted on investor message boards using false identities in attempt to continue pumping DECN's stock price. GX 25.

The Defendant's criminal activities had their desired effects. DECN's stock price rose precipitously and the Defendant was able to issue additional shares to the market, bringing into DECN the money he desperately needed to fund his lifestyle. *See*, *e.g.*, GX 3L at p. 12.

The Defendant faced one roadblock in the middle of his scheme: an investigation by the SEC. On April 23, 2020, the SEC announced a ten-day suspension in the trading of DECN's stock. GX 21. In the trading suspension order, the SEC stated:

> It appears to the Securities and Exchange Commission that the public interest and the protection of investors require a suspension in the trading of the securities of Decision Diagnostics Corp. ("DECN" or "the Company") (CIK No. 0001144225) because of questions regarding the accuracy and adequacy of information in the marketplace since at least March 3, 2020. Those questions relate to DECN's press releases, among other things, (i) claiming to have "technology perfected" to allow it to manufacture and sell a COVID-19 test kit that would provide results "in 15 seconds, based on a small finger prick blood sample," and (ii) issuing sales forecasts that up to 525 million COVID 19 test kits would be sold in the first year of production. …. The Commission is of the opinion that the public interest and the protection of investors require a suspension of trading in the securities of the above-listed company.

*Id*. The questions raised by the SEC, however, did not stop the Defendant. Instead, the Defendant, again using aliases, threatened and attempted to intimidate individuals who approached the SEC

as well as the SEC investigators themselves. *See*, *e.g.*, GX 25 at 42 ("First of all Berman has been charged with nothing…He will force the SEC to examine their own actions.  And the part of the SEC who implemented the suspension will not be the ones that evaluate its right or wrongness. Berman is looking way past the SEC action.  All he cares about is GenViro!, FDA, and FDA….I will leak one thing.  Berman was given a list of stock traders who the SEC is looking to formally sanction and asked to comment.  I wonder who is on that list"); at 106 ("You would be surprised how much weight that Shareholder Letter has carried.  And I believe there will be another one that takes the May 20, 2020 [SEC Staff Attorney] fantasy/hit job piece and brings Shareholder concerns up to the moment.").  The Defendant, using an alias, also directed DECN shareholders (*i.e.*, the Defendant's victims), to write "shareholder" letters to the SEC in an effort to stop the SEC's investigation.  Unbeknownst to these victims, the Defendant's purpose was to prevent the SEC from revealing the Defendant's fraud to them and the rest of the market. GX 29C-F; GX 88.

The SEC's ten-day trading suspension did not end the Defendant's scheme.  Instead, he fought the trading suspension by publicly denying any allegations of wrongdoing and falsely affirming – under oath – that the very lies he has now pled guilty to making were, in fact, true statements.  GX 3O  Compounding the harm, the Defendant then published his submission attacking and undermining the SEC's trading suspension (and falsely denying that his press releases were false or misleading) on the OTC Markets website for investors and the general public to see.  *Id.*  Worse yet, the Defendant continued issuing false press releases and posting on investor message boards to inflate the price of DECN's stock well after April 2020.  For example, on July 10, 2020, the Defendant issued a press release falsely representing that DECN's COVID-19 blood test was functional, "producing results at:10.5 seconds," and that DECN continued working toward completing the EUA application process by completing the FDA's testing requirements.  GX 1M.

The Defendant also continued posting on investor message boards using an alias to promote DECN and defend his false press releases. GX 25 at 121 (on July 30, 2020 "this new FDA 'at home' guidance is expected to weed out most of the applicants, I would guess 60-80% of them…Nonetheless DECN has a leg up IMO"); at 123 (on August 4, 2020, when an poster wrote that "Berman clearly lied in all press releases", Defendant responded "clearly, huh? Where is your proof? Any proof?"). Defendant's criminal tactics continued to work throughout 2020. DECN's stock price rebounded following the brief trading suspension and remained fraudulently inflated until the unsealing of the Indictment on December 18, 2020, when investors were finally made fully aware of the Defendant's fraud.

