**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | **CRIMINAL NO. 20-CR-278-TNM** |
| **v.** | ) | |
| | ) | |
| **KEITH BERMAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S BACKGROUND MEMORANDUM FOR MARCH 20, 2024 HEARING**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 3

I.      LEGAL BACKGROUND ...................................................................................... 3

II.     FACTUAL BACKGROUND .................................................................................. 4

       A.      DECN Tries to Develop a Blood Test, then Switches to Saliva. ........................... 4

       B.      On April 23, 2020, the SEC Suspends Trading of DECN and Questions the Accuracy of its Press Releases. ................................................................................ 5

       C.      On May 20, 2020, the SEC Defends its Earlier Suspension, Labelling Press Releases "False and Misleading." .......................................................................... 6

       D.      Trading Platforms Warned Investors About DECN Stocks After the Trading Suspension. ............................................................................................................ 7

       E.      The Government Indicts Mr. Berman, Who Eventually Pleads Guilty. ................. 9

ARGUMENT .................................................................................................................... 10

I.      THE FRAUD PERIOD ENDS IN THE SUMMER OF 2020 ........................................ 10

II.     THE DISCLOSURE PERIOD BEGINS IN THE SPRING OR SUMMER OF 2020 ................................................................................................................................ 13

       A.      The Fraud Was Disclosed on April 23, 2020. ...................................................... 14

       B.      Alternatively, the Fraud Was Disclosed on May 20, 2020. .................................. 16

       C.      Alternatively, the Fraud was Disclosed by July 20, 2020. ................................... 20

III.    APPLYING THE GUIDELINES METHOD WITH THE RELEVANT DATES, THE LOSS AMOUNT IS ZERO ..................................................................................... 21

IV.    THE GOVERNMENT'S LOSS CALCULATION IS UNREASONABLE .................... 22

CONCLUSION ................................................................................................................. 24

## INTRODUCTION

For the past twenty years, Keith Berman led DECN, a company that developed and sold diagnostic devices. These devices used impedance spectroscopy to measure glucose in diabetics by identifying the electrochemical signature of a blood sample. Eventually, DECN partnered with The BIO, a Korean biotechnology company, to develop and manufacture the devices.

In late February 2020, The BIO told Mr. Berman it had halted its production operations because officials in Daegu, South Korea had ordered citizens to shelter in place to stem the spread of COVID-19. Soon after, the virus was detected in the United States for the first time. Because no one had developed a vaccine yet, many saw testing as key to curbing its spread. But at the time, there was a test shortage. Robert Kuznia, et al., *Severe Shortages of Swabs and Other Supplies Hamper Coronavirus Testing*, CNN, (Mar. 18, 2020, 6:30 p.m.), https://www.cnn.com/2020/03/18/us/coronovirus-testing-supply-shortages-invs/index.html.

Mr. Berman foresaw the demand for testing, and he believed that he could retool existing impedance spectroscopy (used in DECN products) to invent a device that could detect COVID-19 in blood. At the time, however, DECN was financially insecure. So Mr. Berman issued press releases misstating the status of his fledgling project so he could raise the funds needed to complete it, all the while believing that he could bring his vision to the marketplace. Mr. Berman accepted responsibility for these misrepresentations and pleaded guilty. As this Court prepares to sentence him, it will have to determine the relevant loss amount associated with these offenses.

In cases involving securities fraud offenses, the Guidelines recommend comparing the average price of the security during the period of the fraud with average the price of the security after the fraud was disclosed. Courts then multiply that figure by the number of outstanding shares. Thus, under the Guidelines, there are two relevant variables to determine loss amount: (1) the period that the fraud occurred, and (2) the date the fraud was disclosed to the market.

1

The burden of proving loss falls entirely on the government. *United States v. Bikundi*, 926 F.3d 761, 798 (D.C. Cir. 2019); *In re Sealed Case*, 552 F.3d 841, 846 (D.C. Cir. 2009); *United States v. Washington*, 115 F.3d 1008, 1010 (D.C. Cir. 1997) ("The burden is on the government to prove facts in support of a sentence enhancement by a preponderance of the evidence."); *United States v. Burke*, 888 F.2d 862, 869 (D.C. Cir. 1989) (noting that "insofar as [a Guidelines provision] relates to a matter that would enhance the defendant's sentence, the burden of proof is on the prosecution to satisfy the factual prerequisites of the provision").

Here, the fraud took place between March 3 and July 10, 2020. The government's indictment says so. March 3 was the day DECN issued its first fraudulent press release about its blood-based device. July 10 was the day it issued the last such release. Besides, the government has repeatedly insisted that this case does not involve securities fraud beyond July 10, 2020. This Court should take the government at its word.

Regardless of whether the fraud was disclosed on April 23, 2020, May 20, 2020, or July 20, 2020, the loss amount in this case is minimal. The most appropriate date of fraud disclosure is April 23, 2020, when the SEC suspended trading of DECN shares, citing the inadequacy and inaccuracy of DECN's press releases. Courts have understood such suspension orders to disclose a fraud under the Guidelines. *In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512, 527 (S.D.N.Y. 2012) ("[T]he SEC Order itself was enough to disclose [the] market intervention."). Alternatively, if the fraud was disclosed on May 20, 2020, when the SEC supplemented its justification for suspending DECN trading, asserting allegations that mirrored those in the indictment six months later, there is little to no difference in the loss amount calculation. Finally, if the fraud was disclosed on July 20, 2020, the date by which prominent trading platforms warned investors about buying DECN stocks, by literally placing a skull-and-crossbones next to DECN's

ticker, there is once again no difference in the loss amount. In all three circumstances, the loss is zero.

