1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2
      * * * * * * * * * * * * * * *   )
3     UNITED STATES OF AMERICA,       )        Criminal Action
                                      )         No. 20-00278
4                     Plaintiff,      )
                                      )
5        vs.                          )
                                      )
6     KEITH BERMAN,                   )        Washington, D.C.
                                      )        March 20, 2024
7                     Defendant.      )        11:30 a.m.
                                      )
8     * * * * * * * * * * * * * * *   )

9

10                TRANSCRIPT OF EVIDENTIARY HEARING
               BEFORE THE HONORABLE TREVOR N. McFADDEN
11                  UNITED STATES DISTRICT JUDGE

12

13    APPEARANCES:

14    FOR THE GOVERNMENT:      MATHEW REILLY, ESQ.
                               CHRISTOPHER R. FENTON, ESQ.
15                             U.S DEPARTMENT OF JUSTICE
                               Criminal Division, Fraud Section
16                             1400 New York Avenue, Northwest
                               Washington, D.C. 20530
17
      FOR THE DEFENDANT:       KEVIN B. COLLINS, ESQ.
18                             LORI TAUBMAN, ESQ.
                               JOSE R. RAMOS, ESQ.
19                             JOSE F. GIRON, ESQ.
                               BRANDON HOWELL, ESQ.
20                             JONAH T. PANIKAR, ESQ.
                               NICK XENAKIS, ESQ.
21                             COVINGTON & BURLING, LLP
                               850 Tenth Street, Northwest
22                             Washington, D.C. 2001

23                             MICHELLE PETERSON, ESQ.
                               OFFICE OF THE FEDERAL PUBLIC
24                                DEFENDER
                               625 Indiana Avenue, Northwest
25                             Suite 550
                               Washington, D.C. 20004

```
 1     REPORTED BY:              LISA EDWARDS, RDR, CRR
                                 Official Court Reporter
 2                               United States District Court for the
                                   District of Columbia
 3                               333 Constitution Avenue, Northwest
                                 Room 6706
 4                               Washington, D.C. 20001
                                 (202) 354-3269
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                I N D E X

2

3                                    Direct    Cross     Red.

4

5    WITNESSES FOR THE GOVERNMENT:

     Joshua Mitts, Ph.D.               8        30        117

6

7    WITNESS FOR THE DEFENDANT:

8    James Reilly                     49        85

9

     EXHIBITS RECEIVED IN EVIDENCE                         PAGE

10

11   Government's Exhibit No. 00                            11

12   Government's Exhibit No. 6-A2                          27

13

14   Defendant's Exhibit No. 5                             50

15   Defendant's Exhibit No. 001                           62

16   Defendant's Exhibit No. 002                           63

17   Defendant's Exhibit No. 012                           64

18   Defendant's Exhibit No. 010                           69

19   Defendant's Exhibit No. 042                           71

20   Defendant's Exhibit No. 004                           77

21

22

23

24

25

```
 1            THE COURTROOM DEPUTY:   Your Honor, this is
 2   Criminal Case 20-278, the United States of America versus
 3   Keith Berman.
 4            Counsel, please come forward to identify
 5   yourselves for the record, starting with the Government.
 6            MR. REILLY:  Good morning, your Honor.  Matthew
 7   Reilly and Christopher Fenton for the United States.  We're
 8   joined at counsel table by our paralegals, Rachel Boyer and
 9   Grace Souder.
10            Thank you, your Honor.
11            THE COURT:  Good morning, folks.
12            MR. COLLINS:  Good morning, your Honor.  Kevin
13   Collins from Covington on behalf of Mr. Berman, who's now
14   present.
15            I'm joined by a number of colleagues from
16   Covington:  Jonah Panikar, José Giron, José Ramos, Lori
17   Taubman, Michelle Peterson from the Federal Defender's
18   Office and Nick Xenakis.  And on the bench behind is Brendan
19   Howell.
20            THE COURT:  Good morning.
21            And good morning, Mr. Berman.
22            My apologies to everyone for the late start.  I
23   know Mr. Berman had -- we didn't get his medications this
24   morning.
25            And I'm sure that's been frustrating for you, sir,
```

1     and I know for everyone else.  I apologize for that delay.

2              Mr. Collins, while I've got you up here, you are

3     expecting to present two witnesses; is that correct?

4              MR. COLLINS:  We are, your Honor.  We have a

5     witness on loss amount and a witness on sort of the

6     background, the technology and sort of the product

7     development.  We have Professor Williams, who was going to

8     testify during trial.  There was some discussion about

9     whether this technology was theoretically feasible and

10    possible.

11             And -- but I don't know.  I understand the Court

12    has obviously a busy docket.  So we defer to how the Court

13    wants to proceed.  But one thought we had as we were sitting

14    here is that the Court take the two experts, the

15    Government's and ours, on loss amount and, if there's time,

16    then have Professor Williams testify or potentially

17    reschedule him to appear remotely.

18             He apparently has a bit of a conflict that starts

19    very soon.  He has a project for NASA where he has to be

20    available at his facility.  But he can make time to appear

21    remotely.  So I just -- I'm giving you sort of all of the

22    arguments.

23             THE COURT:  Yes.  Thanks.

24             I guess I was a little surprised to see your

25    notice about him.  I understood this was going to be about

```
 1    loss amounts.  I'm very interested to hear that
 2    back-and-forth.
 3              I mean, what he's describing there really doesn't
 4    seem related to loss amount.  And I don't think you're
 5    disagreeing with that --
 6              MR. COLLINS:  I agree.  I don't disagree.
 7              THE COURT:  -- you know, perhaps more about your
 8    client's culpability or something like that.  I mean, I feel
 9    like there's pretty narrow room for you to be playing on
10    that.
11              MR. COLLINS:  Fair enough.
12              I mean, we think it would go to a couple factors
13    under 3553(a):  number one, the nature and circumstances of
14    the offense.  I mean, this was actual, real development.  I
15    mean, Mr. Berman and DECN hired real experts, you know.
16    They were pursuing an FDA application.  So this wasn't as if
17    this was just sort of totally made up.  There was a
18    theoretical basis for this technology.  And in fact,
19    Mr. Berman just got out in front of his skis in the press
20    releases.  That's kind of what this case is about.
21              But the Government has refused to acknowledge that
22    this technology was technically feasible to detect a virus.
23    We -- there was a lot of colloquy with the Court and the
24    Government at the pretrial conference in November, and we
25    stipulated.  And the Government sort of waffled back and
```

 1    forth.  We never got to it.

 2              That's why -- they've injected this issue into the

 3    case.  So we brought Professor Williams here to say:

 4    Actually, this was real technology, you know.  They might

 5    not agree with that.  But the point is, we're not saying it

 6    worked; but theoretically, it was possible to get a test

 7    that would detect the virus.

 8              THE COURT:  Okay.  Let's see where we are after

 9    loss amounts and then chat on that.  I'm not thrilled about

10    doing a trial after --

11              MR. COLLINS:  Fair enough.  But my -- from our

12    perspective, there was going to be testimony from

13    Dr. Williams at trial.  So if it was relevant at trial,

14    which, from our perspective, certainly it would be relevant

15    background under 3553(a).

16              THE COURT:  Okay.

17              MR. COLLINS:  That's our position, your Honor.  I

18    understand where you're coming from.

19              A number of my colleagues will be handling some of

20    the exams.  I'll act like the Nationals manager and just

21    sort of call them out as the issues arise.

22              THE COURT:  That's fine, as long as I'm hearing

23    from one person per thing.  I'm not excited about --

24              MR. COLLINS:  We're not tag-teaming.

25              THE COURT:  Great.

1          So, Mr. Reilly, you have a professor?  Should we

2    get started with your witness?  Anything before we get

3    started?

4          MR. REILLY:  Your Honor, the only thing is we had

5    anticipated Professor Mitts to testify, listen to the

6    testimony of Mr. Reilly and offer brief rebuttal testimony.

7    And that's the way we had prepared and structured this, and

8    that's what we noticed to the defense.  If the Court would

9    be okay with that, that would be our preference.

10          THE COURT:  I have no problem with, I mean, all

11   three gentlemen being present for any of this that they

12   wish.

13          MR. COLLINS:  I think they're entitled to be

14   present.

15          THE COURT:  Yes.  Great.  Thank you, sir.

16          MR. REILLY:  With that, your Honor, the United

17   States calls Professor Joshua Mitts.

18       JOSHUA MITTS, Ph.D., GOVERNMENT WITNESS, SWORN.

19          THE COURT:  Good morning, sir.

20          THE WITNESS:  Good morning.

21                    DIRECT EXAMINATION

22   BY MR. REILLY:

23   Q.  Would you please state and spell your name for the

24   record?

25   A.  Joshua Mitts, M-I-T-T-S.

```
 1    Q.  Professor Mitts, would you briefly run through your

 2    academic qualifications for the Court.

 3    A.  I have a bachelor's degree from Georgetown University, a

 4    J.D. from Yale Law School and a Ph.D. in finance and

 5    economics from Columbia University, Columbia Business

 6    School.

 7    Q.  Professor --

 8              THE COURT:  You got a J.D. and you got a Ph.D.

 9    I'm shocked.

10              THE WITNESS:  I'm not the only one.

11    BY MR. REILLY:

12    Q.  Where are you currently employed?

13    A.  Columbia University.  Columbia Law School.

14    Q.  What's your role there?

15    A.  I am a professor of law at the law school.

16    Q.  And does -- do you specialize in any particular area of

17    research?

18    A.  My research focuses on trading in the financial markets.

19    Q.  Does your research focus on economic theory and

20    quantitative measures of valuation?

21    A.  Yes.

22    Q.  Are there any other areas of specialty in your research?

23    A.  Sure.  I write on the nature of information transmission

24    in the financial markets, how informed trading makes its way

25    into stock prices.  I write on insider trading, market
```

1    manipulation and other topics in that space.

2    Q.  Is it common for an economist to teach at a law school,

3    Professor Mitts?

4    A.  It is.  Many have J.D.s and Ph.D.s, as I do.  But I do

5    have a colleague who does not have a J.D.  That's been an

6    increasing trend in recent years.

7    Q.  Has your work been published in financial economic

8    publications?

9    A.  Yes.  I have published in the *Journal of Finance*, which

10   is a leading peer-reviewed journal in financial economics,

11   and I have also published in peer-reviewed law and economics

12   journals, the *Journal of Law and Economics*, the *Journal of*

13   *Legal Studies*, published interdisciplinary work that is

14   fundamentally economic in methodology.

15   Q.  Have you served previously as an expert in federal court

16   securities cases?

17   A.  Yes.

18   Q.  And have you ever been deemed an expert by a federal

19   court in connection with any of those representations?

20   A.  Yes.

21   Q.  Would you briefly summarize the judicial findings?

22   A.  Sure.  I was qualified as an expert in the *Set Capital*

23   *v. Credit Suisse* case in the Southern District of Florida of

24   New York.  There was a *Daubert* motion to disqualify me that

25   the Court denied and found that my testimony was reliable.

1    My testimony in the Bayer Securities Litigation matter in

2    the Northern District of California was also accepted by the

3    Court.  There wasn't a *Daubert* motion, but the Court

4    essentially adopted my report.

5    Q.  Do you have a consulting expert business, Professor

6    Mitts?

7    A.  I do.

8    Q.  Would you briefly describe what kind of services that

9    business offers?

10   A.  I have a consulting LLC that provides both consulting

11   expert services.  So generally, let's say, prior to

12   testimony or in a case where counsel are contemplating

13   bringing a case, I'll be engaged as an expert.  But I also

14   testify through that consulting LLC.

15            MR. REILLY:  And, Ms. Boyer, if you'd please bring

16   up Government's Exhibit 00.

17   BY MR. REILLY:

18   Q.  Professor Mitts, is this a current copy of your CV?

19   A.  Yes, it is.

20            MR. REILLY:  Your Honor, I would offer to admit

21   Government's Exhibit 00 into evidence.

22            MS. TAUBMAN:  No objection.

23            THE COURT:  Without objection, 00 is in.

24            (Whereupon, Government's Exhibit No. 00 was

25   entered into evidence.)

1          MR. REILLY:  Your Honor, I would move to certify

2     Professor Mitts as an expert in financial economics.

3          MS. TAUBMAN:  No objection.

4          THE COURT:  Without objection, Professor Mitts

5     will be recognized as an expert in the area of financial

6     economics.

7     BY MR. REILLY:

8     Q.  Professor Mitts, were you engaged by the Department of

9     Justice in this matter?

10    A.  I was.

11    Q.  What were you asked by the Department to do?

12    A.  I was asked to evaluate, one, the losses to investors by

13    applying the modified rescissory method set out in the

14    United States Sentencing Guidelines and, two, to evaluate

15    whether the MRM calculation was a reasonable estimate of the

16    actual loss suffered by investors.

17    Q.  And are you being paid for your work on this matter?

18    A.  I am.

19    Q.  And do you have a contract with the Government where you

20    can bill $600 an hour up to $70,000 for your work in this

21    matter?

22    A.  Yes.

23    Q.  So now that you've explained what you were engaged to

24    do, would you walk the Court through the process you

25    undertook to complete that work.

1    A.   Sure.  So first, I needed to collect pricing data to

2    evaluate the change in price, which is part of the MRM

3    formula.  So I collected pricing data from the OTC Markets

4    database that basically has the closing price and other data

5    points for each OTC traded stock.

6         I collected information on the shares outstanding

7    and other data points concerning the company here, Decision

8    Diagnostics.  I applied the methodology, which I'm happy to

9    get into the calculations, and that yielded my estimate of a

10   numerical loss.  That was the first opinion.

11        And the second opinion:  To evaluate whether it

12   was reasonable, I employed a number of additional analyses

13   to examine whether the price decline reflected in that

14   calculation was the product of other factors, external

15   market forces.  And I'm happy to walk through each of those

16   steps.

17   Q.   Starting with the mathematical calculation, what method

18   did you use to calculate the loss under the guidelines?

19   A.   So generally speaking, the guidelines set out a

20   comparison of average prices over particular intervals.

21        So basically, I needed to collect the prices over

22   the defined intervals that I looked at and then I needed to

23   compute the difference in average prices.

24        Then I needed to multiply that difference in

25   average price by the number of shares that were outstanding.

1    And there were actually two different number of shares

2    outstanding that I used for reasons I'm happy to explain.

3              And I simply multiplied the difference in price by

4    the number of shares outstanding to obtain a measure of the

5    total decline in market value caused by the loss according

6    to the MRM -- caused by the fraud; excuse me -- according to

7    the MRM method.

8    Q.  And this is the methodology found in the application

9    note to Section 2B1.1 of the sentencing guidelines?

10   A.  That's correct.

11             MR. REILLY:  Ms. Boyer, would you put up

12   Government's Demonstrative Exhibit 6-X.

13   BY MR. REILLY:

14   Q.  Can you see that, Professor Mitts?

15   A.  Yes.  Thank you.

16   Q.  Would you walk the Court through kind of the

17   mathematical process you undertook here to come up with your

18   loss amount figure?

19   A.  Sure.  So using the closing price data that I described

20   previously, I took the period of the fraud, which is defined

21   as March 3rd, 2020, to December 17th, 2020.  I took the

22   average of the closing prices over that period, which is

23   19.54 cents per share.  I then calculated the average price

24   over the 90 days following the fraud or following revelation

25   of the fraud, which was December 18th, 2020, to March 17th,

1    2021.  The average price during that period I calculated to

2    be 2.13 cents per share.

3            And then I simply took the difference of those two

4    numbers, which yielded 17.41 cents per share.

5            THE COURT:  Professor, did you come up with the

6    period of the fraud or is that something the Government

7    provided for you?

8            THE WITNESS:  The Government provided me with the

9    dates for the period of the fraud.  I did evaluate based on

10   the materials that I reviewed that were publicly available,

11   the indictment and so forth, whether that seemed reasonable

12   to me.  And it did seem reasonable to me.  But I did not

13   select the dates myself.

14           THE COURT:  Understood.

15   BY MR. REILLY:

16   Q.  And would you just at a high level explain why you

17   thought the date the Government gave you for the period of

18   the fraud was reasonable?

19   A.  Sure.  So generally speaking, it didn't seem to me that

20   there really was much question concerning the beginning

21   date.

22           But the question of when the truth was revealed to

23   the market, you know, I basically started from the question:

24   Well, when was the entirety of the fraud revealed?  And it

25   seemed to me reasonable to look at the publication of the

1   indictment as a date when the totality of the Defendant's

2   activities were revealed to the market.

3   Q.  Looking at the second chart here on the demonstrative

4   exhibit, Professor Mitts, would you walk through the

5   calculations that you ran here to determine the loss amount?

6          THE COURT:  Sorry.  I want to go back to that

7   point.

8          As you're probably aware, there's -- a lot seems

9   to turn on that.  Is this something that is within your area

10  of expertise to try to determine the appropriate time

11  period?  Or is that something that you're looking at as a

12  lawyer yourself and law professor, but not necessarily --

13  that's not where your skill lies?

14         THE WITNESS:  Your Honor, I was not asked by the

15  Department to evaluate that question.

16         I think generally my view would be that that's not

17  a question that can be answered by financial economics.

18         What I can say is, it would seem to me that the

19  key question would be for any alternative date what

20  information was released versus other activity potentially

21  by the Defendant.  And it did not seem obvious to me that

22  there was a date other than this date where the entirety of

23  the information had been released to the market.  And I'm

24  familiar generally with, you know, what's in the record

25  concerning the Defendant's overall conduct in statements

1    that were made even after the trading suspension.

2            So again, I wasn't asked to choose the date.  But

3    it didn't seem, you know, like there was another date that I

4    just -- I felt like, well, we should have used that date.

5    It seemed to me that there was enough ambiguity that I as an

6    economist could feel comfortable with December 18th.  But I

7    don't think the question really can be answered as a matter

8    of financial economics.

9            THE COURT:  So I don't think either party is

10   suggesting this.  But it occurred to me that looking at how

11   the stocks were trading before the fraud could be at least

12   as instructive as the time afterwards.

13           Does that resonate with you at all?  I mean,

14   obviously, that's not what the guidelines suggest.  But why

15   might that -- why is that not an equally good kind of

16   baseline?

17           THE WITNESS:  I think your Honor is making a good

18   point, that if we have an inflationary period, you know, at

19   least there's another period where there wasn't inflation in

20   the price.

21           So I agree with your Honor that, prior to the

22   initial misstatement, that is a period not characterized by

23   the price inflation and the fraud.

24           I guess my thought would be that, you know, there

25   could be other information that came out after the fraud was

1    revealed, and that would be relevant to the company.  And I

2    wouldn't necessarily be measuring the impact of that other

3    information, let's say, in late 2020 or early 2021 if I were

4    looking at the prices in 2019, for example, as a direct

5    measure of that counterfactual that we're discussing.

6              But I do use -- and I'm happy to say more about

7    this -- I do use the period before the fraud in my analysis.

8    I just don't use it in this particular calculation.

9              THE COURT:  Okay.

10   BY MR. REILLY:

11   Q.  Well, why don't you explain for the Court, since this is

12   where we're -- what's of interest:  What did you do with

13   regard to the period prior to the fraud in connection with

14   your analysis?

15   A.  So I used the year preceding the period of the fraud as

16   a period to examine the extent to which Decision Diagnostics

17   thought price is responding to market-wide or industrywide

18   information.  So that's generally the approach that one uses

19   in the economics literature, which is to estimate the

20   relationship between this stock price and the market or

21   industry as a whole to see, you know, does this stock tend

22   to be affected by industry-wide or market-wide news?

23             So I do use the period of the year preceding the

24   fraud to examine that, which ultimately feeds into the

25   reasonableness of this calculation for -- as a measure of

1    investor loss.

2    Q.  So let's stick with this.  You looked at the prior year

3    to determine what?

4    A.  To determine whether -- ultimately whether this

5    mathematical calculation is a reasonable estimate of

6    investor loss, but specifically to examine whether this

7    stock was generally affected by external market forces.

8    Q.  And walk the Court through what kind of analysis you do

9    based on financial economics principles to conduct that

10   analysis.

11   A.  So typically, people use an event study to look at the

12   extent to which other factors might have affected the stock

13   price.  That's the standard method in financial economics.

14           What an event study requires as an initial phase,

15   if you will, is that there's some relationship between this

16   stock price and those external market forces.  So those

17   external market forces could be the market as a whole,

18   industry index, for example, other standard asset pricing

19   factors.

20           When one estimates a regression model, when one

21   looks at the relationship between a stock price and these

22   other factors, you have to identify a statistically

23   significant relationship for these factors to explain

24   changes in the stock price of the company.

25           And I did not identify such a relationship.  So in

1    effect, this was the first half of an event study.  And I

2    concluded that effectively there was no need to proceed

3    beyond that because this stock price was not tracking market

4    or industrywide factors.

5    Q.  That was the regression analysis?

6    A.  That's correct.

7    Q.  That first part of the event study.  Right?

8    A.  That's correct.

9    Q.  And what factors did you use to conduct your regression

10    analysis?

11    A.  So I used the standard asset pricing factors from the

12    literature, which is the market as a whole, the so-called

13    Fama-French factors, which look at small firm returns, value

14    firm returns, and I examined whether there was a

15    statistically significant relationship, correlation, in a

16    regression model between the daily changes in the price of

17    Decision Diagnostics and these factors.

18    Q.  And what was your ultimate finding?

19    A.  I found no statistically significant relationship with

20    any of those standard asset pricing factors.

21    Q.  So taking a step back, what does that mean for kind of

22    the reasonableness of using the MRM approach in calculating

23    loss here?

24    A.  Because there was no statistically significant

25    relationship between the price of Decision Diagnostics and

1    the market factors that I examined, I concluded that the MRM

2    was an appropriate method to measure the actual loss

3    suffered by victims, because very intuitively, if there's no

4    relationship between this company's stock and the market as

5    a whole, then we can conclude that the price decline was not

6    caused by the market.

7    Q.  And turning back to the first question that we jumped

8    off of from here, when looking at one of the dates proposed

9    by the defense, what sort of firm-specific activity would

10   you think would need to be examined in order to select one

11   of those dates?

12   A.  Sure.  So I mean, I think the key question really as I

13   was answering your Honor's question earlier is:  What's the

14   nature of the information that is being brought into the

15   market by the firm or by individuals associated with the

16   firm?

17          So I might be looking at what sort of disclosures

18   are being made, for example, and those -- that would be

19   firm-specific information that could affect the price of the

20   stock.

21   Q.  All right.  And turning back to the loss amount

22   calculation and the multiplication part of the math, would

23   you walk us through briefly your finding here and why there

24   are two different amounts of outstanding shares that you

25   contemplated.

Mitts - DIRECT - By Mr. Reilly

```
1    A.  Sure.  So when I reviewed the -- both the data and the

2    disclosures, Decision Diagnostics was selling additional

3    shares during the period of the fraud.  When companies do

4    this, they're issuing more shares.  So the number of

5    outstanding shares is increasing.

6            And so what we have here are two points in time.

7    So at the beginning of the period of the fraud, there were

8    160 million shares outstanding.  At the end of the period of

9    the fraud, there were 349 million shares outstanding.

10   Q.  Are these both reasonable numbers to use in calculating

11   the loss amount here?

12   A.  In my opinion, yes.  They are both reasonable.

13   Q.  Do you think one was a better measure than the other of

14   the true loss amount?

15   A.  I do.  I think that -- I think the latter is -- 349

16   million shares is more reasonable than the 160 million

17   shares number.

18           The reason is because the company was selling

19   shares during the period of the fraud.  So there were

20   investors who were buying newly issued shares at inflated

21   prices during the period of the fraud.  So those investors'

22   losses would not be captured by the 160 million shares

23   number.

24   Q.  So in any event, what are the two loss amount numbers

25   that you found could be used under the MRM?
```

1    A.  The 27.8 million number is with the 160 million share

2    figure at the beginning of the period of the fraud.  And the

3    60.8 million number is the -- uses the 349 million share

4    figure.

5    Q.  In your opinion, are either of these figures an

6    acceptable measurement of the loss amount caused by

7    Defendant Keith Berman in this case?

8    A.  Yes.

9    Q.  So then we turn to the second part of the analysis that

10   you previewed earlier; and you were asked to then determine

11   if these were reasonable estimates of the actual loss

12   attributable to the change in value of Decision Diagnostics'

13   stock?

14   A.  That's correct.

15   Q.  Okay.  And we've talked a bit about how you worked on

16   determining if it was reasonable.  But can you walk us

17   through the totality of what steps you took to evaluate if

18   this was a reasonable measure.

19   A.  Sure.  So first, I took the daily changes in the price

20   of Decision Diagnostics during the year preceding the fraud.

21   And I estimated a regression model, where I regressed those

22   daily changes in the price on --

23           THE COURT:  Sorry.  Dr. Mitts, going back to the

24   outstanding shares -- forgive my ignorance on this -- does

25   this mean that there's 350 million shares and all of these

24

1   have been bought by individuals?  Or does this mean that

2   there's -- you know, there's shares available, but some of

3   them have not been purchased?

4            THE WITNESS:  Your Honor, from the disclosures and

5   the data that I reviewed, it appeared to me that all of

6   those shares had been purchased.  They were not all

7   purchased by individuals.

8            Just to respond to that point, many of these were

9   purchased by institutions, for example, who had lent the

10  company money.  They might have converted their debt

11  obligations, let's say, to shares, so they might have been

12  cashed out effectively in shares.  But that was issued in a

13  sense for value.  So in a way, it's economically the same.

14           THE COURT:  But the "outstanding shares" term

15  means shares that have been purchased by an entity or

16  person?

17           THE WITNESS:  That's correct.  Generally, the term

18  "shares," "authorized shares," will refer to the number of

19  shares that the board of directors and the shareholders have

20  authorized to be issued.

21           But "outstanding" is really here being used to

22  represent issued and outstanding.  And that number is

23  increasing because these newly issued shares, some of which

24  are being either paid for, as I said, through debt

25  obligations or cash, are being issued by the company; and so

Mitts - DIRECT - By Mr. Reilly

 1   those shares are not held by the company on its own books,

 2   but they're held by these purchasers.  So that increases the

 3   number of outstanding shares, shares that are outstanding

 4   and held by investors.

 5            THE COURT:  And so I'd imagine these shares are

 6   being sold over this period of -- what is it?  About six

 7   months or so?  Maybe more like nine months.  And the price

 8   is probably fluctuating some.

 9            Are you trying to figure out kind of where each

10   share is along there?  Or is this kind of an extrapolation

11   or an approximation?

12            THE WITNESS:  Your Honor is correct that I am not

13   calculating at each point in time what the purchase price

14   was relative to the average figure here in the MRM.

15            So the number at the end of the period, meaning

16   the 349 million shares, you can say, well, you know, it was

17   less than that at some point during that period.  And that's

18   correct.  And that's why I use two numbers.  I think, you

19   know, either one would be reasonable because, you know, they

20   both reflect the magnitude of the market value loss.

21            But I think, you know, neither one perfectly

22   captures the market cap at each point in time, market

23   capitalization.

24            THE COURT:  Okay.

25   BY MR. REILLY:

1    Q.  We talked about the regression that you ran, and that

2    was the testimony provided a few moments ago.  Right?

3    A.  Yes.

4    Q.  Did you look at peer-reviewed literature to assess the

5    reasonableness of these figures?

6    A.  I did look at peer-reviewed literature to assess the

7    reasonableness of the regression results.  Yes.

8    Q.  And what did it say about companies like Decision

9    Diagnostics and how to think about whether this is a

10   reasonable measure of loss?

11   A.  So the literature consistently shows that OTC penny

12   stocks like Decision Diagnostics are generally characterized

13   by idiosyncratic information specific to that firm.  So if

14   the concern is, well, maybe this price decline reflects,

15   let's say, the market or industrywide factors, the

16   literature shows that generally these OTC penny stocks are

17   not following market or industrywide factors as a group.

18          MR. REILLY:  Would you please put up Government's

19   Exhibit 6-A2.

20   BY MR. REILLY:

21   Q.  And, Professor Mitts, is this a chart plotting the stock

22   price of Decision Diagnostics in 2019 and 2020 against the

23   stock price of the NASDAQ biotechnology index?

24   A.  Yes, it is.

25   Q.  And was this chart generated using data from Bloomberg?

 1    A.  Yes.

 2    Q.  Was it originally prepared by FINRA's CPAG group?

 3    A.  That's my understanding.  Yes.

 4    Q.  Do you adopt this chart as your own for purposes of

 5    today's proceeding?

 6    A.  Yes.

 7          MR. REILLY:  With that, your Honor, I would move

 8    to admit Government's Exhibit 6-A2 into evidence.

 9          MS. TAUBMAN:  No objection.

10          THE COURT:  Without objection, 6-A2 is in.

11          (Whereupon, Government's Exhibit No. 6-A2 was

12    entered into evidence.)

13    BY MR. REILLY:

14    Q.  Professor Mitts, as the final step in your

15    reasonableness analysis, did you look at whether Decision

16    Diagnostics' stock price was uncorrelated with

17    industry-specific events?

18    A.  Yes, I did.  And that's --

19    Q.  What does that mean?  That's very technical terminology.

20    A.  Sure.

21    Q.  Maybe if you could walk back what that's really looking

22    at.

23    A.  Sure.  So previously, I discussed the standard asset

24    pricing factors, like the market as a whole, small firms,

25    value firms and so forth.

1          But because the sentencing guidelines also refer

2     to industry-specific factors, I examined whether the price

3     of Decision Diagnostics was systematically correlated with

4     biotechnology firms.  And I measured price changes in

5     biotechnology firms using the NASDAQ biotech index, which is

6     a standard index consisting of NASDAQ-traded biotechnology

7     firms.

8     Q.  Why do you use that particular index?

9     A.  So there's a couple points there.  One is that you want

10    to make sure you're using a basket of stocks, because any

11    individual comparator stock will have its own set of

12    idiosyncratic information.

13         So if you're trying to evaluate, well, was this

14    price change in Decision Diagnostics correlated with biotech

15    industry information, you have to have an index that nets

16    out the changes in individual stocks so that only the

17    industry news or industry price effects remain.  So we

18    definitely need an index of biotechnology firms.

19         In an ideal world, I would have used an

20    over-the-counter biotech index because Decision Diagnostics

21    is an over-the-counter traded stock.  But there is no such

22    index that I'm aware of that satisfies the criteria,

23    meaning, for example, the index needs to reflect companies

24    that are traded frequently enough so that the price

25    measurements are meaningful.  And I'm not aware of any such

```
 1    OTC index.

 2              The closest index that I could find was NBI,

 3    because there are many small NASDAQ-listed companies that

 4    are similar to Decision Diagnostics in many respects.

 5    Q.  Once you got the relevant data for the NBI, did you

 6    conduct another regression analysis?

 7    A.  I did.

 8    Q.  And what did that regression analysis look for?

 9    A.  So I looked for a systematic correlation as measured by

10    regression analysis between Decision Diagnostics' stock

11    price and the NASDAQ biotech index.  And I did not find a

12    statistically significant relationship.

13    Q.  So what does that tell you about the correlation between

14    Decision Diagnostics and industry-specific events?

15    A.  So the absence of a consistent statistically significant

16    relationship between Decision Diagnostics and the NASDAQ

17    biotech index -- the absence of such a correlation indicates

18    that Decision Diagnostics' stock price was not responding to

19    industry-specific news concerning the biotech industry.

20    Q.  So taking everything we've talked about today, the

21    regression analysis, the peer-reviewed literature, what is

22    your opinion as to the reasonableness of using the loss

23    figures that you talked us through in Government's Exhibit

24    6-X for the relevant loss amount here?

25    A.  It is my opinion that the MRM calculation is a
```

```
 1    reasonable estimate of the actual loss suffered by

 2    investors.

 3              MR. REILLY:  No further questions at this time,

 4    your Honor.

 5              THE COURT:  Thank you.

 6              Defense?

 7                        CROSS-EXAMINATION

 8    BY MS. TAUBMAN:

 9    Q.  Good morning, Dr. Mitts.

10              THE COURT:  Remind me of your name, ma'am.

11              MS. TAUBMAN:  I am Lori Taubman on behalf of

12    Mr. Berman.

13              THE COURT:  Thank you.

14    BY MS. TAUBMAN:

15    Q.  You mentioned previously that you have testified in

16    federal court.  Have you ever offered testimony on behalf of

17    a defendant?

18    A.  I was once engaged to write an expert report on behalf

19    of a defendant in a securities class action.  My expert

20    report was submitted under oath, but the case settled before

21    I was deposed.  So that's one case I can think of.

22              I also testified in Alberta in a merger case, a

23    merger litigation dispute.  I can't recall if the party I

24    was engaged for was technically the defendant.  They might

25    have been.
```

1    Q.  Okay.  Have you ever testified against the Government?

2    A.  No.

3    Q.  Your appearance today is not the only engagement you

4    have had with the DOJ's criminal division's fraud section.

5    Is that right?

6    A.  That's correct.

7    Q.  Okay.  Since 2021, you have been paid over $350,000 by

8    the criminal division's fraud section for consulting work.

9    Is that right?

10   A.  I would have to check my figures.  That sounds

11   approximately correct.

12   Q.  And that number does not include work that you've

13   performed in connection with today's hearing.  Correct?

14   A.  That's correct.  I haven't submitted any invoices for

15   this matter yet.

16   Q.  It's fair to say that you've read and done a lot of

17   research about securities markets.  Is that right?

18   A.  Yes.

19   Q.  Okay.  But I saw from your CV, which was entered earlier

20   as an exhibit, that your only professional experience

21   outside of being a law professor was working at a law firm

22   for one year.  Is that accurate?

23   A.  I think I might define "professional experience"

24   differently.  But if you're referring to full-time

25   employment outside of the academy, I'd say that's correct.

1    Q.  So you've never worked in a financial firm?

2    A.  I have not.

3    Q.  You talked about the OTC literature a fair bit.

4            Have you ever purchased a penny stock?

5    A.  I don't believe so, no.

6    Q.  We talked a little bit about the shares outstanding and

7    that number.  Did you review the stock ledger of DECN?

8    A.  I did not.

9    Q.  And the additional shares that we spoke about earlier,

10   did you verify whether they were newly issued shares or

11   shares that were the result of conversions of preferenced

12   older shares?

13   A.  Well, generally speaking, if preferred shares or

14   convertible notes or other derivative securities are

15   converted to common stock, the common stock is newly issued.

16   So I don't understand that to be an either/or distinction.

17   It just goes to where the newly issued shares came from in

18   the sense of:  What was their consideration?  Was an

19   investor paying cash for them?  Or were they exchanging or

20   converting or trading their existing preferred convertible

21   note or other derivative obligation like a warrant for those

22   newly issued common shares?  In all of those cases, the

23   shares that are newly issued, the common shares, are newly

24   issued in all of those cases.

25   Q.  Okay.  But in this particular case, did you look into

1    that in the documents that you consulted?

2    A.   From the disclosures by the company that I reviewed, it

3    was apparent to me that, as I answered the Court's question

4    earlier, these were newly issued common shares.

5    Q.   Okay.  I want to ask you a few questions about the

6    NASDAQ biotechnology index that you were discussing earlier.

7              So stocks could be traded either on an exchange,

8    like NASDAQ, or over the counter.  Is that right?

9    A.   That's correct.

10   Q.   And then to be in the NASDAQ index, the stock must be

11   listed on NASDAQ.  Is that accurate?

12   A.   Generally, I think that's correct.  I'd have to check

13   exactly what the index inclusion rules are.  But that sounds

14   generally correct.

15   Q.   And I think you mentioned earlier that the companies

16   that trade exclusively over the counter would not be

17   included in the NASDAQ index.  Did I get that right?

18   A.   That's correct.

19   Q.   Okay.  In your expert disclosure, you cited an article

20   called Asset Pricing in the Dark:  The Cross-Section of OTC

21   Stocks.

22              Do you remember that article?

23   A.   Yes.

24   Q.   Okay.  And then, as the authors of the article explained

25   in the article's summary, over-the-counter or OTC stocks are

1    far less liquid, disclose less information and exhibit lower

2    institutional holdings than do listed stocks.

3              Is that consistent with your recollection of that

4    article?

5    A.  Yes.

6    Q.  So there's meaningful differences between OTC stocks and

7    stocks that are listed on exchanges like NASDAQ.  Is that

8    right?

9    A.  There's certainly differences when one looks at the

10   entire population.  NASDAQ has some of the largest publicly

11   traded companies.

12             In the biotech space in particular, biotech

13   companies on NASDAQ by and large tend to be very small,

14   either small caps or micro caps.  There are biotechs on

15   NASDAQ which are comparable to OTC stocks like Decision

16   Diagnostics.

17             I don't have the exact numbers in front of me as

18   to the average market cap of each; but from my experience,

19   you know, companies go off and on NASDAQ, particularly

20   biotech companies.  And so, you know, there's a general

21   similarity in the nature of those companies in that group.

22   Q.  So to kind of follow up about that group, the NASDAQ

23   biotechnology index is constructed from the prices of more

24   than 200 securities.  Is that right?

25   A.  That's consistent with my recollection.

 1    Q.  And they include both biotechnology companies and

 2    pharmaceutical companies.  Is that right?

 3    A.  I'd have to go back and check the index inclusion

 4    criteria.  But that sounds correct to me.

 5    Q.  It would include companies like 23andMe?

 6    A.  I don't know off the top of my head which companies --

 7    Q.  So you --

 8    A.  -- are in --

 9    Q.  -- don't know --

10         THE COURT REPORTER:  I'm sorry.  I didn't get the

11    answer.

12         THE WITNESS:  I don't know off the top of my head

13    which companies are -- I don't have the entire list of 200

14    companies in front of me.

15    BY MS. TAUBMAN:

16    Q.  And you showed us a chart earlier.  It was the

17    Government's Exhibit 6-A2.

18         MS. TAUBMAN:  I don't have an electronic version,

19    but I have a paper copy.

20         MR. REILLY:  We can pull it up.

21         MS. TAUBMAN:  That would be great.  Thank you.

22    BY MS. TAUBMAN:

23    Q.  So according to this chart, it looks like the DECN

24    closing price was never more than 45 cents in 2020.  Is that

25    accurate?

1    A.  I'm sorry.  Could you repeat the question?

2    Q.  Yeah.  I'm looking at the chart and looking at the trend

3    in the DECN closing price.  And it appears that it's never

4    higher than 45 cents.  It kind of -- is that right?

5    A.  That is consistent with the data on the chart.  Yes.

6    Q.  Okay.  And -- but the price per stocks traded on NASDAQ

7    tends to be higher than that.  Is that accurate?

8    A.  Not as a general statement.  There are NASDAQ issuers

9    who trade below one dollar.  They're in danger of being

10   delisted off of NASDAQ if they remain below one dollar.  So

11   there are certainly fewer what we would call penny stocks on

12   NASDAQ.

13   Q.  And to be in the NASDAQ biotechnology index, the

14   security must have a minimum market capitalization of

15   $200 million.  Is that accurate?

16   A.  I don't recall the index inclusion criteria.  That

17   wouldn't surprise me.

18   Q.  And over the period that we are discussing for your

19   estimation, DECN's market capitalization, would it have

20   approached $200 million?

21   A.  I'd have to look carefully at the numbers.  But I don't

22   think it would be far from that figure if you took, let's

23   say, just round numbers, 50 cents times, you know, 300

24   million shares, for example, you would get 150 million

25   shares -- excuse me -- $150 million.

1          So I don't -- you know, I don't know exactly what

2     the number would be.  But I don't think it would be an order

3     of magnitude less than 200 million.

4     Q.  But it would be below the minimum of 200 million?

5     A.  Again, it might be.  But I can't say with certainty

6     because, as I was explaining earlier, there were more than

7     300 million shares issued.  I can say probably it would have

8     been below.  But I would have to check to be sure.

9     Q.  And I believe, as your opinion that you shared earlier,

10    that you believe that DECN's stock price is not impacted by

11    industry-specific events.  Is that accurate?

12    A.  I didn't identify any evidence to indicate that Decision

13    Diagnostics' stock price was affected by industry-specific

14    events.

15    Q.  And you reached that conclusion because you found that

16    the DECN stock price was not correlated with this NASDAQ

17    index we were discussing?

18    A.  Well, the NASDAQ biotech index is not a comparator

19    because of the similarity between NBI -- between that index

20    and Decision Diagnostics.

21         The reason why one would compare a stock like

22    Decision Diagnostics to the NASDAQ biotech index is because

23    an index of heavily traded biotech stocks will reflect

24    industry-wide news.  So if the price of NBI goes up, that

25    would occur, among other reasons, if there was positive

1    biotech industry news; and, vice versa, if the price of NBI

2    went down, that would occur, among other reasons, if there

3    was negative biotech industry news.

4         So the way that the peer-reviewed literature in

5    financial economics uses indices -- and in fact, many times

6    the indices that are used to compare stock prices are very

7    different from the companies who are being compared, not

8    because one is comparing between two similar companies, but

9    because the external market forces of interest are measured

10   through the changes in the price of the index.

11        So if there was biotech industry news, one would

12   certainly expect that it would be in the price of NBI.  And

13   if that news were also affecting Decision Diagnostics' stock

14   price, one would expect to see therefore a correlation

15   between these two prices, even though NBI may be different

16   from Decision Diagnostics in many ways.

17   Q.  Right.  But if the index also includes stocks that may

18   be dissimilar from DECN, like a pharmaceutical company, for

19   example, then it would potentially reflect news from other

20   types of companies than DECN.  Is that right?

21   A.  No.  I don't think that's a correct description of the

22   financial economics methodology.

23        There are pharmaceutical indices.  The reason one

24   uses an index of a particular type is precisely to address

25   the concern identified by your question.

1          Any index will consist of companies that are

2     different from each other in lots of ways.  But the purpose

3     of the index is to aggregate together companies that are

4     similar along one dimension, in this case biotechnology.  So

5     pharmaceutical-specific company news will be averaged out

6     such that the biotech index reflects on average

7     biotech-relevant information.

8     Q.  Let me rephrase a bit.

9          That index reflects information that's relevant to

10    all the companies that are included in the -- in deriving

11    it.  Is that right?

12    A.  I wouldn't characterize it as information that's

13    relevant to all of the companies.

14         Each company in the index has information that's

15    idiosyncratic to that company.  But when you aggregate or

16    average them into an index, what remains from that average

17    is what is a common -- we call it pricing factor to all of

18    the companies in that index.

19         But the information reflected by that pricing

20    factor is the only information that's coming to all of the

21    companies in that index.  So if you have information that

22    affects a few companies in the index, but it's not common to

23    all the companies in the index, it would not be measured by

24    the index because the index would be averaging that

25    idiosyncratic information out.

1    Q.  So if there was some information that was relevant to a

2    subset of companies in the index, though, that information

3    might get averaged out and not be reflected as strongly in

4    the overall index if there are essentially other types of

5    companies in the index?

6    A.  The logic of that statement is correct.  But of course

7    it applies both ways.  So it applies to information about

8    some of the companies that could be positive on any given

9    day and it applies to information about other companies that

10   could be negative.  On average, what's left in the change of

11   the price at NBI is what is consistently correlated or

12   consistently common to all of the companies in that index,

13   meaning it goes the same direction.

14            For an index that consists of biotech companies --

15   and that's the inclusion criteria -- the standard approach

16   in the financial economics literature is to use that sort of

17   index as a measure of biotech's industry news.

18   Q.  Did you attempt to identify a peer group of companies

19   for DECN aside from your work with this NASDAQ index?

20   A.  I did not.

21   Q.  Okay.  And you had mentioned earlier when you were

22   discussing your calculations a data source called OTC

23   Markets that tracks stocks that are traded over the counter,

24   like DECN?

25   A.  That's correct.

1    Q.  And the OTC Markets website also includes some industry

2    classification information.  Is that right?

3    A.  It includes industry classification information that in

4    my experience, because I've researched the OTC Markets

5    platform, it's very inconsistent.  There are classification

6    codes that I personally in my work have not found, you know,

7    persuasive or coherent as a means of organizing companies.

8    Some of the industries have maybe less than ten companies in

9    them, which is not a particularly reliable metric of an

10   industry.

11   Q.  Did you make any attempt to replicate the analysis that

12   you performed with a NASDAQ index with that OTC Markets

13   data?

14   A.  I did not.  For reasons I've explained earlier, the OTC

15   Markets generally are a problematic source of stock prices

16   for constructing an index because in order for an index

17   value to be a reliable measure of industry-specific news,

18   the index needs to be heavily traded such that changes that

19   are relevant to the industry are, in fact, impounded into

20   the price of the index.

21             Unfortunately, while the OTC stocks, as I

22   explained earlier, would have been my first choice, I was

23   not satisfied and did not find a group of OTC stocks whose

24   prices were reacting with sufficient frequency that I felt

25   it was a reliable measure of biotech news.

1          So just to clarify, I did think about this

2     question and look at the stock prices that were available.

3     But I did not identify an index that I thought was a

4     reliable measure of industry-specific news in a way that

5     would be consistent with the financial economics literature

6     and methodology.

7     Q.   Okay.  I want to turn back to this chart.  The chart

8     shows the trendline for the NASDAQ biotech index that we

9     were just discussing as well.  Correct?

10    A.   Yes.

11    Q.   And that trendline looks flatter than the DECN price

12    trendline.  Is that right?

13    A.   Yes.  And that's consistent with the literature we were

14    discussing previously, that penny stocks tend to have

15    idiosyncratic volatility, meaning there's a lot of

16    idiosyncratic information that is specific to the penny

17    stock, which will cause the price of that penny stock to be

18    responsive to what's going on with that company far more and

19    maybe even to the exclusion of market-wide or industrywide

20    information.

21    Q.   But these two trend lines are plotted essentially using

22    the different axes, so on the left is the DECN closing price

23    and on the right is the NBI closing price.  Was there any

24    syncing up of the percentages or other ways of associating

25    these two lines when you put them on there?

 1    A.   Yes.   The regression analysis that I described earlier

 2    of the closing price changes in Decision Diagnostics on the

 3    NASDAQ biotech index uses percentage changes, which are

 4    scale invariant, meaning they are -- the percentage change

 5    essentially bakes in the differences in the scales.

 6           And in fact, it's important to recognize that even

 7    in a situation where the stock price moves more in magnitude

 8    than the index -- so let's say for every 1 percent increase

 9    in the index, the stock might go up 2 percent.  That would

10    also be captured by the regression analysis.

11           So the regression analysis would not require a

12    one-to-one correlation between the industry factor and the

13    stock price.  It would also allow and yield potentially a

14    statistically significant coefficient even if the stock were

15    more volatile but were still correlated with the industry

16    factor.

17           So the absence of any statistically significant

18    correlation means that I can rule that out as well.

19    Q.  We can talk about that.  I was just -- sorry.  I thought

20    it was a simple question.

21           On this particular chart, I just see the two

22    lines.  One of them is jumping up and down a lot more than

23    the other.  Is there any meaningful way to compare those two

24    lines and the volatility just looking at this chart?

25    A.  One wouldn't make that comparison by looking at the

1    chart.  One would use the regression analysis that I was

2    describing.

3    Q.  Okay.  And then on the chart, on April 23rd, 2020, the

4    SEC announced that it would suspend trading of DECN stock.

5    Is that right?

6    A.  That's what I recall.  Yes.

7    Q.  And the SEC suspension order specifically referenced

8    language in DECN's press releases.  Correct?

9    A.  That's consistent with my recollection.  Yes.

10   Q.  And the suspension ran from April 24th through May 7th,

11   2020.  Correct?

12   A.  That's consistent with my recollection.  Yes.

13   Q.  Would you agree that during that time no one could sell

14   or purchase DECN stock?

15   A.  That's what a trading suspension is.  Yes.

16   Q.  Okay.  And the suspension is indicated on this chart

17   with the shaded column; is that right?

18   A.  Yes.

19   Q.  Okay.  Would you agree that the DECN share price

20   decreased immediately following the SEC suspension?  Is that

21   correct?

22   A.  Yes.

23   Q.  So you spoke a bit about your regressions earlier.

24            You're using those regressions as part of your

25   opinion that there were no significant changes in DECN's

1    stock price not related to the fraud.  Is that accurate?

2    A.  I don't believe that's accurate.  I'm using the

3    regression analysis to examine whether external market

4    forces consistently or systematically explain changes in the

5    price of Decision Diagnostics' stock.

6    Q.  And when you say "external market forces," are you

7    referring to changed economic circumstances, changed

8    investor expectations and new industry-specific or

9    firm-specific facts, conditions or events?

10   A.  Yes.

11   Q.  So you are considering firm-specific facts, conditions

12   or events in that statement?

13   A.  Well, I agree that that is -- that firm-specific facts

14   are an external market force.

15            For purposes of this analysis, I did not evaluate

16   with a regression analysis  firm-specific facts.  I don't

17   believe it's possible to do that, because any firm-specific

18   facts would be embedded within the stock price of the firm,

19   so you wouldn't have a comparator.  So it's not possible to

20   do that with a regression analysis.

21   Q.  Okay.

22            MS. TAUBMAN:  The Court's indulgence.

23   BY MS. TAUBMAN:

24   Q.  Saying there are newly issued common shares doesn't tell

25   you whether the shares were issued as a result of a

1    preferred shareholder converting its existing preferred

2    shares into common stock that is issued by the company.

3    Correct?

4    A.  I think I agree with that.  Shares can be newly issued

5    for many different reasons.

6    Q.  Did you ever review DECN's public filings?

7    A.  As I mentioned earlier, I did review those filings in

8    the course of preparing my analysis.

9    Q.  Did you ever review any of DECN's quarterly public

10   reports which contain stock and notes tables that would have

11   told you that the new shares of common stocks were actually

12   the result of preferred shareholders converting existing

13   preferred shares into new shares of common stock?

14   A.  As I said before, the fact that shares are issued --

15   newly issued in exchange for cash or in exchange for

16   preferred shares or in exchange for notes or other

17   obligations of the company doesn't change in my view the

18   conclusion that those are newly issued shares.

19        Maybe one way to think about it is a preferred

20   shareholder in that example has, you know, a set of shares

21   that are worth a certain amount.

22        And when they convert, they get a set of common

23   shares that are worth the same amount, so that they're in my

24   view equally injured when the value of those common shares

25   that they received in the conversion is inflated by fraud,

1    because they now become a common shareholder and so they're

2    exposed to the same loss that other common shareholders are

3    exposed to.

4              MS. TAUBMAN:  I have no further questions, your

5    Honor.

6              THE COURT:  Thank you.

7              Hold on just a second.

8              Can you put 6-A2 back up.

9              So, Dr. Mitts, kind of going back to my idea here

10   about the pre-fraud status quo, it looks to me -- I mean,

11   you indicate the 90 days following the fraud, the stocks

12   were worth about 2 cents a share.  Is that right?

13             THE WITNESS:  Yes.

14             THE COURT:  Eyeballing this, it looks to me like

15   there are probably -- they're worth about the same before.

16   Is that right?

17             THE WITNESS:  That's correct, your Honor.

18             THE COURT:  And so I guess in some ways it doesn't

19   really matter.

20             Well, let me ask you this:  Is there a reason that

21   I'm missing why kind of looking at what happened before as a

22   baseline is wrong?

23             THE WITNESS:  No, your Honor.  I don't think it's

24   wrong.  And in fact, I think as an economic matter, if you

25   think about price inflation as false information that has

1    been put into the market, if the price, you know, started

2    out at what it was and then you added that false

3    information, well, the difference should exactly measure the

4    impact of that false information.

5          So I think my reference earlier was just to the

6    fact that I was asked to apply the MRM formula.  But I think

7    it would also be a reasonable estimate of the loss to use

8    the price before.

9          THE COURT:  And I mean, again, I think a major

10    question here is:  When was the fraud period?

11          Can you draw any conclusions from an economic

12    matter that the window you've taken looked to --

13    essentially, it goes back to the status quo ante as opposed

14    to another period earlier in the year, where it would be

15    significantly different?

16          THE WITNESS:  Yes, your Honor.  I think that,

17    apart from what's in the record about additional statements

18    that were made during the period that I referred to as the

19    period of the fraud, it would be standard in the financial

20    economics literature to expect that the price after a

21    complete corrective disclosure, after the truth is revealed,

22    would be approximately similar to the price before a

23    material misstatement was made, because they're both

24    measuring in effect the true value of the shares absent the

25    artificial inflation.

1          THE COURT:  Ms. Taubman, any questions based on my

2     questions?

3          MS. TAUBMAN:  No, your Honor.

4          THE COURT:  Any redirect?

5          MR. REILLY:  Subject to recall on rebuttal, no

6     further questions from the Government either.

7          THE COURT:  Thank you, Professor.  You may step

8     down.

9          (Witness excused.)

10         THE COURT:  Anything further from the Government?

11         MR. REILLY:  That's all we had, your Honor.  Thank

12    you.

13         THE COURT:  For defense?

14         MR. COLLINS:  Your Honor, if you're ready to

15    proceed, we'll call our witness.  I don't know if you wanted

16    to break.

17         THE COURT:  We can continue.  Justice never

18    sleeps.

19         MR. COLLINS:  At this point, on behalf of Keith

20    Berman, we're going to call our expert, Jim Reilly.  Brandon

21    Howell, my colleague, will be doing his exam.

22         JAMES REILLY, DEFENSE WITNESS, SWORN.

23         THE COURT:  Good afternoon, sir.

24                   DIRECT EXAMINATION

25

1    BY MR. HOWELL:

2    Q.  Good afternoon.  Please tell us your name.

3    A.  James Reilly.

4    Q.  Can you spell that?

5    A.  R-E-I-L-L-Y.

6    Q.  Mr. Reilly, can you tell us about your education?

7    A.  Sure.  I received a BS in finance from the University of

8    Maryland in 1987.

9    Q.  Can you tell us about your work experience?

10   A.  Sure.  I have been a compliance professional throughout

11   my professional career.  I started in the late '80s working

12   as a special investigator for an entity that's now known as

13   FINRA, previously known as NASD, regulation.  Various

14   compliance positions throughout the years.

15           The last part of my career, I was managing

16   director and head of global equities compliance at Goldman

17   Sachs.

18           I was then the chief compliance officer, head of

19   all compliance, at TIAA-CREF.

20           Then I became the head of compliance/chief

21   compliance officer for TD Ameritrade.

22   Q.  Now, are any of these companies, your prior employment,

23   broker-dealers?

24   A.  They're all broker-dealers.

25   Q.  Can you explain what a broker-dealer is?

1    A.  Sure.  Very simply, a firm that's authorized under the

2    federal securities laws to transact, you know, equities,

3    fixed income, different types of trades with customers on

4    exchanges, OTC pink sheets, whatever the different things.

5    So it's basically a specific type of legal entity that deals

6    with customers and their trading in the capital markets.

7    Q.  Have you received any specialized training or licenses

8    in your current field?

9    A.  Yes.  Throughout my career, I have obtained a number of

10   licenses in the securities industry.

11   Q.  And can you tell us a little bit more about those

12   licenses?

13   A.  Sure.  So they range from the basic general securities

14   license, which is called the Series 7, that trains you in

15   the basics of the rules and regulations and requirements of

16   the industry.

17           Along the way I also received specialized exams:

18   the New York Stock Exchange chief compliance officer

19   examination; a number of general securities principal

20   licenses that allowed me to supervise others; and the

21   futures and commodities exam, the Series 3.

22   Q.  How do you obtain those licenses?

23   A.  It's standard, you know, study and then taking written

24   tests.

25   Q.  And do you consider yourself an expert in any area or

```
 1    field?
 2    A.  Sure.  Throughout my career, I've become expert in the
 3    various federal securities laws and state -- self-regulatory
 4    body rules and regulations.  So most especially the
 5    Securities Act of 1933, the Exchange Act of 1934 and FINRA
 6    and NFA rules and regulations as well as the Commodity and
 7    Exchange Act.
 8    Q.  Have you ever testified as an expert before?
 9    A.  I have.
10    Q.  Can you explain that?
11    A.  Sure.  Since the fall of 2018, I started doing this type
12    of work about half-time.
13             I've appeared in 36 FINRA arbitrations, which is
14    the main part of the work that I do.  I've appeared in
15    federal court once in the Middle District of Tennessee and
16    I've got a number of pending state and federal court matters
17    coming up.
18    Q.  You just mentioned -- can you explain what your current
19    position is?
20    A.  Sure.  I'm the managing partner of PNA Consulting, LLC,
21    my own sole-member LLC.
22    Q.  Can you explain what your current role and your duties
23    are?
24    A.  Sure.  In this part of my work, I do some consulting for
25    financial services firms and clients, law firms.  I also do
```

1    a lot of expert witness appearances, as we just discussed.

2    Q.  You said you started in 2018?

3    A.  In the fall of 2018.  Correct.

4    Q.  Have you ever worked specifically with assessing when

5    and whether fraud has been disclosed to the market?

6    A.  Yes, I have.

7    Q.  Can you explain that?

8    A.  Sure.  In a couple of arbitrations that I was involved

9    with, that was one of the key elements of at least two

10   cases.

11   Q.  Have you ever calculated the amount of potential loss

12   arising from fraud?

13   A.  Yes.  I do damages calculations in almost all my cases.

14          MR. HOWELL:  Your Honor, we offer Mr. Reilly as an

15   expert relating to -- in the field of financial services,

16   complex litigation matters.

17          MR. FENTON:  No objection.

18          THE COURT:  Without objection, Mr. Reilly will be

19   recognized as an expert in the field of financial services

20   and complex litigation matters.

21          MR. HOWELL:  Thank you.

22   BY MR. HOWELL:

23   Q.  So in preparation for your testimony today, did you

24   review certain information?

25   A.  I did.

1    Q.  What information did you review?

2    A.  The variety of information provided by counsel from

3    discovery between the Government and counsel for the

4    Defendant.  That included information such as -- one of the

5    things that stuck out for me is the Blue Sheet information

6    from July 9, 2020.  You know, the press releases, different

7    pleadings.  I mean, it's standard for an expert to look at a

8    wide variety of information in forming his opinions.

9    Q.  Let's talk about penny stocks.

10            Are you familiar with over-the-counter securities?

11   A.  I am.

12   Q.  Can you explain what over-the-counter securities are?

13   A.  Sure.  So there's a segment of the market,

14   over-the-counter market, where they are -- the securities

15   that trade there are not listed on a major exchange like the

16   NASDAQ or the New York Stock Exchange, typically because

17   they don't meet the listing requirements of those exchanges

18   based on whether it's market capitalization or average daily

19   trading volume, et cetera.

20            And so there's a segment of the market, typically

21   low-value, low-market capitalization securities, that trade

22   on the OTC markets.

23   Q.  How does someone actually trade over-the-counter

24   securities?

25   A.  Sure.  If you wanted to buy shares in a company like

Reilly - DIRECT - By Mr. Howell

1    DECN, you would have to go to your broker-dealer.  And in

2    this day and age, typically you will enter an order

3    electronically saying, Buy 100 shares of XYZ.  That order

4    will be transmitted to -- the OTC market is a little bit

5    different than exchanges.  It's all -- it's a

6    dealer-to-dealer market.  So there's market makers that make

7    markets in the securities as opposed to an exchange, where

8    you can send your orders to have them executed there.

9            And so your broker will then transmit it to a

10   market maker for execution.

11   Q.  Is there, like, a trading system that's generally used

12   for microcap or lower-cap stocks?

13   A.  Well, to trade DECN specifically, you'd have to use the

14   OTC link system of otcmarkets.com.  That is technically what

15   is known as an alternative trading system.  It allows

16   different brokers to trade with each other electronically.

17   Q.  So this is OTC Markets Group?

18   A.  Correct.

19   Q.  Based on the information you reviewed, was DECN stock

20   traded on this OTC Markets Group platform?

21   A.  It was.

22   Q.  What are penny stocks?

23   A.  Penny stocks are defined under the Exchange Act of '34

24   as -- they have basically -- there's a number of different

25   tests, $5 million in market capitalization, a number of

 1     other factors.

 2              I think people use that term more broadly as a

 3     low-priced -- you know, some people call it microcap

 4     securities; some people call them penny stocks.  They are

 5     all basically these stocks -- about 10,000 to 12,000

 6     companies on any -- in any given year that are trading

 7     through OTC Markets.

 8              THE COURT:  So that's basically synonymous?  OTC

 9     and --

10              THE WITNESS:  Yeah.  In my experience, if you hear

11     someone say microcap or penny stock or pink sheet stock --

12     that's another term that's kind of a legacy term.  They

13     literally used to be -- the quotes were published on pink

14     paper.  Those are all kind of used interchangeably in the

15     industry.  They have specific meaning, like penny stocks is

16     defined in the '34 act.  But people use them more

17     interchangeably.

18              THE COURT:  Okay.

19     BY MR. HOWELL:

20     Q.  Can you describe how someone trades in over-the-counter

21     securities?  Is the trading of penny stocks the same?  Is

22     that how penny stocks are traded, the same way?

23     A.  Yes.  You're going to a broker-dealer.  Say I want to,

24     you know, buy or sell whatever shares you're interested in.

25     They will then transmit that order through the OTC Markets

```
 1    link for execution.
 2    Q.  So broker-dealers are very involved in the trading of
 3    penny stocks?
 4    A.  Yes.  Absolutely.
 5    Q.  Can you describe the nature of the risks that are
 6    involved with investing in penny stocks?
 7    A.  Sure.  Well, it is -- I mean, penny stocks, you know,
 8    they have much lower information content than an
 9    exchange-traded stock like an Apple or Google.  They have
10    much lower liquidity typically.  Some don't trade at all on
11    certain days.
12              There's a lot of -- there's -- it's very difficult
13    to access reliable quotations at times for what the best
14    price you can get to buy or sell the security.  So there's a
15    number of risk factors involved with trading in this segment
16    of the market.
17    Q.  So are penny stocks riskier?
18    A.  Yeah.  Riskier than -- as an equity security sub-asset
19    class, they are much more risky and speculative than, you
20    know, let's talk about a mid-cap or even a small-cap or a
21    mid-cap or large-capitalization -- and when I say "cap," I
22    mean capitalization, how much the shares are worth.
23    Q.  So you mentioned speculation.  The penny stock market,
24    based on your experience, is there a fair amount of
25    speculation, speculative trading?
```

Reilly - DIRECT - By Mr. Howell

1    A.   Absolutely.   While I was at TD Ameritrade, we did --

2    TD Ameritrade had -- its business model is self-directed

3    investors who are making their own choices to do whatever

4    kind of trading they want.   Right?   So they can decide to

5    buy 100 shares of Apple or they can decide to buy a thousand

6    shares of DECN.   They basically -- we would facilitate any

7    kind of transactions that they wanted to do.   They'd make

8    their own decisions.   We helped facilitate those.

9         And so going through that process, they have to

10   then enter the orders in.   And there's -- we'll talk in a

11   second about the different steps that they have to go

12   through in this segment of the market.

13   Q.   Based on your experience, could you tell us what was

14   happening in the market in April 2020, the stock market?

15   A.   Well, I would go back to March, quite honestly, with the

16   onset of the worldwide pandemic known as COVID-19 --

17   right? -- that had a distinct effect on the markets.   We saw

18   things like the massive decrease in value of travel-related

19   stocks, airlines.   And then you saw a lot of investors and

20   speculators trying to find buying opportunities to make

21   money in an otherwise-falling market.

22         MR. HOWELL:   Your Honor, we'd like to present an

23   exhibit.   I think there's a bench binder that has exhibits.

24   We aren't going to display them, but just have him refer to

25   the binder.

```
1                    THE COURT:  Okay.

2                    THE WITNESS:  Doing it old-school.

3                    MR. HOWELL:  May I approach, your Honor?

4                    (Tenders document to the Court.)

5                    THE COURT:  Is this for me?

6                    MR. REILLY:  We have them if you want to put them

7         on the screen for everyone.

8                    THE COURT:  That might be easier, actually, if we

9         can do that.

10                   MR. HOWELL:  That's fine.

11                   THE COURT:  If you want to provide one, that's

12        good.  But typically we try to do it electronically.

13                   MR. HOWELL:  It will be Defense Exhibit 005, DX

14        005.

15                   THE COURTROOM DEPUTY:  Is it coming up on the

16        screen?

17                   MR. HOWELL:  I think the Government is going to

18        put it up.

19                   THE WITNESS:  There we go.

20        BY MR. HOWELL:

21        Q.  Have you seen this document before, Mr. Reilly?

22        A.  I have.

23        Q.  Can you explain what it is?

24        A.  Sure.  It's a printout of a website of a gentleman who

25        does trading advice for people who subscribe to his blog and
```

1    his newsletter, if memory serves.

2    Q.  Based on your testimony, the speculation that was taking

3    place, is this a fair example of the penny stock kind of

4    trading patterns and speculation that was taking place in

5    the early 2020 timeframe?

6    A.  Yeah.

7              MR. FENTON:  Objection to form.

8              THE COURT:  Overruled.

9              THE WITNESS:  So yes.  It was, you know, an

10   example of traders, speculators, looking for buying

11   opportunities in the market around that time.  You see this

12   kind of stuff all over the internet all the time.

13   Everyone's got different trading strategies, different

14   ideas, how to express those.  Some people will focus on

15   penny stocks because they think they can get bigger bang for

16   their buck there.  Other people focus on different segments

17   of the market.

18             MR. HOWELL:  Your Honor, we'd move to admit DX 005

19   into evidence.

20             MR. FENTON:  No objection.

21             THE COURT:  Without objection, 5 is in.

22             (Whereupon, Defendant's Exhibit No. 5 was entered

23   into evidence.)

24   BY MR. HOWELL:

25   Q.  Let's talk about SEC trading suspensions.

Reilly - DIRECT - By Mr. Howell

1      A.  Sure.

2      Q.  Does the SEC have the ability to suspend trading of a

3      company's stock?

4      A.  Absolutely.

5      Q.  What are the reasons that the SEC would suspend or could

6      suspend trading?

7      A.  In my professional experience, they've -- they're doing

8      a preliminary investigation.  They have what they think is a

9      credible problem with an issuer.  It could be many different

10     things.  They may not be current in their filings to the

11     Commission; they may find potential indicia of fraud.  And

12     they use those -- they review those factors and decide to

13     issue trading suspensions from time to time.

14     Q.  Does the SEC publicize its suspension of trading?

15     A.  Absolutely.

16     Q.  How does the SEC make the public aware that they're

17     suspending --

18     A.  On sec.gov --

19     Q.  -- a trading?

20     A.  They will publish on sec.gov.  They will also release as

21     a press release the order and the companion details when

22     they have a trading suspension.  That is picked up by all

23     the different exchanges and broker-dealers on Wall Street so

24     that they can take note of that.

25     Q.  So the OTC Markets Group, they would -- this

Reilly - DIRECT - By Mr. Howell

```
 1    information -- pick it up --
 2    A.  Yeah.  They have a feed where they would subscribe to
 3    that kind of -- that kind of news from the SEC so that they
 4    could initiate the suspension on their platform.
 5              MR. HOWELL:  I'd like to pull up DX 001.
 6    BY MR. HOWELL:
 7    Q.  Can you tell me what this document is?
 8    A.  Sure.  It is the trade suspension of DECN dated April
 9    23rd, 2020, by the U.S. Securities and Exchange Commission.
10    Q.  Have you seen this document before?
11    A.  I have.
12    Q.  Did you rely on this document in your analysis?
13    A.  I did.
14    Q.  Is this a fair and accurate copy of the SEC release that
15    you've reviewed?
16    A.  It is.
17              MR. HOWELL:  Your Honor, we'd move to admit DX 001
18    into evidence.
19              MR. FENTON:  No objection.
20              THE COURT:  Without objection, 1 is in.
21              (Whereupon, Defendant's Exhibit No. 001 was
22    entered into evidence.)
23              THE COURT:  Can we pull up DX 002.
24    BY MR. HOWELL:
25    Q.  Can you tell me what this document is?
```

```
 1    A.  This is the more detailed order of the suspension in

 2    trading in Decision Diagnostics.  So this was attached to

 3    the first document we just reviewed also dated April 23rd,

 4    2020.

 5    Q.  Have you seen this document before?

 6    A.  I have.

 7    Q.  Did you rely on this document?

 8    A.  I did.

 9    Q.  Is it a fair and accurate copy of the suspension order

10    that you reviewed?

11    A.  It is.

12              MR. HOWELL:  Judge, we'd move to admit DX 002 into

13    evidence.

14              MR. FENTON:  No objection.

15              THE COURT:  Without objection, 2 is in.

16              (Whereupon, Defendant's Exhibit No. 002 was

17    entered into evidence.)

18              MR. HOWELL:  Turn to DX 012.  Sorry.  That's not

19    the right one.

20              Your indulgence, your Honor.

21              We have a different 012 in our binder.

22              THE WITNESS:  It is now on my screen, Mr. Howell.

23    BY MR. HOWELL:

24    Q.  Thank you.

25              Can you tell me what this document is?
```

1    A.  It is a copy of an investor alert issued by the SEC on

2    April 10th, 2020.

3    Q.  Is there another date that you see on the document?

4    A.  It was -- it looks like it was subsequently updated on

5    May 6th, 2020.

6    Q.  Have you seen this document before?

7    A.  I have.

8    Q.  What is the title of the document or of the investor

9    alert?

10   A.  It talks about -- it says, Frauds Targeting Main Street

11   Investors:  Investor Alert.  And this one is specifically

12   focused on potential frauds related to COVID-19.

13   Q.  Is DECN listed?

14   A.  Yes.  I believe on Page 2, there are a number of

15   securities that are listed.  DECN appears about halfway down

16   the page, roughly.

17   Q.  Thank you.

18              MR. HOWELL:  Your Honor, we'd move to admit DX 012

19   into evidence.

20              MR. FENTON:  No objection.

21              THE COURT:  Without objection, 12 is in.

22              (Whereupon, Defendant's Exhibit No. 012 was

23   entered into evidence.)

24   BY MR. HOWELL:

25   Q.  I want to talk about protocols after trading

1    suspensions.

2    A.  Uh-huh.

3    Q.  So what -- are there protocols in place that alert

4    traders to the fact that, you know, trading with company

5    stock has been suspended?

6    A.  Yes.  Like -- as I said earlier, OTC Markets is the

7    listing market for these types of -- for DECN; I'll keep it

8    specific -- are getting the feeds from the SEC of trading

9    suspensions so that they can initiate the suspension,

10   prevent trading on their platform in the stock while the

11   suspension is in effect.

12            And then when the suspension is lifted, OTC

13   Markets has another set of protocols where they will append

14   two warnings to -- it changes the characteristic of DECN in

15   the market.  They put -- they append a warning that's caveat

16   emptor, whose icon is a skull and crossbones.  Pretty

17   straightforward.

18            And there's another thing that says Expert Market,

19   which means that they will no longer publish live quotations

20   of that security.  So you can ask your broker to trade it,

21   but they're the ones who have to go find out the quotations

22   for you.

23            THE COURT:  And so I'm not an investor.  Could I

24   just go online now and buy penny stocks?

25            THE WITNESS:  You could.  You would have to go

1    through some processes.  I think those processes are

2    important for this case.

3              THE COURT:  And so is that -- the skull and

4    crossbones, would that be visible to the average purchaser?

5              THE WITNESS:  If you go to otcmarkets.com and pull

6    up -- which is, again, the primary listing venue for these

7    securities -- if you pull up DECN, you could see the caveat

8    emptor warning with the skull and crossbones.

9              If you go to TD Ameritrade or Charles Schwab or

10   Fidelity -- pick your favorite online broker-dealer -- what

11   you will see there is something a little bit different,

12   which is if it's -- the processes and procedures at online

13   broker-dealers are to generally allow electronic trading,

14   like you just enter the order and it goes.  But for all OTC

15   market securities, firms have long had policies and

16   procedures from a risk perspective to either flash up, This

17   is a caveat emptor stock.  It's speculative.  You could lose

18   all your money.  Do you want to enter this trade?

19             Or in the case of once it actually does go into a

20   trading suspension, you have to actually call in the order

21   instead of just being able to enter it electronically.  And

22   the call center registered representative will read you a

23   script that says:  This is a speculative security.  You

24   could lose all your money.  It's recently been suspended by

25   the SEC.  Are you sure you want to enter this trade?

Reilly - DIRECT - By Mr. Howell

 1              THE COURT:  And so just one way or the other,

 2      basically anybody who's going to try to buy this stock would

 3      be alerted to this?

 4              THE WITNESS:  Through these channels that I'm

 5      talking about, yes.  Absolutely.

 6              So I find it difficult to see how you could avoid

 7      knowing that there was danger ahead, which is the whole

 8      purpose of the caveat emptor warning.

 9              THE COURT:  And does that -- how long does that

10      stay in place?

11              THE WITNESS:  It is -- that remains on DECN's

12      stock to this day.  So it can be taken down if it's proven

13      by the company that it was not warranted in some way.  But

14      in general, they stay there forever.

15              THE COURT:  Okay.  Thank you.

16              You may proceed.

17      BY MR. HOWELL:

18      Q.  Did you collaborate on demonstratives to kind of help

19      illustrate --

20      A.  I did.  I even tried to enter a trade in a caveat emptor

21      stock on the Schwab platform.

22              MR. HOWELL:  Your Honor, with the Court's

23      permission, we have some slides that help demonstrate

24      exactly what you were just questioning Mr. Reilly on with

25      the skull and crossbones, if you would allow us to put those

1   up.

2            THE COURT:  Okay.

3   BY MR. HOWELL:

4   Q.  So this is -- is this the skull and crossbones that you

5   were -- just referenced to?

6   A.  It is.  So if you pull up DECN's page on otcmarkets.com,

7   you will see these warnings.  Again, these go into place as

8   soon as the stock is suspended.

9   Q.  Even though our slide says July 20, that's -- you're not

10  saying that's --

11  A.  Yeah.  Well, that's --

12           THE COURT REPORTER:  I'm sorry.  For the record, I

13  didn't get a complete question.

14  BY MR. HOWELL:

15  Q.  I said, even though the slide says July 20th, 2020, just

16  because it says -- the slide says July 20, 2020, does not

17  mean that's the first day that he...

18  A.  Well, I like to use primary documents wherever I can.

19  Using the internet archive known as the Wayback Machine,

20  this is the oldest evidence I could find that it was there.

21           I know from my industry experience that as soon as

22  the stock was suspended, OTC Markets, one, stopped trading,

23  as you saw from the gap in one of the charts we reviewed

24  earlier.

25           And, two, these warnings would be appended to the

1    stock from the resumption of trading forward.  And again,

2    this says July 20.  It's the oldest fact-based document that

3    I could find.  If you look today online, you would see the

4    same warnings.

5              MR. HOWELL:  Can we pull up DX 010.

6    BY MR. HOWELL:

7    Q.  So is this the document you were talking about where it

8    had the July 20th -- this is the Wayback Machine --

9    A.  Correct.

10   Q.  -- that you found?

11   A.  Correct.

12   Q.  Do you recognize this document?

13   A.  I do.

14   Q.  And can you tell us -- I don't know if you'll -- if you

15   can on the screen.  But can you read the date that is on the

16   document?

17   A.  You can see -- it's all the way on the top.  You can see

18   the URL shows it was retrieved on July -- this is an archive

19   that was done on July 20th, 2020.

20   Q.  Thank you.

21             MR. HOWELL:  Your Honor, we'd move to admit DX 010

22   into evidence.

23             MR. FENTON:  No objection.

24             THE COURT:  Without objection, 10 is in.

25             (Whereupon, Defendant's Exhibit No. 010 was

```
1    entered into evidence.)

2              MR. HOWELL:  Can we turn to DX 042.

3    BY MR. HOWELL:

4    Q.  What is this document?

5    A.  This is the report I prepared in this case.

6    Q.  When did you prepare this report?

7    A.  I believe last March.  Early March.

8              MR. HOWELL:  Could you just kind of scroll through

9    it so he can see the report briefly?

10   BY MR. HOWELL:

11   Q.  Let me know if you've had a chance to review it,

12   Mr. Reilly.

13   A.  What's that?

14   Q.  Let me know when you've had a chance to review the

15   document.

16   A.  Sure.  This is one of the ones that's easier to do in a

17   physical copy.

18              Yep.  It's March 11, 2024, to clarify the record.

19   That's the date of the report.

20   Q.  This is the report you filed?

21   A.  It is.

22   Q.  Do you think differently about this report today?

23   A.  No.

24              MR. HOWELL:  Your Honor, we'd move to admit DX 042

25   into evidence.
```

```
 1                   MR. FENTON:  No objection.

 2                   THE COURT:  Without objection, 042 is in.

 3                   (Whereupon, Defendant's Exhibit No. 042 was

 4          entered into evidence.)

 5                   MR. HOWELL:  Can we turn to DX -- the same

 6          exhibit, 042, Page 1, Paragraph 5.

 7          BY MR. HOWELL:

 8          Q.  You referenced a Blue Sheet.  What is a Blue Sheet?

 9          A.  So the regulators have subpoena power to require all

10          broker-dealers to submit trading records to them.  So -- and

11          those are collectively known as Blue Sheet reports.  They

12          contain the information of -- for every broker-dealer in the

13          United States that held this particular one, that held -- or

14          customers held shares in DECN as of July 9th, 2020.  So you

15          can see the breakdown of which customers held it, which

16          firms.

17                   And I did a little bit of an analysis off of this

18          data once I received it from counsel.

19          Q.  Did you review the Blue Sheet?

20          A.  I did.

21          Q.  What was the date?

22          A.  July 9, 2020, as I said earlier.

23                   MR. HOWELL:  Can we ask Mr. Panikar to pull that

24          up.

25
```

1    BY MR. HOWELL:

2    Q.  What did you observe on this Blue Sheet?

3    A.  I summarized it in my report, which is -- this is a

4    section -- or part of this demonstrative it draws from.

5           But not surprisingly to me, that over 86 percent,

6    almost 87 percent of the shares on that date were held at

7    the four largest online broker-dealers in the United States.

8    Once again, TD Ameritrade was kind of the top of that pile.

9    When I was chief compliance officer, we were typically 25 to

10   30 percent of trading in OTC pink sheet securities.

11   Q.  And based on your experience, is this of any

12   significance?

13   A.  Yeah.  It's very much along the lines of what I was

14   talking about before, where the process for anyone who wants

15   to trade in DECN, they're going to primarily do it through

16   an online broker-dealer.  Right?

17          And this is evidence of that.  Those online

18   broker-dealers have very specific risk-based processes

19   because of the speculative and dangerous nature of trading

20   in OTC securities that they will put up those warnings that

21   I discussed.

22          Either -- if you're buying one that's not caveat

23   emptor, you're going to get a warning screen that says:

24   This is a speculative security.  You may lose all your

25   money.  Are you sure you want to enter this order?  You have

1    to click "yes" again before entering the order.

2              Or if it's caveat emptor, an expert market, as

3    DECN was coming out of its trading suspension, if you want

4    to enter a trade in the security, you have to call us.  And

5    we will -- and then -- I designed a process at TD Ameritrade

6    where those reps had a script to read that said:  It's

7    recently been suspended.  There's serious questions about

8    the security.  Are you sure you want to invest in this?

9    Q.  You mentioned you at TD Ameritrade -- you helped

10   design --

11   A.  Yes.  As the chief compliance officer of a firm that's

12   doing the largest portion of OTC security trading in the

13   United States, it was prudent for us to design policies,

14   processes and procedures to make sure that customers that

15   were -- wanted to do this kind of speculative trading were

16   at least adequately warned about the speculative and

17   dangerous nature of what they were about to enter into.  We

18   allow it, because it's their money, their choices.

19             But we wanted to make sure -- assure ourselves

20   that they at least were armed with information sufficient to

21   put them on notice that these were speculative and dangerous

22   investments that they could lose all their money in.

23             MR. HOWELL:  Mr. Panikar, if you'd turn to the

24   next slide.

25


Reilly - DIRECT - By Mr. Howell

```
 1   BY MR. HOWELL:
 2   Q.  Does this illustrate what you were just talking about as
 3   far as the controls that are in place?
 4   A.  Yes.  I picked an OTC market stock that is currently
 5   trading that's expert market and caveat emptor and tried to
 6   enter an order from my personal account.  As you can see, I
 7   was not willing to waste any money on it.  But it pops up,
 8   the message that I expected to see.  But I wanted to have
 9   evidence of it for the Court.
10   Q.  Thank you.
11            Were you asked to render an opinion as to loss
12   amount in this case?
13   A.  I was.
14   Q.  Are you familiar with the United States Sentencing
15   Guidelines suggestion as to a formula to calculate that
16   loss?
17   A.  I reviewed the note, yes.
18   Q.  Can you explain the method?
19   A.  Sure.  It basically calls on an average price of the
20   security in the fraud period compared with an average price
21   of a 90-day period after the fraud is disclosed.
22            MR. HOWELL:  We have a demonstrative that will
23   help his further testimony as he discusses the dates.
24   BY MR. HOWELL:
25   Q.  What did you consider to be the period of fraud?
```

Reilly - DIRECT - By Mr. Howell

1    A.  So from my perspective, you know -- well, counsel had

2    said, you know -- we talked about the fraud period ending

3    July 10th.

4          I have a very distinct view about this case, to be

5    clear.  It's clear that the first press release was from

6    March 3rd, 2020, at the beginning of the onset of the COVID

7    pandemic.  It's also very clear that April 23rd was the SEC

8    trading suspension.

9          And from that point forward, from May 8th forward,

10   when trading resumed, you know, as I said, the caveat emptor

11   warning was appended to the stock.

12         So in my professional opinion, it would be, you

13   know, impossible for an investor to miss those warnings when

14   entering into transactions from that point forward.

15         So I did my calculations based off of those key

16   dates.

17   Q.  Did you reach an opinion regarding a date that the fraud

18   relating to the DECN press releases was disclosed to the

19   market?

20   A.  Yeah.  So absolutely.  So the SEC suspension of trading

21   order is very explicit.  They say there's a potential for

22   fraud with a security, and we're suspending it as a

23   consequence.

24   Q.  What was the date of the SEC --

25   A.  Oh, that was April 23rd, 2020.

1    Q.  Okay.

2    A.  If I might add, SEC trading suspensions are not common

3    events.  In 2020, there were 176 trading suspensions issued

4    by the SEC.  In 2023, there were only two, if my records are

5    correct.

6         So they are notable events in the market.

7    Q.  Once again, kind of going back to when you were the

8    chief compliance officer, what was your understanding in

9    that role of why the SEC would suspend trading of a company?

10   A.  Again, they have a very strong and important role to

11   protect market integrity.  Right?  I very much respect the

12   mission of -- basically, customer protection and market

13   integrity are their two main goals and regulatory purposes.

14        So whenever they detect potential fraud on the

15   market, aberrant trading that could be problematic for

16   investors, they have an absolute duty to suspend trading.

17   And they did so in this case.

18   Q.  In addition to April 23rd, 2020, could there be other

19   events and dates that indicate that the fraud was disclosed

20   to the market?

21   A.  Sure.  Again, I feel very strongly that the SEC trading

22   suspension was the date in my mind in terms of when issues

23   with DECN were disclosed to the market.

24        But there was another release on May 20th by the

25   SEC, the Perkins affidavit, as it's called here in the -- in

1    this demonstrative.  That was from my perspective another

2    very clear date.

3              MR. HOWELL:  Can we pull up DX 004.

4    BY MR. HOWELL:

5    Q.  Is this the Perkins declaration you just mentioned?

6    A.  It is.

7    Q.  Have you seen this document before?

8    A.  I have.

9    Q.  And is this a fair and accurate copy of the document?

10   A.  It is.

11             MR. HOWELL:  Your Honor, we'd move to admit DX 004

12   into evidence.

13             MR. FENTON:  No objection.

14             THE COURT:  Without objection, 4 is in.

15             (Whereupon, Defendant's Exhibit No. 004 was

16   entered into evidence.)

17             THE COURT:  Did you say that you think the fraud

18   ended on April 23rd?

19             THE WITNESS:  I think it was disclosed to the

20   market, the potential for fraud and -- with the trading

21   suspension on April 23rd.

22             It's clear from my review of the record that press

23   releases continued for some time after that.  But again, the

24   importance in my world of dealing with traders who are

25   trading in these things is that caveat emptor designation

1    very clearly being there and how that causes broker-dealers

2    to change their policies and procedures and processes in

3    terms of affirmatively warning anyone from that period

4    afterwards that there was an issue with this security.

5              THE COURT:  But yet you agree that wasn't the

6    completion of the fraud, that it continued for months

7    afterwards.  Right?

8              THE WITNESS:  I saw press releases that went all

9    into July of 2020.  So, you know, I wasn't here for that

10   part of it.  But in terms of just as -- looking at it, I

11   could easily see how the Court would extend the period to

12   that.

13             I look at it more from a practical industry

14   perspective of, when did I think any potential investor

15   would be warned adequately about the dangers of the

16   security?  And that's very clearly the April 23rd period and

17   forward.

18             THE COURT:  So I guess I'm wondering how you

19   explain what happened since then.

20             THE WITNESS:  Oh, the continued trading?

21             THE COURT:  Yes.

22             THE WITNESS:  Well, investors and speculators are

23   irrational, would be my shorthand for you.  You know, I'm

24   sure you follow the press well enough to have seen the

25   GameStop meme stock craze.

Reilly - DIRECT - By Mr. Howell

```
 1                    THE COURT:  I have a case involving that.
 2                    THE WITNESS:  Excellent.  I've had several myself.
 3                    The trading in cryptocurrencies.  You could pick a
 4          lot of trading where people seem to do irrational things.
 5                    And again, my lived experience in that period of
 6          time is that people were looking for potential opportunities
 7          to profit off of the onset of the COVID pandemic.  And
 8          traders don't necessarily all do, you know, the deep and
 9          thoughtful kind of analysis that Professor Mitts might do.
10          My experience with traders and speculators in this section
11          of the market is they might look at a stock chart and
12          nothing else and make a decision.
13                    THE COURT:  You may continue, Mr. Howell.
14          BY MR. HOWELL:
15          Q.  I want to clarify a piece of your testimony you just
16          talked about.
17                    You said in addition to May 20th, 2020, July 20th,
18          2020, could also have been another date the fraud was
19          disclosed to the market.  Am I correct?
20          A.  Correct.
21          Q.  Can you explain that date?
22          A.  That was the date when -- that was the date when we --
23          there was absolutely -- with the Wayback Machine, we
24          discovered that there was absolutely without a doubt -- the
25          caveat emptor was appended to the stock.
```

 1            But again, that -- I know from my professional

 2     experience and how OTC Markets worked and how broker-dealers

 3     worked that that would have been there from the resumption

 4     of trading on May 8th going forward.  I like hard evidence

 5     and fact-based documents.  So that's the oldest one I could

 6     find in that regard.

 7            MR. HOWELL:  If we could put the demonstrative

 8     back up so we have all the dates in front of us.

 9            Thank you.

10     BY MR. HOWELL:

11     Q.  So using the disclosure date of April 23rd, 2020, and

12     using the model that's in the sentencing guidelines, did you

13     determine a loss amount?

14     A.  I did the calculations.  But they came out with actually

15     a gain as opposed to a loss.

16     Q.  How did you come up with your calculated amount?

17     A.  Sure.  I mean, the note is very straightforward.  It's

18     the average price of the period before -- so again, I used

19     the April 23rd date.  So March 3rd, 2020, the first press

20     release date, to April 23rd, the SEC's trading suspension.

21     And then I did the 90 days of trading from the resumption of

22     trading onwards.

23     Q.  Same thing --

24            THE COURT:  Sorry.  This demonstrative says the

25     fraud period ends July 10th.  Right?

Reilly - DIRECT - By Mr. Howell

1          THE WITNESS:  Yes.

2          THE COURT:  So I guess I'm confused about -- I

3     mean, you're the expert.  When do you think the fraud period

4     ends?

5          THE WITNESS:  Well, July 10 is my understanding of

6     the record, is the last press release.  Right?

7          So in terms of again -- I look at this from a --

8     when was the potential for fraud disclosed to the market

9     very clearly?  And that's the April 23rd date.

10          THE COURT:  And you're --

11          THE WITNESS:  So they're a little bit at odds with

12     each other.  I understand that.  And that's why you're here.

13          THE COURT:  You may proceed.

14     BY MR. HOWELL:

15     Q.  You mentioned May 20th, 2020, as being another date of

16     disclosure.  If the fraud was disclosed on May 20th, 2020,

17     does that change your opinion of the loss amount?

18     A.  It changes the math a little bit, but it still winds up

19     being -- when you do the math required by the note, it winds

20     up being -- also not being a loss.  The average price in the

21     subsequent 90-day period is higher than the initial period.

22     Q.  If the fraud was disclosed on July 20th, 2020, does that

23     change your analysis with the loss amount?

24     A.  Again, it changes the math a little bit.  But it doesn't

25     change the fact that the subsequent period was higher.  And

1    therefore, under the -- how the note is calculated that

2    demands its calculation, it would not be a loss.

3              MR. HOWELL:  Could I have your Court's indulgence?

4              THE COURT:  Yes.

5              MR. HOWELL:  Thank you, your Honor.

6    BY MR. HOWELL:

7    Q.  I have a couple more questions.

8              This is going to deal with outstanding shares,

9    conversions, preferred stock conversions.

10   A.  Uh-huh.

11   Q.  So saying there are newly issued common shares doesn't

12   tell you whether the shares were issued as a result of a

13   preferred shareholder converting its existing preferred

14   shares into common stock that is issued by the company.  Is

15   that correct?

16   A.  You're going to have to restate that question.  Sorry.

17   Q.  Let's break it down.

18             So just saying that there are newly issued common

19   stock shares, it doesn't tell you whether the shares were

20   issued as a result of preferred shareholders converting

21   existing preferred shares into common stock that was then

22   issued by the company.  Is that correct?

23   A.  Yeah.  If you're looking at outstanding shares at a

24   period of time, you don't know whether they were initially

25   issued in an initial public offering or converted in a

1    subsequent conversion from a preferred stock.  You just know

2    how many shares are outstanding at any point in time what

3    you're looking at.

4    Q.  Did you -- you talked about the information you

5    reviewed.  Did you review DECN's public filings?

6    A.  I did.

7    Q.  Did you ever review any of DECN's quarterly public

8    reports which contain stock and notes tables that would have

9    told you that the new shares of common stock were actually

10   the result of preferred shareholders converting existing

11   preferred shares into new shares of common stock?

12   A.  Quarterly reports and annual reports typically will

13   recap those kind of conversions.  Yes.

14            One other -- based on your Honor's question, on

15   Page 2 of my report, I did calculate the average price for

16   the fraud period as April -- excuse me -- March 3rd, 2020,

17   to July 10th, 2020, when doing my calculations.  And then

18   the subsequent periods were as we discussed earlier.

19            MR. HOWELL:  I think it's in DX 042, if we could

20   have that, please.

21            THE WITNESS:  Page 2.

22            That table there.  So the average price for the

23   period of the fraud period, April 3rd, 2020, to July 10th,

24   2020, was 17 cents a share.

25            And then for the 90-day calculations, I used the

1    three different dates that we discussed:  post-trading

2    suspension from May 8th, post-Perkins affidavit from May

3    20th, and post -- the evidence I could give you for caveat

4    emptor from July 20th.  So you have all those numbers there

5    available to you.

6              MR. HOWELL:  Your indulgence.

7    BY MR. HOWELL:

8    Q.  Regarding the loss amounts, can you just state your

9    conclusions again?

10   A.  Sure.  That, you know, the note says:  Take the two

11   periods.  Calculate the difference and multiply by

12   outstanding shares.

13             As you can see from my report, I did not multiply

14   by outstanding shares to show a theoretical profit

15   because -- but in all cases we could -- I could have done

16   so.

17   Q.  So what is your conclusion as to any loss for the

18   disclosure of April 23rd, 2020?

19   A.  You're going to have to repeat that.

20   Q.  Will you state your conclusion regarding your -- the

21   opinion of if there was a loss amount if the fraud was

22   disclosed to the market on April 23rd, 2020?

23   A.  There was no loss to the market.

24   Q.  Can you state your opinion if the loss amount -- or the

25   fraud was disclosed to the market May 20th, 2020?

1    A.  As you can see from the math, there is no loss using

2    those dates.

3            The same answer for July 20th, 2020.

4            MR. HOWELL:  I have no further questions, your

5    Honor.

6            THE COURT:  Thanks.

7            Why don't we take a quick lunch break.  I think

8    we'll recess until 2:00, but we've got a short status

9    conference.  I think we'll interrupt this and do that and

10   then resume this and we'll push back the sentencing.  And so

11   if you can plan to be back by about 2:05 or so.

12           Thank you.

13           (Thereupon, a luncheon recess was taken, after

14   which the following proceedings were had:)

15           THE COURTROOM DEPUTY:  Your Honor, we're back on

16   the record in Criminal Case 20-278, the United States of

17   America versus Keith Berman.

18           THE COURT:  We'll have cross-examination.

19           Mr. Reilly, I'll remind you you're still under

20   oath.

21           THE WITNESS:  Yes, sir.

22           THE COURT:  Mr. Fenton.

23           MR. FENTON:  Thank you, your Honor.

24                        CROSS-EXAMINATION

25

1    BY MR. FENTON:

2    Q.  Good afternoon, Mr. Reilly.

3    A.  Good afternoon.

4    Q.  You agree the fraud period in this case occurred from

5    March 3rd, 2020, to July 10, 2020.  Correct?

6    A.  I do.

7    Q.  Okay.  Now, you applied the modified rescissory method.

8    Is that right?

9    A.  Correct.

10   Q.  It's the same method that Professor Mitts applied?

11   A.  That's correct.

12   Q.  The major disagreement between you two is about the date

13   on -- the date on which the truth was revealed to the

14   market.  Right?  About the Defendant's fraud?

15   A.  I would call it adequate disclosure to the market as

16   opposed to truth.  But yes.

17   Q.  Okay.  But it's the date that the truth was revealed.

18   Right?

19   A.  The date that the potential for fraud was disclosed to

20   the market.  Yes.

21   Q.  Now, "the market" is another way of saying the

22   shareholders?

23   A.  No, it's not.  It's -- any potential investor would be

24   able to see that.

25   Q.  And, Mr. Reilly, the market includes shareholders?

1    A.  It does.

2    Q.  Okay.  And shareholders are the victims of the crime to

3    which the Defendant pleaded guilty here.  Right?

4    A.  Not necessarily.

5    Q.  Mr. Reilly, you understand the Defendant pleaded guilty

6    to securities fraud.  Correct?

7    A.  I do.

8    Q.  And the shareholders who were defrauded by the Defendant

9    are the victims of that crime.  Right?

10   A.  If they lost money.

11   Q.  Okay.

12   A.  There would be investors in this case who made money.

13   Q.  Mr. Reilly, you understand that loss is not an element

14   of the crime of securities fraud.  Correct?

15   A.  I'm sorry.  In my area of practice, I just try to be

16   specific about these kind of matters.

17   Q.  Right.  I'm being specific about this particular matter.

18   A.  Okay.

19   Q.  Securities fraud, Section 10b:  Loss is not an element

20   of that crime.  Right?

21   A.  Correct.

22   Q.  Okay.  So the shareholders are the victims of the crime

23   to which the Defendant pleaded guilty in this case.  Right?

24   A.  Correct.

25   Q.  Okay.  So the question is:  When did the victims learn

1    the truth about the Defendant's fraud?  Right?

2    A.  I don't know that -- that would vary by individual.

3    Q.  Sir, the question you're trying to answer is:  When did

4    the victims learn the truth about the Defendant's fraud?

5    Right?

6    A.  Well --

7              MR. HOWELL:  Objection, your Honor.

8              THE COURT:  On what basis?

9              MR. HOWELL:  Speculation.

10             THE COURT:  Overruled.

11   BY MR. FENTON:

12   Q.  It's a yes-or-no question, Mr. Reilly.

13   A.  From my professional experience, it is not a yes-or-no

14   question.  The reason being is that you don't know when any

15   particular holder of the security is going to be looking at

16   the news or -- and what import they take from what the

17   different type of disclosures that are made.

18             So you keep on using the word "truth."  I have to

19   use a more -- from my perspective, when was issues with the

20   security adequately disclosed to the market?

21             I don't know -- it's impossible to know without

22   interviewing each individual holder of the security when

23   they knew the truth.

24   Q.  Is it your testimony that it's impossible to know when

25   the truth was revealed to the market?

```
1    A.  Yes.  I mean, that -- it's just -- you know, the idea

2    that when the final -- when the indictment was -- for

3    Mr. Berman was done later in the year, that's a date.

4              But the SEC trading suspension is a very

5    significant disclosure to the market and when you're trading

6    in a security that's traded on the OTC Markets.

7    Q.  Let's talk about that date.

8              So the first date that you put forward -- you put

9    forward three dates -- right? -- when you believe the truth

10   was revealed?

11   A.  When adequate disclosure was made to the market.  I

12   cannot use your word "truth."

13   Q.  Not adequate disclosure by the Defendant, though.

14   Right?

15   A.  I haven't seen anything about -- in terms of the

16   Defendant.  But clearly, the SEC initiated its trading

17   suspension on April 23rd.

18   Q.  Okay.  So that's the day that the SEC suspended trading

19   of DECN stock.  Right?

20   A.  Correct.

21   Q.  And the SEC suspended trading based on questions

22   regarding the accuracy and the adequacy of information in

23   the marketplace?

24   A.  Correct.

25   Q.  The questions were specifically about certain DECN press
```

1    releases issued in March and April 2020?

2    A.  That sounds correct.  Yes.

3    Q.  Now, on March 7, 2020, the Defendant filed a petition to

4    terminate the trading suspension.  Correct?

5    A.  I don't remember that.

6    Q.  Earlier, you testified that you reviewed the SEC's

7    website with respect to -- for information relating to the

8    DECN trading suspension.  Is that correct?

9    A.  That's correct.

10   Q.  And so if they had filed a petition to terminate that

11   trading suspension, presumably you would have seen that.

12   Right?

13   A.  Yeah.  I do recall seeing a petition.  First of all, I

14   know it wasn't granted.  And I don't recall the date, to be

15   more precise.

16   Q.  It's a yes-or-no question.  Yes, they filed a petition

17   to terminate the trading suspension?

18   A.  Yes.

19          MR. FENTON:  Ms. Boyer, can you please pull up

20   Government's Exhibit 3-O.

21   BY MR. FENTON:

22   Q.  Is this the petition the Defendant filed?

23   A.  It appears that it could be.  Could you scroll through

24   the entire 15 pages just so I can refresh myself?

25   Q.  Yes.

1    A.  You can go pretty quick.  You can keep going.  I

2    think -- I'm looking for the date at the end, quite

3    honestly.  Probably on the last page.  Filed November 22nd,

4    2021.

5         MR. REILLY:  Ms. Boyer, can you go back two pages

6    to the date of the filing?

7         THE WITNESS:  Okay.  Filed and certified.  That --

8    okay.  What I'm looking for is when this was released to the

9    public, if you can find that easily.

10   BY MR. FENTON:

11   Q.  So it says here, Certificate of Service:  I hereby

12   certify that a true and correct copy of the foregoing was

13   filed on May 7, 2020, by electronic delivery at

14   apfilings@sec.gov.

15   A.  Uh-huh.

16        THE COURT REPORTER:  Is that yes?

17        THE WITNESS:  Yes.

18   BY MR. FENTON:

19   Q.  So this is the date on which the Defendant filed a

20   petition to terminate the trading suspension.  Correct?

21   A.  It is.  I don't know if that's when it was publicly

22   available, however.

23   Q.  My question is:  This is the date on which it was filed,

24   sir?

25   A.  Well --

1   Q.   The answer is...?

2   A.   Yes.

3            MR. FENTON:  Let's go to --

4            MR. HOWELL:  Objection, your Honor.  Relevance.

5            THE COURT:  Overruled.

6            MR. FENTON:  Let's go to, Ms. Boyer, Page 12,

7   please.

8   BY MR. FENTON:

9   Q.   This is Petitioner Keith M. Berman's sworn statement.

10  Is that right?

11  A.   That's what it says.  Yes.

12  Q.   It says:  I, Keith M. Berman, chief executive officer of

13  Decision Diagnostics Corp., being duly sworn, state that I

14  have read the foregoing petition for termination of

15  suspension of trading in the securities of Decision

16  Diagnostics Corp. and have personal knowledge of the facts

17  contained therein and that such facts are true and correct

18  to the best of my knowledge.

19            Is that an accurate reading?

20  A.   It is.

21  Q.   And the Defendant, Mr. Berman, signed it here.  Correct?

22  A.   It appears he signed it on May 6th, 2020.

23  Q.   It's the Defendant's sworn statement?

24  A.   Correct.

25  Q.   This is a publicly available document, right, on the SEC

```
1    website?
2    A.  Eventually.  I don't think this was publicly available
3    on May --
4    Q.  Sir, it's a yes-or-no question.
5    A.  It was --
6    Q.  Was this a publicly available document?
7    A.  I don't believe this was publicly available on May 6th,
8    2020, based on --
9    Q.  My question, sir, is:  Was this a publicly available
10   document?
11   A.  The earliest I saw in my review of the record was that
12   it was not available until 2021, when the entire file was
13   published.
14   Q.  Mr. Reilly, you reviewed the SEC's website for documents
15   relating to the DECN trading suspension.  Correct?
16   A.  Correct.
17   Q.  As a member of the public, did you find this document?
18   A.  When it was contained in a filing that was published in
19   2021, yes.
20   Q.  And you also reviewed otcmarkets.com.  Correct?
21   A.  Correct.
22   Q.  And are you aware that the Defendant published this on
23   OTC Markets in May 2020?
24   A.  I did not see any record of that.
25   Q.  But you looked at the website?
```

```
1    A.  I did.

2    Q.  Okay.  Let's look at the specific -- some of the

3    specific paragraphs.  Let's look at Page 9, Paragraph 31.

4           It says here:  The suspension order is not

5    necessary and not in the public interest because, A, DECN

6    has not acted in a fraudulent, deceitful or manipulative

7    manner.

8           Do you see that, sir?

9    A.  I do.

10   Q.  That is the Defendant denying that he engaged in fraud.

11   Correct?

12   A.  It's what it says, yes.

13   Q.  B:  As previously stated, each DECN press release was

14   based upon facts that were true at the time the statements

15   were made.

16           That's an accurate reading.  Right?

17   A.  Correct.

18   Q.  Okay.  And so the Defendant again is denying that the

19   press releases that he issued were false or misleading.

20   Correct?

21   A.  Correct.

22   Q.  And in this document, the Defendant specifically

23   addresses each and every press release from March 2020.

24   Right?

25   A.  I will take that assertion from you.
```

1    Q.  Well, let's take a look.  There's no need to take it

2    from me.

3              MR. HOWELL:  Objection, your Honor.  Beyond the

4    scope of direct.

5              THE COURT:  Overruled.

6              MR. HOWELL:  And I'd renew my relevance objection.

7              THE COURT:  Understood.  I'm overruling.

8              You may continue, Mr. Fenton.

9              MR. FENTON:  Can we go to Paragraph 16, please.

10   BY MR. FENTON:

11   Q.  It says here on March 3rd, 2020, DECN issued a press

12   release, a March 3rd press release, prominently quoting

13   Mr. Berman stating, quote, "I want to straight up -- I want

14   to say straight up we have developed a coronavirus screening

15   method, not a cure or a vaccine for this virus.

16             "This press release did not contain any false or

17   misleading statements or omit to state any facts necessary

18   in order to make the statements made not misleading."

19             Is that an accurate reading?

20   A.  It is.

21   Q.  This is another example of where the Defendant is

22   denying that he engaged in any sort of fraud.  Correct?

23   A.  Correct.

24   Q.  And it's another example of where he said he in fact

25   developed a COVID-19 blood test.  Right?

1    A.  I don't see a blood test in here, but it's a test.

2    Q.  Right.

3              MR. FENTON:  Let's look at Paragraph 17, please.

4    BY MR. FENTON:

5    Q.  It says here:  On March 4, 2020, DECN issued a press

6    release.  In this press release, Mr. Berman stated:  I

7    cannot say often enough we are developing a coronavirus

8    screening method.  This press release did not contain any

9    false or misleading statements or omit to state any facts

10   necessary in order to make the statements made not

11   misleading.

12             Is that right?

13   A.  That's an accurate reading.  Yes.

14   Q.  This is another denial, right, of any wrongdoing on

15   Mr. Berman's part?

16   A.  Correct.

17   Q.  Paragraph 18 here talks about the March 11, 2020, press

18   release.  Right?

19   A.  It does.

20   Q.  There's another denial of any wrongdoing.  Correct?

21   A.  There is.

22   Q.  Paragraph 19 talks about the March 16, 2020, press

23   release; is that right?

24   A.  It does.

25   Q.  It says this press release -- there's another denial

1    here:  This press did not contain any false or misleading

2    statements.  Correct?

3    A.  It does.

4    Q.  The same with Paragraph 20?

5         THE COURT:  I get it, Mr. Fenton.

6    BY MR. FENTON:

7    Q.  So there are eight such instances here, right?  All of

8    the press releases in March 2020?

9    A.  Correct.

10   Q.  That gave rise to the trading suspension?

11   A.  From what I've read in the SEC order, yes.

12   Q.  And Mr. Berman went and publicly said there are no false

13   or misleading statements in any of those press releases.

14   A.  I don't know that this was a public document.  This is a

15   document filed with the SEC in trying to get the trading

16   suspension reversed.

17   Q.  Right.  And posted by Mr. Berman on otcmarkets.com,

18   which you reviewed, sir.  Correct?

19   A.  I didn't see evidence of those postings.

20   Q.  Let's move on to the second date that you chose, May

21   20th, 2020.

22   A.  Uh-huh.

23   Q.  That's the date when the SEC filed a brief showing the

24   information on which the trading suspension was based.

25   Right?

```
1    A.  Correct.

2    Q.  That was prepared by SEC staff member Carl Perkins.  Is

3    that right?

4    A.  I believe it's Carlton Perkins.  Yes.

5    Q.  I think it's Carlisle.

6    A.  Carlisle.  Sorry.  I know there was --

7    Q.  I think they call him Carl.

8    A.  Thank you.

9    Q.  Now, in response to the Defendant's petition -- this was

10   filed in response to the Defendant's petition to terminate

11   the trading suspension.  Right?

12   A.  I'm not certain about that.

13   Q.  Well, let's look at Defense Exhibit 2 --

14   A.  Cool.

15   Q.  -- or Defense Exhibit 3.  I'm sorry.  This is an order

16   requesting additional written submissions.  Correct?

17   A.  It is.  That's what it says.

18   Q.  And it says at the bottom here:  On May 7th, 2020, DECN

19   filed a petition to terminate the trading suspension?

20   A.  I see that.

21   Q.  Let's turn to the next page.

22        The SEC ordered a briefing schedule.  Right?

23   A.  Correct.

24   Q.  And Mr. Berman chose to publicly dispute the nature of

25   the allegations underlying the trading suspension.  Correct?
```

1    A.  I don't recall that, but I accept the assertion.

2    Q.  Well, it's right here.  He filed a petition on May 7th

3    and he's appealing the trading suspension, is he not?

4    A.  Oh, he absolutely did appeal the trading suspension.

5    Yes.

6    Q.  Right.  Okay.

7            So the May 20th, 2020, submission is in response

8    to Mr. Berman's appeal, right, of the trading suspension?

9    A.  It's part of the SEC process for that.  Yes.

10   Q.  Right.  Okay.

11           So let's look at -- and the Defendant had an

12   opportunity to respond to that May 20, 2020, filing.

13   Correct?

14   A.  As did others.  Yes.

15   Q.  And, in fact, he did.  Right?

16   A.  (No response.)

17   Q.  I'm going to --

18           THE COURT REPORTER:  I'm sorry.  I didn't get a

19   response.

20           THE WITNESS:  "And he did."

21           THE COURT REPORTER:  I mean the answer.

22           THE WITNESS:  Oh, "yes."  Sorry.

23   BY MR. FENTON:

24   Q.  I'm going to show you what's been marked Government's

25   Exhibit 100, please.  This is the Petitioner's opening brief

1    in support of the petition to terminate the trading

2    suspension.  Correct?

3    A.  That's what it states.  Yes.

4    Q.  Let's turn to Page 6.

5          MR. FENTON:  We have hard copies of this exhibit

6    that we can hand out or that I can put on the ELMO.

7          THE COURT:  Okay.

8          MR. COLLINS:  Judge, I just want to make a

9    standing objection to this line of questioning.  It's

10   irrelevant and beyond the scope.  It's frankly a waste of

11   time.

12         THE COURT:  I don't see that.  I thought the main

13   question here is:  What is the appropriate time of the --

14   when was the fraud exposed?  And I think this does go

15   directly to that.

16         So I'm overruling the objection.

17   BY MR. FENTON:

18   Q.  Can you see the date here, Mr. Reilly?

19   A.  I can.  Do you have a physical copy?  This is -- I'd

20   like to flip through it.

21   Q.  (Tenders document to the witness.)

22   A.  Thank you.

23   Q.  My question, Mr. Reilly, was:  What is the date of this

24   filing?

25   A.  The date this was filed?  It appears to be June 17th,

1      2020.

2      Q.  And that's after the May 20th, 2020, submission by the

3      SEC?

4      A.  Correct.

5      Q.  In fact, this is in response to the May 20, 2020,

6      submission.  Correct?

7      A.  Correct.

8      Q.  Let's turn to Page 2.  Do you see here at the bottom it

9      says:  Factors upholding a trading suspension are not

10     present?  Is that accurate?

11     A.  It is.

12     Q.  And at the bottom it says:  From the time DECN publicly

13     announced that its existing glucose technology used by

14     diabetics had the potential to be utilized to test for the

15     COVID-19 virus, the date of the trading suspension, the

16     company issued no less than 12 detailed releases concerning

17     its proposed COVID-19 GenViro! test kits and the emergency

18     use applications being sought from the Food and Drug

19     Administration.

20             No corrective disclosures were required or made

21     after the trading suspension, and there has been no showing

22     of any demonstrable falsity.

23             Do you see that, sir?

24     A.  I do.

25     Q.  This is not an admission that the Defendant in fact lied

1    about inventing a COVID-19 test.  Correct?

2    A.  Correct.

3    Q.  This is in fact another denial?

4    A.  Correct.

5    Q.  There's an affidavit attached here from Mr. Berman as

6    well.  Correct?

7    A.  I believe I saw that in here.

8    Q.  It's the affidavit of Keith M. Berman in support of the

9    petition to terminate the trading suspension.

10            Do you see that, sir?

11   A.  I do.

12   Q.  Let's look at Paragraph 2 of Mr. Berman's sworn

13   affidavit.

14            Can you just read aloud for the Court what

15   Mr. Berman writes here?

16            THE COURT:  I don't need you to read it.

17   BY MR. FENTON:

18   Q.  Mr. Reilly, this is another denial, right, of the

19   allegation that Mr. Berman did anything wrong.  Right?

20   A.  Yes.

21   Q.  Okay.  And in fact, here, he blames the SEC for engaging

22   in a twisted and misleading investigation, right, and

23   colluding with cybercriminals.  Right?

24   A.  I see those words.  Yes.

25   Q.  Let's move on.

1          Now, you're aware that the Defendant pleaded

2     guilty to obstructing the SEC's investigation of his

3     fraudulent scheme.  Correct?

4     A.  I'm actually not cognizant of his plea agreement.  I

5     haven't reviewed that.

6     Q.  Right.  So my question was:  Are you aware that the

7     Defendant pleaded guilty to obstructing the SEC's

8     investigation into his fraudulent scheme?

9     A.  No.

10    Q.  Is that a fact that you would want to know when opining

11    on whether or not the truth was revealed to the market and

12    when?

13    A.  No.  As I stated very clearly, I hope, in my testimony,

14    the appending of the caveat emptor designation when trading

15    resumed on May 8th, 2020, constitutes adequate disclosure to

16    the market in my professional opinion.

17    Q.  Right.  And my question is this:  If the Government was

18    trying to investigate whether or not Mr. Berman had

19    committed a crime, would you want to know whether or not he

20    obstructed the investigation of that crime?

21    A.  When choosing to invest in or not invest in DECN, that

22    would probably, like, be not particularly material to me.

23    Q.  It wouldn't be material to you?

24    A.  If a trading suspension, which is not a typical step

25    that the SEC takes, in a penny stock is issued and the

1  caveat emptor warning is appended to that stock for all the

2  world to see, I view that as adequate disclosure that this

3  is a dangerous instrument to be involved in.

4  Q.  Right.  Mr. Reilly, my question is:  Is that relevant to

5  you, that he continued to engage in fraud?

6  A.  For my purposes, no.

7  Q.  It doesn't matter to you that after July 2020 the

8  Defendant --

9          MR. HOWELL:  Objection.  Asked and answered.

10  BY MR. FENTON:

11  Q.  -- the Defendant continued to engage in fraud?

12          THE COURT:  Sustained.

13  BY MR. FENTON:

14  Q.  Are you aware that Mr. Berman convinced some of his

15  victims to in fact disbelieve the SEC?

16  A.  I am not.

17  Q.  And that he convinced some of his victims to in fact

18  attack the SEC?

19  A.  I am not.

20  Q.  I'd like to show you Government's Exhibit 102.  This is

21  the Defendant's statement in support of the guilty plea.

22          Do you see that, sir?

23  A.  I do.

24          MR. FENTON:  And let's go to Page 2.  Move on to

25  Page 3, please.  I'm sorry, Ms. Boyer.  Move on to Page 4.

1   BY MR. FENTON:

2   Q.  It says here:  Between May and June 2020, Mr. Berman,

3   using an alias, sent private messages to an investor on the

4   website Investors Hangout to influence the investor to draft

5   an independent shareholder letter accusing the SEC of

6   misconduct for its actions against DECN and Mr. Berman.

7           Is that -- that fact is relevant to your analysis.

8   Right?

9   A.  It's an individual.  Again, I look at this as -- we're

10  talking about fraud on the market.

11  Q.  Right.

12  A.  Right?  So disclosure to the market is relevant.

13          Could there be individuals that are being coerced

14  or otherwise influenced?  Of course there could be.

15          But my mandate is to look at what were the

16  policies, processes and procedures after a trade suspension

17  in an OTC stock, and do those constitute adequate notice to

18  the market?  Because remember, the sentencing guideline

19  requires you to calculate the price against all outstanding

20  shares.

21          You could certainly calculate the individual

22  damages for this person included in your sentencing.  The

23  Court could include that.  But that's not dispositive of the

24  market as a whole.

25  Q.  Mr. Reilly, would it matter if the Defendant convinced

1    dozens of victims to disbelieve the SEC and attack them?

2    A.  How many investors?  How many shares did they hold?  You

3    could calculate those specifically.

4    Q.  Dozens of investors.

5    A.  Okay.  The Government --

6    Q.  Would that be relevant?

7    A.  -- could have easily calculated those specific damages

8    and included them in any charging documents it so chose,

9    that specific information.

10              I could calculate the damage to the market if the

11   SEC gave me access to all the Blue Sheets for all the days

12   in the period involved to a great degree of specificity.

13   Q.  So, Mr. Reilly, is your answer no?

14   A.  My answer was my answer.

15   Q.  Mr. Reilly, is it relevant to your analysis if the

16   Defendant convinced dozens of victims to disbelieve the SEC?

17   A.  No.

18   Q.  It's not relevant?

19   A.  No.

20   Q.  Is it relevant if the Defendant publicly posted a

21   shareholder letter attacking the SEC?

22   A.  No.

23              MR. HOWELL:  Objection.  Asked and answered.

24              THE COURT:  I'm actually not sure that that was.

25              Overruled.

1              THE WITNESS:  Could you restate -- repeat the

2      question?  Sorry.

3      BY MR. FENTON:

4      Q.  Sure.

5              Would it be relevant to your analysis that the

6      Defendant publicly published the SEC shareholder letter, the

7      fake SEC shareholder letter, that he describes here?

8      A.  That he published it?  No.  I don't know how many people

9      relied on that.  Again, I'm doing a market-wide analysis

10     here against the processes that I know as a professional

11     exist for entering transactions in this type of security

12     with this kind of warning attached to it.

13     Q.  What if it was published in otcmarkets.com?

14     A.  It doesn't change my answer.

15     Q.  Okay.  Let's look at Government's Exhibit 3-M.  Are you

16     familiar with this document, sir?

17     A.  I don't remember seeing -- not particularly.  I may have

18     seen it.  But...

19     Q.  So no?

20     A.  No.  I don't recall it.  I may have seen it in my

21     review.

22     Q.  At the bottom it says:  Decision Diagnostics Corp.,

23     shareholder letter, dated June 2nd, 2020.

24              Do you see that?

25     A.  I do.

1    Q.  This is a letter to Jay Clayton, the SEC chairman.

2            Do you see that?

3    A.  I do.

4    Q.  And do you see it says at the top:  We represent a

5    number of concerned shareholders of Decision Diagnostics

6    Corp. and are writing today in response to the following

7    items.  And it lists three different things.  Right?

8    A.  I see that.  Yes.

9    Q.  The April 23rd, 2020, trading suspension.  Right?

10   A.  Correct.

11   Q.  The actions associated with the potential theft of

12   company property and its use against Decision Diagnostics in

13   early 2020, and then the administrative proceeding filed

14   before the Commission on the trading suspension dated May

15   20, 2020.

16   A.  I see all that.  Yes.

17   Q.  This directly relates to the two events that you claim

18   provided adequate notice.  Right?

19   A.  Well, again, they list the -- two of the -- those

20   events.  Yes.

21   Q.  Well, both of them.

22   A.  Yes.

23   Q.  There's three.  So this addresses two of the three?

24   A.  Correct.

25   Q.  Okay.  And let's look at what they say in the

1    shareholder letter about this:  In the section below, we

2    outline what we believe to be numerous inconsistencies

3    between the two documents filed by the SEC that was dated

4    April 23rd and May 20, 2020, as well as many other issues

5    with the investigators' purported findings and how they used

6    these findings to institute enforcement actions against the

7    company.

8    A.  I see that.

9    Q.  Right?

10          These are denials, right, that the SEC got it

11   right?

12   A.  It questions them.  Yes.

13   Q.  This is an attack on the SEC.  Right?

14   A.  If you want to characterize it that way, sure.

15   Q.  Well, I'm asking you.

16   A.  It's questioning their actions.  Absolutely.

17   Q.  Okay.  And this is the letter to which Mr. Berman

18   pleaded guilty for using to obstruct the SEC investigation.

19   Right?

20   A.  I would have to accept that assertion.  I don't

21   know what -- on what basis he pled to that charge.

22   Q.  But you didn't even know that when you did your

23   analysis?

24   A.  Again, as a practitioner, when the caveat emptor

25   designation is appended to a stock that's been suspended by

1   the SEC, I view that as adequate -- more than adequate

2   notice to the market that anyone who chooses to trade in

3   that security does so at great danger.

4   Q.  I understand, sir.

5           But what I'm asking you, sir, is:  When you did

6   your analysis, you didn't know that Mr. Berman had pleaded

7   guilty to obstructing the SEC investigation?

8   A.  I knew he had taken a plea deal.

9   Q.  But you didn't know that he had pled guilty to

10  obstructing the SEC investigation?

11  A.  Well, he wasn't particularly effective in obstructing

12  it, was he?  But yes.

13  Q.  Sir, it's a yes-or-no question.  Did you know this?

14  A.  I see this.  I may have read this in my review.  Again,

15  not relevant for my analysis.

16  Q.  And you didn't read the shareholder letter even though

17  it was on OTC Markets.  Right?

18  A.  I read this shareholder letter at some point in my

19  review.

20  Q.  And you didn't read the petition appealing the trading

21  suspension?

22  A.  Excuse me.  Could you repeat that?

23  Q.  You did not read the petition appealing the trading

24  suspension?

25  A.  I skimmed through it when I was doing my review.

1    Q.  And you didn't read the opening brief challenging the

2    trade suspension?

3    A.  I reviewed that.  Yes, I did.  Again, as a practitioner,

4    those points are not relevant to how the potential for fraud

5    and danger and risk are disclosed to the market.  That is as

6    I described in my previous testimony.

7    Q.  And that's because it all comes down to the skull and

8    bones, the caveat emptor.  Right?  The skull and bones

9    symbol?  That's it for you?

10   A.  I would say that a reasonable investor, faced with the

11   kind of warnings you'd get at TD Ameritrade or Schwab or

12   Fidelity or E*TRADE, when you are given the absolute

13   inability to trade online which you're typically used to,

14   and have to call in and then you're read a script saying:

15   This has been suspended by the SEC; there's a lot of

16   potential risk in trading this security; do you still want

17   to enter this trade?  That is an adequate notice.

18   Q.  So let's talk about the caveat emptor symbol.

19         So the third day that you choose -- that you claim

20   when the truth was revealed or there was this adequate

21   disclosure was July 20th, 2020.  Right?

22   A.  That was the earliest day I could find in terms of

23   absolutely closest to the trading suspension when it was

24   captured by the internet or kind of -- that does not mean in

25   my professional experience -- that was -- that that was when

1    it was disclosed.  I know it was disclosed on May 8th.  But

2    I wanted evidentiary proof.

3    Q.  And so, Mr. Reilly, my question is:  The third date that

4    you claim that the truth was revealed was July 20th, 2020.

5    Yes?

6    A.  That's the third disclosure date that I chose.  Yes.

7    Q.  That's based on the Wayback Machine?

8    A.  Correct.

9    Q.  That's the earliest date when you found that OTC Markets

10   had applied the caveat emptor and skull and bones?

11   A.  That I could prove it empirically, yes.

12   Q.  And that does not mean that July 20 is the actual date,

13   right, that --

14   A.  Correct.

15   Q.  -- they put that up?

16   A.  Correct.

17   Q.  That's just the first date that you found it?

18   A.  Correct.

19   Q.  Let's look at -- I believe it was Defense Exhibit 10.

20   Let's look at that caveat emptor symbol.

21          So at the bottom here, it says:  The caveat emptor

22   designation may be assigned when OTC Markets becomes aware

23   of one or more of the following.  Right?

24   A.  Uh-huh.

25          THE COURT REPORTER:  Is that yes?

Reilly - CROSS - By Mr. Fenton

1          THE WITNESS:  Yes.

2     BY MR. FENTON:

3     Q.  And there's a list that follows.  Correct?

4     A.  There is -- it follows under the next page.

5     Q.  Let's look on to the next page.  So there's one bullet.

6     There's four more here.  The third bullet is

7     suspension/halt.  It says:  A regulatory authority or an

8     exchange has halted or suspended trading for public interest

9     concerns, i.e. not a news or earnings halt.  Correct?

10    A.  Correct.

11    Q.  Okay.  So if the SEC institutes a trading suspension,

12    this automatically gets put up under OTC Markets for that

13    particular stock, the stock that got suspend?

14    A.  Correct.

15    Q.  And if that were the case, this information would

16    already be known to the market by then.  Right?  Because it

17    would have been -- the SEC would have put out notice.  They

18    put out their notice on April 23rd.  Right?  So the market

19    knows about the trading suspension on April 23rd?

20    A.  Correct.

21    Q.  This information is merely confirmatory.  It's just

22    saying the same thing that the SEC has already said?

23    A.  In essence, yes.

24    Q.  Nothing in this document says that the caveat emptor

25    symbol was applied to DECN for any other reason than the

1    fact of the trading suspension.  Correct?

2    A.  Correct.

3    Q.  Okay.  For example, it does not say that the CEO of DECN

4    was lying to his investors?

5    A.  It doesn't have any particular detail like that.  No.

6    Q.  It just is a generic description?

7    A.  Generic in terms of buyer beware and a skull and

8    crossbones, which was picked by OTC Markets to emphasize the

9    "danger ahead" nature of trading in securities like that.

10   Yes.

11   Q.  But this same symbol is used regardless of what stock

12   it's applied to?

13   A.  Well, every symbol -- everyone -- every stock that

14   trades on OTC Markets that's appended with caveat emptor is

15   viewed as speculative.  You could lose all your money.

16   Because, remember, there's a second part to this process:

17   How is it applied at a broker-dealer?

18   Q.  But my question is:  This caveat emptor symbol and

19   explanation is the same for every stock to which it is

20   applied?

21   A.  That is correct.

22   Q.  It's generic?

23   A.  It is the same for all the stocks, Yes.

24   Q.  It's the same for all?

25   A.  That have caveat emptor.  Correct.

1    Q.  Let's look at Page 2 -- I'm sorry.  Let's look at the

2    bottom here, the caveat emptor symbol.

3               So OTC Markets --

4               THE COURT:  Mr. Fenton, you've been going for

5    about 40 minutes.  I'll give you five more minutes.

6               MR. FENTON:  Thank you, your Honor.

7    BY MR. FENTON:

8    Q.  OTC Markets does not say that the investor should not

9    buy DECN stock.  Right?

10   A.  OTC Markets doesn't make any recommendations one way or

11   the other on any stock that's listed on its markets.

12   Q.  And it doesn't say that DECN stock is a fraud.  Right?

13   A.  It doesn't say anything particularly like that.  No.

14   Q.  Now, all it says here is that investors are encouraged

15   to use caution and due diligence in their investment

16   decisions.  Right?

17   A.  Correct.

18   Q.  One of the things that an investor could do if they were

19   exercising caution and due diligence in their investment

20   decisions would be to look at what the CEO of the company

21   says about the company and says about the stock.  Correct?

22   A.  That is one of the things they could do.  Yes.

23               MR. FENTON:  Thank you.  No further questions.

24               THE COURT:  Any redirect?

25               MR. COLLINS:  Your Honor, could we have the

```
 1        Court's indulgence for just 30 seconds?
 2                    THE COURT:  Yes.
 3                    (Discussion had off the record amongst counsel.)
 4                    MR. COLLINS:  Thank you, your Honor.
 5                    MR. HOWELL:  No redirect, your Honor.
 6                    THE COURT:  Thank you, Mr. Reilly.  You may step
 7        down.  You're free to go.
 8                    (Witness excused.)
 9                    THE COURT:  Putting aside the other witness issue,
10        anything further on loss?
11                    MR. COLLINS:  No further testimony.  I don't know
12        if the Court was inclined to hear any kind of summation
13        based on the testimony today or if the Court would accept
14        further briefing on this.
15                    THE COURT:  We'll figure that out later.  Thanks.
16                    Did you want to re-call Dr. Mitts?
17                    MR. REILLY:  Just briefly, your Honor.
18                    THE COURT:  Okay.
19                    MR. REILLY:  Thank you, your Honor.
20                    The Government re-calls Professor Joshua Mitts.
21                    THE COURT:  Professor, I'll remind you you're
22        still under oath.
23                    THE WITNESS:  Thank you.
24                    Mr. Reilly.
25                    MR. REILLY:  Thank you, your Honor.
```

```
 1              (JOSHUA MITTS, GOVERNMENT WITNESS, PREVIOUSLY SWORN.)

 2                           REDIRECT EXAMINATION

 3      BY MR. REILLY:

 4      Q.  Professor Mitts, did you hear Mr. Reilly's testimony on

 5      caveat emptor?

 6      A.  I did, yes.

 7      Q.  Are you yourself familiar with that concept?

 8      A.  Yes.

 9      Q.  Are you familiar with the warnings that are attached

10      when a caveat emptor label is put on an OTC stock?

11      A.  Yes.

12      Q.  And does that label necessarily put investors on notice

13      that officers of a company are engaged in fraud?

14      A.  No.

15      Q.  Does the caveat emptor disclosure let the market know if

16      the executive of that company is engaged in obstruction in

17      an SEC investigation?

18      A.  No, it does not.

19      Q.  Professor Mitts, you're familiar that the application

20      note discussing the MRM requires not just the mathematical

21      analysis, but then an assessment as to whether the resulting

22      loss number is reasonable.  Right?

23      A.  That's correct.

24      Q.  And one of the factors the application note suggests

25      that should be looked at when assessing reasonableness is
```

1    firm-specific facts, conditions and events.  Right?

2    A.  That's correct.

3    Q.  What do firm-specific facts, conditions and events mean

4    to you?

5             MR. XENAKIS:  Objection, your Honor.  Beyond the

6    witness's legal expertise as -- certified as an expert

7    previously.

8             THE COURT:  Sustained.

9    BY MR. REILLY:

10   Q.  Professor Mitts, in conducting your own analysis, did

11   you look at firm-specific facts, conditions and events?

12   A.  Generally, yes.

13   Q.  Is that an important step in determining the

14   reasonableness of a loss number?

15   A.  Yes.

16   Q.  Why?

17   A.  Because to assess whether it's plausible that a

18   particular date revealed the truth of the fraud to the

19   market, one would need to look at the totality of the

20   firm-specific information that was being released on that

21   date or during that time, because otherwise one could

22   mistakenly conclude that the inflation had dissipated from

23   the price when in fact there was some other firm-specific

24   activity that maintained that inflation on a given date.

25   Q.  In your view, is it possible to assess the

1    reasonableness of loss amount without a close analysis of

2    firm-specific events?

3    A.   No.  One needs to consider the totality of the evidence

4    and what happened to determine whether or not the loss

5    amount was reasonable.

6    Q.   And would the appeal of a trading suspension or

7    obstruction of an SEC investigation constitute the types of

8    events that could cause continued price inflation?

9    A.   Yes.  Certainly.  As long as there was some disclosure

10   to the market in some way, those events certainly could

11   maintain a preexisting price inflation.

12   Q.   And to be clear, what does preexisting price inflation

13   mean?

14   A.   Whatever inflationary impact of a prior misstatement is

15   still in the stock price, those additional actions could

16   give the market reason to not, let's say, in this case sell

17   the stock, thereby causing the inflation to dissipate.

18   Q.   In conducting the reasonableness analysis called for in

19   the application note, would the reliable principles in

20   financial economics require some sort of systematic or

21   regression-type tool to support a finding of reasonableness?

22   A.   Yes.  It's generally the case that in order to assess

23   whether a particular measure is a reasonable estimate of

24   loss that one would at least within the basic parameters of

25   the peer-reviewed literature assess questions like whether

1    there's market-specific or industry-specific or other

2    factors that a regression analysis would pick up.

3    Q.  Did you hear any of -- any analysis of that type

4    conducted by Mr. Reilly in explaining his assessment of the

5    loss amount?

6    A.  No, I did not.

7    Q.  What does the financial literature say about the value

8    to the market of statements by a corporate insider as

9    compared to those by third parties or outsiders?

10   A.  There's actually a substantial literature on this,

11   because the fact -- it's not even an assumption.  It's an

12   understanding that corporate insiders have assymetric

13   information about their firms.  They know things the rest of

14   the market doesn't.  When a corporate insider speaks, the

15   market takes that very, very seriously.  The assumption is

16   that third parties might be getting it wrong, but the

17   insider knows what's really going on.

18        So the assymetric information disparity between

19   the insider and the rest of the market is a basis for the

20   market as a whole to ascribe extra importance to what

21   insiders are saying.  And there's a very large literature on

22   this point.

23   Q.  And how does that topic apply to the potential to

24   perpetuate price inflation?

25   A.  Well, I think what that literature implies is that even

1    relatively oblique or indirect or subtle comments by

2    corporate insiders can give investors -- and here, I'm

3    referring to the market as a whole -- a reason not to

4    disbelieve the misstatements, meaning not to sell the stock,

5    not to update their beliefs.

6         It's as if the market looks and says:  Well, you

7    know, look.  It looks like maybe these third-party

8    accusations are wrong.  And so the market's ascribing extra

9    weight to those insider statements.

10        MR. REILLY:  No further questions, your Honor.

11        THE COURT:  Mr. Xenakis.

12        MR. XENAKIS:  Thank you, your Honor.

13                      RECROSS-EXAMINATION

14   BY MR. XENAKIS:

15   Q.  Professor Mitts, as part of your legal expertise, you're

16   familiar with litigation with the SEC.  Correct?

17   A.  I'm not sure I understand what you mean by "litigation

18   with the SEC."

19   Q.  Well, you're familiar with litigation, for example, the

20   litigation that's been discussed today about a stop trade

21   order with the SEC?

22   A.  I'm generally familiar with trading suspensions and

23   attempts to convince the SEC to reverse or overturn a

24   trading suspension.

25   Q.  And the attempts to persuade the SEC to overturn a

1    trading suspension is a legal right that people have.

2    Correct?

3    A.  I'm not entirely sure what you mean by a "legal right."

4    I believe generally the SEC has provided for that as a

5    matter of their own procedure.  But I can't recall the exact

6    framework from a procedural standpoint that applies to those

7    sorts of appeals.

8    Q.  Okay.  I believe you testified on direct that you -- I'm

9    sorry -- on cross-examination that you've testified for the

10   Government before.  Right?

11   A.  I have advised the Department of Justice, but I have not

12   testified for the Department of Justice before.

13   Q.  And have you advised the Department of Justice on issues

14   like -- that have come up today, like the sentencing

15   guidelines?

16   A.  I don't believe this level of specificity.  We certainly

17   have discussed the general issues that were discussed today.

18   The level of specificity today in preparation for this

19   hearing and the analysis that I was asked to conduct was

20   certainly at a higher level of specificity than our prior

21   discussion.

22   Q.  In preparing for that ability to speak with specificity,

23   you reviewed the guidelines closely.  Right?

24   A.  I reviewed the note that I discussed in my testimony and

25   the associated reasonableness analysis.

1  Q.  And when you talk about the note, that's the note for

2  Guideline 2B1.1.  Right?

3  A.  That sounds roughly correct.  I'd have to consult my

4  notes as to the exact provision.  But --

5  Q.  In your review of the guideline, do you remember where

6  it said the word "truth"?

7  A.  I can't recall the exact words.  What I remember is that

8  the language is in substance examining the date when the

9  fraud was revealed to the market or the fact that the

10  misstatement was false.  I don't remember the exact words

11  that were used, but that was my understanding of the

12  formula.

13  Q.  And is it possible you don't recall because the

14  guideline doesn't actually use the word "truth"?

15  A.  That's possible.  As I said, the question as I saw it

16  was whether the dates at issue in fact captured the

17  revelation of the fraud or the dissipation of the price

18  inflation, meaning the market realized that the prior

19  misstatements were false and therefore the inflationary

20  effect of those misstatements came out of the price.

21          MR. XENAKIS:  The Court's indulgence.

22          Nothing further, your Honor.

23          THE COURT:  Thank you, Professor Mitts.  You may

24  step down.

25          (Witness excused.)

1          THE COURT:  Mr. Collins, I'll give you 20 minutes

2     if you want to have Dr. Williams speak now.  I'm happy to

3     hear him speak at sentencing.  I have reviewed his

4     disclosure and I'm happy to review something else he says.

5     I don't think I want to do another hearing, though.

6          MR. COLLINS:  I understand, your Honor.  Can you

7     give me one minute to consult with my team?

8          THE COURT:  Sure.

9          (Discussion had off the record amongst counsel.)

10          MR. COLLINS:  Your Honor, could I suggest Plan B?

11          THE COURT:  Which was that he comes up?

12          MR. COLLINS:  No, no.  That to the extent that we

13     would rely on Professor Williams or Dr. Williams, we might

14     submit something in support of sentencing.

15          But if the Court has some time, we would like --

16     the Court's heard a lot of information.  In our view, we

17     think a summation of some sort for ten minutes would be, we

18     think, beneficial.  If it's beneficial -- if the Court's

19     willing, we'd like to have ten minutes to try to --

20          THE COURT:  Of course.  Yes.

21          MR. COLLINS:  So we'd like to do it orally today

22     or we could do it in briefing.  Whatever the Court prefers.

23          THE COURT:  I don't want briefing.

24          I'll hear from the Government.

25          MR. REILLY:  Thank you, your Honor.

1            The corrective disclosure for the fraud that

2    Mr. Berman engaged in cannot be the trading suspension or

3    the other summer events that the Defendant points to for a

4    number of reasons.  I'll go through them briefly.

5            First, as the Defendant has pled guilty to

6    obstruction of the SEC investigation, an obstruction that

7    targeted shareholders of the company, the victims of his

8    crime, who believed his false press releases and invested in

9    this company, the obstruction plays a critical role in the

10   continued inflation of Decision Diagnostics' stock price

11   even after the SEC's trading suspension.

12           As the Court knows and as we've seen today, the

13   Defendant's efforts to continue to besmirch the SEC, their

14   investigation and to outright call the nature of the

15   investigation into question distorted the market and

16   prevented the market from realizing that in fact the conduct

17   the Defendant had engaged in was fraud.

18           As the Court is aware, there were three letters

19   submitted to the SEC over the course of that summer:  June

20   2nd, July 28th and August 11th.  This was persistent.  And

21   those letters were not only sent to the SEC's investigators

22   and the highest levels of the SEC, but they were shared with

23   investors.  They were signed by 56 investors.

24           And these promoted to the victims of the fraud,

25   circulated in that community, that this fraud was not in

1    fact a fraud.

2          And the result of that is the price of this

3    company's stock remained inflated during the summer until

4    the indictment revealed the truth, including that the

5    Defendant was on the message boards under a false identity

6    refuting what the SEC suggested in its trading suspension,

7    pushing back.

8          THE COURT:  Well, I guess why -- I, of course,

9    have the greatest respect for the Justice Department.  But

10   kind of the average market participant, why would they see

11   an indictment, treat an indictment, differently than the SEC

12   making a very similar claim with these little skull and

13   crossbones?

14         MR. REILLY:  Well, first, the SEC of course

15   doesn't attach that.  That's the OTC Markets.  We've heard

16   about kind of the limitations of what the OTC caveat emptor

17   provides.

18         But the SEC trading suspension is a temporary

19   measure, of course.  It's not --

20         THE COURT:  But it's also a pretty extraordinary

21   one.  Right?  Do you disagree with the claim that it happens

22   only a couple times year?

23         MR. REILLY:  Well, in most years, but not in 2020.

24   In 2020, I had the benefit of being at the Commission at

25   that time, your Honor.

1          And because of COVID-19, there was an

2     inordinate -- I believe Mr. Reilly even testified to the

3     large number of trading suspensions that came out around

4     COVID-19 products.  I believe the uncertainty of the

5     pandemic, the newness of companies, you know, claiming to

6     have COVID-related products, it resulted in an inordinate

7     number of trading suspensions around that time, which I

8     think significantly undermines kind of the rareness, because

9     that year during that particular time the SEC was suspending

10    a number of stocks in order to make sure that these

11    companies weren't getting ahead of themselves on what they

12    were claiming existed.

13          And what we have here is not only that Decision

14    Diagnostics had this, but then the Defendant rebuts this, we

15    now know perjuriously.  Maybe he had a legal right to do it,

16    but he certainly didn't have a legal right -- now that he's

17    pled guilty, we know that the statements he made to the SEC

18    in that document appealing the trading suspension were

19    false, where he denies the press releases --

20          THE COURT:  I get that.

21          MR. REILLY:  Your Honor, then he circulates that

22    on the OTC Market.  And that's so that investors in these

23    penny stocks can see.

24          So the items that he's engaging in to continue the

25    fraud concern circulating a misleading appeal, recruiting

1    investors and pushing, through obstructive conduct,

2    investors to prepare letters to kind of attack the SEC

3    investigation and then continuing to issue at least one

4    false and misleading press release, all after that point in

5    time.

6         And we see it in the stock pricing because, once

7    the indictment comes out, the stock price returns to where

8    it was before the Defendant began putting out those press

9    releases about having these products.

10        The only time that we see the market being on full

11   notice that the EUA process that the Defendant had continued

12   to tell the market that he was far along in was baseless,

13   that the FDA had told Decision Diagnostics that they would

14   need to conduct additional clinical trials in order to get

15   an EUA.  They couldn't afford them.  They couldn't do them.

16   They didn't have the protocols to do them.  And that gets

17   revealed right there.

18        THE COURT:  Is your position in conflict with the

19   indictment and your pretrial claims that the fraud had just

20   existed into that summer?

21        MR. REILLY:  I don't think so, your Honor, because

22   it's really two separate questions.  Right?  The question

23   is, one, how long is the fraud period?  And because of the

24   obstructive conduct and the continued perpetuation of the

25   fraud, we believe the correct measure of the fraud period is

1  all the way until December.

2          But even if the fraud ends on July 10th, the

3  question still remains of:  When was the full scope of the

4  fraudulent conduct revealed to the market?

5          And there is no doubt, whether the fraud ends July

6  10th or the fraud ends when Mr. Berman is indicted, it is

7  not revealed to the market what -- that the Defendant has

8  been using aliases to promote additional false information

9  on the message boards, that the press releases were in fact

10  false, that there's no opportunity to get an EUA.

11          A variety of additional conduct is put out there

12  as well as for the first time a finding by a body, the grand

13  jury, that there is probable cause that criminal conduct has

14  existed.

15          And the stock price shows that that is -- had a

16  significant impact on the market, because that is the first

17  time that the stock goes back to and stays at approximately

18  2 to 5 cents, where it has not been since the Defendant

19  began putting out the false and misleading press releases

20  back in March.

21          THE COURT:  So I'd think an indictment suggests if

22  I could afford to invest in the stock change and I saw

23  someone indicted, that might have even greater effect, like

24  suggesting this whole firm is going to collapse or whatever.

25          Doesn't that have -- isn't there a danger that

1    your post-December timeline even overcompensates and really

2    tanked the company's share price beyond just kind of what

3    would have been implicated by the fraud?

4              MR. REILLY:  Well, your Honor, I think what it

5    indicates is that the market was not baking in the risk that

6    we've heard from the defense in the other disclosures as the

7    market appreciating the full extent.

8              I think the Court's right that these are extreme

9    risks to the viability of DECN.  And had the market had the

10   complete scope of information, including that the Defendant

11   was engaging in obstructive conduct, using pseudonyms and

12   aliases to put out additional false information and that,

13   you know, the core premise of the investment value in this

14   company, which had not been previously disclosed in any of

15   the SEC's public filings, that's really what the indictment

16   is getting at.

17             And I think the comparison shows that if the

18   market had truly appreciated the extent of what the

19   Defendant was doing, the stock price would have reverted to

20   that price over the summer, not until the indictment was

21   revealed.

22             THE COURT:  Thank you.

23             MR. REILLY:  Any other questions?

24             THE COURT:  No.

25             MR. REILLY:  Thank you, your Honor.

 1              MR. GIRON:   José Giron of Covington & Burling for

 2    Mr. Berman.

 3              Your Honor, may it please the Court.

 4              This Court has heard a lot about what the parties

 5    disagree about:  the fraud period, the disclosure period.

 6    But I'd like to begin by highlighting some of the things the

 7    parties do agree about.

 8              For instance, the parties all agree that the

 9    guidelines method -- excuse me -- the guidelines recommend

10    measuring loss using MRM, the modified rescissory method.

11              And, second, the parties agree about how the

12    method works, at least in principle:  You compare the price

13    during the fraud to the price post-disclosure, the idea

14    being that the post-disclosure price is what an investor

15    would have paid if they had complete information.

16              Third, your Honor, the parties -- and

17    importantly -- do not dispute where the burden lies.  Quote:

18    "The overall burden of proving loss under the guidelines

19    always remains with the Government."  That's *United States*

20    *versus Bikundi*, 926 F.3d at 798, D.C. Circuit, 2019, a

21    recent case.

22              I'd like to pivot to some of the things the

23    parties do disagree about, your Honor.

24              First, the period of the fraud.  Well, when did it

25    end?  When did it begin?

1            THE COURT:  You agree on when it began.  Right?

2            MR. GIRON:  That's right, your Honor.  We both

3     agree that -- the parties do agree that it began on March

4     3rd, 2020, when DECN issued its first fraudulent press

5     release.

6            Now, I think the Government --

7            THE COURT:  Isn't a warning sent to me, Mr. Giron,

8     that your method can't be right when the result is that

9     there are no real victims, that they end up better under the

10    fraud than they would have been otherwise?  Doesn't that

11    just kind of fly in the face of common sense?

12           MR. GIRON:  Not necessarily, your Honor.

13           There can be many market forces, many confounding

14    causation events, that can lead to a price increase without

15    there being loss.

16           So just to give you an example, suppose that

17    Mr. Berman on July 10th had invented OpenAI.  You know,

18    anybody who's buying in the market would realize, Whoa, this

19    stock is worth a lot of money.  I want to buy it,

20    notwithstanding prior fraud.

21           THE COURT:  So have you pointed to anything that

22    would suggest something like OpenAI here?

23           MR. GIRON:  No, your Honor.  But it's not our

24    burden to do so; it's the Government's burden to do so.

25           THE COURT:  I get that.  I get that.

1          But nonetheless, they have a pretty convincing

2     kind of bell curve.  You know, it's around 2 to 3 cents;

3     fraud; fraud is exposed; back down to 2 to 3 cents.  There's

4     kind of a logical appeal to their position.

5          Yours, not so much.

6          MR. GIRON:  I disagree with that, your Honor.

7          Before the guidelines were enacted, courts often

8     stressed that the fraud period or the post-disclosure period

9     should be brief.

10         And there's a reason why they did that.  That's

11    because the longer the periods are, whether it's the fraud

12    period or the disclosure period, the likelier it is that

13    there's some other confounding variable that is affecting

14    the stock price and that shouldn't be folded into the loss

15    calculations, because at the end of the day your Honor has

16    to calculate the loss that was, you know, the product of

17    reasonable reliance on the fraudulent statements, not

18    other -- you know, any other confounding variable.

19         And we submit to you the three or four answers

20    that Professor Mitts gave just do not suffice to accomplish

21    that, you know.

22         Moreover, your Honor doesn't need to believe us.

23    The Government's consistent position throughout this

24    litigation has been that the fraud period began in March and

25    ended in July.

1          THE COURT:  So, you know, I thought you were right

2     about that.  But I'm looking back at the indictment, and it

3     actually does say securities fraud from at least in or

4     around February 2020 through in or around December 2020.

5          So I'm not sure exactly where you're getting the

6     summer.  But it looks to me at least their --

7          MR. GIRON:  Your Honor, let me give you --

8          THE COURT:  -- indictment looks longer.

9          MR. GIRON:  A fine question, your Honor.

10         Let me give you what the Government thought the

11    indictment said.

12         In the pretrial conference held on November 13th,

13    2023, the Government said as follows, quote:  "If you look

14    at the indictment, it really is divided into discrete

15    periods of time, with February through July 2020 being the

16    allegedly false and misleading statements and the rest of

17    the time period, basically April through December, related

18    to the obstruction case."

19         I'd like to address for a moment, your Honor, a

20    few of the cases that undermine and I think completely

21    contravene the Government's position.

22         The Government at bottom is saying that

23    Mr. Berman's obstruction somehow extended the period of the

24    fraud.

25         But the case law doesn't back that up.  Tellingly,

1       the Government cannot cite a single solitary case for that

2       proposition, your Honor.  Not one.

3                We can for ours.  Take, for example, *United States*

4       *versus Lundstrom*.  That's out of the District of Nebraska,

5       U.S. District Lexus 195507 at *4.

6                There, a bank doctored financial statements.

7       Okay?  At a later point in time, it said:  We're going to

8       revise those financial statements.  That's all it said.

9                At a third date, your Honor, the bank continued to

10      issue Form 8-K filings with the SEC, and in those filings

11      said:  There's no fraud.  The people who were auditing us,

12      they quit for another reason.  We haven't destroyed any

13      evidence.

14               Those are attempts to conceal the fraud.

15               And the Government there, the fraud section of the

16      Justice Department, the same one that brings this case,

17      argued that, you know, the period of the fraud had ended

18      with that initial disclosure, notwithstanding the

19      later-in-time attempts to conceal the fraud.

20               Your Honor, that case was upheld on appeal by the

21      Eighth Circuit in *United States versus Lundstrom*, 880 F.3d

22      at 444.

23               Likewise, here, the Court should rule that the

24      fraudulent period ended when Mr. Berman issued the last

25      fraudulent press release on July 10th, even though he

1    continued to post about DECN anonymously.

2           And on the anonymous point, your Honor, a real

3    brief detour:  Professor Mitts said that insiders have

4    assymetric access to knowledge, so their word may matter a

5    lot to investors.  I totally agree with that.

6           But that actually undercuts the Government's

7    position, your Honor, because many of Mr. Berman's

8    statements in the obstruction half of the case were posted

9    anonymously, so investors didn't -- couldn't attribute those

10   statements to Mr. Berman.

11          THE COURT:  But they could in the various filings

12   with the SEC.  Right?

13          MR. GIRON:  That's correct, your Honor.  That's

14   true.

15          I'd like to pivot now to maybe the second half --

16   or maybe the second issue that the parties really disagree

17   about, which is the disclosure period.  When was the fraud

18   disclosed?

19          Now, I want to be precise here, your Honor.  The

20   sentencing guidelines speak not of truth, but about the

21   period when, quote, "the fraud was disclosed to the market."

22   That's Sentencing Guideline Section 2B1.1, Comment No. 3,

23   Subdivision (F), Subsection (ix).

24          THE COURT:  Okay.

25          MR. GIRON:  Now, "disclose" is not a term that's

1    defined in the guidelines.  Your Honor decided a case,

2    *United States versus Seefried*, 639 Federal --

3              THE COURT:  I'm familiar with it.  Go ahead.

4              MR. GIRON:  Excellent.  I'm just making a record.

5              -- that held that undefined phrases take their

6    plain meaning.  And as a textualist, I totally agree with

7    that.

8              Now -- so what does it mean to disclose something

9    to the market?  It means, you know, when did a proposition

10   go from being unknown to generally known to the market?

11             And I think, your Honor, the evidence here is

12   overwhelming that that happened on April 23rd.

13             As you know, the SEC had questions relating to

14   the, quote, "accuracy and adequacy of information in the

15   marketplace" since at least March 3rd, 2020.

16             Cases -- courts have held that suspension orders

17   trigger their 90-day -- the post-disclosure period.

18             So, for instance, *United States versus Peppel*,

19   2011 U.S. District Lexis 909957, decided in August of 2011

20   and eventually upheld on -- or reversed on appeal for

21   different reasons said that, quote:  "The announcement of

22   the SEC investigation is an efficient and highly relevant

23   proxy by which to measure the price effects of the

24   fraudulent conduct," end quote.

25             And that's --

1          THE COURT:  Was that a case where there was

2    post-SEC announcement obstruction, though?

3          MR. GIRON:  No, your Honor.

4          But for propositions -- for a case that is more

5    similar to what your Honor is asking about, I would point

6    your Honor to *United States versus Lundstrom*, where there

7    were -- there was disclosure, there was fraud, disclosure,

8    attempts to conceal.  And the outcome there is exactly what

9    we're asking for, which is that, you know, the disclosure

10   happened when it happened.

11         And, your Honor, *Lundstrom* was actually really

12   instructive for that reason.  Many courts have found that

13   disclosure happens when far, far less information is

14   available to the market.  And *Lundstrom* is one such case.

15   So in *Lundstrom*, all the bank said to trigger the

16   disclosure --

17         THE COURT:  That was the Eighth Circuit case you

18   mentioned?

19         MR. GIRON:  That's right.  That's right, your

20   Honor.  Yes.

21         All the company said was:  We're revising our

22   earlier financial statements.

23         It contained none of the detail found in the

24   suspension order.  It contained none of the detail found in

25   the SEC's May 20th filing, detail by the way, your Honor,

1    that is found in the Government's indictment several months

2    later.

3            In our briefing -- your Honor, we wanted to

4    highlight how similar the allegations that the SEC made were

5    to the allegations that the Government, you know, makes.

6    And we have a table set up where your Honor and your Honor's

7    clerks can compare the allegations.  A lot of times they use

8    very similar language.

9            Now, underlying the Government's position is that

10   the disclosure needs to be complete and that it needs to be

11   uncontested.

12           Again, that is -- your Honor, that's not the case.

13   That's not what the case law says.

14           In *United States versus Tuzman* from the Southern

15   District of New York -- that's 2021 U.S. District Lexis

16   142715 -- the Southern District of New York held that the

17   fraudulent scheme was disclosed when a company filed a Form

18   8-K that merely announced, quote, "errors and irregularities

19   in its financial statements from prior years."

20           Again, that is a real big contrast between the

21   detail contained in the documents that we submit, humbly,

22   disclosed the fraud here.

23           Your Honor, in *United States versus Ferguson*, the

24   District of Connecticut -- excuse me -- that's 584 Federal

25   Supplement 2nd 447 -- the District of Connecticut ruled that

1      when a company announced that it had received a subpoena

2      from a state regulator, that was enough to trigger the

3      disclosure.

4              Your Honor, I'd like to make two more points about

5      why the Government's disclosure argument is fatally flawed.

6              First, it collides with the fact that the

7      Government must prove that investors reasonably relied on

8      fraud to measure loss.

9              Loss that is not incurred as a result of

10     reasonable reliance should be omitted from the loss

11     calculations.  That's *United States versus Stein*, an

12     Eleventh Circuit case, 846 F.3d 1135, and a recent one at

13     that, because it was issued in 2017.

14             So, your Honor, just think about what an investor

15     would have had to do on July 21st to buy DECN stock.  When

16     he typed DECN, you know, on otcmarkets.com, he would find a

17     skull and crossbones.

18             He would find that same skull and crossbones on

19     otcmarkets.com once he navigated to DECN's page.

20             There are bright red warnings about how buyers

21     ought to beware as a result of either fraud or, you know,

22     the suspension orders.

23             And if they wanted to place -- if after all of

24     that they wanted to place an order, they couldn't do so

25     online.  You heard Mr. Reilly testify that they actually had

1    to call up broker-dealers.  By that point, the SEC has

2    suspended trading.  It has issued a detailed analysis

3    identifying specific fraudulent statements made on May 20th.

4    And now you have all these blinking-red neon red lights

5    saying, "Don't do this."

6            We submit to you, your Honor, that an investor

7    buying DECN securities on July 21st was not reasonably

8    relying on Mr. Berman's fraudulent statements.

9            THE COURT:  All right.

10           MR. GIRON:  As a result, their sustained losses

11   can't be folded into the calculations.

12           Just one last brief point, your Honor.  I know

13   we've taken up a lot of your time.

14           The Government's test is inadministrable.  They

15   say it has to be a complete disclosure; it has to be

16   uncontested.

17           Well, you can always learn more about a particular

18   fraudulent scheme.  What was the Defendant eating on the day

19   he issued the press release?  We'll never know that.  It's

20   never going to be a part of the record.

21           And so the Government says, Oh, well, the

22   indictment is enough, that, you know, nothing happened

23   before.

24           That doesn't make a lot of sense.

25           Your Honor, because the allegations in the

1    indictment mirrored so closely the allegations made in the

2    SEC, we don't think it adds much, you know, to learn the

3    information contained in that indictment.

4         And the Government's rule would incentivize it

5    if -- if the rule is, Oh, well, let's just measure it by the

6    time the Government indicts, well, then, the Government has

7    this perverse incentive to maybe indict when -- you know, a

8    lot later, when the price of the security has depreciated.

9    Nothing in the guidelines calls -- or gives the Government

10   that power.

11        Your Honor, even if you assume that the Government

12   is right about the fraud period and you take any one of the

13   three disclosure dates, the investors in this case under the

14   guidelines method, which the parties both agree ought to be

15   applied here, have sustained no loss.

16        Thank you, your Honor.

17        THE COURT:  Thank you, Mr. Giron.

18        I appreciate everyone's --

19        MR. REILLY:  Judge, may we be heard on one very

20   brief point?

21        THE COURT:  No.

22        MR. REILLY:  Thank you, your Honor.

23        THE COURT:  I appreciate everybody's hard work and

24   briefing on this.  I appreciate the experts' presence here

25   today.

1              I think we have a schedule for memoranda in aid of
2     sentencing and a sentencing date.  So I'll see you folks
3     then.
4              Thanks, folks.
5              MR. REILLY:  Thank you, your Honor.
6              (Proceedings concluded.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                              **<u>CERTIFICATE</u>**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4       certify that the foregoing constitutes a true and accurate

5       transcript of my stenographic notes, and is a full, true,

6       and complete transcript of the proceedings produced to the

7       best of my ability.

8

9

10                   Dated this 22nd day of March, 2024.

11

12                   <u>/s/ Lisa Edwards, RDR, CRR</u>
                     Official Court Reporter
13                   United States District Court for the
                       District of Columbia
14                   333 Constitution Avenue, Northwest
                     Washington, D.C. 20001
15                   (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## $

**$150** [1] - 36:25
**$200** [2] - 36:15, 36:20
**$350,000** [1] - 31:7
**$600** [1] - 12:20
**$70,000** [1] - 12:20

## '

**'34** [2] - 55:23, 56:16
**'80s** [1] - 50:11

## /

**/s** [1] - 144:12

## 0

**00** [5] - 3:11, 11:16, 11:21, 11:23, 11:24
**001** [4] - 3:15, 62:5, 62:17, 62:21
**002** [4] - 3:16, 62:23, 63:12, 63:16
**004** [4] - 3:20, 77:3, 77:11, 77:15
**005** [3] - 59:13, 59:14, 60:18
**010** [4] - 3:18, 69:5, 69:21, 69:25
**012** [5] - 3:17, 63:18, 63:21, 64:18, 64:22
**042** [7] - 3:19, 70:2, 70:24, 71:2, 71:3, 71:6, 83:19

## 1

**1** [3] - 43:8, 62:20, 71:6
**10** [4] - 69:24, 81:5, 86:5, 112:19
**10,000** [1] - 56:5
**100** [3] - 55:3, 58:5, 99:25
**102** [1] - 104:20
**10b** [1] - 87:19
**10th** [9] - 64:2, 75:3, 80:25, 83:17, 83:23, 129:2, 129:6, 132:17, 135:25
**11** [3] - 3:11, 70:18, 96:17
**1135** [1] - 140:12

**117** [1] - 3:5
**11:30** [1] - 1:7
**11th** [1] - 125:20
**12** [3] - 64:21, 92:6, 101:16
**12,000** [1] - 56:5
**13th** [1] - 134:12
**1400** [1] - 1:16
**142715** [1] - 139:16
**15** [1] - 90:24
**150** [1] - 36:24
**16** [2] - 95:9, 96:22
**160** [4] - 22:8, 22:16, 22:22, 23:1
**17** [2] - 83:24, 96:3
**17.41** [1] - 15:4
**176** [1] - 76:3
**17th** [3] - 14:21, 14:25, 100:25
**18** [1] - 96:17
**18th** [2] - 14:25, 17:6
**19** [1] - 96:22
**19.54** [1] - 14:23
**1933** [1] - 52:5
**1934** [1] - 52:5
**195507** [1] - 135:5
**1987** [1] - 50:8

## 2

**2** [14] - 43:9, 47:12, 63:15, 64:14, 83:15, 83:21, 98:13, 101:8, 102:12, 104:24, 115:1, 129:18, 133:2, 133:3
**2.13** [1] - 15:2
**20** [11] - 1:6, 68:9, 68:16, 69:2, 97:4, 99:12, 101:5, 108:15, 109:4, 112:12, 124:1
**20-00278** [1] - 1:3
**20-278** [2] - 4:2, 85:16
**200** [4] - 34:24, 35:13, 37:3, 37:4
**20001** [2] - 2:4, 144:14
**20004** [1] - 1:25
**2001** [1] - 1:22
**2011** [2] - 137:19
**2017** [1] - 140:13
**2018** [3] - 52:11, 53:2, 53:3
**2019** [3] - 18:4, 26:22, 131:20
**202** [2] - 2:4, 144:15
**2020** [78] - 14:21, 14:25, 18:3, 26:22,

35:24, 44:3, 44:11, 54:6, 58:14, 60:5, 62:9, 63:4, 64:2, 64:5, 68:15, 68:16, 69:19, 71:14, 71:22, 75:6, 75:25, 76:3, 76:18, 78:9, 79:17, 79:18, 80:11, 80:19, 81:15, 81:16, 81:22, 83:16, 83:17, 83:23, 83:24, 84:18, 84:22, 84:25, 85:3, 86:5, 90:1, 90:3, 91:13, 92:22, 93:8, 93:23, 94:23, 95:11, 96:5, 96:17, 96:22, 97:8, 97:21, 98:18, 99:7, 99:12, 101:1, 101:2, 101:5, 103:15, 104:7, 105:2, 107:23, 108:9, 108:13, 108:15, 109:4, 111:21, 112:4, 126:23, 126:24, 132:4, 134:4, 134:15, 137:15
**2021** [7] - 15:1, 18:3, 31:7, 91:4, 93:12, 93:19, 139:15
**2023** [2] - 76:4, 134:13
**2024** [3] - 1:6, 70:18, 144:10
**20530** [1] - 1:16
**20th** [20] - 68:15, 69:8, 69:19, 76:24, 79:17, 81:15, 81:16, 81:22, 84:3, 84:4, 84:25, 85:3, 97:21, 99:7, 101:2, 111:21, 112:4, 138:25, 141:3
**21st** [2] - 140:15, 141:7
**22nd** [2] - 91:3, 144:10
**23andMe** [1] - 35:5
**23rd** [21] - 44:3, 62:9, 63:3, 75:7, 75:25, 76:18, 77:18, 77:21, 78:16, 80:11, 80:19, 80:20, 81:9, 84:18, 84:22, 89:17, 108:9, 109:4, 113:18, 113:19, 137:12
**24th** [1] - 44:10
**25** [1] - 72:9
**27** [1] - 3:12
**27.8** [1] - 23:1
**28th** [1] - 125:20
**2:00** [1] - 85:8
**2:05** [1] - 85:11

**2B1.1** [3] - 14:9, 123:2, 136:22
**2nd** [3] - 107:23, 125:20, 139:25

## 3

**3** [6] - 51:21, 98:15, 104:25, 133:2, 133:3, 136:22
**3-M** [1] - 107:15
**3-O** [1] - 90:20
**30** [3] - 3:5, 72:10, 116:1
**300** [2] - 36:23, 37:7
**31** [1] - 94:3
**333** [2] - 2:3, 144:14
**349** [4] - 22:9, 22:15, 23:3, 25:16
**350** [1] - 23:25
**354-3269** [2] - 2:4, 144:15
**3553(a)** [1] - 6:13
**3553(a)** [1] - 7:15
**36** [1] - 52:13
**3rd** [10] - 14:21, 75:6, 80:19, 83:16, 83:23, 86:5, 95:11, 95:12, 132:4, 137:15

## 4

**4** [4] - 77:14, 96:5, 104:25, 135:5
**40** [1] - 115:5
**444** [1] - 135:22
**447** [1] - 139:25
**45** [2] - 35:24, 36:4
**49** [1] - 3:8

## 5

**5** [6] - 3:14, 55:25, 60:21, 60:22, 71:6, 129:18
**50** [2] - 3:14, 36:23
**550** [1] - 1:25
**56** [1] - 125:23
**584** [1] - 139:24

## 6

**6** [1] - 100:4
**6-A2** [7] - 3:12, 26:19, 27:8, 27:10, 27:11, 35:17, 47:8
**6-X** [2] - 14:12, 29:24

**60.8** [1] - 23:3
**62** [1] - 3:15
**625** [1] - 1:24
**63** [1] - 3:16
**639** [1] - 137:2
**64** [1] - 3:17
**6706** [1] - 2:3
**69** [1] - 3:18
**6th** [3] - 64:5, 92:22, 93:7

## 7

**7** [3] - 51:14, 90:3, 91:13
**71** [1] - 3:19
**77** [1] - 3:20
**798** [1] - 131:20
**7th** [3] - 44:10, 98:18, 99:2

## 8

**8** [1] - 3:5
**8-K** [2] - 135:10, 139:18
**846** [1] - 140:12
**85** [1] - 3:8
**850** [1] - 1:21
**86** [1] - 72:5
**87** [1] - 72:6
**880** [1] - 135:21
**8th** [5] - 75:9, 80:4, 84:2, 103:15, 112:1

## 9

**9** [3] - 54:6, 71:22, 94:3
**90** [3] - 14:24, 47:11, 80:21
**90-day** [4] - 74:21, 81:21, 83:25, 137:17
**909957** [1] - 137:19
**926** [1] - 131:20
**9th** [1] - 71:14

## A

**a.m** [1] - 1:7
**aberrant** [1] - 76:15
**ability** [3] - 61:2, 122:22, 144:7
**able** [2] - 66:21, 86:24
**absence** [3] - 29:15, 29:17, 43:17

**absent** [1] - 48:24
**absolute** [2] - 76:16, 111:12
**absolutely** [11] - 57:4, 58:1, 61:4, 61:15, 67:5, 75:20, 79:23, 79:24, 99:4, 109:16, 111:23
**academic** - 9:2
**academy** [1] - 31:25
**accept** [3] - 99:1, 109:20, 116:13
**acceptable** - 23:6
**accepted** [1] - 11:2
**access** [3] - 57:13, 106:11, 136:4
**accomplish** [1] - 133:20
**according** [3] - 14:5, 14:6, 35:23
**account** [1] - 74:6
**accuracy** [2] - 89:22, 137:14
**accurate** [17] - 31:22, 33:11, 35:25, 36:7, 36:15, 37:11, 45:1, 45:2, 62:14, 63:9, 77:9, 92:19, 94:16, 95:19, 96:13, 101:10, 144:4
**accusations** [1] - 121:8
**accusing** [1] - 105:5
**acknowledge** [1] - 6:21
**act** [2] - 7:20, 56:16
**Act** [4] - 52:5, 52:7, 55:23
**acted** [1] - 94:6
**action** [1] - 30:19
**Action** [1] - 1:3
**actions** [5] - 105:6, 108:11, 109:6, 109:16, 119:15
**activities** [1] - 16:2
**activity** [3] - 16:20, 21:9, 118:24
**actual** [6] - 6:14, 12:16, 21:2, 23:11, 30:1, 112:12
**add** [1] - 76:2
**added** [1] - 48:2
**addition** [2] - 76:18, 79:17
**additional** [10] - 13:12, 22:2, 32:9, 48:17, 98:16, 119:15, 128:14, 129:8, 129:11, 130:12
**address** [2] - 38:24,

134:19
**addresses** [2] - 94:23, 108:23
**adds** [1] - 142:2
**adequacy** [2] - 89:22, 137:14
**adequate** [11] - 86:15, 89:11, 89:13, 103:15, 104:2, 105:17, 108:18, 110:1, 111:17, 111:20
**adequately** [3] - 73:16, 78:15, 88:20
**Administration** [1] - 101:19
**administrative** [1] - 108:13
**admission** [1] - 101:25
**admit** [9] - 11:20, 27:8, 60:18, 62:17, 63:12, 64:18, 69:21, 70:24, 77:11
**adopt** [1] - 27:4
**adopted** [1] - 11:4
**advice** [1] - 59:25
**advised** [2] - 122:11, 122:13
**affect** [1] - 21:19
**affected** [4] - 18:22, 19:7, 19:12, 37:13
**affecting** [2] - 38:13, 133:13
**affects** [1] - 39:22
**affidavit** [5] - 76:25, 84:2, 102:5, 102:8, 102:13
**affirmatively** [1] - 78:3
**afford** [2] - 128:15, 129:22
**afternoon** [4] - 49:23, 50:2, 86:2, 86:3
**afterwards** [3] - 17:12, 78:4, 78:7
**age** [1] - 55:2
**aggregate** [2] - 39:3, 39:15
**ago** [1] - 26:2
**agree** [18] - 6:6, 7:5, 17:21, 44:13, 44:19, 45:13, 46:4, 78:5, 86:4, 131:7, 131:8, 131:11, 132:1, 132:3, 136:5, 137:6, 142:14
**agreement** [1] - 103:4
**ahead** [4] - 67:7, 114:9, 127:11, 137:3

**aid** [1] - 143:1
**airlines** [1] - 58:19
**Alberta** [1] - 30:22
**alert** [3] - 64:1, 64:9, 65:3
**Alert** [1] - 64:11
**alerted** [1] - 67:3
**alias** [1] - 105:3
**aliases** [2] - 129:8, 130:12
**allegation** [1] - 102:19
**allegations** [6] - 98:25, 139:4, 139:5, 139:7, 141:25, 142:1
**allegedly** [1] - 134:16
**allow** [4] - 43:13, 66:13, 67:25, 73:18
**allowed** [1] - 51:20
**allows** [1] - 55:15
**almost** [2] - 53:13, 72:6
**aloud** [1] - 102:14
**alternative** [2] - 16:19, 55:15
**ambiguity** [1] - 17:5
**America** [2] - 4:2, 85:17
**AMERICA** [1] - 1:3
**Ameritrade** [8] - 50:21, 58:1, 58:2, 66:9, 72:8, 73:5, 73:9, 111:11
**amount** [25] - 5:5, 5:15, 6:4, 14:18, 16:5, 21:21, 22:11, 22:14, 22:24, 23:6, 29:24, 46:21, 46:23, 53:11, 57:24, 74:12, 80:13, 80:16, 81:17, 81:23, 84:21, 84:24, 119:1, 119:5, 120:5
**amounts** [4] - 6:1, 7:9, 21:24, 84:8
**analyses** [1] - 13:12
**analysis** [42] - 18:7, 18:14, 19:8, 19:10, 20:5, 20:10, 23:9, 27:15, 29:6, 29:8, 29:10, 29:21, 41:11, 43:1, 43:10, 43:11, 44:1, 45:3, 45:15, 45:16, 45:20, 46:8, 62:12, 71:17, 79:9, 81:23, 105:7, 106:15, 107:5, 107:9, 109:23, 110:6, 110:15, 117:21, 118:10, 119:1, 119:18, 120:2,

120:3, 122:19, 122:25, 141:2
**announced** [4] - 44:4, 101:13, 139:18, 140:1
**announcement** [2] - 137:21, 138:2
**annual** [1] - 83:12
**anonymous** [1] - 136:2
**anonymously** [2] - 136:1, 136:9
**answer** [9] - 35:11, 85:3, 88:3, 92:1, 99:21, 106:13, 106:14, 107:14
**answered** [5] - 16:17, 17:7, 33:3, 104:9, 106:23
**answering** [1] - 21:13
**answers** [1] - 133:19
**ante** [1] - 48:13
**anticipated** [1] - 8:5
**apart** [1] - 48:17
**apfilings@sec.gov** [1] - 91:14
**apologies** [1] - 4:22
**apologize** [1] - 5:1
**apparent** [1] - 33:3
**appeal** [7] - 99:4, 99:8, 119:6, 127:25, 133:4, 135:20, 137:20
**appealing** [4] - 99:3, 110:20, 110:23, 127:18
**appeals** [1] - 122:7
**appear** [2] - 5:17, 5:20
**appearance** [1] - 31:3
**appearances** [2] - 1:13, 53:1
**appeared** [2] - 24:5, 52:13, 52:14
**append** [2] - 65:13, 65:15
**appended** [6] - 68:25, 75:11, 79:25, 104:1, 109:25, 114:14
**appending** [1] - 103:14
**Apple** [2] - 57:9, 58:5
**application** [5] - 6:16, 14:8, 117:19, 117:24, 119:19
**applications** [1] - 101:18
**applied** [9] - 13:8, 86:7, 86:10, 112:10,

113:25, 114:12, 114:17, 114:20, 142:15
**applies** [4] - 40:7, 40:9, 122:6
**apply** [2] - 48:6, 120:23
**applying** [1] - 12:13
**appreciate** [3] - 142:18, 142:23, 142:24
**appreciated** [1] - 130:18
**appreciating** [1] - 130:7
**approach** [4] - 18:18, 20:22, 40:15, 59:3
**approached** [1] - 36:20
**appropriate** [3] - 16:10, 21:2, 100:13
**approximation** [1] - 25:11
**April** [28] - 44:3, 44:10, 58:14, 62:8, 63:3, 64:2, 75:7, 75:25, 76:18, 77:18, 77:21, 78:16, 80:11, 80:19, 80:20, 81:9, 83:16, 83:23, 84:18, 84:22, 89:17, 90:1, 108:9, 109:4, 113:18, 113:19, 134:17, 137:12
**arbitrations** [2] - 52:13, 53:8
**archive** [2] - 68:19, 69:18
**area** [5] - 9:16, 12:5, 16:9, 51:25, 87:15
**areas** [1] - 9:22
**argued** [1] - 135:17
**argument** [1] - 140:5
**arguments** [1] - 5:22
**arise** [1] - 7:21
**arising** [1] - 53:12
**armed** [1] - 73:20
**article** [4] - 33:19, 33:22, 33:24, 34:4
**article's** [1] - 33:25
**artificial** [1] - 48:25
**ascribe** [1] - 120:20
**ascribing** [1] - 121:8
**aside** [2] - 40:19, 116:9
**assertion** [3] - 94:25, 99:1, 109:20
**assess** [6] - 26:4, 26:6, 118:17, 118:25, 119:22, 119:25

**assessing** [2] - 53:4, 117:25
**assessment** [2] - 117:21, 120:4
**Asset** [1] - 33:20
**asset** [5] - 19:18, 20:11, 20:20, 27:23, 57:18
**assigned** [1] - 112:22
**associated** [3] - 21:15, 108:11, 122:25
**associating** [1] - 42:24
**assume** [1] - 142:11
**assumption** [2] - 120:11, 120:15
**assure** [1] - 73:19
**assymetric** [3] - 120:12, 120:18, 136:4
**attach** [1] - 126:15
**attached** [4] - 63:2, 102:5, 107:12, 117:9
**attack** [4] - 104:18, 106:1, 109:13, 128:2
**attacking** [1] - 106:21
**attempt** [2] - 40:18, 41:11
**attempts** [5] - 121:23, 121:25, 135:14, 135:19, 138:8
**attributable** [1] - 23:12
**attribute** [1] - 136:9
**auditing** [1] - 135:11
**August** [2] - 125:20, 137:19
**authority** [1] - 113:7
**authorized** [3] - 24:18, 24:20, 51:1
**authors** [1] - 33:24
**automatically** [1] - 113:12
**available** [13] - 5:20, 15:10, 24:2, 42:2, 84:5, 91:22, 92:25, 93:2, 93:6, 93:7, 93:9, 93:12, 138:14
**Avenue** [4] - 1:16, 1:24, 2:3, 144:14
**average** [21] - 13:20, 13:23, 13:25, 14:22, 14:23, 15:1, 25:14, 34:18, 39:6, 39:16, 40:10, 54:18, 66:4, 74:19, 74:20, 80:18, 81:20, 83:15, 83:22, 126:10
**averaged** [2] - 39:5,

40:3
**averaging** [1] - 39:24
**avoid** [1] - 67:6
**aware** [10] - 16:8, 28:22, 28:25, 61:16, 93:22, 103:1, 103:6, 104:14, 112:22, 125:18
**axes** [1] - 42:22

**B**

**bachelor's** [1] - 9:3
**back-and-forth** [1] - 6:2
**background** [2] - 5:6, 7:15
**bakes** [1] - 43:5
**baking** [1] - 130:5
**bang** [1] - 60:15
**bank** [3] - 135:6, 135:9, 138:15
**based** [20] - 15:9, 19:9, 49:1, 54:18, 55:19, 57:24, 58:13, 60:2, 69:2, 72:11, 72:18, 75:15, 80:5, 83:14, 89:21, 93:8, 94:14, 97:24, 112:7, 116:13
**baseless** [1] - 128:12
**baseline** [2] - 17:16, 47:22
**basic** [2] - 51:13, 119:24
**basics** [1] - 51:15
**basis** [4] - 6:18, 88:8, 109:21, 120:19
**basket** [1] - 28:10
**Bayer** [1] - 11:1
**became** [1] - 50:20
**become** [2] - 47:1, 52:2
**becomes** [1] - 112:22
**BEFORE** [1] - 1:10
**began** [5] - 128:8, 129:19, 132:1, 132:3, 133:24
**begin** [2] - 131:6, 131:25
**beginning** [4] - 15:20, 22:7, 23:2, 75:6
**behalf** [5] - 4:13, 30:11, 30:16, 30:18, 49:19
**behind** [1] - 4:18
**beliefs** [1] - 121:5

**bell** [1] - 133:2
**below** [5] - 36:9, 36:10, 37:4, 37:8, 109:1
**bench** [2] - 4:18, 58:23
**beneficial** [2] - 124:18
**benefit** [1] - 126:24
**BERMAN** [1] - 1:6
**Berman** [34] - 4:3, 4:13, 4:21, 4:23, 6:15, 6:19, 23:7, 30:12, 49:20, 85:17, 89:3, 92:12, 92:21, 95:13, 96:6, 97:12, 97:17, 98:24, 102:5, 102:8, 102:15, 102:19, 103:18, 104:14, 105:2, 105:6, 109:17, 110:6, 125:2, 129:6, 131:2, 132:17, 135:24, 136:10
**Berman's** [7] - 92:9, 96:15, 99:8, 102:12, 134:23, 136:7, 141:8
**besmirch** [1] - 125:13
**best** [3] - 57:13, 92:18, 144:7
**better** [2] - 22:13, 132:9
**between** [21] - 18:20, 19:15, 19:21, 20:16, 20:25, 21:4, 29:10, 29:13, 29:16, 34:6, 37:19, 38:8, 38:15, 43:12, 54:3, 86:12, 105:2, 109:3, 120:18, 139:20
**beware** [2] - 114:7, 140:21
**beyond** [5] - 20:3, 95:3, 100:10, 118:5, 130:2
**big** [1] - 139:20
**bigger** [1] - 60:15
**Bikundi** [1] - 131:20
**bill** [1] - 12:20
**binder** [3] - 58:23, 58:25, 63:21
**biotech** [21] - 28:5, 28:14, 28:20, 29:11, 29:17, 29:19, 34:12, 34:20, 37:18, 37:22, 37:23, 38:1, 38:3, 38:11, 39:6, 39:7, 40:14, 41:25, 42:8, 43:3
**biotech's** [1] - 40:17

**biotech-relevant** [1] - 39:7
**biotechnology** [10] - 26:23, 28:4, 28:5, 28:6, 28:18, 33:6, 34:23, 35:1, 36:13, 39:4
**biotechs** [1] - 34:14
**bit** [13] - 5:18, 23:15, 32:3, 32:6, 39:8, 44:23, 51:11, 55:4, 66:11, 71:17, 81:11, 81:18, 81:24
**blames** [1] - 102:21
**blinking** [1] - 141:4
**blinking-red** [1] - 141:4
**blog** [1] - 59:25
**blood** [2] - 95:25, 96:1
**Bloomberg** [1] - 26:25
**Blue** [7] - 54:5, 71:8, 71:11, 71:19, 72:2, 106:11
**board** [1] - 24:19
**boards** [2] - 126:5, 129:9
**body** [2] - 52:4, 129:12
**bones** [3] - 111:8, 112:10
**books** [1] - 25:1
**bottom** [7] - 98:18, 101:8, 101:12, 107:22, 112:21, 115:2, 134:22
**bought** [1] - 24:1
**Boyer** [7] - 4:8, 11:15, 14:11, 90:19, 91:5, 92:6, 104:25
**BRANDON** [1] - 1:19
**Brandon** [1] - 49:20
**break** [3] - 49:16, 82:17, 85:7
**breakdown** [1] - 71:15
**Brendan** [1] - 4:18
**brief** [8] - 8:6, 97:23, 99:25, 111:1, 133:9, 136:3, 141:12, 142:20
**briefing** [6] - 98:22, 116:14, 124:22, 124:23, 139:3, 142:24
**briefly** [7] - 9:1, 10:21, 11:8, 21:23, 70:9, 116:17, 125:4
**bright** [1] - 140:20
**bring** [1] - 11:15
**bringing** [1] - 11:13

**brings** [1] - 135:16
**broadly** [1] - 56:2
**broker** [20] - 50:23, 50:24, 50:25, 55:1, 55:9, 56:23, 57:2, 61:23, 65:20, 66:10, 66:13, 71:10, 71:12, 72:7, 72:16, 72:18, 78:1, 80:2, 114:17, 141:1
**broker-dealer** [7] - 50:25, 55:1, 56:23, 66:10, 71:12, 72:16, 114:17
**broker-dealers** [1] - 50:23, 50:24, 57:2, 61:23, 66:13, 71:10, 72:7, 72:18, 78:1, 80:2, 141:1
**brokers** [1] - 55:16
**brought** [2] - 7:3, 21:14
**BS** [1] - 50:7
**buck** [1] - 60:16
**bullet** [1] - 113:5, 113:6
**burden** [4] - 131:17, 131:18, 132:24
**BURLING** [1] - 1:21
**Burling** [1] - 131:1
**Business** [1] - 9:5
**business** [3] - 11:5, 11:9, 58:2
**busy** [1] - 5:12
**but..** [1] - 107:18
**buy** [10] - 54:25, 56:24, 57:14, 58:5, 65:24, 67:2, 115:9, 132:19, 140:15
**Buy** [1] - 55:3
**buyer** [1] - 114:7
**buyers** [1] - 140:20
**buying** [6] - 22:20, 58:20, 60:10, 72:22, 132:18, 141:7
**BY** [62] - 2:1, 8:22, 9:11, 11:17, 12:7, 14:13, 15:15, 18:10, 25:25, 26:20, 27:13, 30:8, 30:14, 35:15, 35:22, 45:23, 50:1, 53:22, 56:19, 59:20, 60:24, 62:6, 62:24, 63:23, 64:24, 67:17, 68:3, 68:14, 69:6, 70:3, 70:10, 71:7, 72:1, 74:1, 74:24, 77:4, 79:14, 80:10, 81:14, 82:6, 84:7, 86:1, 88:11, 90:21,

91:10, 91:18, 92:8, 95:10, 96:4, 97:6, 99:23, 100:17, 102:17, 104:10, 104:13, 105:1, 107:3, 113:2, 115:7, 117:3, 118:9, 121:14

## C

**calculate** [9] - 13:18, 74:15, 83:15, 84:11, 105:19, 105:21, 106:3, 106:10, 133:16
**calculated** [6] - 14:23, 15:1, 53:11, 80:16, 82:1, 106:7
**calculating** [3] - 20:22, 22:10, 25:13
**calculation** [9] - 12:15, 13:14, 13:17, 18:8, 18:25, 19:5, 21:22, 29:25, 82:2
**calculations** [11] - 13:9, 16:5, 40:22, 53:13, 75:15, 80:14, 83:17, 83:25, 133:15, 140:11, 141:11
**California** [1] - 11:2
**cannot** [4] - 89:12, 96:7, 125:2, 135:1
**cap** [7] - 25:22, 34:18, 55:12, 57:20, 57:21
**capital** [1] - 51:6
**Capital** [1] - 10:22
**capitalization** [8] - 25:23, 36:14, 36:19, 54:18, 54:21, 55:25, 57:21, 57:22
**caps** [2] - 34:14
**captured** [4] - 22:22, 43:10, 111:24, 123:16
**captures** [1] - 25:22
**career** [4] - 50:11, 50:15, 51:9, 52:2
**carefully** [1] - 36:21
**Carl** [2] - 98:2, 98:7
**Carlisle** [2] - 98:5, 98:6
**Carlton** [1] - 98:4
**case** [40] - 6:20, 7:3, 10:23, 11:12, 11:13, 23:7, 30:20, 30:21, 30:22, 32:25, 39:4, 66:2, 66:19, 70:5, 74:12, 75:4, 76:17, 79:1, 86:4, 87:12, 87:23, 113:15,

119:16, 119:22, 131:21, 134:18, 134:25, 135:1, 135:16, 135:20, 136:8, 137:1, 138:1, 138:4, 138:14, 138:17, 139:12, 139:13, 140:12, 142:13
**Case** [2] - 4:2, 85:16
**cases** [8] - 10:16, 32:22, 32:24, 53:10, 53:13, 84:15, 134:20, 137:16
**cash** [3] - 24:25, 32:19, 46:15
**cashed** [1] - 24:12
**causation** [1] - 132:14
**caused** [4] - 14:5, 14:6, 21:6, 23:6
**causes** [1] - 78:1
**causing** [1] - 119:17
**caution** [2] - 115:15, 115:19
**caveat** [29] - 65:15, 66:7, 66:17, 67:8, 67:20, 72:22, 73:2, 74:5, 75:10, 77:25, 79:25, 84:3, 103:14, 104:1, 109:24, 111:8, 111:18, 112:10, 112:20, 112:21, 113:24, 114:14, 114:18, 114:25, 115:2, 117:5, 117:10, 117:15, 126:16
**center** [1] - 66:22
**cents** [11] - 14:23, 15:2, 15:4, 35:24, 36:4, 36:23, 47:12, 83:24, 129:18, 133:2, 133:3
**CEO** [2] - 114:3, 115:20
**certain** [5] - 46:21, 53:24, 57:11, 89:25, 98:12
**certainly** [10] - 7:14, 34:9, 36:11, 38:12, 105:21, 119:9, 119:10, 122:16, 122:20, 127:16
**certainty** [1] - 37:5
**Certificate** [1] - 91:11
**CERTIFICATE** [1] - 144:1
**certified** [2] - 91:7, 118:6

**certify** [3] - 12:1, 91:12, 144:4
**cetera** [1] - 54:19
**chairman** [1] - 108:1
**challenging** [1] - 111:1
**chance** [2] - 70:11, 70:14
**change** [12] - 13:2, 23:12, 28:14, 40:10, 43:4, 46:17, 78:2, 81:17, 81:23, 81:25, 107:14, 129:22
**changed** [2] - 45:7
**changes** [15] - 19:24, 20:16, 23:19, 23:22, 28:4, 28:16, 38:10, 41:18, 43:2, 43:3, 44:25, 45:4, 65:14, 81:18, 81:24
**channels** [1] - 67:4
**characteristic** [1] - 65:14
**characterize** [2] - 39:12, 109:14
**characterized** [2] - 17:22, 26:12
**charge** [1] - 109:21
**charging** [1] - 106:8
**Charles** [1] - 66:9
**chart** [16] - 16:3, 26:21, 26:25, 27:4, 35:16, 35:23, 36:2, 36:5, 42:7, 43:21, 43:24, 44:1, 44:3, 44:16, 79:11
**charts** [1] - 68:23
**chat** [1] - 7:9
**check** [4] - 31:10, 33:12, 35:3, 37:8
**chief** [2] - 50:18, 51:18, 72:9, 73:11, 76:8, 92:12
**choice** [1] - 41:22
**choices** [2] - 58:3, 73:18
**choose** [2] - 17:2, 111:19
**chooses** [1] - 110:2
**choosing** [1] - 103:21
**chose** [4] - 97:20, 98:24, 106:8, 112:6
**Christopher** [1] - 4:7
**CHRISTOPHER** [1] - 1:14
**Circuit** [4] - 131:20, 135:21, 138:17, 140:12
**circulated** [1] -

125:25
**circulates** [1] - 127:21
**circulating** [1] - 127:25
**circumstances** [2] - 6:13, 45:7
**cite** [1] - 135:1
**cited** [1] - 33:19
**claim** [5] - 108:17, 111:19, 112:4, 126:12, 126:21
**claiming** [2] - 127:5, 127:12
**claims** [1] - 128:19
**clarify** [3] - 42:1, 70:18, 79:15
**class** [2] - 30:19, 57:19
**classification** [3] - 41:2, 41:3, 41:5
**Clayton** [1] - 108:1
**clear** [6] - 75:5, 75:7, 77:2, 77:22, 119:12
**clearly** [5] - 78:1, 78:16, 81:9, 89:16, 103:13
**clerks** [1] - 139:7
**click** [1] - 73:1
**client's** [1] - 6:8
**clients** [1] - 52:25
**clinical** [1] - 128:14
**close** [1] - 119:1
**closely** [2] - 122:23, 142:1
**closest** [2] - 29:2, 111:23
**closing** [8] - 13:4, 14:19, 14:22, 35:24, 36:3, 42:22, 42:23, 43:2
**codes** [1] - 41:6
**coefficient** [1] - 43:14
**coerced** [1] - 105:13
**cognizant** [1] - 103:4
**coherent** [1] - 41:7
**collaborate** [1] - 67:18
**collapse** [1] - 129:24
**colleague** [2] - 10:5, 49:21
**colleagues** [2] - 4:15, 7:19
**collect** [2] - 13:1, 13:21
**collected** [2] - 13:3, 13:6
**collectively** [1] - 71:11

**collides** [1] - 140:6
**Collins** [3] - 4:13, 5:2, 124:1
**COLLINS** [19] - 1:17, 4:12, 5:4, 6:6, 6:11, 7:11, 7:17, 7:24, 8:13, 49:14, 49:19, 100:8, 115:25, 116:4, 116:11, 124:6, 124:10, 124:12, 124:21
**colloquy** [1] - 6:23
**colluding** [1] - 102:23
**COLUMBIA** [1] - 1:1
**Columbia** [6] - 2:2, 9:5, 9:13, 144:13
**column** [1] - 44:17
**comfortable** [1] - 17:6
**coming** [5] - 7:18, 39:20, 52:17, 59:15, 73:3
**Comment** [1] - 136:22
**comments** [1] - 121:1
**Commission** [4] - 61:11, 62:9, 108:14, 126:24
**committed** [1] - 103:19
**commodities** [1] - 51:21
**Commodity** [1] - 52:6
**common** [25] - 10:2, 32:15, 32:22, 32:23, 33:4, 39:17, 39:22, 40:12, 45:24, 46:2, 46:11, 46:13, 46:22, 46:24, 47:1, 47:2, 76:2, 82:11, 82:14, 82:18, 82:21, 83:9, 83:11, 132:11
**community** [1] - 125:25
**companies** [40] - 22:3, 26:8, 28:23, 29:3, 33:15, 34:11, 34:13, 34:19, 34:20, 34:21, 35:1, 35:2, 35:5, 35:6, 35:13, 35:14, 38:7, 38:8, 38:20, 39:1, 39:3, 39:10, 39:13, 39:18, 39:21, 39:22, 39:23, 40:2, 40:5, 40:8, 40:9, 40:12, 40:14, 40:18, 41:7, 41:8, 50:22,

56:6, 127:5, 127:11
**companion** [1] -
61:21
**company** [34] - 13:7,
18:1, 19:24, 22:18,
24:10, 24:25, 25:1,
33:2, 38:18, 39:5,
39:14, 39:15, 42:18,
46:2, 46:17, 54:25,
65:4, 67:13, 76:9,
82:14, 82:22, 101:16,
108:12, 109:7,
115:20, 115:21,
117:13, 117:16,
125:7, 125:9, 130:14,
138:21, 139:17, 140:1
**company's** [4] -
21:4, 61:3, 126:3,
130:2
**comparable** [1] -
34:15
**comparator** [3] -
28:11, 37:18, 45:19
**compare** [5] - 37:21,
38:6, 43:23, 131:12,
139:7
**compared** [3] - 38:7,
74:20, 120:9
**comparing** [1] - 38:8
**comparison** [3] -
13:20, 43:25, 130:17
**complete** [8] - 12:25,
48:21, 68:13, 130:10,
131:15, 139:10,
141:15, 144:6
**completely** [1] -
134:20
**completion** [1] - 78:6
**complex** [2] - 53:16,
53:20
**compliance** [10] -
50:10, 50:14, 50:16,
50:18, 50:19, 50:21,
51:18, 72:9, 73:11,
76:8
**compliance/chief** [1]
- 50:20
**compute** [1] - 13:23
**conceal** [3] - 135:14,
135:19, 138:8
**concept** [1] - 117:7
**concern** [3] - 26:14,
38:25, 127:25
**concerned** [1] -
108:5
**concerning** [5] -
13:7, 15:20, 16:25,
29:19, 101:16
**concerns** [1] - 113:9
**conclude** [2] - 21:5,

118:22
**concluded** [3] - 20:2,
21:1, 143:6
**conclusion** [4] -
37:15, 46:18, 84:17,
84:20
**conclusions** [2] -
48:11, 84:9
**conditions** [5] - 45:9,
45:11, 118:1, 118:3,
118:11
**conduct** [14] - 16:25,
19:9, 20:9, 29:6,
122:19, 125:16,
128:1, 128:14,
128:24, 129:4,
129:11, 129:13,
130:11, 137:24
**conducted** [1] -
120:4
**conducting** [2] -
118:10, 119:18
**conference** [3] -
6:24, 85:9, 134:12
**confirmatory** [1] -
113:21
**conflict** [2] - 5:18,
128:18
**confounding** [3] -
132:13, 133:13,
133:18
**confused** [1] - 81:2
**Connecticut** [2] -
139:24, 139:25
**connection** [3] -
10:19, 18:13, 31:13
**consequence** [1] -
75:23
**consider** [3] - 51:25,
74:25, 119:3
**consideration** [1] -
32:18
**considering** [1] -
45:11
**consist** [1] - 39:1
**consistent** [9] -
29:15, 34:3, 34:25,
36:5, 42:5, 42:13,
44:9, 44:12, 133:23
**consistently** [4] -
26:11, 40:11, 40:12,
45:4
**consisting** [1] - 28:6
**consists** [1] - 40:14
**constitute** [2] -
105:17, 119:7
**constitutes** [2] -
103:15, 144:4
**Constitution** [2] -
2:3, 144:14

**constructed** [1] -
34:23
**constructing** [1] -
41:16
**consult** [2] - 123:3,
124:7
**consulted** [1] - 33:1
**Consulting** [1] -
52:20
**consulting** [6] - 11:5,
11:10, 11:14, 31:8,
52:24
**contain** [6] - 46:10,
71:12, 83:8, 95:16,
96:8, 97:1
**contained** [6] -
92:17, 93:18, 138:23,
138:24, 139:21, 142:3
**contemplated** [1] -
21:25
**contemplating** [1] -
11:12
**content** [1] - 57:8
**continue** [5] - 49:17,
79:13, 95:8, 125:13,
127:24
**continued** [11] -
77:23, 78:6, 78:20,
104:5, 104:11, 119:8,
125:10, 128:11,
128:24, 135:9, 136:1
**continuing** [1] -
128:3
**contract** [1] - 12:19
**contrast** [1] - 139:20
**contravene** [1] -
134:21
**controls** [1] - 74:3
**conversion** [2] -
46:25, 83:1
**conversions** [4] -
32:11, 82:9, 83:13
**convert** [1] - 46:22
**converted** [3] -
24:10, 32:15, 82:25
**convertible** [2] -
32:14, 32:20
**converting** [6] -
32:20, 46:1, 46:12,
82:13, 82:20, 83:10
**convince** [1] -
121:23
**convinced** [4] -
104:14, 104:17,
105:25, 106:16
**convincing** [1] -
133:1
**cool** [1] - 98:14
**copies** [1] - 100:5
**copy** [9] - 11:18,

35:19, 62:14, 63:9,
64:1, 70:17, 77:9,
91:12, 100:19
**core** [1] - 130:13
**coronavirus** [2] -
95:14, 96:7
**Corp** [4] - 92:13,
92:16, 107:22, 108:6
**corporate** [4] -
120:8, 120:12,
120:14, 121:2
**correct** [107] - 5:3,
14:10, 20:6, 20:8,
23:14, 24:17, 25:12,
25:18, 31:6, 31:11,
31:13, 31:14, 31:25,
33:9, 33:12, 33:14,
33:18, 35:4, 38:21,
40:6, 40:25, 42:9,
44:8, 44:11, 44:21,
46:3, 47:17, 53:3,
55:18, 69:9, 69:11,
76:5, 79:19, 79:20,
82:15, 82:22, 86:5,
86:9, 86:11, 87:6,
87:14, 87:21, 87:24,
89:20, 89:24, 90:2,
90:4, 90:8, 90:9,
91:12, 91:20, 92:17,
92:21, 92:24, 93:15,
93:16, 93:20, 93:21,
94:11, 94:17, 94:20,
94:21, 95:22, 95:23,
96:16, 96:20, 97:2,
97:9, 97:18, 98:1,
98:16, 98:23, 98:25,
99:13, 100:2, 101:4,
101:6, 101:7, 102:1,
102:2, 102:4, 102:6,
103:3, 108:10,
108:24, 112:8,
112:14, 112:16,
112:18, 113:3, 113:9,
113:10, 113:14,
113:20, 114:1, 114:2,
114:21, 114:25,
115:17, 115:21,
117:23, 118:2,
121:16, 122:2, 123:3,
128:25, 136:13
**corrective** [3] -
48:21, 101:20, 125:1
**correlated** [5] - 28:3,
28:14, 37:16, 40:11,
43:15
**correlation** [7] -
20:15, 29:9, 29:13,
29:17, 38:14, 43:12,
43:18
**Counsel** [1] - 4:4

**counsel** [8] - 4:8,
11:12, 54:2, 54:3,
71:18, 75:1, 116:3,
124:9
**counter** [11] - 28:20,
28:21, 33:8, 33:16,
33:25, 40:23, 54:10,
54:12, 54:14, 54:23,
56:20
**counterfactual** [1] -
18:5
**couple** [5] - 6:12,
28:9, 53:8, 82:7,
126:22
**course** [8] - 40:6,
46:8, 105:14, 124:20,
125:19, 126:8,
126:14, 126:19
**court** [5] - 10:15,
10:19, 30:16, 52:15,
52:16
**COURT** [130] - 1:1,
4:11, 4:20, 5:23, 6:7,
7:8, 7:16, 7:22, 7:25,
8:10, 8:15, 8:19, 9:8,
11:23, 12:4, 15:5,
15:14, 16:6, 17:9,
18:9, 23:23, 24:14,
25:5, 25:24, 27:10,
30:5, 30:10, 30:13,
35:10, 47:6, 47:14,
47:18, 48:9, 49:1,
49:4, 49:7, 49:10,
49:13, 49:17, 49:23,
53:18, 56:8, 56:18,
59:1, 59:5, 59:8,
59:11, 60:8, 60:21,
62:20, 62:23, 63:15,
64:21, 65:23, 66:3,
67:1, 67:9, 67:15,
68:2, 68:12, 69:24,
71:2, 77:14, 77:17,
78:5, 78:18, 78:21,
79:1, 79:13, 80:24,
81:2, 81:10, 81:13,
82:4, 85:6, 85:18,
85:22, 88:8, 88:10,
91:16, 92:5, 95:5,
95:7, 97:5, 99:18,
99:21, 100:7, 100:12,
102:16, 104:12,
104:24, 112:25,
115:4, 115:24, 116:2,
116:6, 116:9, 116:15,
116:18, 116:21,
118:8, 121:11,
123:23, 124:1, 124:8,
124:11, 124:20,
124:23, 126:8,
126:20, 127:20,

128:18, 129:21,
130:22, 130:24,
132:1, 132:7, 132:21,
132:25, 134:1, 134:8,
136:11, 136:24,
137:3, 138:1, 138:17,
141:9, 142:17,
142:21, 142:23
  **Court** [31] - 2:1, 2:2,
5:11, 5:12, 5:14, 6:23,
8:8, 9:2, 10:25, 11:3,
12:24, 14:16, 18:11,
19:8, 59:4, 74:9,
78:11, 102:14,
105:23, 116:12,
116:13, 124:15,
124:22, 125:12,
125:18, 131:3, 131:4,
135:23, 144:12,
144:13
  **Court's** [9] - 33:3,
45:22, 67:22, 82:3,
116:1, 123:21,
124:16, 124:18, 130:8
  **COURTROOM** [3] -
4:1, 59:15, 85:15
  **courts** [3] - 133:7,
137:16, 138:12
  **COVID** [3] - 75:6,
79:7, 127:6
  **COVID-19** [8] -
58:16, 64:12, 95:25,
101:15, 101:17,
102:1, 127:1, 127:4
  **COVID-related** [1] -
127:6
  **COVINGTON** [1] -
1:21
  **Covington** [3] - 4:13,
4:16, 131:1
  **CPAG** [1] - 27:2
  **craze** [1] - 78:25
  **credible** [1] - 61:9
  **Credit** [1] - 10:23
  **CREF** [1] - 50:19
  **crime** [8] - 87:2,
87:9, 87:14, 87:20,
87:22, 103:19,
103:20, 125:8
  **criminal** [3] - 31:4,
31:8, 129:13
  **Criminal** [4] - 1:3,
1:15, 4:2, 85:16
  **criteria** [4] - 28:22,
35:4, 36:16, 40:15
  **critical** [1] - 125:9
  **Cross** [2] - 3:3, 33:20
  **CROSS** [2] - 30:7,
85:24
  **cross** [2] - 85:18,

122:9
  **CROSS-
EXAMINATION** [2] -
30:7, 85:24
    **cross-examination**
[2] - 85:18, 122:9
  **Cross-Section** [1] -
33:20
  **crossbones** [9] -
65:16, 66:4, 66:8,
67:25, 68:4, 114:8,
126:13, 140:17,
140:18
  **CRR** [3] - 2:1, 144:3,
144:12
  **cryptocurrencies** [1]
- 79:3
  **culpability** [1] - 6:8
  **cure** [1] - 95:15
  **current** [5] - 11:18,
51:8, 52:18, 52:22,
61:10
  **curve** [1] - 133:2
  **customer** [1] - 76:12
  **customers** [5] - 51:3,
51:6, 71:14, 71:15,
73:14
  **CV** [2] - 11:18, 31:19
  **cybercriminals** [1] -
102:23

# D

  **D.C** [7] - 1:6, 1:16,
1:22, 1:25, 2:4,
131:20, 144:14
  **daily** [4] - 20:16,
23:19, 23:22, 54:18
  **damage** [1] - 106:10
  **damages** [3] - 53:13,
105:22, 106:7
  **danger** [6] - 36:9,
67:7, 110:3, 111:5,
114:9, 129:25
  **dangerous** [4] -
72:19, 73:17, 73:21,
104:3
  **dangers** [1] - 78:15
  **Dark** [1] - 33:20
  **data** [13] - 13:1, 13:3,
13:4, 13:7, 14:19,
22:1, 24:5, 26:25,
29:5, 36:5, 40:22,
41:13, 71:18
  **database** [1] - 13:4
  **date** [56] - 15:17,
15:21, 16:1, 16:19,
16:22, 17:2, 17:3,
17:4, 64:3, 69:15,

70:19, 71:21, 72:6,
75:17, 75:24, 76:22,
77:2, 79:18, 79:21,
79:22, 80:11, 80:19,
80:20, 81:9, 81:15,
86:12, 86:13, 86:17,
86:19, 89:3, 89:7,
89:8, 90:14, 91:2,
91:6, 91:19, 91:23,
97:20, 97:23, 100:18,
100:23, 100:25,
101:15, 112:3, 112:6,
112:9, 112:12,
112:17, 118:18,
118:21, 118:24,
123:8, 135:9, 143:2
  **dated** [2] - 62:8,
63:3, 107:23, 108:14,
109:3
  **Dated** [1] - 144:10
  **dates** [13] - 15:9,
15:13, 21:8, 21:11,
74:23, 75:16, 76:19,
80:8, 84:1, 85:2, 89:9,
123:16, 142:13
  **Daubert** [2] - 10:24,
11:3
  **days** [5] - 14:24,
47:11, 57:11, 80:21,
106:11
  **deal** [2] - 82:8, 110:8
  **dealer** [9] - 50:25,
55:1, 55:6, 56:23,
66:10, 71:12, 72:16,
114:17
  **dealer-to-dealer** [1] -
55:6
  **dealers** [11] - 50:23,
50:24, 57:2, 61:23,
66:13, 71:10, 72:7,
72:18, 78:1, 80:2,
141:1
  **dealing** [1] - 77:24
  **deals** [1] - 51:5
  **debt** [2] - 24:10,
24:24
  **deceitful** [1] - 94:6
  **December** [7] -
14:21, 14:25, 17:6,
129:1, 130:1, 134:4,
134:17
  **decide** [3] - 58:4,
58:5, 61:12
  **decided** [2] - 137:1,
137:19
  **Decision** [36] - 13:7,
18:16, 20:17, 20:25,
22:2, 23:12, 23:20,
26:8, 26:12, 26:22,
27:15, 28:3, 28:14,

28:20, 29:4, 29:10,
29:14, 29:16, 29:18,
34:15, 37:12, 37:20,
37:22, 38:13, 38:16,
43:2, 45:5, 63:2,
92:13, 92:15, 107:22,
108:5, 108:12,
125:10, 127:13,
128:13
  **decision** [1] - 79:12
  **decisions** [2] - 58:8,
115:16, 115:20
  **declaration** [1] - 77:5
  **decline** [4] - 13:13,
14:5, 21:5, 26:14
  **DECN** [51] - 6:15,
32:7, 35:23, 36:3,
37:16, 38:18, 38:20,
40:19, 40:24, 42:11,
42:22, 44:4, 44:14,
44:19, 55:1, 55:13,
55:19, 58:6, 62:8,
64:13, 64:15, 65:7,
65:14, 66:7, 71:14,
72:15, 73:3, 75:18,
76:23, 89:19, 89:25,
90:8, 93:15, 94:5,
94:13, 95:11, 96:5,
98:18, 101:12,
103:21, 105:6,
113:25, 114:3, 115:9,
115:12, 130:9, 132:4,
136:1, 140:15,
140:16, 141:7
  **DECN's** [11] - 36:19,
37:10, 44:8, 44:25,
46:6, 46:9, 67:11,
68:6, 83:5, 83:7,
140:19
  **decrease** [1] - 58:18
  **decreased** [1] -
44:20
  **deemed** [1] - 10:18
  **deep** [1] - 79:8
  **Defendant** [41] - 1:7,
16:21, 23:7, 54:4,
87:3, 87:5, 87:8,
87:23, 89:13, 89:16,
90:3, 90:22, 91:19,
92:21, 93:22, 94:10,
94:18, 94:22, 95:21,
99:11, 101:25, 103:1,
103:7, 104:8, 104:11,
105:25, 106:16,
106:20, 107:6, 125:3,
125:5, 125:17, 126:5,
127:14, 128:8,
128:11, 129:7,
129:18, 130:10,
130:19, 141:18

  **defendant** [3] -
30:17, 30:19, 30:24
  **DEFENDANT** [2] -
1:17, 3:7
  **Defendant's** [24] -
3:14, 3:15, 3:16, 3:17,
3:18, 3:19, 3:20, 16:1,
16:25, 60:22, 62:21,
63:16, 64:22, 69:25,
71:3, 77:15, 86:14,
88:1, 88:4, 92:23,
98:9, 98:10, 104:21,
125:13
  **DEFENDER** [1] -
1:24
  **Defender's** [1] - 4:17
  **defense** [5] - 8:8,
21:9, 30:6, 49:13,
130:6
  **DEFENSE** [1] - 49:22
  **Defense** [4] - 59:13,
98:13, 98:15, 112:19
  **defer** [1] - 5:12
  **define** [1] - 31:23
  **defined** [5] - 13:22,
14:20, 55:23, 56:16,
137:1
  **definitely** [1] - 28:18
  **defrauded** [1] - 87:8
  **degree** [2] - 9:3,
106:12
  **delay** [1] - 5:1
  **delisted** [1] - 36:10
  **delivery** [1] - 91:13
  **demands** [1] - 82:2
  **demonstrable** [1] -
101:22
  **demonstrate** [1] -
67:23
  **demonstrative** [6] -
16:3, 72:4, 74:22,
77:1, 80:7, 80:24
  **Demonstrative** [1] -
14:12
  **demonstratives** [1] -
67:18
  **denial** [5] - 96:14,
96:20, 96:25, 102:3,
102:18
  **denials** [1] - 109:10
  **denied** [1] - 10:25
  **denies** [1] - 127:19
  **denying** [1] - 94:10,
94:18, 95:22
  **DEPARTMENT** [1] -
1:15
  **Department** [8] -
12:8, 12:11, 16:15,
122:11, 122:12,
122:13, 126:9, 135:16

**deposed** [1] - 30:21
**depreciated** [1] - 142:8
**DEPUTY** [3] - 4:1, 59:15, 85:15
**derivative** [2] - 32:14, 32:21
**deriving** [1] - 39:10
**describe** [3] - 11:8, 56:20, 57:5
**described** [3] - 14:19, 43:1, 111:6
**describes** [1] - 107:7
**describing** [2] - 6:3, 44:2
**description** [2] - 38:21, 114:6
**design** [2] - 73:10, 73:13
**designation** [4] - 77:25, 103:14, 109:25, 112:22
**designed** [1] - 73:5
**destroyed** [1] - 135:12
**detail** [5] - 114:5, 138:23, 138:24, 138:25, 139:21
**detailed** [3] - 63:1, 101:16, 141:2
**details** [1] - 61:21
**detect** [3] - 6:22, 7:7, 76:14
**determine** [7] - 16:5, 16:10, 19:3, 19:4, 23:10, 80:13, 119:4
**determining** [2] - 23:16, 118:13
**detour** [1] - 136:3
**developed** [2] - 95:14, 95:25
**developing** [1] - 96:7
**development** [2] - 5:7, 6:14
**diabetics** [1] - 101:14
**Diagnostics** [28] - 13:8, 18:16, 20:17, 20:25, 22:2, 23:20, 26:9, 26:12, 26:22, 28:3, 28:14, 28:20, 29:4, 29:14, 29:16, 34:16, 37:20, 37:22, 38:16, 43:2, 63:2, 92:13, 92:16, 107:22, 108:5, 108:12, 127:14, 128:13
**Diagnostics'** [8] - 23:12, 27:16, 29:10, 29:18, 37:13, 38:13,

45:5, 125:10
**difference** [6] - 13:23, 13:24, 14:3, 15:3, 48:3, 84:11
**differences** [3] - 34:6, 34:9, 43:5
**different** [26] - 14:1, 21:24, 38:7, 38:15, 39:2, 42:22, 46:5, 48:15, 51:3, 51:4, 54:6, 55:5, 55:16, 55:24, 58:11, 60:13, 60:16, 61:9, 61:23, 63:21, 66:11, 84:1, 88:17, 108:7, 137:21
**differently** [3] - 31:24, 70:22, 126:11
**difficult** [2] - 57:12, 67:6
**diligence** [2] - 115:15, 115:19
**dimension** [1] - 39:4
**direct** [3] - 18:4, 95:4, 122:8
**DIRECT** [2] - 8:21, 49:24
**Direct** [1] - 3:3
**directed** [1] - 58:2
**direction** [1] - 40:13
**directly** [2] - 100:15, 108:17
**director** [1] - 50:16
**directors** [1] - 24:19
**disagree** [6] - 6:6, 126:21, 131:5, 131:23, 133:6, 136:16
**disagreeing** [1] - 6:5
**disagreement** [1] - 86:12
**disbelieve** [4] - 104:15, 106:1, 106:16, 121:4
**disclose** [3] - 34:1, 136:25, 137:8
**disclosed** [22] - 53:5, 74:21, 75:18, 76:19, 76:23, 77:19, 79:19, 81:8, 81:16, 81:22, 84:22, 84:25, 86:19, 88:20, 111:5, 112:1, 130:14, 136:18, 136:21, 139:17, 139:22
**disclosure** [36] - 33:19, 48:21, 80:11, 81:16, 84:18, 86:15, 89:5, 89:11, 89:13, 103:15, 104:2, 105:12, 111:21, 112:6, 117:15, 119:9,

124:4, 125:1, 131:5, 131:13, 131:14, 133:8, 133:12, 135:18, 136:17, 137:17, 138:7, 138:9, 138:13, 138:16, 139:10, 140:3, 140:5, 141:15, 142:13
**disclosures** [7] - 21:17, 22:2, 24:4, 33:2, 88:17, 101:20, 130:6
**discovered** [1] - 79:24
**discovery** [1] - 54:3
**discrete** [1] - 134:14
**discussed** [9] - 27:23, 53:1, 72:21, 83:18, 84:1, 121:20, 122:17, 122:24
**discusses** [1] - 74:23
**discussing** [8] - 18:5, 33:6, 36:18, 37:17, 40:22, 42:9, 42:14, 117:20
**Discussion** [2] - 116:3, 124:9
**discussion** [2] - 5:8, 122:21
**disparity** [1] - 120:18
**display** [1] - 58:24
**dispositive** [1] - 105:23
**dispute** [3] - 30:23, 98:24, 131:17
**disqualify** [1] - 10:24
**dissimilar** [1] - 38:18
**dissipate** [1] - 119:17
**dissipated** [1] - 118:22
**dissipation** [1] - 123:17
**distinct** [2] - 58:17, 75:4
**distinction** [1] - 32:16
**distorted** [1] - 125:15
**DISTRICT** [3] - 1:1, 1:1, 1:11
**district** [1] - 144:13
**District** [14] - 2:2, 2:2, 10:23, 11:2, 52:15, 135:4, 135:5, 137:19, 139:15, 139:16, 139:24, 139:25, 144:13
**divided** [1] - 134:14

**Division** [1] - 1:15
**division's** [2] - 31:4, 31:8
**docket** [1] - 5:12
**doctored** [1] - 135:6
**document** [32] - 59:4, 59:21, 62:7, 62:10, 62:12, 62:25, 63:3, 63:5, 63:7, 63:25, 64:3, 64:6, 64:8, 69:2, 69:7, 69:12, 69:16, 70:4, 70:15, 77:7, 77:9, 92:25, 93:6, 93:10, 93:17, 94:22, 97:14, 97:15, 100:21, 107:16, 113:24, 127:18
**documents** [7] - 33:1, 68:18, 80:5, 93:14, 106:8, 109:3, 139:21
**DOJ's** [1] - 31:4
**dollar** [2] - 36:9, 36:10
**done** [4] - 31:16, 69:19, 84:15, 89:3
**doubt** [2] - 79:24, 129:5
**down** [10] - 38:2, 43:22, 49:8, 64:15, 67:12, 82:17, 111:7, 116:7, 123:24, 133:3
**dozens** [3] - 106:1, 106:4, 106:16
**Dr** [7] - 7:13, 23:23, 30:9, 47:9, 116:16, 124:2, 124:13
**draft** [1] - 105:4
**draw** [1] - 48:11
**draws** [1] - 72:4
**Drug** [1] - 101:18
**due** [2] - 115:15, 115:19
**duly** [1] - 92:13
**during** [13] - 5:8, 15:1, 22:3, 22:19, 22:21, 23:20, 25:17, 44:13, 48:18, 118:21, 126:3, 127:9, 131:13
**duties** [1] - 52:22
**duty** [1] - 76:16
**DX** [16] - 59:13, 60:18, 62:5, 62:17, 62:23, 63:12, 63:18, 64:18, 69:5, 69:21, 70:2, 70:24, 71:5, 77:3, 77:11, 83:19

**E**

**E*TRADE** [1] - 111:12
**earliest** [3] - 93:11, 111:22, 112:9
**early** [4] - 18:3, 60:5, 70:7, 108:13
**earnings** [1] - 113:9
**easier** [2] - 59:8, 70:16
**easily** [3] - 78:11, 91:9, 106:7
**eating** [1] - 141:18
**economic** [6] - 9:19, 10:7, 10:14, 45:7, 47:24, 48:11
**economically** [1] - 24:13
**economics** [16] - 9:5, 10:10, 10:11, 12:2, 12:6, 16:17, 17:8, 18:19, 19:9, 19:13, 38:5, 38:22, 40:16, 42:5, 48:20, 119:20
**Economics** [1] - 10:12
**economist** [2] - 10:2, 17:6
**education** [1] - 50:6
**EDWARDS** [2] - 2:1, 144:3
**Edwards** [1] - 144:12
**effect** [6] - 20:1, 48:24, 58:17, 65:11, 123:20, 129:23
**effective** [1] - 110:11
**effectively** [2] - 20:2, 24:12
**effects** [2] - 28:17, 137:23
**efficient** [1] - 137:22
**efforts** [1] - 125:13
**eight** [1] - 97:7
**Eighth** [2] - 135:21, 138:17
**either** [10] - 17:9, 23:5, 24:24, 25:19, 33:7, 34:14, 49:6, 66:16, 72:22, 140:21
**either/or** [1] - 32:16
**electronic** [3] - 35:18, 66:13, 91:13
**electronically** [4] - 55:3, 55:16, 59:12, 66:21
**element** [2] - 87:13, 87:19

**elements** [1] - 53:9
**Eleventh** [1] - 140:12
**ELMO** [1] - 100:6
**embedded** [1] - 45:18
**emergency** [1] - 101:17
**emphasize** [1] - 114:8
**empirically** [1] - 112:11
**employed** [2] - 9:12, 13:12
**employment** [2] - 31:25, 50:22
**emptor** [29] - 65:16, 66:8, 66:17, 67:8, 67:20, 72:23, 73:2, 74:5, 75:10, 77:25, 79:25, 84:4, 103:14, 104:1, 109:24, 111:8, 111:18, 112:10, 112:20, 112:21, 113:24, 114:14, 114:18, 114:25, 115:2, 117:5, 117:10, 117:15, 126:16
**enacted** [1] - 133:7
**encouraged** [1] - 115:14
**end** [7] - 22:8, 25:15, 91:2, 131:25, 132:9, 133:15, 137:24
**ended** [4] - 77:18, 133:25, 135:17, 135:24
**ending** [1] - 75:2
**ends** [5] - 80:25, 81:4, 129:2, 129:5, 129:6
**enforcement** [1] - 109:6
**engage** [2] - 104:5, 104:11
**engaged** [11] - 11:13, 12:8, 12:23, 30:18, 30:24, 94:10, 95:22, 117:13, 117:16, 125:2, 125:17
**engagement** [1] - 31:3
**engaging** [3] - 102:21, 127:24, 130:11
**enter** [12] - 55:2, 58:10, 66:14, 66:18, 66:21, 66:25, 67:20, 72:25, 73:4, 73:17, 74:6, 111:17
**entered** [10] - 11:25,

27:12, 31:19, 60:22, 62:22, 63:17, 64:23, 70:1, 71:4, 77:16
**entering** [3] - 73:1, 75:14, 107:11
**entire** [4] - 34:10, 35:13, 90:24, 93:12
**entirely** [1] - 122:3
**entirety** [2] - 15:24, 16:22
**entitled** [1] - 8:13
**entity** [3] - 24:15, 50:12, 51:5
**equally** [2] - 17:15, 46:24
**equities** [2] - 50:16, 51:2
**equity** [1] - 57:18
**errors** [1] - 139:18
**especially** [1] - 52:4
**ESQ** [10] - 1:14, 1:14, 1:17, 1:18, 1:18, 1:19, 1:19, 1:20, 1:20, 1:23
**essence** [1] - 113:23
**essentially** [5] - 11:4, 40:4, 42:21, 43:5, 48:13
**estimate** [7] - 12:15, 13:9, 18:19, 19:5, 30:1, 48:7, 119:23
**estimated** [1] - 23:21
**estimates** [2] - 19:20, 23:11
**estimation** [1] - 36:19
**et** [1] - 54:19
**EUA** [3] - 128:11, 128:15, 129:10
**evaluate** [9] - 12:12, 12:14, 13:2, 13:11, 15:9, 16:15, 23:17, 28:13, 45:15
**event** [5] - 19:11, 19:14, 20:1, 20:7, 22:24
**events** [19] - 27:17, 29:14, 37:11, 37:14, 45:9, 45:12, 76:3, 76:6, 76:19, 108:17, 108:20, 118:1, 118:3, 118:11, 119:2, 119:8, 119:10, 125:3, 132:14
**eventually** [2] - 93:2, 137:20
**evidence** [28] - 11:21, 11:25, 27:8, 27:12, 37:12, 60:19, 60:23, 62:18, 62:22, 63:13, 63:17, 64:19, 64:23, 68:20, 69:22,

70:1, 70:25, 71:4, 72:17, 74:9, 77:12, 77:16, 80:4, 84:3, 97:19, 119:3, 135:13, 137:11
**EVIDENCE** [1] - 3:9
**evidentiary** [1] - 112:2
**EVIDENTIARY** [1] - 1:10
**exact** [5] - 34:17, 122:5, 123:4, 123:7, 123:10
**exactly** [6] - 33:13, 37:1, 48:3, 67:24, 134:5, 138:8
**exam** [2] - 49:21, 51:21
**examination** [3] - 51:19, 85:18, 122:9
**EXAMINATION** [6] - 8:21, 30:7, 49:24, 85:24, 117:2, 121:13
**examine** [5] - 13:13, 18:16, 18:24, 19:6, 45:3
**examined** [4] - 20:14, 21:1, 21:10, 28:2
**examining** [1] - 123:8
**example** [16] - 18:4, 19:18, 21:18, 24:9, 28:23, 36:24, 38:19, 46:20, 60:3, 60:10, 95:21, 95:24, 114:3, 121:19, 132:16, 135:3
**exams** [2] - 7:20, 51:17
**excellent** [2] - 79:2, 137:4
**Exchange** [6] - 51:18, 52:5, 52:7, 54:16, 55:23, 62:9
**exchange** [8] - 33:7, 46:15, 46:16, 54:15, 55:7, 57:9, 113:8
**exchange-traded** [1] - 57:9
**exchanges** [5] - 34:7, 51:4, 54:17, 55:5, 61:23
**exchanging** [1] - 32:19
**excited** [1] - 7:23
**exclusion** [1] - 42:19
**exclusively** [1] - 33:16
**excuse** [6] - 14:6, 36:25, 83:16, 110:22,

131:9, 139:24
**excused** [3] - 49:9, 116:8, 123:25
**executed** [1] - 55:8
**execution** [2] - 55:10, 57:1
**executive** [2] - 92:12, 117:16
**exercising** [1] - 115:19
**Exhibit** [33] - 3:11, 3:12, 3:14, 3:15, 3:16, 3:17, 3:18, 3:19, 3:20, 11:16, 11:21, 11:24, 14:12, 26:19, 27:8, 27:11, 29:23, 35:17, 59:13, 60:22, 62:21, 63:16, 64:22, 69:25, 71:3, 77:15, 90:20, 98:13, 98:15, 99:25, 104:20, 107:15, 112:19
**exhibit** [6] - 16:4, 31:20, 34:1, 58:23, 71:6, 100:5
**exhibits** [1] - 58:23
**EXHIBITS** [1] - 3:9
**exist** [1] - 107:11
**existed** [3] - 127:12, 128:20, 129:14
**existing** [7] - 32:20, 46:1, 46:12, 82:13, 82:21, 83:10, 101:13
**expect** [3] - 38:12, 38:14, 48:20
**expectations** [1] - 45:8
**expected** [1] - 74:8
**expecting** [1] - 5:3
**experience** [16] - 31:20, 31:23, 34:18, 41:4, 50:9, 56:10, 57:24, 58:13, 61:7, 68:21, 72:11, 79:5, 79:10, 80:2, 88:13, 111:25
**expert** [23] - 10:15, 10:18, 10:22, 11:5, 11:11, 11:13, 12:2, 12:5, 30:18, 30:19, 33:19, 49:20, 51:25, 52:2, 52:8, 53:1, 53:15, 53:19, 54:7, 73:2, 74:5, 81:3, 118:6
**Expert** [1] - 65:18
**expertise** [3] - 16:10, 118:6, 121:15
**experts** [2] - 5:14, 6:15

**experts'** [1] - 142:24
**explain** [15] - 14:2, 15:16, 18:11, 19:23, 45:4, 50:25, 52:10, 52:18, 52:22, 53:7, 54:12, 59:23, 74:18, 78:19, 79:21
**explained** [4] - 12:23, 33:24, 41:14, 41:22
**explaining** [2] - 37:6, 120:4
**explanation** [1] - 114:19
**explicit** [1] - 75:21
**exposed** [4] - 47:2, 47:3, 100:14, 133:3
**express** [1] - 60:14
**extend** [1] - 78:11
**extended** [1] - 134:23
**extent** [5] - 18:16, 19:12, 124:12, 130:7, 130:18
**external** [8] - 13:14, 19:7, 19:16, 19:17, 38:9, 45:3, 45:6, 45:14
**extra** [2] - 120:20, 121:8
**extraordinary** [1] - 126:20
**extrapolation** [1] - 25:10
**extreme** [1] - 130:8
**eyeballing** [1] - 47:14

## F

**F.3d** [3] - 131:20, 135:21, 140:12
**face** [1] - 132:11
**faced** [1] - 111:10
**facilitate** [2] - 58:6, 58:8
**facility** [1] - 5:20
**fact** [30] - 6:18, 38:5, 41:19, 43:6, 46:14, 47:24, 48:6, 65:4, 69:2, 80:5, 81:25, 95:24, 99:15, 101:5, 101:25, 102:3, 102:21, 103:10, 104:15, 104:17, 105:7, 114:1, 118:23, 120:11, 123:9, 123:16, 125:16, 126:1, 129:9, 140:6

**fact-based** [2] - 69:2, 80:5

**factor** [4] - 39:17, 39:20, 43:12, 43:16

**factors** [23] - 6:12, 13:14, 19:12, 19:19, 19:22, 19:23, 20:4, 20:9, 20:11, 20:13, 20:17, 20:20, 21:1, 26:15, 26:17, 27:24, 28:2, 56:1, 57:15, 61:12, 101:9, 117:24, 120:2

**facts** [13] - 45:9, 45:11, 45:13, 45:16, 45:18, 92:16, 92:17, 94:14, 95:17, 96:9, 118:1, 118:3, 118:11

**fair** [9] - 6:11, 7:11, 31:16, 32:3, 57:24, 60:3, 62:14, 63:9, 77:9

**fake** [1] - 107:7

**fall** [2] - 52:11, 53:3

**falling** [1] - 58:21

**false** [19] - 47:25, 48:2, 48:4, 94:19, 95:16, 96:9, 97:1, 97:12, 123:10, 123:19, 125:8, 126:5, 127:19, 128:4, 129:8, 129:10, 129:19, 130:12, 134:16

**falsity** [1] - 101:22

**Fama** [1] - 20:13

**Fama-French** [1] - 20:13

**familiar** [11] - 16:24, 54:10, 74:14, 107:16, 117:7, 117:9, 117:19, 121:16, 121:19, 121:22, 137:3

**far** [7] - 34:1, 36:22, 42:18, 74:3, 128:12, 138:13

**fatally** [1] - 140:5

**favorite** [1] - 66:10

**FDA** [2] - 6:16, 128:13

**feasible** [2] - 5:9, 6:22

**February** [2] - 134:4, 134:15

**Federal** [3] - 4:17, 137:2, 139:24

**FEDERAL** [1] - 1:23

**federal** [7] - 10:15, 10:18, 30:16, 51:2, 52:3, 52:15, 52:16

**feed** [1] - 62:2

**feeds** [2] - 18:24, 65:8

**felt** [2] - 17:4, 41:24

**FENTON** [38] - 1:14, 53:17, 60:7, 60:20, 62:19, 63:14, 64:20, 69:23, 71:1, 77:13, 85:23, 86:1, 88:11, 90:19, 90:21, 91:10, 91:18, 92:3, 92:6, 92:8, 95:9, 95:10, 96:3, 96:4, 97:6, 99:23, 100:5, 100:17, 102:17, 104:10, 104:13, 104:24, 105:1, 107:3, 113:2, 115:6, 115:7, 115:23

**Fenton** [5] - 4:7, 85:22, 95:8, 97:5, 115:4

**Ferguson** [1] - 139:23

**few** [4] - 26:2, 33:5, 39:22, 134:20

**fewer** [1] - 36:11

**Fidelity** [2] - 66:10, 111:12

**field** [4] - 51:8, 52:1, 53:15, 53:19

**figure** [7] - 14:18, 23:2, 23:4, 25:9, 25:14, 36:22, 116:15

**figures** [4] - 23:5, 26:5, 29:23, 31:10

**file** [1] - 93:12

**filed** [19] - 70:20, 90:3, 90:10, 90:16, 90:22, 91:3, 91:7, 91:13, 91:19, 91:23, 97:15, 97:23, 98:10, 98:19, 99:2, 100:25, 108:13, 109:3, 139:17

**filing** [5] - 91:6, 93:18, 99:12, 100:24, 138:25

**filings** [8] - 46:6, 46:7, 61:10, 83:5, 130:15, 135:10, 136:11

**final** [2] - 27:14, 89:2

**finance** [2] - 9:4, 50:7

**Finance** [1] - 10:9

**financial** [25] - 9:18, 9:24, 10:7, 10:10, 12:2, 12:5, 16:17, 17:8, 19:9, 19:13, 32:1, 38:5, 38:22, 40:16, 42:5, 48:19, 52:25, 53:15, 53:19,

119:20, 120:7, 135:6, 135:8, 138:22, 139:19

**findings** [3] - 10:21, 109:5, 109:6

**fine** [3] - 7:22, 59:10, 134:9

**FINRA** [3] - 50:13, 52:5, 52:13

**FINRA's** [1] - 27:2

**firm** [24] - 20:13, 20:14, 21:9, 21:15, 21:16, 21:19, 26:13, 31:21, 32:1, 45:9, 45:11, 45:13, 45:16, 45:17, 45:18, 51:1, 73:11, 118:1, 118:3, 118:11, 118:20, 118:23, 119:2, 129:24

**firm-specific** [13] - 21:9, 21:19, 45:9, 45:11, 45:13, 45:16, 45:17, 118:1, 118:3, 118:11, 118:20, 118:23, 119:2

**firms** [11] - 27:24, 27:25, 28:4, 28:5, 28:7, 28:18, 52:25, 66:15, 71:16, 120:13

**first** [21] - 13:1, 13:10, 20:1, 20:7, 21:7, 23:19, 41:22, 63:3, 68:17, 75:5, 80:19, 89:8, 90:13, 112:17, 125:5, 126:14, 129:12, 129:16, 131:24, 132:4, 140:6

**five** [1] - 115:5

**fixed** [1] - 51:3

**flash** [1] - 66:16

**flatter** [1] - 42:11

**flawed** [1] - 140:5

**flip** [1] - 100:20

**Florida** [1] - 10:23

**fluctuating** [1] - 25:8

**fly** [1] - 132:11

**focus** [3] - 9:19, 60:14, 60:16

**focused** [1] - 64:12

**focuses** [1] - 9:18

**folded** [2] - 133:14, 141:11

**folks** [3] - 4:11, 143:2, 143:4

**follow** [2] - 34:22, 78:24

**following** [8] - 14:24, 26:17, 44:20, 47:11, 85:14, 108:6, 112:23

**follows** [3] - 113:3,

113:4, 134:13

**Food** [1] - 101:18

**FOR** [5] - 1:1, 1:14, 1:17, 3:4, 3:7

**force** [1] - 45:14

**forces** [8] - 13:15, 19:7, 19:16, 19:17, 38:9, 45:4, 45:6, 132:13

**foregoing** [3] - 91:12, 92:14, 144:4

**forever** [1] - 67:14

**forgive** [1] - 23:24

**Form** [2] - 135:10, 139:17

**form** [1] - 60:7

**forming** [1] - 54:8

**formula** [4] - 13:3, 48:6, 74:15, 123:12

**forth** [4] - 6:2, 7:1, 15:11, 27:25

**forward** [9] - 4:4, 69:1, 75:9, 75:14, 78:17, 80:4, 89:8, 89:9

**four** [3] - 72:7, 113:6, 133:19

**framework** [1] - 122:6

**frankly** [1] - 100:10

**fraud** [112] - 14:6, 14:20, 14:24, 14:25, 15:6, 15:9, 15:18, 15:24, 17:11, 17:23, 17:25, 18:7, 18:13, 18:15, 18:24, 22:3, 22:7, 22:9, 22:19, 22:21, 23:2, 23:20, 31:4, 31:8, 45:1, 46:25, 47:10, 47:11, 48:10, 48:19, 53:5, 53:12, 61:11, 74:20, 74:21, 74:25, 75:2, 75:17, 75:22, 76:14, 76:19, 77:17, 77:20, 78:6, 79:18, 80:25, 81:3, 81:8, 81:16, 81:22, 83:16, 83:23, 84:21, 84:25, 86:4, 86:14, 86:19, 87:6, 87:14, 87:19, 88:1, 88:4, 94:10, 95:22, 100:14, 104:5, 104:11, 105:10, 111:4, 115:12, 117:13, 118:18, 123:9, 123:17, 125:1, 125:17, 125:24, 125:25, 126:1, 127:25, 128:19,

128:23, 128:25, 129:2, 129:5, 129:6, 130:3, 131:5, 131:13, 131:24, 132:10, 132:20, 133:3, 133:8, 133:11, 133:24, 134:3, 134:24, 135:11, 135:14, 135:15, 135:17, 135:19, 136:17, 136:21, 138:7, 139:22, 140:8, 140:21, 142:12

**Fraud** [1] - 1:15

**Frauds** [1] - 64:10

**frauds** [1] - 64:12

**fraudulent** [13] - 94:6, 103:3, 103:8, 129:4, 132:4, 133:17, 135:24, 135:25, 137:24, 139:17, 141:3, 141:8, 141:18

**free** [1] - 116:7

**French** [1] - 20:13

**frequency** [1] - 41:24

**frequently** [1] - 28:24

**front** [4] - 6:19, 34:17, 35:14, 80:8

**frustrating** [1] - 4:25

**full** [5] - 31:24, 128:10, 129:3, 130:7, 144:5

**full-time** [1] - 31:24

**fundamentally** [1] - 10:14

**futures** [1] - 51:21

**G**

**gain** [1] - 80:15

**GameStop** [1] - 78:25

**gap** [1] - 68:23

**general** [6] - 34:20, 36:8, 51:13, 51:19, 67:14, 122:17

**generally** [21] - 11:11, 13:19, 15:19, 16:16, 16:24, 18:18, 19:7, 24:17, 26:12, 26:16, 32:13, 33:12, 33:14, 41:15, 55:11, 66:13, 118:12, 119:22, 121:22, 122:4, 137:10

**generated** [1] - 26:25

**generic** [3] - 114:6, 114:7, 114:22

**gentleman** [1] - 59:24
**gentlemen** [1] - 8:11
**GenViro** [1] - 101:17
**Georgetown** [1] - 9:3
**GIRON** [14] - 1:19, 131:1, 132:2, 132:12, 132:23, 133:6, 134:7, 134:9, 136:13, 136:25, 137:4, 138:3, 138:19, 141:10
**Giron** [4] - 4:16, 131:1, 132:7, 142:17
**given** [4] - 40:8, 56:6, 111:12, 118:24
**global** [1] - 50:16
**glucose** [1] - 101:13
**goals** [1] - 76:13
**Goldman** [1] - 50:16
**Google** [1] - 57:9
**Government** [32] - 4:5, 6:21, 6:24, 6:25, 12:19, 15:6, 15:8, 15:17, 31:1, 49:6, 49:10, 54:3, 59:17, 103:17, 106:5, 116:20, 122:10, 124:24, 131:19, 132:6, 134:10, 134:13, 134:22, 135:1, 135:15, 139:5, 140:7, 141:21, 142:6, 142:9, 142:11
**GOVERNMENT** [4] - 1:14, 3:4, 8:18, 117:1
**Government's** [23] - 5:15, 11:16, 11:21, 11:24, 14:12, 26:18, 27:8, 27:11, 29:23, 35:17, 90:20, 99:24, 104:20, 107:15, 132:24, 133:23, 134:21, 136:6, 139:1, 139:9, 140:5, 141:14, 142:4
**government's** [2] - 3:11, 3:12
**Grace** [1] - 4:9
**grand** [1] - 129:12
**granted** [1] - 90:14
**great** [5] - 7:25, 8:15, 35:21, 106:12, 110:3
**greater** [1] - 129:23
**greatest** [1] - 126:9
**group** [6] - 26:17, 27:2, 34:21, 34:22, 40:18, 41:23
**Group** [3] - 55:17, 55:20, 61:25
**guess** [6] - 5:24,

17:24, 47:18, 78:18, 81:2, 126:8
**guideline** [3] - 105:18, 123:5, 123:14
**Guideline** [2] - 123:2, 136:22
**Guidelines** [2] - 12:14, 74:15
**guidelines** [16] - 13:18, 13:19, 14:9, 17:14, 28:1, 80:12, 122:15, 122:23, 131:9, 131:18, 133:7, 136:20, 137:1, 142:9, 142:14
**guilty** [11] - 87:3, 87:5, 87:23, 103:2, 103:7, 104:21, 109:18, 110:7, 110:9, 125:5, 127:17

### H

**half** [4] - 20:1, 52:12, 136:8, 136:15
**half-time** [1] - 52:12
**halfway** [1] - 64:15
**halt** [1] - 113:9
**halted** [1] - 113:8
**hand** [1] - 100:6
**handling** [1] - 7:19
**Hangout** [1] - 105:4
**happy** [6] - 13:8, 13:15, 14:2, 18:6, 124:2, 124:4
**hard** [3] - 80:4, 100:5, 142:23
**he..** [1] - 68:17
**head** [5] - 35:6, 35:12, 50:16, 50:18, 50:20
**hear** [7] - 6:1, 56:10, 116:12, 117:4, 120:3, 124:3, 124:24
**heard** [6] - 124:16, 125:16, 130:6, 131:4, 140:25, 142:19
**HEARING** [1] - 1:10
**hearing** [4] - 7:22, 31:13, 122:19, 124:5
**heavily** [2] - 37:23, 41:18
**held** [12] - 25:1, 25:2, 25:4, 71:13, 71:14, 71:15, 72:6, 134:12, 137:5, 137:16, 139:16
**help** [3] - 67:18, 67:23, 74:23
**helped** [2] - 58:8,

73:9
**hereby** [2] - 91:11, 144:3
**high** [1] - 15:16
**higher** [5] - 36:4, 36:7, 81:21, 81:25, 122:20
**highest** [1] - 125:22
**highlight** [1] - 139:4
**highlighting** [1] - 131:6
**highly** [1] - 137:22
**hired** [1] - 6:15
**hold** [2] - 47:7, 106:2
**holder** [2] - 88:15, 88:22
**holdings** [1] - 34:2
**honestly** [2] - 58:15, 91:3
**Honor** [101] - 4:1, 4:6, 4:10, 4:12, 5:4, 7:17, 8:4, 8:16, 11:20, 12:1, 16:14, 17:17, 17:21, 24:4, 25:12, 27:7, 30:4, 47:5, 47:17, 47:23, 48:16, 49:3, 49:11, 49:14, 53:14, 58:22, 59:3, 60:18, 62:17, 63:20, 64:18, 67:22, 69:21, 70:24, 77:11, 82:5, 85:5, 85:15, 85:23, 88:7, 92:4, 95:3, 115:6, 115:25, 116:4, 116:5, 116:17, 116:19, 116:25, 118:5, 121:10, 121:12, 123:22, 124:6, 124:10, 124:25, 126:25, 127:21, 128:21, 130:4, 130:25, 131:3, 131:16, 131:23, 132:2, 132:12, 132:23, 133:6, 133:15, 133:22, 134:7, 134:9, 134:19, 135:2, 135:9, 135:20, 136:2, 136:7, 136:13, 136:19, 137:1, 137:11, 138:3, 138:5, 138:6, 138:11, 138:20, 138:25, 139:3, 139:6, 139:12, 139:23, 140:4, 140:14, 141:6, 141:12, 141:25, 142:11, 142:16, 142:22, 143:5
**Honor's** [3] - 21:13,

83:14, 139:6
**HONORABLE** [1] - 1:10
**hope** [1] - 103:13
**hour** [1] - 12:20
**Howell** [4] - 4:19, 49:21, 63:22, 79:13
**HOWELL** [65] - 1:19, 50:1, 53:14, 53:21, 53:22, 56:19, 58:22, 59:3, 59:10, 59:13, 59:17, 59:20, 60:18, 60:24, 62:5, 62:6, 62:17, 62:24, 63:12, 63:18, 63:23, 64:18, 64:24, 67:17, 67:22, 68:3, 68:14, 69:5, 69:6, 69:21, 70:2, 70:3, 70:8, 70:10, 70:24, 71:5, 71:7, 71:23, 72:1, 73:23, 74:1, 74:22, 74:24, 77:3, 77:4, 77:11, 79:14, 80:7, 80:10, 81:14, 82:3, 82:5, 82:6, 83:19, 84:6, 84:7, 85:4, 88:7, 88:9, 92:4, 95:3, 95:6, 104:9, 106:23, 116:5
**humbly** [1] - 139:21

### I

**i.e** [1] - 113:9
**icon** [1] - 65:16
**idea** [3] - 47:9, 89:1, 131:13
**ideal** [1] - 28:19
**ideas** [1] - 60:14
**identified** [1] - 38:25
**identify** [6] - 4:4, 19:22, 19:25, 37:12, 40:18, 42:3
**identifying** [1] - 141:3
**identity** [1] - 126:5
**idiosyncratic** [6] - 26:13, 28:12, 39:15, 39:25, 42:15, 42:16
**ignorance** [1] - 23:24
**illustrate** [2] - 67:19, 74:2
**imagine** [1] - 25:5
**immediately** [1] - 44:20
**impact** [4] - 18:2, 48:4, 119:14, 129:16
**impacted** [1] - 37:10
**implicated** [1] -

130:3
**implies** [1] - 120:25
**import** [1] - 88:16
**importance** [2] - 77:24, 120:20
**important** [4] - 43:6, 66:2, 76:10, 118:13
**importantly** [1] - 131:17
**impossible** [3] - 75:13, 88:21, 88:24
**impounded** [1] - 41:19
**IN** [1] - 3:9
**inability** [1] - 111:13
**inadministrable** [1] - 141:14
**incentive** [1] - 142:7
**incentivize** [1] - 142:4
**inclined** [1] - 116:12
**include** [4] - 31:12, 35:1, 35:5, 105:23
**included** [5] - 33:17, 39:10, 54:4, 105:22, 106:8
**includes** [4] - 38:17, 41:1, 41:3, 86:25
**including** [2] - 126:4, 130:10
**inclusion** [4] - 33:13, 35:3, 36:16, 40:15
**income** [1] - 51:3
**inconsistencies** [1] - 109:2
**inconsistent** [1] - 41:5
**increase** [2] - 43:8, 132:14
**increases** [1] - 25:2
**increasing** [3] - 10:6, 22:5, 24:23
**incurred** [1] - 140:9
**independent** [1] - 105:5
**index** [59] - 19:18, 26:23, 28:5, 28:6, 28:8, 28:15, 28:18, 28:20, 28:22, 28:23, 29:1, 29:2, 29:11, 29:17, 33:6, 33:10, 33:13, 33:17, 34:23, 35:3, 36:13, 36:16, 37:17, 37:18, 37:19, 37:22, 37:23, 38:10, 38:17, 38:24, 39:1, 39:3, 39:6, 39:9, 39:14, 39:16, 39:18, 39:21, 39:22, 39:23, 39:24, 40:2, 40:4,

40:5, 40:12, 40:14,
40:17, 40:19, 41:12,
41:16, 41:18, 41:20,
42:3, 42:8, 43:3, 43:8,
43:9
**Indiana** [1] - 1:24
**indicate** [3] - 37:12,
47:11, 76:19
**indicated** [1] - 44:16
**indicates** [2] - 29:17,
130:5
**indices** [3] - 38:5,
38:6, 38:23
**indicia** [1] - 61:11
**indict** [1] - 142:7
**indicted** [2] - 129:6,
129:23
**indictment** [19] -
15:11, 16:1, 89:2,
126:4, 126:11, 128:7,
128:19, 129:21,
130:15, 130:20,
134:2, 134:8, 134:11,
134:14, 139:1,
141:22, 142:1, 142:3
**indicts** [1] - 142:6
**indirect** [1] - 121:1
**individual** [6] -
28:11, 28:16, 88:2,
88:22, 105:9, 105:21
**individuals** [4] -
21:15, 24:1, 24:7,
105:13
**indulgence** [6] -
45:22, 63:20, 82:3,
84:6, 116:1, 123:21
**industries** [1] - 41:8
**industry** [33] - 18:21,
18:22, 19:18, 27:17,
28:2, 28:15, 28:17,
29:14, 29:19, 37:11,
37:13, 37:24, 38:1,
38:3, 38:11, 40:17,
41:1, 41:3, 41:10,
41:17, 41:19, 42:4,
43:12, 43:15, 45:8,
51:10, 51:16, 56:15,
68:21, 78:13, 120:1
**industry-specific**
[10] - 27:17, 28:2,
29:14, 29:19, 37:11,
37:13, 41:17, 42:4,
45:8, 120:1
**industry-wide** [2] -
18:22, 37:24
**industrywide** [5] -
18:17, 20:4, 26:15,
26:17, 42:19
**inflated** [3] - 22:20,
46:25, 126:3

**inflation** [13] - 17:19,
17:23, 47:25, 48:25,
118:22, 118:24,
119:8, 119:11,
119:12, 119:17,
120:24, 123:18,
125:10
**inflationary** [3] -
17:18, 119:14, 123:19
**influence** [1] - 105:4
**influenced** [1] -
105:14
**information** [61] -
9:23, 13:6, 16:20,
16:23, 17:25, 18:3,
18:18, 21:14, 21:19,
26:13, 28:12, 28:15,
34:1, 39:7, 39:9,
39:12, 39:14, 39:19,
39:20, 39:21, 39:25,
40:1, 40:2, 40:7, 40:9,
41:2, 41:3, 42:16,
42:20, 47:25, 48:3,
48:4, 53:24, 54:1,
54:2, 54:4, 54:5, 54:8,
55:19, 57:8, 62:1,
71:12, 73:20, 83:4,
89:22, 90:7, 97:24,
106:9, 113:15,
113:21, 118:20,
120:13, 120:18,
124:16, 129:8,
130:10, 130:12,
131:15, 137:14,
138:13, 142:3
**informed** [1] - 9:24
**initial** [5] - 17:22,
19:14, 81:21, 82:25,
135:18
**initiate** [2] - 62:4,
65:9
**initiated** [1] - 89:16
**injected** [1] - 7:2
**injured** [1] - 46:24
**inordinate** [2] -
127:2, 127:6
**insider** [6] - 9:25,
120:8, 120:14,
120:17, 120:19, 121:9
**insiders** [4] - 120:12,
120:21, 121:2, 136:3
**instance** [2] - 131:8,
137:18
**instances** [1] - 97:7
**instead** [1] - 66:21
**institute** [1] - 109:6
**institutes** [1] -
113:11
**institutional** [1] -
34:2

**institutions** [1] -
24:9
**instructive** [1] -
17:12, 138:12
**instrument** [1] -
104:3
**integrity** [2] - 76:11,
76:13
**interchangeably** [2]
- 56:14, 56:17
**interdisciplinary** [1]
- 10:13
**interest** [4] - 18:12,
38:9, 94:5, 113:8
**interested** [2] - 6:1,
56:24
**internet** [3] - 60:12,
68:19, 111:24
**interrupt** [1] - 85:9
**intervals** [2] - 13:20,
13:22
**interviewing** [1] -
88:22
**intuitively** [1] - 21:3
**invariant** [1] - 43:4
**invented** [1] - 132:17
**inventing** [1] - 102:1
**invest** [4] - 73:8,
103:21, 129:22
**invested** [1] - 125:8
**investigate** [1] -
103:18
**investigation** [15] -
61:8, 102:22, 103:2,
103:8, 103:20,
109:18, 110:7,
110:10, 117:17,
119:7, 125:6, 125:14,
125:15, 128:3, 137:22
**investigator** [1] -
50:12
**investigators** [1] -
125:21
**investigators'** [1] -
109:5
**investing** [1] - 57:6
**investment** [3] -
115:15, 115:19,
130:13
**investments** [1] -
73:22
**investor** [19] - 19:1,
19:6, 32:19, 45:8,
64:1, 64:8, 64:11,
65:23, 75:13, 78:14,
86:23, 105:3, 105:4,
111:10, 115:8,
115:18, 131:14,
140:14, 141:6
**investors** [25] -

12:12, 12:16, 22:20,
25:4, 30:2, 58:3,
58:19, 76:16, 78:22,
87:12, 106:2, 106:4,
114:4, 115:14,
117:12, 121:2,
125:23, 127:22,
128:1, 128:2, 136:5,
136:9, 140:7, 142:13
**Investors** [2] - 64:11,
105:4
**investors'** [1] - 22:21
**invoices** [1] - 31:14
**involved** [6] - 53:8,
57:2, 57:6, 57:15,
104:3, 106:12
**involving** [1] - 79:1
**irrational** [2] - 78:23,
79:4
**irregularities** [1] -
139:18
**irrelevant** [1] -
100:10
**is..** [1] - 92:1
**issue** [8] - 7:2, 61:13,
78:4, 116:9, 123:16,
128:3, 135:10, 136:16
**issued** [41] - 22:20,
24:12, 24:20, 24:22,
24:23, 24:25, 32:10,
32:15, 32:17, 32:22,
32:23, 32:24, 33:4,
37:7, 45:24, 45:25,
46:2, 46:4, 46:14,
46:15, 46:18, 64:1,
76:3, 82:11, 82:12,
82:14, 82:18, 82:20,
82:22, 82:25, 90:1,
94:19, 95:11, 96:5,
101:16, 103:25,
132:4, 135:24,
140:13, 141:2, 141:19
**issuer** [1] - 61:9
**issuers** [1] - 36:8
**issues** [6] - 7:21,
76:22, 88:19, 109:4,
122:13, 122:17
**issuing** [1] - 22:4
**items** [2] - 108:7,
127:24
**ix)** [1] - 136:23

### J

**J.D** [3] - 9:4, 9:8,
10:5
**J.D.s** [1] - 10:4
**JAMES** [1] - 49:22
**james** [1] - 3:8

**James** [1] - 50:3
**Jay** [1] - 108:1
**Jim** [1] - 49:20
**joined** [2] - 4:8, 4:15
**JONAH** [1] - 1:20
**Jonah** [1] - 4:16
**JOSE** [2] - 1:18, 1:19
**JOSHUA** [2] - 8:18,
117:1
**Joshua** [4] - 3:5,
8:17, 8:25, 116:20
**José** [3] - 4:16, 131:1
**Journal** [3] - 10:9,
10:12
**journal** [1] - 10:10
**journals** [1] - 10:12
**Judge** [1] - 63:12
**judge** [2] - 100:8,
142:19
**JUDGE** [1] - 1:11
**judicial** [1] - 10:21
**July** [34] - 54:6, 68:9,
68:15, 68:16, 69:2,
69:8, 69:18, 69:19,
71:14, 71:22, 75:3,
78:9, 79:17, 80:25,
81:5, 81:22, 83:17,
83:23, 84:4, 85:3,
86:5, 104:7, 111:21,
112:4, 112:12,
125:20, 129:2, 129:5,
132:17, 133:25,
134:15, 135:25,
140:15, 141:7
**jumped** [1] - 21:7
**jumping** [1] - 43:22
**June** [4] - 100:25,
105:2, 107:23, 125:19
**jury** [1] - 129:13
**Justice** [6] - 12:9,
122:11, 122:12,
122:13, 126:9, 135:16
**justice** [1] - 49:17
**JUSTICE** [1] - 1:15

### K

**keep** [3] - 65:7,
88:18, 91:1
**Keith** [7] - 4:3, 23:7,
49:19, 85:17, 92:9,
92:12, 102:8
**KEITH** [1] - 1:6
**Kevin** [1] - 4:12
**KEVIN** [1] - 1:17
**key** [4] - 16:19,
21:12, 53:9, 75:15
**kind** [40] - 6:20, 11:8,
14:16, 17:15, 19:8,

20:21, 25:9, 25:10,
34:22, 36:4, 47:9,
47:21, 56:12, 56:14,
58:4, 58:7, 60:3,
60:12, 62:3, 67:18,
70:8, 72:8, 73:15,
76:7, 79:9, 83:13,
87:16, 107:12,
111:11, 111:24,
116:12, 126:10,
126:16, 127:8, 128:2,
130:2, 132:11, 133:2,
133:4
**kits** [1] - 101:17
**knowing** [1] - 67:7
**knowledge** [3] -
92:16, 92:18, 136:4
**known** [8] - 50:12,
50:13, 55:15, 58:16,
68:19, 71:11, 113:16,
137:10
**knows** [3] - 113:19,
120:17, 125:12

## L

**label** [2] - 117:10,
117:12
**language** [3] - 44:8,
123:8, 139:8
**large** [4] - 34:13,
57:21, 120:21, 127:3
**large-capitalization**
[1] - 57:21
**largest** [3] - 34:10,
72:7, 73:12
**last** [6] - 50:15, 70:7,
81:6, 91:3, 135:24,
141:12
**late** [3] - 4:22, 18:3,
50:11
**later-in-time** [1] -
135:19
**latter** [1] - 22:15
**law** [10] - 9:15, 10:2,
10:11, 16:12, 31:21,
52:25, 134:25, 139:13
**Law** [3] - 9:4, 9:13,
10:12
**laws** [2] - 51:2, 52:3
**lawyer** [1] - 16:12
**lead** [1] - 132:14
**leading** [1] - 10:10
**learn** [4] - 87:25,
88:4, 141:17, 142:2
**least** [11] - 17:11,
17:19, 53:9, 73:16,
73:20, 119:24, 128:3,
131:12, 134:3, 134:6,

137:15
**ledger** [1] - 32:7
**left** [2] - 40:10, 42:22
**legacy** [1] - 56:12
**legal** [7] - 51:5,
118:6, 121:15, 122:1,
122:3, 127:15, 127:16
**Legal** [1] - 10:13
**lent** [1] - 24:9
**less** [7] - 25:17, 34:1,
37:3, 41:8, 101:16,
138:13
**letter** [10] - 105:5,
106:21, 107:6, 107:7,
107:23, 108:1, 109:1,
109:17, 110:16,
110:18
**letters** [3] - 125:18,
125:21, 128:2
**level** [4] - 15:16,
122:16, 122:18,
122:20
**levels** [1] - 125:22
**Lexis** [2] - 137:19,
139:15
**Lexus** [1] - 135:5
**license** [1] - 51:14
**licenses** [5] - 51:7,
51:10, 51:12, 51:20,
51:22
**lied** [1] - 101:25
**lies** [2] - 16:13,
131:17
**lifted** [1] - 65:12
**lights** [1] - 141:4
**likelier** [1] - 133:12
**likewise** [1] - 135:23
**limitations** [1] -
126:16
**line** [1] - 100:9
**lines** [5] - 42:21,
42:25, 43:22, 43:24,
72:13
**link** [2] - 55:14, 57:1
**liquid** [1] - 34:1
**liquidity** [1] - 57:10
**LISA** [2] - 2:1, 144:3
**Lisa** [1] - 144:12
**list** [3] - 35:13,
108:19, 113:3
**listed** [8] - 29:3,
33:11, 34:2, 34:7,
54:15, 64:13, 64:15,
115:11
**listen** [1] - 8:5
**listing** [3] - 54:17,
65:7, 66:6
**lists** [1] - 108:7
**literally** [1] - 56:13
**literature** [18] -

18:19, 20:12, 26:4,
26:6, 26:11, 26:16,
29:21, 32:3, 38:4,
40:16, 42:5, 42:13,
48:20, 119:25, 120:7,
120:10, 120:21,
120:25
**litigation** [8] - 30:23,
53:16, 53:20, 121:16,
121:17, 121:19,
121:20, 133:24
**Litigation** [1] - 11:1
**live** [1] - 65:19
**lived** [1] - 79:5
**LLC** [4] - 11:10,
11:14, 52:20, 52:21
**LLP** [1] - 1:21
**logic** [1] - 40:6
**logical** [1] - 133:4
**look** [36] - 15:25,
19:11, 20:13, 26:4,
26:6, 27:15, 29:8,
32:25, 36:21, 42:2,
54:7, 69:3, 78:13,
79:11, 81:7, 94:2,
94:3, 95:1, 96:3,
98:13, 99:11, 102:12,
105:9, 105:15,
107:15, 108:25,
112:19, 112:20,
113:5, 115:1, 115:20,
118:11, 118:19,
121:7, 134:13
**looked** [6] - 13:22,
19:2, 29:9, 48:12,
93:25, 117:25
**looking** [21] - 16:3,
16:11, 17:10, 18:4,
21:8, 21:17, 27:21,
36:2, 43:24, 43:25,
47:21, 60:10, 78:10,
79:6, 82:23, 83:3,
88:15, 91:2, 91:8,
134:2
**looks** [11] - 19:21,
34:9, 35:23, 42:11,
47:10, 47:14, 64:4,
121:6, 121:7, 134:6,
134:8
**LORI** [1] - 1:18
**Lori** [2] - 4:16, 30:11
**lose** [5] - 66:17,
66:24, 72:24, 73:22,
114:15
**loss** [61] - 5:5, 5:15,
6:1, 6:4, 7:9, 12:16,
13:10, 13:18, 14:5,
14:18, 16:5, 19:1,
19:6, 20:23, 21:2,
21:21, 22:11, 22:14,

22:24, 23:6, 23:11,
25:20, 26:10, 29:22,
29:24, 30:1, 47:2,
48:7, 53:11, 74:11,
74:16, 80:13, 80:15,
81:17, 81:20, 81:23,
82:2, 84:8, 84:17,
84:21, 84:23, 84:24,
85:1, 87:13, 87:19,
116:10, 117:22,
118:14, 119:1, 119:4,
119:24, 120:5,
131:10, 131:18,
132:15, 133:14,
133:16, 140:8, 140:9,
140:10, 142:15
**losses** [3] - 12:12,
22:22, 141:10
**lost** [1] - 87:10
**low** [2] - 54:21, 56:3
**low-market** [1] -
54:21
**low-priced** [1] - 56:3
**low-value** [1] - 54:21
**lower** [4] - 34:1,
55:12, 57:8, 57:10
**lower-cap** [1] - 55:12
**lunch** [1] - 85:7
**luncheon** [1] - 85:13
**Lundstrom** [6] -
135:4, 135:21, 138:6,
138:11, 138:14,
138:15
**lying** [1] - 114:4

## M

**M-I-T-T-S** [1] - 8:25
**ma'am** [1] - 30:10
**Machine** [4] - 68:19,
69:8, 79:23, 112:7
**magnitude** [3] -
25:20, 37:3, 43:7
**Main** [1] - 64:10
**main** [2] - 52:14,
76:13, 100:12
**maintain** [1] - 119:11
**maintained** [1] -
118:24
**major** [3] - 48:9,
54:15, 86:12
**maker** [1] - 55:10
**makers** [1] - 55:6
**manager** [1] - 7:20
**managing** [2] -
50:15, 52:20
**mandate** [1] - 105:15
**manipulation** [1] -
10:1

**manipulative** [1] -
94:6
**manner** [1] - 94:7
**March** [25] - 1:6,
14:21, 14:25, 58:15,
70:7, 70:18, 75:6,
80:19, 83:16, 86:5,
90:1, 90:3, 94:23,
95:11, 95:12, 96:5,
96:17, 96:22, 97:8,
129:20, 132:3,
133:24, 137:15,
144:10
**marked** [1] - 99:24
**Market** [2] - 65:18,
127:22
**market** [126] - 9:25,
13:15, 14:5, 15:23,
16:2, 16:23, 18:17,
18:20, 18:22, 19:7,
19:16, 19:17, 20:3,
20:12, 21:1, 21:4,
21:6, 21:15, 25:20,
25:22, 26:15, 26:17,
27:24, 34:18, 36:14,
36:19, 38:9, 42:19,
45:3, 45:6, 45:14,
48:1, 53:5, 54:13,
54:14, 54:18, 54:20,
54:21, 55:4, 55:6,
55:10, 55:25, 57:16,
57:23, 58:12, 58:14,
58:21, 60:11, 60:17,
65:7, 65:15, 66:15,
73:2, 74:4, 74:5,
75:19, 76:6, 76:11,
76:12, 76:15, 76:20,
76:23, 77:20, 79:11,
79:19, 81:8, 84:22,
84:23, 84:25, 86:14,
86:15, 86:20, 86:21,
86:25, 88:20, 88:25,
89:5, 89:11, 103:11,
103:16, 105:10,
105:12, 105:18,
105:24, 106:10,
107:9, 110:2, 111:5,
113:16, 113:18,
117:15, 118:19,
119:10, 119:16,
120:1, 120:8, 120:14,
120:15, 120:19,
120:20, 121:3, 121:6,
123:9, 123:18,
125:15, 125:16,
126:10, 128:10,
128:12, 129:4, 129:7,
129:16, 130:5, 130:7,
130:9, 130:18,
132:13, 132:18,

136:21, 137:9, 137:10, 138:14

**market's** [1] - 121:8

**market-specific** [1] - 120:1

**market-wide** [4] - 18:17, 18:22, 42:19, 107:9

**marketplace** [2] - 89:23, 137:15

**Markets** [27] - 13:3, 40:23, 41:1, 41:4, 41:12, 41:15, 55:17, 55:20, 56:7, 56:25, 61:25, 65:6, 65:13, 68:22, 80:2, 89:6, 93:23, 110:17, 112:9, 112:22, 113:12, 114:8, 114:14, 115:3, 115:8, 115:10, 126:15

**markets** [8] - 9:18, 9:24, 31:17, 51:6, 54:22, 55:7, 58:17, 115:11

**Maryland** [1] - 50:8

**massive** [1] - 58:18

**material** [3] - 48:23, 103:22, 103:23

**materials** [1] - 15:10

**math** [5] - 21:22, 81:18, 81:19, 81:24, 85:1

**mathematical** [4] - 13:17, 14:17, 19:5, 117:20

**MATHEW** [1] - 1:14

**matter** [14] - 11:1, 12:9, 12:17, 12:21, 17:7, 31:15, 47:19, 47:24, 48:12, 87:17, 104:7, 105:25, 122:5, 136:4

**matters** [4] - 52:16, 53:16, 53:20, 87:16

**Matthew** [1] - 4:6

**McFADDEN** [1] - 1:10

**mean** [29] - 6:3, 6:8, 6:12, 6:14, 6:15, 8:10, 17:13, 20:21, 21:12, 23:25, 24:1, 27:19, 47:10, 48:9, 54:7, 57:7, 57:22, 68:17, 80:17, 81:3, 89:1, 99:21, 111:24, 112:12, 118:3, 119:13, 121:17, 122:3, 137:8

**meaning** [9] - 25:15, 28:23, 40:13, 42:15,

43:4, 56:15, 121:4, 123:18, 137:6

**meaningful** [3] - 28:25, 34:6, 43:23

**means** [5] - 24:15, 41:7, 43:18, 65:19, 137:9

**measure** [18] - 14:4, 18:5, 18:25, 21:2, 22:13, 23:18, 26:10, 40:17, 41:17, 41:25, 42:4, 48:3, 119:23, 126:19, 128:25, 137:23, 140:8, 142:5

**measured** [4] - 28:4, 29:9, 38:9, 39:23

**measurement** [1] - 23:6

**measurements** [1] - 28:25

**measures** [1] - 9:20

**measuring** [3] - 18:2, 48:24, 131:10

**medications** [1] - 4:23

**meet** [1] - 54:17

**member** [3] - 52:21, 93:17, 98:2

**meme** [1] - 78:25

**memoranda** [1] - 143:1

**memory** [1] - 60:1

**mentioned** [10] - 30:15, 33:15, 40:21, 46:7, 52:18, 57:23, 73:9, 77:5, 81:15, 138:18

**merely** [2] - 113:21, 139:18

**merger** [2] - 30:22, 30:23

**message** [3] - 74:8, 126:5, 129:9

**messages** [1] - 105:3

**method** [15] - 12:13, 13:17, 14:7, 19:13, 21:2, 74:18, 86:7, 86:10, 95:15, 96:8, 131:9, 131:10, 131:12, 132:8, 142:14

**methodology** [5] - 10:14, 13:8, 14:8, 38:22, 42:6

**metric** [1] - 41:9

**MICHELLE** [1] - 1:23

**Michelle** [1] - 4:17

**micro** [1] - 34:14

**microcap** [3] - 55:12, 56:3, 56:11

**mid** [2] - 57:20, 57:21

**mid-cap** [2] - 57:20, 57:21

**Middle** [1] - 52:15

**might** [18] - 7:4, 17:15, 19:12, 21:17, 24:10, 24:11, 30:24, 31:23, 37:5, 40:3, 43:9, 59:8, 76:2, 79:9, 79:11, 120:16, 124:13, 129:23

**million** [20] - 22:8, 22:9, 22:16, 22:22, 23:1, 23:3, 23:25, 25:16, 36:15, 36:20, 36:24, 36:25, 37:3, 37:4, 37:7, 55:25

**mind** [1] - 76:22

**minimum** [2] - 36:14, 37:4

**minute** [1] - 124:7

**minutes** [5] - 115:5, 124:1, 124:17, 124:19

**mirrored** [1] - 142:1

**misconduct** [1] - 105:6

**misleading** [12] - 94:19, 95:17, 95:18, 96:9, 96:11, 97:1, 97:13, 102:22, 127:25, 128:4, 129:19, 134:16

**miss** [1] - 75:13

**missing** [1] - 47:21

**mission** [1] - 76:12

**misstatement** [4] - 17:22, 48:23, 119:14, 123:10

**misstatements** [3] - 121:4, 123:19, 123:20

**mistakenly** [1] - 118:22

**MITTS** [2] - 8:18, 117:1

**Mitts** [29] - 3:5, 8:5, 8:17, 8:25, 9:1, 10:3, 11:6, 11:18, 12:2, 12:4, 12:8, 14:14, 16:4, 23:23, 26:21, 27:14, 30:9, 47:9, 79:9, 86:10, 116:16, 116:20, 117:4, 117:19, 118:10, 121:15, 123:23, 133:20, 136:3

**model** [5] - 19:20, 20:16, 23:21, 58:2, 80:12

**modified** [3] - 12:13,

86:7, 131:10

**moment** [1] - 134:19

**moments** [1] - 26:2

**money** [12] - 24:10, 58:21, 66:18, 66:24, 72:25, 73:18, 73:22, 74:7, 87:10, 87:12, 114:15, 132:19

**months** [4] - 25:7, 78:6, 139:1

**moreover** [1] - 133:22

**morning** [9] - 4:6, 4:11, 4:12, 4:20, 4:21, 4:24, 8:19, 8:20, 30:9

**most** [2] - 52:4, 126:23

**motion** [2] - 10:24, 11:3

**move** [13] - 12:1, 27:7, 60:18, 62:17, 63:12, 64:18, 69:21, 70:24, 77:11, 97:20, 102:25, 104:24, 104:25

**moves** [1] - 43:7

**MR** [178] - 4:6, 4:12, 5:4, 6:6, 6:11, 7:11, 7:17, 7:24, 8:4, 8:13, 8:16, 8:22, 9:11, 11:15, 11:17, 11:20, 12:1, 12:7, 14:11, 14:13, 15:15, 18:10, 25:25, 26:18, 26:20, 27:7, 27:13, 30:3, 35:20, 49:5, 49:11, 49:14, 49:19, 50:1, 53:14, 53:17, 53:21, 53:22, 56:19, 58:22, 59:3, 59:6, 59:10, 59:13, 59:17, 59:20, 60:7, 60:18, 60:20, 60:24, 62:5, 62:6, 62:17, 62:19, 62:24, 63:12, 63:14, 63:18, 63:23, 64:18, 64:20, 64:24, 67:17, 67:22, 68:3, 68:14, 69:5, 69:6, 69:21, 69:23, 70:2, 70:3, 70:8, 70:10, 70:24, 71:1, 71:5, 71:7, 71:23, 72:1, 73:23, 74:1, 74:22, 74:24, 77:3, 77:4, 77:11, 77:13, 79:14, 80:7, 80:10, 81:14, 82:3, 82:5, 82:6, 83:19, 84:6, 84:7, 85:4, 85:23, 86:1, 88:7, 88:9,

88:11, 90:19, 90:21, 91:5, 91:10, 91:18, 92:3, 92:4, 92:6, 92:8, 95:3, 95:6, 95:9, 95:10, 96:3, 96:4, 97:6, 99:23, 100:5, 100:8, 100:17, 102:17, 104:9, 104:10, 104:13, 104:24, 105:1, 106:23, 107:3, 113:2, 115:6, 115:7, 115:23, 115:25, 116:4, 116:5, 116:11, 116:17, 116:19, 116:25, 117:3, 118:5, 118:9, 121:10, 121:12, 121:14, 123:21, 124:6, 124:10, 124:12, 124:21, 124:25, 126:14, 126:23, 127:21, 128:21, 130:4, 130:23, 130:25, 131:1, 132:2, 132:12, 132:23, 133:6, 134:7, 134:9, 136:13, 136:25, 137:4, 138:3, 138:19, 141:10, 142:19, 142:22, 143:5

**MRM** [12] - 12:15, 13:2, 14:6, 14:7, 20:22, 21:1, 22:25, 25:14, 29:25, 48:6, 117:20, 131:10

**MS** [14] - 11:22, 12:3, 27:9, 30:8, 30:11, 30:14, 35:15, 35:18, 35:21, 35:22, 45:22, 45:23, 47:4, 49:3

**multiplication** [1] - 21:22

**multiplied** [1] - 14:3

**multiply** [3] - 13:24, 84:11, 84:13

**must** [3] - 33:10, 36:14, 140:7

## N

**name** [3] - 8:23, 30:10, 50:2

**narrow** [1] - 6:9

**NASA** [1] - 5:19

**NASD** [1] - 50:13

**NASDAQ** [30] - 26:23, 28:5, 28:6, 29:3, 29:11, 29:16, 33:6, 33:8, 33:10, 33:11, 33:17, 34:7,

34:10, 34:13, 34:15, 34:19, 34:22, 36:6, 36:8, 36:10, 36:12, 36:13, 37:16, 37:18, 37:22, 40:19, 41:12, 42:8, 43:3, 54:16

**NASDAQ-listed** [1] - 29:3

**NASDAQ-traded** [1] - 28:6

**Nationals** [1] - 7:20

**nature** [10] - 6:13, 9:23, 21:14, 34:21, 57:5, 72:19, 73:17, 98:24, 114:9, 125:14

**navigated** [1] - 140:19

**NBI** [9] - 29:2, 29:5, 37:19, 37:24, 38:1, 38:12, 38:15, 40:11, 42:23

**Nebraska** [1] - 135:4

**necessarily** [6] - 16:12, 18:2, 79:8, 87:4, 117:12, 132:12

**necessary** [1] - 94:5, 95:17, 96:10

**need** [8] - 20:2, 21:10, 28:18, 95:1, 102:16, 118:19, 128:14, 133:22

**needed** [4] - 13:1, 13:21, 13:22, 13:24

**needs** [5] - 28:23, 41:18, 119:3, 139:10

**negative** [2] - 38:3, 40:10

**neon** [1] - 141:4

**nets** [1] - 28:15

**never** [7] - 7:1, 32:1, 35:24, 36:3, 49:17, 141:19, 141:20

**new** [5] - 45:8, 46:11, 46:13, 83:9, 83:11

**New** [4] - 1:16, 10:24, 51:18, 54:16, 139:15, 139:16

**newly** [15] - 22:20, 24:23, 32:10, 32:15, 32:17, 32:22, 32:23, 33:4, 45:24, 46:4, 46:15, 46:18, 82:11, 82:18

**newness** [1] - 127:5

**news** [17] - 18:22, 28:17, 29:19, 37:24, 38:1, 38:3, 38:11, 38:13, 38:19, 39:5, 40:17, 41:17, 41:25, 42:4, 62:3, 88:16,

113:9

**newsletter** [1] - 60:1

**next** [4] - 73:24, 98:21, 113:4, 113:5

**NFA** [1] - 52:6

**Nick** [1] - 4:18

**NICK** [1] - 1:20

**nine** [1] - 25:7

**none** [2] - 138:23, 138:24

**nonetheless** [1] - 133:1

**Northern** [1] - 11:2

**Northwest** [5] - 1:16, 1:21, 1:24, 2:3, 144:14

**notable** [1] - 76:6

**note** [14] - 14:9, 32:21, 61:24, 74:17, 80:17, 81:19, 82:1, 84:10, 117:20, 117:24, 119:19, 122:24, 123:1

**notes** [6] - 32:14, 46:10, 46:16, 83:8, 123:4, 144:5

**nothing** [5] - 79:12, 113:24, 123:22, 141:22, 142:9

**notice** [10] - 5:25, 73:21, 105:17, 108:18, 110:2, 111:17, 113:17, 113:18, 117:12, 128:11

**noticed** [1] - 8:8

**notwithstanding** [2] - 132:20, 135:18

**November** [3] - 6:24, 91:3, 134:12

**number** [33] - 4:15, 6:13, 7:19, 13:12, 13:25, 14:1, 14:4, 22:4, 22:17, 22:23, 23:1, 23:3, 24:18, 24:22, 25:3, 25:15, 31:12, 32:7, 37:2, 51:9, 51:19, 52:16, 55:24, 55:25, 57:15, 64:14, 108:5, 117:22, 118:14, 125:4, 127:3, 127:7, 127:10

**numbers** [8] - 15:4, 22:10, 22:24, 25:18, 34:17, 36:21, 36:23, 84:4

**numerical** [1] - 13:10

**numerous** [1] - 109:2

# O

**oath** [3] - 30:20, 85:20, 116:22

**objection** [32] - 11:22, 11:23, 12:3, 12:4, 27:9, 27:10, 53:17, 53:18, 60:7, 60:20, 60:21, 62:19, 62:20, 63:14, 63:15, 64:20, 64:21, 69:23, 69:24, 71:1, 71:2, 77:13, 77:14, 88:7, 92:4, 95:3, 95:6, 100:9, 100:16, 104:9, 106:23, 118:5

**obligation** [1] - 32:21

**obligations** [3] - 24:11, 24:25, 46:17

**oblique** [1] - 121:1

**observe** [1] - 72:2

**obstruct** [1] - 109:18

**obstructed** [1] - 103:20

**obstructing** [5] - 103:2, 103:7, 110:7, 110:10, 110:11

**obstruction** [9] - 117:16, 119:7, 125:6, 125:9, 134:18, 134:23, 136:8, 138:2

**obstructive** [3] - 128:1, 128:24, 130:11

**obtain** [2] - 14:4, 51:22

**obtained** [1] - 51:9

**obvious** [1] - 16:21

**obviously** [2] - 5:12, 17:14

**occur** [2] - 37:25, 38:2

**occurred** [2] - 17:10, 86:4

**odds** [1] - 81:11

**OF** [5] - 1:1, 1:3, 1:10, 1:15, 1:23

**offense** [1] - 6:14

**offer** [3] - 8:6, 11:20, 53:14

**offered** [1] - 30:16

**offering** [1] - 82:25

**offers** [1] - 11:9

**OFFICE** [1] - 1:23

**Office** [1] - 4:18

**officer** [7] - 50:18, 50:21, 51:18, 72:9, 73:11, 76:8, 92:12

**officers** [1] - 117:13

**official** [1] - 144:12

**Official** [1] - 2:1

**often** [2] - 96:7, 133:7

**old** [1] - 59:2

**old-school** [1] - 59:2

**older** [1] - 32:12

**oldest** [3] - 68:20, 69:2, 80:5

**omit** [2] - 95:17, 96:9

**omitted** [1] - 140:10

**once** [9] - 29:5, 30:18, 52:15, 66:19, 71:18, 72:8, 76:7, 128:6, 140:19

**one** [66] - 5:13, 6:13, 7:23, 9:10, 12:12, 18:18, 19:20, 21:8, 21:10, 22:13, 25:19, 25:21, 28:9, 30:21, 31:22, 34:9, 36:9, 36:10, 37:21, 38:8, 38:11, 38:14, 38:23, 39:4, 43:12, 43:22, 43:25, 44:1, 44:13, 46:19, 53:9, 54:4, 59:11, 63:19, 64:11, 67:1, 68:22, 68:23, 70:16, 71:13, 72:22, 80:5, 83:14, 112:23, 113:5, 115:10, 115:18, 115:22, 117:24, 118:19, 118:21, 119:3, 119:24, 124:7, 126:21, 128:3, 128:23, 135:2, 135:16, 138:14, 140:12, 141:12, 142:12, 142:19

**one-to-one** [1] - 43:12

**ones** [2] - 65:21, 70:16

**online** [9] - 65:24, 66:10, 66:12, 69:3, 72:7, 72:16, 72:17, 111:13, 140:25

**onset** [3] - 58:16, 75:6, 79:7

**onwards** [1] - 80:22

**OpenAI** [2] - 132:17, 132:22

**opening** [2] - 99:25, 111:1

**opining** [1] - 103:10

**opinion** [15] - 13:10, 13:11, 22:12, 23:5, 29:22, 29:25, 37:9, 44:25, 74:11, 75:12, 75:17, 81:17, 84:21,

84:24, 103:16

**opinions** [1] - 54:8

**opportunities** [3] - 58:20, 60:11, 79:6

**opportunity** [2] - 99:12, 129:10

**opposed** [4] - 48:13, 55:7, 80:15, 86:16

**orally** [1] - 124:21

**order** [27] - 21:10, 37:2, 41:16, 44:7, 55:2, 55:3, 56:25, 61:21, 63:1, 63:9, 66:14, 66:20, 72:25, 73:1, 74:6, 75:21, 94:4, 95:18, 96:10, 97:11, 98:15, 119:22, 121:21, 127:10, 128:14, 138:24, 140:24

**ordered** [1] - 98:22

**orders** [4] - 55:8, 58:10, 137:16, 140:22

**organizing** [1] - 41:7

**originally** [1] - 27:2

**OTC** [52] - 13:3, 13:5, 26:11, 26:16, 29:1, 32:3, 33:20, 33:25, 34:6, 34:15, 40:22, 41:1, 41:4, 41:12, 41:14, 41:21, 41:23, 51:4, 54:22, 55:4, 55:14, 55:17, 55:20, 56:7, 56:8, 56:25, 61:25, 65:6, 65:12, 66:14, 68:22, 72:10, 72:20, 73:12, 74:4, 80:2, 89:6, 93:23, 105:17, 110:17, 112:9, 112:22, 113:12, 114:8, 114:14, 115:3, 115:8, 115:10, 117:10, 126:15, 126:16, 127:22

**otcmarkets.com** [8] - 55:14, 66:5, 68:6, 93:20, 97:17, 107:13, 140:16, 140:19

**otherwise** [4] - 58:21, 105:14, 118:21, 132:10

**otherwise-falling** [1] - 58:21

**ought** [2] - 140:21, 142:14

**ourselves** [1] - 73:19

**outcome** [1] - 138:8

**outline** [1] - 109:2

**outright** [1] - 125:14

**outside** [2] - 31:21, 31:25

**outsiders** [1] - 120:9

**outstanding** [21] - 13:6, 13:25, 14:2, 14:4, 21:24, 22:5, 22:8, 22:9, 23:24, 24:14, 24:21, 24:22, 25:3, 32:6, 82:8, 82:23, 83:2, 84:12, 84:14, 105:19

**over-the-counter** [8] - 28:20, 28:21, 33:25, 54:10, 54:12, 54:14, 54:23, 56:20

**overall** [3] - 16:25, 40:4, 131:18

**overcompensates** [1] - 130:1

**overruled** [5] - 60:8, 88:10, 92:5, 95:5, 106:25

**overruling** [1] - 95:7, 100:16

**overturn** [2] - 121:23, 121:25

**overwhelming** [1] - 137:12

**own** [8] - 25:1, 27:4, 28:11, 52:21, 58:3, 58:8, 118:10, 122:5

---

# P

**PAGE** [1] - 3:9

**Page** [12] - 64:14, 71:6, 83:15, 83:21, 92:6, 94:3, 100:4, 101:8, 104:24, 104:25, 115:1

**page** [7] - 64:16, 68:6, 91:3, 98:21, 113:4, 113:5, 140:19

**pages** [2] - 90:24, 91:5

**paid** [4] - 12:17, 24:24, 31:7, 131:15

**pandemic** [4] - 58:16, 75:7, 79:7, 127:5

**Panikar** [3] - 4:16, 71:23, 73:23

**PANIKAR** [1] - 1:20

**paper** [2] - 35:19, 56:14

**Paragraph** [8] - 71:6, 94:3, 95:9, 96:3, 96:17, 96:22, 97:4, 102:12

**paragraphs** [1] - 94:3

**paralegals** [1] - 4:8

**parameters** [1] - 119:24

**part** [15] - 13:2, 20:7, 21:22, 23:9, 44:24, 50:15, 52:14, 52:24, 72:4, 78:10, 96:15, 99:9, 114:16, 121:15, 141:20

**participant** [1] - 126:10

**particular** [17] - 9:16, 13:20, 18:8, 28:8, 32:25, 34:12, 38:24, 43:21, 71:13, 87:17, 88:15, 113:13, 114:5, 118:18, 119:23, 127:9, 141:17

**particularly** [6] - 34:19, 41:9, 103:22, 107:17, 110:11, 115:13

**parties** [11] - 120:9, 120:16, 131:4, 131:7, 131:8, 131:11, 131:16, 131:23, 132:3, 136:16, 142:14

**partner** [1] - 52:20

**party** [3] - 17:9, 30:23, 121:7

**patterns** [1] - 60:4

**paying** [1] - 32:19

**peer** [8] - 10:10, 10:11, 26:4, 26:6, 29:21, 38:4, 40:18, 119:25

**peer-reviewed** [7] - 10:10, 10:11, 26:4, 26:6, 29:21, 38:4, 119:25

**pending** [1] - 52:16

**penny** [25] - 26:11, 26:16, 32:4, 36:11, 42:14, 42:16, 42:17, 54:9, 55:22, 55:23, 56:4, 56:11, 56:15, 56:21, 56:22, 57:3, 57:6, 57:7, 57:17, 57:23, 60:3, 60:15, 65:24, 103:25, 127:23

**people** [19] - 19:11, 56:2, 56:3, 56:4, 56:16, 59:25, 60:14, 60:16, 79:4, 79:6, 107:8, 122:1, 135:11

**Peppel** [1] - 137:18

**per** [5] - 7:23, 14:23, 15:2, 15:4, 36:6

**percent** [5] - 43:8, 43:9, 72:5, 72:6, 72:10

**percentage** [2] - 43:3, 43:4

**percentages** [1] - 42:24

**perfectly** [1] - 25:21

**performed** [2] - 31:13, 41:12

**perhaps** [1] - 6:7

**period** [67] - 14:20, 14:22, 15:1, 15:6, 15:9, 15:17, 16:11, 17:18, 17:19, 17:22, 18:7, 18:13, 18:15, 18:16, 18:23, 22:3, 22:7, 22:8, 22:19, 22:21, 23:2, 25:6, 25:15, 25:17, 36:18, 48:10, 48:14, 48:18, 48:19, 74:20, 74:21, 74:25, 75:2, 78:3, 78:11, 78:16, 79:5, 80:18, 80:25, 81:3, 81:21, 81:25, 82:24, 83:16, 83:23, 86:4, 106:12, 128:23, 128:25, 131:5, 131:24, 133:8, 133:12, 133:24, 134:17, 134:23, 135:17, 135:24, 136:17, 136:21, 137:17, 142:12

**periods** [4] - 83:18, 84:11, 133:11, 134:15

**perjuriously** [1] - 127:15

**Perkins** [5] - 76:25, 77:5, 84:2, 98:2, 98:4

**permission** [1] - 67:23

**perpetuate** [1] - 120:24

**perpetuation** [1] - 128:24

**persistent** [1] - 125:20

**person** [3] - 7:23, 24:16, 105:22

**personal** [2] - 74:6, 92:16

**personally** [1] - 41:6

**perspective** [7] - 7:12, 7:14, 66:16, 75:1, 77:1, 78:14, 88:19

**persuade** [1] - 121:25

**persuasive** [1] - 41:7

**perverse** [1] - 142:7

**Peterson** [1] - 4:17

**PETERSON** [1] - 1:23

**petition** [15] - 90:3, 90:10, 90:13, 90:16, 90:22, 91:20, 92:14, 98:9, 98:10, 98:19, 99:2, 100:1, 102:9, 110:20, 110:23

**Petitioner** [1] - 92:9

**Petitioner's** [1] - 99:25

**Ph.D** [4] - 3:5, 8:18, 9:4, 9:8

**Ph.D.s** [1] - 10:4

**pharmaceutical** [4] - 35:2, 38:18, 38:23, 39:5

**pharmaceutical-specific** [1] - 39:5

**phase** [1] - 19:14

**phrases** [1] - 137:5

**physical** [2] - 70:17, 100:19

**pick** [4] - 62:1, 66:10, 79:3, 120:2

**picked** [3] - 61:22, 74:4, 114:8

**piece** [1] - 79:15

**pile** [1] - 72:8

**pink** [4] - 51:4, 56:11, 56:13, 72:10

**pivot** [2] - 131:22, 136:15

**place** [8] - 60:3, 60:4, 65:3, 67:10, 68:7, 74:3, 140:23, 140:24

**plain** [1] - 137:6

**Plaintiff** [1] - 1:4

**Plan** [1] - 124:10

**plan** [1] - 85:11

**platform** [5] - 41:5, 55:20, 62:4, 65:10, 67:21

**plausible** [1] - 118:17

**playing** [1] - 6:9

**plays** [1] - 125:9

**plea** [3] - 103:4, 104:21, 110:8

**pleaded** [7] - 87:3, 87:5, 87:23, 103:1, 103:7, 109:18, 110:6

**pleadings** [1] - 54:7

**pled** [4] - 109:21, 110:9, 125:5, 127:17

**plotted** [1] - 42:21

**plotting** [1] - 26:21

**PNA** [1] - 52:20

**point** [20] - 7:5, 16:7, 17:18, 24:8, 25:13, 25:17, 25:22, 49:19, 75:9, 75:14, 83:2, 110:18, 120:22, 128:4, 135:7, 136:2, 138:5, 141:1, 141:12, 142:20

**pointed** [1] - 132:21

**points** [7] - 13:5, 13:7, 22:6, 28:9, 111:4, 125:3, 140:4

**policies** [4] - 66:15, 73:13, 78:2, 105:16

**pops** [1] - 74:7

**population** [1] - 34:10

**portion** [1] - 73:12

**position** [8] - 7:17, 52:19, 128:18, 133:4, 133:23, 134:21, 136:7, 139:9

**positions** [1] - 50:14

**positive** [2] - 37:25, 40:8

**possible** [7] - 5:10, 7:6, 45:17, 45:19, 118:25, 123:13, 123:15

**post** [10] - 84:1, 84:2, 84:3, 130:1, 131:13, 131:14, 133:8, 136:1, 137:17, 138:2

**post-December** [1] - 130:1

**post-disclosure** [4] - 131:13, 131:14, 133:8, 137:17

**post-Perkins** [1] - 84:2

**post-SEC** [1] - 138:2

**post-trading** [1] - 84:1

**posted** [3] - 97:17, 106:20, 136:8

**postings** [1] - 97:19

**potential** [16] - 53:11, 61:11, 64:12, 75:21, 76:14, 77:20, 78:14, 79:6, 81:8, 86:19, 86:23, 101:14, 108:11, 111:4, 111:16, 120:23

**potentially** [4] - 5:16, 16:20, 38:19, 43:13

**power** [2] - 71:9, 142:10

**practical** [1] - 78:13

**practice** [1] - 87:15

**practitioner** [2] - 109:24, 111:3
**pre** [1] - 47:10
**pre-fraud** [1] - 47:10
**preceding** [3] - 18:15, 18:23, 23:20
**precise** [2] - 90:15, 136:19
**precisely** [1] - 38:24
**preexisting** [2] - 119:11, 119:12
**preference** [1] - 8:9
**preferenced** [1] - 32:11
**preferred** [16] - 32:13, 32:20, 46:1, 46:12, 46:13, 46:16, 46:19, 82:9, 82:13, 82:20, 82:21, 83:1, 83:10, 83:11
**prefers** [1] - 124:22
**preliminary** [1] - 61:8
**premise** [1] - 130:13
**preparation** [2] - 53:23, 122:18
**prepare** [2] - 70:6, 128:2
**prepared** [4] - 8:7, 27:2, 70:5, 98:2
**preparing** [2] - 46:8, 122:22
**presence** [1] - 142:24
**present** [6] - 4:14, 5:3, 8:11, 8:14, 58:22, 101:10
**press** [36] - 6:19, 44:8, 54:6, 61:21, 75:5, 75:18, 77:22, 78:8, 78:24, 80:19, 81:6, 89:25, 94:13, 94:19, 94:23, 95:11, 95:12, 95:16, 96:5, 96:6, 96:8, 96:17, 96:22, 96:25, 97:1, 97:8, 97:13, 125:8, 127:19, 128:4, 128:8, 129:9, 129:19, 132:4, 135:25, 141:19
**presumably** [1] - 90:11
**pretrial** [3] - 6:24, 128:19, 134:12
**pretty** [5] - 6:9, 65:16, 91:1, 126:20, 133:1
**prevent** [1] - 65:10
**prevented** [1] - 125:16

**previewed** [1] - 23:10
**previous** [1] - 111:6
**PREVIOUSLY** [1] - 117:1
**previously** [9] - 10:15, 14:20, 27:23, 30:15, 42:14, 50:13, 94:13, 118:7, 130:14
**price** [95] - 13:2, 13:4, 13:13, 13:25, 14:3, 14:19, 14:23, 15:1, 17:20, 17:23, 18:17, 18:20, 19:13, 19:16, 19:21, 19:24, 20:3, 20:16, 20:25, 21:5, 21:19, 23:19, 23:22, 25:7, 25:13, 26:14, 26:22, 26:23, 27:16, 28:2, 28:4, 28:14, 28:17, 28:24, 29:11, 29:18, 35:24, 36:3, 36:6, 37:10, 37:13, 37:16, 37:24, 38:1, 38:10, 38:12, 38:14, 40:11, 41:20, 42:11, 42:17, 42:22, 42:23, 43:2, 43:7, 43:13, 44:19, 45:1, 45:5, 45:18, 47:25, 48:1, 48:8, 48:20, 48:22, 57:14, 74:19, 74:20, 80:18, 81:20, 83:15, 83:22, 105:19, 118:23, 119:8, 119:11, 119:12, 119:15, 120:24, 123:17, 123:20, 125:10, 126:2, 128:7, 129:15, 130:2, 130:19, 130:20, 131:12, 131:13, 131:14, 132:14, 133:14, 137:23, 142:8
**priced** [1] - 56:3
**prices** [13] - 9:25, 13:20, 13:21, 13:23, 14:22, 18:4, 22:21, 34:23, 38:6, 38:15, 41:15, 41:24, 42:2
**Pricing** [1] - 33:20
**pricing** [9] - 13:1, 13:3, 19:18, 20:11, 20:20, 27:24, 39:17, 39:19, 128:6
**primarily** [1] - 72:15
**primary** [2] - 66:6, 68:18
**principal** [1] - 51:19
**principle** [1] - 131:12

**principles** [2] - 19:9, 119:19
**printout** [1] - 59:24
**private** [1] - 105:3
**probable** [1] - 129:13
**problem** [2] - 8:10, 61:9
**problematic** [2] - 41:15, 76:15
**procedural** [1] - 122:6
**procedure** [1] - 122:5
**procedures** [5] - 66:12, 66:16, 73:14, 78:2, 105:16
**proceed** [5] - 5:13, 20:2, 49:15, 67:16, 81:13
**proceeding** [2] - 27:5, 108:13
**Proceedings** [1] - 143:6
**proceedings** [2] - 85:14, 144:6
**process** [8] - 12:24, 14:17, 58:9, 72:14, 73:5, 99:9, 114:16, 128:11
**processes** [8] - 66:1, 66:12, 72:18, 73:14, 78:2, 105:16, 107:10
**produced** [1] - 144:6
**product** [3] - 5:6, 13:14, 133:16
**products** [3] - 127:4, 127:6, 128:9
**professional** [11] - 31:20, 31:23, 50:10, 50:11, 61:7, 75:12, 80:1, 88:13, 103:16, 107:10, 111:25
**Professor** [24] - 5:7, 5:16, 7:3, 8:5, 8:17, 10:3, 11:5, 11:18, 12:2, 12:4, 14:14, 16:4, 26:21, 27:14, 49:7, 79:9, 86:10, 116:20, 117:4, 117:19, 123:23, 124:13, 133:20, 136:3
**professor** [11] - 8:1, 9:1, 9:7, 9:15, 12:8, 15:5, 16:12, 31:21, 116:21, 118:10, 121:15
**profit** [2] - 79:7, 84:14
**project** [1] - 5:19
**prominently** [1] -

95:12
**promote** [1] - 129:8
**promoted** [1] - 125:24
**proof** [1] - 112:2
**property** [1] - 108:12
**proposed** [2] - 21:8, 101:17
**proposition** [2] - 135:2, 137:9
**propositions** [1] - 138:4
**protect** [1] - 76:11
**protection** [1] - 76:12
**protocols** [4] - 64:25, 65:3, 65:13, 128:16
**prove** [2] - 112:11, 140:7
**proven** [1] - 67:12
**provide** [1] - 59:11
**provided** [6] - 15:7, 15:8, 26:2, 54:2, 108:18, 122:4
**provides** [2] - 11:10, 126:17
**proving** [1] - 131:18
**provision** [1] - 123:4
**proxy** [1] - 137:23
**prudent** [1] - 73:13
**pseudonyms** [1] - 130:11
**public** [12] - 46:6, 46:9, 61:16, 82:25, 83:5, 83:7, 91:9, 93:17, 94:5, 97:14, 113:8, 130:15
**PUBLIC** [1] - 1:23
**publication** [1] - 15:25
**publications** [1] - 10:8
**publicize** [1] - 61:14
**publicly** [13] - 15:10, 34:10, 91:21, 92:25, 93:2, 93:6, 93:7, 93:9, 97:12, 98:24, 101:12, 106:20, 107:6
**publish** [2] - 61:20, 65:19
**published** [11] - 10:7, 10:9, 10:11, 10:13, 56:13, 93:13, 93:18, 93:22, 107:6, 107:8, 107:13
**pull** [10] - 35:20, 62:5, 62:23, 66:5, 66:7, 68:6, 69:5, 71:23, 77:3, 90:19

**purchase** [2] - 25:13, 44:14
**purchased** [6] - 24:3, 24:6, 24:7, 24:9, 24:15, 32:4
**purchaser** [1] - 66:4
**purchasers** [1] - 25:2
**purported** [1] - 109:5
**purpose** [2] - 39:2, 67:8
**purposes** [4] - 27:4, 45:15, 76:13, 104:6
**pursuing** [1] - 6:16
**push** [1] - 85:10
**pushing** [2] - 126:7, 128:1
**put** [23] - 14:11, 26:18, 42:25, 47:8, 48:1, 59:6, 59:18, 65:15, 67:25, 72:20, 73:21, 80:7, 89:8, 100:6, 112:15, 113:12, 113:17, 113:18, 117:10, 117:12, 129:11, 130:12
**putting** [3] - 116:9, 128:8, 129:19

## Q

**qualifications** [1] - 9:2
**qualified** [1] - 10:22
**quantitative** [1] - 9:20
**quarterly** [3] - 46:9, 83:7, 83:12
**questioning** [3] - 67:24, 100:9, 109:16
**questions** [18] - 30:3, 33:5, 47:4, 49:1, 49:2, 49:6, 73:7, 82:7, 85:4, 89:21, 89:25, 109:12, 115:23, 119:25, 121:10, 128:22, 130:23, 137:13
**quick** [2] - 85:7, 91:1
**quit** [1] - 135:12
**quite** [2] - 58:15, 91:2
**quo** [2] - 47:10, 48:13
**quotations** [3] - 57:13, 65:19, 65:21
**quote** [8] - 95:13, 131:17, 134:13,

136:21, 137:14, 137:21, 137:24, 139:18
**quotes** [1] - 56:13
**quoting** [1] - 95:12

# R

**R-E-I-L-L-Y** [1] - 50:5
**Rachel** [1] - 4:8
**RAMOS** [1] - 1:18
**Ramos** [1] - 4:16
**ran** [3] - 16:5, 26:1, 44:10
**range** [1] - 51:13
**rareness** [1] - 127:8
**RDR** [3] - 2:1, 144:3, 144:12
**re** [2] - 116:16, 116:20
**re-call** [1] - 116:16
**re-calls** [1] - 116:20
**reach** [1] - 75:17
**reached** [1] - 37:15
**reacting** [1] - 41:24
**read** [15] - 31:16, 66:22, 69:15, 73:6, 92:14, 97:11, 102:14, 102:16, 110:14, 110:16, 110:18, 110:20, 110:23, 111:1, 111:14
**reading** [4] - 92:19, 94:16, 95:19, 96:13
**ready** [1] - 49:14
**real** [6] - 6:14, 6:15, 7:4, 132:9, 136:2, 139:20
**realize** [1] - 132:18
**realized** [1] - 123:18
**realizing** [1] - 125:16
**really** [14] - 6:3, 15:20, 17:7, 21:12, 24:21, 27:21, 47:19, 120:17, 128:22, 130:1, 130:15, 134:14, 136:16, 138:11
**reason** [11] - 22:18, 37:21, 38:23, 47:20, 88:14, 113:25, 119:16, 121:3, 133:10, 135:12, 138:12
**reasonable** [23] - 12:15, 13:12, 15:11, 15:12, 15:18, 15:25, 19:5, 22:10, 22:12, 22:16, 23:11, 23:16,

23:18, 25:19, 26:10, 30:1, 48:7, 111:10, 117:22, 119:5, 119:23, 133:17, 140:10
**reasonableness** [12] - 18:25, 20:22, 26:5, 26:7, 27:15, 29:22, 117:25, 118:14, 119:1, 119:18, 119:21, 122:25
**reasonably** [2] - 140:7, 141:7
**reasons** [8] - 14:2, 37:25, 38:2, 41:14, 46:5, 61:5, 125:4, 137:21
**rebuts** [1] - 127:14
**rebuttal** [2] - 8:6, 49:5
**recap** [1] - 83:13
**RECEIVED** [1] - 3:9
**received** [6] - 46:25, 50:7, 51:7, 51:17, 71:18, 140:1
**recent** [3] - 10:6, 131:21, 140:12
**recently** [2] - 66:24, 73:7
**recess** [2] - 85:8, 85:13
**recognize** [2] - 43:6, 69:12
**recognized** [2] - 12:5, 53:19
**recollection** [4] - 34:3, 34:25, 44:9, 44:12
**recommend** [1] - 131:9
**recommendations** [1] - 115:10
**record** [15] - 4:5, 8:24, 16:24, 48:17, 68:12, 70:18, 77:22, 81:6, 85:16, 93:11, 93:24, 116:3, 124:9, 137:4, 141:20
**records** [2] - 71:10, 76:4
**RECROSS** [1] - 121:13
**RECROSS-EXAMINATION** [1] - 121:13
**recruiting** [1] - 127:25
**Red** [1] - 3:3
**red** [3] - 140:20, 141:4

**REDIRECT** [1] - 117:2
**redirect** [3] - 49:4, 115:24, 116:5
**refer** [3] - 24:18, 28:1, 58:24
**reference** [1] - 48:5
**referenced** [2] - 44:7, 68:5, 71:8
**referred** [1] - 48:18
**referring** [3] - 31:24, 45:7, 121:3
**reflect** [4] - 25:20, 28:23, 37:23, 38:19
**reflected** [3] - 13:13, 39:19, 40:3
**reflects** [3] - 26:14, 39:6, 39:9
**refresh** [1] - 90:24
**refused** [1] - 6:21
**refuting** [1] - 126:6
**regard** [2] - 18:13, 80:6
**regarding** [4] - 75:17, 84:8, 84:20, 89:22
**regardless** [1] - 114:11
**registered** [1] - 66:22
**regressed** [1] - 23:21
**regression** [20] - 19:20, 20:5, 20:9, 20:16, 23:21, 26:1, 26:7, 29:6, 29:8, 29:10, 29:21, 43:1, 43:10, 43:11, 44:1, 45:3, 45:16, 45:20, 119:21, 120:2
**regression-type** [1] - 119:21
**regressions** [2] - 44:23, 44:24
**regulation** [1] - 50:13
**regulations** [3] - 51:15, 52:4, 52:6
**regulator** [1] - 140:2
**regulators** [1] - 71:9
**regulatory** [3] - 52:3, 76:13, 113:7
**REILLY** [44] - 1:14, 4:6, 8:4, 8:16, 8:22, 9:11, 11:15, 11:17, 11:20, 12:1, 12:7, 14:11, 14:13, 15:15, 18:10, 25:25, 26:18, 26:20, 27:7, 27:13, 30:3, 35:20, 49:5, 49:11, 49:22, 59:6,

91:5, 116:17, 116:19, 116:25, 117:3, 118:9, 121:10, 124:25, 126:14, 126:23, 127:21, 128:21, 130:4, 130:23, 130:25, 142:19, 142:22, 143:5
**Reilly** [32] - 3:8, 4:7, 8:1, 8:6, 49:20, 50:3, 50:6, 53:14, 53:18, 59:21, 67:24, 70:12, 85:19, 86:2, 86:25, 87:5, 87:13, 88:12, 93:14, 100:18, 100:23, 102:18, 104:4, 105:25, 106:13, 106:15, 112:3, 116:6, 116:24, 120:4, 127:2, 140:25
**reilly's** [1] - 117:4
**related** [6] - 6:4, 45:1, 58:18, 64:12, 127:6, 134:17
**relates** [1] - 108:17
**relating** [5] - 53:15, 75:18, 90:7, 93:15, 137:13
**relationship** [11] - 18:20, 19:15, 19:21, 19:23, 19:25, 20:15, 20:19, 20:25, 21:4, 29:12, 29:16
**relative** [1] - 25:14
**relatively** [1] - 121:1
**release** [22] - 61:20, 61:21, 62:14, 75:5, 76:24, 80:20, 81:6, 94:13, 94:23, 95:12, 95:16, 96:6, 96:8, 96:18, 96:23, 96:25, 128:4, 132:5, 135:25, 141:19
**released** [4] - 16:20, 16:23, 91:8, 118:20
**releases** [16] - 6:20, 44:8, 54:6, 75:18, 77:23, 78:8, 90:1, 94:19, 97:8, 97:13, 101:16, 125:8, 127:19, 128:9, 129:9, 129:19
**relevance** [2] - 92:4, 95:6
**relevant** [21] - 7:13, 7:14, 18:1, 29:5, 29:24, 39:7, 39:9, 39:13, 40:1, 41:19, 104:4, 105:7, 105:12, 106:6, 106:15,

106:18, 106:20, 107:5, 110:15, 111:4, 137:22
**reliable** [7] - 10:25, 41:9, 41:17, 41:25, 42:4, 57:13, 119:19
**reliance** [2] - 133:17, 140:10
**relied** [2] - 107:9, 140:7
**rely** [3] - 62:12, 63:7, 124:13
**relying** [1] - 141:8
**remain** [2] - 28:17, 36:10
**remained** [1] - 126:3
**remains** [4] - 39:16, 67:11, 129:3, 131:19
**remember** [8] - 33:22, 90:5, 105:18, 107:17, 114:16, 123:5, 123:7, 123:10
**remind** [2] - 30:10, 85:19, 116:21
**remotely** [2] - 5:17, 5:21
**render** [1] - 74:11
**renew** [1] - 95:6
**repeat** [4] - 36:1, 84:19, 107:1, 110:22
**rephrase** [1] - 39:8
**replicate** [1] - 41:11
**report** [12] - 11:4, 30:18, 30:20, 70:5, 70:6, 70:9, 70:19, 70:20, 70:22, 72:3, 83:15, 84:13
**REPORTED** [1] - 2:1
**REPORTER** [6] - 35:10, 68:12, 91:16, 99:18, 99:21, 112:25
**Reporter** [2] - 2:1, 144:12
**reports** [5] - 46:10, 71:11, 83:8, 83:12
**represent** [2] - 24:22, 108:4
**representations** [1] - 10:19
**representative** [1] - 66:22
**reps** [1] - 73:6
**requesting** [1] - 98:16
**require** [3] - 43:11, 71:9, 119:20
**required** [2] - 81:19, 101:20
**requirements** [2] - 51:15, 54:17

**requires** [3] - 19:14, 105:19, 117:20

**reschedule** [1] - 5:17

**rescissory** [3] - 12:13, 86:7, 131:10

**research** [5] - 9:17, 9:18, 9:19, 9:22, 31:17

**researched** [1] - 41:4

**resonate** [1] - 17:13

**respect** [3] - 76:11, 90:7, 126:9

**respects** [1] - 29:4

**respond** [2] - 24:8, 99:12

**responding** [2] - 18:17, 29:18

**response** [7] - 98:9, 98:10, 99:7, 99:16, 99:19, 101:5, 108:6

**responsive** [1] - 42:18

**rest** [3] - 120:13, 120:19, 134:16

**restate** [2] - 82:16, 107:1

**result** [11] - 32:11, 45:25, 46:12, 82:12, 82:20, 83:10, 126:2, 132:8, 140:9, 140:21, 141:10

**resulted** [1] - 127:6

**resulting** [1] - 117:21

**results** [1] - 26:7

**resume** [1] - 85:10

**resumed** [2] - 75:10, 103:15

**resumption** [3] - 69:1, 80:3, 80:21

**retrieved** [1] - 69:18

**returns** [3] - 20:13, 20:14, 128:7

**revealed** [19] - 15:22, 15:24, 16:2, 18:1, 48:21, 86:13, 86:17, 88:25, 89:10, 103:11, 111:20, 112:4, 118:18, 123:9, 126:4, 128:17, 129:4, 129:7, 130:21

**revelation** [2] - 14:24, 123:17

**reverse** [1] - 121:23

**reversed** [2] - 97:16, 137:20

**reverted** [1] - 130:19

**review** [20] - 32:7, 46:6, 46:7, 46:9, 53:24, 54:1, 61:12, 70:11, 70:14, 71:19,

77:22, 83:5, 83:7, 93:11, 107:21, 110:14, 110:19, 110:25, 123:5, 124:4

**reviewed** [27] - 10:10, 10:11, 15:10, 22:1, 24:5, 26:4, 26:6, 29:21, 33:2, 38:4, 55:19, 62:15, 63:3, 63:10, 68:23, 74:17, 83:5, 90:6, 93:14, 93:20, 97:18, 103:5, 111:3, 119:25, 122:23, 122:24, 124:3

**revise** [1] - 135:8

**revising** [1] - 138:21

**rise** [1] - 97:10

**risk** [6] - 57:15, 66:16, 72:18, 111:5, 111:16, 130:5

**risk-based** [1] - 72:18

**riskier** [2] - 57:17, 57:18

**risks** [2] - 57:5, 130:9

**risky** [1] - 57:19

**role** [5] - 9:14, 52:22, 76:9, 76:10, 125:9

**Room** [1] - 2:3

**room** [1] - 6:9

**roughly** [2] - 64:16, 123:3

**round** [1] - 36:23

**rule** [4] - 43:18, 135:23, 142:4, 142:5

**ruled** [1] - 139:25

**rules** [4] - 33:13, 51:15, 52:4, 52:6

**run** [1] - 9:1

## S

**Sachs** [1] - 50:17

**satisfied** [1] - 41:23

**satisfies** [1] - 28:22

**saw** [9] - 31:19, 58:17, 58:19, 68:23, 78:8, 93:11, 102:7, 123:15, 129:22

**scale** [1] - 43:4

**scales** [1] - 43:5

**schedule** [2] - 98:22, 143:1

**scheme** [4] - 103:3, 103:8, 139:17, 141:18

**School** [3] - 9:4, 9:6, 9:13

**school** [3] - 9:15,

10:2, 59:2

**Schwab** [3] - 66:9, 67:21, 111:11

**scope** [4] - 95:4, 100:10, 129:3, 130:10

**screen** [5] - 59:7, 59:16, 63:22, 69:15, 72:23

**screening** [2] - 95:14, 96:8

**script** [3] - 66:23, 73:6, 111:14

**scroll** [2] - 70:8, 90:23

**SEC** [83] - 44:4, 44:7, 44:20, 60:25, 61:2, 61:5, 61:14, 61:16, 62:3, 62:14, 64:1, 65:8, 66:25, 75:7, 75:20, 75:24, 76:2, 76:4, 76:9, 76:21, 76:25, 89:4, 89:16, 89:18, 89:21, 92:25, 97:11, 97:15, 97:23, 98:2, 98:22, 99:9, 101:3, 102:21, 103:25, 104:15, 104:18, 105:5, 106:1, 106:11, 106:16, 106:21, 107:6, 107:7, 108:1, 109:3, 109:10, 109:13, 109:18, 110:1, 110:7, 110:10, 111:15, 113:11, 113:17, 113:22, 117:17, 119:7, 121:16, 121:18, 121:21, 121:23, 121:25, 122:4, 125:6, 125:13, 125:19, 125:22, 126:6, 126:11, 126:14, 126:18, 127:9, 127:17, 128:2, 135:10, 136:12, 137:13, 137:22, 138:2, 139:4, 141:1, 142:2

**SEC's** [9] - 80:20, 90:6, 93:14, 103:2, 103:7, 125:11, 125:21, 130:15, 138:25

**sec.gov** [2] - 61:18, 61:20

**second** [10] - 13:11, 16:3, 23:9, 47:7, 58:11, 97:20, 114:16, 131:11, 136:15, 136:16

**seconds** [1] - 116:1

**Section** [5] - 1:15, 14:9, 33:20, 87:19, 136:22

**section** [6] - 31:4, 31:8, 72:4, 79:10, 109:1, 135:15

**securities** [30] - 10:16, 30:19, 31:17, 32:14, 34:24, 51:2, 51:10, 51:13, 51:19, 52:3, 54:10, 54:12, 54:14, 54:21, 54:24, 55:7, 56:4, 56:21, 64:15, 66:7, 66:15, 72:10, 72:20, 87:6, 87:14, 87:19, 92:15, 114:9, 134:3, 141:7

**Securities** [3] - 11:1, 52:5, 62:9

**security** [21] - 36:14, 57:14, 57:18, 65:20, 66:23, 72:24, 73:4, 73:8, 73:12, 74:20, 75:22, 78:4, 78:16, 88:15, 88:20, 88:22, 89:6, 107:11, 110:3, 111:16, 142:8

**see** [48] - 5:24, 7:8, 14:14, 18:21, 38:14, 43:21, 60:11, 64:3, 66:7, 66:11, 67:6, 68:7, 69:3, 69:17, 70:9, 71:15, 74:6, 74:8, 78:11, 84:13, 85:1, 86:24, 93:24, 94:8, 96:1, 97:19, 98:20, 100:12, 100:18, 101:8, 101:23, 102:10, 102:24, 104:2, 104:22, 107:24, 108:2, 108:4, 108:8, 108:16, 109:8, 110:14, 126:10, 127:23, 128:6, 128:10, 143:2

**Seefried** [1] - 137:2

**seeing** [2] - 90:13, 107:17

**seem** [7] - 6:4, 15:12, 15:19, 16:18, 16:21, 17:3, 79:4

**segment** [4] - 54:13, 54:20, 57:15, 58:12

**segments** [1] - 60:16

**select** [2] - 15:13, 21:10

**self** [2] - 52:3, 58:2

58:2

**self-regulatory** [1] - 52:3

**sell** [5] - 44:13, 56:24, 57:14, 119:16, 121:4

**selling** [2] - 22:2, 22:18

**send** [1] - 55:8

**sense** [4] - 24:13, 32:18, 132:11, 141:24

**sent** [3] - 105:3, 125:21, 132:7

**sentencing** [12] - 14:9, 28:1, 80:12, 85:10, 105:18, 105:22, 122:14, 124:3, 124:14, 136:20, 143:2

**Sentencing** [3] - 12:14, 74:14, 136:22

**separate** [1] - 128:22

**Series** [2] - 51:14, 51:21

**serious** [1] - 73:7

**seriously** [1] - 120:15

**served** [1] - 10:15

**serves** [1] - 60:1

**Service** [1] - 91:11

**services** [5] - 11:8, 11:11, 52:25, 53:15, 53:19

**set** [7] - 12:13, 13:19, 28:11, 46:20, 46:22, 65:13, 139:6

**Set** [1] - 10:22

**settled** [1] - 30:20

**several** [2] - 79:2, 139:1

**shaded** [1] - 44:17

**share** [10] - 14:23, 15:2, 15:4, 23:1, 23:3, 25:10, 44:19, 47:12, 83:24, 130:2

**shared** [2] - 37:9, 125:22

**shareholder** [12] - 46:1, 46:20, 47:1, 82:13, 105:5, 106:21, 107:6, 107:7, 107:23, 109:1, 110:16, 110:18

**shareholders** [12] - 24:19, 46:12, 47:2, 82:20, 83:10, 86:22, 86:25, 87:2, 87:8, 87:22, 108:5, 125:7

**shares** [84] - 13:6, 13:25, 14:1, 14:4, 21:24, 22:3, 22:4,

22:5, 22:8, 22:9,
22:16, 22:17, 22:19,
22:20, 22:22, 23:24,
23:25, 24:2, 24:6,
24:11, 24:12, 24:14,
24:15, 24:18, 24:19,
24:23, 25:1, 25:3,
25:5, 25:16, 32:6,
32:9, 32:10, 32:11,
32:12, 32:13, 32:17,
32:22, 32:23, 33:4,
36:24, 36:25, 37:7,
45:24, 45:25, 46:2,
46:4, 46:11, 46:13,
46:14, 46:16, 46:18,
46:20, 46:23, 46:24,
48:24, 54:25, 55:3,
56:24, 57:22, 58:5,
58:6, 71:14, 72:6,
82:8, 82:11, 82:12,
82:14, 82:19, 82:21,
82:23, 83:2, 83:9,
83:11, 84:12, 84:14,
105:20, 106:2
   **Sheet** [6] - 54:5,
71:8, 71:11, 71:19,
72:2
   **sheet** [2] - 56:11,
72:10
   **sheets** [1] - 51:4
   **Sheets** [1] - 106:11
   **shocked** [1] - 9:9
   **short** [1] - 85:8
   **shorthand** [1] -
78:23
   **show** [3] - 84:14,
99:24, 104:20
   **showed** [1] - 35:16
   **showing** [2] - 97:23,
101:21
   **shows** [6] - 26:11,
26:16, 42:8, 69:18,
129:15, 130:17
   **signed** [3] - 92:21,
92:22, 125:23
   **significance** [1] -
72:12
   **significant** [11] -
19:23, 20:15, 20:19,
20:24, 29:12, 29:15,
43:14, 43:17, 44:25,
89:5, 129:16
   **significantly** [2] -
48:15, 127:8
   **similar** [8] - 29:4,
38:8, 39:4, 48:22,
126:12, 138:5, 139:4,
139:8
   **similarity** [2] - 34:21,
37:19

   **simple** [1] - 43:20
   **simply** [3] - 14:3,
15:3, 51:1
   **single** [1] - 135:1
   **sitting** [1] - 5:13
   **situation** [1] - 43:7
   **six** [1] - 25:6
   **skill** [1] - 16:13
   **skimmed** [1] -
110:25
   **skis** [1] - 6:19
   **skull** [12] - 65:16,
66:3, 66:8, 67:25,
68:4, 111:7, 111:8,
112:10, 114:7,
126:12, 140:17,
140:18
   **sleeps** [1] - 49:18
   **slide** [4] - 68:9,
68:15, 68:16, 73:24
   **slides** [1] - 67:23
   **small** [6] - 20:13,
27:24, 29:3, 34:13,
34:14, 57:20
   **small-cap** [1] - 57:20
   **so-called** [1] - 20:12
   **sold** [1] - 25:6
   **sole** [1] - 52:21
   **sole-member** [1] -
52:21
   **solitary** [1] - 135:1
   **someone** [4] - 54:23,
56:11, 56:20, 129:23
   **soon** [3] - 5:19, 68:8,
68:21
   **sorry** [18] - 16:6,
23:23, 35:10, 36:1,
43:19, 63:18, 68:12,
80:24, 82:16, 87:15,
98:6, 98:15, 99:18,
99:22, 104:25, 107:2,
115:1, 122:9
   **sort** [12] - 5:5, 5:6,
5:21, 6:17, 6:25, 7:21,
21:9, 21:17, 40:16,
95:22, 119:20, 124:17
   **sorts** [1] - 122:7
   **Souder** [1] - 4:9
   **sought** [1] - 101:18
   **sounds** [5] - 31:10,
33:13, 35:4, 90:2,
123:3
   **source** [2] - 40:22,
41:15
   **Southern** [3] - 10:23,
139:14, 139:16
   **space** [2] - 10:1,
34:12
   **speaking** [3] - 13:19,
15:19, 32:13

   **speaks** [1] - 120:14
   **special** [1] - 50:12
   **specialize** [1] - 9:16
   **specialized** [2] -
51:7, 51:17
   **specialty** [1] - 9:22
   **specific** [38] - 21:9,
21:19, 26:13, 27:17,
28:2, 29:14, 29:19,
37:11, 37:13, 39:5,
41:17, 42:4, 42:16,
45:8, 45:9, 45:11,
45:13, 45:16, 45:17,
51:5, 56:15, 65:8,
72:18, 87:16, 87:17,
94:2, 94:3, 106:7,
106:9, 118:1, 118:3,
118:11, 118:20,
118:23, 119:2, 120:1,
141:3
   **specifically** [8] -
19:6, 44:7, 53:4,
55:13, 64:11, 89:25,
94:22, 106:3
   **specificity** [5] -
106:12, 122:16,
122:18, 122:20,
122:22
   **speculation** [5] -
57:23, 57:25, 60:2,
60:4, 88:9
   **speculative** [10] -
57:19, 57:25, 66:17,
66:23, 72:19, 72:24,
73:15, 73:16, 73:21,
114:15
   **speculators** [4] -
58:20, 60:10, 78:22,
79:10
   **spell** [2] - 8:23, 50:4
   **staff** [1] - 98:2
   **standard** [10] -
19:13, 19:18, 20:11,
20:20, 27:23, 28:6,
40:15, 48:19, 51:23,
54:7
   **standing** [1] - 100:9
   **standpoint** [1] -
122:6
   **start** [1] - 4:22
   **started** [7] - 8:2, 8:3,
15:23, 48:1, 50:11,
52:11, 53:2
   **starting** [2] - 4:5,
13:17
   **starts** [1] - 5:18
   **state** [10] - 8:23,
52:3, 52:16, 84:8,
84:20, 84:24, 92:13,
95:17, 96:9, 140:2

   **statement** [6] - 36:8,
40:6, 45:12, 92:9,
92:23, 104:21
   **statements** [22] -
16:25, 48:17, 94:14,
95:17, 95:18, 96:9,
96:10, 97:2, 97:13,
120:8, 121:9, 127:17,
133:17, 134:16,
135:6, 135:8, 136:8,
136:10, 138:22,
139:19, 141:3, 141:8
   **states** [1] - 100:3
   **States** [20] - 2:2, 4:2,
4:7, 8:17, 12:14,
71:13, 72:7, 73:13,
74:14, 85:16, 131:19,
135:3, 135:21, 137:2,
137:18, 138:6,
139:14, 139:23,
140:11, 144:13
   **STATES** [3] - 1:1,
1:3, 1:11
   **stating** [1] - 95:13
   **statistically** [8] -
19:22, 20:15, 20:19,
20:24, 29:12, 29:15,
43:14, 43:17
   **status** [3] - 47:10,
48:13, 85:8
   **stay** [2] - 67:10,
67:14
   **stays** [1] - 129:17
   **Stein** [1] - 140:11
   **stenographic** [1] -
144:5
   **step** [7] - 20:21,
27:14, 49:7, 103:24,
116:6, 118:13, 123:24
   **steps** [3] - 13:16,
23:17, 58:11
   **stick** [1] - 19:2
   **still** [7] - 43:15,
81:18, 85:19, 111:16,
116:22, 119:15, 129:3
   **stipulated** [1] - 6:25
   **Stock** [2] - 51:18,
54:16
   **stock** [106] - 9:25,
13:5, 18:20, 18:21,
19:7, 19:12, 19:16,
19:21, 19:24, 20:3,
21:4, 21:20, 23:13,
26:21, 26:23, 27:16,
28:11, 28:21, 29:10,
29:18, 32:4, 32:7,
32:15, 33:10, 37:10,
37:13, 37:16, 37:21,
38:6, 38:13, 41:15,
42:2, 42:17, 43:7,

43:9, 43:13, 43:14,
44:4, 44:14, 45:1,
45:5, 45:18, 46:2,
46:10, 46:13, 55:19,
56:11, 57:9, 57:23,
58:14, 60:3, 61:3,
65:5, 65:10, 66:17,
67:2, 67:12, 67:21,
68:8, 68:22, 69:1,
74:4, 75:11, 78:25,
79:11, 79:25, 82:9,
82:14, 82:19, 82:21,
83:1, 83:8, 83:9,
83:11, 89:19, 103:25,
104:1, 105:17,
109:25, 113:13,
114:11, 114:13,
114:19, 115:9,
115:11, 115:12,
115:21, 117:10,
119:15, 119:17,
121:4, 125:10, 126:3,
128:6, 128:7, 129:15,
129:17, 129:22,
130:19, 132:19,
133:14, 140:15
   **stocks** [40] - 17:11,
26:12, 26:16, 28:10,
28:16, 33:7, 33:25,
34:2, 34:6, 34:7,
34:15, 36:6, 36:11,
37:23, 38:17, 40:23,
41:21, 41:23, 42:14,
46:11, 47:11, 54:9,
55:12, 55:22, 55:23,
56:4, 56:5, 56:15,
56:21, 56:22, 57:3,
57:6, 57:7, 57:17,
58:19, 60:15, 65:24,
114:23, 127:10,
127:23
   **Stocks** [1] - 33:21
   **stop** [1] - 121:20
   **stopped** [1] - 68:22
   **straight** [2] - 95:13,
95:14
   **straightforward** [2] -
65:17, 80:17
   **strategies** [1] - 60:13
   **Street** [3] - 1:21,
61:23, 64:10
   **stressed** [1] - 133:8
   **strong** [1] - 76:10
   **strongly** [2] - 40:3,
76:21
   **structured** [1] - 8:7
   **stuck** [1] - 54:5
   **Studies** [1] - 10:13
   **study** [5] - 19:11,
19:14, 20:1, 20:7,

51:23
**stuff** [1] - 60:12
**sub** [1] - 57:18
**sub-asset** [1] - 57:18
**Subdivision** [1] - 136:23
**subject** [1] - 49:5
**submission** [3] - 99:7, 101:2, 101:6
**submissions** [1] - 98:16
**submit** [5] - 71:10, 124:14, 133:19, 139:21, 141:6
**submitted** [3] - 30:20, 31:14, 125:19
**subpoena** [2] - 71:9, 140:1
**subscribe** [2] - 59:25, 62:2
**Subsection** [1] - 136:23
**subsequent** [4] - 81:21, 81:25, 83:1, 83:18
**subsequently** [1] - 64:4
**subset** [1] - 40:2
**substance** [1] - 123:8
**substantial** [1] - 120:10
**subtle** [1] - 121:1
**suffered** [3] - 12:16, 21:3, 30:1
**suffice** [1] - 133:20
**sufficient** [2] - 41:24, 73:20
**suggest** [3] - 17:14, 124:10, 132:22
**suggested** [1] - 126:6
**suggesting** [2] - 17:10, 129:24
**suggestion** [1] - 74:15
**suggests** [2] - 117:24, 129:21
**Suisse** [1] - 10:23
**Suite** [1] - 1:25
**summarize** [1] - 10:21
**summarized** [1] - 72:3
**summary** [1] - 33:25
**summation** [2] - 116:12, 124:17
**summer** [6] - 125:3, 125:19, 126:3, 128:20, 130:20, 134:6

**supervise** [1] - 51:20
**Supplement** [1] - 139:25
**support** [5] - 100:1, 102:8, 104:21, 119:21, 124:14
**suppose** [1] - 132:16
**surprise** [1] - 36:17
**surprised** [1] - 5:24
**surprisingly** [1] - 72:5
**suspend** [7] - 44:4, 61:2, 61:5, 61:6, 76:9, 76:16, 113:13
**suspended** [11] - 65:5, 66:24, 68:8, 68:22, 73:7, 89:18, 89:21, 109:25, 111:15, 113:8, 141:2
**suspending** [3] - 61:17, 75:22, 127:9
**suspension** [69] - 17:1, 44:7, 44:10, 44:15, 44:16, 44:20, 61:14, 61:22, 62:4, 62:8, 63:1, 63:9, 65:9, 65:11, 65:12, 66:20, 73:3, 75:8, 75:20, 76:22, 77:21, 80:20, 84:2, 89:4, 89:17, 90:4, 90:8, 90:11, 90:17, 91:20, 92:15, 93:15, 94:4, 97:10, 97:16, 97:24, 98:11, 98:19, 98:25, 99:3, 99:4, 99:8, 100:2, 101:9, 101:15, 101:21, 102:9, 103:24, 105:16, 108:9, 108:14, 110:21, 110:24, 111:2, 111:23, 113:11, 113:19, 114:1, 119:6, 121:24, 122:1, 125:2, 125:11, 126:6, 126:18, 127:18, 137:16, 138:24, 140:22
**suspension/halt** [1] - 113:7
**suspensions** [9] - 60:25, 61:13, 65:1, 65:9, 76:2, 76:3, 121:22, 127:3, 127:7
**sustained** [4] - 104:12, 118:8, 141:10, 142:15
**sworn** [4] - 92:9, 92:13, 92:23, 102:12
**SWORN** [3] - 8:18,

49:22, 117:1
**symbol** [8] - 111:9, 111:18, 112:20, 113:25, 114:11, 114:13, 114:18, 115:2
**syncing** [1] - 42:24
**synonymous** [1] - 56:8
**system** [3] - 55:11, 55:14, 55:15
**systematic** [2] - 29:9, 119:20
**systematically** [2] - 28:3, 45:4

**T**

**table** [3] - 4:8, 83:22, 139:6
**tables** [2] - 46:10, 83:8
**tag** [1] - 7:24
**tag-teaming** [1] - 7:24
**talks** [3] - 64:10, 96:17, 96:22
**tanked** [1] - 130:2
**targeted** [1] - 125:7
**Targeting** [1] - 64:10
**TAUBMAN** [15] - 1:18, 11:22, 12:3, 27:9, 30:8, 30:11, 30:14, 35:15, 35:18, 35:21, 35:22, 45:22, 45:23, 47:4, 49:3
**Taubman** [3] - 4:17, 30:11, 49:1
**TD** [8] - 50:21, 58:1, 58:2, 66:9, 72:8, 73:5, 73:9, 111:11
**teach** [1] - 10:2
**team** [1] - 124:7
**teaming** [1] - 7:24
**technical** [1] - 27:19
**technically** [3] - 6:22, 30:24, 55:14
**technology** [6] - 5:6, 5:9, 6:18, 6:22, 7:4, 101:13
**tellingly** [1] - 134:25
**temporary** [1] - 126:18
**ten** [3] - 41:8, 124:17, 124:19
**tend** [3] - 18:21, 34:13, 42:14
**tenders** [2] - 59:4, 100:21
**tends** [1] - 36:7

**Tennessee** [1] - 52:15
**Tenth** [1] - 1:21
**term** [6] - 24:14, 24:17, 56:2, 56:12, 136:25
**terminate** [8] - 90:4, 90:10, 90:17, 91:20, 98:10, 98:19, 100:1, 102:9
**termination** [1] - 92:14
**terminology** [1] - 27:19
**terms** [7] - 76:22, 78:3, 78:10, 81:7, 89:15, 111:22, 114:7
**test** [8] - 7:6, 95:25, 96:1, 101:14, 101:17, 102:1, 141:14
**testified** [9] - 30:15, 30:22, 31:1, 52:8, 90:6, 122:8, 122:9, 122:12, 127:2
**testify** [5] - 5:8, 5:16, 8:5, 11:14, 140:25
**testimony** [19] - 7:12, 8:6, 10:25, 11:1, 11:12, 26:2, 30:16, 53:23, 60:2, 74:23, 79:15, 88:24, 103:13, 111:6, 116:11, 116:13, 117:4, 122:24
**tests** [2] - 51:24, 55:25
**textualist** [1] - 137:6
**THE** [178] - 1:1, 1:10, 1:14, 1:17, 1:23, 3:4, 3:7, 4:1, 4:11, 4:20, 5:23, 6:7, 7:8, 7:16, 7:22, 7:25, 8:10, 8:15, 8:19, 8:20, 9:8, 9:10, 11:23, 12:4, 15:5, 15:8, 15:14, 16:6, 16:14, 17:9, 17:17, 18:9, 23:23, 24:4, 24:14, 24:17, 25:5, 25:12, 25:24, 27:10, 30:5, 30:10, 30:13, 35:10, 35:12, 47:6, 47:13, 47:14, 47:17, 47:18, 47:23, 48:9, 48:16, 49:1, 49:4, 49:7, 49:10, 49:13, 49:17, 49:23, 53:18, 56:8, 56:10, 56:18, 59:1, 59:2, 59:5, 59:8, 59:11, 59:15, 59:19, 60:8, 60:9, 60:21, 62:20, 62:23, 63:15,

63:22, 64:21, 65:23, 65:25, 66:3, 66:5, 67:1, 67:4, 67:9, 67:11, 67:15, 68:2, 68:12, 69:24, 71:2, 77:14, 77:17, 77:19, 78:5, 78:8, 78:18, 78:20, 78:21, 78:22, 79:1, 79:2, 79:13, 80:24, 81:1, 81:2, 81:5, 81:10, 81:11, 81:13, 82:4, 83:21, 85:6, 85:15, 85:18, 85:21, 85:22, 88:8, 88:10, 91:7, 91:16, 91:17, 92:5, 95:5, 95:7, 97:5, 99:18, 99:20, 99:21, 99:22, 100:7, 100:12, 102:16, 104:12, 106:24, 107:1, 112:25, 113:1, 115:4, 115:24, 116:2, 116:6, 116:9, 116:15, 116:18, 116:21, 116:23, 118:8, 121:11, 123:23, 124:1, 124:8, 124:11, 124:20, 124:23, 126:8, 126:20, 127:20, 128:18, 129:21, 130:22, 130:24, 132:1, 132:7, 132:21, 132:25, 134:1, 134:8, 136:11, 136:24, 137:3, 138:1, 138:17, 141:9, 142:17, 142:21, 142:23
**theft** [1] - 108:11
**themselves** [1] - 127:11
**theoretical** [2] - 6:18, 84:14
**theoretically** [2] - 5:9, 7:6
**theory** [1] - 9:19
**thereby** [1] - 119:17
**therefore** [3] - 38:14, 82:1, 123:19
**therein** [1] - 92:17
**Thereupon** [1] - 85:13
**they've** [2] - 7:2, 61:7
**third** [9] - 111:19, 112:3, 112:6, 113:6, 120:9, 120:16, 121:7, 131:16, 135:9
**third-party** [1] - 121:7

**thoughtful** [1] - 79:9
**thousand** [1] - 58:5
**three** [9] - 8:11, 84:1, 89:9, 108:7, 108:23, 125:18, 133:19, 142:13
**thrilled** [1] - 7:9
**throughout** [5] - 50:10, 50:14, 51:9, 52:2, 133:23
**TIAA** [1] - 50:19
**TIAA-CREF** [1] - 50:19
**timeframe** [1] - 60:5
**timeline** [1] - 130:1
**title** [1] - 64:8
**today** [14] - 29:20, 31:3, 53:23, 69:3, 70:22, 108:6, 116:13, 121:20, 122:14, 122:17, 122:18, 124:21, 125:12, 142:25
**today's** [2] - 27:5, 31:13
**together** [1] - 39:3
**took** [6] - 14:20, 14:21, 15:3, 23:17, 23:19, 36:22
**tool** [1] - 119:21
**top** [5] - 35:6, 35:12, 69:17, 72:8, 108:4
**topic** [1] - 120:23
**topics** [1] - 10:1
**total** [1] - 14:5
**totality** [4] - 16:1, 23:17, 118:19, 119:3
**totally** [3] - 6:17, 136:5, 137:6
**tracking** [1] - 20:3
**tracks** [1] - 40:23
**trade** [21] - 33:16, 36:9, 54:15, 54:21, 54:23, 55:13, 55:16, 57:10, 62:8, 65:20, 66:18, 66:25, 67:20, 72:15, 73:4, 105:16, 110:2, 111:2, 111:13, 111:17, 121:20
**traded** [14] - 13:5, 28:6, 28:21, 28:24, 33:7, 34:11, 36:6, 37:23, 40:23, 41:18, 55:20, 56:22, 57:9, 89:6
**traders** [5] - 60:10, 65:4, 77:24, 79:8, 79:10
**trades** [3] - 51:3, 56:20, 114:14

**trading** [114] - 9:18, 9:24, 9:25, 17:1, 17:11, 32:20, 44:4, 44:15, 51:6, 54:19, 55:11, 55:15, 56:6, 56:21, 57:2, 57:15, 57:25, 58:4, 59:25, 60:4, 60:13, 60:25, 61:2, 61:6, 61:13, 61:14, 61:19, 61:22, 63:2, 64:25, 65:4, 65:8, 65:10, 66:13, 66:20, 68:22, 69:1, 71:10, 72:10, 72:19, 73:3, 73:12, 73:15, 74:5, 75:8, 75:10, 75:20, 76:2, 76:3, 76:9, 76:15, 76:16, 76:21, 77:20, 77:25, 78:20, 79:3, 79:4, 80:4, 80:20, 80:21, 80:22, 84:1, 89:4, 89:5, 89:16, 89:18, 89:21, 90:4, 90:8, 90:11, 90:17, 91:20, 92:15, 93:15, 97:10, 97:15, 97:24, 98:11, 98:19, 98:25, 99:3, 99:4, 99:8, 100:1, 101:9, 101:15, 101:21, 102:9, 103:14, 103:24, 108:9, 108:14, 110:20, 110:23, 111:16, 111:23, 113:8, 113:11, 113:19, 114:1, 114:9, 119:6, 121:22, 121:24, 122:1, 125:2, 125:11, 126:6, 126:18, 127:3, 127:7, 127:18, 141:2
**training** [1] - 51:7
**trains** [1] - 51:14
**transact** [1] - 51:2
**transactions** [3] - 58:7, 75:14, 107:11
**transcript** [2] - 144:5, 144:6
**TRANSCRIPT** [1] - 1:10
**transmission** [1] - 9:23
**transmit** [2] - 55:9, 56:25
**transmitted** [1] - 55:4
**travel** [1] - 58:18
**travel-related** [1] - 58:18

**treat** [1] - 126:11
**trend** [3] - 10:6, 36:2, 42:21
**trendline** [3] - 42:8, 42:11, 42:12
**TREVOR** [1] - 1:10
**trial** [4] - 5:8, 7:10, 7:13
**trials** [1] - 128:14
**tried** [2] - 67:20, 74:5
**trigger** [3] - 137:17, 138:15, 140:2
**true** [8] - 22:14, 48:24, 91:12, 92:17, 94:14, 136:14, 144:4, 144:5
**truly** [1] - 130:18
**truth** [20] - 15:22, 48:21, 86:13, 86:16, 86:17, 88:1, 88:4, 88:18, 88:23, 88:25, 89:9, 89:12, 103:11, 111:20, 112:4, 118:18, 123:6, 123:14, 126:4, 136:20
**try** [5] - 16:10, 59:12, 67:2, 87:15, 124:19
**trying** [6] - 25:9, 28:13, 58:20, 88:3, 97:15, 103:18
**turn** [10] - 16:9, 23:9, 42:7, 63:18, 70:2, 71:5, 73:23, 98:21, 100:4, 101:8
**turning** [2] - 21:7, 21:21
**Tuzman** [1] - 139:14
**twisted** [1] - 102:22
**two** [29] - 5:3, 5:14, 12:14, 14:1, 15:3, 21:24, 22:6, 22:24, 25:18, 38:8, 38:15, 42:21, 42:25, 43:21, 43:23, 53:9, 65:14, 68:25, 76:4, 76:13, 84:10, 86:12, 91:5, 108:17, 108:19, 108:23, 109:3, 128:22, 140:4
**type** [7] - 38:24, 51:5, 52:11, 88:17, 107:11, 119:21, 120:3
**typed** [1] - 140:16
**types** [5] - 38:20, 40:4, 51:3, 65:7, 119:7
**typical** [1] - 103:24
**typically** [9] - 19:11, 54:16, 54:20, 55:2, 57:10, 59:12, 72:9,

83:12, 111:13

# U

**U.S** [5] - 1:15, 62:9, 135:5, 137:19, 139:15
**ultimate** [1] - 20:18
**ultimately** [2] - 18:24, 19:4
**uncertainty** [1] - 127:4
**uncontested** [2] - 139:11, 141:16
**uncorrelated** [1] - 27:16
**undefined** [1] - 137:5
**under** [16] - 6:13, 7:15, 13:18, 22:25, 30:20, 51:1, 55:23, 82:1, 85:19, 113:4, 113:12, 116:22, 126:5, 131:18, 132:9, 142:13
**undercuts** [1] - 136:6
**underlying** [2] - 98:25, 139:9
**undermine** [1] - 134:20
**undermines** [1] - 127:8
**understood** [3] - 5:25, 15:14, 95:7
**undertook** [2] - 12:25, 14:17
**unfortunately** [1] - 41:21
**UNITED** [3] - 1:1, 1:3, 1:11
**united** [1] - 2:2
**United** [19] - 4:2, 4:7, 8:16, 12:14, 71:13, 72:7, 73:13, 74:14, 85:16, 131:19, 135:3, 135:21, 137:2, 137:18, 138:6, 139:14, 139:23, 140:11, 144:13
**University** [4] - 9:3, 9:5, 9:13, 50:7
**unknown** [1] - 137:10
**up** [49] - 5:2, 6:17, 11:16, 12:20, 14:11, 14:17, 15:5, 26:18, 34:22, 35:20, 37:24, 42:24, 43:9, 43:22, 47:8, 52:17, 59:15, 59:18, 61:22, 62:1,

62:5, 62:23, 66:6, 66:7, 66:16, 68:1, 68:6, 69:5, 71:24, 72:20, 74:7, 77:3, 80:8, 80:16, 81:18, 81:20, 90:19, 95:13, 95:14, 112:15, 113:12, 120:2, 122:14, 124:11, 132:9, 134:25, 139:6, 141:1, 141:13
**update** [1] - 121:5
**updated** [1] - 64:4
**upheld** [2] - 135:20, 137:20
**upholding** [1] - 101:9
**URL** [1] - 69:18
**uses** [5] - 18:18, 23:3, 38:5, 38:24, 43:3
**utilized** [1] - 101:14

# V

**vaccine** [1] - 95:15
**valuation** [1] - 9:20
**value** [13] - 14:5, 20:13, 23:12, 24:13, 25:20, 27:25, 41:17, 46:24, 48:24, 54:21, 58:18, 120:7, 130:13
**variable** [2] - 133:13, 133:18
**variety** [3] - 54:2, 54:8, 129:11
**various** [3] - 50:13, 52:3, 136:11
**vary** [1] - 88:2
**venue** [1] - 66:6
**verify** [1] - 32:10
**versa** [1] - 38:1
**version** [1] - 35:18
**versus** [12] - 4:2, 16:20, 85:17, 131:20, 135:4, 135:21, 137:2, 137:18, 138:6, 139:14, 139:23, 140:11
**viability** [1] - 130:9
**vice** [1] - 38:1
**victims** [13] - 21:3, 87:2, 87:9, 87:22, 87:25, 88:4, 104:15, 104:17, 106:1, 106:16, 125:7, 125:24, 132:9
**view** [8] - 16:16, 46:17, 46:24, 75:4,

104:2, 110:1, 118:25, 124:16
**viewed** [1] - 114:19
**virus** [4] - 6:22, 7:7, 95:15, 101:15
**visible** [1] - 66:4
**volatile** [1] - 43:15
**volatility** [2] - 42:15, 43:24
**volume** [1] - 54:19
**vs** [1] - 1:5

# W

**waffled** [1] - 6:25
**walk** [8] - 12:24, 13:15, 14:16, 16:4, 19:8, 21:23, 23:16, 27:21
**Wall** [1] - 61:23
**wants** [2] - 5:13, 72:14
**warned** [2] - 73:16, 78:15
**warning** [9] - 65:15, 66:8, 67:8, 72:23, 75:11, 78:3, 104:1, 107:12, 132:7
**warnings** [9] - 65:14, 68:7, 68:25, 69:4, 72:20, 75:13, 111:11, 117:9, 140:20
**warrant** [1] - 32:21
**warranted** [1] - 67:13
**Washington** [6] - 1:6, 1:16, 1:22, 1:25, 2:4, 144:14
**waste** [2] - 74:7, 100:10
**Wayback** [4] - 68:19, 69:8, 79:23, 112:7
**ways** [5] - 38:16, 39:2, 40:7, 42:24, 47:18
**website** [7] - 41:1, 59:24, 90:7, 93:1, 93:14, 93:25, 105:4
**weight** [1] - 121:9
**Whoa** [1] - 132:18
**whole** [10] - 18:21, 19:17, 20:12, 21:5, 27:24, 67:7, 105:24, 120:20, 121:3, 129:24
**wide** [7] - 18:17, 18:22, 37:24, 42:19, 54:8, 107:9
**Williams** [7] - 5:7, 5:16, 7:3, 7:13, 124:2, 124:13

**willing** [2] - 74:7, 124:19
**window** [1] - 48:12
**winds** [2] - 81:18, 81:19
**wish** [1] - 8:12
**WITNESS** [43] - 3:7, 8:18, 8:20, 9:10, 15:8, 16:14, 17:17, 24:4, 24:17, 25:12, 35:12, 47:13, 47:17, 47:23, 48:16, 49:22, 56:10, 59:2, 59:19, 60:9, 63:22, 65:25, 66:5, 67:4, 67:11, 77:19, 78:8, 78:20, 78:22, 79:2, 81:1, 81:5, 81:11, 83:21, 85:21, 91:7, 91:17, 99:20, 99:22, 107:1, 113:1, 116:23, 117:1
**witness** [7] - 5:5, 8:2, 49:15, 53:1, 100:21, 116:9
**Witness** [3] - 49:9, 116:8, 123:25
**witness's** [1] - 118:6
**WITNESSES** [1] - 3:4
**witnesses** [1] - 5:3
**wondering** [1] - 78:18
**word** [5] - 88:18, 89:12, 123:6, 123:14, 136:4
**words** [3] - 102:24, 123:7, 123:10
**works** [1] - 131:12
**world** [3] - 28:19, 77:24, 104:2
**worldwide** [1] - 58:16
**worth** [6] - 46:21, 46:23, 47:12, 47:15, 57:22, 132:19
**write** [3] - 9:23, 9:25, 30:18
**writes** [1] - 102:15
**writing** [1] - 108:6
**written** [2] - 51:23, 98:16
**wrongdoing** [2] - 96:14, 96:20

# X

**XENAKIS** [5] - 1:20, 118:5, 121:12, 121:14, 123:21
**Xenakis** [2] - 4:18,

121:11
**XYZ** [1] - 55:3

# Y

**Yale** [1] - 9:4
**year** [10] - 18:15, 18:23, 19:2, 23:20, 31:22, 48:14, 56:6, 89:3, 126:22, 127:9
**years** [4] - 10:6, 50:14, 126:23, 139:19
**yes-or-no** [5] - 88:12, 88:13, 90:16, 93:4, 110:13
**yield** [1] - 43:13
**yielded** [2] - 13:9, 15:4
**York** [6] - 1:16, 10:24, 51:18, 54:16, 139:15, 139:16
**yourself** [3] - 16:12, 51:25, 117:7
**yourselves** [1] - 4:5