# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| | **Criminal No.** |
| **v.** | **1:20-cr-00278-TNM** |
| **KEITH BERMAN,** | |
| **Defendant.** | |

## UNITED STATES' SENTENCING MEMORANDUM

Defendant Keith Berman is a cruel and callous criminal.  At the height of the pandemic, the defendant gave people false hope that he had invented a COVID-19 blood test to defraud them into investing in his company Decision Diagnostics Corp. ("DECN" or "Decision Diagnostics"). The defendant's greed led him to carelessly distract the U.S. Food and Drug Administration ("FDA") from its efforts to save lives by seeking approval for a test he knew could not detect COVID-19.  And when the U.S. Securities and Exchange Commission ("SEC") raised questions about the defendant's purported COVID-19 test, the defendant launched a relentless campaign of lies aimed at ruining the lives and careers of the SEC staff by falsely accusing them of committing serious crimes.  The defendant did not stop there. After he was indicted for fraud and obstruction, he continued to commit the same types of crimes: (i) harassing, intimidating, manipulating, and defrauding his victims them anew; (ii) tampering with the government's witnesses; and (iii) fraudulently selling Decision Diagnostics' future (non-existent) receipts in exchange for cash advances in agreements on which he subsequently defaulted and attempting to fraudulently enter into a $6 million loan that he knew he could never repay.  (*See* ECF 124, 125.)  The defendant only stopped committing crime when his bond was revoked and he was detained in federal custody. On the eve of trial, the defendant transparently attempted to game the system: he pleaded guilty to the Superseding Indictment while admitting to only the bare minimum facts, only to then falsely downplay his role in and the seriousness of the crimes for which he purports to accept responsibility.  The final Presentence Investigation Report ("PSR") (ECF 191) calculated a total offense level of 35 and a Criminal History Category I, resulting in an advisory Guidelines of 168 to 210 months.  The government respectfully submits the Court should sentence the defendant to a term of 120 months' imprisonment.

## I.      OFFENSE CONDUCT

At the start of 2020, Decision Diagnostics was in a perilous financial situation because, among other things, the defendant had misused hundreds of thousands of dollars of company funds to carry on an online relationship with a webcam model who performed sex acts for money.  (PSR ¶ 17; ECF 62.)  When, in February 2020, the COVID-19 pandemic began to sweep the world, the defendant saw an opportunity to steal more money to continue paying the webcam model and otherwise enrich himself.  (PSR ¶ 17; ECF 62.)  The defendant sought to capitalize on the fear and desperation experienced by other Americans during this time by falsely claiming that he had invented a medical miracle in order to drive his company's share price sky high and attract new investors.  (PSR ¶¶ 18-19.)  Throughout March and April 2020, the defendant issued twelve false and misleading press releases describing a 15-second test to detect COVID-19 in a finger-prick sample of blood that did not actually exist (*e.g.*, March 3, March 4, March 11, March 16, March 17, March 18, March 20, March 23, March 25, April 3, April 7, and April 23).  (*Id.*)  During this period, Decision Diagnostics' stock price increased by over 1,500 percent.  (*Id.* ¶ 20.)

The defendant's private conversations show that he knew his actions were criminal.  While he was putting out false and misleading press releases touting his invention of a medical miracle, the defendant privately confided in a friend the test could not actually detect COVID-19:

- On March 20, 2020, in a private email to his friend, Berman wrote:  "The current design … can identify a virus, but probably cannot distinguish between the common types of flu." (GX 177-18.)

- That same day, on March 20, 2020, Berman issued a press release which falsely claimed: "Our GenViro! Rapid Kit will offer Covid- 19 test results for $6.95, test a patient in under a minute, require less than 2 microliters of whole blood derived from a finger prick."  (GX 1G (describing COVID-19 blood test and efforts to use the test to raise millions of dollars by selling debt securities).)

- The next day, on March 21, 2020, in another private email to his friend, Berman wrote: "This method will work and can be calibrated to test similar viruses, SARS, SARS2 (Corona), Bird Fly, H1N1.  The method will not be specific enough to tell anyone which of these flues has been detected, but that is of lesser importance.  It will tell them that some flu virus is present.  Since 97-98% of those tested will be negative, this method will determine the 2-3% that are positive and once positive, the patient should be tested again (same method), and if confirmed at the screening level moved up the chain to a more specific method."  (ECF 177-19.)

In a separate private conversation, the defendant described what he was doing as a "penny pump".

(ECF 177-10.)

On April 23, 2020, the SEC suspended trading in Decision Diagnostics stock out of concern about the accuracy and adequacy of the company's press releases about its new COVID-19 blood test.  (PSR ¶ 18.)  The SEC's investigation jeopardized the defendant's ability to raise money.  (*See* GX 81 ("my company cannot raise money based on GenViro news as long as the SEC is investigating us").)  To put a stop to the SEC's investigation before it revealed the defendant's fraud, the defendant launched a campaign of obstruction.  (PSR ¶¶ 18, 21.)

