# GOVERNMENT EXHIBIT 3M

June 2, 2020

To:    Jay Clayton, SEC Chairman
       Carl Hoecker, SEC Inspector General
       Stephanie Avakian, SEC Co-Director, Division of Enforcement
       Vanessa Countryman, Office of the Secretary

We represent a number of concerned shareholders of Decision Diagnostics Corp., and are writing to you today in response to the following items:

I.     Release No. 34-88735, Order of Trading Suspension, dated April 23, 2020
II.    Actions associated with the potential theft of company property and its use against Decision Diagnostics Corp. in early May 2020.
III.   Administrative Proceeding File No. 3-19788, Information Before the Commission at the time of the Trading Suspension, dated May 20, 2020.

In the sections below, we outline what we believe to be numerous inconsistencies between the two documents filed by the SEC (those dated April 23 and May 20, 2020), as well as many other issues with the investigators' purported findings and how they used these findings to institute enforcement actions against the company.  We believe much of the information provided may have been submitted and presented by third parties in a twisted and misleading way.  We believe it is apparent that these individuals seek to do the company harm, as we have seen them attempt over many years without any fear of being held accountable.

We also outline our opinion of claims of bias and possibly collusion between the SEC investigators and rogue message board posters many who are also perhaps cyber criminals, who aim to destroy Decision Diagnostics Corp., and with that the chance to possibly curtain the spread of COVID-19 and return normalcy to all Americans.

In these trying times, the enhanced enforcement against rogue companies who make unsubstantiated claims concerning their COVID-19 products is not only warranted but applauded.  However, it has become clear to us over the past weeks that Decision Diagnostics Corp.'s actions did not warrant the trading suspension which was issued on April 23.

This action has negatively impacted the company, its shareholders, and its CEO Keith Berman.  Most of all, these activities are damaging to humanity with respect to the creation, development and, we hope (as should you and every American), emergency use authorization of the GenViro! products to assist in the detection of the deadly Coronavirus.

**GOVERNMENT
EXHIBIT
3M**

1:20-cr-00278-TNM

Decision Diagnostics Corp. Shareholder Letter dated 6/2/2020

June 2, 2020

We will outline our points in the sections below.  The information presented by the shareholder group has been obtained through research of information in public domain.  This letter represents our thoughts and opinions based on the events that have transpired, as well as the public documents associated with them.  We present this to you in hopes of a positive future outcome with respect to the company and their novel GenViro! products.

Addition information is included in an addendum to this document, containing additional inconsistencies associated with the SEC investigation.

I.    Release No. 34-88735, Order of Trading Suspension, dated April 23, 2020

Referring to the initial order, Vanessa A Countryman identifies two overriding objections to the company's press releases:

(i)    claiming to have "technology perfected" to allow it to manufacture and sell a COVID-19 test kit that would provide results "in 15 seconds, based on a small finger prick blood sample," and

(ii)    issuing sales forecasts that up to 525 million COVID 19 test kits would be sold in the first year of production.

With respect to (i) above, it appears Ms. Countryman is assuming that the claim of 'technology perfected' is false and/or misleading.   "Technology perfected" is not the same as saying 'perfect technology'.  A simple reference to dictionary.com reveals:

**Perfect**

**verb (used with object)**

18. to bring to completion; finish.
19. to bring to perfection; make flawless or faultless:
    *He has succeeded in perfecting his recipe for chicken Kiev.*
20. to bring nearer to perfection; improve; make better:
    *She works hard to perfect her writing.*
21. to make fully skilled.

Please note in the above dictionary entry, that the first (more common) entry for the meaning perfect as a verb (technology perfected – uses the past participle verb form) is to bring to completion or finish, as is also reflected in the word's origin stated above.

Decision Diagnostics Corp. Shareholder Letter dated 6/2/2020

June 2, 2020

Therefore "technology perfected" means the technology is completed or finished to be able to render the desired result, here an impedance-based test that would give the desired accurate result without any delay. As such, this is not a false or misleading statement unless the SEC had in its possession proof that the test kit and technology to be built by the company would not or could not work, something to our knowledge the SEC has not provided or indicated that it had, either in the Suspension Order or subsequent filings.

The term "technology perfected" does not mean that the company's technology was a perfect technology in the sense of being impossible to being improved upon, something the term 'perfect technology' might imply.  In fact, the context and full sentence in the March 3, 2020 PR states, **"We have the technology perfected which will take months off of the development schedule."**

The company was consistent in stating in the PRs released during the SEC's referenced timeframe, that the test kit was in development.  In its Supplemental Documents filed with the SEC on March 30th, the company gives an extensive explanation of the development and potential timeframe needed to bring the test kits to market.

With respect to (ii) above, Ms. Countryman states that the sales forecasts by the company are somehow false and/or misleading.

Projections (forecasts) are just that – estimations of future demand.  Definitions notwithstanding, it is not unreasonable to assume that if the company's test kit received EUA approval, there would be significant worldwide demand, let alone domestic demand as there was/is no competitive test kit that can detect the virus or its absence in 15 seconds, at any price.   No one can dispute that effective testing with immediate results is a critical component of any medical and economic recovery.

By way of example, with all college and professional sports suspended until testing can allow a return to some live activity, such test kits would have enormous demand to be used not once per person, but several times a week for the same person over a prolonged period.  As stated above projections are always just that, an estimate.  There are numerous examples of companies large and small, known and unknown, who publish projections and fall massively short.  No SEC actions are taken against those companies, simply because projections do not materialize.

In the case of Decision Diagnostics, Mr. Berman wrote that the company's test kit would not be available until the summer (of 2020).  At this point nothing in any forecast that does not begin until the summer of 2020 can be inferred, yet the SEC takes a contrary position.

Decision Diagnostics Corp. Shareholder Letter dated 6/2/2020

June 2, 2020

Taking everything into account (above mentioned sports teams, employee testing, public services/agencies, etc), and the massive need for rapid, portable testing of the COVID-19 virus, the projection may be, in the absence of any competitive product, _understated_.

II.     Actions associated with the potential theft of company property and it's use against Decision Diagnostics Corp. in early May 2020

Based on our own research, and information gathered from the Amended Petition for Termination of Suspension of Trading in the Securities of Decision Diagnostics Corp, Release No. 88735, dated May 15, 2020, it seems apparent the same rogue message board posters were involved in the following:

1.  Removal of non-public information from the PharmaTech Solutions, Inc website, trading this purloined information among themselves, and

2.  Submission of that information to various governmental agencies under false pretenses.

Item 1 - Removal of Non-Public Information from the PharmaTech Solutions, Inc Website

On or around May 5, various posters on IHUB claimed to be possession of a slide deck identifying GenViro! as 'FDA cleared'.  IHUB posts that appeared publicly on or around May 5 stated:



**Re:** None
**Post #** 65344 of 80663 Go    ☮ 0

PAGE 12 FDA CLEARED
http://www.pharmatechsolutions.co/assets/inserts/20200318_GenViro!_PP.pdf
Product: GenViro! COVID-19 Screen
? PharmaTech Solutions sensors for screening the Coronavirus
? **FDA cleared for use with GenViro! Precision Meter**
? PharmaTech Solutions is a wholly owned subsidiary of Decision Diagnostics Corp. (OTCBB:DECN)
? Types of Products: Home diagnostic and testing supplies
? Primary Customer: People concerned about the Coronavirus and consumers who have GenViro! Precision Meters.
? Typical Usage: 1 test to screen for COVID-19
P

Decision Diagnostics Corp. Shareholder Letter dated 6/2/2020

Page 4

DOJ-BERMAN-R_0000345004

4 of 40

June 2, 2020

For background, http://www.pharmatechsolutions.co/assets/ is the url to the backend database that was 'hacked'. There is no possible way any webmaster would allow that folder to exist in the UI (User Interface - what the public can see) because it doesn't 'link' to anything - it's basically just a file folder structure meant for the company's developer to generate links which eventually appear on the company homepage.

In short, there would be no way for anyone to access this file unless they hacked into it, and if these "hackers" traded the information among themselves and then provided it to an enforcement agency of the Federal government, that would these acts cybercrimes. The "hackers" to our understanding had no ties to the company.

The link below shows the correct product page for GenViro! with the correct slide.

http://www.pharmatechsolutions.co/genviro.html

The screengrab of that slide that was then posted to an anonymous Amazon Web Services account, was as follows:

https://s3.amazonaws.com/bbemail/PROD/ulib/3d0u1e/img/gVFDA_approved.png

Numerous posts and rogue posters attempt to correlate this slide, from the non-public side of the Pharmatech Solutions, Inc. webpage, to the actual 'live' slide thru the 'front end' user interface.

Many of these posts brag about how they have submitted this in process slide, obtained illegally and posted to an anonymous Amazon Web Services account, to various government agencies, including the SEC:



Decision Diagnostics Corp. Shareholder Letter dated 6/2/2020

DOJ-BERMAN-R_0000345005

June 2, 2020

While we are not privy to internal discussions between the SEC and the company, it seems likely, based on our assumption, that Mr. Perkins and/or SEC staff took the screenshot from the Amazon Web Services Account and used it, in part, as a reference point in his May 20 letter as we specify below.

