# GOVERNMENT EXHIBIT 101

UNITED STATES OF AMERICA
BEFORE THE
SECURITIES AND EXCHANGE COMMISSION

ADMINISTRATIVE PROCEEDING
File No. 3-19788
_____

In the Matter of

DECISION DIAGNOSTICS CORP.
_____

### PETITIONER'S REPLY BRIEF IN FURTHER SUPPORT OF PETITION TO TERMINATE TRADING SUSPENSION

**GOLDBERG SEGALLA LLP**

*Attorneys for Petitioner*
*Decision Diagnostics Corp.*
50 Main Street, Suite 425
White Plains, New York 10606
Tel: (914) 798-5419
rherzog@goldbergsegalla.com

GOVERNMENT
EXHIBIT
**101**
1:20-cr-00278-TNM

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ......................................................................................................................... 3

    A.    (i)  The March 3, 2020 Press Release .......................................................... 4

             (ii) The March 11, 2020 Press Release ...................................................... 5

             (iii) The March 16 and 17, 2020 Press Releases ........................................ 6

             (iv) The April 7, 2020 Press Release ........................................................ 7

    B.  The Berman Interviews ............................................................................. 8

    C.  DECN's Stock Price and Trading Volume ............................................... 8

CONCLUSION ...................................................................................................................... 9

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In the Matter of Efuel Enf. Corp.*,
    Exchange Act Rel. No. 8630786307, 2019 SEC LEXIS 1663 (July 5, 2019)..........................9

**Statutes**

Securities Act of 1934 Sections 13 and 15(d)...............................................................................2, 5

27060610.v1

UNITED STATES OF AMERICA
BEFORE THE
SECURITIES AND EXCHANGE COMMISSION

ADMINISTRATIVE PROCEEDING
File No. 3-19788

---

In the Matter of

DECISION DIAGNOSTICS CORP.,

**PETITIONER'S REPLY
BRIEF IN FURTHER
SUPPORT OF PETITION
TO TERMINATE
TRADING SUSPENSION**

---

Decision Diagnostics Corp., respectfully submits this Reply Brief in response to the Division of Enforcement's July 1, 2020 Answering Brief (the "Answering Brief") and in further support of Decision Diagnostic's ("DECN") petition to terminate the ten-day trading suspension issued on April 23, 2020. The Answering Brief is long on generalities but woefully short on specifics of any alleged inaccuracies or omissions in DECN's press releases that support the imposition of the trading suspension, if the suspension was really about press releases to begin with.

## INTRODUCTION

The unfortunate underlying theme that emerges from the Answering Brief is that since DECN is a penny stock whose common stock is not any longer registered with the Commission and was (until the suspension) quoted on OTC link (formerly known as the Pink Sheets) both the company and its proposed test kit for the Coronavirus are presumptively suspect and in fact are likely part of some hoax or fraud being perpetrated on investors. For example, the Division of Enforcement now asserts that the lack of current financial information for DECN was a factor

which warranted the trading suspension (Answering Brief, pg. 4). This argument is made of whole cloth. It simply ignores the fact that DECN has not filed an annual audited financial statement since its 2012 Annual Report, and that its last auditor reviewed statement was for Q3 of 2013. (Berman Reply Affidavit, ¶ 8). The financial statements DECN has subsequently submitted to OTC Markets (including for the period ended March 31, 2020) have been unaudited and are in accordance with OTC Markets, (and the SEC Form 15 the Company filed). Why this level of financial reporting suddenly warranted a trading suspension is, of course, never explained, presumably because all DECN filings are regulatory compliant. If this level of financial reporting was somehow a legitimate basis for a trading suspension of DECN stock, which of course it is not, it would undoubtedly have manifested itself during the nearly seven years DECN has not, or was not required to file audited financial statements. Similarly, DECN has issued a going concern qualification in all of its Annual Reports, Audited and Unaudited, since January 2003 when Mr. Berman, the current CEO, joined the DECN Board, when the company was then called Caredecision Corp. and subsequently  Instacare Corp. (Berman Reply ¶ 8). Yet a going concern inclusion in its 2019 Annual Report is, we are told, another factor purportedly relied on in the issuance of the trading suspension (Answering Brief, pg. 4). If this was indeed the  rationale for the suspension,   as now asserted by the Answering Brief, it is clearly improper since DECN filed its SEC Form 15, which suspended DECN's duty to file reports under Sections 13 and 15(d) of the Securities Act of 1934. This filing, of course, alleviated DECN's need to report to the SEC.

