**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | **CRIMINAL NO. 20-CR-278-TNM** |
| **v.** | ) | |
| | ) | |
| **KEITH BERMAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>KEITH BERMAN'S SENTENCING MEMORANDUM</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

KEITH BERMAN'S BACKGROUND ................................................................. 2

I.      MR. BERMAN'S PERSONAL LIFE ...................................................... 2

II.     MR. BERMAN'S HISTORY OF PRODUCT DEVELOPMENT .............. 3

III.    GENVIRO! – DECN'S COVID-19 TEST ............................................... 4

IV.     MR. BERMAN'S MEDICAL CONDITIONS .......................................... 5

ARGUMENT ..................................................................................................... 6

I.      THE SENTENCING GUIDELINES ........................................................ 6

        A.      The PSR's Loss Amount Calculation Is Erroneous ..................... 6

                1.      The fraud was disclosed before the indictment was unsealed. .................. 6

                2.      The government has not met its burden on reliance. .................................. 9

                3.      It is not a requirement to find loss to sentence a fraud defendant............. 12

        B.      The Government Has Not Proven Substantial Financial Hardship ..................... 14

        C.      The Enhancement for Sophisticated Means Does Not Apply.............................. 15

        D.      Mr. Berman Has Accepted Responsibility ........................................................... 17

        E.      Mr. Berman Should Receive the Zero-Point Offender Downward
                Adjustment ............................................................................................................ 19

        F.      Mr. Berman's Total Offense Level Is 10 .............................................................. 20

        G.      A Downward Departure is Warranted if the Court Adopts the Government's
                Loss Amount ......................................................................................................... 21

II.     THE STATUTORY SENTENCING FACTORS SUPPORT A SENTENCE OF
        TIME SERVED........................................................................................................ 22

        A.      Nature and Circumstances of the Offense Do Not Support a Lengthy
                Sentence ................................................................................................................ 23

                1.      Mr. Berman put genuine effort into developing a COVID-19 test. .......... 23

2.      Mr. Berman consulted with regulatory lawyers to get GenViro! cleared by the FDA. ....................................................................... 25

B.      Mr. Berman's History and Characteristics Do Not Support a Lengthy Sentence ........................................................................................ 25

C.      A Long Sentence Is Not Necessary to Afford Adequate Deterrence or Protect the Public ...................................................................... 27

1.      Specific deterrence is not served by a lengthy sentence because Mr. Berman is unlikely to repeat his crime. ................................................... 27

2.      General deterrence of crime does not support a lengthy sentence............ 29

D.      The Seriousness of the Offense, Respect for the Law, and Just Punishment Do Not Support a Lengthy Sentence ..................................... 30

E.      The Need to Avoid Unwarranted Sentencing Disparities Supports a Shorter Sentence ......................................................................................... 31

CONCLUSION .................................................................................................. 33

**INTRODUCTION**

Keith Berman is 70 years old. He has no criminal record. For most of his life, he developed devices that helped patients get the medical care they needed. Over the last 20 years, he sold affordable and reliable diagnostic devices that helped diabetics monitor their blood glucose levels. These devices worked using impedance spectroscopy, a sophisticated technology that can detect the electrochemical signature of a blood sample. In late February 2020, as demand for COVID-19 tests exploded, Mr. Berman believed that he could leverage his knowledge of this technology to invent a device that could detect COVID-19 in blood. He consulted with experts in the United States and Korea to work up design specifications, and he hired FDA-savvy counsel to try and get the requisite approvals. At the time, however, Mr. Berman needed money, so he issued press releases misstating the status of his project to raise the funds needed to complete it and personally enrich himself from the company's success. In the process, Mr. Berman committed securities fraud, wire fraud, and obstructed justice. When the time came, Mr. Berman took responsibility for his offenses and pled guilty.

Since March of last year, Mr. Berman has been incarcerated. These days, he suffers from several acute medical issues. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

As the Court prepares to sentence Mr. Berman, it must consider this whole picture before choosing the appropriate punishment. *See Concepcion v. United States*, 597 U.S. 481, 491 (2022) (noting the court's "responsibility to sentence the whole person before them"). Multiple

individuals have written to the Court to help with that process.  They are friends and business associates who have known the real Keith Berman for years.  They know him as "kind," "friendly," "honest," "savvy," "innovative," "insightful," "bright," "caring," and fundamentally, "good."  Exs. A–H (letters and affidavits in support).

Because Mr. Berman has already spent over one year incarcerated, he respectfully submits that the appropriate sentence is time served.  The government has not met its burden to justify the application of various Guidelines enhancements that it seeks to apply, including loss amount, substantial financial hardship, and sophisticated means.  And even if this Court believed that those enhancements did apply, a sentence of time served is "sufficient, but not greater than necessary," to achieve the purposes of sentencing under 18 U.S.C. § 3553(a).

**KEITH BERMAN'S BACKGROUND**

## I.  MR. BERMAN'S PERSONAL LIFE

Born in 1953, Mr. Berman grew up in St. Louis, Missouri.  His father was a family physician, and his mother worked for the local school district.  From the outside, Mr. Berman's childhood should have been ordinary—but it was far from that.  He suffered brutal mental and emotional abuse from his mother throughout his childhood.  ██████████████████

████████████████████████████████████████████████

████████████████   And while attending college at Indiana University in Bloomington, Mr. Berman's father passed away.  Simply put, Mr. Berman's early years were fraught.

As an escape, Mr. Berman restored antique radios.  He enjoyed working with his hands and was intrigued by the technology inside the radios he restored.  He also played hockey, and even became quite proficient at the sport.  In college, Mr. Berman played for Indiana University's club hockey team while he pursued his undergraduate degree.  *See* Ex. I (photograph of Indiana

University club hockey team in 1974–1975 yearbook).[1]  In 1975, he obtained his bachelor's degree from Indiana University, and two years later he obtained his Master's in Public Affairs.

In 1980, Mr. Berman began a romantic relationship with Wendy Block, a schoolteacher. Although they never married, they lived together for over forty years and had a son, Zachary Berman.  Mr. Berman was heavily involved in Zachary's childhood.  He chaperoned school field trips, coached Zachary's high school baseball team, and dutifully supported his son as he got his medical degree.  Mr. Berman raised his son well.  His son is currently a radiologist and an Assistant Clinical Professor of Radiology at the University of California, San Diego, and he has over 15 different academic publications in his field.[2]  While Mr. Berman and his son were close for most of his son's life, their relationship became strained after Mr. Berman was arrested for this offense. His relationship with Wendy became strained then, too.  She was traumatized when officers arrived at her home unannounced to arrest Mr. Berman.

## II.    MR. BERMAN'S HISTORY OF PRODUCT DEVELOPMENT

After obtaining his Master's degree, Mr. Berman embarked on a prolific and successful career in product development.  He began at Technicon, a medical device firm that manufactured devices that analyzed human blood.  While there, he successfully organized and designed a multiphasic screening tool, an experience he leveraged at his next job with Boehringer Mannheim (now Roche), a pharmaceutical and medical supply company.  At Boehringer Mannheim, Mr. Berman was a program manager, overseeing the development and approval of various medical devices the company intended to sell.  During his time at the company, Mr. Berman became adept at navigating the FDA's processes and procedures for obtaining "510(k) clearance" of medical

---

[1]  The full Indiana University yearbook for 1974–1975 can be found here: https://issuu.com/arbutusyearbook/docs/1975_arbutus.
[2] *See* UCSD Profiles, *Zachary Berman*, https://profiles.ucsd.edu/zachary.berman (last visited April 1, 2024).

devices.[3]   Eventually, Mr. Berman decided to leave Boehringer Mannheim and start his own company, Access Health, which developed laboratory computer systems that were designed to handle all the logistical functions necessary to run a testing laboratory.

