# EXHIBIT E

## <u>AFFIDAVIT OF LISA L. PRITCHARD</u>

Lisa L. Pritchard, being duly sworn, states:

1. I am Vice President of Regulatory, Quality, Clinical and Engineering with the regulatory law firm of DuVal & Associates, P.A. in Minneapolis, Minnesota. DuVal & Associates has worked with over 1,000 medical device companies, assisting them in bringing products through the FDA commercialization process. For over thirty years, I have specialized in regulatory, quality, and compliance topics with the Food and Drug Administration (FDA). I hold a Bachelor of Science degree in Electrical and Electronics Engineering from North Dakota State University.

2. In my role at DuVal & Associates, I draft and file FDA submissions, including emergency use authorizations (EUAs), for medical devices of all kinds. In addition, I often discuss submissions with FDA staff and explain the technology and why a device meets the standard for clearance, approval, or, in the case of EUAs, authorization for emergency use. In 2020, FDA standard processes were substantially disrupted as both the Agency and industry worked to make important products available to address the COVID-19 pandemic. FDA began working with companies to authorize products from test kits to ventilators. In particular, the FDA office that reviews in vitro diagnostic devices, such as those used to diagnose COVID-19, was inundated with requests for authorization of test kits. In the early months of the pandemic, little information was publicly available regarding FDA's expectations for these test kits. FDA established weekly Town Hall teleconference calls to provide updates on their current thinking and expectations which changed at an unprecedentedly rapid pace. As expectations became more mature, FDA issued multiple guidance documents to provide further assistance.

1

3. In early March 2020, I was asked to assist Keith Berman on an EUA application for the proposed GenViro! test kit, which was designed to detect the presence of the COVID-19 virus. I primarily worked with Keith Berman and Matthew Musho to obtain information about the GenViro! Test Kit to facilitate preparation of the initial communication to FDA. Mr. Berman typically provided the high level business and product information while Mr. Musho provided the more detailed device construction and details of the mechanism of action (including a supportive literature publication for the methodology) as needed for communication with FDA. This is typical of the submission teams for most clients, which include multiple people coming together from a variety of functions based on individual areas of expertise. The initial communication with FDA was called a "pre-EUA" and included available information to describe the test kit, its mechanism of action, and the proposed testing that should be expected to support an authorization. The first pre-EUA that I submitted to FDA on behalf of Pharma Tech Solutions Inc. was for a professional use version of the GenViro! Kit, which was designed to use a blood sample to determine if a patient had been exposed to the SARS-COV-2 virus that caused COVID-19. The submission was made on behalf of Pharma Tech Solutions Inc., which I understand is a subsidiary of Decision Diagnostics Corporation.

4. I initially contacted FDA on March 13, 2020, to provide a description of the product. In that communication, I explained that the product in development could be effective in screening for the SARS-CoV-2 virus by using impedance spectroscopy to identify the virus in blood samples. In my communication to FDA, I explained that it was anticipated that the test would be applied by a professional to a walk-in patient at entities such as pharmacies, long term care facilities, physician group practices, and urgent care clinics. I

further explained that we were in the process of identifying the testing necessary to support an EUA for the test and requested to speak with someone who could provide additional direction on the necessary information.

5.  On April 3, 2020, I submitted the first pre-EUA application for the professional-use version of GenViro!, which included additional information regarding that device.  In that submission, I utilized the then-existing EUA Interactive Review Template issued for molecular-based tests related to COVID-19.  Although the GenViro! COVID-19 Screen Kit was not a molecular-based test, that template was used because it was the only one available at that time.  In the submission, I explained that the GenViro! COVID-19 Screen Kit is a "real-time impedance spectroscopy device" and that "impedance value can be used to quantify the virus concentration."  In addition, I also asked FDA to provide a template for blood-based test kits (which would apply to the GenViro! Kit) that could be used for the final EUA submission upon completion of the minimally required testing.  In response, FDA stated that the device was outside of the scope of devices that they were reviewing but that they would assign a pre-EUA to discuss as resources allowed.  They also requested that I provide FDA 3514 Form (CDRH Premarket Review Submission Cover Sheet), which is optional for standard submissions (so should not have been considered required for an EUA submission) and resubmit the entire package.  Because I believed that it was critical to obtain the pre-EUA feedback for the GenViro! kit, I submitted the requested FDA 3514 form and re-attached the pre-EUA document later that same day and requested that FDA assign it as a pre-EUA as soon as possible.

