1            UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
2
   * * * * * * * * * * * * * * *   )
3  UNITED STATES OF AMERICA,       )     Criminal Action
                                   )      No. 20-00278
4                 Plaintiff,       )
                                   )
5     vs.                          )
                                   )
6  KEITH BERMAN,                   )     Washington, D.C.
                                   )     April 12, 2024
7                 Defendant.       )     1:10 p.m.
                                   )
8  * * * * * * * * * * * * * * *   )

9

10            TRANSCRIPT OF SENTENCING HEARING
        BEFORE THE HONORABLE TREVOR N. McFADDEN
11              UNITED STATES DISTRICT JUDGE

12

   APPEARANCES:
13

14 FOR THE GOVERNMENT:      CHRISTOPHER R. FENTON, ESQ.
                           MATTHEW REILLY, ESQ.
                           KATHERINE McCARTHY, ESQ.
15                          U.S DEPARTMENT OF JUSTICE
                           Criminal Division, Fraud Section
16                          1400 New York Avenue, Northwest
                           Washington, D.C. 20530
17
   FOR THE DEFENDANT:       KEVIN B. COLLINS, ESQ.
18                          LORI TAUBMAN, ESQ.
                           JOSE R. RAMOS, ESQ.
19                          JOSE F. GIRON, ESQ.
                           BRANDON HOWELL, ESQ.
20                          JONAH T. PANIKAR, ESQ.
                           NICK XENAKIS, ESQ.
21                          COVINGTON & BURLING, LLP
                           850 Tenth Street, Northwest
22                          Washington, D.C. 2001

23                          MICHELLE PETERSON, ESQ.
                           OFFICE OF THE FEDERAL PUBLIC
24                            DEFENDER
                           625 Indiana Avenue, Northwest
25                          Suite 550
                           Washington, D.C. 20004

```
1    FOR U.S. PROBATION:       HANA FIELD

2    REPORTED BY:              LISA EDWARDS, RDR, CRR
                               Official Court Reporter
3                              United States District Court for the
                                 District of Columbia
4                              333 Constitution Avenue, Northwest
                               Room 6706
5                              Washington, D.C. 20001
                               (202) 354-3269

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURTROOM DEPUTY:  Your Honor, this is
 2   Criminal Case 20-278, the United States of America versus
 3   Keith Berman.
 4              From Probation, Officer Hana Field.
 5              Counsel, please come forward to identify
 6   yourselves for the record, starting with the Government.
 7              MR. FENTON:  Good afternoon, your Honor.
 8   Christopher Fenton, Kate McCarthy, and Matthew Reilly for
 9   the United States.
10              THE COURT:  Good afternoon, folks.
11              MR. FENTON:  And we have here with us today at
12   counsel table Grace Souder and Rachel Boyer, our paralegals.
13              THE COURT:  Thanks for being here, ladies.
14              MR. FENTON:  Thank you.
15              MR. COLLINS:  Good afternoon, your Honor.  Kevin
16   Collins from Covington & Burling with the rest of our
17   baseball team, Jonah Panikar from Covington & Burling, José
18   Giron, José Ramos, Lori Taubman, Brandon Howell, and Nick
19   Xenakis sitting next to Mr. Berman.
20              THE COURT:  Good afternoon, folks.
21              This has got to be the best-lawyered case I've had
22   in a while.
23              MR. COLLINS:  Thank you, your Honor.
24              THE COURT:  We're here for the sentencing of the
25   Defendant, Keith Berman, who's pled guilty to Counts 1
```

 1    through 3 of the superseding indictment.  Those counts are

 2    securities fraud, wire fraud and obstruction of an agency

 3    proceeding.

 4          I've received and reviewed the presentence

 5    investigation report and sentencing recommendation from the

 6    probation office as well as sentencing memoranda from the

 7    Government and the defense.

 8          I've also reviewed the sentencing exhibits filed

 9    by each party and the record developed at last month's

10    evidentiary hearing.  And of course, among the exhibits I

11    received from the Defendant were various letters submitted

12    on his behalf.

13          Are there any other documents or materials that I

14    should have reviewed?  Mr. Fenton?

15          MR. FENTON:  No, your Honor.

16          THE COURT:  And Mr. Collins?

17          MR. XENAKIS:  No, your Honor.

18          THE COURT:  Mr. Berman, this sentencing hearing

19    will proceed in four steps, some of which may seem a bit

20    mechanical to you.  But I want you to keep in mind why we're

21    here today and the gravity of the situation:  You've

22    committed a federal crime.  Today's proceeding is a serious

23    matter, as it is about the consequences that you will face

24    because of your decision to engage in criminal behavior in

25    violation of federal law.

1          Sir, the first step of today's hearing is for me

2     to determine whether you've reviewed the presentence

3     investigation report and whether there are any outstanding

4     objections to it and, if so, to resolve those objections.

5          The second step is to calculate your recommended

6     sentence under the sentencing guidelines.

7          The third step is to hear from the Government,

8     from your attorney and you if you wish to be heard about

9     sentencing in this case.

10          And the final step requires the Court to fashion a

11     just and fair sentence in light of all the factors Congress

12     set forth in 18 USC 3553(a).  As part of this last step, the

13     Court will actually impose the sentence along with the other

14     required consequences of the offense.

15          So turning to that first step, the final

16     presentence investigation report was filed on April 4th.

17     The probation office filed its final sentencing

18     recommendation on the same day.  Memoranda in aid of

19     sentencing were due on April 5th.  The Government filed its

20     memorandum on April 5th and Mr. Berman filed his on April

21     6th.

22          Does the Government have any objection to any of

23     the factual determinations set forth in the presentence

24     report?  Mr. Fenton?

25          MR. FENTON:  No, your Honor.

```
1              THE COURT:  And I know that the defense has
2      various -- well, Mr. Collins, are you speaking this
3      afternoon?
4              MR. COLLINS:  Your Honor, it will be a combination
5      of Mr. Panikar and Mr. Xenakis.  And I'll do bat cleanup.
6              THE COURT:  So, Mr. Panikar, then, I guess, have
7      you and Mr. Berman read and discussed the presentence
8      report?
9              MR. XENAKIS:  I'll be answering procedural
10     questions, your Honor.
11             Yes, your Honor, we have.
12             THE COURT:  And I know you have some disagreements
13     with the guideline calculation, and there are probably
14     factual disputes relating to them.  But other than those, is
15     there any factual dispute that we should be discussing
16     today?
17             MR. XENAKIS:  No, your Honor.
18             THE COURT:  And, Mr. Berman, are you fully
19     satisfied with your attorneys in this case?
20             THE DEFENDANT:  Yes, your Honor.
21             THE COURT:  Do you feel you've had enough time to
22     talk with them about the probation office's presentence
23     investigation report and the papers the Government filed in
24     connection with sentencing?
25             THE DEFENDANT:  Yes, your Honor.
```

1          THE COURT:  The Court will accept the facts as

2     stated in the presentence investigation report.  The

3     presentence investigation report will serve as my findings

4     of fact for purposes of this sentencing.

5          The presentence investigation report lays out the

6     probation office's calculation of the advisory guideline

7     range that applies in this case.  I'll attempt to summarize

8     it as follows:

9          The guidelines manual provides the base offense

10    level for each of Mr. Berman's convictions.  For Counts 1

11    and 2, the base offense level is 7.  For Count 3 -- that's

12    the obstruction count -- the base offense level is 14.  The

13    probation office has grouped all three counts together for

14    guidelines calculation purposes.

15         Counts 1 and 2 are grouped under 3D1.2(d) because

16    the offense was a continuous offense and the offense level

17    is determined primarily by a measure of aggregate harm.

18         Count 3 is grouped with the others under Guideline

19    2J1.2, Comment 3, and Guideline 3C1.1, Comment 8, because

20    Mr. Berman has been convicted of both an obstruction offense

21    and an underlying offense.

22         In sum, then, all three counts are grouped for

23    guideline purposes, and the lead count for determining the

24    total offense level is Count 1.

25         According to the probation office, the offenses

1    carry with them four enhancements:  First, Mr. Berman's

2    fraud caused a total loss of between $25 million and $65

3    million.  As a result, a 22-level enhancement applies under

4    2B1.1(b)(1)(L).

5           Second, Mr. Berman's fraud caused substantial

6    financial hardship to at least five individual victims.

7    Thus, a four-level enhancement applies under 2B1.1(b)(2)(B).

8           Third, Mr. Berman's fraud involved sophisticated

9    means and he intentionally engaged in or caused the conduct

10   constituting sophisticated means by using aliases to

11   encourage his victims to invest in the company.  So a

12   two-level enhancement applies under 2B1.1(b)(10)(C).

13          And fourth, Mr. Berman willfully obstructed or

14   impeded the administration of justice or attempted to do so

15   with respect to the investigation, prosecution or sentencing

16   of his offense of conviction.  This brings another two-level

17   enhancement under 3C1.1.

18          Probation has also recommended that Mr. Berman's

19   total offense level be reduced by two levels for having

20   clearly demonstrated acceptance of responsibility for the

21   offense.

22          All told, that leaves us with a total offense

23   level of 35.

24          He has no criminal history, placing him in

25   Criminal History Category I.

1            So with a total offense level of 35 and a criminal

2     history category of I, the guidelines range applicable to

3     Mr. Berman is 168 to 210 months.  The guidelines fine range

4     is $40,000 to $5 million.  And the guidelines term of

5     supervised release is one to three years.

6            I know both parties have some objections.  I have

7     heard from the parties on the loss amount and reviewed your

8     briefing.  I'm not interested in hearing additional argument

9     on that.

10           But does the Government wish to be heard on any of

11    the additional issues raised by the parties in the briefing?

12           MR. FENTON:  Yes, your Honor.

13           THE COURT:  All right.

14           MR. FENTON:  The Government's only disagreement

15    with the PSR is the PSR's decision to grant a two-point

16    reduction for acceptance of responsibility.

17           The Government believes that it's clear from the

18    letter that Mr. Berman submitted to Probation as well as the

19    manner in which he has litigated the loss issue at the

20    evidentiary hearing and also his sentencing memorandum as

21    well that Mr. Berman has not fully accepted responsibility

22    to the level that would meet the standard for him getting

23    the two-point reduction.

24           In particular, the Government is concerned about

25    the fact that Mr. Berman seems to frame himself as the real

1    victim of this prosecution.  And while, yes, he has accepted

2    responsibility in sufficient terms for the purpose of

3    supporting the plea, he has not fully accepted

4    responsibility for all of the relevant conduct that goes

5    along with that.

6         One example that particularly troubles the

7    Government is the fact that Mr. Berman seems to argue that

8    the victims are essentially to blame for their own loss,

9    that they acted irrationally and that they should have not

10    believed his lies.

11         That was a theme that was consistently made

12    throughout the evidentiary hearing and also a theme that

13    carries in his briefs.

14         The second thing that troubles the Government

15    about Mr. Berman's approach is the fact that he continues to

16    argue that he acted in good faith when he was attempting to

17    develop the COVID-19 test.

18         And what the Government submitted along with its

19    sentencing memorandum were two really key pieces of

20    evidence:  emails from March 20, 2020, and March 21st, 2020,

21    which was about a month into the fraud, that demonstrated

22    that even at that time in private conversations Mr. Berman

23    clearly, clearly understood that what he had and what he was

24    working on, the design itself, was something that could not

25    detect COVID.  It was a COVID test that could not actually

1   detect COVID.  That is not a COVID test at all.

2          And his friend who he -- with whom he was

3   corresponding said that is a general virus screen device and

4   that is something that nobody would be interested in.

5          Mr. Berman knew at that time, because he admitted

6   it privately, that he did not have a COVID test.  And that

7   is very clear evidence that refutes this notion that he was

8   in fact working in good faith at that time to develop

9   something that could be workable.

10          The final thing I just want to point out for your

11   Honor is that Mr. Berman seems to argue here that he in fact

12   is the real victim of the prosecution in that the fact that

13   he was charged and the manner in which he was arrested is

14   responsible for where he is with his family.

15          And in his sentencing submission, he makes it

16   clear that he blames the fact that the Government came and

17   arrested him without knocking for traumatizing his partner

18   and essentially causing her to leave him.  And also, that

19   this case being -- is the reason why he no longer has a

20   relationship with his son, which understandably it's clear

21   that he loves his son.  There's no doubt about that.

22          But blaming the Government and arguing that the

23   Government did this to him and that he is the victim, it's

24   consistent with the conduct throughout the relevant time

25   period where Mr. Berman was constantly talking about the

1    fact that he was unfairly being targeted by the FDA, the

2    SEC, the Department of Justice and all the various victim

3    investors who had questions and concerns about whether or

4    not what Mr. Berman was saying was accurate.

5            So for all of those reasons, the Government

6    believes that Mr. Berman should not get the two-point

7    reduction for acceptance of responsibility.

8            THE COURT:  I'm not going to do a back-and-forth

9    here.  So if you want to respond to any of the defense

10   arguments on the sophisticated means, now is your chance to

11   do that.

12           MR. FENTON:  Yes, your Honor.

13           I believe that -- the Government believes that

14   sophisticated means is really clear here.  The aliases that

15   were used were not simply aliases, not simply slapping a

16   name tag on or introducing yourself as somebody other than

17   who you are.

18           There are a number of steps that were required on

19   Mr. Berman's part to conceal his identity; and the

20   concealment of his identity was really crucial to the

21   success of his crime.

22           He needed to pose as another individual to

23   convince them as a third party that they together should go

24   and help Mr. Berman to stop the SEC investigation, to

25   vindicate Mr. Berman's name.

1          So when you look at the actual steps that were

2     taken to create that alias, it's really a persona.

3          And one of the things that's significant about

4     this is that he's using email addresses, using a profile

5     that is associated with an internet stock message board and

6     he's cultivating this persona over a long period of time

7     both in terms of the communications publicly and also the

8     communications that he's having privately with the specific

9     victims who he ultimately tricks into helping him.

10         And for all of those reasons, the Government

11    believes that there is definitely a preponderance of

12    evidence that supports that the steps that Mr. Berman took

13    were indeed sophisticated with respect to that aspect of the

14    crime.

15         THE COURT:  On the significant financial hardship

16    point, remind me:  How many victim impact statements have

17    you submitted?

18         MR. FENTON:  I don't recall the exact number.  I

19    think it was approximately around ten who we identify in our

20    sentence submission, seven individuals who we think clearly

21    qualify as individuals who were substantially harmed.

22         THE COURT:  Okay.  So this is -- even if I

23    disagreed on -- you're not arguing that each of these shows

24    a significant financial harm, but that at least five of them

25    do?

```
 1              MR. FENTON:  At least five.  That's correct.
 2              In any event, even if the number of individuals --
 3     even if the number of victims who were substantially
 4     financially harmed fell below five, there's still the
 5     two-point enhancement that would apply here, because there
 6     is at least one victim who would have been substantially
 7     financially harmed and there are certainly ten or more
 8     victims as well.
 9              So while it would have an impact on the guidelines
10     calculation, that impact would not be significant.
11              The other point that I would make is if your Honor
12     were to find that Mr. Berman had substantially financially
13     harmed at least one individual, one victim, that means that
14     he would not be -- not qualify for the zero-point offender
15     two-point reduction.
16              THE COURT:  So this ends up being kind of a
17     question of two levels in your mind; is that right?
18     Assuming that I agree that there's at least one person who
19     was substantially harmed.
20              MR. FENTON:  Yes.
21              THE COURT:  It's a matter of two levels?
22              MR. FENTON:  Yes.
23              THE COURT:  Okay.  Thank you, Mr. Fenton.
24              Mr. Panikar?
25              MR. PANIKAR:  Yes.  Good afternoon.
```

1          I think I'll just focus on the acceptance of

2     responsibility, sophisticated means and substantial

3     financial hardship.

4          We'll start with acceptance.  Quite frankly, we

5     were a little puzzled with the Government's position on

6     acceptance.

7          If you look at the statement of facts that were

8     submitted as part of the guilty plea, Mr. Berman made it

9     pretty clear what he was admitting to.  He admitted to

10    essentially making misleading statements about the progress

11    and status of DECN's COVID-19 blood test, the press

12    releases -- in press releases to attract a larger corporate

13    partner.

14         He also admitted to using an alias to influence an

15    investor to draft the shareholder letter.

16         The points the Government was making about not

17    fully accepting responsibility on the point about the

18    victims acting irrationally, that was not the intent of the

19    defense to present that at the evidentiary hearing.  It was

20    a matter of reliance.

21         As we've argued and I'm sure as your Honor has

22    seen in the briefing, we have argued extensively about

23    reliance as a critical aspect of this case; and what

24    investors actually relied upon when they decided to invest

25    in the company matters.

1          And that's what Mr. Reilly was testifying to

2     during the hearing and that's what our argument was.  We

3     were not trying to belittle individuals who had invested in

4     the company.  So that's not at all what the intent was.

5          With respect to Mr. Berman being a victim of the

6     government with regards to the arrest, we're not trying to

7     make him out to be a victim in that respect.  It was simply

8     to explain to the Court what this process has done to him

9     for the nature and circumstances, for his history and

10    characteristics.  It's really for the 3553 factors.  It's

11    not meant to cast himself as the sole victim of all of this.

12    So that wasn't our intent either.

13         And then with respect to the actual statements

14    that were made in the letter, really it feels like the

15    Government is engaging in word games or semantics here.

16    When you actually look at the entirety of the statement,

17    it's pretty clear what Mr. Berman is admitting to.  And he's

18    admitting to the crime, again, to issuing false and

19    misleading press releases about the progress and status of

20    the blood test, using an alias, influencing an investor to

21    write a shareholder letter, accusing the SEC of misconduct.

22    It's pretty clear that Mr. Berman has accepted

23    responsibility.

24         THE COURT:  It seems like there is kind of a

25    disagreement, though, about whether he was even trying to

1    put together a blood test.  Why doesn't that create a

2    problem for you?

3            MR. PANIKAR:  So the issue there, it seems to be

4    that the Government has a position about what this case is

5    and what the facts are.

6            What we've shown in our sentencing memorandum and

7    with the evidence is that there was in fact a good-faith

8    effort.

9            The issue that Mr. Berman ran into is that he

10   misstated where he was in the development of this.  That's

11   still illegal.  That is still misconduct.  And he admitted

12   to that, accepted responsibility for doing that.

13           But he's allowed to clarify and present that

14   evidence, particularly for the 3553 factors.

15           And it's important context when comparing him to

16   other defendants when determining the severity of this

17   offense.

18           But the fact of the matter remains that -- and we

19   disagree with the Government's assertion on sort of what two

20   individual emails might have said when you look at the

21   broader context of all the emails sent and then also the

22   affidavit of Dr. Williams, the affidavit of Lisa Pritchard,

23   making it clear what efforts were actually going into this.

24           But the actual misconduct of releasing press

25   releases that misstated where they were, that's what

1    Mr. Berman admitted to.  And that's really what the illegal

2    conduct is.

3            Setting aside acceptance of responsibility, with

4    respect to sophisticated means, I think it's important to

5    remember that the guidelines are clear that it has to be

6    especially complex or especially intricate offense conduct.

7    And they even provide examples of what that means.

8            Setting up an account on the internet and using an

9    alias is not especially complex or especially intricate.

10   Even the case that the Government cites, *United States*

11   *versus Milligan*, it involved more than just creating an

12   email account and sending communications.  That individual

13   also set up a mailbox for a fake company so that they could

14   engage in embezzlement of funds.

15           There's no allegation against Mr. Berman about

16   that.  The only allegation is that he created this persona

17   on internet message boards and sent messages.  That's not

18   particularly sophisticated conduct.  Anyone can really do

19   that.  That's really what the point is for that enhancement.

20   It's not just a concealment enhancement; it has to be

21   complex or intricate conduct to do it.

22           And with respect to substantial financial

23   hardship, I think it's important to note that the Government

24   hasn't even specified which of those folks in the PSR

25   suffered substantial financial hardship.  And really,

1     there's an issue of reliance here.  As we noted in our

2     brief, the Government has not actually been able to present

3     evidence that these folks relied on the blood test press

4     releases and suffered harm as a result.

5              In fact, as we noted, there were folks in there

6     that invested based on a saliva test, which the Government

7     has made clear is not fraudulent conduct in this case.  And

8     so to ascribe those individuals and not really verify any of

9     these allegations, the Government is asking this Court to

10    apply a four-level enhancement on just sort of its word

11    without actually presenting evidence to justify the

12    application of that enhancement.

13             THE COURT:  Well, it's not just its word.  I mean,

14    you do have these ten victim impact statements.  Right?

15             MR. PANIKAR:  Well, the problem with at least a

16    good number of these impact statements is they don't

17    actually specify when they invested.  They're vague or in

18    fact just don't say it at all.  And some of the ones that we

19    do, as we indicated in our brief, indicate that they

20    invested in later 2020 or invested based on the saliva test.

21             And so you have -- when you have that problem,

22    where there is clearly an issue with verification and when

23    some of these investments were made, you do have to dig in a

24    little bit more to confirm it.

25             And the Government just hasn't done its job there

1      on that.  I think that's the real core issue.

2              THE COURT:  They would have been investing in the

3      same stock either way.  But you're saying that the victims

4      should have specified specifically when and why they did

5      invest.  Is that right?

6              MR. PANIKAR:  Essentially, yes.  Just even

7      providing that basic information, even just sort of when,

8      you could at least infer for at least some of these folks

9      what might have impacted their decisionmaking.  But for a

10     good number of them, even in the PSR, it doesn't indicate

11     when they actually invested in the company.

12              And as we noted, again, some of them were far

13     later in time.  And essentially the Government is asking the

14     Court to apply a four-level enhancement based off of that.

15              And that's a real problem here, especially

16     because, as the Government noted, that has an impact on the

17     zero-point offender calculation because if substantial

18     financial hardship applies, Mr. Berman doesn't get the

19     two-level credit for zero point offender.

20              That's essentially our argument on this.  I figure

21     you don't want under the circumstances to go through the

22     3553s just yet.

23              THE COURT:  No.  You'll get another opportunity.

24              MR. PANIKAR:  I figured.

25              So yeah.  That's -- I think that's it for us on

1    those issues.

2              THE COURT:  Okay.  And by the way, I meant to

3    thank you all for coming an hour earlier than we expected.

4    I've got a preliminary injunction and a TRO to handle later

5    today.  So thanks for your accommodating me.

6              I'll rule on the various objections now to

7    Probation's proposed guideline calculation.

8              First, the Government argues that Mr. Berman

9    should not receive a two-level reduction for acceptance of

10   responsibility because he has minimized his role and told

11   more lies since his plea.  I'm looking to the Government's

12   memorandum at Page 15.

13             Likewise, he presented an expert, quote, "who

14   repeatedly blamed the Defendant's victims for their own

15   losses," closed quote, Page 16.

16             I agree with the probation office and defense that

17   Mr. Berman has accepted responsibility for his crimes.  He

18   pleaded guilty to the superseding indictment even without a

19   plea agreement and has truthfully admitted the conduct

20   comprising the offenses of conviction and has not falsely

21   denied any additional relevant conduct.  I'm looking to

22   3E1.1, Application Note 1 A.

23             Mr. Berman has disputed the loss amount in this

24   case.  But I agree with the defense that the loss amount is

25   not an element of the charges of conviction, and so his

1    challenging the Government's calculation does not constitute

2    a false denial of relevant conduct.

3            I think I also need to be a little careful here

4    between attributing kind of legal arguments from his

5    attorneys to his own acceptance of responsibility.  I

6    recognize that at a certain level those arguments from his

7    attorneys are attributable to him, but I also want to be

8    sensitive to the reality that defense attorneys often make

9    arguments out of vigorous representation of their clients

10   that may or may not represent the Defendant's own views

11   about what actually occurred.

12           I likewise agree with the defense about the

13   Government's complaints regarding the statement in support

14   of the guilty plea and Mr. Berman's attempt to present

15   evidence from Dr. Williams.

16           To my mind, neither of these count against the

17   acceptance of responsibility reduction.

18           I think it's fair to say that some of Mr. Berman's

19   statements have minimized his behavior or could have been

20   given more fulsomely.  But I think that is best addressed

21   through an adjustment within the guidelines range rather

22   than a revocation of the credit altogether.

23           I also note he's already lost the third point he

24   normally would be entitled to in plea cases.

25           Nor does the effort to present evidence from

1    Dr. Williams count against the acceptance of responsibility

2    reduction.  First, of course, we do not actually hear

3    evidence from Dr. Williams.  And in any event, the testimony

4    of Dr. Williams was not directly relevant to the issue of

5    whether Mr. Berman has actually engaged in the misconduct

6    alleged.

7          I also think that -- I agree with Mr. Panikar that

8    cites to his family issues and the family reactions to his

9    arrest and incarceration more go to mitigating factors to be

10   considered under 3553 than to claiming that the Defendant is

11   somehow the victim here or has not accepted responsibility.

12         In sum, I agree with the probation office and

13   defense and will apply the acceptance of responsibility

14   guideline for a two-level reduction in Mr. Berman's total

15   offense level.

16         I will next address Mr. Berman's objections

17   regarding the PSR's calculation of the loss amount and its

18   application of the significant financial hardship

19   enhancement.  These enhancements dovetail, so I will deal

20   with them together.

21         Mr. Berman disputes the PSR's calculation of the

22   total loss caused by his fraud.  The PSR puts the total loss

23   amount at $27.8 million.  By contrast, Mr. Berman argues

24   that the actual loss caused by his fraud was zero dollars.

25   I'm looking to the evidentiary hearing briefing at Page 21,

24

1      ECF No. 179.

2              I agree with the probation office and the

3      Government's more conservative estimate and find that the

4      loss amount was approximately $28 million.

5              In short, I find the Government's expert to be the

6      more credible between its and the defense's and I view his

7      testimony as more persuasive and his methodology as more

8      reliable than that put forward by the defense.

9              To recap, the Government offered Professor Joshua

10     Mitts as an expert in financial economics and the defense

11     offered Jim Reilly as an expert in financial services and

12     complex litigation matters.

13             Both were admitted as experts without objection.

14     I'm looking to the hearing transcript, Page 12, Lines 1 to

15     6, and Page 53, Lines 14 to 20.

16             I found Professor Mitts's testimony more credible

17     than Mr. Reilly's.  First, I agree with the Government's

18     proposed start and end dates for the fraud period.

19             The parties agree that the fraud period begins on

20     March 30th, 2020.  And I'm looking to the defense evidence

21     hearing brief, Page 2, and the Government's brief, Page 9.

22             So the question is solely whether the -- when the

23     fraud period ended.

24             The Government argues the fraud period ended on

25     December 18th, 2020, the date on which the indictment in the

1    case was unsealed.  The defense by contrast argues that the

2    fraud period ended on either April 23rd, May 20th or June

3    20th, 2020.  And I'm looking to their hearing brief, Page 2.

4           I agree with the Government.  December 18, 2020,

5    was the date on which the full scope of the Defendant's

6    misconduct became known to the public and it was the first

7    date on which the falsity of his statements was finally

8    revealed.

9           Mr. Berman disagrees and says that the fraud

10   period cannot extend beyond July 20th because that was the

11   date that the last fraudulent press release was issued.

12          Alternatively, he points to April 23rd, when the

13   SEC suspended trading of DECN stocks, or May 20th, when the

14   SEC supplemented its stop trading order.

15          None of these options is persuasive.  First, the

16   July 10th date cannot be correct because the question for

17   our purposes is that when the falsity of Mr. Berman's

18   statement became known, not when he stopped making false

19   statements.  So the July 10 date is unresponsive to the

20   factual issue here.

21          As for the two SEC notice dates, I think that this

22   is the unusual case where the SEC's public announcements did

23   not fully disclose the fraudulent statements to the public.

24          First, these notices were mere allegations and

25   they were not as comprehensive as the later filed

1    indictment.  But more importantly, Mr. Berman's own conduct

2    undercut the value that these announcements might otherwise

3    have had.

4          To be sure, I think in the normal case, an SEC

5    notice like this probably would largely expose and

6    ameliorate the fraud.  But here, a core component of

7    Mr. Berman's criminal scheme was using aliases to persuade

8    prospective investors to ignore the SEC, doubt its

9    credibility and keep investing in DECN.  I'm looking to the

10   statement of offense, Pages 3 and 4.

11         Indeed, he went to extraordinary lengths to sow

12   confusion in the investing public, undermine the efficacy of

13   the SEC notices and make the public believe that the DECN

14   was about to come out with a truly remarkable COVID testing

15   product.

16         Having successfully induced investors to ignore

17   the stop trading notice and keep buying, Mr. Berman cannot

18   now turn around and say that they should have ignored him

19   and listened to the SEC instead.

20         I'm looking to *Story Parchment Company versus*

21   *Paterson Parchment Paper*, 282 U.S. 555, Page 565, from 1931.

22         So to whatever extent investors continued to buy

23   stocks after the SEC suspended trading, that choice was

24   driven in large part by Mr. Berman's own conduct, sowing

25   distrust in the SEC's decision and attempting to persuade

1    investors to keep buying.  That is a sufficient causal

2    connection to find the investors' post-suspension losses

3    remained attributable to Mr. Berman's misconduct.

4            I therefore agree with the Government that the

5    fraud period ends in December 2020.

6            Having determined that the relevant period was

7    March 3rd through December 18th, 2020, I also agree with

8    Professor Mitts's calculation of the loss amount.

9            Professor Mitts reliably applied the methodology

10   outlined in Sentencing Guideline 2B1.1's application note to

11   derive a loss amount from that fraud period.

12           He also clearly explained how he statistically

13   determined that the changes in DECN's stock price were not

14   the result of industry-specific fluctuations in the market

15   or other financial trends.  I'm looking to Pages 27 to 29 of

16   that hearing transcript.

17           I also credit Professor Mitts's testimony because

18   of his openness about the potential limitations of his

19   methodology and his explanation of why specific concerns

20   brought up by the Court or by the parties may or may not

21   impact the loss calculation.  I'm looking to Pages 17 and 18

22   of that transcript.

