1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA
2

3     UNITED STATES OF AMERICA,
                                        Criminal Action
4               Plaintiff,             No. 1:20-cr-00278

5          vs.                         November 13, 2023
                                        10:15 a.m.
6     KEITH BERMAN,

7               Defendant.              Washington, D.C.
      _____

8

9       **TRANSCRIPT OF THE PARTIALLY SEALED PRETRIAL CONFERENCE**
            **BEFORE THE HONORABLE TREVOR N. MCFADDEN**
10               **UNITED STATES DISTRICT JUDGE**

11

12    APPEARANCES:

13    For the Government:

14          Christopher Richard Fenton, Esquire
            U.S. DEPARTMENT OF JUSTICE
15          Criminal Division, Fraud Section
            1400 New York Avenue, NW
16          Washington, D.C. 20530

17
            Katherine McCarthy, Esquire
18          DOJ-CRM
            1400 New York Avenue, NW
19          Washington, D.C. 20005

20
            Matthew Reilly, Esquire
21          DOJ-CRM
            Fraud Section
22          1400 New York Avenue NW
            Washington, D.C. 20005
23

24

25

```
1    (APPEARANCES CONTINUED:)

2


3    For the Defense:

4    Kevin B. Collins, E
     COVINGTON & BURLING LLP
5    One CityCenter
     850 Tenth Street, NW
6    Washington, DC 20001
     (202) 662-5598
7


8


9


10   Court Reporter:

11           Stacy Johns, RPR
             Official Court Reporter
12
             Proceedings recorded by mechanical stenography,
13           transcript produced by computer-aided transcription

14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

1    DEPUTY CLERK:  Your Honor, this is criminal

2  Case 20-278, United States of America versus Keith Berman.

3    Counsel, please come forward to identify yourselves

4  for the record, starting with the Government.

5    MR. FENTON:  Good morning, Your Honor.  Christopher

6  Fenton, Kate McCarthy, Matt Reilly for the United States.

7    THE COURT:  Good morning, folks.

8    MR. FENTON:  And we're joined here at counsel's table

9  today by Rachel Boyer and Grace Souder, our paralegals.

10    THE COURT:  All right.

11    MR. COLLINS:  Good morning, Your Honor.  Kevin Collins

12  from Covington & Burling on behalf of Mr. Berman, who's

13  present.  Joined here by a number of my colleagues.

14    THE COURT:  You roll heavy.

15    MR. COLLINS:  We do.  As a housekeeping matter, if the

16  Court doesn't know, we've taken this matter on as a referral

17  from the federal defender and we're doing it pro bono.  So it's

18  our hope that a number of my colleagues will have an

19  opportunity to address the Court at the appropriate time.

20    Mr. Xenakis, who is sitting next to Mr. Berman, and I

21  are sort of the senior lawyers and will be heavy involved.  But

22  we appreciate the Court's willingness and permission to have

23  our younger lawyers address the Court as appropriate.

24    THE COURT:  I think that's a great idea.  I'm not

```
1    interested in being tag-teamed.  So you'll divide it up and I'm

2    happy to hear from one person per motion.  But we'll keep it at

3    that.

4              MR. COLLINS:  That's fine, Your Honor.  So Mr. Xenakis

5    is at counsel table.  Across from me is Jose Giron, Jonah

6    Panikar.  Next to Mr. Panikar is Lori Taubman, and then next to

7    her is Brandon Howell.  Behind them is our co-counsel, Shelly

8    Peterson.  And on the phone, not last but least, Jose Ramos

9    from our California office is joining remotely.

10             THE COURT:  Great.  Good morning, everyone.  And good

11   morning, Mr. Berman.

12             All right.  We've got a lot to accomplish today.

13   We're here for a pretrial conference.  We can, I think, start

14   at the back end with the most recent motion to dismiss,

15   count 4.

16             Mr. Collins, any objection?

17             MR. COLLINS:  No, no objection to that.  But can we

18   take up another matter at the beginning, Your Honor?

19             THE COURT:  I'm going to grant the Government's motion

20   to dismiss count 4.  And I'll hear from you.

21             MR. COLLINS:  So again, Ken Collins for Mr. Berman.

22             One of the thoughts that the Court I think had in

23   setting the pretrial is to address Mr. Berman's medical

24   conditions.

25             THE COURT:  Yeah.
```

1          MR. COLLINS:  I'd like to do that now, and if I can

2     have the Court's permission, given that we are going to talk

3     about his medical conditions and some of his issues, with the

4     Government's permission and the Court's permission, I'd like to

5     seal at least this portion of the record so I can talk about

6     some of his specific medical issues.

7          THE COURT:  Okay.  I see only people related to this

8     case here in the courtroom.  So I'm not going to seal the

9     courtroom per se but I'm happy to seal the record.

10         MR. COLLINS:  That's fine, Your Honor.











```
 1                MS. MCCARTHY:  Thank you, Your Honor.

 2                THE COURT:  I've got a number of motions to discuss

 3      today.  I want to make sure, is the Government's motion in

 4      limine number 30, does the Government believe that's still

 5      ripe?  I know this was filed some time ago.

 6                MR. FENTON:  Yes, Your Honor.

 7                THE COURT:  Okay.  And Mr. Collins, I know this was

 8      opposed by predecessor counsel.  You're still opposing

 9      motion 30?

10                MR. COLLINS:  One moment, Your Honor.

11                Yes, Your Honor.  We're opposing.

12                THE COURT:  Okay.  Mr. Fenton, are you dealing with

13      number 30?

14                MR. FENTON:  Yes, Your Honor.

15                THE COURT:  So it looks to me like there's a couple of

16      questions here.  One is the evidence relating to saliva test

17      and, secondly, kind of a theoretical possibility of a blood

18      test.

19                As I understand it, there's a passing reference to the

20      saliva test largely in terms of quoting the defendant, I think,

21      when talking about the blood test and the indictment.  How, if

22      at all, do you expect the saliva test to come up in your case

23      in chief?

24                MR. FENTON:  This saliva test will not come up at all

25      in the Government's case in chief.
```

1              THE COURT:  Okay.  And -- well, let's leave it there.

2       I'll hear from the defense on that point, how they think it's

3       relevant.

4              So your blood test -- the theoretical possibility of

5       the blood test point, I guess, I'm -- are you going to be

6       arguing that it is -- a blood test is not theoretically

7       possible?

8              MR. FENTON:  No, Your Honor.

9              THE COURT:  Do you agree that it is theoretically

10      possible?

11             MR. FENTON:  We do not know, Your Honor.

12             THE COURT:  Okay.  Would you be open to a stipulation

13      that a blood test may be possible?

14             MR. FENTON:  I think what the Government expects the

15      fact witnesses to say is that Mr. Berman asked Mr. Daniel Kim,

16      who will be a witness at trial, whether or not he believed that

17      it was possible to use impedance technology to detect viruses

18      in blood or saliva.  And that's Paragraph 16 of the superseding

19      indictment.

20             And what we expect Mr. Kim to testify is consistent

21      with the email, is that he said that he thinks it may be

22      possible -- theoretically possible to detect a virus but he

23      does not know whether it would be detectable in blood or

24      saliva.  And that is what the email says.

25             So the Government has no issue and, in fact,

1   anticipates that that testimony will come in at trial and the

2   defendant, of course, could point to that and say, I asked

3   Mr. Kim the question and this was his response.  But with

4   respect to the issue of theoretical feasibility, the Government

5   doesn't anticipate, based on the case in chief, that there be

6   any additional testimony that would come in on that issue or

7   any additional evidence.  We would really truly be limited to

8   that one interaction.

9          THE COURT:  Yeah, I guess I want to hear from the

10  defense on this point but it strikes me if the defendant were a

11  chair maker and claimed that I have created a chair that will

12  teleport you around the world, and you're able to say not only

13  did he not do so but that's not even theoretically possible to

14  do so, I feel like that -- the theoretical possibility would be

15  a relevant point in your case in chief, that this is patently

16  impossible.

17         Whereas, if he was saying that he made a wooden chair

18  that was especially comfortable or something like that and

19  you're saying, well, he didn't, whether or not it would

20  nonetheless be theoretically possible that he could do so would

21  be helpful to him.

22         So I guess I hear your concerns about a mini-trial

23  about theory and I want to avoid that too.  But it strikes me

24  that he should be able to show that he could -- this was --

25  this is not an impossibility, this is not the teleporting

1    chair, and you know, he's a knowledgeable person in this market

2    and had a reasonable belief that he could make this test.

3          MR. FENTON:  Your Honor, if I could just make two

4    points in response to the Court's point.  The first is that the

5    Government believes that what's relevant here, the question

6    before the jury, is what the defendant knew at the time that he

7    made the allegedly false and misleading statements.  And here

8    those allegedly false and misleading statements were primarily

9    made in March and April of 2020.

10          THE COURT:  But your indictment lasts through the

11   year, right?  Doesn't it last into December 2020?

12          MR. FENTON:  It does but the allegedly false and

13   misleading statements that serve as the basis for the crimes

14   charged go until about July 2020, and the rest of the time

15   period is really -- the allegation's really back to the

16   defendant's efforts to conceal his criminal conduct and to

17   obstruct the SEC's investigation.

18          So if you look at the indictment, it really is divided

19   into discrete periods of time, with February through July 2020

20   being the allegedly false and misleading statements and the

21   rest of the time period, basically April through December,

22   related to the obstruction case.

23          So from the perspective of the question that's

24   presented before the jury, the question -- the Government's

25   view is:  At the time in March 2020 when Mr. Berman said he had

1   developed this COVID-19 test, what did he know at the time that

2   he made that statement with respect to whether or not he

3   developed that test?

4           And to the extent that he had read some literature

5   that suggested that it may be possible or to the extent that he

6   asked somebody and they told him that it might be possible,

7   that seems like that would be relevant to Mr. Berman's state of

8   mind.

9           THE COURT:  And you would not be -- you're not going

10  to be introducing evidence disputing that; is that correct?

11          MR. FENTON:  That's correct, Your Honor.  But the

12  question of whether or not it is impossible, that is a burden

13  the Government does not believe that it need assume --

14          THE COURT:  Agreed.

15          MR. FENTON:  -- in this case.  The Government should

16  not have the burden of demonstrating that it is impossible to

17  do what the defendant had already told the public he had done.

18  We think that the burden should be limited just to show that at

19  the time he said that it was done, that it was not, in fact,

20  done.

21          THE COURT:  Yeah.

22          MR. FENTON:  And that he knew it was not in fact done.

23          THE COURT:  So I guess -- you know, I'll hear from

24  defense on this, but I'm wondering whether there could be some

25  sort of stipulation that would make clear you're not arguing

1  the teleporting hypo and agree that it's not ultimately what

2  the jury is going to have to decide about whether this was

3  theoretically possible; it was whether he had done what he said

4  he had done.

5         MR. FENTON:  That is absolutely 100 percent the

6  Government's case.  That is correct, Your Honor.

7         And I think one thing to add to that, and this relates

8  to the motion in limine with respect to Dr. Stuart Williams,

9  the Government's concern presently is and has always been that

10 the defendant would find an expert, bring the expert to Court,

11 have the expert take the stand and basically explain to the

12 jury using scientific language that is completely

13 incomprehensible all of these theories and concepts and ideas

14 that are -- demonstrate the theoretical possibility that this

15 idea, if it had been developed differently than the way that

16 Mr. Berman did it, was something that could have been achieved.

17        And I think that when we were standing here two years

18 ago, which is almost unbelievable to say -- but when we were

19 standing here two years ago with a different set of defense

20 counsel, everybody said, well, hold on a second, that would be

21 a detour and a frolic.  And that's not what we're trying to do.

22        We're trying to just show that when Mr. Berman had

23 conversations with Daniel Kim, who will be a witness at trial,

24 when Mr. Berman had conversations with Matt Musho, who will be

25 a witness at trial, this idea was discussed, is it

1    theoretically feasible, and certain answers were given.

2            So that -- that, I think, at the time was where the

3    parties agreed that that seemed like fair game and the parties

4    at the time agreed that it would be inadmissible to call an

5    expert to introduce all scientific evidence about what was

6    theoretically feasible beyond what the defendant knew at the

7    time he made the statements.

8            THE COURT:  All right.  Yeah, clearly there's a lot of

9    water under the bridge since then.  I think you, Mr. Berman and

10   I are the only three that have been here through it.  So I'm

11   not sure that I -- it's completely fair to limit defense to

12   what counsel a couple years ago said.  But I hear you on that.

13           All right.  I'll give you the last word but let me

14   hear from the defense on motion 30.

15           MR. FENTON:  Your Honor, if I may, could I just

16   briefly address the saliva test issue?  Or I can respond.

17           THE COURT:  Yeah, why don't I let you respond.

18           MR. COLLINS:  Your Honor, for the defense, Mr. Panikar

19   is going to address this.

20           THE COURT:  All right.  Mr. Panikar.

21           MR. PANIKAR:  Good morning, Your Honor.  Jonah Panikar

22   on behalf of Mr. Berman.

23           THE COURT:  Good morning.

24           MR. PANIKAR:  With respect to the blood versus saliva

25   issue, really the defense's contention is this all goes to

1    Mr. Berman's good faith, that it was a genuine effort to

2    develop a product here.  And one of the critical elements that

3    the Government has to prove in this case is that Mr. Berman had

4    fraudulent intent.

5            And it's the defense's contention that from March all

6    the way through, Mr. Berman was genuinely trying to develop a

7    product here.  He was consulting with advisers and he relied on

8    a white paper, and he was using existing technology that he had

9    to develop this product that would detect COVID, essentially

10   retrofitting existing technology.  And we find all of that is

11   really relevant to that mens rea and good faith reliance that

12   you mentioned just now.

13           THE COURT:  So that existing technology was the

14   glucose test?

15           MR. PANIKAR:  Yes.  Within the glucose test --

16   unfortunately, I'm not a science expert but my understanding is

17   the glucose test uses technology called impedance spectroscopy,

18   and Mr. Berman's idea was to use that same technology to detect

19   COVID-19 and that's really what he was trying to do here, and

20   that manifested itself -- that was the question he asked,

21   whether you could use that technology to identify COVID-19 in

22   saliva or in blood.

23           THE COURT:  So is the glucose test a blood test?

24           MR. PANIKAR:  The glucose test is a blood test.  My

25   understanding, it's a blood test.  It's a finger stick test.

1          THE COURT:  What, if anything, had he done on the

2     saliva test side?

3          MR. PANIKAR:  So the way the technology works,

4     impedance, you can use a liquid -- it's about it being a liquid

5     substance that you can then identify contents within that

6     liquid, like a virus in this instance.  So it could be blood,

7     it could be saliva but it's really just that it's a liquid that

8     you're putting into the device.

9          THE COURT:  So what I'm hearing from you is he hadn't

10    done anything on either but he thought maybe with this glucose

11    test he could?

12         MR. PANIKAR:  When you say he hadn't done anything on

13    either, he had done work on blood with -- with his diabetes

14    device with the glucose test.  With the development of the

15    COVID test, that really did start February and March and

16    relying on this white paper, consulting with his advisers to

17    determine whether or not this could actually work.

18          And a point that we want to make as well:  The

19    Government's contention is that Mr. Berman made certain

20    statements in these press releases, and their entire argument

21    really is that this case is about March because Mr. Berman said

22    certain things in those releases.  We expect at trial there is

23    going to be serious dispute about what these press releases

24    actually say and actually mean.  And that it's our contention

25    that they reflect iterative development of a product over time.

1          And because of that, it's all relevant to demonstrate

2    that there was actually that iterative development, that

3    Mr. Berman was, in fact, trying to develop a product here.

4          THE COURT:  Do the press releases refer to a saliva

5    test?

6          MR. PANIKAR:  So in March, it does not.  It references

7    the impedance technology, existing DECN technology that they

8    had.  I believe the first reference to saliva in a press

9    release is in July.  But as the superseding indictment

10   indicates, Mr. Berman was asking about both blood and saliva as

11   early as February of 2020.

12         THE COURT:  All right.

13         MR. PANIKAR:  And I should add as well that what --

14   since this is all sort of baked into Dr. Williams and what he

15   is doing to testify about, we expect that that testimony is

16   really going to note that the core characteristics of both the

17   blood test and the saliva test when it comes to impedance are

18   the same.  It's the same biosensor.  So it is relevant and

19   important for the jury to hear that this technology was

20   consistent throughout, from the blood test through to the

21   saliva test and that there was a genuine effort here.

22         THE COURT:  I guess, I mean, the Government's

23   indictment focuses on blood tests.  You're telling me, you

24   know, it's kind of looking maybe at either, although sounds to

25   me like maybe later in the summer.  I'm struggling to hear how

1  you're prejudiced by just a focus on blood.

2          MR. PANIKAR:  Well, it, again, demonstrates that there

3  was a good faith reliance here.  This was an iterative

4  development of a product.  And what's really what we want to be

5  able to show, that he was trying to develop a product here,

6  and --

7          THE COURT:  And the product is the glucose test?

8          MR. PANIKAR:  No, no.  I see.  The product is the

9  COVID test, the development of that.  His efforts to develop

10  that test.  We don't intend to go into depth about the -- we

11  don't expect that we'll go into depth about the glucose test or

12  present evidence about Mr. Berman's development of the glucose

13  test.  It's really just about the COVID test and how that

14  developed over time, from trying to use impedance technology to

15  detect the virus in blood and then retrofitting it for saliva.

16          THE COURT:  Say that part again.

17          MR. PANIKAR:  Essentially, he was asking about both

18  blood and saliva, but he started with blood and they then

19  switched to saliva.  But this was all --

20          THE COURT:  In July.

21          MR. PANIKAR:  In July is when the announcement was

22  made.

23          THE COURT:  And this is all, kind of going back to, he

24  has this glucose test.  He's thinking about how can I tweak

25  this to make it to a COVID test?

1            MR. PANIKAR:  Precisely.  Precisely.

2            THE COURT:  Okay.  And then let's talk about the

3    theoretical possibility point.  You're going to show that it's

4    theoretically possible through Dr. Williams; is that right?

5            MR. PANIKAR:  So Dr. Williams testimony we expect is

6    really going to be focused on the design of this product.  We

7    don't expect to spend a lot of time on theory in general about

8    impedance.  To the extent he's going to testify about that,

9    it's essentially that at the time Mr. Berman was making the

10   choice there were a few options that he had available to use

11   impedance to test for COVID-19.

12           And Mr. Berman chose a particular option based off of

13   the information that he had.  That choice made sense, and he's

14   going -- we expect he'll testify about how the information he

15   relied upon was clearly reflected in the product that he

16   developed.

17           So we don't expect to spend a lot of time and have a

18   mini-trial about whether this could have in some -- in a vacuum

19   or in some separate area worked.  To the extent that we are

20   going to discuss it, it really is just about why he believed

21   what he believed at the time he made this decision.

22           THE COURT:  And again, how are you going to show that?

23           MR. PANIKAR:  It will be through Dr. Williams and the

24   white paper that Mr. Berman relied on.

25           THE COURT:  Okay.  Would a -- what do you think about

1   my stipulation idea?

2          MR. PANIKAR:  We would have to work out exactly what

3   the language would be on the theoretical possibility and

4   whether we would stipulate to that.  It's certainly something

5   that we're open to but we would have to work out the specifics

6   on that.

7          THE COURT:  Okay.  Thank you.

8          MR. PANIKAR:  Thank you, Your Honor.

9          THE COURT:  Mr. Fenton.

10          MR. FENTON:  Thank you, Your Honor.  There appears to

11   be a fundamental misunderstanding on the defendant's part as to

12   what the good faith defense is.  The good faith defense in this

13   case is not whether the defendant thought that things would

14   work out eventually or could work out, but rather -- rather, he

15   thought that the statements that he made were true at the time

16   that he made those statements, in March, in April, in May, and

17   there's one statement in July as well.

18          That is what the good faith defense would be limited

19   to.  At the time that he spoke to the market, at the time he

20   spoke to investors, did he have a good faith basis to believe

21   that the words that he was speaking at that moment in time

22   were, in fact, true.  Not, did he think that eventually things

23   would work out.

24          And that's really critical.  Because when you look at

25   the good faith defense in that context, which is the limited,

relevant, applicable context here, these arguments about saliva aren't relevant.  They confuse the issues.  They're going to mislead the jury.

And when you go back and look at the indictment, the indictment is focused exclusively on false statements about the blood test, not the saliva test.  Again, these statements are made from March to July 2020.  And this is totally separate from saliva.  Saliva is not mentioned until July 10th, 2020, after it was clear that this blood test had failed.

And the defendant essentially needed, yet again, a new story to continue raising money because the blood test was dead, and the defendant says, well, I'll test saliva.  And if you even look at the press release, it's ECF148-1.  We attached it to our reply brief.  It says:  I now have a saliva test as an alternative to the blood test.  And that's really important.

So our indictment is focused on the statements about the blood tests early in 2020.  To the extent that the defendant wants to make a good faith argument, his good faith argument should be limited to whether or not he had good faith at the time he made those statements, not just this general idea of did he generally think that this was something that down the road he said -- he said he had already developed it.  He said it was ready to go.  He said it had been validation tested.

He's essentially arguing that it doesn't matter

1    whether or not that's true because what matters is whether he

2    believed that, you know, down the road it might be something

3    that he can make happen.  And that is not a defense to the

4    crimes charged in this case.

5            With respect to the theoretical possibility argument,

6    it may be beneficial to the Court -- we, of course, defer to

7    the Court.  But it may be beneficial to hear the Government's

8    arguments with respect to the motion to limine to exclude

9    Dr. Williams's testimony, because I do think that it is

10   difficult to just resolve that issue without understanding

11   exactly how the defendant intends to tee that issue up.

12           So we would ask to be heard on that before the Court

13   makes any ruling.

14           One more point on saliva.  Your Honor, my apologies to

15   jump around.  We now have the benefit -- at the time that we

16   originally argued this motion two years ago we did not have the

17   real benefit as to an understanding as to how the defendant was

18   going to introduce evidence in its case about the saliva test.

19   We now know.  And the reason we know is because the defendant

20   has shared his exhibit list.  There are about 263 exhibits on

21   that list.  Approximately 50 of those 263 exhibits relate to

22   the saliva test.  That's a lot of exhibits.

23           And what those exhibits talk about are primarily this

24   competition, this XPRIZE competition that took place in the

25   latter part of the year, where the defendant submitted his

1    saliva tests in this competition.  And ultimately, what happens

2    is the defendant's test is eliminated from the competition

3    because it didn't work.  And the defendant went out and told

4    victims that it was part of the -- the reason it didn't work --

5    the reason it got eliminated was because the Government

6    indicted him in this case.

7         In fact, 30 of those 50 exhibits that the defendant

8    proposes to admit at trial are post-indictment.  They're all

9    documents that are dated post-indictment.  So this is the

10   direction that the defendant wants to take the saliva test.  He

11   wants to talk about this XPRIZE competition.  He wants to

12   introduce evidence that post-dates the indictment.  And this is

13   just yet another reason why it would confuse issues, mislead

14   the jury and, quite frankly, be a waste of the Court and the

15   jurors' time.

16        THE COURT:  All right.  I'm going to now rule in part

17   on ECF number 30, the Government's motion in limine to exclude

18   discussion of the defendant's work on a saliva test for

19   COVID-19, as well as discussion of a theoretical possibility of

20   a COVID-19 blood test.  The Government argues that neither

21   subject is relevant to this case and if either subject is

22   relevant, that is significantly more prejudicial than

23   probative.

24        I will grant the Government's motion as to the saliva

25   test.  I agree that the defendant's potential work on a

1   COVID-19 saliva test is not relevant in this case.  And I will

2   grant the Government's motion to exclude any evidence or

3   testimony related to such a test.

4         The Government's allegations of fraud all center

5   around the defendant's statement about a blood test that his

6   company was developing.  They do not concern a saliva test.

7   Indeed, looking to the paragraph titled, "Manner and Means of

8   the Scheme to Defraud," the Government identifies,

9   specifically, the defendants, quote, development of a test

10  capable of detecting COVID-19 in a sample of blood.  Closed

11  quote.  And its, quote, application to the FDA for EUA of a

12  test capable of detecting COVID-19 in a sample of blood, closed

13  quote, from paragraph 14.

14        The focus is squarely on the blood test with no

15  mentions of saliva testing.

16        Federal rule of evidence 401 provides that evidence

17  must be, quote, of consequence in determining the action,

18  closed quote, to be relevant.  In other words, quote, relevant

19  evidence tends to make a necessary element of an offense more

20  or less probable, closed quote.  From the United States versus

21  Davis 636 F.3d 1281, Page 1298, from the 10th Circuit in 2011.

22        But no element of the charged offenses relates to

23  saliva testing.  Indeed, all of the charged offenses focus on

24  the defendant's statements with regard to his blood test.  The

25  saliva tests make only an offhand and passing appearance as

1    part of a narrative in the indictment.  And discussion of

2    saliva testing also provides no basis to defend the defendant's

3    statements about blood testing, because I think those are two

4    very different types of tests.  At least that's how the public

5    would understand them.

6         The defendant's argument to the contrary centers on

7    the fact that saliva testing is mentioned in the indictment,

8    which he claims makes it inherently relevant.  That is

9    incorrect.  As I noted, the test for relevance is not whether a

10   fact is mentioned in the indictment but rather whether it tends

11   to make some necessary element of the charged offense more or

12   less likely.

13        Here, the Government filed a speaking indictment,

14   which, because it presents a narrative, of course includes a

15   significant amount of information that may not strictly be

16   relevant in an evidentiary sense to the charges against the

17   defendant.

18        To say that merely being mentioned in the indictment

19   makes some fact relevant would unduly expand the meaning of

20   relevance and undermine the whole purpose of Rule 401.  Unless

21   a given statement in the indictment is a, quote, step on one

22   evidentiary route to the alternate fact, closed quote, at issue

23   in the case, it is not relevant and subject to consideration at

24   trial.

25        And I'm looking to Old Chief versus United States 519

1  U.S. 172, Page 179 from 1999.

2          So in short, I'm going to grant the Government's

3  motion to exclude to the extent that the evidence on -- that

4  the defendant's -- I'm sorry, I'm going to grant the

5  Government's motion to the extent that it addresses evidence

6  that defendant's company was working on a saliva test.

7          All right.  Let's go now to ECF number 80.  That is

8  another Government's motion in limine.  I guess you're seeking

9  to exclude the blood -- the glucose test there, Mr. Fenton?

10          MR. FENTON:  Yes, Your Honor.  And --

11          THE COURT:  Just quickly, Mr. Collins, I take it you

12  are still seeking to introduce that blood test -- the glucose

13  test, I beg your pardon.

14          MR. COLLINS:  There's going to be certain testimony

15  about it but we're not going to introduce the physical exhibit.

16          THE COURT:  Okay.  Sounds like this might not be

17  relevant.  So you're not seeking to introduce a physical

18  exhibit, which was on the original exhibit list.

19          MR. FENTON:  That's right, Your Honor.  Originally,

20  this motion was to exclude Exhibit N on the defendant's exhibit

21  list.  We've spoken with counsel and they have told us that

22  they're no longer seeking to admit Exhibit N, which was a

23  tangible object.

24          THE COURT:  Okay.  I'm going to deny Government's

25  Exhibit 80 as moot.

