UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**UNITED STATES**,

v.

**KEITH BERMAN**,

Defendant.

No. 20-cr-00278 (TNM)

## **MEMORANDUM ORDER**[*]

The Court must determine the amount of restitution that Defendant Keith Berman owes the victims of his fraud. Berman challenges the Government's proffered sum on two grounds. First, he insists that one of the tendered award recipients is not a "victim" under the Mandatory Victims Restitution Act. On that front, the Court agrees. This would-be recipient was not directly harmed by the conduct underlying Berman's offense of conviction. Second, Berman argues that the Government failed to prove that various stock losses happened during the fraud period. There, the Court disagrees. The Victim Impact Statements establish that the challenged stock purchases were made relying on Berman's misrepresentations, indicating they were purchased during the fraud period. Finally, the Court determines that Berman's precarious financial condition renders him unable to pay the full amount of the restitution order immediately. It thus instructs Berman to pay a reduced monthly sum.

**I.**

In late 2023, Keith Berman pled guilty to three felonies: securities fraud, wire fraud, and obstruction of Securities and Exchange Commission ("SEC") proceedings. Superseding Indictment, ECF No. 19, at 20–22; Def.'s Stmt. Supp. Guilty Plea, ECF No. 170 ("Def.'s

---

[*] An unredacted version of this Order was filed under seal on April 30, 2025.

1

Stmt."). The charges stemmed from Berman's fraudulent conduct as CEO of his publicly traded company, Decision Diagnostics Corp. Superseding Indictment ¶ 3; Def.'s Stmt. at 3. In early 2020, Decision Diagnostics and its CEO were facing financial straits. Superseding Indictment ¶ 9; Def.'s Stmt. at 3. The company's blood-glucose monitoring and testing devices were not bringing in the profits that Berman needed. Superseding Indictment ¶ 9. But the onset of the COVID-19 pandemic brought about new business opportunities—and potential salvation. Superseding Indictment ¶ 15; Def.'s Stmt. at 3. Berman believed he could restructure existing technology to develop a groundbreaking device able to detect the rampant virus in the bloodstream, known as "impedance" technology. Superseding Indictment ¶ 11 ("BERMAN wrote an email in which he stated, 'We have a lot at stake here . . . . [T]his coronavirus through impedance is the story that will allow me to raise millions.'"); Def.'s Stmt. at 3. He just needed a little help—and he was willing to break a few rules to get it.

In the first frightening months of the pandemic, Berman issued a series of press releases that greatly exaggerated the company's progress developing the detection device. Superseding Indictment ¶¶ 18–35; Def.'s Stmt. at 3. Though Berman's technical advisors expressed serious doubts as to the viability of using impedance technology to test for COVID-19, Berman did not reveal this to the public. Superseding Indictment ¶¶ 17–19. Instead, he lauded Decision Diagnostics' "break-through" new technology, which he claimed the company had already "perfected." *Id.* ¶ 18. He announced that the technology "provided a positive or negative result in 15 seconds based on a small finger prick blood sample," and that since "government fast track and waivers" had already begun, the test kits would be "commercial ready in summer 2020." *Id.*

None of this was true. Decision Diagnostics had developed no test kit at all, much less one that could accurately detect the virus in 15 seconds. *Id.* ¶ 19. Nor did Berman have any

evidence that the impedance method could actually work. *Id.* And the company had taken no steps towards obtaining any government approvals for a product that remained entirely speculative. *Id.*

Berman was undeterred. He continued to issue press releases representing that Decision Diagnostics was "making significant progress toward bringing the product to market and would be ready to manufacture and sell hundreds of millions of units in the first year." *Id.* ¶ 20. Behind the scenes, Berman's vendor was repeatedly informing him that the proposed impedance method was unlikely to be scientifically viable. *Id.* The vendor ultimately concluded and communicated to Berman that the impedance method would never work. *Id.* ¶ 22. Still, Berman did not disclose that devastating development to the market. *Id.* Instead, he continued to assure investors that Food & Drug Administration ("FDA") emergency approval was forthcoming. *Id.* ¶¶ 23–25, 28–31, 34 ("On or about April 23, 2020, BERMAN authorized a press release stating that DECN had 'completed discussions and have come to an understanding with the FDA on all of the testing required . . . . We plan to engage a specialty reference laboratory to complete this testing in the next 10 days. Testing should take about a week."). In reality, the FDA approval was stalled because the agency required clinical testing. *Id.* ¶ 31. But Decision Diagnostics could not submit to testing because it lacked a prototype and the necessary insurance to conduct reliable testing on human subjects. *Id.* ¶ 26.