I.    **THE PSR CORRECTLY APPLIED A 22-LEVEL ENHANCEMENT FOR LOSS**

   A. **The Guidelines' MRM Methodology Is an Appropriate and Reasonable Method for Calculating Loss in Securities Fraud Cases**

The PSR correctly applied a 22-level enhancement for a total loss of more than $25 million. PSR (ECF 176) ¶¶ 27, 49. In a securities fraud matter, the Court should look to U.S.S.G. § 2B1.1 to calculate the loss amount. "The court need only make a reasonable estimate of the loss" and, because of the sentencing judge's "unique position to assess the evidence and estimate the loss[,]" that calculation is entitled to "appropriate deference." U.S.S.G. § 2B1.1, Application Note 3(C) (citing 18 U.S.C. § 3742(e) and (f)). When the loss amount exceeds $6,500, the Court then looks to table at U.S.S.G. § 2B1.1(b) to determine the additional increases the Defendant's offense level based on the extent of the loss. The Guidelines instruct that loss estimates should be based on "available information, taking into account, as appropriate and practicable under the circumstances, factors such as … [t]he reduction that resulted from the offense in the value of equity securities or other corporate assets." *Id.*

As § 2B1.1 covers a number of forms of fraud and other theft offenses, the Application Notes provide detailed guidance on how to determine the loss amount in various case types. *See* Application Note 3(F) (Special Rules).   In cases "involving the fraudulent inflation or deflation in the value of a publicly traded security or commodity, the court in determining loss may use any method that is appropriate and practicable under the circumstances." Application Note 3(F)(ix). The Guidelines specifically describe one method that can be used to accomplish this goal, namely the modified rescissory method ("MRM"), whereby:

> the actual loss attributable to the change in value of the security or commodity is the amount determined by—
>
> (I)     calculating the difference between the average price of the security or commodity during the period that the fraud occurred and the average price of the security or commodity during the 90-day period after the fraud was disclosed to the market, and
>
> (II)   multiplying the difference in average price by the number of shares outstanding.

Once the amount is determined, the Court may consider whether the resulting figure is a "reasonable estimate of the actual loss attributable to the change in value of the security or commodity". *Id.* According to the Guidelines, relevant factors may include:

> the extent to which the amount so determined includes significant changes in value not resulting from the offense (*e.g.*, changes caused by external market forces, such as changed economic circumstances, changed investor expectations, and new industry-specific or firm-specific facts, conditions, or events).

*Id*. The Guidelines' MRM is a widely accepted method for calculating loss in securities fraud cases like this one.  *See United States v. Kumar,* 617 F.3d 612, 632 (2d Cir. 2010) ("While losses from causes other than the fraud must be excluded from the loss calculation, courts frequently calculate loss in securities fraud cases by relying on the change of market capitalization as a result of the disclosure of the fraud."); *United States v. Brown*, 595 F.3d 498, 524 (3d Cir. 2010) (approving use of "'average selling price methodology' for determining the amount of shareholder

loss" and rejecting defendant's argument that there was no shareholder loss, but remanding case for resentencing on other grounds); *see also United States v. Rand*, 835 F.3d 451, 467 (4th Cir. 2016); *United States v. Snyder,* 291 F.3d 1291 (11th Cir. 2002); *United States v. Bakhit,* 218 F.Supp.2d 1232 (C.D. Cal. 2002); *United States v. Grabske,* 260 F.Supp.2d 866 (N.D. Cal. 2002). The government need only establish loss by a preponderance. *United States v. Miller*, 901 F. Supp. 371, 375 (D.D.C. 1995), *aff'd*, 99 F.3d 448 (D.C. Cir. 1996) (citing *United States v. Salmon,* 948 F.2d 776, 778–79 (D.C. Cir. 1991)).

### B.  Applying the Guidelines' MRM Method Yields a Loss in Excess of $25 Million

At sentencing, the Government intends to call Professor Joshua Mitts, the David J. Greenwald Professor of Law at Columbia University, as its expert witness.[2]  As discussed in Exhibit C, Professor Mitts holds a Ph.D. in Finance & Economics from Columbia University, a J.D. from Yale University, and a B.A. in Liberal Studies from Georgetown University.  Professor Mitts is widely published in the fields of economics, finance, and law.[3]  The Government offers Professor Mitts as an expert in financial economics.