## BACKGROUND

### I.    LEGAL BACKGROUND

"The overall burden of proving loss under the Guidelines always remains with the government." *Bikundi*, 926 F.3d at 798; *see United States v. Price*, 409 F.3d 436, 444 (D.C. Cir. 2005) (government "carries the burden of proving any facts that may be relevant in sentencing").

Sentencing courts enjoy broad discretion in measuring loss. To do so, Guidelines commentary provides that courts "may use any method that is appropriate and practicable." U.S.S.G. § 2b1.1 cmt. n.3 (F)(ix). Even so, the Guidelines describe and recommend a method that courts often use in cases that involve the "[f]raudulent [i]nflation . . . of [s]ecurities." *Id*. This is how the Guidelines method works. First, a court calculates the share price "during the period that the fraud occurred." *Id.* Next, it tallies the average price of the security "during the 90-day period after the fraud was disclosed to the market." *Id.* Then, it measures the difference between the former (price during fraud) and the latter (price after disclosure). *Id.* The idea being that the post-disclosure price is what investors would have paid if they had complete information when they bought the security. Finally, the court multiplies the difference by the number of outstanding shares.[1]

To determine the relevant fraud period, courts look to the facts alleged in the government's indictment. *United States v. Peppel,* 2011 U.S. Dist. LEXIS 90957, at *25 (S.D. Ohio Aug. 16, 2011) (excluding consequential damages to bank stemming from fraud because defendant was not

---

[1] This method purports to measure the "actual loss." U.S.S.G. § 2B1.1 cmt. n.3 (F)(ix). The Guidelines define that term to mean "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* cmt. n.3 (A)(i).

charged with bank fraud). And to determine the date of disclosure, courts consider the effect that events have on the investing public. Courts, for instance, have ruled that the following events disclose fraud (1) newspaper articles reporting on the fraud; (2) filings of SEC reports indicating fraud; (3) a company's announcement that it had received subpoenas from state regulators; (4) SEC press releases; (5) SEC orders suspending trade in the relevant stock. *See United States v. Peppel*, 707 F.3d 627, 644 (6th Cir. 2013); *United States v. Lundstrom*, 880 F.3d 423, 444 (8th Cir. 2018); *Peppel*, 2011 U.S. Dist. LEXIS 90957, at *27–28 ("In the absence of a specific disclosure in this case, the Court finds that the announcement of the SEC investigation is an efficient and highly relevant proxy by which to measure the price effects of the fraudulent conduct."); *In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d at 527 ("[T]he SEC Order itself was enough to disclose [the] market intervention.").

The Guidelines also provide helpful guidance for courts after they reach an initial estimate of the loss. In particular, the Guidelines require that a court's estimate be reasonable. To that end, the Guidelines encourage sentencing courts to consider whether the stock's depreciation was caused by factors unrelated to the fraud. U.S.S.G. § 2B1.1 cmt. n.3 (F)(ix).

In short, a court following the Guidelines method must identify two periods. First, it must determine the period during which the fraud occurred—when it began and when it ended. Second, it must determine the date on which the fraud was disclosed and count 90 days after the disclosure date. No matter how it defines the various periods, its loss calculations must always be reasonable.

## II.     FACTUAL BACKGROUND

### A.     DECN Tries to Develop a Blood Test, then Switches to Saliva.

Mr. Berman hoped to leverage his company's expertise in impedance spectroscopy to detect COVID-19 in blood. To develop this idea, Mr. Berman hired two teams of scientists—one in the United States, and another in Korea. Both confirmed that such a test was possible. Indeed,

the Korean team shared a peer-reviewed article that explained how impedance spectroscopy could detect viruses in bio samples. E-Mail from Daniel Kim to Keith Berman (Feb. 29, 2020, 3:02 a.m. PT), attached as **Exhibit A**.

Because his expertise lay in blood-based diagnostics, Mr. Berman first tried to develop a device, christened GenViro!, that worked with human blood. After some difficulties in development, however, DECN decided to tack a different course. In July 2020, it switched to a design that used human saliva.

**B.    On April 23, 2020, the SEC Suspends Trading of DECN and Questions the Accuracy of its Press Releases.**

On April 23, 2020, the SEC issued a release to the public, explaining that it had "questions regarding the accuracy and adequacy of information in the marketplace since at least March 3, 2020." Decision Diagnostics Corp., Exchange Act Release No. 88735, 2020 WL 2110487 (Apr. 23, 2020), attached as **Exhibit B**. Those questions "relate[d] to" specific statements made by DECN. *Id.* For instance, the SEC press release highlighted DECN's claim that it had the "technology perfected" for a device that would provide results in "15 seconds, based on a small finger prick blood sample." *Id.* (internal quotation marks omitted). The SEC also cited DECN's sales forecasts, which predicted that "up to 525 million COVID-19 test kits would be sold in the first year of production." *Id.* SEC explicitly "caution[ed] brokers, dealers, shareholders, and prospective purchasers" to "carefully consider" the doubts it had raised. *Id.*

The SEC's concerns were so serious that it suspended trading in DECN that same day. *Id.* The order mirrored the allegations in the release. Given those allegations, concluded the SEC, "the public interest and the protection of investors require a suspension of trading in" DECN securities. *Id.*

C.      **On May 20, 2020, the SEC Defends its Earlier Suspension, Labelling Press Releases "False and Misleading."**

On May 20, 2020, the SEC issued a document to the public titled "Information Before the Commission at the Time of the Trading Suspension." Decision Diagnostics Corp., Exchange Act Admin. File No. 3-19788, (May 20, 2020), attached as **Exhibit C**. The document contains a declaration by SEC Senior Counsel Carlisle E. Perkins. *Id.*

Mr. Perkins's declaration has a heading titled "DECN Disseminated False and Misleading Information in Press Releases." *Id.* at 3. The document then goes on to specifically identify some of those statements. For instance, the Mr. Perkins challenged DECN's claim that it had "perfected" its COVID-19 detection technology. Mr. Perkins also focused on DECN's statements forecasting sales for the product. Below, we include some of Mr. Perkins's criticisms to show how detailed they were:

- "In January and February 2020, DECN issued three press releases concerning its diabetes glucose test kits, and just weeks later issued a press release announcing its entry into the screening and testing for COVID-19 by using its 'innovative impedance technology' first used for diabetes." *Id.* ¶ 12.