*First*, the defendant repeatedly lied under oath in briefs and affidavits that he submitted to the SEC in an effort to corruptly influence the agency to lift the trading suspension:

- On May 7, 2020, the defendant submitted to the SEC a "verified" petition that he signed under oath.  (ECF 177-7.)  The petition called for the termination of the trading suspension based on the defendant's sworn statement that each of the press releases were "based upon <u>facts</u> that were true at the time the statements were made", and "did not contain any false or misleading statements, or omit to state any facts necessary in order to make the statements made not misleading."  (*Id.* ¶¶ 16-23, 31.)  Ten separate times the defendant denied lying about the COVID-19 blood test.  (*Id.*)  The defendant posted the "verified" petition on OTCMarkets.com where it could be accessed by Decision Diagnostics investors and the general public.  (*Id.*)

- On June 17, 2020, the defendant submitted to the SEC a second brief calling for the termination of the trading suspension, which was accompanied by a 20-page affidavit that the defendant signed under oath.  (GX 100; Mar. 20, 2024 Hr'g Tr. at 99:24 – 104:24.)  In his sworn affidavit, the defendant accused Carlisle Perkins (a Senior Counsel who had submitted a declaration explaining the SEC's reasons for imposing the trading suspension) of lying under oath.  (*See, e.g., id.* ¶ 40 (summarizing allegations of Mr. Perkins's

3

wrongdoing described in detail throughout the affidavit).)   Berman also accused Mr. Perkins and other SEC staff attorneys of another crime, namely conspiring with cybercriminals to fabricate evidence in support of the trading suspension.  (*Id.*)  The brief and affidavit was publicly available on the SEC's website.

- On July 15, 2020, the defendant submitted to the SEC a third brief calling for the termination of the trading suspension, which was accompanied by another affidavit that Berman signed under oath.  (GX 101.)  In his sworn affidavit, the defendant again targeted Mr. Perkins, falsely accusing him of various crimes including lying under oath, manufacturing evidence, and conspiring with cybercriminals.  (*Id.* ¶¶ 2-4, 9, 11.)  The defendant also accused the Mr. Perkins and the SEC of "harm[ing] everyone" by depriving the world of "desperately needed" COVID-19 tests.  (*Id.* ¶ 10.)  This brief and affidavit was also publicly available on the SEC's website.

*Second*, the defendant tricked some of the investors he had victimized into writing letters to the SEC demanding the agency stop its investigation into the defendant and his company.  Using a fake identity – "Matthew Steinmann" – the defendant befriended one of his victims (M.C.)  – and convinced M.C. to write a letter to the SEC on behalf of Decision Diagnostics' shareholders.  (PSR ¶23.)  The defendant then worked with M.C. – as both Matthew Steinmann and Keith Berman – to draft a 38-page letter and obtain the support and signature of over 50 other victims.  (ECF 177-11, 177-12, 177-13, 177-14; GX 3M.)  The defendant also deceptively signed the letter using his alias.  (GX 3M.)

On June 2, 2020, per the defendant's instructions, M.C. sent the "shareholder" letter to the most senior officials at the SEC, including the Chairman, Inspector General, General Counsel and Co-Director of the Division of Enforcement.  (ECF 177-11; GX 3M.)  The "shareholder" letter is remarkable in three respects:

- the letter baselessly accused the SEC of colluding with cybercriminals to destroy the defendant and his company (*id.*);

- the letter suggested that the SEC's trading suspension and investigation "are damaging to humanity with respect to the creation, development and, we hope …, emergency use

authorization of the GenViro! products to assist in the detection of the deadly Coronavirus" (*id.* at 1); and

- the letter accused Mr. Perkins of committing numerous crimes as part of the SEC's investigation of the defendant and his company, including "ma[king] a false statement under penalty of perjury" (*id.* at 6).

The defendant posted the "shareholder" letter on OTCMarkets.com for his other victims to see. (*Id.*)  The defendant then convinced M.C. to write two additional "shareholder" letters, which M.C. respectively sent on July 28, 2020 and August 11, 2020.  (ECF 177-20.)  The July 28, 2020 was signed by over 120 victims.  (*Id.*)  The August 11, 2020 was signed by approximately 80 victims.  (*Id.*)  And the defendant also signed both letters using his fake identity "Matthew Steinmann".  (*Id.*)

*Third*, the defendant used an alias on stock message boards to attack the SEC.  (PSR ¶ 22; ECF 180.)  Between March and October 2020, the defendant posted over 1,100 posts on the stock message board at investorshub.com using the alias "plutoniumimplosion".  (ECF 180.) Many of the defendant's posts accused the SEC of misconduct.  (*Id.*)  Others targeted Mr. Perkins personally, calling him names and accusing him of committing crimes, like perjury.  (*See, e.g.,* ECF 180 at iHub post nos. 688, 692, 694, 720, 721, 722, 723, 744, 761, 763, 857.)  Among other things, the defendant claimed that the SEC's mishandling of the investigation would "end the career at the SEC of Fredo Perkins".[1]  (*Id.* at iHub post no. 763.)  Even worse, the defendant used his alias on the stock message boards to repeatedly threaten individuals who provided information to the SEC staff looking into the defendant and his company.  (PSR ¶ 22.)  The

---

[1] "Fredo" is a derogatory nickname the defendant gave to Mr. Perkins.  It appears to be a reference to Frederico "Fredo" Corleone, the fictional character in Mario Puzo's 1969 novel and the 1972 film *The Godfather* who was weak and less intelligent than the other members of the Corleone family.

defendant referred to them as "informants" and suggested they would be arrested when the authorities showed up at their homes on "knock knock day". (*See, e.g.,* ECF 180 at iHub post nos. 651, 673, 674, 676, 679, 683, 692, 722, 727, 765, 795, 796, 798, 912.)