More than one of these posts erroneously identifies GenViro! as being FDA 'approved'. The title of the AWS file contains the word 'approved' (rather than 'cleared for use', which appears on the stolen slide). In his May 20 certification, Mr. Perkins, in Items 19, 21, 22 and 23, and possible others, erroneously continues to make statements concerning the alleged 'approved' status of GenViro!, including a dissertation about the FDA 'approval' process and how it appears Decision Diagnostics Corp. is promoting this 'approved' classification for GenViro!.

It is clear from numerous posts that the stolen slide with the location titled 'approved', as well as more than one rogue poster who uses this term (instead of 'cleared', the proper term) while at the same time claiming they had contacted the SEC, are intertwined. As a point of information, FDA nomenclature describes drugs as "approved." Medical devices as "cleared," and completed Emergency Waivers (EUA's) as "authorized." The stolen slide cannot be relied upon and Mr. Perkins is negligent or worse for not investigating this.

The commonalities in verbiage between these rogue posts, the title of the stolen file, and Mr. Perkins language in Items 19, 21, 22 and 23 all logically deduce, in our opinion, that they are directly related. It is our opinion that it is more than plausible that Mr. Perkins used this stolen slide as a basis in the above sections after it was provided by at least one of the rogue posters identified in the posts above. It is also our strong belief that Mr. Perkins obtained this information <u>after</u> April 23, as the identified posts do not mention this issue prior to May 5.

If this information was obtained <u>after</u> the suspension date of April 23, Mr. Perkins would have made a false statement under penalty of perjury.

> 'Pursuant to the Commission's Order Requesting Additional Written Submissions ("the Order"), the Division of Enforcement ("Division") has attached the Declaration of Carlisle E. Perkins dated May 20, 2020, **setting forth the substantive facts before the Commission at the time it issued an order** suspending trading in the securities of Decision Diagnostics Corp. on April 23, 2020.

III.     <u>Administrative Proceeding File No. 3-19788, Information Before the Commission at the time of the Trading Suspension, dated May 20, 2020</u>

We will now identify numerous key inconsistencies, observed bias and in our opinion, obviously dubious claims made in the above-mentioned document certified to by Carlisle Perkins, Senior Counsel, SEC Division of Enforcement.

Additional inconsistencies can be found in the addendum to this document.

All items are identified by their section number as they appear in Mr. Perkins declaration.

Decision Diagnostics Corp. Shareholder Letter dated 6/2/2020

June 2, 2020

Item 22

Mr. Perkins writes 'In a press release dated April 7, 2020, DECN announced that it received a "Pre EUA-Acknowledgment and device serial number," touting this as a huge development akin to FDA approval of the test kits.  The release included the following statement from Berman:

 'We submitted the application late in the afternoon EDT, and incredibly we received our Pre-EUA Acknowledgement the morning of April 4, 2020, less than 24 hours later, and on the weekend. We were so stunned by the rapid acknowledgment that we waited almost two days to inquire whether the acknowledgment was what we have come to know as the 'Pre-EUA.' We were assured that this letter from the FDA and the device serial number assigned are exactly what we had been hoping for'.

The press release further claimed that 'it was clear that the FDA review staff was aware that our methodology was different than those slower and older methods that had received FDA EUAs or were in review.'

Firstly, the statement, ...'touting this as a huge development akin to FDA approval of the test kits' we believe is not only false, but disingenuous.  Mr. Perkins, 1) is erroneously and with bias, accusing Mr. Berman of inferring that 'Pre EUA-Acknowledgement' and 'FDA approval' are synonymous, and 2) shows Mr. Perkins complete lack of understanding with regards to FDA processes.  The company is not and has not applied for FDA' approval.  They, like numerous other companies engaged in the life and death struggle against COVID-19, have applied for an EUA, which is an emergency waiver to sell their test kits in lieu of FDA clearance, using an FDA EUA Authorization, when granted.

Item 24

Mr. Perkins writes, 'The press releases were also published on the company's website, which included a banner advertising COVID-19 kits on the home page. In the "About Us" section of DECN's website, it states:

'Through our subsidiary, PharmaTech Solutions, Inc., we provide blood glucose home testing test strips and exciting new concepts for blood testing monitors! All of our products are FDA cleared and have entered the market as an economical alternative for patients and healthcare providers.

The COVID-19 test kit is elsewhere listed as one of the subsidiary's products. While the banner for its COVID-19 test kits state that the product is still in development, the statements on the website give the misleading impression that the COVID-19 kit is ready or near-ready for purchase.'

The last paragraph (directly above) we believe shows the continued bias of Mr. Perkins.  No rational person would or could jump to the conclusion that a product 'still in development 'is ready or near-ready for use'.  Many other products on the PharmaTech Solutions, Inc. webpage are also 'in development', however the only one that Mr. Perkins has identified is GenViro!.

Decision Diagnostics Corp. Shareholder Letter dated 6/2/2020

Page 7

DOJ-BERMAN-R_0000345007

7 of 40

June 2, 2020

Additionally, it would be interesting to know if and on what date Mr. Perkins or any SEC investigator actually visited the PharmaTech Solutions, Inc webpage to verify the information above. This is conspicuous in its absence from the certification but should be easy enough to find, providing the PharmaTech Solutions, Inc site tracks IP addresses. If Mr. Perkins or any SEC investigator did not verify this information prior to the April 23 suspension order, he would have made a false statement under penalty of perjury.

How and when the information identified from the PharmaTech Solutions, Inc. website in Item 24 was obtained is of obvious significance. We would urge you to make this determination by contacting counsel for Decision Diagnostics to determine if IP addresses were tracked. Almost all companies do this tracking. If the 'verification' of this information (it's erroneous at best) was completed after the April 23 suspension letter, Mr. Perkins certification would be demonstrably false:

Item 28

Mr. Perkins writes, 'DECN's share price and volume spiked again following its April 7 press release announcing the receipt of its "Pre EUA-Acknowledgement and device serial number" raising concerns that the market misunderstood the news to believe it to mean that a device had been approved by the FDA'

He then cherry-picks a list of statements, without context, to support his conclusion.

Significantly, the SEC fails to identify any of the other challenged press releases which had an impact on the market.

Mr. Perkins's tactics here appear to be similar to those outlined in Item 24 above (and elsewhere), where the assumption is made that shareholders cannot read plain English in order to understand that GenViro! has not been granted an EUA waiver but has merely applied for one.

It is our belief that several, if not most, of Mr. Perkins's statements can be directly linked to various unsavoury message board posters from the website www.investorshub.com (IHUB). Certain posters there have boasted about communicating with the SEC (among other agencies) in an apparent attempt to destroy the company and Mr. Berman. These posters (some of whom will be identified by screenname in the next section of this document) appear to have an unknown vendetta against the company, and specifically Mr. Berman himself.

Decision Diagnostics Corp. Shareholder Letter dated 6/2/2020

June 2, 2020

In our opinion, it appears one of two things has happened or continues to happen with respect to the May 20 submission, and both cannot be true.

1. Mr. Perkins and his investigators have been taking information from select IHUB posters at face value, and have not done their own investigations prior to using them in SEC documentation, or,

2. Mr. Perkins and his investigators came to the conclusions on their own, which in our opinion demonstrates a callous disregard of the facts.

The fact that there may be, and presumably are unscrupulous individuals attempting to profit from the misery caused from the Coronavirus does not mean that anyone who is working on a workable solution should be cast in the same light.

In conclusion to this section, we believe that it is quite apparent that information used by Mr. Perkins originated with rogue message board posters and is being accepted and in fact relied on without adequate vetting by Mr. Perkins or his staff.

We are very aware that the current environment may have played a role in Decision Diagnostics Corp. being swept up in the group of 30+ apparently unscrupulous and fraudulent companies touting their COVID-19 products.  However, that does not in any way condone Mr. Perkins and all other SEC staff from responsibility for, in our opinion, this incomplete and bias investigation.  The suspension that resulted from this slipshod investigation dealt a crushing blow to both the company and honest shareholders, not to mention any business entity looking to do business with Decision Diagnostics Corp. in the future, including those who may have been expected to partner with GenViro!

Shareholders are and should be adamant that the SEC revisit this topic with a clear, unbiased direction.

We remain terribly troubled by the words and actions of Mr. Carlisle Perkins, Senior Counsel, Securities & Exchange Commission, Division of Enforcement.  As discussed in sections II and III in this document, it appears to us and to those who have advised us, that Mr. Perkins may have carried on a biased investigation of Decision Diagnostics Corp. replete with ex-parte discussions with person(s) who may be cyber criminals.

These individuals may have removed documents from a hidden directory on the company's server and forwarded these documents to Mr. Perkins and perhaps others at the SEC for use in the investigation. This is exactly what the rogue message board posters have done for many, many years.