The Division also seeks to impugn DECN's credibility and the efficacy of its GenViro! test kit by asserting that DECN was "changing its business" in order to produce a COVID-19 test kit (*Id.,* pg. 1). To the extent this assertion suggests that DECN is abandoning its successful diabetes testing test kit (which utilizes most of the same basic technology as the proposed COVID-19 test

2

kit) this statement is knowingly false. Enforcement staff could not have missed finding the Petitioner's diabetic testing GenUltimate products on both Petitioner's Pharma Tech subsidiary and GenUltimate's own website, both of which confirm that GenUltimate is still being sold while DECN develops its GenViro test kits. In addition, a simple search of Petitioner's entire GenViro! FDA file, provided compiled and written under control of DECN's FDA counsel, the Division's current position is tantamount to bad faith.   Nonetheless, to the extent this change in business model argument is intended to suggest that DECN is akin to companies who are inexperienced and unqualified in this area, but are simply attempting to cash in on the panic created by this worldwide pandemic, DECN's expertise and experience in impedance measurement technology stands unchallenged.  Yet these baseless claims continue.

As noted in DECN's June 17, 2020 opening brief but not addressed in the Answering Brief, the Commission's recent opinions upholding Section 12(2) suspensions were based on clearly documented misrepresentations of existing facts by managements with dubious reputations and (lack of) qualifications.  This is simply not the case here; conjecture and bias are being substituted for facts.   The information that was in fact in the Commission's possession on April 23, 2020 (as opposed to what the Division now asserts the Commission possessed) did not provide even a subjective basis for the issuance of a trading suspension.

## **ARGUMENT**

The Answering Brief is comprised in large part of generalities[1] and select statements taken from certain of DECN's press releases in the weeks prior to the Trading Suspension Order. These will be addressed chronologically.

---

[1]  For example, the Division states that the Commission acted appropriately by reason of DECN's unsupportable claims regarding the efficacy of its product.  Answering Brief, pg. 13.  The sole citation for this conclusory assertion is an aggregate reference completely lacking in detail to all thirteen of DECN's  press releases.  *Id.*

### A. (i)  <u>The March 3, 2020 Press Release</u>

On March 3, 2020 DECN issued what the Division now asserts in conclusory fashion to have been the first in "a series of apparently false and misleading press releases" concerning the company's proposed COVID-19 test kits. (Answering Brief, pg. 5). The Division claims to having taken exception to the following statements:

- The proposed test kit involved a "new screening methodology"

- The product would be "simple to use [and] cost effective"

- The product's "technology [was] perfected"

- The product would be "field tested" in Korea

- It would initially be available to commercial users, followed by home use

- It would be "ready in the summer of 2020".

All of the then existing facts in this release were true, and the Division has failed to refute them. DECN's technology (based on its comparable use as the "special sauce" in its diabetes test kit) had been perfected and used in another of DECN's products, which is also a medical device, its screening methodology for the immediate detection of COVID-19 is "new"[2], as to the best of DECN's knowledge its technology is unique in the medical diagnostics field. DECN's kits will be cost effective and simple to use, requiring only a finger prick. As accurately stated, DECN committed to initially making the kits available to medical professionals, believing they could do the most good there. It also intended to "test" the product in Korea. Nothing containing in this press release was false or misleading. The Division simply labelling these statements as such does not make them so.

---

[2] One of the many problems DECN's proposed test kit is designed to eliminate is the inordinate delay in providing results. As the virus is now surging in parts of the country, reports are emerging of people having to wait a <u>week</u> or <u>more</u> for test results.

While DECN still expects its test kits to be commercially ready in the summer of 2020, due to unanticipated (and DECN believes unjustified and specifically designed) testing requirements imposed by the FDA on DECN, and apparently only on DECN, it appears the test kits will initially be available outside the United States during the late summer.