Mr. Berman engaged in a few other successful ventures in the years that followed, and by the early 2000s, he was selling diabetic test strips and wound care products.  He did this under several different company names, the latest being Decision Diagnostics ("DECN").  As the leader of DECN, Mr. Berman developed and sold glucose test strips that utilized a sophisticated technology, known as "electrochemical impedance spectroscopy," to detect the electrochemical signature of a blood sample.  Using this technology, Mr. Berman's glucose tests were quick, reliable, and more affordable than name-brand competitors.  To ensure that he complied with FDA requirements, Mr. Berman hired counsel experienced with the FDA's regulatory framework for medical devices.  *See* Ex. F, Affidavit of M. DuVal at 3–6.  Mr. Berman also worked with a Korean biotechnology company, The Bio, and a scientist based in the United States, Dr. Matthew Musho, to develop DECN's glucose test strips.  *See* Ex. B, Letter from D. Kim at 1; Ex. F, at 3–4.

## III.   GENVIRO! – DECN'S COVID-19 TEST

In late February 2020, Mr. Berman learned that The Bio had halted its production operations because officials in Daegu, South Korea had ordered citizens to shelter in place to stem the spread of COVID-19.  Foreseeing the demand for COVID-19 test kits, Mr. Berman hoped to leverage his company's expertise in impedance spectroscopy to detect COVID-19 in blood.  To

---

[3] The 510(k) process is the method by which medical device manufacturers get clearance from the FDA to market certain eligible products in the United States.  "The 510(k) clearance process involves a comprehensive review of safety and performance data for the device, which may include scientific, non-clinical, and clinical data, as appropriate, to determine if a new device is substantially equivalent to a device that is already on the market."  United States Food and Drug Administration, *Medical Device Safety and the 510(k) Clearance Process*, https://www.fda.gov/medical-devices/510k-clearances/medical-device-safety-and-510k-clearance-process (last visited March 31, 2024).

develop this idea, Mr. Berman consulted with Daniel Kim, the owner of The Bio, who believed that such a test was theoretically possible and shared a peer-reviewed article that explained how impedance spectroscopy could detect viruses in biological samples.  ECF No. 179-1 (e-mail from D. Kim to K. Berman).

To obtain FDA clearance for GenViro!, Mr. Berman hired the same counsel that worked on with him on glucose testing.  *See* Ex. E, Affidavit of L. Pritchard ¶ 3; Ex. F, at 6–7.  Mr. Berman, however, did not have the funds necessary to complete the project.  To obtain the money he needed and to enrich himself, Mr. Berman released press releases misstating the status and development of GenViro!, starting in March 2020.  During that time, Mr. Berman ran into challenges getting an at-home blood-based COVID-19 test to work.  So in July 2020, DECN decided to tack a different course and switched to a design that used human saliva, which the company announced in a press release.  *See* Ex. J, DECN July 10, 2020 Press Release at 1–2 (announcing "plans to provide a new single-use saliva testing kit option").  The company continued its efforts to develop a saliva test throughout the rest of 2020 into 2021, developing schematics and a sample device that contained several working components.  *See* Ex. K, Affidavit of Dr. Williams ¶¶ 6–9; Ex. L, GenViro! saliva test presentation; *see also* Ex. M, Schematics of GenViro! electrode.

## IV.   MR. BERMAN'S MEDICAL CONDITIONS

Over the last few years, Mr. Berman has suffered from a variety of chronic medical conditions. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████     Throughout his life, Mr. Berman rarely drank

and never abused any illicit substances.  *Id.* ¶ 84.

## ARGUMENT

## I.    THE SENTENCING GUIDELINES

To impose a valid sentence, the Court must first calculate the appropriate Guidelines range.

*See Gall v. United States*, 552 U.S. 38, 49 (2007) ("[A] district court should begin all sentencing

proceedings by correctly calculating the applicable Guidelines range").  Mr. Berman's total offense

level is 10 and he has no criminal history, which means the appropriate Guidelines range is 6–12

months' imprisonment.

### A.    The PSR's Loss Amount Calculation Is Erroneous

The PSR incorrectly adopts the government's asserted loss figure of "at least $27.8

million."  PSR ¶ 49.  This calculation is erroneous for the reasons articulated by Mr. Berman in

brief (ECF No. 179) and during oral argument at the March 20, 2024 hearing on loss amount,

which are hereby incorporated in this Sentencing Memorandum.  It is also erroneous for the

reasons discussed below.

### 1.    *The fraud was disclosed before the indictment was unsealed.*

As the evidence at the March 20, 2024 hearing demonstrated, the fraud was publicly

revealed to investors multiple times before the indictment was unsealed.  On April 23, 2020, the

SEC issued a release publicly questioning "the accuracy and adequacy" of the press releases issued

by DECN, including claims that DECN had the "technology perfected" for a COVID-19 blood test

that would provide results "in 15 seconds" and that "up to 525 million COVID 19 test kits would

be sold in the first year of production."  ECF No. 179-2, at 3 (DX-001 and DX-002 at March 20,

2024 hearing).[4]  That same day, the SEC suspended trading of DECN, *id.*, an action that the SEC seldom takes, Ex. O, Tr. of March 20, 2024 Hr'g at 76:2–3 ("SEC trading suspensions are not common events.").

Then, on May 20, 2020, the SEC publicly released a declaration by SEC Senior Counsel Carlisle E. Perkins, which stated unequivocally that "***DECN Disseminated False and Misleading Information in Press Releases***" and specified all of the statements in the press releases that were false and misleading.[5]  ECF No. 179-3, at 6 (DX-004 at March 20, 2024 hearing) (emphasis added).  The allegations in the affidavit were extensive and mirrored the allegations in the indictment against Mr. Berman.  *See* ECF No. 179, at 19–22 (Def. Background Mem. for March 20, 2024 Hr'g) (comparing the allegations in the declaration and the affidavit side by side).

The SEC's statements were picked up by at least July 20, 2020—and likely well before[6]— by over-the-counter ("OTC") trading platforms, which (1) displayed a skull-and-crossbones image next to DECN's ticker, (2) included several bright red "Warning[s]!," and (3) explained that the platform "has discontinued the public display of quotes for [DECN] because it has been labeled Caveat Emptor (Buyer Beware)."  ECF No. 179-5 (DX-010 at March 20, 2024 hearing) (DECN webpage on OTCMarkets.com) (color in original).  At the March 20, 2024 hearing, the Court

---

[4] For this Sentencing Memorandum, pincites for ECF citations are based on the ECF page number unless otherwise indicated.

[5] At the March 20, 2024 hearing, the government claimed that the indictment is "[t]he only time" that the market was on notice that Mr. Berman was not "far along" in getting FDA approval for GenViro!.  Ex. O, at 128:10–17.  This is false.  The Perkins declaration directly stated, "At the time of the March 3, 2020, press release – when DECN claimed that its 'product' would be 'commercial [sic] ready in the summer of 2020' – DECN had not applied for authorization from the FDA to sell or distribute its COVID-19 test kit."  ECF No. 179-3, at 9.

[6] As James Reilly testified at the March 20, 2024 hearing: "I know from my industry experience that as soon as the stock was suspended, OTC Markets, one, stopped trading, as you saw from the gap in one of the charts we reviewed earlier.  And, two, these warnings would be appended to the stock from the resumption of trading forward."  Ex. O, at 68:21–69:1.  The government offered no evidence to rebut this testimony.

learned about the effect of the skull-and-crossbones/Caveat Emptor designation:  if an investor wanted to invest in DECN after the trading suspension, he would have to call in the order, upon which "the call center registered representative will read you a script that says:  ***This is a speculative security. You could lose all your money.  It's recently been suspended by the SEC. Are you sure you want to enter this trade?***"  Ex. O, at 66:14–25 (emphasis added).