6.  The next day—which was a Saturday—I received an acknowledgement letter from FDA as well as feedback regarding required testing.  Because typical acknowledgement letters

3

are only issued Monday through Friday, we were encouraged that this appeared to indicate that FDA was working to expedite the review of EUA submissions.  The acknowledgement letter assigned the submission control number PEUA200323.  The feedback explained that FDA recommended the following four validation studies for a SARS-CoV-2 antigen test: Limit of Detection/Analytical Sensitivity, Cross-reactivity/Analytical Specificity, Microbial Interference, and Clinical Agreement Study

7.  Following this initial pre-EUA submission, we continued to discuss the proposed GenViro! test kit with FDA.  This is typical of most submissions with FDA, and was required for all EUA submissions that I was involved in.  Submissions to FDA typically require negotiation before FDA is in a position to render a decision.  FDA utilized pre-EUA submissions as repositories of information and documentation of the communications until there was a point where FDA had enough information to allow authorization.  These communications typically include requests from FDA for clarification on information that has been provided, requests for additional information (e.g., testing), requests for changes to product labeling, and associated responses to those requests). At the conclusion of the final communication, if FDA agreed that the totality of provided information supported the statutory criteria for authorization, FDA would finally convert the pre-EUA to an EUA and issue the authorization.

8.  On April 14, 2020, I, along with my colleague Mark DuVal, Matthew Musho, Leslie Musho, and Keith Berman, participated in a conference call with FDA staff Maria Ines Garcia and Laura Ulitzky to discuss testing that had been requested by FDA.  In that call, we provided FDA with additional background regarding the device.  We explained that the GenViro! test was based on technology used by over 18 million people in the United States

4

with diabetes to complete glucose monitoring.  On that call, FDA requested a publication related to the use of impedance measurements for detecting viruses.  I also shared the proposed "Indications for Use" language with FDA staff before we addressed the four tests requested by FDA.

9.    Although no clarification or discussion was required for the Limit of Detection/Analytical Sensitivity test, we discussed the remaining three tests with FDA staff; these tests included Cross-reactivity/Analytical Specificity, Microbial Interference, and Clinical Agreement Study.  With respect to Cross-reactivity/Analytical Specificity, we identified certain organisms that would not be expected to appear in a fingerstick sample and therefore should not be included in such testing.  As to Microbial Interference, we explained to FDA that a microbial interferent would not be expected to alter the physical characteristics of the target virus and thus believed that microbial interference testing should not apply to the GenViro! Test.  Finally, we requested that FDA allow us to use contrived venous whole blood samples instead of human specimens for the Clinical Agreement Study.  This request was made because such an approach would lower the overall risk of conducting the study, minimizing unnecessary exposure to infected individuals.  FDA requested that we provide justification for deviation from the required testing.

10.   The following week—on April 20, 2020—I provided follow-up documentation to FDA. That documentation included the requested justification for testing as discussed in the April 14, 2020 conference call and minutes from that call.  These materials also included three

5

reference articles[1] relating to the use of impedance spectroscopy, the technology that Keith Berman planned to leverage in the GenViro! test kit.  On April 30, 2020, FDA provided comments to the minutes and the proposal.  In those comments, FDA requested fingerstick samples from infected individuals be used for a clinical agreement study and noted that contrived samples alone would be insufficient for a fingerstick claim.