23           Ultimately, his methodology and inputs were both

24   consistent with accepted standard practices such as those

25   endorsed by the sentencing guidelines and also had intuitive

1    appeal.

2            By contrast, I found the Defendant's expert less

3    credible.  As I said before, I disagree with his choice of

4    end date for the fraud period, which fails to fully account

5    for Mr. Berman's involvement in inducing the public to

6    continue buying his stocks.

7            But I also think Mr. Reilly's indecision about the

8    end date counts against his credibility.  He repeatedly

9    appeared confused or self-contradictory on this point.  At

10   times he said the fraud period ended in April, but at other

11   times he said he thought the true end date was in July.  I'm

12   looking to Pages 75 to 80 and also Page 86 of that

13   transcript.

14           These inconsistent statements, presented without

15   explanation on the central issue in dispute, cut against his

16   credibility.

17           More, Mr. Reilly's explanation at times simply

18   boiled down to "Investors and speculators are irrational."

19   I'm looking to Page 78, Lines 22 to 24, of the hearing

20   transcript.

21           I do not find this to be a credible answer to the

22   Government's evidence of loss.  Likewise, Mr. Reilly's claim

23   that the Defendant's fraud resulted in a gain as opposed to

24   a loss was not credible.  I'm looking to Page 80.

25           I suppose this is theoretically possible, but it

1    seems unlikely in general and highly unlikely in this

2    specific case.

3              In addition to this credibility assessment, I also

4    put weight on the ability of the experts' theories to

5    explain the objective evidence.  As I look at the stock

6    prices, there's kind of a bell curve both before and after

7    the fraud period.  The stock price hovered around two cents

8    per share.  But during the fraud period, it rose

9    considerably.  I'm looking to the hearing transcript, Page

10   47.

11             This bell curve makes sense on the Government's

12   theory.  The fair market value of the stock was around two

13   cents a share.  Mr. Berman's statements caused it to trade

14   significantly above that true fair market value.  And when

15   the fraud was finally disclosed, the price returned to that

16   true fair market value of two cents per share.  In that

17   respect, the Government's theory explains the observational

18   data, and this data also provides further support for the

19   Government's choice of December 18th as the end date for the

20   fraud.

21             By contrast, the defense theory fails to explain

22   any of this.  If the stock purchases were untethered to

23   Mr. Berman's fraudulent statements, then the stock price

24   should not have moved in this way.  And if the true extent

25   of the fraud were revealed by the SEC's April and May

1    disclosures, then the price of the stock should have

2    returned to the fair market value at this time.  It did not.

3            So the fact that the Government's theory easily

4    explains the observational evidence while the defense theory

5    does not is another point in the Government's favor.

6            Mr. Berman has other arguments, too.  He also says

7    that the loss amount calculation is faulty because the

8    Government does not point to any specific investor who

9    relied on his false statement.  I'm looking to Page 10 of

10   his memorandum.

11           This argument runs headlong into long-settled law

12   on causation.  Circumstantial evidence is perhaps the most

13   common form of evidence used to prove causation, and that

14   evidence is not somehow deficient simply because it is not

15   direct.  Indeed, courts often resort to circumstantial

16   evidence of loss amount in this exact context.

17           I'm looking to *United States versus Berger*, 587

18   F.3d 1038, Page 1044, from the Ninth Circuit in 2009.

19           So this argument fails.

20           And the Government's evidence of temporal

21   proximity is further support for its claim that the

22   investors relied on Mr. Berman's false statements.  There

23   were significant spikes in stock prices, which reflect

24   heightened demand for stock by purchasers shortly following

25   Mr. Berman's false statements.

1          This tight temporal proximity is further

2     circumstantial evidence that Mr. Berman's statements caused

3     investors to buy DECN stocks.  I'm looking to *Clark County*

4     *School District versus Breeden*, 532 U.S. 268, Page 273, in

5     2001.  In other words, his statements drove investor demand

6     and thus caused investor losses.

7          This aggregate evidence is also more persuasive

8     than the isolated testimonials Mr. Berman has produced to

9     show investors either did not rely on his statements or

10    profited from the fraud.  I'm looking to Defendant's

11    Exhibits P and Q.

12         Finally, although it is the Government's burden to

13    prove the amount of loss to a preponderance of the evidence,

14    according to *United States versus Watts*, 519 U.S. 138,

15    Page 156, from 1997, I also think common sense supports the

16    Government's position.

17         Mr. Berman argues that despite having engaged in

18    fraud on a large scale, he caused no harm.

19         This rarely passes the smell test.  Although loss

20    is not necessary to prove securities fraud, it is a rare

21    case indeed where a defendant commits fraud on this scale

22    and yet causes no harm to his victims.

23         To recap, I agree with the probation officer and

24    the Government that the value of the loss Mr. Berman caused

25    his investors is the $27.8 million number.  Because that

1    falls within the $25 to $65 million range, I find the

2    22-level enhancement applies.

3            Next, Mr. Berman objects to the probation office's

4    application of the four-level enhancement under Guideline

5    2B1.B(2) because his offense resulted in financial hardship

6    to five or more victims.

7            The application notes for this guideline indicate

8    that the substantial financial hardship may have been

9    caused, for example, when the Defendant's conduct caused his

10   victims to become insolvent or file for bankruptcy, to

11   suffer substantial loss of a retirement, education or other

12   savings or investment fund, to make substantial changes to

13   their employment or living arrangements or to suffer

14   substantial harm to their ability to obtain credit.

15           Looking at the victim impact statements leaves no

16   room for serious argument that the standard is not met.  The

17   victim impact statements list numerous examples, but only

18   five are needed for the four-level enhancement.

19           Victim BNS invested and lost half of his savings

20   from an 18-year military career and can no longer afford the

21   home he had planned to buy when he retires from the

22   military.

23           Victim MCC lost $61,000 of his savings that he

24   invested into DECN.

25           Victim JCD, a retired senior, lost $7,400 of his

1    and his wife's retirement funds on Mr. Berman's schemes.

2              Victim LL lost nearly $90,000 of his retirement

3    savings on this fraud and says that he will not invest in

4    the stock market ever again.

5              Victims HN and VD lost a combined $139,000 that

6    Mr. Berman induced them to invest in his company.

7              The list goes on.

8              Each of these qualifies as a substantial financial

9    hardship, at least as a substantial loss to a savings or

10   investment fund, but also under some other examples as well.

11             In rebuttal, Mr. Berman relies on the same

12   argument he made earlier about the Government's failure to

13   prove the victims invested because of his fraud.  I'm

14   looking to his memorandum, Page 14.

15             But as I said in response to those arguments

16   earlier, I think his insistence on direct evidence of

17   causation misses the mark.  The Government was not required

18   to call Mr. Berman's victims to the stand and have each one

19   march through what he considered before investing in DECN.

20             Mr. Berman cites no case law or regulation to

21   support his claim that it was.

22             Although Mr. Berman attempts to recast some of the

23   victim impact statements as suggesting they invested in his

24   company for reasons other than his fraud, that claim does

25   not hold water.

1          Read in context, the statements like the one from

2   JCD clearly show that Mr. Berman sugar-coated reports about

3   the DECN's vaccine work induced his victims to buy.  And

4   that is no less true simply because he also touted his

5   company's involvement with the XPRIZE competition.

6          I also think this question about the saliva test

7   would have been -- that was part of his overall fraud scheme

8   here to the extent that it is relevant to my loss

9   calculation at this point.  I think there is kind of one

10  fraudulent statement, one fraudulent press release on

11  another, that are all encouraging people to invest in the

12  company.  And just because there might have been statements

13  that do not relate directly to the fraud covered here, I

14  think the end result, though, is that the Defendant was

15  using various schemes to get people to invest in his

16  company.

17         It is certainly because of his fraud that they

18  have lost value that they had put into the company; and I

19  think they are properly attributed as victims for purposes

20  of the guidelines calculation.

21         Last, Mr. Berman points to an isolated testimonial

22  of one of his victims to show that some people made a profit

23  from his fraud.

24         I don't think that's relevant, ultimately.  Even

25  assuming for the sake of argument that some investors made

1    money, this is not what the enhancement speaks about.  The

2    question is whether five or more victims suffered a

3    substantial financial hardship.

4          I find by a preponderance of the evidence that

5    they did.  And the fact that a different investor profited

6    does not diminish their hardship.

7          Mr. Berman also objects to the probation office's

8    application of a two-level enhancement for use of

9    sophisticated means in the commission of the offense.  He

10   argued that using an alias or pseudonym to disguise his

11   identity while he posted on an internet forum to undercut

12   reliance on the SEC's stop trading order does not rise to

13   the level of sophisticated means.

14         Mr. Berman does not clearly explain what he thinks

15   the enhancement covers, and he admits that it reaches

16   conduct less sophisticated than the example supplied by the

17   guidelines.  And I'm looking to Page 16 of his memorandum.

18   But he argues that whatever it reaches, his conduct here was

19   insufficient.

20         I disagree.  The guidelines provide illustrative

21   examples of what is covered by the sophisticated means

22   enhancement.  One involves a telemarketing scheme where a

23   defendant locates different offices in different

24   jurisdictions to complicate enforcement of law against him.

25   And the other involves the use of fictitious entities,

1    corporate shells or offshore financial conditions to hide

2    assets or transactions.

3            And I'm looking to Application Note 9B of

4    Guideline 2(B)1.1.

5            What I think connects these examples is an effort

6    to structure the Defendant's operations in a manner that

7    hides his identity or helps him evade enforcement efforts.

8            Even though Mr. Berman's conduct may not have been

9    especially technologically sophisticated, it was still

10    sophisticated in the sense contemplated by the guidelines.

11            Indeed, the example regarding fictitious entities

12    or corporate shells appears particularly analogous to

13    Mr. Berman's conduct here.  Both involved the creation of

14    fake identities or entities to hide the Defendant's

15    involvement and to deceive counter-parties or the

16    Government.

17            True enough, the examples in the guidelines both

18    involve corporate enterprises or larger schemes; but nothing

19    in the guideline or in the application note so much as hints

20    that the guideline is limited to that context.

21            D.C. Circuit precedent points to the same way.  In

22    *United States versus Milligan*, 77 F.4th 1008 from 2023,

23    quote, "We do not assess the sophistication of a defendant's

24    concealment actions piecemeal," closed quote, Page 1013.

25            Instead, the Court must look at the gestalt of the

1        Defendant's conduct and decide whether, taken together, it

2        qualifies as sophisticated.

3                And to be sophisticated, the means do not need to

4        be technologically complex.  In fact, even mere possession

5        can be sophisticated in the right circumstances.  I'm

6        looking to *United States versus McCants*, 554 F.3d 155,

7        Page 163, from the D.C. Circuit in 2009.

8                In *Milligan*, the circuit upheld the sophisticated

9        means enhancement for conduct very similar to what we have

10       here.  In that case, the defendant set up an email account

11       in someone's name, sent communications from that account

12       that purported to be from the other person, and established

13       a mailbox in the name of another.  I'm looking to *Milligan*,

14       Page 1013.

15               That's very similar to what happened here.

16       Mr. Berman created a fake account, Plutonium Implosion, on

17       the Investors Hangout internet forum and pretended to be a

18       man named Matthew Steinman.  I'm looking to Paragraphs 41

19       and 42 of the superseding indictment.

20               He claimed to be an independent shareholder in

21       DECN, from Paragraph 42, and used this fake identity to post

22       over 1,000 messages designed to induce investors to buy DECN

23       stock, from Paragraphs 43.

24               He as Matthew Steinman pretended to have an

25       independent company that had reviewed and validated DECN's

1    business prospects.  I'm looking to Paragraph 45 of the

2    indictment.

3          He told investors that demand for DECN's test

4    would be close to 3 billion test kits, from the same

5    paragraph.  He dismissed the naysayers as five to six

6    message board posters who did not understand the technology,

7    from that same paragraph.

8          Mr. Berman would later lie to investigators and

9    say that he never participated in the internet forum,

10   looking to Paragraph 47.  He also used his false identity to

11   suggest that those who had reported DECN to the SEC might be

12   sued or prosecuted by the federal government, looking to

13   Paragraph 50.

14         And he used his alias to persuade other investors

15   to write a shareholder letter to the SEC instructing it to,

16   quote, "Eat shit and die," closed quote, and accusing the

17   SEC investigators of, quote, "unethical and inappropriate

18   conduct against DECN," close quote, Paragraphs 53 to 58.

19         Throughout this process, Mr. Berman as Steinman

20   pretended to consult with Mr. Berman, the real Mr. Berman,

21   in order to continue to dupe investors about his identity.

22         This enterprise was involved; it was long in

23   duration; it was complication in planning; and it was

24   sophisticated within the means of the sentencing guidelines.

25         Mr. Berman went to great lengths to obscure his

1    true identity.  He engaged in an extensive campaign to

2    mislead other investors and the public in order to induce

3    investors to go after the SEC.  And he maintained the

4    charade about his true identity, including the question that

5    his true identity was working with his pseudonym, so that

6    his counter-parties would not uncover his plot.

7          In sum, Mr. Berman's actions and impersonation lie

8    in the same zone of sophistication as the conduct deemed to

9    qualify as sophisticated means in *McCants*.  I'm looking to

10   *Milligan*, 77 F.4th, Page 1014.  Under both *McCants* and

11   *Milligan*, Mr. Berman's conduct qualifies for the

12   sophisticated means enhancement.

13         I therefore agree with the probation office and

14   will apply the two-level sophisticated means enhancement.

15         Finally, Mr. Berman argues he should receive the

16   two-level reduction for defendants with zero criminal

17   history points under Guideline 4c1.1.

18         To obtain this reduction, the defendant must not

19   have personally caused substantial financial hardship.  But

20   as the Court already noted in applying the substantial

21   financial hardship enhancement, Mr. Berman did cause such a

22   hardship.  This is clear from both the Government's

23   aggregate evidence and from the victim impact statements.

24         So for the same reasons I reject the argument

25   above and in light of the clear evidence in the sentencing

1    record, I reject that argument here.

2           Mr. Berman caused his victims to suffer

3    substantial hardship, and he is therefore ineligible for the

4    zero-point offender reduction.

5           I will now discuss the applicable penalties, which

6    include imprisonment, probation, fines and restitution.

7           For Counts 1 and 2, the fraud convictions, the

8    maximum prison term the Court may impose is 20 years.  For

9    Count 3, the obstruction conviction, the maximum term is

10   five years.

11          For the fines, the maximum fine is $5 million for

12   Count 1.  For Counts 2 and 3, it's $250,000.

13          There's also a mandatory special assessment of

14   $100 per count.

15          For all three counts, the Court may impose a term

16   of supervised release of not more than three years, and each

17   term of release shall run concurrently.

18          Because the guidelines range is in Zone D of the

19   sentencing table, Mr. Berman is ineligible for probation

20   under the guidelines.

21          According to 18 USC 3663A, restitution is

22   mandatory in this case, and the required restitution is to

23   be equal to the amount of the pecuniary harm.

24          Have I accurately stated the statutory framework

25   under which we are operating in regards to this case?

1    Mr. Fenton?

2              MR. FENTON:  Yes, your Honor.

3              THE COURT:  And Mr. Panikar?

4              MR. PANIKAR:  Yes, your Honor.

5              THE COURT:  Before I discuss the other sentencing

6    factors that will bear on the Court's final decision, I will

7    at this point share with the parties the particular sentence

8    the probation office has recommended, taking into account

9    the advisory guidelines sentence, the available sentences

10   and all of the factors listed in Section 3553(a):  The

11   probation office has recommended a sentence of 120 months on

12   Counts 1 and 2 and 60 months on Count 3, all to run

13   concurrently.

14             Probation also recommends 36 months of supervised

15   release on all counts, also to run concurrently.

16             Probation recommends no fine or probation, but a

17   special assessment of $300 and restitution in the amount to

18   be determined by the Court.

19             The recommendation of the probation office is

20   based solely on the facts and circumstances contained in the

21   presentence investigation report.

22             I must now consider the relevant factors that

23   Congress set forth in 18 USC 3553(a) to ensure the Court

24   imposes a sentence that is sufficient but not greater than

25   necessary to comply with the purposes of sentencing.

1      These purposes include the need for the sentence

2   imposed to reflect the seriousness of the offense, to

3   provide just punishment for the offense and to promote

4   respect for the law.

5      The sentence should also afford adequate

6   deterrence to criminal conduct, protect the public from

7   further crimes of the Defendant and promote rehabilitation.

8      In addition to the guidelines and policy

9   statements, I must consider the nature and circumstances of

10  the offense, the history and characters of the Defendant,

11  the need for the sentence imposed, the guideline ranges, the

12  need to avoid unwarranted sentence disparities among

13  defendants with similar records who have been found guilty

14  of similar conduct and the types of sentences available.

15      Does the Government wish to be heard on the

16  application of the factors set forth in 3553(a), request a

17  variance or otherwise make a sentencing recommendation?

18      MR. FENTON:  Yes, your Honor.

19      THE COURT:  And before you do, Mr. Fenton, first,

20  I want to hear how -- well, why don't we talk about

21  restitution.  How are you proposing we deal with that?

22      MR. FENTON:  With respect to restitution, your

23  Honor, we have an initial calculation that is based on the

24  victim impact statements that have been filed to date.  That

25  amount is $337,317.

1          The Government has provided notice under the

2     applicable statute that it is requesting an additional 60

3     days during which the Government is going to do additional

4     work to try to identify the losses, the specific losses

5     suffered by other victims as well for restitution purposes.

6          THE COURT:  And so what would happen at the end of

7     that?

8          MR. FENTON:  At the end of that, the Government

9     would submit a restitution figure and supporting

10    calculations so that the Court could include that in the

11    judgment, the amended judgment, and order the Defendant to

12    pay that restitution.

13         THE COURT:  And so do we need to do another

14    hearing at that point?

15         MR. FENTON:  I think it really depends on the

16    defense's position.

17         The Government's intention is to submit to the

18    Court, assuming the Court agrees -- submit -- file a

19    submission that contains the list of the names and the list

20    of the individuals who suffered the loss and the specific

21    amount of the losses they suffered for the Court's inclusion

22    in the amended judgment.

23         THE COURT:  You're seeking a sentence of ten

24    years' imprisonment for a 70-year-old man in ill health.

25    Apparently, he doesn't have a lot of assets.  Are we trying

```
 1    to squeeze blood from a stone here?

 2              MR. FENTON:  With respect to restitution --

 3              THE COURT:  Yes.

 4              MR. FENTON:  -- it's the Government's -- it's a

 5    requirement that the Government seek restitution on behalf

 6    of the victims.

 7              THE COURT:  I think I have the authority to say

 8    that -- my recollection is there are kind of off ramps here,

 9    you know, in a situation where this feels unproductive to

10    say either you don't have -- it's not ascertainable or it's

11    unlikely to be recovered.

12              Is that correct?

13              MR. FENTON:  I'm not certain, your Honor.

14              If that is an issue that we could -- if we could

15    potentially brief it, if your Honor would --

16              THE COURT:  I think your colleague wants to talk.

17              MS. McCARTHY:  Your Honor, under the MVRA, the

18    Court can only off-ramp if the Court determines that it's

19    too complicated to determine.

20              It is not the position of the Government at this

21    time that it's too complicated to determine the individual

22    losses.  We are working to identity those shareholders with

23    losses for purposes of the MVRA, Mandatory Victim

24    Restitution Act.

25              The Court is not entitled under the MVRA to take
```

```
1    into account the Defendant's ability to pay.  We are happy

2    to put in briefing on that issue if your Honor would like

3    it.

4                THE COURT:  I'm not sure that briefing is

5    necessary.  I guess I am wondering if this is much ado about

6    nothing at the end of the day.

7                MS. McCARTHY:  Your Honor, whether or not the

8    Defendant can pay is obviously very much in question at this

9    point.  But as Mr. Fenton rightly stated, it is the

10   Government's statutory obligation to ask the Court for that

11   restitution.

12               THE COURT:  Thank you, Ms. McCarthy and

13   Mr. Fenton.

14               Who from the defense is --

15               MR. PANIKAR:  I am.

16               THE COURT:  How do you think we should be

17   addressing this?

18               MR. PANIKAR:  Your Honor, we would just object,

19   given the points that you had made.

20               Mr. Berman is now 70 years old, in ill health.

21   The PSR makes clear he doesn't have any assets.  This would

22   just prolong the process.  So we would object with

23   continuing on.

24               THE COURT:  I think the Government is right that

25   there's -- victims -- there's kind of a statutory framework
```

1    here.

2              If I agree with the Government that they need to

3    go through this notification process, do you think we need

4    to come back for a hearing in 60 days?

5              MR. PANIKAR:  The Court's indulgence.

6              (Confers with co-counsel privately.)

7              THE COURT:  Ms. Peterson, have you seen this done

8    before?

9              MS. PETERSON:  I have not seen it done in this

10   kind of a situation before.  I've seen it done in child

11   pornography cases.  They frequently need to identify

12   victims, and it takes a little bit longer.

13             This case has been dragging on for as long as it

14   has, so it strikes me as odd that the Government can't

15   identify the victims this many years after the fact.

16             I don't think -- I think if Mr. Berman wishes to

17   waive his presence at that hearing, he can do so.  And

18   that's why we're consulting with him right now.  But he has

19   a right to be there if he doesn't wish to --

20             THE COURT:  Do we need to have a hearing,

21   actually, though?  I'm wondering, especially if I agree that

22   it's at least $300,000, I mean, if I say it's $600,000,

23   is --

24             MS. PETERSON:  It's not going to make any

25   practical difference except for the fact that while he's

1    incarcerated the BOP has a process by which they extract

2    money from people who are in custody.  And I don't know if

3    it matters if -- I don't believe it's any kind of percentage

4    of the amount that's been ordered.  But -- because we don't

5    know what the Government's going to come up with, if they're

6    going to come up with $10 more than what they're suggesting

7    now or if they're going to come up with twice as much.  I

8    think they have to prove restitution.  They can't just say

9    it.

10            So I think there would have to be a hearing if

11   Mr. Berman wants a hearing.  I don't think it's something

12   the Court can just do without giving him an opportunity to

13   respond to the request.

14            THE COURT:  I think he could respond in writing.

15   You think I need to have a hearing?

16            MS. PETERSON:  Again, I think we need to consult

17   with Mr. Berman to see if he wishes -- if he wishes to be

18   present, it would have to be a hearing at least by Zoom with

19   him in custody somewhere else.  It's going to be a

20   substantial hardship for him to have to remain at the jail

21   when he could potentially be in a medical facility.  So I

22   want to have an opportunity to make sure that that's what he

23   wants.

24            THE COURT:  Yes.  But it sounds like you think

25   there needs to be a hearing one way or the other?

```
 1              MS. PETERSON:  Unless once the Government presents
 2    what it's presenting, if we don't have any objection to it,
 3    then there wouldn't have to be.  It depends on what they're
 4    coming up with.  Frequently, restitution is not an issue.
 5    The parties agree to what that restitution ought to be.
 6              THE COURT:  Does the defense disagree that there's
 7    at least $300,000 in restitution?
 8              MS. PETERSON:  I think that the Court can find
 9    that under the victim impact statements.  Yes.  That's all
10    we have at this point.
11              THE COURT:  I'm just -- as I say, it feels like
12    once we're there, I don't really understand why we're
13    waiting 60 days.  But I'm not really sure why it makes much
14    difference to your client either.
15              MS. PETERSON:  From my perspective, the biggest
16    difference it makes is how it affects Mr. Berman's custodial
17    status.
18              THE COURT:  Yes.
19              Mr. Xenakis, do you have a view there?
20              MR. XENAKIS:  I apologize, your Honor.  Just a few
21    more minutes.
22              THE COURT:  Well, I don't think we have to -- I
23    think the Government is right that they have a right to do
24    60 or 90 days or something.  As I say, this feels a little
25    bit like an exercise in futility.  But much that we do under
```

1    the law may be that.

2              So I think we need to do that.  You all can see

3    what the Government is asking for.  Obviously, you certainly

4    have the right to respond to that query whether a hearing is

5    really necessary.  But I think if Mr. Berman is demanding

6    one, I'd be inclined to offer it.

7              So back to the allocution.

8              Mr. Fenton, I want to kind of give you my view of

9    this case, because I think -- I'm not sure that you agree.

10   And it's probably where you can be most helpful to me.

11             I'm inclined to think that Mr. Berman had a

12   legitimate business that did these testing kits and he at

13   some point had hoped to create a COVID test kit, that it

14   very quickly became apparent that he wasn't going to be able

15   to on the timeline and with the money that he had, and that

16   he falsely claimed that he had one, very much to enrich

17   himself, among other things.

18             I guess I think what I'm hearing from you is

19   something more akin to there was never any interest or

20   intent to put together a COVID test kit.  If that's your

21   perspective, I want to hear why you think that.

22             You can remind me of those two emails.  I mean, it

23   does occur to me that sometimes emails can be sent in a

24   moment of poor judgment.  That may not say everything.  And

25   the defense has pointed to various things, including course

1    of practice and letters from the former president of the bio

2    and all that seem to undercut your view.

3            So as I say, this is how I'm inclined to see it.

4    Tell me where I'm wrong and show that to me if you disagree.

5            MR. FENTON:  Absolutely, your Honor.

6            The Government does disagree, respectfully.

7            And the reason why is because the Defendant didn't

8    seem to care at any point whether or not it was possible to

9    actually develop this test.

10           And it's clear that he hatches this scheme in

11   February.  And he hatches it as a result of where he is in

12   life and where his business is at that point financially as

13   a result of everything that's happened up to that point.

14           And he just sees an opportunity in crisis.  He

15   sees an opportunity to put out a new story to raise money.

16   And you can see he starts putting out the press releases;

17   and they say that he's already invented it, it's already

18   developed, it's coming out.

19           And we get a month into this fraud and he is

20   having a private conversation.  And these emails are really

21   critical.  This is a private conversation with an individual

22   he clearly considers to be a friend who is a former director

23   who sat on the board of Decision Diagnostics, the company at

24   issue.  The first email is sent on March 20, 2020, and it is

25   ECF 177-18.

1          And during that private conversation, he is very

2     clear about the fact that there's this idea.  But even if

3     the idea were to work, that that idea would at most identify

4     a virus but not be able to distinguish between different

5     types of viruses.  And that's critical here, because during

6     the COVID-19 pandemic it was absolutely crucial that folks

7     be able to determine whether or not they in fact had

8     COVID-19.  That's the whole purpose of a COVID test, not a

9     general virus-screening device, but a COVID-19 test.  That's

10    what would allow the country to return to normalcy.

11          The next day, Mr. Berman had another private

12    exchange with the same individual, March 21st, 2020, and

13    that is ECF 177-19.

14          And Mr. Berman repeats the exact same thing.  He

15    again talks about the fact that the design, the idea in

16    fact, cannot distinguish between different types of viruses.

17          So this is not something that is written in the

18    heat of the moment and just dashed off and sent.  It's also

19    not a mistake.  It's something that is, in fact, his view.

20          That view is confirmed by everything that happens

21    from that point forward, which includes Mr. Berman's efforts

22    with Daniel Kim to actually develop this test.  And Mr. Kim

23    repeatedly says, We cannot figure this out.  We cannot do

24    this.

25          And what's really critical here is there are

```
1   communications between Mr. Kim and between the Defendant

2   where they're talking about the fact that this cannot be

3   done.  And Mr. Berman is saying, All we need to do -- we

4   don't need a product that actually can be commercialized.

5   We just need something that we can submit to the FDA and get

6   their approval.  Then we can raise money.

7              And what's really critical --

8              THE COURT:  Sorry.  But he is working on

9   something.  Right?  I guess maybe that's where I'm having

10  difficulty with your view, that he is going back to Bio; and

11  I mean, this is not just kind of a figment of his

12  imagination kind of sitting here about doing something that

13  he would never be able to do.  Right?

14             MR. FENTON:  Well, at this point in time, the only

15  thing that the Defendant believes that he actually has, the

16  design that he has, is a test that does not detect COVID.

17  It's just a test that at most, if it were to be successful,

18  would detect a virus.

19             THE COURT:  So he doesn't even have that?

20             MR. FENTON:  Right.

21             THE COURT:  But he wants -- he thinks he can

22  develop a test that would identify a virus?

23             MR. FENTON:  I don't believe that there is

24  evidence that supports that.

25             I think that what he was trying to do, it seems
```

1    pretty clear from the documents we've seen, is submit

2    something to the FDA that would be passable so he can get

3    some sort of emergency-use authorization to just put

4    something out.

5           And that's what's really critical here, is this is

6    just a distraction.  The FDA -- this is February, March,

7    April, May, June 2020.  This is the key time that the FDA is

8    working overtime to try to save people's lives.

9           And the Defendant is out there with this design

10   that he knows damned well will not detect COVID and he is

11   wasting the FDA's time.  Having these conversations,

12   threatening to write to them "Eat shit and die" letters and

13   all these other things that are going to distract and waste

14   their time.

15          What we're talking about here is people's lives.

16          And that's why the Government believes that this

17   crime is so callous.  There is just a total indifference to

18   the reality of the crisis, the national emergency facing the

19   country, and just a total, total inward focus on the

20   Defendant, the fact that he needs to raise money and just on

21   his pure greed.

22          THE COURT:  How do you account for the letter from

23   the former head of Bio or these FDA consultants?  I mean,

24   there's certainly -- why bother spending the money on these

25   efforts if this is only just all a sham?

1          MR. FENTON:  Well, I think paying these

2     individuals lends -- just their mere involvement lends

3     legitimacy to the effort.  And this is something that is

4     often the case in fraudulent schemes.

5          You get folks involved.  You pay a large law firm

6     or you pay a consultant or you pay an accounting firm to

7     come in; and the mere presence of that reputable individual

8     or that reputable firm or business in the equation makes

9     investors believe that it is a legitimate operation.