```
 1              Now to ECF-142 and 145.  That's defense motion to
 2    exclude Thomas Carocci.  Am I pronouncing his name correctly?
 3              MR. REILLY:  Carocci, Your Honor.
 4              THE COURT:  All right.  That was pretty close.  And
 5    then the Government has a motion to exclude defense expert.
 6    Dueling motions.  I can hear from the defense first.
 7              MR. COLLINS:  Ms. Taubman will take that.
 8              THE COURT:  All right.
 9              MS. TAUBMAN:  Good morning, Your Honor.  Lori Taubman
10    for Mr. Berman.
11              THE COURT:  Good morning, ma'am.
12              MS. TAUBMAN:  As we discussed in our briefing, the
13    Government's disclosed testimony extends far beyond what is
14    permitted by federal rule of evidence 1006 and is properly
15    considered to be subject to the evidentiary requirements of
16    Rule 702.
17              THE COURT:  So this is -- you're arguing that
18    Mr. Carocci is an expert?
19              MS. TAUBMAN:  Yes, Your Honor.
20              THE COURT:  Why don't you go pretty quickly through
21    this part.  Assume that I agree with you on this.
22              MS. TAUBMAN:  I'm sorry, Your Honor?
23              THE COURT:  You can assume that I agree with you on
24    this.  Why don't you move on and tell me why I shouldn't allow
25    him to be admitted as an expert.
```

1          MS. TAUBMAN:  Yes.  In particular, we believe that he

2     should not be able to provide testimony regarding determinance

3     of stock prices.  There are two different areas where we

4     described in our briefing where this concept enters into his

5     proposed testimony.

6          First, the background testimony that the Government

7     described in their disclosure included topics including general

8     effects of news reported by publicly traded company on its

9     stock price and trading volume, determinants of stock prices

10    and the relationships between stock price movements and trading

11    volume or liquidity.

12         So with respect to these broad background topics, we

13    believe that Mr. Carocci simply is not qualified to discuss

14    these topics.  He's an attorney.  He doesn't have training as

15    an economist, and, therefore, we do not believe he should be

16    offering testimony regarding these topics.

17         THE COURT:  Isn't this pretty similar to what you want

18    one of your witnesses to testify to?  I forget, Mr. -- is it

19    Lease (ph)?

20         MS. TAUBMAN:  Well, I think Mr. Carocci's disclosure

21    extends far beyond simply summarizing stock prices.  For

22    example, what they characterize as summary fact witness

23    testimony includes things like having Carocci testify that

24    decision diagnostics press releases on certain dates

25    precipitated increases in decision diagnostics stock price and

1    created elevated trade volume over previous months, and to us

2    that sounds a lot like an event study and that requires

3    specialized expertise.

4          And so I think the scope of what they've disclosed

5    with respect to Mr. Carocci extends far beyond simply

6    summarizing stock prices.  For example, we think a summary fact

7    witness testimony should be limited to what is actually allowed

8    under federal rule of evidence 1006.  So simply, he should be

9    able to describe summary charts of press releases.  He should

10   be able to describe summary charts of stock price and volume

11   movements and any terms incorporated into those charts and then

12   how he compiled the information.

13         But when we get into discussions about associating an

14   event with a movement in the stock price, I think that's where

15   we cross the boundary into what requires an expert opinion and

16   training and qualifications.

17         THE COURT:  And so assume I agree with you.  Why

18   doesn't he have that type of background?  I mean, isn't he an

19   investigator who's done a lot of work on securities fraud,

20   market manipulation, that type of thing?

21         MS. TAUBMAN:  For one thing, one has to know what news

22   or events typically impact stock prices.  And that extends

23   beyond the bounds of what you would encounter as an

24   investigator.  One has to know what the appropriate response

25   time would be for an event.  If you're going to say that event

1   X caused movement Y, you need to be able to know, okay, am I

2   likely to see that outcome in one day, two days, three days, et

3   cetera.

4        And these are topics that experts would examine based

5   on their research.  This isn't something, based on what we've

6   learned from Carocci's disclosure, that he has any background

7   researching or training.  It requires econometric knowledge to

8   apply the proper controls to ensure that the event that is

9   being analyzed is actually the thing that could be causing the

10  outcome that you see in the stock price.

11       So it's that association between events or this

12  purported statement -- I would say more of -- any type of --

13  not just a statement of causality but drawing a controversial

14  inference, which I think, at minimum, his proposed testimony

15  does.

16       THE COURT:  So it is your -- your proposed expert is

17  going to be doing very similar things, right?

18       MS. TAUBMAN:  He won't be looking at attributing,

19  like, a change in the press release to -- or the release of a

20  press release to a change in the stock prices.  So the actual

21  scope of his testimony --

22       THE COURT:  But he'd be almost doing the reverse,

23  right?  He would be saying there wasn't a change.  It was

24  because of all these other things.

25       MS. TAUBMAN:  The scope of his testimony would be

1    somewhat dependent on what is allowed from Mr. Carocci.  But

2    right now what we anticipate is he won't be speaking to

3    causality.  He'll be summarizing stock price trends.

4            THE COURT:  Then how is he relevant at all?

5            MS. TAUBMAN:  Because to the extent that Mr. Carocci

6    is introducing evidence that is suggesting that the press

7    releases caused or resulted in an impact on the stock price,

8    then we would need to present evidence suggesting there could

9    be alternative explanations for the movement.

10           THE COURT:  All right.  That sounds to me like

11   causality, right?  You're saying it wasn't this the press

12   release, it was COVID, it was some other news.

13           MS. TAUBMAN:  That's the reason why Mr. Carocci

14   shouldn't be allowed -- that's the one reason why Mr. Carocci

15   shouldn't be allowed to testify as to this because we would

16   impelled to present evidence along these lines as well.

17           THE COURT:  But you haven't -- you're arguing that

18   your guy -- can you remind me of his name?

19           MS. TAUBMAN:  Mr. Reilly.

20           THE COURT:  That Mr. Reilly is qualified, he is an

21   expert.

22           MS. TAUBMAN:  Well, he won't be offering this opinion.

23   He will be offering summary evidence of stock price trends for

24   alternative stocks and showing the movement in those.

25           THE COURT:  Do you feel like he has a different skill

1    set that makes him more -- kind of qualified as an expert and

2    Mr. Carocci doesn't?

3            MS. TAUBMAN:  Well, Mr. Reilly is not offering the

4    same scope of testimony as Mr. Carocci.  Mr. Reilly will simply

5    be summarizing stock prices.  And we're saying that

6    Mr. Carocci, if he wants to just present a summary chart of

7    DECN stock price trends through time, that's fine with us.  If

8    he's not going beyond that and not trying to associate that

9    with an event, that's fine.

10           And from my perspective, Mr. Reilly can do that too

11   with other stocks.  The problem is when they cross the line

12   into associating that movement in stock price trends to an

13   event.  That's where, I think, the specialized expertise is

14   required under 702.

15           THE COURT:  Yeah, I guess it depends exactly how the

16   Government asks the question.  I want to hear from them on that

17   in a minute.  But I guess the bottom line to me is:  I can

18   understand why the Government wants to show that these pressers

19   probably did affect the stock prices.  I understand why you,

20   basically, want to show no, it wasn't the pressers, it was

21   these other things.  And this feels to me like a very much kind

22   of fair game for the cross-examination process and for the jury

23   to figure out.

24           MS. TAUBMAN:  I think also, though, in addition to his

25   not being qualified under 702, if Carocci does want to

1  demonstrate some association between the press releases and

2  stock prices, he didn't disclose a methodology or any reliable

3  methodology at that point.

4        So to the extent he wants to cross the line and start

5  presenting an event study, then we're getting into the Daubert

6  factors and getting into the increased scrutiny that we would

7  apply to actual scientific analysis as opposed to a simple

8  application of specialized knowledge under 702, which I think

9  would be applied to simple summary charts that aren't trying to

10  attribute causality.

11       THE COURT:  If he's just doing what you're suggesting

12  that he could do, kind of a summary, would he need to be

13  qualified as an expert?

14       MS. TAUBMAN:  If he is simply describing the summary

15  chart of the stock price tend and not trying to associate that

16  with any events, I do not think he would need to be qualified

17  as an expert because he's simply -- if he's literally taking

18  data and just plotting the chart and not doing anything beyond

19  that and he wants to testify as to, I took this data -- I'm

20  sorry, took this data, applied this arithmetic and out came

21  this chart, that, I agree, is not expert testimony.  I think

22  he's qualified to do that.

23       THE COURT:  Didn't you also have concerns about him

24  talking about duty of care, that type of thing, for fiduciary?

25  Was this your only concern that would require an expert witness

1  analysis?

2          MS. TAUBMAN:  Outside of the stock price trends, the

3  general background regarding duty of care, I'm not objecting to

4  that.

5          THE COURT:  Say that again.

6          MS. TAUBMAN:  I'm not objecting to that.  It's

7  really -- for the issues that we identified on reply that

8  related to the determinance of stock prices.  And essentially,

9  where he's going through and attempting to imply that the press

10  releases caused the movement in stock prices, that's what we

11  object -- we believe that's subject to 702.

12          And further, Mr. Carocci simply is not qualified to

13  offer an event study.  He didn't describe a methodology that is

14  reliable under Daubert, and then, further, it should be

15  excluded under 403.

16          So it's really that piece where he's describing even

17  general causes of stock price changes or the event study where

18  he's seeking to associate the press releases to changes in

19  stock price.  If he is simply summarizing data and just

20  plotting it and can explain to the Court, I excerpted data from

21  Bloomberg, I output that line, that seems to be summary

22  testimony and that's fine.

23          Our objection is when he starts talking about

24  causality or mixing together elements of the press releases

25  with the data and then trying to lead the jury to infer

1    causality.  That's the piece where we object.

2          THE COURT:  Okay.  Why don't I hear from the

3    Government and I'll give you a chance to follow up afterwards.

4          MR. REILLY:  Thank you, Your Honor.  Anywhere in

5    particular you want me to start with the response?

6          THE COURT:  Why don't you tell me exactly what you

7    expect to ask of him on this topic, because it sounds like

8    maybe there's not much of a disagreement at all, potentially.

9          MR. REILLY:  That's quite right, Your Honor.  I think

10   the parties agree, and something very important that needs to

11   be kept out of this trial is that causation is not an element

12   of the crimes charged.  This is not a civil plaintiff's action,

13   and introducing causation would very likely confuse the jury

14   and substantially prejudice the Government in taking on a

15   non-element that it doesn't need to prove.

16          In light of that -- excuse me, Your Honor, I'm just

17   getting over something -- the Government does not seek to

18   elicit or admit really any of the type of testimony that seems

19   to have the defense so concerned.  Mr. Carocci's testimony is

20   really, I think, fairly separated into two buckets.  The first

21   is the general background testimony that often witnesses given

22   market manipulation cases all the time, as we outlined in our

23   brief, sometimes as summary witnesses, sometimes certified as

24   experts.  Whether or not that's necessary, I think it's

25   sometimes done because, as Your Honor noted, they're clearly

1    qualified in their role as traveling around the country,

2    training federal law enforcement to give this type of

3    background testimony.

4              Turning to what I'll call the as-applied, right, the

5    facts of this case and the summary exhibits, all the Government

6    seeks to do, as we put in the charts that we've already turned

7    over to the defense is, a chart with DECN's price and value

8    movement laid over evidence that is already pre-admitted into

9    the record, which are the press releases from the defendant.

10             So Mr. Carocci will say, here's the stock price on XYZ

11   date.  Here are the dates of the press releases.  That's it.

12   There will be no event study.  There will be no inferences or

13   testimony as to causation.  And Your Honor, to preclude the

14   Government from putting these two items on a chart while --

15             THE COURT:  I don't think they're arguing that you

16   can't.  So you're not going to be asking him, so did the press

17   release cause this jump?

18             MR. REILLY:  No, Your Honor.

19             THE COURT:  Ms. Taubman, are we all on the same page,

20   then, that Mr. Carocci can testify as basically a summary

21   witness and we don't need to do anything further with him?

22             MS. TAUBMAN:  (Inaudible.)

23             THE COURT REPORTER:  Can you speak into the

24   microphone, please?

25             THE COURT:  If you could back up and let her --

1              MS. TAUBMAN:  The exhibits disclosed I believe were

2      Exhibit 6, showed the stock price movements and then plotted

3      the press releases along with the stock price movements and

4      then had arrows pointing to that, which I felt suggested a

5      strong inference of causality.  So that is not appropriate

6      evidence under federal rule of evidence 1006.

7              So that is our objection.  We don't want these two

8      things combined into one exhibit and then offered under

9      FRE-1006.  We think that's inappropriate.

10             THE COURT:  So anybody happen to have this exhibit

11     handy?

12             MR. COLLINS:  I'm sure we have a copy, Your Honor.

13             MR. REILLY:  We do, Your Honor.

14             THE COURT:  Ms. Taubman, I take it you're -- what I

15     hear these arrows are showing the date that the press release

16     happens and then where you see some spike afterwards?

17             MS. TAUBMAN:  Right.  There are dots on the exhibits

18     with arrows pointing to the press releases.

19             MR. REILLY:  Your Honor, if it would be helpful, I

20     could hand up, I think, a representative exhibit that we're

21     talking about.

22             THE COURT:  Sure.  Why don't you just put on the ELMO

23     there, so defense can see what we're all using.  Is that handy

24     there?  Yeah, there you go.

25             MR. REILLY:  Can you see that, Your Honor?

1          THE COURT:  I can.

2          MR. REILLY:  This is one example, Your Honor, of

3     Mr. Carocci's proposed summary exhibits.  As noted, all of the

4     evidence included on this chart, as Rule 1006 contemplates and

5     as the courts have talked about, is largely already admitted

6     evidence.  The press releases which have been pre-admitted by

7     stipulation earlier in the litigation in this matter and then

8     the underlying stock price data.

9          Whatever inferences the defense thinks are being drawn

10    from here, that will be the jury's inference and certainly not

11    one provided by Mr. Carocci in any way.  We don't plan to ask

12    about the correspondence.  This is trying to in a helpful

13    meaningful way to move the trial forward, show the dates of the

14    press releases with when the stock price in volume did

15    different things.

16          THE COURT:  If you could step back for just a moment,

17    sir.  Leave that up there.

18          So Ms. Taubman, again, what's the problem with this

19    coming in through the Government's witness as a summary?

20          MS. TAUBMAN:  So federal rule of evidence 1006 allows

21    one to create a summary chart to prove the content of

22    voluminous writings.  So in my view, this extends beyond what

23    is permitted under that rule.  A summary should not draw

24    controversial inferences.  That's what the D.C. Circuit in

25    United States versus Lamere.

1              To me, this does draw a controversial inference.  It

2     doesn't track any other potential causes of the stock price

3     movements, which could be happening here.  It's pointing to one

4     element, one potential causal factor, and trying to associate

5     it with the stock prices.  To me, that's a controversial

6     inference and, thus, is not appropriate to be admitted under

7     federal rule of evidence 1006.

8              THE COURT:  All right.  This is all just kind of

9     purely factual, right?  I hear your point that you can point to

10    any number of things, like the temperature on these days, and

11    that somebody could infer that the temperature is driving the

12    stocks or the press release or anything like that.  But if the

13    Government isn't saying that one caused the other, and you're

14    going to be providing evidence showing other things that are

15    happening at the same time, I guess I'm struggling to see what

16    the problem is.

17             MS. TAUBMAN:  I think -- well, secondly, under

18    Rule 403, I think entering in this sort of exhibit as evidence,

19    it just would not pass the test of Rule 403 either, because the

20    probative value of what's being demonstrated here would be

21    substantially outweighed by the danger of prejudice, misleading

22    the jury, confusing the issues or wasting time.  You're

23    correct, we will have to put on evidence to try to rebut this

24    if this comes in.

25             THE COURT:  Okay.  But again, to the extent this is

what he's showing, is your argument that he needs to be an expert to put this in or even regardless of whether or not he's an expert he cannot put this in?

MS. TAUBMAN:  I think there's two folds -- two pieces of the argument.  First, is that this is not summary evidence under federal rule of evidence 1006.  It extends beyond the line.  Secondly, if he did want to put this in, this is essentially like an event study.  It's an attempt, although it doesn't explicitly say -- like, he may not testify that the press releases caused the stock price but there's a very strong inference of that here.  And I think to put on testimony along those lines, he needs to be qualified as an expert, under Rule 702.

THE COURT:  But you were saying that even if he was an expert you would still object to this coming in?

MS. TAUBMAN:  Under federal rule of evidence 1006.  I don't think it's an appropriate summary under 1006.  But as an expert, he may demonstrate this or have this as a demonstrative as an expert.

THE COURT:  All right.  Thank you.  So remind me of your name.

MR. REILLY:  Also Mr. Reilly.

THE COURT:  Great.  Further confused.  You're going to need to wear name tags or something.

MR. REILLY:  Yes, Your Honor.