In the meantime, the SEC had begun to investigate Decision Diagnostics and Berman. *Id.* ¶ 36; Def.'s Stmt. at 3. In April 2020, the SEC suspended trading in the company's stock due to its concerns that Berman was materially misrepresenting the progress of its impedance technology to investors. Superseding Indictment ¶ 49; Def.'s Stmt. at 3. Berman was displeased. Pretending to be an independent shareholder of Decision Diagnostics, Berman

3

reached out to a contact (referred to as "Person 2" in the indictment) and directed the contact to draft a letter to the SEC regarding the stock suspension. Superseding Indictment ¶ 53; Def.'s Stmt. 3–4. The letter accused the SEC of unethical and inappropriate conduct against Decision Diagnostics. Superseding Indictment ¶ 58; Def.'s Stmt. 4. Berman directed his contact to gather signatures from the other shareholders before sending the letter to the agency. Superseding Indictment ¶ 57; Def.'s Stmt. 4. Berman himself signed the shareholder letter using the alias "Matthew Steinmann." Superseding Indictment ¶ 58. But Berman would later tell law enforcement agents that neither he nor his company had anything to do with the letter to the SEC. *Id.* ¶ 64. Berman "engaged in this conduct to influence the SEC to end its investigation into [Decision Diagnostics] and [himself.]" Def.'s Stmt. at 4.

All told, Berman's misrepresentations caused his investors to lose at least hundreds of thousands of dollars. Superseding Indictment ¶ 65; Restitution Notice, ECF No. 190, at 1 (Government calculating losses to shareholders over $1 million). Between early March 2020 and the trading suspension, the company's stock price had risen by over 1500%. Superseding Indictment ¶ 37. After the fraud came to light, the stock became worthless. *Id.* ¶ 65.

In light of Berman's guilty plea, the Court sentenced him to 84 months of incarceration on the securities fraud and wire fraud counts, as well as 60 months on the obstruction charge, all to run concurrently. Judgment, ECF No. 197, at 3. The incarceration terms were to be followed by a term of 36 months of supervised release. *Id.* at 4. Before sentencing, the Government noted its intent to seek restitution and calculated the amount it saw as due. Restitution Notice at 2.

The Government provided Victim Impact Statements from individual victims to corroborate the total sum it was seeking from Berman. *See* ECF Nos. 206-1–206-26.

The Court reserved the determination of the amount resolution of restitution for a later date. Minute Entry April 12, 2024; *see also Dolan v. United States*, 560 U.S. 605, 608 (2010) (holding that a sentencing court may order restitution more than 90 days after sentencing when the court "made clear prior to the deadline's expiration that it would order restitution, leaving open (for more than 90 days) only the amount."). The Court now determines the amount of restitution Berman owes his victims.

## II.

Restitution here is required under the Mandatory Victims Restitution Act ("MVRA"), which applies, among other offenses, to offenses "against property under [Title 18] . . . including any offense committed by fraud or deceit . . . in which an identifiable victim or victims has suffered . . . pecuniary loss." 18 U.S.C. § 3663A(c)(1)(A)(ii), (c)(1)(B). A court must "order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A). The Government bears the burden of establishing the amount of loss suffered by each victim by a preponderance of the evidence. *In re Sealed Case*, 702 F.3d 59, 66 (D.C. Cir. 2012).

## III.

Berman brings two challenges to the Government's restitution calculation. First, he insists that one of the alleged victims—A▮▮▮ C▮▮▮—does not fall under the statutory definition of that term and is thus not entitled to restitution. Second, he alleges that the Government has

5

not proven all the alleged losses by a preponderance of the evidence. The Court takes each challenge in turn. It then addresses the proper payment schedule.