---

[2] While the Government does not believe expert testimony is necessary to conduct the straightforward loss calculation here, Professor Mitts is qualified to provide expert testimony on this topic and the Government intends to offer both his affirmative and rebuttal testimony as an expert concerning the loss calculation.

[3] Professor Mitts's articles have appeared in peer-reviewed journals, including the *Journal of Finance* (winner of the Dimensional Fund Advisors Distinguished Paper Prize (2020)), the *Journal of Law and Economics*, the *Journal of Legal Studies*, the *Journal of Institutional and Theoretical Economics*, the *International Review of Law and Economics*, the *Journal of Financial Regulation*, the *Business Lawyer*, and the *Harvard Business Law Review*, among others. At Columbia University, Professor Mitts has taught courses on securities regulation, law and economics, data science, and contracts.  These courses encompass economic theory, quantitative methods of valuation, asset pricing, investments, and data analytics as well as the economics of securities fraud, market manipulation, and insider trading.  Professor Mitts's qualifications, publications, and

The Government anticipates that Professor Mitts will testify that when applying the Guidelines' MRM method (as described in Application Note 3(F)(ix)), the loss is either approximately $27.8 million or approximately $60.8 million. The two options are the result of different potential inputs that can be considered for the volume of outstanding shares of DECN in conducting the Guidelines' calculation.[4] The dates used by Professor Mitts to calculate the average price of DECN during the period that the fraud occurred were March 3, 2020 (the date of the first fraudulent press release in the scheme) to December 17, 2020 (the day before the initial indictment was unsealed).[5] The dates used by Professor Mitts to calculate the average price of DECN during the 90-day period after the fraud was disclosed to the market were December 18, 2020 (the date that the initial indictment in this case was unsealed) to March 17, 2021.[6] The difference in average per-share prices between these two date ranges is $0.1741 per share as reflected in the table below.

---

expert witness testimony over the past five years are summarized in detail in the government's disclosure and Professor Mitts' curriculum vitae. *See* Exhibit C at 1-2; Appendix A.

[4] According to OTC Markets data, the number of DECN shares outstanding during the relevant time period increased from approximately 160 million shares to approximately 349 million shares. This is the result of the Defendant's issuance of approximately 189 million shares during the relevant time period. Professor Mitts will testify that the loss amount could be calculated using either figure: 160 million or 349 million. Either way, the loss amount exceeds $25 million. That said, for the reasons set forth elsewhere in this submission, the Government believes the Court should use the 349 million figure, which yields a loss of approximately $60.8 million.

[5] According to OTC Markets data, from March 3, 2020 to December 17, 2020, the average closing price of DECN was $0.1954 per share (rounded to four decimal places).

[6] According to OTC Markets data, from December 18, 2020 to March 17, 2021, the average closing price of DECN was $0.0213 per share.

|  | Date Ranges | Average DECN Price | Difference b/w Avg. Prices |
|---|---|---|---|
| **Period of the Fraud** | March 3, 2020 to December 17, 2020 | $0.1954 per share | |
| **90 Days Following Fraud** | December 18, 2020 to March 17, 2021 | $0.0213 per share | |
| | | | **$0.1741 per share** |

As discussed in footnote 4 above, there are two options for conducting the calculation based on the additional shares issued by DECN during the period of the Defendant's fraud.  As a result, there are two reasonable MRM outputs that can be applied to determine the loss. [7]

|  | Outstanding Shares | Price Difference | Loss Amount |
|---|---|---|---|
| **Pre-Fraud Outstanding Shares Loss Amount** | ~ 160 million shares | $0.1741 per share | **~ $27.8 million** |
| **Fraud Period Outstanding Shares Loss Amount** | ~ 349 million shares | $0.1741 per share | **~ $60.8 million** |

The Government further anticipates Professor Mitts will testify that it is reasonable to use the volume of shares outstanding at the time that the fraud was disclosed to the market— approximately 349 million shares—because that includes the purchase of shares issued by DECN at prices that had been artificially inflated by the Defendant's fraud.  As discussed above, DECN disclosures show that the company—through the Defendant's acts as sole officer and sole director during this time— issued large volumes of shares (nearly 200 million) during the  period when the Defendant was perpetrating the fraudulent scheme.