- "Between March 3, 2020 and April 7, 2020, DECN issued eleven press releases claiming to have 'technology perfected' to allow it to manufacture and sell a 'revolutionary' COVID-19 test kit that would provide results 'in 15 seconds based on a small finger prick blood sample.'" *Id.* ¶ 13.

- "On March 3, 2020, DECN began to issue a series of apparently false and misleading press releases concerning the company's development and sale of COVID-19 rapid test kits. On March 3, 2020, DECN announced its 'new screening methodology' for COVID-19 stating that the product was 'timely, simple to use, cost effective' and that it would be 'commercial [sic] ready in the summer of 2020.' Berman stated that DECN had the 'technology perfected' for the COVID-19 tests and that the product would be 'field tested' in Korea. Berman also noted that, while the COVID-19 tests would be initially available to medical professionals, once production increased the test would be sold for home use." *Id.* ¶ 14.

- "Berman asserted, without providing supporting evidence, that DECN's COVID-19 test kits should 'allow 80% of the suspected carriers of Coronavirus to exit the quarantine system in places where Coronavirus is rampant.' The press release included a picture of DECN's purported COVID-19 test kit. The kit for the purported COVID-

19 test looks identical to the company's diabetes glucose test kit – marketed '4Pets' listed on its website." *Id.* ¶ 16.

- "In a press release dated March 16, 2020, DECN stated that its COVID-19 test kit could produce results 'through a finger-stick' in 'less than one minute.' The company also stated that it was waiting for COVID-19 blood samples so that DECN could complete its testing and file an 'Emergency Waiver' with the FDA. DECN further claimed that its 'plan is designed to bring at least 100,000 of our kits to market in the USA and Canada, and another 100,000 in Europe during the month of May 2020.' DECN also increased its forecast to 480 million test kits sold in its first full year of production." *Id.* ¶ 17.

- "In a press release the following day, March 17, 2020, DECN announced that it anticipated selling 525 million COVID-19 test kits in its first full year of production. The press release included another image of the company's purported COVID-19 test kit. The release included an updated forecast chart reflecting 21 million in sales in September 2020 alone." *Id.* ¶ 18.

- "At the time of the March 3, 2020, press release – when DECN claimed that its 'product' would be 'commercial [sic] ready in the summer of 2020' – DECN had not applied for authorization from the FDA to sell or distribute its COVID-19 test kit." *Id.* ¶ 20.

Mr. Perkins also described DECN's "Misleading Statements Concerning FDA Approval" of its blood-based testing device, GenViro!. *Id.* at 7. In particular, Mr. Perkins explained that "DECN announced that it received a 'Pre-EUA Acknowledgment and device serial number,'" questioning whether DECN was correct in touting this as a huge development. *Id.* ¶ 22.

Mr. Perkins concluded by explaining that these statements were responsible for the "recent surge" in DECN share price. *Id.* ¶¶ 27–28.

### D.    Trading Platforms Warned Investors About DECN Stocks After the Trading Suspension.

Penny stocks are different than those listed on large stock exchanges like NASDAQ or the New York Stock Exchange. Penny stocks, also known as microcap stocks, are traded in the over-the-counter ("OTC") market. Penny stocks are publicly known to be "among the most risky" type of stock. SEC Investor Publication, *Microcap Stock: A Guide for Investors* (Sep. 18, 2013), https://www.sec.gov/reportspubs/investor-publications/investorpubsmicrocapstock.

This increased risk is driven, in part, by the fact that penny-stock companies need not disclose as much information as other publicly traded companies. *Id*. What's more, the trading process is more complicated. When a trader wants to buy a penny stock, he generally will need to set up a brokerage account and contact a broker. The broker can either sell the shares he has in his own account, or he can contact a separate dealer on behalf of the buyer. The brokers and dealers both rely on OTC platforms that quote the share price of a company's stock.

The fact that penny stock traders use brokers is important. Once the SEC suspends trading, "a broker-dealer generally may not solicit investors to buy or sell the previously-suspended [OTC] stock until certain requirements are met." SEC Investor Alert, *Investor Bulletin: Trading Suspensions* (Dec. 14, 2021), https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins/investor-5. Thus, there are various requirements that penny stock brokers must meet before they can resume quoting the stock in the OTC market.[2] However, this does not prevent unsolicited trading in a previously suspended OTC penny stock; an investor is still allowed to "affirmatively" ask his broker to trade the stock before the broker has met the post-suspended trading requirements. *Id*. But this will generally require the trader to *contact and speak to his broker*, where the broker will discuss the risks of trading securities with this designation prior to placing the trade. *See* Expert Report of James Reilly (Mar. 11, 2024), attached as **Exhibit D.**

---

[2] "Before soliciting quotations or resuming quotations in an OTC stock that has been subject to a trading suspension, a broker-dealer must file a Form 211 with the Financial Industry Regulatory Authority ("FINRA") representing that it has satisfied all applicable requirements, including those of Rule 15c2-11 and FINRA Rule 6432." SEC Investor Alert, *Investor Bulletin: Trading Suspensions* (Dec. 14, 2021), https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins/investor-5.