Undeterred by the SEC's investigation, the defendant continued making false and misleading public statements about Decision Diagnostics' COVID-19 blood test which, in truth, did not exist. (PSR ¶ 22.) For example, on July 10, 2020, the defendant issued a press release falsely claiming that Decision Diagnostics had a working COVID-19 blood test that "produc[ed] results at:10.5 seconds," when it did not. (ECF 177-5.) Moreover, from July 10, 2020 through October 20, 2020, the defendant used his alias – "plutoniumimplosion" – to make post around 150 more messages on the iHub stock message board in furtherance of his fraudulent scheme. (ECF 180 at iHub post nos. 954 – 1102.)

The lies did not stop there. On October 9, 2020, the defendant provided false and misleading testimony to the SEC under oath. (PSR ¶ 24; ECF 145-16.) When SEC investigators asked about whether he posted on stock message boards, the defendant misled them by stating that he was not a member of "Investors Hub Daily" without disclosing that he was a member of "Investors Hub" stock message board. (ECF 145-16 at 21:23 – 23:16.) When SEC investigators followed up to ask additional questions about whether he posted on stock message boards, the defendant refused to answer their questions – and then falsely insisted that he had. (*Id.*)

The defendant also repeatedly lied to the FBI to conceal the fraud and his efforts to obstruct the SEC investigation. (PSR ¶ 24.) On October 27, 2020, two FBI agents went to the defendant's offices to interview him. The defendant agreed to the interview and then lied when he told the FBI agents that he did not post on stock message boards when, in truth, he did. (GX 30.) The defendant also lied when he told the FBI agents that he had nothing to do with the "shareholder"

6

letters that M.C. sent to the SEC and that he understood that M.C. had been "appointed" by a group

of shareholders to write the letter on their behalf.  (GX 30.)  In reality, the defendant had used false

pretenses to persuade M.C. to write the "shareholder" letters – and then provided M.C. detailed

direction on what to write, where to send the letter, and when.  (ECF 177-11, 177-12, 177-13, and

177-14.)

## II.   RELEVANT PROCEDURAL HISTORY

On December 15, 2020, a grand jury returned an indictment against the defendant charging

the defendant with securities fraud in violation of 15 U.S.C. §§ 78j and 78ff and 17 CFR

§240.10b5.[2]  On May 11, 2021, a grand jury returned a superseding indictment that also charged

the defendant with wire fraud in violation of 18 U.S.C. § 1343 and obstruction of agency

proceedings in violation of 18 U.S.C. § 1505.

On or around March 8, 2023, the government filed a motion to revoke the defendant's bond

and order him detained.  (ECF 103, 112.)   The government introduced overwhelming evidence

showing that the defendant had violated his conditions dozens of times.  The defendant repeatedly

contacted his victims to harass, intimidate, manipulate, and defraud them anew; worked to obstruct

the government's prosecution of the criminal case against him by tampering with witnesses; and

fraudulently sold, assigned, and transferred Decision Diagnostics' future receipts in exchange for

cash advances in agreements on which he subsequently defaulted.  Specific examples include the

following:

- On December 21, 2020, the defendant violated his conditions by communicating with
  Victim 2 to launch a campaign to attack the XPRIZE Foundation, a non-profit organization
  that designs and hosts public competitions intended to encourage technological
  development to benefit humanity. Specifically, the defendant directed Victim 2 to recruit

---

[2] The defendant was also charged with making a false statement in violation of 18 U.S.C. § 1001, however, the government moved to dismiss that count on November 10, 2023.  (ECF 153.)

100 other victims to participate in an attack campaign against XPRIZE (akin to the attack which the defendant manipulated and deceived his victims into launching against the SEC). (ECF 112; ECF 115-2, 3.)   The defendant's attack was based on his false claim that his purported COVID-19 test (which did not exist) had been unfairly removed from XPRIZE's COVID-19 test competition based on the allegations made in the indictment rather than the merits of the test itself.  (ECF 115-4.)

- In February 2021, the defendant again repeatedly contacted two victims – Victim 1 and Victim 2 – to harass, intimidate and mislead them for his own personal benefit and to impede and obstruct the government's prosecution of the criminal case against him.  The defendant directed Victim 1 to stop cooperating with the government's investigation, discussed with Victim 1 and Victim 2 the questions the Postal Inspector had asked them and then attacked the Postal Inspector for asking those questions, and attempted to influence Victim 1's view of the facts of the case by making false statements blaming the government for causing his COVID-19 tests to fail.  (ECF 115-6.)

- From at least June 2021 through at least October 2021, the defendant continued to communicate with the same individuals, Victims 1 and 2, in a small group chat. (ECF 115-7.)  Among other things, the defendant discussed his criminal case with Victim 1 and Victim 2 on at least different 17 occasions. (*See id.* at June 29, June 30, July 6, July 15, July 16, July 18, July 21, July 26, July 27, July 28, July 30, August 5, August 6, August 9, August 19, August 25, September 7.)  The defendant even harassed them to act on his behalf on Internet message boards in support of his criminal defense.  (*Id.* at September 21.)

- Throughout 2021 until at least April 2022, the defendant was also separately communicating with numerous victims on Facebook. The defendant communicated with these victims about his criminal case, harassed and intimidated them, and tried to influence their opinion of the allegations against him.  (ECF 115-8, 9.)