Decision Diagnostics Corp. Shareholder Letter dated 6/2/2020

June 2, 2020

This is unfair to the company and its shareholders. We are even more troubled by the May 20, 2020 document that Mr. Perkins completed under penalty of perjury, a document now in the public domain. The May 20 filing had a stated official SEC purpose but in our opinion appears to have instead been used to pile on and to demean the Mr. Berman, and to add allegations to the SEC April 23 ruling.

It is our opinion that at least some of these allegations could not have been known to Mr. Perkins as of April 23. Thus, we ask the SEC to appoint an investigator to look into Mr. Perkins' words and actions associated with the May 20 filing. If it is found that Mr. Perkins abused his authority or any of the other issues we bring to your attention herein, then we will follow up with the SEC at a later date. In summary, we feel this entire "investigation" is very troubling and demands a thorough review.

As shareholders we are fully aware of the assertions contained in this letter. We are also fully aware the powers of the SEC to unilaterally impose such restrictions upon public companies, and the potential consequences of those restrictions.

We do not join this fight lightly. We are very aware what is stake, both for each of us personally, but more importantly for humanity as a whole. Lumping Decision Diagnostics Corp., Mr. Berman, and their revolutionary test kit GenViro! into the same bucket as fraudulent COVID-19 companies is not only wrong but could have deadly consequences.

Imagine a scenario where this kit is proven to be effective against the most widespread pandemic since the 1918 Spanish Flu. And the product cannot be made available due to the crushing blow your office has laid upon the very company who was up to the task.

The SEC is supposed to protect investors. Based on the information we have provided in this letter, we feel the opposite has occurred and is occurring in the case of Decision Diagnostics Corp. And because they are developing a novel product which may just be able to rescue the planet, the attention given to this issue will be, regardless of the outcome, very public and very lasting. The burden of proof associated with wrongdoing in the marketplace lies with the SEC. Thus far is appears, and we do believe will appear to the general public, that Mr. Perkins, with the support of the SEC, assumed the company and Mr. Berman to be guilty and demanded they 'prove' their innocence, while at the same time viewing the company through a biased lens.

Decision Diagnostics Corp. Shareholder Letter dated 6/2/2020

DOJ-BERMAN-R_0000345010

June 2, 2020

This is not how the American justice system is supposed to work.

For that reason, we request your full and immediate attention to these matters and we will be willing to assist you in any way if future investigations are required.

We thank you for your time reading this letter and look forward to your response as promptly as possible in view of the health crisis we are all facing.

Sincerely,

Shareholders in support of this document:



Decision Diagnostics Corp. Shareholder Letter dated 6/2/2020

June 2, 2020

Addendum to Decision Diagnostics Corp. Shareholder Letter, dated 6/2/2020

<u>Administrative Proceeding File No. 3-19788, Information Before the Commission at the time of the Trading Suspension, dated May 20, 2020</u>

<u>Item 6</u>

Mr. Perkins writes, 'Berman was the CEO of a company called Access HealthNet until 1995 when he was fired amid reports of unexpected losses and an infusion of cash from directors and others.

Berman, who was described in the complaint as "cavalier about everything," was a named defendant in a class action securities fraud case brought on behalf of investors, which appears to have settled in 1999. Allegations in the complaint included misleading information in the company's financial statements as well as false press releases which Berman had overseen. (See Kalmus, et al. v. Wertz et al. No. SACV-96-1250-GLT).'

We believe this categorization of Mr. Berman is not only outrageously out of context, it has no relationship to his current role as CEO of Decision Diagnostics Corp.  Furthermore, it is highly prejudiced in nature, has no probative value as its only reference is to an <u>allegation in a complaint</u> and appears to exist only to trash the reputation of Mr. Berman.

We would request that Mr. Perkins disclose the origin of this information, that is nearly a quarter of a century old; e.g. directly from message board posters or through his own investigation.  Also, the purpose of including this allegation, **as it is not identified in the April 23 letter.**

If this information was obtained <u>after </u>the suspension date of April 23, Mr. Perkins would have made a false statement under penalty of perjury.

This twenty-five (25) year old allegation was not identified in the suspension letter and it is our opinion it was included in the May 20th certification only in an attempt to embarrass Mr. Berman.  It was not utilized to obtain the suspension as it is not identified in that document. It appears to us that Mr. Perkins took it upon himself, or acquired information from other sources, to include this information for the sole purpose of publicly shaming Mr. Berman.

Addendum to Decision Diagnostics Corp. Shareholder Letter

June 2, 2020

Item 11

Concluding sentence of the paragraph, Mr. Perkins writes:

'…. The company's annual report for 2019, as well as prior quarterly reports, includes a going concern statement questioning whether it could continue as a financially solvent company.'

As you and investors well know, this is common language included pursuant to the requirements of the Statement of Auditing Standards regarding most if not all developmental companies, among others.  Mr. Perkins, again, attempts to devalue Decision Diagnostics Corp. as well as Mr. Berman with this statement, which we believe shows bias, since as the Commission acknowledges, a going concern qualification was contained in 'prior quarterly reports.  Therefore,  we feel its inclusion in the 2019 annual report could not justify or even be pertinent to the trading suspension.

Item 15

Mr. Perkins writes, 'The following week, on March 11, 2020, DECN issued a press release stating that it expected to sell 420 million COVID-19 test kits in the first year of production, beginning September 2020.  The press release included this apparently baseless forecast chart:

GenViro! 12-Month Forecast

| Number of Months | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | SUM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year 1 | Apr-20 | May-20 | Jun-20 | Jul-20 | Aug-20 | Sep-20 | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | |
| New Facility Customers | 0 | 0 | 0 | 0 | 0 | 5000 | 5000 | 5000 | 5000 | 5000 | 5000 | 5000 | |
| Retained Facilities | 0 | 0 | 0 | 0 | 0 | 0 | 5000 | 10000 | 15000 | 20000 | 25000 | 30000 | |
| Total Facility Customers | 0 | 0 | 0 | 0 | 0 | 5000 | 10000 | 15000 | 20000 | 25000 | 30000 | 35000 | 35,000 |
| Kits Consumed | 0 | 0 | 0 | 0 | 0 | 15,000,000 | 30,000,000 | 45,000,000 | 60,000,000 | 75,000,000 | 90,000,000 | 105,000,000 | 420,000,000 |

Forecasts/projections are estimates of future sales, which are, by nature, 'estimated'.  The verbiage 'apparently baseless' we believe is unjustified and shows bias toward the company.  By their very nature, estimates or forecasts are not 100% accurate.  We do not believe Mr. Perkins had any logical basis to identify these forecasts/projections as he did.

Item 16

Mr. Perkins writes 'Berman asserted, without providing supporting evidence, that DECN's COVID19 test kits should "allow 80% of the suspected carriers of Coronavirus to exit the quarantine system in places where Coronavirus is rampant.'  The press release included a picture of DECN's purported COVID-19 test kit.  The pictured kit for the purported COVID-19 test looks identical to the company's diabetes glucose test kit – marketed "4Pets" listed on its website.

Addendum to Decision Diagnostics Corp. Shareholder Letter

June 2, 2020

Addressing the first statement, it is unclear how this was interpreted by Mr. Perkins.  However, people who were suspected of having COVID-19 simply because of fever or other potential symptoms, were being placed in quarantine until their PCR test results came back from the specialty labs.  This at times involved days or weeks waiting for a test result.  At that time, an estimated 80% of people with symptoms were testing negative for COVID-19.   The PR and statement by Mr. Berman, simply suggests that a 15 second test kit applied to people with potential symptoms for COVID-19 would provide the same negative result for 80% of the people and thus immediately free them from quarantine or having to go into quarantine, rather than force them to encounter a lengthy delay before receiving laboratory results.

It is our opinion that this statement relies on previously establish test results and cannot be deemed in any way to be misleading.

With respect to the second claim, we are of the opinion that Mr. Perkins inexplicitly finds a negative due to the fact that all the company's meters look the same.  Minimal research would have uncovered the fact that all the company's meters look the same because they utilize the same impedance technology.

In fact, in various PRs and Supplemental Disclosure filings, Mr. Berman expressly stated that the Genviro! test strips would have to work with the existing currently, utilized meter formulated for the product development to go forward.  This is something that the SEC should surely have known since the company indicated this in its second PR regarding COVID-19 testing development on March 4, 2020 (emphasis added):

> '…The company will have available samples of the blood of those previously infected available for testing as the company **quickly converts its GenUltimate! TBG methods and Precise meter, into a precise infectious disease testing device** for the screening for Coronavirus.'