### (ii) The March 11, 2020 Press Release

The Answering Brief next calls into question certain statements contained in DECN's March 11, 2020 press release, including its "apparently baseless forecast chart" projecting approximately 420M test kits being sold. (Answering Brief, pg. 5). As DECN previously noted (Berman June 17, 2020 affidavit, ¶15) (the "Berman Affidavit") this forward looking statement was based on an internal analysis performed by DECN of likely users of the test kits and the frequency of the testing they would conduct. The unfortunate surge in COVID cases, particularly domestically, simply reinforces the validity of this initial projection. DECN routinely generates similar studies and forecasts, and even supervised six members of the 2018-2019 MBA graduating class from the California State University Northridge to prepare one such product forecast. Once again, the Answering Brief is long on rhetoric and short of substance.

The Answering Brief also challenges as unsubstantiated DECN's claim that its test kit could allow 80% of suspected carriers to exist in the quarantine system. *Id.,* pg. 5. This has previously been addressed in detail (Berman Affidavit, ¶ 16), but now simply ignored. Simply repeating the same assertions does not afford them any more credibility.

In addition, the Division makes the peculiar argument that the proposed COVID-19 test kit "looked identical to one of [DECN's] current diabetes glucose test kit [sic] – marketed "4Pets" listed on its website." (Answering Brief, pg. 6). Ignoring for the moment the fact that the packaging of the two products bear no similarity to each other (they are different colors and the

"4Pets" kit pictures a dog and cat, while the proposed GenViro! test kit is devoid of any references to or photographs of members of the animal kingdom), the fact that both kits use a common sized and shaped meters (which is not shown on either packaging) cannot be deemed to have created public confusion between a product obviously designed for pets and a product intended to detect COVID-19 in humans.  At present DECN has one meter mold for its three products.  The meters for the three metered products look alike.  It's the special sauce inside the meters, the software, that makes them different.  The Division also attempts to sweep under the proverbial rug the fact that the proposed GenViro! test kit, including the copy contained on page 6 of the Answering Brief, prominently states that it is not yet available for sale in the U.S.A. or Puerto Rico, as seen on the GenViro! landing page, the GenViro! page 2 and the GenViro! presentation.  Yet, according to the Division:

> While a disclaimer for DECN's COVID-19 test kit states that the product is still in development, the statements appearing elsewhere on the website gave the misleading impression that the COVID-19 kit was ready or near-ready for purchase.

Answering Brief, pg. 9.

However, none of these "statements appearing elsewhere on the website" that are alleged to give a misleading impression, or how they were misleading, are ever identified.

### (iii)  The March 16 and 17, 2020 Press Releases

On March 16, 2020, DECN issued a further press release stating that its COVID-19 test kits would provide results "through a finger-stick" in "less than one minute."  (Answering Brief, pg. 6).  These statements were (and remain) absolutely accurate.  Further, for nearly one month the Enforcement staff has had Petitioner's entire GenViro! FDA file prepared  by the Petitioner's FDA counsel which confirms the accuracy of the March 16 and 17 releases are totally accurate.

6

And nothing has been submitted by the Division that would in any way refute, or even dispute, these statements. DECN also disclosed that it was waiting to file an "Emergency Waiver" with the FDA, (*Id.*) another completely accurate statement, as confirmed by the company's April 3, 2020 filing which the Division has. Based on further internal analysis of expected demand, DECN increased its projected sales forecast for the test kit by slightly less than fifteen percent (*Id.,* pg. 7).

### (iv)  The April 7, 2020 Press Release

The Division's continued assertion that DECN's announced receipt of pre-EUA Acknowledgement and a  device serial number was a "huge development akin to FDA approval of the test kits" that was "at best, misleading" (Answering Brief, pg. 8) merits on its face only a brief response. The registration of a product with the FDA admittedly does not confer any rights to the application, and nothing in this press or any other DECN release suggests anything to the contrary. In stating that the FDA's prompt acknowledgement of the EUA <u>application</u> was "exactly what [DECN] had been hoping for" (*Id.*) the Company was merely announcing that the  important first step in the regulatory approval process, the submission of an acceptable application, had been achieved. It should be mentioned that upon first receipt of DECN's application the FDA tried to kill the application after less than 30 minutes, apparently thinking before reading the application that the GenViro! was a different type of test than it actually was. After some intervention by the Petitioner's support team the application was promptly accepted. The Division is also in receipt of the "initial" FDA so-called PEUA's acknowledgement letter as was accurately stated in this release. The factual basis for the Division's assertion that this release was "at best misleading" is at best illogical, and in fact reads similar, if not identical to hundreds of comparable statements that appear daily on public message boards that accuse DECN and its CEO of all kinds of nefarious

and criminal actions including the filing of phantom EUA applications with the FDA, after having previously asserted that GenViro! did not even exist.