The government denies that these events disclosed the fraud.[7]  Instead, the government stresses that Mr. Berman resisted the SEC's allegations and tried to convince others by defending himself on internet message boards using an anonymous account.  In its view, these actions vitiated any otherwise valid disclosure.  But this argument does not make sense.  If the fraud was not disclosed to the market by any of the dates offered by Mr. Berman because he challenged the government's claims, then the disclosure date could not possibly be the date his indictment was unsealed either.  Mr. Berman publicly challenged the charges against him well after he was indicted.  And no party is arguing that disclosure under the Guidelines occurs only when a defendant pleads guilty—rightfully so, because such a rule is completely unsupported by the case law.  *See, e.g.*, *United States v. Peppel*, 2011 WL 3608139, at *9 (S.D. Ohio Aug. 16, 2011) ("[T]he announcement of the SEC investigation is an efficient and highly relevant proxy by which to measure the price effects of the fraudulent conduct"); *United States v. Schena*, 2023 WL 7348458, at *4 (N.D. Cal. Nov. 6, 2023) (Department of Justice Fraud Section arguing that the appropriate disclosure date is "when the SEC suspended the trading for two weeks"); *In re Merrill Lynch*

---

[7] The government's expert, Dr. Mitts, admitted that "[t]he Government provided [him] with the dates for the period of the fraud," Ex. O, at 15:8–9.  Dr. Mitts testified that determining those dates fell outside the realm of his expertise, as it was "not a question that can be answered by financial economics," *id.* 16:16–17; *see also id.* 12:4–6 (recognizing Dr. Mitts as an expert in "financial economics").

*Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512, 527 (S.D.N.Y. 2012) ("[T]he SEC Order itself was enough to disclose [the] market intervention.").[8]

What the case law does demonstrate is that full disclosure of every aspect of the defendant's misconduct is not required to trigger the disclosure date under the Guidelines. *See, e.g.*, *United States v. Tuzman*, 2021 WL 3284231, at *4 (S.D.N.Y. July 29, 2021) (fraud disclosed merely when a company issued a Form 8-K "announcing errors and irregularities in its financial statements from prior years"); *Peppel*, 2011 WL 3608139, at *9 ("announcement of the SEC investigation" sufficient). This makes sense—the further out the disclosure date is pushed, the more likely non-fraud events influence the price of the stock. *See infra* at 11–12 (discussing non-fraud events). Yet in measuring loss, this Court must try to isolate the price effects of the fraud alone. Accordingly, the government's attempt to extend the disclosure date well beyond what the facts or the law supports should be rejected.

> 2. *The government has not met its burden on reliance.*

To prove loss, the government must prove that the loss "resulted from the offense." Application Note 3(A)(i) to U.S.S.G. § 2B1.1   In other words, the government must prove causation. *United States v. Stein*, 846 F.3d 1135, 1152 (11th Cir. 2017) (holding that Guidelines definition of actual loss "incorporates a causation standard that, at a minimum, requires factual causation (often called 'but for' causation)" (cleaned up)); *United States v. Evans*, 744 F.3d 1192, 1196 (10th Cir. 2014) ("[Section] 2B1.1 incorporates and requires both factual or 'but for'

---

[8] The government seemingly attempts to get around this by claiming that Mr. Berman's subsequent obstructive conduct was important information about the fraud that investors needed to know. That is the opposite of what the government has said previously about the fraud charges in this case. *See* ECF No. 179-6, at 24:4–7, 27:4–6 (Tr. of Nov. 13, 2023 Hr'g) (government asserting that the indictment "is focused exclusively on false statements about the blood test," which "***are made from March to July 2020***," and that its "allegations of fraud ***all center around [Mr. Berman's] statements about a blood test*** that his company was developing" (emphasis added)). And as noted above, that is also inconsistent with what the cases say.

causation and legal or foreseeable causation.").  That means the government must demonstrate that all losses in its loss calculation come from "reliance" on Mr. Berman's fraudulent conduct.  *Stein*, 846 F.3d at 1154; *see also United States v. Bazemore*, 839 F.3d 379, 390 (5th Cir. 2016); *United States v. Nacchio*, 573 F.3d 1062, 1078 (10th Cir. 2009).  "Losses from causes other than the fraud must be excluded from the loss calculation."  *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006).

The government has not met its burden.  At the March 20, 2024 hearing, which was held specifically to determine loss amount, the government failed to call a single investor to testify about why he or she invested in DECN.  It adduced no evidence about what an investor considered before investing in DECN, when they invested in DECN, how much they invested in DECN, or why they ignored the warnings from the SEC and the trading platforms about DECN.  The PSR lists individuals that claimed to have suffered loss from the press releases, but this is not sufficient to establish that Mr. Berman's conduct caused loss.  There is no evidence confirming when these individuals invested in DECN, what they viewed before investing in DECN, or whether they sold their stock in DECN.  *See Stein*, 846 F.3d at 1154 ("trial testimony from one investor," "a number of victim impact statements," and testimony that "the only place to get information about [the company's] stock was from press releases and public filings" was "insufficient to support the inference that *all* 2,415 investors relied on [the defendant's] fraudulent information when deciding to purchase [the company's] stock").  In fact, evidence suggests that some investors did not rely on Mr. Berman's press releases about the COVID-19 blood test, and others sold their stocks for a profit.  *See, e.g.*, Ex. P, USPS Interview of B.S. at 1 (Aug. 3, 2021) (investor indicating that he sold his stock for profit in June 2020 and re-invested based on DECN's saliva test); Ex. Q, Timothy Sykes, *How I Called the Best Morning Panic So Far This Year*, Penny Stocks News (Apr. 16,

2022) (DX-005 at March 20, 2024 hearing) (documenting price-movement reasons for investing in DECN in 2020 that are totally divorced from DECN's actual business and discussing profits made from those trades).[9]

The evidence that the government did present—the testimony of Dr. Mitts—was insufficient to establish that its proposed loss amount was attributable to Mr. Berman's fraudulent conduct. Dr. Mitts conceded that it is not possible to assess the reasonableness of a loss amount estimate without a close analysis of firm-specific facts. Ex. O, at 118:25–119:5 ("One needs to consider the totality of the evidence and what happened to determine whether or not the loss amount was reasonable."). However, at the hearing and in his expert disclosure, Dr. Mitts did not offer any testimony explaining how he "[g]enerally" looked at firm-specific facts, conditions, and events. *Id.* at 118:12. In fact, Dr. Mitts testified that his regression modeling could not address this question at all. *Id.* at 45:11–20 ("For purposes of this analysis, ***I did not evaluate with a regression analysis firm-specific facts.*** I don't believe it's possible to do that . . . " (emphasis added)).

Multiple firm-specific factors could explain DECN's price trend in 2020 following disclosure of the fraud. For example, there were ongoing developments at DECN that were unrelated to the charged conduct. In particular, it is undisputed that DECN announced it was switching to a saliva test in July 2020. Ex. J (press release announcing saliva test); *see also* ECF No. 37 (Gov't Reply in Supp. of Mot. in Limine) (acknowledging "the defendant's July 2020 announcement that he planned to develop a COVID-19 saliva test"). And record evidence shows

---

[9] Further highlighting the importance of corroborative evidence, Alpha Credit Resources LLC, another purported victim according to the PSR, "indicated a civil suit was filed on [its] behalf" in the Eastern District of New York, PSR ¶ 35, but it did not mention that this case was ***dismissed with prejudice in September 2022*** following a settlement, *Cyganowski v. Decision Diagnostics Corp.*, 2:21-cv-00888 (E.D.N.Y. Sept. 23, 2022), ECF No. 23.

that investors relied on that information when investing in DECN.  *See, e.g.*, Ex. P, at 1 (investing

based on DECN's saliva test and entrance into X-Prize, a competition that involved the saliva test).

Critically, the government has said repeatedly that Mr. Berman's fraudulent conduct has ***nothing***

to do with the development of his saliva test.  *See* ECF No. 179, at 13 (documenting government's

statements).

      As yet another potential explanation, the DECN price trend could reflect a speculative

bubble.  As James Reilly testified, "traders and speculators in this section of the market . . . might

look at a stock chart and nothing else and make a decision."  Ex. O, at 78:18–79:12 (providing

explanations for continued trading after the disclosure of the fraud).  Record evidence confirms

that this is true.  *See* Ex. Q, at 2–13 (discussing trading of DECN in April 2020 based solely on

price chart).  Accordingly, it is entirely possible that post-July 2020 price movements resulted from

non-fraudulent conduct.  Dr. Mitts offered no testimony explaining how he distinguished among

these firm-specific factors as potential explanations for DECN's price trend.  Rather, the

government simply asserts that Mr. Berman prevented the fraud from being disclosed and that

explains DECN's price trend in 2020 without considering other firm-specific facts, conditions, and

events.  This *ipse dixit* runs in stark contrast to the command that "causes other than the fraud must

be excluded from the loss calculation."[10]  *Ebbers*, 458 F.3d at 128.