11. On May 1, 2020, I submitted pre-EUA documentation for a home use version of GenViro!. This test was identical to the professional use version but was planned for over-the-counter use by patients.  In my communication to FDA, I explained that the GenViro! test was based on the same fundamental technological platform used in many glucose meters and that it would use fingerstick blood samples to evaluate impedance of the sample to detect viral particles.  This submission was acknowledged by FDA on May 2, 2020, and assigned submission number PEUA200947.

12. On June 18, 2020, I contacted FDA staff and requested to further discuss the Clinical Agreement Study and Microbial Interference Testing for the professional use version of the GenViro! test.  In that communication, I explained that using samples from positive donors instead of contrived venous whole blood samples did not seem scientifically necessary and explained that the necessary liability insurance to utilize positive donors could not be procured.  With respect to the Microbial Interference Testing, I explained that FDA had requested this testing prior to the availability of the serology EUA template (a template that

---

[1] Hatsuki, R. et al. (2015), Nonlinear electrical impedance spectroscopy of viruses using very high electric fields created by nanogap electrodes, *Frontiers in Microbiology*; Poenar, D. et al. (2014), Label-free virus identification and characterization using electrochemical impedance spectroscopy, *Electrophoresis*; Poenar, D. et al (2007), Glass-based microfluidic device fabricated by parylene wafer-to-wafer bonding for impedance spectroscopy, *Sensors and Actuators*.

had been issued for blood-based tests), which did not include a requirement for this kind of test.

13. In addition, I attached an updated version of the pre-EUA template to that email which provided further information regarding Pharma Tech's proposal with respect to these studies. The information in this document was drafted based on the communications primarily with Mr. Berman and Mr. Musho  For the Clinical Agreement Study, we proposed to verify in a laboratory setting that the GenViro! test performed as intended in 30 known positive and 30 known negative samples using contrived venous whole blood samples. Our proposal to use venous whole blood in lieu of capillary whole blood was based on adequate comparability of fingerstick to venous whole blood samples as evidenced by publications that were described in that submission. With respect to Microbial Interference Testing, we explained that microbial contamination would not impact the impedance of the viral particle and hence believed that this test should not be required.

14. Beginning in June 2020, there were discussions of a third version of the GenViro! Test, which was intended to test saliva samples rather than blood samples. I had prepared a draft shell for a pre-EUA for this version of the test, which was provided to Mr. Musho on November 11, 2020, so that he would understand the remaining information needed to submit the pre-EUA to FDA. I did not receive the additional required information, so a pre-EUA for the saliva-based test was not submitted to FDA.

15. Although Mr. Berman ultimately did not obtain authorization to commercialize GenViro! from FDA, what I observed during this period was consistent with a good faith effort to apply existing impedance technology to develop a test for COVID-19. The experience

with the GenViro! pre-EUA submissions unfortunately was similar to many other pre-EUAs particularly for COVID-19 test kits. FDA expectations for these test kits were a continuously moving target and were particularly difficult for small companies to meet. I remember a criticism raised during one of the weekly town hall teleconferences hosted by FDA in which industry was concerned that FDA was preferentially favoring large companies in the EUA process. DuVal & Associates is one of the most experienced and successful regulatory law firms in the United States. We have a great track record at navigating products through the EUA process. Despite this experience, we saw many products that were unable to obtain authorization for emergency use. The EUA experience of GenViro! and Keith Berman was not unusual. Many companies encountered similar challenges in identifying the ever-changing FDA testing expectations and the ability to obtain the requested data. From my interactions with Mr. Berman and Mr. Musho, I believe that the information that they provided to me to facilitate preparation of communications with FDA was well-intentioned and truthful. I further believe that Mr. Berman's engagement of DuVal & Associates to assist him through the EUA process supports the level of his commitment to understanding the FDA process requirements so that he could strive to meet them.

*     *     *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Minnesota on 02 Apr 2024.

Lisa L. Pritchard

8