10          And here, they are actually trying to submit

11     something to the FDA, because there is a belief that they

12     can -- on the part of Mr. Berman that he can possibly get

13     by.  He can submit something that's passable just to get

14     permission and then he can take that and go raise money.  He

15     just needs the authorization to go out and raise money from

16     investors.

17          So that's one thing.

18          The other thing is, with respect to these letters,

19     when I read these letters, the thought that I had was, every

20     single one of these individuals is somebody who Mr. Berman

21     previously paid money to, and some of them are individuals

22     to whom he still owes money.

23          And what you don't see are individuals who are

24     just family members, like a partner or a son.  And you also

25     just don't see friends.

1          Each and every one of these individuals is someone

2     the Defendant paid money to and the Defendant may still owe

3     money to.

4          And I obviously cannot speak to Mr. Kim's motive.

5     But I'm sure that Mr. Kim hopes that one day he might get

6     paid.

7          And I think that that's a relevant consideration

8     for the Court.

9          THE COURT:  I hear you.  I guess maybe somehow I'm

10    less cynical than you and saw Mr. Kim's letter and thought,

11    Gee, this is someone who lost his business, I think, because

12    of the Defendant's misconduct and is still saying he thought

13    that the Defendant was trying to do something helpful.

14         MR. FENTON:  Well, I guess my last response, your

15    Honor, would be that I don't believe that Mr. Kim ever saw

16    the private conversation that the Defendant had with his

17    friend and former director, where he said that he in fact

18    did not believe that it was -- the design that he had was

19    something that could actually detect COVID.

20         And maybe had Mr. Kim seen that email, that would

21    be something that would have been relevant to him.  But it

22    was a private communication that showed the Defendant's

23    state of mind and it was not something that was shared more

24    broadly.

25         Your Honor, the last point I would make on this is

1    the Defendant's extraordinary efforts to conceal the fraud

2    is something that is also evidence of his bad intent and

3    also just evidence just generally of the Defendant's

4    characteristics and the Defendant's -- and the nature of the

5    offense.

6            So that's something that the Court should also

7    take into consideration.

8            THE COURT:  Anything further from the Government?

9            MR. FENTON:  I would like to speak to some of the

10   other 3553 factors briefly.

11           Before I do that, I noticed that when you were

12   going through the calculation guidelines, your Honor did not

13   mention obstruction.  And I assume that was because there

14   was no objection by the defense.  But I want to make sure

15   that --

16           THE COURT:  Yes.  I was only dealing with the

17   objections.  I certainly agree that -- I mean, that was in

18   there.  Correct?

19           MR. FENTON:  Right.

20           THE COURT:  Yes.

21           MR. FENTON:  So this case has been going on for

22   several years.  There are a lot of facts.

23           The Government's going to focus just on the truly

24   remarkable aspects of this case.  I think the first here is

25   just the callousness of the crime, the fact that the

1   Defendant acted with total indifference for people who were

2   scared for their lives.  Remember again, this is

3   February-March 2020, the height of the pandemic, and

4   Mr. Berman saw fear and desperation as an opportunity to

5   steal money.  And in fact he did that.

6        It is cold.  The motive was purely greed.  And it

7   was purely to satisfy his personal needs and benefits.

8        The other thing that's remarkable about this crime

9   is how calculated it is and the extraordinary steps that the

10  Defendant took.

11       This was a saga.  It began with the initial stage

12  of the fraud where the Defendant was sending out these press

13  releases in order to raise money.  It then goes on to the

14  stage where the Defendant is actively engaging at multiple

15  levels in different avenues of obstruction to stop the SEC

16  investigation, to bring it to a halt so that he can resume

17  his fundraising efforts and continue to attract new

18  investors.

19       He then goes on to lie to federal agents and try

20  to lie to the SEC during depositions.

21       And then once he is indicted, there is a whole new

22  stage of this crime that continues.  We see an effort to

23  obstruct the Department of Justice investigation.  We see

24  witness tampering.  This goes on for years:  2020, 2021,

25  2022.  It was very calculated, relentless plotting and

1   scheming to try to avoid responsibility and shut down all

2   efforts by the Government to investigate this crime.

3           The other thing that's really important here is

4   that -- this is --

5           THE COURT:  Remind me of the investigator's name,

6   the SEC investigator.

7           MR. FENTON:  Carl Perkins.

8           THE COURT:  Carl Perkins.

9           MR. FENTON:  And I'm going to come to Mr. Perkins

10  in a moment.

11          The other thing that's important here is that this

12  is not just a financial crime; this is also just extremely

13  personal for the victims.  And the victims here were

14  victimized over and over again by the Defendant.  We see

15  threats and intimidation on the stock message boards, and

16  the language that the Defendant uses is frightening

17  language.  He's talking about law enforcement, federal law

18  enforcement agents, showing up on what he called knock-knock

19  day and arresting individuals who speak to the SEC, who will

20  give information to the SEC.

21          That is a frightening prospect, and it is sheer

22  intimidation to try to shut down any effort to look into his

23  fraud.

24          He tricked victims.  And this is really terrible.

25  He tricks victims into working for him for free, to write

1    letters to the SEC that would stop the investigation that

2    would essentially be for the victims' benefit.

3          And there are these extensive conversations that

4    go on, where these folks are tricked into believing that

5    they are talking to somebody other than the Defendant and

6    they are agreeing to go out there and save the Defendant's

7    reputation and try to help him.

8          The Defendant also revictimizes the victims by

9    manipulating them to become his tools in furtherance of the

10   fraud.

11         And we saw in connection with the bond revocation

12   motion just relentless harassment of these individuals,

13   trying to get them to defend Mr. Berman's reputation, defend

14   the company, deny and refute allegations of the fraud and

15   also put out aspects -- put out more lies, more lies about

16   tests and more lies about what the company was doing.  He's

17   manipulating these victims to again act in a way that is

18   against their self-interest.

19         And so he's witness-tampering and he's also

20   turning the victims against the various agencies that are

21   trying to help them:  the FDA, the SEC, the Department of

22   Justice.  There's the exchange where he talks about -- he

23   talks about the U.S. postal inspection service agent --

24   inspector who was out there, the mail lady.  You know,

25   "You're done with the mail lady.  You don't need to talk to

1   her anymore."

2           And also, even this nonprofit XPRIZE, which was

3   just a nonprofit entity that was trying to bring together

4   brilliant minds in the scientific field to try to solve the

5   problem that was facing the world, which was the need for a

6   COVID test.

7           And the Defendant is actively turning the victims

8   against all of these agencies and organizations that are

9   trying to help them.

10          The other thing that is really important is that

11  the Defendant tried to ruin people's lives.  I mean, he

12  actively tried to ruin people's lives for doing their jobs.

13  And this is where I said I was going to come back to

14  Mr. Perkins.

15          The Defendant launched a campaign to destroy

16  Mr. Perkins's life:  with insults; with personal attacks; he

17  called him incompetent; he suggested he was clueless; and

18  then he accused him of serious, serious crimes.  He accused

19  him of the crime of perjury, of falsifying evidence in

20  connection with an SEC investigation.  And he accused him of

21  conspiracy to commit cybercrimes.

22          The goal was to get him fired, clearly.  But the

23  goal was also to destroy his reputation so this man could

24  effectively never work again and, if Mr. Berman were

25  successful, he would go to jail.  And again, the reason this

1    is happening to Mr. Perkins is because Mr. Perkins was

2    trying to do his job and uncover the fraud that Mr. Berman

3    was perpetuating on his victims.

4            This was not a heat-of-the-moment thing.  You see

5    it in the message posts.  We see it in the shareholder

6    letters.  You see it in the numerous briefs that the

7    Defendant briefs in affidavits that the Defendant submitted

8    to the SEC.  This is something that was said dozens and

9    dozens and dozens of times, all to investigate the

10   investigators and attack these individuals and make it very

11   personal.

12           Just one final point, and that is with respect to

13   deterrence.  This is clearly a case where specific

14   deterrence is necessary.  And the reason why is because

15   nothing, nothing stopped the Defendant in this case from

16   committing crimes until his bond was revoked and he was in

17   custody.

18           And your Honor may remember that after the

19   indictment, there were discussions with the Defendant about

20   his conditions and warning him.  He knew that he was being

21   watched, and he still proceeded to engage in

22   witness-tampering.  He engaged in obstruction.  And then he

23   launched a brand-new fraud where he defrauded six new

24   victims out of hundreds and hundreds of thousands of

25   dollars.  And on the eve of when his bond was revoked, the

1    Defendant was trying to defraud a seventh victim of

2    $6 million.

3            And that's really important.  The fact that the

4    Defendant is awaiting trial after being indicted and is

5    still out there committing crime after crime after crime and

6    different types of crimes, some fraud crimes, other

7    obstruction crimes, is all relevant to the fact that nothing

8    deterred him, which is why it is critical that he get a

9    sentence that will prevent him from committing crimes again.

10           And finally, general deterrence.  It is absolutely

11   critical that the Court send a message to criminals who prey

12   on people during times of crisis or national emergency that

13   if they do -- if they go down this road, that they will be

14   met with serious, serious consequences.

15           Thank you, your Honor.

16           THE COURT:  Thank you, sir.

17           Does the defense wish to be heard on the

18   application of the factors set forth in 3553(a), request a

19   variance or otherwise make a sentence recommendation?

20           MR. PANIKAR:  Yes, your Honor.

21           THE COURT:  Mr. Panikar.

22           MR. PANIKAR:  So I think it's important to start

23   right off the bat with the nature and circumstances and

24   history and characteristics.

25           Your Honor pointed out we agree with -- that the

1    evidence really does reflect, especially from the Daniel Kim

2    letter, is that there was a genuine effort to develop a

3    blood test.  And as I said before, the issue Mr. Berman ran

4    into is that he overstated where he was.  But there was a

5    genuine effort to develop a test.  They even worked on

6    testing for the blood test.  That was an actual thing that

7    Mr. Berman was trying to do.

8            And the reason is because, as we noted in our

9    brief, Mr. Berman for decades of his career was a legitimate

10   businessman.  No criminal record.  Never had an issue with

11   the law.

12           The letters of support make that clear, that he

13   was for decades a kind, caring, insightful, innovative,

14   businessperson.

15           And in the spring of 2020, they were trying to

16   develop a COVID-19 blood test.

17           It didn't work, so they switched to saliva.

18           And I think it's important to note -- as you

19   pointed out, if this was all one big hoax, there was no

20   effort to develop a test, then Mr. Berman wouldn't have gone

21   through all the effort he did to have FDA counsel help him

22   get fast approval to work with the Bio and with Dr. Matthew

23   Mousho to develop a test and then switch to saliva when they

24   realized that blood might not work.

25           They even developed, as Dr. Williams noted, an

1    electrode for the test, one of the key components.  And in

2    fact, there are multiple components of their sample test --

3    and the Government has it; we gave it to them -- there were

4    multiple components that were workable, that they had put in

5    actual genuine effort into developing.  And these were based

6    on white papers that Mr. Berman was looking at.  And as

7    Dr. Williams noted, the decisions made sense.

8            And it also wasn't crazy for Mr. Berman to believe

9    that this could work, given what the research was at the

10   time and what we've learned in the intervening years.

11           THE COURT:  So what do you say to those emails,

12   though, from March that suggest he was just trying to, you

13   know, get the blessing from the FDA and knew that it wasn't

14   even really going to be efficacious?

15           MR. PANIKAR:  I think as you noted, there are

16   emails between Mr. Berman and Daniel Kim; and their

17   relationship is one where it's a lot of Mr. Berman trying to

18   get Mr. Kim up to speed and developing this product.  There

19   were disagreements.  This is just product development.

20           And actually getting Mr. Kim on board and

21   developing the product, as he indicated, he genuinely

22   believed that Mr. Berman thought he was going to develop

23   this test, and Mr. Berman did as well.

24           THE COURT:  And are both of those emails to

25   Mr. Kim?

1          MR. PANIKAR:  The emails with respect to -- I

2     think, as the Government was mentioning, creating a test

3     that could detect a virus in general.  Is that what you're

4     referring to?

5          THE COURT:  The March 20th and 21st emails.

6          MR. PANIKAR:  I think the conversation is with

7     Daniel Kim.  I'd have to look at them again, but I believe

8     the conversation is with Daniel Kim.  It could have been

9     with someone else.

10          THE COURT:  The prosecutors think you're mistaken.

11          MR. PANIKAR:  And it could have been with someone

12     else at the Bio at the time.  I believe that the exhibit is

13     redacted.

14          But the fact of the matter is is Daniel Kim and

15     Mr. Berman even after that were still working on developing

16     this test and switched to saliva.  If this was all one big

17     hoax, they wouldn't have switched to saliva in the first

18     place.  Mr. Berman would have wrote the press releases and

19     done nothing else.

20          THE COURT:  Well, I have a feeling Mr. Fenton

21     would say that he realized he wasn't getting the FDA

22     approval -- wasn't tricking the FDA through -- or wasn't

23     going to be able to trick them through a blood test and so

24     he decided to try another way.

25          MR. PANIKAR:  Well, he still does testing and he

1  still developed this sample that we gave to the Government;

2  and as we saw with the electrode, you compare it to the dime

3  in the exhibit that Dr. Williams had in his affidavit.  And

4  those are all things that Mr. Berman did in fact develop.

5       So "This is just to get FDA approval and do

6  nothing else," that's inconsistent with that because he did

7  actually have a product package and a package insert.  He

8  had a device.  Ultimately, they weren't able to develop a

9  working device, but he was developing one and they actually

10  did have fruits of their labor.

11       And that's really the problem that I think the

12  Government seems to be ignoring here, is those were all

13  efforts by Mr. Berman to develop this product.

14       And the evidence is more consistent with what we

15  have said.  He got ahead of himself, ahead of his skis.  He

16  was not where he should have been, and he released those

17  press releases that misstated where the company was.  And

18  that's fundamentally what the problem was with respect to

19  the press releases.

20       I also think it's important to note that, again,

21  Mr. Berman doesn't have a criminal record.  He had no prior

22  criminal issues in the past.  And he was a legitimate

23  businessman.  He worked on developing a glucose test.  Even

24  for those, he had FDA lawyers.  He worked with Dr. Mousho.

25  He worked with the Bio.  And he had an accurate, affordable,

1   reliable glucose test because that was his business for

2   quite a while before he got into the COVID test, thinking

3   that he could use electrochemical impedance spectroscopy and

4   to get this to work.

5          And with respect to the point that the Government

6   made about the letters not having anyone who's a friend, we

7   disagree.  That's just frankly wrong.  Sanjay Patel is a

8   friend of Mr. Berman's and he wrote one of the letters on

9   his behalf.

10          And we also noted in our brief the reason

11   Mr. Berman's family didn't write letters is, as we noted,

12   the arrest was a traumatic thing for their family.  And

13   that's a consequence that Mr. Berman now has to deal with as

14   a result of having a federal conviction.

15          But that fact shouldn't be used against him,

16   particularly when even, as the Government admits, Mr. Berman

17   was a loving father to his son for decades.  He supported

18   him, taking him on school field trips, the high school

19   baseball team -- he was his coach -- helping him through

20   medical school.  And now his son is a successful radiologist

21   in California and a prolific researcher as well.

22          So that is the full picture that is Mr. Berman.

23   It's not just a sliver.  This Court is going to sentence

24   Mr. Berman.  It has to look at the entire person.  I think

25   when you take a step back and you do, it's not really as

1    clear as the Government tries to make it out to be that

2    Mr. Berman is worthy of a sentence of ten years.

3              And now with respect to deterrence, I think it's

4    also important to note that this is a crime that Mr. Berman

5    realistically can never possibly commit again.  He's a

6    federal felon.  He has a conviction for securities fraud,

7    wire fraud and obstruction of justice.  He's barred from the

8    securities industry.  He cannot participate in that.

9              He'll have extreme difficulty getting a job.  His

10   reputation is destroyed.

11             He has no money, as we saw in the PSR.  So it's

12   unlikely he'll be able to run a public company and generate

13   money for his firm or secure loan agreements like with

14   respect to the bond revocation in particular.

15             THE COURT:  I'm not sure that Mr. Fenton is

16   suggesting something quite that specific.  I think he's

17   concerned about fraud in general, which is actually pretty

18   easy to reoffend on.

19             MR. PANIKAR:  Well, I think the issue is, here,

20   Mr. Berman, as we said, had never had a criminal conviction

21   before.  And then he got his bond revoked and he's been in

22   jail.  And he's been in jail now for 13 months.  He's been

23   in jail for over a year at this point.

24             And as the PSR notes, he's not had any

25   disciplinary problems while incarcerated.  He hasn't had any

1    issues.  There's been no indication.  So I think you can see

2    from that that there has been some change as a result of

3    that time in jail.

4              And also, there's the decades of conduct prior,

5    where there was no fraudulent behavior.  And so really you

6    just have this small portion of his life.

7              And with his advanced age and his medical

8    issues -- and, your Honor, just for the sake -- since we had

9    filed it under seal, I can go into the medical issues

10   specifically.  But I think it's fine just to refer to them

11   as the medical issues --

12             THE COURT:  Yes.

13             MR. PANIKAR:  -- that were in our brief.

14             With those medical issues, it's unlikely he's

15   going to be able to commit this crime or commit crimes like

16   this again in the future.

17             And with respect to the statements that were made

18   to the SEC that the Government was focusing on, it's

19   important to note a couple of things about that.

20             THE COURT:  Sorry.  Back to the emails.

21             MR. PANIKAR:  Yes.

22             THE COURT:  One is from Robert -- "Jingonich"?

23             MR. PANIKAR:  Jagonich.

24             THE COURT:  Who's that?

25             MR. PANIKAR:  That's an individual that Mr. Berman

```
1    had consulted with as part of his business to develop

2    products.  He's someone who Mr. Berman has known for, I

3    believe, technically decades at this point.

4            THE COURT:  So I mean, that feels -- why doesn't

5    that support Mr. Fenton's position that in his honest

6    moments with someone who's not involved he's saying, We know

7    this isn't going to work, but we're just trying to make

8    money?

9            MR. PANIKAR:  I think the idea is, this is

10   something that they are trying to develop and they're trying

11   to get a working product out.

12           And Mr. Berman just wrote that in an email.  It's

13   not indicative of everything else they did subsequent to

14   that in trying to develop a COVID test.  It was the one

15   conversation that's largely inconsistent with his conduct

16   after that.  I think that's the point.

17           And it's in product development.  They're floating

18   a wide variety of ideas of how you can get a product out,

19   what you can do, maybe we can do this if this doesn't work.

20   That's really -- especially from the Daniel Kim letter, that

21   you can see really what this process is like.  It's never as

22   clean as you have an idea and you're going to do it.

23           You have an idea.  You have to bounce it off some

24   folks.  You have to develop it.  There's some challenges

25   that you're going to run into.
```

1          And so I think this is really just a reflection of

2     one email at a particular point in time.  But then

3     subsequent conduct made very clear that they were trying to

4     develop a COVID test.  They were unsuccessful, but they were

5     actually trying to do it, as evidenced by the sample, as

6     evidenced by the electrode and from what Dr. Williams had

7     put in his affidavit of a genuine effort to develop a test,

8     and what Lisa Pritchard wrote as well, a genuine effort to

9     develop a COVID-19 blood test.

10          And with respect to the obstruction offense, I

11    think it's important to note that this case does not involve

12    any physical attacks of harm or any stalking of any law

13    enforcement officer.

14          What Mr. Berman did was wrong.  But in the context

15    of this, Mr. Berman is not the first defendant to be upset

16    with being investigated by the SEC or by the Government.

17    These are criticisms.  Criticism is a part of litigation

18    with the SEC.

19          And for some of the filings in particular that the

20    Government is noting, he was filing them with an attorney.

21    He had a respected attorney who was filing these things on

22    his behalf.  The briefs were filed with the attorney.  He

23    wasn't *pro se* firing from the hip.  This was someone he was

24    working with, who was an attorney filing things to the SEC

25    as part of that litigation.

1          And so that's just context that I think is

2    important for the Court when considering that offense in

3    particular and the overall sentence that Mr. Berman should

4    get.

5          With respect to just punishment and seriousness of

6    the offense, it's also, like I said, important to remember

7    that Mr. Berman has now been in jail for 13 months.  He has

8    lost his family, lost his reputation.  His life is frankly

9    never going to be the same as a result of just this

10   conviction.  So a lengthy federal sentence here,

11   particularly again given his age and his medical issues,

12   isn't really going to achieve a lot of the goals of

13   sentencing.

14         And that's why the guidelines range in particular,

15   168 to 210, and even with just a recommendation of 120

16   months of imprisonment, it's not really reflective of the

17   seriousness of the offense and the comparison to other

18   defendants.

19         As we noted in our brief, a significant portion of

20   Mr. Berman's offense level comes solely from the loss

21   enhancement, the loss enhancement that's been criticized by

22   courts for being at least fairly arbitrary and not

23   necessarily reflecting all of the complex realities of a

24   financial crime.

25         In this instance, it quadruples Mr. Berman's base

1    offense level and it occupies 60 percent of his total

2    offense level.  So it's a significant portion.  And as the

3    Second Circuit noted, even when the loss enhancement just

4    triples a defendant's base offense level, that's worthy in

5    and of itself of considering a departure downward or a

6    variance downward.  We think this is precisely that type of

7    case.

8         As we also noted in our brief, there are plenty of

9    courts that do vary downward fairly considerably after

10   considering that entire picture and the Defendant's whole

11   profile.  As we noted in *United States versus Taylor*, the

12   Defendant had a guidelines range of 262 to 327 months, and

13   the Defendant got 12 months.

14        And in *United States versus Shore*, it was 168 to

15   210 months, was the guideline range.  Similar to here.  The

16   defendant got 40 months.

17        And as we noted in our brief, roughly 60 percent

18   of defendants who are 2B1.1 defendants like Mr. Berman at

19   35/I receive a below-guidelines sentence.  The vast majority

20   of them do.  And as we noted with the cases, a lot of them

21   receive significantly lower sentences.

22        And so should this Court decide to impose a

23   sentence of imprisonment, we don't think that a lengthy one

24   like the Government is suggesting is appropriate here.  We

25   think one much, much shorter is more appropriate,

1    particularly also because, frankly, it's not the highest and

2    best use of the Government's resources to house Mr. Berman

3    given his age and medical issues that are going to require

4    constant care, funding, and it's something that really he

5    should handle on his own outside of jail.

6          But should the Court decide to ultimately sentence

7    Mr. Berman to a term of imprisonment, we would recommend

8    that it be at a federal medical center and that a

9    recommendation be set that he be sent to a federal medical

10   center so that he can receive the care that he needs for all

11   the issues that we noted in our brief.

12          THE COURT:  Thank you, sir.

13          MR. PANIKAR:  I'm sorry.  Did you ask a question?

14          THE COURT:  No.  I thanked you.

15          MR. PANIKAR:  That's everything that we have on

16   that point.

17          THE COURT:  I appreciate it, Mr. Panikar.

18          Mr. Berman, you have the opportunity to make a

19   statement or to present any information to mitigate the

20   sentence.

21          Is there anything you would like to say to me

22   before I impose sentence?

23          THE DEFENDANT:  Your Honor, I'd like to speak to

24   counsel for a minute or two, if that's okay.

25          THE COURT:  Sure.  Yes.

1          THE DEFENDANT:  (Confers with counsel privately.)

2          THE COURT:  Are we ready?

3          MR. XENAKIS:  Your Honor, after consultation with

4    Mr. Berman, Mr. Berman is not going to exercise his right to

5    speak.

6          We would note for the Court in making that

7    decision, there's obviously several outstanding legal issues

8    in this case and that Mr. Berman --

9          THE COURT:  Say that again.

10          MR. XENAKIS:  There are several outstanding legal

11    issues in this case and that Mr. Berman has pled guilty and

12    accepted responsibility.

13          THE COURT:  Okay.  That's fine.

14          I've assessed the particular facts of this case in

15    light of the relevant 3553(a) factors.

16          MR. FENTON:  Your Honor, I'm sorry to interrupt.

17    Just briefly, because there's individuals in the courtroom,

18    we just want to make sure that there are no victims here who

19    should be heard.  I think the Government -- we do not

20    believe that there are, but we just want to make sure.

21          THE COURT:  Are there any victims in this case who

22    believe they should be heard?

23          I think it is my next case that are patiently

24    waiting for me.

25          I now want to provide remarks for the record and

1    for you, Mr. Berman, about my considerations in regard to

2    the nature of the offense and your history and

3    characteristics.

4           I find this to be a truly shocking crime.  Early

5    in COVID, when everyone was living in a state of great fear

6    and uncertainty about COVID, you capitalized on this

7    situation to falsely claim that you'd found a test for

8    COVID.

9           As you fully expected, DECN's stock prices soared

10   as a result.  Indeed, it went up by over 1,500 percent.

11          As shown by the victim impact statements, these

12   weren't just corporate investors or private family offices

13   that invested.  Real middle-class Americans believed you,

14   invested their life savings in DECN and are now living with

15   the consequences.

16          One victim says that he lost about half his

17   savings.  Another described having to curtail travel plans

18   because of the lost money and that he now has to look into a

19   home equity loan.

20          Another couple worries they might not be able to

21   retire at all after investing about $140,000 in your

22   fraudulent scheme.

23          And another who tried to warn others about your

24   scheme ended up moving because of the threats he received

25   and he says he's lost faith in our law enforcement system as

1      a result.

2              These are very real financial, emotional and

3      psychological harms that you caused.

4              More, even once the SEC caught on to your schemes,

5      you doubled down on your scheme, created a *nom de guerre* to

6      undermine their investigation, attacked the integrity and

7      credibility of the SEC staff member involved and anyone else

8      who dared to raise questions about your actions and worked

9      to encourage people to continue to invest in DECN on false

10     pretense.

11             To a large extent, this worked.  I think

12     Mr. Fenton is right that your actions caused the wasting of

13     valuable FDA time at a time when that agency was desperately

14     trying to provide help for people who were sick and scared

15     about the pandemic.

16             I think that he's also right in describing you

17     tricking victims into writing letters to agencies that

18     really were against their own self-interest and that were

19     attempting to stymie the efforts to stop your fraud.

20             And I think your attacks on Investigator Perkins

21     are despicable.  It was only after the DOJ indicted you that

22     your scheme finally unraveled.  But even that didn't really

23     stop you.  I find by a preponderance of the evidence that

24     you tampered with witnesses and obstructed the investigation

25     through your contacts with Victims 1 and 2 specifically and

1   other victims throughout 2021 and 2022 and that you engaged

2   in additional fraudulent conduct through entering into loan

3   agreements you had no intention of repaying, all in

4   violation of your release conditions.

5          This is significant, shocking additional

6   misconduct, the extent of which I rarely see even with

7   hardened criminals.  Even your attorneys admit that it took

8   having your release conditions revoked for you finally to

9   wake up to the severity of your actions.

10          I also have very little evidence of remorse here

11   for me to consider in your benefit.

12          I recognize this is not the whole story.  First, I

13   note you have a spotless criminal record.  This fact is

14   minimized to a certain extent by the length and severity of

15   your misconduct here, but is still an important factor in

16   your favor.

17          I also acknowledge that DECN is a real company and

18   that you've been a productive citizen for many years.

19          I think the letters and other evidence submitted

20   on your behalf that this COVID test idea was not a sham from

21   the beginning is convincing.  I think Mr. Panikar has made

22   good arguments on your behalf on that.  And I think you

23   probably did hope you could produce a real product.  When

24   your initial efforts weren't working, you decided to claim

25   otherwise to raise money while still hoping that you could

1      come up with a useful product.

2              I've considered the emails that Mr. Fenton points

3      me to, and I think he makes a fair point there.  But

4      ultimately, I think the letter from Mr. Kim, Mr. Panikar's

5      arguments about all of the surrounding steps that you took

6      are more persuasive in the end.

7              This in no way negates your misconduct or

8      minimizes your harm to the victims.  But it does put your

9      crime in a different category than someone who never had any

10     intention of creating a product in the first place.

11             Finally, I note and credit the character letters

12     submitted on your behalf, including by one of your victims

13     and people who have suffered, lost jobs and businesses

14     because of your misconduct.  They describe you as a kind

15     person, a hardworking innovator and a good friend.

16             I think it really says something about you that

17     people who have suffered because of your misconduct still

18     say such warm things about you.

19             The parties propose very different sentences here,

20     although both sides agree that a downward variance is

21     appropriate.

22             I want to make clear that I have no disagreement

23     with the general policy approach or the sentencing

24     guidelines as to loss valuation and disagree with your

25     attorneys on that point.

1          At the end of the day, I think there are certain

2     aggravating and mitigating factors in this case that take it

3     out of the mine-run of fraud cases.

4          I also therefore think, while I've carefully

5     considered the unwarranted sentencing disparity arguments

6     made by your attorneys, that they're not all that relevant

7     given the specific and unusual factors in this case.

8          I find the aggravating factors include the fact

9     that you took advantage of the COVID pandemic to defraud

10    people, that you so personally and intentionally attacked

11    investigators trying to stop your fraud scheme and that you

12    continued to violate the law and your release conditions

13    even after your indictment.

14          I also agree with Mr. Fenton that there's a strong

15    need for general deterrence here, recognizing how vulnerable

16    we as a country are to fraud during disaster circumstances

17    and the need to send a clear message that that type of crime

18    will be punished severely.

19          These factors frankly suggest that a sentence near

20    the top of the statutory maximum would be appropriate.

21          On the other hand, there are several significant

22    mitigating factors here, including my belief that you hoped

23    to develop a COVID test, your age and your serious health

24    conditions.

25          But for these factors, I would be sentencing you

1    to a much higher sentence than I intend to impose.  I want

2    to make clear that I am varying down from what I believe to

3    be the properly calculated guideline range but that I would

4    still issue the same sentence even if I'm wrong about the

5    guideline range, including even if your attorneys are

6    correct about the various departures that they argue should

7    apply and the loss calculation in particular.