```
1            THE COURT:  So your preference, though, is that he
2       does not come in as an expert, just as a summary witness?
3            MR. REILLY:  Your Honor, Mr. Carocci clearly qualifies
4       as an expert.  And if it would eliminate some of the issues
5       that we're facing here for Mr. Carocci to give non-opinion
6       testimony, laying out the stock price of DECN on a particular
7       day and the dates of the press releases, it is without question
8       that he is qualified as an expert to introduce what the stock
9       market did on a particular day and what press releases that are
10      already in evidence, what dates they came out.  We certainly
11      can proceed that way.
12            Sensitive and being cautious that the defense seems to
13      be interested in moving causation into the case, we thought it
14      prudent and maybe unnecessary to ask to certify Mr. Carocci as
15      an expert.  He certainly can be, particularly as the testimony
16      has been continually narrowed through this process to
17      background testimony and laying out simply factual testimony on
18      charts.
19            We can proceed either way.  We think it's appropriate
20      to proceed as a summary witness but, certainly, if the issue is
21      that he needs to be an expert to put in this flat factual data
22      of what the stock price was and what the volume was on a given
23      day compared to what dates the press releases came out, we
24      certainly can proceed that way.
25            THE COURT:  Okay.  I'll have to think about this.  I
```

1    mean, if the defense is asking for him to be an expert and you

2    think he is qualified as an expert, I think he probably is

3    qualified as an expert.  Hard to see what we lose by removing

4    an appellate issue.  But I'll think about that.

5         Do you want to be heard on your motion to exclude

6    experts?

7         MR. REILLY:  If I could be heard, Your Honor, just to

8    Mr. Reilly, given the close correlation.  I dealt with

9    Mr. Reilly and Mr. Carocci, so I can certainly turn to that.

10        Your Honor, the proposed testimony that they've laid

11   out on the defense side for Mr. Reilly is incredibly

12   problematic for the very reasons that we've narrowed what

13   Mr. Carocci is going to testify about.  The reason that we're

14   talking about the purely factual testimony as to what the stock

15   price was and what dates the press release were.  Because

16   Mr. Reilly cannot testify as to causation.  It's not an element

17   of the case.

18        And the defense has been explicit both in their briefs

19   and again here today that they are seeking to ask Mr. Reilly

20   not just to lay out maybe what some other companies that they

21   cherry-picked to compare the stock price to, but to give an

22   opinion, Your Honor, to do the very type of event study to

23   give -- and this is a quote from their disclosure and their

24   briefs.

25        To show a very close correspondence between the

1  movement in DECN's stock price and these other companies.  That

2  is a test of causation.  That is an attempt at proving

3  causation and it's linking eight different companies to DECN

4  without any of the technical rigor analytics that they've

5  complained about for Mr. Carocci, for their own witness to

6  offer what we've already said we recognize and agree

7  Mr. Carocci can't testify about, but neither can Mr. Reilly.

8      THE COURT:  So is our problem him saying one caused

9  the other or is there any reason they couldn't introduce

10  something very similar to this and show just the lines of DECN

11  stock prices, along with the lines of eight other -- what they

12  would say are comparable companies and let the jury kind of

13  reach its own conclusions.

14      MR. REILLY:  Your Honor, I haven't heard any argument

15  for the relevance of that.  The Government has the burden to

16  prove beyond a reasonable doubt that the defendant met the

17  elements of the crime, but what we're proposing here is in

18  furtherance of reaching those elements.  The defendant's

19  motive, where he talks about in his emails and his chats

20  wanting to pump the stock price.

21      So here, if that is his motive, as he has stated, we

22  need to put in evidence to show that, because he issued a

23  serious of press releases, his motive is being achieved, he's

24  seeing some of the results, even if it's not a causal way, the

25  defendant is seeing if I put out a press release I'm getting

1    what I want, the pump in the stock price.

2              THE COURT:  Wouldn't the defense witness then be

3    impeaching that mode of evidence?  If they are showing that

4    that's not true, this is kind of a fake -- you know, it's

5    correlation does not show causation.  Okay.  So you happen to

6    be able to point to these points.  Maybe the temperature was

7    also rising around then.  That doesn't mean anything.  We can

8    point to other things that are also going on that may suggest

9    that this didn't have anything to do with -- one didn't have

10   anything to do with the other.

11             MR. REILLY:  Your Honor, I think a focus on DECN's

12   stock price certainly addresses motive and brings forward that

13   point.  To start introducing other companies, right, that

14   begins to creep into causation.  That's showing what the

15   defendant was putting out in his press releases and the results

16   that he was seeing in the market were driven by some

17   alternative basis, which is, again, introducing causation,

18   giving the jury this impression that the Government needs to

19   show that the press releases, in fact, are the reason the stock

20   price moved.

21             Whereas what the Government needs to show is that what

22   the defendant was focused on and what he was thinking about is

23   his own company and what he could attempt to do too.  We don't

24   have to assume the burden and take on attempt to prove that the

25   reason, the factual causal reason that the stock price moved,

1    was either his press releases or, as the defendant will try to

2    argue maybe in the alternative, was caused by something else

3    happening in the market.

4         We need to show what the defendant was thinking was

5    driving his motive.  We think this sticks to that.  It doesn't

6    introduce some sort of broader comparative analysis that,

7    again, sounds very similar to the type of event study that the

8    defense has complained so loudly about.

9         THE COURT:  Do you think I need to do a Daubert

10    hearing on these proposed experts?

11         MR. REILLY:  Certainly not on Mr. Carocci, Your Honor,

12    given that the testimony that we're seeking to introduce is --

13    I mean, again, we don't even think it necessarily needs to be

14    expert testimony and we've, in fact, argued it can be summary

15    testimony, and that he's not giving any opinions.

16         He's not going through the process that the Daubert

17    principals -- there is no methodology or reliable principals to

18    be assessed for what Mr. Carocci will testify to.  He is going

19    to say this is what Bloomberg said the stock price was.  This

20    was what the volume was and these were the dates of the press

21    release.  That's why we thought it was appropriate to proceed

22    as a summary witness.

23         For Mr. Reilly, quite certainly, Your Honor.  They've

24    proffered that he is an experienced expert.  Right.  To move

25    outside of the bounds of the scientific reliability test and

1   just ask the Court to rely on Mr. Reilly saying that because

2   other companies moved in this direction DECN moved in this

3   direction, and that is the very sort of technical analysis that

4   Mr. Reilly is not qualified to give and that he cannot give

5   because he doesn't possess the skills, the experience, the

6   background to do that type of analysis.

7           THE COURT:  What type of person would?

8           MR. REILLY:  Maybe an individual or financial

9   institution who engages in kind of classic event study

10  analysis, right, determining the different movements in the

11  price.  I imagine there could be a professor who studies this

12  type of thing that we certainly could see.

13          But I think what's most important is someone who has

14  an undergraduate degree in finance and worked in compliance

15  departments setting up protocols is not in a position to do the

16  type of economic analysis required to make an opinion on

17  causality.

18          Now, if we're moving outside of --

19          THE COURT:  I'll tell you my impression is Mr. Carocci

20  and Mr. Reilly seem like pretty comparable kind of

21  professionals.  Both have as their job kind of looking for

22  anomalies in the stock market, kind of suggestions, that maybe

23  somebody is violating the law, insider trading, that type of

24  thing.

25          I think they're both kind of looking for causation,

1  looking at stock market trends and trying to determine if

2  there's something problematic there.  Do you disagree with me?

3       MR. REILLY:  In one very key way, Your Honor, is that

4  Mr. Carocci is not seeking to offer an opinion on these topics,

5  whereas Mr. Reilly is.

6       THE COURT:  I hear that.  But otherwise, don't you

7  agree that they both would be -- that's kind of what they're

8  doing in their jobs?

9       MR. REILLY:  I don't know that that's what

10  Mr. Reilly's job is.  It seems he's testified as an expert once

11  in a case that involved whether like a research company in the

12  market followed the securities laws.  Whereas Mr. Carocci

13  regularly testifies about market manipulation cases.  I think

14  over 70 grand jury and federal court appearances in his career.

15  He regularly teaches prosecutors, FBI agents how to look at

16  this type of information and understand it.  Whereas Mr. Reilly

17  was, as I understand it, an in-house compliance personnel.

18       I think there is quite a gulf in their qualifications

19  to talk about these type of things, and particularly if one

20  witness, the defense's witness, is going to be making the kind

21  of economic causation analysis that they've proposed he falls

22  far short of what's required to be able to do that.

23       THE COURT:  Just going back -- help me remember if --

24  do you agree that Mr. Reilly could kind of plot this graph

25  showing DECN's stock value, and then also put it up against

1    eight other firms, medical device firms, and say I think these

2    are all pretty comparable firms and low and behold they've kind

3    of moved up and down largely in tandem?  Do you think that

4    falls into expert testimony?

5         MR. REILLY:  I do not think, Your Honor, that that

6    would need to be expert testimony.  But should that testimony

7    be considered, I think it is certainly encroaching upon the

8    very reasons the Government raised 401 and 403 objections in

9    that it's inviting the question of causation in a way looking

10   at DECN's own conduct does not.

11        I would just add, Your Honor, that if we were to

12   proceed with introducing, essentially, eight random companies

13   that had something to do with COVID in there, that it would be

14   prudent and really necessary to instruct the jury explicitly

15   that causation is not an element of the charged crime, that the

16   Government need not prove causation and to really walk back

17   from what the defendant would be stepping on by bringing this

18   in.

19        And it really just, Your Honor, in summary, is a

20   difference between a focus on DECN and what DECN in is doing in

21   comparison of DECN to eight other companies, which is --

22        THE COURT:  Aren't you comparing them to 500 other

23   companies?

24        MR. REILLY:  No, Your Honor.  The S&P 500 -- first of

25   all, Your Honor, the S&P 500, as Mr. Carocci would testify, is

1    used as the mainstream barometer of whether there is outsized

2    action in the stock market.  It is not used really as a focus

3    on those companies.  The reason it's reported on the news every

4    20 minutes on the radio or that it goes across the ticker is it

5    gives a baseline sense, a context of what's going on.

6         In thinking about this very question I thought Your

7    Honor might ask this weekend, while the jury is obviously going

8    to be familiar with the basics of the S&P 500 as what is going

9    on in the general stock market, the Government thinks it's fair

10   and reasonable to use that kind of baseline generic moniker

11   because the jury likely does not know where the stock market

12   was in March 2020 or April of 2020.

13        It was COVID.  People were focusing on a lot of

14   different things.  There was a lot of swings in the stock

15   market, as the Court is well aware.  And that evidence simply

16   comes in as a baseline.  This was a particular time in the

17   market where the market was not moving, you know, some sort of

18   wild great depression type moment, or in the early 2021 moments

19   when the market was in recovery and the market was expanding

20   wildly.

21        So it's there to baseline, if you will, kind of the

22   context for the jury of what the stock market was like at a

23   time where they likely don't know and where the Government

24   needs to give context --

25        THE COURT:  Yeah, I mean, it just -- it strikes me as

pretty unfair to ask that you can point to what's happening generally in the market but to say that the defense can't point out what's happening in kind of what's arguably a more relevant market, which is kind of comparable medical device companies.

I mean, if it's true let's imagine that all the other medical device companies have exactly the same ups and downs that you're showing that DECN does. That seems pretty devastating to any suggestion that these press releases had anything to do with anything.

MR. REILLY: That's the very concern that the Government has, is that it would give that impression that the jury would need to find in some way that the press releases had any role.

THE COURT: Then why are we introducing this?

MR. REILLY: As we said, Your Honor, to provide context for why Mr. Berman committed the crime, why he was focused on pumping the stock, to show his motive. And of course, the Government has to prove materiality as well, Your Honor, while our victim witnesses --

THE COURT: And they get to try to attack that. I mean --

MR. REILLY: Your Honor, if I may suggest, if the concern from the defense is on the Government's S&P 500 piece of the analysis, and if the Court disagrees with the Government's view that it's there to help set context, we would

1   be prepared and certainly offer to eliminate any need for

2   further issue on this.

3         The Government would concede that it would not submit

4   the S&P 500 comparative evidence if the defense would

5   acknowledge now that it's not going to try to submit evidence

6   of the stock price movements of these eight disparate companies

7   with all different types of COVID products listed on different

8   markets.

9         THE COURT:  All right.  We can talk with them about

10  that.  Do you want to be heard on your motion to exclude the

11  other -- I think you've got several -- like all of their

12  experts you'd like to exclude, I believe.

13        MR. REILLY:  Your Honor, if it would be all right,

14  Mr. Fenton, given the tie in to the saliva, dealt with

15  Dr. Williams.

16        THE COURT:  All right.

17        MR. REILLY:  Thank you, Your Honor.

18        MR. FENTON:  Thank you, Your Honor.  And Ms. McCarthy

19  is going to address DuVal and Pritchard separately.

20        THE COURT:  Okay.

21        MR. FENTON:  Dr. Williams was not involved with the

22  development of the COVID-19 blood test that's at issue in the

23  indictment.  He's an independent third party that's been hired

24  to testify that the COVID-19 blood test was theoretically

25  feasible.

1              And the Government argues that he should be excluded

2     for two reasons.  First, the proposed testimony is

3     insufficiently reliable and, second, the proposed testimony is

4     irrelevant, it will confuse the issues, it will mislead the

5     jury and it will waste time.

6              THE COURT:  Sorry.  Do you think we need to do Daubert

7     hearings as to them?

8              MR. FENTON:  Well, in the first instance we think that

9     the Court should just exclude it based on the failure to make

10    the necessary disclosures.  If the Court disagrees and wants to

11    explore whether to admit Dr. Williams's testimony, we

12    absolutely think there could be a Daubert proceeding.

13             THE COURT:  What if I just have them supplement their

14    disclosures?

15             MR. FENTON:  We think we're past that point, Your

16    Honor.  Standing here today, we still do not know basic facts

17    about what Dr. Williams is going to say when he's on the

18    witness stand.  We have no idea.

19             We don't know the specific opinions that he's going to

20    offer.  We don't know the principles.  We don't know the

21    methods.  And there's no excuse for this, Your Honor.  The

22    defendant has that information and they just will not disclose

23    it, despite their obligations under federal rule of criminal

24    procedure 16, under federal rule of evidence 702, under

25    Daubert.

1           Under these circumstances the defendant cannot meet

2    his burden to show that the proposed testimony is reliable and

3    the Court cannot perform its gatekeeping function.  And there's

4    issues here with respect to the way that the defendant has

5    handled this issue.

6           The defendant had ample time to comply with the expert

7    disclosure, months to prepare the expert disclosures.  They

8    were due on September 25th.  The Government followed up with

9    requests for basic information.  It's been seven weeks since

10   the Government first followed up and the defendant has

11   generally refused to provide that information.  And what little

12   information the defendant has provided is a moving target.  And

13   I just want the give the Court one example.  And this is really

14   critical stuff here.

15          A week after the expert disclosures were shared, a

16   week after the deadline, the defendant disclosed that

17   Dr. Williams -- this is a week after the deadline.

18   Dr. Williams will opine, quote, under controlled testing

19   conditions in a laboratory environment -- under controlled

20   testing conditions in a laboratory environment, DECN's COVID-19

21   device kit was able to detect COVID-19.

22          We had never heard that before.  We have no idea what

23   it means.  Naturally, we asked the defendant -- this is a week

24   late -- what are you talking about.  So can you provide us some

25   basic facts about where the tests have placed, when the tests

1    have placed, who conducted these tests.  What was

2    Dr. Williams's role?  Dr. Williams is going to take the witness

3    stand and testify about --

4            THE COURT:  That feels like kind of fact testimony,

5    right?

6            MR. FENTON:  We don't know.  It feels like it very

7    much could be fact testimony, yes.  And that's exactly the

8    issue, right.

9            THE COURT:  Well, I'm not sure that you'd necessarily

10   be entitled to that anyway at this point.

11           MR. FENTON:  But Dr. Williams is supposed to be an

12   expert.  So what he proposes to testify about is -- there was a

13   requirement the defendant make disclosures so that the Court

14   can test reliability, conserve its gatekeeping function, under

15   Rule 716, under Rule 702, under Daubert, and we have no idea.

16           We have no idea what these tests are, who conducted

17   them, what role Dr. Williams played.  We don't even know

18   specifically what Dr. Williams will opine with respect to these

19   tests or what the principles or methods underlying that

20   testimony would be.

21           Another important point with respect to just this one

22   issue that shows the moving target nature of this, we were told

23   at that time -- this is October 2nd -- that Dr. Williams's

24   testimony was supposedly going to be based on a number of

25   things, but those things included DECN blood and saliva

1  standardized testing, DECN hematocrit testing, DECN GenViro

2  meeting programming database.

3       Again, the Government has no idea what these phrases

4  mean.  We asked.  The defendant refused to provide that

5  information, to provide that -- a description of -- beyond this

6  of what exactly they were talking about.

7       Under Rule 16, it's required to be disclosed in

8  discovery as part of the reciprocal discovery, which we've

9  asked for for years.  It wasn't disclosed until just yesterday.

10 Yesterday we got an email saying here are some of these

11 documents.  Not all of them, some of them.  And by the way,

12 we're not relying on these at trial.  We're not going to admit

13 these.  We're not going to rely on this.

14       As we stand here today -- this is not to be

15 dramatic -- it is a complete mystery to the Government as to

16 what Dr. Williams is going to testify about.  We just don't

17 know.  We know that the top-line conclusion is going to be that

18 the defendant's COVID-19 blood test was theoretically feasible,

19 but we don't know anything about the specific opinions that

20 Dr. Williams will offer, and with respect to this testing,

21 which is really important, we don't know anything about it.

22 And we don't know why because the defendant has an obligation

23 to make those disclosures under the rules, clearly has the

24 information and just won't share it.

25       This is reminiscent, Your Honor, of where we were

1    two years ago when we were talking about Exhibit N.  We were

2    talking about the fact the defendant was going to put before

3    the jury a tangible object that was the blood test.  And when

4    we pushed on that, when the Government pushed on that, it

5    turned out, well, we had to make a motion, actually, to show

6    cause as to why the defendant did not produce that exhibit in

7    discovery, and this went well into January 2022.

8         Eventually, it turned out it wasn't really a blood

9    test.  What it was was just the glucose meter.  It was the

10   thing they were going to use to adapt it.  Then we had the

11   briefing and now that has been declared moot.

12        But the point is we are here again two years later and

13   the Government suspects that what is happening is that there

14   isn't really any sort of testing that actually happened.  We

15   don't know.  We certainly haven't seen evidence of the type of

16   testing that the defendant is suggesting happened.  But this is

17   a big problem for us because we just don't know.

18        And at this stage, a month before trial, when the

19   defendant was supposed to disclose this information seven weeks

20   ago and had a long time to do so, we think that that calls for

21   just blanket exclusion.

22        Even if the Court were to give the defendant an

23   opportunity to supplement it, we think that it's purposeless.

24   It's inevitable that this evidence is going to be excluded.

25        And the reason why is because, again, the question

1    before the jury is what did the defendant know at the time that

2    the defendant made the statements that he made.  And for the

3    defendant to have Dr. Williams come up and testify on that

4    witness stand that it is theoretically possible is a problem

5    because the defendant did not have that information at the time

6    that he made the statements that he made.

7         The defendant can take the witness stand and he can

8    testify about all the academic articles that he relied upon.

9    He can testify about his conversations with Mr. Kim, with

10   Mr. Musho.  The defendant can talk about what the defendant

11   relied upon when the defendant made the statements, because

12   that all goes to the defendant's state of mind.

13        Dr. Williams cannot.  Dr. Williams cannot offer some

14   sort of post hoc rationalization for why it was okay that the

15   defendant did what he did.  He can't explain away the

16   defendant's state of mind because he didn't participate in the

17   development process.  If he was a fact witness that had

18   conversation --

19        THE COURT:  I thought he was involved.

20        MR. FENTON:  No.

21        THE COURT:  Aren't you describing these tests that he

22   had done?

23        MR. FENTON:  No.  Dr. Williams was not involved in the

24   development of COVID-19.  He's an independent third party that

25   the defendant hired to testify as an expert.  If Dr. Williams

1    was a percipient witness, this would be an entirely different

2    issue.  He is not a percipient witness.

3         He is going to take the witness stand top line.  We

4    don't know what the specific opinions are, the specific

5    principles, the specific methods.  He is going to take the

6    witness stand and basically testify to the defendant's state of

7    mind, right, based on what was possible, not what actually took

8    place at that time.  And that is extremely problematic.

9         It is not relevant under Rule 401 and it is -- even if

10   there was some relevance to it, it certainly -- the relevance

11   would be -- any relevance would be substantially outweighed by

12   the confusion of the issues, misleading the jury and just a

13   waste of time to go on what counsel previously called a detour

14   and a frolic, and have the defendant call a witness to provide

15   scientific evidence about something that was well beyond the

16   scope of what the defendant knew at the time.  He made the

17   statements that give rise to the crimes charged.

18        THE COURT:  Okay.

19        MR. FENTON:  And then, Your Honor, if -- should

20   Ms. McCarthy speak on the third aspect of the motion with

21   respect to Mr. DuVal and Ms. Pritchard?

22        THE COURT:  Sure.

23        So two things, just for the record, Mr. Reilly, that

24   exhibit we were looking at, I guess for the record, is that

25   going to be Exhibit 6C?

1          MR. REILLY:  Yes, Your Honor.

2          THE COURT:  All right.  That relates to the issue

3    between the expert, Mr. Reilly, and Mr. Carocci.

4          And then also, I don't know if I made clear,

5    Ms. Johns, but the only sealed portion should have been the

6    discussion about health.  We've been on the record since then,

7    sorry.  I didn't clarify that.

8          All right.  Go ahead.

9          MS. MCCARTHY:  Thanks, Your Honor.  Before we start, I

10   would note that the parties were able to resolve at least one

11   of the issues between DuVal and Pritchard.  The defense let us

12   know yesterday that they only intend on calling Mr. DuVal as an

13   expert.  So the duplicative testimony argument on the experts

14   base is not currently before the Court at this point.

15         Is there anything in particular you'd like me to

16   address regarding Mr. DuVal or should I just jump right in?

17         THE COURT:  Why don't you just jump right in.

18         MS. MCCARTHY:  Sure.  So regarding the outstanding

19   issues for Mr. DuVal, they fall into three general categories:

20   First is notice, second is relevance and the third is improper

21   hybrid testimony.

22         Regarding the notice, the defendant has failed to

23   provide the complete opinions of Mr. DuVal, as required by

24   Rule 16.  Instead, the defendant provided nine, quote, topics

25   about which Mr. DuVal may testify.

1            All but one of those topics regard sort of obstacles

2    or FDA processes faced by companies that are not decision

3    diagnostics.  I can go through the list but obviously Your

4    Honor has them.  In explanation of these topics, the

5    defendant's notice raises questions rather than opinions.  They

6    say that Mr. DuVal may testify regarding, quote, how the

7    commercialization and regulatory strategies employed by

8    companies of all sizes were impacted by COVID-19, including

9    additional pandemic-related delays and availability of seeking

10    emergency-use authorization.

11            But the defendant's notice doesn't actually provide

12    the complete opinion.  How were those strategies impacted?  Was

13    it easier?  Was it more difficult?  I could go on but Your

14    Honor has our briefs.

15            Given the defendant's repeated refusal to provide at a

16    bare minimum the information required by Rule 16, the expert

17    testimony of Mr. DuVal should be excluded in its entirety.

18            Regarding the second category, the defendant has

19    failed to show the topics, and, presumably, resulting opinions

20    are relevant and would not confuse or mislead the jury.

21            To the extent that specifics beyond the nine topics

22    were provided, they provided no support to the relevance of

23    Mr. DuVal's proposed expert testimony.  Instead, they include

24    areas like requirements typically imposed by the FDA, such as

25    testing protocols and how companies generally meet those

1    requirements.

2            Preparations that companies that are not DCEN seeking

3    to commercialize medical devices typically undertake, as well

4    as challenges faced by those business in bringing new medical

5    devices to market.

6            As Your Honor has already stated today, for expert

7    testimony to be relevant it must help a trier of fact to

8    understand the evidence or determine a fact at issue in the

9    case.  Hurdles or experiences faced by companies that are not

10   decision diagnostics and getting FDA approval are not relevant

11   to the question in this case.  Did the defendant intentionally

12   make false and misleading statements to the investing public?

13           THE COURT:  Yeah, I get that.

14           MS. MCCARTHY:  So moving to the third category

15   regarding hybrid testimony, the issue of hybrid testimony is

16   particularly acute here.

17           THE COURT:  Is your understanding that Ms. Pritchard

18   is going to be just a fact witness, then, and does this resolve

19   that concern?

20           MS. MCCARTHY:  I understood they were not calling

21   Ms. Pritchard.  But I don't know if the defense could speak on

22   that.  They're certainly not calling her as an expert, as far

23   as I understand.

24           MR. COLLINS:  (Inaudible.)

25           THE COURT REPORTER:  Can you speak into the