### A.

Start with Berman's assertion that one victim—A▇ C▇—does not meet the statutory definition of a "victim" under the MVRA and is therefore not entitled to restitution. Def.'s Opp'n, ECF No. 211, at 3. The MVRA only authorizes a court to order restitution "to the victim of the offense or, if the victim is deceased, to the victim's estate." 18 U.S.C. § 3663A(a)(1). And a victim is defined as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." *Id.* § 3663A(a)(2). More, "in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity," a victim includes "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *Id.*

Berman construes this definition as limiting the scope of restitution a court may order. He argues that because a victim must have been "directly and proximately harmed" as a result of the defendant's crime, a court may award restitution only for loss that flows directly from the specific conduct that is the basis of the offense of conviction. Def.'s Opp'n at 3 (quoting 18 U.S.C. § 3663A(a)(2)). Berman argues that A▇ C▇ is not entitled to restitution because it acquired stock in Decision Diagnostics years before Berman's COVID-19 scheme. *Id.* at 3–4. This stock was acquired without reliance on any of the misrepresentations detailed in the indictment. *Id.* Thus A▇ C▇'s ultimate losses, according to Berman, did not result from the specific conduct charged here. *Id.* So A▇ C▇ is not a victim under the MVRA. *Id.*

Berman is ultimately correct. But the reason is more complicated than he suggests. The starting point of the Court's analysis is *Hughey v. United States*, 495 U.S. 411 (1990). There, the

Supreme Court interpreted a nearly identical precursor of the MVRA, the Victim and Witness Protection Act ("VWPA"), which simply provided that "a defendant convicted of an offense" may be ordered to "make restitution to any victim of such offense." *Id.* at 415–16. Based on this plain language, and other subsections that "link restitution to the offense of conviction," *Hughey* held that restitution was proper "only for the loss caused by the specific conduct that is the basis of the offense of conviction." *Id.* at 413, 416.

Things got slightly more complex shortly after *Hughey* was published. Over the next several years, Congress enacted amendments to the VWPA. 104 Stat. 4863; 110 Stat. 1229. It also passed the MVRA. 110 Stat. 1227 (codified at 18 U.S.C. § 3663A). All told, this legislation harmonized the definition of "victim" under both statutes:

> The term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2); 18 U.S.C. § 3663(a)(2).

Several courts have understood these amendments to overrule *Hughey* where, as here, the charged crime involves a scheme, conspiracy, or pattern of criminal activity. These courts see the amendments as "expanding district courts' authority to grant restitution" in such cases by permitting restitution orders to "encompass[] losses that result from a criminal scheme or conspiracy, regardless of whether the defendant is convicted for each criminal act within that scheme." *United States v. Henoud*, 81 F.3d 484, 488 (4th Cir. 1996). In other words, the victim's loss need not have resulted from the specific offense of conviction in scheme cases, so long as the harm was "directly caused by the defendant's criminal conduct in the course of the scheme." *United States v. Kones*, 77 F.3d 66, 70 (3d Cir. 1996); *see also United States v.*

7

*DeSalvo*, 41 F.3d 505, 515 (9th Cir. 1994) (holding that the amendments "effected a substantive expansion of the previous law of restitution, in that it partially overruled the Supreme Court's restrictive interpretation of the VWPA in *Hughey*" and collecting cases that agree).

The D.C. Circuit has not directly considered whether Congress vitiated *Hughey* in scheme cases. But it has hinted that it sees *Hughey* as surviving the amendments. In a recent conspiracy case, the Circuit stressed that "restitution is limited to the actual, provable loss suffered by the victim and caused by the offense conduct." *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