---

[7] Either result supports the PSR's finding that the Defendant facts a 22-level enhancement for a loss of between $25 million and $65 million.  PSR (ECF 176) ¶¶ 27, 49; U.S.S.G. § 2B1.1(b)(1)(L).

The Government also anticipates Professor Mitts will testify that the Guidelines' MRM method provides a reasonable estimate of the actual loss attributable to the change in the value of DECN shares.  As a basis for this opinion, Professor Mitts has considered the standard for assessing reasonableness described in the Guidelines (namely, Application Note 3(F)(ix)), and will testify that there is a lack of evidence of external market forces affecting the price of DECN shares.

Specifically, the Government anticipates that Professor Mitts will testify that he did not identify evidence indicating that changes in the price of DECN shares during the relevant time period, or during the 90-day period after the fraud was revealed to the market, were attributable to any external market forces, such as changed economic circumstances, changed investor expectations or new industry-specific or firm-specific facts, conditions or events.  Professor Mitts's conclusion in this regard will be based on three opinions:

*First*, the peer-reviewed literature in finance shows that over-the-counter penny stocks like DECN are illiquid and highly volatile, with changes in value unrelated to external market forces. For example, Professor Mitts will likely cite to Andrew Ang, Assaf A. Shtauber & Paul C. Tetlock, *Asset Pricing in the Dark: The Cross-Section of OTC Stocks*, 26 REV. FIN. STUD. 2985 (2013),  for the proposition that "traditional factor models—using factors constructed from listed returns—do not account for the large illiquidity, size, value, and volatility return premiums in OTC markets."

*Second*, the price of DECN shares generally was uncorrelated with external market forces, as measured by daily changes in the standard Fama-French factors widely employed in finance.[8] Professor Mitts will testify that he ran a regression of daily DECN share-price changes (after

---

[8] Eugene F. Fama & Kenneth R. French, *The Cross-Section of Expected Stock Returns*, 47 J. FIN. 427 (1992).  While various criticisms of Fama and French (1992) appear in the finance literature, this article has been cited over 20,000 times, and Eugene Fama won the 2013 Nobel Prize in Economics.

subtracting the risk-free rate) on these factors over the year prior to the period that the fraud occurred,[9] which yielded statistically insignificant coefficients, as shown in Exhibit C, Appendix B.  Professor Mitts is also expected to testify that this finding is consistent with the peer-reviewed literature and indicates that DECN prices generally were uncorrelated with external market forces.

**Finally**, the Government anticipates that Professor Mitts will testify that the price of DECN shares generally was uncorrelated with industry-specific events, as measured by daily changes in the Nasdaq Biotechnology Index ("NBI").  Professor Mitts will testify concerning a regression analysis he conducted, which showed that daily DECN share-price changes (after subtracting the risk-free rate) on the daily change in NBI (after subtracting the risk-free rate), as well as the standard Fama-French factors, over the year prior to the period that the fraud occurred, yielded statistically insignificant coefficients, as shown in Exhibit C, Appendix B .

As the Government has the burden of establishing the loss amount, it also intends to call Professor Mitts to rebut the anticipated testimony of the Defendant's witness, James Reilly, in addition to Professor Mitts's affirmative testimony in support of the Government's proposed loss amount.

### C.  The Defendant's Fraud Was Not Revealed to the Market Until the Indictment Was Unsealed

---

[9] Consistent with a longstanding peer-reviewed literature which estimates expected returns in event studies using a period excluding the events at issue, Professor Mitts examined the year prior to the period that the fraud occurred.  *See, e.g.*, Stephen J. Brown & Jerold B. Warner, *Using Daily Stock Returns: The Case of Event Studies*, 14 J. FIN. ECON. 3 (1985) (defining estimation period for expected returns as day -244 to -6 before the event period); *see also* Jill Fisch, Jonah Gelbach & Jonathan Klick, *The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 TEXAS L. REV. 553, 582 n. 164 (2018) ("Since the possibility of unusual stock return behavior is the object of an event study in the case, these dates should be removed from the set used in estimating the market model, and we do exclude them.").