As early as July 20, 2020, the OTC trading platforms prominently warned brokers about buying DECN stock. *Decision Diagnostics Corp.*, OTC Markets.com, https://www.otcmarkets.com/stock/DECN/quote (last visited July 20, 2020), attached as **Exhibit E**. When brokers typed "DECN" into the search bar, the platform would display a skull-and-crossbones image next to the company's ticker. Once a broker navigated to the platform's page on DECN, the same skull-and-crossbones image appears at the top. *Id.* Although most text on that page is black, there are several bright red "Warning[s]!." *Id.* (color in original). One explains that the platform "has discontinued the public display of quotes for [DECN] because it has been labeled **Caveat Emptor (Buyer Beware)**." *Id.* (emphasis added). It adds, "[T]here may be reason for investors to exercise additional caution and perform thorough due diligence before making an investment decision in [DECN]." *Id.* The "Caveat Emptor Designation," the platform explains, may result when "[t]here is an investigation or other indication of fraudulent or other criminal activity involving the company, its securities or insiders." *Id.*

### E.    The Government Indicts Mr. Berman, Who Eventually Pleads Guilty.

On December 15, 2020, almost seven months after the SEC warned the public about DECN's misleading press releases, the government released a grand jury indictment of Mr. Berman. The indictment charged Mr. Berman with making "materially false and misleading public statements about the viability of the Covid-19 blood test." Indictment ¶ 14 (Dec. 15, 2020), ECF No. 1. That indictment was eventually replaced by a superseding one, issued on May 11, 2021. Superseding Indictment (May 11, 2021), ECF No. 19. Mr. Berman faced charges of securities fraud, wire fraud, and obstruction.[3] On December 7, 2023, Mr. Berman pleaded guilty to the charges. Mr. Berman's Statement in Support of Guilty Plea (Dec. 7, 2023), ECF No. 170.

---

[3] Mr. Berman was also charged with making false statements in violation of 18 U.S.C. § 1001. But the government dismissed that charge before Mr. Berman pleaded guilty.

## ARGUMENT

To measure loss amount, the Guidelines recommend applying what has come to be known as the modified rescissory method. To apply that method, this Court must answer two questions: When did the fraud occur? When was the fraud disclosed?

Both have straightforward answers. The fraud occurred when the government said it did. That is, the fraud began in March 2020, when DECN issued the first misleading press release charged in the indictment. And it ended in July 2020, when DECN issued the last of the misleading press releases charged in the indictment. Initially, the government said that the charges here are "based on the false and misleading statements [Mr. Berman] made in March, April, May, and June 2020." Gov't Reply Re Omnibus Motion in Limine at 4 (Aug. 17, 2021), ECF No. 37. Later it extended the duration of the fraud to include July, the month which featured DECN's last press release about its blood-based test.

The answer to the second question—when was the fraud disclosed—is also supplied by the government's actions, if not its words. On April 23, it publicly questioned the accuracy of the claims DECN made in its press releases. On the same day, it suspended trading in DECN stock. Still additional disclosures were made throughout April and May, which culminated in May 20, 2020, when senior staff at the SEC denounced DECN's "Disseminat[ion] of False and Misleading Information." **Exhibit C**, at 3. Alternatively, the fraud was disclosed to the public by July 20, 2020, when numerous trading platforms displayed a skull-and-crossbones image warning brokers about DECN.

## I.     THE FRAUD PERIOD ENDS IN THE SUMMER OF 2020

To calculate loss under the Guidelines-recommended method, this Court must identify the period during which the "fraud occurred." U.S.S.G. § 2B1.1 cmt. n.3 (F)(ix).

In defining that period, this Court need look no further than the government's past representations. The superseding indictment, for instance, focuses on the "false and misleading public statements about the viability of the COVID-19 *blood test*." Superseding Indictment at 6 (May 11, 2021), ECF No. 19 (emphasis added). DECN issued the first such press release on March 3, 2020. And the company issued the last such press release on July 10, 2020, when it pivoted to its saliva-based design. Accordingly, the fraud occurred from March 3, 2020 to July 10, 2020. *Cf. Peppel,* 2011 U.S. Dist. LEXIS 90957, at *25 (excluding consequential damages to bank stemming from fraud because the defendant was not charged with bank fraud).

In litigation, the government confirmed that the fraud took place from March to July 2020. A year after charging Mr. Berman, the government explicitly told this Court that "[t]his case is about the lies the defendant told to investors in March 2020." Gov't Resp. to Mr. Berman's Second Motion in Limine at 4 (Nov. 15, 2021), ECF No. 44. The government did not mince words. It stated that public statements after "July 2020 about . . . plans to develop a saliva test [are] not relevant to the elements of the crimes charged." Gov't Reply Re Omnibus Motion in Limine at 4 (Aug. 17, 2021), ECF No. 37. The charges, the government once said, are "based on the false and misleading statements [Mr. Berman] made in March, April, May, and June 2020 relating to the purported COVID-19 *blood* test." *Id.* (emphasis added). Moreover, the government stressed that while "the superseding indictment references the July 10, 2020 press release, it references only the false statements the [Mr. Berman] made in that press release relating to the blood test, not the saliva test." *Id.* What is good for the government's goose should be good for the government's gander.[4] *See Oscanyan v. Arms Co.*, 103 U.S. 261, 263 (1881) ("The power of the court to act in

---

[4] The government also indicated in its own expert disclosure before trial that the relevant press releases extended from March 2020 through June 2020, and that the relevant stock movements (continued…)

the disposition of a trial upon facts conceded by counsel is as plain as its power to act upon the evidence produced.").

The government was not alone in thinking the fraud took place from March to July 2020. On November 13, 2023, this Court held a pretrial conference. In line with its earlier representations, the government sought to exclude evidence regarding DECN's saliva test. Tr. of Pretrial Conference 24:4–7 (Nov. 13, 2023) ("And when you go back and look at the indictment, it is focused exclusively on false statements about the blood test, not the saliva test. Again, these statements are made from March to July 2020."), excerpts of which are attached as **Exhibit F**. This Court agreed that the government's allegations did not relate to the saliva test: "The Government's allegations of fraud all center around the [Mr. Berman's] statements about a blood test that his company was developing. They do not concern a saliva test." *Id.* 27:4–6.