- From the end of 2021 through the beginning of 2022, the defendant entered into six separate agreements whereby he fraudulently agreed to sell, assign, and transfer to six different parties approximately $463,120 of Decision Diagnostics' future receipts in exchange for $330,000 in short-term financing.  (ECF 115-10, 11, 12, 13, and 14; ECF 116-1, 2, 3, and 4).  The defendant, however, had no revenue to repay the large amounts of money due under the six agreements.  He also falsely represented that he was not entering into similar agreements with other parties. He almost immediately defaulted on each agreement.  And, when the parties to these agreements brought actions to recover their money from the defendant, he did not defend against the action and default judgments were entered.  (ECF 115-15, 16, 17, 18 and 19; ECF 116-1, 2, 3, and 4.)  Moreover, the defendant affirmatively concealed from the Court all of these agreements – and the resulting default judgments against him in his personal capacity.   Specifically, the defendant did not disclose this

8

information in his financial affidavit, which he signed under "penalty of perjury".   (ECF 115-20.)

In addition, in January 2023, the defendant fraudulently entered into an agreement to transfer a 20 percent equity stake in one of Decision Diagnostics' subsidiaries as collateral for a $6 million loan for which there is no business purpose and that he could never repay.  (ECF 115-21.)

On or around March 13, 2020, the Court issued an arrest warrant based on the defendant's violations of his conditions of pre-trial release.  On or around March 18, 2020, the defendant was taken into custody.  (PSR ¶ 16.)  On April 25, 2023, following a hearing, the Court granted the government's revocation motion and ordered the defendant detained.  (PSR ¶ 26; ECF 124.)  The Court made the following specific findings:

- there was probable cause to believe the defendant was involved in witness tampering and obstruction based on his contacts with Victims 1 and 2 in December 2020 and February 2021 (Apr. 25, 2023 Hr'g Tr. at 59:22 – 59:25);

- there was probable cause to believe the defendant involved witness tampering and obstruction based on his contacts with victims throughout the rest of 2021 and 2022 (*id.* at 60:15 – 60:20);

- with respect to the six loan agreements, "the evidence at this point is strongly suggestive that … the Defendant was essentially fleecing people who were entering into these contracts with him" (*id.* at 61:22 – 62:1); the Court further found that "this conduct is particularly concerning in the context of this indictment where the Defendant is charged with fraudulent conduct. … [and] is further evidence of fraudulent financial conduct that does have real victims" (*id.* at 63:2 – 63:10);

- the defendant is unlikely to abide by any condition or combination of conditions because "the type of actions the Defendant is accused of doing, financial fraud, witness tampering, obstruction, are exactly the types of crimes that unfortunately can be committed with an iPhone, with a computer right from the comfort of one's own home or even one's own bed" (*id.* at 63:18 – 63:24); and

- "the Defendant poses a danger to the community" (*id.* at 64:14 – 64:24).

On December 7, 2023, on the eve of trial, the defendant entered a guilty plea to the three remaining counts in the Superseding Indictment, including to securities fraud, wire fraud, and obstruction of agency proceedings.  (PSR ¶ 7; ECF 170.)  At the hearing, the defendant admitted he was "personally involved in issuing the press releases in which he willfully and intentionally made materially misleading statements with the intent to defraud about the progress and status of DECN's development of its COVID-19 blood test. The press releases were issued to generate favorable publicity in an effort to attract a larger corporate partner."  (Dec. 7, 2023 Hr'g Tr. at 10:13-19.)  Additionally, he admitted that he influenced an investor to draft a letter accusing the SEC of misconduct, recruited shareholders to sign the letter  (which "levied allegations of bias and collusion against the SEC investigators and asserted that the SEC's actions between April and June 2020 were, quote, damaging to humanity, end quote"), failed to reveal that he was behind the alias, assisted with and authorized the submission of the letter to the SEC, and did so "to influence the SEC to end its investigation into DECN and Mr. Berman." (*Id*. at 11:1-17.)

On March 11, 2024, the initial PSR was filed.  On April 4, 2024, the final PSR was filed along with an addendum. (ECF 191.)  The PSR calculated a total offense level of 35 and a Criminal History Category I, resulting in an advisory Guidelines range of 168 months to 210 months.  (PSR ¶ 107.)

## III.    ADVISORY SENTENCING GUIDELINES CALCULATION

The government agrees with the advisory Guidelines calculation as set forth in the PSR with one exception.  Specifically, the government agrees with: a base offense level of 7 pursuant to USSG § 2B1.1(a)(1); a 22-level enhancement pursuant to USSG § 2B1.1(b)(1)(L) for losses greater than $25,000,000; a four-level enhancement pursuant to USSG § 2B1.1(b)(2)(B) for substantial financial hardship; a two-level enhancement for sophisticated means pursuant to

USSG § 2B1.1(b)(10); and a two-level adjustment for obstruction of justice pursuant to USSG § 3C1.1.  (PSR ¶¶ 48-51, 55.)  The government disagrees with the USPO that Berman should receive credit for acceptance of responsibility.  (*Id.* ¶ 57 and corresponding addendum.)  The government therefore believes the applicable Guidelines range for Berman is 210 to 262 months' imprisonment, based on a total offense level of 37 and Criminal History Category I.  However, the statutorily authorized maximum sentences are less than the maximum of the applicable Guidelines range; therefore, the government believes the applicable Guidelines range is 240 months (20 years).