A week later, the next PR referred to the same (emphasis added):

> 'Keith Berman, CEO of DECN commented, "**Because we perfected the Impedance technology in 2019 for our GenUltimate! TBG glucose test strip and meter, we have shaved months off of the development time for the GenViro! device.** Our GenViro! impedance powered diagnostic will be field tested at ground-zero in Daegu, Korea, the location of our factory and the hospital-based testing site,… "'

Addendum to Decision Diagnostics Corp. Shareholder Letter

DOJ-BERMAN-R_0000345014

June 2, 2020

DECN's March 25 PR, explicitly states in the 2nd paragraph that they will use one of their existing meters for the COVID-19 test strips (emphasis added):

> '…Today, DECN announces that the company, through its advanced development team in Korea, has arrived at a second Covid-19 test methodology, a modified Serology method, that at the completion of documentation, be put through the FDA Emergency Waiver (EUA) process. This second kit will begin assembly for internal testing on April 1, with availability in late summer 2020. **The method will again use a Biosensor (test strip-like device) and the company's Precise meter.'**

The company's 3/30/2020 filing of Supplemental Information for the period ending 12/31/2019, on page 16, as part of its extensive overview of how it decided to pursue COVID-19 testing, states the following (emphasis added):

> The company then set to work, along with Matthew Musho, PhD ("Musho"), to evaluate the designs, keeping in mind the desired specifications of the DECN CEO and product Program Director, which included availability of components without wait time, time to market (assuming FDA EUA), whether the chosen method was applicable to use in point of care and at-home environments, time of assay from commencement of test and until result, size of the blood sample, and finally cost to produce. Given the company's experience in working with biosensors and with electrode technology, the design review process took less time than originally expected. The entire process took 13 days. The last of these days used to determine which of the two Musho specifications was to be chosen. **The design provided by The Bio was discarded because it could not be read on the existing company meter technology, and therefore would require additional development.** At the end of this process, the company chose to produce the product shown in the illustrations, the second of the two Musho alternative versions, but shortly thereafter to begin work on the other Musho specification, to be used as a confirmation tool. Product Design 1 (chosen) The design above is in many regards similar to the direct antibody antigen approaches favored by some of the competitive companies in the Covid-19 testing field. But the major difference (magic) is that the approach used by the company in its GenViro! product allows for swift (15 seconds or less) results using a minimum of blood from a finger prick. As of this writing, work has commenced on the product specification above with components such as the platinum electrodes, platinum carbon paste, industrial films (several types) to make the biosensor, **and perhaps a new impedance chip for the meter.** The company is operating on an 8-week development schedule and is some 10 days into this schedule. The current development cycle is considered advanced development. For FDA EUA filing and the granting of a Pre-EUA by the FDA, the company is preparing its final working concept filing, to be completed within days of this writing.

A review of the company's website at http://www.decisiondiagnostics.co/products.html reveals that the Precise meter for GenUltimate! for people and the meter for GenUltimate! 4Pets is either the same meter or looks the same.  This is in no way is deceptive, contains no false statements and is easily verifiable from the company's public records, filings and PRs. See image below.

Addendum to Decision Diagnostics Corp. Shareholder Letter

June 2, 2020



GenUltimate! TBG High Precision Test Strips & Meter

Availiable Soon

PetSure! Test Strips for Canines and Felines

Buy Now

GenUltimate! 4Pets Test Strips & Meter for Canines and Felines

Addendum to Decision Diagnostics Corp. Shareholder Letter

June 2, 2020



*Not yet available for sale in U.S.A. or Puerto Rico

The above information was easily accessible, and subsequently verifiable. Because certainly these 'issues' are referred to in the May 20 filing, it is our opinion that Mr. Perkins believes these to be false and or misleading.

<u>Item 20</u>

Mr. Perkins writes, 'At the time of the March 3, 2020, press release – when DECN claimed that its "product" would be "commercial [sic] ready in the summer of 2020" – DECN had not applied for authorization from the FDA to sell or distribute its COVID-19 test kit. In addition, as of April 13, 2020, Berman, who alone drafted the press releases on behalf of DECN, stated or suggested in interviews with staff that he:

- knew that the company had no COVID-19 test kits;

- had not seen any of DECN's prototype COVID-19 test kits;

- had no idea how many test kits DECN could produce;

Addendum to Decision Diagnostics Corp. Shareholder Letter

June 2, 2020

- knew that the COVID-19 test kits would require component parts that were different from DECN's current diabetes products, which the company did not yet have and would need before any sales could be made;

- was looking for sources that could provide the component parts but had no idea how much the component parts would cost and the time it would take for the company to obtain the parts in the midst of the pandemic; and

- knew that no COVID-19 test kits could be sold without FDA approval, which the company did not have.

Taking each bullet point individually, and assuming for the purposes of this letter the accuracy of Mr. Perkins' assertions taken from the interviews Mr. Berman voluntarily agreed to reveals the following:

<u>Knew that the company had no COVID-19 test kits.</u>

Because the product was clearly still under development, as stated in numerous company PR's, also required FDA approval, why would Mr. Perkins (or anyone) believe that the company would be in possession of said test kits? This is standard practice for all product development, in any sector. The word 'development' should have resolved this.

<u>Had not seen any of DECN's prototype COVID-19 test kits</u>

As the opening sentences of this section reads, '…Berman, who alone drafted the press releases on behalf of DECN, stated or suggested in interviews with staff…'. We believe confirms that much of what is contained here, was, to be polite, embellished by Mr. Perkins based on what he chose to hear.

To us, it would seem unbelievable that Mr. Berman, who oversaw the design of the prototype test kit, and included images of the pre-prototype kits in company press releases, who state to SEC investigators that he had never seen these test kits.

<u>Had no idea how many test kits DECN could produce</u>

Not privy to the EUA application process, how was this known at the time by Mr. Perkins? Did he complete a thorough review of said application to verify the absence of this information?

It would be interesting to learn if Mr. Perkins interviewed Mr. Berman to come to this conclusion, or simply assumed this to be the case. If the latter is true, it fits Mr. Perkins investigational pattern.

<u>Knew that the COVID-19 test kits would require component parts that were different from DECN's current diabetes products, which the company did not yet have and would need before any sales could be made</u>

It is unclear why Mr. Perkins or SEC investigators would believe this claimed statement to be false and/or misleading for a product which was in the developmental state. This could be concluded from the press releases discussion the modification of the GenUltimate! meter.

Addendum to Decision Diagnostics Corp. Shareholder Letter

June 2, 2020

Was looking for sources that could provide the component parts but had no idea how much the component parts would cost and the time it would take for the company to obtain the parts in the midst of the pandemic

Even if this information came directly from Mr. Berman it would be expected for a developmental stage product.  We would question whether Mr. Perkins or the SEC investigators verify this information was accurate, and if so, why would it be considered false and/or misleading with respect to a developmental stage product?

Knew that no COVID-19 test kits could be sold without FDA approval, which the company did not have

It appears Mr. Perkins and the SEC investigators include this as if it is 1) a revelation to shareholders, and 2) Mr. Berman has not been upfront about this fact, and/or has claimed the opposite.

The company has not applied for FDA approval.  Instead it has applied for EUA, which is a waiver to sell their test kits, on an exigent basis, in lieu of FDA Approval (Approval is the incorrect term as well, as the company's products are identified as medical devices, which are 'cleared' for FDA use').

Item 25

Mr. Perkins writes, 'As of April 23, 2020, Division staff were unable to identify any FDA-approved medical devices relating to COVID-19 in the FDA's publicly available databases under the name of DECN, Berman, or its subsidiaries.

We feel there is no point to this statement.  Mr. Berman at no time has claimed that GenViro! is available for commercial sale, in fact a disclaimer makes it clear that the product is currently not available for sale in the United States or Puerto Rico.

The lack of understanding is surprising, coming from an investigational staff tasked with weeding out fraud in the COVID-19 space.

Addendum to Decision Diagnostics Corp. Shareholder Letter

June 2, 2020

To:    Jay Clayton, SEC Chairman
       Carl Hoecker, SEC Inspector General
       Stephanie Avakian, SEC Co-Director, Division of Enforcement
       Vanessa Countryman, Office of the Secretary

We represent a number of concerned shareholders of Decision Diagnostics Corp., and are writing to you today in response to the following items:

I.     Release No. 34-88735, Order of Trading Suspension, dated April 23, 2020
II.    Actions associated with the potential theft of company property and its use against Decision Diagnostics Corp. in early May 2020.
III.   Administrative Proceeding File No. 3-19788, Information Before the Commission at the time of the Trading Suspension, dated May 20, 2020.

In the sections below, we outline what we believe to be numerous inconsistencies between the two documents filed by the SEC (those dated April 23 and May 20, 2020), as well as many other issues with the investigators' purported findings and how they used these findings to institute enforcement actions against the company. We believe much of the information provided may have been submitted and presented by third parties in a twisted and misleading way. We believe it is apparent that these individuals seek to do the company harm, as we have seen them attempt over many years without any fear of being held accountable.

We also outline our opinion of claims of bias and possibly collusion between the SEC investigators and rogue message board posters many who are also perhaps cyber criminals, who aim to destroy Decision Diagnostics Corp., and with that the chance to possibly curtain the spread of COVID-19 and return normalcy to all Americans.

In these trying times, the enhanced enforcement against rogue companies who make unsubstantiated claims concerning their COVID-19 products is not only warranted but applauded. However, it has become clear to us over the past weeks that Decision Diagnostics Corp.'s actions did not warrant the trading suspension which was issued on April 23.

This action has negatively impacted the company, its shareholders, and its CEO Keith Berman. Most of all, these activities are damaging to humanity with respect to the creation, development and, we hope (as should you and every American), emergency use authorization of the GenViro! products to assist in the detection of the deadly Coronavirus.