### B.  The Berman Interviews

DECN has never concealed the fact that its proposed COVID test kit was in the developmental stage, nor was there concealment that an FDA EUA would be required in order to sell the test kits in the United States and Puerto Rico.  Mr. Berman was completely forthcoming with the Staff during his lengthy voluntary interviews.  In fact in Mr. Berman's two interviews with Enforcement staff, not a single follow-up question was posed to him. While most of the same technology used to correct for a major interfering substance in a test to determine the blood sugar of diabetics was also applicable for COVID-19 testing, actual product development of the COVID-19 test kit would for economic reasons necessarily await FDA authorization.[3]   No claim of any affirmative misrepresentation by DECN has been made and the repeated disclosures of the regulatory approved process refute the Division's assertions of any material omissions from any of the Company's press releases.  Answering Brief, pg. 7.

### C.  DECN's Stock Price and Trading Volume

The Division now asserts that DECN's stock price and trading volume "surged – almost in lockstep with the press releases issued by the company."  Answering Brief, pg. 9.  During the weeks leading up to the Trading Suspension Order, DECN stock exhibited the price movement

---

[3] When it became clear to DECN that the cost of the development of GenViro! was manageable, and since the Covid-pandemic made timing  essential,  the company forged ahead with  development of its GenViro! This was discussed in great detail in the company's FY 2019 Annual Report filed with OTC Markets on March 30, 2020, Management's Discussion, a report downloaded several times by Division staff from the Petitioner's web site but apparently ignored.  To quote one entry in the FY 2019 Management's discussion,  "… The company then set to work … to evaluate the designs, keeping in mind the desired specifications … which included availability of components without wait time, time to market (assuming FDA EUA), whether the chosen method was applicable to use in point of care and at-home environments, time of assay from commencement of test and until result, size of the blood sample, and finally cost to produce. Given the company's experience in working with biosensors and with electrode technology, the design review process took less time than originally expected."

typical of a penny stock, such that a very modest change in the share price equates to a significant percentage move. The Petitioner's stock price went up some days and down others. On several of the days on which COVID – related press releases were issued the market's response was insignificant, both in absolute and percentage terms, thereby demonstrating a measured and knowledgeable assessment of the information being disclosed by DECN.

DECN recognizes that, as stated *In the Matter of Efuel Enf. Corp.*, Exchange Act Rel. No. 86307, 2019 SEC LEXIS 1663 (July 5, 2019), the interests of both current and prospective or potential investors needs to be taken into consideration in assessing whether a trading suspension is warranted. It is therefore worth noting that with the exception of April 22, 2020, a day on which no press release was issued, any investor who between March 2, 2020 and April 23, 2020 would have purchased DECN stock at its daily closing price would as of July 14, 2020 be holding a profitable position. The Trading Suspension Order was not necessary for either current or potential investors.

## **CONCLUSION**

For the foregoing reasons, the Petition of Decision Diagnostics Corp. should be granted and the April 23, 2020 Order suspending the trading of Petitioner's stock should be terminated.

Dated:   White Plains, New York
        July 15, 2020

<div style="margin-left:40%">

Respectfully submitted,

**GOLDBERG SEGALLA LLP**

By:    /s/ *Ronald S. Herzog*
      Ronald S. Herzog
      *Attorneys for Petitioner*
      *Decision Diagnostics Corp.*
      50 Main Street, Suite 425
      White Plains, New York 10606
      Tel: (914) 798-5419
      rherzog@goldbergsegalla.com

</div>

27060610.v1

## CERTIFICATE OF SERVICE

Pursuant to Commission Rule of Practice 151, I hereby certify that true copies of the

*Petitioner's Reply Brief in Further Support of Petition to Terminate Trading Suspension* were

served on the following on this 15th day of July, 2020, in the manner indicated below:

*By Email:*

Office of the Secretary
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-2557
apfilings@sec.gov

David Misler, Trial Counsel
Carlisle Perkins, Senior Counsel
Lesley Atkins, Senior Counsel
Securities and Exchange Commission
Division of Enforcement
100 F Street, N.E.
Washington, D.C. 20549-5041
Mislerd@sec.gov
PerkinsC@sec.gov
AtkinsL@SEC.gov

/s/ *Ronald S. Herzog*

UNITED STATES OF AMERICA
BEFORE THE
SECURITIES AND EXCHANGE COMMISSION

ADMINISTRATIVE PROCEEDING
File No. 3-19788
———————————————————————————

In the Matter of                                                    **AFFIDAVIT OF**
                                                                          **LISA L. PRITCHARD**
DECISION DIAGNOSTICS CORP.