      3.     *It is not a requirement to find loss to sentence a fraud defendant.*

      When crafting a sentence for defendants convicted of fraud-related offenses, federal courts

look to U.S.S.G. § 2B1.1 to determine the appropriate offense level.  Subsection (a) sets out a base

---

[10] Should the Court decide to forego the Guidelines method for calculating loss, it must employ a method that appropriately removes the non-fraud value of DECN stock.  *See Ebbers*, 458 F.3d at 128 (noting that loss calculation must focus only on losses caused by fraud).  Put another way, it would have to subtract the value of the stock if accurate press releases were issued from the total stock price in order to isolate what was actually caused by Mr. Berman's fraudulent conduct.

offense level applicable to all defendants (7 if certain conditions are met, otherwise 6), and subsection (b) outlines 20 different enhancements that, if proven by the government to be applicable, can modify the offense level.  *See* U.S.S.G. § 2B1.1(a)–(b).

Loss amount is just one of those 20 enhancements—subsection (b)(1).  A finding of loss is not necessary to find a defendant guilty of fraud, nor is it necessary to adequately sentence a defendant for fraudulent conduct.  "[S]ections 2B1.1(a) and 2B1.1(b)(1) plainly perform different functions in the Guidelines calculus:  the court applies section 2B1.1(a) in response to the defendant's admittedly fraudulent conduct, but the sole question under section 2B1.1(b)(1) is whether the defendant's fraudulent conduct resulted in pecuniary loss warranting a further increase in his base offense level."  *United States v. Crummy*, 249 F. Supp. 3d 475, 484–85 (D.D.C. 2017) (Brown Jackson, J.).  As then-Judge Brown Jackson ruled, "it is not necessarily troubling" when loss amount is zero under the Guidelines method, because the defendant still "has committed a federal offense" and is subject to a term of imprisonment under the Guidelines.  *Id.* at 485 (finding loss amount of zero because government did not present sufficient evidence supporting its loss amount claim under Guidelines method); *see also United States v. Block*, No. 1:16-cr-595 (S.D.N.Y. Dec. 4, 2017), ECF No. 169 at 31, 68–71 (declining to apply a loss amount of $300 million dollars because the government failed to meet its burden, and instead finding no loss despite defendant "brazenly" manipulating financial results to cover up problems in past disclosures).  Moreover, in cases where U.S.S.G. § 2B1.1 metes out an offense level that, in the sentencing court's view, "substantially understates the seriousness of the offense," the Guidelines state that "an upward departure may be warranted."  Application Note 21(A) to U.S.S.G. § 2B1.1; *Crummy*, 249 F. Supp. 3d at 484 ("[T]o the extent that the offense level does not reflect the full extent of the harm suffered, a court may depart on that basis alone").

At bottom, the sentencing court need not—and should not—eschew a faithful application of the Guidelines method for calculating loss even if loss is zero. The government, asserting a loss amount of millions based on illogical arguments and no case-law support, does precisely that. The Court should not oblige.

### B.    The Government Has Not Proven Substantial Financial Hardship

As with loss amount, the government must prove that Mr. Berman's fraudulent conduct was both the but-for and proximate cause of any investor's substantial financial hardship for the Guidelines enhancement to apply. *United States v. Skouteris*, 51 F.4th 658, 673 (6th Cir. 2022) ("But-for causation requires that the 'substantial financial hardship' could not have occurred without the underlying offense, whereas proximate causation requires the harm to be the foreseeable result of the wrongful act."); *United States v. George*, 949 F.3d 1181, 1187 (9th Cir. 2020) ("Section 2B1.1(b)(2) refers to conduct that 'resulted in' substantial financial hardship, language that we have interpreted to impose a causation requirement. As relevant here, that requirement embraces two distinct concepts: but-for causation and proximate causation." (citation omitted)).

The same arguments regarding the government's failure to demonstrate reliance for loss amount therefore apply with equal force to the substantial financial hardship enhancement. *See supra* at 6–12. The government's claim for substantial financial hardship is premised on erroneous fraud periods and disclosure dates that extend the period far beyond what was reasonably caused by Mr. Berman's fraudulent conduct. Furthermore, the government did not have a single investor testify about why he or she invested in DECN stock. Nor did the government present any evidence corroborating what an investor viewed before investing in DECN, when they invested in DECN, or how much they invested in DECN. And that concern is not merely academic. Even on the limited evidence the government has, the record reveals that multiple investors listed in the PSR

14

invested based on DECN's saliva test, not the blood test.  *See* Ex. P (selling for a profit and then investing based on the saliva test); Ex. R, Victim Impact Statement of J.D. (investing based on DECN's saliva test and participation in X-Prize, a competition involving the saliva test that occurred in late 2020).

The government cites *United States v. Sunmola*, 887 F.3d 830 (7th Cir. 2018) to defend its failure to call any investors at the evidentiary hearing or present any corroborating evidence at all.  *See* ECF No. 193, at 14–15.  But *Sunmola* does not support the government.  *First*, multiple victims "testified at trial" in *Sunmola*.  887 F.3d at 836.  *Second*, unlike here, the defendant had the PSR for six months before the sentencing hearing to verify the claims that were made.  *Id.  Third*, and most importantly, *Sunmola* had nothing to do with *reliance*, *see id.*, which is critical in this case.  As the Eleventh Circuit held, "a number of victim impact statements" are insufficient to support the inference that "*all* . . . investors relied on [the defendant's] fraudulent information when deciding to purchase [the company's] stock." *Stein*, 846 F.3d at 1154.  Instead of remedying its failure, the government hides the issue in a footnote.  *See* ECF No. 193, at 11.[11]

### C.    The Enhancement for Sophisticated Means Does Not Apply

The PSR recommends a two-level enhancement to Mr. Berman's offense level because his offense conduct "involved sophisticated means" pursuant to U.S.S.G. §2B1.1(b)(10)(C).  PSR ¶ 51.  The justification in the PSR for the "sophisticated means" enhancement is that Mr. Berman "used aliases to encourage investors to invest in DECN."  *Id.*  This refers to the fact that, when discussing DECN stock on public Internet message boards, Mr. Berman used a different name.

---

[11] The government claims there is "no loss causation requirement in public enforcement actions," ECF No. 193, at 11 n.4, but the case it cites—*S.E.C. v. Pace*, 173 F. Supp. 2d 30, 33 (D.D.C. 2001)—had nothing to do with U.S.S.G. § 2B1.1, which requires that loss "***result[] from the offense***," to count for the purposes of the enhancement. Application Note 3(A)(i) to U.S.S.G. § 2B1.1 (emphasis added).  The government's argument should receive short shrift.

This conduct does not rise to the level of "sophisticated means" as contemplated by the Guidelines.  The Guidelines define "sophisticated means" as "***especially complex or especially intricate*** offense conduct pertaining to the execution or concealment of an offense."  Application Note 9(B) to USSG 2B1.1 (emphasis added).  To eliminate doubt about what that means, the Guidelines provide examples:

1.  [I]n a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means.

2.  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

*Id.*

The conduct here—utilizing an alias on a public message board—is not nearly as sophisticated as either of these examples.  And while "the enhancement can apply to conduct less sophisticated" than the examples in the Guidelines, it nevertheless must require conduct more complex than merely setting up a fake account on an internet message board.  *United States v. Milligan*, 77 F.4th 1008, 1013 (D.C. Cir. 2023) (affirming, with "due deference," the application of the sophisticated means enhancement where the defendant "set[] up an email account in [another's] name, sen[t] communications from that account that purported to be from [that person], ***and*** establish[ed] a mailbox in the name of [a fake company under that person's name]" (emphasis added)). [12]

---

[12] The government papers over this key difference between *Milligan* and this case by claiming that the sophisticated means enhancement applied in *Milligan* because "among other things the defendant set up an email address in another individual's name."  ECF No. 193, at 14.  But those "other things"—*i.e.*, setting up a mailbox in the name of a fake company—that the government does not mention are critical in this case in determining whether the sophisticated means enhancement applies.  Indeed, they demonstrate that *Milligan* does not neatly fit with the facts here.