8            And again, this is all because of the unusual

9    aggravating and mitigating factors that I don't think the

10   guidelines fully capture in this case.

11           In short, I find that no other sentence would be

12   sufficient but not greater than necessary to achieve the

13   purposes of sentencing.

14           Sir, you will be serving several more years in

15   custody.  I think a significant sentence is necessary to

16   recognize the severity of your misconduct and to deter

17   others from engaging in this type of egregious fraud scheme.

18   I know this has been a difficult and dark chapter for you on

19   various levels, sir.  And I don't think this needs to be

20   your last chapter, though.  And I hope when you're released

21   you will work to rebuild your life and also to begin

22   repaying the many people you defrauded.

23           You're clearly an intelligent and capable man, and

24   I hope that you will once more use your talents for the good

25   of others rather than to defraud them.

1        I will now impose the sentence.

2        It is the judgment of the Court that you, Keith

3   Berman, are hereby sentenced to serve a term of 84 months on

4   each of Counts 1 and 2 and 60 months on Count 3.

5        You must also pay a $300 special assessment.

6        You will also serve a three-year term of

7   supervised release on each of your counts.  All terms of

8   incarceration are to run concurrently and all terms of

9   supervised release are to run concurrently.

10        I will delay entering a restitution order pending

11   the request that the Government is currently making.

12        Within 72 hours of release from custody, you shall

13   report in person to the probation office in the district to

14   which you are released.

15        While on supervision, you shall abide by the

16   following mandatory conditions as well as the standard

17   conditions of supervision listed in the most recent revision

18   of AO Form 245B, which are imposed to establish the basic

19   expectations for your conduct while on supervision.

20        The mandatory conditions include:  You must not

21   commit another federal, state or local crime; you must not

22   unlawfully possess a controlled substance; you must refrain

23   from any unlawful use of a controlled substance.  I am

24   however, waiving the drug testing requirement.

25        You must cooperate in the collection of DNA as

1    directed by the probation officer; and you must make

2    restitution in accordance with 18 USC 3663A and 3663 or any

3    other statute authorizing a sentence of restitution.

4         You shall also comply with the following special

5    conditions:  You must provide the probation office access to

6    any requested financial information and authorize the

7    release of any financial information.

8         The probation office may share financial

9    information with the United States Attorney's Office.

10        You must not incur any credit charges or open

11   additional lines of credit without the approval of the

12   probation office.

13        You must submit your computers as defined in 18

14   USC 1030(e)(1) or other electronic communications or data

15   storage devices or media to a search.  You must warn any

16   other people who use these computers or devices capable of

17   accessing the internet that the devices may be subject to

18   searches pursuant to this condition.

19        A probation officer may conduct a search pursuant

20   to this condition only when reasonable suspicion exists that

21   there is a violation of a condition of supervision and that

22   the computer or device contains evidence of this violation.

23   Any search will be conducted in a reasonable time and in a

24   reasonable manner.

25        You must allow the probation office to install

1   computer-monitoring software on any computer you use.  You

2   must ensure -- to ensure compliance with computer

3   monitoring, you must allow the probation office to conduct

4   initial and periodic unannounced searches of any computers

5   subject to the computer monitoring.

6            These searches shall be conducted to determine

7   whether the computer contains any prohibited data prior to

8   installation of the monitoring software, whether the

9   monitoring software is functioning effectively after its

10  installation and whether there have been attempts to

11  circumvent the monitoring software after its installation.

12           You must warn any other people who use these

13  computers that the computers may be subject to searches

14  pursuant to this condition.

15           I want to make clear that I'm entering these

16  computer conditions in light of your extensive fraudulent

17  behavior and including the misconduct that you committed

18  while on supervised release pretrial in this case.

19           The Court finds that you do not have the ability

20  to pay a fine, and therefore waives imposition of a fine in

21  this case.

22           The financial obligations are immediately payable

23  to the Clerk of the Court for the U.S. District Court for

24  the District of Columbia.

25           Within 30 days of any change of address, you shall

1   notify the Clerk of the Court of the change until such time

2   as the financial obligation is paid in full.

3           The probation office shall release the presentence

4   investigation report to all appropriate agencies, which

5   includes the United States Probation Office in the approved

6   district of residence, in order to execute the sentence of

7   the Court.

8           Treatment agencies shall return the presentence

9   investigation report to the probation office upon the

10  Defendant's completion or termination from treatment.

11          I will also recommend that the Defendant be

12  incarcerated in a federal medical facility as requested by

13  the defense.

14          You may appeal your conviction to the U.S. Court

15  of Appeals for the D.C. Circuit if you believe that your

16  guilty plea was somehow unlawful or involuntary or if there

17  is some other fundamental defect in the proceedings that was

18  not waived in your plea agreement.

19          Under some circumstances, a defendant also has the

20  right to appeal the sentence to the D.C. Circuit.  A

21  defendant may waive that right as part of a plea agreement,

22  however, although you have not entered into a plea

23  agreement.

24          Pursuant to 28 USC 2255, you have also the right

25  to challenge the conviction entered or sentence imposed to

 1    the extent permitted by the statute and by any other

 2    appropriate limitation.

 3             Any notice of appeal must be filed within 14 days

 4    of the entry of judgment or within 14 days of the filing of

 5    a notice of appeal by the Government.

 6             If you are unable to afford the cost of an appeal,

 7    you may request permission from the Court to file an appeal

 8    without cost to you.

 9             On appeal, you may also apply for court-appointed

10    counsel.

11             Are there any objections to the sentence imposed

12    that are not already noted on the record?  Mr. Fenton?

13             MR. FENTON:  No, your Honor.

14             THE COURT:  Mr. Xenakis?

15             MR. XENAKIS:  No, your Honor.

16             THE COURT:  Anything further for the Government?

17    I guess I'll direct you to provide your restitution requests

18    within 90 days.  Is that what you're seeking?

19             MR. FENTON:  That's fine.  Yes, your Honor.

20             THE COURT:  Can you do it in 60?

21             MR. FENTON:  Yes.

22             THE COURT:  I'll direct you to do it within 60

23    days.

24             Anything further for defense?

25             MR. XENAKIS:  Nothing further, your Honor.

1          THE COURT:  Thanks, folks.

2          Mr. Berman, I'm remanding you to the custody of

3     the Attorney General.  Good luck to you, sir.

4          I guess I'll ask the Government to, along with

5     your request, file some sort of status report that you've

6     discussed with defense about the best way to proceed on the

7     restitution request.

8          MR. FENTON:  Thank you, your Honor.

9          THE COURT:  Thank you.

10          The parties are dismissed.

11          (Proceedings concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **<u>CERTIFICATE</u>**

2

3                  I, LISA EDWARDS, RDR, CRR, do hereby

4       certify that the foregoing constitutes a true and accurate

5       transcript of my stenographic notes, and is a full, true,

6       and complete transcript of the proceedings produced to the

7       best of my ability.

8

9

10                  Dated this 21st day of May, 2024.

11

12              <u>/s/ Lisa Edwards, RDR, CRR</u>
                Official Court Reporter
13              United States District Court for the
                  District of Columbia
14              333 Constitution Avenue, Northwest
                Washington, D.C. 20001
15              (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## $

**$10** [1] - 47:6
**$100** [1] - 40:14
**$139,000** [1] - 33:5
**$140,000** [1] - 76:21
**$25** [2] - 8:2, 32:1
**$250,000** [1] - 40:12
**$28** [1] - 24:4
**$300** [2] - 41:17, 82:5
**$300,000** [2] - 46:22, 48:7
**$337,317** [1] - 42:25
**$40,000** [1] - 9:4
**$600,000** [1] - 46:22
**$61,000** [1] - 32:23
**$65** [2] - 8:2, 32:1
**$7,400** [1] - 32:25
**$90,000** [1] - 33:2

## /

**/s** [1] - 88:12

## 1

**1** [11] - 3:25, 7:10, 7:15, 7:24, 21:22, 24:14, 40:7, 40:12, 41:12, 77:25, 82:4
**1,000** [1] - 37:22
**1,500** [1] - 76:10
**10** [2] - 25:19, 30:9
**1008** [1] - 36:22
**1013** [2] - 36:24, 37:14
**1014** [1] - 39:10
**1030(e)(1** [1] - 83:14
**1038** [1] - 30:18
**1044** [1] - 30:18
**10th** [1] - 25:16
**12** [3] - 1:6, 24:14, 73:13
**120** [2] - 41:11, 72:15
**13** [2] - 68:22, 72:7
**138** [1] - 31:14
**14** [5] - 7:12, 24:15, 33:14, 86:3, 86:4
**1400** [1] - 1:16
**15** [1] - 21:12
**155** [1] - 37:6
**156** [1] - 31:15
**16** [2] - 21:15, 35:17
**163** [1] - 37:7
**168** [3] - 9:3, 72:15, 73:14
**17** [1] - 27:21

**177-18** [1] - 50:25
**177-19** [1] - 51:13
**179** [1] - 24:1
**18** [7] - 5:12, 25:4, 27:21, 40:21, 41:23, 83:2, 83:13
**18-year** [1] - 32:20
**18th** [3] - 24:25, 27:7, 29:19
**1931** [1] - 26:21
**1997** [1] - 31:15
**1:10** [1] - 1:7

## 2

**2** [9] - 7:11, 7:15, 24:21, 25:3, 40:7, 40:12, 41:12, 77:25, 82:4
**2(B)1.1** [1] - 36:4
**20** [4] - 10:20, 24:15, 40:8, 50:24
**20-00278** [1] - 1:3
**20-278** [1] - 3:2
**20001** [2] - 2:5, 88:14
**20004** [1] - 1:25
**2001** [2] - 1:22, 31:5
**2009** [2] - 30:18, 37:7
**202** [2] - 2:5, 88:15
**2020** [15] - 10:20, 19:20, 24:20, 24:25, 25:3, 25:4, 27:5, 27:7, 50:24, 51:12, 53:7, 57:3, 57:24, 63:15
**2021** [2] - 57:24, 78:1
**2022** [2] - 57:25, 78:1
**2023** [1] - 36:22
**2024** [2] - 1:6, 88:10
**20530** [1] - 1:16
**20th** [6] - 25:2, 25:3, 25:10, 25:13, 65:5, 88:10
**21** [1] - 23:25
**210** [3] - 9:3, 72:15, 73:15
**21st** [3] - 10:20, 51:12, 65:5
**22** [1] - 28:19
**22-level** [2] - 8:3, 32:2
**2255** [1] - 85:24
**23rd** [2] - 25:2, 25:12
**24** [1] - 28:19
**245B** [1] - 82:18
**262** [1] - 73:12
**268** [1] - 31:4
**27** [1] - 27:15
**27.8** [2] - 23:23, 31:25

**273** [1] - 31:4
**28** [1] - 85:24
**282** [1] - 26:21
**29** [1] - 27:15
**2B1.1** [1] - 73:18
**2B1.1's** [1] - 27:10
**2B1.1(b)(1)(L)** [1] - 8:4
**2B1.1(b)(10)(C)** [1] - 8:12
**2B1.1(b)(2)(B)** [1] - 8:7
**2B1.B(2** [1] - 32:5
**2J1.2** [1] - 7:19

## 3

**3** [10] - 4:1, 7:11, 7:18, 7:19, 26:10, 38:4, 40:9, 40:12, 41:12, 82:4
**30** [1] - 84:25
**30th** [1] - 24:20
**327** [1] - 73:12
**333** [2] - 2:4, 88:14
**35** [2] - 8:23, 9:1
**35/l** [1] - 73:19
**354-3269** [2] - 2:5, 88:15
**3553** [4] - 16:10, 17:14, 23:10, 56:10
**3553(a** [5] - 41:10, 41:23, 42:16, 62:18, 75:15
**3553(a)** [1] - 5:12
**3553s** [1] - 20:22
**36** [1] - 41:14
**3663** [1] - 83:2
**3663A** [2] - 40:21, 83:2
**3C1.1** [2] - 7:19, 8:17
**3D1.2(d** [1] - 7:15
**3E1.1** [1] - 21:22
**3rd** [1] - 27:7

## 4

**4** [1] - 26:10
**40** [1] - 73:16
**41** [1] - 37:18
**42** [2] - 37:19, 37:21
**43** [1] - 37:23
**45** [1] - 38:1
**47** [2] - 29:10, 38:10
**4c1.1** [1] - 39:17
**4th** [1] - 5:16

## 5

**5** [2] - 9:4, 40:11
**50** [1] - 38:13
**519** [1] - 31:14
**53** [2] - 24:15, 38:18
**532** [1] - 31:4
**550** [1] - 1:25
**554** [1] - 37:6
**555** [1] - 26:21
**565** [1] - 26:21
**58** [1] - 38:18
**587** [1] - 30:17
**5th** [2] - 5:19, 5:20

## 6

**6** [2] - 24:15, 62:2
**60** [10] - 41:12, 43:2, 46:4, 48:13, 48:24, 73:1, 73:17, 82:4, 86:20, 86:22
**625** [1] - 1:24
**6706** [1] - 2:4
**6th** [1] - 5:21

## 7

**7** [1] - 7:11
**70** [1] - 45:20
**70-year-old** [1] - 43:24
**72** [1] - 82:12
**75** [1] - 28:12
**77** [2] - 36:22, 39:10
**78** [1] - 28:19

## 8

**8** [1] - 7:19
**80** [2] - 28:12, 28:24
**84** [1] - 82:3
**850** [1] - 1:21
**86** [1] - 28:12

## 9

**9** [1] - 24:21
**90** [2] - 48:24, 86:18
**9B** [1] - 36:3

## A

**abide** [1] - 82:15
**ability** [5] - 29:4,

32:14, 45:1, 84:19, 88:7
**able** [10] - 19:2, 49:14, 51:4, 51:7, 52:13, 65:23, 66:8, 68:12, 69:15, 76:20
**absolutely** [3] - 50:5, 51:6, 62:10
**accept** [1] - 7:1
**acceptance** [12] - 8:20, 9:16, 12:7, 15:1, 15:4, 15:6, 18:3, 21:9, 22:5, 22:17, 23:1, 23:13
**accepted** [9] - 9:21, 10:1, 10:3, 16:22, 17:12, 21:17, 23:11, 27:24, 75:12
**accepting** [1] - 15:17
**access** [1] - 83:5
**accessing** [1] - 83:17
**accommodating** [1] - 21:5
**accordance** [1] - 83:2
**according** [3] - 7:25, 31:14, 40:21
**account** [9] - 18:8, 18:12, 28:4, 37:10, 37:11, 37:16, 41:8, 45:1, 53:22
**accounting** [1] - 54:6
**accurate** [3] - 12:4, 66:25, 88:4
**accurately** [1] - 40:24
**accused** [3] - 60:18, 60:20
**accusing** [2] - 16:21, 38:16
**achieve** [2] - 72:12, 81:12
**acknowledge** [1] - 78:17
**Act** [1] - 44:24
**act** [1] - 59:17
**acted** [3] - 10:9, 10:16, 57:1
**acting** [1] - 15:18
**Action** [1] - 1:3
**actions** [5] - 36:24, 39:7, 77:8, 77:12, 78:9
**actively** [3] - 57:14, 60:7, 60:12
**actual** [6] - 13:1, 16:13, 17:24, 23:24, 63:6, 64:5
**addition** [2] - 29:3,

42:8

**additional** [8] - 9:8,
9:11, 21:21, 43:2,
43:3, 78:2, 78:5,
83:11
**address** [2] - 23:16,
84:25
**addressed** [1] -
22:20
**addresses** [1] - 13:4
**addressing** [1] -
45:17
**adequate** [1] - 42:5
**adjustment** [1] -
22:21
**administration** [1] -
8:14
**admit** [1] - 78:7
**admits** [2] - 35:15,
67:16
**admitted** [7] - 11:5,
15:9, 15:14, 17:11,
18:1, 21:19, 24:13
**admitting** [3] - 15:9,
16:17, 16:18
**ado** [1] - 45:5
**advanced** [1] - 69:7
**advantage** [1] - 80:9
**advisory** [2] - 7:6,
41:9
**affects** [1] - 48:16
**affidavit** [4] - 17:22,
66:3, 71:7
**affidavits** [1] - 61:7
**afford** [3] - 32:20,
42:5, 86:6
**affordable** [1] -
66:25
**afternoon** [6] - 3:7,
3:10, 3:15, 3:20, 6:3,
14:25
**age** [4] - 69:7, 72:11,
74:3, 80:23
**agencies** [5] - 59:20,
60:8, 77:17, 85:4,
85:8
**agency** [2] - 4:2,
77:13
**agent** [1] - 59:23
**agents** [2] - 57:19,
58:18
**aggravating** [3] -
80:2, 80:8, 81:9
**aggregate** [3] - 7:17,
31:7, 39:23
**agree** [22] - 14:18,
21:16, 21:24, 22:12,
23:7, 23:12, 24:2,
24:17, 24:19, 25:4,
27:4, 27:7, 31:23,

39:13, 46:2, 46:21,
48:5, 49:9, 56:17,
62:25, 79:20, 80:14
**agreeing** [1] - 59:6
**agreement** [4] -
21:19, 85:18, 85:21,
85:23
**agreements** [2] -
68:13, 78:3
**agrees** [1] - 43:18
**ahead** [2] - 66:15
**aid** [1] - 5:18
**akin** [1] - 49:19
**alias** [6] - 13:2,
15:14, 16:20, 18:9,
35:10, 38:14
**aliases** [4] - 8:10,
12:14, 12:15, 26:7
**allegation** [2] -
18:15, 18:16
**allegations** [3] -
19:9, 25:24, 59:14
**alleged** [1] - 23:6
**allocution** [1] - 49:7
**allow** [3] - 51:10,
83:25, 84:3
**allowed** [1] - 17:13
**alternatively** [1] -
25:12
**altogether** [1] -
22:22
**ameliorate** [1] - 26:6
**amended** [2] - 43:11,
43:22
**America** [1] - 3:2
**AMERICA** [1] - 1:3
**Americans** [1] -
76:13
**amount** [16] - 9:7,
21:23, 21:24, 23:17,
23:23, 24:4, 27:8,
27:11, 30:7, 30:16,
31:13, 40:23, 41:17,
42:25, 43:21, 47:4
**analogous** [1] -
36:12
**announcements** [2]
- 25:22, 26:2
**answer** [1] - 28:21
**answering** [1] - 6:9
**AO** [1] - 82:18
**apologize** [1] - 48:20
**apparent** [1] - 49:14
**appeal** [8] - 28:1,
85:14, 85:20, 86:3,
86:5, 86:6, 86:7, 86:9
**Appeals** [1] - 85:15
**aPPEARANCES** [1] -
1:12
**appeared** [1] - 28:9

**applicable** [3] - 9:2,
40:5, 43:2
**Application** [2] -
21:22, 36:3
**application** [9] -
19:12, 23:18, 27:10,
32:4, 32:7, 35:8,
36:19, 42:16, 62:18
**applied** [1] - 27:9
**applies** [6] - 7:7, 8:3,
8:7, 8:12, 20:18, 32:2
**apply** [7] - 14:5,
19:10, 20:14, 23:13,
39:14, 81:7, 86:9
**applying** [1] - 39:20
**appointed** [1] - 86:9
**appreciate** [1] -
74:17
**approach** [2] - 10:15,
79:23
**appropriate** [6] -
73:24, 73:25, 79:21,
80:20, 85:4, 86:2
**approval** [5] - 52:6,
63:22, 65:22, 66:5,
83:11
**approved** [1] - 85:5
**April** [10] - 1:6, 5:16,
5:19, 5:20, 25:2,
25:12, 28:10, 29:25,
53:7
**arbitrary** [1] - 72:22
**argue** [4] - 10:7,
10:16, 11:11, 81:6
**argued** [3] - 15:21,
15:22, 35:10
**argues** [7] - 21:8,
23:23, 24:24, 25:1,
31:17, 35:18, 39:15
**arguing** [2] - 11:22,
13:23
**argument** [10] - 9:8,
16:2, 20:20, 30:11,
30:19, 32:16, 33:12,
34:25, 39:24, 40:1
**arguments** [9] -
12:10, 22:4, 22:6,
22:9, 30:6, 33:15,
78:22, 79:5, 80:5
**arrangements** [1] -
32:13
**arrest** [3] - 16:6,
23:9, 67:12
**arrested** [2] - 11:13,
11:17
**arresting** [1] - 58:19
**ascertainable** [1] -
44:10
**ascribe** [1] - 19:8
**aside** [1] - 18:3

**aspect** [2] - 13:13,
15:23
**aspects** [2] - 56:24,
59:15
**assertion** [1] - 17:19
**assess** [1] - 36:23
**assessed** [1] - 75:14
**assessment** [4] -
29:3, 40:13, 41:17,
82:5
**assets** [3] - 36:2,
43:25, 45:21
**associated** [1] - 13:5
**assume** [1] - 56:13
**assuming** [3] -
14:18, 34:25, 43:18
**attack** [1] - 61:10
**attacked** [2] - 77:6,
80:10
**attacks** [3] - 60:16,
71:12, 77:20
**attempt** [2] - 7:7,
22:14
**attempted** [1] - 8:14
**attempting** [3] -
10:16, 26:25, 77:19
**attempts** [2] - 33:22,
84:10
**attorney** [5] - 5:8,
71:20, 71:21, 71:22,
71:24
**Attorney** [1] - 87:3
**Attorney's** [1] - 83:9
**attorneys** [8] - 6:19,
22:5, 22:7, 22:8, 78:7,
79:25, 80:6, 81:5
**attract** [2] - 15:12,
57:17
**attributable** [2] -
22:7, 27:3
**attributed** [1] - 34:19
**attributing** [1] - 22:4
**authority** [1] - 44:7
**authorization** [2] -
53:3, 54:15
**authorize** [1] - 83:6
**authorizing** [1] -
83:3
**available** [2] - 41:9,
42:14
**Avenue** [4] - 1:16,
1:24, 2:4, 88:14
**avenues** [1] - 57:15
**avoid** [2] - 42:12,
58:1
**awaiting** [1] - 62:4

# B

**back-and-forth** [1] -
12:8
**bad** [1] - 56:2
**bankruptcy** [1] -
32:10
**barred** [1] - 68:7
**base** [5] - 7:9, 7:11,
7:12, 72:25, 73:4
**baseball** [2] - 3:17,
67:19
**based** [6] - 19:6,
19:20, 20:14, 41:20,
42:23, 64:5
**basic** [2] - 20:7,
82:18
**bat** [2] - 6:5, 62:23
**bear** [1] - 41:6
**became** [3] - 25:6,
25:18, 49:14
**become** [2] - 32:10,
59:9
**BEFORE** [1] - 1:10
**began** [1] - 57:11
**begin** [1] - 81:21
**beginning** [1] - 78:21
**begins** [1] - 24:19
**behalf** [7] - 4:12,
44:5, 67:9, 71:22,
78:20, 78:22, 79:12
**behavior** [4] - 4:24,
22:19, 69:5, 84:17
**belief** [2] - 54:11,
80:22
**believes** [6] - 9:17,
12:6, 12:13, 13:11,
52:15, 53:16
**belittle** [1] - 16:3
**bell** [2] - 29:6, 29:11
**below** [2] - 14:4,
73:19
**below-guidelines** [1]
- 73:19
**benefit** [2] - 59:2,
78:11
**benefits** [1] - 57:7
**Berger** [1] - 30:17
**BERMAN** [1] - 1:6
**Berman** [116] - 3:3,
3:19, 3:25, 4:18, 5:20,
6:7, 6:18, 7:20, 8:13,
9:3, 9:18, 9:21, 9:25,
10:7, 10:22, 11:5,
11:11, 11:25, 12:4,
12:6, 12:24, 13:12,
14:12, 15:8, 16:5,
16:17, 16:22, 17:9,
18:1, 18:15, 20:18,

21:8, 21:17, 21:23, 23:5, 23:21, 23:23, 25:9, 26:17, 30:6, 31:8, 31:17, 31:24, 32:3, 33:6, 33:11, 33:20, 33:22, 34:2, 34:21, 35:7, 35:14, 37:16, 38:8, 38:19, 38:20, 38:25, 39:15, 39:21, 40:2, 40:19, 45:20, 46:16, 47:11, 47:17, 49:5, 49:11, 51:11, 51:14, 52:3, 54:12, 54:20, 57:4, 60:24, 61:2, 63:3, 63:7, 63:9, 63:20, 64:6, 64:8, 64:16, 64:17, 64:22, 64:23, 65:15, 65:18, 66:4, 66:13, 66:21, 67:13, 67:16, 67:22, 67:24, 68:2, 68:4, 68:20, 69:25, 70:2, 70:12, 71:14, 71:15, 72:3, 72:7, 73:18, 74:2, 74:7, 74:18, 75:4, 75:8, 75:11, 76:1, 82:3, 87:2

**Berman's** [36] - 7:10, 8:1, 8:5, 8:8, 8:18, 10:15, 12:19, 12:25, 22:14, 22:18, 23:14, 23:16, 25:17, 26:1, 26:7, 26:24, 27:3, 28:5, 29:13, 29:23, 30:22, 30:25, 31:2, 33:1, 33:18, 36:8, 36:13, 39:7, 39:11, 48:16, 51:21, 59:13, 67:8, 67:11, 72:20, 72:25

**best** [5] - 3:21, 22:20, 74:2, 87:6, 88:7

**best-lawyered** [1] - 3:21

**between** [8] - 8:2, 22:4, 24:6, 51:4, 51:16, 52:1, 64:16

**beyond** [1] - 25:10

**big** [2] - 63:19, 65:16

**biggest** [1] - 48:15

**billion** [1] - 38:4

**Bio** [5] - 52:10, 53:23, 63:22, 65:12, 66:25

**bio** [1] - 50:1

**bit** [4] - 4:19, 19:24, 46:12, 48:25

**blame** [1] - 10:8

**blamed** [1] - 21:14

**blames** [1] - 11:16

**blaming** [1] - 11:22

**blessing** [1] - 64:13

**blood** [11] - 15:11, 16:20, 17:1, 19:3, 44:1, 63:3, 63:6, 63:16, 63:24, 65:23, 71:9

**BNS** [1] - 32:19

**board** [4] - 13:5, 38:6, 50:23, 64:20

**boards** [2] - 18:17, 58:15

**boiled** [1] - 28:18

**bond** [5] - 59:11, 61:16, 61:25, 68:14, 68:21

**BOP** [1] - 47:1

**bother** [1] - 53:24

**bounce** [1] - 70:23

**Boyer** [1] - 3:12

**brand** [1] - 61:23

**brand-new** [1] - 61:23

**BRANDON** [1] - 1:19

**Brandon** [1] - 3:18

**Breeden** [1] - 31:4

**brief** [13] - 19:2, 19:19, 24:21, 25:3, 44:15, 63:9, 67:10, 69:13, 72:19, 73:8, 73:17, 74:11

**briefing** [6] - 9:8, 9:11, 15:22, 23:25, 45:2, 45:4

**briefly** [2] - 56:10, 75:17

**briefs** [4] - 10:13, 61:6, 61:7, 71:22

**brilliant** [1] - 60:4

**bring** [2] - 57:16, 60:3

**brings** [1] - 8:16

**broader** [1] - 17:21

**broadly** [1] - 55:24

**brought** [1] - 27:20

**burden** [1] - 31:12

**BURLING** [1] - 1:21

**Burling** [2] - 3:16, 3:17

**business** [7] - 38:1, 49:12, 50:12, 54:8, 55:11, 67:1, 70:1

**businesses** [1] - 79:13

**businessman** [2] - 63:10, 66:23

**businessperson** [1] - 63:14

**buy** [5] - 26:22, 31:3, 32:21, 34:3, 37:22

**buying** [3] - 26:17, 27:1, 28:6

**BY** [1] - 2:2

---

# C

**calculate** [1] - 5:5

**calculated** [3] - 57:9, 57:25, 81:3

**calculation** [17] - 6:13, 7:6, 7:14, 14:10, 20:17, 21:7, 22:1, 23:17, 23:21, 27:8, 27:21, 30:7, 34:9, 34:20, 42:23, 56:12, 81:7

**calculations** [1] - 43:10

**California** [1] - 67:21

**callous** [1] - 53:17

**callousness** [1] - 56:25

**campaign** [2] - 39:1, 60:15

**cannot** [9] - 25:10, 25:16, 26:17, 51:16, 51:23, 52:2, 55:4, 68:8

**capable** [2] - 81:23, 83:16

**capitalized** [1] - 76:6

**capture** [1] - 81:10

**care** [3] - 50:8, 74:4, 74:10

**career** [2] - 32:20, 63:9

**careful** [1] - 22:3

**carefully** [1] - 80:4

**caring** [1] - 63:13

**Carl** [2] - 58:7, 58:8

**carries** [1] - 10:13

**carry** [1] - 8:1

**case** [38] - 3:21, 5:9, 6:19, 7:7, 11:19, 15:23, 17:4, 18:10, 19:7, 21:24, 25:1, 25:22, 26:4, 29:2, 31:21, 33:20, 37:10, 40:22, 40:25, 46:13, 49:9, 54:4, 56:21, 56:24, 61:13, 61:15, 71:11, 73:7, 75:8, 75:11, 75:14, 75:21, 75:23, 80:2, 80:7, 81:10, 84:18, 84:21