```
 1   microphone?
 2              MR. COLLINS:  Sorry.  It's possible both get called
 3   but we're only going to call Mr. DuVal as an expert.
 4              THE COURT:  So would Mr. DuVal be a hybrid witness,
 5   then?
 6              MR. COLLINS:  Yes.  Potentially not cumulative.
 7              THE COURT:  I understand.
 8              MR. COLLINS:  We did the disclosure for Ms. Pritchard
 9   in case she was going to be viewed as an expert.  So we didn't
10   know who was coming, and so...
11              THE COURT:  Got it.  Okay.  So all right.  I hear you
12   on the hybrid concern.
13              MS. MCCARTHY:  I think, Your Honor, just to reiterate,
14   it's particularly acute in this case because Mr. DuVal is
15   already a lawyer.  And if we're anointing him both as a lawyer
16   and as an expert on the FDA process, he's now sort of got this
17   aura of reliability that I think is particularly acute in this
18   case, and is addressed by the cases we cited to the Court in
19   our briefs.
20              THE COURT:  All right.  Thank you.
21              MR. COLLINS:  Your Honor, a different batting order.
22              THE COURT:  All right.
23              MR. COLLINS:  Can Mr. Howell briefly address
24   Mr. Reilly, or is Your Honor set on that?
25              THE COURT:  Yeah, I'll give you the last word on
```

1    Mr. Reilly and then Mr. Carocci as well.

2            MR. COLLINS:  Well, Ms. Howell had addressed --

3    Mr. Howell wants to address Mr. Reilly.  We'll be very short,

4    just a response to what the Government said, and then

5    Mr. Panikar has the response on Dr. Williams and Ms. Taubman

6    has a response on Mr. DuVal.

7            THE COURT:  All right.

8            MR. HOWELL:  Good morning.  Brandon Howell for the

9    defense.

10            Real quick on Mr. Reilly.  I think, as you can see

11    from the -- I don't have the benefit of the chart but if

12    they're going to be able to introduce that and say it's not

13    causation, I think Mr. Reilly's rebuttal.  He's supposed to

14    rebut that press releases weren't the only factor in the market

15    at that time that could have affected the stock.

16            THE COURT:  Do you think I need to do a Daubert

17    hearing on Mr. Carocci?

18            MR. HOWELL:  I think if the Court feels like it's

19    satisfied, then no.  If you're not satisfied, it seems like

20    they're conceding that he may be an expert.

21            THE COURT:  They definitely believe he's an expert.

22    Their position is they don't need to qualify him as an expert.

23    But my inclination is, looks like an expert to me.  They say he

24    could be an expert.  You say he needs to be qualified.  My

25    instinct is to qualify him.

1          MR. HOWELL:  I think based on the arguments we made

2     earlier as far as his method, I think that would probably

3     support the Daubert hearing.

4          THE COURT:  I'm sorry, it would support?

5          MR. HOWELL:  It would.

6          THE COURT:  You're changing your view.  You think a

7     Daubert hearing is necessary?

8          MR. HOWELL:  I'm saying if the Court is not satisfied

9     with what it heard today, we would not object to a Daubert

10    hearing.

11         THE COURT:  I see.  Thank you.

12         So Mr. Reilly, is Mr. Reilly going to be speaking to

13    causation?  In other words, what I hear from the Government is

14    that 6C, they're just plotting out these things all happened

15    around the same time.  Is your Mr. Reilly just going to be

16    doing the same thing and saying, well, also at the same time

17    seven other comparable companies were moving up and down?

18         MR. HOWELL:  His testimony will focus on eight

19    companies, similarly situated, and how their stock moved.  It

20    doesn't do anything with press releases.  It's just a simple

21    time and movement in stock price.

22         THE COURT:  Okay.  Is he going to be saying that these

23    press releases did not cause the spikes?

24         MR. HOWELL:  He will testify -- proposed to testify

25    that these companies were COVID related and that drove the

1    movement in the market.

2              THE COURT:  Sorry, did you say these stocks were COVID

3    related or the movement --

4              MR. HOWELL:  These companies were developing

5    COVID-related products.  Which during that time were --

6    COVID-19 was heating up.  That affected the market and that's

7    what that will show is that there's another aspect that the

8    Government has not said, because they've said that press

9    releases are the -- basically, the only thing that has affected

10   DCEN.  So we're rebutting that with Reilly, saying, well, there

11   was something else.

12             THE COURT:  Right.  So I mean, I'll tell you -- I

13   mean, my instinct is to allow the Government to introduce

14   charts comparable to 6C and say this is -- these are the dates

15   that he was making press releases.  This is what was happening

16   with his DCEN stock.  This is what was happening on the S&P.

17   Not saying that one caused the other but these are all facts

18   and dates, and to allow Mr. Reilly to say, but also at the same

19   time, these other eight companies were doing the same thing and

20   their stocks were moving up and down comparably.

21             I'm inclined to prohibit both parties from saying X

22   caused Y.  In other words, I think I'm inclined to allow you

23   both to speak to correlation but prohibit you both from

24   speaking to causation.

25             Are you comfortable with that?

```
1              MR. HOWELL:  I am.  I think the main thing with the
2    causation from our point was rebuttal.  I think if they're not
3    putting up causation, then that would negate us as far as the
4    causation aspect.
5              THE COURT:  Do you think that Mr. Reilly needs to
6    be -- do you think either individuals need to be qualified as
7    an expert to do those things?
8              MR. HOWELL:  It sounds like they're simply summarizing
9    facts.  So I mean, if they're just taking data and plotting it
10   out and saying here's the data, that doesn't seem like you need
11   an expert.
12             MR. COLLINS:  Defense says no.
13             THE COURT:  Great.  I think maybe we simplified things
14   a little there.  Thank you.
15             MR. HOWELL:  Thank you, Your Honor.
16             MR. XENAKIS:  Your Honor, what's next?
17             THE COURT:  Why don't we hit Dr. Williams.  Actually,
18   on your way up, Mr. Reilly, that's my inclination on handling
19   those two people, tell me if you think I need to make any
20   additional ruling or if I'm missing something here.
21             MR. REILLY:  Your Honor, the Government is largely in
22   agreement with where we've landed, with one slight caveat.
23   Given what we've now heard that Mr. Reilly's testimony is going
24   to be we don't see any need, reason or appropriate basis for
25   him to be certified as an expert.  He's essentially a summary
```

1    witness for the defense.

2        THE COURT:  Yeah, I think that's what I heard from

3    Mr. Collins.  Neither individual would be an expert witness.

4        MR. COLLINS:  Invoking goose/gander, that's fine.

5        THE COURT:  Thanks.  Okay.  Have a seat.  I'll hear on

6    Dr. Williams.

7        MR. PANIKAR:  Good morning, Your Honor.  I think it

8    makes sense to address the disclosure first and then go into

9    the actual testimony.  I just wanted to clear up a few points.

10        The Government said that we have provided them with

11    virtually nothing or almost nothing.  It's important to note,

12    as we indicated in our disclosure, Mr. Berman relied on a white

13    paper to develop this product, and Dr. Williams, his expected

14    testimony is essentially going to compare the device described

15    in that white paper with the device that Mr. Berman was trying

16    to develop, just to demonstrate that there was, in fact,

17    actually a good faith basis.  This was a genuine effort to

18    develop it.

19        Now, on the actual disclosure we indicate precisely

20    that and we say that Dr. Williams will offer testimony about

21    the similarities.  We go even further than that.  We also talk

22    about what those similarities are.  We identify the biosensor

23    test strip.  We identify the impedance measurement technology.

24    And further than that, we also note in our exhibit list the

25    white paper that Mr. Berman did, in fact, rely upon.  It's