Though the Circuit merely said this in passing without explicitly acknowledging it was resolving a thorny question, following its direction is still sound. The post-*Hughey* amendments merely expounded on the definition of "victim" in the statute. But *Hughey* itself grounded its analysis in the statute's admonition that "a defendant convicted of any offense" may be ordered to "make restitution to any victim *of such offense*." *Hughey*, 495 U.S. at 415–16 (emphasis added). The Court stressed that "a straight-forward reading of the provisions indicates that the referent of 'such offense' and 'an offense' is the offense of conviction." *Id.* at 416. To the *Hughey* Court, "the repeated focus in [the statute] on the offense of which the defendant was convicted suggests strongly that restitution as authorized by the statute is intended to compensate victims only for losses caused by the conduct underlying the offense of conviction." *Id.*

Congress' clarification of the meaning of "victim" did not change this offense-centric thrust of the statute. *United States v. Welsand*, 23 F.3d 205, 207 (8th Cir. 1994) ("The [amendment] mainly expands the definition of the term 'victim.' It does not explicitly extend the contours of the word 'offense.'"). Thus *Hughey*'s holding that restitution "be tied to the loss caused by the offense of conviction" was not impacted by the later, victim-oriented amendments.

8

*Hughey*, 495 U.S. at 418.  In other words, "[t]he amendment enlarged the group of victims who would be entitled to restitution, but the triggering event—the offense of conviction—remains the same."  *United States v. Akande*, 200 F.3d 136, 141 (3d Cir. 1999); *see also United States v. Goodrich*, 12 F.4th 219, 228 n.8 (2d Cir. 2021) ("*Hughey* was interpreting language ('victim *of the offense*,') that remains intact in both the VWPA and MVRA.  The post-*Hughey* amendments . . . do[] not undermine the offense-oriented nature and language of either statute.").  Thus even when a scheme, conspiracy, or pattern of criminal activity is at issue, restitution must derive from the specific offense of conviction.

Still, the practical outcome of this fine legal distinction is not so detectable.  That is because when a scheme or conspiracy is an element of the offense of conviction, a court considers actions taken pursuant to the scheme or conspiracy to be "conduct that is the basis of the offense of conviction."  *United States v. Bennett*, 943 F.2d 738, 741 (7th Cir. 1991).  In other words, the court "looks through" the convicted offense when a scheme is an element of that offense and considers the overt actions that were taken in furtherance of the scheme to satisfy the *Hughey* rule.  So, for example, in *United States v. Brothers*, 955 F.2d 493, 494 (7th Cir. 1992), the Seventh Circuit rejected the defendant's argument that "the district court had authority only to require him to make restitution for the three checks he was convicted of improperly receiving from the United States in counts one through three" of the indictment.  *Id.* at 496–97.  It stressed that "the indictment alleged a mail fraud scheme from 1972 until 1987 to defraud the United States."  *Id.* at 497.  Thus, "[t]he district court had the authority to order restitution for the losses caused by the entire fraud scheme, not merely for the losses caused by the specific acts of fraud proved by the government at trial."  *Id.*  Such a finding, the court held, was in line with *Hughey*, and the amendments thereafter.  *Id.* at 497 n.3.  Several other courts have concluded the same.

9

*See United States v. Pepper*, 51 F.3d 469, 473 (5th Cir. 1995) ("Because a fraudulent scheme is an element of [the] offenses of mail and wire fraud, actions pursuant to that scheme are conduct underlying the offense of conviction."); *United States v. Manzer*, 69 F.3d 222, 230 (8th Cir. 1995) ("Because a scheme or artifice to defraud is an essential element of the offenses of both mail and wire fraud, a conviction for mail or wire fraud can support a conviction for a broad scheme regardless of whether the defendant is convicted for each fraudulent act within that scheme."). *But see United States v. Jewett*, 978 F.2d 248, 251 (6th Cir. 1992) (limiting the offense of conviction to the two mailings which served as the basis for the defendant's mail fraud conviction).

This Court agrees with that approach. *Hughey* instructs that "the loss caused by the conduct underlying the offense of conviction establishes the outer limits of a restitution order." 495 U.S. at 420. When an indictment describes a scheme in detail, then incorporates those allegations into a charge that contains a scheme as an essential element, the artifice as a whole necessarily underlies the offense of conviction. In other words, the offense of conviction depends just as much on the artifice as it does on the discrete acts of fraud. *See United States v. Alston*, 609 F.2d 531, 536 (D.C. Cir. 1979) ("Conviction for mail or wire fraud requires proof of . . . two elements: (1) a scheme to defraud, and (2) use of the mails or wires for the purpose of executing the scheme."). Thus the Court may look to the plea agreement and indictment as a whole to determine the appropriate bounds of a restitution award. *United States v. Turino*, 978 F.2d 315, 318 (7th Cir. 1992).