In support of his position that his fraud resulted in no loss to investors, the Defendant intends to call James Reilly to testify that the SEC's ten-day trading suspension put the market on notice of the Defendant's fraud.  However, this temporary halt did not bring a stop to the Defendant's fraudulent scheme or reveal to the market the truth about the Defendant's false and misleading statements.  The dates on which the Defendant's expert relies to calculate loss are thus incorrect.

   1.  *The SEC's Trading Suspension Did Not Reveal to the Market the Truth About the Defendant's Fraud*

The SEC's trading suspension order contained no factual findings or conclusions.  GX 21. Rather, the order was based on "questions" the SEC had regarding certain of DECN's then-recent press releases.  *Id.*  It is two pages in length.  *Id.*

The Indictment, in contrast, is nineteen pages long, and detailed numerous factual allegations that were not contained in the SEC's training suspension order, including: (1) the Defendant's false and misleading statements regarding the viability of a COVID-19 blood test, (2) the Defendant's false and misleading statements regarding DECN's FDA Emergency Use Authorization ("EUA") application, (3) the Defendant's use of a false identity on investor message boards, and (4) the Defendant's involvement in the obstructive April 2020 shareholder letter.  ECF 1.  This information was not available to the market prior to the unsealing of the Indictment.  The Indictment served as the first time that the market was aware that there was probable cause that the statements regarding DECN's purported blood test in the Defendant's press releases were false and misleading.

   2.  *In Response to the SEC's Trading Suspension, the Defendant Publicly Denied Making Any False and Misleading Statements and Told More Lies Under Oath*

In response to the SEC's order, the Defendant drafted a petition asking the SEC to terminate the trading suspension – and, on May 8, 2020, publicly filed it on the OTC Markets website.  GX

3O.  In his petition, the Defendant repeated his lies to investors, again claiming that he had invented a COVID-19 blood test when, in truth, he had not.  *Id.* ¶¶ 15-24.  The Defendant also publicly addressed each of the eight press releases he had issued in March 2020 and, after describing each one, denied – under oath – any allegations of wrongdoing with respect to his press releases.  *Id.* at p. 12.  On eight separate occasions the Defendant publicly stated: "This press release did not contain any false or misleading statements, or omit to state any facts necessary in order to make the statements made not misleading."  *Id.* ¶¶ 16-23.  The Defendant also publicly denied any wrongdoing with respect to his periodic OTC Markets filings: "There are no false or misleading statements contained in any OTC Markets filings, nor have any facts been omitted so as to make the statement made not misleading."  *Id.* ¶ 24.  In addition, the Defendant publicly asserted that he had not engaged in fraud:  "DECN has not acted in a fraudulent, deceitful or manipulative manner. … As previously stated, each DECN press release was based upon <u>facts</u> that were true at the time the statements were made."  *Id.* ¶ 31 (emphasis in original).  And in conclusion, the Defendant appealed to investors' patriotism to falsely claim that he was acting honorably:  "DECN has acted as a transparent and fully compliant public company, providing the public with timely and completely accurate updates as it works feverishly to develop a reliable COVID test kit.  What the Company has done used to be called the 'American Way.'"  *Id.* ¶ 37.

In light of the Defendant's public response to the SEC's order, the Defendant's argument that the trading suspension revealed the truth about the fraud he had perpetrated on investors is incredible and should be rejected.

### 3. *The Defendant's Criminal Activities Included Obstructing the SEC Investigation and Lying to Investors to Discredit the SEC Investigation*

The Defendant pleaded guilty to impeding the SEC's investigation into his scheme.  ECF No. 19; ECF Minute Entry of 12/7/2023.  Specifically, the Defendant acknowledged that, after the

SEC's training suspension took effect, he arranged for shareholders to send a false and misleading "shareholder" letter accusing the SEC of misconduct to be sent to the SEC in an attempt to influence the SEC to end its investigation into DECN and the Defendant.  By definition, the SEC's trading suspension order could not have disclosed these criminal activities to the market, given that they were undertaken in direct response to the trading suspension.