The defense suspects that the government will disagree with its past representations, and propose a different fraud period. The government may now assert that the fraud ended when the government unveiled its indictment (December 2020), not when DECN last committed fraud. To support that proposal, the government might argue that Mr. Berman "concealed the true facts relating to the blood test and concealed the scheme to defraud based on the blood test from regulators, law enforcement, shareholders, and the investing public." Gov't Reply Re Omnibus Motion in Limine, at 2–6 (Aug. 17, 2021), ECF No. 37.

---

occurred during that period as well. *See* Gov't Sept. 4, 2023 Disclosure of Thomas Carocci at 3 (Sept. 4, 2023), ECF No. 144-1 (noting that the witness would "review and summarize the contents of press releases issued by DECN" between March 3, 2020 and July 10, 2020 and would testify to "the stock price movement following the announcement"). The government did not state that it intended to present any testimony about stock price movements that occurred *months after* the July 10, 2020 press release.

That approach would make little sense. To understand why, suppose one person sells another a car. The seller fails to disclose that the car's engine is filled with sand. So the buyer offers $10,000. A few days later, the buyer discovers the failure and immediately sells the car for its market value of $5,000. The seller tries to conceal his deceit and evades the buyer for one year. When he finally confesses, the car is worth $2,500. In this scenario, the buyer's loss is still $5,000—the difference between what he actually paid for the car and what he would have paid with all the relevant information. It does not matter that the seller continued to evade responsibility and intervening events caused the price to decrease in the interim. Likewise, here, the period of the fraud lasts until the last fraudulent press release was issued, notwithstanding that Mr. Berman accepted responsibility later on. *See United States v. Stein*, 846 F.3d 1135, 1152 (11th Cir. 2017) (explaining that courts must measure the loss caused by the fraud and the fraud alone, not other confounding variables).

The government's indictment and its past representations show that the charged fraud took place from March 2020 to July 2020.

## II.   THE DISCLOSURE PERIOD BEGINS IN THE SPRING OR SUMMER OF 2020

Under the Guidelines method, this Court must identify the date on which DECN's fraud was "disclosed to the market." U.S.S.G. § 2B1.1 cmt. n.3 (F)(ix)(I). The Guidelines, however, leave that term undefined. Accordingly, the term "disclosed" takes its plain, ordinary meaning. *See United States v. Seefried*, 639 F. Supp. 3d 8, 10 (D.D.C. 2022) (McFadden, J.) ("In interpreting the Sentencing Guidelines, the Court applies the ordinary tools of statutory interpretation and looks to the plain meaning of its terms.").

To disclose is "to make known or public." Disclose, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/disclose (last visited Mar. 8, 2024). Thus, this Court

must determine when Mr. Berman's fraud went from unknown or private to "known" or exposed in the eyes of the market. *Id.* There are three plausible disclosure dates.

### A.     The Fraud Was Disclosed on April 23, 2020.

On April 23, 2020, the SEC suspended trading in DECN shares. In a release justifying the suspension, the SEC stated that it doubted the "accuracy and adequacy of information in the marketplace since at least March 3, 2020," the day DECN announced GenViro! to the public. Decision Diagnostics Corp., Exchange Act Release No. 88735, 2020 WL 2110487 (Apr. 23, 2020), attached as **Exhibit B**.

The SEC went further. It identified the specific DECN statements whose veracity it doubted. For instance, the SEC highlighted DECN's claim that DECN had the "technology perfected" for a device that would provide results in "15 seconds, based on a small finger prick blood sample." *Id.* at 1 (internal quotation marks omitted). The SEC also zeroed in on DECN's sales forecasts, which predicted that "up to 525 million COVID 19 test kits would be sold in the first year of production." *Id*. At the end of the release, the SEC explicitly "caution[ed] brokers, dealers, shareholders, and prospective purchasers" to "carefully consider" the doubts it had raised in the suspension order and the related press release. *Id.* These were the same statements charged as fraudulent by the government in its indictments.

Critically, these documents were available to the public. *Cf. United States v. Lundstrom*, 2016 U.S. Dist. LEXIS 195507, at *4 (D. Neb. Mar. 14, 2016) (concluding that a Form 8-K disclosed the fraud, not a third-party's financial report, because only the former was available to the public). And the government's investigation reveals that the public took notice. *See, e.g.*, USPIS Interview of F.S. at 2 (April 7, 2021) (investor indicating that he was aware of the SEC suspension of trading), attached as here **Exhibit G**; FBI Interview of C.T. at 2 (Nov. 19, 2021) (investor indicating that he was aware "there was a suspension for multiple weeks" on DECN stock

and sold in June 2020 when he "saw the price of the stock decreasing"), attached as **Exhibit H**. Thus, the fraud was disclosed on April 23, 2020, when the SEC issued its suspension order and warned the public about irregularities with DECN's press releases.

The government's behavior in other cases confirms that the fraud was disclosed on April 23, 2020. In *United States v. Schena*, the Justice Department's fraud section called an expert to calculate the losses caused by the defendant's fraud. Order on Sentencing Guidelines Calculation, *United States v. Schena*, 2023 U.S. Dist. LEXIS 199428, at *12–13 (N.D. Cal. Nov. 6, 2023). The expert measured the loss by tracking prices until the SEC suspended trading of that security, concluding that the fraud had been disclosed when the SEC issued its suspension order. *Id.* at *11 (comparing share price when the securities fraud scheme purportedly began and "when the SEC suspended the trading for two weeks."). As in *Schena*, this Court should also conclude that the SEC's suspension order discloses the fraud.