### A.  The PSR Correctly Applied a 22-Level Enhancement for Loss

The PSR correctly applied a 22-level enhancement for a total loss of more than $25 million.  (PSR ¶¶ 27, 49, and corresponding addendum.)  To avoid repeating the arguments and evidence already submitted to the Court, the government agrees the loss is $60.8 million[3] based on (i) the reasons set forth in the government's submission in anticipation of the evidentiary hearing (ECF 177 at 5-15, ECF 177-C); and (ii) the testimony provided by the government's expert, Professor Joshua Mitts, at the evidentiary hearing (Mar. 20, 2023 Hr'g Tr. at 8-30, 117 – 121 and Government Exhibit No. 6A-2), which the government incorporates by reference here.[4]

---

[3] To the extent the loss is not $60.8 million, it is $27.8 million.  Either way, a 22-level enhancement for losses greater than $25,000,000 should be applied pursuant to USSG § 2B1.1(b)(1)(L).

[4] "[T]here is no 'loss causation' requirement in public enforcement actions."  *S.E.C. v. Pace*, 173 F. Supp. 2d 30, 33 (D.D.C. 2001) (quoting *Graham v. SEC*, 222 F.3d 994, 1001 n. 15 (D.C. Cir. 2000)).  However, the government anticipates that the defendant will continue to argue that causation is required for calculating the loss amount.  And, while there is no controlling authority addressing the question in this Circuit, numerous circuit courts have held that this concept is also inapplicable in the criminal sentencing context.  As the Ninth Circuit found in distinguishing the applicability of this principle from civil cases:

> In criminal sentencing, however, a court gauges the amount of loss caused, i.e., the harm that society as a whole suffered from the defendant's fraud. Whether and to what extent a particular individual suffered actual loss is not usually an important consideration in criminal fraud

### B. The PSR Correctly Applied a Four-Level Enhancement for Substantial Financial Hardship

The PSR correctly applied a four-level enhancement because the fraud resulted in a substantial financial hardship for 5 or more victims based on the response of victims who submitted victim impact statements and/or were interviewed by federal law enforcement agents.  (PSR ¶¶ 25, 29-38, 50, and 58, and corresponding addendum.)  Specifically, the PSR lists at least seven victims who suffered substantial financial hardship as that term is defined by the Guidelines:

- H.N. and V.D. jointly invested in Decision Diagnostics stock and lost $139,000.  As a result of the losses they suffered, H.N. and V.D. experienced substantial financial hardship because they had to borrow a home equity line of credit on their primary residence to cover their loss and living expenses.  Consequently, their personal debt is increasing daily.  (PSR

---

sentencing. Therefore, where the value of securities have been inflated by a defendant's fraud, the defendant may have caused aggregate loss to society in the amount of the fraud-induced overvaluation, even if various individual victims' respective losses cannot be precisely determined or linked to the fraud. As a result, the principle underlying the *Dura Pharmaceuticals* Court's reluctance to allow mere overvaluation as a basis for establishing loss is generally not present in the criminal sentencing context, and we are not persuaded that it would be appropriate to expand the *Dura Pharmaceuticals* rule to the criminal sentencing context.

*United States v. Berger*, 587 F.3d 1038, 1044 (9th Cir. 2009) (internal citations omitted) (referencing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (applying a loss causation standard in private, civil 10b-5 cases)); *see also United States v. Rand*, 835 F.3d 451, 468-69 (4th Cir. 2016); *United States v. Georgiou*, 777 F.3d 125, 146 (3d Cir. 2015), *cert. denied*, 136 S.Ct. 401 (2015); *United States v. Peppel*, 707 F.3d 627, 644–45 (6th Cir. 2013).  However, the other circuit courts have found or otherwise suggested that loss-causation principles should apply in the criminal sentencing context for securities fraud cases. *See, e.g.*, *United States v. Olis*, 429 F.3d 540 (5th Cir. 2005); *United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007); *United States v. Nacchio*, 573 F.3d 1062, 1078 (10th Cir. 2009); *United States v. Stein*, 846 F.3d 1135, 1152 (11th Cir. 2017).

Even if the Court were to apply the reliance standard (which it should not), the government has met its burden.  "[I]n cases such as this one involving numerous investors, the government may instead offer specific circumstantial evidence from which the district court may reasonably conclude that all of the investors relied on the defendant's fraudulent information."  *See Stein*, 846 F.3d at 1153–54.  Here, a comparison of Decision Diagnostics' stock price during the pre-fraud period and post-fraud period with the stock price during the time of the defendant's false and misleading press releases demonstrates what drew investors into an otherwise dormant diabetes company: the defendant's lies about having invented a miraculous COVID-19 test.  This, corroborated by the victim impact statements, the anticipated trial testimony that has been proffered to the Court, and the testimony of Professor Mitts, clearly supports a finding—if one were required—that investors were relying on defendant's false statements when they invested in Decision Diagnostics.

¶ 37.)  In addition to submitting a victim impact statement, H.N. and V.D. submitted brokerage records further substantiating their loss claim.

- L.L. invested in Decision Diagnostics stock and lost $89,415.24.  As a result of the losses he suffered, L.L. experienced substantial financial hardship because he now needs to postpone his retirement.  (PSR ¶ 34.)  In addition to submitting a signed victim impact statement, L.L. submitted brokerage records further substantiating his loss claim.

- M.T. (who was Victim 1 described above) was interviewed by a federal law enforcement agent on several occasions and was prepared to testify at trial.  He stated that he invested in Decision Diagnostics stock and lost over $40,000.  He explained that he experienced substantial financial hardship because the loss of money caused his family to use money from their children's college funds for unexpected expenses. Further, he and his wife had to stop contributing to their own retirement account to help pay for expenses.  (PSR ¶ 31.)