Decision Diagnostics Corp. Shareholder Letter dated 6/2/2020

June 2, 2020

We will outline our points in the sections below. The information presented by the shareholder group has been obtained through research of information in public domain. This letter represents our thoughts and opinions based on the events that have transpired, as well as the public documents associated with them. We present this to you in hopes of a positive future outcome with respect to the company and their novel GenViro! products.

Addition information is included in an addendum to this document, containing additional inconsistencies associated with the SEC investigation.

I.      Release No. 34-88735, Order of Trading Suspension, dated April 23, 2020

Referring to the initial order, Vanessa A Countryman identifies two overriding objections to the company's press releases:

(i)     claiming to have "technology perfected" to allow it to manufacture and sell a COVID-19 test kit that would provide results "in 15 seconds, based on a small finger prick blood sample," and

(ii)    issuing sales forecasts that up to 525 million COVID 19 test kits would be sold in the first year of production.

With respect to (i) above, it appears Ms. Countryman is assuming that the claim of 'technology perfected' is false and/or misleading. "Technology perfected" is not the same as saying 'perfect technology'. A simple reference to dictionary.com reveals:

**Perfect**

**verb (used with object)**

18. to bring to completion; finish.
19. to bring to perfection; make flawless or faultless:
    *He has succeeded in perfecting his recipe for chicken Kiev.*
20. to bring nearer to perfection; improve; make better:
    *She works hard to perfect her writing.*
21. to make fully skilled.

Please note in the above dictionary entry, that the first (more common) entry for the meaning perfect as a verb (technology perfected – uses the past participle verb form) is to bring to completion or finish, as is also reflected in the word's origin stated above.

Decision Diagnostics Corp. Shareholder Letter dated 6/2/2020

June 2, 2020

Therefore "technology perfected" means the technology is completed or finished to be able to render the desired result, here an impedance-based test that would give the desired accurate result without any delay. As such, this is not a false or misleading statement unless the SEC had in its possession proof that the test kit and technology to be built by the company would not or could not work, something to our knowledge the SEC has not provided or indicated that it had, either in the Suspension Order or subsequent filings.

The term "technology perfected" does not mean that the company's technology was a perfect technology in the sense of being impossible to being improved upon, something the term 'perfect technology' might imply.  In fact, the context and full sentence in the March 3, 2020 PR states, **"We have the technology perfected which will take months off of the development schedule."**

The company was consistent in stating in the PRs released during the SEC's referenced timeframe, that the test kit was in development.  In its Supplemental Documents filed with the SEC on March 30th, the company gives an extensive explanation of the development and potential timeframe needed to bring the test kits to market.

With respect to (ii) above, Ms. Countryman states that the sales forecasts by the company are somehow false and/or misleading.

Projections (forecasts) are just that – estimations of future demand.  Definitions notwithstanding, it is not unreasonable to assume that if the company's test kit received EUA approval, there would be significant worldwide demand, let alone domestic demand as there was/is no competitive test kit that can detect the virus or its absence in 15 seconds, at any price.   No one can dispute that effective testing with immediate results is a critical component of any medical and economic recovery.

By way of example, with all college and professional sports suspended until testing can allow a return to some live activity, such test kits would have enormous demand to be used not once per person, but several times a week for the same person over a prolonged period.  As stated above projections are always just that, an estimate.  There are numerous examples of companies large and small, known and unknown, who publish projections and fall massively short.  No SEC actions are taken against those companies, simply because projections do not materialize.

In the case of Decision Diagnostics, Mr. Berman wrote that the company's test kit would not be available until the summer (of 2020).  At this point nothing in any forecast that does not begin until the summer of 2020 can be inferred, yet the SEC takes a contrary position.

Decision Diagnostics Corp. Shareholder Letter dated 6/2/2020

June 2, 2020

Taking everything into account (above mentioned sports teams, employee testing, public services/agencies, etc), and the massive need for rapid, portable testing of the COVID-19 virus, the projection may be, in the absence of any competitive product, _understated_.

II.    Actions associated with the potential theft of company property and it's use against Decision Diagnostics Corp. in early May 2020

Based on our own research, and information gathered from the Amended Petition for Termination of Suspension of Trading in the Securities of Decision Diagnostics Corp, Release No. 88735, dated May 15, 2020, it seems apparent the same rogue message board posters were involved in the following:

1.  Removal of non-public information from the PharmaTech Solutions, Inc website, trading this purloined information among themselves, and

2.  Submission of that information to various governmental agencies under false pretenses.

Item 1 - Removal of Non-Public Information from the PharmaTech Solutions, Inc Website

On or around May 5, various posters on IHUB claimed to be possession of a slide deck identifying GenViro! as 'FDA cleared'.  IHUB posts that appeared publicly on or around May 5 stated:

**Re:** None

**Post #** 65344     of 80663   Go

PAGE 12 FDA CLEARED
http://www.pharmatechsolutions.co/assets/inserts/20200318_GenViro!_PP.pdf
Product: GenViro! COVID-19 Screen
? PharmaTech Solutions sensors for screening the Coronavirus
? **FDA cleared for use with GenViro! Precision Meter**
? PharmaTech Solutions is a wholly owned subsidiary of Decision Diagnostics
Corp. (OTCBB:DECN)
? Types of Products: Home diagnostic and testing supplies
? Primary Customer: People concerned about the Coronavirus and consumers
who have GenViro! Precision Meters.
? Typical Usage: 1 test to screen for COVID-19
P

Decision Diagnostics Corp. Shareholder Letter dated 6/2/2020

June 2, 2020

For background, http://www.pharmatechsolutions.co/assets/ is the url to the backend database that was 'hacked'. There is no possible way any webmaster would allow that folder to exist in the UI (User Interface - what the public can see) because it doesn't 'link' to anything - it's basically just a file folder structure meant for the company's developer to generate links which eventually appear on the company homepage.

In short, there would be no way for anyone to access this file unless they hacked into it, and if these "hackers" traded the information among themselves and then provided it to an enforcement agency of the Federal government, that would these acts cybercrimes. The "hackers" to our understanding had no ties to the company.

The link below shows the correct product page for GenViro! with the correct slide.

http://www.pharmatechsolutions.co/genviro.html

The screengrab of that slide that was then posted to an anonymous Amazon Web Services account, was as follows:

https://s3.amazonaws.com/bbemail/PROD/ulib/3d0u1e/img/gVFDA_approved.png

Numerous posts and rogue posters attempt to correlate this slide, from the non-public side of the Pharmatech Solutions, Inc. webpage, to the actual 'live' slide thru the 'front end' user interface.

Many of these posts brag about how they have submitted this in process slide, obtained illegally and posted to an anonymous Amazon Web Services account, to various government agencies, including the SEC:



Decision Diagnostics Corp. Shareholder Letter dated 6/2/2020

While we are not privy to internal discussions between the SEC and the company, it seems likely, based on our assumption, that Mr. Perkins and/or SEC staff took the screenshot from the Amazon Web Services Account and used it, in part, as a reference point in his May 20 letter as we specify below.

More than one of these posts erroneously identifies GenViro! as being FDA 'approved'. The title of the AWS file contains the word 'approved' (rather than 'cleared for use', which appears on the stolen slide). In his May 20 certification, Mr. Perkins, in Items 19, 21, 22 and 23, and possible others, erroneously continues to make statements concerning the alleged 'approved' status of GenViro!, including a dissertation about the FDA 'approval' process and how it appears Decision Diagnostics Corp. is promoting this 'approved' classification for GenViro!.

It is clear from numerous posts that the stolen slide with the location titled 'approved', as well as more than one rogue poster who uses this term (instead of 'cleared', the proper term) while at the same time claiming they had contacted the SEC, are intertwined. As a point of information, FDA nomenclature describes drugs as "approved." Medical devices as "cleared," and completed Emergency Waivers (EUA's) as "authorized." The stolen slide cannot be relied upon and Mr. Perkins is negligent or worse for not investigating this.

The commonalities in verbiage between these rogue posts, the title of the stolen file, and Mr. Perkins language in Items 19, 21, 22 and 23 all logically deduce, in our opinion, that they are directly related. It is our opinion that it is more than plausible that Mr. Perkins used this stolen slide as a basis in the above sections after it was provided by at least one of the rogue posters identified in the posts above. It is also our strong belief that Mr. Perkins obtained this information <u>after</u> April 23, as the identified posts do not mention this issue prior to May 5.

If this information was obtained <u>after</u> the suspension date of April 23, Mr. Perkins would have made a false statement under penalty of perjury.

> 'Pursuant to the Commission's Order Requesting Additional Written Submissions ("the Order"), the Division of Enforcement ("Division") has attached the Declaration of Carlisle E. Perkins dated May 20, 2020, **setting forth the substantive facts before the Commission at the time it issued an order** suspending trading in the securities of Decision Diagnostics Corp. on April 23, 2020.