———————————————————————————

STATE OF MINNEAPOLIS              )
                                                ) ss.:
COUNTY OF HENNEPIN              )

Lisa L. Pritchard, being duly sworn, states:

1.      I am a regulatory, quality, and compliance consultant with the regulatory law firm of
DuVal & Associates, P.A. in Minneapolis, Minnesota. For over thirty years, I have specialized in
regulatory, quality, and compliance topics with the Food and Drug Administration. I hold a
Bachelor of Science degree in Electrical and Electronics Engineering from North Dakota State
University.

2.      DuVal & Associates is assigned with researching and understanding the technologies
we submit to FDA. We draft and file submissions for devices of all kinds including 510(k)s, de
novos, and pre-market approvals (PMAs), as well as emergency use authorizations (EUAs). We
explain to FDA the device's technology, the data substantiating the device's safety and
effectiveness, and why the device meets the standard for clearance, approval, or, in the case of
EUAs, a public emergency use authorization.

3.      DuVal & Associates has worked with Mr. Berman and Decision Diagnostics since
2011 in connection with various FDA matters, including seeking the clearance of medical devices

1

under the 510(k) "substantial equivalence" provisions of the Food, Drug & Cosmetic Act. In early March 2020, DuVal & Associates was contacted by Keith Berman of Decision Diagnostics Corp. and its subsidiary Pharma Tech Solutions, Inc. to work on and author the company's EUA application for its proposed GenViro! test kit designed to detect the presence of the COVID-19 virus. The first pre-EUA application, submitted to the FDA and accepted for review by FDA on April 4, 2020, has now expanded to a second pre-EUA Application for at-home COVID-19 testing, submitted on May 1, 2020. I am also working on or have worked on other EUAs for other companies in 2020.

4.    I was assigned as the point person at DuVal & Associates for the GenViro! EUA applications. I have come to learn and understand the GenViro! technology in completing the pre-EUA Applications. My understanding is that the Decision Diagnostic's proposed GenViro! test kit uses impedance measurement technology which is the same basic technology used in its test kits for diabetes.

5.    On behalf of Decision Diagnostics, our firm submitted separate pre-EUAs to the FDA for both its commercial and home-use test kits. These submissions are both in the pre-EUA stage, which is designed to allow applicants to solicit input from the FDA regarding specific testing that will be required to obtain authorization of the final EUA submission.

6.    While a determination of the efficacy of Decision Diagnostics's proposed COVID-19 test kits must await completion of validation testing, it is my opinion that the evidence provided to me appears to demonstrate that the proposed test kits and their impedance technology provide a (so far) unique, researched, and legitimate basis for rapid and highly accurate test results to detect the presence of the Novel Coronavirus. The evidence provided to me on the GenViro! devices appears to demonstrate that the devices present an important advantage to assist in testing for the

Coronavirus by providing an easy-to-use methodology that offers very fast results. If the validation testing of the GenViro! test, when completed, supports the FDA expectations for sensitivity and specificity for test kits designed to detect the Coronavirus, this device should be a very important technology in the arsenal of diagnostics needed to address the current COVID-19 pandemic.

7.     This affidavit was reviewed and approved by Mark DuVal, JD, FRAPS, President and CEO of DuVal & Associates, P.A.

Lisa L. Pritchard

Sworn to before me this 14th day of July 2020

Notary Public

TREVOR LEE MATHESON
NOTARY PUBLIC - MINNESOTA
MY COMMISSION EXPIRES 01/31/2025

3

## **CERTIFICATE OF SERVICE**

Pursuant to Commission Rule of Practice 151, I hereby certify that true copies of the

*Affidavit of Lisa L. Pritchard,* was served on the following on this 15th day of July,  2020, in

the manner indicated below:


*By Email:*

Office of the Secretary
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-2557
apfilings@sec.gov