### D.      Mr. Berman Has Accepted Responsibility

Despite pleading guilty to all pending charges before going to trial, the government advances three reasons for its conclusion that Mr. Berman does not deserve a two-level credit for accepting responsibility.  *See* U.S.S.G. § 3E1.1(a).  None persuades.

*First*, the government contends that Mr. Berman has not accepted responsibility because he intended to have Dr. Williams testify about certain aspects of his COVID-19 test.  ECF No. 177, at 17 (Gov't Evid. Br. for March 20, 2024 Hr'g) ("While the Defendant is entitled to present evidence at this stage of the case, the presentation of Dr. Williams's anticipated testimony is inconsistent with acceptance of responsibility").  Mr. Berman has repeatedly told the government that he does not intend to argue that he developed a working COVID-19 blood test, or that his press releases were accurate.  Indeed, Mr. Berman admits that his press releases were materially false and misleading *because* they misstated the progress of DECN's development of a COVID-19 blood test.  Through Dr. Williams, Mr. Berman merely intends to show the Court what work he was doing to develop a COVID-19 test, which is relevant to the nature and circumstances of Mr. Berman's offense, his history and characteristics, and the sentence he should receive relative to similarly situated defendants.  *See* 18 U.S.C. § 3553(a)(1), (a)(6).  Contrary to the government's position, a defendant is allowed to present evidence relevant to the sentencing factors in 18 U.S.C. § 3553(a) and still receive a credit for acceptance of responsibility—particularly where, as here, the defendant admits that he is guilty of all the charged crimes.

*Second*, the government claims that Mr. Berman has not accepted responsibility because his  statement of offense is insufficient.  *See* ECF No. 193, at 16–17.  The government's position is puzzling.  After all, the government explicitly told this Court that the statement of facts supporting the guilty plea was adequate.  And that statement substantially mirrors statement of offense, which the government now finds wanting.  The government was right the first time.  Mr.

Berman admitted that he "willfully and intentionally made materially misleading statements, with the intent to defraud, about the progress and status of DECN's development of its COVID-19 blood test" in "press releases [that] were issued to generate favorable publicity in an effort to attract a larger corporate partner."  ECF No. 170, at 3.  He also admitted that, "using an alias," he "sent private messages to an investor on the website Investors Hangout to influence the investor to draft an independent 'shareholder letter' accusing the SEC of misconduct," "assisted with the review of the shareholder letter," "authorized its submission to the SEC," "recruit[ed] shareholders to sign the letter," "levied allegations of bias and collusion against SEC investigators" in the letter, "did not reveal to shareholders or the SEC that he was behind the alias," and "engaged in this conduct to influence the SEC to end its investigation into DECN."  *Id.* at 3–4.  Mr. Berman has fully admitted to his misconduct.

*Third*, the government insists that Mr. Berman should not obtain the acceptance-of-responsibility reduction because he has challenged the government's proposed loss amount.  *See* ECF No. 193, at 17.  Not so.  As the government has argued repeatedly throughout this case, "loss is not an element" of any of the charged crimes.  Ex. O, at 87:13; *see also* ECF No. 145, at 25 (Gov't Mot. to Exclude Proposed Expert Testimony) (moving to exclude Mr. Berman's expert because loss is not an element).  Rather, loss is an enhancement under the Guidelines that the government has the burden to prove.  By challenging loss, then, Mr. Berman is not falsely denying offense conduct.

Besides, courts routinely reduce sentences under U.S.S.G. § 3E1.1, even though defendants challenge the government's loss calculations.  *See, e.g.*, *United States v. Locke*, No. 1:09−cr−259, ECF No. 92, at 24 (D.D.C. Apr. 13, 2011) (reducing offense levels despite dispute over loss calculations), *aff'd*, 664 F.3d 353 (D.C. Cir. 2011); *Crummy*, 249 F. Supp. 3d at 488 & n.5 (same);

*United States v. Miller*, 901 F. Supp. 371, 373–78 (D.D.C. 1995) (same); *see also United States v. Castillo*, 779 F.3d 318, 325 (5th Cir. 2015) (holding that government may not oppose the discretionary acceptance-of-responsibility reduction of U.S.S.G. § 3E1.1(b) on the grounds that the defendant made a "good faith" argument challenging loss amount).

Mr. Berman is entitled to dispute the applicability of a sentencing enhancement under the Guidelines and still receive credit for acceptance of responsibility. The government is merely weaponizing its inability to reliably measure loss into a sword to punish Mr. Berman. That is incorrect.

### E.    Mr. Berman Should Receive the Zero-Point Offender Downward Adjustment

Under U.S.S.G. § 4C1.1, a defendant with zero criminal history points—also known as a "zero-point offender"—is eligible for an additional two-level downward adjustment to his offense level if the following criteria are met:

1. the defendant did not receive any criminal history points from Chapter Four, Part A;

2. the defendant did not receive an adjustment under § 3A1.4 (Terrorism);

3. the defendant did not use violence or credible threats of violence in connection with the offense;

4. the offense did not result in death or serious bodily injury;

5. the instant offense of conviction is not a sex offense;

6. the defendant did not personally cause substantial financial hardship;

7. the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

8. the instant offense of conviction is not covered by § 2H1.1 (Offenses Involving Individual Rights);

9. the defendant did not receive an adjustment under § 3A1.1 (Hate Crime Motivation or Vulnerable Victim) or § 3A1.5 (Serious Human Rights Offense); and

10. the defendant did not receive an adjustment under § 3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848;

U.S.S.G. § 4C1.1(a).

There is no dispute that Mr. Berman has zero criminal history points. PSR ¶ 62. Nor is it disputed that Mr. Berman satisfies at least nine of the ten requirements. As for the sixth requirement, the government has not met its burden showing that Mr. Berman caused substantial financial hardship. *See supra* at 14–15. Mr. Berman should therefore receive the two-level downward adjustment for zero-point offenders.

### F.  Mr. Berman's Total Offense Level Is 10

After removing the enhancements for loss amount, substantial financial hardship, and sophisticated means, Mr. Berman's adjusted offense level for Counts 1 and 2 is 9.[13] *See* PSR ¶¶ 48–56 (offense level of 9 after removing paragraphs 49, 50, and 51). That is lower than Mr. Berman's adjusted offense level for Count 3 (obstruction of justice), which is 14. *See* U.S.S.G. § 2J1.2. The offense level for Count 3 therefore controls the calculation of Mr. Berman's total offense level. *See* Application Note 8 to U.S.S.G. § 3C1.1. That results in a total offense level of 10 after taking into account acceptance of responsibility (-2 levels) and the "zero-point offender" adjustment (-2 levels). The Guidelines range for a defendant with a total offense level of 10 and a criminal history category of I is 6–12 months' imprisonment.

---

[13] Mr. Berman agrees with the government that the 4-level enhancement in U.S.S.G. § 2B1.1(b)(20) does not apply to him because he is not an officer or director of a "publicly traded company," as that term is defined in the Guidelines. *See* PSR at 27 (government asserting that U.S.S.G. § 2B1.1(b)(20) does not apply to Mr. Berman). DECN, an OTC stock, was not on a national securities exchange, and thus the company was not an issuer of "a class of securities registered under section 12 of the Securities Exchange Act of 1934." Application Note 1 to U.S.S.G. § 2B1.1 (defining "publicly traded company"). Likewise, because DECN common stock was traded OTC, DECN was generally not "required to file reports under section 15(d) of the Securities Exchange Act of 1934." *Id.*

### G.    A Downward Departure is Warranted if the Court Adopts the Government's Loss Amount

Application Note 21(C) to U.S.S.G. § 2B1.1, entitled "Downward Departure Consideration," states: "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense.  In such cases, a downward departure may be warranted."  Should the Court decide to adopt the loss amount proposed by the government, Mr. Berman respectfully submits that a downward departure is warranted here.