**Case** [1] - 3:2

**cases** [4] - 22:24,

46:11, 73:20, 80:3

**cast** [1] - 16:11

**Category** [1] - 8:25

**category** [2] - 9:2, 79:9

**caught** [1] - 77:4

**causal** [1] - 27:1

**causation** [3] - 30:12, 30:13, 33:17

**caused** [16] - 8:2, 8:5, 8:9, 23:22, 23:24, 29:13, 31:2, 31:6, 31:18, 31:24, 32:9, 39:19, 40:2, 77:3, 77:12

**causes** [1] - 31:22

**causing** [1] - 11:18

**center** [2] - 74:8, 74:10

**central** [1] - 28:15

**cents** [3] - 29:7, 29:13, 29:16

**certain** [4] - 22:6, 44:13, 78:14, 80:1

**certainly** [5] - 14:7, 34:17, 49:3, 53:24, 56:17

**CERTIFICATE** [1] - 88:1

**certify** [1] - 88:4

**challenge** [1] - 85:25

**challenges** [1] - 70:24

**challenging** [1] - 22:1

**chance** [1] - 12:10

**change** [3] - 69:2, 84:25, 85:1

**changes** [2] - 27:13, 32:12

**chapter** [2] - 81:18, 81:20

**character** [1] - 79:11

**characteristics** [4] - 16:10, 56:4, 62:24, 76:3

**characters** [1] - 42:10

**charade** [1] - 39:4

**charged** [1] - 11:13

**charges** [2] - 21:25, 83:10

**child** [1] - 46:10

**choice** [3] - 26:23, 28:3, 29:19

**CHRISTOPHER** [1] - 1:13

**Christopher** [1] - 3:8

**Circuit** [6] - 30:18, 36:21, 37:7, 73:3,

85:15, 85:20

**circuit** [1] - 37:8

**circumstances** [8] - 16:9, 20:21, 37:5, 41:20, 42:9, 62:23, 80:16, 85:19

**circumstantial** [3] - 30:12, 30:15, 31:2

**circumvent** [1] - 84:11

**cites** [3] - 18:10, 23:8, 33:20

**citizen** [1] - 78:18

**claim** [6] - 28:22, 30:21, 33:21, 33:24, 76:7, 78:24

**claimed** [2] - 37:20, 49:16

**claiming** [1] - 23:10

**clarify** [1] - 17:13

**Clark** [1] - 31:3

**class** [1] - 76:13

**clean** [1] - 70:22

**cleanup** [1] - 6:5

**clear** [24] - 9:17, 11:7, 11:16, 11:20, 12:14, 15:9, 16:17, 16:22, 17:23, 18:5, 19:7, 39:22, 39:25, 45:21, 50:10, 51:2, 53:1, 63:12, 68:1, 71:3, 79:22, 80:17, 81:2, 84:15

**clearly** [12] - 8:20, 10:23, 13:20, 19:22, 27:12, 34:2, 35:14, 50:22, 60:22, 61:13, 81:23

**Clerk** [2] - 84:23, 85:1

**client** [1] - 48:14

**clients** [1] - 22:9

**close** [2] - 38:4, 38:18

**closed** [3] - 21:15, 36:24, 38:16

**clueless** [1] - 60:17

**co** [1] - 46:6

**co-counsel** [1] - 46:6

**coach** [1] - 67:19

**coated** [1] - 34:2

**cold** [1] - 57:6

**colleague** [1] - 44:16

**collection** [1] - 82:25

**Collins** [3] - 3:16, 4:16, 6:2

**COLLINS** [4] - 1:17, 3:15, 3:23, 6:4

**Columbia** [3] - 2:3, 84:24, 88:13

**COLUMBIA** [1] - 1:1
**combination** [1] - 6:4
**combined** [1] - 33:5
**coming** [3] - 21:3, 48:4, 50:18
**Comment** [2] - 7:19
**commercialized** [1] - 52:4
**commission** [1] - 35:9
**commit** [5] - 60:21, 68:5, 69:15, 82:21
**commits** [1] - 31:21
**committed** [2] - 4:22, 84:17
**committing** [3] - 61:16, 62:5, 62:9
**common** [2] - 30:13, 31:15
**communication** [1] - 55:22
**communications** [6] - 13:7, 13:8, 18:12, 37:11, 52:1, 83:14
**company** [17] - 8:11, 15:25, 16:4, 18:13, 20:11, 33:6, 33:24, 34:12, 34:16, 34:18, 37:25, 50:23, 59:14, 59:16, 66:17, 68:12, 78:17
**Company** [1] - 26:20
**company's** [1] - 34:5
**compare** [1] - 66:2
**comparing** [1] - 17:15
**comparison** [1] - 72:17
**competition** [1] - 34:5
**complaints** [1] - 22:13
**complete** [1] - 88:6
**completion** [1] - 85:10
**complex** [6] - 18:6, 18:9, 18:21, 24:12, 37:4, 72:23
**compliance** [1] - 84:2
**complicate** [1] - 35:24
**complicated** [2] - 44:19, 44:21
**complication** [1] - 38:23
**comply** [2] - 41:25, 83:4
**component** [1] -

26:6
**components** [3] - 64:1, 64:2, 64:4
**comprehensive** [1] - 25:25
**comprising** [1] - 21:20
**computer** [7] - 83:22, 84:1, 84:2, 84:5, 84:7, 84:16
**computer-monitoring** [1] - 84:1
**computers** [5] - 83:13, 83:16, 84:4, 84:13
**conceal** [2] - 12:19, 56:1
**concealment** [1] - 12:20, 18:20, 36:24
**concerned** [2] - 9:24, 68:17
**concerns** [2] - 12:3, 27:19
**concluded** [1] - 87:11
**concurrently** [5] - 40:17, 41:13, 41:15, 82:8, 82:9
**condition** [4] - 83:18, 83:20, 83:21, 84:14
**conditions** [11] - 36:1, 61:20, 78:4, 78:8, 80:12, 80:24, 82:16, 82:17, 82:20, 83:5, 84:16
**conduct** [32] - 8:9, 10:4, 11:24, 18:2, 18:6, 18:18, 18:21, 19:7, 21:19, 21:21, 22:2, 26:1, 26:24, 32:9, 35:16, 35:18, 36:8, 36:13, 37:1, 37:9, 38:18, 38:9, 39:11, 42:6, 42:14, 69:4, 70:15, 71:3, 78:2, 82:19, 83:19, 84:3
**conducted** [2] - 83:23, 84:6
**confers** [2] - 46:6, 75:1
**confirm** [1] - 19:24
**confirmed** [1] - 51:20
**confused** [1] - 28:9
**confusion** [1] - 26:12
**Congress** [2] - 5:11, 41:23
**connection** [4] - 6:24, 27:2, 59:11,

60:20
**connects** [1] - 36:5
**consequence** [1] - 67:13
**consequences** [4] - 4:23, 5:14, 62:14, 76:15
**conservative** [1] - 24:3
**consider** [3] - 41:22, 42:9, 78:11
**considerably** [2] - 29:9, 73:9
**consideration** [2] - 55:7, 56:7
**considerations** [1] - 76:1
**considered** [4] - 23:10, 33:19, 79:2, 80:5
**considering** [3] - 72:2, 73:5, 73:10
**considers** [1] - 50:22
**consistent** [3] - 11:24, 27:24, 66:14
**consistently** [1] - 10:11
**conspiracy** [1] - 60:21
**constant** [1] - 74:4
**constantly** [1] - 11:25
**constitute** [1] - 22:1
**constitutes** [1] - 88:4
**constituting** [1] - 8:10
**Constitution** [2] - 2:4, 88:14
**consult** [2] - 38:20, 47:16
**consultant** [1] - 54:6
**consultants** [1] - 53:23
**consultation** [1] - 75:3
**consulted** [1] - 70:1
**consulting** [1] - 46:18
**contacts** [1] - 77:25
**contained** [1] - 41:20
**contains** [3] - 43:19, 83:22, 84:7
**contemplated** [1] - 36:10
**context** [7] - 17:15, 17:21, 30:16, 34:1, 36:20, 71:14, 72:1
**continue** [4] - 28:6, 38:21, 57:17, 77:9
**continued** [2] -

26:22, 80:12
**continues** [2] - 10:15, 57:22
**continuing** [1] - 45:23
**continuous** [1] - 7:16
**contradictory** [1] - 28:9
**contrast** [4] - 23:23, 25:1, 28:2, 29:21
**controlled** [2] - 82:22, 82:23
**conversation** [7] - 50:20, 50:21, 51:1, 55:16, 65:6, 65:8, 70:15
**conversations** [3] - 10:22, 53:11, 59:3
**convicted** [1] - 7:20
**conviction** [10] - 8:16, 21:20, 21:25, 40:9, 67:14, 68:6, 68:20, 72:10, 85:14, 85:25
**convictions** [2] - 7:10, 40:7
**convince** [1] - 12:23
**convincing** [1] - 78:21
**cooperate** [1] - 82:25
**core** [2] - 20:1, 26:6
**corporate** [5] - 15:12, 36:1, 36:12, 36:18, 76:12
**correct** [5] - 14:1, 25:16, 44:12, 56:18, 81:6
**corresponding** [1] - 11:3
**cost** [2] - 86:6, 86:8
**Counsel** [1] - 3:5
**counsel** [6] - 3:12, 46:6, 63:21, 74:24, 75:1, 86:10
**Count** [7] - 7:11, 7:18, 7:24, 40:9, 40:12, 41:12, 82:4
**count** [5] - 7:12, 7:23, 22:16, 23:1, 40:14
**counter** [2] - 36:15, 39:6
**counter-parties** [2] - 36:15, 39:6
**country** [3] - 51:10, 53:19, 80:16
**Counts** [7] - 3:25, 7:10, 7:15, 40:7, 40:12, 41:12, 82:4

**counts** [7] - 4:1, 7:13, 7:22, 28:8, 40:15, 41:15, 82:7
**County** [1] - 31:3
**couple** [2] - 69:19, 76:20
**course** [3] - 4:10, 23:2, 49:25
**COURT** [83] - 1:1, 3:10, 3:13, 3:20, 3:24, 4:16, 4:18, 6:1, 6:6, 6:12, 6:18, 6:21, 7:1, 9:13, 12:8, 13:15, 13:22, 14:16, 14:21, 14:23, 16:24, 19:13, 20:2, 20:23, 21:2, 41:3, 41:5, 42:19, 43:6, 43:13, 43:23, 44:3, 44:7, 44:16, 45:4, 45:12, 45:16, 45:24, 46:7, 46:20, 47:14, 47:24, 48:6, 48:11, 48:18, 48:22, 52:8, 52:19, 52:21, 53:22, 55:9, 56:8, 56:16, 56:20, 58:5, 58:8, 62:16, 62:21, 64:11, 64:24, 65:5, 65:10, 65:20, 68:15, 69:12, 69:20, 69:22, 69:24, 70:4, 74:12, 74:14, 74:17, 74:25, 75:2, 75:9, 75:13, 75:21, 86:14, 86:16, 86:20, 86:22, 87:1, 87:9
**court** [1] - 86:9
**Court** [42] - 2:2, 2:3, 5:10, 5:13, 7:1, 16:8, 19:9, 20:14, 27:20, 36:25, 39:20, 40:8, 40:15, 41:18, 41:23, 43:10, 43:18, 44:18, 44:25, 45:10, 47:12, 48:8, 55:8, 56:6, 62:11, 67:23, 72:2, 73:22, 74:6, 75:6, 82:2, 84:19, 84:23, 85:1, 85:7, 85:14, 86:7, 88:12, 88:13
**Court's** [3] - 41:6, 43:21, 46:5
**court-appointed** [1] - 86:9
**COURTROOM** [1] - 3:1
**courtroom** [1] - 75:17
**courts** [3] - 30:15, 72:22, 73:9

**covered** [2] - 34:13, 35:21
**covers** [1] - 35:15
**COVID** [22] - 10:25, 11:1, 11:6, 26:14, 49:13, 49:20, 51:8, 52:16, 53:10, 55:19, 60:6, 67:2, 70:14, 71:4, 76:5, 76:6, 76:8, 78:20, 80:9, 80:23
**COVID-19** [7] - 10:17, 15:11, 51:6, 51:8, 51:9, 63:16, 71:9
**COVINGTON** [1] - 1:21
**Covington** [2] - 3:16, 3:17
**crazy** [1] - 64:8
**create** [3] - 13:2, 17:1, 49:13
**created** [3] - 18:16, 37:16, 77:5
**creating** [3] - 18:11, 65:2, 79:10
**creation** [1] - 36:13
**credibility** [5] - 26:9, 28:8, 28:16, 29:3, 77:7
**credible** [5] - 24:6, 24:16, 28:3, 28:21, 28:24
**credit** [7] - 20:19, 22:22, 27:17, 32:14, 79:11, 83:10, 83:11
**crime** [21] - 4:22, 12:21, 13:14, 16:18, 53:17, 56:25, 57:8, 57:22, 58:2, 58:12, 60:19, 62:5, 68:4, 69:15, 72:24, 76:4, 79:9, 80:17, 82:21
**crimes** [9] - 21:17, 42:7, 60:18, 61:16, 62:6, 62:7, 62:9, 69:15
**Criminal** [4] - 1:3, 1:15, 3:2, 8:25
**criminal** [11] - 4:24, 8:24, 9:1, 26:7, 39:16, 42:6, 63:10, 66:21, 66:22, 68:20, 78:13
**criminals** [2] - 62:11, 78:7
**crisis** [3] - 50:14, 53:18, 62:12
**critical** [8] - 15:23, 50:21, 51:5, 51:25, 52:7, 53:5, 62:8, 62:11

**criticism** [1] - 71:17
**criticisms** [1] - 71:17
**criticized** [1] - 72:21
**CRR** [3] - 2:2, 88:3, 88:12
**crucial** [2] - 12:20, 51:6
**cultivating** [1] - 13:6
**curtail** [1] - 76:17
**curve** [2] - 29:6, 29:11
**custodial** [1] - 48:16
**custody** [6] - 47:2, 47:19, 61:17, 81:15, 82:12, 87:2
**cut** [1] - 28:15
**cybercrimes** [1] - 60:21
**cynical** [1] - 55:10

# D

**D.C** [10] - 1:6, 1:16, 1:22, 1:25, 2:5, 36:21, 37:7, 85:15, 85:20, 88:14
**damned** [1] - 53:10
**Daniel** [7] - 51:22, 63:1, 64:16, 65:7, 65:8, 65:14, 70:20
**dared** [1] - 77:8
**dark** [1] - 81:18
**dashed** [1] - 51:18
**data** [4] - 29:18, 83:14, 84:7
**date** [11] - 24:25, 25:5, 25:7, 25:11, 25:16, 25:19, 28:4, 28:8, 28:11, 29:19, 42:24
**Dated** [1] - 88:10
**dates** [2] - 24:18, 25:21
**days** [9] - 43:3, 46:4, 48:13, 48:24, 84:25, 86:3, 86:4, 86:18, 86:23
**de** [1] - 77:5
**deal** [3] - 23:19, 42:21, 67:13
**dealing** [1] - 56:16
**decades** [5] - 63:9, 63:13, 67:17, 69:4, 70:3
**deceive** [1] - 36:15
**December** [5] - 24:25, 25:4, 27:5, 27:7, 29:19
**decide** [3] - 37:1,

73:22, 74:6
**decided** [3] - 15:24, 65:24, 78:24
**decision** [5] - 4:24, 9:15, 26:25, 41:6, 75:7
**Decision** [1] - 50:23
**decisionmaking** [1] - 20:9
**decisions** [1] - 64:7
**DECN** [13] - 25:13, 26:9, 26:13, 31:3, 32:24, 33:19, 37:21, 37:22, 38:11, 38:18, 76:14, 77:9, 78:17
**DECN's** [6] - 15:11, 27:13, 34:3, 37:25, 38:3, 76:9
**deemed** [1] - 39:8
**defect** [1] - 85:17
**defend** [2] - 59:13
**defendant** [8] - 31:21, 35:23, 37:10, 39:18, 71:15, 73:16, 85:19, 85:21
**Defendant** [38] - 1:7, 3:25, 4:11, 23:10, 34:14, 42:7, 42:10, 43:11, 45:8, 50:7, 52:1, 52:15, 53:9, 53:20, 55:2, 55:13, 55:16, 57:1, 57:10, 57:12, 57:14, 58:14, 58:16, 59:5, 59:8, 60:7, 60:11, 60:15, 61:7, 61:15, 61:19, 62:1, 62:4, 73:12, 73:13, 85:11
**DEFENDANT** [5] - 1:17, 6:20, 6:25, 74:23, 75:1
**Defendant's** [19] - 21:14, 22:10, 25:5, 28:2, 28:23, 31:10, 32:9, 36:6, 36:14, 37:1, 45:1, 55:12, 55:22, 56:1, 56:3, 56:4, 59:6, 73:10, 85:10
**defendant's** [2] - 36:23, 73:4
**defendants** [6] - 17:16, 39:16, 42:13, 72:18, 73:18
**DEFENDER** [1] - 1:24
**defense** [23] - 4:7, 6:1, 12:9, 15:19, 21:16, 21:24, 22:8, 22:12, 23:13, 24:8,

24:10, 24:20, 25:1, 29:21, 30:4, 45:14, 48:6, 49:25, 56:14, 62:17, 85:13, 86:24, 87:6
**defense's** [2] - 24:6, 43:16
**deficient** [1] - 30:14
**defined** [1] - 83:13
**definitely** [1] - 13:11
**defraud** [3] - 62:1, 80:9, 81:25
**defrauded** [2] - 61:23, 81:22
**delay** [1] - 82:10
**demand** [3] - 30:24, 31:5, 38:3
**demanding** [1] - 49:5
**demonstrated** [2] - 8:20, 10:21
**denial** [1] - 22:2
**denied** [1] - 21:21
**deny** [1] - 59:14
**DEPARTMENT** [1] - 1:15
**Department** [3] - 12:2, 57:23, 59:21
**departure** [1] - 73:5
**departures** [1] - 81:6
**depositions** [1] - 57:20
**DEPUTY** [1] - 3:1
**derive** [1] - 27:11
**describe** [1] - 79:14
**described** [1] - 76:17
**describing** [1] - 77:16
**design** [5] - 10:24, 51:15, 52:16, 53:9, 55:18
**designed** [1] - 37:22
**desperately** [1] - 77:13
**desperation** [1] - 57:4
**despicable** [1] - 77:21
**despite** [1] - 31:17
**destroy** [2] - 60:15, 60:23
**destroyed** [1] - 68:10
**detect** [7] - 10:25, 11:1, 52:16, 52:18, 53:10, 55:19, 65:3
**deter** [1] - 81:16
**determinations** [1] - 5:23
**determine** [5] - 5:2, 44:19, 44:21, 51:7, 84:6

**determined** [4] - 7:17, 27:6, 27:13, 41:18
**determines** [1] - 44:18
**determining** [2] - 7:23, 17:16
**deterred** [1] - 62:8
**deterrence** [6] - 42:6, 61:13, 61:14, 62:10, 68:3, 80:15
**develop** [22] - 10:17, 11:8, 50:9, 51:22, 52:22, 63:2, 63:5, 63:16, 63:20, 63:23, 64:22, 66:4, 66:8, 66:13, 70:1, 70:10, 70:14, 70:24, 71:4, 71:7, 71:9, 80:23
**developed** [4] - 4:9, 50:18, 63:25, 66:1
**developing** [6] - 64:5, 64:18, 64:21, 65:15, 66:9, 66:23
**development** [3] - 17:10, 64:19, 70:17
**device** [5] - 11:3, 51:9, 66:8, 66:9, 83:22
**devices** [3] - 83:15, 83:16, 83:17
**Diagnostics** [1] - 50:23
**die** [2] - 38:16, 53:12
**difference** [3] - 46:25, 48:14, 48:16
**different** [9] - 35:5, 35:23, 51:4, 51:16, 57:15, 62:6, 79:9, 79:19
**difficult** [1] - 81:18
**difficulty** [2] - 52:10, 68:9
**dig** [1] - 19:23
**dime** [1] - 66:2
**diminish** [1] - 35:6
**direct** [4] - 30:15, 33:16, 86:17, 86:22
**directed** [1] - 83:1
**directly** [2] - 23:4, 34:13
**director** [2] - 50:22, 55:17
**disagree** [8] - 17:19, 28:3, 35:20, 48:6, 50:4, 50:6, 67:7, 79:24
**disagreed** [1] - 13:23
**disagreement** [3] - 9:14, 16:25, 79:22

**disagreements** [2] - 6:12, 64:19
**disagrees** [1] - 25:9
**disaster** [1] - 80:16
**disciplinary** [1] - 68:25
**disclose** [1] - 25:23
**disclosed** [1] - 29:15
**disclosures** [1] - 30:1
**discuss** [2] - 40:5, 41:5
**discussed** [2] - 6:7, 87:6
**discussing** [1] - 6:15
**discussions** [1] - 61:19
**disguise** [1] - 35:10
**dismissed** [2] - 38:5, 87:10
**disparities** [1] - 42:12
**disparity** [1] - 80:5
**dispute** [2] - 6:15, 28:15
**disputed** [1] - 21:23
**disputes** [2] - 6:14, 23:21
**distinguish** [2] - 51:4, 51:16
**distract** [1] - 53:13
**distraction** [1] - 53:6
**District** [6] - 2:3, 2:3, 31:4, 84:23, 84:24, 88:13
**district** [3] - 82:13, 85:6, 88:13
**DISTRICT** [3] - 1:1, 1:1, 1:11
**distrust** [1] - 26:25
**Division** [1] - 1:15
**DNA** [1] - 82:25
**documents** [2] - 4:13, 53:1
**DOJ** [1] - 77:21
**dollars** [2] - 23:24, 61:25
**done** [8] - 16:8, 19:25, 46:7, 46:9, 46:10, 52:3, 59:25, 65:19
**doubled** [1] - 77:5
**doubt** [2] - 11:21, 26:8
**dovetail** [1] - 23:19
**down** [6] - 28:18, 58:1, 58:22, 62:13, 77:5, 81:2
**downward** [4] - 73:5, 73:6, 73:9, 79:20

**dozens** [3] - 61:8, 61:9
**Dr** [11] - 17:22, 22:15, 23:1, 23:3, 23:4, 63:22, 63:25, 64:7, 66:3, 66:24, 71:6
**draft** [1] - 15:15
**dragging** [1] - 46:13
**driven** [1] - 26:24
**drove** [1] - 31:5
**drug** [1] - 82:24
**due** [1] - 5:19
**dupe** [1] - 38:21
**duration** [1] - 38:23
**during** [8] - 16:2, 29:8, 43:3, 51:1, 51:5, 57:20, 62:12, 80:16

## E

**early** [1] - 76:4
**easily** [1] - 30:3
**easy** [1] - 68:18
**eat** [2] - 38:16, 53:12
**ECF** [3] - 24:1, 50:25, 51:13
**economics** [1] - 24:10
**education** [1] - 32:11
**EDWARDS** [2] - 2:2, 88:3
**Edwards** [1] - 88:12
**effectively** [2] - 60:24, 84:9
**efficacious** [1] - 64:14
**efficacy** [1] - 26:12
**effort** [13] - 17:8, 22:25, 36:5, 54:3, 57:22, 58:22, 63:2, 63:5, 63:20, 63:21, 64:5, 71:7, 71:8
**efforts** [10] - 17:23, 36:7, 51:21, 53:25, 56:1, 57:17, 58:2, 66:13, 77:19, 78:24
**egregious** [1] - 81:17
**either** [6] - 16:12, 20:3, 25:2, 31:9, 44:10, 48:14
**electrochemical** [1] - 67:3
**electrode** [3] - 64:1, 66:2, 71:6
**electronic** [1] - 83:14
**element** [1] - 21:25
**email** [7] - 13:4, 18:12, 37:10, 50:24,

55:20, 70:12, 71:2
**emails** [13] - 10:20, 17:20, 17:21, 49:22, 49:23, 50:20, 64:11, 64:16, 64:24, 65:1, 65:5, 69:20, 79:2
**embezzlement** [1] - 18:14
**emergency** [3] - 53:3, 53:18, 62:12
**emergency-use** [1] - 53:3
**emotional** [1] - 77:2
**employment** [1] - 32:13
**encourage** [2] - 8:11, 77:9
**encouraging** [1] - 34:11
**end** [11] - 24:18, 28:4, 28:8, 28:11, 29:19, 34:14, 43:6, 43:8, 45:6, 79:6, 80:1
**ended** [5] - 24:23, 24:24, 25:2, 28:10, 76:24
**endorsed** [1] - 27:25
**ends** [2] - 14:16, 27:5
**enforcement** [6] - 35:24, 36:7, 58:17, 58:18, 71:13, 76:25
**engage** [3] - 4:24, 18:14, 61:21
**engaged** [6] - 8:9, 23:5, 31:17, 39:1, 61:22, 78:1
**engaging** [3] - 16:15, 57:14, 81:17
**enhancement** [25] - 8:3, 8:7, 8:12, 8:17, 14:5, 18:19, 18:20, 19:10, 19:12, 20:14, 23:19, 32:2, 32:4, 32:18, 35:1, 35:8, 35:15, 35:22, 37:9, 39:12, 39:14, 39:21, 72:21, 73:3
**enhancements** [2] - 8:1, 23:19
**enrich** [1] - 49:16
**ensure** [3] - 41:23, 84:2
**entered** [2] - 85:22, 85:25
**entering** [3] - 78:2, 82:10, 84:15
**enterprise** [1] - 38:22
**enterprises** [1] -

36:18
**entire** [2] - 67:24, 73:10
**entirety** [1] - 16:16
**entities** [3] - 35:25, 36:11, 36:14
**entitled** [2] - 22:24, 44:25
**entity** [1] - 60:3
**entry** [1] - 86:4
**equal** [1] - 40:23
**equation** [1] - 54:8
**equity** [1] - 76:19
**especially** [9] - 18:6, 18:9, 20:15, 36:9, 46:21, 63:1, 70:20
**ESQ** [11] - 1:13, 1:14, 1:14, 1:17, 1:18, 1:18, 1:19, 1:19, 1:20, 1:20, 1:23
**essentially** [7] - 10:8, 11:18, 15:10, 20:6, 20:13, 20:20, 59:2
**establish** [1] - 82:18
**established** [1] - 37:12
**estimate** [1] - 24:3
**evade** [1] - 36:7
**eve** [1] - 61:25
**event** [2] - 14:2, 23:3
**evidence** [36] - 10:20, 11:7, 13:12, 17:7, 17:14, 19:3, 19:11, 22:15, 22:25, 23:3, 24:20, 28:22, 29:5, 30:4, 30:12, 30:13, 30:14, 30:16, 30:20, 31:2, 31:7, 31:13, 33:16, 35:4, 39:23, 39:25, 52:24, 56:2, 56:3, 60:19, 63:1, 66:14, 77:23, 78:10, 78:19, 83:22
**evidenced** [2] - 71:5, 71:6
**evidentiary** [5] - 4:10, 9:20, 10:12, 15:19, 23:25
**exact** [3] - 13:18, 30:16, 51:14
**example** [4] - 10:6, 32:9, 35:16, 36:11
**examples** [6] - 18:7, 32:17, 33:10, 35:21, 36:5, 36:17
**except** [1] - 46:25
**exchange** [2] - 51:12, 59:22
**execute** [1] - 85:6

**exercise** [2] - 48:25, 75:4
**exhibit** [2] - 65:12, 66:3
**exhibits** [2] - 4:8, 4:10
**Exhibits** [1] - 31:11
**exists** [1] - 83:20
**expectations** [1] - 82:19
**expected** [2] - 21:3, 76:9
**expert** [5] - 21:13, 24:5, 24:10, 24:11, 28:2
**experts** [1] - 24:13
**experts'** [1] - 29:4
**explain** [4] - 16:8, 29:5, 29:21, 35:14
**explained** [1] - 27:12
**explains** [2] - 29:17, 30:4
**explanation** [3] - 27:19, 28:15, 28:17
**expose** [1] - 26:5
**extend** [1] - 25:10
**extensive** [3] - 39:1, 59:3, 84:16
**extensively** [1] - 15:22
**extent** [7] - 26:22, 29:24, 34:8, 77:11, 78:6, 78:14, 86:1
**extract** [1] - 47:1
**extraordinary** [3] - 26:11, 56:1, 57:9
**extreme** [1] - 68:9
**extremely** [1] - 58:12

## F

**F.3d** [2] - 30:18, 37:6
**F.4th** [2] - 36:22, 39:10
**face** [1] - 4:23
**facility** [2] - 47:21, 85:12
**facing** [2] - 53:18, 60:5
**fact** [36] - 7:4, 9:25, 10:7, 10:15, 11:8, 11:11, 11:12, 11:16, 12:1, 17:7, 17:18, 19:5, 19:18, 30:3, 35:5, 37:4, 46:15, 46:25, 51:2, 51:7, 51:15, 51:16, 51:19, 52:2, 53:20, 55:17, 56:25, 57:5, 62:3,

62:7, 64:2, 65:14, 66:4, 67:15, 78:13, 80:8
**factor** [1] - 78:15
**factors** [18] - 5:11, 16:10, 17:14, 23:9, 41:6, 41:10, 41:22, 42:16, 56:10, 62:18, 75:15, 80:2, 80:7, 80:8, 80:19, 80:22, 80:25, 81:9
**facts** [6] - 7:1, 15:7, 17:5, 41:20, 56:22, 75:14
**factual** [4] - 5:23, 6:14, 6:15, 25:20
**fails** [3] - 28:4, 29:21, 30:19
**failure** [1] - 33:12
**fair** [7] - 5:11, 22:18, 29:12, 29:14, 29:16, 30:2, 79:3
**fairly** [2] - 72:22, 73:9
**faith** [4] - 10:16, 11:8, 17:7, 76:25
**fake** [4] - 18:13, 36:14, 37:16, 37:21
**falls** [1] - 32:1
**false** [8] - 16:18, 22:2, 25:18, 30:9, 30:22, 30:25, 38:10, 77:9
**falsely** [3] - 21:20, 49:16, 76:7
**falsifying** [1] - 60:19
**falsity** [2] - 25:7, 25:17
**family** [8] - 11:14, 23:8, 54:24, 67:11, 67:12, 72:8, 76:12
**far** [1] - 20:12
**fashion** [1] - 5:10
**fast** [1] - 63:22
**father** [1] - 67:17
**faulty** [1] - 30:7
**favor** [2] - 30:5, 78:16
**FDA** [15] - 12:1, 52:5, 53:2, 53:6, 53:7, 53:23, 54:11, 59:21, 63:21, 64:13, 65:21, 65:22, 66:5, 66:24, 77:13
**FDA's** [1] - 53:11
**fear** [2] - 57:4, 76:5
**February** [3] - 50:11, 53:6, 57:3
**February-March** [1] - 57:3