```
 1   Exhibit 7 in our exhibit list.
 2           So we've told them there was a white paper.  They have
 3   the white paper.  We've identified the similarities between
 4   these devices.  They have the information they need to
 5   effectively cross-examine Dr. Williams.  So I don't think the
 6   disclosure argument that they're making really holds water,
 7   given what we have actually provided them and clarified with
 8   them with our supplemental disclosure.
 9           THE COURT:  All right.  So just summarize for me:
10   Dr. Williams had never met or interacted with your clients,
11   correct?
12           MR. PANIKAR:  Yes, that's correct.
13           THE COURT:  And so what's the relevance?  What's he
14   going to say and why is it relevant?
15           MR. PANIKAR:  Precisely.  So Dr. Williams is
16   essentially going to testify -- what we expect he'll testify to
17   is that there are similarities between this device described in
18   the white paper, the impedance aspects of the device --
19           THE COURT:  That's your client's white paper?
20           MR. PANIKAR:  No.  This is a white paper that
21   Mr. Berman relied upon to develop the product.  This is what
22   our argument essentially is, is that this was a good faith
23   attempt to develop a product.  And Dr. Williams is essentially
24   going to testify about that similarities between that device
25   and Mr. Berman's product, specifically on the impedance
```

1   technology, so the biosensor and the impedance meter.  So

2   that's essentially what the testimony is about.

3          And to the extent we're going to be talking about

4   other impedance -- other ways to test for COVID using

5   impedance, it's really just about the fact that there were

6   other options that were available, a menu of options available

7   to identify COVID-19 using impedance, and Mr. Berman chose a

8   particular option based off of the information he had.  So it's

9   really about why he made the decisions he made.

10         THE COURT:  So I don't think I know very much about

11  what your client actually did.  I take it Dr. Williams isn't

12  going to be able to tell us this, right?

13         MR. PANIKAR:  Dr. Williams will be able to compare the

14  two devices on key issues.

15         THE COURT:  What were the two devices?

16         MR. PANIKAR:  I'm not speaking specifically enough.

17  The device described in the white paper or the information

18  described in the white paper and the device Mr. Berman

19  developed, the blood test.

20         THE COURT:  Are you talking about the glucose test

21  that preexisted?

22         MR. PANIKAR:  The blood COVID test.

23         THE COURT:  So he did come up with something else?

24         MR. PANIKAR:  Yes.  So this was his idea between the

25  blood COVID test and the similarities between what was

1  described in the white paper and what Mr. Berman was trying to

2  develop with the blood test.

3          THE COURT:  How are we going to learn about that blood

4  test?

5          MR. PANIKAR:  The blood test Mr. Berman was

6  developing?

7          THE COURT:  Yes.

8          MR. PANIKAR:  It will be through a comparison of how

9  DECN described the blood test, the information they put out

10  there, the specifications for what they wanted to create with

11  the blood test.  So there are aspects of it that Dr. Williams

12  was able to look at, and then compare what those specs are with

13  the specs in that white paper that Mr. Berman was relying upon.

14          THE COURT:  And what is the timeline that your client

15  developed his blood test on?

16          MR. PANIKAR:  The blood test development period, it

17  was the spring of 2020 up through roughly summer of 2020.  So

18  it's that period of time.

19          THE COURT:  Okay.  And so when did he have a blood

20  test ready to go?

21          MR. PANIKAR:  So ultimately, the blood test, they

22  switched into the saliva test through the press release in

23  June -- in July.  They use the same technology, that impedance

24  technology that we had talked about earlier.

25          But the point is that Mr. Berman had a good faith

1    attempt at developing this product.  That this wasn't a hoax.

2    That there was genuine effort here.  So he didn't have

3    fraudulent intent when he was writing these press releases and

4    when he was developing these products, that there was actual

5    effort.

6         THE COURT:  Okay.  So you're going to -- again, I

7    guess, who is going to be telling us about those efforts that

8    he was taking?  Because it's not going to be Dr. Williams,

9    correct?

10        MR. PANIKAR:  No.  Dr. Williams won't be able to

11   because he wasn't involved in this actual development of the

12   product.  He wasn't there.  But what he will be able to do is

13   he will be able to --

14        THE COURT:  My question is who is.

15        MR. PANIKAR:  Who is going to testify to that?

16        THE COURT:  Yes.

17        MR. PANIKAR:  Well, there were individuals involved

18   from DECN in the Government's witness list.  There are

19   individuals who were there.  So it would be Matthew Musho,

20   Daniel Kim.  Those individuals were actually involved in the

21   efforts to develop this product.

22        THE COURT:  So they're going to testify to something

23   that was not finalized but something they were working on?

24        MR. PANIKAR:  Yes, yes.  The efforts to develop this

25   product.  What Mr. Berman was trying to develop, they'll be

1    able to testify about that.

2         THE COURT:  And then Dr. Williams, you want

3    Dr. Williams to be able to say that this could have worked?  Is

4    that --

5         MR. PANIKAR:  Yes.  Based off the design

6    specifications that this could have actually worked.  All to

7    really explain why -- again, why Mr. Berman was doing what he

8    was doing based off the information that he had.  Because the

9    critical element in this case really is fraudulent intent.  And

10   so this all goes back to why Mr. Berman was making the

11   decisions he was making.

12        THE COURT:  Again, if -- could the parties just

13   stipulate that it would have been possible to create a COVID

14   blood test, and if they can stipulate to that, is there any

15   point in having Dr. Williams testify?

16        MR. PANIKAR:  I think the added point is really the

17   efforts, that Mr. Berman was, in fact, making these efforts

18   himself to develop this.  And the jury should be able to see

19   the white paper and compare and have someone who has that

20   technical expertise to say these are similar to each other, and

21   Mr. Berman was -- we'll make the argument Mr. Berman was making

22   the effort.  This is evidence that Mr. Berman was actually

23   trying to develop a product here.

24        THE COURT:  Okay.

25        MR. PANIKAR:  I didn't know if you wanted me to keep

1  going or if you had another question, Your Honor.

2          THE COURT:  Is this -- I was under the impression

3  you'd agreed not to elicit evidence about the antigen test

4  article.  Is that a different article?

5          MR. PANIKAR:  The antigen test article, for

6  clarification, that's an article that Dr. Williams had wrote.

7  Essentially, it's another way an individual can use impedance

8  to identify COVID-19.  It's identifying antibodies.

9          THE COURT:  But he's not going to talk about that?

10         MR. PANIKAR:  To the extent we have him talk about it,

11  it's again to that point about how there were a menu of options

12  that were available to Mr. Berman at the time he made his

13  decision.  Mr. Berman didn't go down that route.  He chose a

14  different option, essentially, and why he would choose that

15  option based off the information that he had.

16         So we don't expect him to testify at length about the

17  efficacy of using antibody tests to identify COVID and all of

18  that.  That's not really what we expect we'll have him testify

19  to.  That's a separate issue.

20         THE COURT:  Okay.  Thank you, sir.

21         MR. FENTON:  Your Honor, can we briefly respond to

22  Dr. Williams's testimony?

23         THE COURT:  I think I'm just going to hear from the

24  defense and you'll get a chance to speak at the end.

25         MS. TAUBMAN:  Lori Taubman on behalf of Mr. Berman.

```
1    With respect to Mark DuVal's testimony, the disclosed testimony
2    will help the jury to understand evidence, and therefore is
3    relevant.  FDA approval processes and the challenges faced by
4    smaller companies in commercializing medical devices are topics
5    that the average juror just does not have experience with.  And
6    DuVal's testimony will provide helpful background information
7    regarding these topics.  His training and experience are a
8    sufficient basis for his opinions.  He has deep professional
9    experience.
10         THE COURT:  So let's just talk about relevance.  I
11   guess I'm skeptical that the difficulties in the process is
12   relevant.  I think the Government's argument is that your
13   client didn't do these things, and kind of whether they might
14   be difficult or not strikes me as beside the point.
15         MS. TAUBMAN:  So the Government mischaracterizes what
16   we're trying to do with Mark DuVal as putting the FDA's
17   approval process on trial.  Simply what we're trying to do is
18   if you read the superseding indictment there's references to
19   press releases that discuss emergency use authorization, EUA.
20         The entire FDA approval process and understanding kind
21   of the factual evidence that we presented at trial, these are
22   all topics that we just don't think the average juror is
23   familiar with.  So we thought it would be helpful to have
24   someone kind of provide some overview testimony about what that
25   is.
```

1              So we're bringing this in or we propose to bring this

2       in through Mark DuVal as an expert because he's going to be

3       relying on his experience counseling companies through the

4       years.  Not just his experience with respect to DECN on this

5       particular matter; to describe the approval processes

6       generally.

7              In addition, COVID-19 was a challenge, right?  And

8       there were -- the availability of the emergency use

9       authorization in various other aspects of the approval

10      processes just varied from what typically one might expect.  So

11      we wanted to present -- we felt it would be helpful to give the

12      jurors a little bit of background with respect to that.

13             In addition, the commercialization process and

14      strategies of smaller companies, this is something that, again,

15      we don't think most jurors are going to have the familiarity

16      with respect to these concepts.  So for those reasons, we

17      believe this testimony will be helpful to the jury in

18      understanding the evidence and therefore that's why we believe

19      that it's relevant.

20             THE COURT:  All right.  Thank you, ma'am.

21             MS. TAUBMAN:  I think there were two other points they

22      raised:  Notice and hybrid testimony.  First, with respect to

23      the hybrid testimony issue.  As we disclosed, Lisa Pritchard

24      will not be testifying -- we don't expect Lisa Pritchard to be

25      testifying as an expert witness.  She was kind of the main

1    intermediary as far as the DuVal firm and the FDA goes.  So we

2    don't expect that to raise any concerns.

3          As we explained in our opposition, the comparison to

4    the Phoenix case is just not really a good parallel here.  In

5    fact, the Government suggested that we ask the questions about

6    the FDA approval processes through Maria Garcia, who is a fact

7    witness on their side involved here.  So that would also raise

8    potential hybrid witness concerns.

9          So, again, we just don't think those concerns are a

10   basis for preventing Mark DuVal from testifying, and if you

11   still have those concerns you could issue an instruction to the

12   jury or we could stage the testimony in a way that hopefully

13   would alleviate any such concerns.

14         Finally, with respect to notice, again, we believe the

15   appropriate remedy to extend the notice insufficient is to

16   supplement that.  However --

17               THE COURT:  I don't need to hear from you on notice.

18               MS. TAUBMAN:  Thank you.

19               THE COURT:  Thank you, Ms. Taubman.

20         All right.  Mr. Fenton, why don't you focus on

21   Dr. Williams.

22               MR. FENTON:  Yes, Your Honor.  Thank you.  You heard

23   from counsel that they want Dr. Williams to take the stand and

24   testify that the defendant relied on a white paper.  The

25   defendant had a menu of options before him.  The defendant

1    chose a certain method that was theoretically feasible.

2            But the problem is this is not the proper purview of

3    expert testimony.  The defendant cannot -- the expert,

4    Dr. Williams, cannot testify about what the defendant relied

5    upon.  The only witness who can testify --

6            THE COURT:  Yeah, I don't think they're trying to do

7    that.  I completely agree with you, they need to have these

8    other fact witnesses show that.  But what I hear Dr. Williams

9    is going to say is that this wasn't a fraud.  That there's

10   something real there.

11           You know, again, back to my silly chair analogy, he's

12   not talking about teleporting.  This was kind of -- there's

13   something -- there's fire there, not just smoke.  And I

14   think -- I guess I'm struggling to understand why that isn't

15   relevant.  I certainly think if it was on the other foot you

16   would be -- if, you know, he was working on something --

17   ostensibly working on something that was completely impossible

18   and he knew that, I would think you would be trying to show

19   that, say that he said he was working on this test but this

20   wasn't -- this had nothing to do with a blood test and it had

21   nothing to do with COVID.  Right?  I mean, that would go to

22   show that this was a fraud.  And so I guess I'm struggling to

23   see why he can't show the opposite.

24           MR. FENTON:  Because the Government doesn't have to

25   assume the burden to prove that this is impossible.  All the

1    Government has to prove beyond a reasonable doubt is that at

2    the time that he said he had developed the test, he had not, in

3    fact, developed it.  That's it.

4          To the extent that the defendant wants to say there is

5    a white paper and I was in receipt of that white paper and I

6    reviewed the white paper and I relied on the white paper and

7    jury, here's that white paper.  He absolutely can present that

8    defense, if it's the case that he reviewed that white paper,

9    had that white paper, that knowledge was in his mind at the

10   time that he made those statements.  That seems relevant.  And

11   the defendant is not prohibited, not barred in any way from

12   taking the stand and introducing that testimony.

13         He's also not barred from asking other witnesses at

14   trial about whether or not there was a white paper and whether

15   or not it was something that was discussed and if they reviewed

16   it and that is something that they are able to do.

17         They are also able to elicit testimony about whether

18   or not Mr. Berman asked these other witnesses whether or not

19   this was a theoretically possible concept.  And we know what

20   the answer is in black and white.  We've seen the email.  And

21   it's described for everybody in Paragraph 16 of the superseding

22   indictment.  That's fair game.

23         Once we have an expert on the stand who is going to

24   testify about what Mr. Berman did and thought and about

25   Mr. Berman's efforts, that is a problem.  Because that is

1    exactly what the Court in Kaufman -- and we point to that case

2    in our brief -- said is post hoc rationalization.  You cannot

3    introduce an expert to basically come up with a justification

4    after the fact for what the defendant -- for what the defendant

5    said could have been plausible.

6            That is just not what was in the defendant's minds.

7    That's what an expert comes up with after the defendant has

8    been charged with a crime.  And the Kaufman case is 2021

9    Westlaw 4084523.

10           THE COURT:  What court?

11           MR. FENTON:  Southern District of New York.

12           THE COURT:  Okay.

13           MR. FENTON:  And that's exactly what the defendant is

14   looking to do here.  And if you go back and you look over the

15   transcript, they're saying they're going to talk about the fact

16   that Mr. Berman relied on the white paper.  The witness is

17   going to, the expert.  That Mr. Berman either -- you can tell

18   by Mr. Berman's efforts.  This witness, this expert, was not a

19   percipient witness.  It's not appropriate.  And even if he

20   could --

21           THE COURT:  I think this defense is savvy enough that

22   they're not going to be asking what the defendant did.  They're

23   going to have to show from somebody else what he did, and

24   they're looking to have Dr. Williams say that this wasn't a

25   hoax.  That if somebody did these things, this could lead to a

1    blood test.  I need to hear from you why that isn't relevant.

2              MR. FENTON:  Because the purpose of that, so says the

3    defendant, is that it goes to good faith.  And that is not the

4    good faith defense that is applicable here.  The good faith

5    defense is not whether or not it was this idea -- did the

6    defendant have good faith believing that one day he could

7    develop this test.

8              The good faith defense is strictly limited to the

9    crimes charged, and the crimes charged here are based on

10   allegedly false and misleading statements that the defendant

11   made in March, in April, May.  There's also one in July.

12             And to the extent that he is trying to use the

13   theoretical possibility to establish good faith, it must be

14   with respect to those statements.  It can't be with respect to

15   the idea that this is not a hoax.  The Government need not

16   prove that the -- that impedance could not be used to detect

17   COVID-19 in blood.

18             All the Government need prove at trial beyond a

19   reasonable doubt is that at the time the defendant said that he

20   had developed this test, he, in fact, had not developed the

21   test and he knew that.  That's all the Government needs to

22   show.

23             Once we get into -- once we start talking about

24   whether or not the concept, the idea, is, in fact, a good one

25   or a possible one or a plausible one, whether or not that idea

is a hoax, that's a completely different issue and it doesn't
go to good faith.

So the reason it's not relevant is because the good
faith defense is here is about did the defendant have good
faith at the time that he spoke the statements that formed the
basis of the indictment.  That is it.

Anything beyond that, it's confusing the issues, it's
misleading the jury and it's just wasting time because it's
introducing scientific evidence that's going to be difficult
for the jury to comprehend about whether or not this idea is
possible.  And that's not relevant in any way, shape or form.
And to the extent there's some minimal relevance, it's
substantially outweighed, substantially outweighed by the
confusing and misleading nature of that testimony.

The one final point I would make -- two final points
Your Honor.  One is that there has been -- we have been going
back and forth for months almost, for almost two months to try
and find out what Dr. Williams is going to testify about.  And
the fact that there was no clear explanation of that testimony
until now is a problem and it warrants exclusion, quite
frankly, given that all of this information was supposed to be
out there on September 25th.

The other thing that's important is what you did not
hear from the defendant, was the fact that this claim that they
were going to testify -- that Dr. Williams was going to testify

1    that under controlled testing conditions in a laboratory

2    environment, DECN's COVID-19 device kit was able to detect

3    COVID-19.

4            It's really important, if Dr. Williams is not going to

5    testify about that, the Government needs to know that now.

6    Because that's something that the defendant has said

7    Dr. Williams is going to testify about.  I did not -- when I

8    heard the description from counsel about what Dr. Williams was

9    actually going to testify about, it did not include that

10   opinion.

11           So the Government would ask that the Court clarify

12   with counsel whether or not Dr. Williams is going to testify

13   about whether under controlled testing conditions in a

14   laboratory environment, DECN's COVID-19 device kit was able to

15   detect COVID-19.

16           THE COURT:  Okay.  Thank you.

17           Sir, if you could address that last point.

18           MR. PANIKAR:  Your Honor, if it would be appropriate,

19   there's another thing I'd like to address about the press

20   releases.  I can address both.  It would be very short.

21           THE COURT:  All right.  Why don't you handle my

22   question fist.

23           MR. PANIKAR:  I'll handle that question first, of

24   course.  Your Honor, frankly, for our disclosure we disclosed a

25   lot in an effort to really boil the ocean on all of the

1    potential testimony that Dr. Williams could potentially talk

2    about.  Really, what we expect the focus of it is going to be

3    is on those design specifications and the similarities.

4           So to the extent it would be about the ability to

5    detect COVID, it would be how the design, as I talked about

6    briefly earlier, the design of the test based off of those

7    specifications it would be able to detect COVID-19.  That's

8    what the testimony we expect would be.

9           THE COURT:  Okay.  So he is not -- there is no product

10   that's been tested, period, correct?

11          MR. PANIKAR:  To my understanding, no, there is no

12   product.

13          THE COURT:  So Dr. Williams certainly --

14          MR. PANIKAR:  Yes.  Dr. Williams was not involved in

15   any testing of this device itself.  It would be based off of

16   the design.  Would this be able to detect COVID-19?

17          THE COURT:  If you so -- it's like, if this had been

18   created, it could have tested COVID?

19          MR. PANIKAR:  So my understanding --

20          THE COURT:  Or could have detected COVID?

21          MR. PANIKAR:  It could have detected COVID.  My

22   understanding is we're not going to have Dr. Williams testify

23   about any testing.  We've taken that off the table.  Any

24   testing data, all that is off the table.  It's really about the

25   design specifications and similarities and how that design

1    would have been able to detect COVID.  That's fundamentally

2    what we expect the testimony will be from Dr. Williams on that

3    point that the Government is making.

4            If I could briefly talk about --

5            THE COURT:  So I guess to Mr. Fenton's point, the

6    Government is -- their claims are that your client said that he

7    had done these things.  I think had created a test.  I don't

8    hear you disagreeing with them that he, A, said that he had

9    created a test and, B, said -- had not, in fact, created such a

10   test.  Why is it relevant that he could have come up with a

11   test that would have worked?

12           MR. PANIKAR:  So on that point -- and I think we

13   indicated this in our brief.  We disagree with their assertion

14   of what these statements say at base, that these statements do,

15   in fact, say that there was a completed test.  In fact, we

16   don't want to get into the nitty-gritty of all the press

17   releases, because that's not what the hearing is about.

18           But if you look at them, there are statements like

19   this is a product in development.  There are forward-looking

20   statements.  There is a disagreement over, for example, what

21   "validation" meant in that context.  The Government argued that

22   it meant FDA validation.  We disagree with that

23   characterization as well.

24           So the idea that these press releases mean what the

25   Government says it means, and that we are necessarily limited

1   by their interpretation before the jury can even look at these

2   press releases, is frankly inappropriate.

3        THE COURT:  Right.  I mean, I certainly agree you can

4   and should be arguing about the meaning of the press releases.

5   But if -- so your understanding of the press releases is he's

6   saying that I am working on this type of thing?

7        MR. PANIKAR:  So yes.  Yes, on that point.

8   Essentially, that this was iterative development and that there

9   is going to be a factual question for the jury to decide about

10  what these press releases are saying.  It's our contention,

11  precisely as you said, that he is working on this device and

12  that it was advancing --

13        THE COURT:  Okay.

14        MR. PANIKAR:  -- over time.

15        THE COURT:  Did you want to say something else on the

16  press release?

17        MR. PANIKAR:  No.  That was it essentially on the

18  press releases, Your Honor.

19        THE COURT:  Okay.  I'm going to rule on those

20  questions after lunch.  I wanted to talk with you-all -- first,

21  I want to thank you for your work on the voir dire questions.

22  They basically look good to me.  I'll just tell you about the

23  process.  I don't think any of you -- well, Ms. Peterson, maybe

24  you haven't even -- she knows how I do these.

25        But we'll have the venire all sitting in the audience

section.  I will ask the public questions out loud in front of

everybody.  I will tell people at the outset if there's any

answer to any of those questions that either they would not

feel comfortable with answering in front of everyone or that

the answer to the question could be prejudicial in some ways to

the parties, I'd ask them to just ask to approach.

But my expectation and experience has been that these

public questions almost never are either embarrassing or really

relevant to the particular parties, and that it's both faster

and more conducive to a public jury trial right to have those

asked and answered out loud.

So those questions I'll ask those -- ask those

questions.  If somebody has a "yes" answer, I'll ask them to

raise their hand and we'll have a microphone.  I'll go around

and have them answer where they're standing.  I'll ask any

relevant follow-up questions I think are necessary.

To the extent you have an interest in exploring those

questions further with them, you should note that to yourself

and you can ask those questions later.  But I'll be the only

one doing the follow-ups for those "yes" questions.

And so along those lines, your question 17, if you

have had any of the investment experience as described above

were those experiences positive or negative, that would be a

follow-up question that I would ask to somebody who said yes.

Once we get through those questions, everybody will

1    have a notecard and they will write down the number of any

2    "yes" questions -- "yes" answers to the private questions.

3    I'll just read those questions all out lout and ask them all to

4    write down if they do have a "yes" answer.

5           Once we've gone through all those questions, we'll

6    bring the parties up.  I am not going to be able to have

7    all-you-all up here.  So you're going to need to figure out one

8    or maybe two attorneys from each side who are going to handle

9    this.  We've got a bunch of earphones.  So certainly, the

10   defendant and hopefully most of the rest of you can listen in.

11          But we'll have each of the veniremen come up one at a

12   time.  I'll direct those questions but I'll give you a brief

13   opportunity to ask follow-ups to the extent it seems like there

14   might be anything interesting there.

15          You-all are familiar with the veniremen who has

16   answered "yes" to half of the questions.  If that happens, I

17   will usually go to the catch-all question or something that you

18   can kind of skip to the end, usually.  And if it looks like

19   this person is not going to be a good fit for this trial, I

20   will just ask any objections.  That is my indication to you-all

21   that I think we'd be striking this person.

22          So if you want to try to rehabilitate the person, you

23   should go for it then.  Otherwise, I'm not going to bother

24   going through the other half dozen "yes" answers and would just

25   expect to excuse that person.

1          Immediately after we've spoken to the person at the

2    bench is your opportunity to strike for cause.  Speak then or

3    forever hold your peace.

4          After we've qualified, I believe, 33 jurors --

5    Ms. Chaclan, does that sound right?

6          DEPUTY CLERK:  Thirty-two.

7          THE COURT:  Thirty-two.  Maybe 33 just to make sure.

8    We'll move on to the peremptory strikes.  Post-COVID, I have

9    not been doing kind of the musical chairs and seating people.

10   They will just be in the audience where they were and you will

11   do simultaneous strikes.  So we're doing just one round of the

12   Government's 6, the defense's 10 strikes into the audience, and

13   you can just kind of keep track where we are.

14         I'll do one additional round for one alternate strike.

15   So we'll clarify -- make sure we're all on the same page about

16   who the alternates are.  But you should not be striking an

17   alternate in that first round because you'll have a second

18   opportunity to do your alternate strikes.

19         Mr. Collins, do you want to pick an alternate?  I

20   should say, juror number 1 is in the seat closest to me.  Juror

21   number 14 is in the back farthest from me.

22         MR. COLLINS:  Four.

23         THE COURT:  Okay.  Mr. Fenton.

24         MR. FENTON:  13.

25         THE COURT:  So four will be our first alternate, 13