Where does that leave Berman and A▓▓ C▓▓▓? First, following *Hughey*, the Court must define the contours of the offense of conviction. Second, under the MVRA, the Court must

query whether A███ C███ was "directly and proximately" harmed by that offense conduct. 18 U.S.C. § 3663A(a)(2).

When defining the specific offense of conviction, the Court must remain on guard—the mere fact that other events are "factually connected" to the charged scheme "does not make them legally relevant." *Akande*, 200 F.3d at 143. Indeed, "[t]he scheme concept is by its nature an amorphous one, and may only support an award of restitution if it is defined with specificity." *Bennett*, 943 F.2d at 741. Any other rule "would allow vague allegations of a scheme to support restitution based on broad, unsubstantiated conduct." *Id.* Reading the plea agreement and indictment narrowly as such "places the burden on the Government, which has control over the drafting of the indictment, to include language sufficient to cover all acts for which it will seek restitution." *United States v. DeSalvo*, 41 F.3d 505, 514 (9th Cir. 1994).

Berman has pled guilty to a scheme to defraud investors by issuing materially misleading statements about the viability of his nonexistent impedance technology. Superseding Indictment ¶¶ 13–48. He also helped create a fake shareholder letter to pressure the SEC to drop its investigation of Decision Diagnostics. *Id.* ¶¶ 49–65. In doing so, Berman aimed to "artificially increase and maintain the share price of [Decision Diagnostics] securities to enrich himself through access to additional corporate funds and compensation." *Id.* ¶ 13.

With the specific offense conduct in mind, the Court turns to whether A███ C███ was "directly and proximately harmed" thereby. 18 U.S.C. § 3663A(a)(1). Courts have understood this language "to impose cause-in-fact and proximate cause requirements, respectively." *Goodrich*, 12 F.4th at 229. More, where, as here, the offense conduct is securities fraud, courts look to causation standards in securities fraud cases to determine whether a party is a victim. *See United States v. Marino*, 654 F.3d 310, 321 (2d Cir. 2011). Causation in such cases "has two

11

aspects, both which must be alleged and proven: transaction causation and loss causation." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 196–97 (2d Cir. 2003). Transaction causation "is established simply by showing that, but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." *Id.* at 197. Loss causation, in contrast "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff" and requires that the plaintiff show its losses were "a foreseeable consequence of any misrepresentation or material omission." *Id.* (cleaned up).

The Government has failed to establish transaction causation for A▇ C▇'s losses. *See Goodrich*, 12 F.4th at 231 (holding that the Government bears the burden of showing causation for restitution awards). A▇ C▇ issued loans to Decision Diagnostics from November 2007 through December 2015. ECF No. 206-26, at 6. The parties executed a loan agreement in which Decision Diagnostics issued to A▇ C▇ common and preferred shares in the company in exchange for A▇ C▇'s waiver of more than $2.8 million due under the outstanding loans. *Id.* Under the terms of the parties' agreement, within a year of issuance of the preferred shares, A▇ C▇ could convert the preferred shares into common stock and sell them. *Id.* at 6, 10. But when A▇ C▇ invoked that provision in 2019, Berman refused to convert the shares. *See id.* at 10; *see also id.* at 202, ¶¶ 118–121. A▇ C▇, acting through its Receiver, filed suit against Decision Diagnostics in 2021 to compel conversion; the suit was settled later that year. *Id.* at 10. The shares were later converted to common stock and available to sell. *Id.* That said, A▇ C▇ insists that "the Receiver was unable to sell any of the Shares

12

during 2022 or at any time thereafter, because no broker would agree to sell any of the Decision Diagnostics Shares held by A▇ as a result of the Criminal Acts." *Id.*