The Defendant took specific efforts, not only to impede the SEC's investigation through threats and intimidation, but to convince investors (using a false identity) that the SEC's actions were meritless and DECN's claims were accurate.  *See*, *e.g.*, GX 25 at 61 (Defendant wrote "if you were a part of [the SEC's investigation] I would be very concerned. A group of non-shareholders contacting the SEC and providing false documents and a false narrative"); at 62 (on May 10, 2020 Defendant wrote "because your cabal didn't think Berman and DECN shareholders were punished enough, given [a DECN powerpoint] to the SEC along with lies and innuendo, to act on.  There is only one word for that – criminal.  Not only that, but the SEC person you duped will probably lose their jobs.  Too bad.  We will see what happens but I do not think Berman will be the one who goes to jail"); at 66 (on May 14, 2020 Defendant claimed that individuals working with the SEC had "lie[d] with impunity about him").

> ### 4. *The Defendant's Criminal Activities Continued Long After the Trading Suspension*

The Defendant's fraudulent scheme, including both misleading press releases and the use of false identities to mislead investors on message boards, continued well after the SEC's trading suspension.  For example, on July 10, 2020, the Defendant issued a press release falsely representing that DECN's COVID-19 blood test was functional, "producing results at:10.5 seconds," and that DECN continued working toward completing the EUA application process by completing the FDA's testing requirements.  GX 1M.  The Defendant also continued posting on

investor message boards using an alias to promote DECN and defend his false press releases GX 25 at 42 ("First of all Berman has been charged with nothing…He will force the SEC to examine their own actions.  And the part of the SEC who implemented the suspension will not be the ones that evaluate its right or wrongness.  Berman is looking way past the SEC action.  All he cares about is GenViro!, FDA, and FDA"); at 121 (on July 30, 2020 "this new FDA 'at home' guidance is expected to weed out most of the applicants, I would guess 60-80% of them…Nonetheless DECN has a leg up IMO"); at 123 (on August 4, 2020, when a poster wrote that "Berman clearly lied in all press releases", Defendant responded "clearly, huh? Where is your proof? Any proof?").  Put another way, long after the SEC's training suspension took effect, the Defendant continued to take affirmative steps to conceal his fraudulent scheme from investors and maintain DECN's artificially inflated stock price based on his false representations that DECN had created a working COVID-19 blood test.

## II.   THE DEFENDANT HAS NOT MET HIS BURDEN TO SHOW GENUINE ACCEPTANCE OF RESPONSIBILITY

Even a "defendant who enters a guilty plea is not entitled to an adjustment ... as a matter of right." *United States v. Saani*, 650 F.3d 761, 767 (D.C. Cir. 2011) (quoting USSG § 3E1.1 cmt. n.3).  Rather, "[i]t is the defendant's burden to convince the district court that he is entitled to the downward adjustment for acceptance of responsibility."  *United States v. Leyva*, 916 F.3d 14, 28 (D.C. Cir. 2019) (citing *United States v. McLean*, 951 F.2d 1300, 1302 (D.C. Cir. 1991)).  "[I]f a defendant desires the two-point reduction specified in § 3E1.1, he must be prepared to carry his burden of convincing the court by a preponderance of the evidence that he is entitled to it." *McLean*, 951 F.2d at 1302 (citing *United States v. Burke,* 888 F.2d 862, 869 (D.C.Cir.1989)).  "[District of Columbia Circuit] case law is clear: It is not error for a district court to 'require an

acceptance of responsibility that extended beyond the narrow elements of the offense' to 'all of the circumstances' surrounding the defendant's offense.' *Leyva*, 916 F.3d at 28 (quoting *United States v. Taylor*, 937 F.2d 676, 680–81 (D.C. Cir. 1991). The Application Notes to § 3E1.1 provide, "[a] defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility". USSG § 3E1.1 cmt. n.1(A).