Case law only confirms what common sense and the government's past representations suggest: the fraud was disclosed by the SEC suspension order on April 23, 2020. Consider *United States v. Peppel*. 2011 U.S. Dist. LEXIS 90957 (S.D. Ohio Aug. 16, 2011). In *Peppel*, a court measuring loss under the Guidelines held that "the announcement of the SEC investigation is an efficient and highly relevant proxy by which to measure the price effects of the fraudulent conduct." *Id.* at *28. If mere investigation suffices to disclose fraud, so too does an investigation that is followed by a suspension. *See In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d at 527 ("[T]he SEC Order itself was enough to disclose [the] market intervention."); *Cf. United States v. Tuzman*, 2021 U.S. Dist. LEXIS 142715, at *13 (S.D.N.Y. July 29, 2021) (Fraud was disclosed when a company issued a Form 8-K "announcing errors and irregularities in its financial statements from prior years").

True enough, the suspension order does not outright accuse DECN of fraud. But the order need not utter magic words to put the investing public on notice about the charged offenses. In *United States v. Ferguson*, for instance, an insurance company issued a press release announcing that "it received subpoenas from the New York Attorney General and the SEC." *United States v. Ferguson*, 584 F. Supp. 2d 447, 450 (D. Conn. 2008). Shortly after the announcement, the company's stock plummeted. That press release, however, failed to mention the specific scheme that later gave rise to the indictment. Even so, the government used that date in an event study to determine the loss caused by the unmentioned fraud. And the court sanctioned that approach, concluding that the "stock price [shift] on the day [the press release was issued] can be attributed to the fraud." *Id.* at 454; *see also United States v. Rand*, 835 F.3d 451, 467–68 (4th Cir. 2016) (holding that investors were put on notice of fraud on June 27, 2007, when company announced that its former chief accounting officer had been "fired for 'destroy[ing] documents' and that an investigation was ongoing involving mortgage origination and 'related matters.'").

In sum, the SEC, the government entity in charge of "vigorously enforcing the federal securities laws to ensure truth and fairness," suspended trading in DECN. *Mission*, SEC.gov, https://www.sec.gov/about/mission (last visited Mar. 8, 2024). In a document issued to the public, the SEC defended its suspension by questioning the truth and adequacy of specific statements made by DECN. The investing public widely discussed that suspension. Finally, case law, along with the government's position in other cases, confirm that an SEC suspension suffices to disclose fraud for purposes of § 2B1.1.

**B.    Alternatively, the Fraud Was Disclosed on May 20, 2020.**

If this Court rejects the SEC suspension order as insufficient to disclose the fraud, then the next plausible disclosure date falls on May 20, 2020. On that date, the SEC issued a document

titled, "Information Before the Commission at the Time of the Trading Suspension." **Exhibit C**, at 1.[5]

The document, accessible to the public, contained a declaration of SEC Senior Counsel Carlisle E. Perkins. That declaration, like the SEC suspension order, discusses specific statements made by DECN. But it also delves into much greater detail. For instance:

> Berman asserted, without providing supporting evidence, that DECN's COVID-19 test kits should "allow 80% of the suspected carriers of Coronavirus to exit the quarantine system in places where Coronavirus is rampant." The press release included a picture of DECN's purported COVID-19 test kit. The kit for the purported COVID-19 test looks identical to the company's diabetes glucose test kit – marketed "4Pets" listed on its website.

*Id.* ¶ 16.

And it outright accused Mr. Berman of fraud. Indeed, one of the document's sections is titled "DECN Disseminated False and Misleading Information in Press Releases." *Id.* at 3. The document uses the words "fraud," "baseless," "misleading," and "false" a combined total of ten times.

What's more, the allegations in the SEC declaration mirror the government's indictment. Here's a side-by-side comparison of the two:

| May 5, 2020 SEC Document | December 15, 2020 DOJ Indictment |
|---|---|
| II.   ***DECN Disseminated False and Misleading Information in Press Releases*** | Acts in Furtherance of the Scheme to Defraud ***BERMAN's Materially False and Misleading Public Statements*** About the Viability of theCOVID-19 Blood Test |
| | |

---

[5] Before the May 20 Declaration, the SEC had placed DECN on a public list of companies engaged in COVID-19-related fraud. SEC Staff Investor Alert and Bulletin, *Frauds Targeting Main Street Investors- Investor Alert* (May 6, 2020), attached as **Exhibit I.**

| | |
|---|---|
| ¶ 13: Between March 3, 2020 and April 7, 2020, DECN issued eleven press releases claiming to have "***technology perfected***" to allow it to manufacture and sell a "revolutionary" ***COVID-19 test kit that would provide results "in 15 seconds based on a small finger prick blood sample."***<br><br>¶ 14: On March 3, 2020, DECN announced its "new screening methodology" for COVID-19 stating that the product was "timely, simple to use, cost effective" and that it would be "commercial [sic] ready in the summer of 2020." Berman stated that DECN had the "technology perfected" for the COVID-19 tests and that the product would be "field tested" in Korea. | ¶ 16: On or about March 3 and 4, 2020, BERMAN issued two press releases introducing DECN's "new screening methodology" for COVID-19, which he characterized as a "breakthrough." BERMAN stated that DECN had "developed a Coronavirus screening method," and that DECN had "***the technology perfected*** which will take months off of the development schedule." ***BERMAN further represented that the test provided a positive or negative result in 15 seconds based on a small finger prick blood sample . . . .*** |
| ¶ 15: ***DECN issued a press release stating that it expected to sell 420 million COVID-19 test kits*** in the first year of production, beginning September 2020. | ¶ 18: Throughout March 2020, BERMAN and DECN continued to issue materially misleading press releases regarding the purported DECN COVID-19 blood test, including to falsely represent that DECN was making significant progress toward bringing the product to market and ***would be ready to manufacture and sell hundreds of millions of units in the first year.*** BERMAN issued nine press releases in March 2020, and filed the company's annual report and accompanying disclosures on or about March 30, 2020. |
| ¶ 17: DECN stated that its COVID-19 test kit could produce results "through a finger-stick" in "less than one minute." ***The company also stated that it was waiting for COVID-19 blood samples so that DECN could complete its testing and file an "Emergency Waiver" with the FDA.*** | ¶ 25: BERMAN issued a press release titled: "Emergency Waiver in Progress With U.S. FDA," in which ***BERMAN represented that DECN was "awaiting release of blood samples from previously infected people in Daegu, Korea, so that [DECN] can complete testing and make a final report to the U.S. FDA so that [DECN] may secure our Emergency Waiver.*** In the meantime, all other requests made by the FDA will be met this week and next." |
| | |