- K.L. was interviewed by a federal law enforcement agent on several occasions and was prepared to testify at trial.  She stated that she invested in Decision Diagnostics stock and lost approximately $2,800.  K.L. experienced substantial financial hardship because she had to use money from her savings account and cut expenses until she could recover from the financial loss she suffered as a result of Decision Diagnostics.  K.L. had to build up their savings account again after the loss. (PSR ¶ 29.)

- B.S. was interviewed by a federal law enforcement agent on several occasions and also submitted a signed victim impact statement.  He stated that he and his wife jointly invested in Decision Diagnostics stock and lost approximately $66,102.  B.S. explained that he and his wife jointly invested half of their retirement savings from 18 years in the military.  B.S. and his wife experienced substantial financial hardship because they planned to retire from the Navy after 20 years of service and use the money towards a down payment for a house, but because of their losses, they had to delay their retirement.  (PSR ¶ 29.)  In addition to submitting a signed victim impact statement, B.S. submitted brokerage records further substantiating his loss claim.

The defendant objected on the ground that the government did not call these victims to testify at the evidentiary hearing.   (Defendant's PSR Objections to ¶ 50.) The government, however, is not required to present direct testimony from victims to substantiate their individual losses or substantial financial hardship.   To the contrary, courts may rely on victim impact statements as a sufficient basis to apply the substantial financial hardship enhancement.  *See, e.g., United States v. Sunmola*, 887 F.3d 830, 836–37 (7th Cir. 2018) (rejecting defendant's argument

that the Court was not permitted to rely on victim impact statements to find substantial financial hardship unless the government independently verified each victim's claims).

The defendant also objected to B.S.'s inclusion on the list of victims who experienced substantial financial hardship because, according to the defendant, B.S. sold his shares in DECN in June 2020 for a profit and then reinvested based on press releases unrelated to the misconduct in this case.  (Defendant's PSR Objections to ¶ 50.)  B.S., however, reinvested at a time when Decision Diagnostics' stock price was still artificially inflated as a result of the fraud – and as such suffered a loss when the truth was revealed after the defendant was indicted and his shares became worthless.

### C. The PSR Correctly Applied a Two-Level Enhancement for Use of Sophisticated Means

The PSR correctly applied the two-point enhancement pursuant to USSG § 2B1.1(b)(10)(C) for the defendant's use of sophisticated means in furtherance of the fraudulent scheme.  (PSR ¶ 51.)  "Sophisticated means" includes especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  This case is a textbook application of the sophisticated means enhancement because the defendant used a fake persona that he had created ("Matthew Steinmann") that was associated with an email address ("madefortunes@yahoo.com") stock message board account ("plutoniumimplosion") in furtherance of the fraud – including to make false claims, obstruct the SEC investigation, and intimidate potential witnesses from stepping forward.  *See United States v. Milligan*, 77 F.4th 1008, 1014 (D.C. Cir. 2023) (affirming the application of the sophisticated means enhancement where, among other things, the defendant set up an email address in another individual's name and used that account to author and send several emails from that account in an effort to conceal her offense).

### D.  The PSR Correctly Applied a Two-Level Obstruction Adjustment

The PSR correctly applied a two-level obstruction adjustment.  (PSR ¶¶ 39, 55.)  The adjustment applies for a number of reasons, including, most significantly, that the defendant pled guilty to Count 3 of the Superseding Indictment for obstruction of agency proceedings.  In addition to the defendant's plea to Count 3, the obstruction adjustment is also warranted based on: (i) the defendant's lies to the SEC in affidavits he submitted in May, June and July 2020 and live testimony he gave under oath in October 2020; (ii) the defendant's lies to the FBI in October 2020; and (iii) the Court's findings that there was probable cause that, after he was indicted, the defendant engaged in obstruction of justice and witness tampering in December 2020, 2021 and 2022.  *See generally* USSG § 3C1.1, cmt. n.4 (explaining that the adjustment applies to acts such as witness tampering, perjury (including in civil proceedings), making false statements to a law enforcement agent, and other conduct prohibited by obstruction of justice provisions under title 18, United States Code).

### E.  The Defendant Should Not Receive Credit for Acceptance of Responsibility

The defendant's post-guilty plea behavior is inconsistent with acceptance of responsibility.  Rather than genuinely taking responsibility for his serious criminal actions, the defendant is attempting to game this Court to get a lighter sentence by admitting the bare minimum needed to satisfy the elements of the charged offenses and then submitting a letter to Probation (PSR ¶ 40) minimizing his role and telling more lies.  For example:

- the defendant wrote:  "I was personally involved in issuing the press releases which had misleading statements about the progress and status of DECN's development of its COVID-19 blood test."  (*Id.*)  The defendant misstated his role in the offense.  The defendant, who was the company's sole officer and sole director, came up with the idea to issue false and misleading press releases and then drafted, approved, and disseminated them to the public.  The defendant was not merely "involved"; he was solely responsible.

15

- the defendant also wrote:  "I believed that I could leverage the technology DECN used for decades in its glucose monitoring and testing devices—impedance technology—to develop a groundbreaking product that could detect COVID-19 in blood."  *Id.*  This too is a lie.  In a private email that the defendant sent on March 21, 2020, he admitted that his purported COVID-19 test could not actually detect COVID-19:  "The method will not be specific enough to tell anyone which of these flus has been detected, but that is of lesser importance. It will tell them that some flu virus is present.  Since 97-98% of those tested will be negative, this method will determine the 2-3% that are positive and once positive, the patient should be tested again (same method), and if confirmed at the screening level moved up the chain to a more specific methods."  (ECF 177-18.  *See also* ECF 177-19.)