III.     <u>Administrative Proceeding File No. 3-19788, Information Before the Commission at the time of the Trading Suspension, dated May 20, 2020</u>

We will now identify numerous key inconsistencies, observed bias and in our opinion, obviously dubious claims made in the above-mentioned document certified to by Carlisle Perkins, Senior Counsel, SEC Division of Enforcement.

Additional inconsistencies can be found in the addendum to this document.

All items are identified by their section number as they appear in Mr. Perkins declaration.

Decision Diagnostics Corp. Shareholder Letter dated 6/2/2020

June 2, 2020

Item 22

Mr. Perkins writes 'In a press release dated April 7, 2020, DECN announced that it received a "Pre EUA-Acknowledgment and device serial number," touting this as a huge development akin to FDA approval of the test kits. The release included the following statement from Berman:

'We submitted the application late in the afternoon EDT, and incredibly we received our Pre-EUA Acknowledgement the morning of April 4, 2020, less than 24 hours later, and on the weekend. We were so stunned by the rapid acknowledgment that we waited almost two days to inquire whether the acknowledgment was what we have come to know as the 'Pre-EUA.' We were assured that this letter from the FDA and the device serial number assigned are exactly what we had been hoping for'.

The press release further claimed that 'it was clear that the FDA review staff was aware that our methodology was different than those slower and older methods that had received FDA EUAs or were in review.'

Firstly, the statement, ...'touting this as a huge development akin to FDA approval of the test kits' we believe is not only false, but disingenuous. Mr. Perkins, 1) is erroneously and with bias, accusing Mr. Berman of inferring that 'Pre EUA-Acknowledgement' and 'FDA approval' are synonymous, and 2) shows Mr. Perkins complete lack of understanding with regards to FDA processes. The company is not and has not applied for FDA' approval. They, like numerous other companies engaged in the life and death struggle against COVID-19, have applied for an EUA, which is an emergency waiver to sell their test kits in lieu of FDA clearance, using an FDA EUA Authorization, when granted.

Item 24

Mr. Perkins writes, 'The press releases were also published on the company's website, which included a banner advertising COVID-19 kits on the home page. In the "About Us" section of DECN's website, it states:

'Through our subsidiary, PharmaTech Solutions, Inc., we provide blood glucose home testing test strips and exciting new concepts for blood testing monitors! All of our products are FDA cleared and have entered the market as an economical alternative for patients and healthcare providers.

The COVID-19 test kit is elsewhere listed as one of the subsidiary's products. While the banner for its COVID-19 test kits state that the product is still in development, the statements on the website give the misleading impression that the COVID-19 kit is ready or near-ready for purchase.'

The last paragraph (directly above) we believe shows the continued bias of Mr. Perkins. No rational person would or could jump to the conclusion that a product 'still in development 'is ready or near-ready for use'. Many other products on the PharmaTech Solutions, Inc. webpage are also 'in development', however the only one that Mr. Perkins has identified is GenViro!.

Decision Diagnostics Corp. Shareholder Letter dated 6/2/2020

DOJ-BERMAN-R_0000345026

June 2, 2020

Additionally, it would be interesting to know if and on what date Mr. Perkins or any SEC investigator actually visited the PharmaTech Solutions, Inc webpage to verify the information above. This is conspicuous in its absence from the certification but should be easy enough to find, providing the PharmaTech Solutions, Inc site tracks IP addresses. If Mr. Perkins or any SEC investigator did not verify this information prior to the April 23 suspension order, he would have made a false statement under penalty of perjury.

How and when the information identified from the PharmaTech Solutions, Inc. website in Item 24 was obtained is of obvious significance. We would urge you to make this determination by contacting counsel for Decision Diagnostics to determine if IP addresses were tracked. Almost all companies do this tracking. If the 'verification' of this information (it's erroneous at best) was completed after the April 23 suspension letter, Mr. Perkins certification would be demonstrably false:

### Item 28

Mr. Perkins writes, 'DECN's share price and volume spiked again following its April 7 press release announcing the receipt of its "Pre EUA-Acknowledgement and device serial number" raising concerns that the market misunderstood the news to believe it to mean that a device had been approved by the FDA'

He then cherry-picks a list of statements, without context, to support his conclusion.

Significantly, the SEC fails to identify any of the other challenged press releases which had an impact on the market.

Mr. Perkins's tactics here appear to be similar to those outlined in Item 24 above (and elsewhere), where the assumption is made that shareholders cannot read plain English in order to understand that GenViro! has not been granted an EUA waiver but has merely applied for one.

It is our belief that several, if not most, of Mr. Perkins's statements can be directly linked to various unsavoury message board posters from the website www.investorshub.com (IHUB). Certain posters there have boasted about communicating with the SEC (among other agencies) in an apparent attempt to destroy the company and Mr. Berman. These posters (some of whom will be identified by screenname in the next section of this document) appear to have an unknown vendetta against the company, and specifically Mr. Berman himself.

Decision Diagnostics Corp. Shareholder Letter dated 6/2/2020

In our opinion, it appears one of two things has happened or continues to happen with respect to the May 20 submission, and both cannot be true.

1. Mr. Perkins and his investigators have been taking information from select IHUB posters at face value, and have not done their own investigations prior to using them in SEC documentation, or,

2. Mr. Perkins and his investigators came to the conclusions on their own, which in our opinion demonstrates a callous disregard of the facts.

The fact that there may be, and presumably are unscrupulous individuals attempting to profit from the misery caused from the Coronavirus does not mean that anyone who is working on a workable solution should be cast in the same light.

In conclusion to this section, we believe that it is quite apparent that information used by Mr. Perkins originated with rogue message board posters and is being accepted and in fact relied on without adequate vetting by Mr. Perkins or his staff.

We are very aware that the current environment may have played a role in Decision Diagnostics Corp. being swept up in the group of 30+ apparently unscrupulous and fraudulent companies touting their COVID-19 products. However, that does not in any way condone Mr. Perkins and all other SEC staff from responsibility for, in our opinion, this incomplete and bias investigation. The suspension that resulted from this slipshod investigation dealt a crushing blow to both the company and honest shareholders, not to mention any business entity looking to do business with Decision Diagnostics Corp. in the future, including those who may have been expected to partner with GenViro!

Shareholders are and should be adamant that the SEC revisit this topic with a clear, unbiased direction.

We remain terribly troubled by the words and actions of Mr. Carlisle Perkins, Senior Counsel, Securities & Exchange Commission, Division of Enforcement. As discussed in sections II and III in this document, it appears to us and to those who have advised us, that Mr. Perkins may have carried on a biased investigation of Decision Diagnostics Corp. replete with ex-parte discussions with person(s) who may be cyber criminals.

These individuals may have removed documents from a hidden directory on the company's server and forwarded these documents to Mr. Perkins and perhaps others at the SEC for use in the investigation. This is exactly what the rogue message board posters have done for many, many years.

Decision Diagnostics Corp. Shareholder Letter dated 6/2/2020

Page 9
DOJ-BERMAN-R_0000345028

28 of 40

June 2, 2020

This is unfair to the company and its shareholders. We are even more troubled by the May 20, 2020 document that Mr. Perkins completed under penalty of perjury, a document now in the public domain. The May 20 filing had a stated official SEC purpose but in our opinion appears to have instead been used to pile on and to demean the Mr. Berman, and to add allegations to the SEC April 23 ruling.

It is our opinion that at least some of these allegations could not have been known to Mr. Perkins as of April 23. Thus, we ask the SEC to appoint an investigator to look into Mr. Perkins' words and actions associated with the May 20 filing. If it is found that Mr. Perkins abused his authority or any of the other issues we bring to your attention herein, then we will follow up with the SEC at a later date. In summary, we feel this entire "investigation" is very troubling and demands a thorough review.

As shareholders we are fully aware of the assertions contained in this letter. We are also fully aware the powers of the SEC to unilaterally impose such restrictions upon public companies, and the potential consequences of those restrictions.

We do not join this fight lightly. We are very aware what is stake, both for each of us personally, but more importantly for humanity as a whole. Lumping Decision Diagnostics Corp., Mr. Berman, and their revolutionary test kit GenViro! into the same bucket as fraudulent COVID-19 companies is not only wrong but could have deadly consequences.

Imagine a scenario where this kit is proven to be effective against the most widespread pandemic since the 1918 Spanish Flu. And the product cannot be made available due to the crushing blow your office has laid upon the very company who was up to the task.

The SEC is supposed to protect investors. Based on the information we have provided in this letter, we feel the opposite has occurred and is occurring in the case of Decision Diagnostics Corp. And because they are developing a novel product which may just be able to rescue the planet, the attention given to this issue will be, regardless of the outcome, very public and very lasting. The burden of proof associated with wrongdoing in the marketplace lies with the SEC. Thus far is appears, and we do believe will appear to the general public, that Mr. Perkins, with the support of the SEC, assumed the company and Mr. Berman to be guilty and demanded they 'prove' their innocence, while at the same time viewing the company through a biased lens.

Decision Diagnostics Corp. Shareholder Letter dated 6/2/2020

June 2, 2020

This is not how the American justice system is supposed to work.

For that reason, we request your full and immediate attention to these matters and we will be willing to assist you in any way if future investigations are required.