David Misler, Trial Counsel
Carlisle Perkins, Senior Counsel
Lesley Atkins, Senior Counsel
Securities and Exchange Commission
Division of Enforcement
100 F Street, N.E.
Washington, D.C. 20549-5041
Mislerd@sec.gov
PerkinsC@sec.gov
AtkinsL@SEC.gov


/s/ *Ronald S. Herzog*

ADMINISTRATIVE PROCEEDING
File No. 3-19788

In the Matter of

DECISION DIAGNOSTICS CORP.,

**REPLY AFFIDAVIT IN
FURTHER SUPPORT OF
PETITION TO
TERMINATE TRADING
SUSPENSION**

STATE OF CALIFORNIA      )
                                  ) ss.:
COUNTY OF VENTURA     )

    I, **KEITH M. BERMAN**, being duly sworn, states:

    1. I am the Chief Executive Officer of Petitioner Decision Diagnostics Corp. ("DECN").
I submit this reply affidavit in further support of DECN's application to terminate the April 23,
2020 trading suspension issued by the United States Securities and Exchange Commission (the
"SEC" or the "Commission") and to respond to various assertions contained in the July 1, 2020
declaration of Carlisle E. Perkins (the "July Perkins Certification").

    2. Before addressing certain statements in the July Perkins Certification, what it fails to
address must be noted. In his May 20, 2020 Certification Mr. Perkins stated that DECN had failed
to comply with the Commission's informal March 25, 2020 request for documents. However, as
I stated in my June 17, 2020 affidavit, and as DECN's counsel Ronald S. Herzog independently
confirmed in his June 17, 2020 affirmation, we were separately informed by Mr. Perkins that this
informal request did not have to be complied with since I had agreed to again be interviewed by
the Staff. I would not have agreed to a second voluntary interview had Mr. Perkins not made this

representation. To be compelled to answer the March 25, 2020 questions posed by Enforcement Staff and then answer these same questions in a second detailed interview is redundant and affords the Staff the ability to make the distorted arguments it has based on what I purportedly said over the course of nearly three hours of interviews. Mr. Perkins has not addressed, much less refuted, my sworn assertions or those of Mr. Herzog. The Division's contention that this point was "never in controversy" since the request was voluntary (Answering Brief, pg. 15) is baseless; compliance was never in controversy because Mr. Perkins told me (and DECN's counsel) the requests did not have to be complied with.

3. Mr. Perkins now states that "[p]rior to the trading suspension, Division Staff visited DECN's website on a number of occasions." July Perkins Certification, ¶ 3. This sworn statement is presumably correct, and I in fact confirmed this in my initial interview with the Staff. However, it completely fails to address the statement in my initial affidavit concerning certain of the information contained in the May 20, 2020 Perkins Declaration, which is claimed to have provided the basis for the trading suspension issued on April 23, 2020. This information could not have been in the Commission's possession on April 23, 2020, if ever on the grounds stated, because anything resembling this information was never on DECN's website, but rather on the separate site of its wholly owned subsidiary, Pharm Tech Solutions.

4. As I also stated in my June 17, 2020 affidavit, there is no evidence of the Division's Staff having visited Pharma Tech's website prior to April 23, 2020. This point is now conceded, albeit *sub silentio*. This leaves only two possibilities; this information was not in the Commission's possession prior to April 23, 2020, or, if it was, it was provided in a manner and by

2

persons not identified in the Division's response.[1] Either way, the facts flatly contradict arguments made in the Commission's July 1, 2020 submission.

5.    Paragraph 19 of the July Perkins Certification states that on March 18 FINRA referred DECN to the Division Staff because FINRA found certain press releases issued between March 3rd and the 18th to be "suspicious" and possible indications of an attempt to manipulate DECN's stock price.

6.    While DECN currently lacks the ability to ascertain the accuracy of this statement, it appears very suspect. First, it is totally lacking in any detail, including the FINRA representative who initiated this contact, and more significantly, exactly what was deemed suspicious about certain unidentified press releases. In addition, FINRA is not, to our knowledge, in the news release verification or investigation business.