For years, courts have questioned the "correlation between loss and moral seriousness" at the heart of U.S.S.G. § 2B1.1(b)(1) and have criticized "the rigidity of the loss amount overriding the diverse reality of complex financial crimes."  *United States v. Johnson*, 2018 WL 1997975, at *4 (E.D.N.Y. Apr. 27, 2018) (documenting critiques of loss enhancement); *see also Block*, No. 1:16-cr-595, ECF No. 169, at 71 (noting "how broken the guidelines are with respect to being arbitrarily driven by factors that happen to be quantifiable," such as "loss amount in financial cases," "to the exclusion of considerations that actually go to a defendant's culpability"); Mark H. Allenbaugh, *Drawn from Nowhere: A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Rep. 19, 22 (2013) (noting from Sentencing Commission's data an "increasing divergence between the average Guidelines minimum and the average sentence actually imposed as loss amount grows").

Courts have also noted that the combined effect of the loss enhancement alongside the various other enhancements in U.S.S.G. § 2B1.1 "represents . . . the kind of 'piling-on' of points for which the guidelines have frequently been criticized."  *United States v. Adelson*, 441 F. Supp. 2d 506, 510 (S.D.N.Y. 2006) (eschewing sentence recommended by the Guidelines due to an "absurd" loss amount and relying more heavily on the § 3553(a) factors); *accord United States v. Bikundi*, 2022 WL 1451402, at *1 (D.D.C. May 9, 2022) (noting downward departure for fraud

defendant because "the combination of multiple enhancements under the Guidelines had resulted in a piling-on effect because some of the enhancements applied addressed very similar and overlapping considerations" (cleaned up)).  For this reason, the Second Circuit has held that "[w]here the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence."  *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (remanding for sentencing court to consider whether non-Guidelines sentence is appropriate where the loss enhancement ***tripled*** the defendant's base offense level).

Here, Mr. Berman's base offense level is 7.  The government's proposed loss amount would add 22 levels, thereby ***quadrupling*** Mr. Berman's offense level.  With that enhancement alongside the others, the Guidelines range for Mr. Berman, a first-time offender in his 70s, would be 168 to 210 months (*i.e.*, 14  to 17.5 years).  That sentence is not proportional with Mr. Berman's base offense level, and it is discordant with the sentencing factors in 18 U.S.C. § 3553(a).  *See infra* at 23–33.  Indeed, the PSR notes that the median sentence for a defendant with the same offense level and criminal history category is 96 months.  PSR ¶ 135.

## II.    THE STATUTORY SENTENCING FACTORS SUPPORT A SENTENCE OF TIME SERVED

Any sentence the Court chooses to impose on Mr. Berman must be "sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  18 U.S.C. § 3553(a).  While the Guidelines are the starting point for any sentence, the Court "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented."  *Gall*, 552 U.S. at 39.  The Court must consider:

> (1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely, (a) just punishment (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the

Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution.

*Rita v. United States*, 551 U.S. 338, 347–48 (2007).  The sentencing factors support a sentence of time served.

## A.     Nature and Circumstances of the Offense Do Not Support a Lengthy Sentence

Crucial to understanding the nature and circumstances of Mr. Berman's offense is understanding that DECN was a real company that sold real products, and Mr. Berman put genuine effort into developing a COVID-19 blood test.  What Mr. Berman did was undoubtedly wrong, but in determining the appropriate sentence for him, it is a mistake to believe that he is a career fraudster, or that GenViro! was an entirely fictitious product.  Neither is true.

### 1.     *Mr. Berman put genuine effort into developing a COVID-19 test.*

For many years, DECN developed and sold glucose test strips that used impedance spectroscopy to detect the electrochemical signature of a blood sample.  *See* Ex. B, at 1.  DECN's test strips were both affordable and reliable, and the company continually innovated.  Mr. Berman sought ways to improve DECN's test strips so that diabetics could receive more accurate measurements of their glucose levels.  *See id.* ("Importantly, because the GenUlitmate TBG meter was able to automatically adjust[] for hematocrit interference, the device was able to provide a more precise glucose result[] than our earlier products.").  Mr. Berman also hired counsel experienced with the FDA's regulatory framework for medical devices to comply with FDA rules. He consulted closely with his counsel and ran a legitimate and reputable business.  *See* Ex. F, at 3–6 (M. DuVal outlining DECN's efforts to comply with FDA regulations).

In February 2020, with news about the COVID-19 pandemic growing increasingly dim, Mr. Berman believed that he could alleviate the burden on the public.  He believed that he could use impedance spectroscopy to invent a test kit—GenViro!—that could detect COVID-19 in blood.

He consulted with The Bio to determine the viability of GenViro! and put together schematics of what the product would look like. *See* ECF No. 179-1; Ex. K, at 91–100 ("GenViro! Development Summary" from The Bio).

Mr. Berman's belief was not groundless. Respected authorities in the field have opined that electrochemical impedance spectroscopy ("EIS") can be used to detect viruses, including COVID-19. *See* Ex. K ¶¶ 3–4 ("Theoretically, an EIS system can detect viruses, including COVID-19, if the system properly employs three core elements of EIS."). Although flawed, Mr. Berman's GenViro! design complied with several core elements of an EIS system. *See id.* ¶¶ 6–8. That is not a coincidence—Mr. Berman put great thought into developing GenViro!. For example, Mr. Berman's decision to use photolithography patterned platinum electrodes instead of screen printed electrodes, which was done in one of the papers he relied on, made the device more accurate. *See id.* ¶ 7 ("The inconsistent surface area of screen printed electrodes introduces greater variability in EIS measurements and could be less precise."). Mr. Berman's detection parameters also reflected genuine thought: the frequencies he chose accounted for background effects that could make virus detection less accurate. *See id.* ¶ 8 ("These detection parameters are adequate because 100 kHz and larger frequencies are used to avoid background effects from liquid-electrode reactions, and here a liquid electrode reaction would be present."). In short, Mr. Berman's GenViro! design had "a logical electrode design and proper detection parameters for the EIS detection of a virus in a clean sample." *Id.* ¶ 6; *see also* Ex. M (schematics of the electrode).

Unfortunately, Mr. Berman was ultimately unable to develop a COVID-19 blood test after running into several difficulties. Mr. Berman thus decided to switch to a saliva test, which his consultants believed would be a more workable option given the differences between blood samples and saliva samples. Mr. Berman announced the switch in a press release in July 2020, *see*

Ex. J, and, leveraging what he had developed during his work on the blood test, worked doggedly on a saliva test throughout the rest of 2020 into 2021, developing a full-scale model with several working components, *see* Ex. K ¶ 9; Ex. L (presentation outlining saliva test development and schematics).

2. *Mr. Berman consulted with regulatory lawyers to get GenViro! cleared by the FDA.*

While he was developing a workable design for GenViro!, Mr. Berman consulted with the FDA counsel he had worked with on DECN's diabetic test strips to get GenViro! cleared by the FDA. From March through June 2020, Mr. Berman worked with FDA counsel to seek Emergency Use Authorization from the FDA for a blood-based COVID-19 test. *See* Ex. E, ¶¶ 3–13; Ex. F, at 6–7. As part of that process, Mr. Berman's FDA counsel prepared submissions for the FDA regarding the proposed test and discussed the proposed GenViro! test kit with FDA staff. *See* Ex. E, ¶¶ 3–13. At the time, "FDA expectations for these test kits were a continuously moving target and were particularly difficult for small companies to meet." *Id.* ¶ 15. And although Mr. Berman did not develop a test, his engagement of FDA counsel "to assist him through the EUA process supports the level of his commitment to understanding the FDA process requirements so that he could strive to meet them." *Id.* ("Although Mr. Berman ultimately did not obtain authorization to commercialize GenViro! from FDA, what I observed during this period was consistent with a good faith effort to apply existing impedance technology to develop a test for COVID-19.").