**federal** [12] - 4:22, 4:25, 38:12, 57:19, 58:17, 67:14, 68:6, 72:10, 74:8, 74:9, 82:21, 85:12
**FEDERAL** [1] - 1:23
**fell** [1] - 14:4
**felon** [1] - 68:6
**FENTON** [37] - 1:13, 3:7, 3:11, 3:14, 4:15, 5:25, 9:12, 9:14, 12:12, 13:18, 14:1, 14:20, 14:22, 41:2, 42:18, 42:22, 43:8, 43:15, 44:2, 44:4, 44:13, 50:5, 52:14, 52:20, 52:23, 54:1, 55:14, 56:9, 56:19, 56:21, 58:7, 58:9, 75:16, 86:13, 86:19, 86:21, 87:8
**Fenton** [15] - 3:8, 4:14, 5:24, 14:23, 41:1, 42:19, 45:9, 45:13, 49:8, 65:20, 68:15, 77:12, 79:2, 80:14, 86:12
**Fenton's** [1] - 70:5
**few** [1] - 48:20
**fictitious** [2] - 35:25, 36:11
**FIELD** [1] - 2:1
**field** [2] - 60:4, 67:18
**Field** [1] - 3:4
**figment** [1] - 52:11
**figure** [3] - 20:20, 43:9, 51:23
**figured** [1] - 20:24
**file** [4] - 32:10, 43:18, 86:7, 87:5
**filed** [11] - 4:8, 5:16, 5:17, 5:19, 5:20, 6:23, 25:25, 42:24, 69:9, 71:22, 86:3
**filing** [4] - 71:20, 71:21, 71:24, 86:4
**filings** [1] - 71:19
**final** [6] - 5:10, 5:15, 5:17, 11:10, 41:6, 61:12
**finally** [8] - 25:7, 29:15, 31:12, 39:15, 62:10, 77:22, 78:8, 79:11
**financial** [26] - 8:6, 13:15, 13:24, 15:3, 18:22, 18:25, 20:18, 23:18, 24:10, 24:11, 27:15, 32:5, 32:8, 33:8, 35:3, 36:1,

39:19, 39:21, 58:12, 72:24, 77:2, 83:6, 83:7, 83:8, 84:22, 85:2
**financially** [4] - 14:4, 14:7, 14:12, 50:12
**findings** [1] - 7:3
**fine** [8] - 9:3, 40:11, 41:16, 69:10, 75:13, 84:20, 86:19
**fines** [2] - 40:6, 40:11
**fired** [1] - 60:22
**firing** [1] - 71:23
**firm** [4] - 54:5, 54:6, 54:8, 68:19
**first** [16] - 5:1, 5:15, 8:1, 21:8, 23:2, 24:17, 25:6, 25:15, 25:24, 42:19, 50:24, 56:24, 65:17, 71:15, 78:12, 79:10
**five** [9] - 8:6, 13:24, 14:1, 14:4, 32:6, 32:18, 35:2, 38:5, 40:10
**floating** [1] - 70:17
**fluctuations** [1] - 27:14
**focus** [3] - 15:1, 53:19, 56:23
**focusing** [1] - 69:18
**folks** [11] - 3:10, 3:20, 18:24, 19:3, 19:5, 20:8, 51:6, 54:5, 59:4, 70:24, 87:1
**following** [3] - 30:24, 82:16, 83:4
**follows** [1] - 7:8
**FOR** [4] - 1:1, 1:13, 1:17, 2:1
**foregoing** [1] - 88:4
**Form** [1] - 82:18
**form** [1] - 30:13
**former** [4] - 50:1, 50:22, 53:23, 55:17
**forth** [6] - 5:12, 5:23, 12:8, 41:23, 42:16, 62:18
**forum** [3] - 35:11, 37:17, 38:9
**forward** [3] - 3:5, 24:8, 51:21
**four** [7] - 4:19, 8:1, 8:7, 19:10, 20:14, 32:4, 32:18
**four-level** [5] - 8:7, 19:10, 20:14, 32:4, 32:18
**fourth** [1] - 8:13

**frame** [1] - 9:25
**framework** [2] - 40:24, 45:25
**frankly** [5] - 15:4, 67:7, 72:8, 74:1, 80:19
**Fraud** [1] - 1:15
**fraud** [54] - 4:2, 8:2, 8:5, 8:8, 10:21, 23:22, 23:24, 24:18, 24:19, 24:23, 24:24, 25:2, 25:9, 26:6, 27:5, 27:11, 28:4, 28:10, 28:23, 29:7, 29:8, 29:15, 29:20, 29:25, 31:10, 31:18, 31:20, 31:21, 33:3, 33:13, 33:24, 34:7, 34:13, 34:17, 34:23, 40:7, 50:19, 56:1, 57:12, 58:23, 59:10, 59:14, 61:2, 61:23, 62:6, 68:6, 68:7, 68:17, 77:19, 80:3, 80:11, 80:16, 81:17
**fraudulent** [11] - 19:7, 25:11, 25:23, 29:23, 34:10, 54:4, 69:5, 76:22, 78:2, 84:16
**free** [1] - 58:25
**frequently** [2] - 46:11, 48:4
**friend** [6] - 11:2, 50:22, 55:17, 67:6, 67:8, 79:15
**friends** [1] - 54:25
**frightening** [2] - 58:16, 58:21
**fruits** [1] - 66:10
**full** [4] - 25:5, 67:22, 85:2, 88:5
**fully** [8] - 6:18, 9:21, 10:3, 15:17, 25:23, 28:4, 76:9, 81:10
**fulsomely** [1] - 22:20
**functioning** [1] - 84:9
**fund** [2] - 32:12, 33:10
**fundamental** [1] - 85:17
**fundamentally** [1] - 66:18
**funding** [1] - 74:4
**fundraising** [1] - 57:17
**funds** [2] - 18:14, 33:1
**furtherance** [1] -

59:9
**futility** [1] - 48:25
**future** [1] - 69:16

# G

**gain** [1] - 28:23
**games** [1] - 16:15
**Gee** [1] - 55:11
**general** [8] - 11:3, 29:1, 51:9, 62:10, 65:3, 68:17, 79:23, 80:15
**General** [1] - 87:3
**generally** [1] - 56:3
**generate** [1] - 68:12
**genuine** [5] - 63:2, 63:5, 64:5, 71:7, 71:8
**genuinely** [1] - 64:21
**gestalt** [1] - 36:25
**GIRON** [1] - 1:19
**Giron** [1] - 3:18
**given** [6] - 22:20, 45:19, 64:9, 72:11, 74:3, 80:7
**glucose** [2] - 66:23, 67:1
**goal** [2] - 60:22, 60:23
**goals** [1] - 72:12
**good-faith** [1] - 17:7
**GOVERNMENT** [1] - 1:13
**government** [2] - 16:6, 38:12
**Government** [70] - 3:6, 4:7, 5:7, 5:19, 5:22, 6:23, 9:10, 9:17, 9:24, 10:7, 10:14, 10:18, 11:16, 11:22, 11:23, 12:5, 12:13, 13:10, 15:16, 16:15, 17:4, 18:10, 18:23, 19:2, 19:6, 19:9, 19:25, 20:13, 20:16, 21:8, 24:9, 24:24, 25:4, 27:4, 30:8, 31:24, 33:17, 36:16, 42:15, 43:1, 43:3, 43:8, 44:5, 44:20, 45:24, 46:2, 46:14, 48:1, 48:23, 49:3, 50:6, 53:16, 56:8, 58:2, 64:3, 65:2, 66:1, 66:12, 67:5, 67:16, 68:1, 69:18, 71:16, 71:20, 73:24, 75:19, 82:11, 86:5, 86:16, 87:4

**Government's** [27] -
9:14, 15:5, 17:19,
21:11, 22:1, 22:13,
24:3, 24:5, 24:17,
24:21, 28:22, 29:11,
29:17, 29:19, 30:3,
30:5, 30:20, 31:12,
31:16, 33:12, 39:22,
43:17, 44:4, 45:10,
47:5, 56:23, 74:2
  **Grace** [1] - 3:12
  **grant** [1] - 9:15
  **gravity** [1] - 4:21
  **great** [2] - 38:25,
76:5
  **greater** [2] - 41:24,
81:12
  **greed** [2] - 53:21,
57:6
  **grouped** [4] - 7:13,
7:15, 7:18, 7:22
  **guerre** [1] - 77:5
  **guess** [8] - 6:6, 45:5,
49:18, 52:9, 55:9,
55:14, 86:17, 87:4
  **Guideline** [6] - 7:18,
7:19, 27:10, 32:4,
36:4, 39:17
  **guideline** [12] - 6:13,
7:6, 7:23, 21:7, 23:14,
32:7, 36:19, 36:20,
42:11, 73:15, 81:3,
81:5
  **guidelines** [26] - 5:6,
7:9, 7:14, 9:2, 9:3,
9:4, 14:9, 18:5, 22:21,
27:25, 34:20, 35:17,
35:20, 36:10, 36:17,
38:24, 40:18, 40:20,
41:9, 42:8, 56:12,
72:14, 73:12, 73:19,
79:24, 81:10
  **guilty** [7] - 3:25,
15:8, 21:18, 22:14,
42:13, 75:11, 85:16

## H

  **half** [2] - 32:19,
76:16
  **halt** [1] - 57:16
  **HANA** [1] - 2:1
  **Hana** [1] - 3:4
  **hand** [1] - 80:21
  **handle** [2] - 21:4,
74:5
  **Hangout** [1] - 37:17
  **happy** [1] - 45:1
  **harassment** [1] -

59:12
  **hardened** [1] - 78:7
  **hardship** [17] - 8:6,
13:15, 15:3, 18:23,
18:25, 20:18, 23:18,
32:5, 32:8, 33:9, 35:3,
35:6, 39:19, 39:21,
39:22, 40:3, 47:20
  **hardworking** [1] -
79:15
  **harm** [9] - 7:17,
13:24, 19:4, 31:18,
31:22, 32:14, 40:23,
71:12, 79:8
  **harmed** [5] - 13:21,
14:4, 14:7, 14:13,
14:19
  **harms** [1] - 77:3
  **hatches** [2] - 50:10,
50:11
  **head** [1] - 53:23
  **headlong** [1] - 30:11
  **health** [3] - 43:24,
45:20, 80:23
  **hear** [5] - 5:7, 23:2,
42:20, 49:21, 55:9
  **heard** [7] - 5:8, 9:7,
9:10, 42:15, 62:17,
75:19, 75:22
  **HEARING** [1] - 1:10
  **hearing** [26] - 4:10,
4:18, 5:1, 9:8, 9:20,
10:12, 15:19, 16:2,
23:25, 24:14, 24:21,
25:3, 27:16, 28:19,
29:9, 43:14, 46:4,
46:17, 46:20, 47:10,
47:11, 47:15, 47:18,
47:25, 49:4, 49:18
  **heat** [2] - 51:18, 61:4
  **heat-of-the-
moment** [1] - 61:4
  **height** [1] - 57:3
  **heightened** [1] -
30:24
  **help** [6] - 12:24,
59:7, 59:21, 60:9,
63:21, 77:14
  **helpful** [2] - 49:10,
55:13
  **helping** [2] - 13:9,
67:19
  **helps** [1] - 36:7
  **hereby** [2] - 82:3,
88:3
  **hide** [2] - 36:1, 36:14
  **hides** [1] - 36:7
  **high** [1] - 67:18
  **higher** [1] - 81:1
  **highest** [1] - 74:1

**highly** [1] - 29:1
  **himself** [4] - 9:25,
16:11, 49:17, 66:15
  **hints** [1] - 36:19
  **hip** [1] - 71:23
  **history** [7] - 8:24,
9:2, 16:9, 39:17,
42:10, 62:24, 76:2
  **History** [1] - 8:25
  **HN** [1] - 33:5
  **hoax** [2] - 63:19,
65:17
  **hold** [1] - 33:25
  **home** [2] - 32:21,
76:19
  **honest** [1] - 70:5
  **Honor** [46] - 3:1, 3:7,
3:15, 3:23, 4:15, 4:17,
5:25, 6:4, 6:10, 6:11,
6:17, 6:20, 6:25, 9:12,
11:11, 12:12, 14:11,
15:21, 41:2, 41:4,
42:18, 42:23, 44:13,
44:15, 44:17, 45:2,
45:7, 45:18, 48:20,
50:5, 55:15, 55:25,
56:12, 61:18, 62:15,
62:20, 62:25, 69:8,
74:23, 75:3, 75:16,
86:13, 86:15, 86:19,
86:25, 87:8
  **HONORABLE** [1] -
1:10
  **hope** [3] - 78:23,
81:20, 81:24
  **hoped** [2] - 49:13,
80:22
  **hopes** [1] - 55:5
  **hoping** [1] - 78:25
  **hour** [1] - 21:3
  **hours** [1] - 82:12
  **house** [1] - 74:2
  **hovered** [1] - 29:7
  **Howell** [1] - 3:18
  **HOWELL** [1] - 1:19
  **hundreds** [2] - 61:24

## I

  **idea** [8] - 51:2, 51:3,
51:15, 70:9, 70:22,
70:23, 78:20
  **identify** [7] - 3:5,
13:19, 43:4, 46:11,
46:15, 51:3, 52:22
  **identities** [1] - 36:14
  **identity** [1] - 12:19,
12:20, 35:11, 36:7,

37:21, 38:10, 38:21,
39:1, 39:4, 39:5,
44:22
  **ignore** [2] - 26:8,
26:16
  **ignored** [1] - 26:18
  **ignoring** [1] - 66:12
  **ill** [2] - 43:24, 45:20
  **illegal** [2] - 17:11,
18:1
  **illustrative** [1] -
35:20
  **imagination** [1] -
52:12
  **immediately** [1] -
84:22
  **impact** [14] - 13:16,
14:9, 14:10, 19:14,
19:16, 20:16, 27:21,
32:15, 32:17, 33:23,
39:23, 42:24, 48:9,
76:11
  **impacted** [1] - 20:9
  **impedance** [1] - 67:3
  **impeded** [1] - 8:14
  **impersonation** [1] -
39:7
  **Implosion** [1] - 37:16
  **important** [16] -
17:15, 18:4, 18:23,
58:3, 58:11, 60:10,
62:3, 62:22, 63:18,
66:20, 68:4, 69:19,
71:11, 72:2, 72:6,
78:15
  **importantly** [1] -
26:1
  **impose** [7] - 5:13,
40:8, 40:15, 73:22,
74:22, 81:1, 82:1
  **imposed** [5] - 42:2,
42:11, 82:18, 85:25,
86:11
  **imposes** [1] - 41:24
  **imposition** [1] -
84:20
  **imprisonment** [5] -
40:6, 43:24, 72:16,
73:23, 74:7
  **inappropriate** [1] -
38:17
  **incarcerated** [3] -
47:1, 68:25, 85:12
  **incarceration** [2] -
23:9, 82:8
  **inclined** [3] - 49:6,
49:11, 50:3
  **include** [5] - 40:6,
42:1, 43:10, 80:8,
82:20

**includes** [2] - 51:21,
85:5
  **including** [6] - 39:4,
49:25, 79:12, 80:22,
81:5, 84:17
  **inclusion** [1] - 43:21
  **incompetent** [1] -
60:17
  **inconsistent** [3] -
28:14, 66:6, 70:15
  **incur** [1] - 83:10
  **indecision** [1] - 28:7
  **indeed** [6] - 13:13,
26:11, 30:15, 31:21,
36:11, 76:10
  **independent** [2] -
37:20, 37:25
  **Indiana** [1] - 1:24
  **indicate** [3] - 19:19,
20:10, 32:7
  **indicated** [2] - 19:19,
64:21
  **indication** [1] - 69:1
  **indicative** [1] - 70:13
  **indicted** [3] - 57:21,
62:4, 77:21
  **indictment** [8] - 4:1,
21:18, 24:25, 26:1,
37:19, 38:2, 61:19,
80:13
  **indifference** [2] -
53:17, 57:1
  **individual** [10] - 8:6,
12:22, 14:13, 17:20,
18:12, 44:21, 50:21,
51:12, 54:7, 69:25
  **individuals** [15] -
13:20, 13:21, 14:2,
16:3, 19:8, 43:20,
54:2, 54:20, 54:21,
54:23, 55:1, 58:19,
59:12, 61:10, 75:17
  **induce** [2] - 37:22,
39:2
  **induced** [3] - 26:16,
33:6, 34:3
  **inducing** [1] - 28:5
  **indulgence** [1] - 46:5
  **industry** [2] - 27:14,
68:8
  **industry-specific** [1]
- 27:14
  **ineligible** [2] - 40:3,
40:19
  **infer** [1] - 20:8
  **influence** [1] - 15:14
  **influencing** [1] -
16:20
  **information** [6] -
20:7, 58:20, 74:19,

83:6, 83:7, 83:9
**initial** [4] - 42:23, 57:11, 78:24, 84:4
**injunction** [1] - 21:4
**innovative** [1] - 63:13
**innovator** [1] - 79:15
**inputs** [1] - 27:23
**insert** [1] - 66:7
**insightful** [1] - 63:13
**insistence** [1] - 33:16
**insolvent** [1] - 32:10
**inspection** [1] - 59:23
**inspector** [1] - 59:24
**install** [1] - 83:25
**installation** [3] - 84:8, 84:10, 84:11
**instance** [1] - 72:25
**instead** [2] - 26:19, 36:25
**instructing** [1] - 38:15
**insufficient** [1] - 35:19
**insults** [1] - 60:16
**integrity** [1] - 77:6
**intelligent** [1] - 81:23
**intend** [1] - 81:1
**intent** [5] - 15:18, 16:4, 16:12, 49:20, 56:2
**intention** [3] - 43:17, 78:3, 79:10
**intentionally** [2] - 8:9, 80:10
**interest** [3] - 49:19, 59:18, 77:18
**interested** [2] - 9:8, 11:4
**internet** [7] - 13:5, 18:8, 18:17, 35:11, 37:17, 38:9, 83:17
**interrupt** [1] - 75:16
**intervening** [1] - 64:10
**intimidation** [2] - 58:15, 58:22
**intricate** [3] - 18:6, 18:9, 18:21
**introducing** [1] - 12:16
**intuitive** [1] - 27:25
**invented** [1] - 50:17
**invest** [8] - 8:11, 15:24, 20:5, 33:3, 33:6, 34:11, 34:15, 77:9
**invested** [12] - 16:3,

19:6, 19:17, 19:20, 20:11, 32:19, 32:24, 33:13, 33:23, 76:13, 76:14
**investigate** [2] - 58:2, 61:9
**investigated** [1] - 71:16
**investigation** [18] - 4:5, 5:3, 5:16, 6:23, 7:2, 7:3, 7:5, 8:15, 12:24, 41:21, 57:16, 57:23, 59:1, 60:20, 77:6, 77:24, 85:4, 85:9
**Investigator** [1] - 77:20
**investigator** [1] - 58:6
**investigator's** [1] - 58:5
**investigators** [4] - 38:8, 38:17, 61:10, 80:11
**investing** [5] - 20:2, 26:9, 26:12, 33:19, 76:21
**investment** [2] - 32:12, 33:10
**investments** [1] - 19:23
**investor** [6] - 15:15, 16:20, 30:8, 31:5, 31:6, 35:5
**Investors** [1] - 37:17
**investors** [22] - 12:3, 15:24, 26:8, 26:16, 26:22, 27:1, 28:18, 30:22, 31:3, 31:9, 31:25, 34:25, 37:22, 38:3, 38:14, 38:21, 39:2, 39:3, 54:9, 54:16, 57:18, 76:12
**investors'** [1] - 27:2
**involuntary** [1] - 85:16
**involve** [2] - 36:18, 71:11
**involved** [7] - 8:8, 18:11, 36:13, 38:22, 54:5, 70:6, 77:7
**involvement** [4] - 28:5, 34:5, 36:15, 54:2
**involves** [1] - 35:22, 35:25
**inward** [1] - 53:19
**irrational** [1] - 28:18
**irrationally** [2] - 10:9, 15:18

**isolated** [2] - 31:8, 34:21
**issue** [17] - 9:19, 17:3, 17:9, 19:1, 19:22, 20:1, 23:4, 25:20, 28:15, 44:14, 45:2, 48:4, 50:24, 63:3, 63:10, 68:19, 81:4
**issued** [1] - 25:11
**issues** [14] - 9:11, 21:1, 23:8, 66:22, 69:1, 69:8, 69:9, 69:11, 69:14, 72:11, 74:3, 74:11, 75:7, 75:11
**issuing** [1] - 16:18
**itself** [2] - 10:24, 73:5

## J

**Jagonich** [1] - 69:23
**jail** [8] - 47:20, 60:25, 68:22, 68:23, 69:3, 72:7, 74:5
**JCD** [2] - 32:25, 34:2
**Jim** [1] - 24:11
**Jingonich** [1] - 69:22
**job** [3] - 19:25, 61:2, 68:9
**jobs** [2] - 60:12, 79:13
**JONAH** [1] - 1:20
**Jonah** [1] - 3:17
**JOSE** [2] - 1:18, 1:19
**Joshua** [1] - 24:9
**José** [2] - 3:17, 3:18
**JUDGE** [1] - 1:11
**judgment** [6] - 43:11, 43:22, 49:24, 82:2, 86:4
**July** [4] - 25:10, 25:16, 25:19, 28:11
**June** [2] - 25:2, 53:7
**jurisdictions** [1] - 35:24
**Justice** [3] - 12:2, 57:23, 59:22
**justice** [2] - 8:14, 68:7
**JUSTICE** [1] - 1:15
**justify** [1] - 19:11

## K

**Kate** [1] - 3:8
**KATHERINE** [1] -

1:14
**keep** [4] - 4:20, 26:9, 26:17, 27:1
**Keith** [3] - 3:3, 3:25, 82:2
**KEITH** [1] - 1:6
**Kevin** [1] - 3:15
**KEVIN** [1] - 1:17
**key** [5] - 10:19, 53:7, 64:1
**Kim** [15] - 51:22, 52:1, 55:15, 55:20, 63:1, 64:16, 64:18, 64:20, 64:25, 65:7, 65:8, 65:14, 70:20, 79:4
**kim** [1] - 55:5
**Kim's** [2] - 55:4, 55:10
**kind** [14] - 14:16, 16:24, 22:4, 29:6, 34:9, 44:8, 45:25, 46:10, 47:3, 49:8, 52:11, 52:12, 63:13, 79:14
**kit** [2] - 49:13, 49:20
**kits** [2] - 38:4, 49:12
**knock** [2] - 58:18
**knock-knock** [1] - 58:18
**knocking** [1] - 11:17
**known** [3] - 25:6, 25:18, 70:2
**knows** [1] - 53:10

## L

**labor** [1] - 66:10
**ladies** [1] - 3:13
**lady** [2] - 59:24, 59:25
**language** [2] - 58:16, 58:17
**large** [4] - 26:24, 31:18, 54:5, 77:11
**largely** [2] - 26:5, 70:15
**larger** [2] - 15:12, 36:18
**last** [7] - 4:9, 5:12, 25:11, 34:21, 55:14, 55:25, 81:20
**launched** [2] - 60:15, 61:23
**law** [13] - 4:25, 30:11, 33:20, 35:24, 42:4, 49:1, 54:5, 58:17, 63:11, 71:12, 76:25, 80:12

**lawyered** [1] - 3:21
**lawyers** [1] - 66:24
**lays** [1] - 7:5
**lead** [1] - 7:23
**learned** [1] - 64:10
**least** [14] - 8:6, 13:24, 14:1, 14:6, 14:13, 14:18, 19:15, 20:8, 33:9, 46:22, 47:18, 48:7, 72:22
**leave** [1] - 11:18
**leaves** [2] - 8:22, 32:15
**legal** [3] - 22:4, 75:7, 75:10
**legitimacy** [1] - 54:3
**legitimate** [4] - 49:12, 54:9, 63:9, 66:22
**lends** [2] - 54:2
**length** [2] - 78:14
**lengths** [2] - 26:11, 38:25
**lengthy** [2] - 72:10, 73:23
**less** [4] - 28:2, 34:4, 35:16, 55:10
**letter** [10] - 9:18, 15:15, 16:14, 16:21, 38:15, 53:22, 55:10, 63:2, 70:20, 79:4
**letters** [14] - 4:11, 50:1, 53:12, 54:18, 54:19, 59:1, 61:6, 63:12, 67:6, 67:8, 67:11, 77:17, 78:19, 79:11
**level** [29] - 7:10, 7:11, 7:12, 7:16, 7:24, 8:7, 8:12, 8:16, 8:19, 8:23, 9:1, 9:22, 19:10, 20:14, 20:19, 21:9, 22:6, 23:14, 23:15, 32:4, 32:18, 35:8, 35:13, 39:14, 39:16, 72:20, 73:1, 73:2, 73:4
**levels** [5] - 8:19, 14:17, 14:21, 57:15, 81:19
**lie** [4] - 38:8, 39:7, 57:19, 57:20
**lies** [5] - 10:10, 21:11, 59:15, 59:16
**life** [6] - 50:12, 60:16, 69:6, 72:8, 76:14, 81:21
**light** [4] - 5:11, 39:25, 75:15, 84:16
**likewise** [3] - 21:13,

22:12, 28:22
**limitation** [1] - 86:2
**limitations** [1] -
27:18
**limited** [1] - 36:20
**lines** [1] - 83:11
**Lines** [3] - 24:14,
24:15, 28:19
**Lisa** [3] - 17:22, 71:8,
88:12
**LISA** [2] - 2:2, 88:3
**list** [4] - 32:17, 33:7,
43:19
**listed** [2] - 41:10,
82:17
**listened** [1] - 26:19
**litigated** [1] - 9:19
**litigation** [2] - 24:12,
71:17, 71:25
**lives** [5] - 53:8,
53:15, 57:2, 60:11,
60:12
**living** [2] - 32:13,
76:5, 76:14
**LL** [1] - 33:2
**LLP** [1] - 1:21
**loan** [3] - 68:13,
76:19, 78:2
**local** [1] - 82:21
**locates** [1] - 35:23
**long-settled** [1] -
30:11
**look** [10] - 13:1, 15:7,
16:16, 17:20, 29:5,
36:25, 58:22, 65:7,
67:24, 76:18
**looking** [30] - 21:11,
21:21, 23:25, 24:14,
24:20, 25:3, 26:9,
26:20, 27:15, 27:21,
28:12, 28:19, 28:24,
29:9, 30:9, 30:17,
31:3, 31:10, 32:15,
33:14, 35:17, 36:3,
37:6, 37:13, 37:18,
38:1, 38:10, 38:12,
39:9, 64:6
**Lori** [1] - 3:18
**LORI** [1] - 1:18
**loss** [30] - 8:2, 9:7,
9:19, 10:8, 21:23,
21:24, 23:17, 23:22,
23:24, 24:4, 27:8,
27:11, 27:21, 28:22,
28:24, 30:7, 30:16,
31:13, 31:19, 31:24,
32:11, 33:9, 34:8,
43:20, 72:20, 72:21,
73:3, 79:24, 81:7
**losses** [8] - 21:15,

27:2, 31:6, 43:4,
43:21, 44:22, 44:23
**lost** [14] - 22:23,
32:19, 32:23, 32:25,
33:2, 33:5, 34:18,
55:11, 72:8, 76:16,
76:18, 76:25, 79:13
**loves** [1] - 11:21
**loving** [1] - 67:17
**lower** [1] - 73:21
**luck** [1] - 87:3

**M**

**mail** [2] - 59:24,
59:25
**mailbox** [2] - 18:13,
37:13
**maintained** [1] - 39:3
**majority** [1] - 73:19
**man** [4] - 37:18,
43:24, 60:23, 81:23
**Mandatory** [1] -
44:23
**mandatory** [4] -
40:13, 40:22, 82:16,
82:20
**manipulating** [2] -
59:9, 59:17
**manner** [4] - 9:19,
11:13, 36:6, 83:24
**manual** [1] - 7:9
**March** [10] - 10:20,
24:20, 27:7, 50:24,
51:12, 53:6, 57:3,
64:12, 65:5
**march** [1] - 33:19
**mark** [1] - 33:17
**market** [6] - 27:14,
29:12, 29:14, 29:16,
30:2, 33:4
**materials** [1] - 4:13
**matter** [5] - 4:23,
14:21, 15:20, 17:18,
65:14
**matters** [3] - 15:25,
24:12, 47:3
**MATTHEW** [1] - 1:14
**Matthew** [4] - 3:8,
37:18, 37:24, 63:22
**maximum** [4] - 40:8,
40:9, 40:11, 80:20
**MCC** [1] - 32:23
**McCants** [3] - 37:6,
39:9, 39:10
**McCarthy** [5] - 1:14,
3:8, 44:17, 45:7,
45:12
**McFADDEN** [1] -