```
 1    will be our second.

 2              Any questions about that process, Mr. Fenton?

 3              MR. FENTON:  No, Your Honor.

 4              THE COURT:  Mr. Collins.

 5              MR. COLLINS:  Just briefly, on the simultaneous

 6    strikes --

 7              THE COURT:  They're double dead.

 8              MR. COLLINS:  That, I figured out.  But then if we

 9    have an extra -- does that eliminate one of our strikes?

10              THE COURT:  Correct.

11              MR. COLLINS:  Thank you.

12              THE COURT:  Let's talk about schedule.  So I have us

13    starting at 9:00 a.m. on January 8th.  The -- December 8th.  If

14    I said January, my apologies.

15              The government, you-all should definitely be ready to

16    do openings that day.  I typically am finished by early to

17    mid-afternoon.  So it should be ready to do openings.  The

18    Government should be ready with at least one substantive or

19    couple short witnesses.  But I don't like to sit around waiting

20    for witnesses.  So please make sure you've got your witnesses

21    ready.

22              I have us down to end Thursday the 14th.  Mr. Fenton,

23    does that still sound right to you?  So that would be four full

24    days of testimony?  I should ask you:  How long do you expect

25    your case in chief the last?
```

```
 1              MR. FENTON:  We think it will be five days.
 2              THE COURT:  You think you would have five full days.
 3              MR. COLLINS:  That was my question, Your Honor.
 4              THE COURT:  How about -- I'm sorry, I do have it going
 5    on to the next week.  I have it going all through the next
 6    week.  So how long do you expect your case in chief to last,
 7    sir?
 8              MR. COLLINS:  It depends on the Government's case.  We
 9    have several witnesses we may call.  We may not call them.
10              THE COURT:  Give me a good faith guess.
11              MR. COLLINS:  Two days.
12              THE COURT:  Okay.  So I think I will tell people --
13    oh, my goodness.  So Ms. Chaclan, we are going to sit on Friday
14    the 15th, and we're going to need to move those hearings.  With
15    the Christmas holidays, I think we are not even allowed to sit
16    during the week after Christmas.  So I am going to be moving
17    you all along because I would really like to try to get a
18    verdict.
19              MR. COLLINS:  May I make an inquiry to ask the Court
20    to ask the Government if there is time allotment, including our
21    cross --
22              THE COURT:  Your five days is everything, including
23    the cross, correct.
24              MR. FENTON:  Yes, Your Honor.  It includes the cross.
25    We obviously don't know how long --
```

```
1              THE COURT:  I get that.

2              MR. FENTON:  It's based on our best guess.

3              THE COURT:  All right.  So we will be sitting on

4    Friday the 15th.  So I certainly expect we would be into the

5    defense case certainly by that Friday.  So we could hopefully

6    get it to the jury.  I guess I'll tell them by the 19th, but

7    I'm also going to make clear to them that we're not sitting the

8    week -- they're not going to be deliberating the week of

9    Christmas.  So we're going to have kind of a break there if we

10   don't get a jury -- or we don't get a verdict that week.

11             All right.  Any question about that before we break

12   for lunch?  Mr. Fenton.

13             MR. FENTON:  No, Your Honor.

14             THE COURT:  Mr. Collins.

15             MR. COLLINS:  No, Your Honor.  Thanks, folks.  I'm

16   going to take a bit longer of a break.  Let's come back at

17   2:00, and I'll have my oral ruling for you on those outstanding

18   motions then.  Thank you.

19             MR. FENTON:  Your Honor, just one point.  We do have

20   some additional issues that we want to raise with the Court.

21             THE COURT:  We'll deal with those then.

22        (A recess was taken at 12:34 PM)