Just because A▇ C▇ ultimately lost money on its Decision Diagnostics stock does not make it a victim under the MVRA. As Berman points out, A▇ C▇ did not acquire its shares in Decision Diagnostics in reliance on the misrepresentations undergirding the offense of conviction. A▇ C▇'s choice to forgive Decision Diagnostics' debt in return for stock options occurred before the scheme detailed in the indictment. Thus A▇ C▇ cannot show that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." *In re Interbank Funding Corp. Sec. Litig.*, 668 F. Supp. 2d 44, 48–49 (D.D.C. 2009), *aff'd*, 629 F.3d 213 (D.C. Cir. 2010). In other words, transaction causation fails where the misrepresentations occurred after the disadvantageous deal was consummated. Thomas Lee Hazen, 4 *Treatise on the Law of Securities Regulation* § 12.92 n.8 (2023); *accord Arst v. Stifel, Nicolaus & Co.*, 86 F.3d 973, 977 (10th Cir. 1996). Because the misrepresentations sketched in the indictment had no impact on A▇ C▇'s initial decision to enter acquire Decision Diagnostics stock, A▇ C▇ was not "directly" harmed by the offense conduct. *See United States v. Farano*, 749 F.3d 658, 666 (7th Cir. 2014) (Posner, J.) (holding banks were not "victims" under the MVRA where they did not rely on fraudulent misrepresentations); *United States v. Stein*, 846 F.3d 1135, 1153 (11th Cir. 2017) ("The government also must show reliance to prove 'but for' causation for restitution purposes."). Thus A▇ C▇ was not a "victim" under the MVRA, and A▇ C▇ is not entitled to

restitution. The Court therefore subtracts A▮▮▮ C▮▮▮'s proffered award from the total restitution sum.

**B.**

Turn now to Berman's assertion that a substantial fraction of the Government's asserted losses is unsubstantiated. Def.'s Opp'n at 4–6. Berman challenges the calculation of awards to seven victims. *Id.* at 5. He argues that several of the Victim Impact Statements and accompanying transaction records fail to show that Decision Diagnostics stock purchases occurred within the fraud period. *Id.*

The Government responds by reducing the amount for one victim, as "[t]he original proposal inadvertently included certain transactions that occurred outside the period of the scheme." Gov.'s Reply, ECF No. 212, at 1. But it insists that the awards to the other six victims are supported by the victims' bank statements and own assertions that they relied on Berman's false statements in choosing to buy Decision Diagnostics securities. *Id.* at 1–3.

The Court agrees with the Government. All six of the challenged victims have submitted Victim Impact Statements detailing the financial harm that they suffered as a result of Berman's misrepresentations. The Court credits these claims. The statements describe how they relied on Berman's claims about impedance technology, indicating the stock purchases were made within the fraud period. *See, e.g.*, P▮ R▮▮ Victim Impact Stmt., ECF No. 206-17, at 1 ("I was led to believe by Keith Berman that Decision Diagnostics had a revolutionary product that would go to market at just the right time. Between message boards and company press releases, I was fraudulently reassured that not only was there a viable product that would ease some of the burden of the pandemic by increasing testing capability, but that this product could increase the safety of those in healthcare by providing rapid results."); B▮▮ S▮ Victim Impact Stmt.,

14

ECF No. 206-21, at 1 ("We (my wife and I) believed that this company . . . was about to provide a key element in the fight against COVID-19. . . . Believed so strongly, we invested half our savings from an 18-year military career."). The victims signed their impact statements, establishing their veracity. And the Government need only substantiate the victims' losses by proving them by a preponderance of the evidence. The Government has done so here.

## C.

That leaves one final matter: the establishment of a payment schedule. All told, Berman owes $613,286.08 in restitution, after the relevant adjustments are made to account for the findings of this Order. Under 18 U.S.C. § 3664(f)(2), the Court must specify "the manner in which, and the schedule according to which, the restitution is to be paid, in consideration of" the following factors: (A) "the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled"; (B) "projected earnings and other income of the defendant"; and (C) "any financial obligations of the defendant; including obligations to dependents." A payment schedule may take the form of a "single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments." 18 U.S.C. § 3664(f)(3)(A). Alternatively, if the Court finds "that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments," the Court "may direct the defendant to make nominal periodic payments." *Id.* § 3664(f)(3)(B).