Here, it appears the Defendant is attempting to game this Court to get a lighter sentence by admitting the bare minimum of what he must to satisfy the elements of the charged offenses and then submitting a letter to Probation (PSR (ECF 176) ¶ 40) that minimizes his role and contains more lies. For example:

- In his statement, the Defendant writes: "I was personally involved in issuing the press releases which had misleading statements about the progress and status of DECN's development of its COVID-19 blood test." *Id.* Berman misstates his role in the offense. The Defendant, who was DECN's sole officer and sole director, came up with the idea to issue false and misleading press releases and then drafted, approved, and disseminated them to the public. The Defendant was not merely "involved"; he was solely responsible.

- In his statement, the Defendant also writes: "I believed that I could leverage the technology DECN used for decades in its glucose monitoring and testing devices—impedance technology—to develop a groundbreaking product that could detect COVID-19 in blood." *Id.* This too is a lie. In a private email that the Defendant sent on March 21, 2020, he admitted that his purported COVID-19 test could not actually detect COVID-19: "The method will not be specific enough to tell anyone which of these flus has been detected, but that is of lesser importance. It will tell them that some flu virus is present. Since 97-98% of those tested will be negative, this method will determine the 2-3% that are positive and once positive, the patient should be tested again (same method), and if confirmed at the screening level moved up the chain to a more specific methods." GX 51. *See also* GX 52.

- In his statement, the Defendant also writes: "Between May and June 2020, I exchanged private messages with a shareholder and collaborated with him in drafting an independent 'shareholder letter' accusing the SEC of misconduct for its actions against DECN and me." (PSR (ECF 176) ¶ 40.) Again, the Defendant misstates the facts in order to minimize his role in the offense. The Defendant did not "collaborate" with a shareholder. Rather, the Defendant came up with the idea and then used a false identity to persuade one of the shareholders – who was his victim – to send a false and misleading letter under false

pretenses.  *See, e.g.*, GX 29C, 29D, 29E, and 29F.  Moreover, once the victim unwittingly agreed, the Defendant (again, using a false identity), directed the victim as to what to do and say.

The Defendant has not met his burden to show he is entitled to the downward adjustment for acceptance of responsibility.  *See, e.g., Taylor*, 937 F.2d at 680–81 (the Court is entitled to require a truthful and complete explanation of, and a genuine acceptance of responsibility for, all of the circumstances surrounding the defendant['s] [] offense[s]. …[and] to require an acceptance of responsibility that extended beyond the narrow elements of the offense[s]").  The Defendant still has additional opportunities to demonstrate true acceptance of responsibility – both at the upcoming evidentiary hearing and at his sentencing hearing.  The Defendant, however, has indicated that he intends to introduce evidence from Dr. Stuart Williams for the purpose of establishing that the COVID-19 blood test that the Defendant lied about inventing was, indeed, theoretically possible and that he "genuinely sought to develop and bring to the market an impedance based COVID-19 test kit."  Exhibit A at 2.  While the Defendant is entitled to present evidence at this stage of the case, the presentation of Dr. Williams's anticipated testimony is inconsistent with acceptance of responsibility.  It is also wasteful of judicial resources.  If the Defendant proceeds with introducing such evidence and argument, the Government expects to take the position that he should not receive the two-point reduction otherwise available to him under § 3E1.1.

## **CONCLUSION**

For all of the reasons set forth above, the Government submits that PSR correctly applied a 22-level enhancement for loss and should accept the anticipated of Professor Mitts in support of this finding.

Dated: March 13, 2024                     Respectfully submitted,

                                          GLENN S. LEON
                                          CHIEF, FRAUD SECTION
                                          Criminal Division, U.S. Department of Justice

                                          /s/ Christopher Fenton
                                          CHRISTOPHER FENTON
                                          KATE T. MCCARTHY
                                          MATTHEW REILLY
                                          Trial Attorneys


                                          Fraud Section, Criminal Division
                                          United States Department of Justice
                                          1400 New York Avenue, NW
                                          Washington, D.C. 20005
                                          Telephone: (202) 320-0539
                                          Fax: (202) 514-0152
                                          Christopher.Fenton@usdoj.gov

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 13, 2024, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.

 */s/ Kate T. McCarthy*
Kate T. McCarthy
Trial Attorney