| | |
|---|---|
| ¶ 20: ***DECN had not applied for authorization from the FDA to sell or distribute its COVID-19 test kit.*** | ¶ 17: ***DECN had taken no steps towards obtaining any government approvals or waivers for a COVID-19 test that would be required for a COVID-19 test kit to be "commercial ready in summer 2020."***<br><br>¶ 35: DECN still did not take any steps to develop a COVID-19 test, validate the accuracy of the impedance method for detecting COVID-19, conduct the clinical studies required by the FDA, or receive FDA authorization related to the DECN COVID-19 blood test. |
| ¶ 20: Berman, who alone drafted the press releases on behalf of DECN, stated or suggested in interviews with staff that he:<br><br>• knew that the company had no COVID-19 test kits;<br>• ***had not seen any of DECN's prototype COVID-19 test kit***s;<br>• had no idea how many test kits DECN could produce;<br>• knew that the COVID-19 test kits would require component parts that were different from DECN's current diabetes products, which the company did not yet have and would need before any sales could be made;<br>• was looking for sources that could provide the component parts but had no idea how much the component parts would cost and the time it would take for the company to obtain the parts in the midst of the pandemic; and<br>• knew that no COVID-19 test kits could be sold without FDA approval, which the company did not have. | ¶ 17: DECN did not at that time have a COVID-19 test, did not know whether BERMAN's purported impedance method would actually be able to detect COVID-19<br><br>¶ 35: DECN's purported COVID-19 blood test had never been developed nor reliably tested<br><br>¶ 24: ***BERMAN concealed and disguised from the market that DECN had not actually built a prototype for use in testing.***<br><br>¶ 18: falsely represent that DECN . . . would be ready to manufacture and sell hundreds of millions of units in the first year.<br><br>¶ 23: Throughout 2020, BERMAN and DECN issued press releases and periodic disclosures that contained materially false and misleading statements touting the progress of DECN's emergency use application to the FDA for use of DECN's purported COVID-19 test. |
| ¶ 22: In a press release dated April 7, 2020, DECN announced that it received a "Pre-EUA Acknowledgment and device serial number," touting this as a huge development akin to FDA approval of the test kits. . . . The press release further claimed that "***it was clear that*** | ¶ 27: BERMAN issued a press release characterizing DECN's receipt of the FDA acknowledgement letter as a "grant by the FDA" and a "major milestone." BERMAN further stated that, in response to DECN's submission of its EUA application, ***"the FDA*** |

| | |
|---|---|
| *the FDA review staff was aware that our methodology was different than those slower and older methods that had received FDA EUAs, or were in review.*" | *review staff [made clear it] was aware that [DECN's] methodology was different than those slower and older methods that had received FDA EUAs, or were in review.* |

Because the SEC's document is so detailed, because it was available to the investing public, and because it mirrors the indictment that gave rise to this case, it "disclosed" the fraud to "the market." U.S.S.G. § 2B1.1 cmt. n.3 (F)(ix)(I).

### C.    Alternatively, the Fraud was Disclosed by July 20, 2020.

Assuming the fraud was not disclosed by the SEC's suspension order or its later fraud allegations, the next plausible disclosure date falls on July 20, 2020.

As discussed previously, penny stocks are not typically listed on large stock exchanges like NASDAQ or the New York Stock Exchange. Instead, investors, brokers, and dealers buy or sell penny stocks through OTC platforms, like OTCmarkets.com.

By at least July 20, 2020, this platform prominently warned brokers and traders about buying DECN stock. *Decision Diagnostics Corp.*, OTC Markets.com, https://www.otcmarkets.com/stock/DECN/quote (last visited July 20, 2020), attached as **Exhibit H**. When brokers or traders typed "DECN" into the search bar, the platform would display a warning: a skull-and-crossbones image next to the company's ticker. Once a broker or trader navigated to DECN's page on the platform, the same skull-and-crossbones warning appears at the top. *Id.* Although most text on that page is black, there are several bright red "Warning[s]!." *Id.* (color in original). One explains that the platform "has discontinued the public display of quotes for [DECN] because it has been labeled **Caveat Emptor (Buyer Beware)**." *Id.* (emphasis added). It adds, "[T]here may be reason for investors to exercise additional caution and perform thorough due diligence before making an investment decision in [DECN]." *Id.* The "Caveat Emptor Designation," the platform explains,

may result when "[t]here is an investigation or other indication of fraudulent or other criminal activity involving the company, its securities or insiders." *Id.*

These warnings, coupled with the SEC's suspension order and press release and its later May 20, 2020 filing, put DECN stock traders on notice and thus disclosed the fraud to the market.

## III. APPLYING THE GUIDELINES METHOD WITH THE RELEVANT DATES, THE LOSS AMOUNT IS ZERO

As explained above, the Guidelines measures loss by comparing stock prices over two periods: the period during which the fraud occurred, and the 90-day period following the disclosure of that fraud.