- the defendant also wrote: "Between May and June 2020, I exchanged private messages with a shareholder and collaborated with him in drafting an independent 'shareholder letter' accusing the SEC of misconduct for its actions against DECN and me."  (PSR (ECF 176) ¶ 40.)  Again, the defendant misstated the facts to minimize his role in the offense. The defendant did not "collaborate" with a shareholder.  Rather, the defendant came up with the idea and then used a false identity to persuade one of the shareholders – M.C., who was his victim – to send a false and misleading letter under false pretenses.  (*See, e.g.*, ECF 177-11, 177-12, 177-13, and 177-14.)  Moreover, once the victim unwittingly agreed, the defendant (again, using a false identity), directed the victim as to what to do and say.

Moreover, at the evidentiary hearing, the defendant put on an expert witness who repeatedly blamed the defendant's victims for their own losses.  (Mar. 20, 2024 Hr'g Tr. at 109:24 – 110:3; 111:10 – 111:17.)  He testified that the defendant's victims were irrational and should have known better than to believe the defendant's lies.  (*Id.*)  This is inconsistent with acceptance of responsibility.  USSG § 3E1.1 cmt. n.1(A) ("A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility".).

"It is the defendant's burden to convince the district court that he is entitled to the downward adjustment for acceptance of responsibility."  *United States v. Leyva*, 916 F.3d 14, 28 (D.C. Cir. 2019).  Despite being given several opportunities, the defendant has not met his burden to prove he is entitled to the downward adjustment for acceptance of responsibility.  *See, e.g., United States v. Taylor*, 937 F.2d 676, 680–81 (D.C. Cir. 1991) (the Court is entitled to require a

truthful and complete explanation of, and a genuine acceptance of responsibility for, all of the circumstances surrounding the defendant['s] [] offense[s]. …[and] to require an acceptance of responsibility that extended beyond the narrow elements of the offense[s]").  Accordingly, the defendant should not receive the two-point reduction under USSG § 3E1.1.

## IV.    SECTION 3553(a) FACTORS

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing identified in 18 U.S.C. § 3553(a).  *United States v. Rita*, 551 U.S. 338, 348 (2007).  Although the Guidelines are not binding, they "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives."  *Id.* at 350.

Under 18 U.S.C. § 3553(a)(1), the Court should consider the nature and circumstances of the offense and the history and characteristics of the defendant.  Furthermore, the Court should consider the need for the sentence imposed to: (i) reflect the seriousness of the offense, (ii) promote respect for the law, (iii) provide just punishment, (iv) afford adequate deterrence, (v) protect the public, and (vi) avoid unwarranted sentence disparities.  18 U.S.C. § 3553(a)(2) and (6).

## V.    GOVERNMENT'S SENTENCING RECOMMENDATION

### A.  Term of Custody

Considering the relevant 18 U.S.C. § 3553(a) factors, the government recommends a sentence of 120 months' imprisonment as sufficient, but not greater than necessary, to achieve the sentencing goals here notwithstanding a Guidelines range of 240 months.

#### 1.  Nature and Circumstances of the Offense and History and Characteristics of the Defendant (§ 3553(a)(1))

The defendant's history and characteristics and the nature and circumstances of his offenses weigh heavily in favor of a significant custodial sentence.

The defendant is a remorseless fraudster.  He stole hundreds of thousands of dollars from his publicly-listed company to pay a webcam model for cybersex.  And when he ran out of money, he made up a heinous lie about inventing a medical miracle to steal money from everyday Americans who were desperate for a COVID test in order to get more money to satisfy his greed.

The defendant was relentless in his personal attacks on the government employees who were merely doing their jobs investigating the defendant and his company.  When it appeared the SEC was close to uncovering his fraudulent scheme, the defendant targeted the SEC investigators and tried to ruin their lives.  The defendant focused the majority of his wrath on Mr. Perkins, and falsely accused him of committing serious crimes including perjury, fabricating evidence, and conspiring with cybercriminals.  The defendant also tried to end Mr. Perkins' career by, among other things, orchestrating a fake "shareholder" campaign to stop the SEC investigation and terminate Mr. Perkins' employment at the agency.  Every minute the defendant dedicated to destroying Mr. Perkins and his colleagues at the SEC, the defendant knew that his claims were predicated on pure lies.

The defendant persistently victimized the individuals who he successfully defrauded.  He repeatedly contacted his victims to harass, intimidate, manipulate, and defraud them anew.  He spent years engaging one-on-one with his victims – via text message, email, instant messages, stock message boards, and Facebook.  The defendant spent significant time convincing his victims that he had not victimized them and demonizing the FDA, SEC and DOJ.  And he repeatedly blamed and shamed his victims whenever they attempted to cooperate with the government's investigation.

The defendant's criminal behavior was relentless and he was not dissuaded by the charges levied against him.  After he was charged in this case, the defendant told his victims that his

COVID-19 test had been eliminated from the XPRIZE Foundation's COVID-19 test competition because of the allegations in the indictment rather than the merits of the test itself.  (ECF 115-4.) The defendant knew this was not true.  Still the defendant directed his victims to launch a campaign attack a non-profit organization that was hosting a public competition to encourage technological development of a legitimate COVID-19 test that could actually save lives.  (ECF 112; ECF 115-2, 3, 4.)