We thank you for your time reading this letter and look forward to your response as promptly as possible in view of the health crisis we are all facing.

Sincerely,

Shareholders in support of this document:

  

Decision Diagnostics Corp. Shareholder Letter dated 6/2/2020

June 2, 2020

Addendum to Decision Diagnostics Corp. Shareholder Letter, dated 6/2/2020

Administrative Proceeding File No. 3-19788, Information Before the Commission at the time of the Trading Suspension, dated May 20, 2020

Item 6

Mr. Perkins writes, 'Berman was the CEO of a company called Access HealthNet until 1995 when he was fired amid reports of unexpected losses and an infusion of cash from directors and others.

Berman, who was described in the complaint as "cavalier about everything," was a named defendant in a class action securities fraud case brought on behalf of investors, which appears to have settled in 1999. Allegations in the complaint included misleading information in the company's financial statements as well as false press releases which Berman had overseen. (See Kalmus, et al. v. Wertz et al. No. SACV-96-1250-GLT).'

We believe this categorization of Mr. Berman is not only outrageously out of context, it has no relationship to his current role as CEO of Decision Diagnostics Corp.  Furthermore, it is highly prejudiced in nature, has no probative value as its only reference is to an allegation in a complaint and appears to exist only to trash the reputation of Mr. Berman.

We would request that Mr. Perkins disclose the origin of this information, that is nearly a quarter of a century old; e.g. directly from message board posters or through his own investigation.  Also, the purpose of including this allegation, **as it is not identified in the April 23 letter.**

If this information was obtained after the suspension date of April 23, Mr. Perkins would have made a false statement under penalty of perjury.

This twenty-five (25) year old allegation was not identified in the suspension letter and it is our opinion it was included in the May 20th certification only in an attempt to embarrass Mr. Berman.  It was not utilized to obtain the suspension as it is not identified in that document. It appears to us that Mr. Perkins took it upon himself, or acquired information from other sources, to include this information for the sole purpose of publicly shaming Mr. Berman.

Addendum to Decision Diagnostics Corp. Shareholder Letter

June 2, 2020

Item 11

Concluding sentence of the paragraph, Mr. Perkins writes:

'…. The company's annual report for 2019, as well as prior quarterly reports, includes a going concern statement questioning whether it could continue as a financially solvent company.'

As you and investors well know, this is common language included pursuant to the requirements of the Statement of Auditing Standards regarding most if not all developmental companies, among others. Mr. Perkins, again, attempts to devalue Decision Diagnostics Corp. as well as Mr. Berman with this statement, which we believe shows bias, since as the Commission acknowledges, a going concern qualification was contained in 'prior quarterly reports. Therefore, we feel its inclusion in the 2019 annual report could not justify or even be pertinent to the trading suspension.

Item 15

Mr. Perkins writes, 'The following week, on March 11, 2020, DECN issued a press release stating that it expected to sell 420 million COVID-19 test kits in the first year of production, beginning September 2020. The press release included this apparently baseless forecast chart:

GenWave 12-Month Forecast

| Number of Months | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | SUM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year 1 | Apr-20 | May-20 | Jun-20 | Jul-20 | Aug-20 | Sep-20 | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-22 | |
| New Facility Customers | 0 | 0 | 0 | 0 | 0 | 5000 | 5000 | 5000 | 5000 | 5000 | 5000 | 5000 | |
| Retained Facilities | 0 | 0 | 0 | 0 | 0 | 0 | 5000 | 10000 | 15000 | 20000 | 25000 | 30000 | |
| Total Facility Customers | 0 | 0 | 0 | 0 | 0 | 5000 | 10000 | 15000 | 20000 | 25000 | 30000 | 35000 | 35,000 |
| Kits Consumed | 0 | 0 | 0 | 0 | 0 | 15,000,000 | 30,000,000 | 45,000,000 | 60,000,000 | 75,000,000 | 90,000,000 | 105,000,000 | 420,000,000 |

Forecasts/projections are <u>estimates of future sales</u>, which are, by nature, 'estimated'. The verbiage 'apparently baseless' we believe is unjustified and shows bias toward the company. By their very nature, estimates or forecasts are not 100% accurate. We do not believe Mr. Perkins had any logical basis to identify these forecasts/projections as he did.

Item 16

Mr. Perkins writes 'Berman asserted, without providing supporting evidence, that DECN's COVID19 test kits should "allow 80% of the suspected carriers of Coronavirus to exit the quarantine system in places where Coronavirus is rampant.' The press release included a picture of DECN's purported COVID-19 test kit. The pictured kit for the purported COVID-19 test looks identical to the company's diabetes glucose test kit – marketed "4Pets" listed on its website.

Addendum to Decision Diagnostics Corp. Shareholder Letter

June 2, 2020

Addressing the first statement, it is unclear how this was interpreted by Mr. Perkins. However, people who were suspected of having COVID-19 simply because of fever or other potential symptoms, were being placed in quarantine until their PCR test results came back from the specialty labs. This at times involved days or weeks waiting for a test result. At that time, an estimated 80% of people with symptoms were testing negative for COVID-19. The PR and statement by Mr. Berman, simply suggests that a 15 second test kit applied to people with potential symptoms for COVID-19 would provide the same negative result for 80% of the people and thus immediately free them from quarantine or having to go into quarantine, rather than force them to encounter a lengthy delay before receiving laboratory results.

It is our opinion that this statement relies on previously establish test results and cannot be deemed in any way to be misleading.

With respect to the second claim, we are of the opinion that Mr. Perkins inexplicitly finds a negative due to the fact that all the company's meters look the same. Minimal research would have uncovered the fact that all the company's meters look the same because they utilize the same impedance technology.

In fact, in various PRs and Supplemental Disclosure filings, Mr. Berman expressly stated that the Genviro! test strips would have to work with the existing currently, utilized meter formulated for the product development to go forward. This is something that the SEC should surely have known since the company indicated this in its second PR regarding COVID-19 testing development on March 4, 2020 (emphasis added):

> '...The company will have available samples of the blood of those previously infected available for testing as the company **quickly converts its GenUltimate! TBG methods and Precise meter, into a precise infectious disease testing device** for the screening for Coronavirus.'

A week later, the next PR referred to the same (emphasis added):

> 'Keith Berman, CEO of DECN commented, "**Because we perfected the Impedance technology in 2019 for our GenUltimate! TBG glucose test strip and meter, we have shaved months off of the development time for the GenViro! device.** Our GenViro! impedance powered diagnostic will be field tested at ground-zero in Daegu, Korea, the location of our factory and the hospital-based testing site,... "'

Addendum to Decision Diagnostics Corp. Shareholder Letter

June 2, 2020

DECN's March 25 PR, explicitly states in the 2nd paragraph that they will use one of their existing meters for the COVID-19 test strips (emphasis added):

'... Today, DECN announces that the company, through its advanced development team in Korea, has arrived at a second Covid-19 test methodology, a modified Serology method, that at the completion of documentation, be put through the FDA Emergency Waiver (EUA) process. This second kit will begin assembly for internal testing on April 1, with availability in late summer 2020. **The method will again use a Biosensor (test strip-like device) and the company's Precise meter.'**

The company's 3/30/2020 filing of Supplemental Information for the period ending 12/31/2019, on page 16, as part of its extensive overview of how it decided to pursue COVID-19 testing, states the following (emphasis added):

The company then set to work, along with Matthew Musho, PhD ("Musho"), to evaluate the designs, keeping in mind the desired specifications of the DECN CEO and product Program Director, which included availability of components without wait time, time to market (assuming FDA EUA), whether the chosen method was applicable to use in point of care and at-home environments, time of assay from commencement of test and until result, size of the blood sample, and finally cost to produce. Given the company's experience in working with biosensors and with electrode technology, the design review process took less time than originally expected. The entire process took 13 days. The last of these days used to determine which of the two Musho specifications was to be chosen. **The design provided by The Bio was discarded because it could not be read on the existing company meter technology, and therefore would require additional development.** At the end of this process, the company chose to produce the product shown in the illustrations, the second of the two Musho alternative versions, but shortly thereafter to begin work on the other Musho specification, to be used as a confirmation tool. Product Design 1 (chosen) The design above is in many regards similar to the direct antibody antigen approaches favored by some of the competitive companies in the Covid-19 testing field. But the major difference (magic) is that the approach used by the company in its GenViro! product allows for swift (15 seconds or less) results using a minimum of blood from a finger prick. As of this writing, work has commenced on the product specification above with components such as the platinum electrodes, platinum carbon paste, industrial films (several types) to make the biosensor, **and perhaps a new impedance chip for the meter.** The company is operating on an 8-week development schedule and is some 10 days into this schedule. The current development cycle is considered advanced development. For FDA EUA filing and the granting of a Pre-EUA by the FDA, the company is preparing its final working concept filing, to be completed within days of this writing.

A review of the company's website at http://www.decisiondiagnostics.co/products.html reveals that the Precise meter for GenUltimate! for people and the meter for GenUltimate! 4Pets is either the same meter or looks the same.  This is in no way is deceptive, contains no false statements and is easily verifiable from the company's public records, filings and PRs. See image below.