7.    Moreover, on March 20, 2020, I was contacted by Sarah Musamoto of FINRA. At no time during that conversation did Ms. Musamoto ask me anything about any of DECN's press releases or the market activity in DECN's stock, but instead told me this was a standard call. I also exchanged emails with Ms. Musamoto on March 20. This call and a short email exchange between Ms. Musamoto and myself occurred two days after FINRA had purportedly raised sufficient questions about the content of certain DECN press releases that resulted in the suspension of trading by the SEC less than one week later. Although I cannot be certain, I am finding it very difficult to believe that FINRA made a referral to the SEC over press releases (as stated by Mr. Perkins) on March 18, 2020 and then began an investigation by contacting me on

---

[1]    Mr. Perkins carefully worded assertion that "[a]t no time prior to the trading suspension" did the Staff speak to "DECN investors, message board bloggers or other members of the general public" (July Perkins Certification, ¶ 20) leaves open the possibility that communications with such individuals occurred after April 23 but prior to Mr. Perkins' May 20 Certification, with information provided to him during this time frame being utilized in the Commission's May 20th submission.

March 20, 2020.  Significantly, no representative of FINRA has contacted me since March 20, 2020 about any issues, including DECN's press releases, or any market activity in its stock.

8.   DECN has not filed an audited financial statement since FY 2012.  Its last auditor reviewed quarterly statement was for Q3 of 2013.  A going concern statement has been included in DECN's financial statement since at least FY 2003 when I first was elected to the company's Board of Directors.  DECN's 2019 financial statements were a continuation of long-standing reporting practices that had never been questioned by the SEC.

9.   Having now reviewed all the Division's submissions, I am compelled to conclude that DECN's status as a penny stock, coupled with Enforcement's bias and its lack of understanding of the technology behind the proposed GenViro! test kits, was what resulted in the improper issuance of the trading suspension.  Further, the information produced for the SEC originally prepared by our FDA counsel includes two GenViro! Applications filed with the FDA for Emergency Use, and substantial proprietary information about our products, and yet the Division has never acknowledged any of this. These productions amount to multiple gigabytes of production.  It is my firm and supported belief that a group of malcontents, all non-shareholders in DECN, has hijacked this entire process, with the SEC as their willing co-conspirator.

10.  DECN's impedance measurement technology provides a legitimate basis for desperately needed testing in the battle against COVID – a fact that is never addressed by the Division.   DECN based its invention (now patent pending) on three relatively recent published and influential technology papers written by scientists and engineers in Japan and Singapore. There is also, with a little help from Google, the ability to bring up all of the recent impedance based applications (products) both in healthcare and other allied fields. The Division appears not to have done this. Further, the Division has also failed to come forward with any evidence of a

misrepresentation or material omission in DECN's press releases. They have instead demeaned me, and by inclusion, harmed everyone, including numerous investors who support our proprietary (many would say unique) product designed to assist in the fight against COVID-19.

11. While I have been informed of the discretion and latitude afforded the SEC in deciding whether to issue a ten-day trading suspension, this should not be equated to conjecture coupled with an inherent bias, prejudice and manufactured statements throughout but manifested in Mr. Perkins May 20, 2020 Declaration. The SEC seems to practice the old theory that if at first they don't succeed try and try again. Nonetheless, the April 23, 2020 Order and the May 20, 2020 Perkin's Declaration under oath are documents that continue to speak for themselves. The assertions by the Commission in its repeated explanations cannot be true as there are major conflicts among them. Asserting "no its this", followed by "instead it's this" and finally "ignore that, it's really this" doesn't work. What it does do is reveal the lack of merit to the trading suspension.

For the foregoing reasons, together with the facts contained in my June 17, 2020 affidavit, the petition to terminate the trading suspension should be granted.

Keith M. Berman

Sworn to before me this
15 day of July, 2020

Notary Public

DANIKKA MORRISON
COMM. #2245978
Notary Public - California
Los Angeles County
My Comm. Expires June 14, 2022
NRO1

5

27059085.v1

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Commission Rule of Practice 151, I hereby certify that true copies of the

*Reply Affidavit of Keith M. Berman in Further Support of Petition to Eliminate Trading*

*Suspension,* were served on the following on this 15th day of July, 2020, in the manner

indicated below:


<u>By Email:</u>

Office of the Secretary
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-2557
apfilings@sec.gov

David Misler, Trial Counsel
Carlisle Perkins, Senior Counsel
Lesley Atkins, Senior Counsel
Securities and Exchange Commission
Division of Enforcement
100 F Street, N.E.
Washington, D.C. 20549-5041
Mislerd@sec.gov
PerkinsC@sec.gov
AtkinsL@SEC.gov


/s/ *Ronald S. Herzog*

26809299.v1