**B.     Mr. Berman's History and Characteristics Do Not Support a Lengthy Sentence**

Equally important to this Court's sentencing determination is the fact that Mr. Berman has never been convicted of a crime before. He is a first-time offender in his 70s. The attached letters of support demonstrate that Mr. Berman is an honest broker with a long history of genuine product development:

- "I have known Keith for over 30 years and have always found him to be a kind, honest, and highly responsible individual and citizen."  Ex. A, Letter from S. Patel at 1.

- "I have known Mr. Berman for the past 18-years. . . . I consider him a friend and a business partner.  Mr. Berman has always been a tough and savvy business man. But he has also pushed our companies to be innovative and aggressive."  Ex. B, Letter from D. Kim at 1.

- "I found Mr. Berman to be kind, friendly and always professional in our working relationship.  Prompt completion of our work tasks was our mutual goal, and Mr. Berman proved to be reliable and forthcoming."  Ex. C, Letter from L. Bains at 1.

- "I am writing this letter in support of a man who has always dealt straight, honestly and fairly with me and my staff over a long time and many transactions."  Ex. D, Letter from A. Rabinowitz at 2.

- "Mr. Berman's engagement of DuVal & Associates to assist him through the EUA process supports the level of commitment to understanding the FDA process requirements so that he could strive to meet them."  Ex. E, Affidavit of L. Pritchard ¶ 15.

- "Keith Berman is an honest man, a good man."  Ex. F, Affidavit of M. DuVal at 7.

- "The Keith that I knew, was kind, considerate, generous, and trustworthy."  Ex. G, Letter from B. Lyons at 1.

The letters also show that Mr. Berman was always striving to innovate and never willing to give up easily when he faced a challenge.  Bill Lyons, Mr. Berman's friend of over 30 years, put it best:

> Keith is extremely bright, capable, competent, intuitive, and insightful.  While working together, he always sought to discover a unique technology, a cutting-edge device or a medical breakthrough.  His intelligence and vision enabled him to see opportunities invisible to others and his work ethic drove him to convert them into reality.  It is difficult for someone outside of the technological startup industry to fully appreciate the difficulty of creating something from nothing and then converting it to success.  Very few attempt that challenge and only a small percentage are able to actually develop a novel product/device/technology and then launch it into a virgin market.  That was Keith's driving motivation and unique skill.  We worked together pursuing breakthrough technologies and were able to discover some.  Keith viewed these pursuits as a mission and never surrendered.

Ex. G, at 1.

The Court should also consider Mr. Berman's strong history with his family. Mr. Berman was an excellent father to his son. *See id.* ("He is a caring friend, wonderful father to Zac and a devoted husband to Wendy."). While there is no question that he made mistakes in his family life over the years, there is no doubt that Mr. Berman was heavily involved in raising his son, chaperoning school field trips, coaching his son's high school baseball team, and supporting his son as he got his medical degree. Although they have become estranged since his arrest, Mr. Berman raised his son well, instilling in him a strong work ethic and good values. Mr. Berman's son is currently a radiologist and researcher at the University of California, San Diego, and he has a prolific catalogue of academic publications. *See supra* at 3.

At bottom, throughout his life, Mr. Berman was devoted to being both a good corporate executive and a good father. In sentencing Mr. Berman, "the punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). Here, neither the offender nor the offense merit a lengthy sentence of imprisonment.

### C.     A Long Sentence Is Not Necessary to Afford Adequate Deterrence or Protect the Public

A lengthy sentence is not necessary to "afford adequate deterrence to criminal conduct" or "protect the public from further crimes." 18 U.S.C. § 3553(a)(2)(B)–(C).

1.     *Specific deterrence is not served by a lengthy sentence because Mr. Berman is unlikely to repeat his crime.*

Given the consequences of his conviction, it is highly unlikely Mr. Berman will ever be able to engage in this misconduct again. The SEC upheld the trading suspension against DECN.[14]

---

[14] The opinion can be found here: https://www.sec.gov/files/litigation/opinions/2024/34-99439.pdf.

The company's reputation, which Mr. Berman spent years building, is tarnished beyond repair.[15] And due to his status as a convicted felon, it is unlikely Mr. Berman will be able to raise money from investors or issue securities for a public company ever again.  *See United States v. Johnson*, 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018) (varying down to a 24-month sentence from a Guidelines range of 87-108 months in part because the court believed "it is highly unlikely that [the defendant] will work again as an FX trader, or anything similar"); *Block*, No. 1:16-cr-595, ECF No. 169, at 70 ("It is also true that the fact of a felony conviction and the presumed inability of the defendant to maintain his profession is significant punishment in itself").  For instance, as a felon convicted of securities fraud, Mr. Berman is disqualified from participating in the securities industry.  *See* 15 U.S.C. § 78c(a)(39); 17 CFR § 227.503(a)(1).  He also faces countless other collateral consequences as a result of his conviction.  *See United States v. Nesbeth*, 188 F. Supp. 3d 179, 184 (E.D.N.Y. 2016) (noting that "there are nationwide nearly 50,000 federal and state statutes and regulations that impose penalties, disabilities, or disadvantages on convicted felons"); *see also* Ex. D, at 1 (A. Rabinowitz: "Due to his guilty plea and the nature of the charges it is practically impossible for Keith to again be in a situation where he could ever duplicate the actions preceding his guilty plea.").

Mr. Berman has also suffered the consequences of his actions in his personal life.  Mr. Berman's partner has not spoken with him since his arrest in this case, and neither has his son, who had a close relationship with Mr. Berman his whole life.  Mr. Berman has also lost friendships with

---

[15] *See, e.g.*, Department of Justice Office of Public Affairs, *Biotech CEO Pleads Guilty to COVID-19 Securities Fraud Scheme*, https://www.justice.gov/opa/pr/biotech-ceo-pleads-guilty-covid-19-securities-fraud-scheme (Dec. 8, 2024); Mansur Shaheen, *Man Who Made Theranos-Like Claims About a COVID Blood Test Pleads Guilty*, https://www.msn.com/en-us/money/companies/man-who-made-theranos-like-claims-about-a-covid-blood-test-pleads-guilty/ar-AA1lGQv8 (Dec. 18, 2023).

countless friends he has made during his 70 years of life.  Mr. Berman will also face considerable difficulty obtaining a job given his age, his medical conditions, and his felony conviction.

Mr. Berman's decision to violate the terms of his pre-trial release does not undercut this calculus.  The Court's decision to revoke pre-trial release, frankly, gave Mr. Berman the wakeup call he needed.  Mr. Berman has accrued a spotless disciplinary record.  *See* PSR ¶ 14.  And, importantly, Mr. Berman is unlikely to repeat the same violation—that is, sell an asset valued at more than $10,000 without the Court's permission.  Mr. Berman has no money, and as discussed above, his reputation, along with his business's reputation, has been obliterated.  He is now a convicted felon, and it is unlikely he will be able to raise money like he did before he was convicted.

Mr. Berman is also unlikely to reoffend given his background.  He has no criminal history points, and the Sentencing Commission has found that "offenders with zero criminal history points have considerably lower recidivism rates than other offenders, including offenders with one criminal history point."  Amendment 821 to the U.S. Sentencing Guidelines, Reason for Amendment (effective Nov. 1, 2023).  So the need to impose a lengthy criminal sentence against Mr. Berman is minimal here, since he is unlikely to reoffend in the first place.

2.     *General deterrence of crime does not support a lengthy sentence.*

A lengthy federal sentence does not advance general deterrence of crime either.  The Department of Justice itself has said that "[i]ncreasing the severity of punishment does little to deter crime."  U.S. Dep't of Justice, National Institute of Justice, *Five Things About Deterrence*, (June 5, 2016), https://nij.ojp.gov/topics/articles/five-things-about-deterrence.  Courts and commentators agree—there is "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders."  *Adelson*, 441 F. Supp. 2d at 514 (citing academic articles and Sentencing Commission data); *Block*, No. 1:16-cr-595, ECF No. 169,

at 71 (noting in securities fraud case that "with respect to crimes like this people don't think they're going to get caught, and a sentence of seven years versus two years versus three years does not make a huge difference in general deterrence.").  Accordingly, this Court should not impose a lengthy sentence in the name of deterring crime.  Not only is it no more effective than a shorter sentence, "[t]here is no justice in imposing a sentence merely to make an example out of a defendant."  *United States v. Musgrave*, 647 F. App'x 529, 533 (6th Cir. 2016).