1:10
**mean** [8] - 19:13,
46:22, 49:22, 52:11,
53:23, 56:17, 60:11,
70:4
**means** [17] - 8:9,
8:10, 12:10, 12:14,
14:13, 15:2, 18:4,
18:7, 35:9, 35:13,
35:21, 37:3, 37:9,
38:24, 39:9, 39:12,
39:14
**meant** [2] - 16:11,
21:2
**measure** [1] - 7:17
**mechanical** [1] -
4:20
**media** [1] - 83:15
**medical** [11] - 47:21,
67:20, 69:7, 69:9,
69:11, 69:14, 72:11,
74:3, 74:8, 74:9,
85:12
**meet** [1] - 9:22
**member** [1] - 77:7
**members** [1] - 54:24
**memoranda** [2] -
4:6, 5:18
**memorandum** [8] -
5:20, 9:20, 10:19,
17:6, 21:12, 30:10,
33:14, 35:17
**mention** [1] - 56:13
**mentioning** [1] -
65:2
**mere** [4] - 25:24,
37:4, 54:2, 54:7
**message** [7] - 13:5,
18:17, 38:6, 58:15,
61:5, 62:11, 80:17
**messages** [2] -
18:17, 37:22
**met** [2] - 32:16,
62:14
**methodology** [4] -
24:7, 27:9, 27:19,
27:23
**MICHELLE** [1] - 1:23
**middle** [1] - 76:13
**middle-class** [1] -
76:13
**might** [8] - 17:20,
20:9, 26:2, 34:12,
38:11, 55:5, 63:24,
76:20
**military** [2] - 32:20,
32:22
**Milligan** [6] - 18:11,
36:22, 37:8, 37:13,
39:10, 39:11

**million** [9] - 8:2, 8:3,
9:4, 23:23, 24:4,
31:25, 32:1, 40:11,
62:2
**mind** [4] - 4:20,
14:17, 22:16, 55:23
**minds** [1] - 60:4
**mine** [1] - 80:3
**mine-run** [1] - 80:3
**minimized** [3] -
21:10, 22:19, 78:14
**minimizes** [1] - 79:8
**minute** [1] - 74:24
**minutes** [1] - 48:21
**misconduct** [14] -
16:21, 17:11, 17:24,
23:5, 25:6, 27:3,
55:12, 78:6, 78:15,
79:7, 79:14, 79:17,
81:16, 84:17
**mislead** [1] - 39:2
**misleading** [2] -
15:10, 16:19
**misses** [1] - 33:17
**misstated** [3] -
17:10, 17:25, 66:17
**mistake** [1] - 51:19
**mistaken** [1] - 65:10
**mitigate** [1] - 74:19
**mitigating** [4] - 23:9,
80:2, 80:22, 81:9
**Mitts** [2] - 24:10,
27:9
**Mitts's** [3] - 24:16,
27:8, 27:17
**moment** [4] - 49:24,
51:18, 58:10, 61:4
**moments** [1] - 70:6
**money** [20] - 35:1,
47:2, 49:15, 50:15,
52:6, 53:20, 53:24,
54:14, 54:15, 54:21,
54:22, 55:2, 55:3,
57:5, 57:13, 68:11,
68:13, 70:8, 76:18,
78:25
**monitoring** [6] -
84:1, 84:3, 84:5, 84:8,
84:9, 84:11
**month** [2] - 10:21,
50:19
**month's** [1] - 4:9
**months** [13] - 9:3,
41:11, 41:12, 41:14,
68:22, 72:7, 72:16,
73:12, 73:13, 73:15,
73:16, 82:3, 82:4
**most** [5] - 30:12,
49:10, 51:3, 52:17,
82:17

**motion** [1] - 59:12
**motive** [2] - 55:4,
57:6
**Mousho** [2] - 63:23,
66:24
**moved** [1] - 29:24
**moving** [1] - 76:24
**MR** [71] - 3:7, 3:11,
3:14, 3:15, 3:23, 4:15,
4:17, 5:25, 6:4, 6:9,
6:17, 9:12, 9:14,
12:12, 13:18, 14:1,
14:20, 14:22, 14:25,
17:3, 19:15, 20:6,
20:24, 41:2, 41:4,
42:18, 42:22, 43:8,
43:15, 44:2, 44:4,
44:13, 45:15, 45:18,
46:5, 48:20, 50:5,
52:14, 52:20, 52:23,
54:1, 55:14, 56:9,
56:19, 56:21, 58:7,
58:9, 62:20, 62:22,
64:15, 65:1, 65:6,
65:11, 65:25, 68:19,
69:13, 69:21, 69:23,
69:25, 70:9, 74:13,
74:15, 75:3, 75:10,
75:16, 86:13, 86:15,
86:19, 86:21, 86:25,
87:8
**MS** [8] - 44:17, 45:7,
46:9, 46:24, 47:16,
48:1, 48:8, 48:15
**multiple** [3] - 57:14,
64:2, 64:4
**must** [19] - 36:25,
39:18, 41:22, 42:9,
82:5, 82:20, 82:21,
82:22, 82:25, 83:1,
83:5, 83:10, 83:13,
83:15, 83:25, 84:2,
84:3, 84:12, 86:3
**MVRA** [3] - 44:17,
44:23, 44:25

**N**

**name** [5] - 12:16,
12:25, 37:11, 37:13,
58:5
**named** [1] - 37:18
**names** [1] - 43:19
**national** [3] - 53:18,
62:12
**nature** [5] - 16:9,
42:9, 56:4, 62:23,
76:2
**naysayers** [1] - 38:5

**near** [1] - 80:19
**nearly** [1] - 33:2
**necessarily** [1] - 72:23
**necessary** [7] - 31:20, 41:25, 45:5, 49:5, 61:14, 81:12, 81:15
**need** [20] - 22:3, 37:3, 42:1, 42:11, 42:12, 43:13, 46:2, 46:3, 46:11, 46:20, 47:15, 47:16, 49:2, 52:3, 52:4, 52:5, 59:25, 60:5, 80:15, 80:17
**needed** [2] - 12:22, 32:18
**needs** [6] - 47:25, 53:20, 54:15, 57:7, 74:10, 81:19
**negates** [1] - 79:7
**never** [10] - 38:9, 49:19, 52:13, 60:24, 63:10, 68:5, 68:20, 70:21, 72:9, 79:9
**New** [1] - 1:16
**new** [5] - 50:15, 57:17, 57:21, 61:23
**next** [5] - 3:19, 23:16, 32:3, 51:11, 75:23
**NICK** [1] - 1:20
**Nick** [1] - 3:18
**Ninth** [1] - 30:18
**nobody** [1] - 11:4
**nom** [1] - 77:5
**none** [1] - 25:15
**nonprofit** [2] - 60:2, 60:3
**normal** [1] - 26:4
**normalcy** [1] - 51:10
**normally** [1] - 22:24
**Northwest** [5] - 1:16, 1:21, 1:24, 2:4, 88:14
**Note** [2] - 21:22, 36:3
**note** [12] - 18:23, 22:23, 27:10, 36:19, 63:18, 66:20, 68:4, 69:19, 71:11, 75:6, 78:13, 79:11
**noted** [19] - 19:1, 19:5, 20:12, 20:16, 39:20, 63:8, 63:25, 64:7, 64:15, 67:10, 67:11, 72:19, 73:3, 73:8, 73:11, 73:17, 73:20, 74:11, 86:12
**notes** [3] - 32:7, 68:24, 88:5

**nothing** [8] - 36:18, 45:6, 61:15, 62:7, 65:19, 66:6, 86:25
**notice** [6] - 25:21, 26:5, 26:17, 43:1, 86:3, 86:5
**noticed** [1] - 56:11
**notices** [2] - 25:24, 26:13
**notification** [1] - 46:3
**notify** [1] - 85:1
**noting** [1] - 71:20
**notion** [1] - 11:7
**number** [7] - 12:18, 13:18, 14:2, 14:3, 19:16, 20:10, 31:25
**numerous** [2] - 32:17, 61:6

## O

**object** [2] - 45:18, 45:22
**objection** [4] - 5:22, 24:13, 48:2, 56:14
**objections** [7] - 5:4, 9:6, 21:6, 23:16, 56:17, 86:11
**objective** [1] - 29:5
**objects** [2] - 32:3, 35:7
**obligation** [2] - 45:10, 85:2
**obligations** [1] - 84:22
**obscure** [1] - 38:25
**observational** [2] - 29:17, 30:4
**obstruct** [1] - 57:23
**obstructed** [2] - 8:13, 77:24
**obstruction** [10] - 4:2, 7:12, 7:20, 40:9, 56:13, 57:15, 61:22, 62:7, 68:7, 71:10
**obtain** [2] - 32:14, 39:18
**obviously** [4] - 45:8, 49:3, 55:4, 75:7
**occupies** [1] - 73:1
**occur** [1] - 49:23
**occurred** [2] - 22:11
**odd** [1] - 46:14
**OF** [5] - 1:1, 1:3, 1:10, 1:15, 1:23
**off-ramp** [1] - 44:18
**offender** [4] - 14:14, 20:17, 20:19, 40:4

**offense** [34] - 5:14, 7:9, 7:11, 7:12, 7:16, 7:20, 7:21, 7:24, 8:16, 8:19, 8:21, 8:22, 9:1, 17:17, 18:6, 23:15, 26:10, 32:5, 35:9, 42:2, 42:3, 42:10, 56:5, 71:10, 72:2, 72:6, 72:17, 72:20, 73:1, 73:2, 73:4, 76:2
**offenses** [2] - 7:25, 21:20
**offer** [1] - 49:6
**offered** [2] - 24:9, 24:11
**Office** [2] - 83:9, 85:5
**office** [19] - 4:6, 5:17, 7:13, 7:25, 21:16, 23:12, 24:2, 39:13, 41:8, 41:11, 41:19, 82:13, 83:5, 83:8, 83:12, 83:25, 84:3, 85:3, 85:9
**OFFICE** [1] - 1:23
**office's** [4] - 6:22, 7:6, 32:3, 35:7
**officer** [4] - 31:23, 71:13, 83:1, 83:19
**Officer** [1] - 3:4
**offices** [2] - 35:23, 76:12
**official** [1] - 88:12
**Official** [1] - 2:2
**offshore** [1] - 36:1
**often** [3] - 22:8, 30:15, 54:4
**old** [1] - 45:20
**once** [5] - 48:1, 48:12, 57:21, 77:4, 81:24
**one** [34] - 9:5, 10:6, 13:3, 14:6, 14:13, 14:18, 33:18, 34:1, 34:9, 34:10, 34:22, 35:22, 47:25, 49:6, 49:16, 54:17, 54:20, 55:1, 55:5, 61:12, 63:19, 64:1, 64:17, 65:16, 66:9, 67:8, 69:22, 70:14, 71:2, 73:23, 73:25, 76:16, 79:12
**ones** [1] - 19:18
**open** [1] - 83:10
**openness** [1] - 27:18
**operating** [1] - 40:25
**operation** [1] - 54:9
**operations** [1] - 36:6
**opportunity** [7] - 20:23, 47:12, 47:22,

50:14, 50:15, 57:4, 74:18
**opposed** [1] - 28:22
**options** [1] - 25:15
**order** [8] - 25:14, 35:12, 38:21, 39:2, 43:11, 57:13, 82:10, 85:6
**ordered** [1] - 47:4
**organizations** [1] - 60:8
**otherwise** [4] - 26:2, 42:17, 62:19, 78:25
**ought** [1] - 48:5
**outlined** [1] - 27:10
**outside** [1] - 74:5
**outstanding** [3] - 5:3, 75:7, 75:10
**overall** [2] - 34:7, 72:3
**overstated** [1] - 63:4
**overtime** [1] - 53:8
**owe** [1] - 55:2
**owes** [1] - 54:22
**own** [8] - 10:8, 21:14, 22:5, 22:10, 26:1, 26:24, 74:5, 77:18

## P

**p.m** [1] - 1:7
**package** [2] - 66:7
**Page** [23] - 21:12, 21:15, 23:25, 24:14, 24:15, 24:21, 25:3, 26:21, 28:12, 28:19, 28:24, 29:9, 30:9, 30:18, 31:4, 31:15, 33:14, 35:17, 36:24, 37:7, 37:14, 39:10
**Pages** [4] - 26:10, 27:15, 27:21, 28:12
**paid** [4] - 54:21, 55:2, 55:6, 85:2
**pandemic** [4] - 51:6, 57:3, 77:15, 80:9
**Panikar** [9] - 3:17, 6:5, 6:6, 14:24, 23:7, 41:3, 62:21, 74:17, 78:21
**PANIKAR** [25] - 1:20, 14:25, 17:3, 19:15, 20:6, 20:24, 41:4, 45:15, 45:18, 46:5, 62:20, 62:22, 64:15, 65:1, 65:6, 65:11, 65:25, 68:19, 69:13, 69:21, 69:23, 69:25, 70:9, 74:13, 74:15

**Panikar's** [1] - 79:4
**Paper** [1] - 26:21
**papers** [2] - 6:23, 64:6
**paragraph** [2] - 38:5, 38:7
**Paragraph** [4] - 37:21, 38:1, 38:10, 38:13
**Paragraphs** [3] - 37:18, 37:23, 38:18
**paralegals** [1] - 3:12
**Parchment** [2] - 26:20, 26:21
**part** [10] - 5:12, 12:19, 15:8, 26:24, 34:7, 54:12, 70:1, 71:17, 71:25, 85:21
**participate** [1] - 68:8
**participated** [1] - 38:9
**particular** [9] - 9:24, 41:7, 68:14, 71:2, 71:19, 72:3, 72:14, 75:14, 81:7
**particularly** [7] - 10:6, 17:14, 18:18, 36:12, 67:16, 72:11, 74:1
**parties** [11] - 9:6, 9:7, 9:11, 24:19, 27:20, 36:15, 39:6, 41:7, 48:5, 79:19, 87:10
**partner** [3] - 11:17, 15:13, 54:24
**party** [2] - 4:9, 12:23
**passable** [2] - 53:2, 54:13
**passes** [1] - 31:19
**past** [1] - 66:22
**Patel** [1] - 67:7
**Paterson** [1] - 26:21
**patiently** [1] - 75:23
**pay** [8] - 43:12, 45:1, 45:8, 54:5, 54:6, 82:5, 84:20
**payable** [1] - 84:22
**paying** [1] - 54:1
**pecuniary** [1] - 40:23
**penalties** [1] - 40:5
**pending** [1] - 82:10
**people** [14] - 34:11, 34:15, 34:22, 47:2, 57:1, 62:12, 77:9, 77:14, 79:13, 79:17, 80:10, 81:22, 83:16, 84:12
**people's** [4] - 53:8, 53:15, 60:11, 60:12

**per** [3] - 29:8, 29:16, 40:14
**percent** [3] - 73:1, 73:17, 76:10
**percentage** [1] - 47:3
**perhaps** [1] - 30:12
**period** [15] - 11:25, 13:6, 24:18, 24:19, 24:23, 24:24, 25:2, 25:10, 27:5, 27:6, 27:11, 28:4, 28:10, 29:7, 29:8
**periodic** [1] - 84:4
**perjury** [1] - 60:19
**Perkins** [6] - 58:7, 58:8, 58:9, 60:14, 61:1, 77:20
**perkins** [1] - 61:1
**Perkins's** [1] - 60:16
**permission** [2] - 54:14, 86:7
**permitted** [1] - 86:1
**perpetuating** [1] - 61:3
**person** [5] - 14:18, 37:12, 67:24, 79:15, 82:13
**persona** [3] - 13:2, 13:6, 18:16
**personal** [4] - 57:7, 58:13, 60:16, 61:11
**personally** [2] - 39:19, 80:10
**perspective** [2] - 48:15, 49:21
**persuade** [3] - 26:7, 26:25, 38:14
**persuasive** [4] - 24:7, 25:15, 31:7, 79:6
**Peterson** [1] - 46:7
**PETERSON** [7] - 1:23, 46:9, 46:24, 47:16, 48:1, 48:8, 48:15
**physical** [1] - 71:12
**picture** [2] - 67:22, 73:10
**piecemeal** [1] - 36:24
**pieces** [1] - 10:19
**place** [2] - 65:18, 79:10
**placing** [1] - 8:24
**Plaintiff** [1] - 1:4
**planned** [1] - 32:21
**planning** [1] - 38:23
**plans** [1] - 76:17
**plea** [10] - 10:3, 15:8, 21:11, 21:19, 22:14,

22:24, 85:16, 85:18, 85:21, 85:22
**pleaded** [1] - 21:18
**pled** [2] - 3:25, 75:11
**plenty** [1] - 73:8
**plot** [1] - 39:6
**plotting** [1] - 57:25
**Plutonium** [1] - 37:16
**point** [39] - 9:15, 9:23, 11:10, 12:6, 13:16, 14:5, 14:11, 14:14, 14:15, 15:17, 18:19, 20:17, 20:19, 22:23, 28:9, 30:5, 30:8, 34:9, 40:4, 41:7, 43:14, 45:9, 48:10, 49:13, 50:8, 50:12, 50:13, 51:21, 52:14, 55:25, 61:12, 67:5, 68:23, 70:3, 70:16, 71:2, 74:16, 79:3, 79:25
**pointed** [3] - 49:25, 62:25, 63:19
**points** [7] - 15:16, 25:12, 34:21, 36:21, 39:17, 45:19, 79:2
**policy** [2] - 42:8, 79:23
**poor** [1] - 49:24
**pornography** [1] - 46:11
**portion** [3] - 69:6, 72:19, 73:2
**pose** [1] - 12:22
**position** [6] - 15:5, 17:4, 31:16, 43:16, 44:20, 70:5
**possess** [1] - 82:22
**possession** [1] - 37:4
**possible** [2] - 28:25, 50:8
**possibly** [2] - 54:12, 68:17
**post** [2] - 27:2, 37:21
**post-suspension** [1] - 27:2
**postal** [1] - 59:23
**posted** [1] - 35:11
**posters** [1] - 38:6
**posts** [1] - 61:5
**potential** [1] - 27:18
**potentially** [2] - 44:15, 47:21
**practical** [1] - 46:25
**practice** [1] - 50:1
**practices** [1] - 27:24
**precedent** [1] - 36:21

**precisely** [1] - 73:6
**preliminary** [1] - 21:4
**preponderance** [4] - 13:11, 31:13, 35:4, 77:23
**presence** [2] - 46:17, 54:7
**present** [7] - 15:19, 17:13, 19:2, 22:14, 22:25, 47:18, 74:19
**presented** [2] - 21:13, 28:14
**presentence** [12] - 4:4, 5:2, 5:16, 5:23, 6:7, 6:22, 7:2, 7:3, 7:5, 41:21, 85:3, 85:8
**presenting** [2] - 19:11, 48:2
**presents** [1] - 48:1
**president** [1] - 50:1
**press** [12] - 15:11, 15:12, 16:19, 17:24, 19:3, 25:11, 34:10, 50:16, 57:12, 65:18, 66:17, 66:19
**pretended** [3] - 37:17, 37:24, 38:20
**pretense** [1] - 77:10
**pretrial** [1] - 84:18
**pretty** [5] - 15:9, 16:17, 16:22, 53:1, 68:17
**prevent** [1] - 62:9
**previously** [1] - 54:21
**prey** [1] - 62:11
**price** [5] - 27:13, 29:7, 29:15, 29:23, 30:1
**prices** [3] - 29:6, 30:23, 76:9
**primarily** [1] - 7:17
**prison** [1] - 40:8
**Pritchard** [2] - 17:22, 71:8
**private** [8] - 10:22, 50:20, 50:21, 51:1, 51:11, 55:16, 55:22, 76:12
**privately** [4] - 11:6, 13:8, 46:6, 75:1
**pro** [1] - 71:23
**probation** [29] - 4:6, 5:17, 6:22, 7:6, 7:13, 7:25, 21:16, 23:12, 24:2, 31:23, 32:3, 35:7, 39:13, 40:6, 40:19, 41:8, 41:11, 41:16, 41:19, 82:13,

83:1, 83:5, 83:8, 83:12, 83:19, 83:25, 84:3, 85:3, 85:9
**PROBATION** [1] - 2:1
**Probation** [6] - 3:4, 8:18, 9:18, 41:14, 41:16, 85:5
**Probation's** [1] - 21:7
**problem** [7] - 17:2, 19:15, 19:21, 20:15, 60:5, 66:11, 66:18
**problems** [1] - 68:25
**procedural** [1] - 6:9
**proceed** [2] - 4:19, 87:6
**proceeded** [1] - 61:21
**proceeding** [2] - 4:3, 4:22
**proceedings** [2] - 85:17, 88:6
**Proceedings** [1] - 87:11
**process** [6] - 16:8, 38:19, 45:22, 46:3, 47:1, 70:21
**produce** [1] - 78:23
**produced** [2] - 31:8, 88:6
**product** [13] - 26:15, 52:4, 64:18, 64:19, 64:21, 66:7, 66:13, 70:11, 70:17, 70:18, 78:23, 79:1, 79:10
**productive** [1] - 78:18
**products** [1] - 70:2
**Professor** [4] - 24:9, 24:16, 27:8, 27:17
**professor** [1] - 27:9
**profile** [2] - 13:4, 73:11
**profit** [1] - 34:22
**profited** [2] - 31:10, 35:5
**progress** [2] - 15:10, 16:19
**prohibited** [1] - 84:7
**prolific** [1] - 67:21
**prolong** [1] - 45:22
**promote** [2] - 42:3, 42:7
**properly** [2] - 34:19, 81:3
**propose** [1] - 79:19
**proposed** [2] - 21:7, 24:18
**proposing** [1] -

42:21
**prosecuted** [1] - 38:12
**prosecution** [3] - 8:15, 10:1, 11:12
**prosecutors** [1] - 65:10
**prospect** [1] - 58:21
**prospective** [1] - 26:8
**prospects** [1] - 38:1
**protect** [1] - 42:6
**prove** [5] - 30:13, 31:13, 31:20, 33:13, 47:8
**provide** [7] - 18:7, 35:20, 42:3, 75:25, 77:14, 83:5, 86:17
**provided** [1] - 43:1
**provides** [2] - 7:9, 29:18
**providing** [1] - 20:7
**proximity** [2] - 30:21, 31:1
**pseudonym** [2] - 35:10, 39:5
**PSR** [7] - 9:15, 18:24, 20:10, 23:22, 45:21, 68:11, 68:24
**PSR's** [3] - 9:15, 23:17, 23:21
**psychological** [1] - 77:3
**PUBLIC** [1] - 1:23
**public** [9] - 25:6, 25:22, 25:23, 26:12, 26:13, 28:5, 39:2, 42:6, 68:12
**publicly** [1] - 13:7
**punished** [1] - 80:18
**punishment** [2] - 42:3, 72:5
**purchasers** [1] - 30:24
**purchases** [1] - 29:22
**pure** [1] - 53:21
**purely** [2] - 57:6, 57:7
**purported** [1] - 37:12
**purpose** [2] - 10:2, 51:8
**purposes** [10] - 7:4, 7:14, 7:23, 25:17, 34:19, 41:25, 42:1, 43:5, 44:23, 81:13
**pursuant** [4] - 83:18, 83:19, 84:14, 85:24
**put** [13] - 17:1, 24:8, 29:4, 34:18, 45:2,

49:20, 50:15, 53:3, 59:15, 64:4, 71:7, 79:8
**puts** [1] - 23:22
**putting** [1] - 50:16
**puzzled** [1] - 15:5

## Q

**quadruples** [1] - 72:25
**qualifies** [3] - 33:8, 37:2, 39:11
**qualify** [3] - 13:21, 14:14, 39:9
**query** [1] - 49:4
**questions** [4] - 6:10, 12:3, 77:8
**quickly** [1] - 49:14
**quite** [3] - 15:4, 67:2, 68:16
**quote** [8] - 21:13, 21:15, 36:23, 36:24, 38:16, 38:17, 38:18

## R

**Rachel** [1] - 3:12
**radiologist** [1] - 67:20
**raise** [8] - 50:15, 52:6, 53:20, 54:14, 54:15, 57:13, 77:8, 78:25
**raised** [1] - 9:11
**Ramos** [1] - 3:18
**RAMOS** [1] - 1:18
**ramp** [1] - 44:18
**ramps** [1] - 44:8
**ran** [2] - 17:9, 63:3
**range** [11] - 7:7, 9:2, 9:3, 22:21, 32:1, 40:18, 72:14, 73:12, 73:15, 81:3, 81:5
**ranges** [1] - 42:11
**rare** [1] - 31:20
**rarely** [2] - 31:19, 78:6
**rather** [2] - 22:21, 81:25
**RDR** [3] - 2:2, 88:3, 88:12
**reaches** [2] - 35:15, 35:18
**reactions** [1] - 23:8
**read** [3] - 6:7, 34:1, 54:19
**ready** [1] - 75:2

**real** [9] - 9:25, 11:12, 20:1, 20:15, 38:20, 76:13, 77:2, 78:17, 78:23
**realistically** [1] - 68:5
**realities** [1] - 72:23
**reality** [2] - 22:8, 53:18
**realized** [2] - 63:24, 65:21
**really** [37] - 10:19, 12:14, 12:20, 13:2, 16:10, 16:14, 18:1, 18:18, 18:19, 18:25, 19:8, 43:15, 48:12, 48:13, 49:5, 50:20, 51:25, 52:7, 53:5, 58:3, 58:24, 60:10, 62:3, 63:1, 64:14, 66:11, 67:25, 69:5, 70:20, 70:21, 71:1, 72:12, 72:16, 74:4, 77:18, 77:22, 79:16
**reason** [6] - 11:19, 50:7, 60:25, 61:14, 63:8, 67:10
**reasonable** [3] - 83:20, 83:23, 83:24
**reasons** [4] - 12:5, 13:10, 33:24, 39:24
**rebuild** [1] - 81:21
**rebuttal** [1] - 33:11
**recap** [2] - 24:9, 31:23
**recast** [1] - 33:22
**receive** [5] - 21:9, 39:15, 73:19, 73:21, 74:10
**received** [3] - 4:4, 4:11, 76:24
**recent** [1] - 82:17
**recognize** [3] - 22:6, 78:12, 81:16
**recognizing** [1] - 80:15
**recollection** [1] - 44:8
**recommend** [2] - 74:7, 85:11
**recommendation** [7] - 4:5, 5:18, 41:19, 42:17, 62:19, 72:15, 74:9
**recommended** [4] - 5:5, 8:18, 41:8, 41:11
**recommends** [2] - 41:14, 41:16
**record** [8] - 3:6, 4:9, 40:1, 63:10, 66:21,

75:25, 78:13, 86:12
**records** [1] - 42:13
**recovered** [1] - 44:11
**redacted** [1] - 65:13
**reduced** [1] - 8:19
**reduction** [11] - 9:16, 9:23, 12:7, 14:15, 21:9, 22:17, 23:2, 23:14, 39:16, 39:18, 40:4
**refer** [1] - 69:10
**referring** [1] - 65:4
**reflect** [3] - 30:23, 42:2, 63:1
**reflecting** [1] - 72:23
**reflection** [1] - 71:1
**reflective** [1] - 72:16
**refrain** [1] - 82:22
**refute** [1] - 59:14
**refutes** [1] - 11:7
**regard** [1] - 76:1
**regarding** [3] - 22:13, 23:17, 36:11
**regards** [2] - 16:6, 40:25
**regulation** [1] - 33:20
**rehabilitation** [1] - 42:7
**REILLY** [1] - 1:14
**Reilly** [3] - 3:8, 16:1, 24:11
**Reilly's** [4] - 24:17, 28:7, 28:17, 28:22
**reject** [2] - 39:24, 40:1
**relate** [1] - 34:13
**relating** [1] - 6:14
**relationship** [2] - 11:20, 64:17
**release** [15] - 9:5, 25:11, 34:10, 40:16, 40:17, 41:15, 78:4, 78:8, 80:12, 82:7, 82:9, 82:12, 83:7, 84:18, 85:3
**released** [3] - 66:16, 81:20, 82:14
**releases** [10] - 15:12, 16:19, 17:25, 19:4, 50:16, 57:13, 65:18, 66:17, 66:19
**releasing** [1] - 17:24
**relentless** [2] - 57:25, 59:12
**relevant** [14] - 10:4, 11:24, 21:21, 22:2, 23:4, 27:6, 34:8, 34:24, 41:22, 55:7, 55:21, 62:7, 75:15,

80:6
**reliable** [2] - 24:8, 67:1
**reliably** [1] - 27:9
**reliance** [4] - 15:20, 15:23, 19:1, 35:12
**relied** [4] - 15:24, 19:3, 30:9, 30:22
**relies** [1] - 33:11
**rely** [1] - 31:9
**remain** [1] - 47:20
**remained** [1] - 27:3
**remains** [1] - 17:18
**remanding** [1] - 87:2
**remarkable** [3] - 26:14, 56:24, 57:8
**remarks** [1] - 75:25
**remember** [4] - 18:5, 57:2, 61:18, 72:6
**remind** [3] - 13:16, 49:22, 58:5
**remorse** [1] - 78:10
**reoffend** [1] - 68:18
**repaying** [2] - 78:3, 81:22
**repeatedly** [3] - 21:14, 28:8, 51:23
**repeats** [1] - 51:14
**report** [14] - 4:5, 5:3, 5:16, 5:24, 6:8, 6:23, 7:2, 7:3, 7:5, 41:21, 82:13, 85:4, 85:9, 87:5
**reported** [1] - 38:11
**REPORTED** [1] - 2:2
**Reporter** [2] - 2:2, 88:12
**reports** [1] - 34:2
**represent** [1] - 22:10
**representation** [1] - 22:9
**reputable** [2] - 54:7, 54:8
**reputation** [5] - 59:7, 59:13, 60:23, 68:10, 72:8
**request** [7] - 42:16, 47:13, 62:18, 82:11, 86:7, 87:5, 87:7
**requested** [2] - 83:6, 85:12
**requesting** [1] - 43:2
**requests** [1] - 86:17
**require** [1] - 74:3
**required** [4] - 5:14, 12:18, 33:17, 40:22
**requirement** [2] - 44:5, 82:24
**requires** [1] - 5:10
**research** [1] - 64:9