23             THE COURT:  All right.  We're back on the record in

24   the pretrial conference for United States versus Berman.  I'll

25   now rule on the remaining motions.
```

1              Looking first to the second half of ECF number 30,

2     Government's motion in limine as far as it pertains to the

3     theoretical possibility of a blood-based COVID test, and the

4     third and fourth motions in limine, ECFs number 142 and 145.

5              I'm going to address the Government's motion to

6     exclude discussion of the theoretical possibility of blood

7     tests for COVID-19.  This rises largely in the context of the

8     Government's first motion, ECF number 30, but also in the

9     context of its fourth motion in limine, ECF number 145, seeking

10    to exclude the testimony of Dr. Williams.

11             I'm denying the Government's motion to the extent that

12    it argues that the theoretical possibility of a COVID-19 blood

13    test is irrelevant to this case.  As I stated earlier, quote,

14    relevant evidence tends to make a necessary element of an

15    offense more or less probable, close quote.  That's from the

16    United States versus Davis, 636 F.3d 1281, Page 1298 from the

17    10th Circuit in 2011.

18             If a piece of evidence is, quote, a step on one

19    evidentiary route to the ultimate fact, close quote, at issue

20    in the case, then it is relevant.  That's from Old Chief versus

21    United States, 519 U.S. 172, Page 179 from 1999.

22             The Government argues that the theoretical possibility

23    of a blood test for COVID-19 has no bearing on whether the

24    defendant had actually produced such a test, and in the

25    alternative, that is likely to confuse the jury.  I disagree.

1    Whether a blood test is possible is relevant to whether the

2    defendant had produced one.

3            To take a simple example, if the Government were to

4    prove the blood test were not possible, then it would have to

5    be true that the defendant had not and indeed could not produce

6    one.  That would go directly toward the facts at issue in this

7    case and makes the evidence relevant.

8            More to my mind, there's little risk of confusing the

9    jury on these issues.  The parties need not -- indeed should

10   not go into extensive detail to explain whether and how a blood

11   test is possible.  I think discussion of this point is a

12   relatively minor issue in this case and should not consume a

13   great deal of trial time.

14           Indeed, I do not want to have a mini-trial in this

15   case on whether blood testing for COVID-19 is possible.  I

16   still encourage the parties to consider whether a stipulation

17   is possible, would it serve the defense purpose without needing

18   to have expert testimony on this.  But at this point, I'm going

19   to deny the Government's motion as to the question of whether

20   the theoretical possibility of a blood test is relevant.

21           I'm going to address ECF number 142 and 145 together,

22   as they address similar issues.  Under Rule 702, there are

23   three basic prerequisites to admissibility of evidence from

24   expert witnesses.  First, the evidence must be based on

25   scientific, technical or other specialized knowledge and must

1    be useful to the trier of fact in understanding the evidence or

2    in making factual determinations necessary to decide the

3    ultimate issue of fact.

4         Second, the proposed witness must be qualified to

5    provide that assistance.  And third, the proposed evidence must

6    be reliable or trustworthy in an evidentiary sense.

7         As an initial matter, I find that the testimony of the

8    proposed expert Mark DuVal should be excluded because it is not

9    relevant to this case.  The defense indicates they intend to

10   offer Mr. DuVal to provide testimony regarding, quote, the

11   FDA's emergency use authorization authority, any relevant

12   milestones and related processes.  I'm looking to Page 15 from

13   ECF 147 for that.

14        The defendant argues that this will, quote, assist the

15   jury in understanding the Government's charges and, quote,

16   provide helpful background information to better equip the jury

17   to understand how the regulatory environment adapted to meet

18   the challenges posed by the pandemic.  And I'm looking to

19   Pages 15 and 16 for that.

20        To be relevant, evidence must be probative and

21   material.  That is, it must make some fact that is of

22   consequence in determining the action, quote, more or less

23   probable than it would be without the evidence.  And I'm

24   looking to Rule 401 for that.

25        I find that Mr. DuVal's testimony is not material to

1  this case.  Although he plans to opine on various issues, none

2  of his proposed testimony relates to a fact that is, quote, of

3  consequence in determining the action, close quote.

4       The indictment does not allege any fraud on the FDA,

5  nor does the indictment suggest the regulatory complexity from

6  the FDA could plausibly be raised as a valid defense.  The

7  Government's theory of the case is that the defendant lied to

8  the public about his progress on the COVID-19 blood test, and

9  that these lies had a material effect on stock prices.

10       I believe that theory has nothing to do with the FDA's

11  regulatory process.  It certainly does not relate to the

12  medical device approval process.

13       In its opposition, the defendant does not argue that

14  Mr. DuVal's testimony would be directly relevant to any

15  allegation in the indictment.  Instead, he only argues that the

16  testimony would provide useful background information.

17       I find that the background information would itself be

18  irrelevant.  Jurors are not entitled to an overall primer on

19  the medical device development and approval process.  The

20  background information they can be given is that which is

21  likely to help them understand and decide this case.

22       I think the background information Mr. DuVal would

23  provide would not help the jury decide the case.  How the

24  medical device approval process works does not make it more or

25  less likely the defendant lied to the public.

1          I do think there is a substantial concern that

2     introduction of this evidence would be confusing to the jury.

3     Juries might become distracted by unrelated matters relating to

4     the FDA approval process.  The proposed evidence is unlikely to

5     shed light on the facts in this case, and very likely to

6     mislead or confuse the jurors.

7          In addition, I think that concern is particularly

8     present here because the defendant expects to call Mr. DuVal to

9     testify as a hybrid witness.  A hybrid witness is one that is

10    qualified as an expert but presents both lay and expert

11    testimony.  As the D.C. Circuit has recognized, such witnesses

12    present an inherent risk of prejudice because the expert's

13    remarks might cause, quote, the jury reasonably to assume that

14    all of his opinion testimony was based upon his expertise and

15    not merely on his own perceptions of events, close quote, from

16    United States versus Williams, 827 F.3d 1134, Page 1160 from

17    2016.

18          As I said, Mr. DuVal would be a hybrid witness.  The

19    defense seeks to admit him as an expert but also as a lay fact

20    witness who has relevant knowledge as the former legal counsel

21    to the defendant.  Admitting him to testify would likely

22    confuse the jury and prejudice the Government.  I think first

23    qualifying him as an expert would lend an additional veneer of

24    credibility to his testimony, including his lay fact testimony.

25    And I'm looking to Williams, Page 1165 for that.

1          I think there's a serious risk that the jury would not

2     be able to disentangle the expert testimony for which he has

3     been qualified from the lay fact testimony for which he is no

4     different from any other witness.  This would prejudice the

5     Government by putting a thumb on the scales in favor of a

6     defense witness who intends to provide exculpatory testimony.

7          Second, the presentation of this hybrid testimony

8     would likely confuse the injury.  And I'm looking to Rule 403

9     here.  It would be very difficult for the jury to keep straight

10    which aspects of this testimony was expert as opposed to fact

11    because the testimony would be, quote, interspersed, close

12    quote, with both fact and expert testimony.  The jury would be

13    required to engage in, quote, mental gymnastics to keep track

14    of each aspect of the testimony.  And that's from Page 1160 in

15    Williams.

16         In sum, then, I find that the hybrid nature of

17    Mr. DuVal's proposed testimony provides another basis on which

18    to exclude it.  That testimony is likely to be substantially

19    more prejudicial than probative because it will confuse the

20    jury and will take on an unwarranted veneer of credibility in

21    the jury's eyes.

22         I'm therefore granting the Government's motion to

23    exclude the expert testimony of Mark DuVal.  I'm doing so on

24    the grounds that the testimony is not relevant under 401.  And

25    in the alternative, I'm finding that whatever relevance it may

1  have is clearly outweighed by the risk of prejudice under

2  Rule 403.  And that is especially so because of the defendant's

3  plan to call this witness as a hybrid fact expert witness.

4          To be clear, I'm not prohibiting him from testifying

5  as a fact witness, an issue that is not currently before me.

6          As for Lisa Pritchard, the defense has today indicated

7  that it no longer intends to call her as an expert witness.  So

8  I consider the Government's motion on this point moot and deny

9  it on that basis.

10          Ms. Pritchard would be able to testify as to her

11  specific experience as a lay witness, but she cannot go beyond

12  that into the kind of expert testimony that she was initially

13  anticipated to provide.  If it appears that her testimony is

14  veering into that kind of testimony, I would certainly consider

15  an objection from the Government at that time.

16          I want to turn next to the testimony of Mr. Reilly and

17  Mr. Carocci.  Both individuals are expected to testify as to

18  the correlation between Mr. Berman's press releases and the

19  market price of his company's stock.  The parties have today, I

20  think, both agreed -- or have agreed that both individuals are

21  not expert witnesses, at least to the extent they'll testify in

22  line with my ruling here.

23          They also agree that each intends to testify solely as

24  a summary fact witness under federal rule of evidence 1006.

25  They have also agreed that they do not object to the other side

calling its respective witness as a summary fact witness to
testify about the correlation between Mr. Berman's statements
and the market price of his company's stock.

In light of that agreement, I consider the parties
respective motions to disqualify those witnesses under Rule 702
as moot. I want to make clear that I think the correlation
testimony is appropriately admitted as summary fact testimony
by a lay witness under Rule 1006. And to the extent those
witnesses are properly considered experts, I find that the
parties have expressly waived such an argument here through
their statements today.

So the core of the issue as pertains to Mr. Reilly and
Mr. Carocci is now solely whether each witness's testimony
would be relevant to this case.

Again, to recap that standard, the question is whether
either witness's testimony would, quote, tend to make a
necessary element of an offense more or less probable, close
quote, from Davis, Page 1298. I find that both witness's
testimony is clearly relevant. As the Government has presented
Mr. Carocci's testimony, he intends to show a correlation
between Mr. Berman's press releases, the timing of those press
releases and the stock price of his company.

And looking against the background of the S&P 500, the
Government has argued that this illustrates a motive to make
false statements. In other words, it goes to the defendant's

1    mens rea.  The Government's framed this using language along

2    the lines of Mr. Berman realizing, quote, when I say something

3    the price goes up and I get what I want, close quote.

4            That's a paraphrase but it's the gist of what the

5    Government has argued Mr. Carocci's evidence would show.

6            I think that this type of evidence would be clearly

7    relevant.  Motive is always relevant in a criminal case, even

8    if it is not an element of the crime, according to United

9    States versus Hill, 643 F.3d 807, Page 843, from the 11th

10   Circuit in 2011.  So Mr. Carocci's testimony, which would go

11   directly to motive, is clearly relevant.

12           I find that the same is true of Mr. Reilly's

13   testimony.  First, Mr. Reilly's testimony is largely directed

14   at rebutting or impeaching Mr. Carocci's evidence.  Impeachment

15   of a witness is always relevant.  Quote, evidence that can

16   impeach a witness's memory or truthfulness, and therefore

17   credibility, would be relevant, close quote.  From United

18   States versus Fitzsimmons, 342 Frd. 18, Page 20, from this

19   Court in 2022, which was in turn citing Davis versus Alaska,

20   425 U.S. 308, Page 316, from 1974.

21           Second, to the extent that Mr. Reilly is testifying

22   not as an impeachment witness but rather as a standalone

23   witness, arguing a lack of motive, that too is clearly relevant

24   for the same reason Mr. Carocci's evidence is.  And that is

25   again looking to the Hill case from the 11th Circuit.

So I think both witness's testimony is relevant under federal rule of evidence 401. I find neither expert's testimony is significantly more prejudicial than probative, such that it would be excluded under Rule 403. The defendant had argued in his papers that Mr. Carocci's testimony goes to issues of, quote, complicated securities laws that will, quote, confuse the jury.

I don't hear the defendant to be maintaining that concern here today, but in any event, I think Mr. Carocci's proposed testimony on this issue is relatively simple. It centers around what stocks did in response to the defendant's statements. That does not risk bringing in unrelated issues or confusing the jury.

The Government's disclosure and arguments today show that Mr. Carocci's testimony will be relatively straightforward. Its account of the testimony is essentially that Mr. Carocci will show that prices changed in predictable ways after Mr. Berman's press releases.

I find that that does not involve any kind of econometric analysis or complicated assessment of either securities law or economic data. This is both information and analysis that is readily understandable to and digestible by a jury, and it does not risk either confusion or prejudice in the way the defendant suggested in its papers.

I similarly see no reason to believe that Mr. Reilly's

1  testimony would be significantly more prejudicial than

2  probative.  The Government has offered no reason to believe

3  that to be the case and I see none.

4      So I'm denying both parties' motions to disqualify and

5  exclude Mr. Carocci and Mr. Reilly.  I want to be clear on this

6  point, though.  I consider only the correlation testimony

7  properly admittable as summary fact testimony.  In my view,

8  testimony as to causation from either of these gentlemen would

9  clearly go beyond the scope of this order and would be

10 inadmissible.

11     I'm therefore prohibiting the parties from attempting

12 to elicit testimony from either Mr. Carocci or Mr. Reilly that

13 would involve either witness's opinion as to whether the

14 defendant's press releases were the cause of movement in stock

15 prices that they observed.

16     As I suggested before, each witness can properly give

17 lay testimony as to the correlation or lack thereof between

18 Mr. Berman's press releases and stock prices.  And each can

19 properly give background testimony about stock market concepts

20 and terminology as necessary for his testimony.

21     The parties have made clear today that they are not

22 arguing that that type of background testimony is expert

23 testimony.  That differs somewhat from what I saw in some of

24 the papers, but they've made clear this morning that they agree

25 such background testimony is properly considered lay testimony,

1    and I agree with them.

2              So in sum, Mr. Carocci and Mr. Reilly may testify

3    about background stock market concepts.  They may testify about

4    stock market terminology, and they may testify about the

5    correlation between Mr. Berman's statements and the stock price

6    of his company.  That is, they may testify as to what happened

7    to the stock prices around the time of Mr. Berman's statements.

8    But Mr. Carocci and Mr. Reilly may not testify as to whether

9    Mr. Berman's statements did or did not cause the movement in

10   stock prices.

11             Last, I'll move to Dr. Williams's proposed expert

12   testimony.  First off, I do not believe that a full Daubert

13   hearing would be necessary or useful in this case as to

14   Dr. Williams.  The Supreme Court held until in Kumho Tire

15   Company versus Carmichael, 526 U.S. 137, from 1999, that,

16   quote, whether or when special briefing or other proceedings

17   are needed to investigate reliability, close quote, is a matter

18   committed to the sound discretion of the District Court at

19   Page 152.

20             Continuing from that page, that discretion is intended

21   to help assure that District Courts can, quote, avoid

22   unnecessary reliability proceedings in ordinary cases, close

23   quote, and also insist on more elaborate proceedings, end

24   quote, the less usual or more complex cases where causes for

25   questioning the expert's reliability arises, close quote.

1    And the Supreme Court has instructed District Courts

2    to factor in the risk of, quote, unjustifiable expense in

3    delay, close quote, that needless Daubert hearings might cause,

4    from Page 153.  That is based on the federal rules of evidence

5    instruction at Rule 102.

6    Exercising that discretion, I will not be requiring a

7    Daubert hearing in this case.  The parties have already

8    extensively briefed the qualifications and credentials of

9    Dr. Williams.  They provided information about him in their

10   initial disclosures, in their briefs, in their motions in

11   limine and in the exhibits attached to those briefs.  I also,

12   of course, heard extensive further argument this morning on his

13   qualifications and testimony.

14   In light of this briefing and argument, I find no

15   further hearings are necessary for me to rule on that motion.

16   No party disputes Dr. Williams's credentials.  The argument is

17   about whether his credentials qualify him to opine and whether

18   his methodology is reliable.

19   I'm satisfied that all the relevant issues to the

20   qualification decision have been fully ventilated.  I will now

21   turn to addressing each factor on that analysis.

22   I do want to address one initial concern that the

23   Government objects on the grounds that it believes the

24   defendant failed to comply with its disclosure obligations

25   under Rule 16 and it seeks exclusion on that basis.

1           Under Rule 16, the defendant must disclose to the

2    Government a, quote, complete statement of all opinions that

3    the defendant will elicit from the witness in the defendant's

4    case in chief, the basis and reasons for them and the witness's

5    qualifications, close quote, and the list of recent cases in

6    which the expert was qualified.

7           Notably, the standard was recently heightened to

8    require more fulsome notice than used to be necessary.  The

9    defendant's disclosures fail to comply with these heightened

10   requirements.  Across the board, they discuss the subject

11   matter of the expert's opinions but fail to describe the actual

12   opinions the defendant expects to elicit at trial.  Where they

13   do explain what those opinions are, I believe they fail to

14   explain the reasons and bases for them.

15          As one example, defendant's disclosure for

16   Dr. Williams says he will testify as to, quote, the detection

17   of viruses through impedance technology, close quote.  That's

18   from ECF 145-2, Page 3.  But the disclosure does not explain

19   what he will say about it.  The Government has been left

20   unaware whether Dr. Williams intends to testify that such

21   detection is possible or impossible, easy or hard.  The

22   disclosure gives no indication.

23          Similarly, the defendant said that Dr. Williams will

24   give testimony, quote, regarding the feasibility of using an

25   electrochemical impedance spectroscopy-based biosensor for the

1   detection of pathogen viruses, closed quote, from that same

2   page.  But again, the Government is left to guess about what

3   the testimony regarding the feasibility will be.  And there's

4   no statement whatsoever about how Dr. Williams came to his

5   opinion on this subject.

6           I find that these deficiencies are prejudicial.  The

7   Government has argued throughout its papers that it cannot

8   fully evaluate whether the expert should be qualified or not

9   because the disclosures are so deficient that it lacks the

10  information it needs to make that decision.  I think that point

11  is well taken.  And I should note that I also found it

12  difficult to fully assess the experts in light of the paucity

13  of information from the defendant on this point.

14          That being said, I'm not inclined to exclude

15  Dr. Williams for the Rule 16 violation.  Rule 16 allows the

16  Government to seek an order compelling a disclosure if it feels

17  the defendant is not complying.  And I'm looking to Rule 16(d).

18  The Government did not move to compel the defendant.  I don't

19  think it's appropriate for the Government to now come forward

20  at this point and seek to exclude significant amounts of expert

21  testimony without having first sought a more limited remedy.  I

22  also think the defense is entitled to some solicitude, given

23  the recent rule change.  Indeed, it changed during the pendency

24  of this case.

25          So I will not be excluding the expert testimony on the

1  grounds that the defendant failed to comply with Rule 16, but

2  Rule 16 exists to protect important interests and to avoid the

3  possibility of surprise at trial.

4  I do want to avoid a situation where either party is

5  being confronted with an expert that it has not had the

6  opportunity to prepare for in advance.  I do think that would

7  significantly prejudice the Government.  So I'm going to order

8  the defendant to serve complete and accurate Rule 16

9  disclosures on the Government within one week from today.

10 That's November 20th.

11 The defendant should take care to scrupulously adhere

12 to Rule 16 requirements.  If the defendant's disclosures

13 continue to be deficient, I would be open at that time to

14 reviewing a renewed motion to exclude Dr. Williams on the

15 grounds that the defendant has refused to comply with a court

16 order and Rule 16.

17 But going to the substance of what I believe will be

18 Dr. Williams's testimony, the Government has moved to exclude

19 any testimony by Dr. Williams relating to the theoretical

20 possibility of a blood test for COVID-19, as well as testimony

21 relating to an academic article he wrote about antigen tests.

22 And I'm looking to ECF number 145, Pages 11 and 12.

23 First, I don't think I need to rule on the antigen

24 test article.  The defendant has now agreed not to elicit

25 testimony relating to that article.  I'm looking to page -- ECF

number 147, Page 23, note two.  I find that concern is moot.
If the defendant attempts to elicit such testimony at trial, I
would certainly consider an objection from the Government at
that point.

Second, I think Dr. Williams's testimony about the
theoretical possibility of a COVID-19 blood test is relevant
for the same reasons I mentioned previously in deciding the
first motion in limine, ECF 30.  So I incorporate by reference
my reasoning there.

I also want to note that it is relevant for yet
another reason.  The parties anticipate a dispute over the
meaning of Mr. Berman's press releases.  The defendant intends
to argue that the press releases were simply stating that a
blood test for COVID was in development.  Under the defense
reading of these press releases, I think Dr. Williams's
testimony would be clearly relevant because it would go to the
feasibility of such a test and whether it could reasonably be
said to have been in development.

Because I'm rejecting the two relevancy objections to
Dr. Williams's testimony, I'll move on to his qualifications.
The defense disclosures reveal that Dr. Williams holds a PhD in
mechanical engineering and that he currently works as a
professor of mechanical engineering at the University of
Louisville.  I'm looking to ECF 145-1, Page 2.

He also has written on the subject of impedence

testing and methodologies for viruses at Page 3.  I find that this is both education and experience directly contributing to his qualifications in this case.

The defense disclosure states that he will testify on a few topics, including the feasibility of impedence testimony for COVID-19, the similarity between the defendant's prototype tests and those tests described in academic articles, the operation and design of impedence tests and the feasibility of the defendant's specific prototype test.

His education and experience seem clearly connected to this proposed testimony.  He has a background in the academic study of impedence testimony -- or testing and impedence test design.

Page 2, the defendant's motion does not contest this point.  Instead, it largely relies on the deficiencies in the defendant's disclosure to state that it cannot determine the reliability of Dr. Williams's testimony.

I take the Government's point that his methodology may not be flawless, but Rule 702 embraces a, quote, liberal standard for qualification of experts, and I'm looking to In Re Paoli Railroad Yard, PCB litigation 35 F.3d 717, Page 754, from the Third Circuit in 1994.

I find that Dr. Williams has not fallen below the floor of reliable methodology to the point where he cannot be qualified.  As the 3rd Circuit noted in that case, mere errors

1    in the proposed expert's methodology do not render the expert

2    unqualified.  I'm looking to Page 754, again.  Unless these

3    errors are so pervasive or fundamental as to render the

4    testimony suspect.

5          Discussion of the impact of errors is properly

6    reserved for the jury to consider in deciding what weight to

7    assign to Dr. Williams's testimony.

8          If the Government wishes to impeach or undermine

9    Dr. Williams's testimony at trial by pointing to errors in his

10   processes, it certainly can do so.  It can also attempt to

11   persuade the jury to discount Dr. Williams as an expert.  But

12   the Government has not satisfied the Court that Dr. Williams's

13   testimony should be barred from admittance all together.  I am

14   therefore denying the Government's motion to exclude

15   Dr. Williams's testimony.

16         I want to make clear that Dr. Williams, since he

17   hasn't had any firsthand involvement with the defendant, he

18   certainly couldn't testify about explaining what the defendant

19   has done here, but I think if the defense otherwise can admit

20   evidence showing what has happened, that Dr. Williams could

21   testify as an expert as to the value of those actions and

22   whether or not they might be consistent with a successful

23   COVID-19 blood test.

24         I also understand that Dr. Williams has not actually

25   tested the product here, and so I'd certainly prohibit him from

testifying as to any firsthand knowledge of the defendant's

actions or the viability of the actual -- whatever the

defendant actually created.  But I think he can talk in general

terms about if the defendant has done what is -- the defense

claims, whether that would, in fact, be reliable and whether

that would be a productive COVID-19 test.

All right.  Does the Government have any questions as

to my rulings, Mr. Fenton?

MR. FENTON:  No, Your Honor.  The Government would

just reserve its right to move again, once the defendant

provides the supplemental expert disclosure on November 20th.

THE COURT:  Yeah.  Obviously, if you don't think

you've gotten appropriate notifications under Rule 16 by next

Monday, you should file something, and I would certainly

consider it probably at the outset of trial.

MR. FENTON:  Thank you, Your Honor.

THE COURT:  Mr. Collins, does defense have any

questions as to my rulings?

MR. COLLINS:  No questions, Your Honor.

THE COURT:  Mr. Fenton, you said there were a couple

other matters you wanted to bring up.

MR. FENTON:  Yes, Your Honor.  On October 30th, the

Government learned for the first time that Ronald Herzog is on

the defense's witness list.  As Your Honor likely recalls,

Mr. Herzog is the defendant's long-time attorney, and, in fact,

1   represented the defendant in this case until earlier this year

2   when he withdrew.

3        The same day that the Government learned this

4   information, it requested from counsel some additional

5   information and to meet and confer, to try to understand

6   exactly what Mr. Herzog would testify about, just at a high

7   level.  Of course, the concern being that the defendant had not

8   indicated that he was going to raise an advice of counsel

9   defense, despite having been asked numerous times and ensuring

10  us, in fact, that he was not going to.  And counsel refused.

11       Based on the exhibit list, it appears that Mr. Herzog

12  may testify about at least two separate topics.  One, is he may

13  testify that he reviewed certain press releases that were

14  issued by the defendant's company, though these press releases

15  are later press releases.  They're not the March or April press

16  releases that are the subject of the indictment.  And

17  Mr. Herzog may also testify that he reviewed the shareholder

18  letter that is the subject of the obstruction charge.

19       THE COURT:  Sorry, when were those two pressers?

20       MR. FENTON:  So the press releases that it appears

21  Mr. Herzog will testify about were July 10th, 2020, and

22  July 17th, 2020.

23       Counsel finally disclosed that they are not planning

24  to rely on advice of counsel defense with respect to

25  Mr. Herzog, but it appears that the inference that they're

1    going to ask the jury the draw is the same, namely that

2    defendant sought and received and relied on Mr. Herzog to

3    review press releases and to -- and the shareholder letter.

4    And therefore, the defendant didn't act with any fraudulent

5    intent.

6          As we see it, there's really two options on how to

7    proceed from the defendant's prospective.  One, is to say if he

8    wants to argue this inference, it must be treated as an advice

9    of counsel defense and he has to waive privilege and produce

10   the relevant discovery, the appropriate discovery.

11         If not, then we believe that the Court should prohibit

12   any testimony from Mr. Herzog under 403.  The relevance is

13   minimal and it would substantially prejudice the Government

14   because it would put on the witness stand an individual who

15   actually represented Mr. -- the defendant both in connection

16   with the events that are the subject of the indictment and also

17   in this actual case itself.

18         The Government strongly believes that the time to

19   resolve this issue is now.  And the reason why is if Mr. Herzog

20   testifies, the first question from the Government at

21   cross-examination is likely going to be something like:  Did

22   the defendant tell you X.?  Or:  The defendant told you X,

23   right?  Basically, communications with the defendant.  At that

24   point the defendant would need to waive privilege and provide

25   discovery to which the Government is entitled.

1          This is going to cause a big problem in the middle of

2    trial, likely necessitate a recess.  It would probably be

3    lengthy so we could review all of that discovery and then

4    address this issue.  It also, I think, would create juror

5    confusion to wait for this issue to arise during the trial.  We

6    think that we should resolve the issue now.

7          We think that this situation can be avoided by

8    addressing these issues up front.  And we also just want to

9    note for the Court that this is something that the Government

10   had raised as early as January 2021 in a notice that we

11   provided to the Court on January 21st, 2021.  There was

12   correspondence on this issue from the defendant on

13   January 29th, 2021.  There was a follow-up notice that was

14   provided to the Court in April 2021.

15         One of the reasons why the Government was so concerned

16   back then was the possibility that Mr. Herzog would be a

17   witness, either a witness that might be called by the defendant

18   or possibly even by the Government because he was a percipient

19   witness.

20         And at the time, there was a representation that was

21   made that Mr. Herzog did not have any unique non-privileged

22   information.  And that was a representation that was made by

23   Mr. Herzog himself and his co-counsel, Pat Loughlin, in their

24   January 29th, 2021, correspondence.

25         One of the other issues here that the Government was

concerned about at the time was conflicts.  And that is because
Mr. Herzog represented eight other parties in this case.  Those
parties included Decision Diagnostics, Kimberly Binder, Shep
Doniger, Matthew Musho, Leslie Musho, the Musho's company,
which is the name Stony Fork Consulting, and a victim named
Shelly Sedlitz (ph).

        Were Herzog to testify, there's a meaningful
possibility that he's potentially testifying based on facts
that he learned not necessarily firsthand but from his
representation of these various parties in connection with this
case.

        We raised this possibility with counsel.  Counsel
dismissed this notion, essentially arguing that the Government
is not able to assert privilege on behalf of these individuals.
But the point is not that we're trying to assert privilege on
behalf of these individuals, but that Mr. Herzog has a
professional responsibility, a duty of confidentiality to all
these clients as well.  And many of these clients may in
fact -- former clients, I believe, may in fact be witnesses at
this trial.

        So we think that that's a relevant consideration as
well.  We think that this is a thorny issue.  We were surprised
to learn that Mr. Herzog was on the defendant's witness list
and we just want to raise it with the Court for the Court's
consideration.