Berman rightly points out that his financial situation is dire. The Government does not dispute this fact. He "appears to have negative net worth" and remains "incarcerated with no monthly cash flow." Final PSR, ECF No. 191, at 21. He has minimal assets but extensive

15

liabilities, resulting in a negative net worth of several hundreds of thousands of dollars. *Id.* at 19. More, he is 70 years old and suffers from several serious medical issues. *Id.* at 15; *see also* Medical Declaration, ECF No. 194-2, at 2–4.

Still, Berman is an intelligent and educated man. He has two bachelor's degrees and a master's degree. Final PSR ¶ 86. He has started his own company in the past that had multiple employees. *Id.* ¶ 92. At one point, he was even a professor of economics. *Id.* ¶ 95. Berman does not face a life sentence; there is still reason to believe that he can earn an income upon his release. *See United States v. Ben Zvi*, 242 F.3d 89, 100 (2d Cir. 2001) ("A defendant's limited financial resources at the time restitution is imposed is not dispositive of whether restitution is proper, particularly where the defendant has a reasonable potential for future earnings."). Thus while his current financial situation is bad, the Court cannot confidently say that he will be unable to pay an order of restitution in the foreseeable future under a reasonable schedule. 18 U.S.C. § 3664(f)(3)(B); *see also id.* § 3664(k) (permitting a court to adjust the payment schedule in light of material changes in a defendant's economic circumstances.). It thus directs Berman to make monthly payments of $100 towards the restitution order. The Court further rejects Berman's request to delay the start of the schedule until he is released from prison. He may use prison funds and earnings to pay the restitution award until his release. His victims should not have to wait for years before any chance of restitution.

## IV.

For those reasons, the Government's Restitution Motion is **GRANTED IN PART AND DENIED IN PART.** A███ C████ is not a "victim" under the MVRA and is not entitled to a

restitution award. But the Government has properly substantiated the remaining awards by a preponderance of the evidence. Thus it is hereby

**ORDERED** that Berman shall pay restitution in the amount of $613,286.08 to the following victims: J▮▮▮ B▮▮▮ ($1,423.72); F▮▮▮ B▮▮▮▮▮ ($4,857.68); J▮▮▮▮▮ C▮▮▮▮ ($1,598.50); B▮▮▮ C▮▮▮ ($3,399.46); D▮▮▮ C▮▮▮▮▮▮ ($31,513.46); C▮▮▮▮▮▮ G▮▮ ($3,001.74); A▮▮▮▮ H▮▮▮▮ ($5,889.93); D▮▮▮ J▮▮▮▮ ($5,610.61); A▮▮▮▮ J▮▮▮ ($1,080.85); A▮▮▮▮ J▮▮▮ ($1,939.99); I▮▮▮▮ K▮▮▮ ($2,500.00); D▮▮▮ L▮▮▮▮▮▮ ($2,557.39); L▮▮ L▮▮ ($89,415.24); P▮▮ M▮▮▮▮ ($13,118.18); H▮▮▮ N▮▮▮▮ ($138,800.05); P▮▮ R▮▮ ($49,428.50); M▮▮ R▮▮▮ ($7,178.98); D▮▮▮ S▮▮▮▮▮▮ ($2,025.35); D▮▮▮ S▮▮ ($61,099.18); B▮▮▮▮▮▮ S▮▮ ($66,102.71); J▮▮▮ S▮▮▮ ($2,136.75); D▮▮▮ T▮▮▮▮▮▮ ($13,125.91); P▮▮▮▮▮ W▮▮ ($39,275.02); T▮▮ W▮▮ ($66,206.88); it is further

**ORDERED** that restitution payments begin immediately; and it is further

**ORDERED** that Berman's minimum payment schedule is $100 a month.

**SO ORDERED.**

Dated: May 16, 2025                                         TREVOR N. McFADDEN, U.S.D.J