The fraud period lasted from March 3, 2020 (the date of the first fraudulent press release) to July 10, 2020 (the date of the last fraudulent press release). The average price of DECN common stock during that period was $0.1708 per share. *See* Expert Report of James Reilly (Mar. 11, 2024), attached as **Exhibit D**.

The average price during the disclosure period will depend on when this Court finds that the fraud was disclosed. If the Court agrees that the fraud was disclosed on April 23, 2020, then the average price of DECN common stock over the 90 days after disclosure equals $0.2312 per share. *Id*. If however the fraud was disclosed on May 20, 2020, then the average share price for DECN common stock during the 90 days after disclosure equals $0.2512. *See* DECN Share Prices, attached as **Exhibit J**. Finally, if this Court decides that the fraud was disclosed on July 20, 2020, then the relevant post-disclosure average equals $0.2547 per share. *Id*.

In every scenario, however, the post-disclosure share price exceeds the share price of DECN stock during the fraud period. As a result, the relevant loss under the guidelines is zero.

## IV.     THE GOVERNMENT'S LOSS CALCULATION IS UNREASONABLE

If the government is right about (1) the duration of the fraud and (2) the date on which the fraud was disclosed, its loss calculation would still be unreasonable for two reasons. First, the government has failed to prove that investors relied on DECN's fraudulent statements. After all, the government's position is that investors did not rely on the SEC suspension order, the subsequent declaration by Mr. Perkins, or the caveat emptor warnings on trading platforms. If those investors did not rely on those developments, the government should (but cannot) explain why investors holding DECN stock did so in reliance on the press releases. Second, and relatedly, the government fails to account for other, non-fraud factors, that might have affected DECN's share price.

As the 11th Circuit has held, "the government may show reliance in a securities fraud case either through direct evidence or specific circumstantial evidence." *United States v. Stein*, 846 F.3d 1135 (11th Cir. 2017). In *United States v. Stein*, the government prosecuted a lawyer for issuing press releases that inflated the stock price of his client. *Id.* at 1139. Witnesses testified that "the only place to get information about [the relevant security] was from press releases and public filings." There, as here, the government tried to prove investor reliance with victim impact statements, with only a few specifically identifying the fraudulent statements upon which they relied. *Id.* at 1154. There, the Court rejected the government's calculations, holding that the government's "evidence standing alone is insufficient to support the inference that all 2,415 investors relied on Mr. Stein's fraudulent information." *Id.*

Second, the government's choice of an inappropriately long fraud period increases the likelihood that other, non-fraud factors impact its loss estimate. As mentioned earlier, the Guidelines method purports to measure investors' actual losses. U.S.S.G. 2B1.1 cmt. n.3 (F)(ix). That is, the loss that "resulted from" the fraud. *Id.* cmt. n.3 (A)(i). Appellate courts have interpreted

this "results from" language to require the government to prove factual causation. *See Stein*, 846 F.3d at 1152 (The Guidelines definition of actual loss "incorporates [a] causation standard that, at a minimum, requires factual causation (often called 'but for' causation)." (internal quotation marks omitted)); *United States v. Evans*, 744 F.3d 1192, 1196 (10th Cir. 2014) ("[Section] 2B1.1 incorporates and requires both factual or 'but for' causation and legal or foreseeable causation."). In other words, to measure actual loss the government must calculate the damage caused by the fraud and the fraud alone. *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006) ("Losses from causes other than the fraud must be excluded from the loss calculation.").

Here, the government's estimates have failed to do that. The government's method of estimating loss estimate implicitly assumes that any difference between the average price of DECN stock during its proposed fraud period (March 3 through December 17, 2020) and the average price of DECN during the 90-day period after the initial indictment was unsealed (December 18, 2020 through March 17, 2021) was due to the misleading statements in the press releases, as charged in its indictment. This approach likely inflates the government's loss estimate. In particular, the indictment of the CEO and resulting skepticism by investors regarding DECN's viability could have impacts on the stock price that far exceed any impact of misleading statements in the press releases. Further, in arriving at its loss estimate, the government adopts a fraud period that extends *five months* past the date of the final press release charged in the indictment. During those five months—a period during which the market was on notice regarding the SEC's concern with irregularities in DECN press releases—any number of factors beyond the charged fraud could have impacted the value of DECN shares. Thus, the government's application of the Guidelines method is unreasonable.

## CONCLUSION

For the reasons explained above, the loss amount does not enhance Mr. Berman's sentence under Guideline U.S.S.G. § 2B1.1 cmt. n.3 (F)(ix).

DATED: March 13, 2024                          Respectfully submitted,

                                        */s/Kevin B. Collins*
                                        Kevin B. Collins (D.C. Bar No. 445305)
                                        Nicholas J. Xenakis (D.C. Bar No. 90001123)
                                        Jose J. Ramos (*pro hac vice*)
                                        Lori Taubman (D.C. Bar No. 1673026)
                                        Jonah T. Panikar (D.C. Bar No. 90006218)
                                        José F. Girón (D.C. Bar No. 90020611)
                                        Brandon Howell (D.C. Bar No. 1671396)
                                        COVINGTON & BURLING LLP
                                        One CityCenter
                                        850 Tenth Street, NW
                                        Washington, D.C. 20001
                                        (202) 662-5598

                                        Michelle Peterson (D.C. Bar No. 438930)
                                        Assistant Federal Public Defender
                                        For the District of Columbia
                                        625 Indiana Avenue, N.W.
                                        Washington, DC 20004

                                        *Counsel for Keith Berman*

## **CERTIFICATE OF SERVICE**

I hereby certify that I caused copies of the foregoing to be transmitted to counsel registered to receive electronic service.

*/s/ Kevin B. Collins*
Kevin B. Collins (D.C. Bar No. 445305)

*Counsel for Keith Berman*