## 2.  Seriousness of the Offense, Respect for the Law, and Just Punishment (§ 3553(a)(2)(A))

A significant custodial sentence is also needed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

The defendant's crimes were cruel.  He devised his fraudulent scheme during the first days of the pandemic.  The defendant took advantage of the public's legitimate fears around getting sick with COVID-19 and desperation for a test for the virus to defraud them into investing in his company.  Once the United States declared a national emergency and states began issuing stay-at-home orders, he seized the opportunity to feed lies to a captive audience who was frantically searching the Internet for hope.  During this time, the defendant serially issued press releases, touting his invention of a test that he falsely claimed would help the nation emerge from quarantine and return to normalcy in order to fraudulently pump the price of his company's stock and attract new investors.

The defendant's crimes were also egregious because his fraud distracted federal agencies that were responsible for responding to the pandemic and consumed their precious time and resources with lies.  The defendant callously tied up FDA resources by submitting applications for a COVID-19 blood test that did not exist.  The defendant also consumed the SEC's time and

attention with his repeated attempts to obstruct the agency's investigation with false allegations of misconduct.   Further, the defendant actively worked to undermine people's trust in these institutions by engaging in countless attacks, including on the stock message boards.

The defendant clearly has no respect for the law.   He repeatedly lied to the SEC.   He repeatedly lied to the FBI.   He repeatedly violated this Court's order setting his pre-trial conditions of release, including by committing new crimes like witness tampering and obstruction.   He ignored numerous civil actions brought by the real victims he defrauded while on pre-trial release – and ignored the default judgments that those victims obtained.   And, in January 2023, the defendant committed perjury by submitting a false financial affidavit to this Court.

### 3.   Affording Adequate Deterrence and Protecting the Public from Further Crimes of the Defendant (§ 3553(a)(2)(B) and (C))

There is a strong need in this case to impose a sentence that will specifically deter the defendant from committing fraud post-release.   The defendant is a serial fraudster who has shown time and again that he will not be deterred.   Even after being indicted, the defendant continued to engage in the same types of crimes with which he had been charged, namely fraud and obstruction. Remarkably, while on pre-trial release, the defendant defrauded six different victims out of hundreds of thousands of dollars and attempted to defraud a seventh victim out of $6 million.   This Court found that "the Defendant poses a danger to the community".   (Apr. 25, 2023 Hr'g Tr. at 64:14 – 64:24.)   Specific deterrence is therefore especially important here because the defendant has relentlessly sought to game the judicial system, and it is important that his actions be met with significant consequences.

There is also a strong need to impose a sentence that generally deters others from carrying out fraud crimes during a national emergency.   Like the need to promote respect for the law, a

significant custodial sentence in this case will send a message to other potential wrongdoers that there are serious consequences for defrauding people during a time of crisis. Moreover, as these crimes "can be committed with an iPhone, with a computer right from the comfort of one's own home or even one's own bed" (Apr. 25, 2023 Hr'g Tr. at 63:18 – 63:24), it is critical that the Court make clear that a defendant who commits such a horrendous fraud – and then obstructs the government's efforts to investigate him – will receive a meaningful sentence.

### 4. Avoiding Unwanted Sentencing Disparities (§ 3553(a)(6))

The government recommends a significant custodial sentence based on all of the factors described above. In the PSR, the USPO identified the defendant's medical issues as a mitigating factor for a downward variance. (PSR ¶ 134.) The government agrees with the PSR and believes that the defendant's age and medical issues should be taken into consideration when fashioning a sentence. In light of these factors, the government has recommended a term of 120 months' imprisonment. The government believes that such a sentence avoids any unwanted sentencing disparities. While below the Guidelines, the government's recommended sentence of 120 months is around the average sentence imposed during the last five years on defendants who were convicted of fraud-related offenses and had a similar Guidelines profile as the defendant (Offense Level = 37 and Criminal History Category I). (*See* Judicial Sentencing Information ("JSIN").) Such a sentence permits the Court to account for the defendant's age and medical issues while still imposing a sentence that is sufficient, but not greater than necessary, to achieve the ends of justice.

### B. Supervised Release, Restitution, Mandatory Special Assessment, and Fine,

The government recommends that the defendant be sentenced to three years of supervised release. The government also recommends that the defendant be ordered to pay (i) restitution in an amount to be determined within 90 days of the sentencing hearing (ECF 190; 18 U.S.C. § 3664),

21

and (ii) a $300 mandatory special assessment.  The government takes no position on the imposition of a fine.

## VII.  CONCLUSION

For the above reasons, the government respectfully requests that the Court impose the following sentence as to defendant Keith Berman: (i) a term of 120 months' imprisonment; (ii) three years of supervised release; (iii) restitution in an amount to be determined; and (iv) a special assessment of $300.


Date: April 5, 2024

                                          Respectfully submitted,

GLENN S. LEON
CHIEF, FRAUD SECTION
Criminal Division, U.S. Department of Justice

   /s/ Christopher Fenton
Christopher Fenton
Kate T. McCarthy
Matthew Reilly
Fraud Section, Criminal Division
United States Department of Justice
1400 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 320-0539
Facsimile: (202) 514-3708
Email:  Christopher.Fenton@usdoj.gov