Addendum to Decision Diagnostics Corp. Shareholder Letter

June 2, 2020



*Not for Sale in the USA or Puerto Rico

## GenUltimate! TBG High Precision Test Strips & Meter

Available Soon



PetSure! Test Strips for Canines and Felines

Buy Now



GenUltimate! 4Pets Test Strips & Meter for Canines and Felines

Addendum to Decision Diagnostics Corp. Shareholder Letter

June 2, 2020



*Not yet available for sale in U.S.A. or Puerto Rico.

The above information was easily accessible, and subsequently verifiable. Because certainly these 'issues' are referred to in the May 20 filing, it is our opinion that Mr. Perkins believes these to be false and or misleading.

Item 20

Mr. Perkins writes, 'At the time of the March 3, 2020, press release – when DECN claimed that its "product" would be "commercial [sic] ready in the summer of 2020" – DECN had not applied for authorization from the FDA to sell or distribute its COVID-19 test kit. In addition, as of April 13, 2020, Berman, who alone drafted the press releases on behalf of DECN, stated or suggested in interviews with staff that he:

* knew that the company had no COVID-19 test kits;

* had not seen any of DECN's prototype COVID-19 test kits;

* had no idea how many test kits DECN could produce;

Addendum to Decision Diagnostics Corp. Shareholder Letter

- knew that the COVID-19 test kits would require component parts that were different from DECN's current diabetes products, which the company did not yet have and would need before any sales could be made;

- was looking for sources that could provide the component parts but had no idea how much the component parts would cost and the time it would take for the company to obtain the parts in the midst of the pandemic; and
- knew that no COVID-19 test kits could be sold without FDA approval, which the company did not have.

Taking each bullet point individually, and assuming for the purposes of this letter the accuracy of Mr. Perkins' assertions taken from the interviews Mr. Berman voluntarily agreed to reveals the following:

Knew that the company had no COVID-19 test kits.

Because the product was clearly still under development, as stated in numerous company PR's, also required FDA approval, why would Mr. Perkins (or anyone) believe that the company would be in possession of said test kits?  This is standard practice for all product development, in any sector.  The word 'development' should have resolved this.

Had not seen any of DECN's prototype COVID-19 test kits

As the opening sentences of this section reads, '...Berman, who alone drafted the press releases on behalf of DECN, stated or suggested in interviews with staff...'.  We believe confirms that much of what is contained here, was, to be polite, embellished by Mr. Perkins based on what he chose to hear.

To us, it would seem unbelievable that Mr. Berman, who oversaw the design of the prototype test kit, and included images of the pre-prototype kits in company press releases, who state to SEC investigators that he had never seen these test kits.

Had no idea how many test kits DECN could produce

Not privy to the EUA application process, how was this known at the time by Mr. Perkins? Did he complete a thorough review of said application to verify the absence of this information?

It would be interesting to learn if Mr. Perkins interviewed Mr. Berman to come to this conclusion, or simply assumed this to be the case.  If the latter is true, it fits Mr. Perkins investigational pattern.

Knew that the COVID-19 test kits would require component parts that were different from DECN's current diabetes products, which the company did not yet have and would need before any sales could be made

It is unclear why Mr. Perkins or SEC investigators would believe this claimed statement to be false and/or misleading for a product which was in the developmental state.  This could be concluded from the press releases discussion the modification of the GenUltimate! meter.

Addendum to Decision Diagnostics Corp. Shareholder Letter

DOJ-BERMAN-R_0000345037

June 2, 2020

Was looking for sources that could provide the component parts but had no idea how much the component parts would cost and the time it would take for the company to obtain the parts in the midst of the pandemic

Even if this information came directly from Mr. Berman it would be expected for a developmental stage product. We would question whether Mr. Perkins or the SEC investigators verify this information was accurate, and if so, why would it be considered false and/or misleading with respect to a developmental stage product?

Knew that no COVID-19 test kits could be sold without FDA approval, which the company did not have

It appears Mr. Perkins and the SEC investigators include this as if it is 1) a revelation to shareholders, and 2) Mr. Berman has not been upfront about this fact, and/or has claimed the opposite.

The company has not applied for FDA approval. Instead it has applied for EUA, which is a waiver to sell their test kits, on an exigent basis, in lieu of FDA Approval (Approval is the incorrect term as well, as the company's products are identified as medical devices, which are 'cleared' for FDA use').

### Item 25

Mr. Perkins writes, 'As of April 23, 2020, Division staff were unable to identify any FDA-approved medical devices relating to COVID-19 in the FDA's publicly available databases under the name of DECN, Berman, or its subsidiaries.

We feel there is no point to this statement. Mr. Berman at no time has claimed that GenViro! is available for commercial sale, in fact a disclaimer makes it clear that the product is currently not available for sale in the United States or Puerto Rico.

The lack of understanding is surprising, coming from an investigational staff tasked with weeding out fraud in the COVID-19 space.

Addendum to Decision Diagnostics Corp. Shareholder Letter

**CERTIFICATION OF DOMESTIC RECORDS**
**OF REGULARLY CONDUCTED ACTIVITY**
**Pursuant to Fed. R. Evidence 902(11)**

The undersigned declarant hereby declares, certifies, verifies, or states the following:

1.  The declarant is a records custodian or other qualified person who can provide a written declaration regarding the records of regularly conducted business activity which are the subject of this certification.

2.  The records of regularly conducted business activity (hereinafter "records") which are the subject of this certification are identified as:

    a.  **Quotation Activity:** An Excel file labeled "DECN Closing Bid-Ask 2020.xlxs" containing the inside priced bid and priced offer for broker-dealer quotations on OTC Link ATS in Decision Diagnostics Corp. ("DECN") for each trading day from January 1, 2020 through December 31, 2020 (the "Relevant Period")

    b.  **OTCIQ User Activity:** An Excel file labeled "LoginLog (DECN)(2020).xls" containing the login activity related to the use of OTC Markets Group's OTCIQ portal ("OTCIQ") by DECN's authorized user(s) during the Relevant Period. Keith Berman was the sole individual authorized by DECN to post information on behalf of DECN via OTCIQ during the Relevant Period.

    c.  **Disclosure:** An Excel file labeled "HistoricOTCIQFilings(DECN)(2020).xls" containing a list of disclosure documents posted by DECN via OTCIQ during the Relevant Period (including Report Status, Period Date, Created and Release Date and other information) and copies of each corresponding item of disclosure posted via OTCIQ, labeled as described below:

        1 – OTC PINK SUPPLEMENTAL INFORMATION TABLE FIX.pdf
        2 – OTC PINK CURRENT 2019 ANNUAL REPORT FINANCIALS &.pdf
        3 – OTC PINK CURRENT 2019 ANNUAL REPORT MANAGEMENTS.pdf
        4 – OTC PINK CURRENT 2019 ANNUAL REPORT SUPPLEMENTAL.pdf
        5 – OPINION LETTER FROM THOMAS COOK ESQ REGARDING.pdf
        6 – SEC Form 550.pdf
        7 – OTC PINK 1Q2020 FINANCIALS FOOTNOTES AND.pdf
        8 – OTC PINK 1Q2020 MANAGEMENT'S DISCUSSION AND.pdf
        9 – OTC PINK 1Q 2020 SUPPLEMENTAL INFORMATION.pdf
        10 – DECN Shareholder Letter to SEC.pdf
        11 – June 2 2020 Shareholder Letter, revised for security.pdf
        12 – OTC MARKETS 2Q2020 FINANCIALS, FOOTNOTES AND.pdf
        13 – OTC MARKETS 2Q2020 MANAGEMENTS' DISCUSSION &.pdf
        14 – OTC MARKETS 2Q2020 SUPPLEMENTAL INFORMATION &.pdf
        15 – OTC MARKETS 3Q 2020FINANCIALS FOOTNOTES AND.pdf
        16 – OTC MARKETS 3Q2020 MANAGEMENT'S DISCUSSION &.pdf
        17 – OTC MARKETS 3Q2020 SUPPLEMENTAL DISCLOSURES AND.pdf

DOJ-BERMAN-R_0000344966

    d. **OTC Weekly Reports**:  .MSG files containing OTC Weekly Report emails sent by OTC Markets Group Inc. to DECN during the Relevant Period and PDF files containing each of the corresponding OTC Weekly Reports.

    e. **Tier History:**  An Excel file labeled "DECN_Tier_Caveat_Change (2020).xlsx" containing changes in market tier (*e.g.* Pink Current, Pink Limited) or Caveat Emptor status for DECN during the Relevant Period.

3. The records are originals or duplicate copies of domestic (United States) business records;

4. The records were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

5. The records were kept in the course of a regularly conducted business activity; and

6. The records were made by the regularly conducted business activity as a regular practice.

*I hereby declare, certify, verify, or state, under penalty of perjury, that the foregoing is true and correct.*

Executed on November 22, 2021.

Cass Sanford
Associate General Counsel
OTC Markets Group Inc.

DOJ-BERMAN-R_0000344967