### D.   The Seriousness of the Offense, Respect for the Law, and Just Punishment Do Not Support a Lengthy Sentence

Section 3553(a)(2)'s goals for a sentence "to reflect the seriousness of the offense," "to promote respect for the law" and "to provide just punishment" are not achieved by a lengthy sentence of incarceration here.

Mr. Berman's crimes were serious, but a sentence of 168–210 months' imprisonment overstates the moral seriousness of his offenses.  Mr. Berman's Guidelines range is driven in large part by a loss amount figure that the government has failed to support.  *See supra* at 6–12.  And even if the Court disagreed with that, it is undisputed that the loss enhancement by itself accounts for well over 50% of Mr. Berman's adjusted offense level.  Courts have repeatedly criticized the lack of correlation between moral culpability and total loss in financial crimes.  *See supra* at 21–22.  That is particularly true in a case like this one involving penny stocks.  The evidence shows that this is a market that is typically occupied with speculation and outright gambling.  *See* Ex. O, at 57:23–58:1 ("The penny stock market, based on your experience, is there a fair amount of . . . speculative trading?  Absolutely."); *id.* at 79:5–12 ("[M]y lived experience in that period of time is that people were looking for potential opportunities to profit off of the onset of the COVID pandemic. . . . My experience with traders and speculators in this section of the market is they might look at a stock chart and nothing else and make a decision."); Ex. Q, at 2–13 (discussing

trading strategies focused solely on DECN's price chart).  That is not to say that Mr. Berman's conduct was okay—it was not—but it is clear that Mr. Berman's conduct was not so heinous that it rises up to some of most odious forms of securities fraud, wire fraud, or obstruction of justice possible.  Yet a sentence of 168–210 months says precisely that.

Also, such a lengthy sentence does not promote respect for the law or promote just punishment.  As explained above, a shorter sentence in a case like this is just as likely as a longer sentence to deter criminal behavior.  *See supra* at 29–30.  And the collateral consequences of a federal conviction in this case—including incarceration with significant medical issues, public vilification, inability to get a job, loss of business, loss of rights, and loss of family—alongside a shorter sentence provide sufficient just punishment for this offense to achieve the retributive goals of sentencing.  *See supra* at 27–29.

### E.      The Need to Avoid Unwarranted Sentencing Disparities Supports a Shorter Sentence

The "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" supports a sentence of time served in this case.  From 2015 to 2021, the median sentence for a defendant in this District (1) whose primary Guideline was U.S.S.G. § 2B1.1, (2) had no criminal history, and (3) was in Zone D, was 20 months' imprisonment.  *See* United States Sentencing Commission, *Interactive Data Analyzer*, https://ida.ussc.gov/analytics/saw.dll?Dashboard (last visited Apr. 4, 2024).    Nationally, the median sentence was 26 months.  *Id.*

Even if this Court were to disagree with Mr. Berman and adopt the enhancements argued by the government, a sentence significantly lower than 168–210 months' imprisonment is warranted.  Of defendants who had a total offense level of 35 and had a criminal history category of I in the last five years, *58%* received below Guidelines sentences.  United States Sentencing

Commission, *Judiciary Sentencing Information*, https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last visited April 4, 2024).  The median length of imprisonment for those defendants was 96 months.  *Id.*  But given the sheer number of duplicative enhancements that apply to cases driven by U.S.S.G. § 2B1.1, and individual defendant-specific factors, courts frequently vary downward even lower.  Below are just a few examples:

- *United States v. Taylor*, 1:19-cr-850 (S.D.N.Y. Mar. 26, 2021), ECF No. 157 (sentencing COO of publicly traded biopharmaceutical company to 12 months' imprisonment despite offense level of 39 and criminal history category of I, because "a guidelines range of 262 to 327 months in prison" was "[b]izarre, barbaric, absurd," and "just one more reflection of how misguided the guidelines are in this area").

- *United States v. Shor*, 1:18-cr-328 (S.D.N.Y. Nov. 11, 2019), ECF Nos. 297, 301 (sentencing trader to 40 months' imprisonment for overinflating assets despite Guidelines range of 168–210 months' imprisonment).

- *United States v. Rowan*, 1:16-cr-10343 (D. Mass. Jan. 23, 2020), ECF No. 1167 (sentencing racketeering conspiracy defendant to 27 months' imprisonment despite having Guidelines range of 135–168 months).

- *United States v. Milton*, 1:21-cr-478 (S.D.N.Y. Jan. 17, 2024), ECF Nos. 315, 327 (sentencing defendant to 48 months' imprisonment despite PSR claiming a total offense level of 37 and recommending a 132-month sentence).

- *United States v. Musgrave*, 647 F. App'x  529, 538 (6th Cir. 2016) (affirming downward variance for defendant with offense level of 25 and a $1.7 million loss to sentence of one day of imprisonment "because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices" and thus "is particularly appropriate for variances").

- *United States v. Johnson*, 2018 WL 1997975, at *3–4 (E.D.N.Y. April 27, 2018) (varying downward to 24 months' imprisonment despite $3.1 million loss from front-running trades and Guidelines range of 87 to 108 months' imprisonment because "the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime").

- *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (sentencing defendant to 42 months' imprisonment despite loss of $50 million and Guidelines range of 85 years' imprisonment because the Guidelines placed an "inordinate emphasis" on loss).

These statistics and cases make one thing abundantly clear:  a Guidelines sentence is not appropriate in this case.  Defendants whose sentences are driven by U.S.S.G. § 2B1.1 repeatedly receive sentences significantly lower than their Guidelines range, particularly when the loss amount is so high.  That should be no different here.  Given the case-specific circumstances articulated above, and the time Mr. Berman has already served, his sentence should be time served.

## CONCLUSION

For most of his life, Keith Berman strived to help patients get better medical care.  He was a good businessman and a loving father.  He had no criminal record.  When the COVID-19 pandemic hit, he believed he could offer the world a test kit that would give people the chance to return to some semblance of normalcy.  But he made mistakes.  He committed securities fraud, wire fraud, and obstructed justice.  When it came time to face the music, he admitted to his crimes and pled guilty.  His reputation is now in tatters.  His business is destroyed.  His relationship with his family is strained.  And at 70, with significant medical issues and a felony conviction, his chances of living his life like before are nonexistent.  As this Court prepares to sentence Mr. Berman, it must consider this whole picture and fashion a sentence that is "sufficient, but not greater than necessary," to serve the purposes of sentencing.  18 U.S.C. § 3553(a).  Mr. Berman respectfully submits that, given the amount of time he has already served, the appropriate sentence is time served.  Such a sentence will achieve the retributive and deterrent goals of sentencing and ensure that resources are not wasted on incarcerating someone with no real risk of recidivism.

DATED: April 6, 2024                     Respectfully submitted,


                                         */s/Kevin B. Collins*
                                         Kevin B. Collins (D.C. Bar No. 445305)
                                         Nicholas J. Xenakis (D.C. Bar No. 90001123)
                                         Jose J. Ramos (*pro hac vice*)
                                         Lori Taubman (D.C. Bar No. 1673026)
                                         Jonah T. Panikar (D.C. Bar No. 90006218)
                                         José F. Girón (D.C. Bar No. 90020611)
                                         Brandon Howell (D.C. Bar No. 1671396)
                                         COVINGTON & BURLING LLP
                                         One CityCenter
                                         850 Tenth Street, NW
                                         Washington, D.C. 20001
                                         (202) 662-5598

                                         Michelle Peterson (D.C. Bar No. 438930)
                                         Assistant Federal Public Defender
                                         For the District of Columbia
                                         625 Indiana Avenue, N.W.
                                         Washington, DC 20004


                                         *Counsel for Keith Berman*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused copies of the foregoing to be transmitted to counsel registered

to receive electronic service.


 */s/ Kevin B. Collins*
Kevin B. Collins (D.C. Bar No. 445305)


*Counsel for Keith Berman*