**researcher** [1] - 67:21
**residence** [1] - 85:6
**resolve** [1] - 5:4
**resort** [1] - 30:15
**resources** [1] - 74:2
**respect** [21] - 8:15, 13:13, 16:5, 16:7, 16:13, 18:4, 18:22, 29:17, 42:4, 42:22, 44:2, 54:18, 61:12, 65:1, 66:18, 67:5, 68:3, 68:14, 69:17, 71:10, 72:5
**respected** [1] - 71:21
**respectfully** [1] - 50:6
**respond** [4] - 12:9, 47:13, 47:14, 49:4
**response** [2] - 33:15, 55:14
**responsibility** [20] - 8:20, 9:16, 9:21, 10:2, 10:4, 12:7, 15:2, 15:17, 16:23, 17:12, 18:3, 21:10, 21:17, 22:5, 22:17, 23:1, 23:11, 23:13, 23:13, 58:1, 75:12
**responsible** [1] - 11:14
**rest** [1] - 3:16
**restitution** [21] - 40:6, 40:21, 40:22, 41:17, 42:21, 42:22, 43:5, 43:9, 43:12, 44:2, 44:5, 45:11, 47:8, 48:4, 48:5, 48:7, 82:10, 83:2, 83:3, 86:17, 87:7
**Restitution** [1] - 44:24
**result** [11] - 8:3, 19:4, 27:14, 34:14, 50:11, 50:13, 67:14, 69:2, 72:9, 76:10, 77:1
**resulted** [2] - 28:23, 32:5
**resume** [1] - 57:16
**retire** [1] - 76:21
**retired** [1] - 32:25
**retirement** [3] - 32:11, 33:1, 33:2
**retires** [1] - 32:21
**return** [2] - 51:10, 85:8
**returned** [2] - 29:15, 30:2
**revealed** [1] - 25:8,

29:25
  **revictimizes** [1] - 59:8
  **reviewed** [6] - 4:4, 4:8, 4:14, 5:2, 9:7, 37:25
  **revision** [1] - 82:17
  **revocation** [3] - 22:22, 59:11, 68:14
  **revoked** [4] - 61:16, 61:25, 68:21, 78:8
  **rightly** [1] - 45:9
  **rise** [1] - 35:12
  **road** [1] - 62:13
  **Robert** [1] - 69:22
  **role** [1] - 21:10
  **room** [1] - 32:16
  **Room** [1] - 2:4
  **rose** [1] - 29:8
  **roughly** [1] - 73:17
  **ruin** [2] - 60:11, 60:12
  **rule** [1] - 21:6
  **run** [8] - 40:17, 41:12, 41:15, 68:12, 70:25, 80:3, 82:8, 82:9
  **runs** [1] - 30:11

## S

  **saga** [1] - 57:11
  **sake** [2] - 34:25, 69:8
  **saliva** [7] - 19:6, 19:20, 34:6, 63:17, 63:23, 65:16, 65:17
  **sample** [3] - 64:2, 66:1, 71:5
  **Sanjay** [1] - 67:7
  **sat** [1] - 50:23
  **satisfied** [1] - 6:19
  **satisfy** [1] - 57:7
  **save** [2] - 53:8, 59:6
  **savings** [7] - 32:12, 32:19, 32:23, 33:3, 33:9, 76:14, 76:17
  **saw** [6] - 55:10, 55:15, 57:4, 59:11, 66:2, 68:11
  **scale** [2] - 31:18, 31:21
  **scared** [2] - 57:2, 77:14
  **scheme** [10] - 26:7, 34:7, 35:22, 50:10, 76:22, 76:24, 77:5, 77:22, 80:11, 81:17
  **schemes** [5] - 33:1, 34:15, 36:18, 54:4,

77:4
  **scheming** [1] - 58:1
  **School** [1] - 31:4
  **school** [2] - 67:18, 67:20
  **scientific** [1] - 60:4
  **scope** [1] - 25:5
  **screen** [1] - 11:3
  **screening** [1] - 51:9
  **se** [1] - 71:23
  **seal** [1] - 69:9
  **search** [3] - 83:15, 83:19, 83:23
  **searches** [4] - 83:18, 84:4, 84:6, 84:13
  **SEC** [30] - 12:2, 12:24, 16:21, 25:13, 25:14, 25:21, 26:4, 26:8, 26:13, 26:19, 26:23, 38:11, 38:15, 38:17, 39:3, 57:15, 57:20, 58:6, 58:19, 58:20, 59:1, 59:21, 60:20, 61:8, 69:18, 71:16, 71:18, 71:24, 77:4, 77:7
  **SEC's** [4] - 25:22, 26:25, 29:25, 35:12
  **Second** [1] - 73:3
  **second** [3] - 5:5, 8:5, 10:14
  **Section** [2] - 1:15, 41:10
  **secure** [1] - 68:13
  **securities** [4] - 4:2, 31:20, 68:6, 68:8
  **see** [15] - 47:17, 49:2, 50:3, 50:16, 54:23, 54:25, 57:22, 57:23, 58:14, 61:4, 61:5, 61:6, 69:1, 70:21, 78:6
  **seek** [1] - 44:5
  **seeking** [2] - 43:23, 86:18
  **seem** [3] - 4:19, 50:2, 50:8
  **sees** [2] - 50:14, 50:15
  **self** [3] - 28:9, 59:18, 77:18
  **self-contradictory** [1] - 28:9
  **self-interest** [2] - 59:18, 77:18
  **semantics** [1] - 16:15
  **send** [2] - 62:11, 80:17
  **sending** [2] - 18:12,

57:12
  **senior** [1] - 32:25
  **sense** [4] - 29:11, 31:15, 36:10, 64:7
  **sensitive** [1] - 22:8
  **sent** [7] - 17:21, 18:17, 37:11, 49:23, 50:24, 51:18, 74:9
  **sentence** [35] - 5:6, 5:11, 5:13, 13:20, 41:7, 41:9, 41:11, 41:24, 42:1, 42:5, 42:11, 42:12, 43:23, 62:9, 62:19, 67:23, 68:2, 72:3, 72:10, 73:19, 73:23, 74:6, 74:20, 74:22, 80:19, 81:1, 81:4, 81:11, 81:15, 82:1, 83:3, 85:6, 85:20, 85:25, 86:11
  **sentenced** [1] - 82:3
  **sentences** [4] - 41:9, 42:14, 73:21, 79:19
  **SENTENCING** [1] - 1:10
  **sentencing** [28] - 3:24, 4:5, 4:6, 4:8, 4:18, 5:6, 5:9, 5:17, 5:19, 6:24, 7:4, 8:15, 9:20, 10:19, 11:15, 17:6, 27:25, 38:24, 39:25, 40:19, 41:5, 41:25, 42:17, 72:13, 79:23, 80:5, 80:25, 81:13
  **Sentencing** [1] - 27:10
  **serious** [7] - 4:22, 32:16, 60:18, 62:14, 80:23
  **seriousness** [3] - 42:2, 72:5, 72:17
  **serve** [3] - 7:3, 82:3, 82:6
  **service** [1] - 59:23
  **services** [1] - 24:11
  **serving** [1] - 81:14
  **set** [8] - 5:12, 5:23, 18:13, 37:10, 41:23, 42:16, 62:18, 74:9
  **setting** [2] - 18:3, 18:8
  **settled** [1] - 30:11
  **seven** [1] - 13:20
  **seventh** [1] - 62:1
  **several** [5] - 56:22, 75:7, 75:10, 80:21, 81:14
  **severely** [1] - 80:18

  **severity** [4] - 17:16, 78:9, 78:14, 81:16
  **shall** [8] - 40:17, 82:12, 82:15, 83:4, 84:6, 84:25, 85:3, 85:8
  **sham** [2] - 53:25, 78:20
  **share** [5] - 29:8, 29:13, 29:16, 41:7, 83:8
  **shared** [1] - 55:23
  **shareholder** [5] - 15:15, 16:21, 37:20, 38:15, 61:5
  **shareholders** [1] - 44:22
  **sheer** [1] - 58:21
  **shells** [2] - 36:1, 36:12
  **shit** [2] - 38:16, 53:12
  **shocking** [2] - 76:4, 78:5
  **Shore** [1] - 73:14
  **short** [2] - 24:5, 81:11
  **shorter** [1] - 73:25
  **shortly** [1] - 30:24
  **show** [4] - 31:9, 34:2, 34:22, 50:4
  **showed** [1] - 55:22
  **showing** [1] - 58:18
  **shown** [2] - 17:6, 76:11
  **shows** [1] - 13:23
  **shut** [2] - 58:1, 58:22
  **sick** [1] - 77:14
  **sides** [1] - 79:20
  **significant** [11] - 13:3, 13:15, 13:24, 14:10, 23:18, 30:23, 72:19, 73:2, 78:5, 80:21, 81:15
  **significantly** [2] - 29:14, 73:21
  **similar** [5] - 37:9, 37:15, 42:13, 42:14, 73:15
  **simply** [6] - 12:15, 16:7, 28:17, 30:14, 34:4
  **single** [1] - 54:20
  **sitting** [2] - 3:19, 52:12
  **situation** [4] - 4:21, 44:9, 46:10, 76:7
  **six** [2] - 38:5, 61:23
  **skis** [1] - 66:15
  **slapping** [1] - 12:15

  **sliver** [1] - 67:23
  **small** [1] - 69:6
  **smell** [1] - 31:19
  **soared** [1] - 76:9
  **software** [4] - 84:1, 84:8, 84:9, 84:11
  **sole** [1] - 16:11
  **solely** [3] - 24:22, 41:20, 72:20
  **solve** [1] - 60:4
  **someone** [8] - 55:1, 55:11, 65:9, 65:11, 70:2, 70:6, 71:23, 79:9
  **sometimes** [1] - 49:23
  **somewhere** [1] - 47:19
  **son** [5] - 11:20, 11:21, 54:24, 67:17, 67:20
  **sophisticated** [22] - 8:8, 8:10, 12:10, 12:14, 13:13, 15:2, 18:4, 18:18, 35:9, 35:13, 35:16, 35:21, 36:9, 36:10, 37:2, 37:3, 37:5, 37:8, 38:24, 39:9, 39:12, 39:14
  **sophistication** [2] - 36:23, 39:8
  **sorry** [4] - 52:8, 69:20, 74:13, 75:16
  **sort** [5] - 17:19, 19:10, 20:7, 53:3, 87:5
  **Souder** [1] - 3:12
  **sounds** [1] - 47:24
  **sow** [1] - 26:11
  **sowing** [1] - 26:24
  **speaking** [1] - 6:2
  **speaks** [1] - 35:1
  **special** [4] - 40:13, 41:17, 82:5, 83:4
  **specific** [10] - 13:8, 27:14, 27:19, 29:2, 30:8, 43:4, 43:20, 61:13, 68:16, 80:7
  **specifically** [3] - 20:4, 69:10, 77:25
  **specified** [2] - 18:24, 20:4
  **specify** [1] - 19:17
  **spectroscopy** [1] - 67:3
  **speculators** [1] - 28:18
  **speed** [1] - 64:18
  **spending** [1] - 53:24

**spikes** [1] - 30:23
**spotless** [1] - 78:13
**spring** [1] - 63:15
**squeeze** [1] - 44:1
**staff** [1] - 77:7
**stage** [3] - 57:11, 57:14, 57:22
**stalking** [1] - 71:12
**stand** [1] - 33:18
**standard** [4] - 9:22, 27:24, 32:16, 82:16
**start** [3] - 15:4, 24:18, 62:22
**starting** [1] - 3:6
**starts** [1] - 50:16
**state** [3] - 55:23, 76:5, 82:21
**statement** [8] - 15:7, 16:16, 22:13, 25:18, 26:10, 30:9, 34:10, 74:19
**statements** [28] - 13:16, 15:10, 16:13, 19:14, 19:16, 22:19, 25:7, 25:19, 25:23, 28:14, 29:13, 29:23, 30:22, 30:25, 31:2, 31:5, 31:9, 32:15, 32:17, 33:23, 34:1, 34:12, 39:23, 42:9, 42:24, 48:9, 69:17, 76:11
**STATES** [3] - 1:1, 1:3, 1:11
**States** [13] - 2:3, 3:2, 3:9, 18:10, 30:17, 31:14, 36:22, 37:6, 73:11, 73:14, 83:9, 85:5, 88:13
**statistically** [1] - 27:12
**status** [4] - 15:11, 16:19, 48:17, 87:5
**statute** [3] - 43:2, 83:3, 86:1
**statutory** [4] - 40:24, 45:10, 45:25, 80:20
**steal** [1] - 57:5
**Steinman** [3] - 37:18, 37:24, 38:19
**stenographic** [1] - 88:5
**step** [7] - 5:1, 5:5, 5:7, 5:10, 5:12, 5:15, 67:25
**steps** [6] - 4:19, 12:18, 13:1, 13:12, 57:9, 79:5
**still** [16] - 14:4, 17:11, 36:9, 54:22,

55:2, 55:12, 61:21, 62:5, 65:15, 65:25, 66:1, 78:15, 78:25, 79:17, 81:4
**stock** [15] - 13:5, 20:3, 27:13, 29:5, 29:7, 29:12, 29:22, 29:23, 30:1, 30:23, 30:24, 33:4, 37:23, 58:15, 76:9
**stocks** [4] - 25:13, 26:23, 28:6, 31:3
**stone** [1] - 44:1
**stop** [9] - 12:24, 25:14, 26:17, 35:12, 57:15, 59:1, 77:19, 77:23, 80:11
**stopped** [2] - 25:18, 61:15
**storage** [1] - 83:15
**story** [2] - 50:15, 78:12
**Story** [1] - 26:20
**Street** [1] - 1:21
**strikes** [1] - 46:14
**strong** [1] - 80:14
**structure** [1] - 36:6
**stymie** [1] - 77:19
**subject** [3] - 83:17, 84:5, 84:13
**submission** [3] - 11:15, 13:20, 43:19
**submit** [8] - 43:9, 43:17, 43:18, 52:5, 53:1, 54:10, 54:13, 83:13
**submitted** [8] - 4:11, 9:18, 10:18, 13:17, 15:8, 61:7, 78:19, 79:12
**subsequent** [2] - 70:13, 71:3
**substance** [2] - 82:22, 82:23
**substantial** [16] - 8:5, 15:2, 18:22, 18:25, 20:17, 32:8, 32:11, 32:12, 32:14, 33:8, 33:9, 35:3, 39:19, 39:20, 40:3, 47:20
**substantially** [5] - 13:21, 14:3, 14:6, 14:12, 14:19
**success** [1] - 12:21
**successful** [1] - 52:17, 60:25, 67:20
**successfully** [1] - 26:16
**sued** [1] - 38:12

**suffer** [3] - 32:11, 32:13, 40:2
**suffered** [8] - 18:25, 19:4, 35:2, 43:5, 43:20, 43:21, 79:13, 79:17
**sufficient** [4] - 10:2, 27:1, 41:24, 81:12
**sugar** [1] - 34:2
**sugar-coated** [1] - 34:2
**suggest** [3] - 38:11, 64:12, 80:19
**suggested** [1] - 60:17
**suggesting** [4] - 33:23, 47:6, 68:16, 73:24
**Suite** [1] - 1:25
**sum** [3] - 7:22, 23:12, 39:7
**summarize** [1] - 7:7
**superseding** [3] - 4:1, 21:18, 37:19
**supervised** [6] - 9:5, 40:16, 41:14, 82:7, 82:9, 84:18
**supervision** [4] - 82:15, 82:17, 82:19, 83:21
**supplemented** [1] - 25:14
**supplied** [1] - 35:16
**support** [6] - 22:13, 29:18, 30:21, 33:21, 63:12, 70:5
**supported** [1] - 67:17
**supporting** [2] - 10:3, 43:9
**supports** [3] - 13:12, 31:15, 52:24
**suppose** [1] - 28:25
**surrounding** [1] - 79:5
**suspended** [2] - 25:13, 26:23
**suspension** [1] - 27:2
**suspicion** [1] - 83:20
**switch** [1] - 63:23
**switched** [3] - 63:17, 65:16, 65:17
**system** [1] - 76:25

## T

**table** [2] - 3:12, 40:19

**tag** [1] - 12:16
**talents** [1] - 81:24
**talks** [3] - 51:15, 59:22, 59:23
**tampered** [1] - 77:24
**tampering** [3] - 57:24, 59:19, 61:22
**targeted** [1] - 12:1
**Taubman** [1] - 3:18
**TAUBMAN** [1] - 1:18
**Taylor** [2] - 73:11
**team** [2] - 3:17, 67:19
**technically** [1] - 70:3
**technologically** [2] - 36:9, 37:4
**technology** [1] - 38:6
**telemarketing** [1] - 35:22
**temporal** [2] - 30:20, 31:1
**ten** [5] - 13:19, 14:7, 19:14, 43:23, 68:2
**Tenth** [1] - 1:21
**term** [8] - 9:4, 40:8, 40:9, 40:15, 40:17, 74:7, 82:3, 82:6
**termination** [1] - 85:10
**terms** [4] - 10:2, 13:7, 82:7, 82:8
**terrible** [1] - 58:24
**test** [46] - 10:17, 10:25, 11:1, 11:6, 15:11, 16:20, 17:1, 19:3, 19:6, 19:20, 31:19, 34:6, 38:3, 38:4, 49:13, 49:20, 50:9, 51:8, 51:9, 51:22, 52:16, 52:17, 52:22, 60:6, 63:3, 63:5, 63:6, 63:16, 63:20, 63:23, 64:1, 64:2, 64:23, 65:2, 65:16, 65:23, 66:23, 67:1, 67:2, 70:14, 71:4, 71:7, 71:9, 76:7, 78:20, 80:23
**testifying** [1] - 16:1
**testimonial** [1] - 34:21
**testimonials** [1] - 31:8
**testimony** [4] - 23:3, 24:7, 24:16, 27:17
**testing** [5] - 26:14, 49:12, 63:6, 65:25, 82:24
**tests** [1] - 59:16
**thanked** [1] - 74:14

**THE** [92] - 1:1, 1:10, 1:13, 1:17, 1:23, 3:1, 3:10, 3:13, 3:20, 3:24, 4:16, 4:18, 6:1, 6:6, 6:12, 6:18, 6:20, 6:21, 6:25, 7:1, 9:13, 12:8, 13:15, 13:22, 14:16, 14:21, 14:23, 16:24, 19:13, 20:2, 20:23, 21:2, 41:3, 41:5, 42:19, 43:6, 43:13, 43:23, 44:3, 44:7, 44:16, 45:4, 45:12, 45:16, 45:24, 46:7, 46:20, 47:14, 47:24, 48:6, 48:11, 48:18, 48:22, 52:8, 52:19, 52:21, 53:22, 55:9, 56:8, 56:16, 56:20, 58:5, 58:8, 62:16, 62:21, 64:11, 64:24, 65:5, 65:10, 65:20, 68:15, 69:12, 69:20, 69:22, 69:24, 70:4, 74:12, 74:14, 74:17, 74:23, 74:25, 75:1, 75:2, 75:9, 75:13, 75:21, 86:14, 86:16, 86:20, 86:22, 87:1, 87:9
**theme** [2] - 10:11, 10:12
**theoretically** [1] - 28:25
**theories** [1] - 29:4
**theory** [5] - 29:12, 29:17, 29:21, 30:3, 30:4
**therefore** [5] - 27:4, 39:13, 40:3, 80:4, 84:20
**thinking** [1] - 67:2
**thinks** [2] - 35:14, 52:21
**third** [4] - 5:7, 8:8, 12:23, 22:23
**thousands** [1] - 61:24
**threatening** [1] - 53:12
**threats** [2] - 58:15, 76:24
**three** [6] - 7:13, 7:22, 9:5, 40:15, 40:16, 82:6
**three-year** [1] - 82:6
**throughout** [4] - 10:12, 11:24, 38:19, 78:1
**tight** [1] - 31:1

**timeline** [1] - 49:15
**today** [4] - 3:11, 4:21, 6:16, 21:5
**today's** [2] - 4:22, 5:1
**together** [7] - 7:13, 12:23, 17:1, 23:20, 37:1, 49:20, 60:3
**took** [5] - 13:12, 57:10, 78:7, 79:5, 80:9
**tools** [1] - 59:9
**top** [1] - 80:20
**total** [13] - 7:24, 8:2, 8:19, 8:22, 9:1, 23:14, 23:22, 53:17, 53:19, 57:1, 73:1
**touted** [1] - 34:4
**trade** [1] - 29:13
**trading** [5] - 25:13, 25:14, 26:17, 26:23, 35:12
**transactions** [1] - 36:2
**transcript** [8] - 24:14, 27:16, 27:22, 28:13, 28:20, 29:9, 88:5, 88:6
**TRANSCRIPT** [1] - 1:10
**traumatic** [1] - 67:12
**traumatizing** [1] - 11:17
**travel** [1] - 76:17
**treatment** [2] - 85:8, 85:10
**trends** [1] - 27:15
**TREVOR** [1] - 1:10
**trial** [1] - 62:4
**trick** [1] - 65:23
**tricked** [2] - 58:24, 59:4
**tricking** [2] - 65:22, 77:17
**tricks** [2] - 13:9, 58:25
**tried** [3] - 60:11, 60:12, 76:23
**tries** [1] - 68:1
**triples** [1] - 73:4
**trips** [1] - 67:18
**TRO** [1] - 21:4
**troubles** [2] - 10:6, 10:14
**true** [11] - 28:11, 29:14, 29:16, 29:24, 34:4, 36:17, 39:1, 39:4, 39:5, 88:4, 88:5
**truly** [3] - 26:14, 56:23, 76:4

**truthfully** [1] - 21:19
**try** [8] - 43:4, 53:8, 57:19, 58:1, 58:22, 59:7, 60:4, 65:24
**trying** [25] - 16:3, 16:6, 16:25, 43:25, 52:25, 54:10, 55:13, 59:13, 59:21, 60:3, 60:9, 61:2, 62:1, 63:7, 63:15, 64:12, 64:17, 70:7, 70:10, 70:14, 71:3, 71:5, 77:14, 80:11
**turn** [1] - 26:18
**turning** [3] - 5:15, 59:20, 60:7
**twice** [1] - 47:7
**two** [24] - 8:12, 8:16, 8:19, 9:15, 9:23, 10:19, 12:6, 14:5, 14:15, 14:17, 14:21, 17:19, 20:19, 21:9, 23:14, 25:21, 29:7, 29:12, 29:16, 35:8, 39:14, 39:16, 49:22, 74:24
**two-level** [8] - 8:12, 8:16, 20:19, 21:9, 23:14, 35:8, 39:14, 39:16
**two-point** [5] - 9:15, 9:23, 12:6, 14:5, 14:15
**type** [3] - 73:6, 80:17, 81:17
**types** [4] - 42:14, 51:5, 51:16, 62:6

**U**

**U.S** [8] - 1:15, 2:1, 26:21, 31:4, 31:14, 59:23, 84:23, 85:14
**ultimately** [6] - 13:9, 27:23, 34:24, 66:8, 74:6, 79:4
**unable** [1] - 86:6
**unannounced** [1] - 84:4
**uncertainty** [1] - 76:6
**uncover** [2] - 39:6, 61:2
**under** [22] - 5:6, 7:15, 7:18, 8:3, 8:7, 8:12, 8:17, 20:21, 23:10, 32:4, 33:10, 39:10, 39:17, 40:20, 40:25, 43:1, 44:17,

44:25, 48:9, 48:25, 69:9, 85:19
**undercut** [3] - 26:2, 35:11, 50:2
**underlying** [1] - 7:21
**undermine** [2] - 26:12, 77:6
**understandably** [1] - 11:20
**understood** [1] - 10:23
**unethical** [1] - 38:17
**unfairly** [1] - 12:1
**united** [1] - 2:3
**UNITED** [3] - 1:1, 1:3, 1:11
**United** [12] - 3:2, 3:9, 18:10, 30:17, 31:14, 36:22, 37:6, 73:11, 73:14, 83:9, 85:5, 88:13
**unlawful** [2] - 82:23, 85:16
**unlawfully** [1] - 82:22
**unless** [1] - 48:1
**unlikely** [5] - 29:1, 44:11, 68:12, 69:14
**unproductive** [1] - 44:9
**unraveled** [1] - 77:22
**unresponsive** [1] - 25:19
**unsealed** [1] - 25:1
**unsuccessful** [1] - 71:4
**untethered** [1] - 29:22
**unusual** [3] - 25:22, 80:7, 81:8
**unwarranted** [2] - 42:12, 80:5
**up** [16] - 14:16, 18:8, 18:13, 27:20, 37:10, 47:5, 47:6, 47:7, 48:4, 50:13, 58:18, 64:18, 76:10, 76:24, 78:9, 79:1
**upheld** [1] - 37:8
**upset** [1] - 71:15
**USC** [6] - 5:12, 40:21, 41:23, 83:2, 83:14, 85:24
**useful** [1] - 79:1
**uses** [1] - 58:16

**V**

**vaccine** [1] - 34:3

**vague** [1] - 19:17
**validated** [1] - 37:25
**valuable** [1] - 77:13
**valuation** [1] - 79:24
**value** [7] - 26:2, 29:12, 29:14, 29:16, 30:2, 31:24, 34:18
**variance** [4] - 42:17, 62:19, 73:6, 79:20
**variety** [1] - 70:18
**various** [9] - 4:11, 6:2, 12:2, 21:6, 34:15, 49:25, 59:20, 81:6, 81:19
**vary** [1] - 73:9
**varying** [1] - 81:2
**vast** [1] - 73:19
**VD** [1] - 33:5
**verification** [1] - 19:22
**verify** [1] - 19:8
**versus** [10] - 3:2, 18:11, 26:20, 30:17, 31:4, 31:14, 36:22, 37:6, 73:11, 73:14
**victim** [25] - 10:1, 11:12, 11:23, 12:2, 13:16, 14:6, 14:13, 16:5, 16:7, 16:11, 19:14, 23:11, 32:15, 32:17, 32:19, 32:23, 32:25, 33:2, 33:23, 39:23, 42:24, 48:9, 62:1, 76:11, 76:16
**Victim** [1] - 44:23
**victimized** [1] - 58:14
**Victims** [1] - 77:25
**victims** [41] - 8:6, 8:11, 10:8, 13:9, 14:3, 14:8, 15:18, 20:3, 21:14, 31:22, 32:6, 32:10, 33:5, 33:13, 33:18, 34:3, 34:19, 34:22, 35:2, 40:2, 43:5, 44:6, 45:25, 46:12, 46:15, 58:13, 58:24, 58:25, 59:8, 59:17, 59:20, 60:7, 61:3, 61:24, 75:18, 75:21, 77:17, 78:1, 79:8, 79:12
**victims'** [1] - 59:2
**view** [7] - 24:6, 48:19, 49:8, 50:2, 51:19, 51:20, 52:10
**views** [1] - 22:10
**vigorous** [1] - 22:9
**vindicate** [1] - 12:25
**violate** [1] - 80:12

**violation** [4] - 4:25, 78:4, 83:21, 83:22
**virus** [6] - 11:3, 51:4, 51:9, 52:18, 52:22, 65:3
**virus-screening** [1] - 51:9
**viruses** [2] - 51:5, 51:16
**vs** [1] - 1:5
**vulnerable** [1] - 80:15

**W**

**waiting** [2] - 48:13, 75:24
**waive** [2] - 46:17, 85:21
**waived** [1] - 85:18
**waives** [1] - 84:20
**waiving** [1] - 82:24
**wake** [1] - 78:9
**wants** [4] - 44:16, 47:11, 47:23, 52:21
**warm** [1] - 79:18
**warn** [3] - 76:23, 83:15, 84:12
**warning** [1] - 61:20
**Washington** [6] - 1:6, 1:16, 1:22, 1:25, 2:5, 88:14
**waste** [1] - 53:13
**wasting** [2] - 53:11, 77:12
**watched** [1] - 61:21
**water** [1] - 33:25
**Watts** [1] - 31:14
**weight** [1] - 29:4
**white** [1] - 64:6
**whole** [4] - 51:8, 57:21, 73:10, 78:12
**wide** [1] - 70:18
**wife's** [1] - 33:1
**willfully** [1] - 8:13
**Williams** [9] - 17:22, 22:15, 23:1, 23:3, 23:4, 63:25, 64:7, 66:3, 71:6
**wire** [2] - 4:2, 68:7
**wish** [5] - 5:8, 9:10, 42:15, 46:19, 62:17
**wishes** [3] - 46:16, 47:17
**witness** [3] - 57:24, 59:19, 61:22
**witness-tampering** [2] - 59:19, 61:22
**witnesses** [1] - 77:24

**wondering** [2] - 45:5, 46:21
**word** [3] - 16:15, 19:10, 19:13
**words** [1] - 31:5
**workable** [2] - 11:9, 64:4
**world** [1] - 60:5
**worries** [1] - 76:20
**worthy** [2] - 68:2, 73:4
**write** [5] - 16:21, 38:15, 53:12, 58:25, 67:11
**writing** [2] - 47:14, 77:17
**written** [1] - 51:17
**wrote** [4] - 65:18, 67:8, 70:12, 71:8

## X

**XENAKIS** [9] - 1:20, 4:17, 6:9, 6:17, 48:20, 75:3, 75:10, 86:15, 86:25
**Xenakis** [4] - 3:19, 6:5, 48:19, 86:14
**XPRIZE** [2] - 34:5, 60:2

## Y

**year** [2] - 68:23, 82:6
**years** [12] - 9:5, 40:8, 40:10, 40:16, 45:20, 46:15, 56:22, 57:24, 64:10, 68:2, 78:18, 81:14
**years'** [1] - 43:24
**York** [1] - 1:16
**yourself** [1] - 12:16
**yourselves** [1] - 3:6

## Z

**zero** [6] - 14:14, 20:17, 20:19, 23:24, 39:16, 40:4
**zero-point** [3] - 14:14, 20:17, 40:4
**zone** [1] - 39:8
**Zone** [1] - 40:18
**Zoom** [1] - 47:18