```
1            THE COURT:  Sorry, in those earlier times, did you say
2    defense had said they were not relying on advice of counsel?
3    I'm looking back.  I don't see a filing from January 29th,
4    2021.  What are you saying that the defense's representations
5    to you were back in 2021?
6            MR. FENTON:  So the representation back then -- on
7    January 29th, 2021, Mr. Herzog represented that he didn't know
8    whether or not he was going to testify at that time, but that
9    the Government could never call him because he didn't have any
10   unique non-privileged information.  That any information that
11   he had that was not privileged could be obtained from some
12   other witness, probably Matt Chad or Shep Doniger or somebody
13   else that was involved in some of the same things Mr. Herzog
14   was as well.
15           And we can provide Your Honor with a copy of that
16   correspondence.
17           THE COURT:  That was not on the record.
18           MR. FENTON:  It was filed under seal, so it doesn't
19   show up in the docket.  And the same is true with respect to
20   the Government's notices as well.  They were all filed under
21   seal.
22           The defendant later, when we were preparing for trial
23   back in December 2021, later represented that he would not be
24   asserting an advice of counsel defense with respect to
25   Mr. Herzog or Mr. DuVal or any of the attorneys that
```

1    represented him.  When we learned, again -- when we learned for

2    the first time that Mr. Herzog was actually on the defendant's

3    witness list in connection with this new trial date, we asked

4    counsel and counsel eventually said, look, we're not asserting

5    an advice of counsel defense.

6            But it's the Government's position that even if

7    they're not formally doing so, they're still asking for the

8    jury to draw the same inference.  And Mr. Herzog's

9    involvement -- his provision of advice to -- well, the

10   defendant's request and receipt and reliant upon advice from

11   Mr. Herzog is -- undermines any inference of fraudulent intent.

12           THE COURT:  Okay.

13           MR. XENAKIS:  Good afternoon, Your Honor.  Nicholas

14   Xenakis for Mr. Berman.

15           Your Honor, I think the Government is getting a little

16   bit ahead of things here.  I think the Government is correct

17   that Mr. Berman has asserted repeatedly that he will not be

18   raising advice of counsel defense, and I can make that

19   representation here again, including after following

20   discussions with Mr. Herzog.

21           What we have here, and once again, I think this is why

22   we're getting a little bit ahead of things, is that Mr. Herzog

23   was put on the defendant's witness list as a possible may call

24   witness and rebuttal witness.  Any of his testimony would be

25   purely factual.

1          As the Government referenced, there were discussions

2   that Mr. Herzog was part of that were not privileged that

3   involve witnesses like Mr. Doniger and Mr. Chad.  Under those

4   circumstances, if necessary, based on the evidence that the

5   government presents, Mr. Herzog should be allowed to testify in

6   response.

7          THE COURT:  Say that again, Mr. Xenakis.

8          MR. XENAKIS:  So --

9          THE COURT:  Why do you think his testimony would be

10  relevant?

11         MR. XENAKIS:  Based on testimony that the Government

12  possibly elicits from witnesses like Mr. Doniger and Mr. Chad

13  that Mr. Herzog participated in in a non-privileged capacity,

14  his testimony could be used to rebut any evidence the

15  Government presents purely on that factual basis.

16         THE COURT:  All right.  Do you agree the Government

17  would be entitled to discovery at that point about the -- it

18  sounds like there could be Jencks material at the very least,

19  if not other otherwise material that might have otherwise been

20  privileged.

21         MR. XENAKIS:  Yes, Your Honor.  I think that we would

22  propose -- obviously, we could comply with any of our discovery

23  obligations involving our witnesses.  If there are any issues

24  that the Government wants to raise about possible privilege, I

25  think that we'd ask -- following kind of normal procedures,

1    have the Court review those ex parte and make a conclusion from

2    there.  But once again, we don't anticipate any of those

3    problems arising.  But we absolutely agree that we would follow

4    our discovery obligations if he's called as a witness.

5         THE COURT:  So help me understand:  What are the types

6    of issues you're imagining?

7         MR. XENAKIS:  So part of it right now is that it's

8    unclear.  It's unexpected.  Looking at the Government's witness

9    list and the witnesses that they want to call about various

10   discussions that were had and either went into the press

11   releases or development of the testing kit, Mr. Herzog was a

12   factual witness for those in non-privileged circumstances.

13        So if the Government wants to present evidence about

14   the nature of those discussions, and Mr. Herzog is able to

15   rebut the Government's evidence, we would like to call him in

16   those circumstances.

17        THE COURT:  Would one of those topics be whether or

18   not he reviewed the shareholder letter?

19        MR. XENAKIS:  Potentially.  I don't want to -- that

20   could potentially be an issue.  Once again, we would want to

21   confirm that any circumstances in which he reviewed the

22   non-shareholder letter was purely in a non-privilege

23   circumstance.

24        THE COURT:  How would his viewing of the shareholder

25   letter be ever relevant?

1          MR. XENAKIS:  Once again, Your Honor, this is why he's

2     purely listed as a rebuttal witness.  It would only be relevant

3     to the degree that the Government decides to insert that issue

4     as relevant as part of their case in chief.

5          THE COURT:  You think the Government would be?

6          MR. XENAKIS:  I certainly hope not.  But that's one

7     issue in which we would want to be able to utilize Mr. Herzog.

8     I think Mr. Herzog may be more relevant to issues around the

9     press releases or, once again, you know, assertions about the

10    process through which Mr. Berman was trying to develop this

11    technology and make public statements about it.

12         THE COURT:  All right.  So I mean, I understand why

13    the Government raised this and is concerned about this.  It

14    sounds like we're all shooting a little in the dark here.  I

15    guess I'll give you my instinct.

16         A, it sounds like Mr. Herzog has said previously, and

17    I think I found that notice that was filed under seal, that he

18    was not in any sort of privileged conversations, that any of

19    the conversations he had with the defendant, other people were

20    also around for.

21         And it sounds like that's why you'd want to use him

22    too.  You're saying it was precisely because he was around for

23    them and could be really more of a corroborative witness to

24    what a non-attorney would say about non-privileged

25    conversations.

1           So my general instinct is that I'm going to be
2    skeptical about his -- the appropriateness of calling him.  I
3    think if you've got another witness who can testify to the same
4    thing I would try very hard to get that person to be here.  I'm
5    also -- I mean, we've talked about the very realtiming issues
6    that we're all going to be under.  I will not allow you to wait
7    to pull together documentation.

8           So if you're -- if there's even a possibility that
9    you're going to be calling him, you need to make sure you've
10   got any documentation that the Government would be entitled to
11   and have it ready to turn over in very short order.

12          And then otherwise, I'll just direct -- direct you to
13   seek leave of the Court before calling him as a witness.

14          Any questions or concerns about that, sir?

15          MR. XENAKIS:  No, Your Honor.  Thank you, Your Honor.

16          THE COURT:  Mr. Fenton, as I say, I'm not sure that I
17   can do much more than that right now.  What Mr. -- I hear your
18   concern but I also -- I think what Mr. Xenakis is describing
19   is -- kind of sounds like fair game to me, and it's
20   understandable they're being cautious too.

21          MR. FENTON:  Yes, Your Honor.  I mean, the Government
22   still continues to believe this is a shield and sword
23   situation, where they are going to have Mr. Herzog testify and
24   then draw some sort of -- there's going to be a limit on what
25   the Government can ask about on cross-examination.  That's the

1    place that we're going to find ourselves.

2         We think there are going to be objections based on

3    when we try to cross-examine Mr. Herzog about what he saw and

4    what was said, because at that point we're entitled, I think,

5    to ask Mr. Herzog additional questions not only about what took

6    place in that conversation, but also what other information he

7    knew at the time.  And that's the problem is that --

8         THE COURT:  So you think that if he comes and

9    testifies as to a non-privileged matter you'd be entitled to go

10   into privileged matters?

11        MR. FENTON:  We don't think that there's a

12   non-privileged matter about which he could testify.  So for

13   example, the press releases, okay --

14        THE COURT:  The --

15        MR. FENTON:  The press releases.  The press releases.

16        THE COURT:  Okay.

17        MR. FENTON:  So we've looked at the defendant's

18   exhibits, and one of the exhibits is a press release -- an

19   email exchange between Mr. Herzog, the defendant and

20   Mr. Doniger, relating to these press releases, to a draft press

21   release.  Okay?  Not necessarily one that's relevant here, but

22   nevertheless, a press release.

23        It says attorney/client privilege, attorney work

24   product on the document.  That's because at the time Mr. Herzog

25   was functioning as an attorney who was reviewing that press

1  release.

2          Now, he represented Mr. Berman in this case, but at

3  the time he also represented Decision Diagnostics as well.  So

4  he represented Decision Diagnostics, the company, and he owes a

5  duty of confidentiality to the company as well.  So there's a

6  privilege issue there.

7          But that is not non-privileged.  He is reviewing and

8  commenting on the press release in his capacity as an attorney.

9  Same thing with respect to the shareholder letter.  Mr. Herzog

10 at all points was an attorney who worked at Goldberg Segalla,

11 at the law firm that he was retained to work at.  He wasn't

12 doing this out of charity.

13         Mr. Herzog, as far as I'm aware, has no

14 industry-specific knowledge or experience or background that

15 would make him an individual who could offer his, you know,

16 advice with respect to the medical device industry or biopharma

17 industry.  He's commenting solely as an attorney.  There are no

18 non-privilege matters about which he could testify.

19         I think that that's what Mr. Herzog basically said in

20 that letter, that to the extent that I -- there's nothing

21 that's unique and non-privileged about which I could testify.

22 And I think in part what he was saying was his communication --

23 his role was as an attorney.  His communications were

24 privileged.  And to the extent there were's anything else that

25 he would testify about, another individual would be able to

1    provide that information.

2              THE COURT:  Right.  So but what I hear from

3    Mr. Xenakis is he's concerned that you may be -- both sides

4    agree this is not privileged but he is a witness to a

5    conversation that he heard differently than somebody -- one of

6    your witnesses would testify to.  So what do I do there?

7              MR. FENTON:  I don't know that Mr. Herzog was a

8    witness to any conversations, period.  And I think that to the

9    extent that the defendant has concerns like that, that perhaps

10   the best way to proceed may be to have them share with the

11   Court ex parte what subjects -- what specific conversations or

12   subjects they expect Mr. Herzog to testify about.

13             Because as far as I can tell, most everything that was

14   done in this case was done via email.  We have those emails.

15   We know which ones the defense wants to admit as potential

16   exhibits because they're on their exhibit list, and they

17   concern Mr. Herzog's review of press releases in his capacity

18   as an attorney and Mr. Herzog's review of that shareholder

19   letter or the shareholder letters in his capacity as an

20   attorney.

21             So the Government is not aware of any non-privileged

22   communications, topics, subject matter that Mr. Herzog would

23   ever testify about.  Now, we appreciate that defense counsel

24   may not want to share all that information with us.  But we

25   think that they should share with the Court, so that the Court

1   can --

2         THE COURT:  Well, but what I hear from Mr. Xenakis is

3   he doesn't know what you're going to ask, doesn't know what

4   you're going to elicit.  I mean, do you want to share what

5   you're going to be asking -- I forgot, Chad or whoever these

6   witnesses are.

7         MR. FENTON:  I think that it's pretty clear from our

8   speaking indictment that the specific types of testimony that

9   we're going to elicit from these witnesses.  I mean, our

10   speaking indictment is very, very thorough and details what

11   we're going to cover there.

12         So we're going to put Mr. Chad up on the witness stand

13   and ask him about the private communications that he had with

14   Mr. Berman when Mr. Berman was using an alias, and

15   communications that he had with Mr. Berman in Mr. Berman's true

16   identity as Mr. Berman.  And then we're going to talk to him --

17   we're going to elicit testimony about the shareholder letters

18   and the work that he did on the shareholder letters, and we're

19   going to walk through the email communications.

20         So it's our understanding that Mr. Chad only spoke to

21   Mr. Berman on one occasion on the telephone and then all other

22   communications were in writing.  So we just don't see a

23   situation where Mr. Herzog would have any sort of -- we just

24   don't see the situation that Mr. Xenakis is describing

25   potentially arising, because that one conversation as far as we

understand it had nothing to do with the shareholder letter.
It had to do with whether or not Mr. Chad should take a seat on
Decision Diagnostics board of directors.  And that pre-dated
the indictment.

THE COURT:  Okay.  Yeah, I appreciate you flagging
this.  Obviously, I know less about this case than the many
attorneys in this well, and I feel just kind of behind the
eight ball.  I'm not sure how I can rule on this.  One thing --
it sounds like there's a couple concerns.  One is kind of the
appearance of propriety and good faith by having an attorney
testifying.

It occurs to me that perhaps I'd prohibit Mr. Herzog
from identifying himself as an attorney, and he can be
described as somebody who's working with the defendant on this
matter or something, but that seems like that would ameliorate
some of your advice of counsel through the back door concerns.

To the extent your concern is about discovery, I'm not
sure that I can do much more than I've already done, which is
to tell the defense to be ready to provide it in very short
order if it looks like they're going to be calling him.  I
mean, am I missing something?

MR. FENTON:  No, Your Honor.  That seems like a
prudent path.

THE COURT:  Okay.  All right.  So I'm directing --
just to be clear, I'm directing the defense to the extent they

1    anticipate possibly calling Mr. Herzog, that you should

2    certainly have any relevant discovery ready to go well before

3    you call him, and also obtain my leave before you put him on

4    the stand.  And be ready to explain why he is necessary as

5    opposed to some other person.

6            Okay.  Anything else, Mr. Fenton?

7            MS. MCCARTHY:  Your Honor, we'd like to be heard

8    briefly on the jury instructions.

9            THE COURT:  Yeah, I'm not really --

10           MS. MCCARTHY:  It's late in the day.

11           THE COURT:  I'll tell you, I have not looked at these

12   close enough yet to be able to be very useful.

13           MS. MCCARTHY:  We're happy to submit something very

14   brief in writing in response to what the defense filed.

15           THE COURT:  Okay.  Mr. Collins, how is your version

16   different from the Government's?

17           MR. COLLINS:  We filed a version that had

18   strike-throughs on three Government instructions.  But what I

19   was going to suggest, Your Honor, is I think there's going to

20   be some other motions that are filed before trial.  I know we

21   just got the Government's witness list.  There's some exhibits.

22   We'll obviously have a meet and confer with them.

23           But I was going to ask the Court if the Court had the

24   time to set a short hearing the week of jury selection.  I know

25   we've got Thanksgiving in between.  But if we could get a short

1    hearing.  Hopefully we can work out the instructions because we

2    haven't had that much of a discussion.  I think we're at

3    loggerheads, so it may require the Court's intervention there.

4         But the answer to the specific question, we filed

5    instructions with strike-throughs of Government instructions.

6    Plus, I think there's going to be a motion we file if we can't

7    get agreement from the Government on some of their exhibits.

8         THE COURT:  So I'm out at an AO conference up until

9    that Friday.  So I'm not around that week.  I just want to,

10   again, make sure I understand.  So your proposed instructions,

11   you have not added anything; you've proposed striking out a few

12   instructions?

13        MR. COLLINS:  As noted in our filing, I guess it's

14   document 151, we identified basically four differences.  The

15   first is a request for a good faith instruction and the

16   authority there.  And then Roman numeral II, III and IV take

17   exception to instructions requested by the Government.

18        THE COURT:  It looks to me like you guys are largely

19   in agreement.

20        MR. COLLINS:  Except for those four issues.  From our

21   perspective.

22        THE COURT:  This feels like something we are probably

23   going to just resolve during trial, as things go.  If you want

24   to file a brief response, I'm certainly happy to look at it.

25   But I'm not going to -- this feels to me like something that we

1    will handle at 5:00 p.m. one evening during trial when I have

2    so much more energy than I do right now.

3          So you think you're going to be filing additional

4    motions?

5          MR. COLLINS:  Again, we just got there exhibit list

6    last week on Monday.  There's a lot going on.  We haven't had a

7    chance to confer with them.  I suspect we'll be filing

8    something because the Government I'm sure wants to use these

9    exhibits.  So we'll probably file a short motion in limine on

10   some of the Government's Exhibits.

11         THE COURT:  All right.  Well --

12         MR. REILLY:  Your Honor, if we may be heard.  I think

13   we're somewhat in agreement on the need for additional process

14   here.  Over the weekend, on Saturday, the Government filed or

15   served on the defendant objections to its 263 defense exhibits,

16   which are largely hearsay statements of the defendant, and many

17   of which are irrelevant to the now excluded issue of the saliva

18   testing.

19         So we are also going to seek from the Court a process

20   by which the defendant could give us some proffers as to how

21   some of this evidence could be admissible, so that we could

22   file a motion in limine as well, seeking to exclude some of

23   these categories of documents which are largely hearsay and/or

24   irrelevant.

25         THE COURT:  All right.  So let's -- I feel bad about

1   asking you guys to work through Thanksgiving but I think that's
2   probably where we're going to be.
3          Let's talk about the hearing.  Thursday November 30th,
4   3:00 p.m., does that work for the Government?
5          MS. MCCARTHY:  Yes, Your Honor.
6          THE COURT:  And does it work for the defense?
7          MR. COLLINS:  Works for the defense, Your Honor.
8          THE COURT:  Okay.  So I'll set a motion hearing for
9   Thursday, November 30th at 3:00 p.m.  I'm just kind of backing
10  up from there.
11         I think what I'll do is direct any motions to be filed
12  a week from today and any oppositions to be filed by
13  November 27th.  If you wish to file a very brief reply, you may
14  do so by noon on the 29th, but I'm not necessarily expecting
15  replies to motions here.
16         Let me also say, again, typically I find that motions
17  on relevance to particular exhibits I handle better in the
18  middle of trial rather than -- I appreciate the fact that
19  you-all are on top of things and are trying to make things go
20  smoothly during trial.  I share that desire.  But at some point
21  there are diminishing returns to fighting the trial ahead of
22  time when I don't know much about it.
23         So for your own sake, if not for mine, I'd encourage
24  you-all to be judicious on the amount of motions that you're
25  filing on specific objections because I think I'm likely to be

```
1   just reserving judgment on them until I hear how it's playing

2   out.

3          MR. REILLY:  Thank you, Your Honor.  That sounds good.

4   And we certainly take that message to heart.

5          If we may, can we ask for one additional step in this

6   process?

7          THE COURT:  Okay.

8          MR. REILLY:  The Government, as we've noted, has

9   already served its federal rule of evidence objections to each

10  of the 263 exhibits the defendant has provided.  We've asked

11  for a high level proffer to understand relevancy and/or what

12  exception under the hearsay rule the defendant might be relying

13  on.  And to get that information would allow us to

14  significantly streamline and minimize the extent of our

15  briefing and any potential motions we need to file.

16         We've asked for the defense to let us know by

17  Wednesday how they plan to introduce this evidence, given the

18  objections we've noticed.  We would ask that the Court

19  implement that into the kind of briefing schedule here because

20  I do think it will significantly reduce the amount of potential

21  briefing, to understand if there's maybe a hearsay exception

22  they're relying on that we're not seeing or understand the

23  relevance of some of these documents.

24         And certainly, if they want to provide us with their

25  objections in advance we're happy to provide the same high
```

1    level proffers to help them understand our theory of

2    admissibility.

3              THE COURT:  All right.  Mr. Collins.

4              MR. COLLINS:  We disagree.  I've never been in a

5    criminal case where we exchange case theories and responses to

6    objections.  If there's an objection to an exhibit and we don't

7    have a good faith basis, I'm sure Your Honor will tell us.  I

8    mean, this is process upon process.  We need to get ready for

9    trial.

10             We have specific objections that we're going to object

11   to.  The Government's objected to virtually all of our

12   exhibits.  We don't think it's well founded.  We're not going

13   to go through a four-hour meet and confer to try to go through

14   each exhibit.  I object to this request.

15             THE COURT:  So I think I do want to direct you to have

16   a meet and confer.  I'm not necessarily -- I hear your point,

17   Mr. Collins, that you don't need to be laying out your theory

18   on everything, but it strikes me that it might be useful for

19   everyone if you-all are in a room talking to each other and at

20   least are able to try to see what you can resolve.

21             So are you -- is the Government available 3:00 p.m. on

22   Thursday -- I'm sorry, this Wednesday, the 15th?

23             MR. REILLY:  Your Honor, we'll be -- at least some of

24   the team will be out of town on other court appearances and

25   with preexisting booked travel to meet with other witnesses in

1    this case.  If we could ask for maybe Thursday of this week.

2         THE COURT:  Well, what I'm trying to do is give you

3    time to draft your motions.  So I don't think Thursday makes

4    sense.

5         MR. REILLY:  Your Honor, could we do it telephonically

6    and then we could be available in the afternoon?

7         THE COURT:  None of you are around on Wednesday?

8         MR. FENTON:  I'm around, Your Honor.  For an in-person

9    meet and confer with defense counsel?

10         THE COURT:  Yes.

11         MR. FENTON:  I can do that on Wednesday.

12         THE COURT:  Okay.  You have a vast team over there.

13    I'm sure you've got a couple folks that can meet and discuss on

14    Wednesday.

15         MR. COLLINS:  Sure.  I'll be deer hunting in northern

16    Minnesota on Wednesday but I'm sure we'll figure out somebody

17    who can meet with him.

18         THE COURT:  Mr. Xenakis, are you available?

19         MR. XENAKIS:  Yes, Your Honor, I am.

20         THE COURT:  I'm going to direct you to meet at

21    Government's offices at 3:00 p.m. on Wednesday the 15th.

22         Anything further for the Government?

23         MR. REILLY:  Very briefly, Your Honor.  On

24    October 25th, the Government provided -- which we had already

25    provided to prior counsel -- notice that three anticipated

1    Government witnesses.  Two have a misdemeanor -- two have

2    misdemeanor convictions and one has a criminal/civil citation.

3    It's a state offense from the '90s.

4          We noticed these criminal histories and asked the

5    defense to confirm that they would not seek to cross-examine

6    these witnesses, as it falls outside the scope of Rule 609

7    impeachment.

8          Unfortunately, the defense replied on November 4th,

9    without providing any confirmation that they would not seek to

10   impeach on these topics, which we think are clearly outside the

11   scope of 609.  We feel compelled to file a motion in advance in

12   order to ensure our witnesses that they're not going to be

13   asked about these misdemeanors on the stand.

14         We were hoping with maybe a little judicial

15   intervention today we could get some more clarity whether the

16   defense intends to seek impeachment on --

17         THE COURT:  We've got a briefing schedule, sir.

18   Anything further?

19         MR. REILLY:  We'll file our brief.  Thank you, Your

20   Honor.

21         THE COURT:  Thanks.

22         Anything further from the defense?

23         MR. XENAKIS:  No.

24         THE COURT:  Thanks, gentlemen and ladies.  I will see

25   you on the 30th at 3:00 p.m.

1          (Proceedings concluded at 3:20 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


I, Stacy Johns, certify that the foregoing is an

accurate transcription of the proceedings in the

above-entitled matter.



/s/ Stacy Johns                Date: November 15, 2023

Stacy Johns, RPR
Official Court Reporter